

# Transcript of Mark J. Schmidt

**Date:** January 23, 2020
**Case:** Pursley -v- The City of Rockford, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

1         IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF ILLINOIS

3  - - - - - - - - - - - - -x

4  PATRICK PURSLEY,      :

5       Plaintiff,     :

6  vs.                  :   Case No. 3:18-cv-50040

7  THE CITY OF ROCKFORD,  :
    et al.,

8                    :

       Defendants.    :

9                    :

10  - - - - - - - - - - - - -x

11       Deposition of MARK J. SCHMIDT

12         Rockford, Illinois

13      Thursday, January 23, 2020

14           9:18 a.m.

15

16

17

18

19

20  Job No.: 271740
    Pages: 1 - 294
21  Reported By: Beth A. Wakenight,
           B.A., CSR, RPR, CRR
22

23

24

1     Deposition of MARK J. SCHMIDT, held at the

2   offices of:

3          Hinshaw & Culbertson LLP

4          100 Park Avenue

5          Rockford, Illinois 61105

6          815-490-4900

7

8

9

10

11

12

13

14

15     Pursuant to notice and subpoena, before

16   Beth A. Wakenight, a Certified Shorthand Reporter,

17   Registered Professional Reporter, and Certified

18   Realtime Reporter, in and for the State of

19   Illinois.

20

21

22

23

24

```
1               A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFF:

3       Ms. Ashley Waddell Tingstad, Esquire

4       HOOPER HATHAWAY, P.C.

5       126 South State Street

6       Ann Arbor, Michigan 48104

7       734-662-4426

8

9    ON BEHALF OF THE PLAINTIFF:

10      Ms. Roshna Keen, Esquire

11      (Appeared via telephone from Chicago)

12      LOEVY & LOEVY

13      312 North May Street

14      Suite 100

15      Chicago, Illinois 60607

16      312-243-5900

17
     ON BEHALF OF THE DEFENDANTS JIM BOWMAN, RON
18   GALLARDO, JOHN GENENS, GREG HANSON, JEFF
     HOUDE, SAM POBJECKY AND MARK SCHMIDT:
19

20      Mr. Michael Iasparro, Esquire

21      HINSHAW & CULBERTSON LLP

22      100 Park Avenue

23      Rockford, Illinois 61101

24      815-490-4900
```

1

2   ON BEHALF OF THE DEFENDANTS JAMES BARTON,
    STEPHEN PIRAGES, CHRISTINE BISHOP, DOUG
3   WILLIAMS AND BRUCE SCOTT:

4       Mr. Joel M. Huotari, Esquire

5       WILLIAMS MCCARTHY, LLP

6       120 West State Street

7       Rockford, Illinois 61105-0219

8       815-987-8982

9

10  ON BEHALF OF THE DEFENDANTS JAMES BARTON,
    STEPHEN PIRAGES, CHRISTINE BISHOP, DOUG
11  WILLIAMS AND BRUCE SCOTT:

12      Ms. Patricia L. Hall, Esquire

13      WILLIAMS MCCARTHY, LLP

14      120 West State Street

15      Rockford, Illinois 61105

16      815-987-8948

17

18

19

20

21

22

23

24

1

2  ON BEHALF OF THE DEFENDANTS HOWARD FORRESTER,
   MARY REFFETT AND DAVID EKEDAHL:
3
       Mr. Robert C. Pottinger, Esquire
4
       BARRICK, SWITZER, LONG, BALSLEY & VAN
5
       EVERA, LLP
6
       6833 Stalter Drive
7
       Rockford, Illinois 61108
8
       815-962-6611
9

10
   ON BEHALF OF THE DEFENDANT CITY OF ROCKFORD:
11
       Mr. Ifeanyi Mogbana, Esquire
12
       CITY OF ROCKFORD
13
       Assistant City Attorney
14
       425 East State Street
15
       Rockford, Illinois 61104
16
       815-298-7855
17

18

19

20

21

22

23

24

1

2      ON BEHALF OF THE DEFENDANTS DANIEL GUNNELL,
       PETER STRIUPAITIS AND JACK WELTZ:
3

4          Ms. Amanda Kozar, Esquire

5          (Appeared via telephone from Chicago)

6          ASSISTANT ATTORNEY GENERAL

7          100 West Randolph Street

8          13th Floor

9          Chicago, Illinois 60601

10         312-814-6122

11

12

13   ALSO PRESENT:  Mr. Patrick Pursley
                    (via telephone from Champaign, IL)
14

15

16

17

18

19

20

21

22

23

24

```
1                    I N D E X

2

3    WITNESS:  Mark J. Schmidt

4    EXAMINATION                              PAGE

5    By Ms. Tingstad                            9

6    By Mr. Iasparro                          277

7    By Ms. Kozar                             291

8

9

10

11                  E X H I B I T S

12

13   NUMBER           DESCRIPTION            PAGE

14   Ex.1    CONFIDENTIAL - Report - Bates    81
             Schmidt 178 thru 188
15
     Ex.2    Report - Bates Schmidt 108 thru  96
16           112

17   Ex.3    Report - Bates RFD Defense 107  161
             thru 121
18
     Ex.4    Photographs - Bates Pursley 14108 211
19           thru 14121

20   Ex.5    Statement - Bates Schmidt 264 thru 222
             269
21
     Ex.6    Statement - Bates RFD Defense    223
22           122 thru 127

23   Ex.7    Report and Statement - Bates    246
             Schmidt 114 thru 119
24
```

Ex.8    Report and Statement - Bates        250
        Schmidt 66 thru 67

Ex.9    Bates Schmidt 241 thru 243          263

Ex.10   CONFIDENTIAL - Bates RFD Defense    264
        272 thru 274

Ex.11   Request and Statement - Bates RFD   264
        Defense 275 thru 279

Ex.12   Mark Schmidt's Answers to           269
        Plaintiff's First Set of
        Interrogatories

Ex.13   CONFIDENTIAL - Bates Schmidt        274
        707 thru 713

        (Original exhibits returned
        to Mr. Iasparro.  Copies of
        exhibits provided electronically.)

```
1                  TRANSCRIPT OF PROCEEDINGS
2          MARK J. SCHMIDT, called as a witness
3    herein, having been first duly sworn on oath, was
4    examined and testified as follows:
5                        EXAMINATION
6    BY MS. TINGSTAD:
7        Q  Good morning, Mr. Schmidt.
8        A  Good morning.
9        Q  My name is Ashley Waddell Tingstad, and
10   I'm an attorney who is representing Patrick
11   Pursley.  Could you please state your full name
12   for the record.
13       A  Mark J. Schmidt, S-C-H-M-I-D-T.
14       Q  And you're aware that you're being deposed
15   today in the case of Patrick Pursley versus
16   City of Rockford and several other defendants?
17       A  Yes.
18       Q  Have you ever been deposed before?
19       A  Yes.
20       Q  So you know how this works.  I'll just
21   remind you that a deposition is under oath, as
22   you know.  And I'm going to be asking questions.
23   You're going to be answering them today.  It's
24   important that we don't interrupt each other,
```

1   so that we can get a clean record.  And it's

2   important that your answers be verbal as opposed

3   to "uh-huh" or nods of the head.  There is nothing

4   wrong with asking me to repeat a question if you

5   don't understand it.  If you do answer the

6   question, I'm just going to assume that you did

7   understand it.

8        If you need clarification for any

9   question, look to me.  You don't have to -- don't

10  look to your attorney for that.  And if you need

11  to take a break -- and we will be taking

12  breaks today -- just don't be shy.

13      A  Okay.

14      Q  Let me know.  So, Mr. Schmidt, can you

15  tell me a little bit about -- well, first, are

16  you -- do you work?  Are you working right now?

17      A  No.

18      Q  Okay.  You're retired?

19      A  Yes.

20      Q  And where are you retired from?

21      A  The City of Rockford Police Department.

22      Q  Okay.  Can you tell me when you retired?

23      A  I retired January 17th of 2007 or -- yeah,

24  2007.

1      Q   And when did you start at the Rockford

2  Police Department?

3      A   March 17, 1975.

4      Q   What types of positions did you hold while

5  you were at the Rockford Police Department?

6      A   I was in patrol.

7      Q   You started in patrol?

8      A   That's correct.  And then do you want to

9  know other areas that I was involved in?

10     Q   Yes.

11     A   Like SWAT?

12     Q   Sure.

13     A   I was a SWAT officer for approximately ten

14  years.

15     Q   What were those years?

16     A   I don't recall.

17     Q   Were they before or after the 1998 --

18  1993?

19     A   I was still in SWAT when I was promoted

20  to the detective division in 1988.  And then

21  somewhere in between towards the -- probably

22  three or -- three years or so into it, you know,

23  while I was in the detective division, it was just

24  so overwhelming that I ended up dropping out of

1   SWAT because with the classes and the different

2   things and the training and everything, it was

3   hard to get time off to do that because of the

4   caseloads and stuff.  So I was -- I dropped out

5   of it at that time.

6        (Mr. Mogbana enters the deposition

7   proceedings.)

8   BY MS. TINGSTAD:

9        Q  So SWAT was a special division or a

10  special designation at the police department that

11  was separate from the detective bureau?

12       A  Right.

13       Q  Okay.

14       A  You did that along with your other duties.

15       Q  Okay.  You would be the person who would

16  take a SWAT call if there was one?

17       A  Right, I was part of the SWAT team.

18       Q  Right, okay.  So you were a patrol

19  officer; and from 1975, then you started doing

20  SWAT as a patrol officer?

21       A  That's correct.

22       Q  And then you moved.  You said you were

23  promoted to the detective division in 1988?

24       A  That's correct.

1      Q  Okay.  And sometime after that, you

2  dropped -- you stopped doing SWAT, and you just

3  focused on the detective division?

4      A  That's correct.

5      Q  And as an officer in the detective

6  division in 1988 through, let's say, 1994 time

7  frame, were you still an officer in the detective

8  division through 1994?

9      A  Yes.

10     Q  And what rank were you?

11     A  Detective.

12     Q  Detective, okay.  So you had supervising

13  officers that were above you?

14     A  Yes.

15     Q  Okay.  And at that time when you were the

16  rank of detective who was supervising you?

17     A  My immediate supervisor was Sergeant Steve

18  Pirages.

19     Q  Uh-huh.  And who else was?

20     A  Lieutenant Gambini.

21     Q  And he would have been above Sergeant

22  Pirages?

23     A  That's correct.

24     Q  And then one level higher than Lieutenant

1    Gambini, was it the chief?

2        A  It would have been assistant deputy chief

3    Dominic Iasparro and then the "chief" chief above

4    him.

5        Q  Who was the chief at that time, do you

6    recall?

7        A  William Fitzpatrick, I believe, at that

8    time.

9        Q  Did you have subordinates as a detective

10   at that -- in that time frame, 1988 to 1994?  Was

11   anyone lower rank than you that you would have --

12   that would have been subordinate to you?

13       A  If you were a detective, you were a

14   detective.  When -- you know, when you're

15   brand-new, you're learning and stuff like this.

16   And then there was senior detectives that had

17   been in there, you know, much longer and stuff;

18   but you're still the same rank.

19       Q  You're all the same rank?

20       A  Right.

21       Q  But some folks are more senior than

22   others?

23       A  Depending on how many years you got on,

24   yes.

1    Q  So what were some of your -- how -- strike

2    that.  When you were promoted to detective, what

3    kind of training did you have to start being a

4    detective?

5    A  Once I got assigned to the detective

6    division, I was promoted -- I believe it was in

7    July of '88.  I'm not exactly sure of the exact

8    date that I -- that an opening opened up and I

9    went in.  I started out in the burglary division.

10   And I was there for probably pretty close to --

11   oh, I want to say three years or so.  I went to

12   different schools, you know.  They would assign

13   me, like, interviews and interrogations through

14   Reids School.  Reids, I believe it's R-E-E-D-S

15   (sic).  It's a Reids Interviews and

16   Interrogations.

17       I went to a homicide school in Louisville,

18   Kentucky.  I went to a blood spatter school there.

19   I went to a sex crime class.  These are all just

20   classes that we went to; we're assigned to go.

21   And it was a lot of them --

22   Q  Uh-huh.

23   A  -- you know, like that.  I went to several

24   interview and interrogation-type classes.

1      Q   And you talked about the Reids School.

2  What is that?

3      A   It's just a -- that's who put on the

4  course.  It's Reids.  They have classes for

5  interviews and interrogations and different things

6  like that.

7      Q   Did you also receive training from

8  Rockford Police Department regarding interviews

9  and interrogations?

10      A   Well, just what you learned with the

11  people you work with, you know, and not -- not a

12  class, per se, that I know of for sure that -- you

13  know, I'm sure they had different courses.  You

14  know, we were often assigned to different schools

15  that, you know, some of them came to our

16  department and we'd attend.  It might be an

17  eight-hour course and it might be a two-day

18  course.  It could be four or, you know, even a

19  week, so.

20      Q   So what I hear you saying is that a lot

21  of these trainings were performed by outside

22  organizations or education outfits that would

23  either come to you or you would go to them?

24      A   That's correct.

1       Q   Do you recall any general orders regarding

2   interviews and interrogations, policies and

3   procedures, that were put in place at the Rockford

4   Police Department?

5       A   I'm sure they had them.  To recite them

6   from, you know, that long ago, I don't know.

7       Q   Do you remember having a copy of the

8   general --

9       A   Yes.

10      Q   -- orders?  Where would you keep that

11  copy?

12      A   Well, when I was in patrol I had general

13  orders.  You had a book --

14      Q   A book?

15      A   -- of the general orders.  Every time

16  they issued a new one, you -- you know, or if they

17  updated one, you would take that one out and put

18  that in the book.  And the department often

19  checked your book to make sure your general

20  orders were up-to-date on everything.  So, I

21  mean, that was a pretty thick book.  And when

22  I was in the detective division I kept that in

23  my desk.  When I was in patrol it was in my

24  locker.

1    Q  So you said that you were trained

2  regarding how to conduct interviews and

3  interrogations.  Is there a distinction between

4  an interview and interrogation?

5    A  Well, when -- an interrogation is more

6  the accusatory part of it.  Interviewing somebody

7  would be, like, a witness statement or something

8  like that; or getting general information from

9  somebody and kind of getting the gist of it.

10  Then more interrogating somebody would be when

11  you'd advise them of their rights; and now you're

12  going to go ahead and talk to them about the --

13  whatever incident it is you're going to talk to

14  them about.

15    Q  So if a person is suspected of a crime,

16  and you suspect them of a crime, and you're going

17  to ask them questions about that, would that be

18  considered an interview or an interrogation?

19    A  Could be both.

20    Q  So the distinction for you -- what I'm

21  hearing you saying is, the distinction for you

22  is whether or not within that interview or within

23  that conversation you're accusing them of

24  something?

1      A  Yes, I think.

2      Q  Were you trained on Miranda rights?

3      A  I don't -- I'm not sure if you're -- you

4  know, I knew Miranda rights, and we were, you

5  know -- how to give them.  You know, we had

6  Miranda rights forms that if we had somebody

7  out on the street, we had a card that we'd read

8  from for Miranda.

9       And then in the detective division we had

10  forms that we -- you know, we always use two

11  copies.  One copy, we'd mark the top line, have

12  the individual read it.  That way we knew that

13  they understood it, and they could speak English.

14  And then we would read the rest of the warning,

15  while they followed along with their copy.  And

16  we would check off, you know, that we read each

17  one to them.  Asked them again if they understood

18  their rights, if they had any questions; and then

19  we'd have them initial it and sign it.

20      Q  And at what point, what would trigger the

21  Miranda warnings?

22      A  Well, if you were going to interview

23  somebody regarding crimes that they're involved in

24  or you suspect that they're involved in.

1    Q  Is there anything else that would trigger

2    the Miranda warning other than preparing to

3    interview someone for a crime that they were

4    involved in?

5    A  I didn't -- you didn't have to give the

6    Miranda warning unless you were going to talk to

7    them about whatever crime they did.

8    Q  Okay.  So if you were talking to them

9    prior to giving the Miranda warning, you would be

10   talking to them about other things?

11   A  Yes.

12   Q  Even if you suspected them of committing a

13   crime, you wouldn't give a Miranda warning until

14   you started talking to them about that crime?

15       MR. IASPARRO:  Object to form; foundation;

16   if you understand, you can answer.

17       THE WITNESS:  Pardon?

18       MR. IASPARRO:  If you understand that, you

19   can answer.

20       THE WITNESS:  Could you repeat that again.

21       MS. TINGSTAD:  Would you mind reading back

22   the question?

23       (Record read.)

24       THE WITNESS:  If they were in custody,

1    it's custodial interrogations.  If you -- if

2    they're not in custody, charged with something,

3    then, no, you wouldn't have to Mirandize them.

4    BY MS. TINGSTAD:

5        Q  If they're not in custody or charged with

6    something?

7        A  If they're not in custody; Miranda is a

8    custodial warning for them.  Once they're in

9    custody, then it's more so they understand their

10   rights.  They have the right not to talk to you.

11   They have a right to consult with a lawyer and

12   stuff like that.

13       Q  So a person can be in custody without

14   having been charged with something, correct?

15       A  Yes.

16       Q  And you were trained also in procedures on

17   how to question witnesses, correct?  I think you

18   testified to that.

19       A  I'm not sure I know what you mean by that.

20       Q  You said you went to Reids trainings

21   regarding interviews and interrogations.  That

22   would include questioning witnesses?

23       A  Well, a witness is -- you know, it's a

24   different thing.  You know, you're getting

1  information about what they know about something,
2  what they seen, what they heard or whatever.
3      Q  And was there ever a time that you -- when
4  you interviewed witnesses that you sensed they
5  weren't telling the truth?
6      A  Sure.
7      Q  And what was your approach -- strike that.
8  Were there any policies or procedures regarding
9  how to approach a witness who might be giving you
10  information that doesn't make sense with regard to
11  what you know about facts?
12      A  Like what?
13      Q  For example, if you're interviewing a
14  witness and you know that a crime occurred, you
15  know, at night; and the witness is telling you,
16  "I know about this crime and it happened in the
17  morning."  Are there -- did you have any
18  techniques or practices to address that?  What
19  would you do?
20      MR. IASPARRO:  Object to form.
21      MS. TINGSTAD:  I can restate the question.
22  It was a long one.
23      Q  So I gave you an example of a witness
24  who's saying they're giving you information about

1   a crime, but their facts are wrong.  How would you

2   approach that with the witness?

3       A  Well, I'd let them give me an explanation

4   of what they are talking about, let them give me

5   an account of what happened.  And if it's obvious

6   that it's not right, you know, first I'm going to

7   let them give me an account of what they know.

8   And then it's up to me to try to determine if

9   those facts are true or not, if they match up or,

10  you know.

11        You know, like, for instance, we might

12  have multiple suspects in.  And this person is

13  talking to one, and somebody else is talking to

14  somebody else.  You let them give their account

15  of what they're saying.

16      Q  Uh-huh.

17      A  And then we might come out and say:  You

18  know, mine said that it happened, you know, this

19  way.  Mine says it happened here.  And now you're

20  going to try -- they're both at the same place,

21  both giving the same account.  You want to try to

22  find out what isn't right.  If that's what you're

23  talking about; I'm not sure.

24      Q  Would you ever attempt to corroborate

1    factual allegations that a witness would give you

2    about a crime?

3        A  Corroborate it with whom?

4        Q  Just, let's say corroborate it just with

5    facts that you could glean, right?  Did you ever

6    try to -- for example, if a witness said, "I was

7    on the third floor of such and such building,"

8    would you ever check and see if there is a third

9    floor on that building, for example?

10        A  I suppose.

11        Q  Yeah.  Corroborate things that the witness

12    tells you to see whether or not they are credible?

13        A  Yes.

14        Q  Have you ever taken witness statements,

15    written statements?

16        A  Yes.

17        Q  And were there policies and procedures at

18    the Rockford Police Department regarding taking

19    witness statements?

20        A  As far as what?

21        Q  The process, how to do it properly?

22        A  Yes, I'm sure there was.

23        Q  Do you recall what those were?

24        A  Just what I learned from when I got in

1    there, how you take a typed statement and stuff;

2    at the time when I was in there, there was -- we

3    didn't videotape or record.  Everything was

4    just -- you'd interview them, whatever, and then

5    type up the statement.  And other than that, I

6    don't -- I think that's pretty much it.

7        Q  So walk me through the process of

8    interviewing someone and typing their statement.

9        A  Okay.  If I was starting with you, and

10   like today I would ask you:  Okay, what time did

11   you leave the hotel this morning to come here?

12   You want to tell me?  And then I would say:  Okay,

13   8:00.  I would type that down.  Tell me what you

14   did then.  Park, come down here, and you parked

15   in the parking lot.  I would type that down.  You

16   know, if you said, if that's what you told me,

17   I would type that down.  Then I would read it back

18   to you as we go.  Is that correct?  Yes.  Okay.

19   Then what did you do from there?  I came in here

20   and I put my folders on the desk and I got

21   prepared for this deposition.  I would type that

22   down.  I'd read it back to you.  Is that correct?

23   Yes.  And I would go like this through the whole

24   day or however long you're going to do this.

1          And then when it was all done, then I

2     would go back with you on it, and I would have

3     you read your statement.  And I would have you

4     put your initials at the beginning and end of each

5     statement as you read it.  We would do that

6     through the whole statement.  If I had a

7     typographical error or I crossed something out

8     or something weren't right, I'd cross that out.

9     I'd have you initial any X-outs or mistakes.

10         Then when the statement was all done, then

11    I would have you sign your name and put the time

12    on it, the date and the time.  And then I would

13    also sign it and put the time down, and whoever

14    else was in there during that statement.  Is that

15    what you were asking?

16       Q  Yes, thank you.  If in the course of

17    someone giving you their statement they were to

18    give a detail that didn't seem plausible, would

19    it be proper for you to suggest to them that they

20    should rethink that; that it didn't seem -- you

21    know, or ask them again to see if they could give

22    you a different answer?

23       A  No, at that time I've already talked to

24    them.  They've already gave me a verbal account.

1    And now we're taking the typed statement, what

2    they told me.  Now, you know, that typed statement

3    is what you're telling me.  I'm not putting

4    nothing down.  All I'm doing is typing.  You're

5    telling me what you want there.  And, you know,

6    if it's -- aside from that, I don't know what else

7    to tell you.

8        Q  So it would be improper for you to make

9    suggestions to a witness while you were typing the

10   statement; that before you typed what they said,

11   that the statement they're giving you doesn't make

12   sense?

13       MR. IASPARRO:  Object to form; but if you

14   understand, you can answer.

15   BY MS. TINGSTAD:

16       Q  Uh-huh.  It would be improper to feed

17   information to a witness, for example?

18       MR. IASPARRO:  Same objection.

19   BY MS. TINGSTAD:

20       Q  Would that be improper?

21       A  For me to tell them what to say?

22       Q  Yes.

23       A  Yes, I would never do that.

24       Q  You said that before you would start

1    typing a statement, you would interview a witness.

2    It would be something -- you've already

3    interviewed them, and they've already given you

4    a verbal account; and then you move into the typed

5    statement --

6        A  Yes.

7        Q  -- correct?  So prior to moving into the

8    typed statement, you would have discussed all of

9    the details that eventually end up into the typed

10   statement, correct?

11       A  That's correct.

12       Q  So during the interview portion while a

13   witness is recounting details to you; if they

14   give you a detail that doesn't comport with your

15   knowledge of the case, would it be proper for

16   you to suggest that they rethink that?

17       A  Are you talking about after the Mirandize

18   and you're talking to them now about the offense?

19       Q  Yes.

20       A  Sure.

21       Q  It would be improper?

22       A  No, it would not.

23       Q  It would not?

24       A  No, if I knew you were blatantly lying to

1    me about something; like, "I just drove in from

2    Chicago."  Well, I know that isn't the truth

3    because you just told me you came from a hotel

4    here in Rockford.  And I'll say:  "Well, you're

5    not being truthful with me; you're not being

6    honest.  You just got done telling me that you

7    came from Rockford, not Chicago," something like

8    that.  Sure, you'd confront them on that.

9        Q  So during the interview or the

10   interrogation prior to typing up a statement,

11   you might have a back-and-forth with a witness

12   regarding statements they're making that you

13   believe to be false?

14       A  Yes.

15       Q  You gave an example of me making two

16   conflicting statements just now.  Would you also

17   confront a witness with -- in the same way if

18   they gave a statement that didn't comport with

19   what you thought had happened in a case?

20           MR. IASPARRO:  Object to form.

21           MS. TINGSTAD:  Yeah.

22           MR. IASPARRO:  If you understand --

23           MS. TINGSTAD:  Yeah.

24           MR. IASPARRO:  -- you can answer.

1    BY MS. TINGSTAD:

2        Q   I can rephrase it if it's confusing.

3        A   If you're asking:  Would I question it?

4    Sure, I would, absolutely.

5        Q   So if you had a theory of how events

6    transpired and the witness was giving you

7    something else, you would confront them with that

8    and question that?

9        MR. IASPARRO:   Object to form and

10   foundation.

11   BY MS. TINGSTAD:

12       Q   What's your answer?

13       A   Yes.

14       Q   And that process is consistent with your

15   training?

16       A   Yes.

17       Q   When you would conduct investigations in

18   the detective bureau, did you share information

19   between detectives working on the case?

20       A   Say that again, please.

21       Q   So criminal investigations often involve

22   the work of more than one detective, correct?

23       A   Absolutely.

24       Q   You'll have several detectives working on

1    one investigation.  Did detectives doing different

2    things share information with each other?

3         A   Yes.

4         Q   And how would that happen typically?

5         A   Well, most investigations -- let's take,

6    like, Sergeant Pirages.  He would be in charge.

7    He would assign the detectives to whatever task

8    he wanted them to do.  Detective Pirages would --

9    or Sergeant Pirages would have what they call the

10   lead sheet.  He'd fill out stuff.  Here's the

11   crime.  This is what we got.  This needs to be

12   done.  This needs to be done, whether it be a

13   neighborhood search or things like that; or, you

14   know, we need to pick up this or do that.

15        And he would assign detectives to do the

16   various tasks.  Like, if I was -- you know, he'd

17   assign me to be with somebody else.  Like, this

18   particular case was Howard Forrester's case.

19   He was assigned to it.  This was his case.  I was

20   assigned to assist on different things, as other

21   detectives were.

22        Some detectives did the search warrant.

23   Some detectives did follow-up on weapons and cars

24   and different -- there's a bunch of different

1    things going on.  And, yes, we'd get together and

2    find out what's going on with, you know, each part

3    of it, sure.

4        Q  And you'd get together how often?

5        A  Be up to supervisors.

6        Q  You said that in this particular case,

7    in the Ascher homicide investigation, you were

8    not the case detective.  It was Forrester's case?

9        A  That's correct.

10       Q  As a detective that was assigned to assist

11   Forrester, would you also get copies of the

12   various reports that were being written up as the

13   investigation proceeded?

14       A  Well, I don't know if I -- it depended

15   if they were done.  You know, sometimes -- you

16   know, you did all these different things, and

17   then you typed the report up at a later time.

18   And then the reports would go in to Sergeant

19   Pirages or whoever, and they would kind of

20   maintain everything.  You know, but would we

21   talk about it?  Sure.

22       Q  You would talk about it.  You wouldn't

23   necessarily have the reports that other detectives

24   had written in your --

1      A   If you're -- you might.  If I'm assigned

2  it, I might have the original report --

3      Q   Uh-huh.

4      A   -- from the original incident.  And

5  then from there it would branch out.  All the

6  supplement reports that other people did;

7  everybody that did anything is going to leave a

8  report, especially if it's a serious crime.

9          They're going to -- you know, if you've

10  got five officers that arrived at the scene, those

11  five officers are going to leave a report of what

12  they did when they got there, what they saw, what

13  they heard.  If they went door to door checking

14  for witnesses or whatever function that they did,

15  they're going to leave a report.

16          And then once the reports are in, the

17  lead detective would get those reports because

18  he's the one following up on everything.  He's

19  got more things.  I might be assigned to assist

20  in the interview.  I might be assigned to do a

21  neighborhood check.  And, you know, it all

22  depends.

23          The supervisor is going to assign me

24  whatever he wants me to do.  And if something else

1   comes up that they need, whoever is available is

2   going to get assigned to that.

3        Q  So when you were assigned to assist and

4   take on a task in an ongoing investigation, before

5   you would jump into that task did you get briefed

6   by other detectives or the lead detective

7   regarding developments that had occurred in the

8   case?

9        A  Yes.

10       Q  So you would get up to speed before you

11  would take on your next investigative task?

12       A  Well, you would discuss what you're going,

13  you know.

14       Q  Okay.

15       A  You didn't just go in blind.  You know,

16  sure, you would discuss it.

17       Q  So is it fair to say that information

18  sharing happened in real time, would you say, with

19  regard to developments in a case or an

20  investigation?

21       MR. IASPARRO:  Object to form.

22  BY MS. TINGSTAD:

23       Q  Is it fair to say that developments that

24  were occurring with regard to an investigation

1   would be shared between the investigating

2   detectives in real time?

3       A  It depends on what your assignment was.

4   I didn't know what all Howard was doing because

5   it's his case.  We all had -- you know, this was

6   one case out of many.  Everybody has got their own

7   cases that they're doing, too.  This particular

8   case is Howard's.  When he needed assistance with

9   anything or if Sergeant Pirages said, "We need

10  this done or that done," he would assign various

11  people to do things.

12          If Howard was talking to somebody else,

13  I'm not going to know that, you know.  Down the

14  road, you know, when the proceedings start, you're

15  going to have reports and stuff like that.

16      Q  Uh-huh.

17      A  But there's a lot of times where if I'm

18  not involved in it, I have not a clue what he's

19  doing.

20      Q  If you're not involved in it?

21      A  Correct.

22      Q  When you get involved you get up to speed?

23      A  Right.

24      Q  Yeah.  I want to go back to a question

1    that I had regarding the interrogation that would

2    precede a written statement being taken.  You said

3    that you would confront a witness during that

4    interrogation if you thought that what they were

5    saying was false for any reason.  When you

6    confronted the witness, would you simply say --

7    strike that.

8         Would you ever suggest to the witness what

9    you thought to be the truth?

10        A  I could.

11        Q  And that was -- that wouldn't be improper

12   for you to suggest to the witness a fact that the

13   witness hadn't given you?

14        MR. IASPARRO:  I object to form, but if

15   you understand.

16        THE WITNESS:  You'd have to reword that.

17   I'm --

18   BY MS. TINGSTAD:

19        Q  Uh-huh.

20        A  -- not sure I know what you're --

21        Q  So if a witness gave you information

22   that you thought was false, you could respond by

23   suggesting or confronting them with what you

24   believed to be true, even if that was a fact that

1    the witness had not given you?  It was a fact that

2    you knew -- well, just forget that last part.

3         A  If she told -- or if somebody told me

4    something that I know isn't true, I would probably

5    tell them:  That's not true.

6         Q  That's not true; and would you -- would it

7    be proper for you to then say, "Isn't it true,

8    XYZ," this other thing that the witness had not

9    said?

10        A  I'm not sure I know what you're saying.

11        Q  Yeah.  So if a witness tells you:  The

12   perpetrator was wearing a red sweater; and would

13   it be proper for you to say:  You're not telling

14   me the truth; the sweater was brown, wasn't it?

15   Would it be proper for you to say that --

16        A  It could.  I --

17        Q  -- in an interrogation?

18        A  It could be.

19        Q  You wouldn't consider that to be feeding

20   information to the witness that they didn't

21   already know?

22           MR. IASPARRO:  Object to form.

23   BY MS. TINGSTAD:

24        Q  Can you answer verbally?

1      A   No.

2      Q   So if you were to suggest a different

3   detail than the one that a witness had given you,

4   that wouldn't violate any policy or procedure of

5   the Rockford Police Department?

6          MR. IASPARRO:  Form and foundation.

7   BY MS. TINGSTAD:

8      Q   To restate what we just discussed:

9   If during the course of an interrogation a witness

10  gives you a detail and you were to suggest a

11  different detail, that would be proper pursuant

12  to your training and work at the Rockford Police

13  Department?

14         MR. IASPARRO:  Form and foundation.

15         MR. MOGBANA:  I'll join the objection.

16         MR. IASPARRO:  If you understand that, you

17  can answer it.

18         THE WITNESS:  Not really, I'm --

19  BY MS. TINGSTAD:

20     Q   Okay.  It wouldn't be improper for you to

21  suggest a different detail from the one that was

22  given to you by a witness in an interrogation?

23         MR. IASPARRO:  Form and foundation.

24         MR. MOGBANA:  I'll join.

1    BY MS. TINGSTAD:

2        Q   You can answer.

3        A   Are you trying -- you mean for me to give

4    them facts that I want them to tell me?

5        Q   Well, it's really -- yes, for you to give

6    them facts that you know or that you believe to be

7    true, but that the witness isn't giving you?

8            MR. IASPARRO:  I don't understand the

9    question.

10           MS. TINGSTAD:  Uh-huh.

11           MR. IASPARRO:  It would not be improper

12   because I think that was the way you started the

13   question.  So I think it's a little confusing.

14           MS. TINGSTAD:  Got it.  We'll restart.

15       Q   Would it be proper for you to -- for

16   example, if a witness says, "The person was

17   wearing a brown coat," and you believe that to be

18   a false statement -- for you to confront them and

19   say, "Actually, you're not telling me the truth;

20   the coat was black, wasn't it?"  Would that be

21   proper?

22           MR. IASPARRO:  That particular example.

23           THE WITNESS:  Yes, I think it would be.

24   BY MS. TINGSTAD:

1      Q  More generally, would it be proper for

2  if a witness gives you information, to give them

3  a detail that you believed -- no, strike that.

4         Would it be proper for you to suggest a

5  different detail from a witness who's given you a

6  conflicting account?

7         MR. IASPARRO:  Form; foundation;

8  incomplete hypothetical.

9         MR. MOGBANA:  I'll join.

10         MR. IASPARRO:  If you understand, you can

11  answer.

12         THE WITNESS:  Yeah, I don't.

13  BY MS. TINGSTAD:

14      Q  Okay.  We'll move on.  Were there policies

15  and procedures at the Rockford Police Department

16  regarding how to question witnesses aside from the

17  training that you had at the Reids School?

18      A  Written policies?  I don't recall.

19      Q  Uh-huh.  Was it your understanding that it

20  was proper in an interview to suggest details to

21  the person you were interviewing?

22         MR. IASPARRO:  Object to form and

23  foundation.

24         MR. MOGBANA:  Join.

1          THE WITNESS:  I don't know.

2    BY MS. TINGSTAD:

3       Q  You don't know whether that would be

4    proper?

5       A  I'm not sure I know what you're asking,

6    so.

7       Q  Uh-huh, okay.  Let's talk about report

8    writing.  You mentioned that all the different

9    detectives who would be investigating a crime

10   would do their work and then write reports

11   sometimes after the fact.  Those would be

12   submitted to the sergeant.  What triggered the

13   requirement to write a report?

14      A  What triggered it?

15      Q  Uh-huh.  Did you have to write a report

16   about everything you did?

17      A  If it was -- for an example, there might

18   be -- if I worked with this detective on

19   something, he might cover me in his report

20   instead of duplicating the exact same thing, okay.

21          I don't know how to explain it to you.

22   You know, reports that I did by myself or

23   assignments that I had; like, if I did a

24   neighborhood search, that's on me.  I'm going

1   to list everything that I did and leave a report.

2   That's what I was assigned to do.  If me and

3   another officer are assigned to do something, we

4   might not both leave a report on the same thing.

5   You might be covered in their report.  If that's

6   what you're asking, I'm not sure I --

7       Q  Was there a written policy regarding --

8   regarding that?

9       A  A written policy?

10      Q  Uh-huh.

11      A  About a report?

12      Q  Regarding when you were required to write

13  a report?

14      A  That would have been -- a supervisor would

15  have said:  I need a report on this.

16      Q  Uh-huh.

17      A  Okay.  Whoever is doing it, if -- like,

18  I'll just -- the only thing I can think of is,

19  I'll give an example.  Say Sergeant Pirages

20  stopped by the COM center and picked up the tape

21  of the 911 call.

22      Q  Uh-huh.

23      A  Okay.  Did he leave a report on that?  No,

24  he might have given it to me to tag into evidence;

1    and then I'm going to cover that in my report.

2    He didn't need to leave a report on that because

3    it's covered, if that clarifies anything.

4        Q  If you performed any significant

5    investigative tasks, is it your understanding that

6    you were required to write a report about those

7    tasks?

8        A  Somebody would, yes.

9        Q  Somebody would.  It wouldn't need to be

10   you if you were the one who performed the tasks?

11       A  Like I said, if you were -- if you and

12   somebody else are working together, that one of

13   you are going to leave a report.

14       Q  But both are not required --

15       A  Right.

16       Q  -- to leave a report?

17       A  Right.  Like, for a statement; if me and

18   another person are assigned to take a statement

19   and we're in there in the interview room, it's all

20   going to be covered in the report.  One person is

21   going to lead that report.  It might be me; it

22   might be somebody else.  One of you is going to

23   leave a report.  There is no point in having both

24   of you leaving a report to cover the same thing,

1    if that's what you're asking.

2        Q   Why is there no point to it?  Wouldn't

3    both people have different perspectives?

4        A   I -- that's just the way it is.

5        Q   That's the way that it worked at the

6    police department?

7        A   Right.  If my supervisor determined that

8    I needed to leave a report also on something, then

9    he would tell me:  Leave a report on that.

10       Q   He would tell you?

11       A   Yes.

12       Q   Okay.  So if he saw a report from one

13   officer who completed investigative tasks and you

14   were mentioned in that report, he may not ask you

15   to complete a report as well?

16       A   That's correct.

17       Q   What sorts of things should be -- what

18   sort of details should be included in a police

19   report about interviewing a witness?

20       A   What you covered.

21       Q   What do you mean by that?

22       A   You're going to leave a report on what you

23   talked to them about, and what they had to say

24   about it.

1      Q  Would you record any of that

2  back-and-forth that we discussed that sometimes

3  happens in an interrogation where a person says

4  one thing; you push back and say:  "That's not

5  true; didn't it happen this way"?  Would you

6  record that back-and-forth in a police report?

7      A  No.  You mean, like, if:  I didn't do it.

8  Yes, you did.  No, I didn't; that kind of stuff?

9  No, that would be a pretty interesting report to

10  read.

11     Q  So you wouldn't include in the report the

12  back-and-forth and that -- of the interrogation

13  that eventually led to whatever the witness

14  statement or the defendant statement ended up

15  being?  You would just record the end result?

16     A  Not necessarily, it depends.

17     Q  What would it depend on?

18     A  It would depend on what transpired during

19  that.

20     Q  So give me an example of a situation

21  where you would record the back-and-forth of an

22  interrogation where a witness says one thing, and

23  you push back.

24          MR. IASPARRO:  I object to form.

1          THE WITNESS:  Yeah, I don't know.

2    BY MS. TINGSTAD:

3      Q  But sometimes that would go into a police

4    report, is what you said?

5      A  It depended.  You know, every one is

6    different.  I wouldn't have a clue, you know, what

7    to say hypothetically about every --

8      Q  Uh-huh.

9      A  -- situation that could come up.

10      Q  Did you ever say in an interview or in an

11    interrogation:  "You know, if you work with us,

12    we'll try to help you"?  Did you ever say anything

13    like that in an interrogation?

14          MR. IASPARRO:  Object to form.

15          THE WITNESS:  I'm sure.  I'm sure it's

16    happened.

17    BY MS. TINGSTAD:

18      Q  Would you record something like that in a

19    police report about the interrogation?

20      A  I might.

21      Q  You might.  If you said things to a person

22    you were interviewing, like:  "You're in a lot of

23    trouble," or, "If you don't work with us, this

24    might happen"; if you ever made comments like that

1  in an interrogation, would it end up in a police

2  report?

3          MR. IASPARRO:  Form; foundation.

4          THE WITNESS:  I'd have to know specifics

5  on what you're talking about on that one.

6  BY MS. TINGSTAD:

7      Q  Is it fair to say that a lot of the

8  back-and-forth that might happen in an

9  interrogation may not end up in a police report

10  describing that interrogation?

11      A  Yes.

12      Q  Would the witness's demeanor end up in a

13  police report?

14      A  It could.

15      Q  Or it might not?

16      A  It might not.

17      Q  Did you review any documents in

18  preparation for this deposition today?

19      A  Have I?  Yes.

20      Q  What have you reviewed?

21      A  Reports concerning this case.

22      Q  How many reports did you review?

23      A  Oh, my God, a lot.

24      Q  A lot; were they -- do you recall whether

1    those documents were marked with a Bates at the

2    bottom with your name, "Schmidt," and a number?

3         A   Some of them.

4         Q   Uh-huh.   Did you review reports other than

5    the reports that you drafted?

6         A   Yes.

7         Q   Did you have any conversations with anyone

8    other than your attorney in preparation for your

9    deposition today?

10        A   No.

11        Q   Did you talk about this case with anyone

12   else?

13        A   No.

14        Q   Did you send any e-mails or text messages

15   to anyone regarding this case?

16        A   No.

17        Q   Did you review documents prior to giving

18   your testimony?   And let me stop -- strike that.

19   You also gave testimony in court in 2018 --

20        A   Yes.

21        Q   -- regarding this case?   Did you review

22   documents in preparation for that testimony?

23        A   Yes.

24        Q   Did you talk to anyone before you gave

1   that testimony about this case?

2        A  No.

3        Q  Just a few more questions about the

4   process of interrogating someone:  If you were

5   to talk or provide to the person that you're

6   interrogating, facts surrounding a crime that you

7   want them to talk about, would that be improper?

8        MR. IASPARRO:  Object to form and

9   foundation.

10       MR. MOGBANA:  Join.

11       THE WITNESS:  It depends on what it is.

12  BY MS. TINGSTAD:

13       Q  Would it be proper for -- if you bring

14  someone in and you want them to tell you about

15  an armed robbery -- would it be proper for you

16  to tell them about the armed robbery?

17       MR. IASPARRO:  Object to form and

18  foundation.

19       MR. MOGBANA:  Join.

20  BY MS. TINGSTAD:

21       Q  You can answer.  Before you started asking

22  them questions, for example?

23       A  If I'm talking to somebody about an armed

24  robbery, am I going to mention that there was an

1    armed robbery?  Yeah.

2        Q  Well, no, tell them the date, the time,

3    the location, basic facts about the crime.

4    Would it be improper for you to give them that

5    information before you started asking questions?

6        A  I might ask them, you know:  Where were

7    you at, at this date and time?  You know, what

8    did you do?  You know, things like that; you got

9    to get into the -- you know, what you're talking

10   about.

11       Q  Uh-huh.

12       A  People don't just come in and go:  "Yes,

13   I did that and this is why I did it."  And, you

14   know, you know, a lot of times they come in and

15   they deny.  You're going to talk to them.  It

16   depends on what you have on them.  You know, you

17   might have fingerprints.  You might have other

18   evidence to -- that you can corroborate stuff

19   with.

20       Q  Uh-huh.

21       A  So, you know, all of it depends on what

22   you have and what you know about it.

23       Q  So if you have some evidence already

24   regarding a person's involvement in a crime, you

1   might push harder when you're questioning them?

2        MR. IASPARRO:  Object to form and

3   foundation.

4        MR. MOGBANA:  Join.

5        THE WITNESS:  I don't know about push

6   harder.

7   BY MS. TINGSTAD:

8        Q  Uh-huh.

9        A  You might question them on it.

10       Q  Uh-huh.  Would you ever, in the course

11  of that interrogation, say:  We have this

12  information already?

13       MR. IASPARRO:  Form and foundation.

14       MR. MOGBANA:  Join.

15       THE WITNESS:  I could.

16  BY MS. TINGSTAD:

17       Q  Before any investigations into the Ascher

18  homicide, did you know Patrick Pursley?

19       A  No.

20       Q  Did you know of him?

21       A  No.

22       Q  Had you worked with Detective Forrester

23  before on investigations?

24       A  Oh, I'm sure during the course of things,

1    you know, we -- you know, we have worked together.

2    There is ten of us in the unit --

3        Q   Uh-huh.

4        A   -- at that time.  There is ten detectives

5    for all the aggravated battery, all crimes against

6    persons and sex crimes at that time, homicides,

7    violent crimes against persons and so on.  So

8    there is a lot of interaction between us.  You

9    know, we -- if you got to go out and pick up

10   somebody, you know, Sergeant Pirages might say:

11   "You two go out and do this," or, "You two go

12   do that" or whatever.

13           It just all depends, you know, where

14   you're at and what the situation is.  If you don't

15   have a heavy caseload, you might get more than

16   this guy does that has got a bunch of cases going

17   and stuff, so.

18       Q   Was Detective Forrester senior to you?

19       A   Oh, yes.

20       Q   Was he the most senior detective in the

21   violent crimes unit?

22       A   At that time I believe he was.

23       Q   And you were a fairly junior detective in

24   the violent crimes unit?

1        A   Pretty -- pretty new.

2        Q   And you had worked with Detective

3   Forrester on other investigations prior to the

4   Ascher homicide?

5        A   Yeah, sure.

6        Q   Would you, as a junior detective, be

7   assigned as a case detective on some crimes; or

8   is that something that was left to the senior

9   detectives?

10       A   Well, it depended.  It was up to my

11  supervisor.  If he -- if he assigned me a case,

12  then that's my case, you know.

13       Q   Uh-huh.

14       A   And I might have other detectives

15  assisting me --

16       Q   Uh-huh.

17       A   -- you know, to do various things,

18  interviews and whatever it is you're trying to

19  accomplish.  That's all.  You know, supervisor

20  will tell you what to do.  So, you know, it wasn't

21  like Howard would come in and say, "Hey, Mark,

22  I need you to come with me and do this," you know.

23  Sergeant Price (sic) would have said, "Get Mark

24  and you guys go do this," or vice versa.

1   You know, if he needed something, you know, minor,

2   you know, he might say:  "Mark, can you grab me

3   this or do that"; but anything that's -- if it's

4   assigned, it's going to be assigned by Sergeant

5   Pirages or whoever is in charge at that time.

6       Q  You said that Detective Forrester was the

7   case detective on the Pursley investigation --

8       A  Yes.

9       Q  -- or the Andrew Ascher investigation.

10  Was there another case detective on that

11  investigation?

12      A  Well, all of us were assisting in it.

13      Q  Assisting, but, I mean --

14      A  No --

15      Q  -- whose case it was?

16      A  -- that would have been his case.

17      Q  Bruce Scott wouldn't be sharing that with

18  him?

19      A  Bruce was also assisting.  Bruce had

20  different functions in that.  Like, for example,

21  Howard Forrester, it's his case.  He obtained the

22  search warrant.  He filed the affidavit for the

23  search warrant, obtained that.  Detective Scott

24  went out and served the search warrant while

1    Detective Forrester was doing other things.

2    Detective Scott happened to be -- I'm assuming,

3    when the Crimestopper call came in, Howard

4    Forrester was assigned to go and talk to that;

5    and Detective Scott went with him to the

6    Crimestopper office when they received that call.

7    I'll guarantee you, somebody assigned him to do

8    that.  So that -- you know, if that's what you're

9    asking, you know, everybody had assignments that

10   they were done.  But the supervisor, who had the

11   lead sheet, knew what needed to be done, what

12   needed to be followed up on; he would assign

13   people, just like when this call came in.  Myself,

14   the reason I got it and Bruce Scott got it and

15   Forrester got it, was because we were all there

16   to do a part-time job.  We were going out on a

17   part-time job.  Then this came in, so.

18        Q   What do you mean by a part-time job?

19        A   I was going to work an off-duty job.

20        Q   The three of you were together doing an

21   off-duty job?

22        A   Well, according to the reports, that's --

23   you know, we weren't -- we were at the station.

24   We were getting ready to go do something.  Since

1    we were there when that -- the call came in,

2    Sergeant Pirages said:  Okay, you three guys,

3    since you're here -- me and -- he directed myself

4    and Detective Forrester to go to the scene.  And

5    he assigned Detective Scott to go to the hospital

6    where the victim was en route there, and the

7    victim's girlfriend.  We were assigned to do that.

8        Q  Uh-huh.

9        A  So --

10       Q  You said you were going to do an off-duty

11   job.  What is an off-duty job?  What does that

12   mean?

13       A  Be like if I was going to go direct

14   traffic here.  Maybe I was going to go work.

15   It's an off-duty job that -- you know, where

16   policemen are needed.  You know, at that time

17   I don't know what it was.  I have no idea.

18   I don't recall; but, you know, there is police

19   officers that work schools, you know, like, for

20   football and basketball games, wrestling matches,

21   a number of things like that, so.

22       Q  In the course of the investigation of the

23   Andrew Ascher murder, when Patrick Pursley was

24   named as a suspect, did you ever talk with

1    Detective Forrester about Patrick Pursley?

2        A  In what regards?

3        Q  With regard to --

4        A  Did I know that eventually he was named as

5    a suspect in this?

6        Q  Sure.

7        A  Yeah.

8        Q  Yes.  Did you ever talk to Detective

9    Forrester about any interactions he had with

10   Patrick Pursley prior to him being named a

11   suspect?

12       A  No.

13       Q  Detective Forrester never told you that

14   Patrick Pursley ever touched him in the

15   courthouse?  He never told you that?

16       A  That?

17       Q  That Patrick Pursley touched him one time

18   in the courthouse?

19       A  No.

20       Q  He never told you that?  Did he ever tell

21   you that -- so he never told you how he felt about

22   Patrick Pursley?

23       A  No.

24          MR. IASPARRO:  Do you need a break?

1          THE WITNESS:  Pretty soon.

2          MR. IASPARRO:  Okay.

3          MS. TINGSTAD:  I think it's a good time to

4   take a break.

5          (A brief recess was taken commencing at

6   10:27 a.m. and concluding at 10:45 a.m.)

7          (Ms. Keen joins the deposition proceedings

8   via telephone.)

9          MS. TINGSTAD:  Okay.  I guess we're ready

10  to go back on record.

11      Q  Mr. Schmidt, how many interviews have you

12  done over the course of your tenure as a police

13  officer?

14      A  I would have no way of --

15      Q  Is it in the order of thousands?

16      A  Could be, 32 years.  You know, not all --

17  you know, did some interviews as patrolman, you

18  know.  Follow up on stuff that we get; you're the

19  first one on the scene and stuff.  So I would have

20  no way of knowing exactly.

21      Q  You've conducted a lot of interviews?

22      A  Yes.

23      Q  You've conducted a lot of interrogations

24  as well.  When conducting an interrogation were

1    you allowed to give the witness facts about the

2    case that were publicly known?

3         MR. IASPARRO:  Object to form.

4         THE WITNESS:  It depended on the

5    situation.

6    BY MS. TINGSTAD:

7        Q  What did it depend on?

8        A  I don't know.

9        Q  What factors did it depend on for whether

10   or not you were allowed to give a witness facts

11   about a case that were publicly known?

12        MR. IASPARRO:  Foundation.

13   BY MS. TINGSTAD:

14       Q  Were you trained with regard to whether or

15   not you could give a witness facts during an

16   interrogation?

17       A  What do you mean: give them facts?

18       Q  Give them facts about whatever you're

19   investigating that are publicly known?

20        MR. IASPARRO:  Foundation.

21   BY MS. TINGSTAD:

22       Q  Were you allowed to give a witness facts

23   about the case as you interrogated them?

24        MR. IASPARRO:  Same objection.

1    BY MS. TINGSTAD:

2        Q   Facts that the witness didn't give to you?

3            MR. IASPARRO:  Same objection.

4            THE WITNESS:  I don't know.

5    BY MS. TINGSTAD:

6        Q   You don't know whether or not that was

7    allowed?

8        A   I don't think there is anything set that

9    this ain't allowed, but this is; and, you know,

10   it all depended on the situation.  I don't know.

11       Q   What kind of situation would allow you to

12   give a witness facts about a case --

13       A   I don't know.

14       Q   -- and --

15       A   I don't remember.

16       Q   Were you allowed to give a witness facts

17   that were not publicly known in an interrogation?

18           MR. IASPARRO:  Foundation.

19           THE WITNESS:  Be the same thing.  Depend

20   on -- you know, you'd have to be more specific

21   than that.  I don't know.

22   BY MS. TINGSTAD:

23       Q   You don't know whether or not you were

24   allowed to give a witness facts that were not

```
 1   publicly known during an interrogation?
 2          MR. IASPARRO:  Form and foundation.
 3   BY MS. TINGSTAD:
 4       Q  Yes or no?
 5       A  I don't know.
 6       Q  When conducting an interrogation were you
 7   allowed to tell the witness they would go to jail
 8   if they don't cooperate?
 9          MR. IASPARRO:  Form.
10          THE WITNESS:  A witness?
11   BY MS. TINGSTAD:
12       Q  Yes.
13       A  I don't know why you would do that.
14       Q  Were you allowed to tell the person you
15   were interviewing that they would go to jail if
16   they didn't cooperate?
17          MR. IASPARRO:  I object to foundation.
18   The word "allowed" is -- what does that mean?
19   It hasn't been established.  Allowed by whom,
20   by what?
21          MS. TINGSTAD:  I've asked the witness
22   about whether or not he received training, what
23   kinds of policies and procedures were governed
24   at the Rockford City Police Department regarding
```

1    the conduct of interrogations and interviews.

2        Q   And your testimony was that the policies,

3    as you understood them, you gleaned from learning

4    them from other officers.  There was nothing

5    written down?

6            MR. IASPARRO:  Object to form and

7    foundation; misstates the prior testimony.

8            THE WITNESS:  I don't recall if there was

9    anything written regarding that.  It's been a long

10   time.  I have -- I don't know.

11   BY MS. TINGSTAD:

12       Q   With regard to the practices at the

13   Rockford Police Department, was it your

14   understanding that you were allowed to tell a

15   person you were interviewing that they would go

16   to jail if they didn't cooperate?

17           MR. IASPARRO:  So that question is limited

18   to the practices of the Rockford Police

19   Department?

20           MS. TINGSTAD:  Yes.

21           MR. IASPARRO:  If you understand the

22   question, you can answer.  I object to foundation

23   but --

24           THE WITNESS:  Yes.

1    BY MS. TINGSTAD:

2        Q  You were allowed to say that.  With

3    regard to the practices at the Rockford Police

4    Department, as you understood them, were you

5    allowed to threaten a witness when you were

6    interrogating them?

7            MR. IASPARRO:  Same objection; foundation.

8            MR. MOGBANA:  Join.

9            THE WITNESS:  What do you mean, "threaten

10   them"?

11   BY MS. TINGSTAD:

12       Q  You were a police officer.  You don't know

13   what the word "threaten" means?

14       A  Yeah, I don't know what you mean by that.

15   What do you mean by "threaten"?

16       Q  As a police officer, your testimony right

17   now is that you do not know what the word

18   "threaten" means?

19           MR. IASPARRO:  That's not what he said.

20           MR. POTTINGER:  It's argumentative, too.

21           THE WITNESS:  I know what my

22   interpretation --

23           MR. MOGBANA:  Objection; mischaracterizes

24   his testimony.

```
 1   BY MS. TINGSTAD:
 2       Q   Was it your understanding that you could
 3   threaten a witness with jail time for not
 4   cooperating --
 5           MR. IASPARRO:  Form and foundation.
 6           MR. MOGBANA:  Join.
 7   BY MS. TINGSTAD:
 8       Q   -- pursuant to the policies and practices
 9   of the Rockford Police Department?
10           MR. IASPARRO:  Same objection.
11           MR. MOGBANA:  Join.
12           THE WITNESS:  I can't speak for everybody.
13   Me, I never threatened nobody.  So, you know,
14   would I threaten somebody?  No.  I don't know what
15   else to tell you on that.
16   BY MS. TINGSTAD:
17       Q   And what is your -- what does "threaten"
18   mean to you?
19       A   Threaten would be, like:  If you don't
20   tell me, I'm going to beat the shit out of you.
21       Q   So you're referring to physical threats?
22       A   I thought that's what you were talking
23   about.
24       Q   When conducting an interrogation pursuant
```

1   to your understandings of the practices at the

2   Rockford Police Department, were you allowed to

3   slam your fist on the table?

4       MR. IASPARRO:  Form and foundation.

5   BY MS. TINGSTAD:

6       Q  Yes or no?

7       A  It happened, sure.

8       Q  So, yes?

9       A  Yeah.

10      Q  Were you allowed to raise your voice?

11      MR. IASPARRO:  Same objection; this is

12  limited to practices of the Rockford Police

13  Department?

14      MS. TINGSTAD:  Policies and practices of

15  the Rockford Police Department.

16      MR. IASPARRO:  Form and foundation; we

17  haven't established which policies we're talking

18  about.  You haven't put a single policy in front

19  of him.

20      MS. TINGSTAD:  I've asked him about the

21  policies and practices, and he said that they

22  weren't written down.

23      THE WITNESS:  I said I don't recall if

24  they were.  I have no idea if they were written.

1  It's been a long time since I've been there, so.

2  BY MS. TINGSTAD:

3      Q  Is it your understanding that you were

4  allowed, in the course of conducting hundreds of

5  interrogations, to raise your voice?

6          MR. IASPARRO:  Again, allowed by whom or

7  what?  What are we talking about?

8  BY MS. TINGSTAD:

9      Q  Would it have been proper for you, as a

10 Rockford police officer, to raise your voice

11 during an interrogation: yes or no?

12         MR. IASPARRO:  Object to form and

13 foundation; "proper" according to what or whom?

14 BY MS. TINGSTAD:

15     Q  Were you allowed to do that?

16         MR. IASPARRO:  By whom?  By what?

17 BY MS. TINGSTAD:

18     Q  By your sergeant?

19         MR. MOGBANA:  Objection; form.

20         MR. IASPARRO:  I agree.

21         THE WITNESS:  I don't know what to say

22 to that.  If you're asking me:  Have I ever raised

23 my voice; I'm sure I have.  If you're asking me

24 if, you know, that was what they wanted me to do,

1  there is -- no, there is times you might raise

2  your voice to talk over them because they're

3  yelling or something to that effect.  I don't know

4  what the circumstance was.

5  BY MS. TINGSTAD:

6      Q  When conducting an interrogation pursuant

7  to the policies and practices of the Rockford

8  Police Department, were you allowed to tell a

9  witness that you wanted them to implicate a

10 certain person?

11      MR. IASPARRO:  Object to form and

12 foundation; which policies?

13      MR. MOGBANA:  Join.

14 BY MS. TINGSTAD:

15     Q  You can answer.

16      MR. IASPARRO:  Do you understand the

17 question?

18      THE WITNESS:  I think so.  I'm not sure,

19 but it -- if you're talking about multiple

20 suspects, yeah, you probably would ask.

21 BY MS. TINGSTAD:

22     Q  You would -- you could tell the witness

23 that you wanted them to implicate a certain

24 person?  Yes?  Is that your answer?

1    MR. IASPARRO:  Form and foundation.

2    THE WITNESS:  Do I want them to implicate

3 them?  No, I just want them to tell me what

4 happened and tell me the truth.  If, you know,

5 somebody else is involved, yeah, tell me about

6 that; not -- you know, but just to pick somebody

7 out and implicate this or that, I -- no.

8 BY MS. TINGSTAD:

9    Q  So you could name the suspect that you had

10 and ask for -- ask the witness for information

11 implicating that suspect?

12    MR. MOGBANA:  Objection; form.

13    MR. IASPARRO:  Objection; form and

14 foundation.

15    MR. MOGBANA:  Also, the question is vague.

16 BY MS. TINGSTAD:

17    Q  When conducting an interrogation at the

18 Rockford Police Department, were you allowed to

19 tell a witness that they couldn't call a family

20 member?

21    MR. IASPARRO:  Form and foundation;

22 allowed by what, by whom?

23 BY MS. TINGSTAD:

24    Q  Was that a policy and practice of the

1    Rockford Police Department that you could tell a

2    witness who wanted to make a phone call that they

3    couldn't make a phone call?

4        A   Not that I know of, no.

5        Q   It's not that you know of; there was no

6    policy or practice?

7        A   That you couldn't tell them that -- you

8    know, there was no policy that says, you can't let

9    them make a phone call.

10       Q   Or --

11       A   That I know of.

12       Q   Or you can't prohibit them from making a

13   phone call?

14       MR. IASPARRO:   Form and foundation.

15       MR. MOGBANA:   Join.

16   BY MS. TINGSTAD:

17       Q   I'll ask that question again.   When

18   conducting an interrogation pursuant to your

19   practice at the Rockford Police Department, were

20   you allowed to tell -- could you tell a witness

21   that they couldn't call a family member if they

22   asked to call a family member?

23       MR. IASPARRO:   Form and foundation; and

24   I think what you just asked him is:   Your

```
1   practice?  Is that what you're asking him?
2         MS. TINGSTAD:  I just asked him about
3   his practice, yes.
4         MR. IASPARRO:  That's the question?
5         MS. TINGSTAD:  Yes.
6         MR. IASPARRO:  Could you read it back.
7         (Record read.)
8         MR. IASPARRO:  Do you understand that?
9         THE WITNESS:  I think you could -- you
10  know, if I wanted to let them make a phone call,
11  sure, I could let them make a phone call.
12  BY MS. TINGSTAD:
13     Q  And if you wanted to say, "No, you can't
14  make a phone call," you could also do that?
15     A  It would depend on the situation.  You
16  know, if I'm in the middle of an interview and
17  she wants to call, you know, it would all depend
18  on what the phone call is.  I don't know what
19  you're getting at.
20     Q  What would it depend on?
21     A  I don't know.  Give me an example.
22     Q  We'll get into examples later.  Is it
23  your understanding that there was -- strike that.
24  When conducting an interrogation pursuant to the
```

1  policy and practice of the Rockford Police

2  Department, were you allowed to tell a witness

3  that you would help them if they cooperated?

4        MR. IASPARRO:  Object to form and

5  foundation.

6        MR. MOGBANA:  Join.

7        THE WITNESS:  Well, again, it would depend

8  on the circumstances.

9  BY MS. TINGSTAD:

10     Q  What kind of circumstances would permit

11  you to tell a witness that you would help them if

12  they cooperated?

13     A  Give me an example.

14     Q  I'm asking for your example.  You said

15  it would depend on the circumstances.  Give me --

16  what kind of circumstances would allow you to tell

17  a witness that; that they -- that you would help

18  them if they cooperated?

19     A  Say they asked.  Say they said:  Well, if

20  I give you this, you know, can you help me do

21  this?  I might tell them:  Well, it'll be up to

22  the state's attorney office.  We'll review it

23  with them and we'll talk about it.  You know, but

24  as far as promising them anything, no, we would

1   never do that.

2       Q  Could you promise that you would put in a

3   good word with the state's attorney office?

4           MR. IASPARRO:  Form and foundation.

5           MR. MOGBANA:  Join.

6   BY MS. TINGSTAD:

7       Q  You just said that you might say:  It's up

8   to the state's attorney office, but we'll review

9   it with them?

10      A  Sure.

11      Q  So you could promise a witness that you

12  would --

13      A  No, promise nothing; I might say that

14  we'll interview them, or, you know, speak to the

15  state's attorney.  I'm not going to promise them

16  anything.

17      Q  You could promise them that you would

18  speak to the state's attorney on their behalf?

19      A  I can tell them I will speak to the

20  state's attorney.

21      Q  Uh-huh.  You mentioned earlier that on

22  the evening of April 2nd, 1993, you were in the

23  station and you received a call to respond to the

24  Ascher homicide?

1      A   Detective Scott received a call from the

2    shift supervisor, and who had contacted Sergeant

3    Pirages at home, okay, because he was off.

4    Sergeant Pirages informed whoever was the

5    shift supervisor at that time, to get ahold --

6    Bruce Scott was already in there.  So he talked

7    to Bruce Scott.  And Sergeant Pirages advised

8    Bruce Scott to go to the hospital.  And he said:

9    And have Smith and Forrester come to the scene,

10   and he would meet us there.

11     Q   Do you have an independent recollection of

12   that evening of heading out to that scene?

13     A   Well, I remember going out there, yes.

14     Q   About what time did you receive that call

15   or did Bruce Scott receive that call?

16     A   It was after 10:00, I believe, or -- yeah,

17   somewhere in that area.

18     Q   And --

19     A   I'm not sure.  I'd have to see the report,

20   but -- for the exact time, but --

21     Q   Can you describe for me how you got to the

22   scene?

23     A   Myself and Detective Forrester rode out

24   in the same car, and we drove out to 2709 Silent

1    Wood where the crime scene was.

2        Q   Do you remember what the weather was like

3    that night?

4        A   I think there was -- there was snow on the

5    ground in areas.  I don't remember.  You know, it

6    was chilly.  I don't remember how cold or anything

7    like that.

8        Q   What did you observe when you got to the

9    scene?

10       A   I observed -- first when we got there, we

11   met with Sergeant Pirages, who informed us that --

12   you know, what they had encountered.  He said that

13   there was a gunshot victim.  A guy and his

14   girlfriend were in the vehicle.  It was an armed

15   robbery attempt.  And he said that the victim had

16   been taken to -- I believe it was Saint Anthony

17   Hospital.  And the girlfriend that was with him

18   also went to the hospital, along with her sister

19   and -- or her brother and his wife.  Bruce Scott

20   was en route to the hospital to meet them there.

21           And we seen their -- Mr. Ascher's vehicle

22   parked on the southwest edge of the parking lot.

23   Both doors were open.  There was quite a bit of

24   blood on the seat in that area.  There was some

1    shell casings.  And Detective -- Sergeant Pirages

2    advised us, you know, what he knew at that time.

3    And then we were assigned to go back to the

4    detective division and wait for the victim's

5    girlfriend and then her brother and his wife to

6    be brought into the police station to be

7    interviewed.

8        Q  So how long would you say that you were at

9    the scene before you headed back to the public

10   safety building?

11       A  Maybe an hour.

12       Q  Who else was there when you got there?

13       A  Lieutenant Ferguson was there; Sergeant

14   Pirages; Detective Arduino, Mike Arduino,

15   A-R-D- --

16       Q  U-I-N-O?

17          MR. IASPARRO:  U-I-N-O.

18          THE REPORTER:  Thank you.

19          THE WITNESS:  Thank you.  McAnnally,

20   Officer McAnnally; Officer West; Officer Eauclaire

21   was there.  Eauclaire, E-U-C-L-A-R-E (sic), I

22   think.

23   BY MS. TINGSTAD:

24       Q  E-A-U- --

1      A   E-A-U.

2      Q   -- C-L-A-I-R-E, I'm looking at it, so.

3      A   Thanks.

4      Q   It's hard.  Was there a canine unit, do

5    you recall?

6      A   Not when we got -- I believe that Sergeant

7    Pirages indicated that they had called in the

8    county canine unit and had them check for prints

9    in the field and a scent.  And the dog couldn't

10   find nothing.

11     Q   The dog couldn't pick up a scent?

12     A   Yeah.

13     Q   Do you recall if there was snow on the

14   ground?

15     A   I believe there was in areas.  I don't

16   know if it was totally covered, but there were

17   some areas that had little patches of snow.

18     Q   So patches of snow; was the ground frozen?

19     A   I don't recall.  It was in April.  So I

20   don't know if it would have been frozen.  I don't

21   think it was that cold, but I don't recall.

22     Q   So you said you returned -- back up.

23   What other activities did you engage in when you

24   first arrived on the scene during that hour?

```
 1        A   Mainly we viewed the crime scene and we
 2   were briefed by Sergeant Pirages.  Other officers
 3   that were already there, first responders to it,
 4   they had already done a neighborhood check,
 5   checked for any possible witnesses or anything
 6   like that.  They were all doing their thing like
 7   that.  We viewed the scene, went over what they
 8   knew at the time.  And then myself and Forrester
 9   went back to wait for the other people, the
10   witnesses, to come back.
11        Q   So you went back to the public safety
12   division and what did you do next?
13        A   We waited for the witnesses to come from
14   the hospital.  Becky was -- all of them were still
15   at the hospital.  Detective Scott was going to
16   have them all come meet us at the detective
17   division.  Sergeant Pirages wanted us to interview
18   the brother, the wife from the apartment or the
19   condo there, number three, that they went to
20   and -- or that they were going to, her brother's
21   house, and then Becky.
22        Q   And did you end up interviewing one of
23   those?
24        A   Yes.
```

1    Q   Who did you interview?

2    A   I spoke to Becky's brother.

3    Q   Do you remember his name?

4    A   I believe it was Brian.

5    Q   Brian George?

6    A   Brian George.

7    Q   What do you recall him telling you?

8    A   That he was -- his wife got home about

9   9:30.  He had to work the next day.  He was going

10  to work.  He had to be there at 6:00 in the

11  morning.  So it was about 10:00.  He went up to

12  get ready for bed.  He was getting into bed, and

13  his wife was getting ready to go to bed.  And he

14  said that, all of a sudden, he heard a bunch of

15  banging on the door.  His wife went down and

16  opened the door.  And Becky come running in,

17  screaming, hysterical, saying for Brian to call

18  911; Andy had been shot.  And she did that several

19  times and then ran back out.  You want me to keep

20  going?

21    Q   Sure.

22    A   Then Brian said he called 911 on his

23  cordless phone and started getting dressed.

24  And the dispatcher was asking him all kinds of

1    questions involving this, and he didn't have any

2    of the answers.  So he went outside to try to get

3    the answers that the dispatcher was asking him.

4    And he says when he walked out, he seen both car

5    doors open.  He said that he walked over to the

6    passenger side first, and he could see a lot of

7    blood on the right side of Andy Ascher's face.

8    And then he walked around where Becky and his

9    wife were on the driver's side, and he seen a lot

10   of blood on the left side of his face.  He said

11   that he seen some -- I believe it was his wallet

12   was in his lap.  And he tried to get answers from

13   Becky that the dispatcher was asking, but she was

14   so hysterical.

15        And he said that the dispatcher -- when

16   the police arrived, the dispatcher told them to

17   get Becky away from the scene, so the fire

18   department ambulance could check on the victim.

19   Kind of get her out of the way; he said he tried

20   to calm her down, but she was still really

21   hysterical.  And then the fire department took

22   Andy, and they went to the hospital.  And then

23   Becky went to the hospital.  And then him and his

24   wife went there to be with Becky.

1      Q   And Becky at that time made statements to

2   Brian about what had happened, correct?

3      A   At the scene?

4      Q   Uh-huh.

5      A   Yeah, she said that they were just sitting

6   in the car talking.  And somebody opened up the

7   driver's door or pulled it open.  And she said

8   that they seen a guy with a gun in both hands and

9   said that this was a -- I believe Brian George

10  said that Becky told him it was a burglary --

11  whatever, you know -- that was his words.  And

12  she says that Andy was getting his wallet out.

13  She was digging through her purse getting her

14  money out.  And she says he just shot him twice

15  in the -- shot him.

16     Q   And did Becky tell Brian where she thought

17  the suspect might have run to?

18     A   She said that she thought he would have

19  went east because they were facing west.  And she

20  never seen him go in front of the car.  So she

21  thought he ran back towards Silent Wood eastbound.

22     Q   She didn't see him run eastbound, but she

23  assumed that because she didn't see anybody cross

24  in front of --

1      A   That's what Brian said, yes.

2      Q   I'm going to mark as Exhibit 1 -- let me

3   find where -- this is 1.

4          MS. KEEN:  What's the Bates number,

5   Ashley?

6          MS. TINGSTAD:  This is Schmidt 178.

7          MS. KEEN:  Thank you.

8          THE REPORTER:  Was that Amy on the phone

9   that just said that?  Sorry.  Was that Amy who

10  just spoke?

11         MS. KEEN:  No, it's Roshna Keen, the

12  attorney that appeared for plaintiff.

13         MS. TINGSTAD:  You can make that

14  Schmidt 1.

15         (Exhibit 1 was marked for identification.)

16  BY MS. TINGSTAD:

17     Q   Let the record reflect that Schmidt 1 has

18  been marked.  It's Bates labeled Schmidt 178

19  through 188.  Mr. Schmidt, do you recognize this

20  document?

21     A   Yes.

22     Q   What is it?

23     A   It's a police report I did.

24     Q   What is the date of this report?

1       A   April 2nd, 1993.

2       Q   So April 2nd, that's at the top?

3       A   Right.

4       Q   And the time is 22:15?

5       A   Right.

6       Q   Would that -- what time does that reflect?

7       A   10:15.

8       Q   And 10:15 is when you received a call or

9   when you arrived?  What time does that reflect?

10      A   That's when we were assigned to go out.

11      Q   That's when you were assigned by Sergeant

12   Pirages.  And there is a date at the bottom as

13   well, a handwritten date?

14      A   Uh-huh.

15      Q   What -- of 4/5/93, do you see that?

16      A   Yes.

17      Q   And what does that reflect?

18      A   That would have been the time that

19   Sergeant Pirages reviewed my report and signed it.

20      Q   So that's Sergeant Pirages' date and time?

21      A   Yes.

22      Q   And this is an 11-page report.  And pages

23   2, 3, 4, 5, contain a lot of lines and names.

24   What are all of these names?

1      A   Those were people I interviewed doing a

2   neighborhood check.  Myself and several other

3   detectives were assigned to go out to the

4   Greendale address, the neighborhood there, and

5   do a neighborhood check for any possible

6   witnesses.

7      Q   And did you, in the course of that

8   neighborhood check, talk to anybody who had seen

9   or heard anything?

10     A   Not regarding this (indicating).

11     Q   In the course of that neighborhood check

12   you interviewed someone at apartment three.  This

13   is on --

14     A   Roush?

15     Q   Yes, David Roush, what do you remember

16   about that interview?

17     A   He didn't hear or see anything the night

18   of this incident.  But he said that he did

19   remember the day before on the 1st, that when

20   he came home, there was a gray car.  He thought

21   it was a Plymouth Volare, parked out in front

22   of his apartment building.  And he says that he

23   saw a black male get out of the passenger side

24   of the car and go into his building.

1          He drove around and parked in the back

2     and then went in -- was going into his apartment.

3     And he could hear that guy go up the stairs, run

4     down the hall, and then go back downstairs and

5     out.  And he says that a while earlier there had

6     been an armed robbery at that building where a

7     pizza delivery man had been sent to their

8     apartment building to deliver a pizza.  And the

9     pizza -- or the person that they were delivering

10    the pizza to did not live at that building.

11    When the pizza delivery guy was leaving, he was

12    confronted outside and robbed.  And so he says

13    that he just tries to watch anything that might

14    be suspicious, you know, that he seen.  He says

15    he's never seen that car in the area before and

16    had no idea who they were.

17         Q  Did you consider this to be a potential

18    lead?

19         A  A lead?

20         Q  Yeah, something unusual that happened in

21    the neighborhood the day before?

22         A  That's why we write it down.  We check

23    into everything.

24         Q  Did you check into a 1976 four-door

1    Volare?  Did you try to figure out what that might

2    be or who might have been driving that --

3        A  Did I personally?

4        Q  -- on that day?  Uh-huh.

5        A  No.

6        Q  Did you pass that information along to

7    anyone else to follow?

8        A  Sure, the report was --

9        Q  Sergeant Pirages?

10       A  -- submitted to my supervisor.

11       Q  Are you aware of whether or not Sergeant

12   Pirages had anyone follow up on that lead?

13       A  I'm not aware.

14       Q  So you conducted this neighborhood check

15   of 3523 Greendale Avenue or Greendale Apartments.

16       A  That was the apartment building.

17       Q  The apartment building was called 3523

18   Greendale, and where was that in relation to the

19   scene of the Ascher homicide?

20       A  That was down at the end of the street.

21   Silent Wood, when you get to the end, winds around

22   onto Greendale.

23       Q  Uh-huh.  Becomes Greendale?

24       A  Yes.

1      Q   Okay.  And so that -- was that within

2   eyeshot of the crime scene?

3      A   There is a lot of big apartment buildings.

4   I don't know if it was eyeshot from there.  It

5   was -- from Silent Wood, from 2709, the drive

6   going into the parking lot to there, was about

7   800 feet --

8      Q   Okay.

9      A   -- to Greendale.  And this was one of the

10   first big apartment buildings right there on the

11   corner, and then there is just a bunch of other

12   apartment buildings.

13      Q   A couple more?  And between -- in that

14   800 feet between the Silent Wood address and this

15   address is a field, or what is in between that?

16   What was in between that?  Let me --

17      A   Yeah.  There was -- there was several

18   fields.  There's fields across the street.  It's

19   all different now; but back then, you know, from

20   what I remember --

21      Q   Uh-huh.

22      A   -- there was some big fields.  And then

23   when you get down on Greendale you have apartment

24   buildings.

1      Q   Okay.  And there is a few notations of

2   talking to people at 3518 Greendale.  Where was

3   3518 Greendale?

4      A   Probably had been the next apartment

5   building.

6      Q   Did you also --

7      A   There was -- there was about four

8   detectives that went out to canvass this area.  So

9   I checked as many apartments as I could at 3523.

10     Q   Uh-huh.

11     A   Other detectives went to other buildings.

12  And then I just -- when -- you know, if you never

13  got an answer, we left a card.  We kept going

14  back, making sure we talked to everybody that we

15  could.  And then when I got everybody in my

16  building, I went and got people at the next one.

17  And then, you know, so on and so forth; tried to

18  cover everybody that we could.  If they weren't

19  home, we either went back or they called in, and

20  then we talked to them about it.

21     Q   And other than Mr. Roush, who had seen

22  something the day before, did any other leads come

23  out of your neighborhood check?

24     A   No.

1          Q   Later that day on April 3rd, 1993, you

2     attended the autopsy of Andy Ascher?

3          A   Yes.

4          Q   And after that, at 11:55 at night or --

5     no, that would have been -- 11:55 military time

6     is just before noon, right?

7          A   Right.

8          Q   You received the cassette tapes of the

9     911 call?

10         A   From Sergeant Pirages.

11         Q   Uh-huh.  Did you listen to those tapes?

12         A   No.

13         Q   You were just assigned to tag them into

14    evidence?

15         A   Right.

16         Q   Is this report a complete accounting of

17    all of the activities that you conducted on

18    April 2nd and 3rd, 1993, with regard to the

19    Ascher homicide?

20         A   Unless I was with somebody else doing

21    something and they covered me in their report;

22    but as far as I know, yeah.

23         Q   Do you know if there were any leads at

24    this time in early April, right after the murder,

1    regarding a suspect?

2         A  Not that I'm aware of.

3         Q  Are you aware of a Crimestoppers call

4    coming in shortly after the murder regarding a

5    potential suspect?

6         A  Shortly after the murder?  No.

7         Q  If a Crimestoppers call did come in

8    shortly after the murder, would you expect that

9    lead to be investigated?

10         MR. IASPARRO:  What do you mean by

11    "shortly after the murder"?  What?

12         MS. TINGSTAD:  I can give you a date.

13         Q  On April 4th, 1993, so two days after the

14    murder?

15         A  Yeah, I'm sure it would have been.

16         Q  You're not aware of any Crimestoppers

17    calls that came in on April 4th, 1993?

18         A  Me personally, no.

19         MS. KEEN:  I didn't hear that response.

20    I'm sorry.  Can you repeat it?

21         THE WITNESS:  Not me personally, no, I

22    didn't know anything about that.

23         THE REPORTER:  Was that Ms. Keen who

24    spoke?  I need to know -- get a speaker I.D.

1        MS. KEEN:  Yes.  I'll identify myself next

2  time.  Thank you.

3        THE REPORTER:  Okay.  Yes, if you could

4  identify yourselves before you speak, that would

5  be great.  Thank you.

6        MS. KEEN:  Will do.  Thank you.

7  BY MS. TINGSTAD:

8     Q  Were you aware of any suspects that were

9  identified by the Loves Park Police Department for

10  this crime?

11     A  No.

12     Q  You don't recall hearing the name

13  Antrone Turner?

14     A  No.

15     Q  Or Vantele Turner?

16     A  No.

17     Q  Shawn Barmore?

18     A  No.  I know that name.  I don't have

19  any recollect- -- or recollection of that from

20  Loves Park.

21     Q  How do you know the name Shawn Barmore?

22     A  I just know the Barmores.

23     Q  How do you know the Barmores?

24     A  I just -- I know the name.  I don't

1    recall.

2       Q   Through, like, a personal acquaintance

3    or --

4       A   Well, no, it wouldn't have been a personal

5    acquaintance; but I don't know anything about the

6    Loves Park incident that I can recall.  Whose

7    report is that in?

8       Q   If -- there is a -- I'm referring to a

9    report written by Kevin Rice regarding -- dated

10   April 3rd, 1993.

11      A   Okay.  Yeah.

12      Q   Would you have expected that a suspect

13   identified by a different police department would

14   have been a lead that would have been

15   investigated?

16          MR. IASPARRO:  Object; form; foundation;

17   and that assumes facts not in evidence.

18          MR. MOGBANA:  Join.

19   BY MS. TINGSTAD:

20      Q   Would you expect that -- that a lead

21   regarding a different -- a suspect of the

22   murder would have been investigated?

23          MR. IASPARRO:  Same objections.

24          THE WITNESS:  Anything that came in like

1   that would have gone through Sergeant Pirages.

2   And it would have been his determination whether

3   or not it got assigned to something.  So I don't

4   know.

5   BY MS. TINGSTAD:

6       Q  So that would have been Sergeant Pirages'

7   decision?

8       A  (Witness nods head.)

9       Q  And he would have received all of these

10  reports?

11      A  Is that marked with a homicide on the top

12  (indicating)?

13      Q  It says murder, offense, murder.

14      A  Okay.  From Silent Wood?

15      Q  Yes.

16      A  Okay.  He would have gotten all those

17  reports.  It would have all been in the file.

18      Q  So when the reports say 2709 Silent Wood

19  at the top, and the offense says homicide or

20  murder, that would have gone to Sergeant Pirages?

21      A  Absolutely.

22      Q  Would it have also gone to Detective

23  Forrester?

24      A  Depended; Sergeant Pirages would -- you

1    know, it was his case.  So eventually I'm sure

2    he had all the case information.

3        Q  It was Forrester's case, is what you mean

4    by "his"?

5        A  Yes.

6        Q  Do you have any recollection of an armed

7    robbery that occurred at a Burger King in April of

8    1993?

9        A  I do now.  Back then --

10       Q  What do you mean:  You do now?

11       A  Well, I have seen the information in the

12   report.  But as far as, you know, back then, no,

13   I didn't.

14       Q  So back in April 1993, you didn't know

15   about the -- a Burger King armed robbery?

16       A  In April?

17       Q  Uh-huh.

18       A  No.

19       Q  Did you, before preparing for this

20   deposition, ever read police reports regarding

21   an April 1993 Burger King robbery?

22       A  I have seen them, I think, yeah.

23       Q  Did you see them back in 1993?

24       A  I don't recall if I did or not.

1      Q  You recall being present for a statement

2   by Sam Crabtree regarding an April 1993 Burger

3   King armed robbery, correct?

4      A  Yes.

5      Q  Prior to hearing or taking that statement,

6   did you know any facts about the Burger King armed

7   robbery?

8      A  No.

9      Q  You hadn't read the report that you --

10  that's the Lathom report?

11     A  I don't recall.  Howard had the

12  information on that.  Howard took the statement

13  from her on that.  I was in the interview room

14  when he talked to her about that.  But other than

15  that, I don't know anything about it, that I can

16  recall.

17     Q  And by "Howard" you're referring to

18  Detective Forrester?

19     A  Detective Forrester, I'm sorry.

20     Q  No need to apologize.  Do you have a

21  recollection of investigating an armed bank

22  robbery from May of 1993?

23     A  Yes.

24     Q  What do you remember about that?

1      A   I remember that there was a bank robbery

2   at First Bank North across from the post office

3   on Harrison.  Myself and other detectives were

4   sent there.  I interviewed one of the tellers.

5   Another detective interviewed a different teller.

6   I was with myself and an FBI agent, Mulvey, I

7   believe his name was.  We interviewed the one

8   teller about the incident.  And while we were in

9   the bank getting the information, the suspect

10  vehicle was recovered over on Mariposa.  Squads

11  went over there and they found some money on the

12  ground and an Olds Toronado, gray, parked on

13  Mariposa in the 2000 block.  And I did my report

14  on the bank robbery.

15      Q   Do you recall whether there was a suspect

16  in that bank robbery identified in May 1993?  Did

17  you have any suspects?

18      A   When in May?

19      Q   Anytime in May; the robbery occurred

20  May 12th, 1993.

21      A   No, no.

22      Q   Do you know whose case was -- who was

23  assigned to this bank robbery?

24      A   I don't recall whose specific case it was.

1      Q   Was it assigned to you?

2      A   Not that I know of; I worked on it.

3   I don't know who -- what detective was involved

4   in it.

5      Q   Okay.

6          MS. TINGSTAD:  Just take one and pass it

7   down.  We can mark it as Schmidt 2.

8          (Exhibit 2 was marked for identification.)

9          MS. TINGSTAD:  For those on the phone,

10   the Bates number is Schmidt 108 through 112.

11   I apologize.  That seems to be my phone.

12      Q   Do you recognize this document --

13      A   Yes.

14      Q   -- Mr. Schmidt?  And what is it?

15      A   It's a police report, my police report

16   involving the armed robbery at the First Bank

17   North.

18      Q   And the date of this report at the top

19   would be?

20      A   May 12th.

21      Q   May 12th; time, 11:30 in the morning?

22      A   Yes.

23      Q   And the date at the bottom when it was

24   reviewed by Sergeant Pirages would be May 20th,

1    1993?

2         A   Right.

3         Q   That's your signature in line 376 or

4    Box 376?

5         A   Are you talking my name?

6         Q   Yes, that's your signature?

7         A   That's my signature.

8         Q   Yeah.  And then Box 377, that's Sergeant

9    Pirages' signature?

10        A   That's correct.

11        Q   And you recall interviewing Lisa Donmeyer?

12        A   Yes.

13        Q   What do you recall her saying about this

14   bank robbery?

15        A   She was behind the counter.  She had

16   observed the suspect coming through the doors.

17        Q   How did she describe him?

18        A   Said he was a black male, five-seven,

19   150; was wearing a black ski mask, a purple

20   baseball cap, gray sweatshirt, pants oversized

21   with black leather driving gloves.

22        Q   Did he pull a gun to this -- did the

23   suspect pull a gun?

24        A   No.

1      Q   Did Ms. Donmeyer ever see a weapon?

2      A   No.

3      Q   Is this report -- does it accurately

4   relate all of the information that she relayed to

5   you when you interviewed her?

6      A   Yes.

7      Q   And does it accurately relate your

8   activities investigating this armed robbery on

9   May 12th, 1993?

10     A   Yes.

11     Q   Is there anything -- do you have any

12  reason to believe that there is anything left out

13  of this report?

14     A   That I did?

15     Q   Uh-huh.

16     A   No.

17     Q   Prior to a Crimestoppers call coming in

18  implicating Patrick Pursley in this bank robbery,

19  are you aware of any suspects that the police

20  department was investigating?

21     A   No.

22     Q   Can you think of any reason why Sergeant

23  Pirages would not have assigned a detective to

24  investigate a lead?

1        MR. IASPARRO:  Form and foundation.

2        MR. MOGBANA:  Join.

3        THE WITNESS:  That would -- I would never

4   second-guess what he -- he's in charge.  So, you

5   know, if he had something that he thought was a

6   valid lead, he definitely would assign somebody

7   to it.

8   BY MS. TINGSTAD:

9       Q  Were you ever a sergeant in the detective

10  bureau?

11      A  No.

12      Q  Did you ever talk to Sergeant Pirages

13  about why he didn't assign -- why he didn't assign

14  anyone to investigate a lead?

15      A  No.

16        MR. IASPARRO:  In this case?

17  BY MS. TINGSTAD:

18      Q  In any case?

19      A  No.

20      Q  So you don't know what his decision-making

21  matrix was like?  You don't know what factors he

22  would consider?

23      A  He's got many cases.  He's assigning stuff

24  all the time.  Everything that comes through goes

1    through him and lieutenant.  So, I -- no, I

2    wouldn't have a clue why he wouldn't or would

3    assign somebody.

4        Q  After the Ascher homicide, there was

5    news reports regarding the homicide, correct?

6        A  Oh, I'm certain, yeah.

7        Q  Did you watch any of those news reports?

8        A  Not that I recall; I'm sure I might have

9    heard it on the news at times, but not that I

10   recall specifically.

11       Q  Do you recall whether a suspect was

12   described in a news report?  There was a

13   description of the suspect given in a news report?

14       A  Well, if there was a description of the

15   suspect and they're doing the newscast, there

16   probably was.  I don't recall offhand what it was.

17       Q  Do you know who would have provided a

18   suspect's description to the news, to the media?

19       A  No.

20       Q  Was it a certain person's responsibility

21   within the police department to make those

22   decisions?

23       A  Well, I don't know.  A lot of times they

24   come down and they can get reports from the

1    records division.  So I don't know if they

2    obtained the reports that way or if they talked

3    to the supervisor and he relayed some of that.

4    I don't know.

5        Q  So you don't know what the procedure would

6    be for providing a suspect description to the

7    media?

8        MR. IASPARRO:  Are you asking generally?

9    BY MS. TINGSTAD:

10       Q  Uh-huh, generally?

11       A  Yeah, it would be up to the shift

12   commanders, the people in charge.  You know, if

13   they wanted to put something out there, they

14   would.  They would, you know, speak to them and

15   let them know what they have and stuff like that.

16   That's up to them.  We wouldn't release nothing

17   personally.

18       MR. HUOTARI:  Ashley, this is Joel Huotari

19   speaking.  I got a 12:00 I'm hoping to keep.

20   Are you intending to break for lunch at any point?

21   Would this be a good stopping point?

22       MS. TINGSTAD:  That is a fine stopping

23   point for me.

24       MR. HUOTARI:  Thanks.  Want to pick it up

1    at, like, 1:15?

2          MS. TINGSTAD:  That's fine, if it works

3    for everybody.

4          MR. HUOTARI:  Appreciate that.

5          THE WITNESS:  Want these back?

6          MR. IASPARRO:  Off the record.

7          (Discussion off the record commencing at

8    11:47 a.m. and concluding at 11:47 a.m.)

9          (A lunch recess was taken commencing at

10   11:47 a.m. and concluding at 1:20 p.m.)

11         (Mr. Mogbana leaves the deposition

12   proceedings.)

13         (Mr. Huotari leaves the deposition

14   proceedings.)

15         (Ms. Hall arrives to the deposition

16   proceedings.)

17         MS. TINGSTAD:  Let's get started.

18      Q  I might have already said this,

19   Mr. Schmidt; but when did you start working as

20   a detective in the violent crimes unit?

21      A  I'm not for sure the --

22      Q  Could be approximate.

23      A  You know, I just -- I went -- when I first

24   went there I worked in burglary.  And I know I

1    was in burglary probably at least two or three

2    years.  So, you know, somewhere in that time

3    period then I -- there was an opening in violent

4    crimes, and they asked me -- Steve asked me if

5    I wanted to go in there, and I did.

6        Q  So approximately '91/'92 time frame?

7        A  Approximately, I just -- I really -- I

8    just don't know the date.  I know I went to

9    the -- I was promoted in '88 in July.  But it

10   wasn't, like, you're promoted and the next day

11   you start in the detective division.

12       Q  Uh-huh.

13       A  You know, you had to wait.  You were

14   promoted and -- but you -- until there was an

15   opening, you didn't get put in yet.  So I'm not --

16   I'm not exactly sure what the exact date was that

17   I went in.  But when I first went in, I was in the

18   burglary division.  And I worked burglaries until

19   the slot opened up in violent crimes.  So it might

20   have been maybe a year.

21       Q  Uh-huh.

22       A  You know.

23       Q  So even could be earlier, like, 1989/1990

24   time frame?

1      A  Oh, not -- for the violent crime unit?

2      Q  Yeah.

3      A  No, no, it would have been later than

4   that.

5      Q  Oh, later; but before 1993, you were in

6   the violent --

7      A  Oh, yes, I was in violent crime during

8   this (indicating), but I was pretty new.

9         MS. TINGSTAD:  Did someone just join the

10   call?  Probably on mute.

11      Q  And when -- and then how long did you stay

12   in violent crimes?

13      A  I believe 1997-ish.

14      Q  Okay.  So about six years-ish, you were

15   in violent crimes as a detective.  We'll benchmark

16   it, about five or six years?

17      A  Yeah.

18      Q  Five or six years; and during those five

19   or six years that you were a detective in the

20   violent crimes unit, did you participate in

21   charging conversations with the ASAs about whether

22   or not to charge a specific suspect?

23      A  Charging conversations?

24      Q  Yeah, like, a conversation with the

1    state's attorney?

2        A   Sure.   Every charge had to be authorized.

3        Q   And so you participated in

4    conversations --

5        A   Well, you'd review what you had with the

6    state's attorney.   And then they would ultimately

7    decide if they would issue, you know, complaints

8    on that.

9        Q   So you would sit down with the state's

10   attorney and review what?

11       A   The case you had.

12       Q   So police reports, statements; anything

13   else you would review?

14       A   Anything concerning the case.

15       Q   Anything you had concerning the case; and

16   about how many of those conversations did you

17   participate in?

18       A   Would have no -- no idea.

19       Q   Ballpark in that -- in those five or six

20   years?

21       A   I couldn't even tell you.

22       Q   Yeah.

23       A   You know, like I say, any -- if I wanted

24   to charge somebody with burglary --

1        Q  Yeah.

2        A  -- okay.  I would have what I worked up.

3        Q  Uh-huh.

4        A  Then I'd contact the state's attorney or

5    I'd either do it by phone or go over, review it

6    with them; and they would either authorize it or

7    not.  And so I couldn't tell you how many cases

8    or --

9        Q  It would have been a lot?

10       A  Yeah.

11       Q  It happened quite often, okay.  And were

12   you familiar with the Illinois State Police crime

13   lab?

14       A  I knew of it, sure.

15       Q  And did you work -- were you a case

16   detective in gun cases during your time at the

17   violent crimes unit?

18       A  I'm sure I -- at some point, yeah.

19       Q  Uh-huh.  And as a case detective in gun

20   cases, how would you typically communicate with

21   the Illinois State Police Lab if you had forensic

22   ballistics evidence?

23       A  Usually ID took care of that.  They would

24   submit the -- whatever evidence you had, if

1    something needed to be tested or whatever.  Most

2    cases, you know, they would submit it; or, you

3    know, depending on the situation, they might have

4    us run it over and drop it off.  But usually, you

5    know, either property or ID would take care of

6    that.

7        Q   And not specifically running the physical

8    evidence over to the ISP lab, but making a

9    decision as to when to send the evidence to the

10   ISP lab?  Would that be a case detective's

11   decision?

12       A   No, no.

13       Q   That would -- whose decision?

14       A   You mean, like, this is my case --

15       Q   Uh-huh.

16       A   -- and -- okay.  I'm going to do this; I'm

17   going to send it over?

18       Q   Or you're making a decision about when to

19   send forensic evidence over to the lab?

20       A   The supervisor would do that.

21       Q   The supervisor would do that?

22       A   Or it could be a supervisor, you know;

23   it would either be, you know, property.  That's

24   where everything is going.  When you take it into

1    evidence it goes to property.  So somebody would

2    notify property that it needs to go over or not.

3    And that would be, you know, Sergeant Pirages or

4    whatever supervisor you have, might come in and

5    say:  I need you to run this over there, or he

6    might just have property take it over or whatever

7    because, you know, you've got a chain of evidence

8    that you got to maintain.  So they -- it wasn't,

9    like, it's passed around, so.

10       Q  Right, right.  Did you ever have, in a

11   gun case, spent slugs and shell casings that you

12   recovered from a scene that you would send over to

13   ISP to provide information about what kind of

14   weapon that might be?

15       A  That I would do?

16       Q  As a case detective in a gun case?

17       A  No.

18          MS. KOZAR:  Object to form.

19          THE REPORTER:  Who was that, sorry?

20          MS. KOZAR:  Object to form.

21          THE REPORTER:  Is that Ms. Kozar?

22          MS. KOZAR:  Yes.

23   BY MS. TINGSTAD:

24       Q  So if it was your case and it was a gun

1    case, and you were responsible for trying to solve

2    it --

3        A   I wouldn't touch none of the --

4        Q   No, you wouldn't touch it?

5        A   -- the evidence.  So what would happen is,

6    ID would be called out to the scene, if there were

7    spent casings on the ground or whatever evidence

8    you have or a weapon or anything else.  ID would

9    recover it.  They would tag it and they would put

10   it in property.  Then, you know, it isn't going to

11   be my decision when it goes over or who takes it

12   over.  That's a supervisor's position.

13       Q   That's a supervisor?

14       A   Or state's attorney, State's Attorneys

15   Office might say:  Hey, we need this done or

16   whatever.

17       Q   But that wouldn't be the case

18   detectives' --

19       A   No.

20       Q   -- decision?

21       A   We don't make those decisions.

22       Q   So in your time as a case detective in

23   the violent crimes unit, did you ever pick up

24   the phone and call the crime lab and ask them to

1   look at evidence --

2       A   Sure.

3       Q   -- of one of your cases?

4       A   Yes.

5       Q   Were you familiar with the firearms

6   examiners over there in the Rockford lab?

7       A   I don't know "familiar."  I knew Jack

8   Welty, but I don't know what particular role

9   he played in it, but I knew him.  I have talked to

10  him before.

11      Q   So you said that you have picked up the

12  phone with ISP lab and said:  Can you review this

13  ballistics evidence?  You've done that in a case

14  before?

15      A   Not review it; I might have -- I might

16  have -- you know, maybe just for an example.

17  Maybe Sergeant Pirages said:  Hey, call over to

18  state crime lab and see if they were able to check

19  on that yet.  I might call and see, you know,

20  where they're at on it.  If they started, you

21  know, looking into it, if they come up with

22  anything, and then give that back to him.  But

23  for me to -- you know, no, I never:  "Hey, I need

24  you to do this and do that."

1      Q  You wouldn't have picked up the phone

2   without being asked to do so by Sergeant Pirages?

3      A  To have them investigate something?

4      Q  Uh-huh.

5      A  No.

6      Q  Okay.

7      A  But I might call to see if -- you know,

8   what they found out about it, you know, if they --

9   you know, have you done a ballistics test?  You

10  know, were you able to do that yet?  If you were

11  waiting for the results or whatever, you might

12  have seen, you know, where it's at.  Where they

13  do it at, you know, the only time I've ever had

14  anything to do with them was just down the street

15  here.  I would run it over there to a crime lab

16  here, but there's other crime labs.  So I don't

17  know if they send it out or, you know, no idea,

18  so.

19      Q  When evidence -- in your experience when

20  evidence went over to the crime lab, about how

21  long would it take for you to get some type of

22  opinion back?

23      A  No idea, it could be -- you know, it all

24  depends on how busy they are.

1      Q  How quick?  What's the quickest?

2      A  I don't know.

3      Q  Can you estimate what the quickest was?

4      A  Can I guess?

5      Q  Don't guess, but what is the quickest in

6   your experience?

7      A  It could be a couple days.  It could be,

8   you know, a month.  It could be longer than that.

9   You know, it all depends, what they've got to do,

10  what they're looking at, you know.  Once it's over

11  there, I don't have no say in how they do what

12  they do.  That's -- you know, that's a totally

13  different section there.

14     Q  As a detective in the violent crimes unit

15  in the early '90s, is it fair to say that you

16  interviewed hundreds of witnesses?

17     A  Yes.

18     Q  And was it your practice to ask witnesses

19  about motives they might have to falsely implicate

20  someone in a crime?

21         MR. IASPARRO:  All witnesses?

22         MS. TINGSTAD:  Yeah.

23     Q  I mean, would you ask -- if a witness was

24  implicating someone in a crime, would you probe

1    to find out if they had any motives to falsify

2    that information?

3        A   I might, depending on the situation.

4    You know, the last thing I want to do is arrest

5    somebody that isn't responsible.

6        Q   And you would make efforts to corroborate

7    facts that witnesses told you?

8        A   A lot of times, absolutely.

9        Q   And that would be just to probe the

10   credibility?

11       A   Well, that and the facts that you have,

12   sure.

13       Q   When you were interviewing witnesses, as

14   in the violent crimes unit, did you ever deny a

15   phone call to a witness?

16       A   Did I?  Not that I recall; it would have

17   to -- yeah, I don't know why.  You know, we didn't

18   just, you know:  Hey, I want to call my -- you

19   know, my mom.  And you're in the middle of an

20   investigation.  You might say:  Well, as soon as

21   we get done here, you can.  You know, it wasn't

22   like they're going to run in and out making calls

23   all day.  You know, but, no, it's depending on

24   what they wanted.

1    Q  And this would be a witness who is not in

2   custody.  You might say -- it's your testimony

3   that you might say:  You can make that call after

4   we're finished here?

5    A  Yeah.

6    Q  On what authority would you tell a witness

7   who wasn't in custody that they couldn't make a

8   phone call when they wanted to?

9    A  On what?

10    Q  On what authority?

11    MR. IASPARRO:  Object to form and

12   foundation.

13    THE WITNESS:  You're talking a witness.

14   If they didn't want to talk to me, they could go.

15   BY MS. TINGSTAD:

16    Q  Did you ever deny a phone call to a person

17   in custodial interrogation?

18    A  I don't recall ever -- I don't recall

19   anybody ever asking me to make a phone call during

20   an interview or interrogation, so.

21    Q  Never?

22    A  I don't know what else to tell you.

23    Q  Did you ever hear any other officers

24   deny a phone call to a person in custodial

1   interrogation?

2          MR. IASPARRO:  Form and foundation.

3          THE WITNESS:  No.

4   BY MS. TINGSTAD:

5      Q  Your answer is?

6      A  No, not that I know of.

7      Q  Did you ever threaten a witness that they

8   would never see their children again unless they

9   gave a statement?

10     A  No.

11     Q  Did you ever hear any other officers make

12  threats to that effect?

13     A  No.

14     Q  If an officer made that kind of threat,

15  would you consider that to be coercive?

16         MR. IASPARRO:  Objection; form and

17  foundation.

18         THE WITNESS:  If I heard somebody say

19  what?

20  BY MS. TINGSTAD:

21     Q  If you heard -- if you or another officer

22  would threaten a witness to say, "You'll never see

23  your children again if you don't give this, give a

24  statement," would you consider that to be

1    coercive?

2            MR. IASPARRO:  Object; form and

3    foundation; that calls for a legal conclusion.

4            THE WITNESS:  I don't know.

5    BY MS. TINGSTAD:

6        Q  You said you never threatened a witness --

7        A  No, I haven't.

8        Q  -- like that.  Why not?

9        A  Why would I?

10       Q  What would be the danger of threatening a

11   witness with that kind of a --

12           MR. IASPARRO:  Object to form and

13   foundation.

14           THE WITNESS:  We can do hypotheticals

15   all day.

16   BY MS. TINGSTAD:

17       Q  Uh-huh.

18       A  I never threatened anybody.  That's all I

19   can tell you.  You can come up with ten different

20   reasons saying:  You know, why haven't you or

21   did you?  I didn't.  So I don't know what else

22   you want me to say about that.

23       Q  So turning your attention to early

24   June 1993, at that time you didn't have any leads

1    in the -- or the police department didn't have

2    any leads in the Andrew Ascher murder, correct?

3        A  That's correct.

4        Q  Or in the First North bank robbery?

5        A  Correct.

6        Q  Are you aware of a shooting that took

7    place at Robert Poe's house on June 8th, 1993?

8        A  I am now, yes.

9        Q  Were you aware at that time about the

10   shooting?

11       A  Not that I recall.

12       MS. TINGSTAD:  Did someone just join the

13   deposition?

14       MR. PURSLEY:  Yes, Patrick Pursley.

15       THE REPORTER:  I'm sorry.  Can you speak

16   up, please.

17       MR. PURSLEY:  Patrick Pursley.

18   BY MS. TINGSTAD:

19       Q  So at the time you were aware of a

20   shooting, what did you know about that shooting?

21       MR. POTTINGER:  Objection; he said he

22   wasn't aware.

23       MR. IASPARRO:  Yeah, he said he wasn't.

24   BY MS. TINGSTAD:

1      Q  Oh, you said you weren't aware at the

2  time?

3      A  Right.

4      Q  Oh, okay.

5      A  Other officers were involved in that, not

6  me.

7      Q  Were you aware of a Crimestoppers call

8  that came in on June 8th, 1993, regarding the

9  Andrew Ascher murder?

10     A  Yes.

11     Q  What do you -- what did you learn about

12 that call?

13     A  I learned that Carmen from Crimestoppers

14 called the detective division and said that there

15 was a Crimestopper caller who had information on

16 the Andy Ascher murder.

17     Q  Are you giving me this information now

18 based on your review of reports or based on your

19 recollection?

20     A  Mainly the reports.

21     Q  Do you remember talking to Detective

22 Forrester around that time about the contents of

23 the Crimestopper call?

24     A  Well, I'm sure I did talk to him; but at

1    that time Detective Forrester and Detective Scott

2    took the information from that caller, and I

3    wasn't aware of any of that.  You know, we were

4    all doing our own cases.  And then he was

5    following up on different things involving that.

6    So, you know, I might have heard that the -- you

7    know, the crime -- you know, we might have all got

8    together and said that, you know, Crimestopper

9    called and gave this information; but I wasn't

10   involved in any of that.

11        Q  And would you have been briefed on the

12   information that the Crimestopper gave Detectives

13   Forrester and Scott the same day?

14        A  I don't know.

15        Q  The next day?

16        A  Possibly.

17        Q  Would you have been briefed on that

18   information before you met Samantha Crabtree on

19   June 10th?

20        A  Yeah, I'm sure.

21        Q  You would have known that information by

22   then?

23        A  Yeah, I'm sure.

24        Q  You were aware at this point, or do you

1    recall at this point whether the Crimestopper

2    caller was anonymous?

3        A  At that point I believe he was anonymous.

4    I don't believe he -- they asked if he would be

5    willing to come in and give a statement, and if

6    he'd be willing to testify.  And he said he wanted

7    to talk it over with his wife and they would let

8    him know later.  And it was probably, you know, a

9    week or a week and a half later that he actually

10   called in and came in and gave a statement.

11       Q  Now, at this point with just this

12   Crimestoppers call, just the anonymous

13   Crimestoppers call, you couldn't have gone to

14   the state's attorney at that point to charge

15   Patrick Pursley, could you?

16       MR. IASPARRO:  Object; form and

17   foundation; calls for speculation.

18   BY MS. TINGSTAD:

19       Q  You participated in charging

20   conversations, many charging conversations as

21   a violent crimes detective?

22       A  Are you asking --

23       Q  Uh-huh.

24       A  -- if I would have went to the state's

1    attorney's office with just the Crimestopper

2    information --

3        Q  Yes.

4        A  -- and want a complaint?

5        Q  Yes.

6        A  No.

7        Q  You needed more evidence?

8        A  Right.

9        Q  Did you learn anything about the weapon

10   that might have been used in the crime around that

11   time on June 8th or June 9th?

12       A  Such as?

13       Q  What kind of weapon it might have been?

14       A  Yes.

15       Q  What did you learn?

16       A  That it was a 9-millimeter.

17       Q  It was a 9-millimeter.  And how did you

18   learn that?

19       A  I believe Greg Hanson went to the

20   Bullet Stop Gun Shop and discovered that

21   Samantha Crabtree purchased a Taurus 9-millimeter

22   in February.  So that's --

23       Q  And so the working theory was that the

24   murder weapon could have been that Taurus --

1       MR. IASPARRO:  Object to form.

2   BY MS. TINGSTAD:

3       Q  -- at the time?  Is that what you're

4   saying, though?  You learned about -- did you

5   learn about a preliminary examination that was

6   done at the ISP crime lab on the same day --

7       MR. IASPARRO:  Which?

8   BY MS. TINGSTAD:

9       Q  -- regarding the bullets and shell casings

10  found at the scene?

11      A  I've since read it, but I didn't know it

12  then.

13      Q  You didn't know it then.  Did you talk

14  with Detective Forrester about what Greg Hanson

15  learned regarding the Taurus?

16      A  I'm sure we all did.

17      Q  You talked to Mr. Hanson about that?

18      A  I don't know if I talked to him

19  personally.  It might have been Sergeant Pirages

20  that got us together in reviewing everything that

21  we had up to that time.  I don't know.  I don't

22  recall.

23      Q  You don't recall.  And do you recall

24  that Detective Forrester prepared a warrant

1   request or a warrant petition for a search of

2   Patrick Pursley's apartment around that time?

3       A   Yes, he filled out an affidavit for a

4   search warrant.

5       Q   Did you assist with that process in any

6   way?

7       A   No.  Well, let me take that back.  To what

8   extent?

9       Q   Did you assist Detective Forrester in

10  drafting the affidavit or --

11      A   No.

12      Q   -- providing facts for --

13      A   No.

14      Q   -- the affidavit?

15      A   None of that, no.

16      Q   To what extent did you assist him?

17      A   We drove by her house and Detective Scott

18  had the search warrant.  And I was there when he

19  read her the search warrant and gave her a copy of

20  it.

21      Q   But in terms of the preparation of the

22  affidavit --

23      A   No.

24      Q   -- you --

1      A  Had nothing to do with it.

2      Q  -- didn't have any part of that?

3      A  No.

4      Q  Prior to or on June 10th, 1993, did you

5   obtain a copy of any written notes or report

6   detailing the allegations of the Crimestopper

7   caller?

8      A  I don't know if there was any report done

9   at that time yet.  It had just -- he had just

10  gotten it.  You're talking two days later.  So I

11  don't know if there was even a report done on it

12  yet.

13     Q  Or notes written about it?

14     A  Well, if there was notes, Detective Scott

15  and Detective Forrester would have had those.

16     Q  You weren't given a copy --

17     A  No.

18     Q  -- of notes?  What was your next

19  involvement in the case, or what was your

20  involvement in the case starting on June 10th,

21  1993?

22     A  At the beginning?

23     Q  Yes.

24     A  Sergeant Pirages assigned myself,

1    Detective Vincere -- Joe Vincere, Pat Girardi,

2    Viola, and Bruce Scott to set up surveillance

3    on 901 Ashland Avenue, Apartment Number Two.

4    And that was at 9:00 in the morning.

5        Q  And what did you observe during that

6    surveillance?

7        A  At -- I don't know what time it was -- at

8    1:15, I believe it was, something like that.

9    We observed Samantha Crabtree and Patrick Pursley

10   exit the east side second floor apartment and

11   walk out to Samantha's car, a 1984 Chevy

12   Celebrity.  And Samantha got in the driver's

13   side and Patrick Pursley got in the driver's --

14   or passenger side.

15       Q  You said you were assigned to conduct

16   surveillance.  What kind of vehicle were you in

17   for the surveillance?

18       A  I was in -- myself and Detective Vincere

19   was in a blue and gray van, unmarked.

20       Q  Unmarked van; and were there other officer

21   vehicles around conducting surveillance or --

22       A  Detective Scott was in a car, and he was

23   mobile in the area.  And Viola and Girardi were

24   also set up.  They were on Woodlawn watching.  And

1    we were on -- we were set up on Ashland watching.

2        Q   And where they were on Woodlawn, were they

3    also in an unmarked van?

4        A   They weren't in -- I believe they were in

5    an unmarked squad car.

6        Q   So you just pulled up to your surveillance

7    spots, and you sat there from 9:00 in the morning?

8        A   I did, yes.

9        Q   Yes?  And you stayed until 1:15

10   approximately before anything happened?

11       A   That's when they left.  That's when they

12   started driving.  We followed.  And when they --

13   following, we were told that they were in the

14   process of obtaining a warrant and a search

15   warrant.  So when they left, we called in and

16   asked:  "You know, what do you want us to do?

17   They're moving."

18           They said:  "Follow them and wait until

19   we can get uniformed officers to make a vehicle

20   stop."  So we called in and tried to get some

21   marked cars to make the vehicle stop.

22       Q   So when you observed Mr. Pursley and

23   Ms. Crabtree leaving 901 Ashland, was there anyone

24   with them?

1      A  You know, I don't know.  I don't -- I

2  cannot recall if --

3      Q  You don't recall if there were children?

4      A  Yeah, I do not recall if her -- you know,

5  if her kids came out with them, or if the kids

6  were already over there on Evergreen.  I just

7  don't recall that.

8      Q  It's possible that the kids were in the

9  car with Mr. Pursley and Ms. Crabtree?

10     A  Well, Detective Scott followed her.

11  She left at 11:00-something.  And he followed her

12  over onto 200 Hinkley.  And he thought that she

13  dropped off a child there, and then came back the

14  same way to the house.  But, like I said, I do not

15  recall.  I just -- I can't remember if she came

16  out with the two kids or -- I just don't recall.

17     Q  So was your unmarked van directly behind

18  the Celebrity as you started driving or was there

19  another car in between?

20     A  No, we would have -- as they left on

21  Ashland and got to Rockton, when they turned onto

22  Rockton going north, then we started following.

23  They were stopped at the light there at Rockton

24  and Auburn.  And then we ended up behind them

1   right there at the light, waiting for it.  And

2   we were still waiting for if they wanted us to

3   stop it or if, you know, what.  And they said to

4   wait until we got some uniformed marked squads

5   there to make the vehicle stop.  And the light

6   changed and she went, continued north on Rockton.

7   And as soon as she crossed the railroad tracks,

8   not very far, just a couple blocks, she turned

9   onto Yonge Street.  As soon as she hit Yonge

10  Street, she took off.  And, of course, we're

11  letting dispatch know the direction that they're

12  going, so the marked squads could come.

13          And there was barricades at Evergreen

14  and Yonge because Auburn Street was tore up.

15  So there was, like, a temporary stop sign on one

16  of the barricades there at that location.  She

17  ran the stop sign, turned left, going south onto

18  Evergreen, and pulled over in front of 1619

19  Evergreen.  And as soon as she stopped, the

20  passenger door opened up and Patrick Pursley took

21  off running.  And he ran up the driveway, across

22  the backyard over a fence with us chasing him.

23      Q  So when you viewed her turn left and park

24  in front of 1619 Evergreen, what -- were you

1  driving?

2        A   No, I was a passenger.

3        Q   So Detective Vincere was driving?

4        A   Detective Vincere was driving.

5        Q   He pulled over and --

6        A   (Witness nods head.)

7        Q   -- did both of you jump out of the van?

8        A   Yes.

9        Q   And you both took chase on foot?

10       A   That's correct.

11       Q   And where did you go?

12       A   Detective Vincere followed him across the

13  yard and over the fence.  I continued south to

14  come around in case he went that way.  Didn't know

15  where he was going to go to.  So, and by that time

16  now, other officers are converging on the area and

17  we're trying to seal off the area.  And then we

18  did a search of the area and could not locate him.

19       Q   And at that time when Mr. Pursley jumped

20  out of the van -- out of the car -- had you heard

21  that there was an arrest warrant --

22       A   Yes.

23       Q   -- issued?

24       A   We were notified of that.

1      Q  Prior to giving chase?

2      A  That's correct.

3      Q  How long were you chasing or on foot?  How

4  long were you looking for Mr. Pursley on foot?

5      A  It was over an hour.

6      Q  And how did that get called off?  How did

7  the foot search end?

8      A  Exhausted all areas that we could find,

9  you know, to look.  And we went back.  And at that

10  time Sergeant Pirages was there.  And Sergeant

11  Pirages assigned Detective Forrester and myself

12  to interview Samantha.

13      Q  Now, just backing up a minute, the

14  anonymous Crimestopper caller who turned out to be

15  a man named Marvin Windham; are you familiar with

16  that?

17      A  Uh-huh.

18      Q  He had given information about

19  Mr. Pursley's involvement in various crimes.

20  Had he already given information about

21  Sam Crabtree's involvement in crimes?

22      A  He said that she was there.

23      Q  He'd already said that to Detective

24  Forrester and Detective Scott?

1    A  Yeah, he said that she drove her car and

2  dropped him off.

3    Q  Dropped him off to do?

4    A  At the stolen car, take him to the --

5  he said that he asked Patrick Pursley, you know,

6  what Samantha did.  He said that she dropped him

7  off.  And he said, "You know, like she always

8  does" or "at that time."

9    Q  So the Crimestopper had implicated

10  Sam Crabtree in crimes?

11    A  Well, he said it was her gun that she had

12  purchased and --

13    Q  It was her gun that was used in the Ascher

14  homicide, is what he said?

15    A  He said that it was her gun that she had

16  purchased.  And he knew her name was Sam, but he

17  didn't know what her last name was.

18    Q  And the Crimestoppers caller also had said

19  that Sam served as a getaway driver for the

20  murder, correct?

21    A  I believe I -- that's what I recall.

22    Q  And that she was a getaway driver for a

23  bank robbery as well?

24    A  Well, she dropped him off, and then waited

1    for him to come back with the stolen car and get

2    in her car and go.

3        Q  And that's what the Crimestoppers caller

4    had said?  So at this point is Samantha Crabtree

5    also a suspect?

6        A  Well, we haven't talked to her yet.  You

7    know, I don't know.

8        Q  She'd been connected to a murder and an

9    armed robbery.  Being a getaway driver gives you

10   some criminal liability, doesn't it?

11       A  I don't know what she did yet.  We hadn't

12   talked to her.

13       Q  You just know what the anonymous crime --

14       A  We have an anonymous tip.  Don't know who

15   the guy is or what it's about.  So, you know, we

16   only have what he said.  So, you know, I don't

17   know what else to tell you from there.

18       Q  But Detective Forrester had written a

19   search warrant affidavit regarding these events

20   that included Sam Crabtree's involvement, correct?

21       A  I don't have no idea about the search

22   warrant.  I wasn't there.  In fact, when he was

23   doing that, I was sitting on Ashland Avenue.

24       Q  When Detective Pirages assigned you and

1    Detective Forrester to interview Sam Crabtree, you

2    were aware that she was suspected in these crimes

3    as well, weren't you?

4        A  Well, I don't know what knowledge she had

5    of them.  You know, she may have driven him to the

6    crime scenes and didn't know what he was doing.

7    We didn't know until we talked to her.

8        Q  So describe the scene a little bit after

9    you stopped the foot chase of Mr. Pursley.  You go

10   back to 1619 Evergreen.  How many police cars are

11   on the street at that point?

12       A  Couldn't tell you.  I don't know.  I don't

13   remember.

14       Q  Were there two?  Were there five?

15       A  Could have been.  Could have been two.

16       Q  More than two?

17       A  Could have been five.  I don't know.

18   My car was there.

19       Q  Your car was there.  The other unmarked

20   van was there?

21       A  There wasn't another van, I don't believe.

22       Q  Sergeant Pirages' car was there?

23       A  I'm sure his was.  Lieutenant Gambini's

24   car was there.

1      Q  Lieutenant Gambini's car; Detective

2  Scott's car?

3      A  Now, whether or not they were on that

4  street, I don't know.  They were, you know,

5  searching in the area.  I don't know who all was

6  right out there, so.

7      Q  And did Sergeant Pirages tell you and

8  Detective Forrester in person that you were

9  assigned to interview Sam Crabtree?

10      A  Yes.

11      Q  And what did he tell you at that point

12  about what he wanted you to interview her about?

13  Did he give you any details?

14      A  No.

15      Q  Did he give you a specific assignment?

16      A  No, just take her in and see if she'll

17  come down and talk to you.

18      Q  Did he say anything about the car, her

19  car?

20      A  No.  Detective Forrester did.  I don't

21  recall if Sergeant Pirages said anything.  I know

22  Detective Forrester asked her if it would be all

23  right if somebody else drives her car to the

24  public safety building.  And she said that would

1   be fine, and she handed Detective Forrester the

2   keys.  And I don't know who drove the car.  And

3   I don't know if -- I don't recall who actually

4   drove her car in.  And then he asked her when they

5   get it down there, would she consent to a search

6   of her vehicle?  And she said:  Yeah, that would

7   be fine.

8       Q  To locate us in time here, you and

9   Detective Vincere started following Sam Crabtree

10  at about 1:15 in the afternoon, correct?  Then

11  there is a foot chase that lasted about an hour?

12      A  (Witness nods head.)

13      Q  And you're reconvening at 1619 around

14  2:30 p.m.  Does that sound right?

15      A  Yeah, 2:40, somewhere in that area; what

16  we did is, we went -- Detective Scott had the

17  search warrant.  And so we asked -- Lieutenant

18  Gambini was driving.  Myself and Detective

19  Forrester and Samantha were in his car.  And

20  we were on our way in.

21      Q  Wait, pause.  Let's back up for a minute.

22  We're not in the car yet.  When Sergeant Pirages

23  asked you and Detective Forrester to interview

24  Sam Crabtree, where was Sam Crabtree?

1      A  Sitting on the front porch with Mira -- is

2   it Foster -- Mira Foster, I think.

3      Q  And who was Mira Foster?

4      A  She is Patrick Pursley's -- her daughter

5   has a son with Patrick Pursley.  So her grandson

6   is -- Patrick Pursley is the father and -- of her

7   daughter's kid.

8      Q  And as Sam Crabtree is sitting on this

9   porch with Mira Foster, did you see any kids

10  around?

11     A  Not that I recall.

12     Q  And what are Sam and Mira doing on the

13  porch as you approach?

14     A  Sitting there.

15     Q  Just sitting there?  Were they sitting on

16  the steps?  Were they sitting on a chair?  Do you

17  remember?

18     A  I don't recall.

19     Q  And what transpired there on the porch,

20  if you can describe for me?

21     A  We asked her if she would come down and

22  talk to us about Patrick Pursley, and she said

23  she would.

24     Q  So Detective Forrester asked or did you

1    ask her?

2        A  Detective Forrester.

3        Q  He asked her.  And what did she -- she

4    said "yes"?

5        A  Right.

6        Q  Did she say anything else?

7        A  Her kids were there.  I don't know if

8    three of them or two of them, but Mira Foster

9    at that time said she would watch the kids until

10   she gets back.  And she said that would be fine.

11       Then Detective Forrester asked her about,

12   if it would be okay if somebody else drove her

13   car in.  And she said "yes," and gave Detective

14   Forrester the keys.  Who drove it in, I don't

15   recall if it was Detective Hanson, or I don't know

16   for sure who it was that called them in -- or

17   drove that in.

18       Q  Did Sam ask you how long you wanted her to

19   come with -- how long it would be that she would

20   be coming with you?

21       A  No.

22       Q  Did she say -- she didn't say, "How long

23   is this going to take?"

24       A  No, I wouldn't have known.

1      Q  You don't recall her asking that?

2      A  No, she didn't ask that.  I'm saying,

3  I wouldn't have known how long it was going to

4  take, so.

5      Q  And did she ask if she could hug her

6  children before --

7      A  I don't recall.

8      Q  -- she went with you?

9      A  I don't recall that.  It's twenty -- it

10  was a long time ago.  I just don't recall it.

11  I don't remember seeing them.  So I wouldn't know

12  if she did that or not.  If they would have been

13  there and she would have asked us, then we would

14  say, "Certainly," you know.

15      Q  Did she ask whether or not she was going

16  to be coming back that night?

17      A  Not that I recall, no.

18      Q  You don't recall her asking any questions

19  at that point on the porch?

20      A  Huh-uh, no.

21      Q  And how did she get to the PSB?

22      A  Lieutenant Gambini drove.  And myself and

23  Samantha and Howard were in the car with

24  Lieutenant Gambini.

1     Q   So Lieutenant Gambini was in the front

2   seat.  Detective Forrester was riding shotgun?

3     A   I believe he was in the passenger front

4   seat.  And me and Samantha were in the back seat.

5     Q   And what was her demeanor like during that

6   ride to the PSB?

7     A   Fine.

8     Q   What does "fine" mean?

9     A   Kind of like what you are right now.

10    Q   Did you have any conversation with her as

11  you drove her to the PSB?

12    A   No.  In fact, while we were driving,

13  that's when they asked us if we could stop by

14  her house because Detective Scott had the search

15  warrant, and he wanted to read her that and give

16  her a copy of it.  So it's right on the way.

17  We stopped at her house.  And when we got there,

18  Detective Scott read her a copy of the search

19  warrant and then gave her, her copy.  And then

20  she gave him the keys to the apartment.

21    Q   Were you -- where were you when Detective

22  Scott read her the search warrant?

23    A   In the car.

24    Q   You were still sitting in the car?

1      A  Yes.

2      Q  Was Ms. Crabtree still in the car as well?

3      A  I believe she was, yes.

4      Q  So Detective Scott brought the search

5   warrant over to the car and she signed it there?

6      A  That's -- yes.  I don't know if she signed

7   it.  I don't recall if she signed it, but it was

8   read to her.  And then she was given a copy of it,

9   and then she gave Detective Scott the keys to her

10  apartment.

11     Q  And at this time you were still in the

12  back seat with Ms. Crabtree.  And were Lieutenant

13  Gambini and Detective Forrester still in the car

14  as well?

15     A  Yes.

16     Q  So do you remember approximately what time

17  that occurred?  Does 2:43 p.m. sound --

18     A  Yes.

19     Q  -- right to you?  So what did you do next?

20  Did you -- what did you do next?

21     A  They asked her where the guns were

22  located.

23     Q  Did they go into her apartment first or

24  did they ask her immediately after --

1      A   No, I think she -- she told them where

2   the guns were located.  So then they went in and

3   they searched and they found one gun, but they

4   couldn't find the other one.  And so they came

5   back out and they asked Samantha if she had any

6   other idea where that gun might be.  And so

7   Samantha said that she'd show them where she

8   last seen it.  So she went back up into her

9   apartment with them, and, I'm assuming, pointed

10  out where the gun was.  I don't know.  I wasn't

11  in there, so.

12     Q   So let's rewind for a second.  First,

13  Detective Scott read her the search warrant.

14  Then who asked Ms. Crabtree where the guns were?

15     A   I'm not sure.  I would imagine it was

16  Detective Scott.  You know, I'm not sure if -- you

17  know, if they were looking, they couldn't find

18  them and came out; or I'm not sure how that -- all

19  I know is that they found one gun.  And she went

20  up and helped them find the other one.

21     Q   Did you hear the conversation where

22  Detective Scott said, "Where are your guns?"

23  And what answer did she give?

24     A   I don't know what she explained to them,

1    you know, where they were located at.

2        Q   Were you sitting right there next to her?

3        A   I might have been out of the car standing

4    by the car, and she might have gotten out right

5    there and was talking to them.  I don't know.

6    We were all right there.  So whatever was said,

7    I'm sure -- I just don't recall it.

8        Q   You don't recall where she said her guns

9    were located --

10       A   Right.

11       Q   -- to Detective Scott?

12       A   Right.  They were doing a search warrant

13   and had nothing to do with that, so.  I just don't

14   recall what she said to them, where they were at

15   or anything about it.

16       Q   You just recall that Detective Scott asked

17   her, "Where are your guns?"  And she gave an

18   answer, but you don't recall what the answer was.

19   Is that your testimony?

20       A   As much as I can recall about it, that's

21   what I remember.  I don't know if it's from the

22   report; or, you know, like I said, you know, it's

23   either in the report or I don't know.

24       Q   Or your recollection?

1       A   Right.

2       Q   At this time how many squad cars are on

3   the street, would you -- would you --

4       A   At her house?

5       Q   Yes.

6       A   Ours, and I'm sure -- I don't know how

7   many were doubled up.  Detective Scott would have

8   had his car there.  I believe Detectives Ekedahl

9   and Hanson were there.  Jeff Houde would have

10  had his ID vehicle there.  I believe Lon

11  Christenson from the FBI was also there.  So

12  I'm assuming his vehicle was there.  Other than

13  that, I don't know if Ekedahl and Hanson came in

14  one car.  I don't know who was in what car, but

15  it could have been probably four or five cars.

16      Q   And your recollection is that the officers

17  executing the search warrant went into the

18  apartment.  They had to go upstairs, correct?

19  Do you remember that?

20      A   It was an upstairs apartment, so.

21      Q   And you waited outside with Sam Crabtree?

22      A   Yes.

23      Q   Were you standing -- standing outside at

24  this time or were you sitting in the car?

1      A   While I could have been standing out

2  talking to somebody, or, you know, I don't know.

3  I just don't recall.

4      Q   Why were you waiting there at that point?

5      A   Well, I would imagine to -- in case there

6  was a problem with trying to locate anything.

7  You know, they went in and she gave them the keys.

8  And they went in and searched the place.  And they

9  came out and I just remember somebody saying that

10  they found one of the guns, but they couldn't find

11  the other one.

12      Q   Do you remember if they named the gun that

13  was found?

14      A   No.

15      Q   They didn't say they found a particular

16  brand of gun?  They couldn't --

17      A   They would have known, but -- you know,

18  I'm assuming they would have known, whoever was

19  searching for them, but I didn't.

20      Q   Do you remember who came down and told

21  Sam that they only found one gun?

22      A   I think -- I'm not sure.  I'm assuming it

23  was Detective Scott, but it could have been

24  somebody else.  I don't know.

1      Q  You don't -- can't remember?

2      A  Could have been any one of them that -- it

3   wouldn't have been Houde, you know, from ID.

4   So it would have been one of the other detectives

5   or Scott.  I'm assuming it was Scott, but I don't

6   -- personally I just can't recall.

7      Q  At this point Sam goes upstairs into the

8   apartment.

9      A  Yes.

10     Q  Did you accompany her?

11     A  No.

12     Q  Did any of the officers in the squad car

13  with you accompany her?

14     A  No.

15     Q  So she went upstairs with --

16     A  One of the officers that were -- that's

17  why I think it was Detective Scott, but I can't

18  be positive of it.

19     Q  So how long was she upstairs, would you

20  estimate?

21     A  Not very long, I don't know.  I don't

22  know, five, ten minutes.

23     Q  And when she returned downstairs, did she

24  come down with a detective?

1        A   Sure.

2        Q   Was that Detective Scott?

3        A   Could have been.

4        Q   But you don't recall exactly?

5        A   No, I don't recall.

6        Q   And --

7        A   Could have been two detectives who walked

8    her down.  I don't know.

9        Q   What, if anything, do you recall Detective

10   Scott -- or whoever was -- whichever detective it

11   was -- and Sam saying at that point when she came

12   downstairs?

13       A   Nothing.

14       Q   You don't recall any type of conversation

15   about the search that was taking place?

16       A   No.

17       Q   Did Sam say anything about not knowing

18   where her gun was?

19       A   No.  In fact, that's why -- the best I

20   can recollect, she told him where the guns were

21   located.  Then they looked and they found one,

22   but they couldn't find another one.  And I don't

23   know how that all came about or, you know, which

24   one they found or, you know, what it was.  And

1    then they came down and asked her if she would

2    show them where the other one -- you know, where

3    she had last seen it.  And she said, "Sure," and

4    she went up and took them up there.

5         Q  And you don't know what happened after

6    that?

7         A  No, she was in the house.  I --

8         Q  You never asked her about that when she

9    got back --

10        A  No.

11        Q  -- to the vehicle?

12        A  (Witness shakes head.)

13        Q  So when she got back to the vehicle what

14   happened next?

15        A  We continued on to the public safety

16   building.

17        Q  And it was Lieutenant Gambini --

18        A  Driving.

19        Q  -- Detective Forrester, you in the back,

20   Sam Crabtree?

21        A  That's correct.

22        Q  The four of you; did she understand why

23   you were taking her to the police station?

24        A  Yes.

1    Q  You told her you wanted to take her there

2  to ask her some questions?

3    A  We told her we wanted to talk to her about

4  Patrick Pursley.

5    Q  You told her that on the porch, that you

6  wanted to talk about Patrick Pursley?

7    A  Yeah.

8    Q  Was there any reason why you couldn't ask

9  her questions about Patrick Pursley at Mira

10  Foster's house?

11    A  Because we wanted to interview her on

12  these -- on this information.

13    Q  Was there any reason why you couldn't

14  interview her at Mira Foster's house?

15    A  It's a little distracting.  That, and my

16  sergeant said, "See if she'll go with you to the

17  public safety building and talk to you."

18    Q  What if she had said "no" on the porch?

19  What if she had said, "I don't" --

20      MR. IASPARRO:  Objection; let you finish

21  your question.

22  BY MS. TINGSTAD:

23    Q  What if she said, "I don't want to go

24  with you"?

1          MR. IASPARRO:  I object to foundation and

2    calls for speculation.

3    BY MS. TINGSTAD:

4       Q  You're a police officer.  What would you

5    have done if she had not agreed to go to the

6    station with you?

7          MR. IASPARRO:  Same objection.

8          THE WITNESS:  I would have looked at

9    Sergeant Pirages and said, "What do you want to

10   do," to be honest with you.

11   BY MS. TINGSTAD:

12      Q  Where did Sergeant Pirages go after

13   Mira Foster's house?

14      A  I don't know.  He might have gone to the

15   house.  He might have been -- in fact, I think

16   he was there with the search warrant, when they

17   did the search warrant.  Is that right?

18      Q  Yes, I see that, according to Detective

19   Scott's report.

20      A  I couldn't remember who all was --

21   Ekedahl; Girardi might have even been there.

22   I'm not sure.

23      Q  So as you drove from 901 Ashland to the

24   PSB, do you recall having any conversations with

1    Ms. Crabtree at that point?

2        A  No.

3        Q  Do you recall the other detectives in the

4    car having any conversations about the search

5    warrant?

6        A  No.

7        Q  Was it a silent ride?

8        A  Pretty much, it's only a few blocks.

9        Q  Did you tell Sam Crabtree on the porch

10   before she got in the car with you -- did you

11   tell her that you were going to take her to

12   her apartment --

13       A  We didn't know.

14       Q  -- because there was a search warrant?

15       A  We were going to take her to the public

16   safety building.  And that's when they asked if

17   we could swing by there, so they could serve her

18   with a copy of the search warrant.

19       Q  So she wasn't aware that that's where you

20   were going to go first?

21       A  I wasn't aware of it, so, no.

22       Q  Neither of you were aware of it.  When

23   you became aware of it, did you tell Ms. Crabtree,

24   "We're going to go by your apartment"?

1      A  They asked her if it would be all right

2  and she said, "Sure."  We informed her that, you

3  know, "They have a search warrant for your house;

4  is it all right if we stop by there on the way

5  into the station?"  She said, "Yeah."

6      Q  Did anybody tell Ms. Crabtree at that time

7  that she wasn't required to comply with the search

8  warrant immediately?

9          MR. IASPARRO:  The search warrant?

10         THE WITNESS:  Well, you know, we wouldn't

11  have had to stop by there and get her car -- or

12  her house keys.  They could have kicked the door

13  in.  He had a valid search warrant.  It wasn't

14  like she had a choice of -- they're going to

15  execute the search warrant or not.

16  BY MS. TINGSTAD:

17     Q  She didn't have a choice?

18     A  No, it's a search warrant issued by a

19  judge.

20     Q  So you said that you were at the apartment

21  for how long approximately before you headed to

22  the PSB?

23     A  The warrant was read to her at 2:43, I

24  believe; and we were at the PSB at 3:15.  So, you

1    know, the driving time, it's all so close.  You

2    know, you're only talking blocks.  So, you know,

3    it's -- by the time they looked, and then she went

4    up and came down, you know, I don't know if it

5    could have been ten, you know, five to 15 minutes,

6    you know, not a long time.

7         Q  So you arrive at the public safety

8    building at 3:15 p.m.  And what did you do next?

9         A  Samantha Crabtree was taken to one of the

10   interview rooms in the detective division.

11        Q  What is the interview room like?

12        A  It's a small room with plain walls; had a

13   table and three chairs.

14        Q  Did it have any windows?

15        A  No.

16        Q  How small -- can you give me approximate

17   dimensions?

18        A  God, it's been a long time, maybe 5 or

19   6 X 7, somewhere in that area.  I'm not sure.

20   It's -- they're just a small interview room,

21   8 X 7 X 9.  You know, they're not -- they're not

22   huge rooms.

23        Q  And when you got to the PSB and you placed

24   her in an interview room, what was her demeanor

1   like at that point?

2       A   She was fine.

3       Q   Did she use the restroom or anything?

4       A   I don't recall if -- you know, when she

5   used it.  Anytime she asked to use the restroom,

6   it was right -- right by the interview room.  She

7   was allowed to go to the bathroom.

8       Q   So at that point who was in the interview

9   room with Sam?

10      A   Well, it would have been Detective

11  Forrester, me and Sam.

12      Q   So three people?

13      A   Right.

14      Q   Do you recall how you started asking

15  questions of her at this point?

16      A   Yes.

17      Q   Do you recall who started asking the

18  questions?

19      A   Detective Forrester was talking to her.

20  I was just sitting in there.  Detective Forrester

21  was at the table with her.  Samantha would have

22  been sitting there and they were talking.

23      Q   Did anybody have a note pad and pen?

24  Do you recall anybody -- either you or Detective

1    Forrester taking notes?

2        A   Absolutely, I'm sure.

3        Q   Were you taking notes?

4        A   I don't recall if I did or if Howard was

5    taking them.  He was the one -- he had the

6    information from the Crimestopper and all the

7    other stuff.  So, you know, he -- I would assume

8    that he was probably taking all the notes.

9        Q   During this part of the interview, were

10   you -- did you stay in the room the entire time?

11       A   During the -- yeah.

12       Q   This, between 3:15 --

13       A   And 5:00?

14       Q   And 5:00?

15       A   Yes.

16       Q   You stayed in the whole time?

17       A   Right.

18       Q   And what do you remember about what

19   Detective Forrester was asking Sam at the time?

20       A   At that time he was just asking her

21   general information.  He was asking her, you know,

22   about Patrick Pursley, when they met, how long

23   they lived together, where they lived at, height,

24   weight, general information like that.  Talked to

1   her about just general stuff.  And then I know

2   he asked her about, you know, either one of them

3   had a drug problem.  She said that, you know, she

4   didn't use cocaine, but she did use marijuana; but

5   Patrick used cocaine, things to that extent.

6   It was, you know, just descriptions and what

7   she knew about Patrick.

8       Q  When Detective Scott -- skipping back

9   to the search warrant being read to her; when

10  Detective Scott was reading her the search

11  warrant, did -- was she advised of the charges

12  or the charge -- the allegations against

13  Mr. Pursley at the time?  Did she know why the

14  search warrant was issued?

15      A  I -- I don't know.

16      Q  Did Detective Scott say anything about:

17  This search warrant is pursuant to an

18  investigation into the death of Andrew Ascher?

19      A  I don't recall what Detective Scott said

20  to her.

21      Q  Did Detective Forrester tell Sam why he

22  was asking her questions about Mr. Pursley?

23      A  Well, at that time we had a warrant for

24  him for another incident.  You know, I'm sure he

1   asked, you know, about her guns; asked her if,

2   you know -- when she got those; and if anybody

3   handled those guns, you know, who?  Asked her who

4   might have handled those guns.  And she said

5   the only persons that would have touched those

6   guns were her or Patrick.  And --

7       Q  She didn't say anything about lending the

8   gun to Marvin Windham?

9       A  No.

10      Q  Or lending the gun to Lester Brown?

11      A  At that time we didn't even know who

12  Marvin Windham was.

13          MR. IASPARRO:  Fair point.

14  BY MS. TINGSTAD:

15      Q  Fair point; she didn't mention Marvin

16  Windham's name in that initial interview?

17      A  No.

18      Q  What else did Detective Forrester talk

19  with -- talk about with Sam Crabtree during that

20  first hour and 45 minutes?

21      A  You want to give me his report?  I can

22  review it, but I don't recall the --

23      Q  You don't recall if he told her that

24  Mr. Pursley was wanted for murder?

1     A  That he was wanted for murder?  No, he

2  wouldn't have said that because he wasn't at

3  that point.

4     Q  Would he have -- do you recall if

5  he told Samantha Crabtree that Patrick Pursley was

6  a suspect in a murder?

7     A  I don't recall if he did at that time or

8  not, or if it was the second interview.  I'd have

9  to see his report to --

10     Q  Mr. Schmidt --

11     A  I'm going off of his report from 27 years

12  ago, so.

13     Q  Mr. Schmidt, you didn't draft a report

14  about your investigative activities from this day,

15  June 10th, 1993?

16     A  No, Howard did.

17     Q  And it's your testimony that Detective

18  Forrester's report covered all of your activities?

19     A  Yes.

20     Q  And so, therefore, you weren't required to

21  write your own report about June 10th, 1993?

22     A  That's correct.  Well, I did reports on

23  June 10th from the surveillance and stuff; but

24  I didn't -- or excuse me.  Joe Vincere's report

1  covered me and him setting up on that

2  surveillance.  And then I don't recall anything --

3  Detective Forrester's report covers me in what

4  we did from the time we got to the public safety

5  building while -- from going from the porch to

6  the public safety building and on.

7     Q  Would you have had a conversation with

8  Detective Forrester about which one of you was

9  going to write the report about -- regarding these

10 activities of June 10th?

11    A  Probably not, it was his case.  So, you

12 know, he's the one that had the Crimestopper

13 information.  He's the one that obtained the

14 search warrant.  He's the one that obtained the

15 arrest warrant for Woodlawn.  He's the one that

16 got the warrant for Samantha.  So, now it was

17 pretty much his report.

18    Q  So during that first conversation in --

19 between 3:15 and 5:00 p.m., did you ask any

20 questions?

21    A  I don't think so.

22    Q  You just sat there silently?

23    A  I listened, yes.  I could have

24 interjected, you know, if -- if he's talking

1    about something and I remembered something, I

2    might have said something.  You know, I just --

3    I don't recall offhand what it would have been.

4        Q  Was it unusual for two detectives to

5    interview a witness?

6        A  No.

7        Q  That was a normal practice?

8        A  Yes.

9        Q  At this point did you consider

10   Sam Crabtree to be a witness or did -- did you

11   consider her to be a suspect?

12       A  Could have been both.

13       Q  And at this time that she's sitting in

14   the interview room at the PSB, her car was in the

15   station, having been driven there by a different

16   officer?

17       A  Yes.

18       Q  Right?  And she consented to a search of

19   that car?

20       A  Yes.

21       Q  At this point she couldn't just drive away

22   in that car, could she?

23       A  I don't know how to -- a car didn't do

24   nothing, so, you know.

1      Q  Could she have asked for her car back and

2  just driven home at that point?

3      A  Well, probably not.

4      Q  Why not?

5      A  Because we were talking to her, and

6  she never asked.  So, you know, again, these are

7  hypotheticals.  What if?  You know, would have,

8  could have, should have.  You know, it never came

9  up.

10     Q  At that point you weren't going to let her

11  leave, were you?

12     A  It never came up.  It wouldn't have been

13  my call anyway.

14     Q  During this hour and 45 minutes, did she

15  eat anything?

16     A  She was offered.  She didn't want anything

17  to eat.  She just wanted to smoke.

18     Q  Was she smoking in that room?

19     A  Yes.

20     Q  Did she drink anything?

21     A  Yes, she did.  She had two cans of pop and

22  some water.

23     Q  During this time did she say anything

24  about her children?  Did she worry about her

1    children?

2         A   At which time?

3         Q   During this time between 3:15 and 5:00?

4         A   No.

5         Q   Was Sam asked about her whereabouts on

6    April 2nd, 1993, during this time frame?

7         A   I'd have to look at his report.

8         Q   Let's mark that.

9             (Discussion off the record commencing at

10   2:39 p.m. and concluding at 2:40 p.m.)

11            MR. IASPARRO:  Ashley, before we jump

12   into this, can we take a two-minute bathroom

13   break?

14            MS. TINGSTAD:  Sure.

15            (A brief recess was taken commencing at

16   2:40 p.m. and concluding at 2:41 p.m.)

17            (Discussion off the record commencing at

18   2:41 p.m. and concluding at 2:42 p.m.)

19            (Exhibit 3 was marked for identification.)

20            (Discussion off the record commencing at

21   2:42 p.m. and concluding at 2:44 p.m.)

22            (A brief recess was taken commencing at

23   2:44 p.m. and concluding at 2:50 p.m.)

24            (Exhibit 3 was re-marked for

1    identification.)

2         MS. TINGSTAD:  All right.  We can go back

3    on the record.

4         Q  For the record, we've marked as Schmidt 3,

5    a police report with a Bates number RFD Defense

6    107 through RFD Defense 121.  Before we get into

7    this report, I have a few other questions about

8    what was going on at the PSB after you arrived at

9    3:15 p.m.

10        So once you arrived at the PSB at

11   3:15 p.m., did both you and Detective Forrester

12   walk with Sam into the building?

13        A  Yes.

14        Q  Did you go straight to an interview room?

15        A  We went into the detective division, and

16   then she was seated in an interview room.

17        Q  And at that time did you leave her in

18   the interview room for a while before you started

19   questioning her?

20        A  I don't recall.

21        Q  You don't recall if Ms. Crabtree was

22   placed in the detect- -- in the interview room

23   and the door was closed while you and Detective

24   Forrester did something else?

1      A   Could have been.

2      Q   Would you have had to gather your

3  documents and your note pads and things like that

4  in preparation for the interview?

5      A   Would we have left them in there?

6      Q   Or did you have to go gather them?

7      A   I don't know if we had any, to be honest

8  with you.

9      Q   It's possible that Sam -- that you might

10  have left Ms. Crabtree waiting in the interview

11  room for some time before --

12      A   No.

13      Q   -- you began the interview?

14      A   No, we wouldn't have left her in the

15  interview room and gone off and done something,

16  no.

17      Q   Could she have been waiting in the

18  interview room for some period of time?

19      A   I'm pretty sure that we were -- one of us

20  was always there.  Like, if Howard is talking to

21  her and she wanted a pop, I might have went and

22  been the one that went and got the pop.  If she

23  asked to use the restroom, you know, one of us

24  would have just walked her around the corner there

1    to the bathroom, you know, that kind of stuff.

2    But as far as just leaving her in this room by

3    herself, no, it wouldn't have happened.

4        Q  You're certain that that wouldn't have

5    happened?

6        A  Not -- not that I recall.

7        Q  Or you just don't remember that it

8    happened, whether it happened or not?

9        A  I can't imagine doing that, so.

10       Q  Why not?

11       A  Huh?

12       Q  Why not?

13       A  Why would I leave somebody in the room by

14   themselves?  You know, if we stepped outside to

15   talk, you know, that could have been, you know,

16   to -- you know, for whatever reason; but not to

17   leave her and then walk away and do something and

18   leave her in there for 10, 15, 20 minutes by

19   herself.

20       Q  And you mentioned that if she needed to go

21   to the restroom, one of you would have walked out

22   and accompanied her to the restroom?

23       A  Yeah.

24       Q  Why would you accompany her to the

1  restroom?

2      A  Show her where it was at.  It's just a

3  couple doors down.

4      Q  Would you wait outside the restroom until

5  she finished?

6      A  Well, I wouldn't stand right at the door,

7  but I'd be where I could see.

8      Q  And why would you be waiting where you

9  could see?

10     A  Because I'm waiting to interview her.

11     Q  You're -- so you want to make sure that

12  she goes back into the interview room after she

13  uses the restroom?

14     A  Right.  Doesn't turn and go the wrong way

15  into the evidence room or, you know, which was

16  right next door to the bathroom, whatever.

17     Q  Or that she doesn't turn and walk out of

18  the building?

19     A  Yeah.

20     Q  So you testified that the first part of

21  the interview went from about 3:15 p.m. to

22  5:00 p.m.?

23     A  Right.

24     Q  An hour and 45 minutes; during that time,

1  was there ever a moment that any other detective

2  came and knocked on the door and had a message for

3  you and/or Detective Forrester?

4      A  I don't recall.

5      Q  Did you receive any information about the

6  results of the search of 901 Ashland during that

7  first hour and 45 minutes?

8      A  Did I receive results of it?  No, not

9  that I -- I don't know what you mean by that.

10     Q  Did anyone give you information about what

11  had been found at 901 Ashland?

12     A  Not while we were interviewing her.

13     Q  So at 5:00 p.m. -- actually, let's look at

14  Exhibit 3.  Do you recognize Exhibit 3?

15     A  Uh-huh.

16     Q  What is it?

17     A  It's Officer Forrester's report.

18     Q  This report at the very top has a start

19  date of June 8th, 1993?

20     A  Yes.

21     Q  1:50 p.m., 13:50 p.m.?

22     A  Yes.

23     Q  Yeah.  And at the bottom it has a date of

24  June 18th, 1993 --

1    A  Yes.

2    Q  -- in Box 379?  And that would be the day

3  that Detective or Sergeant Pirages signed off on

4  it, correct?

5    A  That's correct.  Excuse me.

6    Q  So Detective Forrester in this report

7  starting on page six, and going through page nine,

8  details or describes the contents of the interview

9  with Sam Crabtreen between 3:15 p.m. and 5:00 p.m.?

10    A  That's correct.

11    Q  You testified to Detective Forrester,

12  talking about asking her general information about

13  she and Mr. Pursley?

14    A  Yes.

15    Q  Do you also recall Detective Forrester

16  asking Ms. Crabtree about a guy named Tramp?

17    A  Yes.

18    Q  Do you recall that Detective Forrester

19  showed Ms. Crabtree photos --

20    A  Of the bank robbery?

21    Q  -- of the bank robbery?

22    A  Yes.

23    Q  Do you recall -- at the top of page eight,

24  do you recall Detective Forrester talking with

1   Samantha about buying another gun?

2        A   Yes.

3        Q   From your recollection of this interview,

4   do you understand why Detective Forrester would

5   have written:  "She also bought another gun"?

6        A   Well, probably because she bought two

7   guns; and we had the bill of sales from the

8   Bullet Stop.  Well, we didn't have about the

9   second gun, but I would imagine that that one

10  came from the fact that there was two guns at

11  her apartment when they executed the search

12  warrant.

13       Q   I'm just going to read this first part of

14  the paragraph at the top of page eight:

15          "Samantha stated that she also bought

16  another gun.  She stated that it was a Beretta

17  9-millimeter, 16-shot, model 92F, and it was black

18  with black grips.  She stated that she had $200

19  and Patrick gave her the other 320 she needed to

20  get the gun.  Samantha was asked about any other

21  guns they may have.  She stated that she has

22  another 9-millimeter.  She stated that it is a

23  Taurus 9-millimeter, 16-shot, that it (sic) has

24  brown wood grips on a black gun."

1          THE REPORTER:  I'm sorry, brown wood

2    grips?

3          MS. TINGSTAD:  On a black gun.

4          THE REPORTER:  Brown grips on a black gun?

5          MS. TINGSTAD:  Uh-huh.

6          MR. IASPARRO:  Wood, brown wood.

7          MS. TINGSTAD:  Brown wood grips on a

8    black gun.

9      Q  Do you remember that part of the

10   conversation?

11     A  Uh-huh, yes.

12     Q  Do you -- Samantha first talked about the

13   Beretta, and then she was asked about any other

14   guns.  And then she said she had another one?

15     A  Right.

16     Q  At that point in the interview did

17   Detective Forrester ask Sam about the gun that --

18   that the detectives weren't able to locate in

19   her apartment?

20     A  They located both guns in her apartment.

21     Q  They hadn't located the second gun?

22     A  They located that before we ever left

23   there.  That's what they took her up for, to look

24   for the other gun.  Are you talking about during

1    the search warrant?

2        Q   Yes.

3        A   Yeah, both guns were recovered.

4        Q   You testified earlier, and I think you

5    were referring to Detective Forrester's report,

6    top of page six.  In the middle of the paragraph

7    at the top of page six, it says:  "The detectives

8    came down a short time later and stated they had

9    located one of the 9-millimeters but could not

10   locate the other.  Samantha then agreed to go up

11   and point out where she had last seen the other

12   gun."

13       A   Yes.

14       Q   "She then came back down."  This report

15   doesn't say that the other gun was located at

16   that time.

17       A   What does the search warrant report say?

18       Q   What makes you believe that the other gun

19   was located at that time when Sam went upstairs?

20       A   The ID officer collected it.  The FBI

21   agent was there, four other detectives; and they

22   recovered two guns.

23       Q   So the ID officer collected it.  Do you

24   know whether the ID officer collected it at the

1    time that Samantha went upstairs?

2        A  I couldn't tell you.  I wasn't up there.

3        Q  So you don't know whether or not she

4    showed them where she had last seen the gun or

5    whether she showed them where the gun was at that

6    time?

7        A  You'd have to ask them.  I don't know.

8    I wasn't there.

9        Q  Okay.  Back to page eight, in that same

10   paragraph, the first full paragraph on page eight;

11   do you recall Samantha talking about storing the

12   Taurus under her waterbed mattress?

13       A  Storing it?

14       Q  Yes, or placing it under her water --

15       A  Yeah.  To hide it from -- she said that

16   she didn't tell Patrick about it for a couple

17   weeks, or whatever she said here, until he found

18   it under the water mattress.  For the first two

19   weeks she didn't tell him that she had the gun,

20   and then she told him after he found it under the

21   waterbed mattress.

22       Q  So Samantha was asked about her guns.

23   And then she was asked if she had any knowledge of

24   Patrick being involved in a murder of a white male

1    on the east side?

2        A  Yes.

3        Q  And her response was, she heard about the

4    murder from a friend, Jill Deadmond?

5        A  That's correct.

6            (Whereupon, there was a brief

7    interruption.)

8    BY MS. TINGSTAD:

9        Q  Do you recall Detective Forrester's

10   conversation with Ms. Crabtree at this point about

11   how -- whether she knew about the murder of

12   Andy Ascher?  Do you recall that?

13       A  Yeah.

14       Q  Do you recall whether Ms. Crabtree said

15   that when she was asked about Patrick's

16   whereabouts on that evening, do you recall her

17   saying, "We were probably at home"?

18       A  That she said she was at home?

19       Q  Yes.

20       A  No, no, she said Patrick wasn't at the

21   house during that time.

22       Q  So she didn't say at first -- when she was

23   first asked, she didn't say, "We were probably at

24   home"?

1      A   No.   She was -- she was familiar with

2   Andy Ascher.   She said that she knew him, and

3   knew Becky and her -- because those girls all

4   went to school together, so.   And she said when

5   she talked to Jill, that her -- that's when, you

6   know, Jill told her about Andy being shot and

7   stuff.   And then when Detective Forrester asked

8   her, you know, if she had taken him anywhere and

9   dropped him off, she said, "No."   And then she

10  said that she wasn't -- Patrick wasn't home during

11  that time.

12          That's when she said that he had called

13  her and told her to come and pick him up.   And

14  she says she just thought that was really strange

15  because he's never -- he usually doesn't go on

16  that end of town.   And he's never called her to

17  come and pick him up before.   When -- she said

18  that she went to 11th Street and Harrison to pick

19  him up, 11th Street and Harrison at the Stop-N-Go.

20      Q   11th and Harrison is pretty far from the

21  scene of the Ascher homicide, isn't it?

22      A   Yeah, it's just -- I don't know how far,

23  but, you know.

24      Q   It would be far by foot, wouldn't it?

1      A   By foot?  Yeah.

2      Q   And Samantha was also asked about if she

3   had any knowledge of a Burger King -- of Patrick

4   robbing a Burger King.  Do you recall that?

5      A   Yeah, I remember.  I don't know much about

6   that case, but she said that Patrick told her,

7   you know.  I don't know at which point, but

8   Forrester worked on that case.  I don't know

9   anything about that really.

10     Q   And what did Forrester tell her about that

11  case, do you remember?  Did he tell her what time

12  it occurred?

13     A   No, she -- she said that, you know, like

14  everything else, Patrick often left at, you know,

15  4:30 in the morning, would come back at, you know,

16  11:00 in the morning and use her car and stuff

17  like that, but, you know.

18     Q   Uh-huh.  Did she talk generally about

19  Patrick being absent from home a lot?  Did she say

20  he was out a lot at night or out a lot?

21     A   I don't know if it ever came up.

22     Q   Okay.

23     A   Not during this time.

24     Q   So she was just asked about specific

1 dates?

2     A  No, she wasn't asked about -- she was

3 asked about specific incidents that we were

4 looking into, like the bank robbery where, you

5 know, they asked if she drove her -- you know, if

6 she knew anything about it.  She said she didn't.

7 And then she would go on to say that:  "Oh, I

8 remember it was a Wednesday because it was Whopper

9 Wednesday."  And Patrick asked her to drive him

10 over to this place.

11        He had a backpack.  And she dropped him

12 off at a car, but she didn't really know what he

13 was doing.  He told her to park here and wait for

14 him.  And then she says, "I did what he said, and

15 he came, drove up behind me."  She said, "I didn't

16 know what he did, but I figured a car might have

17 been stolen," because he got out of that car and

18 jumped in her car.  And then they went home, so,

19 you know, things like that.  But it wasn't, like,

20 on this date and time did you do this?

21     Q  Uh-huh.

22     A  Or, no.

23     Q  So she said -- she told you that

24 information about what she remembered about the

1    date of the bank robbery.  She told you that

2    between 3:15 and 5:00 p.m., according to this

3    report?

4        A  Hang on a second.  Samantha stated that

5    she heard -- oh, Detective Forrester asked

6    Samantha if she had any information that

7    Patrick Pursley had robbed a bank and it was

8    possible that her car was used.  She stated she

9    knew nothing about it.  She said then, that's when

10   she'd go in -- I do recall that on a Wednesday, it

11   was a Whopper Wednesday because she remembers

12   that, and she works at Burger King, and remembered

13   that Patrick had her drive her and so on and so

14   forth, but --

15       Q  That was from page seven of this report?

16       A  Right.

17       Q  And so she gave that information

18   regard- -- when she was asked about the bank

19   robbery, information about --

20       A  About Patrick's involvement --

21       Q  -- being in a car?

22       A  -- in it.  And she said she didn't know

23   anything about that.

24       Q  And then regarding the murder here, it

1    says that she was asked about his whereabouts and

2    he wasn't in the apartment, but she was in the

3    apartment, is what she said on page eight,

4    correct?

5            (Mr. Iasparro and Mr. Pottinger confer

6    outside the hearing of all outside parties.)

7            THE WITNESS:  It doesn't say she says

8    she was there.  It says that she stated that he

9    was not at the apartment during that time and he

10   was gone somewhere.  And unless you see something

11   different than I do; I don't see anything where it

12   says she was there during that time.

13   BY MS. TINGSTAD:

14       Q  Do you have any independent recollection

15   of Detective Forrester asking Samantha:  "If it

16   was proved that your gun was involved with the

17   murder, what would you say"?  Do you have an --

18       A  Yes.

19       Q  -- independent recollection of that?

20   And do you recall what her answer was?

21       A  Yeah.

22       Q  What was it?

23       A  She said, "If my gun was used in a

24   homicide, it was Patrick," because her and

1  Patrick were the only ones that ever touched

2  that gun.

3      Q  She said that?

4      A  Yes.

5      Q  That's not written in this report, is it?

6      A  It isn't?

7      Q  I don't see it.

8          MR. IASPARRO:  On page eight.

9  BY MS. TINGSTAD:

10     Q  Bottom of page eight?  No.  On the bottom

11 of page eight, I don't see anything where it says

12 that she and Patrick were the only ones who

13 touched the gun.

14     A  That was earlier during this -- this time.

15 But when asked about the gun, she said, "If my gun

16 was involved in the murder, then Patrick would

17 have done it."

18     Q  That's what she said?

19     A  Right.

20     Q  And you recall that independently --

21     A  Yes.

22     Q  -- from this report?  Do you recall

23 anything else about this initial interview that

24 isn't reflected in Detective Forrester's report?

1      A   No.

2      Q   So what happened at 5:00?

3      A   At 5:00 we came out of the interview room.

4   We were done talking to her.  We got the general

5   information between -- you know, about her and

6   Patrick's relationship and where they lived and

7   height and weight and all this stuff.  Then we

8   went and we met with Assistant Deputy Chief

9   Dominick Iasparro and Sergeant Pirages and

10  reviewed what we had talked to her about.  And

11  at the time it was decided that we were going to

12  advise her of her Miranda rights and now question

13  her about these incidents.

14     Q   What did she say in that first part of the

15  interview that caused you to decide to Mirandize

16  her at this point?

17     A   Well, it was just general information.

18  She always kept herself out of it.  She wasn't

19  involved in nothing.  She didn't know that he did

20  anything and stuff, where now we're going to talk

21  to her about:  We got a Crimestopper information,

22  you know, right on down the line, from the bank to

23  how much money they got to, you know, the stolen

24  car, right on down the line.  We were going to

1   talk to her about that.

2       Q   So she didn't say anything in that initial

3   interview that implicated herself or necessarily

4   implicated Patrick in these crimes, is what you're

5   saying?

6       A   No, no, you know, it wasn't, like:

7   "I knew Patrick did that, I knew" -- no, no.

8   It was just general, always just on the outskirts

9   of everything.  She would -- you know, you know,

10  "I picked Patrick up here, but, you know, I didn't

11  drop him off anywhere," or, "We went to -- you

12  know, he had me drop him off at this car and then

13  told me to wait here, but I didn't know what he

14  was going to do.  I didn't know that he was going

15  to rob a bank in the initial thing."  You know, we

16  just let her give her account of what she knew

17  about Patrick.  And then that's when we decided to

18  Mirandize her and now we're going to question her

19  on that.

20      Q   So is it --

21      A   That makes sense.

22      Q   -- fair to say that -- is it fair to say

23  that she didn't give you any new information -- or

24  let me strike that.

1       You said a minute ago that you decided to

2   Mirandize her so you could ask her questions about

3   what the Crimestopper had said, right?

4       A  No.  Well, we Mirandize her because now

5   we're going to start accusing her.  She -- there

6   was no question that she was involved in some of

7   these incidences, you know.  It was just -- you

8   know, so we're going to talk to her about that.

9   How much involvement she had remained to be seen.

10  We didn't know.

11      Q  So why did you -- why do you say that

12  there is no question about her involvement at that

13  point?

14      A  That's what we were going to determine.

15      Q  So there was no question at the point

16  where you decided to Mirandize her; there was no

17  question --

18      A  That we were going to question her as to

19  her involvement in these cases.

20      Q  You are -- and you had the information

21  from the Crimestopper about her alleging her

22  involvement in these cases before you even picked

23  her up at Peachy Foster's house, right?

24      A  We had an unknown person who called in --

1      Q  Right.

2      A  -- claiming stuff, but we don't know what

3  motive he had to say anything.  We didn't know

4  what she actually knew about it until we talked

5  to her.

6      Q  So when you talked to her, what about what

7  she said gave you the information you felt you

8  needed to start accusing her of what the

9  Crimestopper said she did?

10     A  It was nothing that she -- it was just

11  that she was always right there on the outskirts

12  of it.  We just got general information from her.

13  That's all that was, just her, you know, story of

14  what she did.  You know, she didn't know anything;

15  but yet she dropped him off and then came by this

16  with this gray car, and she just assumed it was

17  stolen.  She really didn't have any knowledge,

18  that stuff.  Well, all this stuff fit with what

19  the Crimestopper had reported to us.  But we

20  didn't have any -- we didn't know who he was at

21  that time, you know, other than what information

22  he gave.  Everything that he gave was coinciding

23  with what we knew of the cases.  So it was

24  pretty -- pretty close.

1      Like, he knew that -- he said that Patrick

2  told him he got $16,000 from the bank robbery.

3  Well, that was never publicized.  He actually got

4  16,400, minus whatever he threw down on the

5  ground, so to throw the police off, according to

6  the Crimestopper.  But there was things that,

7  you know, like, you know, we had a stolen car

8  that was used in the bank robbery.  He had that

9  information.  He had -- knew that Sam was his

10  girlfriend and Sam had purchased these guns.

11  Found out that she did.  In fact, she had a valid

12  Firearm Owners I.D. card, FOID card.  And she

13  legally purchased the -- first, the Taurus in

14  February.  And then she purchased the Beretta

15  with proceeds from the bank robbery that they

16  later got.

17      Q  So regarding the Crimestopper

18  talking about Samantha purchasing two guns --

19  scratch that.  So what was the content of your

20  conversation with -- what is it -- Assistant

21  Deputy Chief Iasparro, Sergeant Pirages and

22  Lon Christenson and Detective Forrester at that

23  time; yeah, Detective Pirages and Lon Christenson?

24      A  Of the FBI.

1    Q  What was the content of that conversation

2  at 5:00?

3    A  Just what we had talked to her about in

4  the initial interview.

5    Q  Whose decision was it to Mirandize her at

6  that point?

7    A  I don't know if, you know, Howard or

8  Detective Pirages said:  Well, let's Mirandize

9  her now and talked about it.  I don't know.

10   Q  So at 5:00 when you stepped out of the

11  interview room, did you close the door behind you?

12   A  Yes.

13   Q  And you re-entered 20 minutes later.

14  At that point when Detective Forrester advised

15  Ms. Crabtree of her rights, you were there?

16   A  Yes.

17   Q  She -- what was her reaction to that?

18   A  She -- Detective Forrester advised her

19  of her rights.  He handed her a copy of the

20  rights waiver form, and he had another one that

21  is identical.  He put an X on the top line and had

22  her read that out loud, and which she did.  And

23  then Detective Forrester went through and read

24  each other, you know, line, and then check -- put

1    a check mark by that; and then asked her if she

2    knew and understood her rights, and she said that

3    she did.  She then signed the rights waiver form

4    at 5:23.  And then myself and Detective Forrester

5    also signed that.

6         Q  While you were out in the hallway or

7    wherever you were having this conversation prior

8    to 5:20 p.m., did you learn about the results of

9    the search of 901 Ashland?  Did you learn about

10   what was found there?

11        A  No, I don't think we were even -- we

12   didn't do nothing with the thing from the search

13   warrant until we went out with her and came back

14   in.  So that was, you know --

15        Q  So at that --

16        A  -- late.

17        Q  -- point you weren't informed that there

18   was -- that a Taurus was found at her apartment?

19        A  I'm assuming that a Taurus was recovered

20   there.

21        Q  You weren't informed by that --

22        A  No.

23        Q  -- at that point?

24        A  I wasn't told anything about what they

1   found; had no idea what they all gathered.

2       Q   So at the top of page ten, Detective

3   Forrester at that point asked her if she ever

4   had any work done on the Taurus?

5       A   Right.

6       Q   And she said she never had any work done

7   on it?

8       A   Right.

9       Q   Do you know why Detective Forrester asked

10  her that?

11      A   Probably because the Crimestopper that

12  called in said that Patrick told her that -- or

13  told him that he had his girlfriend go and get the

14  gun adjusted, so if they ever caught him, they

15  wouldn't be able to match the gun to this crime.

16      Q   That's what the Crimestopper said?

17      A   I'm pretty sure.

18      Q   And you got that statement from one of --

19  from something that you read?

20      A   I never talked to Crimestopper but --

21      Q   So fair to say that you read that

22  somewhere?

23      A   I'll show you.

24          MR. IASPARRO:  (Inaudible.)

1          THE WITNESS:  Huh?

2          MR. IASPARRO:  Top of page four.

3          THE WITNESS:  Thank you.

4    BY MS. TINGSTAD:

5       Q  Top of page four, are you referring to

6    the line --

7       A  "He also stated that he had Sam go and

8    get the gun adjusted afterwards."  And he told --

9    "He also told him that since then, they bought

10   another 9-millimeter and he showed him a black

11   9-millimeter automatic (sic) with black grips."

12      Q  Okay.

13      A  And he had the ski mask and the backpack

14   and all that stuff.

15      Q  So at least in this report of the

16   Crimestoppers initial call, what's noted here

17   is that he had Sam go get the -- he stated that

18   he had Sam go get the gun adjusted?

19      A  The Crimestopper said that.

20      Q  The Crimestopper said that.

21      A  That's why Howard asked her, "Did you ever

22   have any work done on your gun?"  And she said,

23   "No."

24      Q  And then the next thing that Detective

1    Forrester did, according to this report is, she

2    "was then told that she was not telling the entire

3    truth and that we wanted her to be completely

4    honest"?

5        A  Yes.

6        Q  What was Samantha's demeanor when she was

7    told that Detective Forrester didn't believe she

8    was telling the entire truth at that point?

9        A  She was fine.  I don't know what you mean

10   by -- you know, she wasn't jumping up and down or

11   anything.

12       Q  Was there ever a moment that she started

13   to cry?

14       A  There were times when she cried.  Those

15   were times when she would tell us about Patrick

16   Pursley threatening to kill her and her two kids.

17   Then she would cry.  She was afraid of him and

18   afraid of what he's going to do.  She kept saying

19   that "If I -- you know, Patrick told me if I tell

20   on him, like I am now, he's going to kill me or

21   have somebody kill me and my two kids."  She says

22   he'd never kill her baby, Marcus, who was mixed;

23   but her and the other two kids, he'd have no

24   problem killing.

1      Q   And do you have an
2   independent recollection --
3      A   Yes, oh, yeah.
4      Q   -- of her saying that?  Up until the
5   point of this, is it fair to say -- call it the
6   accusatory phase of the interview or the
7   interrogation -- up until this interrogation,
8   Ms. Crabtree hadn't told you anything that would
9   place Mr. Pursley at the scene of Andrew Ascher's
10  murder, had she?
11     A   Just generally.
12     Q   Generally meaning:  "I think he was out
13  that night"?
14     A   "During this time he wasn't home, but he
15  called me.  It was really strange that he called
16  me at, you know, around that time to come and
17  pick him up at 11th Street and Harrison at the
18  Stop-N-Go, which he's never done before."
19  Silent Wood is just off of Harrison.
20     Q   Silent --
21     A   You know, yeah, so.
22     Q   You agree with me, though, that Silent
23  Wood and -- Silent Wood and Harrison, and 11th and
24  Harrison is quite a long distance?

1      A   If that was true.

2      Q   If that was true?

3      A   Which we didn't believe.

4      Q   You didn't believe when she said that?

5   So --

6      A   That was when she was just giving us this

7   general account, always leaving herself out of it

8   and not implicating herself in anything.

9      Q   So to ask again:  Up until -- up until

10  the accusatory phase, she hadn't told you or

11  Detective Forrester anything that placed Patrick

12  Pursley on Silent Wood on the night of April

13  2nd --

14     A   No.

15     Q   -- 1993?

16     A   She didn't know anything about it at that

17  time other than --

18     Q   She mentioned something --

19     A   -- what her friends had told her, you

20  know, when she called her -- Jill Deadmond.  And

21  there was a day before the visitation, but yet

22  she knew all these people, too.  So she was

23  familiar with Andy Ascher and his girlfriend and

24  so on.

1       Q  So because she knew Andy Ascher and she

2   knew the girlfriend --

3       A  And her girlfriend is the one who said --

4       Q  She knew about the details of the murder

5   and would have remembered those because she was

6   familiar with Andy Ascher and Becky George and

7   Jill Deadmond?  It's possible?

8       A  She said that at that time, you know --

9   she just said that Jill Deadmond had told her

10  about it, that Andy had been shot, and explained

11  or told her that some kid came to rob him and shot

12  him.  And she says that, you know, "I knew these

13  guys and stuff," and, again, just kind of putting

14  herself out of it.

15          MR. IASPARRO:  Ashley, before you go on,

16  I got a message from Amanda Kozar asking to call

17  in.

18          MS. TINGSTAD:  Oh, yeah, no worries.

19          THE REPORTER:  Are we going off record?

20          MR. IASPARRO:  Just for a second.

21          (Discussion off the record commencing at

22  3:35 p.m. and concluding at 3:36 p.m.)

23          MR. IASPARRO:  Go ahead.  I just told her

24  I would open up the line again.

1  BY MS. TINGSTAD:

2      Q  So at this point at 5:30 or so when you

3  began the accusatory phase, Ms. Crabtree had been

4  with you since 2:30 p.m.?

5      A  Yeah.

6      Q  So three hours; and at this point --

7      A  Actually, only from 3:15 that we were at

8  the station, but she had been with us --

9      Q  At the station?

10     A  -- going to -- no, she wasn't with us at

11 the station until 3:15.  She was with us from 2:30

12 when we left Evergreen and then went to her house

13 and then to the station.

14     Q  But she was with you and Detective

15 Forrester from 2:30 on?

16     A  Yes.

17     Q  And at this point she understood that she

18 was not free to leave, correct?

19         MR. POTTINGER:  Objection.

20         THE WITNESS:  I don't think that --

21         MR. POTTINGER:  Objection as to foundation

22 at this point.

23 BY MS. TINGSTAD:

24     Q  Was -- at 5:30 or 5:23 when she was read

1    her rights, was Ms. Crabtree free to leave at that

2    point?

3        A  I don't think so, no.

4        Q  Had she eaten or drank anything up until

5    this point other than the two sodas that you

6    mentioned?

7        A  She had water and offered numerous times

8    for something to eat.

9        Q  What was offered --

10       A  Whatever she wanted.

11       Q  -- do you recall?

12       A  Whether a sandwich, we had vending

13   machines there with sandwiches.  We had -- when

14   they brought the pizza in, we offered her pizza;

15   you know, if she wanted chips or a candy bar

16   or anything like that.

17       Q  Were you -- had she thrown up during this

18   time?

19       A  No, not -- not that I know of.

20       Q  Had she told you that she's pregnant?

21       A  No.

22       Q  At this time after she was read her rights

23   during this accusatory phase of the interrogation,

24   did she express any concern for her children?

1      A   There was times where -- when she's given

2    the account of what was happening, she would say,

3    "They're going to take my kids away."

4      Q   She would say that?

5      A   She said that.

6      Q   And what was Detective Forrester's

7    response to that?

8      A   Said it wasn't up to us, you know; totally

9    be up to whatever the state's attorney decided,

10   you know, when they reviewed this.

11     Q   During this accusatory phase were you --

12   did you start asking questions?

13     A   No, Detective Forrester was interviewing

14   her.

15     Q   Did you stay in the room the whole time?

16     A   Yes.

17     Q   You didn't leave and come back?

18     A   Yeah, I might have stepped out to get a

19   pop, you know, if she wanted a pop, you know.  Get

20   her cigarettes or water or whatever; but other

21   than that, I was there the whole time.

22     Q   At this time did she give a verbal account

23   admitting to being involved in the Andrew Ascher

24   murder?

1      A   I believe it was the bank robbery first.

2      Q   She gave a verbal account admitting to

3  involvement in the bank robbery first?

4      A   Yes.  She explained to us how they --

5  Patrick always dreamed of robbing a bank and

6  drove -- she had -- he had her drive him by

7  three banks that he was thinking about doing,

8  and showed her the banks and so on.  And then she

9  told us how he needed to steal a car to do the

10  bank robbery.  But she gave us accounts of, you

11  know, at first, you know, he says, "Maybe I'll

12  just park your car in the neighborhood."  And

13  she goes, "Are you sure?"  And he goes, "Why?

14  You don't think that will work?" and stuff like

15  that.  And then he decided to -- they were going

16  to steal a car.  So he had her and her kids drive

17  him around on the east side to look for a car to

18  steal for the bank robbery.

19      Q   And you're remembering these things that

20  she said from your review of the Forrester report?

21      A   And both.

22      Q   What would be the other -- your review of

23  the Forrester report and something else?

24      A   And my recollection because she took us

1    out and showed us where he spotted the car.  He --

2    she dropped him off.  She went around the office

3    buildings.  She then seen him leaving in the car,

4    and she was upset because she lost him by Newburg.

5    She didn't know what to do.  She said, "I searched

6    for him for an hour."  She says, "I thought he was

7    really going to be pissed at me because I didn't

8    know where he went."  And she thought he was going

9    to be mad because he didn't give her a ride or she

10   didn't give him a ride.  And so she finally --

11   after about an hour, she went home.  And then

12   Patrick showed up there, but he wasn't mad because

13   he had gotten a ride down

14   to the bus station downtown and then he walked

15   home.  But then went on to explain how, you know,

16   Patrick had showed her where he wanted her to park

17   before on Mariposa and --

18        Q   This was all in the interrogation room;

19   she's explaining all this?

20        A   Yes.

21        Q   And she talked about the bank -- you said

22   she talked about the bank robbery first?

23        A   Yeah, it's -- we didn't talk to her for --

24   I don't even think it was 20 minutes, and she laid

1   everything out.  And then when she was done with

2   that, she was -- you know, went into the -- yeah.

3   Then he asked her about, you know, being in the

4   area of the murder with Patrick, if she had

5   dropped him off and stuff.  And then she went

6   on to --

7       Q  So he -- so Detective Forrester said,

8   "Did you drop Patrick off on Silent Wood for the

9   murder"?

10      A  No, she said --

11      Q  Did he ask her that?

12      A  He said, "Did you drive Patrick to the

13  area of the murder?"

14      Q  And she said --

15      A  "Yeah."

16      Q  -- "yes"?

17      A  She said that, you know, she didn't know

18  there was going to be a murder.  She said, you

19  know, "We -- he had me driving around.  We were

20  looking for" -- they had gotten into an argument

21  that morning, she said, about being broke.  They

22  didn't have a job.  They needed money and Patrick

23  said, "I can take care of that."  She (sic) says,

24  "I'll, you know, maybe go break into a place and

1    get some money or sell whatever we steal."  And

2    he had her drive her -- him around on the east

3    side looking for a place to break into.  That's

4    when this incident happened on Silent Wood.  She

5    says, "I just thought he was looking for a place

6    to break into."  And that's what she was doing is

7    driving around.

8        Q  Did Detective Forrester, when she started

9    giving this account of driving around at night

10   looking for a place to break into, did Detective

11   Forrester ask her where her young children were

12   at that time?

13       A  No.

14       Q  He didn't ask her if they were home alone?

15       A  When they did the --

16       Q  Yeah.

17       A  -- the murder?

18       Q  No, when -- as Samantha was describing

19   driving around with Mr. Pursley looking for a

20   place to rob at night, she never said anything

21   about where her children were at the time?

22       A  Most of the times they were with them.

23   So I don't know if -- I don't recall if she said

24   that when they were just driving around looking

1    for this place -- I don't believe -- I don't know

2    where her kids were at the time of the murder.

3    But the armed robbery, they were with them.

4    Stealing the car, they were with them.  Other

5    than that, I -- I'm not -- it never came up that

6    I know of, as far as the murder on Silent Wood.

7        Q  Did Detective Forrester ever say, during

8    this time to Ms. Crabtree, "You know you're in

9    trouble, don't you?"  Would he -- could he have

10   said that to her?

11       A  I don't recall that.

12       Q  Is it possible he said that?

13          MR. POTTINGER:  Objection; form.

14          THE WITNESS:  Anything is possible.

15   BY MS. TINGSTAD:

16       Q  You don't recall it?

17       A  I don't recall it.

18       Q  And do you recall him saying, "You have

19   three young children.  Do you want to see them

20   again?"  Do you recall him --

21       A  No.

22       Q  -- saying that to her?

23       A  He never said nothing like that, no,

24   absolutely not.

1      Q  If he had said that to her, would that

2   have been a problem?

3          MR. IASPARRO:  Form and foundation.

4   BY MS. TINGSTAD:

5      Q  If he had said that to her, would that

6   have violated any policy or practice at the

7   Rockford Police Department?

8          MR. IASPARRO:  Form and foundation.

9          THE WITNESS:  I don't know if it would

10  have or not, but it never happened.  So, you know,

11  you're again just going into hypotheticals; and

12  that never occurred.  So I couldn't tell you.

13  BY MS. TINGSTAD:

14     Q  Did he ever say to Ms. Crabtree, "I can

15  make it so you can't see your children again

16  until they're 40"?

17     A  No.

18     Q  And you were in the room the whole time?

19     A  Exactly; longer than he was, because I

20  took the typed statement.  He had left while I

21  was typing the statement up.

22     Q  Do you recall whether Detective Forrester

23  ever said, "If you cooperate and help us, then

24  we can help you"?

1    A   Not -- not that I recall.

2    Q   Samantha was implicating herself in some

3   pretty serious crimes, right?

4    A   The bank robbery, yeah, and dropping him

5   off at the thing; but, again, she was assuming

6   that he was just looking for a place to break

7   into on the Silent Wood deal.

8    Q   Do you recall Detective Forrester saying

9   anything about if Samantha went to prison for

10  40 years, that her children wouldn't even know

11  her when she got out?

12   A   No.  Samantha was very cooperative.

13  Basically she was very cooperative.  I mean, all

14  these things didn't even take an hour to get an

15  account of the bank robbery, the murder, stealing

16  the car, the Burger King.  I mean, we didn't -- we

17  were only talking to her for pretty close to an

18  hour, I think.  I'd have to -- total, so.

19   Q   An hour total at this point; you had

20  already spoken with her --

21   A   Right.

22   Q   -- for an hour and 45 minutes before?

23   A   Well, yeah, but that was just general

24  information.  That was sitting there talking and

1  she's fine, and, you know, telling us:  Yeah, I

2  met him here.  I'm five-eight, whatever.  You

3  know, I weigh 150 pounds, and Patrick is this.

4  I've known him for this long and general

5  information.  There wasn't, you know, an

6  accusatory, just kind of run things by her.

7      Q  She was asked about the bank robbery and

8  the murder?

9      A  If she knew anything about Patrick being

10  involved in that and she didn't.

11      Q  Did Detective Forrester ever use the

12  words, "I want you to help me nail Patrick"?

13  Did he ever use the --

14      A  No.

15      Q  -- words "nail Patrick"?

16      A  No.

17      Q  You're certain about that?

18      A  Yeah, that sounds more like when she got

19  with Patrick to recant her statements and stuff,

20  more -- more or less.

21      Q  Were you taking notes during Detective

22  Forrester's interview of Samantha Crabtree at

23  this point?

24      A  I think Howard was.  He was at the table.

1    I was sitting in the chair.  So I don't think I

2    did at all.

3        Q   You were just a silent observer at this

4    point?

5        A   Right.

6        Q   What was your purpose in the room?

7        A   Well, to assist whatever he needed, if

8    he asked her something and -- or if I remembered

9    something different than, you know, I might, you

10   know, ask her that or something like that.

11   But basically Howard -- I didn't know all the

12   Crimestopper.  It wasn't a report that I could

13   read to know what -- all the crimes.  Howard had

14   all that information.

15       Q   Did he have it with him in the room or

16   he just had it in his --

17       A   Well, I'm sure he had notes, you know,

18   regarding that.  I'm assuming that he did.  You

19   know, he talked to him, and Detective Scott did;

20   but at that time we didn't know who it was.

21       Q   When Samantha was first asked where

22   she was on April 2nd or what she was doing on

23   April 2nd, the night of April 2nd, did she answer:

24   "We were probably home"?

1     A   Where do you see that at?

2     Q   I'm looking at her sworn testimony at the

3   trial.

4     A   Is that the one where she recants

5   everything?

6     Q   Yes.

7     A   Well, no, I -- no, that's -- (laughs).

8   I wouldn't have information on that.

9     Q   So you don't recall her saying that?

10    A   She didn't say that.  It's not "recall."

11  That would have been the time where she was

12  charged with perjury then, during that time?

13  Is that the part of the testimony that --

14    Q   This is her trial testimony.

15    A   And she was charged with perjury for that?

16    Q   I'm the one asking the questions.

17    A   Okay.  Sorry.

18    Q   Did Detective Forrester ever say in that

19  interview room that he knew what kind of person

20  Patrick Pursley was?

21    A   That he knew what kind of person he was?

22    Q   Uh-huh, yeah; that he knew what kind of

23  person Patrick Pursley was --

24    A   No.

1      Q  -- that he was a bad person?

2      A  No.

3      Q  Detective Forrester never said anything

4  like that?

5      A  Not that I recall.

6      Q  Did he tell Ms. Crabtree that he had her

7  M.O. down?  He understood her M.O.?

8      A  Who had whose M.O.?

9      Q  That Detective Forrester had her M.O.

10  down; did he ever say that to her?

11      A  Had her modus operandi?

12      Q  Yes.

13      A  No, not that I recall.

14      Q  Did Detective Forrester ever say that --

15  to Sam Crabtree that she wasn't the type of

16  person to get into trouble, and that what she'd

17  gotten into wasn't her fault?  So -- that he

18  could help her; did he ever say that?

19      A  No.

20      Q  Did Detective Forrester ask -- strike

21  that.  So at 6:35 did you go somewhere with

22  Sam Crabtree?

23      A  Yes.

24      Q  And who was in the car?

1      A  Myself, Detective Forrester, and

2  Samantha Crabtree.

3      Q  And Detective Forrester was driving?

4      A  No, I was driving.

5      Q  You were driving?

6      A  I was driving.

7      Q  Where was Detective Forrester sitting?

8      A  He was in the passenger front seat, and

9  Samantha was in the back seat.

10     Q  Was there ever a time that you were

11  sitting in the back seat with Sam Crabtree on

12  this trip?

13     A  It's kind of hard to drive like that; but,

14  no, I was -- it was my squad and I was driving.

15     Q  So on page 10 of Detective Forrester's

16  report it lists all sorts of places that --

17     A  Where she directed us to?

18     Q  -- you drove?  So before she got in the

19  car with you and Detective Forrester, she had

20  been crying during the interview, correct?

21     A  At times when she would give us an account

22  of what had happened, and, again, it was when she

23  would talk about Patrick is going to kill her for

24  telling.  She was really concerned about her and

1   her kids, what Patrick is going to do because

2   she told on him.  It wasn't like she burst out

3   bawling hysterically or nothing.  She was just

4   crying, you know.  "And, well, you know, Patrick

5   is going to kill me, you know, for -- he told

6   me that he would kill me for doing this."

7   (Indicating.)

8       Q  And when you first got in the car --

9   strike that.  When you first got in the car where

10  did you go -- where did you drive first with

11  Sam Crabtree?

12      A  We left the police station and we went up

13  Harrison Avenue.

14      Q  And did you drive straight to 2709 Silent

15  Wood?

16      A  I drove east on Harrison.  And as we --

17  she was directing me.  She was in the back seat

18  saying, you know -- of course, they came the other

19  way, but that's the way we were going.  She says,

20  "Turn in here.  Patrick told me to turn onto

21  Silent Wood here."  Turned onto Silent Wood.

22  We -- the road snakes around and then goes down

23  to Greendale.  We went past the apartments there

24  on Silent Wood Trail, the -- what -- what was it,

1    2709.  Went past that.  And she had us go down

2    around the corner because they were looking -- at

3    that time Patrick was having her -- they were

4    looking for a place to break into or something

5    to steal.  She got down to that big apartment

6    building at 3523 Greendale.  And she said,

7    "Patrick told me to turn around here."  She says,

8    "I thought I could make the U-turn, but the road

9    was too narrow.  So I had to pull into this

10   driveway."  And she pointed at the driveway at --

11   on Greendale there, 3523 Greendale.  She backed up

12   and then they started going back up Silent Wood.

13   And she said that -- now, the apartments are on

14   her left side.  She says when they got to the

15   curve, she said, "Patrick told me to pull over and

16   turn my lights out."  So she did.

17        I pulled my squad over where she told me

18   to stop.  And she said that Patrick had gotten out

19   there.  And she said it was real dark.  She, you

20   know, couldn't see nothing.  And she says that

21   Patrick had -- she thought he had found or spotted

22   something to go break into or to steal.  She said

23   that she heard a couple shots and she said, "I got

24   really scared."  And then Patrick come running in.

1    He had her gun in his hand, got on the floor of

2    the car and told her to drive.  And she says,

3    "Where?"  He says, "I don't care, just drive."

4    And she says, "I was" -- so then while we were at

5    that location, Detective Forrester took pictures.

6    He took pictures on Greendale where she had pulled

7    in, backed out, and then went back.  And then he

8    took pictures of the location where I parked my

9    squad in relation to -- from the front, looking

10   back at 2709 Silent Wood, and from Silent Wood

11   looking south on -- or north on Silent Wood where

12   my car is.  So from the front and the back, he

13   took pictures of it.

14        Q  And, Detective Schmidt, some of the things

15   that you just recounted, the words that you used

16   about Ms. Crabtree saying she thought she could

17   make a U-turn, but she couldn't make it; those

18   appear in her written statement, correct?

19        A  I don't know.

20        Q  Those appear in the statement that you --

21        A  Whatever she told me during the time of

22   that written statement is what I typed down.

23        Q  Uh-huh.  And you're -- do you have an

24   independent recollection of driving with

1   Ms. Crabtree at this time or --

2       A   Yeah.

3       Q   -- are you -- you have an independent

4   recollection?

5       A   Yeah, I remember taking her out in the

6   car.

7       Q   You've also read her statement in

8   preparation for this deposition?

9       A   I took the typed statement.  I typed it.

10      Q   And you took the typed statement?

11      A   So, yeah, I've read it.

12      Q   You've read it as well --

13      A   Sure.

14      Q   -- recently?

15          MR. IASPARRO:  Ashley, this can be off

16  the record.

17          (Discussion off the record commencing at

18  4:00 p.m. and concluding at 4:01 p.m.)

19          (A brief recess was taken commencing at

20  4:01 p.m. and concluding at 4:03 p.m.)

21  BY MS. TINGSTAD:

22      Q   On page 10 of Detective Forrester's

23  report it states here that -- the second-to-last

24  paragraph, "We first started driving," that

1   paragraph?

2       A  Okay.

3       Q  It states that she drove past Silent --

4   drove past 2709 Silent Wood, turned around at

5   3523 Greendale.  3523 Greendale is the apartment

6   building where you conducted a neighborhood check,

7   correct?

8       A  It was one of them, yeah.

9       Q  So according to this report, Samantha --

10  she turned around there, and then pulled, drove

11  past Silent Wood, 2709 Silent Wood.  And then

12  it says, "And then (sic) she showed us the way

13  she went.  Polaroids were taken by Detective

14  Forrester at various locations."

15          The Polaroids you're referring to, would

16  those be these Polaroids?  (Tenders documents to

17  witness.)

18          MS. TINGSTAD:  You can mark that as

19  Exhibit 4.  And these are black and white.

20          (Discussion off the record commencing at

21  4:04 p.m. and concluding at 4:05 p.m.)

22          (Exhibit 4 was marked for identification.)

23  BY MS. TINGSTAD:

24      Q  Do you recognize these photos?

1        A   I don't see anything on that photo.

2            MR. POTTINGER:  That looks like the back

3    for some.  I think that might --

4            MS. TINGSTAD:  There is a front and back

5    of each photo.

6            THE WITNESS:  Oh, okay.

7            MR. IASPARRO:  Photocopy of the front and

8    back of the Polaroid.

9            MR. POTTINGER:  I think just the exhibit

10   for the trial is stuck on the back.

11   BY MS. TINGSTAD:

12       Q   For the record, what's been marked as

13   Schmidt 4 is Bates stamped Pursley 14108 through

14   Pursley 14121.  Detective Schmidt, are these the

15   Polaroids that Detective Forrester took that day?

16       A   Yes.

17       Q   I know it's hard to see; but on the first

18   photo, what's that a photo of?

19       A   That's Howard standing in front of my

20   squad car.  Myself and Samantha are in the car.

21   And he's taking a picture back towards the parking

22   lot of where you'd enter 2709 Silent Wood.

23       Q   So this is Silent Wood?  This is Silent

24   Wood here?

1      A  Yes.

2      Q  And why did he take this photo?

3      A  Just to show where she said that she had

4   parked and waited for him when she -- when he got

5   out of the car.

6      Q  Do you recall your testimony at the trial

7   that you and Samantha are sitting in the car here?

8      A  Yeah.

9      Q  Do you recall testifying that you were

10  both sitting in the back seat at that point?

11     A  No, I wouldn't have got out of the

12  driver's seat.  I was just sitting there waiting

13  for Howard to take the pictures.  I was never

14  in the back seat with Samantha.  I don't know.

15  That might have been on one of her other

16  statements there that she changed.

17     Q  And are these -- to your knowledge, do

18  these truly and accurately represent the Polaroid

19  photos that Detective Forrester took that day?

20     A  Yes.

21     Q  Were there any other Polaroid photos that

22  he took that day, to your knowledge, that aren't

23  included here?

24     A  Yeah.  Are you talking about from --

1    you've got the Silent Wood one.  You've got

2    3523 Greendale.  You've got the median here on

3    Harrison Avenue.  That was all from that incident.

4        Q  And in Detective Forrester's statement on

5    page 10, the last sentence of this second-to-last

6    paragraph it says:  "Then (sic) she showed us

7    the way she went."  And then it refers to the

8    Polaroids?

9        A  He was taking pictures as they -- he

10   didn't take a picture while we're driving.

11       Q  Uh-huh.

12       A  She showed us the directions that, you

13   know, she went and where he told her to pull over.

14   There should be pictures also of -- well, that

15   probably wouldn't be for the -- on the homicide.

16   But we took pictures of where they stole the car,

17   parked the car, waited for the armed robbery and

18   stuff like that.  She directed us to all that

19   stuff.

20          When we were leaving Silent Wood Trail

21   here, this picture of where the median was, that's

22   when -- as I started to pull out to go west on

23   Harrison, that's when she said:  "Oh, and I hit

24   that median right there," (indicating).  She says,

1  "I was so scared that he was on the floor of the

2  car holding the gun."  She says, "I was so scared,

3  I ran the stop sign.  And when I turned to go,

4  you know, west on Harrison," she says, "I hit this

5  median and the car jumped up."  And Patrick

6  threatened her that he'd kill her if she gets him

7  caught.

8      Q  And she said that to you while she was

9  riding in the car with you?

10     A  Yes, I had no knowledge of it.

11     Q  And you have a recollection of Sam -- of

12 Ms. Crabtree saying -- telling you about running

13 over a median while you were driving there?

14     A  Yeah, that's why we took the picture of

15 it.

16     Q  And then at that point there are no photos

17 of where Ms. Crabtree might have driven after that

18 or where she said she drove after that?

19     A  Yeah.  Like I said, we ain't going to take

20 pictures -- how are you going to take a Polaroid

21 picture driving west on Harrison, and then driving

22 up the hill and making a mistake and coming back

23 around?  How do you do that?

24     Q  So you didn't stop -- you didn't stop to

1    take photos of those other places?

2        A   We took photos where she said that they

3    had gone with -- you know, for the bank robbery

4    stuff.  She directed us to those.  We took

5    pictures of Orchard Hills, I think, apartments

6    there where they stashed the stolen car, waiting

7    to do the bank robbery.  And, in fact, when we

8    were leaving, that's when she said that the search

9    warrant had already been executed at her house.

10   But she says, "There is a briefcase in my closet

11   that was in that stolen car that Patrick stole."

12   And she says, "It's a black briefcase and that's

13   at home in my closet."

14           Well, we didn't know about that.  And so

15   when we got back to the station, I filled out a

16   consent to search warrant, which she agreed to

17   sign and let us go back to her house and get that.

18   I had no idea that Mr. Swaagstra was missing a

19   briefcase from his car, Mr. Swaagstra.

20           MR. IASPARRO:  Here.

21           THE WITNESS:  I'm sorry.

22           MR. POTTINGER:  I got it.

23           MR. IASPARRO:  Here you go.

24           MR. POTTINGER:  Right here (indicating).

1          THE WITNESS:  Oh, okay, it's

2    S-W-A-A-G-S-T-R-A, Swaagstra.  That's how I

3    pronounce it.  It was his car that was stolen

4    and then used in that armed robbery.  I got these

5    mixed up.

6          MR. IASPARRO:  These are -- those are

7    mine, I think.

8    BY MS. TINGSTAD:

9       Q  So at this time after you say that Sam

10   told you to turn left on Harrison, and that she

11   jumped the median, did she -- where did she tell

12   you to go next?  Where do you recall she told you

13   to go next?

14      A  Well, then we drove to where they did the

15   bank robbery.

16      Q  Did you at that point drive up around the

17   Aldi and turn around?

18      A  No, no.

19      Q  You didn't do those things?

20      A  No, she just explained everything in the

21   typed statement.  She said that instead of -- she

22   made a mistake.  And instead of turning right on

23   20th Street, she turned left.  And she says

24   because, again, she's scared.  She says that

1    "As I started driving up the hill, I noticed

2    Bob's Hardware."  She says, "I knew I was going

3    the wrong way."  Well, Aldi's is just before that.

4         So she noticed a road there.  She turned

5    in.  She was going to turn around.  Well, she said

6    that the road went through.  So she was going to

7    drive down and then come back out on Harrison.

8         Q  Did she tell you that when you were

9    driving around with her or when she was -- when

10   you were --

11        A  In the statement.

12        Q  -- taking her statement?

13        A  Yeah.

14        Q  So at this point she didn't tell you about

15   all of that?

16        A  (Inaudible.)

17        MR. IASPARRO:  Is that a "no"?

18        THE WITNESS:  No, I'm sorry.

19   BY MS. TINGSTAD:

20        Q  Did you or Detective Forrester, as you

21   drove down Silent Wood and getting to the

22   Greendale apartments, did you or Detective

23   Forrester ask Samantha:  "Is this where you

24   turned around?"

1      A   No.

2      Q   Did you or Detective Forrester --

3      A   Are you talking about on Greendale?

4      Q   Yes.

5      A   No, we didn't ask her that.

6      Q   And did you or Detective Forrester, after

7   turning around at Greendale, drive past

8   2709 Silent Wood and ask Samantha, "Is this about

9   where you stopped your car?"

10     A   No.  She said -- she was directing me.

11  She goes, "Okay, keep going."  She says, "Where

12  the road curves there, right here, okay, right

13  here, stop."  She says, "This is where Patrick

14  told me to pull over and turn my lights out and

15  wait for him."  She says, "I thought he was going

16  to run and -- I thought he found a place to break

17  into."

18         So she was just sitting in the car waiting

19  for him with the lights out there.  That's why we

20  stopped there.  That's why Howard took pictures of

21  from the front of my car looking back and from the

22  back of my car -- or from the drive looking to

23  where my car was parked.  I would have had no idea

24  where she stopped or where they parked that.

1      Q  So all that information came from

2  Sam Crabtree?

3      A  Everything did, yes.

4      Q  When Sam expressed concerns about her kids

5  being taken away, did you or Detective Forrester

6  tell her that you could tell the state's attorney

7  that she cooperated?

8      A  No.

9      Q  You didn't tell her that?

10     A  No.

11     Q  You didn't tell her it would weigh in her

12  favor if she cooperated?

13     A  Did we tell her that?

14     Q  Yes.

15     A  No.

16     Q  Did you tell her that you would put in a

17  good word for her?

18     A  No.

19     Q  Did either you or Detective Forrester at

20  any time tell Ms. Crabtree that she could be

21  charged with bank robbery for her participation?

22         MR. IASPARRO:  In exchange for her

23  participation?

24         MS. TINGSTAD:  No.

1       Q  For her participation in the -- in the

2   bank robbery that she talked about?

3       A  No, we were just getting the facts and

4   putting them down and getting her on a statement.

5   In fact, while I have no idea; but while I was

6   taking the typed statement, Howard was obtaining

7   a warrant for her for that.  I didn't know he was

8   doing that.

9       Q  So neither you nor Detective Forrester

10  told Samantha that she could be charged with bank

11  robbery and do 40 years in prison for the

12  allegations that -- you know, that she had made

13  about --

14      A  I was only a policemen for 32 years, but

15  I've never heard of anybody getting 40 years for a

16  bank robbery.

17      Q  Federal bank robbery?

18      A  Yeah.

19      Q  In federal court?  You never heard of

20  anyone getting 40 years for a bank robbery?

21      A  Huh-uh.

22      Q  Does Detective Forrester's state- --

23  report here, Schmidt 3, does it say anywhere that

24  Samantha was crying during the interview?

1    A  I don't -- no, not that I know of.

2    Q  And you didn't write a report --

3    A  No.

4    Q  -- that reflected?

5    A  I was asked and I told what I knew.

6    Q  Okay.  I'm going to mark as Schmidt 5,

7  this statement.

8        (Exhibit 5 was marked for identification.)

9        MS. TINGSTAD:  I apologize.  This is

10  another written-all-over statement.

11        MR. IASPARRO:  Do you want a clean one?

12        MS. TINGSTAD:  What's that?

13        MR. IASPARRO:  Do you want a clean one?

14        MS. TINGSTAD:  It's readable.

15        MR. IASPARRO:  It's up to you.

16        MS. TINGSTAD:  I don't know who made these

17  markings.

18        THE WITNESS:  Which ones?

19        MR. TINGSTAD:  The underlining.

20        MR. IASPARRO:  Off the record.

21        (Discussion off the record commencing at

22  4:19 p.m. and concluding at 4:20 p.m.)

23  BY MS. TINGSTAD:

24    Q  So, Mr. Schmidt, I'm showing you what has

1   been marked as Schmidt 5.  At the bottom there is

2   a Bates Number, Schmidt 264 through 269.  This

3   is a statement that you took for Sam Crabtree,

4   correct?

5       A  Yes.

6       Q  And for the record, there are underlines

7   and scribbles on this statement.  Did you make

8   those underlines?

9       A  No.

10      Q  Did you make those notes -- I guess some

11  of them you did, some of them you didn't, but --

12          MR. POTTINGER:  Why don't you get a clean

13  copy?

14          MS. TINGSTAD:  Yeah.  This is not going to

15  work.

16          THE REPORTER:  Are we going off?

17          MR. IASPARRO:  Just for a second.

18          (Discussion off the record commencing at

19  4:21 p.m. and concluding at 4:21 p.m.)

20          (Mr. Iasparro leaves the deposition

21  proceedings.)

22          (Mr. Iasparro returns to the deposition

23  proceedings.)

24          (Exhibit 6 was marked for identification.)

1          MS. TINGSTAD:  Okay.  Going back on the

2     record.

3          Q  We've marked as Schmidt 6, a clean copy

4     of the Samantha Crabtree statement, Bates

5     number RFD --

6          MS. HALL:  Is this 6?  I thought it was 5.

7          THE WITNESS:  She did both.

8          MR. POTTINGER:  We did both.

9          MS. HALL:  Okay.

10         MR. POTTINGER:  Five is the marked-up

11    version.

12         MS. HALL:  Sorry.

13    BY MS. TINGSTAD:

14         Q  RFD Defense 122 through RFD Defense 127;

15    Detective Schmidt, if we could turn back to

16    2709 Silent Wood, the place where Ms. Crabtree

17    showed you and Detective Forrester that she

18    stopped the car; about how far away was that

19    from the parking lot where the murder took place?

20         A  That's -- Howard estimated it at 175 feet.

21    Detective Reffett from ID, he went out and

22    diagrammed it.  And he measured it with a roller

23    tape, and he came up with 300 and whatever it was,

24    300 and some feet.  And I know that during the

1  trial they asked me, you know:  Well, if somebody

2  else said something different, is he lying?

3  Well, no, he had a roller tape.  I would go with

4  whatever he put down with the roller tape.

5      Q  So, and to be clear, your testimony is

6  that Sam Crabtree told you she heard gunshots

7  from that spot 300 feet from the driveway,

8  correct?

9      A  I can only tell you what she said.

10     Q  She said she heard gunshots to you?

11     A  Is it in the statement?

12     Q  It's in the statement on page three of

13 six.

14     A  Okay.  That's what she said.

15     Q  And did she tell you she heard any talking

16 or any voices?

17     A  Not that I know of.

18     Q  So after driving around with Ms. Crabtree,

19 you returned to the station with her at what time?

20     A  19:45, 7:45.

21     Q  So 7:45 p.m., and what did you do at that

22 point?

23     A  I filled out a consent to search form for

24 the briefcase that she had told us, while we were

1   out driving, that was in the stolen car and is now

2   in her closet.

3       Q   Did you take her back to the interview

4   room?

5       A   Yes.

6       Q   Is that where you filled out the

7   consent --

8       A   Yes.

9       Q   -- to search form?  And at some point did

10  you learn that there was some items at the ID

11  section?

12      A   Yes.

13      Q   How did you learn that?

14      A   I don't know if Detective Houde came and

15  told us or Sergeant Pirages did; but they had some

16  items laid out on the -- on the counter that they

17  recovered from doing the search warrant.

18      Q   And do you recall what items -- well, at

19  that point did you take Sam to the ID section?

20      A   Yes, myself and Detective Forrester walked

21  her in there.

22      Q   You walked her in there?

23      A   Just a few feet.

24      Q   It was on the same floor?

1      A   Yes.

2      Q   And before this time had Samantha said

3  anything to you about what Patrick Pursley was

4  allegedly wearing on the night of the Ascher

5  homicide?  Had she talked to you about that

6  already?

7      A   Yeah, I believe so.

8      Q   You believe so or --

9      A   Yeah, when she was taking us around,

10  somewhere in there she said that he was wearing a

11  black hooded sweatshirt, black pants and black

12  boots.

13      Q   Detective Forrester's account of the

14  interview of Sam Crabtree, prior to taking her

15  to the ID section, doesn't include a description

16  of what Mr. Pursley was allegedly wearing on the

17  night?

18      A   Okay.  Maybe I got it from my statement

19  then.

20      Q   Okay.

21      A   I know --

22      Q   So it's possible that --

23      A   I know it's down there somewhere.

24      Q   It's possible that she didn't talk about

1  what Patrick Pursley was allegedly wearing the

2  night of April 2nd until after you'd gotten back

3  from driving around?  Is it possible?

4      A  It's possible.

5      Q  You don't have an independent recollection

6  of her talking about what he was wearing?

7      A  No, other than what she told me in my

8  statement.

9      Q  In the statement; so at 8:10, you and

10  Detective Forrester take Sam to the ID section.

11  Did Detective Forrester have a conversation with

12  Detective Houde prior to taking Sam down to the

13  ID section, do you recall?

14      A  It's possible.  Like I said, it could

15  have been Detective Houde who come -- you know,

16  came to us and said, "Hey, could she look at

17  this"; or, you know, maybe Sergeant Pirages said,

18  you know, "He's got some stuff laid out, and we

19  want you to take her down there to view it."

20  I don't know.

21      Q  Who would have determined what would

22  be laid out for the witness to view, or for

23  Sam Crabtree to review?

24      A  I don't -- the stuff that they brought it

1    in, it wasn't just for her to view.  He brought it

2    in.  They were going to tag everything.  And they

3    wanted to see if she could identify anything from

4    these various crimes that we had.

5        Q  So you're not aware of Detective Forrester

6    telling Detective Houde to bring out certain items

7    and place them on a table --

8        A  No.

9        Q  -- for her to view?

10       A  Not that I know of, no.

11       Q  You didn't witness that?

12       A  No.

13       Q  Would that have been a normal practice for

14   a detective to ask for specific items to be laid

15   out?

16       A  It could be.  You know, I don't know.

17       Q  So at 8:10 p.m., you and Detective

18   Forrester took Ms. Crabtree to the ID bureau.

19   Do you remember what happened in the ID bureau?

20   Do you recall that?

21       A  She viewed the stuff.

22       Q  What did she view, do you recall?

23       A  She viewed items of clothing.  She pointed

24   out -- she looked at the -- like, from the bank

1    robbery, they had a pair of sweatpants there.

2    She said Patrick was wearing those during the bank

3    robbery.  She says, "Those aren't his.  Those are

4    my sweatpants.  They're bigger than what he wears,

5    so he could get them over some clothes."  She

6    says, "The sweatshirt that he wore during the bank

7    robbery isn't here because that's what he had on

8    when he ran" from us on the 10th of June when

9    he fled from the car there on Evergreen.  Then

10   she went on to point out a sweatshirt; said that

11   he was wearing that sweatshirt that night.  And

12   there was, I guess, two-pair of black jeans.  And

13   she says, "One of those would have been one of the

14   pair that he had on."

15         And I don't even know if she viewed the

16   guns.  I'm -- if they had the guns there, you

17   know, she might have identified those as her guns,

18   too, so.

19       Q  You don't recall her identifying a gun at

20   that point?  You don't have a recollection of

21   that?

22       A  I don't know.

23       Q  But you do have a recollection of her

24   pointing to a sweatshirt and saying, "That's the

1    sweatshirt that Mr. Pursley wore on the night of

2    the murder"?

3        A   Right.  Well, no -- yeah, yeah.

4        Q   You have a recollection of that?

5        A   Right.  And I don't know what she -- you

6    know, like I said, everything that they had gotten

7    that they brought in; so the guns would have been

8    there, too.  I don't know what she said about the

9    guns.

10        Q   If you recall, did Ms. Crabtree touch any

11    of the evidence items that were laid out on the

12    table --

13        A   No.

14        Q   -- at that point?

15        A   Absolutely not.

16        Q   And you were in the ID bureau during that

17    whole time with Sam Crabtree?

18        A   The ten minutes or so, yeah.

19        Q   And Detective Forrester was there?

20        A   Yes.

21        Q   Detective Houde was there?

22        A   Yes.

23        Q   Was anyone else there?

24        A   Not that I recall.

1          Q  Turning your attention to Schmidt 6,

2     which is -- appears to be a statement written

3     by Sam Crabtree.  Is this a statement that you

4     typed on the night of June 10th, 1993, for

5     Sam Crabtree?

6          A  Yes.

7          Q  And the start time on this statement is

8     8:25 p.m.?

9          A  That's correct.

10         Q  So that's approximately 15 minutes after

11    you --

12         A  25 minutes after 8:00.

13         Q  25?

14         A  Oh, I'm sorry.

15         Q  Fifteen minutes after you took Sam to the

16    ID section approximately?

17         A  Yeah.

18         Q  That's when you start typing the

19    statement.  Who else was in the room when you

20    were typing this statement?

21         A  It was just me and her.

22         Q  So Detective Forrester had gone?

23         A  Right.

24         Q  At any point during the typing of this

1    statement, which lasted until 11:25 p.m., correct?

2        A  Correct.

3        Q  So at any point --

4        A  Well, that was the last -- that was the --

5    it actually ended at 11:10.  That's when she

6    signed the first page, but then it was just her

7    reading and initialling and stuff like that, each

8    page.

9        Q  So in total for her to complete this and

10   complete the initialling and reading, it took

11   about three hours, correct?

12       A  Yeah, if you count the initialling and

13   signing all the pages, yeah.

14       Q  And during that time, do you recall

15   Samantha stepped out to use the restroom?

16       A  Could have.  Anytime she wanted to, she

17   was allowed to use the restroom, of course.

18       Q  Do you recall whether she told you that

19   she had thrown up in the restroom?

20       A  No, she never told us that.

21       Q  She never told you that she threw up in

22   the restroom?

23       A  No.

24       Q  She never told you that she was pregnant?

1      A  No.

2      Q  Is it your testimony that this statement

3  reflects everything that Samantha Crabtree told

4  you about the Andrew Ascher murder on June 10th,

5  1993?

6      A  Yes.

7      Q  She didn't say anything in addition to

8  what was reflected here?

9      A  When she was finished with this, I went

10  on to the -- to the next crime.

11      Q  Let me rephrase that.  She didn't say

12  anything in addition -- anything regarding the

13  Andrew Ascher murder in addition to what was

14  written here?

15      A  No.

16      Q  And she didn't say anything different

17  regarding the Andrew Ascher murder than what is

18  written here?

19      A  That's correct.

20      Q  Looking at page one of the statement?

21      A  Yes.

22      Q  Third paragraph, in this paragraph there

23  is a description of what Patrick was allegedly

24  wearing -- Mr. Pursley was allegedly wearing on

1    the night of April 2nd, 1993, correct?

2        A   Yes.

3        Q   It includes black combat boots, black

4    jeans and a black hooded sweatshirt?

5        A   That's correct.

6        Q   The black hooded sweatshirt was a

7    pullover type and had buttons by the neck?

8        A   That's correct.

9        Q   And the inside of the hood was lined with

10   a gray sweatshirt material?

11       A   That's what she said.

12       Q   Is that the sweatshirt that just a few

13   minutes prior, Ms. Crabtree had viewed in the

14   ID bureau?

15       A   I don't know.  You'd have to look at

16   Detective Houde's and see what she identified.

17   I don't know.  I wasn't -- I don't know what he

18   wrote down.

19       Q   She had, just a few minutes prior, viewed

20   black jeans and a sweatshirt, correct?

21       A   Right, but I don't know if it was this

22   sweatshirt.  I have no idea.

23       Q   And it says here:  "It was around 9:00

24   p.m. on Friday night that (sic) we left 901

1  Ashland," correct?

2      A   Yes.

3      Q   Do you recall asking Sam, "What time did

4  you leave the house that night"?

5      A   No, she told me.  They were going to look

6  for a place to break into.

7      Q   Do you recall her saying, "We probably

8  left at 8:00"?

9      A   If she said that, I would have typed that

10 in.

11     Q   So you didn't sit back for a minute and

12 say, "You had to leave later than 8:00"?

13     A   No.

14     Q   And you didn't say, "Approximately what

15 time, 9:00"?

16     A   No.

17     Q   You didn't suggest that to her?

18     A   No.

19         (Whereupon, there was a brief

20 interruption.)

21 BY MS. TINGSTAD:

22     Q   And when you asked Ms. Crabtree, "What

23 was Patrick wearing that night," and she

24 responded -- did she respond, "A black

1    sweatshirt"?

2        A  It's what I typed in there.  That's what

3    she said.

4        Q  And did you ask her for more details about

5    the sweatshirt?

6        A  I just typed what she said.

7        Q  So you didn't ask her, "Which black

8    sweatshirt, the one we saw in the ID room"?

9        A  No.

10       Q  Turning to page 3 of 6, as you were taking

11   Sam Crabtree's statement regarding where she went

12   after she allegedly pulled away from the murder

13   scene, did she tell you that she went home, that

14   she was heading home?

15       A  I'm not following you on that, what -- at

16   what point?

17       Q  When you asked her, "Where did you go?"

18       A  She told me how she left, you know, how

19   she was going to turn right onto 20th and made a

20   mistake, if that's what you're asking.

21       Q  So she said, "I made a left on 20th."

22   And did you say, "I thought you said you were

23   going home.  That's" --

24       A  No.

1    Q  -- "not the way home"?

2    A  No.

3    Q  You didn't say that?

4    A  No.

5    Q  So her testimony was that she got into a

6  left-hand turning lane and made a left-hand turn

7  when she meant to make a right turn?  That was her

8  testimony to you?

9    A  I just wrote down what she said.  She

10  said, "When I got to 20th Street" -- I don't

11  think she said what lane she was in.  She says,

12  "Instead of turning right to go home," she said,

13  "I made a mistake and I turned left."  She says,

14  "I didn't" -- because she was all upset.  She

15  goes, "I got up to the -- you know, as I started

16  up the hill, I realized I was going the wrong

17  way because I seen Bob's Hardware."  Then she

18  turned into the Aldi lot and there was a road that

19  went through.  And she thought that she could come

20  right back out onto Harrison.

21      That's when they seen the squad cars

22  coming up Harrison.  And Patrick looked up over

23  and seen the red lights coming.  And she told him

24  or he told her, "Where are you taking me?  If

1    you're taking me back there, I'll kill you, Sam.

2    I swear, I'll kill you."

3        Q  So she described this, making the wrong

4    left and turning around and that whole scenario;

5    she described to you as you were taking the

6    statement?

7        A  Yeah.

8        Q  Correct?  She hadn't described that to you

9    when you were driving around in the squad car?

10       A  No, she never said that.

11       Q  Did you ask her why she hadn't told you

12   that when she was driving around in the squad car?

13       A  No.

14       Q  The murder of Andrew Ascher occurred at

15   about 10:00 p.m. on April 2nd, 1993, correct?

16       A  I was assigned at 20 -- at 10:15, but,

17   yeah, it could have been right around there.

18       Q  And she said that she got back to her

19   house on 901 -- or according to this statement,

20   that she and Patrick got back to their house at

21   901 Ashland at around 10:30 p.m., correct?

22       A  That's what I put down.  That's what she

23   said.  What page is that on?

24       Q  That's at the top of page four.

1       A   Yeah.

2       Q   Did you ever attempt to corroborate the

3   timing of this statement with regard to what time

4   she said she returned back home?  Did you ever

5   drive the route that she --

6       A   No.

7       Q   -- laid out for you?

8       A   No.

9       Q   And the fourth paragraph of page four

10  talks about -- strike that.  I'm on page five of

11  the statement, second paragraph.  The statement

12  says, "I got ready for work."  Next sentence:

13  "I then heard on the news that Andy Ascher was

14  shot and killed, and it was at some apartments on

15  Silent Wood."  Then it states, "It stated it

16  happened Friday night in the parking lot, and then

17  gave a description of the suspect, but I can't

18  remember what all they said, but I knew it was

19  Patrick that they were describing."

20          Do you recall Ms. Crabtree saying that

21  to you?

22      A   Yes, that's why I typed it.

23      Q   And this was the day after the murder that

24  she was describing?

1      A   The day after?

2      Q   Yes.

3      A   Yeah.  Well, she was -- she caught the

4   5:00 news, so, yeah, it would have had to have

5   been the next day.

6      Q   Did you ever review the news report from

7   5:00 that day --

8      A   No.

9      Q   -- to see whether or not they gave a

10  description of the suspect?

11     A   No.

12     Q   Turning to the last page of this

13  statement, had -- prior to when you were taking

14  this statement with Ms. Crabtree, had she talked

15  at all about cleaning her gun?

16     A   No.

17     Q   How did it come about that you typed this

18  paragraph regarding her cleaning a gun, cleaning

19  the gun?

20     A   It's what she told me.  It might have come

21  from before during the interview when he asked her

22  if she had anything -- any work done on the gun.

23  I don't know, but that -- during when we were

24  talking to her, Howard Forrester asked her if she

1   had taken the gun anywhere or had any work done on

2   it.  And she said, "No."

3        Q  So then did you ask her that again when --

4        A  No.

5        Q  -- you were taking her statement?

6        A  She's just telling me.

7        Q  She offered this information?

8        A  Right.

9        Q  She said that she took the gun apart?

10       A  To clean it, yes.

11       Q  Did you ask her why she was going to clean

12  the gun?  Did you ask her why?

13       A  (Witness shakes head.)

14       Q  No?

15       A  No.

16       Q  She said that -- in the middle of that

17  paragraph:  "And when I shot the gun, it fired,

18  but the top part of the gun stayed back, instead

19  of sliding back forward to load another shell into

20  the gun.  So I figured I put the gun together

21  wrong.  I put (sic) the top back a little and

22  the empty shell fell out, and it went forward.

23  And at that time I went back home and put the gun

24  back under the water mattress in my room"?

```
 1      A   Yes, yes.  She was explaining that she had
 2   dropped the gun about a week -- on the floor about
 3   a week before she cleaned it, or a few days before
 4   she cleaned it.  And she was cleaning it.  She
 5   said that she never used any solvents or anything,
 6   just paper towels or whatever to wipe parts off.
 7   And she said that when she put the gun together,
 8   she drove -- she had a magazine with only six
 9   rounds in it left.  So she drove out to -- way
10   out Cunningham Road; she didn't tell me where.
11   She said she wanted to fire the gun to see if
12   she put the gun together right.  And she says,
13   "It fired," but she says, "When the slide came
14   back it -- it didn't eject the round.  It stayed
15   back."  Well, she jerked it back a little bit and
16   an empty casing fell out, and then it went forward
17   again.  And then she was done.  That's what she
18   had said.
19      Q   She said all that?
20      A   Yes, yeah, I didn't know she cleaned the
21   gun.
22      Q   And she was -- she said that this happened
23   after the murder took place, correct?
24      A   Well, this is --
```

1      Q  That was her statement?

2      A  -- almost in a chronological order.

3  So, yeah, I'm assuming it would have been.

4      Q  On page five it says at the bottom

5  paragraph:  "I kept the bullets in the dining

6  room cabinet; and a couple weeks after the murder,

7  I found the bullets missing"?

8      A  Yeah, that's from the first gun.

9      Q  And then it -- the first gun?

10     A  Yeah, when she bought the first gun --

11     Q  The Taurus?

12     A  Right.  She bought the cheapest rounds

13 they had, which to her looked like military

14 surplus ammunition.  And she said that after --

15 sometime after the murder, she found the bullets

16 missing.  And Patrick said he accidentally threw

17 them away.  When she bought the second gun, she

18 bought good rounds that were in a red box with

19 an eagle on them.

20     Q  Which gun was Ms. Crabtree referring to

21 on page six of six:  "I took my gun and cleaned

22 it"?  Is she referring to the Taurus?

23     A  Yes.

24     Q  So this statement was completed on -- at

1    11:25 p.m.?

2        A   Yes.

3        Q   What was Ms. Crabtree's demeanor as you

4    were taking the statement?  Did she cry at any

5    time?

6        A   Just recanting (sic) what she remembered

7    and telling me what happened.

8            MR. IASPARRO:  Recounting or recanting?

9            THE WITNESS:  I'm sorry, recounting.

10   BY MS. TINGSTAD:

11       Q   Did she cry at any time when you were --

12   when she was giving the statement?

13       A   No.

14       Q   She wasn't emotional?

15       A   (Witness shakes head.)

16       Q   Did she seem -- had she eaten or drank

17   anything while she was giving the statement?

18       A   I don't know when she drank the two cans

19   of pop and the water and stuff like that.  She

20   never ate anything, but she had cigarettes and

21   stuff to drink.  She just didn't want to eat

22   nothing.  In fact, when this was done we came

23   out.  They had just brought in boxes of pizzas

24   for everybody that was working.  And we -- fresh,

1    just brought it in.  We asked her if she wanted

2    some of that.  She said, "No."

3        Q  I'm going to mark as Houde 7 --

4           MR. IASPARRO:  Schmidt 7?

5           MS. TINGSTAD:  Schmidt 7.

6        Q  Take one and pass it down.  (Tenders

7    documents to witness.)  Let the record reflect

8    that this is a document with a Bates stamp

9    Schmidt 114 through Schmidt 119.

10           (Exhibit 7 was marked for identification.)

11   BY MS. TINGSTAD:

12       Q  The first page of this exhibit is a

13   police report by Detective Forrester dated as

14   completed June 15th, 20- -- 1993.  And it states

15   that Ms. Crabtree gave a statement to you --

16   Detective Schmidt -- in the presence of Detective

17   Forrester, admitting her involvement in a bank

18   robbery?

19       A  Yes.

20       Q  And that the case was reviewed with

21   Assistant State's Attorney Karner, and he

22   authorized a charge of armed robbery against

23   Samantha Crabtree?

24       A  Yes.

1      Q  And is what's following on the next page,

2  is that the statement that you took of Samantha

3  Crabtree starting at 11:37 p.m. --

4      A  Yes.

5      Q  -- on June 10th, 1993?  And at this

6  point Samantha Crabtree had been with you for

7  an unbroken period from 2:30 p.m., and now it's

8  11:37 p.m., and you hadn't seen her eat anything,

9  correct?

10     A  Yeah, me either.  I would have liked to

11  have pizza, but she didn't want any.  So I went

12  right in and started typing the next statement.

13     Q  At any point in this process -- so

14  Detective Forrester, did he come back in the room

15  when you were taking this statement --

16     A  No.

17     Q  -- as you recall?

18     A  No.

19     Q  His police report said --

20     A  He came in when the statement was

21  finished.  And then Samantha read it and

22  initialled, and he was there for that.

23     Q  And he would be there?

24     A  She said that this was her statement,

1    it's correct; and then we both signed it.

2        Q   Okay.  So during the taking of the

3    statement, he wasn't in there?

4        A   Right.

5        Q   At any point in this process of this long

6    evening of interrogation, did you hear Detective

7    Forrester -- did you hear Sam ask -- or

8    Ms. Crabtree ask if she could check on her

9    children?

10       A   No.

11       Q   Or whether one of you could check on her

12   children for her?

13       A   No.

14       Q   She never asked you to check on her kids?

15       A   No.

16       Q   And Detective Forrester never said to

17   Ms. Crabtree, "I haven't seen my kids in three

18   days and you want me to feel sorry for you"?

19       A   You must be getting that off the perjury

20   one, right?

21       Q   You didn't hear Detective Forrester say

22   that to Ms. Crabtree?

23       A   No, did not; never happened.

24       Q   Is it your testimony that this

1   statement, Mark Schmidt 7, reflects everything

2   that Sam Crabtree told you about the bank robbery

3   on June 10th, 1993?

4       A  Yes.

5       Q  And she didn't say anything in addition

6   to what's reflected here about the bank robbery

7   on June 10th, 1993?  She didn't say anything in

8   addition to what's reflected here?

9       A  No.

10      Q  And she didn't say anything different from

11  what's reflected here?

12      A  Not during this statement, no.

13      Q  What time was this statement completed?

14      A  Actual typing was done at 1:20.  Then

15  she read it.  Well, actually, the way you'd

16  want to do it, where she initialed and signed

17  everything would have been at 1:28 in the morning.

18      Q  So you finished typing at 1:20.  And then

19  at 1:28, that was -- the signing was completed?

20      A  Probably a little bit before; 1:20, when

21  she signed that; that was -- she had already

22  read the first page, and then signed that at 1:20.

23  So it would have been actually finished typing the

24  statement, a little before then.

1    Q  So totally, all in all, completed with

2  signing all of these pages at 1:28 a.m. on

3  June 11th, 1993?

4    A  Yes.

5    Q  And that was approximately 11 hours from

6  the time that you first -- she first went with

7  you at 2:30 p.m. the day before, correct?

8    A  Yes.

9    Q  Okay.  What happened next?  Was there

10  another statement that was given?

11    A  Detective Forrester took a statement

12  regarding the armed robbery at the Burger King,

13  I believe.

14    Q  Were you in the room at the time that

15  Detective Forrester took that statement?

16    A  No.

17    Q  Where were you?

18    A  I think I might have went and had a piece

19  of pizza, to be honest with you.

20        MS. TINGSTAD:  We'll mark this as

21  Schmidt 8.

22        THE WITNESS:  Oh, I'm sorry.

23        MR. IASPARRO:  That's okay.

24        (Exhibit 8 was marked for identification.)

1    BY MS. TINGSTAD:

2        Q   The first page of Schmidt 8 is a police

3    report signed by Detective Forrester at 6 -- on

4    June 15th, 1993, or dated June 15th, 1993; is that

5    correct?

6        A   That would have been dated by Sergeant

7    Pirages.

8        Q   Dated by Sergeant Pirages; have you ever

9    seen this police report?

10       A   Yes.

11       Q   And in this police report it states that

12   "Samantha Crabtree gave a typed statement to

13   Detective Forrester, in the presence of Detective

14   Schmidt, admitting (sic)" -- "stating that Patrick

15   Pursley admitted to her that he had robbed the

16   Burger King on West Riverside."

17           Were you in the room -- you said you were

18   not in the room when --

19       A   I was in the room when she gave the verbal

20   account of everything.  When --

21       Q   Hours earlier, you mean?

22       A   When he took the actual typed statement,

23   I had left.  And then he called me back in.  And

24   I -- like he did with me; and then I -- he went

1    over the information, had her initial and sign it

2    and in front of me.  I was there when she did

3    that, and then I signed it.  Howard took the

4    typed statement on this one.

5        Q  If you recall, according to Detective

6    Forrester's report, which covered you, when

7    Samantha Crabtree was earlier asked about

8    the Burger King robbery, she said that sometimes

9    Mr. Pursley is gone at 4:30 in the morning?

10       A  Uh-huh.

11       Q  There is no notation there that she said

12   that she asked Patrick if he robbed the Burger

13   King, and he stated, "Yes"?

14       A  I believe that came later.  That was in

15   another -- when she was giving the verbal account.

16   The one you're describing is when she was -- we

17   were talking to her vaguely, I think.  But there

18   is a report that covers that she had talked to

19   him about that because she went back to work.

20   Her manager -- one of the managers from that thing

21   talked to her.  She couldn't remember if it was

22   the day before or whatever.  But when she found

23   out that had -- that somebody had came in early

24   in the morning and robbed them, she went and asked

1    Patrick.  And she said that Patrick said that,

2    yeah, he did that.

3         Q  So that's not reflected in Detective

4    Forrester's report giving the account of this

5    interrogation.  You can review it if you --

6         A  This is in a statement.

7         Q  It appears in the statement?

8         A  Right.

9         Q  It doesn't appear in the report?

10        A  Yeah, that's --

11        Q  You agree with me?

12        A  Yes, it's not -- are you talking about in

13   this one-page report?

14        Q  Uh-huh.

15        A  Yeah, it's not in there.

16            (Ms. Hall leaves the deposition

17   proceedings.)

18   BY MS. TINGSTAD:

19        Q  Were you aware that the suspect or the

20   eyewitness in the Burger -- of the Burger King

21   robbery described the suspect as white?

22        A  I really didn't know anything about the

23   Burger King robbery.  I didn't work on it.  What

24   I can remember, I don't -- other than what I read,

1    I don't know.

2        Q   So you weren't aware that the suspect was

3    described as a white male?

4        A   No.

5        Q   And this statement start time is

6    1:30 a.m.?

7        A   Yes.

8        Q   End time, 1:51 a.m.?

9        A   That's correct.

10       Q   What occurred after 1:51 a.m.?

11       A   Detective Forrester served her with

12   the complaint for armed robbery, and she was

13   at -- sometime right after that, she was taken

14   to the jail section at 2:05.

15       Q   2:05 a.m.?

16       A   2:05, yes, 2:05 a.m. on 6/11/93, she was

17   served with her copy of the complaint for armed

18   robbery.  And then she was lodged in jail, lodged,

19   taken to.

20       Q   So why was it that you didn't take the

21   third statement from Sam?

22       A   Probably because I didn't know anything

23   about that case.

24       Q   So if --

1      A   And I just had two statements that I

2   typed; so probably more so to give me a break

3   than anything else.

4          (Ms. Hall returns to the deposition

5   proceedings.)

6   BY MS. TINGSTAD:

7      Q   At any time during this interrogation,

8   did you or Detective Forrester raise your voice

9   at Ms. Crabtree?  Is it possible?

10     A   Not that I recall.

11     Q   Not that you recall?

12     A   (Witness nods head.)

13     Q   Did you have any involvement in this

14  case -- actually, take that back, one other thing.

15  Scratch that.  Turning back to Detective

16  Forrester's report --

17     A   The 15-page one?

18     Q   Yes, the long one; on page 12 of 15,

19  middle of the page, do you see where it says:

20  "On June 11th, '93, at 10:40 hours, the case was

21  reviewed with ASA Koski and State's Attorney

22  Paul Logli, in the presence of Lieutenant Gambini,

23  A.D.C." -- yeah --

24     A   Assistant deputy chief.

1      Q  -- "Assistant Deputy Chief Iasparro and

2   Detective Sergeant Pirages, with Detective Schmidt

3   and myself.  A charge of first degree murder was

4   then authorized for Patrick Pursley."

5          Do you recall being part of that

6   conversation?

7      A  Yes.

8      Q  And do you recall why, at that time, this

9   states it was decided not to pursue a charge of

10  bank robbery for Patrick Pursley?

11     A  No, I don't.  We took the reports over.

12  Assistant Deputy -- Dave Koski, Assistant State's

13  Attorney; Paul Logli, the State's Attorney; and

14  everybody, we presented what we had, talked to

15  them.  And I don't know why they didn't charge

16  him with bank robbery.

17     Q  Do you know why they didn't charge him

18  with robbery of the Burger King?

19     A  Probably because they had a first degree

20  murder warrant for him with no bond, so.

21     Q  What else do you -- what do you remember

22  about that conversation?

23     A  Just reviewing the facts; they were

24  reading reports and going over statements and

1    stuff like this.  And then they determined that

2    they were going to authorize the charge of first

3    degree murder.  And then their office typed up

4    the complaint and Howard signed it.

5         Q  And you were aware at that -- at that

6    point, you were required to turn over all relevant

7    information to the state's attorney about the

8    case, so that they could make their charging

9    decision, right?

10            MR. IASPARRO:  Object to form and

11   foundation; that also calls for a legal

12   conclusion.

13   BY MS. TINGSTAD:

14        Q  You were under an obligation to turn --

15   to give all relevant information to the state's

16   attorney?  You were?

17            MR. IASPARRO:  All relevant information,

18   what does that mean?

19   BY MS. TINGSTAD:

20        Q  All information about regarding your

21   investigation.

22            MR. IASPARRO:  In what context?

23            THE WITNESS:  I don't even know if the

24   reports were written by then.  This one was

```
1   signed at -- on 6/18.  You're talking about

2   talking to the state's attorney on, what, the

3   11th?  So how were we going to turn everything

4   over?  We hadn't even done our reports yet.

5   BY MS. TINGSTAD:

6       Q  When you did do your reports, were you

7   obligated to turn those over to the state's

8   attorney's office?

9       A  Well, any -- yeah, anything that we had,

10  you know, regarding these reports would have gone

11  to them, sure.

12      Q  And you were obligated -- you understand

13  that you were obligated to -- you were under --

14  scratch that.

15         You understand that you were under a

16  continuing obligation to turn over all information

17  relevant to this invest- -- the investigation of

18  the Andrew Ascher homicide --

19      MR. IASPARRO:  Form.

20  BY MS. TINGSTAD:

21      Q  -- to the state's attorney's office?

22      MR. IASPARRO:  Form; foundation; you know,

23  there is no time frame here, and it asks for a

24  legal conclusion.  I just don't know what "all
```

1  relevant information" means, what the time frame

2  is, what the context is.  When?  What is "all

3  relevant information"?

4  BY MS. TINGSTAD:

5      Q  All information that is relevant to the

6  charge of murder against Patrick Pursley for the

7  murder of Andrew Ascher, information regarding the

8  charge of murder, you were --

9      A  Like, statements and reports and stuff?

10  Sure.

11      Q  And you were under an obligation to turn

12  over any exculpatory information regarding the

13  murder charge against Patrick Pursley?

14          MR. IASPARRO:  Form; foundation; calls

15  for a legal conclusion.

16          THE WITNESS:  Such as what?

17  BY MS. TINGSTAD:

18      Q  Such as -- I'm just saying:  Were you

19  aware that you were under a continuing obligation?

20      A  Yeah, I turned over everything I was

21  involved in, absolutely.

22      Q  On June 23rd you testified at the grand

23  jury, correct?

24      A  Yeah.

1      Q  And Sam Crabtree testified at the grand

2   jury as well, correct?

3      A  I don't know.  I'm sure she did.  I don't

4   know if it was that day, or I don't know when she

5   testified or what she testified to.

6      Q  You weren't present in the courtroom for

7   her testimony?

8      A  In the grand jury?

9      Q  Yes.

10     A  No.

11     Q  In a criminal investigation when there is

12   a victim, is there usually one officer who is the

13   officer who would communicate with the victim's

14   family or the victim?

15         MR. IASPARRO:  Form and foundation.

16         THE WITNESS:  No, not necessarily.

17   BY MS. TINGSTAD:

18     Q  Would the police department keep the

19   victim's family updated on any developments in

20   the case?

21     A  Sure.

22     Q  And who would be the person from the

23   police department who would communicate with the

24   victim?

1    A   Could be whose case it is; it could be the

2    supervisor.  You know, it depends on, you know,

3    what it is.

4        Q   Did you know the Ascher family?

5        A   Did I know them?

6        Q   Yes.

7        A   Prior to this?

8        Q   Yes.

9        A   No.

10       Q   Do you know, in the investigation of the

11   Ascher homicide, whether -- or who would be the

12   person giving updates to the Ascher family

13   regarding developments of the investigation?

14           MR. IASPARRO:  Object to form; foundation;

15   assumes facts not in evidence.

16           THE WITNESS:  Like I said, it could have

17   been -- you know, if they called in and wanted to

18   know what's going on or whatever.  It could have

19   been, you know, the supervisor; or it could have

20   been whosever case it was.

21   BY MS. TINGSTAD:

22       Q   So either Detective Pirages or Detective

23   Forrester -- Sergeant Pirages or Detective

24   Forrester?

1    A   Could have been.  You know, I don't know.

2    Q   You're not aware --

3    A   Right.

4    Q   -- of who was communicating with the

5  Ascher family during the course of the

6  investigation?

7    A   (Witness shakes head.)

8        MR. IASPARRO:  If anybody.

9  BY MS. TINGSTAD:

10    Q   If anybody?

11    A   Well, I had -- I talked to Vernon Ascher,

12  the father.

13    Q   You talked to --

14    A   But it wasn't for updates; he called in

15  and he needed the keys that Andy Ascher had on

16  him the night of the homicide.  They needed it

17  for some tool boxes at work.  So I checked with

18  the supervisor.  And they said, "Yeah, that can

19  be released to the family" because they don't

20  need them, you know, for evidence.  So I filled

21  out a form for property to release them.  And

22  it turned out that -- it turned out that

23  Vernon Ascher came down and got two keys for a

24  Craftsman tool box from me.

1          THE REPORTER:  This is 9 then?

2          MS. TINGSTAD:  Yes, this is Schmidt 9;

3    marking as Schmidt 9, documents with Bates numbers

4    Schmidt 241 to 243.

5          (Exhibit 9 was marked for identification.)

6          MR. IASPARRO:  This can be off the record.

7          (Discussion off the record commencing at

8    5:18 p.m. and concluding at 5:18 p.m.)

9    BY MS. TINGSTAD:

10     Q  Was the date that you gave the keys to

11   Vernon Ascher, May 19th, 1993?

12     A  Yes.

13     Q  Is the documents reflected on Schmidt 242

14   and 243, the documentation that you referred to,

15   giving two keys to Vernon Ascher?

16     A  Yes.

17     Q  And on page --

18     A  Oh, I'm sorry.

19     Q  Page 241, Schmidt 241, this is dated

20   April 13th, 1993, and that's your signature at

21   the bottom.  Did you also meet with Vernon Ascher

22   on April 13th, 1993?

23     A  Oh, this is different.  This is release

24   of his vehicle.

1      Q   So this is a separate day?

2      A   Yeah, yeah, this was a couple -- you know,

3  this was, what, on the 13th.  They had already

4  finished with his car, and it was able to be

5  released to the family.  And Vernon came down

6  and got the car.

7      Q   Do you recall having any more -- do you

8  recall having involvement in this case in October

9  of 1993?

10      A   Regarding?

11      Q   Regarding an interview with someone by the

12  name of Olen Bell, Senior?

13      A   Yes.

14      Q   Let me give you what we'll mark as Schmidt

15  10 and Schmidt 11.  That's Schmidt 10.  This is

16  Schmidt 11.

17      A   Do you want this back?

18      Q   No, you can just pass them down.  Yeah,

19  there's two separate documents.  I just gave you

20  copies.

21          (Discussion off the record commencing at

22  5:20 p.m. and concluding at 5:20 p.m.)

23          (Exhibits 10 and 11 was marked for

24  identification.)

1    BY MS. TINGSTAD:

2         Q   Looking at Schmidt 10, for the record,

3    the Bates label is RFD Defense 272 to 274.

4    Do you recognize this document?

5         A   Okay.  Which one?

6         Q   This, the police report?

7         A   Yes.

8         Q   It says here that this is the police

9    report signed by Detective Forrester, and it

10   appears that the date that this was signed by a

11   supervisor was November 1st, 1993?

12        A   Right.

13        Q   That would be Lieutenant Gambini's

14   signature, if you can tell?  That's a guess on

15   my part.

16        A   I'm not sure.  I think so.

17        Q   It says here that Detective Forrester was

18   contacted by you; and "he advised that Deputy

19   Chief Iasparro had assigned" Forrester and you

20   to interview Olen Bell, Senior.  Is this -- there

21   is no police report that you wrote about this

22   interview, correct?

23        A   No.

24        Q   Is this one of those situations where your

1    involvement was covered by Detective Forrester's

2    police report?

3         A  Right, it was at 5:30.  And the only

4    reason -- the only thing I can assume is, I

5    was at the station working.  And Detective or

6    Assistant Deputy Chief Iasparro came in and had

7    information that Olen Bell had information.

8    And he says, "Get ahold of Forrester at home

9    and you and him go up and talk to him."  So I

10   contacted Detective Forrester and -- you know,

11   but I'm assuming that.  He wouldn't have called me

12   at home and then had me call Howard.  He wouldn't

13   have called me at home and then had me call

14   Howard.  If he was going to call somebody at home,

15   he would just have called Howard direct.  Like I

16   say, he was in the station.  He must have --

17   whatever, he must have -- I must have been there

18   working late or whatever, you know, on another --

19   on something else or --

20        Q  Do you recall the interview that you and

21   Detective Forrester had with Olen Bell, Senior?

22        A  Yeah.

23        Q  You do?  And did you stay in the room

24   during the interview with Olen Bell, Senior?

1      A   Yes.

2      Q   Did you stay in the room while the

3   statement was being typed, do you recall?

4      A   Yes.

5      Q   Was there any -- ever any discussion of

6   Olen Bell, Senior's gang affiliation?

7      A   Yeah.

8      Q   And what gang did he say he was a member

9   of?

10     A   Vice Lords.

11     Q   Does this police report accurately reflect

12  your activities on October 29th, 1993, with regard

13  to this interview of Olen Bell, Senior?

14     A   Yes.

15     Q   Was there ever any discussion with regard

16  to the gang affiliation of Lester Brown with

17  Olen Bell, Senior?  It's not in the report.

18     A   Huh?

19     Q   It's not in the report.

20     A   Not -- no, just that he spoke to "Late."

21  That was his nickname, Late.

22          MR. IASPARRO:  L-A-T-E.

23          THE WITNESS:  They all had nicknames.

24  BY MS. TINGSTAD:

1        Q   And in turning to Schmidt 11, this

2    statement that Olen Bell, Senior, gave; is it

3    your testimony that this statement reflects

4    everything that Olen Bell, Senior, said to you

5    and Detective Forrester on October 29th, 1993?

6        A   Yes.

7        Q   And he didn't say anything in addition to

8    what is reflected here?

9        A   Whatever he said was put in this

10   statement.

11       Q   So he didn't say anything different from

12   what was reflected here?

13       A   No.

14       Q   Would you adopt Detective Forrester's

15   report as your own with regard to Schmidt

16   Exhibit 10?

17       A   Adopt it?

18           MR. IASPARRO:  I'll object to form.

19           THE WITNESS:  Pardon?

20           MR. IASPARRO:  I said, I'll object to

21   form.

22           THE WITNESS:  It's -- it's --

23   BY MS. TINGSTAD:

24       Q   It accurately reflects your activities --

```
1        A   Yeah.

2        Q   -- of that day?  Just a few more

3    questions:  Do you recall answering

4    interrogatories in this case?  Do you know

5    what an interrogatory is?  It's a list of

6    questions that were -- have been sent to your

7    lawyer for you to answer under oath.  Do you

8    recall receiving interrogatories in this case?

9        A   I probably did, but --

10       Q   Let me see if I can pull it.

11       A   Is that one of the things that came almost

12   two years ago?

13           MR. IASPARRO:  More recent.

14   BY MS. TINGSTAD:

15       Q   It would have been more recent than that.

16           MS. TINGSTAD:  You can mark this as

17   Houde 12 -- Schmidt 12, sorry.

18           (Discussion off the record commencing at

19   5:28 p.m. and concluding at 5:28 p.m.)

20           (Exhibit 12 was marked for

21   identification.)

22           (Mr. Iasparro confers with the witness

23   outside the hearing of all outside parties.)

24   BY MS. TINGSTAD:
```

1      Q   Do you recall reviewing this document?

2      A   Yeah.

3      Q   And is that -- is it your signature that's

4   reflected on the second-to-last page labeled

5   Verification at the top?

6      A   Yes.

7      Q   You're aware that Patrick Pursley's

8   conviction was overturned for the murder of

9   Andrew Ascher, correct?

10      A   Yes.

11      Q   You're aware of that?  And you're aware

12   that that was based on forensic ballistic

13   evidence?

14      MR. IASPARRO:  Object to form; foundation.

15   BY MS. TINGSTAD:

16      Q   Are you aware of the testimony or the

17   new evidence regarding the gun that was placed --

18   scratch all that.

19      Do you have any opinion about Patrick

20   Pursley's guilt or innocence in this case?

21      MR. IASPARRO:  Object to form and

22   foundation, but you can answer the question.

23      THE WITNESS:  Yes, I think he's guilty.

24   There's no question in my mind that he committed

1    this murder, committed the bank robbery, did the

2    stolen car; none to me.

3    BY MS. TINGSTAD:

4        Q   And you're aware that Patrick Pursley was

5    acquitted after a retrial, correct?  He was found

6    not guilty --

7        A   Yes.

8        Q   -- after a retrial?

9        A   Because we had no -- they didn't get

10   Marvin Windham in.  They didn't have any of these

11   other people come and testify.  Samantha Crabtree

12   recanted her statement and pleaded the Fifth

13   during that.  I mean, it just goes on and on.

14   I don't know how much of a good trial that was;

15   but, yes, he was being acquitted on that.

16       Q   You're aware that a new firearms expert

17   said that the bullets and shell casings found at

18   the crime scene could not have been fired by the

19   Taurus found in Mr. Pursley's apartment?

20       MR. IASPARRO:  Form and foundation;

21   misstates the evidence.

22       THE WITNESS:  That's your witness, your

23   expert witness.

24   BY MS. TINGSTAD:

1      Q   Not my witness.

2      A   Well, you know what I'm saying.  You know,

3  I don't know.  I'm not an expert on that, so.

4      Q   What's your understanding of the comments

5  that Lois Ascher made about the murder weapon, the

6  recent comments about -- that she made about the

7  murder weapon?

8      A   What did she say?

9      Q   She said that -- and I'm paraphrasing --

10  that after the trial, a detective told her that

11  they never found the gun that killed her son?

12         MR. IASPARRO:  I object to form;

13  foundation; and that misstates the evidence and

14  her testimony in December of 2018.

15         THE WITNESS:  Is that during the first

16  trial?  Is that what you're saying?

17  BY MS. TINGSTAD:

18      Q   You're not --

19      A   The retrial or the first trial?

20      Q   The retrial, prior to the retrial?

21      A   When was this said?

22      Q   It was said, I believe, in 20- -- there

23  was a statement in 2017, and a statement in 2018.

24  You are not aware of those statements?

1      A  I wasn't even in that department then, so.

2      Q  So you're not aware of any --

3      A  No.

4      Q  -- recent statements that the victim's --

5      A  Well, I heard.

6      Q  -- mother might have said about the murder

7  weapon?

8      A  Yeah, I heard once I got subpoenaed for

9  these, yeah; but, yeah, I never -- I never talked

10  to her.

11      Q  Turning to the last page of your

12  interrogatory, page five, Interrogatory Number 15

13  states:  "Identify all complaints that have ever

14  been made against you relating to your role as a

15  law enforcement official, including all internal

16  affairs intra- or interdepartmental, and citizen

17  complaints alleging dishonest behavior, lying

18  under oath, witness manipulation, improper

19  behavior during interrogations or interviews."

20          And it goes on and on there, and asks

21  you to list, include for each complaint:  "The

22  date, a description of the content, an identifying

23  number and how it was resolved, including any

24  discipline imposed."

1      You answered:  "None."  There were several

2 citizen complaints that were made against you

3 during --

4    A  I hadn't -- I didn't have the records or

5 anything to look that up.

6      MR. IASPARRO:  And I'm going to object

7 because this is specific to complaints alleging

8 all of those things.

9      MS. TINGSTAD:  Including excessive force

10 and false arrest, for which there are complaints.

11      MR. IASPARRO:  None -- none which where

12 founded.

13      MS. TINGSTAD:  Didn't ask for complaints

14 that were founded; it asked for all complaints.

15      THE WITNESS:  I had no way of knowing.

16 I don't have no records.

17      MS. TINGSTAD:  Schmidt 13.

18      MR. IASPARRO:  False accusations work both

19 ways.

20      MS. TINGSTAD:  Mark this as Schmidt 13.

21      (Exhibit 13 was marked for

22 identification.)

23 BY MS. TINGSTAD:

24    Q  Let the record reflect that Schmidt 13 is

1    Bates stamped Schmidt 707 through 713.

2          MR. IASPARRO:  I object, for the record,

3    that any of these fall within the context of

4    Interrogatory 15.  You can answer her question

5    but --

6    BY MS. TINGSTAD:

7      Q  Schmidt 707 is dated May 19th, 1980,

8    correct?

9      A  What, 707?

10     Q  Yes, Schmidt 707.

11     A  Okay.

12          MR. IASPARRO:  Forty years ago, Mark.

13          THE WITNESS:  Huh?

14          MR. IASPARRO:  Forty years ago.

15          THE WITNESS:  Yeah.

16   BY MS. TINGSTAD:

17     Q  And --

18     A  1980, that was unfounded.

19     Q  This alleges that an officer attacked the

20   complainant from behind and choked him.  This was

21   unfounded as a finding.

22          MR. IASPARRO:  Is that a question?

23          MS. TINGSTAD:  No, it's not.

24     Q  Moving on to Schmidt 709, this allegation

1   describes excessive force.  Would you agree?

2        A   Well, it's what the complaint was, yeah.

3            MR. IASPARRO:  Forty-two years ago, Mark.

4            THE WITNESS:  Yes.

5   BY MS. TINGSTAD:

6        Q   Schmidt 710 --

7        A   Which I was exonerated on also.

8        Q   Do you recall an incident reflected in

9   Schmidt 710 --

10       A   Yes.

11       Q   -- that occurred in 1977 at the Stage Door

12  Lounge?

13       A   Yes.

14           MR. IASPARRO:  Forty-three years ago,

15  Mark.

16           THE WITNESS:  Forty-three years.

17  BY MS. TINGSTAD:

18       Q   Do you recall giving a statement under

19  oath in that -- in that situation?

20       A   Yes.

21           MR. IASPARRO:  Counsel, again, which one

22  of these modifying categories in Interrogatory 15

23  does Smith 710 fall under?

24           MS. TINGSTAD:  Administrative complaints.

1          MR. IASPARRO:  Filed in state or federal

2     courts?

3          MS. TINGSTAD:  Or agencies.

4          MR. IASPARRO:  It doesn't say agencies.

5          MS. TINGSTAD:  Alleging misconduct.

6      Q  Mr. Schmidt, this complaint was sustained,

7     and you were suspended without pay for four

8     days --

9      A  That's correct.

10     Q  -- correct?  And this had to do with

11    drinking to the extent that judgment was impaired?

12     A  Yep.

13     Q  And Officer Thomas in this case was

14    terminated for his involvement --

15     A  Yes.

16     Q  -- at the Stage Door Lounge.

17         MR. IASPARRO:  I also object to the

18    relevance of any of this.  It's never admissible.

19    It's not admissible.

20         MS. TINGSTAD:  I don't think I have any

21    more questions.  So if you want to jump in and

22    ask your questions, I may come up with one more,

23    but I don't think I do, so.

24                    EXAMINATION

1    BY MR. IASPARRO:

2        Q  I'm going to run through these.  I'm

3    sorry.

4        A  No, that's okay.

5        Q  I'll go through these as quickly as I

6    can.  Quickly ask you to look at Detective

7    Forrester's report, which is Schmidt Exhibit 3.

8    In particular, I'm showing it to you right now,

9    page 10 of 15.  At the middle, the paragraph I'm

10   pointing to:  "She then stated that Patrick also

11   admitted to her that he had robbed the Burger King

12   on Riverside.  She also gave a verbal statement on

13   this."  Is that referring to Samantha Crabtree?

14       A  Yes.

15       Q  So during her verbal account of these

16   three crimes that you guys went through with her,

17   she did say that --

18       A  Right.

19       Q  -- Pursley admitted to her that he had

20   robbed the Burger King on Riverside?

21       A  Yes.

22       Q  You've reviewed Detective Forrester's

23   report before today, during the course of today's

24   deposition, correct?

1     A   Yes.

2     Q   And with respect to the portions of it

3  which relate to your and Detective Forrester's

4  interaction with Samantha Crabtree on June 10th,

5  through June 11th, 1993, does Detective

6  Forrester's report fairly and accurately summarize

7  your interactions with Samantha Crabtree?

8     A   Yes.

9     Q   Mr. Schmidt, did you fabricate any

10  evidence against Patrick Pursley with respect to

11  the murder of Andrew Ascher?

12     A   No.

13     Q   Do you know of any Rockford police officer

14  or Illinois State Police forensic scientist who

15  did?

16     A   No.

17     Q   Did you ever conceal the fabrication of

18  any evidence from Mr. Pursley or his lawyers?

19     A   No.

20     Q   Are you aware of anybody who did?

21     A   No.

22     Q   Did you ever conceal any exculpatory or

23  impeachment evidence from Mr. Pursley or his

24  lawyers at any time?

1     A  No.

2     Q  Are you aware of anybody who did?

3     A  No.

4     Q  You were not involved at any time in

5  interviewing or talking to or taking a statement

6  from a man named Marvin Windham in connection with

7  the Ascher homicide investigation?

8     A  No.

9     Q  At any time during the course of your

10  interaction with Samantha Crabtree on June 10th,

11  and June 11th, 1993, did you pressure her into

12  giving any statements, verbal or written, on those

13  days?

14     A  No.

15     Q  Did you coerce her in any way?

16     A  No.

17     Q  Did you promise her anything?

18     A  No.

19     Q  Did you ever threaten her in any way?

20     A  No.

21     Q  Did you ever suggest to her that her kids

22  were going to be taken away from her?

23     A  No.

24     Q  Did you hear Detective Forrester at any

1  time pressure her in any way?

2       A  No.

3       Q  Coerce her in any way?

4       A  No.

5       Q  Threaten her in any way?

6       A  No.

7       Q  Did Detective Forrester ever slam his

8  fist on the table in your presence at any time

9  during the Samantha Crabtree interviews?

10      A  No.

11      Q  Did you?

12      A  No.

13      Q  Did Detective Forrester ever suggest to

14 Ms. Crabtree that he or somebody was going to take

15 her kids away if she didn't cooperate with you?

16      A  No.

17      Q  Was she cooperative throughout the

18 12-hours-plus that you and Detective Forrester

19 were with her?

20      A  Yes.

21      Q  Did she ever tell you at any time during

22 that time period:  "I'm done, guys.  I just can't

23 do this anymore"?

24      A  No.

1      Q   "I don't want to talk to you anymore"?

2      A   No.

3      Q   Did she ever ask for a lawyer?

4      A   No.

5      Q   Who was the only person she ever told you

6   she was scared of that day?

7      A   Patrick Pursley.

8      Q   Are you aware of, or have any knowledge of

9   any Rockford police officer planting any evidence

10  at the apartment at 901 Ashland or fabricating the

11  results of the execution of the search warrant on

12  that apartment on June 10th, 1993?

13     A   No.

14     Q   Are you aware of any Rockford police

15  officer ever doing it during the course of your

16  career?

17     A   No.

18     Q   And were you involved in any way in

19  submitting any physical evidence in the Ascher

20  homicide case to the Illinois State Police crime

21  lab for testing?

22     A   No.

23     Q   Did you ever talk to any members of the

24  Illinois State Police crime lab or personnel of

1    the crime lab with respect to any forensic testing

2    that was done on any physical evidence in the

3    case?

4       A  Not that I know of, no.

5       Q  And I think you testified to this, but

6    have you ever spoken to a woman by the name of

7    Lois Ascher?

8       A  No.

9       Q  You testified to your contacts with her

10   husband, Vernon Ascher, correct?

11       A  Right.  The only contact I had with the --

12       (Whereupon, there was a cell phone

13   interruption.)

14       THE WITNESS:  Sorry, can I get that?

15       (Discussion off the record commencing at

16   5:45 p.m. and concluding at 5:45 p.m.)

17       THE WITNESS:  Sorry, my daughter, go

18   ahead.

19   BY MR. IASPARRO:

20       Q  Other than the contacts that you had

21   with Vernon Ascher in terms of releasing his son's

22   vehicle to him after it had been processed, and

23   releasing some keys to him, did you have any other

24   contact with Vernon Ascher at any other time?

1      A   No.

2      Q   Do you have any knowledge of any Rockford

3  police officer at any time discussing with Vernon

4  Ascher or Lois Ascher something about a gun or a

5  different gun having been found than the one that

6  was introduced into evidence?

7      A   No.

8      Q   Are you aware of any Rockford Police

9  Department policy or practice that was in place

10  while you were with the Rockford Police Department

11  with regard to pursuing convictions without regard

12  for the truth?  Did you ever have any policy or

13  practice employed by the Rockford Police

14  Department where you and your fellow officers

15  would pursue convictions of people without regard

16  for the truth?

17      A   No.

18      Q   And were you ever aware of any Rockford

19  Police Department policy or practice whereby

20  officers were not adequately trained and

21  supervised with respect to their requirements

22  and obligations to disclose exculpatory and

23  impeachment evidence?  It's a bad way of asking

24  the question.

1      A   Yeah.

2      Q   Let me ask it again.

3      A   Are you asking me if I knew it?

4      Q   Were you aware of your obligation --

5      A   Yes.

6      Q   -- to disclose exculpatory or impeachment

7  evidence to prosecutors?

8      A   Yes.

9      Q   Did you follow that obligation in the

10 Pursley case?

11     A   Yes.

12     Q   Were you trained on those obligations

13 during the course of your career?

14     A   Yes.

15     Q   Were you ever aware of the Rockford Police

16 Department turning a blind eye towards officers

17 who did not follow those obligations?

18     A   No.

19     Q   Are you aware of any sort of code of

20 silence that was ever followed by Rockford police

21 officers while you were employed with the Rockford

22 Police Department?

23     A   No.

24     Q   A few more follow-up questions:  Early on

1    Counsel asked you about report writing.  And I

2    think we've talked about reports sort of being a

3    summary of what's done during the course of

4    investigation, but why doesn't every detail in an

5    interview or interrogation end up in a police

6    report?

7         A  Well, because you refer that to the

8    statement.  It's why you take a typed statement

9    for; so you have everything that whoever you're

10   interviewing is -- you know, puts down.  It's

11   no sense in duplicating everything.

12        Q  Prior to the interview of Samantha

13   Crabtree on June 10th, 1993, had you discussed,

14   at least in general terms, the information that

15   Detectives Forrester and Scott had developed

16   from the Crimestoppers informant about Patrick

17   Pursley's involvement in the Ascher murder?

18        A  Yes.

19        Q  So you had that baseline going into the

20   interview of Samantha Crabtree; is that fair to

21   say?

22        A  Right, right.

23        Q  And on that day, prior to interviewing

24   Samantha Crabtree, and while -- I guess after you

1    had established surveillance, you saw Mr. Pursley

2    and Ms. Crabtree come out of 901 Ashland, correct?

3        A   That's correct, Apartment 2.

4        Q   And you and other officers followed them

5    over to Evergreen?

6        A   That's correct.

7        Q   And Mr. Pursley fled that day, correct?

8        A   Yes, he did.

9        Q   Your understanding, that he knew you guys

10   were police officers?

11       A   Yeah, I'm sure.

12       Q   When you and Detective Forrester went up

13   to Mira Foster's porch that day, June 10th, 1993,

14   and asked Ms. Crabtree if she would be willing to

15   come down and talk to you about Patrick Pursley,

16   did she ever say, "No"?

17       A   No.

18       Q   Did she hesitate in any way?

19       A   No.

20       Q   Did she ask, "What is this about," other

21   than the fact that she knew it was about Patrick

22   Pursley?

23       A   No.

24       Q   Did she seem concerned for her children

1  that day?

2       A  No.

3       Q  Mira Foster, who I think is also known as

4  Peachy Foster, agreed --

5       A  Right.

6       Q  -- to watch her kids, right?

7       A  That's correct.

8       Q  Did Samantha Crabtree seem satisfied with

9  that?

10      A  Yes.

11      Q  And outside of 901 Ashland when Detective

12 Scott read the search warrant to Mrs. Crabtree,

13 did Mrs. Crabtree object in any way to the search

14 warrant being executed?

15      A  No.

16      Q  Whether she had a legal right to do so or

17 not?

18      A  No.

19      Q  Was she handcuffed at that time?

20      A  No.

21      Q  And when she was asked to go up into the

22 apartment and assist the detectives who were

23 conducting the search and locating one of those

24 two firearms, did she hesitate in any way?

1      A  No.

2      Q  Was she cooperative?

3      A  Yes.

4      Q  Did she ever say, "No, I'm not going to

5  help you guys"?

6          THE REPORTER:  What?  Was she cooperative?

7  Okay.

8          THE WITNESS:  She was cooperative, yes.

9  BY MR. IASPARRO:

10     Q  Did she ever say, "No, I'm not going to

11  help you guys?"

12     A  No.

13     Q  During the course of the Crabtree

14  interview -- the first portion, I'll call it --

15  where you were gathering the general information

16  and kind of getting a general sense of what she

17  was going to tell you, do you recall Detective

18  Forrester showing him -- showing her some

19  photographs of the bank robbery suspect from

20  that First Bank North bank robbery?

21     A  Yes.

22     Q  And do you remember what she said?

23     A  She said, "He's" -- you know, "It looked

24  like him"; but when they left in the morning, he

1   was wearing dark clothes.  And when he got back

2   into her car, he still had dark clothes on.

3   She didn't know.  She says, "You know, he wasn't

4   wearing those clothes, so."

5        Q  And a little bit later on when you were

6   talking to her about the Ascher murder, and she

7   indicated that Mr. Pursley had taken off about

8   7:30 that evening and then called her between

9   12:30 and 1:00 a.m., and had her pick him up at

10  the Stop-N-Go at 11th and Harrison; do you recall

11  that?

12       A  Yes.

13       Q  Did you think she was telling you the

14  truth at that time?

15       A  No.

16       Q  And the murder took place, if I recall

17  correctly, about 10:00 p.m. over on Silent Wood,

18  correct?

19       A  That's correct.

20       Q  So if, for the sake of argument, somebody

21  on foot was at 2907 (sic) Silent Wood at

22  10:00 p.m., could they walk to the Stop-N-Go

23  on 11th Street and Harrison and get there by

24  12:30 a.m.?

1      A   Yes, I believe they --

2          MS. TINGSTAD:  Objection; calls for

3   speculation.  You also said 12:30 a.m.  I'm not

4   sure you meant to say that.

5          MR. IASPARRO:  I did.

6          MS. TINGSTAD:  Oh.

7          MR. IASPARRO:  That's all I have.

8          MR. POTTINGER:  I don't have any

9   questions.

10          MS. HALL:  I don't have any questions.

11          MR. IASPARRO:  Anybody still on the phone?

12          MS. KOZAR:  I'm on the phone, yes.

13          MS. TINGSTAD:  Do you have any questions?

14          MS. KOZAR:  I have just a couple really

15   quick questions.

16          THE REPORTER:  I'm sorry.  Can you

17   identify?  Is this Ms. Kozar?

18          MS. KOZAR:  Yes.

19                    EXAMINATION

20   BY MS. KOZAR:

21      Q   Mr. Schmidt, my name is Amanda Kozar,

22   and I represent defendants Jack Welty, Pete

23   Striupaitis, and Dan Gunnell in this case.

24   You mentioned earlier that you know Jack Welty,

1  correct?

2       A  I know of him, yes.

3       Q  Okay.  How do you know of him?

4       A  Well, I have taken stuff over to the state

5  crime lab there -- not on this case -- but other

6  times.

7       Q  Okay.  Did you have any communication

8  with Jack Welty pertaining to this case?

9       A  No.

10      Q  Okay.  And I'm sorry.  You had no

11  communication with him during the pendency of

12  this case or after it was closed; is that correct?

13      A  That's correct.

14      Q  Okay.  When was the last time you spoke to

15  Mr. Welty?

16      A  Oh, God, I would have no idea.

17      Q  Okay.  Do you know anyone by the name of

18  Peter Striupaitis?

19      A  Not that I can recall.

20      Q  Okay.  Do you know anyone by the name of

21  Dan Gunnell?

22      A  No.

23      Q  Okay.  While the investigation for this

24  case was ongoing, did you speak to anyone

1  affiliated with Illinois State Police about this

2  case?

3      A  Regarding the Pursley case?

4      Q  Yes.

5      A  No.

6      Q  Okay.  That's all I have.  Thank you.

7          MS. TINGSTAD:  I have no questions.

8          MR. IASPARRO:  Mark, last thing here,

9  you have an opportunity, if you wish, to read the

10  transcript of today's deposition -- which would

11  take you several hours undoubtedly -- just to make

12  sure that everything was taken down correctly,

13  correct certain errors; or you can waive that and

14  trust that our court reporter, who does this every

15  day, got everything down correctly, which I

16  suggest you do.

17          THE WITNESS:  Yes, I trust her.

18          (Concluded at 5:55 p.m.)

19          (Original exhibits returned to

20  Mr. Iasparro.  Copies of exhibits provided

21  electronically.)

22

23

24

1

2                CERTIFICATE OF COURT REPORTER

3

4     I, Beth A. Wakenight, Certified Shorthand

5   Reporter No. 084.003605, B.A., CSR, RPR, CRR, for

6   the County of Kane, State of Illinois, the officer

7   before whom the foregoing deposition was taken, do

8   hereby certify that the foregoing transcript is a

9   true and correct record of the testimony given;

10   that said testimony was taken by me

11   stenographically and thereafter reduced to

12   typewriting under my direction; that reading and

13   signing was not requested; and that I am neither

14   counsel for, related to, nor employed by any of

15   the parties to this case and have no interest,

16   financial or otherwise, in its outcome.

17     Dated this 4th day of February, 2020.

18

19

20

21
      _____
      BETH A. WAKENIGHT, CSR/RPR/CRR
22    CSR No. 084.003605

23

24

**A**

a-r-d
75:15
able
110:18, 111:10,
169:18, 186:15,
264:4
above
13:13, 13:21,
14:3
absent
174:19
absolutely
30:4, 30:23,
92:21, 113:8,
154:2, 199:24,
231:15, 259:21
accidentally
244:16
accompanied
164:22
accompany
145:10, 145:13,
164:24
accomplish
53:19
according
55:22, 66:13,
149:18, 176:2,
183:5, 188:1,
211:9, 239:19,
252:5
account
23:5, 23:7,
23:14, 23:21,
26:24, 28:4,
40:6, 180:16,
190:7, 194:2,
194:22, 195:2,
198:9, 201:15,
206:21, 227:13,
251:20, 252:15,
253:4, 278:15
accounting
88:16
accounts
195:10

accurately
98:3, 98:7,
213:18, 267:11,
268:24, 279:6
accusations
274:18
accusatory
18:6, 189:6,
190:10, 192:3,
193:23, 194:11,
202:6
accusing
18:23, 181:5,
182:8
acquaintance
91:2, 91:5
acquitted
271:5, 271:15
across
86:18, 95:2,
128:21, 129:12
activities
76:23, 88:17,
98:8, 157:14,
157:18, 158:10,
267:12, 268:24
actual
249:14, 251:22
actually
39:19, 120:9,
135:3, 166:13,
182:4, 183:3,
192:7, 233:5,
249:15, 249:23,
255:14
addition
234:7, 234:12,
234:13, 249:5,
249:8, 268:7
address
22:18, 83:4,
86:14, 86:15
adequately
284:20
adjusted
186:14, 187:8,
187:18
administrative
276:24

admissible
277:18, 277:19
admitted
251:15, 278:11,
278:19
admitting
194:23, 195:2,
246:17, 251:14
adopt
268:14, 268:17
advise
18:11, 179:12
advised
73:7, 75:2,
155:11, 184:14,
184:18, 265:18
affairs
273:16
affidavit
54:22, 123:3,
123:10, 123:14,
123:22, 132:19
affiliated
293:1
affiliation
267:6, 267:16
afraid
188:17, 188:18
after
11:17, 13:1,
28:17, 41:11,
73:16, 88:4,
88:24, 89:4,
89:6, 89:8,
89:11, 89:13,
100:4, 114:3,
133:8, 140:24,
147:5, 149:12,
162:8, 165:12,
171:20, 193:22,
196:11, 215:17,
215:18, 217:9,
219:6, 225:18,
228:2, 232:10,
232:12, 232:15,
237:12, 240:23,
241:1, 243:23,
244:6, 244:14,

244:15, 254:10,
254:13, 271:5,
271:8, 272:10,
283:22, 286:24,
292:12
afternoon
135:10
afterwards
187:8
again
19:17, 20:20,
26:21, 30:20,
66:6, 69:17,
71:7, 115:8,
115:23, 160:6,
190:9, 191:13,
191:24, 199:20,
200:11, 200:15,
201:5, 206:22,
217:24, 242:3,
243:17, 276:21,
285:2
against
52:5, 52:7,
155:12, 246:22,
259:6, 259:13,
273:14, 274:2,
279:10
agencies
277:3, 277:4
agent
95:6, 170:21
aggravated
52:5
ago
17:6, 138:10,
157:12, 181:1,
269:12, 275:12,
275:14, 276:3,
276:14
agree
66:20, 189:22,
253:11, 276:1
agreed
149:5, 170:10,
216:16, 288:4
ahead
18:12, 191:23,

283:18
**ahold**
73:5, 266:8
**ain't**
60:9, 215:19
**al**
1:8
**aldi**
217:17, 238:18
**aldi's**
218:3
**allegation**
275:24
**allegations**
24:1, 124:6,
155:12, 221:12
**allegedly**
227:4, 227:16,
228:1, 234:23,
234:24, 237:12
**alleges**
275:19
**alleging**
181:21, 273:17,
274:7, 277:5
**allow**
60:11, 71:16
**allowed**
59:1, 59:10,
59:22, 60:7,
60:9, 60:16,
60:24, 61:7,
61:14, 61:18,
61:19, 62:14,
63:2, 63:5,
65:2, 65:10,
66:4, 66:6,
66:15, 67:8,
68:18, 68:22,
69:20, 71:2,
153:7, 233:17
**almost**
244:2, 269:11
**alone**
198:14
**along**
12:14, 19:15,
74:18, 85:6

**already**
26:23, 26:24,
28:2, 28:3,
37:21, 50:23,
51:12, 73:6,
77:3, 77:4,
102:18, 127:6,
130:20, 130:23,
201:20, 216:9,
227:6, 249:21,
264:3
**also**
6:14, 16:7,
21:16, 26:13,
29:16, 32:11,
44:8, 48:19,
54:19, 68:15,
70:14, 74:18,
87:6, 92:22,
125:24, 126:3,
131:18, 132:5,
143:11, 167:15,
168:5, 168:15,
174:2, 185:5,
187:7, 187:9,
210:7, 214:14,
257:11, 263:21,
276:7, 277:17,
278:10, 278:12,
288:3, 291:3
**always**
19:10, 131:7,
163:20, 179:18,
180:8, 182:11,
190:7, 195:5
**amanda**
6:5, 191:16,
291:21
**ambulance**
79:18
**ammunition**
244:14
**amy**
81:8, 81:9
**andrew**
54:9, 56:23,
117:2, 118:9,
155:18, 189:9,

194:23, 234:4,
234:13, 234:17,
239:14, 258:18,
259:7, 270:9,
279:11
**andy**
78:18, 79:7,
79:22, 80:12,
88:2, 118:16,
172:12, 173:2,
173:6, 190:23,
191:1, 191:6,
191:10, 240:13,
262:15
**ann**
3:6
**anonymous**
120:2, 120:3,
120:12, 130:14,
132:13, 132:14
**another**
42:3, 43:18,
54:10, 95:5,
115:21, 127:19,
133:21, 146:22,
155:24, 168:1,
168:5, 168:16,
168:22, 169:14,
184:20, 187:10,
222:10, 242:19,
250:10, 252:15,
266:18
**answer**
10:5, 20:16,
20:19, 26:22,
27:14, 29:24,
30:12, 37:24,
38:17, 39:2,
40:11, 49:21,
62:22, 67:15,
67:24, 87:13,
115:5, 141:23,
142:18, 177:20,
203:23, 269:7,
270:22, 275:4
**answered**
274:1
**answering**
9:23, 269:3

**answers**
8:11, 10:2,
79:2, 79:3,
79:12
**anthony**
74:16
**antrone**
90:13
**anybody**
80:23, 83:8,
114:19, 116:18,
151:6, 153:23,
153:24, 156:2,
221:15, 262:8,
262:10, 279:20,
280:2, 291:11
**anymore**
281:23, 282:1
**anyone**
14:11, 48:7,
48:11, 48:15,
48:24, 85:7,
85:12, 99:14,
126:23, 166:10,
221:20, 231:23,
292:17, 292:20,
292:24
**anything**
20:1, 33:7,
35:9, 43:3,
46:12, 54:3,
60:8, 62:9,
71:24, 72:16,
74:6, 77:5,
83:9, 83:17,
84:13, 89:22,
91:5, 91:24,
94:15, 98:11,
98:12, 105:12,
105:14, 105:15,
109:8, 110:22,
111:14, 121:9,
126:10, 134:18,
134:21, 137:6,
142:15, 144:6,
146:9, 146:17,
153:3, 155:16,
156:7, 158:2,

160:15, 160:16,
160:20, 160:23,
174:9, 175:6,
176:23, 177:11,
178:11, 178:23,
179:20, 180:2,
182:3, 182:14,
185:24, 188:11,
189:8, 190:8,
190:11, 190:16,
193:4, 193:16,
198:20, 199:14,
201:9, 202:9,
205:3, 212:1,
227:3, 229:3,
234:7, 234:12,
234:16, 241:22,
243:5, 245:17,
245:20, 247:8,
249:5, 249:7,
249:10, 253:22,
254:22, 255:3,
258:9, 268:7,
268:11, 274:5,
280:17

**anytime**
95:19, 153:5,
233:16

**anyway**
160:13

**anywhere**
173:8, 180:11,
221:23, 242:1

**apart**
242:9

**apartment**
77:18, 83:12,
83:22, 84:2,
84:8, 85:16,
85:17, 86:3,
86:10, 86:12,
86:23, 87:4,
123:2, 125:3,
125:10, 139:20,
140:10, 140:23,
141:9, 143:18,
143:20, 145:8,
150:12, 150:24,

151:20, 168:11,
169:19, 169:20,
177:2, 177:3,
177:9, 185:18,
208:5, 211:5,
271:19, 282:10,
282:12, 287:3,
288:22

**apartments**
85:15, 87:9,
207:23, 208:13,
216:5, 218:22,
240:14

**apologize**
94:20, 96:11,
222:9

**appear**
209:18, 209:20,
253:9

**appeared**
3:11, 6:6,
81:12

**appears**
232:2, 253:7,
265:10

**appreciate**
102:4

**approach**
22:7, 22:9,
23:2, 136:13

**approximate**
102:22, 152:16

**approximately**
11:13, 103:6,
103:7, 126:10,
140:16, 151:21,
232:10, 232:16,
236:14, 250:5

**april**
72:22, 76:19,
82:1, 82:2,
88:1, 88:18,
88:24, 89:13,
89:17, 91:10,
93:7, 93:14,
93:16, 93:21,
94:2, 161:6,
190:12, 203:22,

203:23, 228:2,
235:1, 239:15,
263:20, 263:22

**arbor**
3:6

**arduino**
75:14

**area**
73:17, 74:24,
84:15, 87:8,
125:23, 129:16,
129:17, 129:18,
134:5, 135:15,
152:19, 197:4,
197:13

**areas**
11:9, 74:5,
76:15, 76:17,
130:8

**aren't**
213:22, 230:3

**argument**
197:20, 290:20

**argumentative**
63:20

**armed**
49:15, 49:16,
49:23, 50:1,
74:14, 84:6,
93:6, 93:15,
94:3, 94:6,
94:21, 96:16,
98:8, 132:9,
199:3, 214:17,
217:4, 246:22,
250:12, 254:12,
254:17

**around**
79:8, 84:1,
85:21, 108:9,
118:22, 121:10,
123:2, 125:21,
129:14, 135:13,
136:10, 163:24,
189:16, 195:17,
196:2, 197:19,
198:2, 198:7,
198:9, 198:19,

198:24, 207:22,
208:2, 208:7,
211:4, 211:10,
215:23, 217:16,
217:17, 218:5,
218:9, 218:24,
219:7, 225:18,
227:9, 228:3,
235:23, 239:4,
239:9, 239:12,
239:17, 239:21

**arrest**
113:4, 129:21,
158:15, 274:10

**arrive**
152:7

**arrived**
33:10, 76:24,
79:16, 82:9,
162:8, 162:10

**arrives**
102:15

**asa**
255:21

**asas**
104:21

**ascher**
32:7, 51:17,
53:4, 54:9,
56:23, 72:24,
85:19, 88:2,
88:19, 100:4,
117:2, 118:9,
118:16, 131:13,
155:18, 172:12,
173:2, 173:21,
190:23, 191:1,
191:6, 194:23,
227:4, 234:4,
234:13, 234:17,
239:14, 240:13,
258:18, 259:7,
261:4, 261:11,
261:12, 262:5,
262:11, 262:15,
262:23, 263:11,
263:15, 263:21,
270:9, 272:5,

279:11, 280:7,
282:19, 283:7,
283:10, 283:21,
283:24, 284:4,
286:17, 290:6
**ascher's**
74:21, 79:7,
189:9
**ashland**
125:3, 126:1,
126:23, 127:21,
132:23, 149:23,
166:6, 166:11,
185:9, 236:1,
239:21, 282:10,
287:2, 288:11
**ashley**
3:3, 9:9, 81:5,
101:18, 161:11,
191:15, 210:15
**aside**
27:6, 40:16
**asked**
19:17, 61:21,
65:20, 69:22,
69:24, 70:2,
71:19, 103:4,
111:2, 120:4,
126:16, 131:5,
134:22, 135:4,
135:17, 135:23,
136:21, 136:24,
137:3, 137:11,
138:13, 139:13,
140:21, 141:5,
141:14, 142:16,
147:1, 147:8,
150:16, 151:1,
153:5, 155:2,
156:1, 156:3,
160:1, 160:6,
161:5, 163:23,
168:20, 169:13,
171:22, 171:23,
172:15, 172:23,
173:7, 174:2,
174:24, 175:2,
175:3, 175:5,

175:9, 176:5,
176:18, 177:1,
178:15, 185:1,
186:3, 186:9,
187:21, 197:3,
202:7, 203:8,
203:21, 222:5,
225:1, 236:22,
237:17, 241:21,
241:24, 246:1,
248:14, 252:7,
252:12, 252:24,
274:14, 286:1,
287:14, 288:21
**asking**
9:22, 10:4,
26:15, 30:3,
41:5, 42:6,
44:1, 49:21,
50:5, 55:9,
66:22, 66:23,
70:1, 71:14,
78:24, 79:3,
79:13, 101:8,
114:19, 120:22,
138:1, 138:18,
153:14, 153:17,
154:19, 154:20,
154:21, 155:22,
167:12, 167:16,
177:15, 191:16,
194:12, 204:16,
236:3, 237:20,
284:23, 285:3
**asks**
258:23, 273:20
**assign**
15:12, 31:7,
31:15, 31:17,
33:23, 35:10,
55:12, 99:6,
99:13, 100:3
**assigned**
15:5, 15:20,
16:14, 31:19,
31:20, 32:10,
33:1, 33:19,
33:20, 34:2,

34:3, 42:2,
42:3, 43:18,
53:7, 53:11,
54:4, 55:4,
55:7, 56:5,
56:7, 75:3,
82:10, 82:11,
83:3, 88:13,
92:3, 95:23,
96:1, 98:23,
124:24, 125:15,
130:11, 132:24,
134:9, 239:16,
265:19
**assigning**
99:23
**assignment**
35:3, 134:15
**assignments**
41:23, 55:9
**assist**
31:20, 32:10,
33:19, 34:3,
123:5, 123:9,
123:16, 203:7,
288:22
**assistance**
35:8
**assistant**
5:24, 6:7,
14:2, 179:8,
183:20, 246:21,
255:24, 256:1,
256:12, 266:6
**assisting**
53:15, 54:12,
54:13, 54:19
**assume**
10:6, 154:7,
266:4
**assumed**
80:23, 182:16
**assumes**
91:17, 261:15
**assuming**
55:2, 141:9,
143:12, 144:18,
144:22, 145:5,

185:19, 201:5,
203:18, 244:3,
266:11
**ate**
245:20
**attacked**
275:19
**attempt**
23:24, 74:15,
240:2
**attend**
16:16
**attended**
88:2
**attention**
116:23, 232:1
**attorney**
5:24, 6:7,
9:10, 10:10,
48:8, 71:22,
72:3, 72:8,
72:15, 72:18,
72:20, 81:12,
105:1, 105:6,
105:10, 106:4,
109:14, 120:14,
194:9, 220:6,
246:21, 255:21,
256:13, 257:7,
257:16, 258:2
**attorney's**
121:1, 258:8,
258:21
**attorneys**
109:14
**auburn**
127:24, 128:14
**authority**
114:6, 114:10
**authorize**
106:6, 257:2
**authorized**
105:2, 246:22,
256:4
**automatic**
187:11
**autopsy**
88:2

**available**
34:1
**avenue**
2:6, 3:24,
85:15, 125:3,
132:23, 207:13,
214:3
**aware**
9:14, 85:11,
85:13, 89:2,
89:3, 89:16,
90:8, 98:19,
117:6, 117:9,
117:19, 117:22,
118:1, 118:7,
119:3, 119:24,
133:2, 150:19,
150:21, 150:22,
150:23, 229:5,
253:19, 254:2,
257:5, 259:19,
262:2, 270:7,
270:11, 270:16,
271:4, 271:16,
272:24, 273:2,
279:20, 280:2,
282:8, 282:14,
284:8, 284:18,
285:4, 285:15,
285:19
**away**
79:17, 159:21,
164:17, 194:3,
220:5, 224:18,
237:12, 244:17,
280:22, 281:15

**B**

**baby**
188:22
**back**
20:21, 25:17,
25:22, 26:2,
35:24, 45:4,
45:23, 58:10,
70:6, 75:3,
75:9, 76:22,
77:9, 77:10,

77:11, 78:19,
80:21, 84:1,
84:4, 86:19,
87:14, 87:19,
93:9, 93:12,
93:14, 93:23,
102:5, 110:22,
111:22, 123:7,
127:13, 130:9,
132:1, 133:10,
135:21, 137:10,
138:16, 139:4,
140:12, 141:5,
141:8, 147:9,
147:13, 147:19,
155:8, 160:1,
162:2, 165:12,
170:14, 171:9,
174:15, 185:13,
194:17, 206:9,
206:11, 207:17,
208:12, 209:7,
209:10, 209:12,
212:2, 212:4,
212:8, 212:10,
212:21, 213:10,
213:14, 215:22,
216:15, 216:17,
218:7, 219:21,
219:22, 224:1,
224:15, 226:3,
228:2, 236:11,
238:20, 239:1,
239:18, 239:20,
240:4, 242:18,
242:19, 242:21,
242:23, 242:24,
243:14, 243:15,
247:14, 251:23,
252:19, 255:14,
255:15, 264:17,
290:1
**back-and-forth**
29:11, 45:2,
45:6, 45:12,
45:21, 47:8
**backed**
208:11, 209:7

**backing**
130:13
**backpack**
175:11, 187:13
**backyard**
128:22
**bad**
205:1, 284:23
**ballistic**
270:12
**ballistics**
106:22, 110:13,
111:9
**ballpark**
105:19
**balsley**
5:7
**banging**
78:15
**bank**
94:21, 95:1,
95:2, 95:9,
95:14, 95:16,
95:23, 96:16,
97:14, 98:18,
117:4, 131:23,
167:20, 167:21,
175:4, 176:1,
176:7, 176:18,
179:22, 180:15,
183:2, 183:8,
183:15, 195:1,
195:3, 195:5,
195:10, 195:18,
196:21, 196:22,
201:4, 201:15,
202:7, 216:3,
216:7, 217:15,
220:21, 221:2,
221:10, 221:16,
221:17, 221:20,
229:24, 230:2,
230:6, 246:17,
249:2, 249:6,
256:10, 256:16,
271:1, 289:19,
289:20
**banks**
195:7, 195:8

**bar**
193:15
**barmore**
90:17, 90:21
**barmores**
90:22, 90:23
**barricades**
128:13, 128:16
**barrick**
5:7
**barton**
4:2, 4:11
**baseball**
97:20
**based**
118:18, 270:12
**baseline**
286:19
**basic**
50:3
**basically**
201:13, 203:11
**basketball**
56:20
**bates**
7:14, 7:17,
7:19, 7:22,
7:24, 7:27,
7:29, 8:1, 8:4,
8:6, 8:8, 8:15,
48:1, 81:4,
81:18, 96:10,
162:5, 212:13,
223:2, 224:4,
246:8, 263:3,
265:3, 275:1
**bathroom**
153:7, 161:12,
164:1, 165:16
**battery**
52:5
**bawling**
207:3
**beat**
64:20
**became**
150:23
**because**
12:1, 12:3,

29:3, 33:17,
35:4, 39:12,
43:2, 55:15,
67:2, 73:3,
80:19, 80:23,
108:7, 128:14,
139:14, 148:11,
150:14, 157:2,
160:5, 165:10,
168:6, 173:3,
173:15, 175:8,
175:17, 176:11,
177:24, 181:4,
186:11, 191:1,
191:5, 195:24,
196:4, 196:7,
196:9, 196:12,
200:19, 207:1,
208:2, 217:24,
230:7, 238:14,
238:17, 252:19,
254:22, 256:19,
262:19, 271:9,
274:7, 286:7

**becky**
77:14, 77:21,
78:16, 79:8,
79:13, 79:17,
79:23, 79:24,
80:1, 80:10,
80:16, 173:3,
191:6

**becky's**
78:2

**becomes**
85:23

**bed**
78:12, 78:13

**been**
9:3, 9:18,
13:21, 14:2,
14:12, 14:17,
21:14, 42:14,
54:16, 61:19,
62:9, 66:1,
66:9, 74:16,
76:20, 78:18,
81:18, 82:18,

84:6, 84:7,
85:2, 87:4,
88:5, 89:15,
91:4, 91:14,
91:22, 92:2,
92:6, 92:17,
103:20, 104:3,
106:9, 119:11,
119:17, 121:10,
121:13, 121:24,
122:19, 132:8,
133:15, 133:17,
138:12, 142:3,
143:15, 144:1,
144:23, 145:2,
145:3, 145:4,
146:3, 146:7,
149:15, 149:21,
152:5, 152:18,
153:10, 153:22,
159:3, 159:12,
159:15, 160:12,
163:1, 163:17,
163:22, 164:15,
166:11, 175:17,
191:10, 192:3,
192:8, 200:2,
204:11, 206:20,
212:12, 213:15,
216:9, 223:1,
228:15, 229:13,
230:13, 231:7,
239:17, 241:5,
244:3, 247:6,
249:17, 249:23,
251:6, 261:17,
261:19, 261:20,
262:1, 266:17,
269:6, 269:15,
271:18, 273:14,
283:22, 284:5

**before**
2:19, 9:18,
11:17, 27:10,
27:24, 34:4,
34:10, 48:24,
49:21, 50:5,
51:17, 51:23,

75:9, 83:19,
84:15, 84:21,
87:22, 88:6,
90:4, 93:19,
104:5, 110:10,
110:14, 119:18,
126:10, 138:6,
150:10, 151:21,
161:11, 162:6,
162:18, 163:11,
169:22, 173:17,
181:22, 189:18,
190:21, 191:15,
196:17, 201:22,
206:18, 218:3,
227:2, 241:21,
243:3, 249:20,
249:24, 250:7,
252:22, 278:23,
294:7

**began**
163:13, 192:3

**beginning**
26:4, 124:22

**behalf**
3:2, 3:9, 3:18,
4:2, 4:11, 5:2,
5:18, 6:2, 72:18

**behavior**
273:17, 273:19

**behind**
97:15, 127:17,
127:24, 175:15,
184:11, 275:20

**being**
9:14, 15:3,
29:5, 32:12,
36:2, 45:15,
57:10, 94:1,
111:2, 132:9,
155:9, 171:24,
173:6, 174:19,
176:21, 194:23,
197:3, 197:21,
202:9, 220:5,
256:5, 267:3,
271:15, 286:2,
288:14

**believe**
14:7, 15:6,
15:14, 29:13,
39:6, 39:17,
52:22, 73:16,
74:16, 76:6,
76:15, 78:4,
79:11, 80:9,
95:7, 98:12,
104:13, 120:3,
120:4, 121:19,
125:8, 126:4,
131:21, 133:21,
139:3, 140:3,
143:8, 143:10,
151:24, 170:18,
188:7, 190:3,
190:4, 195:1,
199:1, 227:7,
227:8, 250:13,
252:14, 272:22,
291:1

**believed**
36:24, 40:3

**bell**
264:12, 265:20,
266:7, 266:21,
266:24, 267:6,
267:13, 267:17,
268:2, 268:4

**benchmark**
104:15

**beretta**
168:16, 169:13,
183:14

**best**
146:19

**beth**
1:24, 2:20,
294:4, 294:22

**between**
11:21, 18:3,
30:19, 35:1,
52:8, 86:13,
86:14, 86:15,
86:16, 127:19,
154:12, 158:19,
161:3, 167:9,

176:2, 179:5,
290:8
**big**
86:3, 86:10,
86:22, 208:5
**bigger**
230:4
**bill**
168:7
**bishop**
4:3, 4:12
**bit**
10:15, 74:23,
133:8, 243:15,
249:20, 290:5
**black**
39:20, 83:23,
97:18, 97:19,
97:21, 168:17,
168:18, 168:24,
169:3, 169:4,
169:8, 187:10,
187:11, 211:19,
216:12, 227:11,
230:12, 235:3,
235:4, 235:6,
235:20, 236:24,
237:7
**blatantly**
28:24
**blind**
34:15, 285:16
**block**
95:13
**blocks**
128:8, 150:8,
152:2
**blood**
15:18, 74:24,
79:7, 79:10
**blue**
125:19
**bob's**
218:2, 238:17
**bond**
256:20
**book**
17:13, 17:14,

17:18, 17:19,
17:21
**boots**
227:12, 235:3
**both**
18:19, 23:20,
23:21, 42:4,
43:14, 43:23,
44:3, 74:23,
79:4, 80:8,
129:7, 129:9,
159:12, 162:11,
169:20, 170:3,
195:21, 213:10,
224:7, 224:8,
248:1, 274:18
**bottom**
48:2, 82:12,
96:23, 166:23,
178:10, 223:1,
244:4, 263:21
**bought**
168:5, 168:6,
168:15, 187:9,
244:10, 244:12,
244:17, 244:18
**bowman**
3:18
**box**
97:4, 97:8,
167:2, 244:18,
262:24
**boxes**
245:23, 262:17
**branch**
33:5
**brand**
144:16
**brand-new**
14:15
**break**
10:11, 57:24,
58:4, 101:20,
161:13, 197:24,
198:3, 198:6,
198:10, 201:6,
208:4, 208:22,
219:16, 236:6,

255:2
**breaks**
10:12
**brian**
78:4, 78:5,
78:6, 78:17,
78:22, 80:2,
80:9, 80:16,
81:1
**brief**
58:5, 161:15,
161:22, 172:6,
210:19, 236:19
**briefcase**
216:10, 216:12,
216:19, 225:24
**briefed**
34:5, 77:2,
119:11, 119:17
**bring**
49:13, 229:6
**broke**
197:21
**brother**
74:19, 75:5,
77:18, 78:2
**brother's**
77:20
**brought**
75:6, 140:4,
193:14, 228:24,
229:1, 231:7,
245:23, 246:1
**brown**
37:14, 39:17,
156:10, 168:24,
169:1, 169:4,
169:6, 169:7,
267:16
**bruce**
4:4, 4:13,
54:17, 54:19,
55:14, 73:6,
73:7, 73:8,
73:15, 74:19,
125:2
**building**
24:7, 24:9,

75:10, 83:22,
83:24, 84:6,
84:8, 84:10,
85:16, 85:17,
87:5, 87:16,
134:24, 147:16,
148:17, 150:16,
152:8, 158:5,
158:6, 162:12,
165:18, 208:6,
211:6
**buildings**
86:3, 86:10,
86:12, 86:24,
87:11, 196:3
**bullet**
121:20, 168:8
**bullets**
122:9, 244:5,
244:7, 244:15,
271:17
**bunch**
31:24, 52:16,
78:14, 86:11
**bureau**
12:11, 30:18,
99:10, 229:18,
229:19, 231:16,
235:14
**burger**
93:7, 93:15,
93:21, 94:2,
94:6, 174:3,
174:4, 176:12,
201:16, 250:12,
251:16, 252:8,
252:12, 253:20,
253:23, 256:18,
278:11, 278:20
**burglaries**
103:18
**burglary**
15:9, 80:10,
102:24, 103:1,
103:18, 105:24
**burst**
207:2
**bus**
196:14

busy
111:24
buttons
235:7
buying
168:1

**C**

c-l-a-i-r-e
76:2
cabinet
244:6
call
12:16, 31:9,
42:21, 55:3,
55:6, 55:13,
56:1, 68:19,
69:2, 69:3,
69:9, 69:13,
69:21, 69:22,
70:10, 70:11,
70:14, 70:17,
70:18, 72:23,
73:1, 73:14,
73:15, 78:17,
82:8, 88:9,
89:3, 89:7,
98:17, 104:10,
109:24, 110:17,
110:19, 111:7,
113:15, 113:18,
114:3, 114:8,
114:16, 114:19,
114:24, 118:7,
118:12, 118:23,
120:12, 120:13,
160:13, 187:16,
189:5, 191:16,
266:12, 266:13,
266:14, 289:14
called
9:2, 76:7,
78:22, 85:17,
87:19, 109:6,
118:14, 119:9,
120:10, 126:15,
126:20, 130:6,
137:16, 173:12,

173:16, 181:24,
186:12, 189:15,
190:20, 251:23,
261:17, 262:14,
266:11, 266:13,
266:15, 290:8
caller
118:15, 119:2,
120:2, 124:7,
130:14, 131:18,
132:3
calls
89:17, 113:22,
116:3, 120:17,
149:2, 257:11,
259:14, 291:2
calm
79:20
came
16:15, 25:19,
29:3, 29:7,
55:3, 55:13,
55:17, 56:1,
83:20, 89:17,
91:24, 118:8,
120:10, 127:5,
127:13, 127:15,
141:4, 141:18,
143:13, 144:9,
144:20, 146:11,
146:23, 147:1,
152:4, 160:8,
160:12, 166:2,
168:10, 170:8,
170:14, 174:21,
175:15, 179:3,
182:15, 185:13,
191:11, 199:5,
207:18, 220:1,
224:23, 226:14,
228:16, 243:13,
245:22, 247:20,
252:14, 252:23,
262:23, 264:5,
266:6, 269:11
can't
64:12, 69:8,
69:12, 70:13,

127:15, 145:1,
145:6, 145:17,
164:9, 200:15,
240:17, 281:22
candy
193:15
canine
76:4, 76:8
cannot
127:2
cans
160:21, 245:18
canvass
87:8
cap
97:20
card
19:7, 87:13,
183:12
care
106:23, 107:5,
197:23, 209:3
career
282:16, 285:13
carmen
118:13
cars
31:23, 126:21,
133:10, 143:2,
143:15, 238:21
case
1:6, 9:15,
28:15, 29:19,
30:19, 31:18,
31:19, 32:6,
32:8, 34:8,
34:19, 35:5,
35:6, 35:8,
47:21, 48:11,
48:15, 48:21,
49:1, 53:7,
53:11, 53:12,
54:7, 54:10,
54:15, 54:16,
54:21, 59:2,
59:11, 59:23,
60:12, 93:1,
93:2, 93:3,

95:22, 95:24,
99:16, 99:18,
105:11, 105:14,
105:15, 106:15,
106:19, 107:10,
107:14, 108:11,
108:16, 108:24,
109:1, 109:17,
109:22, 110:13,
124:19, 124:20,
129:14, 144:5,
158:11, 174:6,
174:8, 174:11,
246:20, 254:23,
255:14, 255:20,
257:8, 260:20,
261:1, 261:20,
264:8, 269:4,
269:8, 270:20,
277:13, 282:20,
283:3, 285:10,
291:23, 292:5,
292:8, 292:12,
292:24, 293:2,
293:3, 294:15
caseload
52:15
caseloads
12:4
cases
35:7, 52:16,
99:23, 106:7,
106:16, 106:20,
107:2, 110:3,
119:4, 181:19,
181:22, 182:23
casing
243:16
casings
75:1, 108:11,
109:7, 122:9,
271:17
cassette
88:8
categories
276:22
caught
186:14, 215:7,

241:3
**caused**
179:15
**celebrity**
125:12, 127:18
**cell**
283:12
**center**
42:20
**certain**
67:10, 67:23,
100:6, 100:20,
164:4, 202:17,
229:6, 293:13
**certainly**
138:14
**certificate**
294:2
**certified**
2:20, 2:21,
294:4
**certify**
294:8
**chain**
108:7
**chair**
136:16, 203:1
**chairs**
152:13
**champaign**
6:15
**changed**
128:6, 213:16
**charge**
31:6, 54:5,
99:4, 101:12,
104:22, 105:2,
105:24, 120:14,
155:12, 246:22,
256:3, 256:9,
256:15, 256:17,
257:2, 259:6,
259:8, 259:13
**charged**
21:2, 21:5,
21:14, 204:12,
204:15, 220:21,
221:10

**charges**
155:11
**charging**
104:21, 104:23,
120:19, 120:20,
257:8
**chase**
129:9, 130:1,
133:9, 135:11
**chasing**
128:22, 130:3
**cheapest**
244:12
**check**
19:16, 24:8,
33:21, 76:8,
77:4, 79:18,
83:2, 83:5,
83:8, 83:11,
84:22, 84:24,
85:14, 87:23,
110:18, 184:24,
185:1, 211:6,
248:8, 248:11,
248:14
**checked**
17:19, 77:5,
87:9, 262:17
**checking**
33:13
**chevy**
125:11
**chicago**
3:11, 3:15,
6:6, 6:10, 29:2,
29:7
**chief**
14:1, 14:2,
14:3, 14:5,
179:8, 183:21,
255:24, 256:1,
265:19, 266:6
**child**
127:13
**children**
115:8, 115:23,
127:3, 138:6,
160:24, 161:1,

193:24, 198:11,
198:21, 199:19,
200:15, 201:10,
248:9, 248:12,
287:24
**chilly**
74:6
**chips**
193:15
**choice**
151:14, 151:17
**choked**
275:20
**christenson**
143:11, 183:22,
183:23
**christine**
4:3, 4:12
**chronological**
244:2
**cigarettes**
194:20, 245:20
**circumstance**
67:4
**circumstances**
71:8, 71:10,
71:15, 71:16
**citizen**
273:16, 274:2
**city**
1:7, 5:18,
5:22, 5:24,
9:16, 10:21,
61:24
**claiming**
182:2
**clarification**
10:8
**clarifies**
43:3
**class**
15:19, 16:12
**classes**
12:1, 15:20,
15:24, 16:4
**clean**
10:1, 222:11,
222:13, 223:12,

224:3, 242:10,
242:11
**cleaned**
243:3, 243:4,
243:20, 244:21
**cleaning**
241:15, 241:18,
243:4
**clear**
225:5
**close**
15:10, 152:1,
182:24, 184:11,
201:17
**closed**
162:23, 292:12
**closet**
216:10, 216:13,
226:2
**clothes**
230:5, 290:1,
290:2, 290:4
**clothing**
229:23
**clue**
35:18, 46:6,
100:2
**coat**
39:17, 39:20
**cocaine**
155:4, 155:5
**code**
285:19
**coerce**
280:15, 281:3
**coercive**
115:15, 116:1
**coinciding**
182:22
**cold**
74:6, 76:21
**collected**
170:20, 170:23,
170:24
**com**
42:20
**combat**
235:3

**come**
16:23, 23:17,
25:11, 25:14,
46:9, 50:12,
50:14, 53:21,
53:22, 73:9,
77:10, 77:13,
77:16, 78:16,
87:22, 89:7,
100:24, 108:4,
110:21, 116:19,
120:5, 128:12,
129:14, 132:1,
134:17, 136:21,
137:19, 145:24,
173:13, 173:17,
174:15, 189:16,
194:17, 208:24,
218:7, 228:15,
238:19, 241:17,
241:20, 247:14,
271:11, 277:22,
287:2, 287:15
**comes**
34:1, 99:24
**coming**
89:4, 97:16,
98:17, 137:20,
138:16, 215:22,
238:22, 238:23
**commanders**
101:12
**commencing**
58:5, 102:7,
102:9, 161:9,
161:15, 161:17,
161:20, 161:22,
191:21, 210:17,
210:19, 211:20,
222:21, 223:18,
263:7, 264:21,
269:18, 283:15
**comments**
46:24, 272:4,
272:6
**committed**
270:24, 271:1
**committing**
20:12

**communicate**
106:20, 260:13,
260:23
**communicating**
262:4
**communication**
292:7, 292:11
**complainant**
275:20
**complaint**
121:4, 254:12,
254:17, 257:4,
273:21, 276:2,
277:6
**complaints**
105:7, 273:13,
273:17, 274:2,
274:7, 274:10,
274:13, 274:14,
276:24
**complete**
44:15, 88:16,
233:9, 233:10
**completed**
44:13, 244:24,
246:14, 249:13,
249:19, 250:1
**completely**
188:3
**comply**
151:7
**comport**
28:14, 29:18
**conceal**
279:17, 279:22
**concern**
193:24
**concerned**
206:24, 287:24
**concerning**
47:21, 105:14,
105:15
**concerns**
220:4
**concluded**
293:18
**concluding**
58:6, 102:8,

102:10, 161:10,
161:16, 161:18,
161:21, 161:23,
191:22, 210:18,
210:20, 211:21,
222:22, 223:19,
263:8, 264:22,
269:19, 283:16
**conclusion**
116:3, 257:12,
258:24, 259:15
**condo**
77:19
**conduct**
18:2, 30:17,
62:1, 125:15
**conducted**
58:21, 58:23,
85:14, 88:17,
211:6
**conducting**
58:24, 61:6,
64:24, 66:4,
67:6, 68:17,
69:18, 70:24,
125:21, 288:23
**confer**
177:5
**confers**
269:22
**confidential**
7:14, 8:6, 8:15
**conflicting**
29:16, 40:6
**confront**
29:8, 29:17,
30:7, 36:3,
39:18
**confronted**
36:6, 84:12
**confronting**
36:23
**confusing**
30:2, 39:13
**connected**
132:8
**connection**
280:6

**consent**
135:5, 216:16,
225:23, 226:7
**consented**
159:18
**consider**
37:19, 84:17,
99:22, 115:15,
115:24, 159:9,
159:11
**considered**
18:18
**consistent**
30:14
**consult**
21:11
**contact**
106:4, 283:11,
283:24
**contacted**
73:2, 265:18,
266:10
**contacts**
283:9, 283:20
**contain**
82:23
**content**
183:19, 184:1,
273:22
**contents**
118:22, 167:8
**context**
257:22, 259:2,
275:3
**continued**
128:6, 129:13,
147:15
**continuing**
258:16, 259:19
**converging**
129:16
**conversation**
18:23, 104:24,
139:10, 141:21,
146:14, 158:7,
158:18, 169:10,
172:10, 183:20,
184:1, 185:7,

228:11, 256:6,
256:22
**conversations**
48:7, 104:21,
104:23, 105:4,
105:16, 120:20,
149:24, 150:4
**conviction**
270:8
**convictions**
284:11, 284:15
**cooperate**
61:8, 61:16,
62:16, 200:23,
281:15
**cooperated**
71:3, 71:12,
71:18, 220:7,
220:12
**cooperating**
64:4
**cooperative**
201:12, 201:13,
281:17, 289:2,
289:6, 289:8
**copies**
8:19, 19:11,
32:11, 264:20,
293:20
**copy**
17:7, 17:11,
19:11, 19:15,
123:19, 124:5,
124:16, 139:16,
139:18, 139:19,
140:8, 150:18,
184:19, 223:13,
224:3, 254:17
**cordless**
78:23
**corner**
86:11, 163:24,
208:2
**correct**
11:8, 12:21,
12:24, 13:4,
13:23, 16:24,
21:14, 21:17,

25:18, 25:22,
28:7, 28:10,
28:11, 30:22,
32:9, 35:21,
44:16, 80:2,
94:3, 97:10,
100:5, 117:2,
117:3, 117:5,
129:10, 130:2,
131:20, 132:20,
135:10, 143:18,
147:21, 157:22,
167:4, 167:5,
167:10, 172:5,
177:4, 192:18,
206:20, 209:18,
211:7, 223:4,
225:8, 232:9,
233:1, 233:2,
233:11, 234:19,
235:1, 235:5,
235:8, 235:20,
236:1, 239:8,
239:15, 239:21,
243:23, 247:9,
248:1, 250:7,
251:5, 254:9,
259:23, 260:2,
265:22, 270:9,
271:5, 275:8,
277:9, 277:10,
278:24, 283:10,
287:2, 287:3,
287:6, 287:7,
288:7, 290:18,
290:19, 292:1,
292:12, 292:13,
293:13, 294:9
**correctly**
290:17, 293:12,
293:15
**corroborate**
23:24, 24:3,
24:4, 24:11,
50:18, 113:6,
240:2
**could**
9:11, 16:18,

18:19, 19:13,
20:20, 24:5,
26:21, 36:10,
36:22, 37:16,
37:18, 46:9,
47:14, 51:15,
58:16, 59:15,
64:2, 67:22,
68:9, 69:1,
69:20, 70:6,
70:9, 70:11,
70:14, 72:2,
72:11, 72:17,
79:6, 79:18,
84:3, 87:9,
87:15, 87:18,
90:3, 102:22,
103:23, 107:22,
111:23, 112:7,
112:8, 114:14,
120:15, 121:24,
128:12, 129:18,
130:8, 133:15,
133:17, 138:5,
139:13, 143:15,
144:1, 144:23,
145:2, 146:3,
146:7, 150:17,
151:12, 152:5,
158:23, 159:12,
159:22, 160:1,
160:8, 163:1,
163:17, 164:15,
165:7, 165:9,
170:9, 181:2,
199:9, 203:12,
205:18, 208:8,
209:16, 220:6,
220:20, 221:10,
224:15, 228:14,
228:16, 229:3,
229:16, 230:5,
233:16, 238:19,
239:17, 248:8,
248:11, 257:8,
261:1, 261:16,
261:18, 261:19,
262:1, 271:18,

290:22
**couldn't**
68:19, 69:3,
69:7, 69:21,
76:9, 76:11,
105:21, 106:7,
114:7, 120:13,
133:12, 141:4,
141:17, 144:10,
144:16, 146:22,
148:8, 148:13,
149:20, 159:21,
171:2, 200:12,
208:20, 209:17,
252:21
**counsel**
276:21, 286:1,
294:14
**count**
233:12
**counter**
97:15, 226:16
**county**
76:8, 294:6
**couple**
86:13, 112:7,
128:8, 165:3,
171:16, 208:23,
244:6, 264:2,
291:14
**course**
16:4, 16:17,
16:18, 26:16,
38:9, 51:10,
51:24, 56:22,
58:12, 66:4,
83:7, 83:11,
128:10, 207:18,
233:17, 262:5,
278:23, 280:9,
282:15, 285:13,
286:3, 289:13
**courses**
16:13
**court**
1:1, 48:19,
221:19, 293:14,
294:2

courthouse
57:15, 57:18
courtroom
260:6
courts
277:2
cover
41:19, 43:1,
43:24, 87:18
covered
42:5, 43:3,
43:20, 44:20,
76:16, 88:21,
157:18, 158:1,
252:6, 266:1
covers
158:3, 252:18
crabtree
94:2, 119:18,
121:21, 125:9,
126:23, 127:9,
131:10, 132:4,
133:1, 134:9,
135:9, 135:24,
136:8, 140:2,
140:12, 141:14,
143:21, 147:20,
150:1, 150:9,
150:23, 151:6,
152:9, 156:19,
157:5, 159:10,
162:21, 163:10,
167:9, 167:16,
167:19, 172:10,
172:14, 184:15,
189:8, 192:3,
193:1, 199:8,
200:14, 202:22,
205:6, 205:15,
205:22, 206:2,
206:11, 207:11,
209:16, 210:1,
215:12, 215:17,
220:2, 220:20,
223:3, 224:4,
224:16, 225:6,
225:18, 227:14,
228:23, 229:18,

231:10, 231:17,
232:3, 232:5,
234:3, 235:13,
236:22, 240:20,
241:14, 244:20,
246:15, 246:23,
247:3, 247:6,
248:8, 248:17,
248:22, 249:2,
251:12, 252:7,
255:9, 260:1,
271:11, 278:13,
279:4, 279:7,
280:10, 281:9,
281:14, 286:13,
286:20, 286:24,
287:2, 287:14,
288:8, 288:12,
288:13, 289:13
crabtree's
130:21, 132:20,
237:11, 245:3
craftsman
262:24
credibility
113:10
credible
24:12
cried
188:14
crime
15:19, 18:15,
18:16, 20:3,
20:7, 20:13,
20:14, 22:14,
22:16, 23:1,
24:2, 31:11,
33:8, 41:9,
49:6, 50:3,
50:24, 74:1,
77:1, 86:2,
90:10, 104:1,
104:7, 106:12,
109:24, 110:18,
111:15, 111:16,
111:20, 112:20,
112:24, 119:7,
121:10, 122:6,

132:13, 133:6,
186:15, 234:10,
271:18, 282:20,
282:24, 283:1,
292:5
crimes
19:23, 52:5,
52:6, 52:7,
52:21, 52:24,
53:7, 102:20,
103:4, 103:19,
104:12, 104:15,
104:20, 106:17,
109:23, 112:14,
113:14, 120:21,
130:19, 130:21,
131:10, 133:2,
180:4, 201:3,
203:13, 229:4,
278:16
crimestopper
55:3, 55:6,
118:15, 118:23,
119:8, 119:12,
120:1, 121:1,
124:6, 130:14,
131:9, 154:6,
158:12, 179:21,
181:3, 181:21,
182:9, 182:19,
183:6, 183:17,
186:11, 186:16,
186:20, 187:19,
187:20, 203:12
crimestoppers
89:3, 89:7,
89:16, 98:17,
118:7, 118:13,
120:12, 120:13,
131:18, 132:3,
187:16, 286:16
criminal
30:21, 132:10,
260:11
cross
26:8, 80:23
crossed
26:7, 128:7

crr
1:25, 294:5,
294:22
cry
188:13, 188:17,
245:4, 245:11
crying
206:20, 207:4,
221:24
csr
1:25, 294:5,
294:22, 294:23
culbertson
2:4, 3:23
cunningham
243:10
curve
208:15
curves
219:12
custodial
21:1, 21:8,
114:17, 114:24
custody
20:24, 21:2,
21:5, 21:7,
21:9, 21:13,
114:2, 114:7

D

dan
291:23, 292:21
danger
116:10
daniel
6:2
dark
208:19, 290:1,
290:2
date
15:8, 26:12,
50:2, 50:7,
81:24, 82:12,
82:13, 82:20,
89:12, 96:18,
96:23, 103:8,
103:16, 166:19,
166:23, 175:20,

176:1, 263:10,
265:10, 273:22
**dated**
91:9, 246:13,
251:4, 251:6,
251:8, 263:19,
275:7, 294:17
**dates**
175:1
**daughter**
136:4, 283:17
**daughter's**
136:7
**dave**
256:12
**david**
5:3, 83:15
**day**
25:24, 78:9,
83:19, 84:21,
85:4, 87:22,
88:1, 103:10,
113:23, 116:15,
119:13, 119:15,
122:6, 157:14,
167:2, 190:21,
212:15, 213:19,
213:22, 240:23,
241:1, 241:5,
241:7, 250:7,
252:22, 260:4,
264:1, 269:2,
282:6, 286:23,
287:7, 287:13,
288:1, 293:15,
294:17
**days**
89:13, 112:7,
124:10, 243:3,
248:18, 277:8,
280:13
**deadmond**
172:4, 190:20,
191:7, 191:9
**deal**
201:7
**death**
155:18

**december**
272:14
**decide**
105:7, 179:15
**decided**
179:11, 180:17,
181:1, 181:16,
194:9, 195:15,
256:9
**decision**
92:7, 107:9,
107:11, 107:13,
107:18, 109:11,
109:20, 184:5,
257:9
**decision-making**
99:20
**decisions**
100:22, 109:21
**defendant**
5:18, 45:14
**defendants**
1:10, 3:18,
4:2, 4:11, 5:2,
6:2, 9:16,
291:22
**defense**
7:19, 7:27,
8:6, 8:9, 162:5,
162:6, 224:14,
265:3
**definitely**
99:6
**degree**
256:3, 256:19,
257:3
**deliver**
84:8
**delivering**
84:9
**delivery**
84:7, 84:11
**demeanor**
47:12, 139:5,
152:24, 188:6,
245:3
**deny**
50:15, 113:14,

114:16, 114:24
**department**
10:21, 11:2,
11:5, 12:10,
16:8, 16:16,
17:4, 17:18,
24:18, 38:5,
38:13, 40:15,
44:6, 61:24,
62:13, 62:19,
63:4, 64:9,
65:2, 65:13,
65:15, 67:8,
68:18, 69:1,
69:19, 71:2,
79:18, 79:21,
90:9, 91:13,
98:20, 100:21,
117:1, 200:7,
260:18, 260:23,
273:1, 284:9,
284:10, 284:14,
284:19, 285:16,
285:22
**depend**
45:17, 45:18,
59:7, 59:9,
60:19, 70:15,
70:17, 70:20,
71:7, 71:15
**depended**
32:14, 46:5,
53:10, 59:4,
60:10, 92:24
**depending**
14:23, 107:3,
113:3, 113:23
**depends**
33:22, 35:3,
45:16, 49:11,
50:16, 50:21,
52:13, 111:24,
112:9, 261:2
**deposed**
9:14, 9:18
**deposition**
1:13, 2:1,
9:21, 12:6,

25:21, 47:18,
48:9, 58:7,
93:20, 102:11,
102:13, 102:15,
117:13, 210:8,
223:20, 223:22,
253:16, 255:4,
278:24, 293:10,
294:7
**deputy**
14:2, 179:8,
183:21, 255:24,
256:1, 256:12,
265:18, 266:6
**describe**
73:21, 97:17,
133:8, 136:20
**described**
100:12, 239:3,
239:5, 239:8,
253:21, 254:3
**describes**
167:8, 276:1
**describing**
47:10, 198:18,
240:19, 240:24,
252:16
**description**
7:13, 100:13,
100:14, 100:18,
101:6, 227:15,
234:23, 240:17,
241:10, 273:22
**descriptions**
155:6
**designation**
12:10
**desk**
17:23, 25:20
**detail**
26:18, 28:14,
38:3, 38:10,
38:11, 38:21,
40:3, 40:5,
286:4
**detailing**
124:6
**details**
28:9, 28:13,

40:20, 44:18,
134:13, 167:8,
191:4, 237:4
**detect**
162:22
**detective's**
107:10
**detectives**
14:16, 30:19,
30:24, 31:1,
31:7, 31:15,
31:21, 31:22,
31:23, 32:23,
34:6, 35:2,
41:9, 52:4,
53:9, 53:14,
83:3, 87:8,
87:11, 95:3,
109:18, 119:12,
143:8, 145:4,
146:7, 150:3,
159:4, 169:18,
170:7, 170:21,
286:15, 288:22
**determination**
92:2
**determine**
23:8, 181:14
**determined**
44:7, 228:21,
257:1
**developed**
286:15
**developments**
34:7, 34:19,
34:23, 260:19,
261:13
**diagrammed**
224:22
**different**
12:1, 15:12,
16:5, 16:13,
16:14, 21:24,
26:22, 31:1,
31:20, 31:24,
32:16, 38:2,
38:11, 38:21,
40:5, 41:8,

44:3, 46:6,
54:20, 86:19,
91:13, 91:21,
95:5, 112:13,
116:19, 119:5,
159:15, 177:11,
203:9, 225:2,
234:16, 249:10,
263:23, 268:11,
284:5
**digging**
80:13
**dimensions**
152:17
**dining**
244:5
**direct**
56:13, 266:15
**directed**
56:3, 206:17,
214:18, 216:4
**directing**
207:17, 219:10
**direction**
128:11, 294:12
**directions**
214:12
**directly**
127:17
**discipline**
273:24
**disclose**
284:22, 285:6
**discovered**
121:20
**discuss**
34:12, 34:16
**discussed**
28:8, 38:8,
45:2, 286:13
**discussing**
284:3
**discussion**
102:7, 161:9,
161:17, 161:20,
191:21, 210:17,
211:20, 222:21,
223:18, 263:7,

264:21, 267:5,
267:15, 269:18,
283:15
**dishonest**
273:17
**dispatch**
128:11
**dispatcher**
78:24, 79:3,
79:13, 79:15,
79:16
**distance**
189:24
**distinction**
18:3, 18:20,
18:21
**distracting**
148:15
**district**
1:1, 1:2
**division**
11:20, 11:23,
12:9, 12:23,
13:3, 13:6,
13:8, 15:6,
15:9, 17:22,
19:9, 75:4,
77:12, 77:17,
101:1, 103:11,
103:18, 118:14,
152:10, 162:15
**document**
81:20, 96:12,
246:8, 265:4,
270:1
**documentation**
263:14
**documents**
47:17, 48:1,
48:17, 48:22,
163:3, 211:16,
246:7, 263:3,
263:13, 264:19
**dog**
76:9, 76:11
**doing**
12:19, 13:2,
27:4, 31:1,

35:4, 35:7,
35:19, 42:17,
55:1, 55:20,
77:6, 83:1,
88:20, 100:15,
119:4, 132:23,
133:6, 136:12,
142:12, 164:9,
175:13, 195:7,
198:6, 203:22,
207:6, 221:8,
226:17, 282:15
**dominic**
14:3
**dominick**
179:9
**done**
26:1, 26:10,
29:6, 31:12,
32:15, 35:10,
55:10, 55:11,
58:12, 77:4,
109:15, 110:13,
111:9, 113:21,
122:6, 124:8,
124:11, 149:5,
163:15, 178:17,
179:4, 186:4,
186:6, 187:22,
189:18, 197:1,
241:22, 242:1,
243:17, 245:22,
249:14, 258:4,
281:22, 283:2,
286:3
**donmeyer**
97:11, 98:1
**door**
33:13, 78:15,
78:16, 80:7,
128:20, 151:12,
162:23, 165:6,
165:16, 166:2,
184:11, 276:11,
277:16
**doors**
74:23, 79:5,
97:16, 165:3

doubled
143:7
doug
4:3, 4:12
down
25:13, 25:14,
25:15, 25:17,
25:22, 26:13,
27:4, 35:13,
62:5, 65:22,
78:15, 79:20,
84:4, 84:22,
85:20, 86:23,
96:7, 100:24,
105:9, 111:14,
134:17, 135:5,
136:21, 144:20,
145:24, 146:8,
147:1, 152:4,
165:3, 170:8,
170:14, 179:22,
179:24, 183:4,
188:10, 196:13,
205:7, 205:10,
207:22, 208:1,
208:5, 209:22,
218:7, 218:21,
221:4, 225:4,
227:23, 228:12,
228:19, 235:18,
238:9, 239:22,
246:6, 262:23,
264:5, 264:18,
286:10, 287:15,
293:12, 293:15
downstairs
84:4, 145:23,
146:12
downtown
196:14
draft
157:13
drafted
48:5
drafting
123:10
drank
193:4, 245:16,

245:18
dreamed
195:5
dressed
78:23
drink
160:20, 245:21
drinking
277:11
drive
5:11, 86:5,
159:21, 175:9,
176:13, 195:6,
195:16, 197:12,
198:2, 206:13,
207:10, 207:14,
209:2, 209:3,
217:16, 218:7,
219:7, 219:22,
240:5
driven
133:5, 159:15,
160:2, 215:17
driver
131:19, 131:22,
132:9
driver's
79:9, 80:7,
125:12, 125:13,
213:12
drives
134:23
driveway
128:21, 208:10,
225:7
driving
85:2, 97:21,
126:12, 127:18,
129:1, 129:3,
129:4, 135:18,
139:12, 147:18,
152:1, 197:19,
198:7, 198:9,
198:19, 198:24,
206:3, 206:4,
206:5, 206:6,
206:14, 209:24,
210:24, 214:10,

215:13, 215:21,
218:1, 218:9,
225:18, 226:1,
228:3, 239:9,
239:12
drop
107:4, 180:11,
180:12, 197:8
dropped
12:4, 13:2,
127:13, 131:2,
131:3, 131:6,
131:24, 173:9,
175:11, 182:15,
196:2, 197:5,
243:2
dropping
11:24, 201:4
drove
29:1, 73:24,
84:1, 123:17,
131:1, 135:2,
135:4, 137:12,
137:14, 137:17,
138:22, 139:11,
149:23, 175:5,
175:15, 195:6,
206:18, 207:16,
211:3, 211:4,
211:10, 215:18,
217:14, 218:21,
243:8, 243:9
drug
155:3
duly
9:3
duplicating
41:20, 286:11
during
26:14, 28:12,
29:9, 36:3,
38:9, 45:18,
51:24, 59:15,
61:1, 66:11,
76:24, 104:7,
104:18, 106:16,
114:19, 125:5,
139:5, 154:9,

154:11, 156:19,
158:18, 160:14,
160:23, 161:3,
161:6, 165:24,
166:6, 169:24,
172:21, 173:10,
174:23, 177:9,
177:12, 178:14,
189:14, 193:17,
193:23, 194:11,
199:7, 202:21,
204:12, 206:20,
209:21, 221:24,
224:24, 230:2,
230:6, 231:16,
232:24, 233:14,
241:21, 241:23,
248:2, 249:12,
255:7, 262:5,
266:24, 271:13,
272:15, 273:19,
274:3, 278:15,
278:23, 280:9,
281:9, 281:21,
282:15, 285:13,
286:3, 289:13,
292:11
duties
12:14

**E**

e-a-u
75:24, 76:1
e-mails
48:14
e-u-c-l-a-r-e
75:21
each
9:24, 19:16,
26:4, 31:2,
32:2, 184:24,
212:5, 233:7,
273:21
eagle
244:19
earlier
72:21, 84:5,
103:23, 170:4,

178:14, 251:21,
252:7, 291:24
**early**
88:24, 112:15,
116:23, 252:23,
285:24
**east**
5:26, 80:19,
125:10, 172:1,
195:17, 198:2,
207:16
**eastbound**
80:21, 80:22
**eat**
160:15, 160:17,
193:8, 245:21,
247:8
**eaten**
193:4, 245:16
**eauclaire**
75:20, 75:21
**edge**
74:22
**education**
16:22
**effect**
67:3, 115:12
**efforts**
113:6
**eight**
167:23, 168:14,
171:9, 171:10,
177:3, 178:8,
178:10, 178:11
**eight-hour**
16:17
**either**
16:23, 87:19,
106:5, 106:6,
107:5, 107:23,
142:23, 153:24,
155:2, 220:19,
247:10, 261:22
**eject**
243:14
**ekedahl**
5:3, 143:8,
143:13, 149:21

**electronically**
8:20, 293:21
**else**
13:19, 20:1,
23:13, 23:14,
26:14, 27:6,
30:7, 31:17,
33:24, 35:12,
43:12, 43:22,
48:12, 64:15,
68:5, 75:12,
85:7, 88:20,
105:13, 109:8,
114:22, 116:21,
132:17, 134:23,
137:6, 137:12,
144:24, 156:18,
162:24, 174:14,
178:23, 195:23,
225:2, 231:23,
232:19, 255:3,
256:21, 266:19
**emotional**
245:14
**employed**
284:13, 285:21,
294:14
**empty**
242:22, 243:16
**en**
56:6, 74:20
**encountered**
74:12
**end**
26:4, 28:9,
45:15, 47:1,
47:9, 47:12,
77:22, 85:20,
85:21, 130:7,
173:16, 254:8,
286:5
**ended**
11:24, 45:14,
127:24, 233:5
**enforcement**
273:15
**engage**
76:23

**english**
19:13
**enter**
212:22
**enters**
12:6
**entire**
154:10, 188:2,
188:8
**error**
26:7
**errors**
293:13
**especially**
33:8
**esquire**
3:3, 3:10,
3:22, 4:5, 4:15,
5:5, 5:20, 6:5
**established**
61:19, 65:17,
287:1
**estimate**
112:3, 145:20
**estimated**
224:20
**et**
1:8
**even**
16:18, 20:12,
36:24, 103:23,
105:21, 124:11,
149:21, 156:11,
181:22, 185:11,
196:24, 201:10,
201:14, 230:15,
257:23, 258:4,
273:1
**evening**
72:22, 73:12,
172:16, 248:6,
290:8
**events**
30:5, 132:19
**eventually**
28:9, 45:13,
57:4, 93:1
**ever**
9:18, 22:3,

23:24, 24:5,
24:8, 24:14,
36:8, 46:10,
46:12, 46:24,
51:10, 56:24,
57:8, 57:14,
57:20, 66:22,
93:20, 98:1,
99:9, 99:12,
108:10, 109:23,
111:13, 113:14,
114:16, 114:18,
114:19, 114:23,
115:7, 115:11,
166:1, 169:22,
174:21, 178:1,
186:3, 186:14,
187:21, 188:12,
199:7, 200:14,
200:23, 202:11,
202:13, 204:18,
205:10, 205:14,
205:18, 206:10,
240:2, 240:4,
241:6, 251:8,
267:5, 267:15,
273:13, 279:17,
279:22, 280:19,
280:21, 281:7,
281:13, 281:21,
282:3, 282:5,
282:15, 282:23,
283:6, 284:12,
284:18, 285:15,
285:20, 287:16,
289:4, 289:10
**evera**
5:9
**evergreen**
127:6, 128:13,
128:18, 128:19,
128:24, 133:10,
192:12, 230:9,
287:5
**every**
17:15, 46:5,
46:7, 105:2,
286:4, 293:14

**everybody**
33:7, 35:6,
55:9, 64:12,
87:14, 87:15,
87:18, 102:3,
245:24, 256:14
**everything**
12:2, 17:20,
25:3, 32:20,
33:18, 41:16,
42:1, 84:23,
99:24, 107:24,
122:20, 174:14,
180:9, 182:22,
197:1, 204:5,
217:20, 220:3,
229:2, 231:6,
234:3, 249:1,
249:17, 251:20,
258:3, 259:20,
268:4, 286:9,
286:11, 293:12,
293:15
**evidence**
42:24, 50:18,
50:23, 88:14,
91:17, 106:22,
106:24, 107:8,
107:9, 107:19,
108:1, 108:7,
109:5, 109:7,
110:1, 110:13,
111:19, 111:20,
121:7, 165:15,
231:11, 261:15,
262:20, 270:13,
270:17, 271:21,
272:13, 279:10,
279:18, 279:23,
282:9, 282:19,
283:2, 284:6,
284:23, 285:7
**ex**
7:14, 7:17,
7:19, 7:22,
7:24, 7:27,
7:29, 8:1, 8:4,
8:6, 8:8, 8:11,

8:15
**exact**
15:7, 41:20,
73:20, 103:16
**exactly**
15:7, 58:20,
103:16, 146:4,
200:19
**examination**
7:4, 9:5,
122:5, 277:24,
291:19
**examined**
9:4
**examiners**
110:6
**example**
22:13, 22:23,
24:6, 24:9,
27:17, 29:15,
39:16, 39:22,
41:17, 42:19,
45:20, 49:22,
54:20, 70:21,
71:13, 71:14,
110:16
**examples**
70:22
**excessive**
274:9, 276:1
**exchange**
220:22
**exculpatory**
259:12, 279:22,
284:22, 285:6
**excuse**
157:24, 167:5
**execute**
151:15
**executed**
168:11, 216:9,
288:14
**executing**
143:17
**execution**
282:11
**exhausted**
130:8

**exhibit**
81:2, 81:15,
96:8, 161:19,
161:24, 166:14,
211:19, 211:22,
212:9, 222:8,
223:24, 246:10,
246:12, 250:24,
263:5, 268:16,
269:20, 274:21,
278:7
**exhibits**
8:18, 8:20,
264:23, 293:19,
293:20
**exit**
125:10
**exonerated**
276:7
**expect**
89:8, 91:20
**expected**
91:12
**experience**
111:19, 112:6
**expert**
271:16, 271:23,
272:3
**explain**
41:21, 196:15
**explained**
141:24, 191:10,
195:4, 217:20
**explaining**
196:19, 243:1
**explanation**
23:3
**express**
193:24
**expressed**
220:4
**extent**
123:8, 123:16,
155:5, 277:11
**eye**
285:16
**eyeshot**
86:2, 86:4

**eyewitness**
253:20

---

**F**

**fabricate**
279:9
**fabricating**
282:10
**fabrication**
279:17
**face**
79:7, 79:10
**facing**
80:19
**fact**
36:12, 36:24,
37:1, 41:11,
132:22, 139:12,
146:19, 149:15,
168:10, 183:11,
216:7, 221:5,
245:22, 287:21
**factors**
59:9, 99:21
**facts**
22:11, 23:1,
23:9, 24:5,
39:4, 39:6,
49:6, 50:3,
59:1, 59:10,
59:15, 59:17,
59:18, 59:22,
60:2, 60:12,
60:16, 60:24,
91:17, 94:6,
113:7, 113:11,
123:12, 221:3,
256:23, 261:15
**factual**
24:1
**fair**
34:17, 34:23,
47:7, 112:15,
156:13, 156:15,
180:22, 186:21,
189:5, 286:20
**fairly**
52:23, 279:6

fall
275:3, 276:23
false
29:13, 36:5,
36:22, 39:18,
274:10, 274:18
falsely
112:19
falsify
113:1
familiar
106:12, 110:5,
110:7, 130:15,
173:1, 190:23,
191:6
family
68:19, 69:21,
69:22, 260:14,
260:19, 261:4,
261:12, 262:5,
262:19, 264:5
far
24:20, 71:24,
88:22, 93:12,
128:8, 164:2,
173:20, 173:22,
173:24, 199:6,
224:18
father
136:6, 262:12
fault
205:17
favor
220:12
fbi
95:6, 143:11,
170:20, 183:24
february
121:22, 183:14,
294:17
federal
221:17, 221:19,
277:1
feed
27:16
feeding
37:19
feel
248:18

feet
86:7, 86:14,
224:20, 224:24,
225:7, 226:23
fell
242:22, 243:16
fellow
284:14
felt
57:21, 182:7
fence
128:22, 129:13
ferguson
75:13
few
49:3, 87:1,
150:8, 162:7,
226:23, 235:12,
235:19, 243:3,
269:2, 285:24
field
76:9, 86:15
fields
86:18, 86:22
fifteen
232:15
fifth
271:12
figure
85:1
figured
175:16, 242:20
file
92:17
filed
54:22, 277:1
fill
31:10
filled
123:3, 216:15,
225:23, 226:6,
262:20
finally
196:10
financial
294:16
find
23:22, 32:2,

76:10, 81:3,
113:1, 130:8,
141:4, 141:17,
141:20, 144:10,
146:22
finding
275:21
fine
101:22, 102:2,
135:1, 135:7,
137:10, 139:7,
139:8, 153:2,
188:9, 202:1
fingerprints
50:17
finish
148:20
finished
114:4, 165:5,
234:9, 247:21,
249:18, 249:23,
264:4
fire
79:17, 79:21,
243:11
firearm
183:12
firearms
110:5, 271:16,
288:24
fired
242:17, 243:13,
271:18
first
8:12, 9:3,
10:15, 23:6,
58:19, 74:10,
76:24, 77:3,
79:6, 86:10,
95:2, 96:16,
102:23, 103:17,
117:4, 140:23,
141:12, 150:20,
156:20, 158:18,
165:20, 166:7,
168:13, 169:12,
171:10, 171:18,
172:22, 172:23,

179:14, 183:13,
195:1, 195:3,
195:11, 196:22,
203:21, 207:8,
207:9, 207:10,
210:24, 212:17,
233:6, 244:8,
244:9, 244:10,
246:12, 249:22,
250:6, 251:2,
256:3, 256:19,
257:2, 272:15,
272:19, 289:14,
289:20
fist
65:3, 281:8
fit
182:18
fitzpatrick
14:7
five
33:10, 33:11,
104:16, 104:18,
105:19, 133:14,
133:17, 143:15,
145:22, 152:5,
224:10, 240:10,
244:4, 273:12
five-eight
202:2
five-seven
97:18
fled
230:9, 287:7
floor
6:9, 24:7,
24:9, 125:10,
209:1, 215:1,
226:24, 243:2
focused
13:3
foid
183:12
folders
25:20
folks
14:21
follow
58:18, 85:7,

85:12, 126:18,
285:9, 285:17
**follow-up**
31:23, 285:24
**followed**
19:15, 55:12,
126:12, 127:10,
127:11, 129:12,
285:20, 287:4
**following**
33:18, 119:5,
126:13, 127:22,
135:9, 237:15,
247:1
**follows**
9:4
**foot**
129:9, 130:3,
130:4, 130:7,
133:9, 135:11,
173:24, 174:1,
290:21
**football**
56:20
**force**
274:9, 276:1
**foregoing**
294:7, 294:8
**forensic**
106:21, 107:19,
270:12, 279:14,
283:1
**forget**
37:2
**form**
20:15, 22:20,
27:13, 29:20,
30:9, 34:21,
36:14, 37:22,
38:6, 38:14,
38:23, 40:7,
40:22, 45:24,
46:14, 47:3,
49:8, 49:17,
51:2, 51:13,
59:3, 61:2,
61:9, 62:6,
64:5, 65:4,

65:16, 66:12,
66:19, 67:11,
68:1, 68:12,
68:13, 68:21,
69:14, 69:23,
71:4, 72:4,
91:16, 99:1,
108:18, 108:20,
114:11, 115:2,
115:16, 116:2,
116:12, 120:16,
122:1, 184:20,
185:3, 199:13,
200:3, 200:8,
225:23, 226:9,
257:10, 258:19,
258:22, 259:14,
260:15, 261:14,
262:21, 268:18,
268:21, 270:14,
270:21, 271:20,
272:12
**forms**
19:6, 19:10
**forrester's**
31:18, 32:8,
93:3, 157:18,
158:3, 166:17,
170:5, 172:9,
178:24, 194:6,
202:22, 206:15,
210:22, 214:4,
221:22, 227:13,
252:6, 253:4,
255:16, 266:1,
268:14, 278:7,
278:22, 279:3,
279:6
**forth**
87:17, 176:14
**forty**
275:12, 275:14
**forty-three**
276:14, 276:16
**forty-two**
276:3
**forward**
242:19, 242:22,

243:16
**foster**
136:2, 136:3,
136:9, 137:8,
288:3, 288:4
**foster's**
148:10, 148:14,
149:13, 181:23,
287:13
**found**
95:11, 111:8,
122:10, 141:3,
141:19, 144:10,
144:13, 144:15,
144:21, 146:21,
146:24, 166:11,
171:17, 171:20,
183:11, 185:10,
185:18, 186:1,
208:21, 219:16,
244:7, 244:15,
252:22, 271:5,
271:17, 271:19,
272:11, 284:5
**foundation**
20:15, 30:10,
38:6, 38:14,
38:23, 40:7,
40:23, 47:3,
49:9, 49:18,
51:3, 51:13,
59:12, 59:20,
60:18, 61:2,
61:17, 62:7,
62:22, 63:7,
64:5, 65:4,
65:16, 66:13,
67:12, 68:1,
68:14, 68:21,
69:14, 69:23,
71:5, 72:4,
91:16, 99:1,
114:12, 115:2,
115:17, 116:3,
116:13, 120:17,
149:1, 192:21,
200:3, 200:8,
257:11, 258:22,

259:14, 260:15,
261:14, 270:14,
270:22, 271:20,
272:13
**founded**
274:12, 274:14
**four**
16:18, 87:7,
143:15, 147:22,
170:21, 187:2,
187:5, 239:24,
240:9, 277:7
**four-door**
84:24
**fourth**
240:9
**frame**
13:7, 14:10,
103:6, 103:24,
161:6, 258:23,
259:1
**free**
192:18, 193:1
**fresh**
245:24
**friday**
235:24, 240:16
**friend**
172:4
**friends**
190:19
**front**
65:18, 80:20,
80:24, 83:21,
128:18, 128:24,
136:1, 139:1,
139:3, 206:8,
209:9, 209:12,
212:4, 212:7,
212:19, 219:21,
252:2
**frozen**
76:18, 76:20
**full**
9:11, 171:10
**function**
33:14
**functions**
54:20

## G

**gallardo**
3:19
**gambini**
13:20, 14:1,
135:18, 138:22,
138:24, 139:1,
140:13, 147:17,
255:22
**gambini's**
133:23, 134:1,
265:13
**games**
56:20
**gang**
267:6, 267:8,
267:16
**gather**
163:2, 163:6
**gathered**
186:1
**gathering**
289:15
**gave**
22:23, 26:24,
29:15, 29:18,
36:21, 48:19,
48:24, 115:9,
119:9, 119:12,
120:10, 123:19,
137:13, 139:19,
139:20, 140:9,
142:17, 144:7,
168:19, 176:17,
182:7, 182:22,
195:2, 195:10,
240:17, 241:9,
246:15, 251:12,
251:19, 263:10,
264:19, 268:2,
278:12
**genens**
3:19
**general**
6:7, 17:1,
17:8, 17:12,
17:15, 17:19,

18:8, 154:21,
154:24, 155:1,
167:12, 179:4,
179:17, 180:8,
182:12, 190:7,
201:23, 202:4,
286:14, 289:15,
289:16
**generally**
40:1, 101:8,
101:10, 174:18,
189:11, 189:12
**george**
78:5, 78:6,
80:9, 191:6
**getaway**
131:19, 131:22,
132:9
**getting**
18:8, 18:9,
21:24, 55:24,
70:19, 78:12,
78:13, 78:23,
80:12, 80:13,
95:9, 218:21,
221:3, 221:4,
221:15, 221:20,
248:19, 289:16
**girardi**
125:1, 125:23,
149:21
**girlfriend**
56:7, 74:14,
74:17, 75:5,
183:10, 186:13,
190:23, 191:2,
191:3
**girls**
173:3
**gist**
18:9
**give**
19:5, 20:5,
20:13, 23:3,
23:4, 23:7,
23:14, 24:1,
26:18, 26:21,
28:14, 39:3,

39:5, 40:2,
42:19, 45:20,
50:4, 59:1,
59:10, 59:15,
59:17, 59:18,
59:22, 60:2,
60:12, 60:16,
60:24, 70:21,
71:13, 71:15,
71:20, 89:12,
110:22, 115:23,
120:5, 134:13,
134:15, 139:15,
141:23, 152:16,
156:21, 166:10,
180:16, 180:23,
194:22, 196:9,
196:10, 206:21,
255:2, 257:15,
264:14
**given**
28:3, 36:13,
37:1, 38:3,
38:22, 40:5,
42:24, 100:13,
124:16, 130:18,
130:20, 140:8,
194:1, 250:10,
294:9
**gives**
38:10, 40:2,
132:9
**giving**
20:9, 22:9,
22:24, 23:21,
26:17, 27:11,
30:6, 39:7,
48:17, 118:17,
130:1, 190:6,
198:9, 245:12,
245:17, 252:15,
253:4, 261:12,
263:15, 276:18,
280:12
**glean**
24:5
**gleaned**
62:3

**gloves**
97:21
**go**
15:20, 16:23,
18:12, 25:18,
25:23, 26:2,
32:18, 34:15,
35:24, 46:3,
50:12, 52:9,
52:11, 53:24,
55:4, 55:24,
56:4, 56:5,
56:13, 56:14,
58:10, 61:7,
61:15, 62:15,
73:8, 75:3,
78:13, 80:20,
82:10, 83:3,
83:24, 84:3,
84:4, 103:5,
106:5, 108:2,
114:14, 129:11,
129:15, 132:2,
133:9, 140:23,
143:18, 148:16,
148:23, 149:5,
149:12, 150:20,
150:24, 153:7,
162:2, 162:14,
163:6, 164:20,
165:14, 170:10,
173:15, 175:7,
176:10, 186:13,
187:7, 187:17,
187:18, 191:15,
191:23, 197:24,
205:21, 207:10,
208:1, 208:22,
214:22, 215:3,
216:17, 216:23,
217:12, 217:13,
225:3, 237:17,
238:12, 266:9,
278:5, 283:17,
288:21
**god**
47:23, 152:18,
292:16

goes
99:24, 108:1,
109:11, 145:7,
165:12, 195:13,
207:22, 219:11,
238:15, 271:13,
273:20
gone
92:1, 92:20,
92:22, 120:13,
149:14, 163:15,
177:10, 216:3,
232:22, 252:9,
258:10
good
9:7, 9:8, 58:3,
72:3, 101:21,
220:17, 244:18,
271:14
gotten
92:16, 124:10,
142:4, 196:13,
197:20, 205:17,
208:18, 228:2,
231:6
governed
61:23
grab
54:2
grand
259:22, 260:1,
260:8
grandson
136:5
gray
83:20, 95:12,
97:20, 125:19,
182:16, 235:10
great
90:5
greendale
83:4, 85:15,
85:18, 85:22,
85:23, 86:9,
86:23, 87:2,
87:3, 207:23,
208:6, 208:11,
209:6, 211:5,

214:2, 218:22,
219:3, 219:7
greg
3:19, 121:19,
122:14
grips
168:18, 168:24,
169:2, 169:4,
169:7, 187:11
ground
74:5, 76:14,
76:18, 95:12,
109:7, 183:5
guarantee
55:7
guess
58:9, 112:4,
112:5, 223:10,
230:12, 265:14,
286:24
guilt
270:20
guilty
270:23, 271:6
gun
80:8, 97:22,
97:23, 106:16,
106:19, 108:11,
108:16, 108:24,
121:20, 131:11,
131:13, 131:15,
141:3, 141:6,
141:10, 141:19,
144:12, 144:16,
144:21, 146:18,
156:8, 156:10,
168:1, 168:5,
168:9, 168:16,
168:20, 168:24,
169:3, 169:4,
169:8, 169:17,
169:21, 169:24,
170:12, 170:15,
170:18, 171:4,
171:5, 171:19,
177:16, 177:23,
178:2, 178:13,
178:15, 186:14,

186:15, 187:8,
187:18, 187:22,
209:1, 215:2,
230:19, 241:15,
241:18, 241:19,
241:22, 242:1,
242:9, 242:12,
242:17, 242:18,
242:20, 242:23,
243:2, 243:7,
243:11, 243:12,
243:21, 244:8,
244:9, 244:10,
244:17, 244:20,
244:21, 270:17,
272:11, 284:4,
284:5
gunnell
6:2, 291:23,
292:21
guns
140:21, 141:2,
141:14, 141:22,
142:8, 142:17,
144:10, 146:20,
156:1, 156:3,
156:4, 156:6,
168:7, 168:10,
168:21, 169:14,
169:20, 170:3,
170:22, 171:22,
183:10, 183:18,
230:16, 230:17,
231:7, 231:9
gunshot
74:13
gunshots
225:6, 225:10
guy
52:16, 74:13,
80:8, 84:3,
84:11, 132:15,
167:16
guys
53:24, 56:2,
191:13, 278:16,
281:22, 287:9,
289:5, 289:11

H

half
120:9
hall
4:15, 84:4,
102:15, 224:6,
224:9, 224:12,
253:16, 255:4,
291:10
hallway
185:6
hand
209:1
handcuffed
288:19
handed
135:1, 184:19
handled
156:3, 156:4
hands
80:8
handwritten
82:13
hang
176:4
hanson
3:19, 121:19,
122:14, 122:17,
137:15, 143:9,
143:13
happen
31:4, 45:5,
47:8, 109:5
happen"
46:24
happened
22:16, 23:5,
23:18, 23:19,
29:19, 34:18,
46:16, 55:2,
65:7, 68:4,
80:2, 84:20,
106:11, 126:10,
147:5, 147:14,
164:3, 164:5,
164:8, 179:2,
198:4, 200:10,

206:22, 229:19,
240:16, 243:22,
245:7, 248:23,
250:9
**happening**
194:2
**happens**
45:3
**hard**
12:3, 76:4,
206:13, 212:17
**harder**
51:1, 51:6
**hardware**
218:2, 238:17
**harrison**
95:3, 173:18,
173:19, 173:20,
189:17, 189:19,
189:23, 189:24,
207:13, 207:16,
214:3, 214:23,
215:4, 215:21,
217:10, 218:7,
238:20, 238:22,
290:10, 290:23
**hathaway**
3:4
**head**
10:3, 92:8,
129:6, 135:12,
147:12, 242:13,
245:15, 255:12,
262:7
**headed**
75:9, 151:21
**heading**
73:12, 237:14
**hear**
16:20, 83:17,
84:3, 89:19,
114:23, 115:11,
141:21, 248:6,
248:7, 248:21,
280:24
**heard**
22:2, 33:13,
78:14, 83:9,

100:9, 115:18,
115:21, 119:6,
129:20, 172:3,
176:5, 208:23,
221:15, 221:19,
225:6, 225:10,
225:15, 240:13,
273:5, 273:8
**hearing**
18:21, 90:12,
94:5, 177:6,
269:23
**heavy**
52:15
**height**
154:23, 179:7
**held**
2:1
**help**
46:12, 71:3,
71:11, 71:17,
71:20, 200:23,
200:24, 202:12,
205:18, 289:5,
289:11
**helped**
141:20
**here**
23:19, 25:11,
25:14, 25:19,
29:4, 56:3,
56:14, 111:15,
111:16, 113:21,
114:4, 135:8,
171:17, 175:13,
176:24, 180:10,
180:13, 187:16,
202:2, 207:20,
207:21, 208:7,
210:23, 212:24,
213:7, 213:23,
214:2, 214:21,
216:20, 216:23,
216:24, 219:12,
219:13, 221:23,
230:7, 234:8,
234:14, 234:18,
235:23, 249:6,

249:8, 249:11,
258:23, 265:8,
265:17, 268:8,
268:12, 293:8
**here's**
31:10
**hereby**
294:8
**herein**
9:3
**herself**
164:3, 164:19,
179:18, 180:3,
190:7, 190:8,
191:14, 201:2
**hesitate**
287:18, 288:24
**hey**
53:21, 109:15,
110:17, 110:23,
113:18, 228:16
**hide**
171:15
**higher**
13:24
**hill**
215:22, 218:1,
238:16
**hills**
216:5
**him"**
289:24
**hinkley**
127:12
**hinshaw**
2:4, 3:23
**hit**
128:9, 214:23,
215:4
**hold**
11:4
**holding**
215:2
**home**
73:3, 78:8,
83:20, 87:19,
160:2, 172:17,
172:18, 172:24,

173:10, 174:19,
175:18, 189:14,
196:11, 196:15,
198:14, 203:24,
216:13, 237:13,
237:14, 237:23,
238:1, 238:12,
240:4, 242:23,
266:8, 266:12,
266:13, 266:14
**homicide**
15:17, 32:7,
51:18, 53:4,
72:24, 85:19,
88:19, 92:11,
92:19, 100:4,
100:5, 131:14,
173:21, 177:24,
214:15, 227:5,
258:18, 261:11,
262:16, 280:7,
282:20
**homicides**
52:6
**honest**
29:6, 149:10,
163:7, 188:4,
250:19
**hood**
235:9
**hooded**
227:11, 235:4,
235:6
**hooper**
3:4
**hoping**
101:19
**hospital**
56:5, 73:8,
74:17, 74:18,
74:20, 77:14,
77:15, 79:22,
79:23
**hotel**
25:11, 29:3
**houde**
3:20, 143:9,
145:3, 226:14,

228:12, 228:15,
229:6, 231:21,
246:3, 269:17
**houde's**
235:16
**hour**
75:11, 76:24,
130:5, 135:11,
156:20, 160:14,
165:24, 166:7,
196:6, 196:11,
201:14, 201:18,
201:19, 201:22
**hours**
192:6, 233:11,
250:5, 251:21,
255:20, 293:11
**hours-plus**
281:18
**house**
77:21, 117:7,
123:17, 127:14,
139:14, 139:17,
143:4, 147:7,
148:10, 148:14,
149:13, 149:15,
151:3, 151:12,
172:21, 181:23,
192:12, 216:9,
216:17, 236:4,
239:19, 239:20
**howard**
5:2, 31:18,
35:4, 35:12,
53:21, 54:21,
55:3, 94:11,
94:12, 94:17,
138:23, 154:4,
157:16, 163:20,
184:7, 187:21,
202:24, 203:11,
203:13, 212:19,
213:13, 219:20,
221:6, 224:20,
241:24, 252:3,
257:4, 266:12,
266:14, 266:15
**howard's**
35:8

**however**
25:24
**hug**
138:5
**huge**
152:22
**huh**
164:11, 187:1,
267:18, 275:13
**huh-uh**
138:20, 221:21
**hundreds**
66:4, 112:16
**huotari**
4:5, 101:18,
101:24, 102:4,
102:13
**husband**
283:10
**hypothetical**
40:8
**hypothetically**
46:7
**hypotheticals**
116:14, 160:7,
200:11
**hysterical**
78:17, 79:14,
79:21
**hysterically**
207:3

---
**I**

**id**
106:23, 107:5,
109:6, 109:8,
143:10, 145:3,
170:20, 170:23,
170:24, 224:21,
226:10, 226:19,
227:15, 228:10,
228:13, 229:18,
229:19, 231:16,
232:16, 235:14,
237:8
**idea**
56:17, 65:24,
84:16, 105:18,

111:17, 111:23,
132:21, 141:6,
186:1, 216:18,
219:23, 221:5,
235:22, 292:16
**identical**
184:21
**identification**
81:15, 96:8,
161:19, 162:1,
211:22, 222:8,
223:24, 246:10,
250:24, 263:5,
264:24, 269:21,
274:22
**identified**
90:9, 91:13,
95:16, 230:17,
235:16
**identify**
90:1, 90:4,
229:3, 273:13,
291:17
**identifying**
230:19, 273:22
**ifeanyi**
5:20
**il**
6:15
**illinois**
1:2, 1:14, 2:8,
2:23, 3:15,
3:25, 4:8, 4:21,
5:13, 5:28,
6:10, 106:12,
106:21, 279:14,
282:20, 282:24,
293:1, 294:6
**imagine**
141:15, 144:5,
164:9, 168:9
**immediate**
13:17
**immediately**
140:24, 151:8
**impaired**
277:11
**impeachment**
279:23, 284:23,

285:6
**implicate**
67:9, 67:23,
68:2, 68:7,
112:19
**implicated**
131:9, 180:3,
180:4
**implicating**
68:11, 98:18,
112:24, 190:8,
201:2
**important**
9:24, 10:2
**imposed**
273:24
**improper**
27:8, 27:16,
27:20, 28:21,
36:11, 38:20,
39:11, 49:7,
50:4, 273:18
**incidences**
181:7
**incident**
18:13, 33:4,
83:18, 91:6,
95:8, 155:24,
198:4, 214:3,
276:8
**incidents**
175:3, 179:13
**include**
21:22, 45:11,
227:15, 273:21
**included**
44:18, 132:20,
213:23
**includes**
235:3
**including**
273:15, 273:23,
274:9
**incomplete**
40:8
**independent**
73:11, 177:14,
177:19, 189:2,

209:24, 210:3,
228:5
**independently**
178:20
**indicated**
76:7, 290:7
**indicating**
83:10, 92:12,
104:8, 207:7,
214:24, 216:24
**individual**
19:12
**informant**
286:16
**information**
18:8, 22:1,
22:10, 22:24,
27:17, 30:18,
31:2, 34:17,
36:21, 37:20,
40:2, 50:5,
51:12, 68:10,
85:6, 93:2,
93:11, 94:12,
95:9, 98:4,
108:13, 113:2,
118:15, 118:17,
119:2, 119:9,
119:12, 119:18,
119:21, 121:2,
130:18, 130:20,
148:12, 154:6,
154:21, 154:24,
158:13, 166:5,
166:10, 167:12,
175:24, 176:6,
176:17, 176:19,
179:5, 179:17,
179:21, 180:23,
181:20, 182:7,
182:12, 182:21,
183:9, 201:24,
202:5, 203:14,
204:8, 220:1,
242:7, 252:1,
257:7, 257:15,
257:17, 257:20,
258:16, 259:1,

259:3, 259:5,
259:7, 259:12,
266:7, 286:14,
289:15
**informed**
73:4, 74:11,
151:2, 185:17,
185:21
**initial**
19:19, 26:9,
156:16, 178:23,
180:2, 180:15,
184:4, 187:16,
252:1
**initialed**
249:16
**initialled**
247:22
**initialling**
233:7, 233:10,
233:12
**initials**
26:4
**innocence**
270:20
**inside**
235:9
**instance**
23:11
**instead**
41:20, 217:21,
217:22, 238:12,
242:18
**intending**
101:20
**interaction**
52:8, 279:4,
280:10
**interactions**
57:9, 279:7
**interdepartmental**
273:16
**interest**
294:15
**interesting**
45:9
**interjected**
158:24

**internal**
273:15
**interpretation**
63:22
**interrogated**
59:23
**interrogating**
18:10, 49:4,
49:6, 63:6
**interrogation**
18:4, 18:5,
18:18, 29:10,
36:1, 36:4,
37:17, 38:9,
38:22, 45:3,
45:12, 45:22,
46:11, 46:13,
46:19, 47:1,
47:9, 47:10,
51:11, 58:24,
59:16, 60:17,
61:1, 61:6,
64:24, 66:11,
67:6, 68:17,
69:18, 70:24,
114:17, 114:20,
115:1, 189:7,
193:23, 196:18,
248:6, 253:5,
255:7, 286:5
**interrogation-ty-**
**pe**
15:24
**interrogations**
15:13, 15:16,
16:5, 16:9,
17:2, 18:3,
21:1, 21:21,
58:23, 62:1,
66:5, 273:19
**interrogatories**
8:13, 269:4,
269:8
**interrogatory**
269:5, 273:12,
275:4, 276:22
**interrupt**
9:24

**interruption**
172:7, 236:20,
283:13
**interview**
15:24, 18:4,
18:18, 18:22,
19:22, 20:3,
25:4, 28:1,
28:12, 29:9,
33:20, 40:20,
43:19, 46:10,
70:16, 72:14,
77:17, 78:1,
83:16, 94:13,
114:20, 130:12,
133:1, 134:9,
134:12, 135:23,
148:11, 148:14,
152:10, 152:11,
152:20, 152:24,
153:6, 153:8,
154:9, 156:16,
157:8, 159:5,
159:14, 162:14,
162:16, 162:18,
162:22, 163:4,
163:10, 163:13,
163:15, 163:18,
165:10, 165:12,
165:21, 167:8,
168:3, 169:16,
178:23, 179:3,
179:15, 180:3,
184:4, 184:11,
189:6, 202:22,
204:19, 206:20,
221:24, 226:3,
227:14, 241:21,
264:11, 265:20,
265:22, 266:20,
266:24, 267:13,
286:5, 286:12,
286:20, 289:14
**interviewed**
22:4, 28:3,
75:7, 83:1,
83:12, 95:4,
95:5, 95:7,

98:5, 112:16
**interviewing**
18:6, 22:13,
25:8, 40:21,
44:19, 46:22,
61:15, 62:15,
77:22, 97:11,
113:13, 166:12,
194:13, 280:5,
286:10, 286:23
**interviews**
15:13, 15:15,
16:5, 16:8,
17:2, 18:2,
21:21, 53:18,
58:11, 58:17,
58:21, 62:1,
273:19, 281:9
**intra**
273:16
**introduced**
284:6
**invest**
258:17
**investigate**
98:24, 99:14,
111:3
**investigated**
89:9, 91:15,
91:22
**investigating**
35:1, 41:9,
59:19, 94:21,
98:8, 98:20
**investigation**
31:1, 32:7,
32:13, 34:4,
34:20, 34:24,
54:7, 54:9,
54:11, 56:22,
113:20, 155:18,
257:21, 258:17,
260:11, 261:10,
261:13, 262:6,
280:7, 286:4,
292:23
**investigations**
30:17, 30:21,

31:5, 51:17,
51:23, 53:3
**investigative**
34:11, 43:5,
44:13, 157:14
**involve**
30:21
**involved**
11:9, 19:23,
19:24, 20:4,
35:18, 35:20,
35:22, 68:5,
96:3, 118:5,
119:10, 171:24,
177:16, 178:16,
179:19, 181:6,
194:23, 202:10,
259:21, 280:4,
282:18
**involvement**
50:24, 124:19,
124:20, 130:19,
130:21, 132:20,
176:20, 181:9,
181:12, 181:19,
181:22, 195:3,
246:17, 255:13,
264:8, 266:1,
277:14, 286:17
**involving**
79:1, 96:16,
119:5
**ish**
104:13
**isp**
107:8, 107:10,
108:13, 110:12,
122:6
**issue**
105:7
**issued**
17:16, 129:23,
151:18, 155:14
**it'll**
71:21
**items**
226:10, 226:16,
226:18, 229:6,

229:14, 229:23,
231:11

---
**J**
---

**jack**
6:3, 110:7,
291:22, 291:24,
292:8
**jail**
61:7, 61:15,
62:16, 64:3,
254:14, 254:18
**james**
4:2, 4:11
**january**
1:15, 10:23
**jeans**
230:12, 235:4,
235:20
**jeff**
3:19, 143:9
**jerked**
243:15
**jill**
172:4, 173:5,
173:6, 190:20,
191:7, 191:9
**jim**
3:18
**job**
1:22, 55:16,
55:17, 55:18,
55:19, 55:21,
56:11, 56:15,
197:22
**joe**
125:1, 157:24
**joel**
4:5, 101:18
**john**
3:19
**join**
38:15, 38:24,
40:9, 40:24,
49:10, 49:19,
51:4, 51:14,
63:8, 64:6,
64:11, 67:13,

69:15, 71:6,
72:5, 91:18,
99:2, 104:9,
117:12
**joins**
58:7
**judge**
151:19
**judgment**
277:11
**july**
15:7, 103:9
**jump**
34:5, 129:7,
161:11, 277:21
**jumped**
129:19, 175:18,
215:5, 217:11
**jumping**
188:10
**june**
116:24, 117:7,
118:8, 119:19,
121:11, 124:4,
124:20, 157:15,
157:21, 157:23,
158:10, 166:19,
166:24, 230:8,
232:4, 234:4,
246:14, 247:5,
249:3, 249:7,
250:3, 251:4,
255:20, 259:22,
279:4, 279:5,
280:10, 280:11,
282:12, 286:13,
287:13
**junior**
52:23, 53:6
**jury**
259:23, 260:2,
260:8

---
**K**
---

**kane**
294:6
**karner**
246:21

keen
3:10, 58:7,
81:4, 81:7,
81:11, 89:19,
89:23, 90:1,
90:6
keep
17:10, 78:19,
101:19, 219:11,
260:18
kentucky
15:18
kept
17:22, 87:13,
179:18, 188:18,
244:5
kevin
91:9
keys
135:2, 137:14,
139:20, 140:9,
144:7, 151:12,
262:15, 262:23,
263:10, 263:15,
283:23
kicked
151:12
kid
136:7, 191:11
kids
127:5, 127:8,
127:16, 136:9,
137:7, 137:9,
188:16, 188:21,
188:23, 194:3,
195:16, 199:2,
207:1, 220:4,
248:14, 248:17,
280:21, 281:15,
288:6
kill
188:16, 188:20,
188:21, 188:22,
206:23, 207:5,
207:6, 215:6,
239:1, 239:2
killed
240:14, 272:11

killing
188:24
kind
15:3, 18:9,
32:19, 45:8,
60:11, 71:10,
71:16, 79:19,
108:13, 115:14,
116:11, 121:13,
125:16, 139:9,
164:1, 191:13,
202:6, 204:19,
204:21, 204:22,
206:13, 289:16
kinds
61:23, 78:24
king
93:7, 93:15,
93:21, 94:3,
94:6, 174:3,
174:4, 176:12,
201:16, 250:12,
251:16, 252:8,
252:13, 253:20,
253:23, 256:18,
278:11, 278:20
knew
19:4, 19:12,
28:24, 37:2,
55:11, 75:2,
77:8, 106:14,
110:7, 110:9,
131:16, 155:7,
172:11, 173:2,
173:3, 175:6,
176:9, 180:7,
180:16, 182:4,
182:23, 183:1,
183:9, 185:2,
190:22, 191:1,
191:2, 191:4,
191:12, 202:9,
204:19, 204:21,
204:22, 218:2,
222:5, 240:18,
285:3, 287:9,
287:21
knocked
166:2

knowing
58:20, 146:17,
274:15
knowledge
28:15, 133:4,
171:23, 174:3,
182:17, 213:17,
213:22, 215:10,
282:8, 284:2
known
59:2, 59:11,
59:19, 60:17,
61:1, 119:21,
137:24, 138:3,
144:17, 144:18,
202:4, 288:3
koski
255:21, 256:12
kozar
6:5, 7:7,
108:18, 108:20,
108:21, 108:22,
191:16, 291:12,
291:14, 291:17,
291:18, 291:20,
291:21

L

l-a-t-e
267:22
lab
106:13, 106:21,
107:8, 107:10,
107:19, 109:24,
110:6, 110:12,
110:18, 111:15,
111:20, 122:6,
282:21, 282:24,
283:1, 292:5
label
265:3
labeled
81:18, 270:4
labs
111:16
laid
196:24, 226:16,
228:18, 228:22,

229:14, 231:11,
240:7
lane
238:6, 238:11
lap
79:12
last
37:2, 113:4,
131:17, 141:8,
147:3, 170:11,
171:4, 214:5,
233:4, 241:12,
273:11, 292:14,
293:8
lasted
135:11, 233:1
late
185:16, 266:18,
267:20, 267:21
later
32:17, 70:22,
88:1, 104:3,
104:5, 120:8,
120:9, 124:10,
170:8, 183:16,
184:13, 236:12,
252:14, 290:5
lathom
94:10
laughs
204:7
law
273:15
lawyer
21:11, 269:7,
282:3
lawyers
279:18, 279:24
lead
31:10, 33:17,
34:6, 43:21,
55:11, 84:18,
84:19, 85:12,
89:9, 91:14,
91:20, 98:24,
99:6, 99:14
leads
87:22, 88:23,

116:24, 117:2
**learn**
118:11, 121:9,
121:15, 121:18,
122:5, 185:8,
185:9, 226:10,
226:13
**learned**
16:10, 24:24,
118:13, 122:4,
122:15
**learning**
14:15, 62:3
**least**
103:1, 187:15,
286:14
**leather**
97:21
**leave**
25:11, 33:7,
33:11, 33:15,
42:1, 42:4,
42:23, 43:2,
43:13, 43:16,
43:23, 44:8,
44:9, 44:22,
160:11, 162:17,
164:13, 164:17,
164:18, 192:18,
193:1, 194:17,
236:4, 236:12
**leaves**
102:11, 102:13,
223:20, 253:16
**leaving**
43:24, 84:11,
126:23, 164:2,
190:7, 196:3,
214:20, 216:8
**led**
45:13
**left**
53:8, 79:10,
87:13, 98:12,
126:11, 126:15,
127:11, 127:20,
128:17, 128:23,
163:5, 163:10,

163:14, 169:22,
174:14, 192:12,
200:20, 207:12,
208:14, 217:10,
217:23, 235:24,
236:8, 237:18,
237:21, 238:13,
239:4, 243:9,
251:23, 289:24
**left-hand**
238:6
**legal**
116:3, 257:11,
258:24, 259:15,
288:16
**legally**
183:13
**lending**
156:7, 156:10
**less**
202:20
**lester**
156:10, 267:16
**let's**
13:6, 24:4,
31:5, 41:7,
102:17, 135:21,
141:12, 161:8,
166:13, 184:8
**letting**
128:11
**level**
13:24
**liability**
132:10
**lieutenant**
13:20, 13:24,
75:13, 100:1,
133:23, 134:1,
135:17, 138:22,
138:24, 139:1,
140:12, 147:17,
255:22, 265:13
**light**
127:23, 128:1,
128:5
**lights**
208:16, 219:14,

219:19, 238:23
**liked**
247:10
**limited**
62:17, 65:12
**line**
19:11, 97:3,
179:22, 179:24,
184:21, 184:24,
187:6, 191:24
**lined**
235:9
**lines**
82:23
**lisa**
97:11
**list**
42:1, 269:5,
273:21
**listen**
88:11
**listened**
158:23
**lists**
206:16
**little**
10:15, 39:13,
76:17, 133:8,
148:15, 242:21,
243:15, 249:20,
249:24, 290:5
**live**
84:10
**lived**
154:23, 179:6
**llp**
2:4, 3:23, 4:6,
4:17, 5:9
**load**
242:19
**locate**
129:18, 135:8,
144:6, 169:18,
170:10
**located**
140:22, 141:2,
142:1, 142:9,
146:21, 169:20,

169:21, 169:22,
170:9, 170:15,
170:19
**locating**
288:23
**location**
50:3, 128:16,
209:5, 209:8
**locations**
211:14
**locker**
17:24
**lodged**
254:18
**loevy**
3:12
**logli**
255:22, 256:13
**lois**
272:5, 283:7,
284:4
**lon**
143:10, 183:22,
183:23
**long**
5:7, 17:6,
22:22, 25:24,
62:9, 66:1,
75:8, 104:11,
111:21, 130:3,
130:4, 137:18,
137:19, 137:22,
138:3, 138:10,
145:19, 145:21,
151:21, 152:6,
152:18, 154:22,
189:24, 202:4,
248:5, 255:18
**longer**
14:17, 112:8,
200:19
**look**
10:9, 10:10,
110:1, 130:9,
161:7, 166:13,
169:23, 195:17,
228:16, 235:15,
236:5, 274:5,

278:6
**looked**
146:21, 149:8,
152:3, 229:24,
238:22, 244:13,
289:23
**looking**
76:2, 110:21,
112:10, 130:4,
141:17, 175:4,
197:20, 198:3,
198:5, 198:10,
198:19, 198:24,
201:6, 204:2,
208:2, 208:4,
209:9, 209:11,
219:21, 219:22,
234:20, 265:2
**looks**
212:2
**lords**
267:10
**lost**
196:4
**lot**
15:21, 16:20,
25:15, 35:17,
46:22, 47:7,
47:23, 47:24,
50:14, 52:8,
58:21, 58:23,
74:22, 79:6,
79:9, 82:23,
86:3, 86:6,
100:23, 106:9,
113:8, 174:19,
174:20, 212:22,
224:19, 238:18,
240:16
**loud**
184:22
**louisville**
15:17
**lounge**
276:12, 277:16
**loves**
90:9, 90:20,
91:6

**lower**
14:11
**lunch**
101:20, 102:9
**lying**
28:24, 225:2,
273:17

## M

**machines**
193:13
**mad**
196:9, 196:12
**made**
46:24, 80:1,
115:14, 217:22,
221:12, 222:16,
237:19, 237:21,
238:6, 238:13,
272:5, 272:6,
273:14, 274:2
**magazine**
243:8
**mainly**
77:1, 118:20
**maintain**
32:20, 108:8
**make**
17:19, 22:10,
27:8, 27:11,
69:2, 69:3,
69:9, 70:10,
70:11, 70:14,
81:13, 100:21,
109:21, 113:6,
114:3, 114:7,
114:19, 115:11,
126:19, 126:21,
128:5, 165:11,
200:15, 208:8,
209:17, 223:7,
223:10, 238:7,
257:8, 293:11
**makes**
170:18, 180:21
**making**
29:12, 29:15,
69:12, 87:14,

107:8, 107:18,
113:22, 215:22,
239:3
**male**
83:23, 97:18,
171:24, 254:3
**man**
84:7, 130:15,
280:6
**manager**
252:20
**managers**
252:20
**manipulation**
273:18
**many**
14:23, 35:6,
47:22, 58:11,
87:9, 99:23,
105:16, 106:7,
120:20, 133:10,
143:2, 143:7
**march**
11:3
**marcus**
188:22
**marijuana**
155:4
**mariposa**
95:10, 95:13,
196:17
**mark**
1:13, 2:1,
3:20, 7:3, 8:11,
9:2, 9:13,
19:11, 53:21,
53:23, 54:2,
81:2, 96:7,
161:8, 185:1,
211:18, 222:6,
246:3, 249:1,
250:20, 264:14,
269:16, 274:20,
275:12, 276:3,
276:15, 293:8
**marked**
48:1, 81:15,
81:18, 92:11,

96:8, 126:21,
128:4, 128:12,
161:19, 162:4,
211:22, 212:12,
222:8, 223:1,
223:24, 224:3,
246:10, 250:24,
263:5, 264:23,
269:20, 274:21
**marked-up**
224:10
**marking**
263:3
**markings**
222:17
**marvin**
130:15, 156:8,
156:12, 156:15,
271:10, 280:6
**mary**
5:3
**mask**
97:19, 187:13
**match**
23:9, 186:15
**matches**
56:20
**material**
235:10
**matrix**
99:21
**mattress**
171:12, 171:18,
171:21, 242:24
**maybe**
56:14, 75:11,
103:20, 110:16,
110:17, 152:18,
195:11, 197:24,
227:18, 228:17
**mcannally**
75:19, 75:20
**mccarthy**
4:6, 4:17
**mean**
17:21, 21:19,
39:3, 44:21,
45:7, 54:13,

55:18, 56:12,
59:17, 61:18,
63:9, 63:14,
63:15, 64:18,
89:10, 93:3,
93:10, 107:14,
112:23, 139:8,
166:9, 188:9,
201:13, 201:16,
251:21, 257:18,
271:13
**meaning**
189:12
**means**
63:13, 63:18,
259:1
**meant**
238:7, 291:4
**measured**
224:22
**media**
100:18, 101:7
**median**
214:2, 214:21,
214:24, 215:5,
215:13, 217:11
**meet**
73:10, 74:20,
77:16, 263:21
**member**
68:20, 69:21,
69:22, 267:8
**members**
282:23
**mention**
49:24, 156:15
**mentioned**
41:8, 44:14,
72:21, 164:20,
190:18, 193:6,
291:24
**message**
166:2, 191:16
**messages**
48:14
**met**
74:11, 119:18,
154:22, 179:8,

202:2
**michael**
3:22
**michigan**
3:6
**middle**
70:16, 113:19,
170:6, 242:16,
255:19, 278:9
**might**
16:16, 16:17,
22:9, 23:11,
23:17, 29:11,
33:1, 33:2,
33:19, 33:20,
41:17, 41:19,
42:4, 42:5,
42:24, 43:21,
43:22, 46:20,
46:21, 46:24,
47:8, 47:15,
47:16, 50:6,
50:17, 51:1,
51:9, 52:10,
52:15, 53:14,
54:2, 67:1,
71:21, 72:7,
72:13, 80:17,
84:13, 85:1,
85:2, 100:8,
102:18, 103:19,
107:3, 108:4,
108:6, 108:14,
109:15, 110:15,
110:19, 111:7,
111:11, 112:19,
113:3, 113:20,
114:2, 114:3,
119:6, 119:7,
121:10, 121:13,
122:19, 141:6,
142:3, 142:4,
149:14, 149:15,
149:21, 156:4,
159:2, 163:9,
163:21, 175:16,
194:18, 203:9,
212:3, 213:15,

215:17, 230:17,
241:20, 250:18,
273:6
**mike**
75:14
**military**
88:5, 244:13
**mind**
20:21, 270:24
**mine**
23:18, 23:19,
217:7
**minor**
54:1
**minus**
183:4
**minute**
130:13, 135:21,
181:1, 236:11
**minutes**
145:22, 152:5,
156:20, 160:14,
164:18, 165:24,
166:7, 184:13,
196:24, 201:22,
231:18, 232:10,
232:12, 232:15,
235:13, 235:19
**mira**
136:1, 136:2,
136:3, 136:9,
136:12, 137:8,
148:9, 148:14,
149:13, 287:13,
288:3
**miranda**
19:2, 19:4,
19:6, 19:8,
19:21, 20:2,
20:6, 20:9,
20:13, 21:7,
179:12
**mirandize**
21:3, 28:17,
179:15, 180:18,
181:2, 181:4,
181:16, 184:5,
184:8

**mischaracterizes**
63:23
**misconduct**
277:5
**missing**
216:18, 244:7,
244:16
**misstates**
62:7, 271:21,
272:13
**mistake**
215:22, 217:22,
237:20, 238:13
**mistakes**
26:9
**mixed**
188:22, 217:5
**mobile**
125:23
**model**
168:17
**modifying**
276:22
**modus**
205:11
**mogbana**
5:20, 12:6,
38:15, 38:24,
40:9, 40:24,
49:10, 49:19,
51:4, 51:14,
63:8, 63:23,
64:6, 64:11,
66:19, 67:13,
68:12, 68:15,
69:15, 71:6,
72:5, 91:18,
99:2, 102:11
**mom**
113:19
**moment**
166:1, 188:12
**money**
80:14, 95:11,
179:23, 197:22,
198:1
**month**
112:8

**more**
14:21, 18:5,
18:10, 21:9,
30:22, 33:19,
40:1, 49:3,
52:15, 60:20,
86:13, 121:7,
133:16, 202:18,
202:20, 237:4,
255:2, 264:7,
269:2, 269:13,
269:15, 277:21,
277:22, 285:24
**morning**
9:7, 9:8,
22:17, 25:11,
78:11, 96:21,
125:4, 126:7,
174:15, 174:16,
197:21, 249:17,
252:9, 252:24,
289:24
**most**
31:5, 52:20,
107:1, 198:22
**mother**
273:6
**motive**
182:3
**motives**
112:19, 113:1
**move**
28:4, 40:14
**moved**
12:22
**moving**
28:7, 126:17,
275:24
**much**
14:17, 25:6,
142:20, 150:8,
158:17, 174:5,
179:23, 181:9,
271:14
**multiple**
23:12, 67:19
**mulvey**
95:6

**murder**
56:23, 88:24,
89:4, 89:6,
89:8, 89:11,
89:14, 91:22,
92:13, 92:20,
117:2, 118:9,
118:16, 121:24,
131:20, 132:8,
156:24, 157:1,
157:6, 171:24,
172:4, 172:11,
176:24, 177:17,
178:16, 189:10,
191:4, 194:24,
197:4, 197:9,
197:13, 197:18,
198:17, 199:2,
199:6, 201:15,
202:8, 224:19,
231:2, 234:4,
234:13, 234:17,
237:12, 239:14,
240:23, 243:23,
244:6, 244:15,
256:3, 256:20,
257:3, 259:6,
259:7, 259:8,
259:13, 270:8,
271:1, 272:5,
272:7, 273:6,
279:11, 286:17,
290:6, 290:16
**must**
248:19, 266:16,
266:17
**mute**
104:10
**myself**
41:22, 55:13,
56:3, 73:23,
77:8, 83:2,
90:1, 95:3,
95:6, 124:24,
125:18, 130:11,
135:18, 138:22,
185:4, 206:1,
212:20, 226:20,

256:3
**N**
**nail**
202:12, 202:15
**name**
9:9, 9:11,
26:11, 48:2,
68:9, 78:3,
90:12, 90:18,
90:21, 90:24,
95:7, 97:5,
131:16, 131:17,
156:16, 264:12,
283:6, 291:21,
292:17, 292:20
**named**
56:24, 57:4,
57:10, 130:15,
144:12, 167:16,
280:6
**names**
82:23, 82:24
**narrow**
208:9
**necessarily**
32:23, 45:16,
180:3, 260:16
**neck**
235:7
**need**
10:8, 10:10,
31:14, 34:1,
35:9, 42:15,
43:2, 43:9,
53:22, 57:24,
89:24, 94:20,
108:5, 109:15,
110:23, 262:20
**needed**
35:8, 44:8,
54:1, 55:11,
55:12, 56:16,
107:1, 121:7,
164:20, 168:19,
182:8, 195:9,
197:22, 203:7,
262:15, 262:16

**needs**
31:11, 31:12,
108:2
**neighborhood**
31:13, 33:21,
41:24, 77:4,
83:2, 83:4,
83:5, 83:8,
83:11, 84:21,
85:14, 87:23,
195:12, 211:6
**neither**
150:22, 221:9,
294:13
**never**
27:23, 57:13,
57:15, 57:20,
57:21, 64:13,
72:1, 80:20,
84:15, 87:12,
99:3, 110:23,
114:21, 115:8,
115:22, 116:6,
116:18, 147:8,
160:6, 160:8,
160:12, 173:15,
173:16, 183:3,
186:6, 186:20,
188:22, 189:18,
198:20, 199:5,
199:23, 200:10,
200:12, 205:3,
213:13, 221:15,
221:19, 233:20,
233:21, 233:24,
239:10, 243:5,
245:20, 248:14,
248:16, 248:23,
272:11, 273:9,
277:18
**new**
17:16, 53:1,
104:8, 180:23,
270:17, 271:16
**newburg**
196:4
**news**
100:5, 100:7,

100:9, 100:12,
100:13, 100:18,
240:13, 241:4,
241:6
**newscast**
100:15
**next**
34:11, 77:12,
78:9, 87:4,
87:16, 90:1,
103:10, 119:15,
124:18, 140:19,
140:20, 142:2,
147:14, 152:8,
165:16, 187:24,
217:12, 217:13,
234:10, 240:12,
241:5, 247:1,
247:12, 250:9
**nickname**
267:21
**nicknames**
267:23
**night**
22:15, 74:3,
83:17, 88:4,
138:16, 174:20,
189:13, 190:12,
198:9, 198:20,
203:23, 227:4,
227:17, 228:2,
230:11, 231:1,
232:4, 235:1,
235:24, 236:4,
236:23, 240:16,
262:16
**nine**
167:7
**nobody**
64:13
**nods**
10:3, 92:8,
129:6, 135:12,
255:12
**none**
109:3, 123:15,
271:2, 274:1,
274:11

**noon**
88:6
**normal**
159:7, 229:13
**north**
3:13, 95:2,
96:17, 117:4,
127:22, 128:6,
209:11, 289:20
**northern**
1:2
**notation**
252:11
**notations**
87:1
**note**
153:23, 163:3
**noted**
187:16
**notes**
124:5, 124:13,
124:14, 124:18,
154:1, 154:3,
154:8, 202:21,
203:17, 223:10
**nothing**
10:3, 27:4,
62:4, 72:13,
76:10, 101:16,
124:1, 142:13,
146:13, 159:24,
176:9, 179:19,
182:10, 185:12,
199:23, 207:3,
208:20, 245:22
**notice**
2:19
**noticed**
218:1, 218:4
**notified**
129:24
**notify**
108:2
**november**
265:11
**number**
7:13, 48:2,
56:21, 77:19,

81:4, 96:10,
125:3, 162:5,
223:2, 224:5,
273:12, 273:23
**numbers**
263:3
**numerous**
193:7

**O**

**oath**
9:3, 9:21,
269:7, 273:18,
276:19
**object**
20:15, 22:20,
27:13, 29:20,
30:9, 34:21,
36:14, 37:22,
40:22, 45:24,
46:14, 49:8,
49:17, 51:2,
59:3, 61:17,
62:6, 62:22,
66:12, 67:11,
71:4, 91:16,
108:18, 108:20,
114:11, 116:2,
116:12, 120:16,
122:1, 149:1,
257:10, 261:14,
268:18, 268:20,
270:14, 270:21,
272:12, 274:6,
275:2, 277:17,
288:13
**objection**
27:18, 38:15,
59:24, 60:3,
63:7, 63:23,
64:10, 65:11,
66:19, 68:12,
68:13, 115:16,
117:21, 148:20,
149:7, 192:19,
192:21, 199:13,
291:2
**objections**
91:23

**obligated**
258:7, 258:12,
258:13
**obligation**
257:14, 258:16,
259:11, 259:19,
285:4, 285:9
**obligations**
284:22, 285:12,
285:17
**observe**
74:8, 125:5
**observed**
74:10, 97:16,
125:9, 126:22
**observer**
203:3
**obtain**
124:5
**obtained**
54:21, 54:23,
101:2, 158:13,
158:14
**obtaining**
126:14, 221:6
**obvious**
23:5
**occurred**
22:14, 34:7,
93:7, 95:19,
140:17, 174:12,
200:12, 239:14,
254:10, 276:11
**occurring**
34:24
**october**
264:8, 267:12,
268:5
**off-duty**
55:19, 55:21,
56:10, 56:11,
56:15
**offense**
28:18, 92:13,
92:19
**offered**
160:16, 193:7,
193:9, 193:14,

242:7
**offhand**
100:16, 159:3
**office**
55:6, 71:22,
72:3, 72:8,
95:2, 109:15,
121:1, 196:2,
257:3, 258:8,
258:21
**officer**
11:13, 12:19,
12:20, 13:5,
13:7, 42:3,
44:13, 58:13,
63:12, 63:16,
66:10, 75:20,
115:14, 115:21,
125:20, 149:4,
159:16, 166:17,
170:20, 170:23,
170:24, 260:12,
260:13, 275:19,
277:13, 279:13,
282:9, 282:15,
284:3, 294:6
**officers**
13:13, 33:10,
33:11, 56:19,
62:4, 77:2,
114:23, 115:11,
118:5, 126:19,
129:16, 143:16,
145:12, 145:16,
284:14, 284:20,
285:16, 285:21,
287:4, 287:10
**offices**
2:2
**official**
273:15
**often**
16:14, 17:18,
30:21, 32:4,
106:11, 174:14
**oh**
15:11, 47:23,
51:24, 52:19,

100:6, 104:1,
104:5, 104:7,
118:1, 118:4,
175:7, 176:5,
189:3, 191:18,
212:6, 214:23,
217:1, 232:14,
250:22, 263:18,
263:23, 291:6,
292:16
**okay**
10:13, 10:18,
10:22, 12:13,
12:15, 12:18,
13:1, 13:12,
13:15, 20:8,
25:9, 25:10,
25:12, 25:18,
34:14, 38:20,
40:14, 41:7,
41:20, 42:17,
42:23, 44:12,
56:2, 58:2,
58:9, 73:3,
86:1, 86:8,
87:1, 90:3,
91:11, 92:14,
92:16, 96:5,
104:14, 106:2,
106:11, 107:16,
111:6, 118:4,
137:12, 171:9,
174:22, 187:12,
204:17, 211:2,
212:6, 217:1,
219:11, 219:12,
222:6, 224:1,
224:9, 225:14,
227:18, 227:20,
248:2, 250:9,
250:23, 265:5,
275:11, 278:4,
289:7, 292:3,
292:7, 292:10,
292:14, 292:17,
292:20, 292:23,
293:6
**olds**
95:12

**olen**
264:12, 265:20,
266:7, 266:21,
266:24, 267:6,
267:13, 267:17,
268:2, 268:4
**once**
15:5, 21:8,
33:16, 112:10,
162:10, 273:8
**one**
12:16, 13:24,
17:16, 17:17,
19:11, 19:17,
22:22, 23:13,
30:22, 31:1,
33:18, 35:6,
38:3, 38:21,
43:10, 43:12,
43:20, 43:22,
44:12, 45:4,
45:22, 46:5,
47:5, 57:17,
58:19, 77:22,
86:9, 87:16,
95:4, 95:7,
96:6, 110:3,
128:15, 141:3,
141:4, 141:19,
141:20, 143:14,
144:10, 144:11,
144:21, 145:2,
145:4, 145:16,
146:21, 146:22,
146:24, 147:2,
152:9, 154:5,
155:2, 158:8,
158:12, 158:13,
158:14, 158:15,
163:19, 163:22,
163:23, 164:21,
168:9, 169:14,
170:9, 184:20,
186:18, 191:3,
204:4, 204:16,
211:8, 213:15,
214:1, 222:11,
222:13, 230:13,

234:20, 237:8,
246:6, 248:11,
248:20, 252:4,
252:16, 252:20,
255:14, 255:17,
255:18, 257:24,
260:12, 265:5,
265:24, 269:11,
276:21, 277:22,
284:5, 288:23
**one-page**
253:13
**ones**
178:1, 178:12,
222:18
**ongoing**
34:4, 292:24
**only**
42:18, 111:13,
132:16, 144:21,
150:8, 152:2,
156:5, 178:1,
178:12, 192:7,
201:17, 221:14,
225:9, 243:8,
266:3, 266:4,
282:5, 283:11
**open**
74:23, 79:5,
80:7, 191:24
**opened**
15:8, 78:16,
80:6, 103:19,
128:20
**opening**
15:8, 103:3,
103:15
**operandi**
205:11
**opinion**
111:22, 270:19
**opportunity**
293:9
**opposed**
10:2
**orchard**
216:5
**order**
58:15, 244:2

orders
17:1, 17:10,
17:13, 17:15,
17:20
organizations
16:22
original
8:18, 33:2,
33:4, 293:19
other
9:16, 9:24,
11:9, 12:14,
20:2, 20:10,
25:5, 31:2,
31:20, 32:23,
33:6, 34:6,
37:8, 48:4,
48:8, 50:17,
53:3, 53:14,
55:1, 62:4,
76:23, 77:2,
77:9, 83:2,
86:11, 87:11,
87:21, 87:22,
94:14, 95:3,
111:16, 114:23,
115:11, 118:5,
125:20, 129:16,
133:19, 141:4,
141:6, 141:20,
143:12, 144:11,
145:4, 147:2,
150:3, 154:7,
162:7, 166:1,
168:19, 168:20,
169:13, 169:24,
170:10, 170:11,
170:15, 170:18,
170:21, 182:21,
184:24, 188:23,
190:17, 193:5,
194:20, 195:22,
199:4, 207:18,
213:15, 213:21,
216:1, 228:7,
253:24, 255:14,
271:11, 283:20,
283:23, 283:24,

287:4, 287:20,
292:5
others
14:22
otherwise
294:16
outcome
294:16
outfits
16:22
outside
16:21, 79:2,
84:12, 143:21,
143:23, 164:14,
165:4, 177:6,
269:23, 288:11
outskirts
180:8, 182:11
over
58:12, 67:2,
77:7, 79:5,
95:10, 95:11,
106:5, 107:4,
107:8, 107:17,
107:19, 108:2,
108:5, 108:6,
108:12, 109:11,
109:12, 110:6,
110:17, 111:15,
111:20, 112:10,
120:7, 127:6,
127:12, 128:18,
128:22, 129:5,
129:13, 130:5,
140:5, 175:10,
208:15, 208:17,
214:13, 215:13,
219:14, 230:5,
238:22, 252:1,
256:11, 256:24,
257:6, 258:4,
258:7, 258:16,
259:12, 259:20,
287:5, 290:17,
292:4
oversized
97:20
overturned
270:8

overwhelming
11:24
own
35:6, 119:4,
157:21, 268:15
owners
183:12

**P**

pad
153:23
pads
163:3
page
7:4, 7:13,
82:22, 167:7,
167:23, 168:14,
170:6, 170:7,
171:9, 171:10,
176:15, 177:3,
178:8, 178:10,
178:11, 186:2,
187:2, 187:5,
206:15, 210:22,
214:5, 225:12,
233:6, 233:8,
234:20, 237:10,
239:23, 239:24,
240:9, 240:10,
241:12, 244:4,
244:21, 246:12,
247:1, 249:22,
251:2, 255:17,
255:18, 255:19,
263:17, 263:19,
270:4, 273:11,
273:12, 278:9
pages
1:23, 82:22,
233:13, 250:2
pair
230:1, 230:14
pants
97:20, 227:11
paper
243:6
paragraph
168:14, 170:6,

171:10, 210:24,
211:1, 214:6,
234:22, 240:9,
240:11, 241:18,
242:17, 244:5,
278:9
paraphrasing
272:9
pardon
20:17, 268:19
park
2:6, 3:24,
25:14, 90:9,
90:20, 91:6,
128:23, 175:13,
195:12, 196:16
parked
25:14, 74:22,
83:21, 84:1,
95:12, 209:8,
213:4, 214:17,
219:23, 219:24
parking
25:15, 74:22,
86:6, 212:21,
224:19, 240:16
part
12:17, 18:6,
32:2, 37:2,
124:2, 154:9,
165:20, 168:13,
169:9, 179:14,
204:13, 242:18,
256:5, 265:15
part-time
55:16, 55:17,
55:18
participate
104:20, 105:17
participated
105:3, 120:19
participation
220:21, 220:23,
221:1
particular
31:18, 32:6,
35:7, 39:22,
110:8, 144:15,

278:8
**parties**
177:6, 269:23,
294:15
**parts**
243:6
**pass**
85:6, 96:6,
246:6, 264:18
**passed**
108:9
**passenger**
79:6, 83:23,
125:14, 128:20,
129:2, 139:3,
206:8
**past**
207:23, 208:1,
211:3, 211:4,
211:11, 219:7
**pat**
125:1
**patches**
76:17, 76:18
**patricia**
4:15
**patrick's**
172:15, 176:20,
179:6
**patrol**
11:6, 11:7,
12:18, 12:20,
17:12, 17:23
**patrolman**
58:17
**paul**
255:22, 256:13
**pause**
135:21
**pay**
277:7
**peachy**
181:23, 288:4
**pen**
153:23
**pendency**
292:11
**people**
16:11, 33:6,

35:11, 44:3,
50:12, 55:13,
77:9, 83:1,
87:2, 87:16,
101:12, 153:12,
190:22, 271:11,
284:15
**performed**
16:21, 43:4,
43:10
**period**
103:3, 163:18,
247:7, 281:22
**perjury**
204:12, 204:15,
248:19
**permit**
71:10
**perpetrator**
37:12
**person**
12:15, 18:15,
21:13, 23:12,
39:16, 40:21,
43:18, 43:20,
45:3, 46:21,
49:5, 61:14,
62:15, 67:10,
67:24, 84:9,
114:16, 114:24,
134:8, 181:24,
204:19, 204:21,
204:23, 205:1,
205:16, 260:22,
261:12, 282:5
**person's**
50:24, 100:20
**personal**
91:2, 91:4
**personally**
85:3, 89:18,
89:21, 101:17,
122:19, 145:6
**personnel**
282:24
**persons**
52:6, 52:7,
156:5

**perspectives**
44:3
**pertaining**
292:8
**pete**
291:22
**peter**
6:3, 292:18
**petition**
123:1
**phase**
189:6, 190:10,
192:3, 193:23,
194:11
**phone**
69:2, 69:3,
69:9, 69:13,
70:10, 70:11,
70:14, 70:18,
78:23, 81:8,
96:9, 96:11,
106:5, 109:24,
110:12, 111:1,
113:15, 114:8,
114:16, 114:19,
114:24, 283:12,
291:11, 291:12
**photo**
212:1, 212:5,
212:18, 213:2
**photocopy**
212:7
**photographs**
7:22, 289:19
**photos**
167:19, 211:24,
213:19, 213:21,
215:16, 216:1,
216:2
**physical**
64:21, 107:7,
282:19, 283:2
**pick**
31:14, 52:9,
68:6, 76:11,
101:24, 109:23,
173:13, 173:17,
173:18, 189:17,

290:9
**picked**
42:20, 110:11,
111:1, 180:10,
181:22
**picture**
212:21, 214:10,
214:21, 215:14,
215:21
**pictures**
209:5, 209:6,
209:8, 209:13,
213:13, 214:9,
214:14, 214:16,
215:20, 216:5,
219:20
**piece**
250:18
**pirages**
4:3, 4:12,
13:18, 13:22,
31:6, 31:8,
31:9, 32:19,
35:9, 42:19,
52:10, 54:5,
56:2, 73:3,
73:4, 73:7,
74:11, 75:1,
75:14, 76:7,
77:2, 77:17,
82:12, 82:19,
82:20, 85:9,
85:12, 88:10,
92:1, 92:6,
92:20, 92:24,
96:24, 97:9,
98:23, 99:12,
108:3, 110:17,
111:2, 122:19,
124:24, 130:10,
130:11, 132:24,
133:22, 134:7,
134:21, 135:22,
149:9, 149:12,
167:3, 179:9,
183:21, 183:23,
184:8, 226:15,
228:17, 251:7,

251:8, 256:2,
261:22, 261:23
**pissed**
196:7
**pizza**
84:7, 84:8,
84:9, 84:10,
84:11, 193:14,
247:11, 250:19
**pizzas**
245:23
**place**
17:3, 23:20,
117:7, 144:8,
146:15, 175:10,
189:9, 197:24,
198:3, 198:5,
198:10, 198:20,
199:1, 201:6,
208:4, 219:16,
224:16, 224:19,
229:7, 236:6,
243:23, 284:9,
290:16
**placed**
152:23, 162:22,
190:11, 270:17
**places**
206:16, 216:1
**placing**
171:14
**plain**
152:12
**plaintiff**
1:5, 3:2, 3:9,
81:12
**plaintiff's**
8:12
**planting**
282:9
**plausible**
26:18
**played**
110:9
**pleaded**
271:12
**please**
9:11, 30:20,

**plymouth**
83:21
**pobjecky**
3:20
**poe's**
117:7
**point**
19:20, 43:23,
44:2, 101:20,
101:21, 101:23,
106:18, 119:24,
120:1, 120:3,
120:11, 120:14,
132:4, 133:11,
134:11, 138:19,
144:4, 145:7,
146:11, 150:1,
153:1, 153:8,
153:15, 156:13,
156:15, 157:3,
159:9, 159:21,
160:2, 160:10,
169:16, 170:11,
172:10, 174:7,
179:16, 181:13,
181:15, 184:6,
184:14, 185:17,
185:23, 186:3,
188:8, 189:5,
192:2, 192:6,
192:17, 192:22,
193:2, 193:5,
201:19, 202:23,
203:4, 213:10,
215:16, 217:16,
218:14, 225:22,
226:9, 226:19,
230:10, 230:20,
231:14, 232:24,
233:3, 237:16,
247:6, 247:13,
248:5, 257:6
**pointed**
141:9, 208:10,
229:23
**pointing**
230:24, 278:10

**polaroid**
212:8, 213:18,
213:21, 215:20
**polaroids**
211:13, 211:15,
211:16, 212:15,
214:8
**police**
10:21, 11:2,
11:5, 12:10,
16:8, 17:4,
24:18, 38:5,
38:12, 40:15,
44:6, 44:18,
45:6, 46:3,
46:19, 47:1,
47:9, 47:13,
56:18, 58:12,
61:24, 62:13,
62:18, 63:3,
63:12, 63:16,
64:9, 65:2,
65:12, 65:15,
66:10, 67:8,
68:18, 69:1,
69:19, 71:1,
75:6, 79:16,
81:23, 90:9,
91:13, 93:20,
96:15, 98:19,
100:21, 105:12,
106:12, 106:21,
117:1, 133:10,
147:23, 149:4,
162:5, 183:5,
200:7, 207:12,
246:13, 247:19,
251:2, 251:9,
251:11, 260:18,
260:23, 265:6,
265:8, 265:21,
266:2, 267:11,
279:13, 279:14,
282:9, 282:14,
282:20, 282:24,
284:3, 284:8,
284:10, 284:13,
284:19, 285:15,

285:20, 285:22,
286:5, 287:10,
293:1
**policemen**
56:16, 221:14
**policies**
17:2, 22:8,
24:17, 40:14,
40:18, 61:23,
62:2, 64:8,
65:14, 65:17,
65:21, 67:7,
67:12
**policy**
38:4, 42:7,
42:9, 65:18,
68:24, 69:6,
69:8, 71:1,
200:6, 284:9,
284:12, 284:19
**pop**
160:21, 163:21,
163:22, 194:19,
245:19
**porch**
136:1, 136:9,
136:13, 136:19,
138:19, 148:5,
148:18, 150:9,
158:5, 287:13
**portion**
28:12, 289:14
**portions**
279:2
**position**
109:12
**positions**
11:4
**positive**
145:18
**possible**
77:5, 83:5,
127:8, 163:9,
176:8, 191:7,
199:12, 199:14,
227:22, 227:24,
228:3, 228:4,
228:14, 255:9

**possibly**
119:16
**post**
95:2
**potential**
84:17, 89:5
**pottinger**
5:5, 63:20,
117:21, 177:5,
192:19, 192:21,
199:13, 212:2,
212:9, 216:22,
216:24, 223:12,
224:8, 224:10,
291:8
**pounds**
202:3
**practice**
68:24, 69:6,
69:19, 70:1,
70:3, 71:1,
112:18, 159:7,
200:6, 229:13,
284:9, 284:13,
284:19
**practices**
22:18, 62:12,
62:18, 63:3,
64:8, 65:1,
65:12, 65:14,
65:21, 67:7
**precede**
36:2
**pregnant**
193:20, 233:24
**preliminary**
122:5
**preparation**
47:18, 48:8,
48:22, 123:21,
163:4, 210:8
**prepared**
25:21, 122:24
**preparing**
20:2, 93:19
**presence**
246:16, 251:13,
255:22, 281:8

**present**
6:14, 94:1,
260:6
**presented**
256:14
**pressure**
280:11, 281:1
**pretty**
15:10, 17:21,
25:6, 45:9,
53:1, 58:1,
104:8, 150:8,
158:17, 163:19,
173:20, 182:24,
186:17, 201:3,
201:17
**price**
53:23
**prints**
76:8
**prior**
20:9, 28:7,
29:10, 48:17,
53:3, 57:10,
62:7, 94:5,
98:17, 124:4,
130:1, 185:7,
227:14, 228:12,
235:13, 235:19,
241:13, 261:7,
272:20, 286:12,
286:23
**prison**
201:9, 221:11
**probably**
11:21, 15:10,
37:4, 67:20,
87:4, 100:16,
103:1, 104:10,
120:8, 143:15,
154:8, 158:11,
160:3, 168:6,
172:17, 172:23,
186:11, 203:24,
214:15, 236:7,
249:20, 254:22,
255:2, 256:19,
269:9

**probe**
112:24, 113:9
**problem**
144:6, 155:3,
188:24, 200:2
**procedure**
38:4, 101:5
**procedures**
17:3, 21:16,
22:8, 24:17,
40:15, 61:23
**proceeded**
32:13
**proceedings**
9:1, 12:7,
35:14, 58:7,
102:12, 102:14,
102:16, 223:21,
223:23, 253:17,
255:5
**proceeds**
183:15
**process**
24:21, 25:7,
30:14, 49:4,
123:5, 126:14,
247:13, 248:5
**processed**
283:22
**professional**
2:21
**prohibit**
69:12
**promise**
72:2, 72:11,
72:13, 72:15,
72:17, 280:17
**promising**
71:24
**promoted**
11:19, 12:23,
15:2, 15:6,
103:9, 103:10,
103:14
**pronounce**
217:3
**proper**
26:19, 28:15,

37:7, 37:13,
37:15, 38:11,
39:15, 39:21,
40:1, 40:4,
40:20, 41:4,
49:13, 49:15,
66:9, 66:13
**properly**
24:21
**property**
107:5, 107:23,
108:1, 108:2,
108:6, 109:10,
262:21
**prosecutors**
285:7
**proved**
177:16
**provide**
49:5, 108:13
**provided**
8:20, 100:17,
293:20
**providing**
101:6, 123:12
**psb**
138:21, 139:6,
139:11, 149:24,
151:22, 151:24,
152:23, 159:14,
162:8, 162:10
**public**
75:9, 77:11,
134:24, 147:15,
148:17, 150:15,
152:7, 158:4,
158:6
**publicized**
183:3
**publicly**
59:2, 59:11,
59:19, 60:17,
61:1
**pull**
97:22, 97:23,
208:9, 208:15,
214:13, 214:22,
219:14, 269:10

**pulled**
80:7, 126:6,
128:18, 129:5,
208:17, 209:6,
211:10, 237:12
**pullover**
235:7
**purchased**
121:21, 131:12,
131:16, 183:10,
183:13, 183:14
**purchasing**
183:18
**purple**
97:19
**purpose**
203:6
**purse**
80:13
**pursley**
1:4, 6:14,
7:22, 9:11,
9:15, 51:18,
54:7, 56:23,
57:1, 57:10,
57:14, 57:17,
57:22, 98:18,
117:14, 117:17,
120:15, 125:9,
125:13, 126:22,
127:9, 128:20,
129:19, 130:4,
131:5, 133:9,
136:5, 136:6,
136:22, 148:4,
148:6, 148:9,
154:22, 155:13,
155:22, 156:24,
157:5, 167:13,
176:7, 188:16,
189:9, 190:12,
198:19, 204:20,
204:23, 212:13,
212:14, 227:3,
227:16, 228:1,
231:1, 234:24,
251:15, 252:9,
256:4, 256:10,

259:6, 259:13,
271:4, 278:19,
279:10, 279:18,
279:23, 282:7,
285:10, 287:1,
287:7, 287:15,
287:22, 290:7,
293:3
**pursley's**
123:2, 130:19,
136:4, 270:7,
270:20, 271:19,
286:17
**pursuant**
2:19, 38:11,
64:8, 64:24,
67:6, 69:18,
70:24, 155:17
**pursue**
256:9, 284:15
**pursuing**
284:11
**push**
45:4, 45:23,
51:1, 51:5
**put**
16:3, 17:3,
17:17, 25:20,
26:4, 26:11,
26:13, 65:18,
72:2, 101:13,
103:15, 109:9,
184:21, 184:24,
220:16, 225:4,
239:22, 242:20,
242:21, 242:23,
243:7, 243:12,
268:9
**puts**
286:10
**putting**
27:3, 191:13,
221:4

## Q

**question**
10:4, 10:6,
10:9, 20:22,

21:17, 22:21,
30:3, 30:8,
35:24, 39:9,
39:13, 40:16,
51:9, 62:17,
62:22, 67:17,
68:15, 69:17,
70:4, 148:21,
179:12, 180:18,
181:6, 181:12,
181:15, 181:17,
181:18, 270:22,
270:24, 275:4,
275:22, 284:24
**questioning**
21:22, 51:1,
162:19
**questions**
9:22, 18:17,
19:18, 49:3,
49:22, 50:5,
79:1, 138:18,
148:2, 148:9,
153:15, 153:18,
155:22, 158:20,
162:7, 181:2,
194:12, 204:16,
269:3, 269:6,
277:21, 277:22,
285:24, 291:9,
291:10, 291:13,
291:15, 293:7
**quick**
112:1, 291:15
**quickest**
112:1, 112:3,
112:5
**quickly**
278:5, 278:6
**quite**
74:23, 106:11,
189:24

## R

**r-e-e-d-s**
15:14
**railroad**
128:7

**raise**
65:10, 66:5,
66:10, 67:1,
255:8
**raised**
66:22
**ran**
78:19, 80:21,
128:17, 128:21,
215:3, 230:8
**randolph**
6:8
**rank**
13:10, 13:16,
14:11, 14:18,
14:19
**rd**
259:22
**re-entered**
184:13
**re-marked**
161:24
**reaction**
184:17
**read**
19:7, 19:12,
19:14, 19:16,
20:23, 25:17,
25:22, 26:3,
26:5, 45:10,
70:6, 70:7,
93:20, 94:9,
122:11, 123:19,
139:15, 139:18,
139:22, 140:8,
141:13, 151:23,
155:9, 168:13,
184:22, 184:23,
186:19, 186:21,
192:24, 193:22,
203:13, 210:7,
210:11, 210:12,
247:21, 249:15,
249:22, 253:24,
288:12, 293:9
**readable**
222:14
**reading**
20:21, 155:10,

233:7, 233:10,
256:24, 294:12
**ready**
55:24, 58:9,
78:12, 78:13,
240:12
**real**
34:18, 35:2,
208:19
**realized**
238:16
**really**
38:18, 39:5,
79:20, 103:7,
173:14, 174:9,
175:12, 182:17,
189:15, 196:7,
206:24, 208:24,
253:22, 291:14
**realtime**
2:22
**reason**
36:5, 55:14,
98:12, 98:22,
148:8, 148:13,
164:16, 266:4
**reasons**
116:20
**recant**
202:19
**recanted**
271:12
**recanting**
245:6, 245:8
**recants**
204:4
**receive**
16:7, 73:14,
73:15, 166:5,
166:8
**received**
55:6, 61:22,
72:23, 73:1,
82:8, 88:8, 92:9
**receiving**
269:8
**recent**
269:13, 269:15,

272:6, 273:4
**recently**
210:14
**recess**
58:5, 102:9,
161:15, 161:22,
210:19
**recite**
17:5
**recognize**
81:19, 96:12,
166:14, 211:24,
265:4
**recollect**
90:19, 146:20
**recollection**
73:11, 90:19,
93:6, 94:21,
118:19, 142:24,
143:16, 168:3,
177:14, 177:19,
189:2, 195:24,
209:24, 210:4,
215:11, 228:5,
230:20, 230:23,
231:4
**reconvening**
135:13
**record**
9:12, 10:1,
20:23, 25:3,
45:1, 45:6,
45:15, 45:21,
46:18, 58:10,
70:7, 81:17,
102:6, 102:7,
161:9, 161:17,
161:20, 162:3,
162:4, 191:19,
191:21, 210:16,
210:17, 211:20,
212:12, 222:20,
222:21, 223:6,
223:18, 224:2,
246:7, 263:6,
263:7, 264:21,
265:2, 269:18,
274:24, 275:2,

283:15, 294:9
**records**
101:1, 274:4,
274:16
**recounted**
209:15
**recounting**
28:13, 245:8,
245:9
**recover**
109:9
**recovered**
95:10, 108:12,
170:3, 170:22,
185:19, 226:17
**red**
37:12, 238:23,
244:18
**reduced**
294:11
**refer**
286:7
**referred**
263:14
**referring**
64:21, 91:8,
94:17, 170:5,
187:5, 211:15,
244:20, 244:22,
278:13
**refers**
214:7
**reffett**
5:3, 224:21
**reflect**
81:17, 82:6,
82:9, 82:17,
246:7, 267:11,
274:24
**reflected**
178:24, 222:4,
234:8, 249:6,
249:8, 249:11,
253:3, 263:13,
268:8, 268:12,
270:4, 276:8
**reflects**
234:3, 249:1,

268:3, 268:24
**regard**
22:10, 34:19,
34:24, 57:3,
59:14, 62:12,
63:3, 88:18,
176:18, 240:3,
267:12, 267:15,
268:15, 284:11,
284:15
**regarding**
16:8, 17:1,
18:2, 19:23,
21:21, 22:8,
24:18, 29:12,
34:7, 36:1,
40:16, 42:7,
42:8, 42:12,
48:15, 48:21,
50:24, 61:24,
62:9, 83:10,
89:1, 89:4,
91:9, 91:21,
93:20, 94:2,
100:5, 118:8,
122:9, 122:15,
132:19, 158:9,
176:24, 183:17,
203:18, 234:12,
234:17, 237:11,
241:18, 250:12,
257:20, 258:10,
259:7, 259:12,
261:13, 264:10,
264:11, 270:17,
293:3
**regards**
57:2
**registered**
2:21
**reids**
15:14, 15:15,
16:1, 16:4,
21:20, 40:17
**relate**
98:4, 98:7,
279:3
**related**
294:14

relating
273:14
relation
85:18, 209:9
relationship
179:6
relayed
98:4, 101:3
release
101:16, 262:21,
263:23
released
262:19, 264:5
releasing
283:21, 283:23
relevance
277:18
relevant
257:6, 257:15,
257:17, 258:17,
259:1, 259:3,
259:5
remained
181:9
remember
17:7, 60:15,
73:13, 74:2,
74:5, 74:6,
78:3, 83:15,
83:19, 86:20,
94:24, 95:1,
118:21, 127:15,
133:13, 136:17,
138:11, 140:16,
142:21, 143:19,
144:9, 144:12,
144:20, 145:1,
149:20, 154:18,
164:7, 169:9,
174:5, 174:11,
175:8, 210:5,
229:19, 240:18,
252:21, 253:24,
256:21, 289:22
remembered
159:1, 175:24,
176:12, 191:5,
203:8, 245:6

remembering
195:19
remembers
176:11
remind
9:21
repeat
10:4, 20:20,
89:20
rephrase
30:2, 234:11
reported
1:24, 182:19
reporter
2:20, 2:21,
2:22, 75:18,
81:8, 89:23,
90:3, 108:19,
108:21, 117:15,
169:1, 169:4,
191:19, 223:16,
263:1, 289:6,
291:16, 293:14,
294:2, 294:5
reports
32:12, 32:18,
32:23, 33:6,
33:16, 33:17,
35:15, 41:10,
41:22, 47:21,
47:22, 48:4,
48:5, 55:22,
92:10, 92:17,
92:18, 93:20,
100:5, 100:7,
100:24, 101:2,
105:12, 118:18,
118:20, 157:22,
256:11, 256:24,
257:24, 258:4,
258:6, 258:10,
259:9, 286:2
represent
213:18, 291:22
representing
9:10
request
8:8, 123:1

requested
294:13
required
42:12, 43:6,
43:14, 151:7,
157:20, 257:6
requirement
41:13
requirements
284:21
resolved
273:23
respect
279:2, 279:10,
283:1, 284:21
respond
36:22, 72:23,
236:24
responded
236:24
responders
77:3
response
89:19, 172:3,
194:7
responsibility
100:20
responsible
109:1, 113:5
rest
19:14
restart
39:14
restate
22:21, 38:8
restroom
153:3, 153:5,
163:23, 164:21,
164:22, 165:1,
165:4, 165:13,
233:15, 233:17,
233:19, 233:22
result
45:15
results
111:11, 166:6,
166:8, 185:8,
282:11

rethink
26:20, 28:16
retired
10:18, 10:20,
10:22, 10:23
retrial
271:5, 271:8,
272:19, 272:20
returned
8:18, 76:22,
145:23, 225:19,
240:4, 293:19
returns
223:22, 255:4
review
47:17, 47:22,
48:4, 48:17,
48:21, 71:22,
72:8, 105:5,
105:10, 105:13,
106:5, 110:12,
110:15, 118:18,
156:22, 195:20,
195:22, 228:23,
241:6, 253:5
reviewed
47:20, 82:19,
96:24, 179:10,
194:10, 246:20,
255:21, 278:22
reviewing
122:20, 256:23,
270:1
rewind
141:12
reword
36:16
rfd
7:19, 7:27,
8:6, 8:8, 162:5,
162:6, 224:5,
224:14, 265:3
rice
91:9
ride
139:6, 150:7,
196:9, 196:10,
196:13

**riding**
139:2, 215:9
**right**
10:16, 12:12,
12:17, 12:18,
14:20, 21:10,
21:11, 23:6,
23:22, 24:5,
26:8, 35:23,
43:15, 43:17,
44:7, 63:16,
79:7, 82:3,
82:5, 86:10,
88:6, 88:7,
88:15, 88:24,
97:2, 108:10,
118:3, 121:8,
128:1, 134:6,
134:23, 135:14,
137:5, 139:9,
139:16, 140:19,
142:2, 142:4,
142:6, 142:10,
142:12, 143:1,
149:17, 151:1,
151:4, 153:6,
153:13, 154:17,
159:18, 162:2,
165:6, 165:14,
165:16, 165:23,
169:15, 176:16,
178:19, 179:22,
179:24, 181:3,
181:23, 182:1,
182:11, 186:5,
186:8, 201:3,
201:21, 203:5,
214:24, 216:24,
217:22, 219:12,
231:3, 231:5,
232:23, 235:21,
237:19, 238:7,
238:12, 238:20,
239:17, 242:8,
243:12, 244:12,
247:12, 248:4,
248:20, 253:8,
254:13, 257:9,

262:3, 265:12,
266:3, 278:8,
278:18, 283:11,
286:22, 288:5,
288:6, 288:16
**rights**
18:11, 19:2,
19:4, 19:6,
19:18, 21:10,
179:12, 184:15,
184:19, 184:20,
185:2, 185:3,
193:1, 193:22
**riverside**
251:16, 278:12,
278:20
**road**
35:14, 207:22,
208:8, 218:4,
218:6, 219:12,
238:18, 243:10
**rob**
180:15, 191:11,
198:20
**robbed**
84:12, 176:7,
251:15, 252:12,
252:24, 278:11,
278:20
**robbery**
49:15, 49:16,
49:24, 50:1,
74:15, 84:6,
93:7, 93:15,
93:21, 94:3,
94:7, 94:22,
95:1, 95:14,
95:16, 95:19,
95:23, 96:16,
97:14, 98:8,
98:18, 117:4,
131:23, 132:9,
167:20, 167:21,
175:4, 176:1,
176:19, 183:2,
183:8, 183:15,
195:1, 195:3,
195:10, 195:18,

196:22, 199:3,
201:4, 201:15,
202:7, 214:17,
216:3, 216:7,
217:4, 217:15,
220:21, 221:2,
221:11, 221:16,
221:17, 221:20,
230:1, 230:3,
230:7, 246:18,
246:22, 249:2,
249:6, 250:12,
252:8, 253:21,
253:23, 254:12,
254:18, 256:10,
256:16, 256:18,
271:1, 289:19,
289:20
**robbing**
174:4, 195:5
**robert**
5:5, 117:7
**rockford**
1:7, 1:14, 2:8,
3:25, 4:8, 4:21,
5:13, 5:18,
5:22, 5:28,
9:16, 10:21,
11:1, 11:5,
16:8, 17:3,
24:18, 29:4,
29:7, 38:5,
38:12, 40:15,
61:24, 62:13,
62:18, 63:3,
64:9, 65:2,
65:12, 65:15,
66:10, 67:7,
68:18, 69:1,
69:19, 71:1,
110:6, 200:7,
279:13, 282:9,
282:14, 284:2,
284:8, 284:10,
284:13, 284:18,
285:15, 285:20,
285:21
**rockton**
127:21, 127:22,

127:23, 128:6
**rode**
73:23
**role**
110:8, 273:14
**roller**
224:22, 225:3,
225:4
**ron**
3:18
**room**
43:19, 94:13,
152:11, 152:12,
152:20, 152:24,
153:6, 153:9,
154:10, 159:14,
160:18, 162:14,
162:16, 162:18,
162:22, 163:11,
163:15, 163:18,
164:2, 164:13,
165:12, 165:15,
179:3, 184:11,
194:15, 196:18,
200:18, 203:6,
203:15, 204:19,
226:4, 232:19,
237:8, 242:24,
244:6, 247:14,
250:14, 251:17,
251:18, 251:19,
266:23, 267:2
**rooms**
152:10, 152:22
**roshna**
3:10, 81:11
**round**
243:14
**rounds**
243:9, 244:12,
244:18
**roush**
83:14, 83:15,
87:21
**route**
56:6, 74:20,
240:5
**rpr**
1:25, 294:5,

294:22
**run**
80:17, 80:22,
84:3, 107:4,
108:5, 111:15,
113:22, 202:6,
219:16, 278:2
**running**
78:16, 107:7,
128:21, 208:24,
215:12

**S**

**s**
112:15
**s-c-h-m-i-d-t**
9:13
**s-w-a-a-g-s-t-r-a**
217:2
**safety**
75:10, 77:11,
134:24, 147:15,
148:17, 150:16,
152:7, 158:4,
158:6
**saint**
74:16
**sake**
290:20
**sales**
168:7
**sam**
3:20, 94:2,
130:21, 131:10,
131:16, 131:19,
132:20, 133:1,
134:9, 135:9,
135:24, 136:8,
136:12, 137:18,
143:21, 144:21,
145:7, 146:11,
146:17, 147:20,
150:9, 153:9,
153:11, 154:19,
155:21, 156:19,
159:10, 161:5,
162:12, 163:9,
167:9, 169:17,

170:19, 183:9,
183:10, 187:7,
187:17, 187:18,
205:15, 205:22,
206:11, 207:11,
215:11, 217:9,
220:2, 220:4,
223:3, 225:6,
226:19, 227:14,
228:10, 228:12,
228:23, 231:17,
232:3, 232:5,
232:15, 236:3,
237:11, 239:1,
248:7, 249:2,
254:21, 260:1
**samantha**
119:18, 121:21,
125:9, 125:12,
130:12, 131:6,
132:4, 135:19,
138:23, 139:4,
141:5, 141:7,
152:9, 153:21,
157:5, 158:16,
168:1, 168:15,
168:20, 169:12,
170:10, 171:1,
171:11, 171:22,
174:2, 176:4,
176:6, 177:15,
183:18, 198:18,
201:2, 201:9,
201:12, 202:22,
203:21, 206:2,
206:9, 211:9,
212:20, 213:7,
213:14, 218:23,
219:8, 221:10,
221:24, 224:4,
227:2, 233:15,
234:3, 246:23,
247:2, 247:6,
247:21, 251:12,
252:7, 271:11,
278:13, 279:4,
279:7, 280:10,
281:9, 286:12,

286:20, 286:24,
288:8
**samantha's**
125:11, 188:6
**same**
14:18, 14:19,
23:20, 23:21,
27:18, 29:17,
41:20, 42:4,
43:24, 59:24,
60:3, 60:19,
63:7, 64:10,
65:11, 73:24,
91:23, 119:13,
122:6, 127:14,
149:7, 171:9,
226:24
**sandwich**
193:12
**sandwiches**
193:13
**sat**
126:7, 158:22
**satisfied**
288:8
**saw**
33:12, 44:12,
83:23, 237:8,
287:1
**saying**
16:20, 18:21,
22:24, 23:15,
36:5, 37:10,
78:17, 97:13,
116:20, 122:4,
138:2, 144:9,
146:11, 172:17,
180:5, 188:18,
189:4, 199:18,
199:22, 201:8,
204:9, 207:18,
209:16, 215:12,
230:24, 236:7,
240:20, 259:18,
272:2, 272:16
**says**
23:19, 39:16,
45:3, 45:22,

69:8, 79:4,
80:12, 80:14,
83:22, 84:5,
84:12, 84:14,
92:13, 92:19,
170:7, 173:14,
175:14, 177:1,
177:7, 177:8,
177:12, 178:11,
188:21, 191:12,
195:11, 196:6,
197:23, 198:5,
207:19, 208:7,
208:14, 208:20,
209:2, 209:3,
209:4, 211:12,
214:6, 214:24,
215:2, 215:4,
216:10, 216:12,
217:23, 217:24,
218:2, 219:11,
219:13, 219:15,
230:3, 230:6,
230:13, 235:23,
238:11, 238:13,
240:12, 243:12,
243:13, 244:4,
255:19, 265:8,
265:17, 266:8,
290:3
**scared**
208:24, 215:1,
215:2, 217:24,
282:6
**scenario**
239:4
**scene**
33:10, 56:4,
58:19, 73:9,
73:12, 73:22,
74:1, 74:9,
75:9, 76:24,
77:1, 77:7,
79:17, 80:3,
85:19, 86:2,
108:12, 109:6,
122:10, 133:8,
173:21, 189:9,

237:13, 271:18
**scenes**
133:6
**scent**
76:9, 76:11
**schmidt**
1:13, 2:1,
3:20, 7:3, 7:15,
7:17, 7:24,
7:30, 8:2, 8:4,
8:15, 9:2, 9:7,
9:13, 10:14,
48:2, 58:11,
81:6, 81:14,
81:17, 81:18,
81:19, 96:7,
96:10, 96:14,
102:19, 157:10,
157:13, 162:4,
209:14, 212:13,
212:14, 221:23,
222:6, 222:24,
223:1, 223:2,
224:3, 224:15,
232:1, 246:4,
246:5, 246:9,
246:16, 249:1,
250:21, 251:2,
251:14, 256:2,
263:2, 263:3,
263:4, 263:13,
263:19, 264:14,
264:15, 264:16,
265:2, 268:1,
268:15, 269:17,
274:17, 274:20,
274:24, 275:1,
275:7, 275:10,
275:24, 276:6,
276:9, 277:6,
278:7, 279:9,
291:21
**schmidt's**
8:11
**school**
15:14, 15:17,
15:18, 16:1,
40:17, 173:4

**schools**
15:12, 16:14,
56:19
**scientist**
279:14
**scott**
4:4, 4:13,
54:17, 54:23,
55:2, 55:5,
55:14, 56:5,
73:1, 73:6,
73:7, 73:8,
73:15, 74:19,
77:15, 119:1,
119:13, 123:17,
124:14, 125:2,
125:22, 127:10,
130:24, 135:16,
139:14, 139:18,
139:22, 140:4,
140:9, 141:13,
141:16, 141:22,
142:11, 142:16,
143:7, 144:23,
145:5, 145:17,
146:2, 146:10,
155:8, 155:10,
155:16, 155:19,
203:19, 286:15,
288:12
**scott's**
134:2, 149:19
**scratch**
183:19, 255:15,
258:14, 270:18
**screaming**
78:17
**scribbles**
223:7
**se**
16:12
**seal**
129:17
**search**
31:13, 31:22,
41:24, 54:22,
54:23, 54:24,
123:1, 123:4,

123:18, 123:19,
126:14, 129:18,
130:7, 132:19,
132:21, 135:5,
135:17, 139:14,
139:18, 139:22,
140:4, 141:13,
142:12, 143:17,
146:15, 149:16,
149:17, 150:4,
150:14, 150:18,
151:3, 151:7,
151:9, 151:13,
151:15, 151:18,
155:9, 155:10,
155:14, 155:17,
158:14, 159:18,
166:6, 168:11,
170:1, 170:17,
185:9, 185:12,
216:8, 216:16,
225:23, 226:9,
226:17, 282:11,
288:12, 288:13,
288:23
**searched**
141:3, 144:8,
196:5
**searching**
134:5, 144:19
**seat**
74:24, 139:2,
139:4, 140:12,
206:8, 206:9,
206:11, 207:17,
213:10, 213:12,
213:14
**seated**
162:16
**second**
125:10, 141:12,
157:8, 168:9,
169:21, 176:4,
191:20, 223:17,
240:11, 244:17
**second-guess**
99:4
**second-to-last**
210:23, 214:5,

270:4
**section**
112:13, 226:11,
226:19, 227:15,
228:10, 228:13,
232:16, 254:14
**see**
24:8, 24:12,
26:21, 73:19,
79:6, 80:22,
80:23, 82:15,
83:17, 93:23,
98:1, 110:18,
110:19, 111:7,
115:8, 115:22,
134:16, 136:9,
148:16, 149:18,
157:9, 165:7,
165:9, 177:10,
177:11, 178:7,
178:11, 199:19,
200:15, 204:1,
208:20, 212:1,
212:17, 229:3,
235:16, 241:9,
243:11, 255:19,
269:10
**seeing**
138:11
**seem**
26:18, 26:20,
245:16, 287:24,
288:8
**seems**
96:11
**seen**
22:2, 74:21,
79:4, 79:9,
79:11, 80:8,
80:20, 83:8,
84:14, 84:15,
87:21, 93:11,
93:22, 111:12,
141:8, 147:3,
170:11, 171:4,
181:9, 196:3,
238:17, 238:21,
238:23, 247:8,

248:17, 251:9
**sell**
198:1
**send**
48:14, 107:9,
107:17, 107:19,
108:12, 111:17
**senior**
14:16, 14:21,
52:18, 52:20,
53:8, 264:12,
265:20, 266:21,
266:24, 267:13,
267:17, 268:2,
268:4
**senior's**
267:6
**sense**
22:10, 27:12,
180:21, 286:11,
289:16
**sensed**
22:4
**sent**
84:7, 95:4,
269:6
**sentence**
214:5, 240:12
**separate**
12:11, 264:1,
264:19
**sergeant**
13:17, 13:21,
31:6, 31:9,
32:18, 35:9,
41:12, 42:19,
52:10, 53:23,
54:4, 56:2,
66:18, 73:2,
73:4, 73:7,
74:11, 75:1,
75:13, 76:6,
77:2, 77:17,
82:11, 82:19,
82:20, 85:9,
85:11, 88:10,
92:1, 92:6,
92:20, 92:24,

96:24, 97:8,
98:22, 99:9,
99:12, 108:3,
110:17, 111:2,
122:19, 124:24,
130:10, 133:22,
134:7, 134:21,
135:22, 148:16,
149:9, 149:12,
167:3, 179:9,
183:21, 226:15,
228:17, 251:6,
251:8, 256:2,
261:23
**serious**
33:8, 201:3
**serve**
150:17
**served**
54:24, 131:19,
254:11, 254:17
**set**
8:12, 60:8,
125:2, 125:24,
126:1
**setting**
158:1
**seven**
176:15
**several**
9:16, 15:23,
30:24, 78:18,
83:2, 86:17,
274:1, 293:11
**sex**
15:19, 52:6
**shakes**
147:12, 242:13,
245:15, 262:7
**share**
30:18, 31:2
**shared**
35:1
**sharing**
34:18, 54:17
**shawn**
90:17, 90:21
**she'd**
132:8, 141:7,

176:10, 205:16
**she'll**
134:16, 148:16
**sheet**
31:10, 55:11
**shell**
75:1, 108:11,
122:9, 242:19,
242:22, 271:17
**shift**
73:2, 73:5,
101:11
**shit**
64:20
**shooting**
117:6, 117:10,
117:20
**shop**
121:20
**short**
170:8
**shorthand**
2:20, 294:4
**shortly**
89:4, 89:6,
89:8, 89:11
**shot**
78:18, 80:14,
80:15, 168:17,
168:23, 173:6,
191:10, 191:11,
240:14, 242:17
**shotgun**
139:2
**shots**
208:23
**should**
26:20, 44:17,
44:18, 160:8,
214:14
**show**
141:7, 147:2,
165:2, 186:23,
213:3
**showed**
167:19, 171:4,
171:5, 187:10,
195:8, 196:1,

196:12, 196:16,
211:12, 214:6,
214:12, 224:17
**showing**
222:24, 278:8,
289:18
**shy**
10:12
**sic**
15:15, 53:23,
75:21, 168:23,
187:11, 197:23,
211:12, 214:6,
235:24, 242:21,
245:6, 251:14,
290:21
**side**
79:6, 79:7,
79:9, 79:10,
83:23, 125:10,
125:13, 125:14,
172:1, 195:17,
198:3, 208:14
**sign**
19:19, 26:11,
26:13, 128:15,
128:17, 215:3,
216:17, 252:1
**signature**
97:3, 97:6,
97:7, 97:9,
263:20, 265:14,
270:3
**signature-5tm1q**
294:20
**signed**
82:19, 140:5,
140:6, 140:7,
167:3, 185:3,
185:5, 233:6,
248:1, 249:16,
249:21, 249:22,
251:3, 252:3,
257:4, 258:1,
265:9, 265:10
**significant**
43:4
**signing**
233:13, 249:19,

250:2, 294:13
**silence**
285:20
**silent**
73:24, 80:21,
85:21, 86:5,
86:14, 92:14,
92:18, 150:7,
189:19, 189:20,
189:22, 189:23,
190:12, 197:8,
198:4, 199:6,
201:7, 203:3,
207:14, 207:21,
207:24, 208:12,
209:10, 209:11,
211:3, 211:4,
211:11, 212:22,
212:23, 214:1,
214:20, 218:21,
219:8, 224:16,
240:15, 290:17,
290:21
**silently**
158:22
**simply**
36:6
**since**
55:24, 56:3,
66:1, 122:11,
187:9, 192:4
**single**
65:18
**sister**
74:18
**sit**
105:9, 236:11
**sitting**
80:5, 132:23,
136:1, 136:8,
136:14, 136:15,
136:16, 139:24,
142:2, 143:24,
153:20, 153:22,
159:13, 201:24,
203:1, 206:7,
206:11, 213:7,
213:10, 213:12,

219:18
**situation**
45:20, 46:9,
52:14, 59:5,
60:10, 60:11,
70:15, 107:3,
113:3, 276:19
**situations**
265:24
**six**
104:14, 104:16,
104:18, 104:19,
105:19, 167:7,
170:6, 170:7,
225:13, 243:8,
244:21
**ski**
97:19, 187:13
**skipping**
155:8
**slam**
65:3, 281:7
**slide**
243:13
**sliding**
242:19
**slot**
103:19
**slugs**
108:11
**small**
152:12, 152:16,
152:20
**smith**
73:9, 276:23
**smoke**
160:17
**smoking**
160:18
**snakes**
207:22
**snow**
74:4, 76:13,
76:17, 76:18
**sodas**
193:5
**solve**
109:1

**solvents**
243:5
**some**
14:21, 15:1,
16:15, 31:22,
31:23, 48:3,
50:23, 53:7,
58:17, 74:24,
76:17, 79:11,
86:22, 95:11,
101:3, 106:18,
111:21, 126:20,
128:4, 132:10,
148:2, 160:22,
163:11, 163:18,
181:6, 191:11,
198:1, 201:2,
209:14, 212:3,
223:10, 223:11,
224:24, 226:9,
226:10, 226:15,
228:18, 230:5,
240:14, 246:2,
262:17, 283:23,
289:18
**somebody**
18:6, 18:9,
18:10, 19:6,
19:23, 23:13,
23:14, 31:17,
35:12, 37:3,
43:8, 43:9,
43:12, 43:22,
49:23, 52:10,
55:7, 64:14,
68:5, 68:6,
80:6, 88:20,
99:6, 100:3,
105:24, 108:1,
113:5, 115:18,
134:23, 137:12,
144:2, 144:9,
144:24, 164:13,
188:21, 225:1,
252:23, 266:14,
281:14, 290:20
**someone**
20:3, 25:8,

26:17, 49:4,
49:14, 83:12,
104:9, 112:20,
112:24, 117:12,
264:11
**something**
18:7, 18:24,
21:2, 21:6,
21:14, 22:1,
26:7, 26:8,
28:2, 29:1,
29:7, 30:7,
33:24, 37:4,
41:19, 42:3,
44:8, 46:18,
53:8, 54:1,
55:24, 67:3,
84:20, 87:22,
88:21, 92:3,
99:5, 101:13,
107:1, 111:3,
125:8, 127:11,
159:1, 159:2,
162:24, 163:15,
164:17, 177:10,
186:19, 190:18,
193:8, 195:23,
203:8, 203:9,
203:10, 208:4,
208:22, 225:2,
266:19, 284:4
**sometime**
13:1, 244:15,
254:13
**sometimes**
32:15, 41:11,
45:2, 46:3,
252:8
**somewhere**
11:21, 73:17,
103:2, 135:15,
152:19, 177:10,
186:22, 205:21,
227:10, 227:23
**son**
136:5, 272:11
**son's**
283:21

soon
58:1, 113:20,
128:7, 128:9,
128:19
sorry
81:9, 89:20,
94:19, 108:19,
117:15, 169:1,
204:17, 216:21,
218:18, 224:12,
232:14, 245:9,
248:18, 250:22,
263:18, 269:17,
278:3, 283:14,
283:17, 291:16,
292:10
sort
44:18, 285:19,
286:2
sorts
44:17, 206:16
sound
135:14, 140:17
sounds
202:18
south
3:5, 128:17,
129:13, 209:11
southwest
74:22
spatter
15:18
speak
19:13, 64:12,
72:14, 72:18,
72:19, 90:4,
101:14, 117:15,
292:24
speaker
89:24
speaking
101:19
special
12:9, 12:10
specific
60:20, 95:24,
104:22, 134:15,
174:24, 175:3,

229:14, 274:7
specifically
100:10, 107:7
specifics
47:4
speculation
120:17, 149:2,
291:3
speed
34:10, 35:22
spent
108:11, 109:7
spoke
78:2, 81:10,
89:24, 267:20,
292:14
spoken
201:20, 283:6
spot
225:7
spots
126:7
spotted
196:1, 208:21
squad
126:5, 143:2,
145:12, 206:14,
208:17, 209:9,
212:20, 238:21,
239:9, 239:12
squads
95:10, 128:4,
128:12
stage
276:11, 277:16
stairs
84:3
stalter
5:11
stamp
246:8
stamped
212:13, 275:1
stand
165:6
standing
142:3, 143:23,
144:1, 212:19

start
11:1, 15:3,
27:24, 35:14,
102:19, 103:11,
166:18, 181:5,
182:8, 194:12,
232:7, 232:18,
254:5
started
11:7, 12:19,
15:9, 20:14,
39:12, 49:21,
50:5, 78:23,
102:17, 110:20,
126:12, 127:18,
127:22, 135:9,
153:14, 153:17,
162:18, 188:12,
198:8, 208:12,
210:24, 214:22,
218:1, 238:15,
247:12
starting
25:9, 124:20,
167:7, 247:3
stashed
216:6
state
2:22, 3:5, 4:7,
4:19, 5:26,
9:11, 106:12,
106:21, 110:18,
221:22, 277:1,
279:14, 282:20,
282:24, 292:4,
293:1, 294:6
state's
71:22, 72:3,
72:8, 72:15,
72:18, 72:20,
105:1, 105:6,
105:9, 106:4,
109:14, 120:14,
120:24, 194:9,
220:6, 246:21,
255:21, 256:12,
256:13, 257:7,
257:15, 258:2,

258:7, 258:21
stated
168:15, 168:16,
168:18, 168:21,
168:22, 170:8,
176:4, 176:8,
177:8, 187:7,
187:17, 240:15,
252:13, 278:10
statements
24:14, 24:15,
24:19, 29:12,
29:16, 80:1,
105:12, 202:19,
213:16, 255:1,
256:24, 259:9,
272:24, 273:4,
280:12
states
1:1, 210:23,
211:3, 240:15,
246:14, 251:11,
256:9, 273:13
stating
251:14
station
55:23, 72:23,
75:6, 147:23,
149:6, 151:5,
159:15, 192:8,
192:9, 192:11,
192:13, 196:14,
207:12, 216:15,
225:19, 266:5,
266:16
stay
104:11, 154:10,
194:15, 266:23,
267:2
stayed
126:9, 154:16,
242:18, 243:14
steal
195:9, 195:16,
195:18, 198:1,
208:5, 208:22
stealing
199:4, 201:15

**stenographically**
294:11
**stephen**
4:3, 4:12
**stepped**
164:14, 184:10,
194:18, 233:15
**steps**
136:16
**steve**
13:17, 103:4
**still**
11:19, 13:7,
14:18, 77:14,
79:20, 128:2,
139:24, 140:2,
140:11, 140:13,
290:2, 291:11
**stole**
214:16, 216:11
**stolen**
131:4, 132:1,
175:17, 179:23,
182:17, 183:7,
216:6, 216:11,
217:3, 226:1,
271:2
**stop**
48:18, 121:20,
126:20, 126:21,
128:3, 128:5,
128:15, 128:17,
139:13, 151:4,
151:11, 168:8,
208:18, 215:3,
215:24, 219:13
**stop-n-go**
173:19, 189:18,
290:10, 290:22
**stopped**
13:2, 42:20,
127:23, 128:19,
133:9, 139:17,
219:9, 219:20,
219:24, 224:18
**stopping**
101:21, 101:22
**storing**
171:11, 171:13

**story**
182:13
**straight**
162:14, 207:14
**strange**
173:14, 189:15
**street**
3:5, 3:13, 4:7,
4:19, 5:26, 6:8,
19:7, 85:20,
86:18, 111:14,
128:9, 128:10,
128:14, 133:11,
134:4, 143:3,
173:18, 173:19,
189:17, 217:23,
238:10, 290:23
**strike**
15:1, 22:7,
36:7, 40:3,
48:18, 70:23,
180:24, 205:20,
207:9, 240:10
**striupaitis**
6:3, 291:23,
292:18
**stuck**
212:10
**stuff**
12:4, 14:15,
14:17, 21:12,
25:1, 31:10,
35:15, 45:8,
50:18, 52:17,
58:18, 58:19,
99:23, 101:15,
154:7, 155:1,
157:23, 164:1,
173:7, 174:16,
179:7, 179:20,
182:2, 182:18,
187:14, 191:13,
195:14, 197:5,
202:19, 214:18,
214:19, 216:4,
228:18, 228:24,
229:21, 233:7,
245:19, 245:21,

257:1, 259:9,
292:4
**submit**
106:24, 107:2
**submitted**
41:12, 85:10
**submitting**
282:19
**subordinate**
14:12
**subordinates**
14:9
**subpoena**
2:19
**subpoenaed**
273:8
**sudden**
78:14
**suggest**
26:19, 28:16,
36:8, 36:12,
38:2, 38:10,
38:21, 40:4,
40:20, 236:17,
280:21, 281:13,
293:16
**suggesting**
36:23
**suggestions**
27:9
**suite**
3:14
**summarize**
279:6
**summary**
286:3
**supervised**
284:21
**supervising**
13:12, 13:16
**supervisor**
13:17, 33:23,
42:14, 44:7,
53:11, 53:19,
55:10, 73:2,
73:5, 85:10,
101:3, 107:20,
107:21, 107:22,

108:4, 109:13,
261:2, 261:19,
262:18, 265:11
**supervisor's**
109:12
**supervisors**
32:5
**supplement**
33:6
**suppose**
24:10
**sure**
11:12, 15:7,
16:12, 16:13,
17:5, 17:19,
19:3, 21:19,
22:6, 23:23,
24:22, 28:20,
29:8, 30:4,
32:3, 32:21,
34:16, 36:20,
37:10, 41:5,
42:6, 46:15,
51:24, 53:5,
57:6, 65:7,
66:23, 67:18,
70:11, 72:10,
73:19, 78:21,
85:8, 87:14,
89:15, 93:1,
100:8, 102:21,
103:16, 105:2,
106:14, 106:18,
110:2, 113:12,
118:24, 119:20,
119:23, 122:16,
133:23, 137:16,
141:15, 141:16,
141:18, 142:7,
143:6, 144:22,
146:1, 147:3,
149:22, 151:2,
152:19, 154:2,
155:24, 161:14,
163:19, 165:11,
186:17, 195:13,
203:17, 210:13,
258:11, 259:10,

260:3, 260:21,
265:16, 287:11,
291:4, 293:12
**surplus**
244:14
**surrounding**
49:6
**surveillance**
125:2, 125:6,
125:16, 125:17,
125:21, 126:6,
157:23, 158:2,
287:1
**suspect**
18:16, 19:24,
56:24, 57:5,
57:11, 68:9,
68:11, 80:17,
89:1, 89:5,
91:12, 91:21,
95:9, 95:15,
97:16, 97:23,
100:11, 100:13,
100:15, 101:6,
104:22, 132:5,
157:6, 159:11,
240:17, 241:10,
253:19, 253:21,
254:2, 289:19
**suspect's**
100:18
**suspected**
18:15, 20:12,
133:2
**suspects**
23:12, 67:20,
90:8, 95:17,
98:19
**suspended**
277:7
**suspicious**
84:14
**sustained**
277:6
**swaagstra**
216:18, 216:19,
217:2
**swat**
11:11, 11:13,

11:19, 12:1,
12:9, 12:16,
12:17, 12:20,
13:2
**swear**
239:2
**sweater**
37:12, 37:14
**sweatpants**
230:1, 230:4
**sweatshirt**
97:20, 227:11,
230:6, 230:10,
230:11, 230:24,
231:1, 235:4,
235:6, 235:10,
235:12, 235:20,
235:22, 237:1,
237:5, 237:8
**swing**
150:17
**switzer**
5:7
**sworn**
9:3, 204:2

---
**T**
---
**table**
65:3, 152:13,
153:21, 202:24,
229:7, 231:12,
281:8
**tag**
42:24, 88:13,
109:9, 229:2
**take**
10:11, 12:16,
17:17, 25:1,
31:5, 34:4,
34:11, 43:18,
58:4, 96:6,
107:5, 107:24,
108:6, 111:21,
123:7, 131:4,
134:16, 137:23,
138:4, 148:1,
150:11, 150:15,
161:12, 194:3,

197:23, 201:14,
213:2, 213:13,
214:10, 215:19,
215:20, 216:1,
226:3, 226:19,
228:10, 228:19,
246:6, 254:20,
255:14, 281:14,
286:8, 293:11
**taken**
24:14, 36:2,
58:5, 74:16,
102:9, 152:9,
161:15, 161:22,
173:8, 210:19,
211:13, 220:5,
242:1, 254:13,
254:19, 280:22,
290:7, 292:4,
293:12, 294:7,
294:10
**takes**
109:11
**taking**
10:11, 24:18,
27:1, 94:5,
146:15, 147:23,
154:1, 154:3,
154:5, 154:8,
202:21, 210:5,
212:21, 214:9,
218:12, 221:6,
227:9, 227:14,
228:12, 237:10,
238:24, 239:1,
239:5, 241:13,
242:5, 245:4,
247:15, 248:2,
280:5
**talk**
18:12, 18:13,
20:6, 21:10,
32:21, 32:22,
41:7, 48:11,
48:24, 49:5,
49:7, 50:15,
55:4, 56:24,
57:8, 67:2,

71:23, 83:8,
99:12, 114:14,
118:24, 120:7,
122:13, 134:17,
136:22, 148:3,
148:6, 148:17,
156:18, 156:19,
164:15, 174:18,
179:20, 180:1,
181:8, 196:23,
206:23, 227:24,
266:9, 282:1,
282:23, 287:15
**talked**
16:1, 26:23,
44:23, 73:6,
87:14, 87:20,
94:14, 101:2,
110:9, 122:17,
122:18, 132:6,
132:12, 133:7,
154:24, 169:12,
173:5, 179:10,
182:4, 182:6,
184:3, 184:9,
186:20, 196:21,
196:22, 203:19,
221:2, 227:5,
241:14, 252:18,
252:21, 256:14,
262:11, 262:13,
273:9, 286:2
**talking**
20:8, 20:10,
20:14, 23:4,
23:13, 23:23,
28:17, 28:18,
35:12, 47:5,
49:23, 50:9,
64:22, 65:17,
66:7, 67:19,
80:6, 87:2,
97:5, 114:13,
118:21, 124:10,
142:5, 144:2,
152:2, 153:19,
153:22, 158:24,
160:5, 163:20,

167:12, 167:24,
169:24, 171:11,
179:4, 183:18,
201:17, 201:24,
213:24, 219:3,
225:15, 228:6,
241:24, 252:17,
253:12, 258:1,
258:2, 280:5,
290:6
**talks**
240:10
**tape**
42:20, 224:23,
225:3, 225:4
**tapes**
88:8, 88:11
**task**
31:7, 34:4,
34:5, 34:11
**tasks**
31:16, 43:5,
43:7, 43:10,
44:13
**taurus**
121:21, 121:24,
122:15, 168:23,
171:12, 183:13,
185:18, 185:19,
186:4, 244:11,
244:22, 271:19
**team**
12:17
**techniques**
22:18
**telephone**
3:11, 6:6,
6:15, 58:8
**tell**
10:15, 10:22,
25:12, 25:13,
27:7, 27:21,
37:5, 39:4,
44:9, 44:10,
49:14, 49:16,
50:2, 53:20,
57:20, 61:7,
61:14, 62:14,

64:15, 64:20,
67:8, 67:22,
68:3, 68:4,
68:5, 68:19,
69:1, 69:7,
69:20, 71:2,
71:11, 71:16,
71:21, 72:19,
80:16, 105:21,
106:7, 114:6,
114:22, 116:19,
132:17, 133:12,
134:7, 134:11,
150:9, 150:11,
150:23, 151:6,
155:21, 171:2,
171:16, 171:19,
174:10, 174:11,
188:15, 188:19,
200:12, 205:6,
217:11, 218:8,
218:14, 220:6,
220:9, 220:11,
220:13, 220:16,
220:20, 225:9,
225:15, 237:13,
243:10, 265:14,
281:21, 289:17
**teller**
95:5, 95:8
**tellers**
95:4
**telling**
22:5, 22:15,
27:3, 27:5,
29:6, 37:13,
39:19, 78:7,
188:2, 188:8,
202:1, 206:24,
215:12, 229:6,
242:6, 245:7,
290:13
**tells**
24:12, 37:11
**temporary**
128:15
**ten**
11:13, 52:2,

52:4, 116:19,
145:22, 152:5,
186:2, 231:18
**tenders**
211:16, 246:6
**tenure**
58:12
**terminated**
277:14
**terms**
123:21, 283:21,
286:14
**test**
111:9
**tested**
107:1
**testified**
9:4, 21:18,
165:20, 167:11,
170:4, 259:22,
260:1, 260:5,
283:5, 283:9
**testify**
120:6, 271:11
**testifying**
213:9
**testimony**
48:18, 48:19,
48:22, 49:1,
62:2, 62:7,
63:16, 63:24,
114:2, 142:19,
157:17, 204:2,
204:13, 204:14,
213:6, 225:5,
234:2, 238:5,
238:8, 248:24,
260:7, 268:3,
270:16, 272:14,
294:9, 294:10
**testing**
282:21, 283:1
**text**
48:14
**th**
6:9, 10:23,
95:20, 96:20,
96:21, 96:24,

98:9, 119:19,
124:4, 124:20,
157:15, 157:21,
157:23, 158:10,
166:24, 173:18,
173:19, 173:20,
189:17, 189:23,
217:23, 230:8,
232:4, 234:4,
237:19, 237:21,
238:10, 246:14,
247:5, 249:3,
249:7, 250:3,
251:4, 255:20,
258:3, 263:11,
263:20, 263:22,
264:3, 267:12,
268:5, 275:7,
279:4, 279:5,
280:10, 280:11,
282:12, 286:13,
287:13, 290:10,
290:23
**thank**
26:16, 75:18,
75:19, 81:7,
90:2, 90:5,
90:6, 187:3,
293:6
**thanks**
76:3, 101:24
**that"**
54:3
**themselves**
164:14
**theory**
30:5, 121:23
**thereafter**
294:11
**therefore**
157:20
**thick**
17:21
**thing**
21:24, 37:8,
41:20, 42:4,
42:18, 43:24,
45:4, 45:22,

60:19, 77:6,
113:4, 180:15,
185:12, 187:24,
201:5, 252:20,
255:14, 266:4,
293:8
**things**
12:2, 16:5,
20:10, 24:11,
31:2, 31:13,
31:20, 32:1,
32:16, 33:19,
35:11, 44:17,
46:21, 50:8,
51:24, 53:17,
55:1, 56:21,
119:5, 155:5,
163:3, 175:19,
183:6, 195:19,
201:14, 202:6,
209:14, 217:19,
269:11, 274:8
**think**
19:1, 21:17,
25:6, 39:12,
39:13, 39:23,
42:18, 58:3,
60:8, 67:18,
69:24, 70:9,
74:4, 75:22,
76:21, 93:22,
98:22, 136:2,
141:1, 144:22,
145:17, 149:15,
158:21, 170:4,
185:11, 189:12,
192:20, 193:3,
195:14, 196:24,
201:18, 202:24,
203:1, 212:3,
212:9, 216:5,
217:7, 238:11,
250:18, 252:17,
265:16, 270:23,
277:20, 277:23,
283:5, 286:2,
288:3, 290:13
**thinking**
195:7

**third**
24:7, 24:8,
234:22, 254:21
**this"**
228:17
**thomas**
277:13
**thought**
29:19, 36:4,
36:9, 36:22,
64:22, 80:16,
80:18, 80:21,
83:20, 99:5,
127:12, 173:14,
196:6, 196:8,
198:5, 208:8,
208:21, 209:16,
219:15, 219:16,
224:6, 237:22,
238:19
**thousands**
58:15
**threat**
115:14
**threaten**
63:5, 63:9,
63:13, 63:15,
63:18, 64:3,
64:14, 64:17,
64:19, 115:7,
115:22, 280:19,
281:5
**threatened**
64:13, 116:6,
116:18, 215:6
**threatening**
116:10, 188:16
**threats**
64:21, 115:12
**three**
11:22, 15:11,
55:20, 56:2,
77:19, 83:12,
103:1, 137:8,
152:13, 153:12,
192:6, 195:7,
199:19, 225:12,
233:11, 248:17,

278:16
**threw**
183:4, 233:21,
244:16
**through**
13:6, 13:8,
15:13, 25:7,
25:23, 26:6,
80:13, 81:19,
91:2, 92:1,
96:10, 97:16,
99:24, 100:1,
162:6, 167:7,
184:23, 212:13,
218:6, 223:2,
224:14, 238:19,
246:9, 275:1,
278:2, 278:5,
278:16, 279:5
**throughout**
281:17
**throw**
183:5
**thrown**
193:17, 233:19
**thru**
7:15, 7:17,
7:20, 7:23,
7:24, 7:28,
7:30, 8:2, 8:4,
8:7, 8:9, 8:16
**thursday**
1:15
**times**
35:17, 50:14,
67:1, 78:19,
100:9, 100:23,
113:8, 188:14,
188:15, 193:7,
194:1, 198:22,
206:21, 292:6
**timing**
240:3
**tip**
132:14
**today**
9:15, 9:23,
10:12, 25:10,

47:18, 48:9,
278:23
**today's**
278:23, 293:10
**together**
32:1, 32:4,
43:12, 52:1,
55:20, 119:8,
122:20, 154:23,
173:4, 242:20,
243:7, 243:12
**told**
25:16, 27:2,
29:3, 37:3,
57:13, 57:15,
57:20, 57:21,
79:16, 80:10,
113:7, 126:13,
141:1, 144:20,
146:20, 148:1,
148:3, 148:5,
156:23, 157:5,
171:20, 173:6,
173:13, 174:6,
175:13, 175:23,
176:1, 180:13,
183:2, 185:24,
186:12, 186:13,
187:8, 187:9,
188:2, 188:7,
188:19, 189:8,
190:10, 190:19,
191:9, 191:11,
191:23, 193:20,
195:9, 207:2,
207:5, 207:20,
208:7, 208:15,
208:17, 209:2,
209:21, 214:13,
217:10, 217:12,
219:14, 221:10,
222:5, 225:6,
225:24, 226:15,
228:7, 233:18,
233:20, 233:21,
233:24, 234:3,
236:5, 237:18,
238:23, 238:24,

239:11, 241:20,
249:2, 272:10,
282:5
**took**
79:21, 94:12,
106:23, 117:6,
119:2, 128:10,
128:20, 129:9,
147:4, 169:23,
195:24, 200:20,
209:5, 209:6,
209:8, 209:13,
210:9, 210:10,
212:15, 213:19,
213:22, 214:16,
215:14, 216:2,
216:4, 219:20,
223:3, 224:19,
229:18, 232:15,
233:10, 242:9,
243:23, 244:21,
247:2, 250:11,
250:15, 251:22,
252:3, 256:11,
290:16
**tool**
262:17, 262:24
**top**
19:11, 82:2,
92:11, 92:19,
96:18, 166:18,
167:23, 168:14,
170:6, 170:7,
184:21, 186:2,
187:2, 187:5,
239:24, 242:18,
242:21, 270:5
**tore**
128:14
**toronado**
95:12
**total**
201:18, 201:19,
233:9
**totally**
76:16, 112:12,
194:8, 250:1
**touch**
109:3, 109:4,

231:10
**touched**
57:14, 57:17,
156:5, 178:1,
178:13
**towards**
11:21, 80:21,
212:21, 285:16
**towels**
243:6
**town**
173:16
**tracks**
128:7
**traffic**
56:14
**trail**
207:24, 214:20
**trained**
18:1, 19:2,
21:16, 59:14,
284:20, 285:12
**training**
12:2, 15:3,
16:7, 30:15,
38:12, 40:17,
61:22
**trainings**
16:21, 21:20
**tramp**
167:16
**transcript**
9:1, 293:10,
294:8
**transpired**
30:6, 45:18,
136:19
**trial**
204:3, 204:14,
212:10, 213:6,
225:1, 271:14,
272:10, 272:16,
272:19
**tried**
79:12, 79:19,
87:17, 126:20
**tries**
84:13

**trigger**
19:20, 20:1
**triggered**
41:12, 41:14
**trip**
206:12
**trouble**
46:23, 199:9,
205:16
**true**
23:9, 36:24,
37:4, 37:5,
37:6, 37:7,
39:7, 45:5,
190:1, 190:2,
294:9
**truly**
213:18
**trust**
293:14, 293:17
**truth**
22:5, 29:2,
36:9, 37:14,
39:19, 68:4,
188:3, 188:8,
284:12, 284:16,
290:14
**truthful**
29:5
**try**
23:8, 23:20,
23:21, 24:6,
46:12, 79:2,
85:1
**trying**
39:3, 53:18,
109:1, 129:17,
144:6
**turn**
128:23, 165:14,
165:17, 207:20,
208:7, 208:16,
217:10, 217:17,
218:5, 219:14,
224:15, 237:19,
238:6, 238:7,
257:6, 257:14,
258:3, 258:7,

258:16, 259:11
**turned**
127:21, 128:8,
128:17, 130:14,
207:21, 211:4,
211:10, 215:3,
217:23, 218:4,
218:24, 238:13,
238:18, 259:20,
262:22
**turner**
90:13, 90:15
**turning**
116:23, 217:22,
219:7, 232:1,
237:10, 238:6,
238:12, 239:4,
241:12, 255:15,
268:1, 273:11,
285:16
**twenty**
138:9
**twice**
80:14
**two**
19:10, 29:15,
52:11, 89:13,
103:1, 124:10,
125:3, 127:16,
133:14, 133:15,
133:16, 137:8,
146:7, 159:4,
160:21, 168:6,
168:10, 170:22,
171:18, 183:18,
188:16, 188:21,
188:23, 193:5,
245:18, 255:1,
262:23, 263:15,
264:19, 269:12,
288:24
**two-day**
16:17
**two-minute**
161:12
**two-pair**
230:12
**type**
25:5, 25:13,

25:15, 25:17,
25:21, 111:21,
146:14, 205:15,
235:7
**typed**
25:1, 27:1,
27:2, 27:10,
28:4, 28:8,
28:9, 32:17,
200:20, 209:22,
210:9, 210:10,
217:21, 221:6,
232:4, 236:9,
237:2, 237:6,
240:22, 241:17,
251:12, 251:22,
252:4, 255:2,
257:3, 267:3,
286:8
**types**
11:4
**typewriting**
294:12
**typically**
31:4, 106:20
**typing**
25:8, 27:4,
27:9, 28:1,
29:10, 200:21,
232:18, 232:20,
232:24, 247:12,
249:14, 249:18,
249:23
**typographical**
26:7

___ U ___

**u-i-n-o**
75:16, 75:17
**u-turn**
208:8, 209:17
**uh-huh**
10:3, 13:19,
15:22, 23:16,
27:16, 33:3,
35:16, 36:19,
39:10, 40:19,
41:7, 41:15,

42:10, 42:16,
42:22, 46:8,
48:4, 50:11,
50:20, 51:8,
51:10, 52:3,
53:13, 53:16,
56:8, 72:21,
80:4, 82:14,
85:4, 85:23,
86:21, 87:10,
88:11, 93:17,
98:15, 101:10,
103:12, 103:21,
106:3, 106:19,
107:15, 111:4,
116:17, 120:23,
130:17, 166:15,
169:5, 169:11,
174:18, 175:21,
204:22, 209:23,
214:11, 252:10,
253:14
**ultimately**
105:6
**unbroken**
247:7
**under**
9:21, 171:12,
171:14, 171:18,
171:20, 242:24,
257:14, 258:13,
258:15, 259:11,
259:19, 269:7,
273:18, 276:18,
276:23, 294:12
**underlines**
223:6, 223:8
**underlining**
222:19
**understand**
10:5, 10:7,
20:16, 20:18,
21:9, 27:14,
29:22, 36:15,
38:16, 39:8,
40:10, 62:21,
67:16, 70:8,
147:22, 168:4,

258:12, 258:15
**understanding**
40:19, 43:5,
62:14, 64:2,
66:3, 70:23,
272:4, 287:9
**understandings**
65:1
**understood**
19:13, 19:17,
62:3, 63:4,
185:2, 192:17,
205:7
**undoubtedly**
293:11
**unfounded**
275:18, 275:21
**uniformed**
126:19, 128:4
**unit**
52:2, 52:21,
52:24, 76:4,
76:8, 102:20,
104:1, 104:20,
106:17, 109:23,
112:14, 113:14
**united**
1:1
**unknown**
181:24
**unless**
20:6, 88:20,
115:8, 177:10
**unmarked**
125:19, 125:20,
126:3, 126:5,
127:17, 133:19
**until**
20:13, 103:14,
103:18, 126:9,
126:18, 128:4,
133:7, 137:9,
165:4, 171:17,
182:4, 185:13,
189:4, 189:7,
190:9, 192:11,
193:4, 200:16,
228:2, 233:1

**unusual**
84:20, 159:4
**up-to-date**
17:20
**updated**
17:17, 260:19
**updates**
261:21, 262:14
**upset**
196:4, 238:14
**upstairs**
143:18, 143:20,
145:7, 145:15,
145:19, 170:19,
171:1
**use**
19:10, 153:3,
153:5, 155:4,
163:23, 174:16,
202:11, 202:13,
233:15, 233:17
**uses**
165:13
**usually**
106:23, 107:4,
173:15, 260:12

___ V ___

**vague**
68:15
**vaguely**
252:17
**valid**
99:6, 151:13,
183:11
**van**
5:7, 125:19,
125:20, 126:3,
127:17, 129:7,
129:20, 133:20,
133:21
**vantele**
90:15
**various**
31:16, 32:12,
35:10, 53:17,
130:19, 211:14,
229:4

vehicle
74:14, 74:21,
95:10, 125:16,
126:19, 126:21,
128:5, 135:6,
143:10, 143:12,
147:11, 147:13,
263:24, 283:22
vehicles
125:21
vending
193:12
verbal
10:2, 26:24,
28:4, 194:22,
195:2, 251:19,
252:15, 278:12,
278:15, 280:12
verbally
37:24
verification
270:5
vernon
262:11, 262:23,
263:11, 263:15,
263:21, 264:5,
283:10, 283:21,
283:24, 284:3
versa
53:24
version
224:11
versus
9:15
via
3:11, 6:6,
6:15, 58:8
vice
53:24, 267:10
victim
56:6, 74:13,
74:15, 79:18,
260:12, 260:14,
260:24
victim's
56:7, 75:4,
260:13, 260:19,
273:4

videotape
25:3
view
228:19, 228:22,
229:1, 229:9,
229:22
viewed
77:1, 77:7,
128:23, 229:21,
229:23, 230:15,
235:13, 235:19
vincere
125:1, 125:18,
129:3, 129:4,
129:12, 135:9
vincere's
157:24
viola
125:2, 125:23
violate
38:4
violated
200:6
violent
52:7, 52:21,
52:24, 102:20,
103:3, 103:19,
104:1, 104:6,
104:7, 104:12,
104:15, 104:20,
106:17, 109:23,
112:14, 113:14,
120:21
visitation
190:21
voice
65:10, 66:5,
66:10, 66:23,
67:2, 255:8
voices
225:16
volare
83:21, 85:1
vs
1:6
_____
W
_____
waddell
3:3, 9:9

wait
75:4, 77:9,
103:13, 126:18,
128:4, 135:21,
165:4, 175:13,
180:13, 219:15
waited
77:13, 131:24,
143:21, 213:4,
214:17
waiting
111:11, 128:1,
128:2, 144:4,
163:10, 163:17,
165:8, 165:10,
213:12, 216:6,
219:18
waive
293:13
waiver
184:20, 185:3
wakenight
1:24, 2:20,
294:4, 294:22
walk
25:7, 125:11,
162:12, 164:17,
165:17, 290:22
walked
79:4, 79:5,
79:8, 146:7,
163:24, 164:21,
196:14, 226:20,
226:22
wallet
79:11, 80:12
walls
152:12
want
11:8, 15:11,
23:21, 25:12,
27:5, 35:24,
39:4, 49:7,
49:14, 68:2,
68:3, 78:19,
101:24, 102:5,
113:4, 113:18,
114:14, 116:22,

121:4, 126:16,
148:23, 149:9,
156:21, 160:16,
165:11, 199:19,
202:12, 222:11,
222:13, 228:19,
245:21, 247:11,
248:18, 249:16,
264:17, 277:21,
282:1
wanted
31:8, 66:24,
67:9, 67:23,
69:2, 70:10,
70:13, 77:17,
101:13, 103:5,
105:23, 113:24,
114:8, 120:6,
128:2, 134:12,
137:18, 139:15,
148:1, 148:3,
148:6, 148:11,
156:24, 157:1,
160:17, 163:21,
188:3, 193:10,
193:15, 194:19,
196:16, 229:3,
233:16, 243:11,
246:1, 261:17
wants
33:24, 70:17
warning
19:14, 20:2,
20:6, 20:9,
20:13, 21:8
warnings
19:21
warrant
31:22, 54:22,
54:23, 54:24,
122:24, 123:1,
123:4, 123:18,
123:19, 126:14,
126:15, 129:21,
132:19, 132:22,
135:17, 139:15,
139:19, 139:22,
140:5, 141:13,

142:12, 143:17,
149:16, 149:17,
150:5, 150:14,
150:18, 151:3,
151:8, 151:9,
151:13, 151:15,
151:18, 151:23,
155:9, 155:11,
155:14, 155:17,
155:23, 158:14,
158:15, 158:16,
168:12, 170:1,
170:17, 185:13,
216:9, 216:16,
221:7, 226:17,
256:20, 282:11,
288:12, 288:14

**watch**
84:13, 100:7,
137:9, 288:6

**watching**
125:24, 126:1

**water**
160:22, 171:14,
171:18, 193:7,
194:20, 242:24,
245:19

**waterbed**
171:12, 171:21

**way**
19:12, 23:19,
29:17, 39:12,
44:4, 44:5,
45:5, 58:14,
58:20, 79:19,
101:2, 123:6,
127:14, 129:14,
135:20, 139:16,
151:4, 165:14,
207:19, 211:12,
214:7, 218:3,
238:1, 238:17,
243:9, 249:15,
274:15, 280:15,
280:19, 281:1,
281:3, 281:5,
282:18, 284:23,
287:18, 288:13,

288:24

**ways**
274:19

**we'll**
39:14, 40:14,
46:12, 70:22,
71:22, 71:23,
72:8, 72:14,
104:15, 250:20,
264:14

**we're**
15:20, 27:1,
43:19, 58:9,
65:17, 114:4,
128:10, 129:17,
135:22, 150:24,
179:20, 180:18,
181:5, 181:8,
214:10

**we've**
162:4, 224:3,
286:2

**weapon**
98:1, 108:14,
109:8, 121:9,
121:13, 121:24,
272:5, 272:7,
273:7

**weapons**
31:23

**wearing**
37:12, 39:17,
97:19, 227:4,
227:10, 227:16,
228:1, 228:6,
230:2, 230:11,
234:24, 236:23,
290:1, 290:4

**wears**
230:4

**weather**
74:2

**wednesday**
175:8, 175:9,
176:10, 176:11

**week**
16:19, 120:9,
243:2, 243:3

**weeks**
171:17, 171:19,
244:6

**weigh**
202:3, 220:11

**weight**
154:24, 179:7

**welty**
110:8, 291:22,
291:24, 292:8,
292:15

**weltz**
6:3

**went**
15:9, 15:11,
15:17, 15:18,
15:19, 15:20,
15:23, 21:20,
33:13, 54:24,
55:5, 74:18,
77:7, 77:9,
77:11, 77:19,
78:11, 78:15,
79:2, 79:22,
79:23, 79:24,
80:19, 84:2,
87:8, 87:11,
87:16, 87:19,
95:11, 102:23,
102:24, 103:8,
103:17, 111:20,
120:24, 121:19,
128:6, 129:14,
130:9, 135:16,
138:8, 141:2,
141:8, 141:19,
143:17, 144:7,
144:8, 145:15,
147:4, 152:3,
162:15, 163:21,
163:22, 165:21,
170:19, 171:1,
173:4, 173:18,
175:18, 179:8,
180:11, 184:23,
185:13, 192:12,
196:2, 196:8,
196:11, 196:15,

197:2, 197:5,
201:9, 207:12,
207:23, 208:1,
209:7, 211:13,
214:7, 214:13,
218:6, 224:21,
230:10, 234:9,
237:11, 237:13,
238:19, 242:22,
242:23, 243:16,
247:11, 250:6,
250:18, 251:24,
252:19, 252:24,
278:16, 287:12

**weren't**
22:5, 26:8,
55:23, 65:22,
87:18, 118:1,
124:16, 126:4,
133:3, 157:20,
160:10, 169:18,
185:17, 185:21,
254:2, 260:6

**west**
4:7, 4:19, 6:8,
75:20, 80:19,
214:22, 215:4,
215:21, 251:16

**whatever**
18:13, 20:7,
22:2, 25:4,
31:7, 33:14,
33:24, 45:13,
52:12, 53:18,
59:18, 80:11,
106:24, 107:1,
108:4, 108:6,
109:7, 109:16,
111:11, 142:6,
164:16, 165:16,
171:17, 183:4,
193:10, 194:9,
194:20, 198:1,
202:2, 203:7,
209:21, 224:23,
225:4, 243:6,
252:22, 261:18,
266:17, 266:18,

268:9
**whereabouts**
161:5, 172:16,
177:1
**whereby**
284:19
**whereupon**
172:6, 236:19,
283:12
**wherever**
185:7
**whether**
18:22, 24:12,
31:12, 41:3,
47:24, 59:9,
59:14, 60:6,
60:23, 61:22,
85:11, 92:2,
95:15, 100:11,
104:21, 120:1,
134:3, 138:15,
164:8, 170:24,
171:3, 171:5,
172:11, 172:14,
193:12, 200:22,
233:18, 241:9,
248:11, 261:11,
288:16
**whichever**
146:10
**white**
171:24, 211:19,
253:21, 254:3
**whoever**
26:13, 32:19,
34:1, 42:17,
54:5, 73:4,
144:18, 146:10,
286:9
**whole**
25:23, 26:6,
154:16, 194:15,
194:21, 200:18,
231:17, 239:4
**whopper**
175:8, 176:11
**whosever**
261:20

**wife**
74:19, 75:5,
77:18, 78:8,
78:13, 78:15,
79:9, 79:24,
120:7
**william**
14:7
**williams**
4:4, 4:6, 4:13,
4:17
**willing**
120:5, 120:6,
287:14
**windham**
130:15, 156:8,
156:12, 271:10,
280:6
**windham's**
156:16
**windows**
152:14
**winds**
85:21
**wipe**
243:6
**wish**
293:9
**within**
18:22, 86:1,
100:21, 275:3
**without**
21:13, 111:2,
277:7, 284:11,
284:15
**witness's**
47:12
**witnesses**
21:17, 21:22,
22:4, 33:14,
40:16, 77:5,
77:10, 77:13,
83:6, 112:16,
112:18, 112:21,
113:7, 113:13
**woman**
283:6
**wood**
74:1, 80:21,

85:21, 86:5,
86:14, 92:14,
92:18, 168:24,
169:1, 169:6,
169:7, 189:19,
189:23, 190:12,
197:8, 198:4,
199:6, 201:7,
207:15, 207:21,
207:24, 208:12,
209:10, 209:11,
211:4, 211:11,
212:22, 212:23,
212:24, 214:1,
214:20, 218:21,
219:8, 224:16,
240:15, 290:17,
290:21
**woodlawn**
125:24, 126:2,
158:15
**word**
61:18, 63:13,
63:17, 72:3,
220:17
**words**
80:11, 202:12,
202:15, 209:15
**wore**
230:6, 231:1
**work**
10:16, 16:11,
30:22, 38:12,
41:10, 46:11,
46:23, 55:19,
56:14, 56:19,
78:9, 78:10,
106:15, 186:4,
186:6, 187:22,
195:14, 223:15,
240:12, 241:22,
242:1, 252:19,
253:23, 262:17,
274:18
**worked**
41:18, 44:5,
51:22, 52:1,
53:2, 96:2,

102:24, 103:18,
106:2, 174:8
**working**
10:16, 30:19,
30:24, 43:12,
102:19, 121:23,
245:24, 266:5,
266:18
**works**
9:20, 102:2,
176:12
**worries**
191:18
**worry**
160:24
**wouldn't**
20:13, 21:3,
32:22, 36:11,
37:19, 38:4,
38:20, 43:9,
44:2, 45:11,
46:6, 54:17,
91:4, 100:2,
101:16, 109:3,
109:4, 109:17,
111:1, 137:24,
138:3, 138:11,
145:3, 151:10,
157:2, 160:12,
163:14, 164:3,
164:4, 165:6,
173:24, 186:15,
201:10, 204:8,
213:11, 214:15,
266:11, 266:12
**wrestling**
56:20
**write**
41:10, 41:13,
41:15, 42:12,
43:6, 84:22,
157:21, 158:9,
222:2
**writing**
41:8, 286:1
**written**
24:15, 32:12,
32:24, 36:2,

40:18, 42:7,
42:9, 62:5,
62:9, 65:22,
65:24, 91:9,
124:5, 124:13,
132:18, 168:5,
178:5, 209:18,
209:22, 232:2,
234:14, 234:18,
257:24, 280:12
**written-all-over**
222:10
**wrong**
10:4, 23:1,
165:14, 218:3,
238:16, 239:3,
242:21
**wrote**
235:18, 238:9,
265:21

## X

**x**
1:3, 1:12
**x-outs**
26:9
**xyz**
37:8

## Y

**yard**
129:13
**year**
103:20
**years**
11:14, 11:15,
11:22, 14:23,
15:11, 58:16,
103:2, 104:16,
104:18, 104:19,
105:20, 157:11,
201:10, 221:11,
221:14, 221:15,
221:20, 269:12,
275:12, 275:14,
276:3, 276:14,
276:16
**years-ish**
104:14

**yelling**
67:3
**yep**
277:12
**yonge**
128:9, 128:14
**young**
198:11, 199:19
**yourselves**
90:4

## $

**$16,000**
183:2
**$200**
168:18

## .

**.1**
7:14
**.10**
8:6
**.11**
8:8
**.12**
8:11
**.13**
8:15
**.2**
7:17
**.3**
7:19
**.4**
7:22
**.5**
7:24
**.6**
7:27
**.7**
7:29
**.8**
8:1
**.9**
8:4

## 0

**00**
25:13, 73:16,

78:10, 78:11,
101:19, 125:4,
126:7, 127:11,
154:13, 154:14,
158:19, 161:3,
165:22, 166:13,
167:9, 174:16,
176:2, 179:2,
179:3, 184:2,
184:10, 210:18,
232:12, 235:23,
236:8, 236:12,
236:15, 239:15,
241:4, 241:7,
290:9, 290:17,
290:22
**01**
210:18, 210:20
**0219**
4:8
**03**
210:20
**04**
211:21
**05**
211:21, 254:14,
254:15, 254:16
**084.003605**
294:5, 294:23

## 1

**1**
102:1, 102:10,
125:8, 126:9,
135:10, 166:21,
249:14, 249:17,
249:18, 249:19,
249:20, 249:22,
250:2, 254:6,
254:8, 254:10,
290:9
**10**
58:6, 73:16,
78:11, 82:7,
82:8, 119:19,
124:4, 124:20,
157:15, 157:21,
157:23, 158:10,

164:18, 206:15,
210:22, 214:5,
228:9, 229:17,
230:8, 232:4,
233:5, 234:4,
239:15, 239:16,
239:21, 247:5,
249:3, 249:7,
255:20, 264:15,
264:23, 265:2,
268:16, 278:9,
279:4, 280:10,
282:12, 286:13,
287:13, 290:17,
290:22
**100**
2:6, 3:14,
3:24, 6:8
**107**
7:19, 162:6
**108**
7:17, 96:10
**11**
82:22, 88:4,
88:5, 96:21,
102:8, 102:10,
127:11, 173:18,
173:19, 173:20,
174:16, 189:17,
189:23, 233:1,
233:5, 245:1,
247:3, 247:8,
250:3, 250:5,
254:16, 255:20,
258:3, 264:15,
264:16, 264:23,
268:1, 279:5,
280:11, 290:10,
290:23
**112**
7:18, 96:10
**114**
7:30, 246:9
**119**
7:30, 246:9
**12**
95:20, 96:20,
96:21, 98:9,

101:19, 255:18,
269:17, 269:20,
281:18, 290:9,
290:24, 291:3
**120**
4:7, 4:19
**121**
7:20, 162:6
**122**
7:28, 224:14
**126**
3:5
**127**
7:28, 224:14
**13**
6:9, 166:21,
263:20, 263:22,
264:3, 274:17,
274:20, 274:21,
274:24
**14108**
7:22, 212:13
**14121**
7:23, 212:14
**15**
82:4, 82:7,
82:8, 102:1,
125:8, 126:9,
135:10, 151:24,
152:5, 152:8,
154:12, 158:19,
161:3, 162:9,
162:11, 164:18,
165:21, 167:9,
176:2, 192:7,
192:11, 232:10,
239:16, 246:14,
251:4, 255:17,
255:18, 273:12,
275:4, 276:22,
278:9
**150**
97:19, 202:3
**16**
168:17, 168:23
**16,400**
183:4
**161**
7:19

**1619**
128:18, 128:24,
133:10, 135:13
**17**
10:23, 11:3
**175**
224:20
**178**
7:15, 81:6,
81:18
**18**
1:6, 1:16,
166:24, 258:1,
263:8
**188**
7:15, 81:19
**19**
222:22, 225:20,
263:11, 275:7
**1975**
11:3, 12:19
**1976**
84:24
**1977**
276:11
**1980**
275:7, 275:18
**1984**
125:11
**1988**
11:20, 12:23,
13:6, 14:10
**1989**
103:23
**1990**
103:23
**1993**
11:18, 72:22,
82:1, 88:1,
88:18, 89:13,
89:17, 91:10,
93:8, 93:14,
93:21, 93:23,
94:2, 94:22,
95:16, 95:20,
97:1, 98:9,
104:5, 116:24,
117:7, 118:8,

124:4, 124:21,
157:15, 157:21,
161:6, 166:19,
166:24, 190:15,
232:4, 234:5,
235:1, 239:15,
246:14, 247:5,
249:3, 249:7,
250:3, 251:4,
263:11, 263:20,
263:22, 264:9,
265:11, 267:12,
268:5, 279:5,
280:11, 282:12,
286:13, 287:13
**1994**
13:6, 13:8,
14:10
**1997**
104:13
**1998**
11:17
**1st**
83:19, 265:11

**2**

**2**
135:14, 135:15,
140:17, 151:23,
161:10, 161:16,
161:18, 161:21,
161:23, 192:4,
192:11, 192:15,
247:7, 250:7,
254:14, 254:15,
254:16
**20**
96:24, 102:10,
164:18, 184:13,
185:8, 196:24,
217:23, 222:22,
237:19, 237:21,
238:10, 239:16,
246:14, 249:14,
249:18, 249:20,
249:22, 264:22,
272:22
**200**
127:12

**2000**
95:13
**2007**
10:23, 10:24
**2017**
272:23
**2018**
48:19, 272:14,
272:23
**2020**
1:15, 294:17
**21**
223:19
**211**
7:22
**22**
82:4
**222**
7:24
**223**
7:27
**23**
1:15, 185:4,
192:24, 259:22
**241**
8:4, 263:4,
263:19
**242**
263:13
**243**
3:16, 8:4,
263:4, 263:14
**246**
7:29
**25**
232:8, 232:12,
232:13, 233:1,
245:1
**250**
8:1
**263**
8:4
**264**
7:24, 8:6, 8:8,
223:2
**269**
7:25, 8:11,
223:2

**27**
58:6, 157:11
**2709**
73:24, 86:5,
92:18, 207:14,
208:1, 209:10,
211:4, 211:11,
212:22, 219:8,
224:16
**271740**
1:22
**272**
8:7, 265:3
**274**
8:7, 8:15,
265:3
**275**
8:9
**277**
7:6
**279**
8:9
**28**
249:17, 249:19,
250:2, 269:19
**29**
267:12, 268:5
**2907**
290:21
**291**
7:7
**294**
1:23
**298**
5:30
**2nd**
72:22, 82:1,
82:2, 88:18,
161:6, 190:13,
203:22, 203:23,
228:2, 235:1,
239:15

---
**3**
---
**3**
151:24, 152:8,
154:12, 158:19,
161:3, 162:9,

162:11, 165:21,
167:9, 176:2,
191:22, 192:7,
192:11
**30**
78:9, 96:21,
135:14, 174:15,
192:2, 192:4,
192:11, 192:15,
192:24, 239:21,
247:7, 250:7,
252:9, 254:6,
266:3, 290:8,
290:9, 290:24,
291:3
**300**
224:23, 224:24,
225:7
**312**
3:13, 3:16,
6:11
**32**
58:16, 221:14
**320**
168:19
**35**
191:22, 205:21
**3518**
87:2, 87:3
**3523**
85:15, 85:17,
87:9, 208:6,
208:11, 211:5,
214:2
**36**
191:22
**37**
247:3, 247:8
**376**
97:3, 97:4
**377**
97:8
**379**
167:2
**39**
161:10
**3:-cv**
1:6

**3rd**
88:1, 88:18,
91:10

---
**4**
---
**4**
174:15, 210:18,
210:20, 211:21,
222:22, 223:19,
252:9
**4/5/93**
82:15
**40**
135:15, 161:10,
161:16, 200:16,
201:10, 221:11,
221:15, 221:20,
255:20
**41**
161:16, 161:18
**42**
161:18, 161:21
**425**
5:26
**43**
140:17, 151:23
**44**
161:21, 161:23
**4426**
3:7
**45**
58:6, 156:20,
160:14, 165:24,
166:7, 201:22,
225:20, 225:21,
283:16
**47**
102:8, 102:10
**48104**
3:6
**490**
2:10, 3:26
**4900**
2:10, 3:26
**4th**
89:13, 89:17,
294:17

---
**5**
---
**5**
154:13, 154:14,

158:19, 161:3,
165:22, 166:13,
167:9, 176:2,
179:2, 179:3,
184:2, 184:10,
185:4, 185:8,
192:2, 192:24,
241:4, 241:7,
263:8, 264:22,
266:3, 269:19,
283:16, 293:18
**50**
161:23, 166:21
**50040**
1:6
**51**
254:8, 254:10
**55**
88:4, 88:5,
293:18
**5900**
3:16

---
**6**
---
**6**
78:10, 205:21
**60601**
6:10
**60607**
3:15
**61101**
3:25
**61104**
5:28
**61105**
2:8, 4:8, 4:21
**61108**
5:13
**6122**
6:11
**66**
8:2
**6611**
5:15
**662**
3:7
**67**
8:2

**6833**
5:11

### 7

**7**
225:20, 225:21,
290:8
**707**
8:16, 275:1,
275:7, 275:9,
275:10
**709**
275:24
**710**
276:6, 276:9,
276:23
**713**
8:16, 275:1
**734**
3:7
**7855**
5:30

### 8

**8**
25:13, 228:9,
229:17, 232:8,
232:12
**80**
275:7
**800**
86:7, 86:14
**81**
7:14
**814**
6:11
**815**
2:10, 3:26,
4:9, 4:23, 5:15,
5:30
**88**
15:7, 103:9
**8948**
4:23
**8982**
4:9
**8:**
236:8, 236:12

**8th**
117:7, 118:8,
121:11, 166:19

### 9

**9**
1:16, 78:9,
125:4, 126:7,
235:23, 263:2
**9-millimeter**
121:16, 121:17,
121:21, 168:17,
168:22, 168:23,
187:10, 187:11
**9-millimeters**
170:9
**90**
112:15
**901**
125:3, 126:23,
149:23, 166:6,
166:11, 185:9,
235:24, 239:19,
239:21, 282:10,
287:2, 288:11
**91**
103:6
**911**
42:21, 78:18,
78:22, 88:9
**92**
103:6, 168:17
**93**
254:16, 255:20,
263:11
**96**
7:17
**962**
5:15
**987**
4:9, 4:23
**9:**
236:15
**9th**
121:11