

**EXHIBIT 44**



# Transcript of Peter Striupaitis, Volume 2

**Date:** October 2, 2020
**Case:** Pursley -v- The City of Rockford, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

---

**63**

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE NORTHERN DISTRICT OF ILLINOIS

3  PATRICK PURSLEY,  :

4

5  Plaintiff,  :

6

7  Vs.  : Case No:

8  : 3:18-cv-50040

9  THE CITY OF ROCKFORD, et al  :

10

11  Defendants.  : Volume 2

12  ------------------------------------------------------

13  VIDEOCONFERENCE

14  DEPOSITION OF:  PETER STRIUPAITIS

15  ON BEHALF OF:  Plaintiff

16  DATE:  Friday, October 2, 2020

17  TIME:  10:03 a.m. to 4:05 p.m.

18  PLACE:  Via videoconference

19  STENOGRAPHICALLY

20  REPORTED VIA

21  WEB BY:  KENNETH A. REGAN

22  Court Reporter

23  Notary Public

24  State of Florida at Large

---

**64**

1  APPEARANCES:

2

3  ASHLEY WADDELL TINGSTAD, ESQUIRE

   Hooper Hathaway, P.C.

3  126 South State Street

4  Ann Arbor, Michigan 48104

   734-662-4426

5

6  ALISON LEFF, ESQUIRE

   Loevy & Loevy

7  311 North Aberdeen Street

   3rd Floor

8  Chicago, Illinois 60607

   312-243-5902

9

   -- Attorneys for the Plaintiff

10

11  MICHAEL IASPARRO, ESQUIRE

   Hinshaw & Culbertson, LLP

12  100 Park Avenue

   Rockford, Illinois 61101

13  815-490-4900

14  -- Attorney for Jim Bowman, Ron Gallardo,

   John Genens, Greg Hanson, Jeff Houde, Sam

15  Pobjecky and Mark Schmidt

16

   JOEL M. HUOTARI, ESQUIRE

17  Williams McCarthy, LLP

   120 West State Street

18  P.O. Box 219

   Rockford, Illinois 61105

19  815-987-8948

20  -- Attorney for James Barton, Stephen

   Pirages, Doug Williams and Bruce Scott

21

22

23

24

---

**65**

1  APPEARANCES CONTINUED:

2

   SUNIL S. BHAVE, ESQUIRE

3  Assistant Attorney General

   100 West Randolph Street

4  13th Floor

   Chicago, Illinois 60601

5  312-814-6122

6  -- Attorney for Daniel Gunnell, Peter

   Striupaitis and Jack Welty

7

8  ROBERT C. POTTINGER, ESQUIRE

   Barrick, Switzer, Long, Balsley & Van Evera,

9  LLP

   6833 Stalter Drive

10  Rockford, Illinois 61108

   815-962-6611

11

12  -- Attorney for Howard Forrester, Gary

   Reffett and David Ekedahl:

13

   (All parties appeared via videoconference.)

14

15

16

17

18

19

20

21

22

23

24

---

**66**

1  INDEX TO PROCEEDINGS AND EXHIBITS

2  PETER STRIUPAITIS  PAGE

3  Direct Examination BY MS. TINGSTAD:  69

4

5  Ex. No. 1 - Evidence receipt:  158

6  Ex. No. 2 - Gunnell police report:  167

7  Ex. No. 3 - An email chain:  210

8  Ex. No. 4 - 12/7/16 memorandum opinion

9  of Dan Gunnell:  243

10  Ex. No. 5 - Peter Striupaitis curriculum vitae:  249

11

12

13  Cross Examination by BY MR. HUOTARI:  260

14  Cross Examination by BY MR. BHAVE:  263

15  Redirect Examination BY MS. TINGSTAD:  265

16  Acknowledgment of Deponent:  268

17  Certificate of Court Reporter - Notary Public:  269

18

19

20

21

22

23

24

---

67

1      (Whereupon, the proceedings commenced at
2      10:03 a.m.)
3      THE STENOGRAPHIC REPORTER:  Will
4  everyone please announce themselves and who they
5  represent if they are counsel?
6      MS. LEFF:  Sure.  Good morning.  This is
7  Alison Leff.  I represent the Plaintiff,
8  Patrick Pursley, along with Ashley Tingstad.
9      MR. POTTINGER:  I'm Robert Pottinger.  I
10  represent the Estates of Howard Forrester, David
11  Ekedahl, and Gary Reffett.
12      MR. IASPARRO:  This is Michael Iasparro
13  with Hinshaw and Culbertson.  I represent
14  individual Defendants Houde, Hanson, Gen --
15  Genens, Gallardo, Schmidt, Pobjecky, and Bowman.
16      MR. HUOTARI:  And good morning.  This is
17  Joel Huotari speaking.  I represent Christine
18  Bishop, formally known as Christine Macanally;
19  James Barton; Bruce Scott; Doug Williams; and
20  Steven Pirages.
21      MR. BHAVE:  Good morning.  This is
22  Sunil Bhave; B-H-A-V-E, and I'm here with Erin
23  Walsh and Amanda Kozar.  They are both on here
24  as well.  And the three of us, we represent

68

1  Illinois State Police Defendants Dan Gunnell,
2  Peter Striupaitis, and Jack Welty.
3      And Peter Striupaitis is here today.  He's
4  the deponent sitting next to me.
5      THE STENOGRAPHIC REPORTER:  Okay.
6  That's everyone?  All right.
7      MR. HUOTARI:  As I mentioned, there's
8  another attorney who may be joining us later,
9  and for the record, his name is Ephani Mulbana,
10  and he represents the City of Rockford in case
11  you hear him join in.  That would be who that
12  might be.
13      THE STENOGRAPHIC REPORTER:  Okay.  And,
14  Counsel, for the record, would you kindly
15  confirm that there is no objection to my
16  administering the oath to the witness while not
17  being in his presence, and that you will not
18  object to the admissibility of the transcript
19  being based on the oath?
20      ALL COUNSEL:  No objection.
21      MR. POTTINGER:  And, Ashley, in a prior
22  deposition, we'd actually agreed that one
23  objection from the Defendant would be shared --
24  would be mutual to all of the Defendants unless

69

1  somebody states otherwise.  It makes it a lot
2  easier on the court reporter.
3      MS. TINGSTAD:  Yeah.  I think that -- I
4  think makes a lot of sense, and I appreciate
5  that, mm-hmm.
6      THE STENOGRAPHIC REPORTER:  Okay.  All
7  right.  Now, will the witness please raise their
8  right hand?
9      THE WITNESS:  (Complies.)
10      THE STENOGRAPHIC REPORTER:  Do you
11  solemnly swear, or affirm, to tell the truth,
12  the whole truth, and nothing but the truth?
13      THE WITNESS:  I do.
14      THE STENOGRAPHIC REPORTER:  Thank you.
15      PETER STRIUPAITIS,
16  called as a witness, having been duly sworn, was examined
17  and testified as follows:
18      DIRECT EXAMINATION
19  BY MS. TINGSTAD:
20      Q.  Okay.  We can get started.  Good morning
21  again, Mr. Striupaitis.  My name is Ashley Waddell
22  Tingstad, and I am -- I represent the Plaintiff in this
23  case.
24      I know that you -- this is actually a

70

1  continuation of your deposition, and that if -- you
2  started back on July 15th, so at least a few months have
3  gone by.  I'm just going to go over some of the ground
4  rules just to remind everyone.
5      This deposition is conducted pursuant to the
6  Federal Rules of Civil Procedure and agreement by all
7  parties.  It's being conducted on Zoom.  It's actually
8  not being audio and video recorded today.  It's only
9  being transcribed by the court reporter, who introduced
10  himself to us.
11      And as noted by other counsel, it's
12  important that we all -- one person talks at a time so
13  that the court reporter is able to note everything that's
14  transcribing -- that's occurring.  So in order for him to
15  do his job, we are all going to just take turns and make
16  sure we don't talk over each other.
17      And Mr. Striupaitis, if you don't mind, just
18  making sure you verbalize your responses, you know,
19  instead of nodding and things like that.
20      Some of the attorneys may object after I ask
21  a question.  Just wait for them to make their objection,
22  and then you can answer the question unless your attorney
23  specifically instructs you not to answer.
24      If you need me to repeat the question, if

71

1  it's not clear, or you feel a little confused by what's
2  been asked, or an objection throws you off, just ask --
3  ask for repetition. That's no problem at all.
4       If you do answer a question, I'm going to
5  assume that you understood me, so it's important to ask
6  for clarification if you need it.
7  **A. Very good.**
8  Q. And if you need any breaks, feel free to ask
9  for them, okay?
10 **A. Okay.**
11 Q. All right. So Mr. Striupaitis, you started
12 doing microscope firearm and toolmark work in 1978,
13 right?
14 **A. I started working with the State and**
15 **formally was trained in microscope work in 19 -- wow, you**
16 **caught me there. Let's see. I was 30-years-old in 1980**
17 **technically.**
18 Q. Okay. Okay. And when you joined the ISP in
19 1980, you trained as a fire mark and toolmark analyst at
20 the Juliette crime lab, correct?
21 **A. That's correct.**
22 Q. Okay.
23 **A. That's firearm and toolmark.**
24 Q. Firearm and toolmark?

72

1  **A. Yes, ma'am.**
2  Q. And you trained in firearm and toolmark for
3  about six months, and then you started working cases?
4  **A. I was trained in toolmark identification for**
5  **six months.**
6  Q. Okay.
7  **A. And started working toolmark cases, and then**
8  **I was trained in firearm identification as well during**
9  **that process.**
10 Q. And so can you just tell me what a strict
11 toolmark case would be?
12 **A. Say for instance, there would be, like, a**
13 **burglary case and a screwdriver is used to pry open the**
14 **door.**
15 Q. Okay.
16 **A. And just the -- the police agency would**
17 **submit the items -- the toolmarks that were present on**
18 **that door and the tool, and I would make test marks, and**
19 **then compare them on the comparison microscope.**
20 Q. So is it fair to say that the strict
21 toolmark training and work you were doing didn't involve
22 fired weapons?
23 **A. No. But if I can -- if I can elaborate?**
24 Q. Mm-hmm.

73

1  **A. Toolmark is -- firearm identification, you**
2  **deal -- there is -- there is harder -- an option --**
3  **harder object comes in conduct with a softer object.**
4  Q. Right.
5  **A. So the premise of toolmark identification**
6  **carries over into firearm identification.**
7       So to answer your question: No, I didn't do
8  fire -- I was working firearm -- I was working toolmark
9  cases and then being trained in firearms.
10 Q. So you trained in firearms then for about 18
11 to 24 months?
12 **A. That's correct.**
13 Q. And there was about a two-year training?
14 **A. That's correct.**
15 Q. So from 1980 to 1982, you were a toolmark
16 and firearm trainee, and you were what you called level
17 1?
18 **A. Yeah, forensic scientist 1.**
19 Q. Forensic scientist 1.
20 **A. The training was two years, and then after**
21 **that, then I worked casework in toolmark and firearm**
22 **identification.**
23 Q. Okay. So after two years of training, then
24 you started taking your own independent casework?

74

1  **A. That's correct.**
2  Q. As a level 1 forensic scientist?
3  **A. Yes, that's correct.**
4  Q. Okay.
5  **A. Could I inject something there?**
6  Q. Sure.
7  **A. I -- I actually finished in 18 months.**
8  Q. Oh, so you finished early?
9  **A. And then went -- I signed to the Maywood**
10 **Laboratory.**
11 Q. Okay. Is that because you just studied
12 extra hard or --
13 **A. I was done with the training, and they need**
14 **an examiner there.**
15 Q. Okay.
16 **A. In my supervisor's opinion.**
17 Q. So as a level 1 forensic scientist, what
18 does it mean to be level 1? Is there more supervision?
19 **A. Cases are -- are looked at, but you do --**
20 **you are an independent examiner and work the cases**
21 **independently.**
22 Q. Okay. How -- how is it different from being
23 level 2, in terms of supervision?
24 **A. It's just salary basically, you know. It's,**

75

1  like, first two -- to the best of my recollection, the
2  first two years, you're a one, and after five, you're a
3  two, and after that, you're a three.
4        Q.   Is that -- so the levels that you're
5  describing are actually salary steps within ISP?
6        A.   Yes, ma'am.
7        Q.   And that --
8        A.   That's correct.
9        Q.   And they don't have any bearing on the level
10 of supervision or extra training that might be required
11 for an examiner?
12       A.   Well, there's ongoing continuing education,
13 but otherwise, it's pretty much the same.
14       Q.   Okay.  So after you completed your training
15 in Juliette, you moved -- you said you moved to Maywood
16 Lab?
17       A.   Yes, ma'am, that's correct.
18       Q.   Where is the Maywood Lab?
19       A.   It was located in the basement of the Cook
20 County Sheriff's Headquarters in Maywood, Illinois.  It's
21 adjacent to the courthouse there.
22       Q.   Is it -- does it still exist?
23       A.   No, it does not.
24       Q.   So that was in around 1982 that you moved to

76

1  the Maywood Lab as a level 1 forensic scientist?
2        A.   Yes, that's correct.
3        Q.   About how many cases would you say you
4  worked as a forensic scientist in the Maywood Lab from
5  about -- from 1982 to '85?
6        A.   I would say on the average of 10 to 20 a
7  month.
8        Q.   10 to 20 cases per month?
9        A.   Yes, ma'am.
10       Q.   Okay.  And about how long would each
11 examination take you when you were working at the Maywood
12 Lab?
13       A.   It would depend on the items that were
14 submitted and -- and the complexity of the case.
15 Sometimes the scope took a little bit longer.  Sometimes
16 it was forthright, and it did not.
17       Q.   For cases that are more forthright, how --
18 about how long would those take?
19       A.   I think that the general rule of thumb with
20 the one individual that just retired was he would
21 complete one per day from start to finish.
22       Q.   Mm-hmm.
23       A.   Others could do two per day, but the one
24 that retired was a very thorough, very thorough

77

1  individual.
2        Q.   Who was that?  Who are you referring to?
3        A.   Oh, God.  It eludes me right now, and I --
4  it shouldn't.  I could see his face, but I don't recall
5  his name.
6        Q.   Is this someone at ISP you're referring to?
7        A.   What do you mean, IC --
8        Q.   ISP, ISP.
9        A.   Yeah, ISP Juliette Lab.
10       Q.   Oh, you're referring to someone at the ISP
11 Juliette Lab?
12       A.   Yeah, yeah, and it will come back to me.
13 But I don't -- it's -- and he -- he specifically was --
14 he was thorough, and he was unwavering, and it would be
15 one per day, from opening it up to working it, to writing
16 the report.
17            Okay.  I remember his name.  His name is
18 Robert Hunton, H-u-n-t-o-n.
19       Q.   Do you consider that to be a pretty good
20 standard that Robert Hunton set?
21       A.   I think it was Robert Hunton's standard, and
22 I think that individuals were able to do more than --
23 than -- you know, and it just -- that's the way Bob is or
24 was, is unwavering.  He just was strict that way.

78

1        Q.   Very systematic?
2        A.   Yes, ma'am.
3        Q.   When you were a new forensic examiner at the
4  Maywood Lab in that period from 1982 to '85, did you
5  testify in court?
6        A.   I believe I did.
7        Q.   And about how many times or how often do you
8  recall testifying?
9        A.   You know, I -- I really don't recall.  It
10 was mostly cases that were -- well, it was mostly cases
11 that were -- we worked, and we testified in the
12 courthouse across the way --
13       Q.   Mm-hmm.
14       A.   -- in Maywood, but we did receive some cases
15 from other laboratories that there was a surplus or a
16 backlog, and actually my first toolmark case was a
17 St. Clair County case in St. Clair County, which was
18 around east St. Louis area.
19       Q.   So you also took some backlog cases from
20 other counties?
21       A.   Yes, ma'am, that's correct.
22       Q.   At this time when you were working the
23 Maywood Lab, did you have a capability to take
24 photographs of the items you were looking at?

79

1    A.  No, I don't -- at that particular point in
2 time, that was not the policy.  That came later.
3    Q.  Did you -- were you subjected to anything,
4 like, random reanalysis?  Did they do any of that in the
5 1980s?
6    A.  There was -- I think there was quality
7 assurance that existed, and in quality assurance, a
8 number of cases -- the files are reviewed just
9 administratively, and then the actual items of the case
10 are reviewed for, I don't know, one or a couple of cases.
11    Q.  Did you -- was there a verification process
12 in place at that time in -- in the Maywood Lab?
13    A.  I don't believe so, no.
14    Q.  A few more about that in a bit.  But let's
15 -- okay.
16        So in 1985 --
17    A.  Mm-hmm.
18    Q.  -- you had spent five years then at a level
19 1.  You became a level 2 in 1985?
20    A.  1985, I became an assistant lab director.
21    Q.  Assistant lab director, okay.
22    A.  Right, and I did that seven years.
23    Q.  And you moved that -- you moved to the
24 Broadview Lab to do that?

80

1    A.  Yes.  There was a need for us to expand, and
2 I was assistant lab director at the Broadview --
3 Broadview branch, we would call it.
4    Q.  And what were your responsibilities as
5 assistant lab director at the Broadview branch?
6    A.  I would perform performance evaluations for
7 the employees that were my subordinates.  I would place
8 orders for commodities and supplies.  I would deal with
9 State's attorneys that -- that had questions in regard to
10 the subordinates' cases, and I attended -- detectives --
11 there was -- there was, like, west suburban chiefs, south
12 suburban chiefs.  So there was, like, PR stuff that was
13 going on that I would attend with my -- with my boss.
14 And he was --
15    Q.  Who was your boss at the time?  Who was your
16 boss at the time?
17    A.  Dr. -- Dr. Donald Plautz, P-l-a-u-t-z.
18    Q.  Okay.  And so at the time that you were an
19 assistant lab director in Broadview for seven years --
20    A.  Mm-hmm.
21    Q.  -- you weren't a forensic scientist?  You
22 weren't doing forensic examinations?
23    A.  Well, actually, I was, because my boss
24 wanted me to keep my eye in the microscopy aspect of it.

81

1 So I believe I was -- I was doing -- at one particular
2 point, verifications were brought in during that process.
3    Q.  During the time that you were an assistant
4 lab director --
5    A.  Yes --
6    Q.  -- verifications began?
7    A.  Yes.  I don't know specifically when, but
8 they did -- they did begin.  There was an influx of
9 individuals from the Chicago Police Department, and they
10 felt that there was a need for that, and that's how it --
11 that's how it occurred.
12    Q.  And you -- were some of those people from
13 the Chicago Police Department, were they retired firearm
14 and toolmark analysts?
15    A.  Yes.  Well, they never really retired.  They
16 just left the Chicago PD and came onboard with the State.
17    Q.  With ISP?
18    A.  Yes, ma'am.
19    Q.  And Chicago PD had its own lab that it was
20 using --
21    A.  Yes.
22    Q.  -- where those folks were using?
23    A.  Yes, ma'am.
24    Q.  Does it still have its own lab?

82

1    A.  Do they now currently have?
2    Q.  Yeah, yeah.
3    A.  No.
4    Q.  It's all ISP now?
5    A.  It's all ISP now.
6    Q.  So --
7    A.  You know what?  Let me -- let me retract
8 that.
9        They did initiate a firearms aspect of it a
10 few years ago because the lab, budgetarily, was a concern
11 for Mayor Daley, and the State is mandated to work cases,
12 so then the Forensic Science Center was opened up in
13 Chicago, and the Chicago laboratory was closed.
14 Subsequently, a few years back, just -- just the firearms
15 section opened up with the Chicago PD.
16    Q.  Okay.  Why -- why did those Chicago PD
17 forensic scientists feel that verifications needed to be
18 added to the ISP process?
19        MR. BHAVE:  Objection; foundation and
20    speculation.
21 BY MS. TINGSTAD:
22    Q.  You can answer, if you know.
23    A.  I believe it's something that they have
24 worked with at their laboratory, and they felt there was

83

1  a need for it at the State Police.

2      Q.  In your own words, what is the importance of

3  -- of verification in the forensic science process?

4      A.  Well, it's not just an independent look-see.

5  You have another individual that verifies what it is, in

6  fact, that you see through the comparison microscope.

7      Q.  So four eyes are better than one or two?

8      A.  If that's how you want to phrase it, sure.

9      Q.  So you were assistant lab director when the

10 verification process was being rolled out.

11         Did you have a responsibility to enact that

12 in your lab?

13     A.  Did I do that at my lab?

14     Q.  Well, did you -- what role did you play at

15 all?

16     A.  It was -- it was enacted by the firearms

17 personnel, and then, in turn, my boss said, "You should

18 keep your eye in it," so I actually did verifications.

19     Q.  At the time that that was rolled out, was

20 there any training that was instituted for how to do

21 verifications?

22     A.  If you are an examiner and you're viewing

23 it -- microscopic evidence as you would in -- in a case,

24 however, you are only looking at the fired evidence

84

1  that's on the scope and then initialing the worksheet and

2  indicating that you verify what the examiner -- the

3  primary examiner worked in the case.

4      Q.  So there wasn't -- there wasn't any specific

5  training involved for the verification process, aside --

6      A.  No, not to the best of my recollection.  It

7  was just kind of, like, a rollover.

8      Q.  A rollover?

9      A.  Yeah.  I don't know if that counts as a

10 confirm.  But, you know, the statement -- the Chicago guy

11 said, "This is a good thing to do," they ran it by the

12 State -- the firearms people, and they all concurred, and

13 that's what, in fact, was done.

14     Q.  Were you aware at the time if there was any

15 -- any motivating incident or occurrence that -- that

16 caused the Chicago PD forensic scientists to feel the

17 push for verification was necessary?

18     A.  No, other than the fact that the Chicago PD

19 individuals had been doing that, and they felt that it

20 was necessary to be done with the State Police.

21     Q.  So there was -- at the time that this was

22 being instituted and rolled out, were you the only person

23 in the Maywood Lab who was doing verifications?

24     A.  Yes, I believe so.  You know, if I recall, I

85

1  think it was instituted at laboratories where there was

2  only one -- one firearms examiner, and then, in turn,

3  someone in management who had firearms examiner

4  qualifications was able to do that.

5      Q.  Okay.  You mentioned -- and I'm going to

6  talk a little bit more about the process for

7  verification, but you did mention that it was just to

8  look at the fired-bullet evidence on the scope?

9      A.  Yes, ma'am.

10     Q.  Is that -- as opposed to what?  As opposed

11 to actually firing the test gun yourself or what --

12     A.  As opposed to working the whole case.

13     Q.  What did you mean by that?

14     A.  As opposed to signing it in, working up the

15 worksheets, making notations, test firing --

16     Q.  Okay.

17     A.  -- and then making an identification.

18     Q.  So it's really -- it was really just about

19 looking through the scope?

20     A.  And looking at the fired evidence and verify

21 it.

22     Q.  As far as you know, in the early days of --

23 of verification, were there any written procedures that

24 were handed down by ISP about -- about verification?

86

1      A.  I would like to think there were, but I

2  don't recall.

3      Q.  Were there -- in those -- in those

4  procedures or in any other way, do you recall that you

5  were told -- whether you were told to look out for any

6  risks or red flags, specifically as a verifier?

7      A.  Well, it was -- it was pretty cut and dry.

8  You either concurred with what the examiner saw, or you

9  didn't, and then if you didn't, there's a possibility of

10 another examiner looking at it, as well.

11     Q.  So let's sort of go to that timeframe that

12 you -- where you started -- had started doing

13 verifications.  So this was, like, the late -- late

14 1980s, early 1990s?

15     A.  Correct.  And then after -- after '92, I was

16 a forensic scientist again in '93.

17     Q.  And so then you were -- you were actually

18 doing benchwork and the full workups?

19     A.  Yes, ma'am, that's correct.

20     Q.  So while you were still a lab -- lab

21 assistant or lab director -- assistant lab director,

22 excuse me, about how many verifications would you say

23 that you would perform per week?

24     A.  You know, I don't -- I don't recall.  I

87

1  believe there was -- there was a woman named
2  Karen Vanderworth that was working there, and then
3  Dan Gunnell was working there, and then Don Smith
4  formally of the Chicago Police Department was working
5  there as well.
6      Q.  In the Maywood Lab?
7      A.  At the Broadview branch.
8      Q.  Broadview branch.  Sorry.
9          And you -- when you were the assistant lab
10  director, they were working there?
11     A.  Yes, ma'am.
12     Q.  So you had -- would you have all three of
13  them at a time working there or just one at a time?
14     A.  I believe it was Karen first, she showed up,
15  and then Dan showed up, and then Don Smith showed up.  So
16  I think it was, like, just Karen, then Dan -- Dan and
17  Karen, and then Karen left, and then it was Dan Gunnell
18  and Don Smith.
19     Q.  Okay.  So you had two firearms examiners who
20  were doing their benchwork, and you were -- after you
21  were -- were you the only one doing the verifications at
22  the time?
23     A.  I was doing the verifications when there was
24  only one individual, but then I was asked to do

88

1  verifications when there were others as well.
2      Q.  Okay.  So if there was only one examiner
3  there, you would do the verifications, but then if Dan
4  and Don were both there, would they verify each other?
5      A.  Generally speaking, yes.
6      Q.  Okay.  You mentioned that some people could
7  do two full cases a day, and that this Bob Hunton, he did
8  one full case a day as an examiner doing all of the --
9  the whole workup.
10         As a verifier, about how long would it take
11  you to verify any one identification?
12     A.  You know, not very long actually.  You know,
13  because you can see through the scope the spacial
14  relationships and the contours and everything like that.
15  It might take the primary a long time to find the
16  identification, but once it was set up on the scope for
17  the verifier to see, then the verifier would -- would --
18  would see it, and then, in turn, you just -- depending on
19  the condition of the evidence, you can -- you always look
20  at -- for fired bullets, you always look at the complete
21  periphery of the bullet -- of the land impressions.
22         Sometimes the evidence is damaged, but then
23  there's enough to make an identification from what you
24  have of the -- of that evidence.

89

1      Q.  So if I understand you correctly --
2      A.  Yes, ma'am.
3      Q.  -- what -- and we'll -- you know, I do want
4  to understand sort of start to finish how this
5  verification process would work back in the early '90s.
6  So -- but from what I understand what you're saying is
7  that there would be an examiner doing the full workup.
8  They would be, you know, looking --
9      A.  Signing it in, initial the packages --
10     Q.  -- signing it --
11     A.  -- weigh the bullets, write up the
12  worksheet.
13     Q.  Write everything up.  They're looking at it
14  under the microscope.  They're trying to find whether or
15  not there is an identification there?
16     A.  Correct.
17     Q.  So if they find -- if they -- if they're
18  able to line up that microscopic stria or what have you,
19  in the microscope and see what they are determining to be
20  an identification, that might take them a while, right?
21     A.  Correct.
22     Q.  So once they've done that initial work to
23  sort of get it to the point where they say, "This is how
24  these things are lining up," then they would call over

90

1  another examiner or the assistant lab director such as
2  yourself, and say, "Can you look at this under my
3  microscope?"  Is that how it would go?
4      A.  Exactly right, correct.
5      Q.  And at the time, would they say, "Come over
6  here and look at my -- look at this identification"?
7  Like, you know, sort of how would those conversations go?
8      A.  They would say, "I would like for you to
9  take a look at something that I have on the scope."  It
10  wasn't, you know -- it wasn't, you know, "Look at this ID
11  or whatever."  It was -- it was, "Look and see what I
12  have under the scope."
13     Q.  Mm-hmm.
14     A.  And then, in turn, you would review what was
15  under the scope and subsequent -- subsequent fired
16  evidence items.
17     Q.  And so would you, as the verifier, do --
18  manipulate the fired evidence items as well and -- you
19  know, on the scope so you could -- or would you just, you
20  know, look at what was -- had been already set up for you
21  to look at and then sort of go away and then they -- how
22  would it work?
23     A.  Well, I would move the evidence around so I
24  could get it to where I wanted it to line up.

91

1    Q.  Mm-hmm.
2    A.  And I would look at it initially, and if I
3  saw areas of agreement, that's fine, but then I would
4  look at other areas, and I -- there was a distinct
5  possibility that I would move it around on the holder to
6  get, you know, lighting and areas that -- that I would
7  like to see personally when -- when I look at the
8  evidence.
9    Q.  So once you looked at the evidence, would
10 the -- would the original examiner have already done
11 their worksheet at the time?  Would they have already
12 completed a worksheet?
13   A.  They would -- they would have written up the
14 worksheet as far as giving the physical description of
15 it, and other particulars, the markings that were on the
16 packaging and say the caliber and, you know, the physical
17 description of that evidence, but they wouldn't -- they
18 wouldn't write a report until after it was verified.
19   Q.  I see.  So they wouldn't write up their
20 report until after the verifier was able to look through
21 it in the scope and say, "I agree this is an
22 identification"?
23   A.  Correct.
24   Q.  So did you ever have an instance that --

92

1  strike that.
2        Was it common for the forensic examiners to
3  place the two -- to place the items on the scope and line
4  them up in the way that they think would show the
5  identification?
6    A.  Yes, they would do that.
7    Q.  Was it -- was it common for them to place
8  two items on the scope that they didn't think lined up
9  and -- and ask -- ask a verifier to look at that, to say,
10 "Look at this, it doesn't look like it lines up"?
11   A.  No, they wouldn't --
12   Q.  No.
13   A.  They wouldn't do -- the wouldn't do the
14 latter.  They would -- they would say, "Take a look at
15 this.  I have something interesting."  And generally, it
16 was an identification.
17   Q.  So "something interesting" means, there's
18 something lining up here?
19   A.  Yes, ma'am, that's correct.
20   Q.  Okay.  And if it's a total -- if it's
21 mismatched, if it's not lining up, would they bother to
22 ask another person to go look at the -- under the scope
23 for something that's not lining up?
24   A.  Well, you could -- you could take a look at

93

1  it and see if there was some agreement, but, you know, if
2  there wasn't any agreement by the primary, then there
3  wouldn't be any agreement with the verifier.
4    Q.  Mm-hmm.  So is it fair to say that if a
5  primary examiner looked at two items and said, "I'm going
6  to -- this isn't an elimination," that they wouldn't
7  actually ask for a verification in that instance?
8    A.  What -- what do you mean by "elimination"?
9  That it's, like, totally -- that it's not -- okay.
10 Because the collusions are:  It was fired --
11   Q.  Right.
12   A.  -- it could have been fired, or it was not
13 -- or it's not suitable -- or could -- well, that would
14 be four.  It would be:  Was fired, could have been fired,
15 not suitable for identification, or insufficient markings
16 for an identification.
17   Q.  Right.  So correct me if I'm wrong, but that
18 would be an identification --
19   A.  Right.
20   Q.  -- an inconclusive --
21   A.  Right.
22   Q.  -- or an elimination?
23   A.  The elimination would be -- for instance, if
24 you had a bullet that was six right, and your evidence

94

1  was six left, that would be a total elimination or --
2    Q.  So that would be -- so let's -- let's --
3  let's pause there because I do want to ask you about --
4  about all of those categories and about the different
5  kinds of characteristics.  I do want to ask you about
6  those.
7        But before I do that, just to talk a little
8  bit more about the verification, what I'm hearing you
9  saying is that if an examiner called you over to the
10 scope and said, "I found something interesting," that
11 means, "I found something that lines up, I'm -- I'm
12 looking at a potential identification here."
13   A.  That's correct.
14   Q.  At that time in the early '90s when you
15 would receive a packet of evidence into the lab, did you
16 generally -- did you ever have conversations with the
17 detectives who were dropping them off?
18   A.  No.
19   Q.  Did you ever know anything about the
20 evidence that was being submitted?
21   A.  On occasion, but generally, no.  They were
22 just, you know, messengers and tourists and evidence
23 technicians that were submitting the evidence.
24   Q.  Did you ever talk on the phone with firearm

95

1 -- with detectives who were working any cases?
2     **A. Generally not, no.**
3     Q. But occasionally, you might have?
4     **A. Occasionally, but not -- not very much.**
5     Q. Did you generally know when you got evidence
6 submitted that this was from a murder on the east side of
7 town or something like that?
8     **A. Well, it was -- it would be indicated on the**
9 **Evidence Submittal Sheet, that there was a victim, a**
10 **suspect, and whether it was a death investigation or a**
11 **burglary or a shooting investigation, and then it was**
12 **submitted by a laboratory, and then the -- the items**
13 **would be enumerated in the body of that -- that evidence**
14 **receipt.**
15     Q. Right. And you would have to sign for that?
16     **A. Right. And sign for -- you -- you would**
17 **sign for it, and then when you started working up, you**
18 **would initial all the packaging and everything like that,**
19 **and -- and then move forward with it.**
20     Q. When you were doing -- strike that.
21     Over the years -- I know we've been
22 specifically talking about the early '90s period there in
23 the Broadview branch. But over the years, how many --
24 about how many verifications would you say you've done,

96

1 like thousands?
2     **A. No, no, not -- not thousands. I -- I**
3 **couldn't -- I couldn't speculate. Depending on the**
4 **number of examiners there, you know, it might've been**
5 **more at one period in time and less in another because**
6 **there would be another examiner or --**
7     Q. Mm-hmm.
8     **A. -- or if the examiners were on vacation, so**
9 **then I would, you know -- would verify it, if I could --**
10 **but I couldn't -- tens, maybe hundreds. I don't know. I**
11 **-- I can't say.**
12     Q. Hundred -- a few hundreds maybe. Okay.
13     **A. No, I can't speculate. I really -- I really**
14 **can't.**
15     Q. Okay. A good number, you know --
16     **A. A good number, yes.**
17     Q. So in all of that time doing -- conducting
18 those verifications, did you ever disagree with the --
19 what the examiner had laid out as a potential
20 identification under the scope? Did you ever say, "No, I
21 can't verify this"?
22     **A. No, not that I can recall, no.**
23     Q. Specifically, did you ever disagree with
24 Dan Gunnell in any of his forensic analysis?

97

1     **A. No, not that -- not that I can recall, no.**
2     Q. So is it fair to say that when you're
3 conducting a verification and looking at that evidence
4 that's been set up for you by the original examiner on
5 the scope, that you're not doing an independent
6 examination of the evidence?
7     **A. No, that wouldn't. I don't think it would**
8 **be fair to say. I'd be -- well, I am -- I am looking at**
9 **the evidence without doing the documentation, and looking**
10 **at the same -- what I would look at if I was the primary.**
11     Q. Okay.
12     **A. I'm making a verification.**
13     Q. So let's talk about the process if you were
14 the primary.
15     **A. Mm-hmm.**
16     Q. What -- how would you start with -- with
17 evidence that you were asked to examine, fired-bullet
18 evidence?
19     **A. Okay. So there would be the pink Evidence**
20 **Submission Form, and I would make sure that the -- what**
21 **was listed on the Evidence Receipt Form corresponded to**
22 **the evidence that I had in my possession.**
23     **And first of all, it was placed in a secured**
24 **area that -- that will, like -- there was, like, limited**

98

1 access, and then retrieve that. It was, like -- there
2 would be, like, a section down there that said, you know,
3 "firearms".
4     So retrieve it, and then, in turn, place the
5 evidence in the work area and initial all packaging. But
6 down the evidence number, the item number, the case
7 number, your initials, and the date that you were working
8 it. And then --
9     Q. The purpose of all of that -- the purpose of
10 all of that is to --
11     **A. Chain of custody.**
12     Q. Chain of custody, okay.
13     **A. Right. So -- and then open it up. Make**
14 **sure that -- you know, it indicated that it was --**
15 **everything was received in a sealed condition. And then,**
16 **you know, I always -- it was kind of, like, an akin to it**
17 **being Christmas all the time. You know, you have this**
18 **package, and you're opening it up, you know.**
19     So you open it up, and then you have a
20 worksheet, and what, in fact, is in front of you, you
21 translate onto that worksheet, okay. So if it's a
22 discharged cartridge case or if it's a fired bullet, and
23 then write down all of the characteristics that you see
24 onto that worksheet, and then if there's a gun in question,

99

1  all the characteristics from the gun. You write down the
2  manufacturer, the model number, the barrel length, the
3  finish of the gun, and then you'd look at the barrel and
4  see what the rifling characteristics were. And then —
5      Q.   And so these -- these characteristics that
6  you're describing, are these class characteristics that
7  you're looking at now?
8      A.   Rifling characteristics, there's — there's
9  — there's spiral grooves that are cut into a barrel of
10 the gun, and then they're either — they're either to the
11 left or to the right, counter-clockwise or clockwise, and
12 the reason they're done so is to in part a gyroscopic
13 stability to that bullet when it comes out.
14          The land impression that's translated from
15 the barrel to the — to the bullet is what we key in on
16 — key in on, on the fired bullet.
17     Q.   Mm-hmm. And that -- would that be -- that
18 would be a class characteristic, correct?
19     A.   Yeah. Class characteristics are caliber —
20     Q.   Caliber --
21     A.   — which is the diameter.
22     Q.   Mm-hmm.
23     A.   Number of lands and grooves, and it varies
24 to manufacturer. It could be six, eight, five, and then

100

1  direction of twist.
2      Q.   Right.
3      A.   And it can be to the left or to the right,
4  and then anything else that was, you know, that was
5  pertinent to the gun. If there's an importer on there;
6  the serial number; the condition, whether there was —
7  whether it was bruised or something was, you know — you
8  know, not the way it was supposed to be; the finish of
9  the gun, was it chrome, was it plated, was it glued; the
10 overall, the length of the barrel; the overall length of
11 the firearm; and any other, you know, physical
12 characteristics.
13          So getting back to the class
14 characteristics. So class characteristics are caliber,
15 number of lands and grooves, and direction of twists, to
16 name a few.
17     Q.   What would be the definition of a class
18 characteristic?
19     A.   It would be characteristics that are common
20 to many firearms that are manufactured.
21     Q.   Are they -- are they characteristics that
22 the manufacturer has -- the manufacturer -- part of the
23 manufacturer's design of the weapon?
24     A.   Yes, that would be — that would be the

101

1  appropriate — yes.
2          And then those are the class
3  characteristics, and then there's individual
4  characteristics, which are the characteristics that are
5  imparted — microscopic irregularities that are imparted
6  on the gun. The -- that define it as having it come from
7  that gun, and they're done in the polishing manner, the
8  sanding, filing, you know, what have you, different —
9  different — different ways to impart — impart
10 individually on that — on that particular firearm.
11     Q.   So there's class characteristics, and is
12 class characteristics between a fired-bullet evidence and
13 a submitted weapon -- if they don't match, would that
14 lead to an elimination?
15     A.   Yes. Then that — like I indicated earlier,
16 if the gun characteristics are six right and the bullet
17 is six left, there's no way on God's green Earth that
18 that bullet was fired from that gun.
19     Q.   So that would be a full elimination?
20     A.   Yes, ma'am.
21     Q.   And can you -- if -- if you see a six right
22 gun and a six right twist on a bullet, based on that
23 matching of the class characteristics alone, can you
24 identify the bullet in the gun?

102

1      A.   Well, it's certainly something that we look
2  at in — in the process, but you can have two different
3  manufacturers of six right, and they could have different
4  dimensions as far as the width of the lands and grooves.
5      Q.   Mm-hmm.
6      A.   But if the width of the lands and groves
7  corresponds to the evidence, then — you know, then you'd
8  test fire the gun. You'd look at the test, test-to-test
9  microscopically. And then you remove one of the tests,
10 and then you place the evidence bullet on it, on a
11 comparison microscope.
12     Q.   So you would start -- is it fair to say,
13 just to go back for a second, that you can eliminate
14 based on class characteristics, but you can't make an
15 identification based on the class characteristics alone?
16     A.   Well, you can make it on the class
17 characteristics alone. If the fired evidence is six left
18 and gun is six right —
19     Q.   You can eliminate, right.
20     A.   Yes. In that particular instance, yes.
21     Q.   Yes. You can eliminate, but you can't
22 identify based on class alone?
23     A.   Well, you eliminate by virtue of — if you
24 don't have — you need class and individual

103

1 characteristics to make that call.
2     Q.  Exactly.  So you --
3     A.  If you don't have the class -- if you don't
4 have the class characteristics, that's -- that negates
5 the whole -- the whole process.  It eliminates the -- you
6 know, six right versus six left.  You know, that couldn't
7 have been fired, you know, in that gun.
8     Q.  So once you have an agreement between class
9 characteristics, that's when you move on to doing your
10 test firings --
11     A.  Yes, ma'am.
12     Q.  -- and to looking at individual
13 characteristics?
14     A.  Yes, ma'am, that's correct.
15     Q.  Okay.  So you -- in talking about that
16 process, you mentioned that the next thing you would do
17 if you had an alignment of class characteristics, you
18 would take the weapon, and you would fire test shots?
19     A.  Yes, ma'am.
20     Q.  What kind of ammunition would you use to
21 fire test shots?
22     A.  I would use the ammunition that was used in
23 the case.
24     Q.  Okay.

104

1     A.  I mean, not that -- not the ammunition that
2 was submitted with the case.  Although there have been
3 instances where I actually did have to use it, but I
4 would go to a -- go to the supply at the laboratory and
5 -- because it does -- it makes a difference as to what
6 kind of ammunition you used.
7         And you try to use the same ammunition that
8 was used in that particular case.  And then if you don't
9 have the ammunition, then you'll use some of the
10 ammunition that wasn't fired.  You use that ammunition if
11 it corresponds to physical configuration and caliber and
12 manufacturer.
13     Q.  You would try and use the same type of
14 ammunition that was -- that corresponds to the
15 fired-bullet evidence?
16     A.  Yes.
17     Q.  Is that because different metals mark in
18 different ways?
19     A.  Yeah.  And there's, like, different
20 finishes.  There's brass, there's copper.
21     Q.  Mm-hmm.
22     A.  There's just lead.  You know, for -- you
23 don't compare lead to -- lead to a jacketed, and you --
24 you try as best you can.  It's -- it's critical that you

105

1 use the same ammunition that was used.  And if you can't,
2 then you use the submitted evidence to test fire.
3     Q.  Would you use reloadable or nonreloadable
4 cartridges for test firings?
5     A.  I -- I would never use reloadable -- well,
6 if it called for it, if I -- if I could determine that it
7 was reloadable, then I would shoot reloadable.  But if it
8 didn't call for it, I -- I would not.
9         Reloadable is not -- how would I phrase
10 this?  It's -- it's not reliable, you know, because it's
11 done by individuals that either reload commercially or
12 reload as a hobby.
13         So you -- you want to reload -- you want --
14 you got me on the reload line here -- line of thought.
15 You want to use manufactured ammunition that's pristine.
16     Q.  Pristine.  Why do you want it to be pristine
17 before you shoot it?
18     A.  Because you don't want to have -- have any
19 incidental marks on it so that the markings that are
20 transferred onto that fired evidence are what -- what you
21 look at to make an identification.
22     Q.  So after you fire -- you fire two pristine
23 bullets or cartridges -- I'm not sure -- out of the --
24     A.  The whole -- the whole component is a

106

1 cartridge.
2     Q.  Yes.
3     A.  Just a silver bullet and a cartridge case.
4         We mark up on the side wall of the cartridge
5 case the item number, the case number, and our initials,
6 and we also mark up the bullet as well.  And then we
7 place -- and then we have a specific orientation, is how
8 we line up our test fires in that particular firearm so
9 that -- so that when we look at the tests, it's going to
10 be -- so say, for instance -- save it for -- like, the
11 fired bullets.
12         If I mark them up insistently, then when I
13 place the tests on there, there shouldn't be any
14 variation as far as lining them up from, you know, land
15 impression to land impression.  It might vary ever so
16 slightly, but generally not when I -- because they're --
17 they're -- I believe they're called index marks.
18     Q.  Mm-hmm.
19     A.  So you index them, test fire them, look at
20 the test fires, test-to-test, and then remove one of the
21 test fires, and place the fired evidence on there -- on
22 the scope.
23     Q.  Why would you look at the test fires,
24 test-to-test?  You know that those two were fired from

107

1  the same gun, so why do you look at the two tests,
2  comparing those first?
3  **A.  Because they can -- they can vary ever so**
4  **slightly.**
5      Q.  Okay.
6  **A.  Test -- even test-to-test.  And you want to**
7  **see what that ever so slightly is, you know, but**
8  **generally they stay the same, but you want to -- you want**
9  **to -- you want to get, like, the best markings possible.**
10 **Sometimes those best markings aren't the ones that line**
11 **up, and you use the one that's not -- you know, not as --**
12 **what's the word -- not as -- as pronounced.  It might be**
13 **just a little bit less pronounced, but they do vary**
14 **test-to-test.**
15     Q.  Are you looking for -- you're looking for
16 markings that vary, but are you also looking for the
17 markings that reproduce well?
18 **A.  Yes.  I'm -- I'm keying in on those markings**
19 **that reproduce well.**
20     Q.  And what's the reason why you key in on the
21 markings that reproduce well test-to-test?
22 **A.  Because those are the markings that I base**
23 **my identification on.**
24     Q.  Those are the markings that you would expect

108

1  to see in the -- in the fired-bullet evidence if it was
2  also fired from that gun?
3  **A.  Yes, ma'am, that's correct.**
4      Q.  So you are looking for reproducible marks in
5  the test-to-test?
6  **A.  Correct.**
7      Q.  So that you can then see when you switch one
8  of the tests out with a fired evidence?
9  **A.  Correct.**
10     Q.  Whether or not that mark is now reproduced
11 on the fired evidence?
12 **A.  Correct.**
13     Q.  How important is it --
14 **A.  Depending -- depending on the condition of**
15 **the evidence -- of the fired evidence, because it can go**
16 **into a wall.  It can do this and that, you know, or**
17 **whatever, so --**
18     Q.  How -- how important is it to get that index
19 of reproducibility test-to-test before you move on?
20 **A.  Well, it just makes it a whole lot easier**
21 **for you as an examiner because the index mark, as you**
22 **placed it in the gun, if it hasn't moved, it's going to**
23 **reproduce the same way and transfer onto the fired bullet**
24 **or the -- or the cartridge case.**

109

1      Q.  I'm sorry.  I think I -- I used the word
2  "index" a little bit differently.  I said --
3  **A.  Okay.**
4      Q.  But I can use a different word.
5          I said, how important is it to get that
6  baseline of reproducibility before you move onto looking
7  at the fired evidence?
8  **A.  It -- it's very important, and let's just**
9  **say it's a marking rather than, say -- I mean, we maybe**
10 **use the term "index" not correctly, but, you know, it's**
11 **-- it's to line up that unfired cartridge, to line up in**
12 **a certain position into the firearm so that there's**
13 **reproducibility, test-to-test, as far as positioning of**
14 **the --**
15     Q.  Mm-hmm.
16 **A.  -- of that -- of those test shots.**
17     Q.  Okay.  So getting off of the lining up with
18 the -- with the index mark, just the idea of how
19 important is it to -- for the examiner to look at those
20 two tests next to each other --
21 **A.  Mm-hmm.**
22     Q.  -- and establish what's reproducing?
23 **A.  Right.**
24     Q.  -- before then, looking at a fired -- fired

110

1  evidence?
2  **A.  Correct.**
3      Q.  How important is that first part of looking
4  test-to-test?
5  **A.  Very important, very important.  You key in**
6  **-- you key in on that and look and see how -- how it is**
7  **that -- you know, how it's similar, those markings are.**
8      Q.  So as -- as an examiner conducting -- doing
9  the -- the primary examination, when you're looking at
10 those two items test-to-test, and you're identifying what
11 reproduces, what doesn't, do you create a worksheet that
12 memorializes that?
13 **A.  I -- I don't know if I understand your**
14 **question.  I mean, if my --**
15     Q.  Do you create a worksheet for the
16 test-to-test comparison?
17 **A.  No.  I just indicate on the bottom, the type**
18 **of ammunition that I used and how I marked it off.  And,**
19 **you know, I -- what was the term you used,**
20 **"memorialized"?**
21     Q.  Memorialized.  That just means, did you --
22 would you write it down?  Like, write down the
23 characteristics that you're seeing that are reproducing
24 test-to-test?

111

1      A.  No.
2      Q.  Would you write that down on a worksheet?
3      A.  No.
4      Q.  Okay.  Why not?
5      A.  Because I'm look -- visually looking at the
6 evidence.  I mean, I -- you know, anything that I write
7 down is not what I'd see visually.
8      Q.  Right.  But I mean, in terms of, you know,
9 your ability to recall what you had seen or testify about
10 it later, would it be helpful?
11     A.  I mean, somewhere down the line, there was
12 -- there was -- there were -- there was protocol that was
13 put in there where there were photographs taken -- micro
14 -- photomicrographs, but we never used photomicrographs
15 for the fact that we do not -- I mean, at that particular
16 point in time, we do not base our identification
17 photograph-to-photograph.  We base the identification on
18 what we see visually.
19     Q.  Mm-hmm.
20     A.  And not only that, if there's a duces tecum
21 that comes in, and you provide the -- that -- those
22 micrographs, and the juror looks at it and says, "Well, I
23 see areas of agreement here," or "I don't see areas of
24 agreement".  We don't base our identification on

112

1 photographs.  We base our identification on what we see
2 visually through the comparison scope.
3      Q.  Do you -- does ISP now use photographs for
4 all of their identifications?
5     A.  I believe they do.  I know at the last lab
6 that I worked at, but that's strictly done as
7 documentation.  We don't use it for identification.  We
8 use it for documentation.
9     Q.  Documentation.
10    A.  Right.
11    Q.  And you would use that then -- that
12 documentation then to recall what you had seen, right?
13    A.  Correct.
14    Q.  And to perhaps use as a demonstrative in
15 court?
16    A.  Possibly.
17    Q.  What you're saying is that you never took
18 those photomicrographs in the '90s -- in the early '90s?
19    A.  No.
20    Q.  That wasn't --
21    A.  No.
22    Q.  That wasn't part of the policy?
23    A.  I think the options were based on laboratory
24 accreditation where photomicrographs or an actual sketch

113

1 on the worksheet.
2      And as far as the accreditation, that
3 started some -- you know, as far as that process, I don't
4 -- I don't -- I don't recall.
5      Q.  But at some point for accreditation, it --
6 would -- it was required to have some type of demon --
7 like, demonstrative way of writing that down or recording
8 that, whatever -- whatever you had viewed through the
9 microscope?
10      MR. BHAVE:  Objection; form.
11      MS. TINGSTAD:  Mm-hmm.  I will repeat --
12 or I will rephrase.
13 BY MS. TINGSTAD:
14    Q.  At some point for accreditation, it was
15 important to have either a worksheet sketch of what you'd
16 seen through the microscope or a photomicrograph, right?
17    A.  Yeah.  At some point, there was, yes.
18    Q.  And would that worksheet sketch also include
19 a worksheet showing what was observed test-to-test?
20    A.  No.
21    Q.  It never included test-to-test?
22    A.  No.
23    Q.  Why not?  Do you know?  If you know?
24    A.  Why -- I know what I'm shooting through the

114

1 gun, that it's six right, and I base my -- what I see as
2 far as reproducibility, it would be duplicating the
3 effort.  I mean, there -- I -- there was -- I mean, I
4 don't want to be -- I don't want to sound argumentative
5 or anything like that, but there just wasn't any reason
6 for it.
7      Q.  I'm just trying to understand.
8     A.  Yeah.  Oh, I understand.
9     Q.  So you're -- you're looking test-to-test.
10 What -- about what power of micro -- power of
11 magnification did you use back --
12    A.  The oculars were 5X and 10X, and then the
13 objectives were 1.0, 2.0, and 3.0.  So the magnification,
14 what you do is:  You multiply the ocular -- the power of
15 the ocular --
16    Q.  Mm-hmm.
17    A.  -- times the objective.  Like, say -- say,
18 for instance, your ocular is 10, and your objective is 30
19 -- excuse me.  Your objective is 3, then your
20 magnification is 30.  And what that means is that what
21 you're looking at through the scope is 30 times larger
22 than its actual size.
23    Q.  So in that -- in that language right there,
24 in the 30 times, of what -- what was the range that you

115

1  would examine evidence?
2      A.  No more than -- see, and I use the 10 ocular
3  because it has, like, a wider distance as opposed to the
4  5 -- 5X ocular, and we -- we never went beyond the 3.0
5  objective.
6      Q.  So never beyond 30-times magnification?
7      A.  Correct.
8          (Whereupon, there was a discussion held off
9          The record.)
10         THE WITNESS:  Maybe we can take a break?
11         MS. TINGSTAD:  Do you want to take a
12  break?  Sure.
13         THE WITNESS:  If it's okay with you
14  guys.
15         MS. TINGSTAD:  Maybe a quick bathroom
16  break right now, and we can break maybe a little
17  bit later for lunch.
18         THE WITNESS:  Yeah.
19         MS. TINGSTAD:  Sure.
20         THE WITNESS:  Okay.
21         MS. TINGSTAD:  Does five minutes work
22  for everyone?
23         MR. BHAVE:  Yeah.
24         MR. HUOTARI:  11:15?

116

1          MS. TINGSTAD:  Thanks.  Yep.  That
2  sounds good.
3          (Whereupon, the proceedings went off the
4          record at 11:09 a.m. through 11:20 a.m.)
5  BY MS. TINGSTAD:
6      Q.  Thank you, Mr. Striupaitis.
7      A.  You're welcome.
8      Q.  So before we took the break -- before we
9  took the break, you were talking about the first step in
10  forensic examination or forensic analysis after
11  determining that the class characteristics matched would
12  be to the take test fires and compare test-to-test under
13  the microscope?
14     A.  Yes, ma'am.
15     Q.  And you would be looking for marks that
16  reproduced, correct?
17     A.  Correct.
18     Q.  So let's -- let's talk about cartridge cases
19  and just in the context of looking test-to-test.
20         When looking at cartridge cases
21  test-to-test, what -- what types of markings are you
22  looking at?
23     A.  Looking -- looking at firing pin impressions
24  and looking at retrace markings and looking at if it's a

117

1  semi-automatic pistol, ejector markings and extractor
2  markings.
3      Q.  So starting with firing pin impressions,
4  what would be -- are there class characteristics within
5  firing pin impressions?
6      A.  Yes, there are.
7      Q.  What would those be?
8      A.  It'd be, like -- it could be flat.  It --
9  it's actually round, but then it's flat at the bottom.
10     Q.  Okay.
11     A.  You have a spherical, it could be rounded,
12  or it could be elliptical, or it could be -- those --
13  those are basically the major ones.
14         And then -- those are the class
15  characteristics, and then there's the -- the firing or
16  finishing process -- excuse me -- that'll lay it on --
17  individual characteristics onto those firing pins.
18     Q.  So when the firing pin is being
19  manufactured, it's -- it's a piece of metal that's filed
20  by another piece of metal that would impart?
21     A.  I think they're -- it -- it depends.  I
22  think sometimes it's just punched out.
23     Q.  Punched out.
24     A.  And then they'll file them, polish them, and

118

1  then the polishing we'll put on the individuality.
2      Q.  Is there a type of mark that -- that could
3  be, let's say, due to defect in the manufacturer's tools
4  that could actually not be purposefully put there by the
5  manufacturer, like a flat bottom or an elliptical bottom
6  to a firing pin impression, but rather something that
7  because a tool in the manufacturing process was -- had a
8  defect that was imparted to several tools that end up in
9  several guns?  Have you ever seen anything like that?
10     A.  Yeah, that can happen.
11     Q.  What's -- was -- is there a name for that?
12     A.  That's called subclass characteristics.
13     Q.  Subclass.
14         Can you talk a little bit more about
15  subclass characteristics?  What would be an example?
16     A.  Well, you just -- you just indicated, you
17  know, you have -- there's a defect made by the
18  manufacturer, something like falls in the manufacturing
19  process, and would be, like, a run like those.  Don't ask
20  me how many, hundreds, whatever.  And then all of a
21  sudden, that mark is gone, you know.
22         So you don't base your -- you don't base
23  your identification on -- on subclass.  You base your
24  identification on -- and then to find out about that,

119

1  okay -- if I can give one example.
2      Q.  Please.
3      A.  There was a gun that was manufactured that
4  had the -- breech-face was epoxied, so all those
5  cartridge cases that came -- that were produced by it,
6  they all looked pretty much the same.  Well, the
7  manufacturers went to the forensic people and said, "What
8  can I do to render individuality?"  And they put a belt
9  sander on -- in there.  And that -- that creates a lot of
10  great individual characteristics.  Now, the --
11     Q.  So the manufacturer actually purposefully
12  created the individual?
13     A.  They didn't do it purposefully.  They didn't
14  realize that they were doing it.  They went to the
15  forensic people, and he helped the forensic people, and
16  it's specific to high-point firearms.
17     Q.  So that epoxy that caused all of the
18  cartridge cases to look the same coming out of several
19  different guns, that would be called a subclass
20  characteristic?
21     A.  Correct.
22     Q.  Okay.  Is there -- and you can't base your
23  idea on subclass.  Like you said, just -- you need the
24  individual characteristics still, right?

120

1      A.  Correct.
2      Q.  How can you identify that something is
3  subclass?  How do you know when you look at a mark that
4  it's subclass and not individual?
5      A.  Well, you basically have to rely on the
6  seminars that you would go to and by experience as far as
7  what you see.  You know, it's -- have there been
8  identifications made on subclass?  Unfortunately,
9  probably, yes, but people didn't realize it until they
10  found out through the manufacturing or through seminars
11  that those were, in fact, subclass characteristics.
12     Q.  So you just said unfortunately, probably
13  identifications have been made erroneously based on
14  subclass and not on individual?
15     A.  There is a possibility, yes.
16     Q.  Have you heard of that happening?
17     A.  Maybe on -- maybe on that one occasion with
18  the high point that I indicated, but then he corrected
19  that by placing the little sander in there and adding
20  individual characteristics.
21     Q.  Would looking at -- strike that.
22         And then let's talk about the breech-face
23  marks.  What kind of -- are there any class
24  characteristics involved in breech-face marks?

121

1      A.  Yeah, there is.  There is a concentric
2  circle, there's cross-hatched, and there's parallel, and
3  there's granular, and then there's smooth.
4      Q.  And those are all different micro --
5  microscopic class characteristics?
6      A.  Correct.
7      Q.  You also mentioned the ejector and the
8  extractor marks.
9      A.  Mm-hmm.
10     Q.  When you look at two test fires that were
11  fired in pristine condition, you compared the ejector and
12  extractor marks to see if they reproduce?
13     A.  Yes.  But sometimes, not all the time
14  because if I have pronounced markings in the breech-face
15  and the firing impression, do I look at -- always look at
16  -- I'll always look at the breech-face -- excuse me, the
17  ejector markings because they're right there.
18     Q.  Mm-hmm.
19     A.  But the extractor markings, you have to flip
20  the cartridge case and cant it and move it around to
21  where -- now, if I -- if my -- if my markings were -- are
22  not that pronounced in the breech-face of the firing pin,
23  then I will go to all the other markings.
24     Q.  Oh.

122

1      A.  Just to -- to base my -- to make a
2  determination.
3      Q.  So if you discussed having the importance of
4  looking test-to-test to see what -- what reproduces and
5  these various microscopic class and individual
6  characteristics, would you -- if you had two questioned
7  cartridge cases, would you also compare the questioned to
8  the questioned to see what reproduces?
9      A.  I -- I can, and I do -- and I have, yes.
10     Q.  Is that part of the protocol, the -- that's
11  required by ISP?
12     A.  You know, I -- I -- I don't know if it's
13  written in there specifically, but what's crucial is that
14  -- is that -- see, what happens is you'll get different
15  kinds of ammunition, and the ammunition that you fire
16  might not necessarily correspond to the ammunition that
17  was fired in the case.  So there's variations as far as
18  the -- the metal and such.
19         So I'll -- I'll take a look, but then I base
20  -- I need to see it -- the test to the fired evidence.  I
21  won't just look at it, you know, evidence-to-evidence.
22  If I do look at it evidence-to-evidence and there's --
23  there's pronounced marks, then I could say that they were
24  fired by from the same gun, but I won't say they're fired

123

1  from the gun -- from the gun in question until I can
2  prove that with the tests that I fired.
3       Q.   Mm-hmm.
4            And if you were to see marks that reproduce
5  well questioned-to-questioned, you would expect to see
6  those reproduced also in the tests?
7       A.   That's correct.
8       Q.   Do you look at ejector marks in the
9  questioned cartridge cases as well?
10      A.   Yes.  Again, if -- if the markings -- if the
11  markings are pronounced in the breech-face and the firing
12  impression, and then the ejector markings are right
13  there, right in the face of the -- of the cartridge case,
14  then, yeah, I can -- and as far as orientation or
15  whatever, yes.  Whereas the extractor markings where, you
16  know, you have to remove it and cant it and so on and so
17  forth.
18      Q.   But you would consider the ejector and
19  extractor marks -- potentially consider those in making
20  an identification or an elimination in coming to a
21  conclusion?
22      A.   Yes, that's correct.
23      Q.   So we've talked about various types of marks
24  on cartridge cases, and the process of going test-to-test

124

1  first, sometimes doing questioned-to-questioned, but not
2  always, and then looking test-to-questioned to see if
3  there's an identification.
4       A.   Right.
5       Q.   We also talked a little bit about subclass,
6  and that possibility that a less experienced examiner
7  could confuse subclass for individual characteristics.
8       I want to ask you a little bit more about
9  the verification process.  Again, you mentioned that the
10  way that it would work in practice would be the principal
11  examiner would be looking at evidence, they would say, "I
12  found something interesting," and that meant, "Come over
13  and see, I found some -- some alignment, I found an
14  identification, I want you to see it."
15           Did they -- did the principal examiner do
16  that when they were looking test-to-test?
17      A.   No.
18      Q.   Why not?  You've -- just, I'm curious.  I'm
19  not -- I'm just wondering.
20      A.   No, no.  That's all right.  I understand.
21           Because it's done -- it's done on a
22  examiner's screening level, and that's not -- I mean, has
23  -- has a verifier gone and looked at test-to-test and
24  then gone to the evidence?  Possibly.  I don't recall

125

1  personally doing that.
2            But, you know, I always look at -- at
3  test-to-fired evidence when I'm called upon to make a
4  verification.
5       Q.   So is it fair to say that as a verifier
6  looking test-to-questioned only, you're missed -- the
7  verifier would miss out on that baseline of
8  reproducibility that would be observed by looking
9  test-to-test?
10      A.   No.  The verifier doesn't miss out on
11  anything.  The verifier is looking at agreement and --
12  and there is -- when there's agreement, there's
13  agreement.
14           There's -- I don't know of any laboratory
15  that has individuals do that, you know, look at it.  I
16  mean, the primary certainly does, and if needed, the
17  verifier will be, but as far as the verifier, I've never
18  -- I have never done that.
19      Q.   Okay.  Thank you.
20      A.   Mm-hmm.
21      Q.   Okay.  You talked a little bit about what
22  you would do when you received evidence and the chain of
23  custody, and how careful you were to document everything.
24           I just want to ask a few questions about

126

1  evidence -- evidence storage and handling in the
2  laboratory.
3       A.   Mm-hmm.
4       Q.   Do you have experience with how to store and
5  handle evidence?
6       A.   I do.
7       Q.   And are there policies and protocols at ISP
8  about how to safely handle evidence?
9       A.   There is protocols as to safely handle it,
10  how to mark it, and how to store it, and it's placed in a
11  secured area of limited access.
12      Q.   And why -- why are those policies important?
13  Why is it important to --
14      A.   So you can maintain chain of custody.
15      Q.   And what about the way that bullets -- the
16  way that evidence is -- is stored in terms of maintaining
17  the integrity of the evidence itself?
18      A.   To the best of my recollection, it's
19  returned to -- it's returned into the same packaging --
20  put into the same packaging that was submitted in and
21  then sealed up and returned.
22      Q.   Would two -- would two pieces of fired
23  evidence, for example, ever be stored in the same
24  canister?

127

1    A.   Possibly, yeah.  But I mean, if the -- if
2  they were submitted individually, then they would be
3  returned individually.
4    Q.   Mm-hmm.
5       Is there -- are you aware of any -- any
6  instances of -- of examiners damaging evidence or
7  mishandling it such that it would impart marks to it --
8    A.   No.
9    Q.   -- or -- or remove marks?
10   A.   No.
11   Q.   What about the storage process?  Have you
12  ever heard of evidence -- fired-bullet evidence being
13  stored in a way that would cause it to degrade or change
14  over time?
15   A.   No.  If I can add to that, just --
16   Q.   Sure.
17   A.   If it -- if it's after it leaves the
18  laboratory, and if it's stored, you know, in, like,
19  different conditions or something like that, but when
20  it's at the laboratory, it's secured and limited access
21  in a dry place, and so --
22   Q.   Is the evidence generally stored in airtight
23  or watertight containers?
24   A.   No.  It's -- again, it's -- as I indicated

128

1  earlier, whatever it came in is what we returned it in.
2    Q.   Are film canisters, does that sound familiar
3  in terms of a way to store -- store fired-bullet
4  evidence?
5    A.   Yeah.  The submitting agencies have used
6  those and placed them in there.  You know, what we might
7  do, like, an additional -- wrap it in paper or something
8  and then put it in -- back into the original packaging.
9  But other than that, you know, it's returned in the same
10  packaging it was submitted in.
11   Q.   I just want to cover -- we -- we chatted a
12  while ago about the kinds of conclusions that examiners
13  can come to.
14   A.   Mm-hmm.
15   Q.   How would you define the standard for
16  identification at ISP?
17   A.   Well, there's -- an identification is where
18  there is an agreement in reproducibility of individual
19  similarity and individual and class characteristics.
20   Q.   Does it have to be 100 percent, perfectly
21  exact in terms of the similar -- like, an exact replica?
22       MR. BHAVE:  Objection; form.
23  BY MS. TINGSTAD:
24   Q.   What's the standard in terms of the

129

1  exactness of how the two items that are identified have
2  to compare?
3    A.   It's -- it's -- there's agreement in class
4  and individual characteristics.  It's -- it's not
5  quantitative.  You know, it -- it's what you see, and
6  it's quality, and it's the contour of -- of the land and
7  groove impressions and all the other forms of agreement
8  that are present there microscopically.
9    Q.   What about an inconclusive?
10   A.   An inconclusive will have similar class
11  characteristics, but insufficient markings to make it --
12  in order to call it a positive identification.
13   Q.   And what about an exclusion?
14   A.   An exclusion would be -- in the
15  example-to-fired evidence is five right and they both --
16  the -- is five right and the gun submitted is six left.
17  There's no way in God's green Earth that that bullet was
18  fired from that -- from that gun.
19   Q.   Would you -- is it possible to have an
20  elimination where class characteristics do line up, but
21  there is not sufficient individual characteristics that
22  -- that line up?
23   A.   Yeah.  That would be -- that would be an
24  inconclusive, but then it has to do with -- what happened

130

1  to the gun from the commission of the crime to when it's
2  submitted.  I don't know if I -- you know, did something
3  happen to that gun between the commission of the crime
4  and it was submitted to the laboratory, or did something
5  happen to it afterwards?  So you can have class
6  characteristics but not individual characteristics, and
7  that would be -- that would be an inconclusive.
8    Q.   Is it possible that -- are there -- are
9  there -- let's -- let's -- let me put it this way:  If
10  there are two separate guns of the same class, let's say,
11  you know, the same exact make and model, different serial
12  numbers, different guns, the fired bullet evidence -- the
13  fired bullets that come out of those two separate guns
14  would always have the same class characteristics,
15  correct?
16   A.   Correct, correct.
17   Q.   But would you -- would you be able to
18  eliminate fired-bullet evidence coming from two separate
19  guns based, not on the class characteristics, but based
20  on quantity of differences in individual characteristics?
21   A.   Again, depending on what the gun has been
22  through.  But, yes, you could eliminate it if you knew
23  the history of the gun.  That could also be an exclusion.
24   Q.   What kinds of things could happen to guns --

131

1    A. An inconclusive.

2    Q. An inconclusive.

3    A. I mean, it's -- there's microscopic
4 irregularities that are imparted on the gun during its
5 manufacturing process --

6    Q. Mm-hmm.

7    A. -- during the use and abuse and wear of that
8 gun as well.

9    Q. Would -- strike that.

10    Okay. Is the standard, though -- the
11 standard for an identification or an elimination or an --
12 the standard is a subjective one in the end, correct?

13    A. Yes.

14    Q. It's based on the training and experience of
15 the -- of the firearm examiner who is making that
16 determination?

17    A. It's based on -- yes.

18    Q. Do you recall testifying in the '90s that a
19 gun was a match to the exclusion of all other guns in the
20 world? Do you recall ever testifying to that?

21    A. Yeah. That was terminology that we used
22 that, and in turn, it has been modified, eliminated,
23 because by saying "to the exclusion of all others", the
24 presumption is that you fired every other -- you fired

132

1 all guns in the world or all, you know -- and that is not
2 -- not, in fact, the case, you know. Based upon what was
3 submitted to us and -- and so on.

4    Q. All right. And just for the sake of time,
5 the -- the discussion about your testimony about the
6 reproducibility and the process of looking test-to-test,
7 and then test-to-questioned, would that also apply to
8 your analysis of fired bullets, as well as cartridge
9 cases?

10    A. Yes.

11    Q. Okay.

12    A. Yes.

13    Q. We don't have to go through all that then
14 with the fired bullets.

15    Have you ever been asked as a firearms
16 examiner to conduct an analysis of -- to evidence of --
17 of evidence that's been picked up where there isn't a
18 weapon that -- a suspected weapon to look at --

19    A. Yes.

20    Q. -- to look at evidence?

21    A. Yes, I have.

22    Q. And can you talk about that process?

23    A. Well, there's individuality that's on -- on
24 that evidence, but since there is no gun in question, you

133

1 know you can determine that the fired bullets were fired
2 from the same gun.

3    Q. Mm-hmm.

4    A. The cartridge cases were fired from the same
5 gun, but since you don't have a -- in the case of
6 semi-automatic pistols, but you don't have the gun, so
7 you can't say absolutely -- that you're absolutely certain
8 that those -- the bullet in the cartridge case were a one
9 time -- one ammunition component, you know, because you
10 don't have the gun.

11    Q. Mm-hmm.

12    A. So you say the cartridge cases were fired
13 from the same gun, and the bullets were fired from the
14 same gun.

15    Q. Were you ever asked to go further and give
16 your opinion as to what type of weapon fired the gun?

17    A. Yes. You measure the -- the land and groove
18 impressions, and then you are able to discern the types
19 of guns that would have fired -- the manufacturer of the
20 guns that could have fired that evidence.

21    Q. So that would be sort of trying to narrow --
22 narrow the types of guns that could have -- narrow the
23 universe of the types of guns that could have fired?

24    A. Yes, yes, that's correct.

134

1    Q. And these kinds of comparisons that you're
2 referring to, they would've been done under a microscope,
3 correct?

4    A. That would be done under microscope, and you
5 measure -- measure the measurements of the land -- land
6 and groove impressions.

7    Q. Would you then generate notes -- notes or
8 worksheets based on that -- that microscopic examination
9 and --

10    A. Yeah, I would make notes. There's a --
11 there's actually a database that's compiled by the FBI.
12 It's called a GRC, General Rifling Characteristics
13 Database. And you -- you put in the dimensions of the
14 land and groove impressions, and it gives you a list of
15 possible weapons that could have fired that fired bullet;
16 however, when you write the report, you say that the
17 possible weapons that could've fired, say, a bullet --
18 that's five lands and grooves, right-hand twist would
19 include Smith and Wesson, Taurus, and Rossi -- I'm just
20 naming them as examples.

21    Q. Right.

22    A. But that -- not that it's necessarily true
23 but -- and other firearms with similar rifling
24 characteristics.

135

1    And you qualify that for the fact that there
2 might be guns out there that are not in that database
3 that the FBI compiled.
4    Q.   And that -- that -- there's actually a
5 protocol as to what that report -- what the language of a
6 report like that would say?
7    A.   Yes.
8    Q.   Do you recall if that -- do you recall if
9 that -- when that wording went into place or when that
10 wording was instituted for these kinds of investigative
11 examinations?
12    A.   You know, I don't know.  I've always used
13 it, but as far as when it was instituted specifically, I
14 really couldn't tell you.
15    Q.   Would you have used it, like, even back in
16 -- in the -- when you were a forensic one examiner back
17 in 1985?
18    A.   I think there's -- I think there's a
19 distinct possibility, yes.  It qualified because that
20 database is not all inclusive.
21    Q.   In your experience, have you ever conducted
22 one of these investigative -- I'm going to call it an
23 investigative examination, where you're just looking at
24 evidence, but there's no gun yet to compare it to; is

136

1 that fair?
2    A.   Kind of like a preliminary examination or
3 something?
4    Q.   Sure.  We can call it a preliminary
5 examination just to make sure we are all clear.
6    So in that kind of preliminary examination
7 that you just described, did you -- have you ever
8 conducted one of those and then the firearm would be
9 submitted to the lab -- like, later a firearm would be
10 submitted, and then you would go ahead and proceed with
11 the full forensic examination?
12    A.   I -- I -- you know, personally, I don't
13 recall having to do that.  I've heard of individuals
14 doing that, not with the State Police, but with other
15 agencies, and it's something that's done informally to
16 provide an investigative lead to the submitting agency,
17 but it's not -- it's not written -- well, it's not --
18 it's not bonafide until it's in the report.
19    Q.   Okay.  Until the preliminary examination
20 results are in the report, is what you are saying?
21    A.   Correct.
22    Q.   So once -- once an examiner has done a
23 preliminary examination like that, and then maybe through
24 -- into further investigation, the police recover a

137

1 weapon, that's a suspected weapon, have you ever sort of
2 then done the second part of that, that full
3 investigation or the full comparison with the suspected
4 weapon of the evidence that you already preliminarily
5 looked at?  I'm just asking if that's ever happened in
6 your career?
7    A.   Personally, I have not, no.
8    Q.   You have not, okay.
9    A.   Personally have not, no.
10    Q.   In your experience, have you ever seen --
11 have you ever seen or -- evidence that has been examined
12 preliminarily by one lab, then be moved to a different
13 lab for full examination?  Have you ever seen evidence
14 being moved from one lab to another lab?
15    A.   I -- I've heard about it, but I've never
16 seen it.
17    Q.   And what -- what have you heard about it?
18    A.   Well, I -- individuals that I talked to at
19 seminars, you know.  They'll say they'll give a
20 preliminary and then write a report later.  You know,
21 it's just a courtesy to the -- to the -- to the -- it's
22 an investigative lead, excuse me, to the agency involved.
23    Q.   Okay.  So once the investigative lead is
24 done, and let's say the agency recovers a weapon that

138

1 they think is the weapon that fired the questioned
2 evidence, at that point, have -- have you ever heard of
3 -- of an investigator who did the preliminary, then for
4 whatever reason sending that evidence to another lab in
5 another city to be reviewed or examined?
6    A.   Yeah.  I don't know what you -- you know,
7 preliminarily, if -- if -- you know, I indicated the GRC
8 problem with the FBI.  You know, preliminarily, I would
9 say, there's these three guns or something else that's of
10 similar rifling characteristics that's not included in
11 the database.
12    So, you know, if that provide -- if that --
13 you know, of those three that I mentioned, there's one
14 that's out there that they submit, that's -- then that's
15 -- that's the way it -- then that's -- that's what it is.
16    But I don't understand your question.
17    Q.   Okay.  I -- I get it that you don't
18 understand.
19    Did -- have you ever sent cases that you've
20 already looked at -- have you ever sent evidence that
21 you've already looked at to another lab that there was --
22 evidence that's already in your possession, have you ever
23 sent it to another lab?
24    A.   No, no.

139

1    Q.  Have you ever heard of that happening
2  before?
3        A.  No, no, not -- none that I recall, no.
4        Q.  When you were working in Broadview, do you
5  recall ever receiving evidence from Rockford or the
6  Rockford lab for your review?
7        A.  I certainly could've worked cases from them,
8  but I don't -- you know, I don't recall specifically what
9  they were because if they had a backlog, you know, cases
10  from Fairview Heights and Rockford and the like.
11       Q.  And you would be working cases from Rockford
12  because the examiner in Rockford had a backlog?
13       A.  Correct.
14       Q.  Can you think of any other reason why you
15  would be working a Rockford case?
16       A.  No.
17       Q.  Okay.
18       A.  I mean, a backlog or they were on vacation,
19  but those would be the only reasons.
20       Q.  Mr. Striupaitis, what's your experience with
21  IBIS?
22       A.  I've made entries.  I was trained in it, and
23  I made entries with IBIS, so I have some experience with
24  it, more so with cartridge cases than with fired -- with

140

1  fired bullets.
2        Q.  Just for the record, can you tell us what
3  IBIS is?
4        A.  It's the identification ballistics --
5  Integrated Ballistics Identification System, and it's a
6  video imagery database that enables you to take images of
7  fired evidence and put it into a database, and then, in
8  turn, the database will -- when you get the suspect
9  cartridge case -- because fired bullets have been pretty
10  much eliminated from what I understand and only cartridge
11  cases are entered.
12       Q.  Okay.
13       A.  So you receive a cartridge case and place it
14  into the system.  It'll come back with a list of -- just
15  like that GRC, a list of possibles only with images, as
16  far as, you know, correspondent -- correspondent
17  cartridge cases that could've been fired with the one
18  that you submitted, the one in question.
19       Q.  About how many times have you entered
20  evidence into IBIS?
21       A.  Oh, God, I don't know.  I didn't -- I didn't
22  do it with the State Police.  I worked with another lab,
23  and when I showed up at the lab, there was a 300-case
24  backlog, so I don't know.  It was -- it was quite

141

1  quite a number.  In the hundreds, let's just say.
2        Q.  Have you ever gotten a hit of a potential
3  match with something you have entered into IBIS?
4        A.  Yeah.  On occasion.
5        Q.  And then after you get the hit, what -- what
6  happens next?
7        A.  After the hit, then you -- you -- you
8  recover the actual evidence, and then you look at the
9  evidence microscopically, and then you base your
10  identification on the actual evidence.
11       Q.  Did you ever identify anything?
12       A.  IBIS -- IBIS is used as a search tool.
13       Q.  As a search tool.
14       A.  Mm-hmm.
15       Q.  Did you ever make an identification based on
16  a potential hit that IBIS identified?
17       A.  I -- you -- it sounds like you're repeating
18  yourself.
19       Q.  I'm just asking if you -- if you've ever
20  actually made an identification under a microscope of
21  evidence that's been linked by IBIS?
22       A.  Under microscope, yes.  Of something that --
23  of something that IBIS said was a hit, yes, but only made
24  the identification --

142

1        Q.  And under the --
2        A.  -- only made the identification after I
3  reviewed the -- under the microscope, yes.
4        Q.  And IBIS, it gives a list of low-confidence
5  matches and a list of high-confidence matches, correct?
6        A.  Yeah.  I've -- there's -- from what I
7  recall, it's been sometime now because I left that lab in
8  2000 and -- when did I leave, '11 or '12.
9            So, yeah, it gives you, like -- there's,
10  like -- just, like, a way -- you know, a high priority,
11  low priority, to that effect, and then you look at those,
12  and you make it -- you go -- you go from there.  And then
13  you -- when you think there's a possible candidate, you
14  get the actual evidence and look at it under -- under a
15  -- you look at it microscopically.
16       Q.  If two cartridge cases were fired from the
17  same gun --
18       A.  Mm-hmm.
19       Q.  -- and they were both entered into IBIS,
20  would you expect that they would reflect a high or a
21  low-confidence result in IBIS?
22       A.  I would expect that they would have a high
23  -- high result if, in fact, the cartridge cases were of
24  the same manufacturer.  If they were a different

143

1  manufacturer, you might not get a high-confidence score.
2      Q.  You may get a low confidence?
3          What if they were in the same --
4      A.  Yeah, a low confidence.
5      Q.  Okay.  What if they were in the same -- made
6  of the same metal, the same -- the same finish or the
7  same metal?  Would you expect that?
8      A.  Yes.  I can't -- I can't reiterate enough,
9  it has to be the same manufacturer, the same everything.
10     Q.  Okay.
11     A.  Yeah.
12     Q.  You mentioned in the first part of your
13 deposition that you are past president of AOFTE?
14     A.  Yes, ma'am.
15     Q.  And you are a fellow member of the American
16 Academy of Forensic Sciences?
17     A.  Correct.
18     Q.  And an emeritus life active member of the
19 International Association For Identification?
20     A.  That's correct, emeritus.
21     Q.  Emeritus.
22     A.  Yes.
23     Q.  In your professional career and
24 associations, have you had a chance to get to know a

144

1  fellow examiner by the name of John Murdock?
2      A.  Yes, I have.
3      Q.  And what is your --
4      A.  I know who John Murdock is.
5      Q.  And how do you know who he is?
6      A.  I know him as an examiner that works with --
7  out in California, and that he worked with a certain
8  county, and he actually worked at the ATF lab for a
9  while, that he was on some committees of AOFTE.
10     Q.  Have you ever met him personally?
11     A.  I'm sorry.  You -- seems like you're frozen.
12     Q.  I know.  You are freezing, too, a little
13 bit.
14         Have you ever met him personally?
15     A.  Yeah, sure.  John was -- I -- I taught at --
16 yes, I have.  John -- I taught a training module with
17 ATF, and John would be there in the training capacity,
18 and I would meet him there, and I would meet him at AOFTE
19 seminars as well.
20     Q.  In your -- from your knowledge, does he have
21 a good reputation in the industry?
22     A.  Yes, from what I understand.  He uses a
23 different method to make his identifications, but other
24 than that, from what I understand, he does have a good

145

1  reputation.
2      Q.  What do you mean by a different method?
3  What do you understand to be the differences?
4      A.  I'm sorry?
5      Q.  I'm just asking:  What do you understand to
6  be the different method?  Is it the -- the AOFTE theory
7  of identification?
8      A.  He uses -- there is -- there is -- he uses
9  the consecutive matching stria method to where he counts
10 lines of land impressions, and that's used by a small
11 group of individuals in northern California.  And
12 everybody else uses the traditional method that I use and
13 others use.
14     Q.  And that counting stria, that would imply to
15 bullets, correct?
16     A.  Correct.
17     Q.  When it comes to cartridge cases, do you --
18 are you -- are you both -- would you say -- well --
19     A.  Of the same wavelength?  Yeah.
20     Q.  Same wavelength?
21     A.  Yeah.
22     Q.  Okay.  Do you know an examiner by the name
23 of Chris Coleman?
24     A.  No, I do not.

146

1      Q.  Mr. Striupaitis, did you prepare for the
2  deposition today?  You keep freezing.  I don't know why.
3      A.  I don't know what you mean by "prepare" for
4  today.  Did I -- did I, like --
5      Q.  Did you review documents?
6      A.  Other than what Sunil sent me, that was
7  basically it.
8      Q.  Do you -- what documents did you review?
9      A.  Formal, like, --
10     Q.  Formal -- I'm having a hard time
11 understanding.
12         You reviewed formal court things, you said?
13     A.  Yeah.  Formal court documentation that, you
14 know, had whoever was the plaintiff and stuff like that,
15 and other objectives or whatever in there, and the --
16 just a few pages.
17     Q.  Okay.  And don't tell me anything you -- you
18 discussed with your lawyer, but did you discuss -- did
19 you just discuss with your lawyer this deposition today?
20 Did you talk -- talk with him about it?
21     A.  Well, yeah.  We -- you know, we discussed --
22 I mean, I taught courtroom performance in -- with the
23 State Police, and, you know, usually it's -- we're
24 experts in criminal trials and -- and we don't -- we

147

1  don't do that many depositions, but I've done -- I've
2  done a few depositions in the past, so I'm -- I'm
3  familiar with them.
4      Q.  What -- when have you been deposed in the
5  past?
6      A.  There was a case that I was hired by an
7  individual -- by a lawyer in California who represented
8  Beretta.
9      Q.  Okay.
10     A.  And -- and the lawyers on the other side
11 were the Cochran Group.
12     Q.  Okay.
13     A.  They wanted to know whether or not the
14 Beretta made these markings on cartridge cases.
15     Q.  So you were an expert in that case?
16     A.  I was -- it was a private case, yes.
17     Q.  And -- and how many other depositions have
18 you given?
19     A.  I think there was one other with the State
20 Police, but I don't recall when or the particulars.
21     Q.  Was that as an expert?
22     A.  Yes.
23     Q.  Have you ever been a defendant in a case?
24     A.  What do you -- did I -- what do you mean --

148

1  did I --
2      Q.  Like, have you ever been sued before?
3      A.  No.
4      Q.  Have you ever been sued?
5      A.  No.
6      Q.  Okay.
7      A.  No, I have not.
8      Q.  Okay.  Have -- did you talk with anyone
9  other than your lawyer about this case?
10     A.  No.
11     Q.  Did you talk with anyone about your
12 deposition today other than your lawyer?
13     A.  Other than saying I was going into Chicago
14 for a deposition, no.
15     Q.  Do you know some of the other defendants in
16 this case?
17     A.  Dan -- Dan Gunnell.
18     Q.  Yeah.
19     A.  And you named some of the others.  Jack
20 Welty.
21     Q.  You know him?
22     A.  Yeah, I know him.  And then -- because he
23 was -- he was lead director -- assistant lead director in
24 Juliette, and then he went to Rockford, and he's a former

149

1  firearms examiner.
2      Q.  And what about Beth Patty, do you know her?
3      A.  Yeah, I know Patty.  She was one of my --
4  one of my trainees -- strike that.
5          She worked at the lab.  Danny actually
6  trained her.  I have worked with her.  She was in
7  Chicago.  Then she transferred to Springfield.
8      Q.  And when you say "Danny", you mean
9  Dan Gunnell trained Patty?
10     A.  Gunnell.  We were like, you know, there was
11 Danny, you know, that -- I mean, call me -- but -- but it
12 was Danny, yeah.
13     Q.  So it's fair to say that you were pretty
14 close?
15     A.  Well, it's fair to say that he's past
16 president of AOFTE, and I'm past president of AOFTE, so
17 there was -- there's that connection.
18     Q.  And you worked together in the same lab,
19 too, right?
20     A.  Correct.  Correct.
21     Q.  And you also worked in the same lab with
22 Beth Patty and Dan Gunnell?
23     A.  Daniel -- yeah.  Daniel was the training
24 coordinator.  She worked the cases, and I taught at the

150

1  University of Illinois, Chicago.
2      Q.  Have you ever worked in the same lab with
3  Jack Welty?
4      A.  When he was in Juliette, but he was in an
5  administrative capacity.  I believe he was assistant lab
6  director, and I was a trainee.
7      Q.  Have you talked with any of those other
8  defendants about this case?
9      A.  No.
10     Q.  None at all?
11     A.  Well, we had a -- we had a conference call
12 with -- it was Dan and Jack and myself, and we talked
13 about --
14         MR. BHAVE:  I'm going -- I'm going to
15 instruct Mr. Striupaitis not to disclose the
16 conversations of this meeting because that is
17 covered by the attorney/client privilege.  All
18 the defendants have a common-interest defense.
19         MS. TINGSTAD:  Mr. -- Mr. Sunil, were
20 you present on that call?
21         MR. BHAVE:  I was.
22 BY MS. TINGSTAD:
23     Q.  Did you ever talk with the other defendants
24 when your attorney wasn't present?  Like, have a

151

1 conference call without your attorney?
2 **A. You're directing that to me?**
3 Q. Yes.
4 **A. No.**
5 Q. Outside of having a conference call, have
6 you -- have you spoken with any of the other defendants
7 in the last year or so?
8 **A. No.**
9 MS. TINGSTAD: Mr. Striupaitis, it's
10 12:15 your time. Would you -- do you want to
11 break for lunch, or do you want to just
12 continue?
13 THE WITNESS: No. Let's just keep on
14 going.
15 MS. TINGSTAD: Okay.
16 BY MS. TINGSTAD:
17 Q. Do you remember Patrick's Pursley's --
18 Patrick Pursley's case from 1993?
19 **A. No.**
20 Q. In 1993, you were no longer assistant lab
21 director in Broadview branch, correct?
22 **A. Correct. I was working cases then.**
23 Q. You were -- you were working as a forensics
24 examiner in the Broadview branch lab?

152

1 **A. Yeah. And also was a coordinator for**
2 **another imaging program before IBIS —**
3 Q. The precursor to IBIS?
4 **A. — and I was training people.**
5 **Excuse me?**
6 Q. I said, the precursor to IBIS?
7 **A. There were two systems. One was done by —**
8 **there were two systems. One was done by the ATF, and the**
9 **other by the FBI.**
10 (Whereupon, there was a discussion held off
11 the record.)
12
13 BY MS. TINGSTAD:
14 Q. Mr. Striupaitis --
15 **A. There were two systems.**
16 Q. Go ahead, Mr. Striupaitis. You can answer
17 the question.
18 **A. Well, besides being an examiner, I was also**
19 **a training coordinator to train technicians, and then**
20 **another video imagery program, which was called Drug**
21 **Flyer. It was run by the FBI. And then the other one,**
22 **which was a precursor was IBIS, which was called**
23 **"Bulletproof" was used but — when Drug Flyer is no**
24 **longer — no longer used a video imagery program.**

153

1 Q. Why did you step -- why did you decide to
2 move from assistant lab director back to forensic
3 examiner?
4 **A. Well, because our — our system became**
5 **unionized, and my subordinates were making more money**
6 **than I was, and they were — had worked less time.**
7 **So the Bureau was gracious enough to let me**
8 **back on the bench and recoup a little bit. But then they**
9 **— then I started with the administrative duties, then I**
10 **got back to a nonunion position, let's just say.**
11 **So, you know, it's — it's a State Police**
12 **organization, and they ask you to do certain things, but**
13 **it bugged me that, you know, people with less time than**
14 **me were making more money, and they were gracious enough,**
15 **like I said, to allow me to go back on the bench and**
16 **recoup.**
17 **But then once I get back into the**
18 **administrative thing, it'd be the same old story again.**
19 **You know, it's — it's just the nature of — of that kind**
20 **of thing.**
21 Q. So you had -- you had been a forensic
22 examiner doing your own independent cases from 1982 to
23 1985 for about three years. Then for seven years, you
24 were assistant lab director doing more administrative

154

1 work?
2 **A. Some verifications.**
3 Q. And some verifications?
4 **A. Right.**
5 Q. And then -- and then you moved back to being
6 a forensic examiner in 19 -- around 1992? When was it?
7 **A. 1993.**
8 Q. In 1993, you became a forensic examiner
9 again?
10 **A. Correct.**
11 Q. Did you have to do any refresher courses,
12 anything like that?
13 **A. Other than — other than doing verifications**
14 **and reading the AOFTE general — excuse me, AOFTE Journal**
15 **and going to AOFTE seminars, yeah, if you call those**
16 **refresher courses, and maintain continuing education**
17 **throughout.**
18 Q. And so do you remember, like, what month or
19 season you went back to the bench in 1993? I mean, was
20 it fall, was it winter? Do you, you remember?
21 **A. No, I actually really don't.**
22 Q. Okay. The Broadview Lab at the time, I
23 think you said before Dan Gunnell was also on the bench
24 as a -- as a firearms examiner in Broadview in 1993. Was

155

1 there anyone else there working firearms cases?

2     **A. Correct.**

3     Q. Just the two of you?

4     **A. I think somewhere along the process, Don**

5 **Smith showed up. He retired from the Chicago Police**

6 **Department and came onboard with the State Police. I**

7 **don't recall specifically when that -- when that**

8 **occurred.**

9     Q. You don't recall if this was 1993 or not?

10 Yes or no?

11     **A. I really don't. I think -- I think it**

12 **could've been around there, but I don't recall**

13 **specifically.**

14     Q. So when -- when cases came into the

15 Broadview Lab or Broadview branch when you were working

16 the bench, did you -- did you and -- like, how did you

17 determine who was going to take the case between you and

18 Dan?

19     **A. There was -- well, since I have -- even**

20 **though I had ancillary duties as far as training those**

21 **individuals in that video imagery system, I was still**

22 **considered a three, so I would also work cases.**

23     **So, you know, there were -- you know, I**

24 **believe -- I believe Don Smith was there at that point in**

156

1 time. There are plenty of cases to go around, and, you

2 know, it was, like, whatever is up next, you grab the

3 case, and you just work it that way.

4     Q. Did you -- would you say because of your

5 ancillary duties, that you did fewer forensic cases than

6 the other examiners?

7     **A. No, no. I worked -- I worked just as many.**

8     Q. So was that about ten -- I'm sorry. I wrote

9 down earlier what you said.

10     **A. 10 to 15 a month or -- I mean, it was**

11 **actually a little -- because I had -- of my duties with**

12 **-- to -- the technicians were trained to test fire guns**

13 **to put into the system, or they were going to be putting**

14 **it into the system, and there were others that -- that I**

15 **trained that were putting into the system already.**

16     **So, I mean, I was doing casework, and -- and**

17 **doing other duties, as well.**

18     Q. And at that time, when you were acting as a

19 forensic examiner with Dan Gunnell, did you also act as

20 each other's verifier, or was there someone else in the

21 lab who verified your cases?

22     **A. I believe we acted as each other's verifier,**

23 **and I think there's a possibility Don Smith was there as**

24 **well.**

157

1     Q. So in -- in 1993 when you were working --

2 when you joined Dan Gunnell on the bench, did you have

3 more experience than him or -- or who -- who was the more

4 senior person there? Oh, you froze.

5     **A. I think that would have been me.**

6     Q. Does it sound about right to you that

7 Dan Gunnell started his training in 1990 and finished in

8 1992?

9     **A. And then certainly when Don Smith showed up.**

10     Q. I -- I missed what you said. Can you repeat

11 that? I'm sorry.

12     **A. That's sounds about right.**

13     Q. So when you started working --

14     **A. That sounds about right because he trained**

15 **down in Carbondale and then came up.**

16     Q. So when you started working with him, he had

17 been at -- doing examinations for about a year

18 independently?

19     **A. If that's what your timeframe indicates,**

20 **yes.**

21     Q. How often did you verify Dan Gunnell's work

22 at that time?

23     **A. It would have been all the time until**

24 **Don Smith showed up.**

158

1     Q. And what did you think of the quality of

2 Mr. Gunnell's work?

3     **A. I think it was -- it was good quality work.**

4     Q. Okay. I'm going to show you what I'm going

5 to mark as Exhibit 1 because I -- I know that --

6     MS. TINGSTAD: We can go off the record

7     for just one second.

8     (Whereupon, the proceedings went off the

9     record at 12:26 p.m. through 12:27 p.m.)

10     (Whereupon, Exhibit Number 1 was marked for

11     identification.)

12 BY MS. TINGSTAD:

13     Q. Mr. Striupaitis, I'm going to show you a

14 document that I'm going to mark as Exhibit 1. It is RFD

15 Defense 175 through 177.

16     **A. Is that up on the screen here somewhere**

17 **or --**

18     Q. Your lawyer, I think --

19     **A. Could you repeat that again?**

20     Q. It's RF -- RFD Defense 175 through 177. I

21 can put it on the screen if that's helpful.

22     MR. BHAVE: Can you just -- what's the

23     document?

24     MS. TINGSTAD: Sure. It's the evidence

159

1      receipt.
2          MR. BHAVE:  Yep.  I'll get it for him.
3  BY MS. TINGSTAD:
4      Q.  It's easier for me if I'm looking at you,
5  but I can put it up on the screen, if necessary.
6          MR. BHAVE:  175 RFD Defendants [sic] to
7      177?
8          MS. TINGSTAD:  Yes, that's correct.
9          MR. BHAVE:  Okay.  He's got it.
10          THE WITNESS:  I have it now in front of
11  me.
12  BY MS. TINGSTAD:
13      Q.  Will you just take a few minutes to look at
14  that, Mr. Striupaitis.  Take your time.
15      A.  I see my signature is on here.
16      Q.  Yeah.
17          So what is this document, Mr. Striupaitis?
18      A.  This is an evidence receipt document that's
19  -- generally, it's pink in color, and the submitting
20  agency submits it, and they indicate who's the victim,
21  what the offense is, and their agency numbers, and they
22  put a -- the laboratory in Rockford puts their laboratory
23  casing in the upper right-hand corner.
24          Then when we go through the evidence and

160

1  mark it, and then, in turn, the lab takes custody of it.
2      Q.  And, Mr. Striupaitis, is that your signature
3  on the first page and the second page in the "received
4  by" column?
5      A.  First page, items -- yes, it is.
6      Q.  Okay.  Do you -- do you have any independent
7  recollection of -- of receiving evidence and signing your
8  name on this document?
9      A.  No.
10      Q.  So let's just take a look at the first page
11  under the evidence description, it indicates that a
12  "sealed baggy containing film containers -- containing
13  film containers with bullet fragments, a sealed baggy
14  containing two film containers with spent casings, sealed
15  baggy containing fired bullet, sealed bag containing
16  spent bullet."  This is the way that these items were
17  packaged.
18          Do you see any -- anything strange about
19  that, or is that normal?
20      A.  It seems to -- appears to be normal.  The --
21  the column on the left with the items 1 through 4 is -- I
22  guess was a darker shade of pink or something because it
23  just barely comes through.  It seems to be in order.
24      Q.  Okay.  And then down below when it says

161

1  "received from" and "received by", I'm just going to go
2  through these lines here on June 9th, received from
3  Charlene Getty or C. Getty.  I'm sorry.  I don't want to
4  -- "C. Getty to/received by Jack Welty".  Do you see
5  that?
6      A.  Yeah, I see it.
7      Q.  Okay.  So that would be Mr. Welty.
8          And it looks like two days later on June
9  11th, the items are returned to the firearms section
10  evidence vault received by Emily Ann -- someone.  Do you
11  see that?
12      A.  Yeah.
13      Q.  Would that indicate that the firearm
14  inspection evidence vault is -- would be at the police
15  department, correct?
16      A.  At the laboratory.
17      Q.  At the laboratory.  Okay.  At the -- at the
18  ISP laboratory.  Is that what you call your evidence
19  vault?
20      A.  Yeah, because the Leanne Gray was a worker
21  at the -- at the laboratory in Hartford.
22      Q.  Got it.  So this means that Jack -- so would
23  be in the possession of Jack Welty for two days and then
24  go into the vault.

162

1          Then after that, later that day, 20 minutes
2  later, it looks like from 9:00 -- at 9:20 a.m.,
3  Leanne Gray removed the items from the evidence fault and
4  gave them to someone named John Genes.  Do you see that?
5      A.  Yes, I do.  I see it.  I'm reading the
6  evidence report along with you.
7      Q.  Then the next line indicates that on the
8  same date, June 11th at 10:10 a.m., John Genes gave the
9  items to someone named Greg Hanson.  Do you see that?
10      A.  Yes.
11      Q.  And then the following line indicates on the
12  same day at 12:27, Greg Hanson handed that -- those items
13  off to you, Pete Striupaitis.  Do you see that?
14      A.  Yes, I do.
15      Q.  Do you -- do you know Greg Hanson?
16      A.  No, I do not.
17      Q.  Okay.  Let's look at the -- the next page.
18  This page includes numbered items 5, 6, 7, 8, 9, 10, 11,
19  12.  So continuing the list of items from the first page,
20  is that -- is that fair?
21      A.  Yes.
22      Q.  And it also indicates in that bottom section
23  that on June 11th, at 12:28, it looks like Greg Hanson
24  gave these items to you, Pete Striupaitis; is that fair?

163

1    A.  Yes, that's correct.
2    Q.  Okay.  And at the very bottom, there is a
3  typed message at the bottom of this page that says,
4  "Compare above evidence with four pieces of evidence
5  submitted to Rockford lab on 6/9/93."
6        Do you see that?  It's at the very bottom?
7    A.  Yes, I do.
8    Q.  And that indicates --
9    A.  Compare them.
10    Q.  Yeah.  The four pieces of evidence had
11 already been submitted to the Rockford lab, and then
12 taken to your lab two hours away in Broadview; is that
13 correct?
14    A.  I -- you know, I see what -- okay.  "Compare
15 the evidence with four pieces of evidence submitted to
16 the Rockford lab on 6/9."  Okay.  That's what was -- was
17 given to Welty, and then subsequently, that stuff was
18 delivered on the 11th.
19    Q.  To Broadview?
20    A.  So -- and then compare -- compare 5 through
21 12 through -- 1 through 4.  Yeah.  Okay.  Makes sense.
22    Q.  Did you receive these items on June 11th,
23 and when were you the one who signed for the items in the
24 lab?

164

1    A.  I was probably there, and they asked for a
2  firearms person.  You know, it was in close proximity.
3  This was 12:27?
4    Q.  It was, yeah, 12:28 p.m., it looks like,
5  lunchtime.
6    A.  So probably people were out to lunch, and
7  they said, "You're a firearms guy, you sign it in."
8    Q.  Okay.  Did you know anything about this case
9  when you received -- when you received these -- the --
10 these items?
11    A.  No, I did not.  No, I did not.
12    Q.  Do you recall speaking with Greg Hanson at
13 all about the nature of the items he was delivering?
14    A.  No, I don't recall.
15    Q.  Would you have at this point signed in the
16 items, but at this point, nobody opened all of the bags
17 yet, right?  You're just signing them in but not opening
18 everything up?
19    A.  Well, at the top, and it looks like it's my
20 handwriting.  It says, "The below, received in one sealed
21 brown paper bag, alleged to contain the following".  It
22 was in a sealed brown paper bag, those items 1 through 4.
23        And then items were -- "items 5 through 12
24 were received in one sealed brown paper bag alleged to

165

1  contain the following," so --
2    Q.  Why do you write that language?  Why do you
3  include that language there?
4    A.  Because I don't know what's in the bag.
5    Q.  Okay.  Was that standard procedure?
6    A.  It was the standard -- standard writing that
7  I used, and I picked it up from somewhere.  I don't know
8  if it was written somewhere or -- or whatever, but that's
9  certainly what I used.
10    Q.  You said earlier that you hadn't heard of
11 any cases where one lab would look at items and then send
12 the items to another lab to be examined.  And does this
13 reflect -- does this -- does this refresh your
14 recollection that this -- that -- that this happened in
15 this case?
16    A.  All it indicates to me is that the Rockford
17 lab had evidence, and then, in turn, they submitted it to
18 us.
19    Q.  Okay.  Are you aware that Jack Welty
20 conducted a preliminary examination of the -- of the
21 fired evidence in this case?
22    A.  I -- you know, I don't know.
23    Q.  You -- you aren't aware of that?
24    A.  I don't know.

166

1    Q.  Okay.  If Jack Welty did conduct the
2  preliminary examination in this case, would it surprise
3  you that he didn't do the full examination?  That he
4  wasn't the one to conduct it?
5    A.  Well, you're indicating that's preliminary,
6  so then that wouldn't be, you know, the full, and then it
7  was brought to -- brought to our lab.
8    Q.  Would that surprise you that they would take
9  the evidence from someone who'd already looked at the
10 fired --
11    A.  No.
12    Q.  It wouldn't?
13    A.  No.  I mean, is there -- no.  I mean, I
14 don't know if he was a full-time firearms examiner at
15 that point in time.  I mean, he was trained as a firearms
16 examiner, but I don't -- you know, I don't -- I don't
17 know.
18    Q.  Do you -- do you remember whether you
19 conducted the examination of this evidence or whether
20 someone else did?
21    A.  I did not conduct examination of the
22 evidence.  I just received it.
23    Q.  Okay.  Do you remember, or do you have any
24 recollection of Dan Gunnell conducting the full

167

1 examination of these -- of these items?
2     A.  No.
3     (Whereupon, Exhibit Number 2 was marked for
4     identification.)
5 BY MS. TINGSTAD:
6     Q.  Let's -- I'm going to mark as Exhibit 2 the
7 Pursley 100002 through 9, and this is the Gunnell -- the
8 Gunnell report.
9     A.  Okay.  I have that in front of me.
10     Q.  Okay.  Take a minute to look through it.
11     A.  I reviewed it.
12     Q.  Okay.  Great.  Okay.
13     So let's just take it page by page here.
14 What is this document?
15     A.  The first page, the top page that I was --
16 is the laboratory report, and it indicates the submitting
17 agency, the exhibits that were submitted, and then it
18 gets into -- it itemizes the -- it's a laboratory report
19 that was written in regard to the evidence that was
20 submitted that I signed in for, and it was -- indicates
21 the agency that submitted it, the offense, the suspect,
22 the victim, and then it has all the items -- excuse me,
23 all of the exhibits that were submitted, and then it has
24 findings adjacent to the exhibits and the items, and --

168

1 and then it's got a note at the very bottom, and then
2 it's signed by Dan Gunnell.
3     And then there's worksheets after that.
4 There's a Bullet Worksheet, laboratory worksheet that has
5 a cartridge, another Bullet Worksheet, another Bullet
6 Worksheet, and then a Firearm Worksheet, another Firearm
7 Worksheet, and then some kind of property evidence thing
8 from Rockford Police Department.  There's two pages of
9 it.
10     Q.  Thank you.
11     A.  That's what I have in front of me.
12     Q.  Okay.  Let's just start from the top then.
13 Thank you very much.
14     On page -- on the first page here dated
15 October 7th, 1993, that -- this is a report, as you said,
16 authored by Dan Gunnell.
17     A.  Mm-hmm.
18     Q.  It says "suspect" -- if you can see down
19 here -- "offense, homicide; suspect, Patrick Pursley;
20 victim, James A. Ascher."  Do you see that?
21     A.  Yes, ma'am.
22     Q.  And the next line, it says exhibits 1, 2, 3,
23 and 4 were received in the Suburban Chicago Laboratory
24 Broadview branch on June 11th, 1993, correct?

169

1     A.  Yep, that's what it says.
2     Q.  So 1, 2, 3, and 4 are labeled below as one
3 bullet fragment, two 9 millimeter caliber cartridge
4 cases, one fired bullet, and one fired bullet.  Do you
5 see that?
6     A.  Yes, ma'am, I do.
7     Q.  Okay.  Let's look back at Exhibit 1, the
8 first page of Exhibit 1, evidence receipt.  Did -- do the
9 numbers of these exhibits --
10     A.  Okay.
11     Q.  -- correspond?  You -- you've pointed out
12 that there were exhibit -- lab exhibit numbers 1, 2, 3
13 and 4 that are sort of in a darker color.
14     A.  Yeah.
15     Q.  Did those correspond to the exhibit numbers
16 here in this report?
17     A.  Yes, they appear that they do.
18     Q.  Okay.  All right.  Moving onto the next line
19 in Dan Gunnell's report, Exhibit -- what we're calling
20 now Exhibit 2, it says "Exhibits 5, 6, and 9 were
21 received in the firearm toolmark section on June 15th,
22 1993."
23     Do you see that?
24     A.  I do.

170

1     Q.  What does the "firearm and toolmark section"
2 mean?  How is that different from the Suburban Chicago
3 Laboratory, Broadview branch?  Do you know?
4     A.  Okay.  What were 5, 6, 7, 9?  5, 6, 7, 9,
5 oh, they could've went to -- they could have went to
6 latent prints first for processing, and then, in turn,
7 came to the firearms section.  You know, it's, like, an
8 inter -- interlaboratory stuff.  I'm speculating.  I
9 shouldn't but --
10     Q.  Yeah.
11     That's -- so -- so if we're looking at in
12 Exhibit 1, the evidence receipt, the second page --
13     A.  Right.
14     Q.  -- where it lists exhibits 5, 6, and 9 --
15     A.  Right.
16     Q.  -- which on the second page of Dan Gunnell's
17 report referred to exhibit 5 as a Beretta, exhibits 6 --
18     A.  Right.
19     Q.  -- as the 11, 9 millimeter caliber
20 cartridges, and 9 is the Taurus.  Do you see that?
21     So those items were received by you
22 according to the evidence -- evidence receipt, they were
23 received by you on June 11th?
24     A.  Right.  The reason that I said it could've

171

1 gone to latent prints -- and I shouldn't speculate. I
2 know when I received it, but then -- then possibly Dan
3 opened it up and said, "Wait a minute, it should go to
4 latents first." So then it went to latents first because
5 it was gun -- gun evidence, and then, in turn, latents
6 worked it up, and then it was submitted to -- as he
7 indicated on his report, the firearm and toolmark section
8 four days later.
9     Q.  Was that -- was that normal procedure for
10 evidence to go to latent prints first?
11     A.  Yes.
12     Q.  Why is that?
13     A.  To see if there's any latent prints present.
14     Q.  And was it important for that to happen
15 before a firearm and toolmark analysis?
16     A.  Yes, ma'am.  Yes, ma'am.
17     Q.  Okay.  And then next line here, is that
18 exhibit 7, 8, 10, 11, and 12 were received in the firearm
19 toolmark section on June 18th, 1993.
20         Do you see that?
21     A.  Yeah.
22     Q.  And that would refer to, if we look back to
23 the evidence receipt, Exhibit 1, that would refer to
24 exhibit 7, a 9 millimeter magazine with 14 rounds in a

172

1 sealed baggy; exhibit 8, a 9 millimeter magazine with 15
2 rounds in a sealed baggy; 10, American Eagle ammo box;
3 11, three live 9 millimeter bullets in a sealed baggy;
4 and exhibit 12 is 19 live 9 millimeter bullets in a
5 sealed baggy.
6         And that is also -- those exhibits numbers
7 are consistent with the third page of -- or the second
8 page of Mr. Gunnell's report.  Do you see all that?  Does
9 that make sense?
10    A.  Yes, I do.
11    Q.  Okay.  So this -- let me ask you this:  When
12 an item is checked into -- when evidence is checked into
13 the lab, such as when you signed for it on June 11th, and
14 then sent from you to another part of the lab, the latent
15 prints section, would we expect to see someone sign for
16 it in the latent prints section?
17    A.  Yeah, you would expect to see it.  Now, I
18 mean, I signed it in, and I probably put it at the shelf
19 where the firearms evidence was in the evidence storage
20 area.  So as far as what happened after that --
21    Q.  When different people take that evidence
22 into their custody and do a test on it or do something
23 with it, it's standard procedure for that -- for them to
24 fill out the evidence receipt, correct?

173

1     A.  That's correct.
2     Q.  Such as when Mr. Gunnell would have taken --
3 would have taken custody of the evidence to -- to examine
4 it on these various dates, we would expect to see his
5 signature with those corresponding dates here, correct?
6     A.  Yeah.  I don't know.  I mean, you expect it,
7 but I don't know why.
8     Q.  Okay.  Let's look back at Mr. Gunnell's
9 report, and look under the findings column starting on
10 the first page.
11    A.  Mm-hmm.
12    Q.  He found that exhibit 1, one bullet fragment
13 was unsuitable for microscopic comparison?
14    A.  Mm-hmm.
15    Q.  For 2, exhibit 2, there are actual two
16 cartridge cases here, and he concluded that they were
17 fired by exhibit 9, which is a Taurus?
18    A.  Correct.
19    Q.  He also concluded that exhibit 3, one fired
20 bullet was fired in exhibit 9 and exhibit 4 also fired in
21 Exhibit 9.  Do you see that?
22    A.  Yes, I do.
23    Q.  Okay.  Let's go to the first Bullet
24 Worksheet, Mr. Gunnell's first Bullet Worksheet.  You

174

1 filled out worksheets that looked like this?
2     A.  Yes, ma'am.
3     Q.  This refers to exhibit number 1, and can you
4 just tell me what -- what you see and understand to be on
5 this worksheet?
6     A.  Exhibit number, case number, who we received
7 it from, the date he received it.
8     Q.  He received it on June 15th, 1993?
9     A.  That's what he has on the worksheet, yeah.
10    Q.  Is it -- is it -- that's -- for exhibit 1,
11 that date is actually different than the date on the
12 front page of the report.
13    A.  Yes, it is.
14    Q.  The front page of the report says June 11.
15    A.  Yes, yes, it is.
16    Q.  Is that normal?
17    A.  It's certainly not consistent with what it
18 should be.
19    Q.  But you would expect to see those dates be
20 consistent?
21    A.  Yes, that's correct.
22    Q.  Okay.  So this is inconsistent.  It says
23 it's received on June 15th, 1993.  It's in a film
24 container under "packaging", and it says -- there's

175

1  nothing on caliber, but there's a weight, 2.4 grains.
2      A.  And then the trace evidence is N.O., which I
3  -- I would presume -- which is probably not -- like, not
4  observed.
5      Q.  Oh, N-O, not observed.
6          What is trace evidence?
7      A.  If there would be anything on the bullet
8  that could possibly be of evidentiary value, like, blood,
9  hair, fiber, gypsum if it came from drywall, stuff like
10 that.
11     Q.  Okay.  There's a notation here that says --
12 does that say, "Brass colored fragment of bullet jacket"?
13     A.  Correct.
14     Q.  So that would indicate that this bullet had
15 a fragment of a jacket still on it?
16     A.  It would indicate that it was a fragment of
17 a bullet jacket.
18     Q.  So you -- you mentioned before that some
19 bullets have just lead, and some bullets have jackets on
20 them?
21     A.  Yes, ma'am.
22     Q.  Okay.  And that would be just a coating of
23 metal on the outside of the lead, right?
24     A.  Yeah.  He says "brass colored", so that

176

1  would be -- yes, that would be a coating.
2      Q.  The condition of the bullet says, "mutilated
3  and unidentifiable"?
4      A.  Right.
5      Q.  And the finding is "unsuitable"?
6      A.  Correct.
7      Q.  I don't see any marking here that you would
8  have verified this -- this finding that it was
9  unsuitable.  Is there a reason for that?
10     A.  That is not an identification.
11     Q.  So there's only a requirement to verify
12 identifications?
13     A.  Correct.
14     Q.  Okay.  Let's go onto the next page.  This is
15 page -- it says "laboratory worksheet" on the top.  This
16 is Pursley 100005.
17         At the top, it says, "Date examined, June
18 15th, 1993," and it indicates that the exhibits are
19 two -- exhibit number 2, two cartridge cases.  And then
20 the next line says, "source/date received".
21         Do you see that?
22     A.  I do.
23     Q.  What does "PS" mean for source?
24     A.  That would be my initials.

177

1      Q.  Okay.  So received from PS, Pete
2  Striupaitis?
3      A.  Mm-hmm.
4      Q.  And the date received, June 15th, 1993?
5      A.  Mm-hmm.
6      Q.  Would you expect to -- again, would you
7  expect to see that reflected again in the evidence
8  receipt?
9      A.  Yes, I would expect that.
10     Q.  So if we keep going down, "The description
11 of the package, a clear plastic bag; description of
12 markings as received on the package, laboratory marks,
13 CIDI." What does that mean?
14     A.  Case initials, date initials.
15     Q.  Okay.  And what would that be as a
16 laboratory mark?
17     A.  The -- that would be the case -- that would
18 be what was written on the packaging that the examiner
19 would put on, would be the case number, their initials
20 and the date, and -- then another initial, maybe --
21     Q.  And that -- that would go on the cartridge
22 case itself, on the physical cartridge case?
23     A.  No.  It would go on the packaging.
24     Q.  Okay.  So you see here that Mr. Gunnell, it

178

1  appears he labeled these 2-A and 2-B, the cartridge cases
2  are 2-A and 2-B.
3      A.  Correct.
4      Q.  These are two questioned cartridge cases,
5  correct?
6      A.  Correct.  Two discharged 9 millimeter
7  cartridge cases.
8      Q.  That were, yeah, okay.  Neither of these is
9  a test fire, correct?
10     A.  Correct.
11     Q.  Can you just tell me what you see here in
12 terms of the -- these -- these drawings?
13     A.  It's the base or the head of the cartridge
14 case, and on two ways, it indicates it's not 9 by 19,
15 which is the caliber.  '92, is the year that it was
16 manufactured, and L -- I can't take make that out.  It
17 must be the manufacturer's markings as well.
18         And then it says, "brass -- case color,
19 brass and primer." I think he's referring to -- I don't
20 know what he's referring to there.
21         And under 2-B, it says "CCI", which is the
22 manufacturer, "9 millimeter Luger" is a caliber, and NR,
23 which indicates nonreloadable.  Those cartridges are
24 alluminum, and they -- you don't reload those cartridges,

179

1 and that's what the manufacturer designates on there.
2    Q.   Okay.  So 2-A is -- is it fair to say 2-A is
3 a brass cartridge or brass-colored cartridge?
4    A.   Right.
5    Q.   And 2-B is an alluminum cartridge that is
6 nonreloadable because it says "nonreloadable"?
7    A.   Correct.
8    Q.   Okay.  Down below, there's -- there's
9 writing that says, "Will compare with test fired in
10 exhibit" --
11    A.   5 and 9.
12    Q.   -- "5 and 9".
13    A.   Right.
14    Q.   And just for reference, exhibit 5 is
15 described as Beretta, exhibit 9 as a Taurus.
16    A.   Right.  And then there's some --
17    Q.   Go ahead.
18    A.   The conclusions indicate that both CCs --
19 both cartridge cases were fired in the -- in exhibit 9,
20 which I believe is a Taurus.
21    Q.   And if we look below that -- that is the
22 Taurus.  If we look below that, it says, "Packaging,
23 original.  Date, 17 June '93."  Would that refer to the
24 date that this conclusion was made?

180

1        MR. BHAVE:  Objection; speculation.
2 BY MS. TINGSTAD:
3    Q.   What would that refer to?
4        MR. BHAVE:  Objection; speculation.
5 BY MS. TINGSTAD:
6    Q.   You can answer, if you know.
7    A.   I -- I don't -- it would seem that it is,
8 but I don't -- I don't know.
9    Q.   When you filled out laboratory worksheets
10 like this and dated them, would you -- what date would
11 you put down there in that spot?
12    A.   The date that I was finished with it.
13    Q.   Okay.  And the analyst, are you familiar
14 with that -- those -- those initials?
15    A.   Yeah, that's DBG.  I don't know what his
16 middle initial is, but that's definitely -- those were
17 his initials.
18    Q.   That's Dan.  Okay.
19        So do you see the red stamps -- two red
20 stamps on this page?
21    A.   Mine are black and white.
22    Q.   Okay.  All right.  Well, mine -- you see the
23 two stamps, the verification stamps?
24    A.   Yeah.  We had a stamp that we used and made

181

1 it -- because otherwise, before we used to just handwrite
2 it in, and it was a date stamp, which made it convenient.
3 You just change the date on the date that was verified
4 and stamp it in there, and then there was an -- it says
5 "ID verified", and then there's initials in there.  Those
6 initials are mine.
7    Q.   Okay.  So can you just walk me through the
8 process of how -- at what point would you stamp -- stamp
9 this?
10    A.   After I looked at the evidence
11 microscopically.
12    Q.   So what I'm seeing on this page is:  I'm
13 seeing two questioned cartridge cases, 2-A and 2-B
14 side-by-side?
15    A.   Mm-hmm.
16    Q.   Did you look at 2-A and 2-B side-by-side to
17 -- to put this stamp down, or what would you have looked
18 at?
19    A.   No.  I would look at whatever he had test
20 fired and compared those to the test firings.
21    Q.   Okay.  So he -- reflecting what we discussed
22 before, Mr. Gunnell in this case -- first I want to ask
23 again, do you have any independent recollection of -- of
24 this particular verification?

182

1    A.   No, no, I do not.
2    Q.   Okay.  So what we've discussed in the -- was
3 it -- your process would be, Mr. Gunnell would be looking
4 at, let's say, 2-A and a test fire next to it.  You line
5 it up so that it looked -- so that, you know, it lined up
6 well, and then you say, "I see something interesting
7 here.  Can you come over and take a look?"
8    A.   Right.
9    Q.   And you knew -- you knew that to mean that
10 there's -- there's an identification here, right?
11    A.   Yes.  That's correct.
12    Q.   Okay.  So then you would take a look, and
13 you would say, "Yeah, I agree"?
14    A.   Correct.
15    Q.   Okay.  So at what point then -- as soon as
16 you said, "Yeah, I agree," did Mr. Gunnell have his
17 worksheet right there that you would just stamp it or how
18 did it -- how did that -- how did the stamps happen?
19    A.   I think I would move onto another item, and
20 then he would stamp all of them, and then I would initial
21 all of them.
22    Q.   Oh, okay.  So you would take a look -- he
23 would -- he would line up the other item.  He would say,
24 "Oh, here's 2-B.  Here's the test fire next to 2-B, take

183

1  a look." You take a look, you'd say, "Okay"?
2      A.  Right.
3      Q.  And then he'd put the bullets on for you,
4  you take a look, you'd say, "Okay", and then he actually
5  would stamp these, and you would just initial?
6      A.  Correct.
7      Q.  Okay.  And in this case, as in -- as in the
8  other cases, you wouldn't have, as the verifier, looked
9  at the two test fires and compared those two, correct?
10      A.  No, I would not have.
11      Q.  Okay.  Is this level of detail, in terms of
12  the -- what's observed under the microscope for 2-A and
13  2-B, is this level of detail consistent with how you
14  worked up cases?
15      A.  No.  I would be -- I would probably put it
16  in a little bit more.
17      Q.  Like, can you give me an example?
18      A.  Like, what -- if they were parallel lines in
19  the primary area, I would draw in the parallel lines, and
20  I would put -- you know, drawing just a little bit -- a
21  little bit more then -- that's just me.
22      Q.  It's not required to draw more or give more
23  detail?
24      A.  I believe so.

184

1      Q.  And is this -- is this practice of just
2  diagramming the evidence cartridge cases next to each
3  other and not including any diagrams of test fires, is
4  that according to the ISP protocols?
5      A.  Yeah.  The test fires -- the test fires were
6  never ever documented, but the fired evidence was.
7      Q.  So just to be clear, when you came over to
8  look under the microscope, you were aware that Gunnell
9  had found an identification as you were being asked to
10  verify it?
11          MR. BHAVE:  Objection; speculation.
12  BY MS. TINGSTAD:
13      Q.  Correct?
14          MR. BHAVE:  Objection; speculation.
15  BY MS. TINGSTAD:
16      Q.  We covered this multiple times.  You can
17  answer.
18      A.  He's saying, "I've got something
19  interesting.  Take a look at it."  I would look at it,
20  and I would make the verification.
21      Q.  You were aware when Gunnell called you over,
22  when he would call you over to look at something
23  interesting, that that was for an identification, right?
24      A.  Yes, that's correct.

185

1      Q.  So you knew what his conclusion was before
2  you looked at it under the scope?
3      A.  No, not necessarily.  I -- I -- I mean, are
4  you saying that he wrote that in there at the bottom and
5  said that?  I -- no.  I don't --
6      Q.  No, no.  Just you knew that he was -- he was
7  -- he found an identification before you looked at it
8  under the scope?
9      A.  That's correct.
10      Q.  Okay.  We'll move onto the next page then,
11  Pursley 100006.  This is a Fired Bullet Worksheet, and it
12  indicates this is about exhibit number 3, right?
13      A.  Correct.
14      Q.  Okay.  What does that "received from" mean?
15      A.  That's "FSPS" or -- the "PS", that was me.
16  I don't know what he's got there on the front of it.
17      Q.  You don't know what "FS" might refer to?
18      A.  Well, I know that "FS" refers to forensic
19  scientist.
20      Q.  Huh, okay.
21      A.  I mean, is that an "FS"?  Yeah, I guess it
22  is an "FS".
23      Q.  So received from forensic scientist Pete
24  Striupaitis?

186

1      A.  Correct.
2      Q.  And date received, June 15th, 1993, correct?
3      A.  Correct.
4      Q.  And you'd expect to see that date reflected
5  on the report and on the evidence receipt, correct?
6      A.  Right.  Like I said, I received it, I put it
7  in the vault, so I -- it should be consistent.
8      Q.  So let's -- we'll just walk through each
9  line.  "Package, paper bag, plastic container."  Does
10  that look right?
11      A.  Yes, ma'am.
12      Q.  What is the circle S?
13      A.  Sealed.
14      Q.  Oh, sealed.  Okay.
15          "Markings on package, trace evidence, N.O."
16  That would refer to "not observed", right?
17      A.  Right.  That's what we -- that's what we
18  said before, yeah.
19      Q.  Okay.  "Caliber, 9 millimeter, weight" --
20  this would be the -- they would have weighed this bullet?
21      A.  Right.
22      Q.  Okay.  And then the "rifling", what does
23  that mean?
24      A.  That would mean that it would have six land

187

1 and groove impressions to the right, six right.

2    Q.   Six right.  Okay.

3         What is "type of bullet"?

4    **A.   Where are you at?**

5    Q.   It's the next line.

6    **A.   Yeah.  "Solid, slightly concave" -- I can't**

7 **make that out.**

8    Q.   "Solid slightly", yeah, con -- con

9 something, maybe concave?

10   **A.   Maybe concave, yeah.**

11   Q.   Is "concave" a word that you use to describe

12 bullets?

13   **A.   Yes.**

14   Q.   Okay.

15   **A.   And that would be concave at the base.**

16   Q.   At the base of the bullet?

17   **A.   Yes.**

18   Q.   So where the bullet enters in -- or is

19 inside of the cartridge case?

20   **A.   Correct.**

21   Q.   Okay.  Then inside of this box, there's

22 circled, "it's a jacketed bullet"?

23   **A.   Correct.**

24   Q.   It's a full metal jacket?

188

1    **A.   Right.**

2    Q.   And then it says, "Most part of jacket is

3 missing."

4         Do you see that?

5    **A.   Correct.  Correct.**

6    Q.   Okay.  Why would -- is that -- is that

7 normal for you to see a jacket missing from a bullet?

8    **A.   Yeah.  When the -- when it strikes an object**

9 **or -- there definitely is some of that jacketing that**

10 **comes off.**

11   Q.   Okay.  So the description here, this -- or

12 condition of bullet is circled as mutilated?

13   **A.   Correct.**

14   Q.   But still suitable -- underneath, "findings

15 suitable".

16        So what does that mean, that the bullet that

17 is mutilated is still suitable?  What does that mean?

18   **A.   That it's still suitable for comparison**

19 **purposes.**

20   Q.   So there's still enough markings visible

21 that you can compare it?

22   **A.   Correct.**

23   Q.   Okay.  And then underneath there, it says,

24 "Positive identification date, 17 June 1993."

189

1    **A.   Mm-hmm.**

2    Q.   Do you see that?

3         And then in the "firearm description" box,

4 it indicates that that was exhibit number 9 that it was

5 identified to; is that correct?

6    **A.   Correct.**

7    Q.   And then there's a stamp.  This is a

8 verified stamp?

9    **A.   Right.  And then my initials in the middle**

10 **of it.**

11   Q.   And that verification is dated June 17th,

12 1993?

13   **A.   Correct.**

14   Q.   So for you to verify this bullet, would it

15 be the same process where the -- exhibit 3, this

16 questioned bullet would be on a -- on the microscope with

17 one of the test fires?

18   **A.   Correct.**

19   Q.   And then you would -- you know, Mr. Gunnell

20 would say, "Take a look at this"?

21   **A.   Right.**

22   Q.   And then you would go over and look at it,

23 and you would see that he'd lined up where they sort of

24 -- where the striations --

190

1    **A.   Yeah.  Not just that area, but go around the**

2 **periphery as well.**

3    Q.   Okay.  Can you just -- so that would be,

4 like, being in the phase, right?  The bullet would be in

5 phase, where you -- where you line up the matching land

6 impressions and --

7    **A.   Very good, Counsel.  You know the term.**

8    Q.   I know a lot -- I mean, well, I've just

9 talked to a lot of experts.  So, yes.

10        So the bullet -- so the bullet would already

11 be in phase when you went to look at it.  Then you'd just

12 turn it, turn it, turn it, make sure that it matches all

13 the way around, correct?

14   **A.   Correct.**

15   Q.   Okay.  And then taking a look at the next

16 page, exhibit 4, the Bullet Worksheet.  Again, exhibit 4

17 is a fired bullet.

18        It says, "Received from" on the second line

19 "FSPS".  That's forensic scientist Pete Striupaitis?

20   **A.   Yes.**

21   Q.   And the "date received, 15 June 1993"?

22   **A.   Correct.**

23   Q.   Okay.  The other packaging, we know that's

24 "sealed paper bag, sealed film container, markings on

191

1  package, trace evidence not observed or N.O".  Does that
2  all sound correct to you?
3      **A.  Yes, ma'am, it does.**
4      Q.  Okay.  The "caliber, 9 millimeter".  Then we
5  see the weight indicating a higher weight actually, 107.4
6  grains?
7      **A.  Right.**
8      Q.  What -- what accounts for these weights
9  being different?
10         MR. BHAVE:  Objection; speculation,
11  foundation.
12 BY MS. TINGSTAD:
13     Q.  If you know -- if you know what might
14 account?
15     **A.  Different manufacturer.**
16     Q.  Okay.  And under here, it says, "type of
17 bullet."  Do you see where it says -- I'm sorry.  Let's
18 -- right underneath "caliber", it says "rifling".  You
19 indicated that "six R" means?
20     **A.  Six right.**
21     Q.  Six right with a right-hand twist?
22     **A.  Correct.**
23     Q.  The next line down, what -- what is this
24 "groove IMP, land IMP" in the spaces there?  What would

192

1  that be for?
2      **A.  Those would be the actual measurements that**
3  **one would take of that Bullet Worksheet.  Say for**
4  **instance there was no gun submitted, then you would**
5  **measure the land and groove impressions, and then submit**
6  **them into that database that I mentioned earlier.**
7      Q.  I see.  So you -- so this is crossed out?
8      **A.  You could be -- you didn't have to do that**
9  **for them because there was a gun in question.**
10     Q.  Understood.
11         So is this the same kind of Bullet Worksheet
12 that one might fill out when doing a preliminary
13 examination to try to get enough information to enter it
14 into the database?
15     **A.  It's certainly one that one should fill out,**
16 **but I've heard in some instances that -- it's hearsay --**
17 **where they measure it and do a quick look-see and then**
18 **provide that information to the submitting agency, and**
19 **again, none of it would be bonafide until it was written**
20 **in the worksheet and then sent out a report.**
21     Q.  Okay.
22     **A.  It's to help -- it's to help an**
23 **investigative lead.**
24     Q.  What do you mean by "bonafide" when you say

193

1  that?
2      **A.  Well, bonafide is when you actually fill out**
3  **-- when you actually fill out the worksheet and -- and**
4  **make a report as opposed to informally just, like, take**
5  **measurements and check them against database and tell**
6  **them which -- which guns you think might have fired that**
7  **bullet.**
8      Q.  Was it -- was it policy at --
9      **A.  It's a preliminary as opposed to a formal.**
10     Q.  Was it -- was it the policy at ISP and the
11 forensic lab that if you were -- if one was conducting a
12 preliminary examination and measuring the lands and
13 grooves to enter it in, that, you know, the Bullet
14 Worksheet should have been filled out?
15     **A.  It wasn't the policy, but I've -- I've heard**
16 **it's done by individuals who is -- there's an individual**
17 **that I know did that and -- at his agency because he had**
18 **been working there for 30 years, and they wanted an**
19 **answer.  And then, in turn, they got the gun, and they --**
20 **and it was, in fact, the gun.**
21         **But is it -- is it good practice?**
22 **Absolutely not.**
23     Q.  Why isn't it good practice?  What -- what's
24 the problem with not writing it down?

194

1      **A.  Well, you write it down, and you write it on**
2  **-- it's informal, and there shouldn't be any, you know --**
3  **it's like -- it usually happens on a weekend, and it's,**
4  **like, "Give us an answer so that we can" -- and I'm just**
5  **basing this on to an individual that I know did this, and**
6  **he, in turn, got reprimanded and quit his job.**
7         **So it's when you are comfortable with an**
8  **agency to give them an answer, and you really shouldn't**
9  **do that.**
10     Q.  Do you know -- can you give me a name of the
11 individual that you are referring to?
12     **A.  No.  Okay.  Well, you know what, I will,**
13 **because he's gone.**
14     Q.  Good.
15     **A.  He's not over there.  Robert Shem, Alaska**
16 **Anchorage -- Alaska Department of Public Safety,**
17 **Anchorage, Alaska.  You know, I -- I really -- I**
18 **shouldn't have opened my mouth.  He's a partner of mine.**
19     Q.  Well, I won't -- I won't tell him.
20     **A.  Well, now that it's public record, yeah.**
21     Q.  But, you know, you said it's better to have
22 it -- it's for -- it's informal.  It's informal not to
23 make a note of it, not to make a record -- record of it.
24     Q.  Are there any other quality concerns beyond that with

195

1  not making a record like Mr. Shem did?
2  **A. No.**
3  Q. Why would he have gotten fired for that? Do
4  you know?
5  **A. Because his boss made it an issue.**
6  Q. Okay.
7  **A. I mean, right down the line, unauthorized**
8  **entry, dah, dah, dah, dah, dah. And after 30 years, he**
9  **quit. And I think —**
10  Q. Unauthorized entry into the system, into the
11  database?
12  **A. You know, he — he was there before the boss**
13  **was there, and it was kind of an informal situation, and**
14  **he was good to his agencies, and they were — they were**
15  **good to him, and apparently, the administrator didn't**
16  **like that.**
17  Q. Okay. So we can move on and come back to
18  this Bullet Worksheet.
19  So if you -- I just was asking why that
20  wasn't filled in with the dimensions of the grooves and
21  lands, and you explained that. Under "type of bullet",
22  "RN, open base". What does that mean?
23  **A. Round nose, and the base is open. I don't**
24  **know what he means by "open". Could be something like**

196

1  **more than concave. That's just -- I don't know what he**
2  **means by that. You'd have to ask him.**
3  Q. Okay. In the box there, it says it's a
4  "full jacketed copper" --
5  **A. "Copper colored".**
6  Q. "Copper colored" --
7  **A. Right.**
8  Q. -- "bullet". Okay.
9  And then the condition of the bullet is
10  mutilated. Under findings, it says it's "suitable", and
11  that indicates that it's suitable for comparison,
12  correct?
13  **A. Yes, ma'am, that's correct.**
14  Q. And then the other finding is that it's
15  positive identification on 17 June 1993, with the exhibit
16  9, the Taurus, correct?
17  **A. Correct.**
18  Q. And that was -- this stamp indicates that it
19  was verified by you?
20  **A. Yes, ma'am.**
21  Q. Okay. In the same -- in the same manner
22  that we have discussed already, correct?
23  **A. Correct.**
24  Q. Okay. So this Firearm Worksheets that are

197

1  next. The first one I'm -- is the Beretta, which wasn't
2  identified with any of these, so I'm just going to skip
3  this page and go onto the second Firearm Worksheet about
4  -- Pursley 100009.
5  **A. Hold on a second. I -- you lost me there**
6  **for a second.**
7  Q. Okay. Take your time.
8  **A. You're -- you're not going to do the**
9  **Beretta.**
10  Q. No.
11  **A. And then you want to -- you want to go to**
12  **exhibit 9?**
13  Q. Yes -- or no. If you -- no. I just want to
14  go to the next Firearm Worksheet, exhibit 9. Yes, you're
15  right.
16  **A. Right, right. Okay.**
17  Q. Great. Okay.
18  So it's -- this indicates that this
19  worksheet is for exhibit 9.
20  **A. Mm-hmm.**
21  Q. And it's received from "FSBW". What is
22  that?
23  **A. I don't know.**
24  Q. Forensic scientist BW. The other person you

198

1  said was there might have been Don Smith, right?
2  **A. Right. Right. Remember we talked about**
3  **there's a possibility it went to latent prints? Maybe he**
4  **was a latent prints examiner. I don't -- I don't know**
5  **who that is.**
6  Q. So "FS" could also refer to a latent prints
7  examiner?
8  **A. Yes, ma'am.**
9  Q. Okay. Date received 15 June '93, and it's
10  received from this person, so we would expect to see that
11  in the evidence receipt, correct?
12  **A. Correct.**
13  Q. Okay. "Description of package", that's
14  another circle S, so that means sealed manila --
15  **A. Envelope.**
16  Q. Envelope, okay.
17  "Location of markings are on the package."
18  And then here, is this -- "CAL", does that refer to
19  caliber?
20  **A. Yes, ma'am.**
21  Q. Okay. And that's 9 millimeter, correct?
22  **A. Correct.**
23  Q. Okay. "Make", says "Taurus". What is the
24  rest of that?

199

1      A.   International Manufacturing, Inc.
2      Q.   Oh, okay.
3      A.   I think that's the -- I think that's the
4   importer.
5      Q.   And that would be indicated on -- on
6   the last --
7      A.   No, no.  It's not the importer.  The
8   importer is indicated down below, that it's Taurus and
9   Miami, Florida.  That's, I guess, what was -- we tried to
10  write down what appears on the guns so that probably
11  appeared on the gun, and he wrote it down onto the sheet.
12     Q.   Okay.  So it -- so the "make,
13  Taurus Int", and the "GINC", would have appeared probably
14  on the gun itself, on the weapon?
15     A.   Yes, ma'am.
16     Q.   And then the "model PT99AF", would also
17  appear --
18     A.   On the gun as well.
19     Q.   Okay.  What is the next line, "DERRA --
20  finish, plated, other"?  What does that all mean?
21     A.   I'm trying to -- oh, plated blued finish,
22  whether or not it's plated, if it's chrome plated blue,
23  which is a blue process, whether it's stainless steel, so
24  its finish.

200

1           Were you asking about the DERR, AEIR?
2      Q.   Yeah.  I was just asking what those things
3   mean.
4      A.   DERR is Derringer; AER is aero pistol; REV
5   is revolver; RF is rimfire, which are .22s that don't
6   have a center fire, and then it was -- he circled
7   "pistol" and "smooth bore" refers to shotguns.
8      Q.   Okay.  So "pistol" circled here, that's,
9   like, the kind of weapon it is, right?
10     A.   Yes, ma'am.
11     Q.   Okay.  And then the finish is indicated as
12  "blued"?
13     A.   Right.
14     Q.   Does it really look blue or what is -- I
15  mean, to a layperson, what would that look like?  Because
16  I don't think I've ever seen --
17     A.   It would look like blue or black, yeah.
18     Q.   Almost like a black metal?
19     A.   Yeah.  It's bluish.  It's -- it's a process
20  that they use to -- to manufacture or to -- you know, for
21  that type of weapon.  It's not blue like the sky is blue.
22  It's like a dark blue.
23     Q.   Okay.  And that would be the color of the
24  metal, the metal finish?

201

1      A.   Yes.  That's correct.
2      Q.   Okay.  And then "Where made, Brazil".
3      A.   Right.
4      Q.   And where does this "importer information"
5   come from?  "Miami, Florida", where does that come from?
6      A.   That was probably on the gun.
7      Q.   They stamp -- they stamp the --
8      A.   There's a stamp on the gun, right.
9      Q.   Where is the importer usually stamped?
10     A.   On the slide or the receiver.
11     Q.   Okay.  And then the serial number there is
12  written as "TLF55001D"?
13     A.   Correct.
14     Q.   And then why is there a -- why is "REC"
15  circled right after that?
16     A.   That's the receiver -- that was on the
17  receiver where the serial number was.
18     Q.   So the serial number is on the receiver.
19  What's the receiver again?
20     A.   It's the lower portion of the -- of the gun;
21  sometimes referred to as -- as the frame.  There's a
22  slide that goes back and forth, and there's a barrel.
23  Well, there's -- the receiver is the bottom portion of it
24  that receives the cartridges.

202

1      Q.   Okay.  It's not the grip?  It's not the grip
2   part?
3      A.   Well, the grip is part of the receiver.
4      Q.   Okay.
5      A.   Because the magazine holds the cartridges,
6   and you put the magazine up into the receiver.
7      Q.   I see.  So it is part of the grip then?
8      A.   The grip is part of the receiver, yes.
9      Q.   Then it -- it indicates that capacity is 15.
10  What is that?
11     A.   15, it will take 15 cartridges, and the plus
12  one is one in the chamber.  So you can have -- that will
13  hold 16 cartridges.  By "one in the chamber", that means
14  you would have to -- you put 15 into the magazine.  It's
15  a magazine, it's not a clip.  And then you put one in the
16  -- in the chamber, and then you are able to put another
17  cartridge in the magazine so the capacity is 15 plus 1.
18     Q.   Understood.  What does the next line say?
19  "Magazine" -- what is that above there, that indication?
20     A.   Yeah.  I know.  Something, something
21  "SC".  It's getting more descriptive about the magazine.
22  A large -- it's -- those are large capacity.  I don't
23  know if it -- that's something that he can tell you.
24     Q.   Okay.  So the "firing mechanisms", it says,

203

1  "hammer, single-action, double-action". What does it
2  mean for something to be single and double-action?
3       A.  In single-action, you have -- you have to
4  pull the slide back on the gun and chamber a round and
5  then squeeze the trigger, and it will fire.  It will keep
6  on firing until there's no more -- until you don't
7  squeeze the trigger or there's no more magazine -- no
8  more cartridges in the magazine.
9           In double-action, you don't have to pull the
10  trigger back.  You just squeeze the trigger, and the
11  double -- the trigger will pull the -- pull the hammer
12  back and pull it forward, and it will discharge the gun.
13  So this one that has the capability of being single and
14  double-action.
15       Q.  And then we'll just go ahead and skip down
16  to where it says -- under "ejection".
17       A.  Mm-hmm.
18       Q.  It says, "The operating condition was
19  proper, ejection up."  And then there's a little diagram.
20       A.  Okay.  The diagram is of the firing pin and
21  the ejector, where the ejector is located, and the
22  extractor -- where the extractor is located.
23           And the way this is -- the way this is
24  drawn, it's kind of like if -- it's not looking down at

204

1  the gun, it's, like, looking from behind it.  That gives
2  you documentation as to the position of those -- those
3  items.
4       Q.  So the -- the top of that circle would kind
5  of be, like, 12:00 if you're holding the gun straight up
6  and down, and then you -- it indicates where the
7  extractor mark comes out and where the ejector mark would
8  come?
9       A.  Yeah.  It more or less tells you where --
10  where you can find it on the gun as opposed to the
11  cartridge case.
12       Q.  Okay.  So then if we look down at the
13  bottom, it says -- it indicates some things about trigger
14  pull, "SA" and "DA".  What do those refer to?
15       A.  Single-action and double-action.
16       Q.  Okay.
17       A.  It mentioned earlier the gun has both
18  capabilities, and let's see.  It's indicating that when
19  you use trigger pull, you use weights, free weights.  And
20  the -- in single-action, the weight will hold at 6
21  pounds, and then release at the second number; meaning,
22  it will fall forward.  Whereas in double-action, it would
23  hold at 11 and fall forward at 12.
24           So it's an indication as to what the -- what

205

1  pounds are necessary to have the hammer go forward.
2       Q.  And in the next line, it says "test ammo",
3  and it indicates the kind of ammo that was used
4  to conduct the test?
5       A.  Yeah.  Used CCI 115 grain.
6       Q.  And is "CCI blaze 115 grain", is that an
7  aluminum jacket --
8       A.  Yes, it is.  Because after the "FMJ", it
9  says "NR", which is nonreloadable.
10       Q.  Nonreloadable.  So that would be similar to
11  2-B, which indicates it's a "CCI nonreloadable aluminum
12  jacket", correct?
13       A.  Right.
14       Q.  Okay.  And then the names of these -- it
15  looks like the names of these test ammos are 921 and 922.
16  Do you see that?
17       A.  Let me see that.  Yeah, I don't -- yes.
18       Q.  Okay.  And then under "lab mark", what does
19  that "C SL", circled SL mean?
20       A.  "SABI"?  Oh, that he marked it on the -- on
21  the slide.
22       Q.  Oh, that's where he marked?
23       A.  The -- the lab marks, which are engraved
24  with an engraving -- engraving tool, vibrating engraving

206

1  tool.
2       Q.  And that's just to say who examined it and
3  when, right?
4       A.  This to -- yeah.  That's -- indicate that
5  that individual worked that gun.
6       Q.  Okay.  And you indicated before that -- when
7  you looked at items under the microscope, you didn't
8  really look at anything beyond 30 power, correct?
9       A.  Yes, ma'am.
10       Q.  So you would have done this verification at
11  -- at what -- what power would you have done the
12  verification?
13       A.  Whatever was necessary.  I don't recall what
14  I did -- what I used specifically, but sometimes you can
15  go as low as 10, go up to 20 but don't go -- we're
16  trained not to go to more than 30.
17       Q.  You were trained not to do that?
18       A.  Correct.
19       Q.  And what -- is that currently the practice
20  at ISP or when you retired?
21       A.  I believe so.  You know, it's, like -- you
22  know, and let me -- here's my visual for you:  You know,
23  what do you see -- what do you see when it's at 30, as
24  opposed to what do you see when it's at 70?  You know

207

1  what I'm saying? You know, it's, like -- it just
2  bleaches it out. It doesn't show you the detail that you
3  need. You know, 30 versus -- versus 50 or 70, what do
4  you see? It's just common sense.
5      Q. And you're indicating, just for the record,
6  you're -- you have your hand out, like --
7      A. I have my hand out at 30, and I had my hand
8  pressed to my face at the higher magnification.
9      Q. Okay. Do you have any reason to think based
10 on the descriptions of the containers, of that film
11 containers and such things in this case, do you have any
12 reason to believe that the items weren't stored properly?
13     A. No, I have no reason to believe that they
14 were -- that they were not stored properly. They were
15 stored properly.
16     Q. And you have no reason to believe that they
17 were handled improperly, correct?
18     A. That's correct.
19     Q. Okay. So are you -- are you aware -- do you
20 recall hearing over the years that Mr. Pursley claimed
21 that this gun was misidentified?
22     A. No, I'm not aware of any of that.
23     Q. You haven't heard that over the years?
24     A. No.

208

1      Q. What do you know about Mr. Pursley's claim
2  of innocence?
3      A. Nothing.
4      Q. So you are not aware that he was acquitted
5  after a retrial?
6      A. I think there was some scuttlebutt about
7  that, but that -- that's about it.
8      Q. What do you mean by "scuttlebutt"?
9      A. I -- you know, just, like, people talking,
10 as far as cases and stuff go, hearsay.
11     Q. Where would you have heard about it?
12     A. I don't recall.
13     Q. Would you have talked about it with
14 Dan Gunnell at all?
15     A. I'm sorry?
16     Q. Would you have talked about it with
17 Mr. Gunnell at all?
18     A. No.
19     Q. You weren't called to testify in this case,
20 correct?
21     A. No, I was not.
22     Q. Are you aware that Jack Welty, when he had
23 the questioned evidence in June 1993, that he conducted a
24 preliminary identification of the two evidence bullets

209

1  and two evidence cartridge cases?
2      A. No. I'm not aware.
3      Q. Okay. So you are also not aware of that
4  Mr. Welty notified Rockford Police Department that based
5  on his review of the cartridge cases, he thought they
6  were fired from an Astra, Beretta, or Taurus, but most
7  likely a Taurus?
8      A. No, I'm not aware of that.
9      Q. And you weren't aware that he didn't create
10 any case notes or worksheets or a report related to that?
11     A. No. I'm not aware of that.
12     Q. Are you aware that he gave testimony in
13 court at the trial against Mr. Pursley based on that --
14 that examination that he did?
15     A. No, I'm not aware of that. The preliminary
16 stuff, you don't -- when I heard people do that, they
17 don't give that in regard to cartridge cases. They do
18 about fired bullets, so --
19     Q. Well, it was fired -- fired -- it was
20 recovered bullets and cartridge cases.
21     A. Oh --
22     Q. Yeah.
23     A. Oh, you said "cartridge cases".
24     Q. Oh, yeah. I'm sorry. I meant both, the

210

1  fired bullets --
2      A. No, I'm not aware of it.
3          (Whereupon, Exhibit Number 3 was marked
4          for identification.)
5  BY MS. TINGSTAD:
6      Q. Okay. I'm going to mark as Exhibit 3 what's
7  been -- what's Bates labeled ISP Defendants 1517. It's
8  an email chain.
9          (Whereupon, the proceedings went off the
10         record at 1:50 p.m. through 1:54 p.m.)
11 BY MS. TINGSTAD:
12     Q. Okay. So have you had a chance to look at
13 this, Mr. Striupaitis?
14     A. Yes, ma'am, I did.
15     Q. Okay. I'll represent that this is -- I want
16 to mark this as Exhibit 3, and it is ISP Defendants 1517
17 and 1518. It's an email chain dated October 12th, 2012.
18         On the second page here of the email, this
19 is a summary -- actually, from the first to the second
20 page. It kind of runs to the second page.
21         It's a table of the results of different
22 defense experts' reports and photographs of the -- of the
23 evidence in the Pursley forensic ballistics evidence in
24 the Pursley matter, and it lists Dan Gunnell's report,

211

1  Rusty McClain's notes and John Murdock's report, if you
2  see that. That's sort of the top of this table. Do you
3  see that, Mr. Striupaitis?
4      **A. Yes, I do.**
5      Q. And then on the second page, it indicates in
6  the Dan Gunnell column that the verifications were by
7  Pete Striupaitis. Do you see that?
8      **A. Mm-hmm.**
9      Q. Okay. The second column indicates that
10 Rusty McClain -- do you know who Rusty McClain is?
11     **A. I do.**
12     Q. How do you know Mr. McClain?
13     **A. He's a firearm examiner that was working --**
14 **worked in Rockford.**
15     Q. How long have you known Mr. McClain?
16     **A. Probably as long as he was an examiner, and**
17 **now he's retired.**
18     Q. So a long time, 20, 30 years?
19     **A. Yeah, something -- yeah, I believe that**
20 **would be accurate, yeah.**
21     Q. Have you ever spoken with him about this
22 matter, about this case?
23     **A. No, I have not.**
24     Q. Were you aware that he -- that he had any

212

1  role or any part in this case?
2      **A. No, I had no idea.**
3      Q. Okay. So this second column indicates that
4  he took notes, and it says for exhibit 2, the two fired
5  cartridge cases, he agreed with the identification.
6  Exhibit 3, the fired -- one of the fired bullets, he
7  could -- he had an inconclusive on that. And exhibit --
8  it says "exhibit 3", but I think that's supposed to be
9  exhibit 4 in the last -- well, in this column, it says
10 "conclusive". He agreed with that fired bullet.
11     **A. Mm-hmm.**
12     Q. And then in the fourth column, are you aware
13 that John Murdock conducted an examination of the
14 evidence in this case?
15     **A. I became aware of it by virtue of getting**
16 **that package at the first deposition, and there was a**
17 **file that was there with his name on it, but once the**
18 **deposition stopped, I packaged -- packaged everything up**
19 **and sent it back.**
20     Q. Did you read Mr. Murdock's report or look at
21 any of his case notes?
22     **A. No, I -- no, I did not.**
23     Q. Okay. So you didn't look at any of the
24 photographs from his report either?

213

1      **A. No, I did not.**
2      Q. Okay. In this fourth column or third
3  column, this is Mr. Murdock's results or -- from the
4  examination for. Exhibit 1, which Mr. Gunnell found
5  unsuitable -- he found it to be suitable, and he said
6  it's not fired in -- in the Taurus firearm in its present
7  condition. Exhibit 2 --
8      **A. Did McClain have any --**
9      Q. What's that?
10     **A. Did McClain have anything to say about that**
11 **item?**
12     Q. He didn't have anything to say about it. I
13 can tell you why. It's because Mr. McClain actually
14 entered the bullets and the exhibits 2, 3, and 4, bullets
15 and cartridge cases, he entered those in the IBIS system.
16     **A. Oh, okay.**
17     Q. Yeah. And he actually entered them twice.
18 And during that entry process, he took a look under the
19 microscope and made some notes.
20     **A. Okay. But he didn't say anything about the**
21 **bullet fragment?**
22     Q. No. I don't think he was looking at it. He
23 wasn't entering that into IBIS.
24     **A. Okay.**

214

1      Q. So, no. That -- that was not part of his
2  notes.
3          Would it surprise you to learn that Mr. --
4  Mr. McClain entered the test firings from the Taurus 9 --
5  the Taurus, exhibit 9, and all of these questioned
6  bullets and cartridge cases into IBIS to -- and ran it
7  two times?
8      **A. That would --**
9      Q. Is that --
10     **A. That would not surprise me because there's a**
11 **lot of work involved with the -- with the fired bullets.**
12     Q. And would it surprise you that IBIS returned
13 no -- no matches whatsoever between the test fires and
14 the fired bullets and cartridge cases, not high
15 confidence, not low confidence, nothing? Would that
16 surprise you?
17     **A. No. He says that exhibit 4, he agreed with**
18 **the identification so --**
19     Q. That --
20     **A. -- it's --**
21     Q. That's -- that's his -- that's his view
22 under the microscope.
23     **A. Oh, okay. I see.**
24     Q. That's not coming out of the IBIS program.

215

1       A.   Okay.  So the -- the digital imagery versus
2  looking under the scope itself, okay.  All right.
3  Thanks.
4       Q.   Mm-hmm.
5            Would it surprise you to learn that
6  Mr. McClain entered this all into IBIS, and it did not
7  correlate the evidence and the tests at all?
8            MR. IASPARRO:  This is Michael Iasparro.
9       I object to form and misstates the evidence.
10           MS. TINGSTAD:  Well, I -- we don't -- I
11      didn't -- I don't have the -- I don't have the
12      IBIS conclusions with me right now, although I
13      can pull up the transcript.
14 BY MS. TINGSTAD:
15      Q.   But, you know, you can answer, if you --
16      A.   Well, automation versus the eyeball, I
17  really -- am I surprised?  No.  Does it happen?  Yes.  I
18  don't know.
19           And then you can make your conclusion by
20  looking through the comparison microscope.
21      Q.   Right.  Right.
22           But you said earlier that you would expect
23  if two -- if two bullets, if they were the same
24  manufacturer were fired from the same gun, IBIS would

216

1  probably come up with at least -- would probably come up
2  with a high-confidence match.  You said that earlier,
3  right?
4            THE WITNESS:  One would like to think --
5       one would like to think, yes.
6  BY MS. TINGSTAD:
7       Q.   Okay.
8       A.   Whether -- whether it does or not, that's a
9  machine.
10      Q.   Okay.  If we take a look under -- underneath
11  this table at "potential problems", and you see the
12  language that says "potential problems"?
13      A.   Mm-hmm.  Is that --
14      Q.   It says "Murdock's" -- go ahead.
15      A.   No -- yes, I do.  I see what you're saying.
16  Go ahead.
17      Q.   Okay.  So if for number 1, it says,
18  "Murdock's report indicates the transcripts of the
19  Pursley trial reference Jack Welty as identifying the two
20  fired cartridge cases from the Ascher scene with each
21  other, and subsequently with the test firings from the
22  Taurus pistol.  No case notes or lab report was -- from
23  Welty for review.  This is true.  We have the master
24  file.  Welty is in the chain of custody for the above

217

1  evidence; however, there are no reports or case notes in
2  the file.  We don't know if he did examine the evidence."
3            Do you agree that it is a potential problem
4  that Jack Welty didn't document this examination or his
5  conclusions?
6            MR. IASPARRO:  Object to form and
7       foundation.
8  BY MS. TINGSTAD:
9       Q.   Would you agree with the writer of this
10  report or this email, Joanne McIntyre, that it's a
11  problem that Mr. Welty didn't document in his
12  examination?
13           MR. IASPARRO:  Object to form and
14      foundation.
15  BY MS. TINGSTAD:
16      Q.   You can answer.
17           MR. BHAVE:  I would also object to the
18      incomplete hypothetical.
19           MS. TINGSTAD:  It's not a hypothetical.
20           THE WITNESS:  So you want me to answer
21      that?
22  BY MS. TINGSTAD:
23      Q.   Yes.
24      A.   It's a potential problem, but when you do

218

1  the preliminarily -- the preliminaries, as we discussed
2  early, they are informal, and sure, he didn't document
3  it, and I really don't have anything else to say about
4  it.
5       Q.   Have you ever testified in court about a
6  forensic examination you've done that was informal?
7       A.   No.
8       Q.   To testify in court, do you always have the
9  formal documentation done?
10      A.   Yes.  I might -- I don't even recall doing
11  informals to be -- no.
12      Q.   For number 2 --
13      A.   Let's see.  Missing -- there is a latent
14  print report it says, right?
15      Q.   Mm-hmm.  We do have the report.  "Jim Titone
16  searched for the notes in the correct archive boxes, was
17  -- was unable to find them.  Jim also searched other case
18  numbers in which the numbers could've been transposed."
19           You -- you suggested earlier -- you
20  speculated earlier that the --
21      A.   That it went to latents first.
22      Q.   That it went to latent prints?
23      A.   Right.
24      Q.   Do you agree that it's a problem if there

219

1  were no case notes in latent prints?
2          MR. IASPARRO:  I object to form and
3      foundation.
4  BY MS. TINGSTAD:
5      Q.  You can answer.
6      **A.  Yeah, there should be.**
7  **BY MS. TINGSTAD:**
8      Q.  And just to clarify, you would agree that if
9  a forensic examiner gives testimony in court, there
10 should be a report in case notes that are done?
11         MR. IASPARRO:  Objection; lack of
12     foundation.
13 BY MS. TINGSTAD:
14     Q.  You can answer.
15     **A.  Yeah, there should be.**
16     Q.  Okay.  Okay.  Thank you.  That was Exhibit
17 3.
18         MS. TINGSTAD:  Let's take a five-minute
19     break.  Does that -- does that work for
20     everybody?
21         ALL COUNSEL:  Yes.
22         (Whereupon, the proceedings went off the
23         record at 2:06 p.m. through 2:31 p.m.)
24 BY MS. TINGSTAD:

220

1      Q.  So, Mr. Striupaitis, I think we were in
2  Exhibit 2 that we marked -- the document we marked for --
3  as Exhibit 2, Mr. Gunnell's report.
4      **A.  We've done that already.**
5      Q.  We have, yeah.  We have done that already.
6  I just want to ask you a few follow-up questions about
7  that.  Yeah.
8          You mentioned when we were -- when I was
9  asking you questions about this report, you -- you
10 mentioned in your testimony that you would've included
11 more detail on the diagram of the cartridge cases 2-A and
12 2-B.  Do you remember that?
13     **A.  Yes, I do.**
14     Q.  Okay.  Were there any policies at ISP about
15 the level of detail that should go into laboratory
16 worksheets?
17     **A.  I believe they were.  To the best of my**
18 **knowledge, there were, like, minimum standards, and if**
19 **you did the minimum, it was okay, and if you did more, it**
20 **was okay.  So I just did a little bit more because it was**
21 **just -- just me.**
22     Q.  Did you -- did you attend any trainings that
23 -- that caused you to do more?  Were they --
24     **A.  Because -- because it was our accreditation,**

221

1  and they wanted, you know, either a photomicrograph and a
2  sketch.  Maybe it was because of that.  I don't -- I
3  don't recall.
4      Q.  Why would that -- why is that kind of detail
5  documentation important?
6      **A.  That would -- for me, it would be maybe for**
7  **my -- better for my recollection.  You know, I don't**
8  **know.  You know, I don't really have a good answer for**
9  **you in regard to that.**
10         **Like I say, there's minimum standards, and**
11 **then you can do more.  But I think Dan did minimum, and I**
12 **did more.**
13     Q.  So would you agree with me that the
14 accreditation standard of a detailed sketch or photo was
15 the best practice?
16     **A.  A detailed sketch?  Is that -- no, I**
17 **wouldn't agree with you, no.**
18     Q.  No, okay.
19     **A.  Any -- I think any sketch would do.  That**
20 **was the third thing.  A photomicrograph, a sketch, or a**
21 **narrative.  So if you were verbal or both, then you could**
22 **write a narrative as to what you saw.**
23     Q.  Is the level of documentation that you would
24 have made more detailed than this, would -- would you

222

1  call that to be best practices?
2      **A.  I would call it my practices.  I don't know**
3  **if it's best practices.**
4      Q.  But you practice -- your level of practice
5  was higher than the minimum standard, in your opinion?
6      **A.  I -- I wouldn't say that.  It was just**
7  **something that I did.  You know, you did -- we're**
8  **creatures of habit.**
9      Q.  Would you say that the report that we're --
10 that we're looking at here with these sketches,
11 Mr. Gunnell's report, would you say that they met the
12 minimum standard?
13     **A.  I believe so, yes.**
14     Q.  Would you say that this report fell below
15 the accreditation standard?
16     **A.  No.**
17     Q.  All right.  Let me close my door.
18         In your view, this report would satisfy the
19 requirement for a photo, sketch, or narrative, your
20 accreditation requirement?
21     **A.  The -- it's the -- it's the worksheets.  Do**
22 **they beat the minimum requirement?  Yes.  And the -- and**
23 **the report certainly does, yes.**
24     Q.  How is the -- when we're talking about

223

1  accreditation, what -- what accrediting body are we
2  talking about?
3      **A.  At the time, it was either the Association**
4  **of Crime Lab Directors Laboratory Accreditation Board.**
5      Q.  And is that --
6      **A.  I don't think they -- they're no longer in**
7  **existence.  They're going on through some kind of ISO --**
8  **17025, something or other.  So I don't -- I don't know.**
9  **I've been out of the loop, so to speak.**
10     Q.  So would this accrediting body that you
11 mentioned, the crime lab --
12     **A.  Accreditation board.**
13     Q.  -- accreditation board, would you -- was the
14 Broadview branch lab accredited in 1993?
15     **A.  Yes.**
16     Q.  So it would have been following both the
17 minimum standards of ISP and the requirements of the
18 accreditation board?
19     **A.  Yes.**
20     Q.  And you said that -- you just said that the
21 report itself would meet the standard of the
22 accreditation board.  When you say that --
23     **A.  It's --**
24     Q.  -- are you referring to the two-page report?

224

1      **A.  I'm sorry.  Go ahead.**
2      Q.  Are you referring to the two pages --
3      **A.  Yes.**
4      Q.  -- that are in front?  Okay.
5          And you're referring to the findings that
6  just say -- that say, "These items were fired in exhibit
7  9"?
8      **A.  Yes.**
9      Q.  This report doesn't come with any photos or
10 sketches or detailed narrative, does it?
11     **A.  No.  The reports don't, but the worksheets**
12 **do, and the worksheets are minimum standard -- meet**
13 **minimum standards.**
14     Q.  Okay.  So the worksheets are part of the
15 report, and they meet minimum standards?
16     **A.  Correct.**
17     Q.  And that would be the ISP minimum standards,
18 correct?
19     **A.  And also, since they're accredited by ASCLD**
20 **LAB, also theirs, too.**
21     Q.  So in your view --
22     **A.  It was not mutually exclusive --**
23     Q.  Okay.
24     **A.  -- that the -- I mean, I think I -- I don't**

225

1  think.  I know.
2      **The Illinois State Police Bureau of Forensic**
3  **Sciences was the first lab system in the country to get**
4  **ASCLD Lab accreditation, Association of Crime Lab**
5  **Directors Laboratory Accreditation Board.**
6      Q.  You just mentioned that the ISP minimum
7  standards and the ASCLD accreditation standards are not
8  mutually exclusive.  Is one higher -- does one impose a
9  higher standard than the other?
10     **A.  One would -- one would mimic the other.**
11 **It's -- it's whatever ASCLD has, it's incorporated by the**
12 **Illinois State Police because they were the first lab**
13 **system -- excuse me, by the Bureau of Forensic Sciences**
14 **because they were the first ones to be accredited by the**
15 **body.  So you adhere to that, and that's why you get the**
16 **accreditation, and that was done when we were still --**
17 **when I was still at Maywood.**
18     Q.  So that was done prior to '92, '93?
19     **A.  I -- it was -- I think it was done in -- in**
20 **the -- in the '80s.**
21     Q.  And it's your understanding, you said, that
22 they would be one in the same.  So is your understanding
23 that the accreditation standards would have been
24 reflected in the ISP standards?

226

1      **A.  Yes, that's correct.**
2      Q.  The ISP standards at the time didn't require
3  a photograph or a sketch or a narrative, did they?
4      **A.  No, they did.  As I indicated earlier, it**
5  **was like either a sketch, a narrative, or a**
6  **photomicrograph.  We opted to not have photomicrographs**
7  **because we didn't want them -- to have anybody view them**
8  **and think that they can, you know, they'll see areas of**
9  **agreement, and they'll see areas of disagreement.  We**
10 **didn't want to confuse the issue.  So we -- we didn't**
11 **want narratives, so we close the sketch.**
12     Q.  So -- but the purpose of this sketch was to
13 provide some level of detail, correct?
14     **A.  It was to provide some level of recollection**
15 **and what you did in the -- in the particular case.**
16     Q.  So the purpose of the sketch was really to
17 remind -- your testimony is that it was to remind the
18 examiner about what they looked at?
19     **A.  Yes, ma'am, that's correct.**
20     Q.  So this sketch of 2-A and 2-B by Mr. Gunnell
21 would remind him that -- of the letters that were on the
22 outside of the breech-trace or of the -- of the cartridge
23 case?
24         MR. BHAVE:  Objection; foundation and

227

1    speculation.
2 BY MS. TINGSTAD:
3       Q.   I'm looking at the -- I'm still looking at
4 this Pursley 100005, which is the laboratory worksheet
5 showing this -- Mr. Gunnell's sketches of 2-A and 2-B.
6            And my question for you is:  What -- what --
7 what would these sketches convey to anyone?  What
8 information do they convey?
9            MR. BHAVE:  Objection; speculation.
10           MR. IASPARRO:  And form, Michael
11 Iasparro.
12 BY MS. TINGSTAD:
13      Q.   Okay.  You can answer, and to -- and to make
14 clear, I understand that the identification is based on
15 individual characteristics.  So what individual
16 characteristics are conveyed on these sketches?
17      **A.   There -- these are -- these are conveyed --**
18 **these are not to convey individual characteristics.**
19 **They're to convey minimum standards as far as**
20 **documentation as to what the evidence looked like.  I**
21 **mean, some of us are more artistic than others.  And I am**
22 **certainly not going to be putting in individual**
23 **characteristics on a sketch, you know.  And if you put**
24 **down something, you're meeting the -- the minimum**

228

1 **standards.**
2       Q.   So minimum standards just require that you
3 put down something?
4       **A.   That -- that there's a reflection of what**
5 **you saw as far as the evidence that was received.**
6       Q.   And is there a reflection of what you saw
7 with regard to what led you to make an identification?
8       **A.   No.  It's what I saw through the microscope**
9 **that led me to make an identification.**
10      Q.   Right.  So would your sketch be a reflection
11 of --
12      **A.   No.**
13      Q.   -- what you saw in the microscope?
14      **A.   No.**
15      Q.   So the sketch is just -- is a sketch of
16 what?
17      **A.   Just documentation as far as what -- what**
18 **that item looked like.**
19      Q.   For example, documentation of the color of
20 the -- of the cartridge case?  Is that -- is that one of
21 the things?
22      **A.   Yes.**
23      Q.   Okay.  And the letters or numbers that are
24 stamped on the outside of it?

229

1       **A.   Yes, that's correct.**
2       Q.   But no documentation as to even the class
3 characteristics that you mentioned with regard to breech
4 tracemarks, whether they were hatched or stippled or you
5 -- you talked about those being class characteristics,
6 the tracemarks --
7       **A.   I don't recall what the -- what the minimum**
8 **standards were, you know, but I would -- I would -- you**
9 **know, with him being newly trained, I would -- I would**
10 **say that he met minimum standards.**
11      Q.   Okay.  So you don't recall right now what
12 the minimum standards were?
13      **A.   No, I do not.  No, I do not.**
14      Q.   So you -- you -- you're not testifying right
15 now that he met the minimum standards by this sketch,
16 correct?
17      **A.   No, I'm not.**
18      Q.   Your testimony is that because Mr. Gunnell
19 had a year of experience, that he must've been meeting
20 the -- the minimum standards?
21           MR. BHAVE:  Objection --
22 BY MS. TINGSTAD:
23      Q.   Is that what --
24           MR. BHAVE:  Objection; mischaracterizes

230

1 testimony.
2           MS. TINGSTAD:  Okay.
3           THE WITNESS:  Based on being a
4 newly-trained individual, I would -- one would
5 retain more as far as being newly trained.  That
6 -- that's my opinion.
7 BY MS. TINGSTAD:
8       Q.   So your opinion is that Mr. Gunnell, having
9 been newly trained, would've been aware of the -- of the
10 minimum requirements or the minimum standards, correct?
11           MR. IASPARRO:  Michael Iasparro, object
12 to form and foundation.
13 BY MS. TINGSTAD:
14      Q.   You can answer.
15      **A.   Yeah, yeah.  He would be aware.**
16      Q.   And you -- and then you -- your testimony is
17 that you would further assume that because Mr. Gunnell
18 was aware of the minimum standards, that he would -- that
19 this particular worksheet must meet the minimum standards
20 based on his awareness of it?
21           MR. IASPARRO:  Form and foundation,
22 Michael Iasparro.
23 BY MS. TINGSTAD:
24      Q.   You can answer.

231

1      A.   Yes.

2      Q.   Okay.  But as you sit here today, you can't

3  give -- you can't give me an opinion as a former lab

4  director that this report met the minimum standards, as

5  you sit here today?

6           MR. BHAVE:  Objection; assumes facts not

7  in evidence.

8           MR. IASPARRO:  And foundation.

9  BY MS. TINGSTAD:

10      Q.   You can answer.

11      **A.   The report met minimum standards, and the --**

12  **and the worksheets met minimum standards from what I**

13  **recall.**

14      Q.   From what you recall.

15      **A.   Yes.**

16      Q.   But you don't recall -- you don't recall

17  what the minimum standards are, correct?

18      **A.   Yeah.  That was 1993.  So there's -- there's**

19  **things that I forgot this morning.**

20      Q.   Okay.  You mentioned, Mr. Striupaitis, that

21  you knew Dan Gunnell for a long time?

22      **A.   Yes, ma'am.**

23      Q.   Okay.  Would you consider Mr. Gunnell a

24  friend?

232

1      A.   Yes.

2      Q.   Have you socialized with him outside of

3  work?

4      **A.   Just at -- just at -- at the AOFTE seminar**

5  **because there's, like, activities that go on at the**

6  **seminar, and we're both past AOFTE presidents.**

7      Q.   Did you ever go out for drinks with him or

8  dinner or socialize otherwise?

9      **A.   Possibly at the seminar, but not -- not at**

10  **any other time to the best of my recollection.  You know,**

11  **we belong to the same organization.  He was on the Board**

12  **of Directors and the president.  I was on the Board of**

13  **Directors.  You get to know the people in the**

14  **organization.**

15      Q.   And also from working in the same lab,

16  correct?

17      **A.   Yeah.  And -- and we worked in the same lab.**

18  **I mean, I believe we went out to lunch, you know, things**

19  **like that, yes, absolutely.**

20      Q.   Do you know Mr. Gunnell's family?

21      **A.   Yes, I do.**

22      Q.   And who did you know in his family?

23      **A.   I knew his father.  He worked at the Chicago**

24  **Police Department.**

233

1      Q.   And when did you meet Mr. Gunnell's father?

2  What was his name?

3      **A.   Don Gunnell.**

4      Q.   Don Gunnell.  When did you meet Don Gunnell?

5      **A.   February 1995.**

6      Q.   Oh, wow.  That's a great memory.  What

7  happened in February 1995?

8      **A.   I joined the Chicago Police Department as a**

9  **criminalistics aide in their firearms section.**

10      Q.   That was -- was that 1985, not '95?

11      **A.   Actually -- no, I'm sorry.  It was 1975.**

12      Q.   1975, okay.  Yeah.

13          So in February 1975, that's when you joined

14  the Chicago Police Department as your -- as the

15  criminalistics aide, and that was the beginning of your

16  forensic science career, correct?

17      **A.   That was certainly -- I didn't realize it at**

18  **the time, but it developed into that, yes.**

19      Q.   So you met -- you knew -- you knew Don

20  Gunnell from day one of your career in criminal --

21  criminalistics?

22      **A.   Yes, ma'am.**

23      Q.   Okay.  And did -- what did you know of

24  Don Gunnell of his -- of his reputation?

234

1      **A.   Upstanding guy, worked as a firearms**

2  **technician, examiner, and good family guy, and, you know,**

3  **working with him on a daily basis.  Didn't socialize with**

4  **him or anything like that.  It was a -- it was a work**

5  **relationship.**

6      Q.   Did you look up to him?

7      **A.   Yeah.  There was -- there were ten**

8  **examiners, and some of them were like my -- were father**

9  **figures.**

10      Q.   Would you describe Don Gunnell as a father

11  figure?

12      **A.   No, but an individual who was -- who I**

13  **admired.**

14      Q.   Did you have occasion to continue to

15  interact with Don Gunnell when you were a forensic

16  examiner?

17      **A.   Yeah, because he retired from there, and he**

18  **came onboard to work with the Illinois State Police.**

19      Q.   Was Don Gunnell working for the State Police

20  at the same time that Dan Gunnell was?

21      **A.   Yes.**

22      Q.   And you knew them to be father and son?

23      **A.   Yes.**

24      Q.   Was Don Gunnell a hunter?

235

1    **A. I don't know. He -- he passed away some**
2 **years back. I don't -- I don't believe so.**
3    Q. Okay. Did you know an examiner by the name
4 of Boese?
5    **A. I'm sorry?**
6    MR. HUOTARI: I'm not sure if the court
7 reporter caught that, but it was breaking up on
8 my end. Could you repeat --
9    MS. TINGSTAD: Yeah. It just broke up
10 for me, too.
11    THE STENOGRAPHIC REPORTER: "Examiner by
12 the name of Boese." Can you spell Boese?
13    MS. TINGSTAD: B-o-e-s-e.
14    THE STENOGRAPHIC REPORTER: Thank you.
15 BY MS. TINGSTAD:
16    Q. Or Boese? I don't know how you say it.
17    **A. I knew of a Boese at the Chicago laboratory,**
18 **and I believe he was his father.**
19    Q. Okay. So at the Chicago Police, there was a
20 Boese. Was he there -- was he also a forensic examiner?
21    **A. He was a drug chemist.**
22    Q. A drug chemist. And he -- was he there at
23 the same time that Don Gunnell was there?
24    **A. Yes.**

236

1    Q. So they were both more senior figures in the
2 forensic community when you started?
3    **A. That's correct.**
4    Q. Okay. And then your understanding was that
5 Mr. Boese's son became a firearms examiner?
6    **A. Yeah, but I didn't -- I didn't know anything**
7 **about him.**
8    Q. You didn't know anything about him?
9    **A. No.**
10    Q. Do you know whether he and Mr. Gunnell and
11 you were contemporaries or that -- he was a contemporary
12 with you and Mr. Gunnell?
13    **A. No, I don't. Like I say, I don't know**
14 **anything about him. I know he was a firearms examiner,**
15 **but that was it.**
16    Q. Did he work for the Illinois State Police as
17 well, the younger Mr. Boese?
18    **A. I don't believe so.**
19    Q. Are you aware that he had any involvement in
20 this case?
21    **A. No.**
22    Q. We talked a lot today about the preliminary
23 exams of -- of evidence, fired bullet and cartridge case
24 evidence before a gun has been identified. And were you

237

1 ever asked to give a preliminary examination like that?
2    **A. Not to the best of my knowledge, no.**
3    Q. Okay. So you don't recall ever giving one?
4    **A. No, I don't recall.**
5    Q. Do you recall ever being asked to give one
6 by law enforcement?
7    **A. No.**
8    Q. Okay. You did mention that -- when I was
9 asking you about preliminary examinations, you mentioned
10 that you heard of people giving them?
11    **A. Yes.**
12    Q. Can you give me an example of one of the
13 times you heard of that?
14    **A. That individual I mentioned before that I**
15 **gave you that's on the record, Robert Shem in Alaska.**
16    Q. Anybody else?
17    **A. S-h-e-m. No.**
18    Q. Just -- just that case of Robert Shem?
19    **A. Right.**
20    Q. So you can't give me any other examples
21 beyond that one of Robert Shem in Alaska?
22    MR. BHAVE: Objection; asked and
23 answered.
24    THE WITNESS: No.

238

1 BY MS. TINGSTAD:
2    Q. Okay. When you mentioned the Robert Shem
3 case, you indicated that Mr. Shem worked at the -- worked
4 as a forensic examiner for 30 years, and that "He was
5 good to his agencies, and they were good to him." Do you
6 recall saying that?
7    **A. Yes, I do.**
8    Q. And you also said that the management didn't
9 like that, and that's what led to him leaving, correct?
10    **A. Yes.**
11    Q. What does it mean for a firearm -- let me
12 start first. When you talk about "agencies", being good
13 to his agencies, are you referring to police departments?
14    **A. Yeah. I'm referring to police -- I'm**
15 **referring to -- having a good rapport with the police**
16 **agencies.**
17    Q. Okay. So what does it mean for a firearm
18 forensic scientist to be good to a police department?
19    **A. Just to be friendly when the evidence is**
20 **submitted.**
21    Q. And what does it mean for an agency to be
22 good to the forensic examiner?
23    **A. I don't know if I know the answer to that.**
24    **Be on time, be friendly in court before you go testify or**

239

1  something like that.
2      Q.   Why would just being friendly when evidence
3  is submitted and being on time, why would that lead --
4  why would management not like that?
5      A.   **So you're talking in regard to Shem, as far**
6  **as management liking him?  I think --**
7      Q.   Correct.
8      A.   **Yeah, I don't -- I don't know.**
9      Q.   Does being good to a police -- to a -- to
10 the police department include giving preliminary opinions
11 in an informal way?
12          MR. BHAVE:  Objection; form.
13          MR. IASPARRO:  I join.  Michael
14     Iasparro.
15          THE WITNESS:  Yeah, Shem gave them a
16     preliminary.
17 BY MS. TINGSTAD:
18     Q.   Without writing it up?
19     A.   **It was -- it was a weekend, and they wanted**
20 **to work on the case, and it -- it helped in that regard.**
21     Q.   They wanted -- was it -- was his opinion
22 used to -- are you aware of his opinion being used to
23 obtain a -- a warrant?
24     A.   **Yes.**

240

1          MR. IASPARRO:  Ashley, are we still
2      talking about this guy from Alaska?  Just so
3      we're clear.
4          MS. TINGSTAD:  Yes.  Yes, we are.  Yes,
5      we are.
6          THE WITNESS:  Yeah, we are.
7  BY MS. TINGSTAD:
8      Q.   So his opinion -- his preliminary opinion
9  was used to obtain a warrant in that case is what you
10 just said?
11     A.   **Yes.**
12     Q.   Okay.  Is that what you would refer to as
13 being good to -- to an agency?
14     A.   **I think it was just a matter of -- yeah, I**
15 **worked with that agency, and he provided information to**
16 **them.  He felt that he was like -- being a professional.**
17     Q.   I -- do you recall me asking you about any
18 examples you might know -- I'm sorry.  Let me strike
19 that.
20          Do you recall me asking you why an examiner,
21 a forensic examiner might begin to analyze evidence but
22 then not finish that analysis and have it, you know,
23 handed off to another examiner?  Do you recall you saying
24 that the person could be on vacation?

241

1      A.   **Yeah.**
2      Q.   Do you recall that?
3      A.   **Yeah.**
4      Q.   Do you have any examples of an occasion
5  where a forensic examiner started examining evidence, but
6  then went on vacation and somebody else finished it?
7      A.   **No, I don't.**
8      Q.   You can't recall any examples of that?
9      A.   **No, I don't recall.**
10     Q.   And you can't recall any examples of an
11 examiner starting to analyze evidence but not finishing
12 it because the lab was backlogged?
13     A.   **No, I don't recall.**
14     Q.   Can you think of any other examples in your
15 30-year career with ISP where an examiner began to
16 analyze the evidence but didn't finish it?
17     A.   **No, I -- I don't recall.**
18     Q.   Mr. Striupaitis, you're -- you're now aware
19 that John Murdock conducted an examination of the
20 evidence, the Taurus and the fired bullet evidence, from
21 1993 and rendered an opinion of an elimination for the
22 bullets and the shell casings?
23     A.   **Yes.**
24     Q.   Given Mr. Murdock's -- given Mr. Murdock's

242

1  opinions and report, are you still standing by the
2  accuracy of your verification as you sit here today in
3  1993?
4      A.   **Yes, I am.**
5      Q.   Are you aware that ISP examiner Beth Patty
6  did a full re-examination in 2012 and could not identify
7  the bullets as being fired by the Taurus?
8      A.   **No.**
9      Q.   Are you aware that Dan Gunnell also
10 re-examined the evidence under a microscope in 2012 and
11 agreed with Beth Patty that he could not identify the
12 bullets as being fired by the Taurus?
13     A.   **No, I -- I certainly didn't know that.**
14     Q.   Given that, would you -- are you still
15 standing by the accuracy of your verification in 1993?
16     A.   **Yes.**
17     Q.   Or are you just saying -- are you saying
18 that you believe it was appropriate in 1993, or are you
19 saying that it's still accurate today?
20     A.   **I believe that what I saw in 1993 is what I**
21 **saw; that's a verification.**
22     Q.   In 1993, you didn't look at the test
23 compared to the test to get a baseline of
24 reproducibility, did you?

243

1    A.   No.  As I indicated, I don't -- I don't look
2  at the test as a matter of standard operating procedure.
3  I just look at the -- the evidence.
4         (Whereupon, Exhibit Number 4 was marked for
5         identification.)
6  BY MS. TINGSTAD:
7    Q.   Okay.  I'm going to mark as Exhibit 4 -- are
8  we on Exhibit 4?
9    A.   Which one is Exhibit 4?
10   Q.   I'm just asking, are we on Exhibit 4?  I
11 think we are, right?
12        MR. HUOTARI:  The last one that I recall
13        was Exhibit 3, being that email, that was
14        marked.
15        MS. TINGSTAD:  All right.
16 BY MS. TINGSTAD:
17   Q.   So Exhibit 4 is the memorandum opinion of
18 Dan Gunnell from December 7th, 2016, and it's Pursley
19 10829 and 10830.
20        So I'm going to represent to you,
21 Mr. Striupaitis, that after Mr. -- after Mr. Murdock
22 issued his report, which you saw ISP leadership
23 discussing in that email chain of Exhibit 3, after that
24 report was issued, that's when Rusty McClain went back

244

1  and did the IBIS report, and looked -- looked through the
2  microscope and wrote some notes.  And then there was
3  formal re-examination done by Beth Patty in 2012, and
4  then litigation ensued.
5         So Exhibit 4 is -- is a memorandum that
6  Dan Gunnell wrote to the Judge, Judge Joseph McGraw, on
7  December 7th, 2016, in response to an Order of the Court
8  for him to -- for -- for Mr. Gunnell to explain the --
9  his -- his conclusions after looking through the
10 microscope with Beth Patty.
11        Mr. Gunnell looked through that microscope
12 with Beth Patty after she completed her -- her
13 examination but did not make any notes.  And so the Court
14 ordered Mr. Gunnell to write some notes and explain
15 himself.  So that's what this is, and I just want to give
16 you a minute to read it.
17   A.   Okay.  I've read it.
18   Q.   Okay.  As you can see -- if you'll take a
19 look at the second photograph.  "As part of an
20 examination of physical evidence involved in the homicide
21 of Mr. James Ascher, laboratory case number R93-1450, I
22 identified exhibit 3 and exhibit 4, both 9 millimeter
23 fired bullets, as having fired from exhibit 9, a Taurus
24 model PT99AF pistol, serial number TLF55001D.  This

245

1  identification along with its verification by forensic
2  scientist, Peter Striupaitis, occurred on October 15th,
3  1993.
4         All appropriate procedures and protocols in
5  place at this time were followed.
6         In October of 2012, I had the opportunity to
7  re-examine these exhibits in the presence of FS Beth
8  Patty at the Springfield Forensic Science Laboratory.  As
9  a result of this examination, although I could determine
10 class characteristics agreement and some individual
11 characteristic agreement, there is insufficient
12 individual characteristics currently present to enable me
13 to make an identification."
14        And then Mr. Gunnell goes on to explain that
15 he is left with the opinion that, "The physical evidence
16 had somehow changed or been altered over the intervening
17 19 years."
18   Q.   Do you see that?
19   A.   Yes.
20   Q.   And he states that there was verifying stria
21 that he -- he no longer sees, and he talks about
22 incidences in Massachusetts and New York.
23        Have you ever been -- have you ever known
24 stria on a bullet to -- that's been stored properly and

246

1  handled properly to disappear?
2    A.   Not to the best of my recollection.
3    Q.   You've never heard of that before?
4    A.   Well, I've heard of it deteriorating, but
5  it's sometimes more so with lead ammunition, though.
6  It's certainly not impossible.
7    Q.   With copper-jacketed ammunition?  Have you
8  ever heard of that?
9    A.   Well, depending on the thickness of the
10 jacketing.
11        Counsel, you know, in the third column, it
12 says, "Therefore I could neither identify nor exclude
13 exhibits 3 and 4 as having been fired from exhibit 9, the
14 Taurus."
15   Q.   Mm-hmm.
16   A.   So he's saying it's an inconclusive.
17   Q.   Mm-hmm.
18   A.   So he's agreeing that there's class
19 characteristics there, right?
20   Q.   So right twist, but there are a lot of guns
21 that fire bullets with a right twist; is that correct?
22   A.   There are.
23   Q.   Including every Taurus 9 millimeter?
24   A.   Right.

247

1    Q.  Including Berettas and Astras and others,
2  correct?
3    **A.  And revert back to the first paragraph where**
4  **-- where -- no, the second paragraph, where he made the**
5  **ID and I made the ID, and I stand by that.**
6    Q.  Okay.  But even though both Beth Patty and
7  Dan Gunnell can no longer identify these -- these bullets
8  as being fired by the Taurus, you still stand by it?
9    **A.  They're not excluding it.  They're saying --**
10    Q.  You still stand by the identification?
11    **A.  I stand by my original verification.**
12    Q.  Okay.
13    **A.  I'm sorry, Counsel.  Didn't McClain agree**
14  **with the one identification in that one column of that --**
15  **of that previous document you had there?**
16    Q.  Yes.  He found one of the bullets -- I can
17  represent to you that in his testimony, he stated that he
18  didn't conduct a full examination.  His notes indicated
19  that he --
20    **A.  I'm sorry.**
21    Q.  -- one of the bullets was inconclusive.
22    **A.  He -- he testified as to what?**
23    Q.  His testimony -- I can represent to you that
24  his testimony was that his job was to enter these

248

1  evidence -- this -- these items into evidence -- or not
2  into evidence, into the IBIS system.
3    **A.  Exactly.**
4    Q.  And while he was doing that, while he was
5  doing that, he did look at them under the microscope.
6    **A.  Okay.**
7    Q.  And made some notes.
8    **A.  Right.**
9    Q.  He did -- he testified that he didn't do a
10  full examination, but he did make some notes, and his
11  notes indicated that he couldn't -- that he was
12  inconclusive on bullet 3, bullet exhibit 3 --
13    **A.  And he was --**
14    Q.  -- and he identified the other one, right.
15  So --
16    **A.  So that juncture, should've been an addendum**
17  **written, an addendum report.**
18    Q.  That's not actually what occurred, but I --
19  I -- I hear you.  That he -- what he did was he had wrote
20  some notes and -- and ended up -- they ended up coming
21  out --
22    **A.  Because I understand it -- because I thought**
23  **I did hear that he find -- you know, but that was IBIS,**
24  **then okay.**

249

1    Q.  He was doing IBIS, yes, yes.
2    **A.  Okay.  Thank you.**
3    Q.  No, it's -- there's a long -- there's a long
4  history.
5    (Whereupon, Exhibit Number 5 was marked
6    for identification.)
7  BY MS. TINGSTAD:
8    Q.  Well, I want to take a quick look at what
9  I'll mark as Exhibit 5, which is your CV, sir.  It's the
10  Plaintiff's -- the Bates number is ISP Defendants 2077,
11  and it goes all the way through 2081.
12    **A.  Okay.**
13    Q.  In the first part of your deposition, you
14  did look at this, correct, Mr. Striupaitis?
15    **A.  The CV?**
16    Q.  Yes, the CV.
17    **A.  No.  I -- I provided -- I was asked to**
18  **provide two CDs -- CVs, and one was to be up to 1993, and**
19  **then as a courtesy, I -- since I already produced this, I**
20  **added on what was to be from '90 -- from '93 until**
21  **currently.**
22    **So this is a current CV that you are looking**
23  **at, except for -- let's see.  It doesn't include this one**
24  **training thing that I'm doing now, so it's not that**

250

1  current.
2    Q.  Okay.  In terms of the -- your professional
3  experience, starting in the first page, from 1975 up
4  until just even -- 2008 at the end of that first page,
5  that's all correct, right?
6    **A.  Yes, that's all correct.**
7    Q.  All right.  We've talked about most of the
8  items on here.  I just want to move down toward the
9  middle of the first page or toward the bottom actually.
10  It says, "Illinois State Police Statewide Quality Review
11  Coordinator"?
12    **A.  Yes.**
13    Q.  "From 1997 to 1999"?
14    **A.  Right.**
15    Q.  What did you do as a quality -- quality
16  review coordinator?
17    **A.  Everybody took turns, as far as being the**
18  **quality review coordinators, and you would receive five**
19  **files and review them administratively, and then one or**
20  **two files where you reviewed the whole case from -- to**
21  **include the evidence.  So administratively, it was all**
22  **the paperwork and no evidence, and then the --**
23    Q.  So the report and -- and the worksheets?
24    **A.  Yes.**

251

1    Q.   What -- what about evidence receipts,
2    anything like that?
3    **A.   Yeah.  Everything -- everything there is,**
4    **all of the paperwork.**
5    Q.   What were you checking for when you did that
6    administrative review?
7    **A.   Typos and if there's any, you know,**
8    **something askew, what have you, you know, because it's --**
9    **it is quality assurance.**
10   **And then one -- at least one case to where**
11   **it was the paperwork and the actual fired evidence where**
12   **you would review it microscopically.**
13   Q.   So, like, a -- like, a random reanalysis?
14   **A.   Correct.**
15   Q.   And what's -- what is your understanding of
16   the purpose of that quality review work?
17   **A.   What is my understanding of it?**
18   Q.   Yeah.  What was the purpose of it?
19   **A.   It was -- it was for quality assurance and**
20   **-- and something that we did, and we all took turns doing**
21   **it, two years at a time.**
22   Q.   And would you do it -- when you did it for
23   two years, were you doing it for the -- you were doing it
24   for the whole state?

252

1    **A.   Correct.**
2    Q.   Would be all the ISP labs in the state?
3    **A.   All the examiners, correct.**
4    Q.   And then you said you would do about five?
5    **A.   I think it was five -- I think it was five**
6    **files for the paperwork, and at least -- at least one**
7    **case, the paperwork and the fired evidence.**
8    Q.   And was that the whole year?  Per year, or
9    per month, or per week?
10   **A.   I -- I don't recall.  There -- there was a**
11   **schedule, and we -- we adhered to the schedule, and I**
12   **don't -- I mean, that was a while ago.**
13   Q.   Okay.  So -- but you said that there was --
14   there were five files, and at least one full
15   re-examination under a microscope?
16   **A.   Correct.**
17   Q.   But that -- what's the period of time for
18   that, is what I'm asking?  Five files in the whole two
19   years, five files in one year?
20   **A.   Oh, no.**
21   Q.   Five files per month?
22   **A.   Five files per examiner, and there were --**
23   **God, I don't know how many examiners.  So probably -- I**
24   **think it probably came out to, like, one -- one per**

253

1    **month, and then on top of it, you were like -- you had**
2    **other duties so --**
3    Q.   I see.
4    **A.   -- on and so forth, so --**
5    Q.   So you meant for each forensic examiner in
6    IPS --
7    **A.   Yes.**
8    Q.   -- five of their files would be
9    administratively reviewed by the quality review
10   coordinator?
11   **A.   And one with the -- with the review --**
12   **administrative review and the actual evidence, like a**
13   **redo of the case in looking at the evidence**
14   **microscopically.**
15   Q.   And would that be per year?
16   **A.   It would be, yes, I believe it was per year**
17   **because then you would issue a report and say that, you**
18   **know, passed the quality assurance --**
19   Q.   Okay.
20   **A.   -- for that year.**
21   Q.   So each -- so for those two years -- for
22   each of those two years, you would review five files and
23   one full re-exam for each forensic examiner in ISP?
24   **A.   Yes.**

254

1    Q.   Okay.
2    **A.   Yes.**
3    Q.   In your two years as statewide quality
4    review coordinator, did you find any administrative
5    reviews that fell below the minimum standard?
6    **A.   No, I did not.**
7    Q.   Did you ever find any mistakes that were
8    made in the microscopic reanalysis?
9    **A.   No, I did not.**
10   Q.   Are you aware of the statewide quality
11   review ever finding or identifying a bum ID, for example?
12   **A.   No.**
13   Q.   In your 30 years being at ISP, you are not
14   aware of a single time that quality review uncovered a
15   mistake?
16        MR. BHAVE:  Objection.  That assumes
17        facts not in evidence.
18        THE WITNESS:  No, I'm not aware.
19   BY MS. TINGSTAD:
20   Q.   In your whole career --
21   **A.   In my whole career.**
22   Q.   -- with ISP?  Okay.
23        And in your career with ISP, are you aware
24   of quality review coming back and saying that a -- on an

255

1　administrative review, that the file fell below the
2　standard?
3　　　A.　No.
4　　　Q.　Could you -- on the second page, under
5　"continued education specialized training", what -- what
6　is "I attended and completed 18 armorers classes." What
7　does that mean?
8　　　A.　They were classes that are provided by the
9　gun manufacturer for armorers at the police departments.
10　An armorer is the actual men and women that can fix guns.
11　　　We took the classes so that we could get a
12　manual on that particular manufacturer so that in the
13　likelihood of a gun coming in that was malfunctioning, we
14　had a reference to look at.
15　　　So, you know, some of these -- some of them
16　were repeats.  I think Glock, I took twice, but, yeah,
17　there were 18 of them that I took.
18　　　Q.　Did you ever take one on Taurus?
19　　　A.　Not to the best of my recollection.
20　　　Q.　Mr. Striupaitis, in all of your years
21　working as a forensic examiner and giving testimony in
22　court about identifications you've made, has there ever
23　been an expert on the other side disagreeing with you?
24　　　A.　No.  I can't recall.  No.

256

1　　　Q.　Never happened in your career?
2　　　A.　No.
3　　　Q.　Would you say that that's pretty rare for a
4　forensic examiner?
5　　　A.　I guess one could say that it is, but I'm --
6　I'm proud in what I do and come from a good system.
7　　　Q.　I -- I'm going to mark as Exhibit 6
8　Mr. Murdock's Report of Laboratory Examination.  It's
9　only a few pages long, six pages starting with ISP
10　Defendants 94 and going through ISP Defendants 99.
11　　　A.　94 through 99?
12　　　Q.　Yes.  If you can just take a few minutes to
13　look through that.
14　　　A.　I'm trying to discern where you see this 94,
15　99.  Oh, so that's the 94.
16　　　Q.　Yeah.
17　　　A.　I see.  I gotcha.  Okay.
18　　　Q.　Okay.
19　　　A.　It was under my -- it was under my nose.
20　　　Q.　I'm actually going to stop you.  Because I
21　think I'm -- I think -- I don't think I'm going to ask
22　any questions about this.  So we can just -- this doesn't
23　need be marked as Exhibit 6.  We can just unmark it if
24　that's okay.

257

1　　　Just one other thing I want to ask you
2　about, Mr. Striupaitis.
3　　　A.　Yes, ma'am.
4　　　Q.　Do you recall testifying as an expert in a
5　Massachusetts case called Commonwealth versus Meeks?
6　　　A.　I do.
7　　　Q.　Okay.  What was that about?
8　　　A.　It was a Dobbert hearing, a Dobbert case,
9　and I was hired by the Suffolk County State's Attorney's
10　Office to basically defend the -- the discipline, the
11　firearms discipline.
12　　　And what it was, it was the Boston PD wasn't
13　receiving sufficient training and/or continuing education
14　so on and so forth, and they -- to be kind --
15　misrepresented themselves in the case.  So they asked
16　some of us and -- and then there was -- opposing counsel
17　was -- or opposing witnesses were Edena Schwartz and
18　others.
19　　　So in essence, I got together all kinds of
20　articles from the FD Journal and printed up on my little
21　home printer -- my own copier, I should say, and then
22　submitted them to Suffolk County, and went and testified,
23　and I testified a half a day, the -- half an afternoon --
24　the whole afternoon the first day and the whole morning

258

1　the second day.
2　　　And I -- I think that the prosecution was
3　relatively pleased what I -- what I had to say.  I know
4　it was a certainly a stressful experience having to
5　testify, you know, all afternoon the first day and all
6　morning the next day, but I felt it was something that
7　needed to be done, and it was in -- in a way, it was a
8　rather rewarding experience.
9　　　Q.　And this was a challenge to the -- to the
10　sort of integrity of --
11　　　A.　Of firearm identification.
12　　　Q.　-- the firearm -- as a forensic science,
13　right?
14　　　A.　Yes, ma'am.
15　　　Q.　Do you recall testifying in that case about
16　a study that you designed called a wear study, where you
17　fired a firearm 501 times?
18　　　A.　Yes.
19　　　Q.　Do you recall talking about that?
20　　　A.　Yes.
21　　　Q.　And what was the purpose of that study?
22　　　A.　To see how long -- how many times it would
23　take to fire it before -- to see reproducibility of the
24　breech face markings of -- of a firearm.

259

1    Q.   Was it a semi-automatic with jacket
2  ammunition; is that right?
3    A.   Yes, ma'am.
4    Q.   What was the result of your -- of your
5  study?
6    A.   We actually looked at the cartridge cases
7  only, and it was from 1 to 501, that there was a positive
8  identification.
9    Q.   So there was no discernable difference
10 between 1 to 501 that would cause you not to be able to
11 identify those cartridge cases to the gun?
12   A.   Yes, that's correct.
13   Q.   If -- if some degree of wear or damage over
14 shooting it 500 times prevented an identification, that
15 would result in a false negative, not a false positive,
16 correct?
17   A.   Correct.
18   Q.   Okay.  Strike that.  Okay.
19        But in that case where you fired the weapon
20 501 times, you were still able to identify bullet number
21 1 to bullet 1 -- 10 -- 501?
22   A.   No.  We didn't look at the bullets.  We
23 looked at the cartridge cases.
24   Q.   You would still be able to identify

260

1  cartridge case number 1 to cartridge case 501, correct?
2    A.   Yes, ma'am, that's correct.
3    Q.   Okay.  All right.
4        MS. TINGSTAD:  I don't think I have any
5  more questions for you, Mr. Striupaitis.
6        MR. IASPARRO:  This is Michael Iasparro.
7  I don't have any questions.
8        MR. BHAVE:  Do any of the other defense
9  counsel have questions?
10       MR. POTTINGER:  This is Steve Pottinger.
11 I do not have any questions.
12       MR. HUOTARI:  I've got a couple of quick
13 questions.  This is Joel Huotari speaking.
14            CROSS EXAMINATION
15 BY MR. HUOTARI:
16   Q.   Mr. Striupaitis, am I pronouncing your name
17 correctly?
18   A.   Yes, sir, you are.
19   Q.   Good afternoon.
20   A.   Good afternoon.
21   Q.   I just have a few things I would like to go
22 over with you real quickly, and we'll try to get you on
23 the road as soon as we can.
24       My clients in this case are

261

1  Christine Macanally, who has since been married, and her
2  name is now Christine Bishop, as well as James Barton,
3  Bruce Scott, Doug Williams, and Steven Pirages.
4        Do you recognize any of those names as
5  Rockford officers that you ever had any connection with?
6    A.   No, sir, I do not.  I do not recognize any
7  of them.
8    Q.   Okay.  Are you aware of any ISP crime lab
9  employees who ever communicated with my clients?
10   A.   Unless they are Rockford employees, no, I'm
11 not aware.
12   Q.   Okay.  Do you --
13   A.   I'm making that jump -- that presumption.  I
14 shouldn't do that.  You know, if it's -- if it's Rockford
15 personnel, as far as -- otherwise, I don't know.
16   Q.   Okay.  And real quickly, do you have any
17 reason to believe any evidence was suppressed or withheld
18 in the Patrick Pursley matter by anyone?
19   A.   No, sir, I don't.  I don't believe anything
20 was withheld or suppressed.
21   Q.   And do you have any reason to believe that
22 any evidence was fabricated by anyone in the Patrick
23 Pursley matter?
24   A.   No, I do not have any reason to believe that

262

1  it was fabricated either.
2    Q.   Do you have any reason to believe that any
3  crime lab employee or Rockford police officer had any
4  intent to incriminate Patrick Pursley despite what the
5  evidence showed?
6    A.   No, I do not.
7    Q.   And do you have any reason to believe that
8  any crime lab employee or Rockford police officer had any
9  intent to cause Patrick Pursley emotional distress?
10   A.   No, I do not.
11       MR. HUOTARI:  Thank you very much, sir.
12 That's all I have for you.
13       MR. BHAVE:  Can we take a ten-minute
14 break?  I do have some follow-up questions, but
15 I want to speak with Erin on the phone before we
16 do that.
17       THE WITNESS:  I don't know if she heard
18 you.
19       MR. BHAVE:  Can you -- can you hear me?
20       MS. TINGSTAD:  You want to speak with
21 me, Ashley?
22       MR. BHAVE:  No, no, not Ashley.  I want
23 to speak with Erin before I -- I have some
24 follow-up questions.  I want to go over my notes

263

1 with Erin. She's not with me. I want to give
2 her a call.
3        MS. TINGSTAD: Okay.
4        MR. BHAVE: Just 10 minutes.
5     (Whereupon, the proceedings went off the
6        record at 3:44 p.m. through 4:01 p.m.)
7            CROSS EXAMINATION
8 BY MR. BHAVE:
9        Q.   Mr. Striupaitis, I just have a few
10 questions.  Do you recall -- do you recall the testimony
11 that you gave regarding documenting test-to-test
12 examinations?
13       A.   Yes, sir, I do.
14       Q.   Isn't it true that the Illinois State
15 Police, there is no --
16          MR. BHAVE:  You know, what actually, can
17       we just go off the record?  There's a phone
18       ringing here.
19     (Whereupon, the proceedings briefly went off
20        the record at 4:01 p.m.)
21 BY MR. BHAVE:
22       Q.   Isn't it true at the Illinois State Police,
23 there is no requirement to document test-to-test
24 examinations?

264

1        A.   Yes, sir, that is correct.
2          MS. TINGSTAD:  Objection; foundation.
3 BY MR. BHAVE:
4        Q.   Based on your experience with the Illinois
5 State Police, was there a requirement to document
6 test-to-test examinations in the 1990s?
7        A.   No, sir, there was no requirement to do such
8 thing.
9        Q.   And based on your experience as a forensics
10 examiner, are you aware of any laboratory in the nation
11 that requires documentation to support a test-to-test
12 examination?
13       A.   No, I'm not aware of any such lab that --
14 that does that.
15       Q.   Mr. Striupaitis, do you remember testifying
16 about the phrase "to the exclusion of all others"?
17       A.   Yes, sir, I do.
18       Q.   And was that a phrase that was used in the
19 early 1990s when a forensics examination resulted in a
20 positive identification?
21       A.   Yes, sir, it was.
22       Q.   Was that a phrase that was used when a
23 forensic examination resulted in a positive
24 identification in 1993?

265

1        A.   Yes, sir, it's -- it was used then.
2        Q.   And is that phrase, "to the exclusion of all
3 others", was that a term of art that was used throughout
4 the firearms examiners community or industry in the
5 1990s?
6        A.   Yes, sir, at the time it was.
7          MS. TINGSTAD:  Objection; leading.
8 That's for the last several questions.
9          MR. BHAVE:  Okay.  I'm done.
10       Okay.  If that's it, we will reserve
11       signature.
12          MS. TINGSTAD:  I just have one follow-up
13       question.  Actually, one redirect follow-up.
14            REDIRECT EXAMINATION
15 BY MS. TINGSTAD:
16       Q.   Mr. Striupaitis, are -- are you aware of
17 anyone at the Rockford Police Department saying to you or
18 anyone else that they didn't find the gun that killed
19 Andrew Ascher?
20       A.   No.  I'm not aware of any such thing being
21 said by anyone to me in that regard.
22       Q.   Are you aware of any -- anyone at the
23 Rockford Police Department saying that to anyone else?
24       A.   No, I'm not aware.

266

1        Q.   Are you aware of anyone at Rockford Police
2 Department saying that because they didn't find the gun,
3 they put another one into evidence in this case?
4        A.   Certainly not, no.
5          MS. TINGSTAD:  Okay.  I have no further
6       questions.
7          MR. BHAVE:  Okay.  If there are no other
8       questions, we will reserve signature.
9          THE STENOGRAPHIC REPORTER:  Okay.
10       Anybody need to order any transcript today?
11       Ashley?
12          MS. TINGSTAD:  I won't be ordering it
13       today.
14          THE STENOGRAPHIC REPORTER:  You won't
15       be?
16          MR. BHAVE:  Yeah.  We'll -- we'll go
17       ahead and order that transcript.
18          THE STENOGRAPHIC REPORTER:  Okay.
19       Anyone else on Zoom be ordering?
20          MR. HUOTARI:  This is Joel Huotari.  I
21       would like to get a copy electronically.
22          THE STENOGRAPHIC REPORTER:  Okay.  Sure.
23          MR. IASPARRO:  Michael Iasparro would as
24       well.

267

1    MR. BHAVE: And could we get that
2 electronically as well, PDF with PDF exhibits?
3    THE STENOGRAPHIC REPORTER: Sure.
4    MR. BHAVE: Okay. Thank you.
5    MR. POTTINGER: Robert Pottinger. I'll
6 take a copy as well.
7    THE STENOGRAPHIC REPORTER: Okay.
8 Robert will as well, Robert Pottinger?
9    MR. POTTINGER: Yes, sir.
10    THE STENOGRAPHIC REPORTER:
11 Electronically for everyone?
12    MR. BHAVE: That's good.
13    THE STENOGRAPHIC REPORTER: All right.
14    (Whereupon, the videoconference deposition
15    concluded at 4:05 p.m.)
16
17
18
19
20
21
22
23
24

268

1    ACKNOWLEDGEMENT OF DEPONENT
2
3  I, PETER STRIUPAITIS, do hereby acknowledge that I have read
4   and examined the foregoing testimony, and the same is a
5   true, correct, and complete transcription of the testimony
6   given by me and any corrections appear on the attached
7   errata sheet signed by me.
8
9
10
11
12 _____    _____
13 (DATE)        (SIGNATURE)
14
15
16
17
18
19
20
21
22
23
24

269

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2
3  I, KENNETH A. REGAN, Court Reporter and Notary Public in and
4   for the State of Florida, do hereby certify that the
5   foregoing transcript is a true and correct record of the
6   testimony given; that said testimony was taken by me
7   stenographically and thereafter reduced to typewriting
8   under my direction; that review was requested; and that I
9   am neither counsel for, related to, nor employed by any of
10  the parties to this case and have no interest, financial or
11  otherwise, in its outcome
12    IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my notarial seal this 17th day of
14  November, 2020.
15
16
17
18
19 _____
20  KENNETH A. REGAN, CCR
21  Notary Public - State of Florida
22  My Commission No. GG 276143
23  My Commission Expires: 11/13/22
24

*Kenneth Andrew Regan*

## A

**aberdeen**
64:11
**ability**
111:9
**able**
70:13, 77:22,
85:4, 89:18,
91:20, 130:17,
133:18, 202:16,
259:10, 259:20,
259:24
**above**
163:4, 202:19,
216:24
**absent**
133:7
**absolutely**
133:7, 193:22,
232:19
**abuse**
131:7
**academy**
143:16
**access**
98:1, 126:11,
127:20
**according**
170:22, 184:4
**account**
191:14
**accounts**
191:8
**accreditation**
112:24, 113:2,
113:5, 113:14,
220:24, 221:14,
222:15, 222:20,
223:1, 223:4,
223:12, 223:13,
223:18, 223:22,
225:4, 225:5,
225:7, 225:16,
225:23
**accredited**
223:14, 224:19,
225:14

**accrediting**
223:1, 223:10
**accuracy**
242:2, 242:15
**accurate**
211:20, 242:19
**acknowledge**
268:3
**acknowledgement**
66:16, 268:1
**acquitted**
208:4
**across**
78:12
**act**
156:19
**acted**
156:22
**acting**
156:18
**active**
143:18
**activities**
232:5
**actual**
79:9, 112:24,
114:22, 141:8,
141:10, 142:14,
173:15, 192:2,
251:11, 253:12,
255:10
**actually**
68:22, 69:24,
70:7, 74:7,
75:5, 78:16,
80:23, 83:18,
85:11, 86:17,
88:12, 93:7,
104:3, 117:9,
118:4, 119:11,
134:11, 135:4,
141:20, 144:8,
149:5, 154:21,
156:11, 174:11,
183:4, 191:5,
193:2, 193:3,
210:19, 213:13,
213:17, 233:11,

248:18, 250:9,
256:20, 259:6,
263:16, 265:13
**add**
127:15
**added**
82:18, 249:20
**addendum**
248:16, 248:17
**adding**
120:19
**additional**
128:7
**adhere**
225:15
**adhered**
252:11
**adjacent**
75:21, 167:24
**administering**
68:16
**administrative**
150:5, 153:9,
153:18, 153:24,
251:6, 253:12,
254:4, 255:1
**administratively**
79:9, 250:19,
250:21, 253:9
**administrator**
195:15
**admired**
234:13
**admissibility**
68:18
**aeir**
200:1
**aer**
200:4
**aero**
200:4
**affirm**
69:11
**affixed**
269:13
**after**
70:20, 73:20,
73:23, 75:2,

75:3, 75:14,
86:15, 87:20,
91:18, 91:20,
105:22, 116:10,
127:17, 141:5,
141:7, 142:2,
162:1, 168:3,
172:20, 181:10,
195:8, 201:15,
205:8, 208:5,
243:21, 243:23,
244:9, 244:12
**afternoon**
257:23, 257:24,
258:5, 260:19,
260:20
**afterwards**
130:5
**again**
69:21, 86:16,
123:10, 124:9,
127:24, 130:21,
153:18, 154:9,
158:19, 177:6,
177:7, 181:23,
190:16, 192:19,
201:19
**against**
193:5, 209:13
**agencies**
128:5, 136:15,
195:14, 238:5,
238:12, 238:13,
238:16
**agency**
72:16, 136:16,
137:22, 137:24,
159:20, 159:21,
167:17, 167:21,
192:18, 193:17,
194:8, 238:21,
240:13, 240:15
**ago**
82:10, 128:12,
252:12
**agree**
91:21, 182:13,
182:16, 217:3,

217:9, 218:24,
219:8, 221:13,
221:17, 247:13
**agreed**
68:22, 212:5,
212:10, 214:17,
242:11
**agreeing**
246:18
**agreement**
70:6, 91:3,
93:1, 93:2,
93:3, 103:8,
111:23, 111:24,
125:11, 125:12,
125:13, 128:18,
129:3, 129:7,
226:9, 245:10,
245:11
**ahead**
136:10, 152:16,
179:17, 203:15,
216:14, 216:16,
224:1, 266:17
**aide**
233:9, 233:15
**airtight**
127:22
**akin**
98:16
**al**
63:9
**alaska**
194:15, 194:16,
194:17, 237:15,
237:21, 240:2
**alignment**
103:17, 124:13
**alison**
64:9, 67:7
**all**
65:22, 68:6,
68:20, 68:24,
69:6, 70:6,
70:12, 70:15,
71:3, 71:11,
82:4, 82:5,
83:15, 84:12,

87:12, 88:8,
94:4, 95:18,
96:17, 97:23,
98:5, 98:9,
98:10, 98:17,
98:23, 99:1,
112:4, 118:20,
119:4, 119:6,
119:17, 121:4,
121:13, 121:23,
124:20, 129:7,
131:19, 131:23,
132:1, 132:4,
132:13, 135:20,
136:5, 150:10,
150:17, 157:23,
164:13, 164:16,
165:16, 167:22,
167:23, 169:18,
172:8, 180:22,
182:20, 182:21,
190:12, 191:2,
199:20, 208:14,
208:17, 214:5,
215:2, 215:6,
215:7, 219:21,
222:17, 243:15,
245:4, 249:11,
250:5, 250:6,
250:7, 250:21,
251:4, 251:20,
252:2, 252:3,
255:20, 257:19,
258:5, 260:3,
262:12, 264:16,
265:2, 267:13
**alleged**
164:21, 164:24
**allow**
153:15
**alluminum**
178:24, 179:5
**almost**
200:18
**alone**
101:23, 102:15,
102:17, 102:22
**along**
67:8, 155:4,

162:6, 245:1
**already**
90:20, 91:10,
91:11, 137:4,
138:20, 138:21,
138:22, 156:15,
163:11, 166:9,
190:10, 196:22,
220:4, 220:5,
249:19
**also**
78:19, 106:6,
107:16, 108:2,
113:18, 121:7,
122:7, 123:6,
124:5, 130:23,
132:7, 149:21,
152:1, 152:18,
154:23, 155:22,
156:19, 162:22,
172:6, 173:19,
173:20, 198:6,
199:16, 209:3,
217:17, 218:17,
224:19, 224:20,
232:15, 235:20,
238:8, 242:9
**altered**
245:16
**although**
104:2, 215:12,
245:9
**aluminum**
205:7, 205:11
**always**
88:19, 88:20,
98:16, 121:15,
121:16, 124:2,
125:2, 130:14,
135:12, 218:8
**amanda**
67:23
**american**
143:15, 172:2
**ammo**
172:2, 205:2,
205:3
**ammos**
205:15

**ammunition**
103:20, 103:22,
104:1, 104:6,
104:7, 104:9,
104:10, 104:14,
105:1, 105:15,
110:18, 122:15,
122:16, 133:9,
246:5, 246:7,
259:2
**analysis**
96:24, 116:10,
132:8, 132:16,
171:15, 240:22
**analyst**
71:19, 180:13
**analysts**
81:14
**analyze**
240:21, 241:11,
241:16
**anchorage**
194:16, 194:17
**ancillary**
155:20, 156:5
**andrew**
265:19
**ann**
64:6, 161:10
**announce**
67:4
**another**
68:8, 83:5,
86:10, 90:1,
92:22, 96:5,
96:6, 117:20,
137:14, 138:4,
138:5, 138:21,
138:23, 140:22,
152:2, 152:20,
165:12, 168:5,
168:6, 172:14,
177:20, 182:19,
198:14, 202:16,
240:23, 266:3
**answer**
70:22, 70:23,
71:4, 73:7,

82:22, 152:16,
180:6, 184:17,
193:19, 194:4,
194:8, 215:15,
217:16, 217:20,
219:5, 219:14,
221:8, 227:13,
230:14, 230:24,
231:10, 238:23
**answered**
237:23
**any**
71:8, 75:9,
79:4, 83:20,
84:4, 84:14,
84:15, 85:23,
86:4, 86:5,
88:11, 93:2,
93:3, 95:1,
96:24, 100:11,
105:18, 106:13,
114:5, 120:23,
125:14, 127:5,
139:14, 150:7,
151:6, 154:11,
160:6, 160:18,
165:11, 166:23,
171:13, 176:7,
181:23, 184:3,
194:2, 194:24,
197:2, 207:9,
207:11, 207:22,
209:10, 211:24,
212:1, 212:21,
212:23, 213:8,
220:14, 220:22,
221:19, 224:9,
232:10, 236:19,
237:20, 240:17,
241:4, 241:8,
241:10, 241:14,
244:13, 251:7,
254:4, 254:7,
256:22, 260:4,
260:7, 260:8,
260:11, 261:4,
261:5, 261:6,
261:8, 261:16,

261:17, 261:21,
261:22, 261:24,
262:2, 262:3,
262:7, 262:8,
264:10, 264:13,
265:20, 265:22,
266:10, 268:6,
269:9
**anybody**
226:7, 237:16,
266:10
**anyone**
148:8, 148:11,
155:1, 227:7,
261:18, 261:22,
265:17, 265:18,
265:21, 265:22,
265:23, 266:1,
266:19
**anything**
79:3, 94:19,
100:4, 111:6,
114:5, 118:9,
125:11, 141:11,
146:17, 154:12,
160:18, 164:8,
175:7, 206:8,
213:10, 213:12,
213:20, 218:3,
234:4, 236:6,
236:8, 236:14,
251:2, 261:19
**aofte**
143:13, 144:9,
144:18, 145:6,
149:16, 154:14,
154:15, 232:4,
232:6
**apparently**
195:15
**appear**
169:17, 199:17,
268:6
**appearances**
64:1, 65:1
**appeared**
65:22, 199:11,
199:13

**appears**
160:20, 178:1,
199:10
**apply**
132:7
**appreciate**
69:4
**appropriate**
101:1, 242:18,
245:4
**arbor**
64:6
**archive**
218:16
**area**
78:18, 97:24,
98:5, 126:11,
172:20, 183:19,
190:1
**areas**
91:3, 91:4,
91:6, 111:23,
226:8, 226:9
**aren't**
107:10, 165:23
**argumentative**
114:4
**armorer**
255:10
**armorers**
255:6, 255:9
**around**
75:24, 78:18,
90:23, 91:5,
121:20, 154:6,
155:12, 156:1,
190:1, 190:13
**art**
265:3
**articles**
257:20
**artistic**
227:21
**ascher**
168:20, 216:20,
244:21, 265:19
**ascld**
224:19, 225:4,

225:7, 225:11
**ashley**
64:3, 67:8,
68:21, 69:21,
240:1, 262:21,
262:22, 266:11
**aside**
84:5
**asked**
71:2, 87:24,
97:17, 132:15,
133:15, 164:1,
184:9, 237:1,
237:5, 237:22,
249:17, 257:15
**askew**
251:8
**asking**
137:5, 141:19,
145:5, 195:19,
200:1, 200:2,
220:9, 237:9,
240:17, 240:20,
243:10, 252:18
**aspect**
80:24, 82:9
**assistant**
65:4, 79:20,
79:21, 80:2,
80:5, 80:19,
81:3, 83:9,
86:21, 87:9,
90:1, 148:23,
150:5, 151:20,
153:2, 153:24
**association**
143:19, 223:3,
225:4
**associations**
143:24
**assume**
71:5, 230:17
**assumes**
231:6, 254:16
**assurance**
79:7, 251:9,
251:19, 253:18
**astra**
209:6

astras
247:1
atf
144:8, 144:17,
152:8
attached
268:6
attend
80:13, 220:22
attended
80:10, 255:6
attorney
64:23, 64:33,
65:4, 65:9,
65:19, 68:8,
70:22, 150:17,
150:24, 151:1
attorney's
257:9
attorneys
64:16, 70:20,
80:9
audio
70:8
authored
168:16
automation
215:16
avenue
64:20
average
76:6
aware
84:14, 127:5,
165:19, 165:23,
184:8, 184:21,
207:19, 207:22,
208:4, 208:22,
209:2, 209:3,
209:8, 209:9,
209:11, 209:12,
209:15, 210:2,
211:24, 212:12,
212:15, 230:9,
230:15, 230:18,
236:19, 239:22,
241:18, 242:5,
242:9, 254:10,

254:14, 254:18,
254:23, 261:8,
261:11, 264:10,
264:13, 265:16,
265:20, 265:22,
265:24, 266:1
awareness
230:20
away
90:21, 163:12,
235:1

**B**

b-h-a-v-e
67:22
b-o-e-s-e
235:13
back
70:2, 77:12,
82:14, 89:5,
100:13, 102:13,
114:11, 128:8,
135:15, 135:16,
140:14, 153:2,
153:8, 153:10,
153:15, 153:17,
154:5, 154:19,
169:7, 171:22,
173:8, 195:17,
201:22, 203:4,
203:10, 203:12,
212:19, 235:2,
243:24, 247:3,
254:24
backlog
78:16, 78:19,
139:9, 139:12,
139:18, 140:24
backlogged
241:12
bag
160:15, 164:21,
164:22, 164:24,
165:4, 177:11,
186:9, 190:24
baggy
160:12, 160:13,
160:15, 172:1,

172:2, 172:3,
172:5
bags
164:16
ballistics
140:4, 140:5,
210:23
balsley
65:13
barely
160:23
barrel
99:2, 99:3,
99:9, 99:15,
100:10, 201:22
barrick
65:13
barton
64:33, 67:19,
261:2
base
107:22, 111:16,
111:17, 111:24,
112:1, 114:1,
118:22, 118:23,
119:22, 122:1,
122:19, 141:9,
178:13, 187:15,
187:16, 195:22,
195:23
based
68:19, 101:22,
102:14, 102:15,
102:22, 112:23,
120:13, 130:19,
131:14, 131:17,
132:2, 134:8,
141:15, 207:9,
209:4, 209:13,
227:14, 230:3,
230:20, 264:4,
264:9
baseline
109:6, 125:7,
242:23
basement
75:19
basically
74:24, 117:13,

120:5, 146:7,
257:10
basing
194:5
basis
234:3
bates
210:7, 249:10
bathroom
115:15
bearing
75:9
beat
222:22
became
79:19, 79:20,
153:4, 154:8,
212:15, 236:5
because
74:11, 80:23,
82:10, 88:13,
93:10, 94:3,
96:5, 104:5,
104:17, 105:10,
105:18, 106:16,
107:3, 107:22,
108:15, 108:21,
111:5, 115:3,
118:7, 121:14,
121:17, 124:21,
131:23, 133:9,
135:19, 139:9,
139:12, 140:9,
142:7, 148:22,
150:16, 153:4,
156:4, 156:11,
157:14, 158:5,
160:22, 161:20,
165:4, 171:4,
179:6, 181:1,
192:9, 193:17,
194:13, 195:5,
200:15, 202:5,
205:8, 213:13,
214:10, 220:20,
220:24, 221:2,
225:12, 225:14,
226:7, 229:18,

230:17, 232:5, 234:17, 241:12, 248:22, 251:8, 253:17, 256:20, 266:2

**been**
69:16, 71:2, 84:19, 90:20, 93:12, 93:14, 95:21, 96:4, 97:4, 103:7, 104:2, 120:7, 120:13, 130:21, 131:22, 132:15, 132:17, 134:2, 137:11, 140:9, 140:17, 141:21, 142:7, 147:4, 147:23, 148:2, 148:4, 153:21, 155:12, 157:5, 157:17, 157:23, 163:11, 193:14, 193:18, 198:1, 210:7, 218:18, 223:9, 223:16, 225:23, 229:19, 230:9, 236:24, 245:16, 245:23, 245:24, 246:13, 248:16, 255:23, 261:1

**before**
94:7, 105:17, 108:19, 109:6, 109:24, 116:8, 139:2, 148:2, 152:2, 154:23, 171:15, 175:18, 181:1, 181:22, 185:1, 185:7, 186:18, 195:12, 206:6, 236:24, 237:14, 238:24, 246:3, 258:23, 262:15, 262:23

**began**
81:6, 241:15

**begin**
81:8, 240:21

**beginning**
233:15

**behalf**
63:15

**behind**
204:1

**being**
68:17, 68:19, 70:7, 70:8, 70:9, 73:9, 74:22, 83:10, 84:22, 94:20, 98:17, 117:18, 127:12, 137:14, 152:18, 154:5, 184:9, 190:4, 191:9, 203:13, 229:5, 229:9, 230:3, 230:5, 237:5, 238:12, 239:2, 239:3, 239:9, 239:22, 240:13, 240:16, 242:7, 242:12, 243:13, 247:8, 250:17, 254:13, 265:20

**believe**
78:6, 79:13, 81:1, 82:23, 84:24, 87:1, 87:14, 106:17, 112:5, 150:5, 155:24, 156:22, 179:20, 183:24, 206:21, 207:12, 207:13, 207:16, 211:19, 220:17, 222:13, 232:18, 235:2, 235:18, 236:18, 242:18, 242:20, 253:16, 261:17, 261:19, 261:21, 261:24, 262:2, 262:7

**belong**
232:11

**below**
160:24, 164:20, 169:2, 179:8, 179:21, 179:22, 199:8, 222:14, 254:5, 255:1

**belt**
119:8

**bench**
153:8, 153:15, 154:19, 154:23, 155:16, 157:2

**benchwork**
86:18, 87:20

**beretta**
147:8, 147:14, 170:17, 179:15, 197:1, 197:9, 209:6

**berettas**
247:1

**besides**
152:18

**best**
75:1, 84:6, 104:24, 107:9, 107:10, 126:18, 220:17, 221:15, 222:1, 222:3, 232:10, 237:2, 246:2, 255:19

**beth**
149:2, 149:22, 242:5, 242:11, 244:3, 244:10, 244:12, 245:7, 247:6

**better**
83:7, 194:21, 221:7

**between**
101:12, 103:8, 130:3, 155:17, 214:13, 259:10

**beyond**
115:4, 115:6, 194:24, 206:8, 237:21

**bhave**
65:3, 66:14, 67:21, 67:22, 82:19, 113:10, 115:23, 128:22, 150:14, 150:21, 158:22, 159:2, 159:6, 159:9, 180:1, 180:4, 184:11, 184:14, 191:10, 217:17, 226:24, 227:9, 229:21, 229:24, 231:6, 237:22, 239:12, 254:16, 260:8, 262:13, 262:19, 262:22, 263:4, 263:8, 263:16, 263:21, 264:3, 265:9, 266:7, 266:16, 267:1, 267:4, 267:12

**bishop**
67:18, 261:2

**bit**
76:15, 79:14, 85:6, 94:8, 107:13, 109:2, 115:17, 118:14, 124:5, 124:8, 125:21, 144:13, 153:8, 183:16, 183:20, 183:21, 220:20

**black**
180:21, 200:17, 200:18

**blaze**
205:6

**bleaches**
207:2

**blood**
175:8

**blue**
199:22, 199:23, 200:14, 200:17, 200:21, 200:22

blued
199:21, 200:12
bluish
200:19
board
223:4, 223:12,
223:13, 223:18,
223:22, 225:5,
232:11, 232:12
bob
77:23, 88:7
body
95:13, 223:1,
223:10, 225:15
boese
235:4, 235:12,
235:16, 235:17,
235:20, 236:17
boese's
236:5
bonafide
136:18, 192:19,
192:24, 193:2
bore
200:7
boss
80:13, 80:15,
80:16, 80:23,
83:17, 195:5,
195:12
boston
257:12
both
67:23, 88:4,
129:15, 142:19,
145:18, 179:18,
179:19, 204:17,
209:24, 221:21,
223:16, 232:6,
236:1, 244:22,
247:6
bother
92:21
bottom
110:17, 117:9,
118:5, 162:22,
163:2, 163:3,
163:6, 168:1,

185:4, 201:23,
204:13, 250:9
bowman
64:23, 67:15
box
64:30, 172:2,
187:21, 189:3,
196:3
boxes
218:16
branch
80:3, 80:5,
87:7, 87:8,
95:23, 151:21,
151:24, 155:15,
168:24, 170:3,
223:14
brass
104:20, 175:12,
175:24, 178:18,
178:19, 179:3
brass-colored
179:3
brazil
201:2
break
115:10, 115:12,
115:16, 116:8,
116:9, 151:11,
219:19, 262:14
breaking
235:7
breaks
71:8
breech
229:3, 258:24
breech-face
119:4, 120:22,
120:24, 121:14,
121:16, 121:22,
123:11
breech-trace
226:22
briefly
263:19
broadview
79:24, 80:2,
80:3, 80:5,

80:19, 87:7,
87:8, 95:23,
139:4, 151:21,
151:24, 154:22,
154:24, 155:15,
163:12, 163:19,
168:24, 170:3,
223:14
broke
235:9
brought
81:2, 166:7
brown
164:21, 164:22,
164:24
bruce
64:34, 67:19,
261:3
bruised
100:7
budgetarily
82:10
bugged
153:13
bullet
88:21, 93:24,
98:22, 99:13,
99:15, 99:16,
101:16, 101:18,
101:22, 101:24,
102:10, 106:3,
106:6, 108:23,
129:17, 130:12,
133:8, 134:15,
134:17, 160:13,
160:15, 160:16,
168:4, 168:5,
169:3, 169:4,
173:12, 173:20,
173:23, 173:24,
175:7, 175:12,
175:14, 175:17,
176:2, 185:11,
186:20, 187:3,
187:16, 187:18,
187:22, 188:7,
188:12, 188:16,
189:14, 189:16,

190:4, 190:10,
190:16, 190:17,
191:17, 192:3,
192:11, 193:7,
193:13, 195:18,
195:21, 196:8,
196:9, 212:10,
213:21, 236:23,
241:20, 245:24,
248:12, 259:20,
259:21
bulletproof
152:23
bullets
88:20, 89:11,
105:23, 106:11,
126:15, 130:13,
132:8, 132:14,
133:1, 133:13,
140:1, 140:9,
145:15, 172:3,
172:4, 175:19,
183:3, 187:12,
208:24, 209:18,
209:20, 210:1,
212:6, 213:14,
214:6, 214:11,
214:14, 215:23,
241:22, 242:7,
242:12, 244:23,
246:21, 247:7,
247:16, 247:21,
259:22
bum
254:11
bureau
153:7, 225:2,
225:13
burglary
72:13, 95:11
bw
197:24

---
C
---

c
161:4, 205:19
cal
198:18

**caliber**
91:16, 99:19,
99:20, 100:14,
104:11, 169:3,
170:19, 175:1,
178:15, 178:22,
186:19, 191:4,
191:18, 198:19

**california**
144:7, 145:11,
147:7

**call**
80:3, 89:24,
103:1, 105:8,
129:12, 135:22,
136:4, 149:11,
150:11, 150:20,
151:1, 151:5,
154:15, 161:18,
184:22, 222:1,
222:2, 263:2

**called**
69:16, 73:16,
94:9, 105:6,
106:17, 118:12,
119:19, 125:3,
134:12, 152:20,
152:22, 184:21,
208:19, 257:5,
258:16

**calling**
169:19

**came**
79:2, 81:16,
119:5, 128:1,
155:6, 155:14,
157:15, 170:7,
175:9, 184:7,
234:18, 252:24

**can't**
96:11, 96:13,
96:14, 96:21,
102:14, 102:21,
105:1, 119:22,
133:7, 143:8,
178:16, 187:6,
231:2, 231:3,
237:20, 241:8,

241:10, 255:24

**candidate**
142:13

**canister**
126:24

**canisters**
128:2

**cant**
121:20, 123:16

**capabilities**
204:18

**capability**
78:23, 203:13

**capacity**
144:17, 150:5,
202:9, 202:17,
202:22

**carbondale**
157:15

**career**
137:6, 143:23,
233:16, 233:20,
241:15, 254:20,
254:21, 254:23,
256:1

**careful**
125:23

**carries**
73:6

**cartridge**
98:22, 106:1,
106:3, 106:4,
108:24, 109:11,
116:18, 116:20,
119:5, 119:18,
121:20, 122:7,
123:9, 123:13,
123:24, 132:8,
133:4, 133:8,
133:12, 139:24,
140:9, 140:10,
140:13, 140:17,
142:16, 142:23,
145:17, 147:14,
168:5, 169:3,
173:16, 176:19,
177:21, 177:22,
178:1, 178:4,

178:7, 178:13,
179:3, 179:5,
179:19, 181:13,
184:2, 187:19,
202:17, 204:11,
209:1, 209:5,
209:17, 209:20,
209:23, 212:5,
213:15, 214:6,
214:14, 216:20,
220:11, 226:22,
228:20, 236:23,
259:6, 259:11,
259:23, 260:1

**cartridges**
105:4, 105:23,
170:20, 178:23,
178:24, 201:24,
202:5, 202:11,
202:13, 203:8

**case**
63:7, 68:10,
69:23, 72:11,
72:13, 76:14,
78:16, 78:17,
79:9, 83:23,
84:3, 85:12,
88:8, 98:6,
98:22, 103:23,
104:2, 104:8,
106:3, 106:5,
108:24, 121:20,
122:17, 123:13,
132:2, 133:5,
133:8, 139:15,
140:9, 140:13,
140:23, 147:6,
147:15, 147:16,
147:23, 148:9,
148:16, 150:8,
151:18, 155:17,
156:3, 164:8,
165:15, 165:21,
166:2, 174:6,
177:14, 177:17,
177:19, 177:22,
178:14, 178:18,
181:22, 183:7,

187:19, 204:11,
207:11, 208:19,
209:10, 211:22,
212:1, 212:14,
212:21, 216:22,
217:1, 218:17,
219:1, 219:10,
226:15, 226:23,
228:20, 236:20,
236:23, 237:18,
238:3, 239:20,
240:9, 244:21,
250:20, 251:10,
252:7, 253:13,
257:5, 257:8,
257:15, 258:15,
259:19, 260:1,
260:24, 266:3,
269:10

**cases**
72:3, 72:7,
73:9, 74:19,
74:20, 76:3,
76:8, 76:17,
78:10, 78:14,
78:19, 79:8,
79:10, 80:10,
82:11, 88:7,
95:1, 116:18,
116:20, 119:5,
119:18, 122:7,
123:9, 123:24,
132:9, 133:4,
133:12, 138:19,
139:7, 139:9,
139:11, 139:24,
140:11, 140:17,
142:16, 142:23,
145:17, 147:14,
149:24, 151:22,
153:22, 155:1,
155:14, 155:22,
156:1, 156:5,
156:21, 165:11,
169:4, 173:16,
176:19, 178:1,
178:4, 178:7,
179:19, 181:13,

183:8, 183:14,
184:2, 208:10,
209:1, 209:5,
209:17, 209:20,
209:23, 212:5,
213:15, 214:6,
214:14, 216:20,
220:11, 259:6,
259:11, 259:23

**casework**
73:21, 73:24,
156:16

**casing**
159:23

**casings**
160:14, 241:22

**categories**
94:4

**caught**
71:16, 235:7

**cause**
127:13, 259:10,
262:9

**caused**
84:16, 119:17,
220:23

**cci**
178:21, 205:5,
205:6, 205:11

**ccr**
269:20

**ccs**
179:18

**cds**
249:18

**center**
82:12, 200:6

**certain**
109:12, 133:7,
144:7, 153:12

**certainly**
102:1, 125:16,
139:7, 157:9,
165:9, 174:17,
192:15, 222:23,
227:22, 233:17,
242:13, 246:6,
258:4, 266:4

**certificate**
66:17, 269:1

**certify**
269:4

**chain**
66:7, 98:11,
98:12, 125:22,
126:14, 210:8,
210:17, 216:24,
243:23

**challenge**
258:9

**chamber**
202:12, 202:13,
202:16, 203:4

**chance**
143:24, 210:12

**change**
127:13, 181:3

**changed**
245:16

**characteristic**
99:18, 100:18,
119:20, 245:11

**characteristics**
94:5, 98:23,
99:1, 99:4,
99:5, 99:6,
99:8, 99:19,
100:12, 100:14,
100:19, 100:21,
101:3, 101:4,
101:11, 101:12,
101:16, 101:23,
102:14, 102:15,
102:17, 103:1,
103:4, 103:9,
103:13, 103:17,
110:23, 116:11,
117:4, 117:15,
117:17, 118:12,
118:15, 119:10,
119:24, 120:11,
120:20, 120:24,
121:5, 122:6,
124:7, 128:19,
129:4, 129:11,
129:20, 129:21,

130:6, 130:14,
130:19, 130:20,
134:12, 134:24,
138:10, 227:15,
227:16, 227:18,
227:23, 229:3,
229:5, 245:10,
245:12, 246:19

**charlene**
161:3

**chatted**
128:11

**check**
193:5

**checked**
172:12

**checking**
251:5

**chemist**
235:21, 235:22

**chicago**
64:13, 65:7,
81:9, 81:13,
81:16, 81:19,
82:13, 82:15,
82:16, 84:10,
84:16, 84:18,
87:4, 148:13,
149:7, 150:1,
155:5, 168:23,
170:2, 232:23,
233:8, 233:14,
235:17, 235:19

**chiefs**
80:11, 80:12

**chris**
145:23

**christine**
67:17, 67:18,
261:1, 261:2

**christmas**
98:17

**chrome**
100:9, 199:22

**cidi**
177:13

**circle**
121:2, 186:12,

198:14, 204:4

**circled**
187:22, 188:12,
200:6, 200:8,
201:15, 205:19

**city**
63:9, 68:10,
138:5

**civil**
70:6

**claim**
208:1

**claimed**
207:20

**clair**
78:17

**clarification**
71:6

**clarify**
219:8

**class**
99:6, 99:18,
99:19, 100:13,
100:14, 100:17,
101:2, 101:11,
101:12, 101:23,
102:14, 102:15,
102:16, 102:22,
102:24, 103:3,
103:4, 103:8,
103:17, 116:11,
117:4, 117:14,
120:23, 121:5,
122:5, 128:19,
129:3, 129:10,
129:20, 130:5,
130:10, 130:14,
130:19, 229:2,
229:5, 245:10,
246:18

**classes**
255:6, 255:8,
255:11

**clear**
71:1, 136:5,
177:11, 184:7,
227:14, 240:3

**client**
150:17

**clients**
260:24, 261:9
**clip**
202:15
**clockwise**
99:11
**close**
149:14, 164:2,
222:17, 226:11
**closed**
82:13
**coating**
175:22, 176:1
**cochran**
147:11
**coleman**
145:23
**collusions**
93:10
**color**
159:19, 169:13,
178:18, 200:23,
228:19
**colored**
175:12, 175:24,
196:5, 196:6
**column**
160:4, 160:21,
173:9, 211:6,
211:9, 212:3,
212:9, 212:12,
213:2, 213:3,
246:11, 247:14
**come**
77:12, 90:5,
101:6, 124:12,
128:13, 130:13,
140:14, 182:7,
195:17, 201:5,
204:8, 216:1,
224:9, 256:6
**comes**
73:3, 99:13,
111:21, 145:17,
160:23, 188:10,
204:7
**comfortable**
194:7

**coming**
119:18, 123:20,
130:18, 214:24,
248:20, 254:24,
255:13
**commenced**
67:1
**commercially**
105:11
**commission**
130:1, 130:3,
269:22, 269:23
**committees**
144:9
**commodities**
80:8
**common**
92:2, 92:7,
100:19, 207:4
**common-interest**
150:18
**commonwealth**
257:5
**communicated**
261:9
**community**
236:2, 265:4
**compare**
72:19, 104:23,
116:12, 122:7,
129:2, 135:24,
163:4, 163:9,
163:14, 163:20,
179:9, 188:21
**compared**
121:11, 181:20,
183:9, 242:23
**comparing**
107:2
**comparison**
72:19, 83:6,
102:11, 110:16,
112:2, 137:3,
173:13, 188:18,
196:11, 215:20
**comparisons**
134:1
**compiled**
134:11, 135:3

**complete**
76:21, 88:20,
268:5
**completed**
75:14, 91:12,
244:12, 255:6
**complexity**
76:14
**complies**
69:9
**component**
105:24, 133:9
**con**
187:8
**concave**
187:6, 187:9,
187:10, 187:11,
187:15, 196:1
**concentric**
121:1
**concern**
82:10
**concerns**
194:24
**concluded**
173:16, 173:19,
267:15
**conclusion**
123:21, 179:24,
185:1, 215:19
**conclusions**
128:12, 179:18,
215:12, 217:5,
244:9
**conclusive**
212:10
**concurred**
84:12, 86:8
**condition**
88:19, 98:15,
100:6, 108:14,
121:11, 176:2,
188:12, 196:9,
203:18, 213:7
**conditions**
127:19
**conduct**
73:3, 132:16,

**complete**
166:1, 166:4,
166:21, 205:4,
247:18
**conducted**
70:5, 70:7,
135:21, 136:8,
165:20, 166:19,
208:23, 212:13,
241:19
**conducting**
96:17, 97:3,
110:8, 166:24,
193:11
**conference**
150:11, 151:1,
151:5
**confidence**
143:2, 143:4,
214:15
**configuration**
104:11
**confirm**
68:15, 84:10
**confuse**
124:7, 226:10
**confused**
71:1
**connection**
149:17, 261:5
**consecutive**
145:9
**consider**
77:19, 123:18,
123:19, 231:23
**considered**
155:22
**consistent**
172:7, 174:17,
174:20, 183:13,
186:7
**contain**
164:21, 165:1
**container**
174:24, 186:9,
190:24
**containers**
127:23, 160:12,
160:13, 160:14,

207:10, 207:11
**containing**
160:12, 160:14,
160:15
**contemporaries**
236:11
**contemporary**
236:11
**context**
116:19
**continuation**
70:1
**continue**
151:12, 234:14
**continued**
65:1, 255:5
**continuing**
75:12, 154:16,
162:19, 257:13
**contour**
129:6
**contours**
88:14
**convenient**
181:2
**conversations**
90:7, 94:16,
150:16
**convey**
227:7, 227:8,
227:18, 227:19
**conveyed**
227:16, 227:17
**cook**
75:19
**coordinator**
149:24, 152:1,
152:19, 250:11,
250:16, 253:10,
254:4
**coordinators**
250:18
**copier**
257:21
**copper**
104:20, 196:4,
196:5, 196:6
**copper-jacketed**
246:7

**copy**
266:21, 267:6
**corner**
159:23
**corrected**
120:18
**corrections**
268:6
**correctly**
89:1, 109:10,
260:17
**correlate**
215:7
**correspond**
122:16, 169:11,
169:15
**corresponded**
97:21
**correspondent**
140:16
**corresponding**
173:5
**corresponds**
102:7, 104:11,
104:14
**could**
74:5, 76:23,
77:4, 88:6,
90:19, 90:24,
92:24, 93:12,
93:13, 93:14,
96:9, 99:24,
102:3, 105:6,
117:8, 117:11,
117:12, 118:2,
118:4, 122:23,
124:7, 130:22,
130:23, 130:24,
133:20, 133:22,
133:23, 134:15,
158:19, 170:5,
175:8, 192:8,
195:24, 198:6,
212:7, 221:21,
235:8, 240:24,
242:6, 242:11,
245:9, 246:12,
255:4, 255:11,

256:5, 267:1
**could've**
134:17, 139:7,
140:17, 155:12,
170:5, 170:24,
218:18
**couldn't**
96:3, 96:10,
103:6, 135:14,
248:11
**counsel**
67:5, 68:14,
68:20, 70:11,
190:7, 219:21,
246:11, 247:13,
257:16, 260:9,
269:9
**counter-clockwise**
99:11
**counties**
78:20
**counting**
145:14
**country**
225:3
**counts**
84:9, 145:9
**county**
75:20, 78:17,
144:8, 257:9,
257:22
**couple**
79:10, 260:12
**courses**
154:11, 154:16
**court**
63:1, 63:22,
66:17, 69:2,
70:9, 70:13,
78:5, 112:15,
146:12, 146:13,
209:13, 218:5,
218:8, 219:9,
235:6, 238:24,
244:7, 244:13,
255:22, 269:1,
269:3
**courtesy**
137:21, 249:19

**courthouse**
75:21, 78:12
**courtroom**
146:22
**cover**
128:11
**covered**
150:17, 184:16
**create**
110:11, 110:15,
209:9
**created**
119:12
**creates**
119:9
**creatures**
222:8
**crime**
71:20, 130:1,
130:3, 223:4,
223:11, 225:4,
261:8, 262:3,
262:8
**criminal**
146:24, 233:20
**criminalistics**
233:9, 233:15,
233:21
**critical**
104:24
**cross**
66:13, 66:14,
260:14, 263:7
**cross-hatched**
121:2
**crossed**
192:7
**crucial**
122:13
**culbertson**
64:19, 67:13
**curious**
124:18
**current**
249:22, 250:1
**currently**
82:1, 206:19,
245:12, 249:21

curriculum
66:10
custody
98:11, 98:12,
125:23, 126:14,
160:1, 172:22,
173:3, 216:24
cut
86:7, 99:9
cv
249:9, 249:15,
249:16, 249:22
cvs
249:18

**D**

da
204:14
dah
195:8
daily
234:3
daley
82:11
damage
259:13
damaged
88:22
damaging
127:6
dan
66:9, 68:1,
87:3, 87:15,
87:16, 87:17,
88:3, 96:24,
148:17, 149:9,
149:22, 150:12,
154:23, 155:18,
156:19, 157:2,
157:7, 157:21,
166:24, 168:2,
168:16, 169:19,
170:16, 171:2,
180:18, 208:14,
210:24, 211:6,
221:11, 231:21,
234:20, 242:9,
243:18, 244:6,

247:7
daniel
65:9, 149:23
danny
149:5, 149:8,
149:11, 149:12
dark
200:22
darker
160:22, 169:13
database
134:11, 134:13,
135:2, 135:20,
138:11, 140:6,
140:7, 140:8,
192:6, 192:14,
193:5, 195:11
date
63:16, 98:7,
162:8, 174:7,
174:11, 176:17,
176:20, 177:4,
177:14, 177:20,
179:23, 179:24,
180:10, 180:12,
181:2, 181:3,
186:2, 186:4,
188:24, 190:21,
198:9, 268:13
dated
168:14, 180:10,
189:11, 210:17
dates
173:4, 173:5,
174:19
david
65:20, 67:10
day
76:21, 76:23,
77:15, 88:7,
88:8, 162:1,
162:12, 233:20,
257:23, 257:24,
258:1, 258:5,
258:6, 269:13
days
85:22, 161:8,
161:23, 171:8

dbg
180:15
deal
73:2, 80:8
death
95:10
december
243:18, 244:7
decide
153:1
defect
118:3, 118:8,
118:17
defend
257:10
defendant
68:23, 147:23
defendants
63:11, 67:14,
68:1, 68:24,
148:15, 150:8,
150:18, 150:23,
151:6, 159:6,
210:7, 210:16,
249:10, 256:10
defense
150:18, 158:15,
158:20, 210:22,
260:8
define
101:6, 128:15
definitely
180:16, 188:9
definition
100:17
degrade
127:13
degree
259:13
delivered
163:18
delivering
164:13
demon
113:6
demonstrative
112:14, 113:7
department
81:9, 81:13,

87:4, 155:6,
161:15, 168:8,
194:16, 209:4,
232:24, 233:8,
233:14, 238:18,
239:10, 265:17,
265:23, 266:2
departments
238:13, 255:9
depend
76:13
depending
88:18, 96:3,
108:14, 130:21,
246:9
depends
117:21
deponent
66:16, 68:4,
268:1
deposed
147:4
deposition
63:14, 68:22,
70:1, 70:5,
143:13, 146:2,
146:19, 148:12,
148:14, 212:16,
212:18, 249:13,
267:14
depositions
147:1, 147:2,
147:17
derr
200:1, 200:4
derra
199:19
derringer
200:4
describe
187:11, 234:10
described
136:7, 179:15
describing
75:5, 99:6
description
91:14, 91:17,
160:11, 177:10,

177:11, 188:11,
189:3, 198:13
**descriptions**
207:10
**descriptive**
202:21
**design**
100:23
**designates**
179:1
**designed**
258:16
**despite**
262:4
**detail**
183:11, 183:13,
183:23, 207:2,
220:11, 220:15,
221:4, 226:13
**detailed**
221:14, 221:16,
221:24, 224:10
**detectives**
80:10, 94:17,
95:1
**deteriorating**
246:4
**determination**
122:2, 131:16
**determine**
105:6, 133:1,
155:17, 245:9
**determining**
89:19, 116:11
**developed**
233:18
**diagram**
203:19, 203:20,
220:11
**diagramming**
184:2
**diagrams**
184:3
**diameter**
99:21
**difference**
104:5, 259:9
**differences**
130:20, 145:3

**different**
74:22, 94:4,
101:8, 101:9,
102:2, 102:3,
104:17, 104:18,
104:19, 109:4,
119:19, 121:4,
122:14, 127:19,
130:11, 130:12,
137:12, 142:24,
144:23, 145:2,
145:6, 170:2,
172:21, 174:11,
191:9, 191:15,
210:21
**differently**
109:2
**digital**
215:1
**dimensions**
102:4, 134:13,
195:20
**dinner**
232:8
**direct**
66:3, 69:18
**directing**
151:2
**direction**
100:1, 100:15,
269:8
**director**
79:20, 79:21,
80:2, 80:5,
80:19, 81:4,
83:9, 86:21,
87:10, 90:1,
148:23, 150:6,
151:21, 153:2,
153:24, 231:4
**directors**
223:4, 225:5,
232:12, 232:13
**disagree**
96:18, 96:23
**disagreeing**
255:23
**disagreement**
226:9

**disappear**
246:1
**discern**
133:18, 256:14
**discernable**
259:9
**discharge**
203:12
**discharged**
98:22, 178:6
**discipline**
257:10, 257:11
**disclose**
150:15
**discuss**
146:18, 146:19
**discussed**
122:3, 146:18,
146:21, 181:21,
182:2, 196:22,
218:1
**discussing**
243:23
**discussion**
115:8, 132:5,
152:11
**distance**
115:3
**distinct**
91:4, 135:19
**distress**
262:9
**district**
63:1, 63:2
**dobbert**
257:8
**document**
125:23, 158:14,
158:23, 159:17,
159:18, 160:8,
167:14, 217:4,
217:11, 218:2,
220:2, 247:15,
263:23, 264:5
**documentation**
97:9, 112:7,
112:8, 112:9,
112:12, 146:13,

204:2, 218:9,
221:5, 221:23,
227:20, 228:17,
228:19, 229:2,
264:11
**documented**
184:6
**documenting**
263:11
**documents**
146:5, 146:8
**doing**
71:12, 72:21,
80:22, 81:1,
84:19, 84:23,
86:12, 86:18,
87:20, 87:21,
87:23, 88:8,
89:7, 95:20,
96:17, 97:5,
97:9, 103:9,
110:8, 119:14,
124:1, 125:1,
136:14, 153:22,
153:24, 154:13,
156:16, 156:17,
157:17, 192:12,
218:10, 248:4,
248:5, 249:1,
249:24, 251:20,
251:23
**don**
87:3, 87:15,
87:18, 88:4,
155:4, 155:24,
156:23, 157:9,
157:24, 198:1,
233:3, 233:4,
233:19, 233:24,
234:10, 234:15,
234:19, 234:24,
235:23
**donald**
80:17
**done**
74:13, 84:13,
84:20, 89:22,
91:10, 95:24,

99:12, 101:7,
105:11, 112:6,
124:21, 125:18,
134:2, 134:4,
136:15, 136:22,
137:2, 137:24,
147:1, 147:2,
152:7, 152:8,
193:16, 206:10,
206:11, 218:6,
218:9, 219:10,
220:4, 220:5,
225:16, 225:18,
225:19, 244:3,
258:7, 265:9
**door**
72:14, 72:18,
222:17
**double**
203:11
**double-action**
203:1, 203:2,
203:9, 203:14,
204:15, 204:22
**doug**
64:34, 67:19,
261:3
**down**
85:24, 98:2,
98:6, 98:23,
99:1, 110:22,
111:2, 111:7,
111:11, 113:7,
156:9, 157:15,
160:24, 168:18,
177:10, 179:8,
180:11, 181:17,
191:23, 193:24,
194:1, 195:7,
199:8, 199:10,
199:11, 203:15,
203:24, 204:6,
204:12, 227:24,
228:3, 250:8
**dr**
80:17
**draw**
183:19, 183:22

**drawing**
183:20
**drawings**
178:12
**drawn**
203:24
**drinks**
232:7
**drive**
65:15
**dropping**
94:17
**drug**
152:20, 152:23,
235:21, 235:22
**dry**
86:7, 127:21
**drywall**
175:9
**duces**
111:20
**due**
118:3
**duly**
69:16
**duplicating**
114:2
**during**
72:8, 81:2,
81:3, 131:4,
131:7, 213:18
**duties**
153:9, 155:20,
156:5, 156:11,
156:17, 253:2

**E**

**each**
70:16, 76:10,
88:4, 109:20,
156:20, 156:22,
184:2, 186:8,
216:20, 253:5,
253:21, 253:22,
253:23
**eagle**
172:2
**earlier**
101:15, 128:1,

156:9, 165:10,
192:6, 204:17,
215:22, 216:2,
218:19, 218:20,
226:4
**early**
74:8, 85:22,
86:14, 89:5,
94:14, 95:22,
112:18, 218:2,
264:19
**earth**
101:17, 129:17
**easier**
69:2, 108:20,
159:4
**east**
78:18, 95:6
**edena**
257:17
**education**
75:12, 154:16,
255:5, 257:13
**effect**
142:11
**effort**
114:3
**eight**
99:24
**either**
86:8, 99:10,
105:11, 113:15,
212:24, 221:1,
223:3, 226:5,
262:1
**ejection**
203:16, 203:19
**ejector**
117:1, 121:7,
121:11, 121:17,
123:8, 123:12,
123:18, 203:21,
204:7
**ekedahl**
65:20, 67:11
**elaborate**
72:23
**electronically**
266:21, 267:2,

267:11
**eliminate**
102:13, 102:19,
102:21, 102:23,
130:18, 130:22
**eliminated**
131:22, 140:10
**eliminates**
103:5
**elimination**
93:6, 93:8,
93:22, 93:23,
94:1, 101:14,
101:19, 123:20,
129:20, 131:11,
241:21
**elliptical**
117:12, 118:5
**else**
100:4, 138:9,
145:12, 155:1,
156:20, 166:20,
218:3, 237:16,
241:6, 265:18,
265:23, 266:19
**eludes**
77:3
**email**
66:7, 210:8,
210:17, 210:18,
217:10, 243:13,
243:23
**emeritus**
143:18, 143:20,
143:21
**emily**
161:10
**emotional**
262:9
**employed**
269:9
**employee**
262:3, 262:8
**employees**
80:7, 261:9,
261:10
**enable**
245:12

enables
140:6
enact
83:11
enacted
83:16
end
118:8, 131:12,
235:8, 250:4
ended
248:20
enforcement
237:6
engraved
205:23
engraving
205:24
enough
88:23, 143:8,
153:7, 153:14,
188:20, 192:13
ensued
244:4
enter
192:13, 193:13,
247:24
entered
140:11, 140:19,
141:3, 142:19,
213:14, 213:15,
213:17, 214:4,
215:6
entering
213:23
enters
187:18
entries
139:22, 139:23
entry
195:8, 195:10,
213:18
enumerated
95:13
envelope
198:15, 198:16
ephani
68:9
epoxied
119:4

epoxy
119:17
erin
67:22, 262:15,
262:23, 263:1
errata
268:7
erroneously
120:13
esquire
64:3, 64:9,
64:18, 64:27,
65:3, 65:12
essence
257:19
establish
109:22
estates
67:10
et
63:9
evaluations
80:6
even
107:6, 135:15,
155:19, 218:10,
229:2, 247:6,
250:4
ever
91:24, 94:16,
94:19, 94:24,
96:18, 96:20,
96:23, 106:15,
107:3, 107:7,
118:9, 126:23,
127:12, 131:20,
132:15, 133:15,
135:21, 136:7,
137:1, 137:5,
137:10, 137:11,
137:13, 138:2,
138:19, 138:20,
138:22, 139:1,
139:5, 141:2,
141:11, 141:15,
141:19, 144:10,
144:14, 147:23,
148:2, 148:4,

150:2, 150:23,
184:6, 200:16,
211:21, 218:5,
232:7, 237:1,
237:3, 237:5,
245:23, 246:8,
254:7, 254:11,
255:18, 255:22,
261:5, 261:9
evera
65:13
every
131:24, 246:23
everybody
145:12, 219:20,
250:17
everyone
67:4, 68:6,
70:4, 115:22,
267:11
everything
70:13, 88:14,
89:13, 95:18,
98:15, 125:23,
143:9, 164:18,
212:18, 251:3
evidence-to-evid-
ence
122:21, 122:22
evidentiary
175:8
ex
66:5, 66:6,
66:7, 66:8,
66:10
exact
128:21, 130:11
exactly
90:4, 103:2,
248:3
exactness
129:1
examination
66:3, 66:13,
66:14, 66:15,
69:18, 76:11,
97:6, 110:9,
116:10, 134:8,

135:23, 136:2,
136:5, 136:6,
136:11, 136:19,
136:23, 137:13,
165:20, 166:2,
166:3, 166:19,
166:21, 167:1,
192:13, 193:12,
209:14, 212:13,
213:4, 217:4,
217:12, 218:6,
237:1, 241:19,
244:13, 244:20,
245:9, 247:18,
248:10, 256:8,
260:14, 263:7,
264:12, 264:19,
264:23, 265:14
examinations
80:22, 135:11,
157:17, 237:9,
263:12, 263:24,
264:6
examine
97:17, 115:1,
173:3, 217:2
examined
69:16, 137:11,
138:5, 165:12,
176:17, 206:2,
268:4
examiner
74:14, 74:20,
75:11, 78:3,
83:22, 84:2,
84:3, 85:2,
85:3, 86:8,
86:10, 88:2,
88:8, 89:7,
90:1, 91:10,
93:5, 94:9,
96:6, 96:19,
97:4, 108:21,
109:19, 110:8,
124:6, 124:11,
124:15, 131:15,
132:16, 135:16,
136:22, 139:12,

144:1, 144:6,
145:22, 149:1,
151:24, 152:18,
153:3, 153:22,
154:6, 154:8,
154:24, 156:19,
166:14, 166:16,
177:18, 198:4,
198:7, 211:13,
211:16, 219:9,
226:18, 234:2,
234:16, 235:3,
235:11, 235:20,
236:5, 236:14,
238:4, 238:22,
240:20, 240:21,
240:23, 241:5,
241:11, 241:15,
242:5, 252:22,
253:5, 253:23,
255:21, 256:4,
264:10
**examiner's**
124:22
**examiners**
87:19, 92:2,
96:4, 96:8,
127:6, 128:12,
156:6, 234:8,
252:3, 252:23,
265:4
**examining**
241:5
**example**
118:15, 119:1,
126:23, 183:17,
228:19, 237:12,
254:11
**example-to-fired**
129:15
**examples**
134:20, 237:20,
240:18, 241:4,
241:8, 241:10,
241:14
**exams**
236:23
**except**
249:23

**exclude**
246:12
**excluding**
247:9
**exclusion**
129:13, 129:14,
130:23, 131:19,
131:23, 264:16,
265:2
**exclusive**
224:22, 225:8
**excuse**
86:22, 114:19,
117:16, 121:16,
137:22, 152:5,
154:14, 167:22,
225:13
**exhibit**
158:5, 158:10,
158:14, 167:3,
167:6, 169:7,
169:8, 169:12,
169:15, 169:19,
169:20, 170:12,
170:17, 171:18,
171:23, 171:24,
172:1, 172:4,
173:12, 173:15,
173:17, 173:19,
173:20, 173:21,
174:3, 174:6,
174:10, 176:19,
179:10, 179:14,
179:15, 179:19,
185:12, 189:4,
189:15, 190:16,
196:15, 197:12,
197:14, 197:19,
210:3, 210:6,
210:16, 212:4,
212:6, 212:7,
212:8, 212:9,
213:4, 213:7,
214:5, 214:17,
219:16, 220:2,
220:3, 224:6,
243:4, 243:7,
243:8, 243:9,

243:10, 243:13,
243:17, 243:23,
244:5, 244:22,
244:23, 246:13,
248:12, 249:5,
249:9, 256:7,
256:23
**exhibits**
66:1, 167:17,
167:23, 167:24,
168:22, 169:9,
169:20, 170:14,
170:17, 172:6,
176:18, 213:14,
245:7, 246:13,
267:2
**exist**
75:22
**existed**
79:7
**existence**
223:7
**expand**
80:1
**expect**
107:24, 123:5,
142:20, 142:22,
143:7, 172:15,
172:17, 173:4,
173:6, 174:19,
177:6, 177:7,
177:9, 186:4,
198:10, 215:22
**experience**
120:6, 126:4,
131:14, 135:21,
137:10, 139:20,
139:23, 157:3,
229:19, 250:3,
258:4, 258:8,
264:4, 264:9
**experienced**
124:6
**expert**
147:15, 147:21,
255:23, 257:4
**experts**
146:24, 190:9,

210:22
**expires**
269:23
**explain**
244:8, 244:14,
245:14
**explained**
195:21
**extra**
74:12, 75:10
**extractor**
117:1, 121:8,
121:12, 121:19,
123:15, 123:19,
203:22, 204:7
**eye**
80:24, 83:18
**eyeball**
215:16
**eyes**
83:7

**F**

**fabricated**
261:22, 262:1
**face**
77:4, 123:13,
207:8, 258:24
**fact**
83:6, 84:13,
84:18, 98:20,
111:15, 120:11,
132:2, 135:1,
142:23, 193:20
**facts**
231:6, 254:17
**fair**
72:20, 93:4,
97:2, 97:8,
102:12, 125:5,
136:1, 149:13,
149:15, 162:20,
162:24, 179:2
**fairview**
139:10
**fall**
154:20, 204:22,
204:23

**falls**
118:18
**false**
259:15
**familiar**
128:2, 147:3,
180:13
**family**
232:20, 232:22,
234:2
**far**
85:22, 91:14,
102:4, 106:14,
109:13, 113:2,
113:3, 114:2,
120:6, 122:17,
123:14, 125:17,
135:13, 140:16,
155:20, 172:20,
208:10, 227:19,
228:5, 228:17,
230:5, 239:5,
250:17, 261:15
**father**
232:23, 233:1,
234:8, 234:10,
234:22, 235:18
**fault**
162:3
**fbi**
134:11, 135:3,
138:8, 152:9,
152:21
**fd**
257:20
**february**
233:5, 233:7,
233:13
**federal**
70:6
**feel**
71:1, 71:8,
82:17, 84:16
**fell**
222:14, 254:5,
255:1
**fellow**
143:15, 144:1

**felt**
81:10, 82:24,
84:19, 240:16,
258:6
**few**
70:2, 79:14,
82:10, 82:14,
96:12, 100:16,
125:24, 146:16,
147:2, 159:13,
220:6, 256:9,
256:12, 260:21,
263:9
**fewer**
156:5
**fiber**
175:9
**figure**
234:11
**figures**
234:9, 236:1
**file**
117:24, 212:17,
216:24, 217:2,
255:1
**filed**
117:19
**files**
79:8, 250:19,
250:20, 252:6,
252:14, 252:18,
252:19, 252:21,
252:22, 253:8,
253:22
**filing**
101:8
**fill**
172:24, 192:12,
192:15, 193:2,
193:3
**filled**
174:1, 180:9,
193:14, 195:20
**film**
128:2, 160:12,
160:13, 160:14,
174:23, 190:24,
207:10

**financial**
269:10
**find**
88:15, 89:14,
89:17, 118:24,
204:10, 218:17,
248:23, 254:4,
254:7, 265:18,
266:2
**finding**
176:5, 176:8,
196:14, 254:11
**findings**
167:24, 173:9,
188:14, 196:10,
224:5
**fine**
91:3
**finish**
76:21, 89:4,
99:3, 100:8,
143:6, 199:20,
199:21, 199:24,
200:11, 200:24,
240:22, 241:16
**finished**
74:7, 74:8,
157:7, 180:12,
241:6
**finishes**
104:20
**finishing**
117:16, 241:11
**fire**
71:19, 73:8,
102:8, 103:18,
103:21, 105:2,
105:22, 106:19,
122:15, 156:12,
178:9, 182:4,
182:24, 200:6,
203:5, 246:21,
258:23
**firearm**
71:12, 71:23,
71:24, 72:2,
72:8, 73:1,
73:6, 73:8,

73:16, 73:21,
81:13, 94:24,
100:11, 101:10,
106:8, 109:12,
131:15, 136:8,
136:9, 161:13,
168:6, 169:21,
170:1, 171:7,
171:15, 171:18,
189:3, 196:24,
197:3, 197:14,
211:13, 213:6,
238:11, 238:17,
258:11, 258:12,
258:17, 258:24
**firearms**
73:9, 73:10,
82:9, 82:14,
83:16, 84:12,
85:2, 85:3,
87:19, 98:3,
100:20, 119:16,
132:15, 134:23,
149:1, 154:24,
155:1, 161:9,
164:2, 164:7,
166:14, 166:15,
170:7, 172:19,
233:9, 234:1,
236:5, 236:14,
257:11, 265:4
**fired**
72:22, 83:24,
85:20, 88:20,
90:15, 90:18,
93:10, 93:12,
93:14, 98:22,
99:16, 101:18,
102:17, 103:7,
104:10, 105:20,
106:11, 106:21,
106:24, 108:2,
108:8, 108:11,
108:15, 108:23,
109:7, 109:24,
121:11, 122:17,
122:20, 122:24,
123:2, 126:22,

129:18, 130:12,
130:13, 131:24,
132:8, 132:14,
133:1, 133:4,
133:12, 133:13,
133:16, 133:19,
133:20, 133:23,
134:15, 134:17,
138:1, 139:24,
140:1, 140:7,
140:9, 140:17,
142:16, 160:15,
165:21, 166:10,
169:4, 173:17,
173:19, 173:20,
179:9, 179:19,
181:20, 184:6,
185:11, 190:17,
193:6, 195:3,
209:6, 209:18,
209:19, 210:1,
212:4, 212:6,
212:10, 213:6,
214:11, 214:14,
215:24, 216:20,
224:6, 236:23,
241:20, 242:7,
242:12, 244:23,
246:13, 247:8,
251:11, 252:7,
258:17, 259:19

**fired-bullet**
85:8, 97:17,
101:12, 104:15,
108:1, 127:12,
128:3, 130:18

**fires**
106:8, 106:20,
106:21, 106:23,
116:12, 121:10,
183:9, 184:3,
184:5, 189:17,
214:13

**firing**
85:11, 85:15,
116:23, 117:3,
117:5, 117:15,
117:17, 117:18,

118:6, 121:15,
121:22, 123:11,
202:24, 203:6,
203:20

**firings**
103:10, 105:4,
181:20, 214:4,
216:21

**first**
75:1, 75:2,
78:16, 87:14,
97:23, 107:2,
110:3, 116:9,
124:1, 143:12,
160:3, 160:5,
160:10, 162:19,
167:15, 168:14,
169:8, 170:6,
171:4, 171:10,
173:10, 173:23,
173:24, 181:22,
197:1, 210:19,
212:16, 218:21,
225:3, 225:12,
225:14, 238:12,
247:3, 249:13,
250:3, 250:4,
250:9, 257:24,
258:5

**five**
75:2, 79:18,
99:24, 115:21,
129:15, 129:16,
134:18, 250:18,
252:4, 252:5,
252:14, 252:18,
252:19, 252:21,
252:22, 253:8,
253:22

**five-minute**
219:18

**fix**
255:10

**flags**
86:6

**flat**
117:8, 117:9,
118:5

**flip**
121:19

**floor**
64:12, 65:6

**florida**
63:24, 199:9,
201:5, 269:4,
269:21

**flyer**
152:21, 152:23

**fmj**
205:8

**folks**
81:22

**follow-up**
220:6, 262:14,
262:24, 265:12,
265:13

**followed**
245:5

**following**
162:11, 164:21,
165:1, 223:16

**follows**
69:17

**foregoing**
268:4, 269:5

**forensic**
73:18, 73:19,
74:2, 74:17,
76:1, 76:4,
78:3, 80:21,
80:22, 82:12,
82:17, 83:3,
84:16, 86:16,
92:2, 96:24,
116:10, 119:7,
119:15, 135:16,
136:11, 143:16,
153:2, 153:21,
154:6, 154:8,
156:5, 156:19,
185:18, 185:23,
190:19, 193:11,
197:24, 210:23,
218:6, 219:9,
225:2, 225:13,
233:16, 234:15,

235:20, 236:2,
238:4, 238:18,
238:22, 240:21,
241:5, 245:1,
245:8, 253:5,
253:23, 255:21,
256:4, 258:12,
264:23

**forensics**
151:23, 264:9,
264:19

**forgot**
231:19

**form**
97:20, 97:21,
113:10, 128:22,
215:9, 217:6,
217:13, 219:2,
227:10, 230:12,
230:21, 239:12

**formal**
146:9, 146:10,
146:12, 146:13,
193:9, 218:9,
244:3

**formally**
67:18, 71:15,
87:4

**former**
148:24, 231:3

**forms**
129:7

**forrester**
65:19, 67:10

**forth**
123:17, 201:22,
253:4, 257:14

**forthright**
76:16, 76:17

**forward**
95:19, 203:12,
204:22, 204:23,
205:1

**found**
94:10, 94:11,
120:10, 124:12,
124:13, 173:12,
184:9, 185:7,

213:4, 213:5,
247:16
**foundation**
82:19, 191:11,
217:7, 217:14,
219:3, 219:12,
226:24, 230:12,
230:21, 231:8,
264:2
**four**
83:7, 93:14,
163:4, 163:10,
163:15, 171:8
**fourth**
212:12, 213:2
**fragment**
169:3, 173:12,
175:12, 175:15,
175:16, 213:21
**fragments**
160:13
**frame**
201:21
**free**
71:8, 204:19
**freezing**
144:12, 146:2
**friday**
63:16
**friend**
231:24
**friendly**
238:19, 238:24,
239:2
**front**
98:20, 159:10,
167:9, 168:11,
174:12, 174:14,
185:16, 224:4
**froze**
157:4
**frozen**
144:11
**fs**
185:17, 185:18,
185:21, 185:22,
198:6, 245:7
**fsbw**
197:21

**fsps**
185:15, 190:19
**full**
86:18, 88:7,
88:8, 89:7,
101:19, 136:11,
137:2, 137:3,
137:13, 166:3,
166:6, 166:24,
187:24, 196:4,
242:6, 247:18,
248:10, 252:14,
253:23
**full-time**
166:14
**further**
133:15, 136:24,
230:17, 266:5

**G**

**gallardo**
64:23, 67:15
**gary**
65:19, 67:11
**gave**
162:4, 162:8,
162:24, 209:12,
237:15, 239:15,
263:11
**gen**
67:14
**genens**
64:24, 67:15
**general**
65:4, 76:19,
134:12, 154:14
**generally**
88:5, 92:15,
94:16, 94:21,
95:2, 95:5,
106:16, 107:8,
127:22, 159:19
**generate**
134:7
**genes**
162:4, 162:8
**getting**
100:13, 109:17,

202:21, 212:15
**getty**
161:3, 161:4
**gg**
269:22
**ginc**
199:13
**give**
119:1, 133:15,
137:19, 183:17,
183:22, 194:4,
194:8, 194:10,
209:17, 231:3,
237:1, 237:5,
237:12, 237:20,
244:15, 263:1
**given**
147:18, 163:17,
241:24, 242:14,
268:6, 269:6
**gives**
134:14, 142:4,
142:9, 204:1,
219:9
**giving**
91:14, 237:3,
237:10, 239:10,
255:21
**glock**
255:16
**glued**
100:9
**go**
70:3, 86:11,
90:3, 90:7,
90:21, 92:22,
102:13, 104:4,
108:15, 120:6,
121:23, 132:13,
133:15, 136:10,
142:12, 152:16,
153:15, 156:1,
158:6, 159:24,
161:1, 161:24,
171:3, 171:10,
173:23, 176:14,
177:21, 177:23,
179:17, 189:22,

190:1, 197:3,
197:11, 197:14,
203:15, 205:1,
206:15, 206:16,
208:10, 216:14,
216:16, 220:15,
224:1, 232:5,
232:7, 238:24,
260:21, 262:24,
263:17, 266:16
**god**
77:3, 140:21,
252:23
**god's**
101:17, 129:17
**goes**
201:22, 245:14,
249:11
**going**
70:3, 70:15,
71:4, 80:13,
85:5, 93:5,
106:9, 108:22,
123:24, 135:22,
148:13, 150:14,
151:14, 154:15,
155:17, 156:13,
158:4, 158:13,
158:14, 161:1,
167:6, 177:10,
197:2, 197:8,
210:6, 223:7,
227:22, 243:7,
243:20, 256:7,
256:10, 256:20,
256:21
**gone**
70:3, 118:21,
124:23, 124:24,
171:1, 194:13
**good**
67:6, 67:16,
67:21, 69:20,
71:7, 77:19,
84:11, 96:15,
96:16, 116:2,
144:21, 144:24,
158:3, 190:7,

193:21, 193:23,
194:14, 195:14,
195:15, 221:8,
234:2, 238:5,
238:12, 238:15,
238:18, 238:22,
239:9, 240:13,
256:6, 260:19,
260:20, 267:12
**gotcha**
256:17
**gotten**
141:2, 195:3
**grab**
156:2
**gracious**
153:7, 153:14
**grain**
205:5, 205:6
**grains**
175:1, 191:6
**granular**
121:3
**gray**
161:20, 162:3
**grc**
134:12, 138:7,
140:15
**great**
119:10, 167:12,
197:17, 233:6
**green**
101:17, 129:17
**greg**
64:24, 162:9,
162:12, 162:15,
162:23, 164:12
**grip**
202:1, 202:3,
202:7, 202:8
**groove**
129:7, 133:17,
134:6, 134:14,
187:1, 191:24,
192:5
**grooves**
99:9, 99:23,
100:15, 102:4,

134:18, 193:13,
195:20
**ground**
70:3
**group**
145:11, 147:11
**groves**
102:6
**guess**
160:22, 185:21,
199:9, 256:5
**gun**
85:11, 98:24,
99:1, 99:3,
99:10, 100:5,
100:9, 101:6,
101:7, 101:16,
101:18, 101:22,
101:24, 102:8,
102:18, 103:7,
107:1, 108:2,
108:22, 114:1,
119:3, 122:24,
123:1, 129:16,
129:18, 130:1,
130:3, 130:21,
130:23, 131:4,
131:8, 131:19,
132:24, 133:2,
133:5, 133:6,
133:10, 133:13,
133:14, 133:16,
135:24, 142:17,
171:5, 192:4,
192:9, 193:19,
193:20, 199:11,
199:14, 199:18,
201:6, 201:8,
201:20, 203:4,
203:12, 204:1,
204:5, 204:10,
204:17, 206:5,
207:21, 215:24,
236:24, 255:9,
255:13, 259:11,
265:18, 266:2
**gunnell**
65:9, 66:6,

66:9, 68:1,
87:3, 87:17,
96:24, 148:17,
149:9, 149:10,
149:22, 154:23,
156:19, 157:2,
157:7, 166:24,
167:7, 167:8,
168:2, 168:16,
173:2, 177:24,
181:22, 182:3,
182:16, 184:8,
184:21, 189:19,
208:14, 208:17,
211:6, 213:4,
226:20, 229:18,
230:8, 230:17,
231:21, 231:23,
233:3, 233:4,
233:20, 233:24,
234:10, 234:15,
234:19, 234:20,
234:24, 235:23,
236:10, 236:12,
242:9, 243:18,
244:6, 244:8,
244:11, 244:14,
245:14, 247:7
**gunnell's**
157:21, 158:2,
169:19, 170:16,
172:8, 173:8,
173:24, 210:24,
220:3, 222:11,
227:5, 232:20,
233:1
**guns**
118:9, 119:19,
130:10, 130:12,
130:13, 130:19,
130:24, 131:19,
132:1, 133:19,
133:20, 133:22,
133:23, 135:2,
138:9, 156:12,
193:6, 199:10,
246:20, 255:10
**guy**
84:10, 164:7,

234:1, 234:2,
240:2
**guys**
115:14
**gypsum**
175:9
**gyroscopic**
99:12

---
**H**
---

**h-u-n-t-o-n**
77:18
**habit**
222:8
**hair**
175:9
**half**
257:23
**hammer**
203:1, 203:11,
205:1
**hand**
69:8, 207:6,
207:7, 269:13
**handed**
85:24, 162:12,
240:23
**handle**
126:5, 126:8,
126:9
**handled**
207:17, 246:1
**handling**
126:1
**handwrite**
181:1
**handwriting**
164:20
**hanson**
64:24, 67:14,
162:9, 162:12,
162:15, 162:23,
164:12
**happen**
118:10, 130:3,
130:5, 130:24,
171:14, 182:18,
215:17

happened
129:24, 137:5,
165:14, 172:20,
233:7, 256:1
happening
120:16, 139:1
happens
122:14, 141:6,
194:3
hard
74:12, 146:10
harder
73:2, 73:3
hartford
161:21
hatched
229:4
hathaway
64:4
head
178:13
headquarters
75:20
hear
68:11, 248:19,
248:23, 262:19
heard
120:16, 127:12,
136:13, 137:15,
137:17, 138:2,
139:1, 165:10,
192:16, 193:15,
207:23, 208:11,
209:16, 237:10,
237:13, 246:3,
246:4, 246:8,
262:17
hearing
94:8, 207:20,
257:8
hearsay
192:16, 208:10
heights
139:10
held
115:8, 152:11
help
192:22

helped
119:15, 239:20
helpful
111:10, 158:21
here
67:22, 67:23,
68:3, 90:6,
92:18, 94:12,
105:14, 111:23,
158:16, 159:15,
161:2, 167:13,
168:14, 168:19,
169:16, 171:17,
173:5, 173:16,
175:11, 176:7,
177:24, 178:11,
182:7, 182:10,
188:11, 191:16,
198:18, 200:8,
210:18, 222:10,
231:2, 231:5,
242:2, 250:8,
263:18
here's
182:24, 206:22
hereby
268:3, 269:4
hereunto
269:12
high
120:18, 142:10,
142:20, 142:22,
142:23, 214:14
high-confidence
142:5, 143:1,
216:2
high-point
119:16
higher
191:5, 207:8,
222:5, 225:8,
225:9
himself
70:10, 244:15
hinshaw
64:19, 67:13
hired
147:6, 257:9

history
130:23, 249:4
hit
141:2, 141:5,
141:7, 141:16,
141:23
hobby
105:12
hold
197:5, 202:13,
204:20, 204:23
holder
91:5
holding
204:5
holds
202:5
home
257:21
homicide
168:19, 244:20
hooper
64:4
houde
64:24, 67:14
hours
163:12
howard
65:19, 67:10
however
83:24, 134:16,
217:1
huh
185:20
hundred
96:12
hundreds
96:10, 96:12,
118:20, 141:1
hunter
234:24
hunton
77:18, 77:20,
88:7
hunton's
77:21
huotari
64:27, 66:13,

67:16, 67:17,
68:7, 115:24,
235:6, 243:12,
260:12, 260:13,
260:15, 262:11,
266:20
hypothetical
217:18, 217:19
_____

                    I
_____

iasparro
64:18, 67:12,
215:8, 217:6,
217:13, 219:2,
219:11, 227:10,
227:11, 230:11,
230:21, 230:22,
231:8, 239:13,
239:14, 240:1,
260:6, 266:23
ibis
139:21, 139:23,
140:3, 140:20,
141:3, 141:12,
141:16, 141:21,
141:23, 142:4,
142:19, 142:21,
152:2, 152:3,
152:6, 152:22,
213:15, 213:23,
214:6, 214:12,
214:24, 215:6,
215:12, 215:24,
244:1, 248:2,
248:23, 249:1
ic
77:7
id
90:10, 181:5,
247:5, 254:11
idea
109:18, 119:23,
212:2
identification
72:4, 72:8,
73:1, 73:5,
73:6, 73:22,
85:17, 88:11,

88:16, 88:23,
89:15, 89:20,
90:6, 91:22,
92:5, 92:16,
93:15, 93:16,
93:18, 94:12,
96:20, 102:15,
105:21, 107:23,
111:16, 111:17,
111:24, 112:1,
112:7, 118:23,
118:24, 123:20,
124:3, 124:14,
128:16, 128:17,
129:12, 131:11,
140:4, 140:5,
141:10, 141:15,
141:20, 141:24,
142:2, 143:19,
145:7, 158:11,
167:4, 176:10,
182:10, 184:9,
184:23, 185:7,
188:24, 196:15,
208:24, 210:4,
212:5, 214:18,
227:14, 228:7,
228:9, 243:5,
245:1, 245:13,
247:10, 247:14,
249:6, 258:11,
259:8, 259:14,
264:20, 264:24
**identifications**
112:4, 120:8,
120:13, 144:23,
176:12, 255:22
**identified**
129:1, 141:16,
189:5, 197:2,
236:24, 244:22,
248:14
**identify**
101:24, 102:22,
120:2, 141:11,
242:6, 242:11,
246:12, 247:7,
259:11, 259:20,

259:24
**identifying**
110:10, 216:19,
254:11
**illinois**
63:2, 64:13,
64:21, 64:31,
65:7, 65:16,
68:1, 75:20,
150:1, 225:2,
225:12, 234:18,
236:16, 250:10,
263:14, 263:22,
264:4
**imagery**
140:6, 152:20,
152:24, 155:21,
215:1
**images**
140:6, 140:15
**imaging**
152:2
**imp**
191:24
**impart**
101:9, 117:20,
127:7
**imparted**
101:5, 118:8,
131:4
**imply**
145:14
**importance**
83:2, 122:3
**important**
70:12, 71:5,
108:13, 108:18,
109:5, 109:8,
109:19, 110:3,
110:5, 113:15,
126:12, 126:13,
171:14, 221:5
**importer**
100:5, 199:4,
199:7, 199:8,
201:4, 201:9
**impose**
225:8

**impossible**
246:6
**impression**
99:14, 106:15,
118:6, 121:15,
123:12
**impressions**
88:21, 116:23,
117:3, 117:5,
129:7, 133:18,
134:6, 134:14,
145:10, 187:1,
190:6, 192:5
**improperly**
207:17
**inc**
199:1
**incidences**
245:22
**incident**
84:15
**incidental**
105:19
**include**
113:18, 134:19,
165:3, 239:10,
249:23, 250:21
**included**
113:21, 138:10,
220:10
**includes**
162:18
**including**
184:3, 246:23,
247:1
**inclusive**
135:20
**incomplete**
217:18
**inconclusive**
93:20, 129:9,
129:10, 129:24,
130:7, 131:1,
131:2, 212:7,
246:16, 247:21,
248:12
**inconsistent**
174:22

**incorporated**
225:11
**incriminate**
262:4
**independent**
73:24, 74:20,
83:4, 97:5,
153:22, 160:6,
181:23
**independently**
74:21, 157:18
**index**
66:1, 106:17,
106:19, 108:18,
108:21, 109:2,
109:10, 109:18
**indicate**
110:17, 159:20,
161:13, 175:14,
175:16, 179:18,
206:4
**indicated**
95:8, 98:14,
101:15, 118:16,
120:18, 127:24,
138:7, 171:7,
191:19, 199:5,
199:8, 200:11,
206:6, 226:4,
238:3, 243:1,
247:18, 248:11
**indicates**
157:19, 160:11,
162:7, 162:11,
162:22, 163:8,
165:16, 167:16,
167:20, 176:18,
178:14, 178:23,
185:12, 189:4,
196:11, 196:18,
197:18, 202:9,
204:6, 204:13,
205:3, 205:11,
211:5, 211:9,
212:3, 216:18
**indicating**
84:2, 166:5,
191:5, 204:18,

**indication**
202:19, 204:24
**individual**
67:14, 76:20,
77:1, 83:5,
87:24, 101:3,
102:24, 103:12,
117:17, 119:10,
119:12, 119:24,
120:4, 120:14,
120:20, 122:5,
124:7, 128:18,
128:19, 129:4,
129:21, 130:6,
130:20, 147:7,
193:16, 194:5,
194:11, 206:5,
227:15, 227:18,
227:22, 230:4,
234:12, 237:14,
245:10, 245:12
**individuality**
118:1, 119:8,
132:23
**individually**
101:10, 127:2,
127:3
**individuals**
77:22, 81:9,
84:19, 105:11,
125:15, 136:13,
137:18, 145:11,
155:21, 193:16
**industry**
144:21, 265:4
**influx**
81:8
**informal**
194:2, 194:22,
195:13, 218:2,
218:6, 239:11
**informally**
136:15, 193:4
**informals**
218:11
**information**
192:13, 192:18,

**207:5**
**initial**
89:9, 89:22,
95:18, 98:5,
177:20, 180:16,
182:20, 183:5
**initialing**
84:1
**initially**
91:2
**initials**
98:7, 106:5,
176:24, 177:14,
177:19, 180:14,
180:17, 181:5,
181:6, 189:9
**initiate**
82:9
**inject**
74:5
**innocence**
208:2
**inside**
187:19, 187:21
**insistently**
106:12
**inspection**
161:14
**instance**
72:12, 91:24,
93:7, 93:23,
102:20, 106:10,
114:18, 192:4
**instances**
104:3, 127:6,
192:16
**instead**
70:19
**instituted**
83:20, 84:22,
85:1, 135:10,
135:13
**instruct**
150:15
**instructs**
70:23
**insufficient**
93:15, 129:11,

**201:4, 227:8,**
**240:15**
**245:11**
**int**
199:13
**integrated**
140:5
**integrity**
126:17, 258:10
**intent**
262:4, 262:9
**inter**
170:8
**interact**
234:15
**interest**
269:10
**interesting**
92:15, 92:17,
94:10, 124:12,
182:6, 184:19,
184:23
**interlaboratory**
170:8
**international**
143:19, 199:1
**intervening**
245:16
**introduced**
70:9
**investigation**
95:10, 95:11,
136:24, 137:3
**investigative**
135:10, 135:22,
135:23, 136:16,
137:22, 137:23,
192:23
**investigator**
138:3
**involve**
72:21
**involved**
84:5, 120:24,
137:22, 214:11,
244:20
**involvement**
236:19
**ips**
253:6

**irregularities**
101:5, 131:4
**iso**
223:7
**isp**
71:18, 75:5,
77:6, 77:8,
77:9, 77:10,
81:17, 82:4,
82:5, 82:18,
85:24, 112:3,
122:11, 126:7,
128:16, 161:18,
184:4, 193:10,
206:20, 210:7,
210:16, 220:14,
223:17, 224:17,
225:6, 225:24,
226:2, 241:15,
242:5, 243:22,
249:10, 252:2,
253:23, 254:13,
254:22, 254:23,
256:9, 256:10,
261:8
**issue**
195:5, 226:10,
253:17
**issued**
243:22, 243:24
**it'd**
117:8, 153:18
**it'll**
140:14
**item**
98:6, 106:5,
172:12, 182:19,
182:23, 213:11,
228:18
**itemizes**
167:18
**items**
72:17, 76:13,
78:24, 79:9,
90:16, 90:18,
92:3, 92:8,
93:5, 95:12,
110:10, 129:1,

160:5, 160:16,
160:21, 161:9,
162:3, 162:9,
162:12, 162:18,
162:19, 162:24,
163:22, 163:23,
164:10, 164:13,
164:16, 164:22,
164:23, 165:11,
165:12, 167:1,
167:22, 167:24,
170:21, 204:3,
206:7, 207:12,
224:6, 248:1,
250:8

**itself**
126:17, 177:22,
199:14, 215:2,
223:21

## J

**jack**
65:10, 68:2,
148:19, 150:3,
150:12, 161:4,
161:22, 161:23,
165:19, 166:1,
208:22, 216:19,
217:4

**jacket**
175:12, 175:15,
175:17, 187:24,
188:2, 188:7,
205:7, 205:12,
259:1

**jacketed**
104:23, 187:22,
196:4

**jacketing**
188:9, 246:10

**jackets**
175:19

**james**
64:33, 67:19,
168:20, 244:21,
261:2

**jeff**
64:24

**jim**
64:23, 218:15,
218:17

**joanne**
217:10

**job**
70:15, 194:6,
247:24

**joel**
64:27, 67:17,
260:13, 266:20

**john**
64:24, 144:1,
144:4, 144:15,
144:16, 144:17,
162:4, 162:8,
211:1, 212:13,
241:19

**join**
68:11, 239:13

**joined**
71:18, 157:2,
233:8, 233:13

**joining**
68:8

**joseph**
244:6

**journal**
154:14, 257:20

**judge**
244:6

**juliette**
71:20, 75:15,
77:9, 77:11,
148:24, 150:4

**july**
70:2

**jump**
261:13

**juncture**
248:16

**june**
161:2, 161:8,
162:8, 162:23,
163:22, 168:24,
169:21, 170:23,
171:19, 172:13,
174:8, 174:14,

174:23, 176:17,
177:4, 179:23,
186:2, 188:24,
189:11, 190:21,
196:15, 198:9,
208:23

**juror**
111:22

## K

**karen**
87:2, 87:14,
87:16, 87:17

**keep**
80:24, 83:18,
146:2, 151:13,
177:10, 203:5

**kenneth**
63:21, 269:3,
269:20

**key**
99:15, 99:16,
107:20, 110:5,
110:6

**keying**
107:18

**killed**
265:18

**kind**
84:7, 98:16,
103:20, 104:6,
120:23, 136:2,
136:6, 153:19,
168:7, 192:11,
195:13, 200:9,
203:24, 204:4,
205:3, 210:20,
221:4, 223:7,
257:14

**kindly**
68:14

**kinds**
94:5, 122:15,
128:12, 130:24,
134:1, 135:10,
257:19

**knew**
130:22, 182:9,

185:1, 185:6,
231:21, 232:23,
233:19, 234:22,
235:17

**knowledge**
144:20, 220:18,
237:2

**known**
67:18, 211:15,
245:23

**kozar**
67:23

## L

**lab**
71:20, 75:16,
75:18, 76:1,
76:4, 76:12,
77:9, 77:11,
78:4, 78:23,
79:12, 79:20,
79:21, 79:24,
80:2, 80:5,
80:19, 81:4,
81:19, 81:24,
82:10, 83:9,
83:12, 83:13,
84:23, 86:20,
86:21, 87:6,
87:9, 90:1,
94:15, 112:5,
136:9, 137:12,
137:13, 137:14,
138:4, 138:21,
138:23, 139:6,
140:22, 140:23,
142:7, 144:8,
149:5, 149:18,
149:21, 150:2,
150:5, 151:20,
151:24, 153:2,
153:24, 154:22,
155:15, 156:21,
160:1, 163:5,
163:11, 163:12,
163:16, 163:24,
165:11, 165:12,
165:17, 166:7,

169:12, 172:13,
172:14, 193:11,
205:18, 205:23,
216:22, 223:4,
223:11, 223:14,
224:20, 225:3,
225:4, 225:12,
231:3, 232:15,
232:17, 241:12,
261:8, 262:3,
262:8, 264:13

**labeled**
169:2, 178:1,
210:7

**laboratories**
78:15, 85:1

**laboratory**
74:10, 82:13,
82:24, 95:12,
104:4, 112:23,
125:14, 126:2,
127:18, 127:20,
130:4, 159:22,
161:16, 161:17,
161:18, 161:21,
167:16, 167:18,
168:4, 168:23,
170:3, 176:15,
177:12, 177:16,
180:9, 220:15,
223:4, 225:5,
227:4, 235:17,
244:21, 245:8,
256:8, 264:10

**labs**
252:2

**lack**
219:11

**laid**
96:19

**land**
88:21, 99:14,
106:14, 106:15,
129:6, 133:17,
134:5, 134:14,
145:10, 186:24,
190:5, 191:24,
192:5

**lands**
99:23, 100:15,
102:4, 102:6,
134:18, 193:12,
195:21

**language**
114:23, 135:5,
165:2, 165:3,
216:12

**large**
63:24, 202:22

**larger**
114:21

**last**
112:5, 151:7,
199:6, 212:9,
243:12, 265:8

**late**
86:13

**latent**
170:6, 171:1,
171:10, 171:13,
172:14, 172:16,
198:3, 198:4,
198:6, 218:13,
218:22, 219:1

**latents**
171:4, 171:5,
218:21

**later**
68:8, 79:2,
111:10, 115:17,
136:9, 137:20,
161:8, 162:1,
162:2, 171:8

**latter**
92:14

**law**
237:6

**lawyer**
146:18, 146:19,
147:7, 148:9,
148:12, 158:18

**lawyers**
147:10

**lay**
117:16

**layperson**
200:15

**lead**
101:14, 104:22,
104:23, 136:16,
137:22, 137:23,
148:23, 175:19,
175:23, 192:23,
239:3, 246:5

**leadership**
243:22

**leading**
265:7

**leanne**
161:20, 162:3

**learn**
214:3, 215:5

**least**
70:2, 216:1,
251:10, 252:6,
252:14

**leave**
142:8

**leaves**
127:17

**leaving**
238:9

**led**
228:7, 228:9,
238:9

**leff**
64:9, 67:6,
67:7

**left**
81:16, 87:17,
94:1, 99:11,
100:3, 101:17,
102:17, 103:6,
129:16, 142:7,
160:21, 245:15

**length**
99:2, 100:10

**less**
96:5, 107:13,
124:6, 153:6,
153:13, 204:9

**let's**
71:16, 79:14,
86:11, 94:2,
94:3, 97:13,

**lead**
109:8, 116:18,
118:3, 120:22,
130:9, 130:10,
137:24, 141:1,
151:13, 153:10,
160:10, 162:17,
167:6, 167:13,
168:12, 169:7,
173:8, 173:23,
176:14, 182:4,
186:8, 191:17,
204:18, 218:13,
219:18, 249:23

**letters**
226:21, 228:23

**level**
73:16, 74:2,
74:17, 74:18,
74:23, 75:9,
76:1, 79:18,
79:19, 124:22,
183:11, 183:13,
220:15, 221:23,
222:4, 226:13,
226:14

**levels**
75:4

**life**
143:18

**lighting**
91:6

**likelihood**
255:13

**likely**
209:7

**liking**
239:6

**limited**
97:24, 126:11,
127:20

**line**
89:18, 90:24,
92:3, 105:14,
106:8, 107:10,
109:11, 111:11,
129:20, 129:22,
162:7, 162:11,
168:22, 169:18,

171:17, 176:20,
182:4, 182:23,
186:9, 187:5,
190:5, 190:18,
191:23, 195:7,
199:19, 202:18,
205:2
**lined**
92:8, 182:5,
189:23
**lines**
92:10, 94:11,
145:10, 161:2,
183:18, 183:19
**lining**
89:24, 92:18,
92:21, 92:23,
106:14, 109:17
**linked**
141:21
**list**
134:14, 140:14,
140:15, 142:4,
142:5, 162:19
**listed**
97:21
**lists**
170:14, 210:24
**litigation**
244:4
**little**
71:1, 76:15,
85:6, 94:7,
107:13, 109:2,
115:16, 118:14,
120:19, 124:5,
124:8, 125:21,
144:12, 153:8,
156:11, 183:16,
183:20, 183:21,
203:19, 220:20,
257:20
**live**
172:3, 172:4
**llp**
64:19, 64:28,
65:14
**located**
75:19, 203:21,

203:22
**location**
198:17
**loevy**
64:10
**long**
65:13, 76:10,
76:18, 88:10,
88:12, 88:15,
211:15, 211:16,
211:18, 231:21,
249:3, 256:9,
258:22
**longer**
76:15, 151:20,
152:24, 223:6,
245:21, 247:7
**look**
85:8, 86:5,
88:19, 88:20,
90:2, 90:6,
90:9, 90:10,
90:11, 90:20,
90:21, 91:2,
91:4, 91:7,
91:20, 92:9,
92:10, 92:14,
92:22, 92:24,
97:10, 99:3,
102:1, 102:8,
105:21, 106:9,
106:19, 106:23,
107:1, 109:19,
110:6, 111:5,
119:18, 120:3,
121:10, 121:15,
121:16, 122:19,
122:21, 122:22,
123:8, 125:2,
125:15, 132:18,
132:20, 141:8,
142:11, 142:14,
142:15, 159:13,
160:10, 162:17,
165:11, 167:10,
169:7, 171:22,
173:8, 173:9,
179:21, 179:22,

181:16, 181:19,
182:7, 182:12,
182:22, 183:1,
183:4, 184:8,
184:19, 184:22,
186:10, 189:20,
189:22, 190:11,
190:15, 200:14,
200:15, 200:17,
204:12, 206:8,
210:12, 212:20,
212:23, 213:18,
216:10, 234:6,
242:22, 243:1,
243:3, 244:19,
248:5, 249:8,
249:14, 255:14,
256:13, 259:22
**look-see**
83:4, 192:17
**looked**
74:19, 91:9,
93:5, 119:6,
124:23, 137:5,
138:20, 138:21,
166:9, 174:1,
181:10, 181:17,
182:5, 183:8,
185:2, 185:7,
206:7, 226:18,
227:20, 228:18,
244:1, 244:11,
259:6, 259:23
**looking**
78:24, 83:24,
85:19, 85:20,
86:10, 89:8,
89:13, 94:12,
97:3, 97:8,
97:9, 99:7,
103:12, 107:15,
107:16, 108:4,
109:6, 109:24,
110:3, 110:9,
111:5, 114:9,
114:21, 116:15,
116:19, 116:20,
116:22, 116:23,

116:24, 120:21,
122:4, 124:2,
124:11, 124:16,
125:6, 125:8,
125:11, 132:6,
135:23, 159:4,
170:11, 182:3,
203:24, 204:1,
213:22, 215:2,
215:20, 222:10,
227:3, 244:9,
249:22, 253:13
**looks**
111:22, 161:8,
162:2, 162:23,
164:4, 164:19,
205:15
**loop**
223:9
**lost**
197:5
**lot**
69:1, 69:4,
108:20, 119:9,
190:8, 190:9,
214:11, 236:22,
246:20
**louis**
78:18
**low**
142:11, 143:2,
143:4, 206:15,
214:15
**low-confidence**
142:4, 142:21
**lower**
201:20
**luger**
178:22
**lunch**
115:17, 151:11,
164:6, 232:18
**lunchtime**
164:5

---

**M**

**ma'am**
72:1, 75:6,

75:17, 76:9,
78:2, 78:21,
81:18, 81:23,
85:9, 86:19,
87:11, 89:2,
92:19, 101:20,
103:11, 103:14,
103:19, 108:3,
116:14, 143:14,
168:21, 169:6,
171:16, 174:2,
175:21, 186:11,
191:3, 196:13,
196:20, 198:8,
198:20, 199:15,
200:10, 206:9,
210:14, 226:19,
231:22, 233:22,
257:3, 258:14,
259:3, 260:2

**macanally**
67:18, 261:1

**machine**
216:9

**made**
118:17, 120:8,
120:13, 139:22,
139:23, 141:20,
141:23, 142:2,
143:5, 147:14,
179:24, 180:24,
181:2, 195:5,
201:2, 213:19,
221:24, 247:4,
247:5, 248:7,
254:8, 255:22

**magazine**
171:24, 172:1,
202:5, 202:6,
202:14, 202:15,
202:17, 202:19,
202:21, 203:7,
203:8

**magnification**
114:11, 114:13,
114:20, 115:6,
207:8

**maintain**
126:14, 154:16

**maintaining**
126:16

**major**
117:13

**make**
70:15, 70:21,
72:18, 88:23,
97:20, 98:13,
102:14, 102:16,
103:1, 105:21,
122:1, 125:3,
129:11, 130:11,
134:10, 136:5,
141:15, 142:12,
144:23, 172:9,
178:16, 184:20,
187:7, 190:12,
193:4, 194:23,
198:23, 199:12,
215:19, 227:13,
228:7, 228:9,
244:13, 245:13,
248:10

**makes**
69:1, 69:4,
104:5, 108:20,
163:21

**making**
70:18, 85:15,
85:17, 97:12,
123:19, 131:15,
153:5, 153:14,
195:1, 261:13

**malfunctioning**
255:13

**management**
85:3, 238:8,
239:4, 239:6

**mandated**
82:11

**manila**
198:14

**manipulate**
90:18

**manner**
101:7, 196:21

**manual**
255:12

**manufacture**
200:20

**manufactured**
100:20, 105:15,
117:19, 119:3,
178:16

**manufacturer**
99:2, 99:24,
100:22, 104:12,
118:5, 118:18,
119:11, 133:19,
142:24, 143:1,
143:9, 178:22,
179:1, 191:15,
215:24, 255:9,
255:12

**manufacturer's**
100:23, 118:3,
178:17

**manufacturers**
102:3, 119:7

**manufacturing**
118:7, 118:18,
120:10, 131:5,
199:1

**many**
76:3, 78:7,
86:22, 95:23,
95:24, 100:20,
118:20, 140:19,
147:1, 147:17,
156:7, 252:23,
258:22

**mark**
64:25, 71:19,
104:17, 106:4,
106:6, 106:12,
108:10, 108:21,
109:18, 118:2,
118:21, 120:3,
126:10, 158:5,
158:14, 160:1,
167:6, 177:16,
204:7, 205:18,
210:6, 210:16,
243:7, 249:9,
256:7

**marked**
110:18, 158:10,

**marking**
109:9, 176:7

**markings**
91:15, 93:15,
105:19, 107:9,
107:10, 107:16,
107:17, 107:18,
107:21, 107:22,
107:24, 110:7,
116:21, 116:24,
117:1, 117:2,
121:14, 121:17,
121:19, 121:21,
121:23, 123:10,
123:11, 123:12,
123:15, 129:11,
147:14, 177:12,
178:17, 186:15,
188:20, 190:24,
198:17, 258:24

**marks**
72:18, 105:19,
106:17, 108:4,
116:15, 120:23,
120:24, 121:8,
121:12, 122:23,
123:4, 123:8,
123:19, 123:23,
127:7, 127:9,
177:12, 205:23

**married**
261:1

**massachusetts**
245:22, 257:5

**master**
216:23

**match**
101:13, 131:19,
141:3, 216:2

**matched**
116:11

**matches**
142:5, 190:12,

214:13
**matching**
101:23, 145:9,
190:5
**matter**
210:24, 211:22,
240:14, 243:2,
261:18, 261:23
**maybe**
96:10, 96:12,
109:9, 115:10,
115:15, 115:16,
120:17, 136:23,
177:20, 187:9,
187:10, 198:3,
221:2, 221:6
**mayor**
82:11
**maywood**
74:9, 75:15,
75:18, 75:20,
76:1, 76:4,
76:11, 78:4,
78:14, 78:23,
79:12, 84:23,
87:6, 225:17
**mccarthy**
64:28
**mcclain**
211:10, 211:12,
211:15, 213:8,
213:10, 213:13,
214:4, 215:6,
243:24, 247:13
**mcclain's**
211:1
**mcgraw**
244:6
**mcintyre**
217:10
**mean**
74:18, 77:7,
85:13, 93:8,
104:1, 109:9,
110:14, 111:6,
111:8, 111:11,
111:15, 114:3,
124:22, 125:16,

127:1, 131:3,
139:18, 145:2,
146:3, 146:22,
147:24, 149:8,
149:11, 154:19,
156:10, 156:16,
166:13, 166:15,
170:2, 172:18,
173:6, 176:23,
177:13, 182:9,
185:3, 185:14,
185:21, 186:23,
186:24, 188:16,
188:17, 190:8,
192:24, 195:7,
195:22, 199:20,
200:3, 200:15,
203:2, 205:19,
208:8, 224:24,
227:21, 232:18,
238:11, 238:17,
238:21, 252:12,
255:7
**meaning**
204:21
**means**
92:17, 94:11,
110:21, 114:20,
161:22, 191:19,
195:24, 196:2,
198:14, 202:13
**meant**
124:12, 209:24,
253:5
**measure**
133:17, 134:5,
192:5, 192:17
**measurements**
134:5, 192:2,
193:5
**measuring**
193:12
**mechanisms**
202:24
**meeks**
257:5
**meet**
144:18, 223:21,

224:12, 224:15,
230:19, 233:1,
233:4
**meeting**
150:16, 227:24,
229:19
**member**
143:15, 143:18
**memorandum**
66:8, 243:17,
244:5
**memorialized**
110:20, 110:21
**memorializes**
110:12
**memory**
233:6
**men**
255:10
**mention**
85:7, 237:8
**mentioned**
68:7, 85:5,
88:6, 103:16,
121:7, 124:9,
138:13, 143:12,
175:18, 192:6,
204:17, 220:8,
220:10, 223:11,
225:6, 229:3,
231:20, 237:9,
237:14, 238:2
**message**
163:3
**messengers**
94:22
**met**
144:10, 144:14,
222:11, 229:10,
229:15, 231:4,
231:11, 231:12,
233:19
**metal**
117:19, 117:20,
122:18, 143:6,
143:7, 175:23,
187:24, 200:18,
200:24

**metals**
104:17
**method**
144:23, 145:2,
145:6, 145:9,
145:12
**miami**
199:9, 201:5
**michael**
64:18, 67:12,
215:8, 227:10,
230:11, 230:22,
239:13, 260:6,
266:23
**michigan**
64:6
**micro**
111:13, 114:10,
121:4
**micrographs**
111:22
**microscope**
71:12, 71:15,
72:19, 83:6,
89:14, 89:19,
90:3, 102:11,
113:9, 113:16,
116:13, 134:2,
134:4, 141:20,
141:22, 142:3,
183:12, 184:8,
189:16, 206:7,
213:19, 214:22,
215:20, 228:8,
228:13, 242:10,
244:2, 244:10,
244:11, 248:5,
252:15
**microscopic**
83:23, 89:18,
101:5, 121:5,
122:5, 131:3,
134:8, 173:13,
254:8
**microscopically**
102:9, 129:8,
141:9, 142:15,
181:11, 251:12,

253:14
**microscopy**
80:24
**middle**
180:16, 189:9,
250:9
**might**
68:12, 75:10,
88:15, 89:20,
95:3, 106:15,
107:12, 122:16,
128:6, 135:2,
143:1, 185:17,
191:13, 192:12,
193:6, 198:1,
218:10, 240:18,
240:21
**might've**
96:4
**millimeter**
169:3, 170:19,
171:24, 172:1,
172:3, 172:4,
178:6, 178:22,
186:19, 191:4,
198:21, 244:22,
246:23
**mimic**
225:10
**mind**
70:17
**mine**
180:21, 180:22,
181:6, 194:18
**minimum**
220:18, 220:19,
221:10, 221:11,
222:5, 222:12,
222:22, 223:17,
224:12, 224:13,
224:15, 224:17,
225:6, 227:19,
227:24, 228:2,
229:7, 229:10,
229:12, 229:15,
229:20, 230:10,
230:18, 230:19,
231:4, 231:11,

231:12, 231:17,
254:5
**minute**
167:10, 171:3,
244:16
**minutes**
115:21, 159:13,
162:1, 256:12,
263:4
**mischaracterizes**
229:24
**mishandling**
127:7
**misidentified**
207:21
**mismatched**
92:21
**misrepresented**
257:15
**miss**
125:7, 125:10
**missed**
125:6, 157:10
**missing**
188:3, 188:7,
218:13
**misstates**
215:9
**mistake**
254:15
**mistakes**
254:7
**mm-hmm**
69:5, 72:24,
76:22, 78:13,
79:17, 80:20,
90:13, 91:1,
93:4, 96:7,
97:15, 99:17,
99:22, 102:5,
104:21, 106:18,
109:15, 109:21,
111:19, 113:11,
114:16, 121:9,
121:18, 123:3,
125:20, 126:3,
127:4, 128:14,
131:6, 133:3,

133:11, 141:14,
142:18, 168:17,
173:11, 173:14,
177:3, 177:5,
181:15, 189:1,
197:20, 203:17,
211:8, 212:11,
215:4, 216:13,
218:15, 246:15,
246:17
**model**
99:2, 130:11,
199:16, 244:24
**modified**
131:22
**module**
144:16
**money**
153:5, 153:14
**month**
76:7, 76:8,
154:18, 156:10,
252:9, 252:21,
253:1
**months**
70:2, 72:3,
72:5, 73:11,
74:7
**more**
74:18, 76:17,
77:22, 79:14,
85:6, 94:8,
96:5, 115:2,
118:14, 124:8,
139:24, 153:5,
153:14, 153:24,
157:3, 183:16,
183:21, 183:22,
196:1, 202:21,
203:6, 203:7,
203:8, 204:9,
206:16, 220:11,
220:19, 220:20,
220:23, 221:11,
221:12, 221:24,
227:21, 230:5,
236:1, 246:5,
260:5

**morning**
67:6, 67:16,
67:21, 69:20,
231:19, 257:24,
258:6
**most**
188:2, 209:6,
250:7
**mostly**
78:10
**motivating**
84:15
**mouth**
194:18
**move**
90:23, 91:5,
95:19, 103:9,
108:19, 109:6,
121:20, 153:2,
182:19, 185:10,
195:17, 250:8
**moved**
75:15, 75:24,
79:23, 108:22,
137:12, 137:14,
154:5
**moving**
169:18
**much**
75:13, 95:4,
119:6, 140:10,
168:13, 262:11
**mulbana**
68:9
**multiple**
184:16
**multiply**
114:14
**murder**
95:6
**murdock**
144:1, 144:4,
212:13, 241:19,
243:21
**murdock's**
211:1, 212:20,
213:3, 216:14,
216:18, 241:24,

256:8
**must**
178:17, 230:19
**must've**
229:19
**mutilated**
176:2, 188:12,
188:17, 196:10
**mutual**
68:24
**mutually**
224:22, 225:8
**myself**
150:12

**N**

**n-o**
175:5
**name**
68:9, 69:21,
77:5, 77:17,
100:16, 118:11,
144:1, 145:22,
160:8, 194:10,
212:17, 233:2,
235:3, 235:12,
260:16, 261:2
**named**
87:1, 148:19,
162:4, 162:9
**names**
205:14, 205:15,
261:4
**naming**
134:20
**narrative**
221:21, 221:22,
222:19, 224:10,
226:3, 226:5
**narratives**
226:11
**narrow**
133:21, 133:22
**nation**
264:10
**nature**
153:19, 164:13
**necessarily**
122:16, 134:22,

185:3
**necessary**
84:1, 84:20,
159:5, 205:1,
206:13
**need**
70:24, 71:6,
71:8, 74:13,
80:1, 81:10,
83:1, 102:24,
119:23, 122:20,
207:3, 256:23,
266:10
**needed**
82:17, 125:16,
258:7
**negates**
103:4
**negative**
259:15
**neither**
178:8, 246:12,
269:9
**never**
81:15, 105:5,
111:14, 112:17,
113:21, 115:4,
115:6, 125:17,
125:18, 137:15,
184:6, 246:3,
256:1
**new**
78:3, 245:22
**newly**
229:9, 230:5,
230:9
**newly-trained**
230:4
**next**
68:4, 103:16,
109:20, 141:6,
156:2, 162:7,
162:17, 168:22,
169:18, 171:17,
176:14, 176:20,
182:4, 182:24,
184:2, 185:10,
187:5, 190:15,

191:23, 197:1,
197:14, 199:19,
202:18, 205:2,
258:6
**nobody**
164:16
**nodding**
70:19
**none**
139:3, 150:10,
192:19
**nonreloadable**
105:3, 178:23,
179:6, 205:9,
205:10, 205:11
**nonunion**
153:10
**normal**
160:19, 160:20,
171:9, 174:16,
188:7
**north**
64:11
**northern**
63:2, 145:11
**nose**
195:23, 256:19
**notarial**
269:13
**notary**
63:23, 66:17,
269:1, 269:3,
269:21
**notation**
175:11
**notations**
85:15
**note**
70:13, 168:1,
194:23
**noted**
70:11
**notes**
134:7, 134:10,
209:10, 211:1,
212:4, 212:21,
213:19, 214:2,
216:22, 217:1,

218:16, 219:1,
219:10, 244:2,
244:13, 244:14,
247:18, 248:7,
248:10, 248:11,
248:20, 262:24
**nothing**
69:12, 175:1,
208:3, 214:15
**notified**
209:4
**november**
269:14
**nr**
178:22, 205:9
**number**
79:8, 96:4,
96:15, 96:16,
98:6, 98:7,
99:2, 99:23,
100:6, 100:15,
106:5, 141:1,
158:10, 167:3,
174:3, 174:6,
176:19, 177:19,
185:12, 189:4,
201:11, 201:17,
201:18, 204:21,
210:3, 216:17,
218:12, 243:4,
244:21, 244:24,
249:5, 249:10,
259:20, 260:1
**numbered**
162:18
**numbers**
130:12, 159:21,
169:9, 169:12,
169:15, 172:6,
218:18, 228:23

**O**

**o**
191:1
**oath**
68:16, 68:19
**object**
68:18, 70:20,

73:3, 188:8,
215:9, 217:6,
217:13, 217:17,
219:2, 230:11
**objection**
68:15, 68:20,
68:23, 70:21,
71:2, 82:19,
113:10, 128:22,
180:1, 180:4,
184:11, 184:14,
191:10, 219:11,
226:24, 227:9,
229:21, 229:24,
231:6, 237:22,
239:12, 254:16,
264:2, 265:7
**objective**
114:17, 114:18,
114:19, 115:5
**objectives**
114:13, 146:15
**observed**
113:19, 125:8,
175:4, 175:5,
183:12, 186:16,
191:1
**obtain**
239:23, 240:9
**occasion**
94:21, 120:17,
141:4, 234:14,
241:4
**occasionally**
95:3, 95:4
**occurred**
81:11, 155:8,
245:2, 248:18
**occurrence**
84:15
**occurring**
70:14
**october**
63:16, 168:15,
210:17, 245:2,
245:6
**ocular**
114:14, 114:15,

114:18, 115:2,
115:4
**oculars**
114:12
**offense**
159:21, 167:21,
168:19
**office**
257:10
**officer**
262:3, 262:8
**officers**
261:5
**often**
78:7, 157:21
**oh**
74:8, 77:3,
77:10, 114:8,
121:24, 140:21,
157:4, 170:5,
175:5, 182:22,
182:24, 186:14,
199:2, 199:21,
205:20, 205:22,
209:21, 209:23,
209:24, 213:16,
214:23, 233:6,
252:20, 256:15
**old**
153:18
**onboard**
81:16, 155:6,
234:18
**once**
88:16, 89:22,
91:9, 103:8,
136:22, 137:23,
153:17, 212:17
**one**
68:22, 70:12,
75:2, 76:20,
76:21, 76:23,
77:15, 79:10,
81:1, 83:7,
85:2, 87:13,
87:21, 87:24,
88:2, 88:8,
88:11, 96:5,

102:9, 106:20,
107:11, 108:7,
119:1, 120:17,
131:12, 133:8,
133:9, 135:16,
135:22, 136:8,
137:12, 137:14,
138:13, 140:17,
140:18, 147:19,
149:3, 149:4,
152:7, 152:8,
152:21, 158:7,
163:23, 164:20,
164:24, 165:11,
166:4, 169:2,
169:4, 173:12,
173:19, 189:17,
192:3, 192:12,
192:15, 193:11,
197:1, 202:12,
202:13, 202:15,
203:13, 212:6,
216:4, 216:5,
225:8, 225:10,
225:22, 228:20,
230:4, 233:20,
237:3, 237:5,
237:12, 237:21,
243:9, 243:12,
247:14, 247:16,
247:21, 248:14,
249:18, 249:23,
250:19, 251:10,
252:6, 252:14,
252:19, 252:24,
253:11, 253:23,
255:18, 256:5,
257:1, 265:12,
265:13, 266:3
**ones**
107:10, 117:13,
225:14
**ongoing**
75:12
**only**
70:8, 83:24,
84:22, 85:2,
87:21, 87:24,

88:2, 111:20,
125:6, 139:19,
140:10, 140:15,
141:23, 142:2,
176:11, 256:9,
259:7
**open**
72:13, 98:13,
98:19, 195:22,
195:23, 195:24
**opened**
82:12, 82:15,
164:16, 171:3,
194:18
**opening**
77:15, 98:18,
164:17
**operating**
203:18, 243:2
**opinion**
66:8, 74:16,
133:16, 222:5,
230:6, 230:8,
231:3, 239:21,
239:22, 240:8,
241:21, 243:17,
245:15
**opinions**
239:10, 242:1
**opportunity**
245:6
**opposed**
85:10, 85:12,
85:14, 115:3,
193:4, 193:9,
204:10, 206:24
**opposing**
257:16, 257:17
**opted**
226:6
**option**
73:2
**options**
112:23
**order**
70:14, 129:12,
160:23, 244:7,
266:10, 266:17

**ordered**
244:14
**ordering**
266:12, 266:19
**orders**
80:8
**organization**
153:12, 232:11,
232:14
**orientation**
106:7, 123:14
**original**
91:10, 97:4,
128:8, 179:23,
247:11
**other**
70:11, 70:16,
78:15, 78:20,
84:18, 86:4,
88:4, 91:4,
91:15, 100:11,
109:20, 121:23,
128:9, 129:7,
131:19, 131:24,
134:23, 136:14,
139:14, 144:23,
146:6, 146:15,
147:10, 147:17,
147:19, 148:9,
148:12, 148:13,
148:15, 150:7,
150:23, 151:6,
152:9, 152:21,
154:13, 156:6,
156:17, 182:23,
183:8, 184:3,
190:23, 194:24,
196:14, 197:24,
199:20, 216:21,
218:17, 223:8,
225:9, 225:10,
232:10, 237:20,
241:14, 248:14,
253:2, 255:23,
257:1, 260:8,
266:7
**other's**
156:20, 156:22

**others**
76:23, 88:1,
131:23, 145:13,
148:19, 156:14,
227:21, 247:1,
257:18, 264:16,
265:3
**otherwise**
69:1, 75:13,
181:1, 232:8,
261:15, 269:11
**out**
83:10, 83:19,
84:22, 86:5,
96:19, 99:13,
105:23, 108:8,
117:22, 117:23,
118:24, 119:18,
120:10, 125:7,
125:10, 130:13,
135:2, 138:14,
144:7, 164:6,
169:11, 172:24,
174:1, 178:16,
180:9, 187:7,
192:7, 192:12,
192:15, 192:20,
193:2, 193:3,
193:14, 204:7,
207:2, 207:6,
207:7, 214:24,
223:9, 232:7,
232:18, 248:21,
252:24
**outcome**
269:11
**outside**
151:5, 175:23,
226:22, 228:24,
232:2
**over**
70:3, 70:16,
73:6, 89:24,
90:5, 94:9,
95:21, 95:23,
124:12, 127:14,
182:7, 184:7,
184:21, 184:22,

189:22, 194:15,
207:20, 207:23,
245:16, 259:13,
260:22, 262:24
**overall**
100:10
**own**
73:24, 81:19,
81:24, 83:2,
153:22, 257:21

---
**P**
---

**p-l-a-u-t-z**
80:17
**package**
98:18, 177:11,
177:12, 186:9,
186:15, 191:1,
198:13, 198:17,
212:16
**packaged**
160:17, 212:18
**packages**
89:9
**packaging**
91:16, 95:18,
98:5, 126:19,
126:20, 128:8,
128:10, 174:24,
177:18, 177:23,
179:22, 190:23
**packet**
94:15
**page**
66:2, 160:3,
160:5, 160:10,
162:17, 162:18,
162:19, 163:3,
167:13, 167:15,
168:14, 169:8,
170:12, 170:16,
172:7, 172:8,
173:10, 174:12,
174:14, 176:14,
176:15, 180:20,
181:12, 185:10,
190:16, 197:3,
210:18, 210:20,

211:5, 250:3,
250:4, 250:9,
255:4
**pages**
146:16, 168:8,
224:2, 256:9
**paper**
128:7, 164:21,
164:22, 164:24,
186:9, 190:24
**paperwork**
250:22, 251:4,
251:11, 252:6,
252:7
**paragraph**
247:3, 247:4
**parallel**
121:2, 183:18,
183:19
**park**
64:20
**part**
99:12, 100:22,
110:3, 112:22,
122:10, 137:2,
143:12, 172:14,
188:2, 202:2,
202:3, 202:7,
202:8, 212:1,
214:1, 224:14,
244:19, 249:13
**particular**
79:1, 81:1,
101:10, 102:20,
104:8, 106:2,
111:15, 181:24,
226:15, 230:19,
255:12
**particulars**
91:15, 147:20
**parties**
65:22, 70:7,
269:10
**partner**
194:18
**passed**
235:1, 253:18
**past**
143:13, 147:2,

147:5, 149:15,
149:16, 232:6
**patrick**
63:3, 67:8,
151:18, 168:19,
261:18, 261:22,
262:4, 262:9
**patrick's**
151:17
**patty**
149:2, 149:3,
149:9, 149:22,
242:5, 242:11,
244:3, 244:10,
244:12, 245:8,
247:6
**pause**
94:3
**pd**
81:16, 81:19,
82:15, 82:16,
84:16, 84:18,
257:12
**pdf**
267:2
**people**
81:12, 84:12,
88:6, 119:7,
119:15, 120:9,
152:4, 153:13,
164:6, 172:21,
208:9, 209:16,
232:13, 237:10
**percent**
128:20
**perfectly**
128:20
**perform**
80:6, 86:23
**performance**
80:6, 146:22
**perhaps**
112:14
**period**
78:4, 95:22,
96:5, 252:17
**periphery**
88:21, 190:2

**person**
70:12, 84:22,
92:22, 157:4,
164:2, 197:24,
198:10, 240:24
**personally**
91:7, 125:1,
136:12, 137:7,
137:9, 144:10,
144:14
**personnel**
83:17, 261:15
**pertinent**
100:5
**pete**
162:13, 162:24,
177:1, 185:23,
190:19, 211:7
**peter**
63:14, 65:9,
66:2, 66:10,
68:2, 68:3,
69:15, 245:2,
268:3
**phase**
190:4, 190:5,
190:11
**phone**
94:24, 262:15,
263:17
**photo**
221:14, 222:19
**photograph**
226:3, 244:19
**photograph-to-ph-
otograph**
111:17
**photographs**
78:24, 111:13,
112:1, 112:3,
210:22, 212:24
**photomicrograph**
113:16, 221:1,
221:20, 226:6
**photomicrographs**
111:14, 112:18,
112:24, 226:6
**photos**
224:9

**phrase**
83:8, 105:9,
264:16, 264:18,
264:22, 265:2
**physical**
91:14, 91:16,
100:11, 104:11,
177:22, 244:20,
245:15
**picked**
132:17, 165:7
**piece**
117:19, 117:20
**pieces**
126:22, 163:4,
163:10, 163:15
**pin**
116:23, 117:3,
117:5, 117:18,
118:6, 121:22,
203:20
**pink**
97:19, 159:19,
160:22
**pins**
117:17
**pirages**
64:34, 67:20,
261:3
**pistol**
117:1, 200:4,
200:7, 200:8,
216:22, 244:24
**pistols**
133:6
**place**
63:18, 79:12,
80:7, 92:3,
92:7, 98:4,
102:10, 106:7,
106:13, 106:21,
127:21, 135:9,
140:13, 245:5
**placed**
97:23, 108:22,
126:10, 128:6
**placing**
120:19

**plaintiff**
63:5, 63:15,
64:16, 67:7,
69:22, 146:14
**plaintiff's**
249:10
**plastic**
177:11, 186:9
**plated**
100:9, 199:20,
199:21, 199:22
**plautz**
80:17
**play**
83:14
**please**
67:4, 69:7,
119:2
**pleased**
258:3
**plenty**
156:1
**plus**
202:11, 202:17
**pobjecky**
64:25, 67:15
**point**
79:1, 81:2,
89:23, 111:16,
113:5, 113:14,
113:17, 120:18,
138:2, 155:24,
164:15, 164:16,
166:15, 181:8,
182:15
**pointed**
169:11
**police**
66:6, 68:1,
72:16, 81:9,
81:13, 83:1,
84:20, 87:4,
136:14, 136:24,
140:22, 146:23,
147:20, 153:11,
155:5, 155:6,
161:14, 168:8,
209:4, 225:2,

225:12, 232:24,
233:8, 233:14,
234:18, 234:19,
235:19, 236:16,
238:13, 238:14,
238:15, 238:18,
239:9, 239:10,
250:10, 255:9,
262:3, 262:8,
263:15, 263:22,
264:5, 265:17,
265:23, 266:1
**policies**
126:7, 126:12,
220:14
**policy**
79:2, 112:22,
193:8, 193:10,
193:15
**polish**
117:24
**polishing**
101:7, 118:1
**portion**
201:20, 201:23
**position**
109:12, 153:10,
204:2
**positioning**
109:13
**positive**
129:12, 188:24,
196:15, 259:7,
259:15, 264:20,
264:23
**possession**
97:22, 138:22,
161:23
**possibility**
86:9, 91:5,
120:15, 124:6,
135:19, 156:23,
198:3
**possible**
107:9, 129:19,
130:8, 134:15,
134:17, 142:13
**possibles**
140:15

**possibly**
112:16, 124:24,
127:1, 171:2,
175:8, 232:9
**potential**
94:12, 96:19,
141:2, 141:16,
216:11, 216:12,
217:3, 217:24
**potentially**
123:19
**pottinger**
65:12, 67:9,
68:21, 260:10,
267:5, 267:8,
267:9
**pounds**
204:21, 205:1
**power**
114:10, 114:14,
206:8, 206:11
**pr**
80:12
**practice**
124:10, 184:1,
193:21, 193:23,
206:19, 221:15,
222:4
**practices**
222:1, 222:2,
222:3
**precursor**
152:3, 152:6,
152:22
**preliminaries**
218:1
**preliminarily**
137:4, 137:12,
138:7, 138:8,
218:1
**preliminary**
136:2, 136:4,
136:6, 136:19,
136:23, 137:20,
138:3, 165:20,
166:2, 166:5,
192:12, 193:9,
193:12, 208:24,

209:15, 236:22,
237:1, 237:9,
239:10, 239:16,
240:8
**premise**
73:5
**prepare**
146:1, 146:3
**presence**
68:17, 245:7
**present**
72:17, 129:8,
150:20, 150:24,
171:13, 213:6,
245:12
**president**
143:13, 149:16,
232:12
**presidents**
232:6
**pressed**
207:8
**presume**
175:3
**presumption**
131:24, 261:13
**pretty**
75:1, 77:19,
86:7, 119:6,
140:9, 149:13,
256:3
**prevented**
259:14
**previous**
247:15
**primary**
84:3, 88:15,
93:2, 93:5,
97:10, 97:14,
110:9, 125:16,
183:19
**primer**
178:19
**principal**
124:10, 124:15
**print**
218:14
**printed**
257:20

**printer**
257:21
**prints**
170:6, 171:1,
171:10, 171:13,
172:15, 172:16,
198:3, 198:4,
198:6, 218:22,
219:1
**prior**
68:21, 225:18
**priority**
142:10, 142:11
**pristine**
105:15, 105:16,
105:22, 121:11
**private**
147:16
**privilege**
150:17
**probably**
120:9, 120:12,
164:1, 164:6,
172:18, 175:3,
183:15, 199:10,
199:13, 201:6,
211:16, 216:1,
252:23, 252:24
**problem**
71:3, 138:8,
193:24, 217:3,
217:11, 217:24,
218:24
**problems**
216:11, 216:12
**procedure**
70:6, 165:5,
171:9, 172:23,
243:2
**procedures**
85:23, 86:4,
245:4
**proceed**
136:10
**proceedings**
66:1, 67:1,
116:3, 158:8,
210:9, 219:22,

263:5, 263:19
**process**
72:9, 79:11,
81:2, 82:18,
83:3, 83:10,
84:5, 85:6,
89:5, 97:13,
102:2, 103:5,
103:16, 113:3,
117:16, 118:7,
118:19, 123:24,
124:9, 127:11,
131:5, 132:6,
132:22, 155:4,
181:8, 182:3,
189:15, 199:23,
200:19, 213:18
**processing**
170:6
**produced**
119:5, 249:19
**professional**
143:23, 240:16,
250:2
**program**
152:2, 152:20,
152:24, 214:24
**pronounced**
107:12, 107:13,
121:14, 121:22,
122:23, 123:11
**pronouncing**
260:16
**proper**
203:19
**properly**
207:12, 207:14,
207:15, 245:24,
246:1
**property**
168:7
**prosecution**
258:2
**protocol**
111:12, 122:10,
135:5
**protocols**
126:7, 126:9,

184:4, 245:4
**proud**
256:6
**prove**
123:2
**provide**
111:21, 136:16,
138:12, 192:18,
226:13, 226:14,
249:18
**provided**
240:15, 249:17,
255:8
**proximity**
164:2
**pry**
72:13
**ps**
176:23, 177:1,
185:15
**ptaf**
199:16, 244:24
**public**
63:23, 66:17,
194:16, 194:20,
269:1, 269:3,
269:21
**pull**
203:4, 203:9,
203:11, 203:12,
204:14, 204:19,
215:13
**punched**
117:22, 117:23
**purpose**
98:9, 226:12,
226:16, 251:16,
251:18, 258:21
**purposefully**
118:4, 119:11,
119:13
**purposes**
188:19
**pursley**
63:3, 67:8,
167:7, 168:19,
176:16, 185:11,
197:4, 207:20,

209:13, 210:23,
210:24, 216:19,
227:4, 243:18,
261:18, 261:23,
262:4, 262:9
**pursley's**
151:17, 151:18,
208:1
**pursuant**
70:5
**push**
84:17
**put**
111:13, 118:1,
118:4, 119:8,
126:20, 128:8,
130:9, 134:13,
140:7, 156:13,
158:21, 159:5,
159:22, 172:18,
177:19, 180:11,
181:17, 183:3,
183:15, 183:20,
186:6, 202:6,
202:14, 202:15,
202:16, 227:23,
228:3, 266:3
**puts**
159:22
**putting**
156:13, 156:15,
227:22

---
**Q**
---

**qualifications**
85:4
**qualified**
135:19
**qualify**
135:1
**quality**
79:6, 79:7,
129:6, 158:1,
158:3, 194:24,
250:10, 250:15,
250:18, 251:9,
251:16, 251:19,
253:9, 253:18,

254:3, 254:10,
254:14, 254:24
**quantitative**
129:5
**quantity**
130:20
**question**
70:21, 70:22,
70:24, 71:4,
73:7, 98:24,
110:14, 123:1,
132:24, 138:16,
140:18, 152:17,
192:9, 227:6,
265:13
**questioned**
122:6, 122:7,
122:8, 123:9,
138:1, 178:4,
181:13, 189:16,
208:23, 214:5
**questioned-to-qu-
estioned**
123:5, 124:1
**questions**
80:9, 125:24,
220:6, 220:9,
256:22, 260:5,
260:7, 260:9,
260:11, 260:13,
262:14, 262:24,
263:10, 265:8,
266:6, 266:8
**quick**
115:15, 192:17,
249:8, 260:12
**quickly**
260:22, 261:16
**quit**
194:6, 195:9
**quite**
140:24, 141:1

---
**R**
---

**r**
191:19, 244:21
**raise**
69:7

**ran**
84:11, 214:6
**randolph**
65:5
**random**
79:4, 251:13
**range**
114:24
**rapport**
238:15
**rare**
256:3
**rather**
109:9, 118:6,
258:8
**re-exam**
253:23
**re-examination**
242:6, 244:3,
252:15
**re-examine**
245:7
**re-examined**
242:10
**read**
212:20, 244:16,
244:17, 268:3
**reading**
154:14, 162:5
**real**
260:22, 261:16
**realize**
119:14, 120:9,
233:17
**really**
78:9, 81:15,
85:18, 96:13,
135:14, 154:21,
155:11, 194:8,
194:17, 200:14,
206:8, 215:17,
218:3, 221:8,
226:16
**reanalysis**
79:4, 251:13,
254:8
**reason**
99:12, 107:20,

114:5, 138:4,
139:14, 170:24,
176:9, 207:9,
207:12, 207:13,
207:16, 261:17,
261:21, 261:24,
262:2, 262:7
**reasons**
139:19
**rec**
201:14
**recall**
77:4, 78:8,
78:9, 84:24,
86:2, 86:4,
86:24, 96:22,
97:1, 111:9,
112:12, 113:4,
124:24, 131:18,
131:20, 135:8,
136:13, 139:3,
139:5, 139:8,
142:7, 147:20,
155:7, 155:9,
155:12, 164:12,
164:14, 206:13,
207:20, 208:12,
218:10, 221:3,
229:7, 229:11,
231:13, 231:14,
231:16, 237:3,
237:4, 237:5,
238:6, 240:17,
240:20, 240:23,
241:2, 241:8,
241:9, 241:10,
241:13, 241:17,
243:12, 252:10,
255:24, 257:4,
258:15, 258:19,
263:10
**receipt**
66:5, 95:14,
97:21, 159:1,
159:18, 169:8,
170:12, 170:22,
171:23, 172:24,
177:8, 186:5,

198:11
**receipts**
251:1
**receive**
78:14, 94:15,
140:13, 163:22,
250:18
**received**
98:15, 125:22,
160:3, 161:1,
161:2, 161:4,
161:10, 164:9,
164:20, 164:24,
166:22, 168:23,
169:21, 170:21,
170:23, 171:2,
171:18, 174:6,
174:7, 174:8,
174:23, 176:20,
177:1, 177:4,
177:12, 185:14,
185:23, 186:2,
186:6, 190:18,
190:21, 197:21,
198:9, 198:10,
228:5
**receiver**
201:10, 201:16,
201:17, 201:18,
201:19, 201:23,
202:3, 202:6,
202:8
**receives**
201:24
**receiving**
139:5, 160:7,
257:13
**recognize**
261:4, 261:6
**recollection**
75:1, 84:6,
126:18, 160:7,
165:14, 166:24,
181:23, 221:7,
226:14, 232:10,
246:2, 255:19
**record**
68:9, 68:14,

115:9, 116:4,
140:2, 152:12,
158:6, 158:9,
194:20, 194:23,
195:1, 207:5,
210:10, 219:23,
237:15, 263:6,
263:17, 263:20,
269:5
**recorded**
70:8
**recording**
113:7
**recoup**
153:8, 153:16
**recover**
136:24, 141:8
**recovered**
209:20
**recovers**
137:24
**red**
86:6, 180:19
**redirect**
66:15, 265:13,
265:14
**redo**
253:13
**reduced**
269:7
**refer**
171:22, 171:23,
179:23, 180:3,
185:17, 186:16,
198:6, 198:18,
204:14, 240:12
**reference**
179:14, 216:19,
255:14
**referred**
170:17, 201:21
**referring**
77:2, 77:6,
77:10, 134:2,
178:19, 178:20,
194:11, 223:24,
224:2, 224:5,
238:13, 238:14,

**238**:15
**refers**
174:3, 185:18,
200:7
**reffett**
65:20, 67:11
**reflect**
142:20, 165:13
**reflected**
177:7, 186:4,
225:24
**reflecting**
181:21
**reflection**
228:4, 228:6,
228:10
**refresh**
165:13
**refresher**
154:11, 154:16
**regan**
63:21, 269:3,
269:20
**regard**
80:9, 167:19,
209:17, 221:9,
228:7, 229:3,
239:5, 239:20,
265:21
**regarding**
263:11
**reiterate**
143:8
**related**
209:10, 269:9
**relationship**
234:5
**relationships**
88:14
**relatively**
258:3
**release**
204:21
**reliable**
105:10
**reload**
105:11, 105:12,
105:13, 105:14,

**178**:24
**reloadable**
105:3, 105:5,
105:7, 105:9
**rely**
120:5
**remember**
77:17, 151:17,
154:18, 154:20,
166:18, 166:23,
198:2, 220:12,
264:15
**remind**
70:4, 226:17,
226:21
**remove**
102:9, 106:20,
123:16, 127:9
**removed**
162:3
**render**
119:8
**rendered**
241:21
**repeat**
70:24, 113:11,
157:10, 158:19,
235:8
**repeating**
141:17
**repeats**
255:16
**repetition**
71:3
**rephrase**
113:12
**replica**
128:21
**report**
66:6, 77:16,
91:18, 91:20,
134:16, 135:5,
135:6, 136:18,
136:20, 137:20,
162:6, 167:8,
167:16, 167:18,
168:15, 169:16,
169:19, 170:17,

**171**:7, 172:8,
173:9, 174:12,
174:14, 186:5,
192:20, 193:4,
209:10, 210:24,
211:1, 212:20,
212:24, 216:18,
216:22, 217:10,
218:14, 218:15,
219:10, 220:3,
220:9, 222:9,
222:11, 222:14,
222:18, 222:23,
223:21, 223:24,
224:9, 224:15,
231:4, 231:11,
242:1, 243:22,
243:24, 244:1,
248:17, 250:23,
253:17, 256:8
**reported**
63:20
**reporter**
63:22, 66:17,
67:3, 68:5,
68:13, 69:2,
69:6, 69:10,
69:14, 70:9,
70:13, 235:7,
235:11, 235:14,
266:9, 266:14,
266:18, 266:22,
267:3, 267:7,
267:10, 267:13,
269:1, 269:3
**reports**
210:22, 217:1,
224:11
**represent**
67:5, 67:7,
67:10, 67:13,
67:17, 67:24,
69:22, 210:15,
243:20, 247:17,
247:23
**represented**
147:7
**represents**
68:10

**reprimanded**
194:6
**reproduce**
107:17, 107:19,
107:21, 108:23,
121:12, 123:4
**reproduced**
108:10, 116:16,
123:6
**reproduces**
110:11, 122:4,
122:8
**reproducibility**
108:19, 109:6,
109:13, 114:2,
125:8, 128:18,
132:6, 242:24,
258:23
**reproducible**
108:4
**reproducing**
109:22, 110:23
**reputation**
144:21, 145:1,
233:24
**requested**
269:8
**require**
226:2, 228:2
**required**
75:10, 113:6,
122:11, 183:22
**requirement**
176:11, 222:19,
222:20, 222:22,
263:23, 264:5,
264:7
**requirements**
223:17, 230:10
**requires**
264:11
**reserve**
265:10, 266:8
**response**
244:7
**responses**
70:18
**responsibilities**
80:4

responsibility
83:11
rest
198:24
result
142:21, 142:23,
245:9, 259:4,
259:15
resulted
264:19, 264:23
results
136:20, 210:21,
213:3
retain
230:5
retired
76:20, 76:24,
81:13, 81:15,
155:5, 206:20,
211:17, 234:17
retrace
116:24
retract
82:7
retrial
208:5
retrieve
98:1, 98:4
returned
126:19, 126:21,
127:3, 128:1,
128:9, 161:9,
214:12
rev
200:4
revert
247:3
review
90:14, 139:6,
146:5, 146:8,
209:5, 216:23,
250:10, 250:16,
250:18, 250:19,
251:6, 251:12,
251:16, 253:9,
253:11, 253:12,
253:22, 254:4,
254:11, 254:14,

254:24, 255:1,
269:8
reviewed
79:8, 79:10,
138:5, 142:3,
146:12, 167:11,
250:20, 253:9
reviews
254:5
revolver
200:5
rewarding
258:8
rf
158:20, 200:5
rfd
158:14, 158:20,
159:6
rifling
99:4, 99:8,
134:12, 134:23,
138:10, 186:22,
191:18
right-hand
134:18, 159:23,
191:21
rimfire
200:5
ringing
263:18
risks
86:6
rn
195:22
road
260:23
robert
65:12, 67:9,
77:18, 77:20,
77:21, 194:15,
237:15, 237:18,
237:21, 238:2,
267:5, 267:8
rockford
63:9, 64:21,
64:31, 65:16,
68:10, 139:5,
139:6, 139:10,

139:11, 139:12,
139:15, 148:24,
159:22, 163:5,
163:11, 163:16,
165:16, 168:8,
209:4, 211:14,
261:5, 261:10,
261:14, 262:3,
262:8, 265:17,
265:23, 266:1
role
83:14, 212:1
rolled
83:10, 83:19,
84:22
rollover
84:7, 84:8
ron
64:23
rossi
134:19
round
117:9, 195:23,
203:4
rounded
117:11
rounds
171:24, 172:2
rule
76:19
rules
70:4, 70:6
run
118:19, 152:21
runs
210:20
rusty
211:1, 211:10,
243:24

| S |
| --- |

s
89:5, 94:14,
95:22, 112:18,
131:18, 225:20
s-h-e-m
237:17
sa
204:14

sabi
205:20
safely
126:8, 126:9
safety
194:16
said
75:15, 83:17,
84:11, 93:5,
94:10, 98:2,
109:2, 109:5,
119:7, 119:23,
120:12, 141:23,
146:12, 152:6,
153:15, 154:23,
156:9, 157:10,
164:7, 165:10,
168:15, 170:24,
171:3, 182:16,
185:5, 186:6,
186:18, 194:21,
198:1, 209:23,
213:5, 215:22,
216:2, 223:20,
225:21, 238:8,
240:10, 252:4,
252:13, 265:21,
269:6
sake
132:4
salary
74:24, 75:5
sam
64:24
same
75:13, 97:10,
104:7, 104:13,
105:1, 107:1,
107:8, 108:23,
119:6, 119:18,
122:24, 126:19,
126:20, 126:23,
128:9, 130:10,
130:11, 130:14,
133:2, 133:4,
133:13, 133:14,
142:17, 142:24,
143:3, 143:5,

143:6, 143:7,
143:9, 145:19,
145:20, 149:18,
149:21, 150:2,
153:18, 162:8,
162:12, 189:15,
192:11, 196:21,
215:23, 215:24,
225:22, 232:11,
232:15, 232:17,
234:20, 235:23,
268:4
**sander**
119:9, 120:19
**sanding**
101:8
**satisfy**
222:18
**save**
106:10
**saw**
86:8, 91:3,
221:22, 228:5,
228:6, 228:8,
228:13, 242:20,
242:21, 243:22
**say**
72:12, 72:20,
76:3, 76:6,
86:22, 89:23,
90:2, 90:5,
90:8, 91:16,
91:21, 92:9,
92:14, 93:4,
95:24, 96:11,
96:20, 97:2,
97:8, 102:12,
106:10, 109:9,
114:17, 118:3,
122:23, 122:24,
124:11, 125:5,
130:10, 133:7,
133:12, 134:16,
134:17, 135:6,
137:19, 137:24,
138:9, 141:1,
145:18, 149:8,
149:13, 149:15,

153:10, 156:4,
175:12, 179:2,
182:4, 182:6,
182:13, 182:23,
183:1, 183:4,
189:20, 192:3,
192:24, 202:18,
206:2, 213:10,
213:12, 213:20,
218:3, 221:10,
222:6, 222:9,
222:11, 222:14,
223:22, 224:6,
229:10, 235:16,
236:13, 253:17,
256:3, 256:5,
257:21, 258:3
**saying**
89:6, 94:9,
112:17, 131:23,
136:20, 148:13,
184:18, 185:4,
207:1, 216:15,
238:6, 240:23,
242:17, 242:19,
246:16, 247:9,
254:24, 265:17,
265:23, 266:2
**says**
111:22, 160:24,
163:3, 164:20,
168:18, 168:22,
169:1, 169:20,
174:14, 174:22,
174:24, 175:11,
175:24, 176:2,
176:15, 176:17,
176:20, 178:18,
178:21, 179:6,
179:9, 179:22,
181:4, 188:2,
188:23, 190:18,
191:16, 191:17,
191:18, 196:3,
196:10, 198:23,
202:24, 203:16,
203:18, 204:13,
205:2, 205:9,

212:4, 212:8,
212:9, 214:17,
216:12, 216:14,
216:17, 218:14,
246:12, 250:10
**sc**
202:21
**scene**
216:20
**schedule**
252:11
**schmidt**
64:25, 67:15
**schwartz**
257:17
**science**
82:12, 83:3,
233:16, 245:8,
258:12
**sciences**
143:16, 225:3,
225:13
**scientist**
73:18, 73:19,
74:2, 74:17,
76:1, 76:4,
80:21, 86:16,
185:19, 185:23,
190:19, 197:24,
238:18, 245:2
**scientists**
82:17, 84:16
**scope**
76:15, 84:1,
85:8, 85:19,
88:13, 88:16,
90:9, 90:12,
90:15, 90:19,
91:21, 92:3,
92:8, 92:22,
94:10, 96:20,
97:5, 106:22,
112:2, 114:21,
185:2, 185:8,
215:2
**score**
143:1
**scott**
64:34, 67:19,

261:3
**screen**
158:16, 158:21,
159:5
**screening**
124:22
**screwdriver**
72:13
**scuttlebutt**
208:6, 208:8
**seal**
269:13
**sealed**
98:15, 126:21,
160:12, 160:13,
160:14, 160:15,
164:20, 164:22,
164:24, 172:1,
172:2, 172:3,
172:5, 186:13,
186:14, 190:24,
198:14
**search**
141:12, 141:13
**searched**
218:16, 218:17
**season**
154:19
**second**
102:13, 137:2,
158:7, 160:3,
170:12, 170:16,
172:7, 190:18,
197:3, 197:5,
197:6, 204:21,
210:18, 210:19,
210:20, 211:5,
211:9, 212:3,
244:19, 247:4,
255:4, 258:1
**section**
82:15, 98:2,
161:9, 162:22,
169:21, 170:1,
170:7, 171:7,
171:19, 172:15,
172:16, 233:9
**secured**
97:23, 126:11,

**seeing**
110:23, 181:12,
181:13
**seem**
180:7
**seems**
144:11, 160:20,
160:23
**seen**
111:9, 112:12,
113:16, 118:9,
137:10, 137:11,
137:13, 137:16,
200:16
**sees**
245:21
**semi-automatic**
117:1, 133:6,
259:1
**seminar**
232:4, 232:6,
232:9
**seminars**
120:6, 120:10,
137:19, 144:19,
154:15
**send**
165:11
**sending**
138:4
**senior**
157:4, 236:1
**sense**
69:4, 163:21,
172:9, 207:4
**sent**
138:19, 138:20,
138:23, 146:6,
172:14, 192:20,
212:19
**separate**
130:10, 130:13,
130:18
**serial**
100:6, 130:11,
201:11, 201:17,
201:18, 244:24

127:20

**set**
77:20, 88:16,
90:20, 97:4,
269:12
**seven**
79:22, 80:19,
153:23
**several**
118:8, 118:9,
119:18, 265:8
**shade**
160:22
**shared**
68:23
**sheet**
95:9, 199:11,
268:7
**shelf**
172:18
**shell**
241:22
**shem**
194:15, 195:1,
237:15, 237:18,
237:21, 238:2,
238:3, 239:5,
239:15
**sheriff's**
75:20
**shoot**
105:7, 105:17
**shooting**
95:11, 113:24,
259:14
**shotguns**
200:7
**shots**
103:18, 103:21,
109:16
**should**
83:17, 171:3,
174:18, 186:7,
192:15, 193:14,
219:6, 219:10,
219:15, 220:15,
257:21
**should've**
248:16

**shouldn't**
77:4, 106:13,
170:9, 171:1,
194:2, 194:8,
194:18, 261:14
**show**
92:4, 158:4,
158:13, 207:2
**showed**
87:14, 87:15,
140:23, 155:5,
157:9, 157:24,
262:5
**showing**
113:19, 227:5
**sic**
159:6
**side**
95:6, 106:4,
147:10, 255:23
**side-by-side**
181:14, 181:16
**sign**
95:15, 95:16,
95:17, 164:7,
172:15
**signature**
159:15, 160:2,
173:5, 265:11,
266:8, 268:13
**signature-5tm1q**
269:18
**signed**
74:9, 163:23,
164:15, 167:20,
168:2, 172:13,
172:18, 268:7
**signing**
85:14, 89:9,
89:10, 160:7,
164:17
**silver**
106:3
**similar**
110:7, 128:21,
129:10, 134:23,
138:10, 205:10
**similarity**
128:19

**since**
132:24, 133:5,
155:19, 224:19,
249:19, 261:1
**single**
203:2, 203:13,
254:14
**single-action**
203:1, 203:3,
204:15, 204:20
**sir**
249:9, 260:18,
261:6, 261:19,
262:11, 263:13,
264:1, 264:7,
264:17, 264:21,
265:1, 265:6,
267:9
**sit**
231:2, 231:5,
242:2
**sitting**
68:4
**situation**
195:13
**six**
72:3, 72:5,
93:24, 94:1,
99:24, 101:16,
101:17, 101:21,
101:22, 102:3,
102:17, 102:18,
103:6, 114:1,
129:16, 186:24,
187:1, 187:2,
191:19, 191:20,
191:21, 256:9
**size**
114:22
**sketch**
112:24, 113:15,
113:18, 221:2,
221:14, 221:16,
221:19, 221:20,
222:19, 226:3,
226:5, 226:11,
226:12, 226:16,
226:20, 227:23,

228:10, 228:15,
229:15
**sketches**
222:10, 224:10,
227:5, 227:7,
227:16
**skip**
197:2, 203:15
**sky**
200:21
**sl**
205:19
**slide**
201:10, 201:22,
203:4, 205:21
**slightly**
106:16, 107:4,
107:7, 187:6,
187:8
**small**
145:10
**smith**
87:3, 87:15,
87:18, 134:19,
155:5, 155:24,
156:23, 157:9,
157:24, 198:1
**smooth**
121:3, 200:7
**socialize**
232:8, 234:3
**socialized**
232:2
**softer**
73:3
**solemnly**
69:11
**solid**
187:6, 187:8
**some**
70:3, 70:20,
78:14, 78:19,
81:12, 88:6,
93:1, 104:9,
113:3, 113:5,
113:6, 113:14,
113:17, 124:13,
139:23, 144:9,

148:15, 148:19,
154:2, 154:3,
168:7, 175:18,
175:19, 179:16,
188:9, 192:16,
204:13, 208:6,
213:19, 223:7,
226:13, 226:14,
227:21, 234:8,
235:1, 244:2,
244:14, 245:10,
248:7, 248:10,
248:20, 255:15,
257:16, 259:13,
262:14, 262:23
**somebody**
69:1, 241:6
**somehow**
245:16
**someone**
77:6, 77:10,
85:3, 156:20,
161:10, 162:4,
162:9, 166:9,
166:20, 172:15
**something**
74:5, 82:23,
90:9, 92:15,
92:17, 92:18,
92:23, 94:10,
94:11, 95:7,
100:7, 102:1,
118:6, 118:18,
120:2, 124:12,
127:19, 128:7,
130:2, 130:4,
136:3, 136:15,
138:9, 141:3,
141:22, 141:23,
160:22, 172:22,
182:6, 184:18,
184:22, 187:9,
195:24, 202:20,
202:23, 203:2,
211:19, 222:7,
223:8, 227:24,
228:3, 239:1,
251:8, 251:20,

258:6
**sometime**
142:7
**sometimes**
76:15, 88:22,
107:10, 117:22,
121:13, 124:1,
201:21, 206:14,
246:5
**somewhere**
111:11, 155:4,
158:16, 165:7,
165:8
**son**
234:22, 236:5
**soon**
182:15, 260:23
**sorry**
87:8, 109:1,
144:11, 145:4,
156:8, 157:11,
161:3, 191:17,
208:15, 209:24,
224:1, 233:11,
235:5, 240:18,
247:13, 247:20
**sort**
86:11, 89:4,
89:23, 90:7,
90:21, 133:21,
137:1, 169:13,
189:23, 211:2,
258:10
**sound**
114:4, 128:2,
157:6, 191:2
**sounds**
116:2, 141:17,
157:12, 157:14
**source**
176:20, 176:23
**south**
64:5, 80:11
**spaces**
191:24
**spacial**
88:13
**speak**
223:9, 262:15,

262:20, 262:23
**speaking**
67:17, 88:5,
164:12, 260:13
**specialized**
255:5
**specific**
84:4, 106:7,
119:16
**specifically**
70:23, 77:13,
81:7, 86:6,
95:22, 96:23,
122:13, 135:13,
139:8, 155:7,
155:13, 206:14
**speculate**
96:3, 96:13,
171:1
**speculated**
218:20
**speculating**
170:8
**speculation**
82:20, 180:1,
180:4, 184:11,
184:14, 191:10,
227:1, 227:9
**spell**
235:12
**spent**
79:18, 160:14,
160:16
**spherical**
117:11
**spiral**
99:9
**spoken**
151:6, 211:21
**spot**
180:11
**springfield**
149:7, 245:8
**squeeze**
203:5, 203:7,
203:10
**st**
78:17, 78:18

**stability**
99:13
**stainless**
199:23
**stalter**
65:15
**stamp**
180:24, 181:2,
181:4, 181:8,
181:17, 182:17,
182:20, 183:5,
189:7, 189:8,
196:18, 201:7,
201:8
**stamped**
201:9, 228:24
**stamps**
180:19, 180:20,
180:23, 182:18
**stand**
247:5, 247:8,
247:10, 247:11
**standard**
77:20, 77:21,
128:15, 128:24,
131:10, 131:11,
131:12, 165:5,
165:6, 172:23,
221:14, 222:5,
222:12, 222:15,
223:21, 224:12,
225:9, 243:2,
254:5, 255:2
**standards**
220:18, 221:10,
223:17, 224:13,
224:15, 224:17,
225:7, 225:23,
225:24, 226:2,
227:19, 228:1,
228:2, 229:8,
229:10, 229:12,
229:15, 229:20,
230:10, 230:18,
230:19, 231:4,
231:11, 231:12,
231:17
**standing**
242:1, 242:15

**start**
76:21, 89:4,
97:16, 102:12,
168:12, 238:12
**started**
69:20, 70:2,
71:11, 71:14,
72:3, 72:7,
73:24, 86:12,
95:17, 113:3,
153:9, 157:7,
157:13, 157:16,
236:2, 241:5
**starting**
117:3, 173:9,
241:11, 250:3,
256:9
**state**
63:24, 64:5,
64:29, 68:1,
71:14, 81:16,
82:11, 83:1,
84:12, 84:20,
136:14, 140:22,
146:23, 147:19,
153:11, 155:6,
225:2, 225:12,
234:18, 234:19,
236:16, 250:10,
251:24, 252:2,
263:14, 263:22,
264:5, 269:4,
269:21
**state's**
80:9, 257:9
**stated**
247:17
**statement**
84:10
**states**
63:1, 69:1,
245:20
**statewide**
250:10, 254:3,
254:10
**stay**
107:8
**steel**
199:23

**stenographic**
67:3, 68:5,
68:13, 69:6,
69:10, 69:14,
235:11, 235:14,
266:9, 266:14,
266:18, 266:22,
267:3, 267:7,
267:10, 267:13
**stenographically**
63:19, 269:7
**step**
116:9, 153:1
**stephen**
64:33
**steps**
75:5
**steve**
260:10
**steven**
67:20, 261:3
**still**
75:22, 81:24,
86:20, 119:24,
155:21, 175:15,
188:14, 188:17,
188:18, 188:20,
225:16, 225:17,
227:3, 240:1,
242:1, 242:14,
242:19, 247:8,
247:10, 259:20,
259:24
**stippled**
229:4
**stop**
256:20
**stopped**
212:18
**storage**
126:1, 127:11,
172:19
**store**
126:4, 126:10,
128:3
**stored**
126:16, 126:23,
127:13, 127:18,

**127:22, 207:12,**
207:14, 207:15,
245:24
**story**
153:18
**straight**
204:5
**strange**
160:18
**street**
64:5, 64:11,
64:29, 65:5
**stressful**
258:4
**stria**
89:18, 145:9,
145:14, 245:20,
245:24
**striations**
189:24
**strict**
72:15, 72:20,
77:24
**strictly**
112:6
**strike**
92:1, 95:20,
120:21, 131:9,
149:4, 240:18,
259:18
**strikes**
188:8
**striupaitis**
63:14, 65:10,
66:2, 66:10,
68:2, 68:3,
69:15, 69:21,
70:17, 71:11,
116:6, 139:20,
146:1, 150:15,
151:9, 152:14,
152:16, 158:13,
159:14, 159:17,
160:2, 162:13,
162:24, 177:2,
185:24, 190:19,
210:13, 211:3,
211:7, 220:1,

231:20, 241:18,
243:21, 245:2,
249:14, 255:20,
257:2, 260:5,
260:16, 263:9,
264:15, 265:16,
268:3
**studied**
74:11
**study**
258:16, 258:21,
259:5
**stuff**
80:12, 146:14,
163:17, 170:8,
175:9, 208:10,
209:16
**subclass**
118:12, 118:13,
118:15, 118:23,
119:19, 119:23,
120:3, 120:4,
120:8, 120:11,
120:14, 124:5,
124:7
**subjected**
79:3
**subjective**
131:12
**submission**
97:20
**submit**
72:17, 138:14,
192:5
**submits**
159:20
**submittal**
95:9
**submitted**
76:14, 94:20,
95:6, 95:12,
101:13, 104:2,
105:2, 126:20,
127:2, 128:10,
129:16, 130:2,
130:4, 132:3,
136:9, 136:10,
140:18, 163:5,

163:11, 163:15,
165:17, 167:17,
167:20, 167:21,
167:23, 171:6,
192:4, 238:20,
239:3, 257:22
**submitting**
94:23, 128:5,
136:16, 159:19,
167:16, 192:18
**subordinates**
80:7, 80:10,
153:5
**subsequent**
90:15
**subsequently**
82:14, 163:17,
216:21
**suburban**
80:11, 80:12,
168:23, 170:2
**sudden**
118:21
**sued**
148:2, 148:4
**sufficient**
129:21, 257:13
**suffolk**
257:9, 257:22
**suggested**
218:19
**suitable**
93:13, 93:15,
188:14, 188:15,
188:17, 188:18,
196:10, 196:11,
213:5
**summary**
210:19
**sunil**
65:3, 67:22,
146:6, 150:19
**supervision**
74:18, 74:23,
75:10
**supervisor's**
74:16
**supplies**
80:8

**supply**
104:4
**support**
264:11
**supposed**
100:8, 212:8
**suppressed**
261:17, 261:20
**sure**
67:6, 70:16,
70:18, 74:6,
83:8, 97:20,
98:14, 105:23,
115:12, 115:19,
127:16, 136:4,
136:5, 144:15,
158:24, 190:12,
218:2, 235:6,
266:22, 267:3
**surplus**
78:15
**surprise**
166:2, 166:8,
214:3, 214:10,
214:12, 214:16,
215:5
**surprised**
215:17
**suspect**
95:10, 140:8,
167:21, 168:18,
168:19
**suspected**
132:18, 137:1,
137:3
**swear**
69:11
**switch**
108:7
**switzer**
65:13
**sworn**
69:16
**system**
140:5, 140:14,
153:4, 155:21,
156:13, 156:14,
156:15, 195:10,

213:15, 225:3,
225:13, 248:2,
256:6
**systematic**
78:1
**systems**
152:7, 152:8,
152:15

|  T  |
| --- |

**table**
210:21, 211:2,
216:11
**take**
70:15, 76:11,
76:18, 78:23,
88:10, 88:15,
89:20, 90:9,
92:14, 92:24,
103:18, 115:10,
115:11, 116:12,
122:19, 140:6,
155:17, 159:13,
159:14, 160:10,
166:8, 167:10,
167:13, 172:21,
178:16, 182:7,
182:12, 182:22,
182:24, 183:1,
183:4, 184:19,
189:20, 192:3,
193:4, 197:7,
202:11, 216:10,
219:18, 244:18,
249:8, 255:18,
256:12, 258:23,
262:13, 267:6
**taken**
111:13, 163:12,
173:2, 173:3,
269:6
**takes**
160:1
**taking**
73:24, 190:15
**talk**
70:16, 85:6,
94:7, 94:24,

97:13, 116:18,
118:14, 120:22,
132:22, 146:20,
148:8, 148:11,
150:23, 238:12
**talked**
123:23, 124:5,
125:21, 137:18,
150:7, 150:12,
190:9, 198:2,
208:13, 208:16,
229:5, 236:22,
250:7
**talking**
95:22, 103:15,
116:9, 208:9,
222:24, 223:2,
239:5, 240:2,
258:19
**talks**
70:12, 245:21
**taught**
144:15, 144:16,
146:22, 149:24
**taurus**
134:19, 170:20,
173:17, 179:15,
179:20, 179:22,
196:16, 198:23,
199:8, 199:13,
209:6, 209:7,
213:6, 214:4,
214:5, 216:22,
241:20, 242:7,
242:12, 244:23,
246:14, 246:23,
247:8, 255:18
**technically**
71:17
**technician**
234:2
**technicians**
94:23, 152:19,
156:12
**tecum**
111:20
**tell**
69:11, 72:10,

135:14, 140:2,
146:17, 174:4,
178:11, 193:5,
194:19, 202:23,
213:13
**tells**
204:9
**ten**
156:8, 234:7
**ten-minute**
262:13
**tens**
96:10
**term**
109:10, 110:19,
190:7, 265:3
**terminology**
131:21
**terms**
74:23, 111:8,
126:16, 128:3,
128:21, 128:24,
178:12, 183:11,
250:2
**test**
72:18, 85:11,
85:15, 102:8,
103:10, 103:18,
103:21, 105:2,
105:4, 106:8,
106:19, 106:20,
106:21, 106:23,
107:6, 109:16,
116:12, 121:10,
122:20, 156:12,
172:22, 178:9,
179:9, 181:19,
181:20, 182:4,
182:24, 183:9,
184:3, 184:5,
189:17, 205:2,
205:4, 205:15,
214:4, 214:13,
216:21, 242:22,
242:23, 243:2
**test-to-fired**
125:3
**test-to-question-
ed**
124:2, 125:6,

132:7
**test-to-test**
102:8, 106:20,
106:24, 107:6,
107:14, 107:21,
108:5, 108:19,
109:13, 110:4,
110:10, 110:16,
110:24, 113:19,
113:21, 114:9,
116:12, 116:19,
116:21, 122:4,
123:24, 124:16,
124:23, 125:9,
132:6, 263:11,
263:23, 264:6,
264:11
**testified**
69:17, 78:11,
218:5, 247:22,
248:9, 257:22,
257:23
**testify**
78:5, 111:9,
208:19, 218:8,
238:24, 258:5
**testifying**
78:8, 131:18,
131:20, 229:14,
257:4, 258:15,
264:15
**testimony**
132:5, 209:12,
219:9, 220:10,
226:17, 229:18,
230:1, 230:16,
247:17, 247:23,
247:24, 255:21,
263:10, 268:4,
268:5, 269:6
**tests**
102:9, 106:9,
106:13, 107:1,
108:8, 109:20,
123:2, 123:6,
215:7
**th**
65:6, 70:2,

161:9, 162:8,
162:23, 163:18,
163:22, 168:24,
169:21, 170:23,
171:19, 172:13,
174:8, 174:23,
176:18, 177:4,
186:2, 189:11,
210:17, 245:2,
269:13
**thank**
69:14, 116:6,
125:19, 168:10,
168:13, 219:16,
235:14, 249:2,
262:11, 267:4
**thanks**
116:1, 215:3
**theirs**
224:20
**themselves**
67:4, 257:15
**theory**
145:6
**thereafter**
269:7
**therefore**
246:12
**thickness**
246:9
**thing**
84:11, 103:16,
153:18, 153:20,
168:7, 221:20,
249:24, 257:1,
264:8, 265:20
**things**
70:19, 89:24,
130:24, 146:12,
153:12, 200:2,
204:13, 207:11,
228:21, 231:19,
232:18, 260:21
**think**
69:3, 69:4,
76:19, 77:21,
77:22, 79:6,
85:1, 86:1,

87:16, 92:4,
92:8, 97:7,
109:1, 112:23,
117:21, 117:22,
135:18, 138:1,
139:14, 142:13,
147:19, 154:23,
155:4, 155:11,
156:23, 157:5,
158:1, 158:3,
158:18, 178:19,
182:19, 193:6,
195:9, 199:3,
200:16, 207:9,
208:6, 212:8,
213:22, 216:4,
216:5, 220:1,
221:11, 221:19,
223:6, 224:24,
225:1, 225:19,
226:8, 239:6,
240:14, 241:14,
243:11, 252:5,
252:24, 255:16,
256:21, 258:2,
260:4

**third**
172:7, 213:2,
221:20, 246:11

**thorough**
76:24, 77:14

**thought**
105:14, 209:5,
248:22

**thousands**
96:1, 96:2

**three**
67:24, 75:3,
87:12, 138:9,
138:13, 153:23,
155:22, 172:3

**through**
83:6, 85:19,
88:13, 91:20,
112:2, 113:8,
113:16, 113:24,
114:21, 116:4,
120:10, 130:22,

132:13, 136:23,
158:9, 158:15,
158:20, 159:24,
160:21, 160:23,
161:2, 163:20,
163:21, 164:22,
164:23, 167:7,
167:10, 181:7,
186:8, 210:10,
215:20, 219:23,
223:7, 228:8,
244:1, 244:9,
244:11, 249:11,
256:10, 256:11,
256:13, 263:6

**throughout**
154:17, 265:3

**throws**
71:2

**thumb**
76:19

**time**
63:17, 70:12,
78:22, 79:2,
79:12, 80:15,
80:16, 80:18,
81:3, 83:19,
84:14, 84:21,
87:13, 87:22,
88:15, 90:5,
91:11, 94:14,
96:5, 96:17,
98:17, 111:16,
121:13, 127:14,
132:4, 133:9,
146:10, 151:10,
153:6, 153:13,
154:22, 156:1,
156:18, 157:22,
157:23, 159:14,
166:15, 197:7,
211:18, 223:3,
226:2, 231:21,
232:10, 233:18,
234:20, 235:23,
238:24, 239:3,
245:5, 251:21,
252:17, 254:14,

265:6

**timeframe**
86:11, 157:19

**times**
78:7, 114:17,
114:21, 114:24,
115:6, 140:19,
184:16, 214:7,
237:13, 258:17,
258:22, 259:14,
259:20

**tingstad**
64:3, 66:3,
66:15, 67:8,
69:3, 69:19,
69:22, 82:21,
113:11, 113:13,
115:11, 115:15,
115:19, 115:21,
116:1, 116:5,
128:23, 150:19,
150:22, 151:9,
151:15, 151:16,
152:13, 158:6,
158:12, 158:24,
159:3, 159:8,
159:12, 167:5,
180:2, 180:5,
184:12, 184:15,
191:12, 210:5,
210:11, 215:10,
215:14, 216:6,
217:8, 217:15,
217:19, 217:22,
219:4, 219:7,
219:13, 219:18,
219:24, 227:2,
227:12, 229:22,
230:2, 230:7,
230:13, 230:23,
231:9, 235:9,
235:13, 235:15,
238:1, 239:17,
240:4, 240:7,
243:6, 243:15,
243:16, 249:7,
254:19, 260:4,
262:20, 263:3,

264:2, 265:7,
265:12, 265:15,
266:5, 266:12

**titone**
218:15

**tlfd**
201:12, 244:24

**today**
68:3, 70:8,
146:2, 146:4,
146:19, 148:12,
231:2, 231:5,
236:22, 242:2,
242:19, 266:10,
266:13

**together**
149:18, 257:19

**told**
86:5

**took**
76:15, 78:19,
112:17, 116:8,
116:9, 212:4,
213:18, 250:17,
251:20, 255:11,
255:16, 255:17

**tool**
72:18, 118:7,
141:12, 141:13,
205:24, 206:1

**toolmark**
71:12, 71:19,
71:23, 71:24,
72:2, 72:4,
72:7, 72:11,
72:21, 73:1,
73:5, 73:8,
73:15, 73:21,
78:16, 81:14,
169:21, 170:1,
171:7, 171:15,
171:19

**toolmarks**
72:17

**tools**
118:3, 118:8

**top**
164:19, 167:15,

168:12, 176:15,
176:17, 204:4,
211:2, 253:1
**total**
92:20, 94:1
**totally**
93:9
**tourists**
94:22
**toward**
250:8, 250:9
**town**
95:7
**trace**
175:2, 175:6,
186:15, 191:1
**tracemarks**
229:4, 229:6
**traditional**
145:12
**train**
152:19
**trained**
71:15, 71:19,
72:2, 72:4,
72:8, 73:9,
73:10, 139:22,
149:6, 149:9,
156:12, 156:15,
157:14, 166:15,
206:16, 206:17,
229:9, 230:5,
230:9
**trainee**
73:16, 150:6
**trainees**
149:4
**training**
72:21, 73:13,
73:20, 73:23,
74:13, 75:10,
75:14, 83:20,
84:5, 131:14,
144:16, 144:17,
149:23, 152:4,
152:19, 155:20,
157:7, 249:24,
255:5, 257:13

**trainings**
220:22
**transcribed**
70:9
**transcribing**
70:14
**transcript**
68:18, 215:13,
266:10, 266:17,
269:5
**transcription**
268:5
**transcripts**
216:18
**transfer**
108:23
**transferred**
105:20, 149:7
**translate**
98:21
**translated**
99:14
**transposed**
218:18
**trial**
209:13, 216:19
**trials**
146:24
**tried**
199:9
**trigger**
203:5, 203:7,
203:10, 203:11,
204:13, 204:19
**true**
134:22, 216:23,
263:14, 263:22,
268:5, 269:5
**truth**
69:11, 69:12
**try**
104:7, 104:13,
104:24, 192:13,
260:22
**trying**
89:14, 114:7,
133:21, 199:21,
256:14

**turn**
83:17, 85:2,
88:18, 90:14,
98:4, 131:22,
140:8, 160:1,
165:17, 170:6,
171:5, 190:12,
193:19, 194:6
**turns**
70:15, 250:17,
251:20
**twice**
213:17, 255:16
**twist**
100:1, 101:22,
134:18, 191:21,
246:20, 246:21
**twists**
100:15
**two**
73:20, 73:23,
75:1, 75:2,
75:3, 76:23,
83:7, 87:19,
88:7, 92:3,
92:8, 93:5,
102:2, 105:22,
106:24, 107:1,
109:20, 110:10,
121:10, 122:6,
126:22, 129:1,
130:10, 130:13,
130:18, 142:16,
152:7, 152:8,
152:15, 155:3,
160:14, 161:8,
161:23, 163:12,
168:8, 169:3,
173:15, 176:19,
178:4, 178:6,
178:14, 180:19,
180:23, 181:13,
183:9, 208:24,
209:1, 212:4,
214:7, 215:23,
216:19, 224:2,
249:18, 250:20,
251:21, 251:23,

252:18, 253:21,
253:22, 254:3
**two-page**
223:24
**two-year**
73:13
**type**
104:13, 110:17,
113:6, 118:2,
133:16, 187:3,
191:16, 195:21,
200:21
**typed**
163:3
**types**
116:21, 123:23,
133:18, 133:22,
133:23
**typewriting**
269:7
**typos**
251:7

---
**U**

**unable**
218:17
**unauthorized**
195:7, 195:10
**uncovered**
254:14
**under**
89:14, 90:2,
90:12, 90:15,
92:22, 96:20,
116:12, 134:2,
134:4, 141:20,
141:22, 142:1,
142:3, 142:14,
160:11, 173:9,
174:24, 178:21,
183:12, 184:8,
185:2, 185:8,
191:16, 195:21,
196:10, 203:16,
205:18, 206:7,
213:18, 214:22,
215:2, 216:10,
242:10, 248:5,

252:15, 255:4,
256:19, 269:8
**underneath**
188:14, 188:23,
191:18, 216:10
**understand**
89:1, 89:4,
89:6, 110:13,
114:7, 114:8,
124:20, 138:16,
138:18, 140:10,
144:22, 144:24,
145:3, 145:5,
174:4, 227:14,
248:22
**understanding**
146:11, 225:21,
225:22, 236:4,
251:15, 251:17
**understood**
71:5, 192:10,
202:18
**unfired**
109:11
**unfortunately**
120:8, 120:12
**unidentifiable**
176:3
**unionized**
153:5
**united**
63:1
**universe**
133:23
**university**
150:1
**unless**
68:24, 70:22,
261:10
**unmark**
256:23
**unsuitable**
173:13, 176:5,
176:9, 213:5
**until**
91:18, 91:20,
120:9, 123:1,
136:18, 136:19,

157:23, 192:19,
203:6, 249:20,
250:4
**unwavering**
77:14, 77:24
**upper**
159:23
**upstanding**
234:1
**use**
103:20, 103:22,
104:3, 104:7,
104:9, 104:10,
104:13, 105:1,
105:2, 105:3,
105:5, 105:15,
107:11, 109:4,
109:10, 112:3,
112:7, 112:8,
112:11, 112:14,
114:11, 115:2,
131:7, 145:12,
145:13, 187:11,
200:20, 204:19
**uses**
144:22, 145:8,
145:12
**using**
81:20, 81:22
**usually**
146:23, 194:3,
201:9

---
**V**

**vacation**
96:8, 139:18,
240:24, 241:6
**value**
175:8
**van**
65:13
**vanderworth**
87:2
**variation**
106:14
**variations**
122:17
**varies**
99:23

**various**
122:5, 123:23,
173:4
**vary**
106:15, 107:3,
107:13, 107:16
**vault**
161:10, 161:14,
161:19, 161:24,
186:7
**verbal**
221:21
**verbalize**
70:18
**verification**
79:11, 83:3,
83:10, 84:5,
84:17, 85:7,
85:23, 85:24,
89:5, 93:7,
94:8, 97:3,
97:12, 124:9,
125:4, 180:23,
181:24, 184:20,
189:11, 206:10,
206:12, 242:2,
242:15, 242:21,
245:1, 247:11
**verifications**
81:2, 81:6,
82:17, 83:18,
83:21, 84:23,
86:13, 86:22,
87:21, 87:23,
88:1, 88:3,
95:24, 96:18,
154:2, 154:3,
154:13, 211:6
**verified**
91:18, 156:21,
176:8, 181:3,
181:5, 189:8,
196:19
**verifier**
86:6, 88:10,
88:17, 90:17,
91:20, 92:9,
93:3, 124:23,

125:5, 125:7,
125:10, 125:11,
125:17, 156:20,
156:22, 183:8
**verifies**
83:5
**verify**
84:2, 85:20,
88:4, 88:11,
96:9, 96:21,
157:21, 176:11,
184:10, 189:14
**verifying**
245:20
**versus**
103:6, 207:3,
215:1, 215:16,
257:5
**via**
63:18, 63:20,
65:22
**vibrating**
205:24
**victim**
95:9, 159:20,
167:22, 168:20
**video**
70:8, 140:6,
152:20, 152:24,
155:21
**videoconference**
63:13, 63:18,
65:22, 267:14
**view**
214:21, 222:18,
224:21, 226:7
**viewed**
113:8
**viewing**
83:22
**virtue**
102:23, 212:15
**visible**
188:20
**visual**
206:22
**visually**
111:5, 111:7,

111:18, 112:2
**vitae**
66:10
**volume**
63:11
**vs**
63:7

---
**W**

**waddell**
64:3, 69:21
**wait**
70:21, 171:3
**walk**
181:7, 186:8
**wall**
106:4, 108:16
**walsh**
67:23
**want**
83:8, 89:3,
94:3, 94:5,
105:13, 105:15,
105:16, 105:18,
107:6, 107:8,
107:9, 114:4,
115:11, 124:8,
124:14, 125:24,
128:11, 151:10,
151:11, 161:3,
181:22, 197:11,
197:13, 210:15,
217:20, 220:6,
226:7, 226:10,
226:11, 244:15,
249:8, 250:8,
257:1, 262:15,
262:20, 262:22,
262:24, 263:1
**wanted**
80:24, 90:24,
147:13, 193:18,
221:1, 239:19,
239:21
**warrant**
239:23, 240:9
**watertight**
127:23

**wavelength**
145:19, 145:20
**way**
77:23, 77:24,
78:12, 86:4,
92:4, 100:8,
101:17, 108:23,
113:7, 124:10,
126:15, 126:16,
127:13, 128:3,
129:17, 130:9,
138:15, 142:10,
156:3, 160:16,
190:13, 203:23,
239:11, 249:11,
258:7
**ways**
101:9, 104:18,
178:14
**we'll**
89:3, 118:1,
185:10, 186:8,
203:15, 260:22,
266:16
**we're**
146:23, 169:19,
170:11, 206:15,
222:7, 222:9,
222:10, 222:24,
232:6, 240:3
**we've**
95:21, 123:23,
182:2, 220:4,
250:7
**weapon**
100:23, 101:13,
103:18, 132:18,
133:16, 137:1,
137:4, 137:24,
138:1, 199:14,
200:9, 200:21,
259:19
**weapons**
72:22, 134:15,
134:17
**wear**
131:7, 258:16,
259:13

**web**
63:21
**week**
86:23, 252:9
**weekend**
194:3, 239:19
**weigh**
89:11
**weighed**
186:20
**weight**
175:1, 186:19,
191:5, 204:20
**weights**
191:8, 204:19
**welcome**
116:7
**welty**
65:10, 68:2,
148:20, 150:3,
161:4, 161:7,
161:23, 163:17,
165:19, 166:1,
208:22, 209:4,
216:19, 216:23,
216:24, 217:4,
217:11
**went**
74:9, 115:4,
116:3, 119:7,
119:14, 135:9,
148:24, 154:19,
158:8, 170:5,
171:4, 190:11,
198:3, 210:9,
218:21, 218:22,
219:22, 232:18,
241:6, 243:24,
257:22, 263:5,
263:19
**weren't**
80:21, 80:22,
207:12, 208:19,
209:9
**wesson**
134:19
**west**
64:29, 65:5,

**80:11**
**whatever**
90:11, 108:17,
113:8, 118:20,
123:15, 128:1,
138:4, 146:15,
156:2, 165:8,
181:19, 206:13,
225:11
**whatsoever**
214:13
**whereas**
123:15, 204:22
**whereof**
269:12
**whereupon**
67:1, 115:8,
116:3, 152:11,
158:8, 158:10,
167:3, 210:3,
210:9, 219:22,
243:4, 249:5,
263:5, 263:19,
267:14
**whether**
86:5, 89:14,
95:10, 100:6,
100:7, 108:10,
147:13, 166:18,
166:19, 199:22,
199:23, 216:8,
229:4, 236:10
**white**
180:21
**whoever**
146:14
**whole**
69:12, 85:12,
88:9, 103:5,
105:24, 108:20,
250:20, 251:24,
252:8, 252:18,
254:20, 254:21,
257:24
**wider**
115:3
**width**
102:4, 102:6

**williams**
64:28, 64:34,
67:19, 261:3
**winter**
154:20
**withheld**
261:17, 261:20
**within**
75:5, 117:4
**without**
97:9, 151:1,
239:18
**witness**
68:16, 69:7,
69:9, 69:13,
69:16, 115:10,
115:13, 115:18,
115:20, 151:13,
159:10, 216:4,
217:20, 230:3,
237:24, 239:15,
240:6, 254:18,
262:17, 269:12
**witnesses**
257:17
**woman**
87:1
**women**
255:10
**wondering**
124:19
**word**
107:12, 109:1,
109:4, 187:11
**wording**
135:9, 135:10
**words**
83:2
**work**
71:12, 71:15,
72:21, 74:20,
82:11, 89:5,
89:22, 90:22,
98:5, 115:21,
124:10, 154:1,
155:22, 156:3,
157:21, 158:2,
158:3, 214:11,

219:19, 232:3,
234:4, 234:18,
236:16, 239:20,
251:16
**worked**
73:21, 76:4,
78:11, 82:24,
84:3, 112:6,
139:7, 140:22,
144:7, 144:8,
149:5, 149:6,
149:18, 149:21,
149:24, 150:2,
153:6, 156:7,
171:6, 183:14,
206:5, 211:14,
232:17, 232:23,
234:1, 238:3,
240:15
**worker**
161:20
**working**
71:14, 72:3,
72:7, 73:8,
76:11, 77:15,
78:22, 85:12,
85:14, 87:2,
87:3, 87:4,
87:10, 87:13,
95:1, 95:17,
98:7, 139:4,
139:11, 139:15,
151:22, 151:23,
155:1, 155:15,
157:1, 157:13,
157:16, 193:18,
211:13, 232:15,
234:3, 234:19,
255:21
**works**
144:6
**worksheet**
84:1, 89:12,
91:11, 91:12,
91:14, 98:20,
98:21, 98:24,
110:11, 110:15,
111:2, 113:1,

113:15, 113:18,
113:19, 168:4,
168:5, 168:6,
168:7, 173:24,
174:5, 174:9,
176:15, 182:17,
185:11, 190:16,
192:3, 192:11,
192:20, 193:3,
193:14, 195:18,
197:3, 197:14,
197:19, 227:4,
230:19
**worksheets**
85:15, 134:8,
168:3, 174:1,
180:9, 196:24,
209:10, 220:16,
222:21, 224:11,
224:12, 224:14,
231:12, 250:23
**workup**
88:9, 89:7
**workups**
86:18
**world**
131:20, 132:1
**would've**
134:2, 220:10,
230:9
**wouldn't**
91:17, 91:18,
91:19, 92:11,
92:13, 93:3,
93:6, 97:7,
166:6, 166:12,
183:8, 221:17,
222:6
**wow**
71:15, 233:6
**wrap**
128:7
**write**
89:11, 89:13,
91:18, 91:19,
98:23, 99:1,
110:22, 111:2,
111:6, 134:16,

137:20, 165:2,
194:1, 199:10,
221:22, 244:14
**writer**
217:9
**writing**
77:15, 113:7,
165:6, 179:9,
193:24, 239:18
**written**
85:23, 91:13,
122:13, 136:17,
165:8, 167:19,
177:18, 192:19,
201:12, 248:17
**wrong**
93:17
**wrote**
156:8, 185:4,
199:11, 244:2,
244:6, 248:19

---

**Y**

**year**
151:7, 157:17,
178:15, 229:19,
241:15, 252:8,
252:19, 253:15,
253:16, 253:20
**years**
73:20, 73:23,
75:2, 79:18,
79:22, 80:19,
82:10, 82:14,
95:21, 95:23,
153:23, 193:18,
195:8, 207:20,
207:23, 211:18,
235:2, 238:4,
245:17, 251:21,
251:23, 252:19,
253:21, 253:22,
254:3, 254:13,
255:20
**years-old**
71:16
**yep**
116:1, 159:2,

169:1
**york**
245:22
**younger**
236:17
**yourself**
85:11, 90:2,
141:18

---
**Z**
---
**zoom**
70:7, 266:19

---
**.**
---
**.22**
200:5

---
**0**
---
**00**
162:2, 204:5
**01**
263:6, 263:20
**03**
63:17, 67:2
**05**
63:17, 267:15
**06**
219:23
**09**
116:4

---
**1**
---
**1**
210:10
**1.0**
114:13
**10**
63:17, 67:2,
76:6, 76:8,
114:12, 114:18,
115:2, 156:10,
162:8, 162:18,
171:18, 172:2,
206:15, 259:21,
263:4
**100**
64:20, 65:5,
128:20

**100002**
167:7
**100005**
176:16, 227:4
**100006**
185:11
**100009**
197:4
**107.4**
191:5
**10829**
243:19
**10830**
243:19
**11**
115:24, 116:4,
142:8, 161:9,
162:8, 162:18,
162:23, 163:18,
163:22, 168:24,
170:19, 170:23,
171:18, 172:3,
172:13, 174:14,
204:23, 269:23
**115**
205:5, 205:6
**12**
142:8, 151:10,
158:9, 162:12,
162:19, 162:23,
163:21, 164:3,
164:4, 164:23,
171:18, 172:4,
204:5, 204:23,
210:17
**120**
64:29
**126**
64:5
**13**
65:6, 269:23
**14**
171:24
**1450**
244:21
**15**
70:2, 115:24,
151:10, 156:10,

169:21, 172:1,
174:8, 174:23,
176:18, 177:4,
186:2, 190:21,
198:9, 202:9,
202:11, 202:14,
202:17, 245:2
**1517**
210:7, 210:16
**1518**
210:17
**158**
66:5
**16**
202:13
**167**
66:6
**17**
179:23, 188:24,
189:11, 196:15,
269:13
**17025**
223:8
**175**
158:15, 158:20,
159:6
**177**
158:15, 158:20,
159:7
**18**
63:8, 73:10,
74:7, 171:19,
255:6, 255:17
**19**
71:15, 154:6,
172:4, 178:14,
245:17
**1975**
233:11, 233:12,
233:13, 250:3
**1978**
71:12
**1980**
71:16, 71:19,
73:15, 79:5,
86:14
**1982**
73:15, 75:24,

76:5, 78:4,
153:22
**1985**
79:16, 79:19,
79:20, 135:17,
153:23, 233:10
**1990**
86:14, 157:7,
264:6, 264:19,
265:5
**1992**
154:6, 157:8
**1993**
151:18, 151:20,
154:7, 154:8,
154:19, 154:24,
155:9, 157:1,
168:15, 168:24,
169:22, 171:19,
174:8, 174:23,
176:18, 177:4,
186:2, 188:24,
189:12, 190:21,
196:15, 208:23,
223:14, 231:18,
241:21, 242:3,
242:15, 242:18,
242:20, 242:22,
245:3, 249:18,
264:24
**1995**
233:5, 233:7
**1997**
250:13
**1999**
250:13

---
**2**
---
**2**
219:23
**2-a**
178:1, 178:2,
179:2, 181:13,
181:16, 182:4,
183:12, 220:11,
226:20, 227:5
**2-b**
178:1, 178:2,

**178:21**, 179:5,
181:13, 181:16,
182:24, 183:13,
205:11, 220:12,
226:20, 227:5
**2.0**
114:13
**2.4**
175:1
**2/7/16**
66:8
**20**
76:6, 76:8,
116:4, 162:1,
162:2, 206:15,
210:17, 211:18
**2000**
142:8
**2008**
250:4
**2012**
210:17, 242:6,
242:10, 244:3,
245:6
**2016**
243:18, 244:7
**2020**
63:16, 269:14
**2077**
249:10
**2081**
249:11
**210**
66:7
**219**
64:30
**22**
269:23
**24**
73:11
**243**
64:14, 66:9
**249**
66:10
**26**
158:9
**260**
66:13

**263**
66:14
**265**
66:15
**268**
66:16
**269**
66:17
**27**
158:9, 162:12,
164:3
**276143**
269:22
**28**
162:23, 164:4

___

**3**

**3**
212:8, 263:6
**3.0**
114:13, 115:4
**30**
71:16, 114:18,
114:20, 114:21,
114:24, 115:6,
193:18, 195:8,
206:8, 206:16,
206:23, 207:3,
207:7, 211:18,
238:4, 241:15,
254:13
**300**
140:23
**31**
219:23
**311**
64:11
**312**
64:14, 65:8
**3:-cv**
63:8
**3rd**
64:12

___

**4**

**4**
63:17, 263:6,
263:20, 267:15

**44**
263:6
**4426**
64:7
**48104**
64:6
**490**
64:22
**4900**
64:22

___

**5**

**5**
179:12
**50**
207:3, 210:10
**500**
259:14
**50040**
63:8
**501**
258:17, 259:7,
259:10, 259:20,
259:21, 260:1
**54**
210:10
**55001**
201:12, 244:24
**5902**
64:14
**5x**
114:12, 115:4

___

**6**

**6/9/93**
163:5
**60601**
65:7
**60607**
64:13
**61101**
64:21
**61105**
64:31
**61108**
65:16
**6122**
65:8

**6611**
65:17
**662**
64:7
**6833**
65:15
**69**
66:3

___

**7**

**70**
206:24, 207:3
**734**
64:7
**7th**
168:15, 243:18,
244:7

___

**8**

**80**
225:20
**814**
65:8
**815**
64:22, 64:32,
65:17
**85**
76:5, 78:4
**8948**
64:32

___

**9**

**9**
162:2, 178:22,
179:12, 224:7
**90**
89:5, 94:14,
95:22, 112:18,
131:18, 249:20
**92**
86:15, 154:6,
178:15, 225:18
**921**
205:15
**922**
205:15
**93**
86:16, 179:23,

198:9, 225:18,
244:21, 249:20
**94**
256:10, 256:11,
256:14, 256:15
**95**
233:10
**962**
65:17
**987**
64:32
**99**
199:16, 244:24,
256:10, 256:11,
256:15
**9th**
161:2