**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

PATRICK PURSLEY,                )
                                )        Case No.  3:18-cv-50040
        Plaintiff,              )
                                )        Hon. Philip G. Reinhard
        v.                      )
                                )        Hon. Margaret J. Schneider,
THE CITY OF ROCKFORD et al.,    )
                                )
        Defendants.             )

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiff Patrick Pursley Responds to the Defendants' Joint Statement of Undisputed

Material Facts Pursuant to Local Rule 56.1. and states:

**I.  THE PARTIES**

1.      Plaintiff, Patrick Pursley, is an individual residing in Champaign County, Illinois.

(Second Amended Complaint, dkt # 100 at ¶ 9).

        **RESPONSE: Undisputed.**

2.      The Defendant, the City of Rockford, Illinois, is an Illinois municipal corporation

existing pursuant to Illinois law and located within this district and division. (Answer to Second

Amended Complaint, dkt # 149 at ¶ 14).  It is one of the parties currently moving for summary

judgment.

        **RESPONSE: Undisputed.**

3.      Individually named Defendants Jeffrey Houde, Mark Schmidt, Bruce Scott, Greg

Hanson, and Stephen Pirages were police officers with the City of Rockford Police Department at

all relevant times.  (Answers to Second Amended Complaint, dkt #s 140-149 at ¶ 10).  They are

some of the parties currently moving for summary judgment. Defendants James Barton, Jim Bowman, Ron Gallardo, Sam Pobjecky, Doug Williams, and John Genens were additionally named as Defendants in this proceeding but they were all dismissed and are no longer parties to this case. (dkt # 280, 317).

**RESPONSE: Undisputed.**

4.     The City Administrator for the City of Rockford is named as a defendant in his capacity as Special Representative of the Estate of Howard Forrester. Forrester was a police officer with the City of Rockford Police Department at all relevant times. Forrester is now deceased and the City Administrator for the City of Rockford is defending his Estate in this action.  (Answer to Second Amended Complaint, dkt # 150 at ¶ 11).  Forrester's Estate is the party currently moving for summary judgment in his place.  The Estates of Gary Reffett and David Ekedahl were additionally named as Defendants in this proceeding but were dismissed pursuant to the stipulation of the parties and are no longer parties to this case. (dkt.# 315).

**RESPONSE: Undisputed. Stating further, Forrester was the lead detective on the Ascher homicide. Ex. 12 (Genens Dep.) at 113:4-9; Ex. 11 (Schmidt Dep.) at 32:6-9. Immaterial that the Estates of Gary Reffett and David Ekedahl were named as defendants but dismissed.**

5.     Defendants Daniel Gunnell, Peter Striupaitis, and Jack Welty were at all relevant times employed as forensic scientists by the Illinois State Police. (Answer to Second Amended Complaint, dkt # 114 at ¶ 15). Peter Striupaitis was dismissed from the case. (Dkt 341). Daniel Gunnell passed away during this litigation, and was substituted as a party by Maureen Gunnell, who is serving as his Special Representative. The remaining "ISP Defendants" (Daniel Gunnell's Special Representative and Jack Welty) join in this Statement of Fact with their co-defendants, but

are filing a standalone motion for summary judgment and memorandum of law rather than joining their co-defendants'.

**RESPONSE: Undisputed.**

6.    Defendant Charlene Getty was dismissed pursuant to the stipulation of the parties and is no longer a party to this case. (dkt # 218).

**RESPONSE: Undisputed.**

7.    Defendant Christine Bishop (also sued under her maiden name Christine McAnally), was dismissed pursuant to the stipulation of the parties and is no longer a party to this case. (dkt # 233).

**RESPONSE: Undisputed.**

8.    Plaintiffs also listed "Unidentified Employees of the Rockford Police Department" and "Unidentified Employees of the Illinois State Police Crime Lab" as defendants, though they have been dismissed as well. (dkt # 317).

**RESPONSE: Undisputed.**

## II.  FACTS SUPPORTING JURISDICTION AND VENUE

9.    Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983 and state law.  Subject matter jurisdiction exists in this court pursuant to 29 U.S.C. §§ 1331 & 1367.  (Answers to Second Amended Complaint, dkt #s 140-150 at ¶ 7).

**RESPONSE: Undisputed.**

10.    All or most of the facts alleged in Plaintiff's Complaint occurred within this district and division, such that venue is proper here pursuant to 28 U.S.C. § 1391(b). (Answers to Second Amended Complaint, dkt #s 140-150 at ¶ 8).

**RESPONSE: Undisputed.**

## III. TIMELINE

11.     The Timeline below is provided to help place the facts into context.  The timing of events is supported by the uncontested facts, and the records cited in support of those facts.

**RESPONSE: Plaintiff objects that this statement of fact is not a fact at all; it violates Local Rule 56.1 in that it contains 18 separate facts, some of which are hotly disputed and/or argumentative, and asks this Court to disregard or strike this fact. *See Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("It is inappropriate to confuse the issues by alleging multiple facts in a single paragraph in hopes of one's opponent missing one.") Plaintiff will respond to the facts in the timeline by responding to each statement of fact listed therein, and requests that this Court disregard the timeline.**

| Timeline: From Murder to Conviction | |
|---|---|
| 04/02/1993 | Murder of Andrew Ascher (SOF ¶ 12) |
| 06/08/1993 | Marvin Windham anonymously calls Crime Stoppers, implicates Pursley in Ascher murder, bank robbery, and Burger King robbery (SOF ¶ 13) |
| 06/08/1993 | Pursley identified by Robert Poe as suspect who shot TV at 609 Woodlawn (SOF ¶ 38) |
| 06/10/1993 | Search warrant issued for Pursley's residence and arrest warrant issued for Pursley for the Poe incident on Woodlawn; Pursley eludes arrest by running on foot; search warrant executed at Pursley/Crabtree residence recovers suspected murder weapon and briefcase from stolen car used in bank robbery (SOF ¶ 39-41) |
| 06/10/1993 | Samantha Crabtree gives written Statements implicating Pursley in Ascher murder, bank robbery, and Burger King robbery (SOF ¶ 42-50) |
| 6/11/1993 | First degree murder charges against Pursley authorized by Winnebago County State's Attorney's Office and arrest warrant issued for Pursley by Winnebago County Circuit judge for the murder of Andrew Ascher (SOF ¶ 167) |
| 06/12/1993 | Marvin Windham gives written Statement implicating Pursley in Ascher murder, bank robbery, and Burger King robbery (SOF ¶ 14) |
| 06/14/1993 | Thomas "Tramp" McCoy tells police about Pursley shooting Poe's TV and Pursley admitting to having killed before (SOF ¶ 51) |
| 06/16/1993 | Pursley found hiding under wheelchair ramp and arrested (SOF ¶ 53) |
| 06/23/1993 | Marvin Windham testifies before Grand Jury, implicating Pursley in the Ascher homicide (SOF ¶ 21) |
| 06/23/1993 | Samantha Crabtree testifies before Grand Jury, implicating Pursley in the Ascher homicide (SOF ¶ 52) |
| 06/23/1993 | Pursley indicted for murdering Andrew Ascher (SOF ¶ 21) |
| 08/05/1993 | Samantha Crabtree tells police about being beaten, almost shot by Pursley (SOF ¶ 55-56) |
| 10/29/1993 | Olen Bell (Vice Lord) gives police written Statement implicating Pursley in Ascher murder, bank robbery, effort to hire hitman to kill Marvin Windham (SOF ¶ 34) |
| 12/29/1993 | Lester Brown gives police written Statement implicating Pursley in Ascher murder, effort to hire hitman to kill Marvin Windham (SOF ¶ 25) |

| | |
|---|---|
| 04/26/1994 | Marvin Windham testifies against Pursley at criminal trial, implicating Pursley in Ascher murder (SOF ¶ 22) |
| 04/22/1994 & 04/25/1994 | Samantha Crabtree testifies at Pursley's murder trial (SOF, ex. 37-38) |
| 04/28/1994 | Patrick Pursley convicted by a jury of murdering Andrew Ascher |

### III. UNCONTESTED FACTS[1]

12.     Andrew Ascher was shot and killed the evening of April 2, 1993. (Second Amended Complaint, dkt # 100 at ¶ 17).  Some of the Defendant officers arrived at the crime scene, but they found no suspects in the area. *Id*. at ¶ 25.

**RESPONSE: Plaintiff objects to this paragraph as it fails to cite to evidence. Plaintiff admits that Andrew Ascher was shot and killed on the evening of April 2, 1993, and clarifies that this statement as overbroad and vague and to the extent it excludes the existence of evidence of suspect in the area such as shoeprints in the snow near a dumpster where an eye witness had seen a man crouching soon after hearing gunshots. Ex. 12 (Houde Dep.) at 49:4-9, Ex. 77 (Bodell Trial Testimony) at 997:15-999:12; Ex. 105 (Supplement Report 4.8.1993) at 4. Plaintiff also clarifies that Defendants failed to investigate other viable suspects that emerged shortly after the crime and well before the June 8, 1993 Crime Stoppers call. For instance, the day after the incident, while still at the hospital, Becky George told the Rockford Police Department that she had problems with her ex-husband that James Ascher would often help her resolve. Ex. 64 (1993.04.03 Reffett Report) at RFD Defense 81; Ex. 21 (Clark Report) at 11-12. She told the RPD that her ex-husband "played games" in order to**

---

[1] Defendants label these facts as "uncontested," but as evidenced within, the majority are contested.

"mentally torture her." Ex. 64 (1993.04.03 Reffett Report) at RFD Defense 81. The officers did not obtain Becky's ex-husband's name or question her further about her ex-husband the problems he had with her. Ex. 64 (1993.04.03 Reffett Report) at RFD Defense 81; Ex. 21 (Clark Report) at 11-12. As another example, the Defendants began to investigate and then appeared to drop the Vantrele Brothers, Antrone and Vantele, as viable possible suspects. Ex. 21 (Clark Report) at 11, 13. About five hours after Ascher's killing, around 3:15 a.m. on April 3, 1993, the RPD went to the home of Antrone Turner and his brother Vantele Turner to investigate a report that they were responsible for property damage at a nearby motel earlier that morning. Ex. 69 (1993.04.03 Report); Ex. 21 (Clark Report) at 11, 13. The RPD report noted that Vantele Turner was "dress [sic] in all dark clothing" and the investigating officer "believed this black male may have been involved in this [Ascher] homicide." Ex. 69 (1993.04.03 Report) at RFD Defense 65-66. The officers did not search the Turners' home. Ex. 69 (1993.04.03 Report); Ex. 21 (Clark Report) at 11, 13.

### A.    Marvin Windham

13.    On June 8, 1993, an informant by the name of Marvin Windham called the Crime Stoppers hotline to report, anonymously at the time, that Patrick Pursley was the person who committed the Ascher homicide, robbed a bank, and robbed a Burger King. (Ex. 1, Windham Dep. at 21:1-23:2); (Ex. 62, Detective Bruce Scott Dep. at 129: 4-21); (Ex. 10 at 000242-45, June 28, 1993 Police Report by Det. Bruce Scott).

**RESPONSE: Plaintiff admits that Marvin Windham called the Crime Stoppers hotline anonymously on June 8, 1993, but disputes the substance of Windham's call.** *See* **PSOF 41-55. Also denied because this statement relies on hearsay without exception, because Pursley did not commit the Ascher homicide. PSOF 1.**

14.     Four days later, on June 12, 1993, Windham met with detective Bruce Scott (one of the Defendants in this case) and provided him with a signed, written Statement implicating Patrick Pursley in the Ascher homicide, bank robbery, and Burger King robbery. (Ex. 1, Windham Dep. at 14:8-16:24; 26:7-27:6); (Ex. 2, Marvin Windham's June 12, 1993 Statement to Police).

**RESPONSE: Undisputed that Windham met with Defendant Scott on June 12, 1993 and signed a document containing inculpatory information about Pursley. Disputed to the extent that this statement relies on hearsay without exception, and denied as to the substance of the statement. PSOF 1; PSOF 41-55. And finally, disputed to the extent that this suggests that Windham wrote the statement; he did not. Ex. 13 (Scott Dep.) at 129:4-14. Defendant Scott typed it and Windham signed it. Ex. 37 (Windham Typed Statement). There is no indication on the document itself that Windham read every paragraph. *Id.***

15.     According to what Windham told the police in his written Statement, Windham originally met Pursley in December 1991, while both were serving time in prison together in Joliet. (Ex. 2 at 000247).  They participated in the same work release program in Rockford after their release. *Id*.  Once released, Pursley told Windham to let Pursley know if he knew anyone selling guns. *Id.*  They started "kicking it" together in early 1993. *Id*.

**RESPONSE: Undisputed only to the extent this statement reflects the June 12, 1993 statement signed by Marvin Windham but otherwise disputed. Pursley and Windham met during work release in Winnebago County, not in prison in Will County. Ex. 1 (Pursley Dep) at 24:14-23. In 1992 to 1993, Pursley and Windham saw each other occasionally. Ex. 1 (Pursley Dep) at 27:6-10.**

16.     According to Windham's Statement, Windham was with Pursley at Pursley's residence on or about April 5, 1993, just a few days after the Ascher murder. (Ex. 2 at 000247).

Windham's Statement indicates that, during that visit, Pursley admitted to Windham that Pursley killed Ascher, and that Pursley's girlfriend, Samantha Crabtree, drove the getaway car for Pursley on the night of the murder. *Id.* at 000247-248. According to Windham, Pursley bragged about the murder, showed Windham a newspaper clipping about the murder, and showed him the gun he had used, which Pursley talked about having "adjusted" after the murder so that "if he got caught the police wouldn't be able to hook the murder on him." *Id*.

**RESPONSE: Undisputed only to the extent this statement accurately recites some of the contents of the June 12, 1993 statement signed by Marvin Windham. Disputed because Windham's Statement does not refer to Ascher by name (*id.*), and does not say that Pursley admitted that his girlfriend drove the "getaway car" (*id.* at 000248). Otherwise, disputed as to the substance of the statement, because the statement was fabricated. *See* PSOF 1; PSOF 41-55.**

17. According to Windham's Statement, a couple of weeks later, Pursley came to Windham's house. (Ex. 2 at 000248). While watching TV, Pursley recognized a guy on TV named "Bingo," whom Pursley said he used to perform stick up robberies with. *Id*. Windham observed Pursley then equip himself with a black hoodie, black skull cap with two holes in it, the same 9 millimeter handgun Windham observed Pursley with previously, and a police scanner with headphones. *Id*. Pursley told Windham he was "fixing to go get him some money." *Id*. Windham observed Pursley go outside, remove the license plate off a vehicle and place a sticker in the back window, as if he had just purchased the car, then take off. *Id*. The next day, Windham went to Pursley's residence and Pursley bragged about getting away with a Burger King Robbery, and showed Windham the approximately $1500 he stole in that robbery. *Id*.

**RESPONSE: Undisputed only to the extent this statement reflects the June 12, 1993 statement signed by Marvin Windham. Otherwise, disputed as to the substance of Windham's statements. PSOF 1; PSOF 41-55.**

18.     According to Windham's Statement, a couple of weeks later Pursley and Samantha Crabtree came to Windham's residence. *Id*. During that visit Pursley told Windham that Pursley was looking for a car to use to rob a bank. *Id.* The next day, Windham was at Pursley's residence, when he observed Pursley packing a black bag with a pistol, an extra clip, a purple mask, police scanner, black pants, and a black hoody. *Id.* The following day, Pursley told Windham that he stole an Oldsmobile, which he and Samantha Crabtree used to rob a bank of $16,000. *Id*. at 000248-249.

**RESPONSE: Undisputed only to the extent this statement reflects the June 12, 1993 statement signed by Marvin Windham. The underlying facts are disputed. PSOF 1; PSOF 41-55.**

19.     Windham's Statement indicates that Pursley began pressuring Windham to join Pursley in performing stickup robberies, since Pursley was concerned that Windham "knew too much." *Id*. Windham's Statement also indicated that Pursley "made some threats to me that before [Pursley] goes back to the penitentiary he would know if it was me or Sam [that told] and he would kill us before he goes back." *Id*. at 000249. Windham's statement indicates that he stopped hanging around Pursley once Pursley threatened to kill him. *Id*.

**RESPONSE: Undisputed only to the extent this statement reflects the June 12, 1993 statement signed by Marvin Windham. The underlying facts are disputed. PSOF 1; PSOF 41-55. Pursley did not not threaten Windham or Sam or commit the Ascher homicide. Ex. 25 (Crabtree Affidavit) at Pursley 014257.**

20.     Windham testified that he called Crime Stoppers to report Pursley because he was scared of Pursley, knew him to be dangerous, and did not want to start participating in robberies and crimes as Pursley wanted him to.  (Ex. 1, Windham Dep. at 21:1-22:15).

**RESPONSE: Denied to the extent that Windham testified in his 2019 deposition that he "was kind of scared" of Pursley. (Defs.' Ex. 1 at 21:18.) Windham also stated that he knew he would get money for providing information to Crime Stoppers on Pursley before he called: "Crime Stoppers, if you turn somebody in with a crime, you get paid so much amount of money." (Defs. Ex. 1 at 31:15-24.)**

21.     Windham testified before a Grand Jury on June 23, 1993.  His testimony implicated Pursley in the Ascher homicide by recounting what he had previously told the police about Pursley's involvement. (Ex. 3, Windham Grand Jury testimony June 23, 1993).  The Grand Jury issued a Bill of Indictment, charging Pursley with the First Degree murder of Andrew Ascher. (Ex. 63, Bill of indictment, Pursley 000679-680).

**RESPONSE: Denied. Windham's Grand Jury testimony was not coextensive with his previous statements to police. For example, in his Grand Jury testimony, Windham stated that Pursley told him he used a "Sixteen-shot, .9 millimeter (Taurus)." (Defs.' Ex. 3 at Pursley 19913.).**

22.     Windham testified at Pursley's murder trial on April 26, 1994.  His testimony implicated Pursley in the Ascher homicide by recounting what he had previously told the police and the Grand Jury about Pursley.  (Ex. 4, Windham trial testimony at 004987-5046).  During trial, he explained that he called Crime Stoppers because Pursley threatened him by saying that Windham "knew too much" and "was either in or out," and that "before he go back to the penitentiary [sic] he will know who told, either me or Samantha." (Ex. 4 at 005040:11 – 5042:4:).

11

**RESPONSE: Denied. There were many differences between Windham's testimony at trial and his previous accounts to the police and grand jury. For example, in his original statement to police Windham recounted that Pursley was upset with the unemployment office because they had "messed up or something" and he was not getting his payments. (Defs.' Ex. 2 at RFD Defense 000247.) At trial, Windham testified that Pursley was saying things like "you denying me because I'm black, if I was white you would have given me unemployment." (Defs.' Ex. 4 at 576:3-5.) Further at trial, the State asked Windham if their trial exhibit 9 resembled the gun that Pursley showed him to be the murder weapon and Windham testified that it did. (Defs.' Ex. 4 at 580:9-19.) Additionally, Windham admitted that he had received $2,650 from Crime Stoppers and that he had lied to police before and told them his name was Marvin Johnson when he was arrested. (Defs. Ex. 4 at 5004:16-5005:21.) Contrary to Defendants' statement above, Windham also stated that in exchange for giving testimony against Pursley, he asked that his wife not be arrested on a misdemeanor warrant. (Defs. Ex. 4 at 10-24.)**

23.     When deposed in 2019, Windham confirmed that the written Statement he gave in 1993 was true (Ex. 1 at 16:6-24), as was his trial testimony in 1994. *Id.* at 31:3-6. He was not coerced into giving his Statement and no one "put words into his mouth." (Ex. 1 at 16:3-11).

**RESPONSE: Undisputed that Windham so testified but object that it is misleading because Windham also testified at his deposition that he did not tell the Defendants certain significant facts that appear in his statement. PSOF 41-55. Further clarifying, this statement fails to recognize that there were many inconsistencies and contradictions among Windham's 2019 deposition testimony, 1993 statements, and 1994 trial testimony. For example, in his trial testimony, Windham stated that he did not know about the Crime**

Stoppers award money before he called the tipline but in his deposition, he admitted that he did. (Ex. 27 at 621:2-13 and Ex. 27, Windham Dep. at 109:11-110:7.)

**B.     Lester "Latee" Brown**

24.     Lester "Latee" Brown testified that he met Patrick Pursley in 1985 or 1986 and that they became partners in crime, performing residential burglaries and robberies together.   (Ex. 5, Brown Dep. #1 at 14:5-15:3).  He testified that he and Patrick Pursley were both members of the Black Gangster Disciples street gang. (Ex. 6, Brown Dep. #2, at 98:22-99:10).

**RESPONSE: The first sentence is denied; Brown did not testify in his October 30, 2019 deposition that they committed "residential burglaries" together. Ex. 94 (Brown Dep. Oct. 30, 2019) at 14:6-23. Undisputed to the extent that Brown testified in his 2019 and 2020 depositions that he and Patrick were both members of the Black Gangster Disciples, but Plaintiff clarifies that Brown never gave any testimony at either criminal trial. Plaintiff also clarifies that according to Brown, by the time he gave his statement to police, he and Pursley were no longer friends. Ex. 95 (Brown dep., August 24, 2020 ) at  21:8 to 22:16.**

**Further, Plaintiff objects because this statement is immaterial. The State did not call Brown to testify at Pursley's 1994 murder trial, and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. DSOF 53 (Pursley arrest on June 16, 1993); DSOF 26 (Brown's statement to police on December 29, 1993). *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at \*3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019**

Wl 1382101, at *4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013
WL 2598151, at *5 (N.D. Ill. June 11, 2013).

25.    Brown met with detective Howard Forrester (one of the defendants in this case) and
provided him with a signed, written Statement dated December 29, 1993, implicating Patrick
Pursley in drug dealing, bank robbery, and robbing a Burger King. (Ex. 5, Brown Dep. #1 at 19:4-
20:6; Ex. 7, Brown Dec. 29, 1993 Statement). In addition to implicating Pursley in those crimes,
Brown's Statement also implicated Pursley in a plot to have Marvin Windham murdered because
Windham was the Crime Stoppers informant who told the police that Pursley was the one who
killed Andrew Ascher. *Id*.

**RESPONSE: Undisputed only to the extent this statement reflects the December 29,
1993 statement signed by Lester Brown. Object that this statement relies on hearsay without
exception. Furthermore, object to the Defendants' reliance on this statement at summary
judgment because it was not known to them when they initiated charges against Patrick and
thus cannot be considered for purposes of probable cause. See DSOF 53 (Pursley arrest on
June 16, 1993); DSOF 26 (Brown's statement to police on December 29, 1993). Denied as to
the underlying facts asserted in the statement. For example, Pursley did not ask Brown to
kill Windham. Ex. 1 (Pursley Dep.) 111:4-11. Pursley did not kill Andrew Ascher and never
told Windham that he did. PSOF 1; Ex. 38 (Pursley Affidavit). Plaintiff further clarifies that
at the time Brown gave his statement, he faced federal charges for robbing a bank with
Samantha Crabtree's sister, Theresa Crabtree. Ex. 96 (Lester Brown plea agreement ) at 2.
Brown knew that he had the highest possible criminal history under the federal sentencing
guidelines and was facing a lot of prison time and had young children at the time. Ex. 95
(Brown dep., August 24, 2020 ) at 17:3-18:20. On December 17, 1993, in hopes of getting less**

time on his sentence in exchange for giving information against Pursley, Brown wrote State's Attorney Koski a letter stating: "You all want to put Patrick to death and I feel I can help 100% percent,"  and "You all are not looking at what I have to lose. You give me 15 and a half, there's a chance my wife will divorce me." Ex. 97 (1993.12.17 L. Brown Letter to D. Koski); Ex. 95 (Brown Aug. 24, 2020 Dep.) at 22:17 to 23:18. In exchange for his testimony, including testimony against Patrick Pursley, the federal prosecutor agreed to recommend a sentence of 15 and a half years for Brown instead of 20. Ex. 95 (Brown dep., August 24, 2020) at 24:20 to 25:8. Ex. 96 (Lester Brown plea agreement) at 12-13.  Brown's  plea agreement stated that he understood his "compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement." Ex. 96 (Lester Brown plea agreement) at 15-16. Brown understood that his plea agreement required him to testify against Pursley at the sentencing. Ex. 95 (Brown Aug. 24, 2020 Dep) at 46:12-17.

Further, Plaintiff objects because this statement is immaterial. The State did not call Brown to testify at Pursley's 1994 murder trial,  and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. DSOF 53 (Pursley arrest on June 16, 1993); DSOF 26 (Brown's statement to police on December 29, 1993).  *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at *3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-

3707, 2019 Wl 1382101, at *4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V

6362, 2013 WL 2598151, at *5 (N.D. Ill. June 11, 2013).

26. Brown's Statement indicates that, once Pursley was arrested for the Ascher

homicide, Brown went to visit him in jail:

> He told me that this dude named Marvin was the guy that called
> Crime Stoppers and told. [on him] . . . Patrick said that he later told
> Marvin, after the bank robbery, about the murder that he (Patrick)
> had done. He said that Samantha had went with him to do the bank
> robbery. . . . Patrick then told me that he had either $17,000 or
> $14,000 and he told me that if I would go kill Marvin that he would
> clear my $3,000 debt to him and we would split the rest of the
> money. He told me that Marvin and Samantha are the only
> witnesses that can give him the death penalty. . . . He told me where
> Marvin lived.

(Ex. 7 at 000285-286).

**RESPONSE: Undisputed only to the extent this statement quotes the December 29,**

**1993 statement signed by Lester Brown. Denied to the extent that this statement relies on**

**inadmissible hearsay without exception and denied to the extent that this statement does not**

**reflect reliable evidence implicating Pursley of these crimes. Also denied as to the underlying**

**facts, for example, Pursley did not ask Brown to kill Windham. Ex. 1 (Pursley) 111:4-11. As**

**another example, in his December 17, 1993, letter to Koski, Brown stated that he found out**

**where Marvin lived through Patrick's girlfriend. Ex. 97 (1993-12-17 L. Brown Letter to D.**

**Koski). But in his December 29, 1993 statement, quoted above, he stated that Pursley told**

**him where Marvin lived. Ex. 98 (1994-07-15 Lester Brown Testimony Sentencing Hearing)**

**at RFD Defense 286-87. Brown also supposedly learned this information in June 1993, but**

**did not tell the police anything about this information he had in June, July, August,**

**September, October, or November 1993. He waited until he faced federal charges in**

**December 1993. Ex. 95 (Brown Aug. 24, 2020 Dep) at 27:14-19. Plaintiff also clarifies that in**

addition to providing information about Patrick, as part of his plea agreement, Brown told federal prosecutors where the money stolen from the bank was located and they recovered it. Ex. 94 (Brown dep. Oct. 30, 2019) at 37:1-11.

Further, Plaintiff objects because this statement is immaterial. The State did not call Brown to testify at Pursley's 1994 murder trial, and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. DSOF 53 (Pursley arrest on June 16, 1993); DSOF 26 (Brown's statement to police on December 29, 1993). *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at *3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at *4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at *5 (N.D. Ill. June 11, 2013).

27.     Brown testified that Pursley wanted Marvin Windham killed because Marvin had snitched on him. (Ex. 6, Brown Dep. #2 at 101:11-102:24).  Brown testified that he subsequently went to the location where Marvin lived but never did locate him, and Brown left when he got cold feet. (*Id*.; Ex. 7 at 000285-286; & Ex. 5, Brown Dep. #1 at 30:4-24).

**RESPONSE: Denied.** This statement does not clarify that Brown was not called to testify at Pursley's trial in 1994 and the statement refers to Brown's 2019 and 2020 depositions. Undisputed that Brown testified to this at his 2019 and 2020 depositions. Denied; Pursley did not ask Brown to kill Windham. Ex. 1 (Pursley Dep.) 111:4-11. Also denied because this statement is inconsistent with Brown's December 29, 1993 statement which only

says that Brown went to Rockton Avenue, asked a girl there if she knew Marvin, she said no, and Brown "left and went home." Ex. 99 (Brown December 19, 1993 Statement) at 286.

Further, Plaintiff objects because this statement is immaterial. The State did not call Brown to testify at Pursley's 1994 murder trial, and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at \*3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at \*4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at \*5 (N.D. Ill. June 11, 2013).

28.     Brown's Statement goes on to indicate that Pursley subsequently had Samantha Crabtree contact Brown to ask him to rob a bank with her to raise money for Pursley—the same bank that she and Pursley had previously robbed together. (Ex. 7 at 000286).

**RESPONSE: Undisputed that this was in Brown's December 19, 1993 statement. Denied because this statement relies on inadmissible hearsay. Denied because Brown told the State's attorney in 2018 that he decided to rob the bank because Patrick had robbed it and gotten away with it, not to raise money for Pursley.  Ex. 100 (State's attorney notes from November 11, 2018 meeting with L. Brown).**

**Further, Plaintiff objects because this statement is immaterial. The State did not call Brown to testify at Pursley's 1994 murder trial, and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and is therefore**

irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at *3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at *4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at *5 (N.D. Ill. June 11, 2013).

29.     Brown's Statement indicates that Crabtree walked him through how she and Pursley had robbed the bank the last time, and drove him around the area to show him the getaway route she and Pursley had previously used. *Id*.  During that drive, Samantha Crabtree pointed out the location where "Patrick killed that guy." (Ex. 7 at 000286-287).  Brown understood Crabtree's reference to "that guy" to mean Andrew Ascher. (Ex. 6, Brown Dep. #2, at 95:12-18). She told Brown that she was the lookout that night on what was supposed to be a burglary, but that she saw Pursley rob a white guy in his car in front of a house and shoot him in the head before Pursley ran back to the car, got in, and they left. (Ex. 7 at 000286-287).

**RESPONSE: This statement of fact contains four separate facts with citations to separate sources. For the sake of clarity, Plaintiff breaks this SOF into its component sentences and addresses them individually. For the first sentence, it is undisputed that this is in Brown's statement. For the second sentence, it is undisputed that Brown claimed Crabtree said this statement, but it is not clear what location Crabtree was pointing to (the statement just says it was three blocks passed a McDonalds on Harrison) and Plaintiff disputes that Patrick Pursley killed anyone. Also denied that Crabtree pointed out anywhere that Patrick had killed someone. *See e.g.,* Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 416:2-14. The third**

statement is denied because the statement does not indicate how Brown interpreted this. Ex. 99 (Brown December 19, 1993 statement) at 286. The fourth sentence is denied because it is not supported by Brown's December 29, 1993 statement. It is also denied because while he says she told him she heard Pursley say "Give me your wallet." Ex. 99 (Brown December 19, 1993 Statement) at RFD Defense 286-87. This is not what the shooter said. Ex. 39 (George testimony 1994.04.21 ) at 141:2-144:1 Plaintiff also denies that Plaintiff clarifies that Brown did not testify to anything in this statement during his testimony at Patrick's sentencing. See Ex. 99 (Brown December 19, 1993 Statement) at 286-87; Ex.98 (Brown Testimony Sentencing Hearing 1994-07-15) at RFD Defense 2340-2506. Plaintiff objects to the statement in its entirety because it relies on inadmissible hearsay.

Further, Plaintiff objects because this statement is immaterial. The State did not call Brown to testify at Pursley's 1994 murder trial, and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at *3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at *4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at *5 (N.D. Ill. June 11, 2013).

30.     Brown's Statement goes on to indicate that the day after Samantha Crabtree told him how to go about robbing the bank, he robbed it with Samantha Crabtree's sister, Theresa Crabtree. (Ex. 7 at 000286-287). The date of the bank robbery was September 15, 1993, according

to the plea agreement he eventually entered into. (Ex. 64 at Pursley 025896).  The money from the bank robbery was supposed to be used in part to extinguish the drug debt Brown owed Pursley. Ex. 7 at 000289.  However, Brown was arrested for the bank robbery, and Samantha Crabtree was unable to find the proceeds from the bank robbery, despite Brown calling her and telling her where he had hidden it. *Id*.

**RESPONSE: Denied because this statement relies on hearsay without exception. Plaintiff's further objects to this statement as irrelevant. Undisputed as to the date of the robbery in the plea agreement. Denied that money from the robbery was supposed to go to Pursley. Brown told the State's Attorney that he robbed the bank with Theresa Crabtree, with whom he was having a sexual relationship, because Pursley had done it and gotten away with it. Ex. 100 (State's attorney notes from November 11, 2018 meeting with L. Brown).**

**Further, Plaintiff objects because this statement is immaterial. The State did not call Brown to testify at Pursley's 1994 murder trial,  and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at \*3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at \*4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at \*5 (N.D. Ill. June 11, 2013).**

31.     Brown's Statement goes on to indicate that, while in jail awaiting bank robbery charges, Brown was approached by a member of the Vice Lords street gang, Olen Bell. (Ex. 7 at

000287-288). Bell was reportedly just in prison in Joliet where Patrick Pursley spoke to him about his problem with Marvin Windham, before Bell was transferred to the same jail that Brown was serving time in. *Id.* Bell told Brown that Pursley had offered Bell money to speak to his fellow Vice Lord brother Marvin, who had called Crime Stoppers and implicated Pursley in the Ascher murder. *Id*. Brown told Bell that Pursley did not have any money to pay Bell for talking to Windham. *Id*.

**RESPONSE: Disputed. Pursley did not know Olen Bell. Ex. 1 (Pursley Dep.) at 111:12-112:2. Disputed further because this statement misrepresents the substance of Brown's Statement, and assumes that the information within Brown's Statement is true. Denied further because this statement relies on inadmissible hearsay and double hearsay without exception.**

**Object to the Defendants' reliance on this statement at summary judgment because it is immaterial: Defendants did not rely on it during their investigation – it did not exist until several months after Plaintiff was charged – and it has no relevance to their course of conduct. The State did not call Brown to testify at Pursley's 1994 murder trial, and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at \*3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at \*4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at \*5 (N.D. Ill. June 11, 2013).**

32. The Statement Brown provided to the police was made in the presence of Brown's own attorney, it was not coerced in any way, and it is truthful. (Ex. 5, Brown Dep. #1 at 19:4-21:10).

**RESPONSE: Denied. This statement ignores Brown's testimony that he reached out to the State's Attorney's in 1993 while he was in jail. Ex. 95 (Brown dep. August 24, 2020) at 22:17-23:18. While Brown testified at Pursley's sentencing hearing that Brown had already been sentenced so he was not getting anything by testifying then and Koski had no leverage over him, this was inaccurate. Ex. 98 (Brown 1994.7.15 sentencing testimony) at RFD Defense 2463:17-2464:3, RFD Defense 2500:1-6. Brown's plea agreement stated that he understood his "compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement." Ex. 96 (Plea Agreement) at 15-16. Brown understood that his plea agreement required him to testify against Pursley at the sentencing. Ex. 95 (Brown dep. August 24, 2020) at 46:12-17**

**Further, Plaintiff objects because this statement is immaterial. The State did not call Brown to testify at Pursley's 1994 murder trial, and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at \*3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at \*4 (N.D.**

Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at \*5 (N.D. Ill. June 11, 2013).

33.     Brown testified at Patrick Pursley's sentencing hearing in the murder case, and testified consistently with his written Statement about Pursley's plot to have Windham murdered. (Ex. 8, Lester Brown's July 15, 1994 testimony at Pursley's sentencing hearing, at 005889-5892).

**RESPONSE: Undisputed that Brown testified at Pursley's sentencing hearing and not at either of his criminal trials. Otherwise denied because Pursley had no plot to have Windham murdered and because Brown's testimony was not consistent with his December 29, 1993 statement. For example, in the statement Brown said Pursley offered him $17,000 or $14,000 but in his sentencing testimony he said it was either $14,000 or $15,000. *See* Ex. 99 (Brown December 19, 1993 Statement) at RFD Defense 285; Ex. 98 (Brown Sentencing Test.) at RFD Defense 002460:20-23.**

**Further, Plaintiff objects because this statement is immaterial. The State did not call Brown to testify at Pursley's 1994 murder trial, and this testimony had not been given at the time Pursley was charged (or even convicted), so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at \*3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at \*4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at \*5 (N.D. Ill. June 11, 2013).**

**C.     Olen Bell**

34.     Olen Bell was interviewed by Detectives Howard Forrester and Mark Schmidt (Defendants in this case) on October 29, 1993, and provided them with a written Statement about Pursley's plot to have Windham killed. (Ex. 34, Detective Mark Schmidt Dep. at 265:7-269:1; Ex. 9, Olen Bell's Oct. 29, 1993 Statement and the related police report). In his Statement, Bell indicated that he was a high ranking member of the Vice Lords street gang. (Ex. 9 at 000276). He was sent to prison in Joliet, Illinois on September 2, 1993, for a parole violation. *Id*. While in prison in Joliet, Bell was informed that a fellow inmate named Patrick (Pursley) wanted to speak with him. *Id*. He was told that Pursley wanted to talk to him because "one of my people" (a fellow Vice Lord) had reportedly signed a statement against him and snitched. *Id*.

**RESPONSE: Plaintiff objects because this statement is immaterial. The State did not call Bell to testify at Pursley's 1994 murder trial, and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. See DSOF 53 (Pursley arrest on June 16, 1993); DSOF 34 (Bell's statement to police on October 29, 1993). *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at \*3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at \*4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at \*5 (N.D. Ill. June 11, 2013).**

**Further disputed because (1) Pursley did not know Olen Bell, Ex. 1 (Pursley Dep.) at 111:12-112:2; (2) this statement relies on hearsay without exception; and (3) mischaracterizes Bell's statements to police and Defendant Schmidt's deposition testimony.**

35.     Bell's Statement goes on to say that he visited Pursley in his cell. At that time, Pursley told him that a guy named Marvin gave a statement against him for killing a white man. (Ex. 9 at 000277). Pursley told Bell that he knew Marvin was the one who gave a statement against him because Marvin was the only one that he had told about it. *Id*. Bell indicated that Pursley said, "If you could get rid of Marvin, I would be in the clear. . . . I will give you $2,000 to get rid of Marvin any way you can, so he can't testify against me." *Id.*

**RESPONSE: Plaintiff objects because this statement is immaterial. The State did not call Bell to testify at Pursley's 1994 murder trial, and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and was therefore irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at \*3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at \*4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at \*5 (N.D. Ill. June 11, 2013). Further, denied because this statement relies on hearsay without exception and mischaracterizes Bell's statements to police.**

36.     Bell's Statement goes on to state that Pursley subsequently gave Bell Marvin's address, Marvin's mother's name and address, and Pursley's "wife" Samantha's address and phone number. *Id*. Pursley told Bell that Samantha would give Bell additional information about how to find Marvin. *Id*. Pursley also told Bell about how he had shot the "white dude" during a stick up, which is why they were seeking the death penalty against him, and why it was "important that

Marvin does not show up to testify." *Id*. at 278. Bell told Pursley that he would "take care of it because Marvin is one of my people." *Id*.

**RESPONSE: Plaintiff objects because this statement is immaterial. The State did not call Bell to testify at Pursley's 1994 murder trial, and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and was therefore irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at \*3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at \*4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at \*5 (N.D. Ill. June 11, 2013). Otherwise denied because this statement relies on hearsay without exception and mischaracterizes Bell's statements to police.**

37.     Bell's statement goes on to state that he was subsequently back in the Winnebago County Jail in the same section as "Latee" (Lester Brown), when Brown told him Pursley doesn't have any money. *Id.* at 278-279.

**RESPONSE: Plaintiff objects because this statement is immaterial. The State did not call Bell to testify at Pursley's 1994 murder trial, and this statement had not been made at the time Pursley was charged, so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at \*3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673,**

**682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at \*4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at \*5 (N.D. Ill. June 11, 2013). Otherwise, denied because this statement relies on hearsay without exception and mischaracterizes Bell's statements to police.**

**D.     Robert Poe**

38.     On June 8, 1993, Robert Poe reported that an individual with two guns shot out his television set at 609 Woodlawn in Rockford. (Ex. 62, Scott Dep. at 130:4-131:14; Ex. 10 at 000244, June 28, 1993 Police Report by Bruce Scott).  He identified the shooter in a manner that matched the description of Patrick Pursley, identified the shooter's residence as being in the area of Pursley and Samantha Crabtree's residence, identified the shooter's car as matching Samantha Crabtree's, and identified its license plate within one digit of Samantha Crabtree's. *Id*.  Poe was presented with a photo lineup including a photo of Pursley, and he identified Pursley as the shooter. *Id*.

**RESPONSE: Denied because this statement relies on hearsay without exception. Plaintiff objects because this statement is immaterial. The State did not call Mr. Poe to testify at Pursley's 1994 murder trial, and Plaintiff's alleged participation in an unrelated crime is irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at \*3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at \*4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at \*5 (N.D. Ill. June 11, 2013).**

**Also denied as to the substance. The cited police report does not include any description that Mr. Poe provided. Ex. 34 (1993.6.28 Scott Report) at 244. It also does not describe how many photos were in the photo line-up or how the line-up was conducted. Ex. 34 (1993.6.28 Scott Report) at 244. Also denied because the evidence technician sent to the scene initially reported that he could not locate any cases or bullet fragments. Ex. 101 (1993.6.9 609 Woodlawn Report) at 124. Also denied because Detective Hackbarth stated in his June 8, 1993 report that Poe told him the suspect had "a larger blue revolver (poss a .357 cal)," Ex. 102 (1993.06.08 Report) at 120, and it was Forrester who wrote in his June 10, 1993 affidavit for a search warrant, without evidence, the Poe perpetrator had what looked like two black "large caliber semi-automatic" guns, one in each hand, Ex. 17 (Forrester Search Warrant Affidavit) at Pursley 720.**

**E.      Execution of Search Warrant and Attempted Execution of Arrest Warrant**

39.      In pursuit of evidence of Pursley and Samantha Crabtree's possible involvement in the murder of Andrew Ascher and the robbery of the First Bank North bank, Detective Forrester sought a search warrant authorizing the police to search their residence at 901 Ashland, in Rockford. (Ex. 65, Sgt. Stephen Pirages Dep., 307:7-308:16); (Ex. 11, June 10, 1993 Complaint for Search Warrant). The complaint for a search warrant noted that forensic scientist Jack Welty, with the Illinois State Police Crime Lab, had opined that the shell casings left at the scene of the Ascher homicide most likely came from a Taurus brand handgun, which is one of the handguns Samantha Crabtree was on record as owning. (Ex. 11, at 154-156). Chief Judge Harris Agnew found probable cause for the search and issued a search warrant on June 10, 1993. *Id. &* (Ex. 12, June 10, 1993 Search Warrant). An arrest warrant was also issued for Patrick Pursley on June 10, 1993, in relation to the Woodlawn shooting. (Ex. 10 at 000245).

**RESPONSE: Disputed. The search warrant stated, "based on the firing pin impression left on the casings, Welty believed it was more likely that the casings were fired from a Taurus brand handgun." Ex. 17 (Forrester Search Warrant Affidavit) at 12. Also denied because Defendant Pirages's deposition does not address Forrester's purpose for seeking the search warrant. Ex. 22 (Pirages Dep.) at 307:7-308:16.**

40.     On June 10, 1993, the Police staked out the 901 Ashland residence, and proceeded to follow a female that left the residence in a Chevy Celebrity with the suspect, Patrick Pursley. (Ex. 62, Scott Dep., 166:15-167:20; Ex. 10 at 000244-245).   The car eventually stopped, Pursley jumped out and ran off between the houses in the area. *Id*.   He eluded arrest that day. *Id*.   The woman who remained at the scene was Samantha Crabtree, who the police presented with the search warrant for her and Pursley's residence at 901 Ashland. *Id.*   The search warrant was read to her at 2:43 PM on June 10, 1993. (Ex. 13 at 000112, Detective Forrester's June 18, 1993 Report re Crabtree interview and Statement). Detective Forrester's police report (Ex. 13) fairly and accurately summarizes Detective Forrester's and Schmidt's interactions with Samantha Crabtree on June 10, 1993. (Ex. 34, Schmidt Dep., 278:22-279:8). Rockford police and an FBI agent searched the 901 Ashland residence once they presented the warrant to Samantha Crabtree. (Ex. 10 at 000244-245).

**RESPONSE: Denied because this statement relies on hearsay without exception as to Samantha Crabtree's statements. Also denied because Detective Forrester's and Detective Schmidt's interactions with Samantha Crabtree are a matter of dispute between the Parties. *See* Ex. 25 (Crabtree Affidavit); Ex. 18 (Crabtree 1994 Test., Day 1); Ex. 6 (Crabtree 1994 Trial Test., Day 2); PSOF 8-40. Plaintiff clarifies that Detective Forrester's report of his**

interactions with Crabtree is dated eight days after that interaction. Ex. 19 (1993.06.18 Forrester Report).

41.     Among the evidence seized from the residence were two 9mm handguns, including a Taurus model, and (later) a black Samsonite briefcase. (Ex. 10 at 000245).  Samantha Crabtree identified the briefcase as having been taken from the stolen car that she and Pursley used to rob the First Bank North bank. (Ex. 10 at 000245).  Raymond Swaagstra, the owner of the stolen car and briefcase, was subsequently presented with the briefcase recovered from Samantha Crabtree and Pursley's residence, and he identified it as the one that he had left in his car when it was stolen. *Id*. at 245-246.

**RESPONSE: Denied because this statement relies on hearsay without exception as to Samantha Crabtree's and Raymond Swagstraa's statements. Admitted that RPD seized two 9mm handguns and a black Samsonite briefcase, subject to the clarification that RPD did not follow proper evidence-collection procedure when it collected the Taurus. See PSOF 12-13.**

**F.     Samantha Crabtree's Statements**

42.     After she attended the search of her residence and assisted the police in locating one of the two guns located there on June 10, 1993, Samantha Crabtree voluntarily went to the detective division at the Public Safety Building for an interview with Detectives Forrester and Schmidt. (Ex. 34, Schmidt Dep. at 162:4-16; 166:13-167:5; Ex. 13 at 000111-112).  She arrived at the PSB at 3:15 PM on June 10, 1993. (Ex. 34, Schmidt Dep. at 151:20-152:10). Samantha Crabtree initially disclaimed any knowledge of Pursley's role in the Ascher murder, the First Bank North bank robbery, and the Burger King robbery that Pursley was suspected of committing.  (Ex. 13 at 000113-115). She was subsequently shown photos of the individual who robbed the bank

and was told that the police had reason to believe it was Pursley, and that he used her car to rob the bank. *Id*. at 000112-113. She acknowledged that the robber in the photos looked like Pursley, and said that the robber was wearing the same kinds of boots he wears, has a portable police scanner like Pursley's, and a sweatshirt like Pursley's. *Id.*

**RESPONSE: Denied because this statement relies on hearsay without exception as to Samantha Crabtree's statements. Also denied because whether Samantha Crabtree went voluntarily to the police station is a disputed matter, *see* Ex. 25 (Crabtree Affidavit); Ex. 6 (Crabtree 1994 Test., Day 2); PSOF 8-40; Ex. 21 (Clark Report) at 27-31 (Crabtree's statements bear the hallmarks of coercion), and Crabtree's voluntariness is a legal determination.**

43.    Samantha Crabtree was read her rights at approximately 5:20 PM on June 10, 1993. (Ex. 13 at 000115). The detectives told her that they did not believe she was giving them the entire truth, and asked her to be completely honest. (Ex. 13 at 000115-116). By 5:40 PM she had given the police a complete verbal account of how she and Pursley had robbed the bank. *Id*. at 000116. By 5:55 PM on June 10, 1993, she gave the police a complete verbal account of her and Pursley's role in the Ascher murder, admitting that she drove Pursley to the area where Ascher was killed, saw Pursley exit the vehicle, she heard gunshots, he came running back to the car, and they drove off together. *Id*. She then told the police that Patrick had also admitted to her that he was responsible for the Burger King robbery. *Id*.

**RESPONSE: Denied because this statement relies on hearsay without exception as to Samantha Crabtree's statements. Denied to the extent that Patrick Pursley had no role in Andrew Ascher's murder. PSOF 1. Denied because the police report relied on conclusively asserts that Crabtree gave complete accounts of various crimes; it does not list the whole**

**accounts. See Ex. 19 (1993.06.18 Forrester Report) at 116. Further, denied because Crabtree did not voluntarily or affirmatively provide this information. *See* Ex. 25 (Crabtree Affidavit); Ex. 6 (Crabtree 1994 Trial Test., Day 2); PSOF 8-40; Ex. 21 (Clark Report) at 27-31 (Crabtree's statements bear the hallmarks of coercion); P. Resp. to DSOF 48.**

44.     At 6:35 PM on June 10, 1993, Samantha Crabtree and Detectives Forrester and Schmidt left the detective division so that she could show the detectives the locations where she and Pursley were when they participated in the Ascher homicide and the bank robbery. *Id*.  She pointed out where she parked and waited for Pursley during the murder, and the route she took when driving Pursley away from the crime scene, while Pursley was hiding on the floorboard of the car. *Id*.  She pointed out where Pursley had stolen the car from the night before he used it in the bank robbery, and where she parked while waiting for him to rob the bank. *Id*. at 000116-117. She told Detectives Forrester and Schmidt about the briefcase from the stolen car, which was in her and Pursley's residence at the time.  *Id*. at 000117.

**RESPONSE: Denied because this statement relies on hearsay without exception as to Samantha Crabtree's statements. Denied to the extent that Patrick Pursley had no role in Andrew Ascher's murder. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 416:2-14. For the second sentence, denied that Samantha showed them where she parked. Ex. 18 (Crabtree 1994 Trial Test., Day 1) at 391:18-392:5. Further, denied because Crabtree did not voluntarily or affirmatively provide this information. *See* Ex. 25 (Crabtree Affidavit); Ex. 6 (Crabtree 1994 Trial Test., Day 2); PSOF 8-40; Ex. 21 (Clark Report) at 27-31 (Crabtree's statements bear the hallmarks of coercion); P. Resp. to DSOF 48.**

45.     At 7:45 PM on June 10, 1993, Samantha Crabtree, Forrester and Schmidt returned to the detective division interview room, having photographed the relevant places that she had

pointed out during their drive. *Id*. at 000117. At 8:06 PM, Samantha Crabtree signed a consent to search form, allowing the police to return to her and Pursley's residence and seek out the briefcase she had described. *Id*. Throughout the interview, and during their drive, the detectives offered Samantha Crabtree food and drink on multiple occasions, but she declined. *Id*.

**RESPONSE: Denied because this statement relies on hearsay without exception as to Samantha Crabtree's statements. Denied that Crabtree did not point out any places to Defendants; Defendants pointed out the relevant places to Crabtree. Ex. 25 (Crabtree Affidavit) at Pursley 014250. Denied to the extent that Patrick Pursley had no role in Andrew Ascher's murder. PSOF 1. Further denied because the term "relevant places" calls for a legal conclusion and is also not supported by the cited report which states, "polaroids were taken off various locations." See Ex. 19 (1993.06.18 Forrester Report) at 116. Further, denied because Crabtree did not voluntarily or affirmatively provide this information. *See* Ex. 25 (Crabtree Affidavit); Ex. 6 (Crabtree 1994 Trial Test., Day 2); PSOF 8-40; Ex. 21 (Clark Report) at 27-31 (Crabtree's statements bear the hallmarks of coercion); P. Resp. to DSOF 48.**

46. At 8:08 PM on June 10, 1993, Detectives Forrester and Schmidt escorted Samantha Crabtree to the I.D. section, where they were joined by Detective Houde for purposes of having her view various items that had been recovered during the search of her and Pursley's residence at 901 Ashland. *Id*. She identified clothing Pursley wore during the bank robbery and during the murder, and identified the Taurus handgun as the one Pursley used to murder Andrew Ascher. *Id*. She was returned to the interview room, given a pop and cigarettes. *Id*.

**RESPONSE: Denied because this statement relies on hearsay without exception as to Samantha Crabtree's statements. Denied to the extent that Patrick Pursley had no role in**

**Andrew Ascher's murder. PSOF 1. Denied that Samantha identified clothing that was worn during the Ascher murder. Ex. 6 (Crabtree 1994 Test., Day 2) at 445:10-446:10. Samantha identified that clothing that was present at the station and belonged to Patrick and not her, not that it was worn during the murder. Ex. 6 (Crabtree 1994 Test., Day 2) at 444:1-7. In fact, the sweatshirt Defendants seized and was at the lock-up—a pullover—did not match the description Rebecca George provided of her attacker's zip-up sweatshirt with the zipper unzipped. See Ex. 20 (Houde Dep.) at 93:19-21; Ex. 128 (1993.4.3. Scott Report) at 173-74. Also denied because the Taurus was determined to be inconsistent with the bullets and casings found at the Ascher murder scene. PSOF 123-131.**

47.     Beginning at 8:25 PM on June 10, 1993, Detective Schmidt began the process of taking a written Statement from Samantha Crabtree about the murder. (Ex. 34, Schmidt Dep., 232:1-234:19; Ex. 14, Samantha Crabtree's June 10, 1993 Statement to police regarding Ascher murder). Once completed, Crabtree read it, Detective Forrester asked her if it was correct, she said that it was, and she signed page 1 at 11:10 PM, page 2 at 11:15 PM, page 3 at 11:18 PM, page 4 at 11:20 PM, page 5 at 11:23 PM, and page 6 at 11:25 PM. (Ex. 13 at 000117-118); (Ex. 14).

**RESPONSE: Denied because this statement relies on hearsay without exception as to Samantha Crabtree's statements. Denied to the extent the statement indicates that Crabtree wrote her statement; Schmidt typed it. Ex. 11 (Schmidt Dep.) 210:20-22. Also denied that the contents were provided by Samantha - many of the details were provided by or modified by Detective Schmidt. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 445:3-446:10. They also pushed Crabtree to add facts about certain topics that they brought up. For example, Schmidt pushed Crabtree to add facts about what Pursley supposedly did with the gun after they returned home. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 463:6-20. Further, denied**

**because Crabtree did not voluntarily or affirmatively provide this information.** *See* **Ex. 25 (Crabtree Affidavit); Ex. 6 (Crabtree 1994 Trial Test., Day 2); PSOF 8-40; Ex. 21 (Clark Report) at 27-31 (Crabtree's statements bear the hallmarks of coercion); P. Resp. to DSOF 48.**

48.     Samantha Crabtree's Statement indicates in relevant part that she drove Pursley around on the night of the murder looking for places to break into.  (Ex. 14 at 002963). It states that Pursley had her park on Silent Wood (near the site of the murder), he got out, two or three minutes later she heard two gun shots, and that about a minute later he got back in the car, sat on the floorboard of the passenger side of her car, and told her to drive.  *Id.*  at  002964-2965.  When Pursley got into the car, he had the Taurus handgun in his hand, and Crabtree figured he had shot somebody. *Id.* at 2965. Crabtree stated that when she ran a stop sign and ran over a median, Pursley pointed the gun at her and said, "if you get me caught, I will kill you, I swear, I'll kill you right now."  *Id.*  Crabtree further stated that, when they saw police cars with their lights and sirens on, he said "where are you taking me, if your [sic] taking me back there, I'll kill you Sam, I swear I'll kill you," and pointed the gun at her again. *Id.*  In the days following, Pursley told Crabtree that if the police caught him, and she said anything to them about what happened, he would come back or have somebody kill her and her two children. *Id.* at 002967.

     **RESPONSE: Denied because this statement relies on hearsay without exception as to Samantha Crabtree's statements. Denied to the extent the statement indicates that Crabtree wrote her statement; Schmidt typed it, Ex. 11 (Schmidt Dep.) 210:20-22, and Crabtree agreed to sign it under duress,** *see* **PSOF 8-40; Ex. 21 (Clark Report) at 27-31 (Crabtree's statements bear the hallmarks of coercion).**

Also denied because Crabtree's statement was false and coerced. *See generally,* PPSOF 8-40. Schmidt and Forrester told her that she knew what they wanted to hear, and that they wanted her to help "nail Patrick." Ex. 25 (Crabtree Affidavit); Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 423:7-20. Crabtree averred that Defendants Schmidt and Forrester used "abusive methods of questioning and coercion," and that she was "physically, emotionally and mentally unable to defend and assert [herself] against the unfair tactics…." Ex. 25 (Crabtree Affidavit) at Pursley 014249. Crabtree averred that her children were used as a device to influence her statement. Ex. 25 (Crabtree Affidavit). Schmidt and Schmidt and Forrester told her that her children would be taken from her and by the time she got out of prison, they "will have forgotten who you are." Ex. 25 (Crabtree Affidavit) at Pursley 014249. Crabtree was suffering emotionally not only because of her pregnancy and the pressure Defendants Schmidt and Forrester were putting on her, but because she feared legal action against her. Ex. 25 (Crabtree Affidavit) at Pursley 014251. She felt like they were wording everything to suit their own needs. Ex. 25 (Crabtree Affidavit) at Pursley 014251. For instance, when she couldn't remember things that they had discussed, they refreshed her recollection with times, sequences of events, and quotes, and she merely agreed. Ex. 25 (Crabtree Affidavit) at Pursley 014251. Defendants Schmidt and Forrester told Crabtree that if she signed the statements, she could go home. Ex. 25 (Crabtree Affidavit) at Pursley 014251-014252. Additionally, Defendant Schmidt provided facts appearing in the statement. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 445:3-446:10; Ex. 18 (Crabtree 1994 Test., Day 1) at 364:19-365:23. Crabtree averred that once she came to understand what her statement would be used for, she became filled with regret and remorse that they would be used to

accuse "a man that I know was not connected" to the murder. Ex. 25 (Crabtree Affidavit) at Pursley 014252.

**Denied specifically as to sentences two and three because Samantha and Pursley were not part of the Ascher homicide.** *See e.g.,* **Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 416:2-14 (stating that Crabtree and Pursley were at home on the evening of April 2, 1993 when the Ascher homicide happened).**

**Denied as to the fourth through sixth sentences; these threats were fabricated. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 445:3-446:10, 458:23-459:14. Crabtree told detectives what they wanted to hear. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 423:7-20. Also denied because the Taurus was determined to be inconsistent with the bullets and casings found at the Ascher murder scene. PSOF 123-131. Denied as to the last statement because Crabtree stated in her August 6, 1993 affidavit that Patrick never threatened her or her children. Ex. 25 (Crabtree Affidavit) at Pursley 014257.**

49.     Beginning at 11:37 PM on June 10, 1993, Detective Schmidt began the process of taking a written Statement from Samantha Crabtree about the bank robbery. (Ex. 13 at 000117; Ex. 15, Samantha Crabtree's June 10, 1993 Statement to police regarding bank robbery).  Once completed, Crabtree read it, Detective Forrester asked her if it was correct, she said that it was, and she signed page 1 at 1:20 AM, page 2 at 1:23 AM, page 3 at 1:25 AM, and page 4 at 1:28 AM. (Ex. 13 at 000117); (Ex. 15).  Samantha Crabtree's second written statement indicates in relevant part that she helped Pursley rob the First Bank North bank by serving as his getaway driver. *Id.*

**RESPONSE: Denied because this statement relies on hearsay without exception as to Samantha Crabtree's statements. Also denied because Crabtree's statement was false and**

38

coerced. *See generally,* **PSOF 8-40; Ex. 21 (Clark Report) at 27-31 (Crabtree's statements bear the hallmarks of coercion); P. Resp. to DSOF 48.**

50.    Beginning at 1:30 AM on June 11, 1993, Detective Forrester began the process of taking a third written Statement from Samantha Crabtree about the Burger King armed robbery. (Ex. 13 at 000118; Ex. 16, Samantha Crabtree's June 11, 1993 Statement to police re Burger King robbery).  Once completed, Crabtree read it, Officer Schmidt asked her if it was correct, she said that it was, and she signed it at 1:51 AM. (Ex. 13 at 000118); (Ex. 16).  Samantha Crabtree's third written Statement indicates in relevant part that Pursley admitted to robbing the Burger King on Riverside on April 15, 1993. *Id.*

**RESPONSE: Denied because this statement relies on hearsay without exception as to Samantha Crabtree's statements. Denied that Samantha and Pursley robbed the burger king. Ex. 32 (1993.4.15 Latham Report) at Schmidt 59 (witnesses described the Burger King robber as white and male); see also PSOF 8-40; Ex. 21 (Clark Report) at 27-31 (Crabtree's statements bear the hallmarks of coercion); P. Resp. to DSOF 48.**

51.    Samantha Crabtree was charged with the armed robbery of the First Bank North bank, and Pursley was charged with the first-degree murder of Andrew Ascher.  (Ex. 13 at 000118). Crabtree subsequently testified before a Grand Jury on June 23, 1993. (Ex. 36). She testified that on the night Ascher was murdered, she drove Pursley to the area where Ascher was murdered for purposes of finding a home to break into, Pursley got out of the car for a minute or two, during which time she heard two gunshots. *Id.* She testified that Pursley then got back into the car with a 9mm handgun still in his hand, and they drove off together. *Id.* She testified that the day after the murder, she asked Pursley if he knew who it was that he shot, and he told her "no." She also testified that, later that day, she and Pursley saw the news about the murder, at which time Pursley

told her that if she told anyone, he would know and that he would have her and her children killed.
*Id.*

**RESPONSE: Undisputed as to the first sentence. Undisputed that sentences two, four and five were in Crabtree's grand jury testimony. Denied as to sentence three because in her grand jury testimony Samantha Crabtree specified that Pursley had *her 9mm Taurus* in hand when he returned to the car. Ex. 103 (Crabtree Grand Jury Testimony) at RFD Defendants 5240-41. Denied as to the underlying truth of these statements. Samantha and Patrick were home on the night of April 2, 1993 when the Ascher murders happened, Ex. 18 (Crabtree 1994 Test., Day 1) at 356:23-357:6, and she was coerced into making this statement, *see* PSOF 8-40; P. Resp. to DSOF 48. Denied because this statement relies on inadmissible hearsay.**

**G. Thomas "Tramp" McCoy**

52.     On June 14, 1993, Detectives Forrester and Scott interviewed Thomas "Tramp" McCoy in relation to the shooting at 609 Woodlawn at Robert Poe's residence. (Ex. 17, Detective Forrester's June 16, 1993 Report regarding McCoy interview).  McCoy told the police that he was present at Robert Poe's house on June 8, 1993, when Pursley came over to recover some stolen drugs, at which time McCoy observed Pursley threaten to blow the kneecaps off Poe, heard Pursley fire his weapon in Poe's house, and was told by Pursley that Pursley had "killed someone before." (Ex. 17).

**RESPONSE: Denied because this statement relies on hearsay without exception and double-hearsay. The State did not call Mr. McCoy to testify at either of Pursley's trials for the Ascher murder and so he has never given sworn testimony subject to cross-examination and Defendants have not been able to locate Mr. McCoy to provide testimony in this case,**

nor disclosed current contact information for Mr. McCoy during the time allowed for discovery.

Plaintiff objects because this statement is immaterial. The State did not call Mr. Poe to testify at Pursley's 1994 murder trial, and RPD did not rely on Poe's statement during their investigation into the Ascher homicide, so it did not form the basis for Pursley's arrest, and is therefore irrelevant to this case. *See, e.g., Akbar v. City of Chicago*, No. 06 C 3685, 2008 WL 5272463, at *3 (N.D. Ill. Dec. 12, 2008) ([P]robable cause to believe an individual committed one crime…does not foreclose a malicious prosecution claim for additional prosecuting the individual on a separate charge.") (citing *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)); *Roldan v. Town of Cicero*, No. 17-CV-3707, 2019 Wl 1382101, at *4 (N.D. Ill. Mar. 27, 2019); *Zolicoffer v. City of Chicago*, No. cc V 6362, 2013 WL 2598151, at *5 (N.D. Ill. June 11, 2013).

Also denied because the evidence technician sent to the scene reported that he could not locate any casings or bullet fragments. Ex. 101 (1993.6.9 609 Woodlawn Report) at 124.

H.  **Pursley's arrest**

53.  At approximately 3:30 AM on June 16, 1993, an unidentified caller informed the police that Pursley was in the Fairgrounds housing projects hiding from police in an abandoned house, and that he may have a sawed-off shotgun.  (Ex. 39, Officer Ron Gallardo Dep., 11:1-13:20; Ex. 18, June 16, 1993 Police report by Sgt. Gibbons regarding Pursley arrest).  Around 4:00 AM, Pursley was located hiding under a wheelchair ramp affixed to an abandoned house in the area described by the anonymous caller and taken into custody. (*Id*; Ex. 19 June 16, 1993 Police report by Officer Gulley regarding Pursley arrest).

**RESPONSE: Undisputed, but Plaintiff clarifies that the caller specified that Pursley did not have any ammunition and Pursley was not found with a sawed-off shotgun when he was arrested. See Ex. 19 (June 18, 1993 Forrester Report) at 13; Ex. 104 (Supplement Report 6.16.1993 Gibbons) at 3.**

54.     Pursley was interviewed by detectives Forrester and Hanson at 6:20 AM on June 16, 1993.  (Ex. 40, Detective Greg Hanson Dep, 168:9-170:22; Ex. 13 at 000119-120).  During his interview, Pursley did not offer any alibis supportive of his innocence, though he denied any involvement in the Ascher murder, the bank robbery, and the Burger King robbery. (*Id*.; see also Ex. 21, Pursley Dep. at 63:22-64:24; 83:17-84:7).  Pursley was turned over to the jail at 8:00 AM. (Ex. 13 at 000119-120).  Pursley was not coerced, threatened, or abused in any way, nor deprived of any of his rights during his interrogation. (Ex. 21, Pursley Dep. at 135:1-138:1).

**RESPONSE: Denied. Pursley repeatedly asked for his lawyer during his interrogation. Ex. 1 (Pursley Dep.) at 64:4-19. Pursley's hands and legs were cuffed during the encounter. See 19 (June 18, 1993 Forrester Report) at 13. Further denied because the cited portion of Pursley's deposition does not even address his interrogation by police on June 16, 1993, much less support any finding that he was not coerced, threatened, or abused during it. See Ex. 1 (Pursley's Dep.) 135:1-138:1.**

I.     **Samantha Crabtree's release**

55.     After she was released, Detective Forrester met with Samantha Crabtree on August 5, 1993, at the Detective Division to facilitate returning her car to her. (Ex. 20, August 9, 1993 Forrester Report re Crabtree). During their meeting, Crabtree recounted an incident in February 1993, when she and Pursley had gotten into a dispute over his ongoing use of crack cocaine. *Id*. at 267-269. On the night in question, she took his cocaine and cash, and left with it, spending the

night away from Pursley in a hotel. *Id*. Upon her return the next morning without the cocaine, Pursley started beating her with his fists. *Id.* At one point, she turned to leave and she heard a "click." *Id*. She turned to see Pursley standing there with her gun in his hand pointed at her. *Id*. She had emptied its ammunition before bringing it into their residence that morning. *Id*. At one point when he was beating her, she fell to the ground and he began kicking her. *Id.*

**RESPONSE: Undisputed that this is what Forrester's August 9, 1993 report says. Denied as to the underlying facts about Crabtree's February 1993 injuries. The police report from Samantha's February 1993 injuries state that her sister's boyfriend beat her and caused these injuries. Ex. 106 (1993.2.22 Crabtree Battery Report).**

56.     On August 5, 1993, Samantha Crabtree told Detective Forrester that Pursley beat her so badly that day in February that she needed to go to the hospital. *Id*. As a result of the beating, she suffered from a concussion, two black eyes, her mouth was swollen, and she was stiff and sore all over. *Id*. She also needed an emergency appendectomy two weeks after the beating. *Id*. Crabtree told Detective Forrester that she lied to hospital staff and said that her sister's boyfriend beat her up rather than admit to the hospital that it was Pursley who did. *Id*.

**RESPONSE: Denied. The police report from Samantha's February 1993 injuries state that her sister's boyfriend beat her and caused these injuries. Ex. 106 (1993.2.22 Crabtree Battery Report).**

57.     Samantha Crabtree also told Detective Forrester on August 5, 1993 that, since her release, she had visited Pursley in jail, and that "he is mad at her for talking." *Id*.

**RESPONSE: Undisputed that Pursley told Crabtree he was mad that she told the police he was involved in the murder but denying that Crabtree interpreted this as a threat. See Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 481:18-482:2**

**J.** **Pursley's Deposition**

58. Patrick Pursley was deposed in this case on December 9, 2020. (Dec. 9, 2020 Patrick Pursley deposition transcript Ex. 21). During his deposition, he invoked his Fifth Amendment Right against self-incrimination and refused to answer questions regarding the following topics:

a. Whether Pursley and Lester "Latee" Brown committed crimes together (Ex. 21 at 36:12-37:4);

b. Whether Pursley and Marvin Windham committed crimes together (Ex. 21 at 37:7-11);

c. Whether Pursley and Samantha Crabtree committed crimes together (Ex. 21 at 37:12-16);

d. Whether he robbed the First Bank North bank with Samantha Crabtree in 1993 (Ex. 21 at 70:22-71:3; 71:4-72:15; 150:2-18);

e. Whether he used illegal drugs including crack cocaine in 1993 (Ex. 21 at 74:11-20) and whether he uses marijuana and other illicit substances (Ex. 21 at 140:6-10);

f. Whether he knew Robert Poe and Thomas "Tramp" McCoy in 1993 (Ex. 21 at 77:21-78:6);

g. Whether he threatened Robert Poe with two handguns and shot out his TV on June 8, 1993 (Ex. 21 at 79:1-8);

h. Whether he was a member of the Gangster Disciples (Ex. 21 at 100:2-10);

i. Whether he ever used Samantha Crabtree's Taurus handgun (Ex. 21 at 57:8-10); and

j. Whether he had a disagreement with Samantha Crabtree about his use of crack cocaine in February of 1993 (Ex. 21 at 157:21-158:2).

(Ex. 21, Patrick Pursley deposition transcript).

**RESPONSE: Undisputed that Mr. Pursley gave this testimony, but Pursley objects that all of these topics are irrelevant to the claims or defenses at issue in this case.**

59.     Pursley testified that he lacks knowledge of any evidence in support of the following allegations in the Complaint:

   a.  That the defendant police officers fabricated evidence against him (Ex. 21 at 43:7-48:9);

   b.  That the defendant police officers planted or fabricated evidence recovered during the search of Pursley's residence on June 10, 1993, including the Taurus handgun (Ex. 21 at 76:5-77:8);

   c.  That the defendant police officers knew that Samantha Crabtree's Statement was in any way false (Ex. 21 at 6:22-118:20; 121:22-122:4);

   d.  That defendant police officers Schmidt and/or Forrester fabricated or coerced Samantha Crabtree's Statement (Ex. 21 at 23:6-21; 116:22-121:14);

   e.  That any of the defendant police officers conspired with the defendant forensic scientists for purposes of fabricating and/or withholding evidence (Ex. 21 at 125:22-126:17; 130:21-131:2);

   f.  That the defendant police officers knew that the Taurus handgun was not truly the murder weapon, but entered it into evidence as the murder weapon anyway (Ex. 21 at 127:20-128:7);

   g.  That the defendant police officers withheld any evidence relevant to the Ascher murder investigation (Ex. 21 at 136:3-8);

   h.  That any of the defendant police officers conspired amongst themselves, or with anyone else, in an effort to wrongfully convict Pursley, deprive Pursley of his civil rights, intentionally inflict emotional distress upon Pursley, or commit any other act of wrongdoing (Ex. 21 at 136:9-19);

   i.  That any of the defendant police officers knew of any wrongdoing by any other defendant in this case, but failed to intervene and prevent that wrongdoing (Ex. 21 at 136:20-137:6);

   j.  That any of the defendant police officers knew Pursley was innocent of the Ascher murder, but intentionally sought to wrongfully convict him anyway (Ex. 21 at 137:8-17);

   k.  That any of the defendant police officers did not actually believe he was the one who killed Andrew Ascher (Ex. 21 at 137:18-23); and

   l.  That there was a lack of probable cause in support of his arrest (Ex. 21 at 80:20-83:12).

(Ex. 21, Patrick Pursley deposition transcript).

**RESPONSE: Disputed because these citations do not support this factual assertion and because they inaccurately characterize the record and rely on legal conclusions from the plaintiff, who is not a lawyer. Further, object that this SOF violates Local Rule 56.1(a)(3). A Local Rule 56.1 statement of material fact must not contain legal conclusions and it must contain only material statements. *See, e.g., Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). These questions called for legal conclusions, and Pursley's inability to recite facts that support the legal elements of a due process violation is immaterial, as he is not a lawyer and lacks the foundation to respond. Mr. Pursley's personal knowledge on ultimate legal issues is neither admissible nor material. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018), *opinion clarified*, No. 12-CV-04428, 2018 WL 11469072 (N.D. Ill. May 17, 2018). Many of the questions related to interrogations or actions that Pursley did not observe and thus he lacks personal knowledge. This Court should disregard this SOF.**

**K.     Samantha Crabtree pled guilty to bank robbery; takes Fifth as to other matters**

60.     On October 27, 1994, Samantha Crabtree pled guilty to having robbed the First Bank North bank with Patrick Pursley in 1993. (Ex. 22, Crabtree Dep. at 11:7-9; 62:12-63:6); (Ex. 23, Oct. 27, 1994 Samantha Crabtree guilty plea).   She was subsequently sentenced and incarcerated from roughly 1995-1997. (Ex. 22 at 112:22-113:5).

**RESPONSE: Undisputed as to the substance of DSOF 60, but disputed as to the heading before DSOF 60. On October 27, 1994, Crabtree entered guilty pleas for robbery based on "a series of Crime Stopper tips and investigation" and for perjury based on giving trial testimony that recanted her testimony implicating Pursley in the Ascher homicide at**

the grand jury hearing. Ex. 107 (Oct. 27, 1994 Samantha Crabtree guilty plea) at 5:22-7:3.

**Crabtree invoked her fifth amendment right at Pursley's retrial and in this civil case. Ex.**

**108 (Crabtree 2019 Testimony). At Pursley's second trial, Crabtree's attorney explained that**

**she was asserting her Fifth Amendment rights because of her prior conviction for perjury.**

**Ex. 108 (Crabtree 2019 Testimony) at 147:9-149:4, 152:6-12. The State declined to extend**

**Ms. Crabtree immunity for her testimony. Ex. 108 (Crabtree 2019 Testimony) at 147:9-**

**149:4.**

61.     Samantha Crabtree was deposed in this case on September 23, 2020. (Sept. 23,

2020 Samantha Crabtree deposition transcript, Ex. 22).  During her deposition, she invoked her

Fifth Amendment Right against self-incrimination and refused to answer questions regarding the

following topics:

a.  Her and Pursley's role in the murder of Andrew Ascher, and their whereabouts on April 2, 1993 (Ex. 22 at 83:19-84:2; 93:13-94:6; 102:9-12; 106:7-16);

b.  Her and Pursley's role in robbing the First Bank North bank in 1993 (Ex. 22 at 62:12-63:10; 72:12-74:16);

c.  Pursley's role in robbing the Burger King in 1993 (Ex. 22 at 101:19-102:7);

d.  Whether she is taking the Fifth because she is afraid that Pursley might harm her or her children if she testified (Ex. 22 at 57:5-14), whether Pursley physically abused her (Ex. 22 at 63:11-70:22), and whether Pursley threatened her and her children (Ex. 22 at 104:2-7; 59:21-24);

e.  Whether she owned a Taurus handgun in 1993 (Ex. 22 at 72:2-9);

f.  Whether Pursley asked her to have a gun worked on to make it untraceable (Ex. 22 at 103:6-11);

g.  Whether she knows of Lester "Latee" Brown (Ex. 22 at 76:24-77:2);

h.  Whether she knows of Olen Bell (Ex. 22 at 81:1-14);

i.  Whether she knows of Marvin Windham (Ex. 22 at 74:18-20), and whether Pursley ever asked her to help Pursley, Lester Brown, and/or Olen Bell retaliate

against Windham for implicating Pursley in the Ascher murder (Ex. 22 at 105:4-22); and

j. Her interrogation by the police, what she told the police about Pursley's role in the Ascher homicide, and whether allegations of police coercion were false. (Ex. 22 at 58:21-60:10; 96:11-101:17).

**RESPONSE: Undisputed that Crabtree took the fifth as to these topics in her September 23, 2020 deposition after she had been convicted of perjury on October 27, 1994, *see* Ex. 107 (Oct. 27, 1994 Samantha Crabtree Guilty Plea) at 6:8-7:3, subject to the clarification that she also invoked the fifth when asked whether she lied during her grand jury testimony. Ex. 109 (Crabtree Dep. 9/23/20) at 27:2-35:3. Denied to the extent this indicates in sections (a) and (d) that Crabtree and Pursley had any role in the Ascher homicide or that Pursley threatened her or her children. Crabtree testified in 1994 that Pursley did not threaten her after he learned she had given a statement against him for the Ascher homicide. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 481:18-482:2; *see* also PSOF 8-40; P's Resp. to DSOF 48.**

L.     **Defendant officers disclaim any involvement in alleged wrongdoing**

62.     Unlike Crabtree and Pursley, none of the defendant officers have invoked the Fifth Amendment in this case. Rather, they have provided sworn Declarations attesting to the facts that: (1) they did not engage in fabrication or withholding of evidence in the Ascher case; (2) they did not conspire with any other officer, forensic scientist, or other individual for purposes of depriving Pursley of his civil rights or depriving him of a fair trial; (3) they subjectively believed that there was probable cause for Pursley's arrest and prosecution, and have at all times relevant believed that Pursley murdered Andrew Ascher; (4) they believe that the Statement Samantha Crabtree gave to the police implicating Pursley in the murder was true; (5) they did not participate in or observe

any coercion of Samantha Crabtree, such as physical abuse, threats, intimidation, punishment, deprivation of food, drinks, cigarettes, or sleep, needlessly prolonging her interrogation, or deceiving her; (6) they were not aware of any of the alleged wrongdoing by any of the codefendants; (7) they had no desire to intentionally inflict emotional distress upon Pursley, but were motivated solely by a desire to uncover the truth and see that justice was done; and (8) they are not aware of any false statements made in support of Pursley's arrest or detention. (Ex. 24-33); *see also* Ex. 34, Schmidt Dep. Trans. at 279:2-285:23. Exhibits 24-33 consist of Declarations from all of the police officer defendants whether they are still in the case or not, other than those who are deceased (namely Detectives Forrester, Reffett, Ekedahl, and Barton).

**RESPONSE: Plaintiff disputes the underlying facts related to each point. For point 1, Plaintiff has presented facts supporting a finding of fabrication. *See* PSOF 90-112, 128-130 . For point 2, Plaintiff has presented facts supporting a finding of conspiracy. *See* PSOF 66-90, 116-122, 132. Point 3 is denied. *See e.g.*, Ex. 69 (1993.04.03 Report) at RFD Defense 65-66 (City of Rockford police officer believed Vantele Turner may have committed Ascher homicide). For points 4 and 5, Samantha Crabtree's statements to police were not truthful and there is evidence supporting a finding that Defendants knew her statements were being coerced. *See* PSOF 8-40; Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 444:13-23. Crabtree was intimidated by Defendants Schmidt and Forrester. Ex. 6 (Crabtree 1994 Test., Day 2) at 412:7-22; *e.g.,* PSOF 18; *see generally* PSOF 8-40. For point 6, Plaintiff has presented evidence that the RPD defendants knew that the match of the Taurus was false. PSOF 90-112, 125-131. For point 7, Plaintiff incorporates all of his facts regarding other constitutional and state-law torts. For point 8, Pursley's arrest rested on false statements including those of Marvin Windham and Samantha Crabtree. *See* PSOF 8-40; PSOF 41-55.**

63.     There is no evidence that James Barton committed any of the wrongdoing plaintiff has complained of in his complaint. (Ex. 21, Patrick Pursley deposition transcript at 43:7-48:9; 76:5-77:8; 116:22-118:20; 121:22-122:4; 125:22-126:17; 130:21-131:2; 127:20-128:7; 136:3-8; 136:9-19; 136:20-137:6; 137:8-17; 137:18-23; & 80:20-83:12).

**RESPONSE: Disputed but immaterial. James Barton is not a defendant. *See* ECF Nos. 279, 280.**

64.     Defendant Mark Schmidt participated in the interrogation of Samantha Crabtree and assisted in taking her written Statements on June 10-11, 1993. (Ex. 34, Schmidt Dep. Trans. at 134:7-255:10). Schmidt testified that Detective Forrester's report (Ex. 13 hereto) covered the investigative activities undertaken by Schmidt and Forrester on June 10, 1993 from the point of picking up Crabtree onward. *Id*. at 157:13-158:6. He testified that Forrester's report fairly and accurately summarizes the detectives' interactions with Crabtree during her June 10-11, 1993 interrogation. *Id*. at 279:2-8. Schmidt testified that Crabtree volunteered to leave her kids with family to go with the police that day, consented to the search of her car and residence, and voluntarily agreed to answer their questions down at the Public Safety Building ("PSB"). *Id*. at 134:7-140:10. Her demeanor was described by Schmidt as "fine" during the ride to the PSB with the police. *Id*. at 139:5-9.

**RESPONSE: The first sentence is denied because Schmidt typed the statements that were attributed to Crabtree and "the details that were typed in there were not all given from [Crabtree]." Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 445:3-446:10. She also testified that her statement was "basically" the Defendants' typed statement of what they said happened. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 434:6-15. The fourth sentence is denied; Crabtree did not volunteer to go to the station. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 438:19-**

**439:13. Ms. Crabtree testified at trial that as soon as the police approached her on the steps on June 10, 1993, she was afraid that something could happen to her children. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 438:19-439:13. She told the police that she did not have anyone to watch her children but the police asked the people around her if they could watch her children. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 438:19-439:13. The fifth sentence is denied; Crabtree was upset and crying during "the whole time" she was detained by police. Ex. 6 (Crabtree 1994 Test., Day 2), at 442:1-6, 463:1-5.**

65.     Samantha Crabtree arrived at the PSB at 3:15 PM on June 10, 1993. *Id.* at 151:20-24-152:10. Once placed in an interview room at the PSB, her demeanor continued to be "fine." *Id.* at 152:23-153:2. She was allowed to use the restroom anytime she wanted to while at the PSB. *Id.* at 153:3-7. Schmidt was in the interview room with Crabtree and Detective Forrester the entire time from 3:15 PM until 5:00 PM, taking down general information from Crabtree. *Id.* at 155:7-24; 179:2-13. During that time, Crabtree was repeatedly offered food, which she refused, along with cigarettes, two cans of pop and some water, which she consumed. *Id.* at 160:14-22; 192:24-193:16. She did not say anything about her children during this time. *Id.* at 160:23-161:4.

**RESPONSE: Object that this statement of fact violates Local Rule 56.1 in that it contains six separate facts, some of which are hotly disputed. *See Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("It is inappropriate to confuse the issues by alleging multiple facts in a single paragraph in hopes of one's opponent missing one."). As for the substance, Sentence one is undisputed for sentence one. For sentence two: undisputed that Crabtree was placed in the interview room, but denied that she was "fine." Crabtree was upset and crying during "the whole time" she was detained by police. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 442:1-6, 463:1-5. When she arrived at the PSB interrogation room she was "a**

mess," "scared," and "upset." Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 413:8-11. Sentences three and four are undisputed, but irrelevant, because Crabtree still felt threatened and intimidated. *See, e.g.,* PSOF 16-19, 22-23; *see generally* PSOF 8-40. Sentence five is denied as Crabtree was throwing up while she was detained. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 413:24-414:3; 446:24-447:3; PSOF 19. Because of her pregnancy, she was unable to eat. Ex. 25 (Crabtree Affidavit) at Pursley 014250; PSOF 19. Sentence six is denied. From the beginning of when he questioned her, Detective Forrester would, "say you know you are in trouble don't you and I would say yes I know. And he would say you know you have 3 young children. I said yes I do and I would start crying. And he would say do you want to see your children again. And I said yes I do. And he said well we can make it very easy or we can make this very hard. He said I can make it so you don't see your children until they are 40 but he said if you cooperate with me and you help me then we can help you." Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 415:1-16. Schmidt and Forrester threatened to take her children away, from the very beginning of her interrogation. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 438:4-18. *See also* Ex. 25 (Crabtree Affidavit) at  Pursley 014249-014250; *see generally* PSOF 16, 17; Resp. to DSOF 48.

66.     From 5:00 to 5:20, Detectives Schmidt and Forrester stepped out of the room that Samantha Crabtree was in to discuss the information she had provided to that point, which they felt was less than complete and failed to reveal her role in the suspected crimes. *Id*. 179:2-185:5. Detectives Schmidt and Forrester returned to the room and Mirandized Crabtree, had her sign a waiver of rights form, and confirmed with her that she understood her rights. *Id*.  Crabtree signed the waiver of rights form at 5:23 PM.  (Ex. 13 at 000115); (Ex. 35, signed Advice of Rights forms).

**RESPONSE: Undisputed that this was Detective Schmidt's 2020 testimony. Denied as to the underlying facts as Crabtree was crying the entire time. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 441:20-442:6.**

67. Detectives Schmidt and Forrester subsequently told Samantha Crabtree that they did not believe she was telling the entire truth and asked her to be completely honest with them. (Ex. 34, Schmidt Dep. Trans. at 187:24-188:11). Her demeanor continued to be "fine" at this point. *Id*.

**RESPONSE: Undisputed that Defendants Schmidt and Forrester told Crabtree that they did not believe she was telling the truth, but disputed that her demeanor was "fine." She was not fine. Crabtree was physically and emotionally distraught, and was suffering emotionally. Ex. 25 (Crabtree Affidavit) at Pursley 014250; Ex. 6 (Crabtree 1994 Trial Test., Day 2)) at 442:1-6, 463:1-5. Schmidt and Forrester threatened to send her to prison and separate her from her children. Ex. 25 (Crabtree Affidavit) at Pursley 014249. She felt pressure to tell them the information they wanted, and was unable to resist Schmidt and Forrester's unfair tactics. Ex. 25 (Crabtree Affidavit) at Pursley 014251.**

68. Detective Schmidt was asked "was there ever any moment when she [Crabtree] started to cry?" and he answered:

> There were times when she cried. Those were times when she would tell us about Patrick Pursley threatening to kill her and her two kids. Then she would cry. She was afraid of him and afraid of what he's going to do. She kept saying that "If I -- you know, Patrick told me if I tell on him, like I am now, he's going to kill me or have somebody kill me and my two kids." She says he'd never kill her baby, Marcus, who was mixed; but her and the other two kids [who were white], he'd have no problem killing.

*Id.* at 188:12-24.

**RESPONSE: Undisputed that this was Defendant Schmidt's testimony at his deposition on January 23, 2020. Denied as to the substance of this testimony. Crabtree was visibly upset during the entire time she was held by police even when she was not discussing Patrick including when she was at the identification unit. See Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 444:8-24, 463:1-5. Crabtree cried almost the entire time she was detained by police for questioning in the Ascher homicide investigation. Ex. 25 (Crabtree Affidavit) at Pursley 014250.**

69.     Detective Schmidt was asked whether Samantha Crabtree expressed any concern for her children after she was Mirandized and the police began an accusatory phase of the interrogation. *Id*. at 193:22-194:10.  He testified that:

> A: There was times where -- when she's given the account of what was happening, she would say, "They're going to take my kids away."
>
> Q: She would say that?
>
> A: She said that.
>
> Q: And what was Detective Forrester's response to that?
>
> A: Said it wasn't up to us, you know; totally be up to whatever the state's attorney decided, you know, when they reviewed this.

*Id.* at 194:1-10. Schmidt was present for the whole time of the accusatory phase of the interrogation, other than perhaps stepping out to get her a pop or cigarettes. *Id.* at 194:11-21.

**RESPONSE: Undisputed that this was Schmidt's testimony at his deposition. Undisputed that Samantha was concerned about her children. Denied that Forrester responded that it was not up to him whether Crabtree's children were taken from her; Forrester told her that he could make it so she didn't see her children until they were 40, but if she cooperated with him, then he could help. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at**

**415:1-16. Schmidt and Forrester threatened to take her children away, from the very beginning of her interrogation. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 438:4-18. Denied as to the truth of the last sentence as Crabtree testified, "Detective Schmidt was present at times in the room but he would get up and walk out every once in a while." Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 415:18-24. When her statements were being taken, only one Defendant was with her at a time. Ex. 25 (Crabtree Affidavit) at Pursley 014251.**

70.     The detectives never threatened to take Samantha Crabtree's children away, as established by Detective Schmidt's testimony as follows:

> Q: Did Detective Forrester ever say, during this time to Ms. Crabtree, "You know you're in trouble, don't you?" Would he -- could he have said that to her?
>
> A: I don't recall that. . . .
>
> Q: You don't recall it?
>
> A: I don't recall it.
>
> Q: And do you recall him saying, "You have three young children. Do you want to see them again?" Do you recall him –
>
> A: No.
>
> Q: -- saying that to her?
>
> A: He never said nothing like that, no, absolutely not. . . . it never happened. . . .
>
> Q: Did he ever say to Ms. Crabtree, "I can make it so you can't see your children again until they're 40"?
>
> A: No. . . .
>
> Q: Do you recall Detective Forrester saying anything about if Samantha went to prison for 40 years, that her children wouldn't even know her when she got out?

A: No. Samantha was very cooperative. Basically she was very cooperative. I mean, all these things didn't even take an hour to get an account of the bank robbery, the murder, stealing the car, the Burger King. I mean, we didn't – we were only talking to her for pretty close to an hour, I think. . . .

Q: Did Detective Forrester ever use the words, "I want you to help me nail Patrick"?

Did he ever use the --

A: No.

Q:  -- words "nail Patrick"?

A: No. . . .

Q: Did Detective Forrester ever say that -- to Sam Crabtree that she wasn't the type of person to get into trouble, and that what she'd gotten into wasn't her fault? So -- that he could help her; did he ever say that?

A: No. . . .

Q: -- . . . she had been crying during the interview, correct?

A: At times when she would give us an account of what had happened, and, again, it was when she would talk about Patrick is going to kill her for telling. She was really concerned about her and her kids, what Patrick is going to do because she told on him. It wasn't like she burst out bawling hysterically or nothing. She was just crying, you know. "And, well, you know, Patrick is going to kill me, you know, for -- he told me that he would kill me for doing this." . . . .

Q: When Sam expressed concerns about her kids being taken away, did you or Detective Forrester tell her that you could tell the state's attorney that she cooperated?

A: No.

Q: You didn't tell her that?

A: No.

Q: You didn't tell her it would weigh in her favor if she cooperated?

A: Did we tell her that?

Q: Yes.

A: No.

Q: Did you tell her that you would put in a good word for her?

A: No.

Q: Did either you or Detective Forrester at any time tell Ms. Crabtree that she could be charged with bank robbery for her participation?.
. .

A: No, we were just getting the facts and putting them down and getting her on a statement.

*Id.* at 199:7-24; 200:10-17; 201:8-18; 202:11-14; 205:14-19; 206:19-207:6; 220:4-221:8.

**RESPONSE: Undisputed that this was Schmidt's testimony at his deposition. Denied because Crabtree testified that Forrester repeatedly threatened that he could make it so that she would not see her children. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 415:1-16, 438:4-18; *see also* PSOF 8-40.**

71.    Detective Schmidt testified that Samantha Crabtree was not crying at any time when he took her statement from her about the Ascher murder. *Id*. at 245:3-15. According to that Statement, it was taken between 8:25 PM and 11:25 PM. (Ex. 14). At no point during her interrogation did Crabtree ask the detectives if she could check on her kids, or whether the police could check on her kids. (Ex. 34, Schmidt Dep. Trans. at 248:5-23).  Detective Schmidt testified that he did not recall raising his voice with Crabtree, and did not recall Detective Forrester doing so during her interrogation. *Id*. at 255:7-10.

**RESPONSE: Undisputed that Schmidt testified in his January 23, 2020 deposition that Crabtree was not crying when he took her statement but denied because she was crying. Ex. 6 (Crabtree 1994 Trial Test., Day 2), at 442:1-6, 463:1-5. Crabtree testified that she asked Forrester if she or the Defendants could check in on her children and he said, "I haven't seen**

my children in 3 days and you want me to feel sorry for you." Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 474:13-475:3.

72. Detective Schmidt testified that neither he nor Detective Forrester pressured Samantha Crabtree into giving her Statements, coerced her, promised her anything, threatened her, slammed their fists on the table, or suggested that her kids would be taken away if she refused to cooperate. *Id*. at 280:9-281:16. He described her as cooperative throughout her time with the detectives, and testified that she never asked for a lawyer or indicated she no longer wanted to talk to the detectives. *Id*. at 281:17-282:4.

**RESPONSE: Undisputed that Defendant Schmidt testified this way in his January 23, 2020 deposition. Denied as to the truth of these statements; Samantha felt intimidated and testified that Schmidt and Forrester threatened that her children would be taken away. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 412:7-22, 415:1-16, 438:4-18. Also denied because Samantha testified that the Defendants would yell at her during their questioning when she did not say what they wanted and stopped yelling when she did. Ex. 6 (Crabtree 1994 Trial Test., Day 2) at 473:22-474:9. Detective Schmidt testified that under the Rockford Police Department policies in 1993, officers were allowed to slam their fists on the table while conducting interrogations. Ex. 19 (Schmidt Dep.) at 66:24-67:9.**

**M. Firearms and Tool Mark Examinations**

73. A firearm and tool mark examiner is a professional whose job is to evaluate physical evidence, which is often collected in connection with the scene of a crime, including comparing test fired evidence from a particular firearm with ballistics evidence collected elsewhere. (Ex. 41, Murdock, 2016 Post Conviction Testimony, Pursley 006991:22-Pursley 006992:6).

**RESPONSE: Undisputed.**[2]

74.     Examining ballistics evidence to determine if there is an identification between crime scene and test fired evidence involves a subjective element based on the examiner's training and experience. (Ex. 42, Welty 1994 Trial Testimony, 286:20-23; Ex. 43, Boese 1994 Trial Testimony, 830:7-13; Ex. 44, Striupaitis Dep., 131:10-13; Ex. 45, Murdock Dep. at 187:17-19, 192:17-21; Ex. 46, Coleman Dep., 99:12-16).

**RESPONSE: Undisputed but clarify that the standard methodology that must be followed to conduct this examination was well-established in 1993 and is not subjective. Ex. Ex. 50 (Murdock Civil Report) at 7. PSOF 93, 96, 97, 98.**

75.     Examining ballistics evidence is not an exact empirical science. (Ex. 42, Welty 1994 Trial Testimony, 289:3-10). There are degrees of expertise in examining firearms evidence. (Ex. 43, Boese 1994 Trial Testimony, 838:22-839:2).

**RESPONSE: Undisputed that examining ballistics evidence is not an exact empirical science, but disputed to the extent that this sentence suggests that there are no objective elements to ballistics analysis. Ex. 55 (Murdock Sept. 2021 Dep.) at 187:20-191:1. In fact, RPD and ISP Defendants used a ballistics identification (among other evidence) to deprive Pursley of his liberty for 23 years.**

76.     There are three findings a firearm and tool mark examiner might make when comparing test fired evidence to crime scene evidence: (1) an identification or a match; (2) an elimination; or (3) an inconclusive finding, which means that there is insufficient information on the evidence that prevents a finding of an identification. (Ex. 43, Boese 1994 Trial Testimony,

---

[2] The parties use several different terms to refer to the ballistics evidence. For purposes of clarity, the evidence that was test fired from Pursley's Taurus is referred to as "tests" and "test fires." The ballistics evidence collected from the crime scene is called "suspect," "questioned," and "evidence."

834:9-835:1; Ex. 47, Noedel Dep., 63:24-64:5). Evidence may also be unsuitable for identification. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3198:12-23).

      **RESPONSE: Undisputed.**

      77.    An "inconclusive" finding is not an "exclusion" or elimination; inconclusive is a term used when an examiner can neither identify nor eliminate evidence as being fired from a particular firearm, but it does not prohibit either an identification or an elimination being made. (Ex. 41, Murdock 2016 Post Conviction Testimony, Pursley 007154:10-12; Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3199:1-21; RFD Defense 3253:13-16).

      **RESPONSE: Object that "prohibit" is undefined and ambiguous, and therefore deny. Deny further that this statement of fact is not supported by the citation.  Clarify that inconclusive is neither an exclusion *nor* an identification.**

      78.    Under Illinois State Police policies, a firearm can be eliminated as the source of crime scene ballistics evidence under two scenarios: (1) elimination based on class characteristics and (2) an "overwhelming difference in individualized detail." (Ex. 49, Patty 2016  Post Conviction Testimony, 77:13-18).

      **RESPONSE: Undisputed.**

      79.    An example of an elimination based on class characteristics is if the firearm has a caliber of 9 millimeters and a bullet with a different caliber or differing number or direction of lands and grooves. (Ex. 49, Patty 2016 Post Conviction Testimony, 77:19-24).

      **RESPONSE: Undisputed.**

      80.    An elimination based on individual characteristics is proper under Illinois State Police policies when there is an "overwhelming difference between individualized detail between the two items." (Ex. 49, Patty 2016 Post Conviction Testimony, 78:6-12).

**RESPONSE: Undisputed, subject to the clarification that "overwhelming difference" is a subjective determination based on the examiner's training and experience. Ex. 51 (Patty Dep.) 130:21-131:2.**

81.     All identifications and eliminations, if they are other than class characteristic eliminations, must be verified by another forensic examiner. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3195:9-18).

**RESPONSE: Undisputed, subject to the clarifications that (1) this citation establishes only that this *ISP's* practice, not necessarily a standard practice; and (2) the preferable form of verification is a blind verification. Ex. 51 (Patty Dep.) at 100:2-9.**

82.     Some aspects of firearms examination have changed since 1993; for instance, examiners in 1993 did not have the benefit of a comparison microscope that would magnify up to 120 power or the benefit of high resolution digital photography. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3307:5-11; RFD Defense 3308:1-4). In addition, standards in testimony changed sometime between 1994 and 2016. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3308:9-12).

**RESPONSE: Undisputed as to the fact that newer microscopes have higher magnifications, but immaterial. The fact that comparison microscopes could not magnify up to 120x in 1993 does not matter here, because John Murdock testified that even under a 15x-20x magnification, which was available in 1993, it was apparent that Pursley's Taurus did not fire the crime scene evidence,. Ex. 55 (Murdock Sept. 2021 Dep.) at 218:12-219:6, 223:18-225:18; Ex. 50 (Murdock Civil Report). Object that "standards in testimony" is undefined and ambiguous and therefore deny.**

**N.      Jack Welty's Preliminary Findings Regarding the Ballistics Evidence**

83.      At all relevant times, Jack Welty was employed with the Illinois State Police as an Assistant Laboratory Director at the Forensic Science Laboratory in Rockford, Illinois, where Welty's job duties included, among other things, performing examinations pertaining to firearm and tool mark evidence. (Ex. 42, Welty 1994 Trial Testimony, 242:11-23).

**RESPONSE: Undisputed.**

84.      At the time of Plaintiff's trial in 1994, Welty had been employed as a forensic scientist with the Illinois State Police for 19.5 years, of which he had spent eight years devoted exclusively to firearm and tool mark identification. (Ex. 42, Welty 1994 Trial Testimony, 245:17-24).

**RESPONSE: Undisputed.**

85.      As part of Welty's job responsibilities, he would occasionally be called upon to perform an "investigative look" at or preliminary review of ballistics evidence (e.g. cartridge casings and bullets) that local law enforcement outside of the Illinois State Police might bring to the ISP Lab in Rockford. (Ex. 42, Welty's 1994 Trial Testimony, 252:5-14; Ex. 50, Welty Dep., 56:19-60:3).

**RESPONSE: Disputed. First, Welty testified at his deposition that he could not recall a single other instance other than this case in which a detective contacted him and asked him to provide an opinion about what kind of gun fired the crime scene ballistics evidence. Ex. 41 (Welty Dep.) at 143:20-144:12. Second, the citations do not support this statement. While Welty testified that he would sometimes be asked to conduct an investigative look, he did not testify that he had ever performed an "investigative look" like the one he performed in this case. Furthermore, the detectives involved in this investigation did not believe they had ever**

**called upon an ISP analyst to perform a preliminary review like the one that was done in this investigation. Ex. 110 (Hanson Response to Plaintiff's Interrogatories 2) at 1; Ex. 111 (Schmidt Response to Plaintiff's Interrogatories 2), at 1; Ex. 86 (J. Bowman Answers to Plaintiff's Second Set of Interrogatories) at 1; Ex. 87 (J. Houde Answers to Plaintiff's Second Set of Interrogatories) at 1; Ex. 44 (Hanson Dep.) at 74:4-14 (Detective Hanson testifying this was "something that I certainly never did"), 72:5-21 (ISP analyst's results would always be submitted in a written report, not through a phone call); Ex. 12 (Genens Dep.) 105:17-06:11 ("Any time the state crime lab did something they put it in the form of a letter. It was in writing eventually.").**

86.     When a firearm and tool mark examiner reviews ballistics evidence to determine a list of possible firearms that could have fired a bullet or a cartridge case, a formal report is not necessary because the examiner is only offering a "preliminary finding." (Ex. 50, Welty Dep., 75:8-76:15).

**RESPONSE: Disputed. Welty testified that it would be best practice to provide the results of a "preliminary finding" like the one performed in this case in writing. Ex. 41 (Welty Dep.) at 77:7-78:13. Further, Welty testified at his deposition that he could not recall a single other instance other than this case in which a detective contacted him and asked him to provide an opinion about what kind of gun fired the crime scene ballistics evidence, so he would not be able to speak to whether a formal report would have been necessary. Ex. 41 (Welty Dep.) at 143:20-144:12.**

87.     On June 9, 1993 at around 2:00 p.m., Charlene Getty with the Rockford Police Department submitted four pieces of ballistics evidence (two cartridge casings and two bullets) to Welty at the ISP Lab in Rockford. (Ex. 50, Welty Dep., 136:9-17; Ex. 42, Welty 1994 Trial

Testimony, 253:17-22). After receiving the cartridge casings and bullets from Getty, Welty placed them in the firearms evidence vault. (Ex. 50, Welty Dep., 136:18-19).

**RESPONSE: Undisputed.**

88.     Later in the afternoon on June 9, 1993, Welty received a call from an investigator with the Rockford Police Department asking if Welty could look at the two cartridge casings and two bullets dropped off by Getty and provide the Rockford Police Investigator with possible firearms that could have fired the bullets and casings. (Ex. 50, Welty Dep., 136:19-137:10; Ex. 42, Welty's 1994 Trial Testimony, 254:23-255:2).

**RESPONSE: Disputed that this states the full conversation. Welty testified that it was his practice to memorialize the substance of the call on a conversation sheet, but that document does not exist anymore.  Ex. 41(Welty Dep.) at 150:15-18; PSOF 106, 108, 116-121. Stating further, Welty spoke with Defendant Forrester, Ex. 41 (Welty Dep.) at 240:3-20; Ex. 19 (Forrester Report) at RFD Defense 111.**

89.     Welty agreed to review the bullets and casings, and to offer possible firearms from which the evidence may have come from. (Ex. 50, Welty Dep., 137:11-14; Ex. 42, Welty 1994 Trial Testimony, 255:2-5). Welty conducted a preliminary review of the evidence and determined that the bullets and cartridge casings had a caliber of 9-millimeter, with the bullets containing six lands and grooves with a right twist. (Ex. 42, Welty 1994 Trial Testimony, 255:20-21, 256:12-14, 256:19-24; 258:14-259:9).

**RESPONSE: Undisputed.**

90.     Welty then compared the bullets and cartridge casings under a comparison microscope and found sufficient matching striations between them to make a preliminary finding

that both of the bullets provided to him by the Rockford Police Investigator were fired from the same gun. (Ex. 42, Welty 1994 Trial Testimony, 261:22-262:8).

**RESPONSE: Disputed that Welty concluded that the cartridge cases were fired from the same weapon. The cited testimony refers only to the bullets. Defs.' Ex. 42, Welty 1994 Trial Testimony, 261:22-262:8.**

91.     After making his preliminary findings under the microscope, Welty consulted a general rifling characteristics notebook, which included thousands of entries with regard to characteristics of firearms. (Ex. 42, Welty 1994 Trial Testimony, 262:17-24, 289:17-22). This notebook is prepared by the FBI. (Ex. 42, Welty 1994 Trial Test., 263:1-4).

**RESPONSE: Undisputed.**

92.     Based on a comparison between his preliminary findings and the information on rifling characteristics in the FBI's notebook, Welty concluded that the ballistics evidence provided to him by the Rockford Police Investigator could have been fired from one of three brands of firearms: (1) Taurus; (2) Beretta; or (3) Astra. (Ex. 50, Welty Dep., 138:19-22; Ex. 42, Welty 1994 Trial Testimony, 263:7-12).

**RESPONSE: Disputed. The FBI notebook identified more than three brands of firearm that could have fired the crime scene bullets. Defs.' Ex. 42 (Welty 1994 Trial Tr.) at 263:13-23.**

93.     Welty recognized that there may be other brands of firearms that fit within the characteristics that he found on the bullets and cartridge casings, but some of those firearms were rare and unusual, and therefore, from an investigative standpoint, Welty believed that it would be more helpful to identify what he would consider the more common and more logical brands that would have fired the bullets and cartridge casings. (Ex. 42, Welty's 1994 Trial Testimony, 263:13-23).

**RESPONSE: Disputed that "Welty believed that it would be more helpful to identify what he would consider the more common and more logical brands that would have fired the bullets and cartridge casings." PSOF 77, 79-80. Otherwise, undisputed.**

94.     After narrowing the possible firearms to a Taurus, Beretta, or an Astra, Welty noted that his review under the comparison microscope revealed that the firing pin impressions included a crater formation (which Welty described as a "mounding") right outside the firing pin impression itself. (Ex. 42, Welty's 1994 Trial Testimony, 264:11-265:1, 268:6-7, 292:24-295:6, 296:6-8).

**RESPONSE: Undisputed but clarify that the cited testimony explains that this was on the breech face, not the firing pin impression.**

95.     Welty recalled that, based on his years of experience with examining cartridge cases and working on two specific cases, he thought that the brand that fired the bullets and cartridge casings was likely a Taurus due to the visibility of the "mounding." (Ex. 42, Welty's Trial Testimony, 265:1-13; Ex. 50, Welty Dep., 191:8-193:20). The firing pin impressions and breach face of cartridge casings are the most important areas that allow examiners to make an identification. (Ex. 42, Welty's Trial Testimony, 266:17-21, 267:12-14).

**RESPONSE: Undisputed.**

96.     Nobody told Welty that they wanted any particular results with respect to the preliminary examination that Welty conducted on June 9, 1993. (Ex. 50, Welty Dep., 241:17-21).

**RESPONSE: Disputed. PSOF 75, 77-80.**

97.     After Welty concluded his preliminary examination, he relayed his conclusion to Detective Howard Forrester after receiving permission from his supervisor to do so. (Ex. 50, Welty Dep., 144:17-20, 147:17-148:4).

**RESPONSE: Undisputed. Stating further, Welty relayed his conclusion to Forrester after having the evidence for less than three hours. PSOF 75.**

98.     Aside from relaying his conclusions to Detective Howard Forrester on June 9, 1993, Welty did not speak with anyone else at the Rockford Police Department about Plaintiff's case. (Ex. 50, Welty Dep., 244:8-244:16). Pursley's claims against Welty are limited to Welty's involvement with this preliminary examination of the ballistics evidence. (Ex. 51, Pursley Resp. to Interrogatories of Jack Welty).

**RESPONSE: Denied. PSOF 116-118. Furthermore, deny that Plaintiff's claims against Welty are limited to the preliminary examination. Plaintiff's interrogatory response alleged that he acted "for the purpose of helping members of the Rockford Police Department frame Plaintiff." Ex. 113 (Pl. Resp. to Welty INT) at 2. Plaintiff has pled conspiracy against Welty. Ex. 114 (Second Amd. Compl.) at Counts I-VII. Further denying, Plaintiff has alleged that Welty conspired with RPD Detectives and with ISP Defendant Daniel Gunnell to fabricate a ballistics "match" that would link the crime-scene evidence to RPD's prime suspect, Patrick Pursley. Ex. 114 at ¶¶52-55 (alleging that the Defendant Forensic Scientists compared the test-fired bullets and cartridge casings from to the crime-scene evidence and, though the comparison revealed the absence of a match, they fabricated evidence "conclusively" linking the gun and "working in concert with the Defendant Officers who had investigated the case, the Defendants fabricated this key "link" between Plaintiff and the crime, and withheld evidence of this fabrication from the prosecution and defense.").**

99.     Starting on June 10, 1993, Welty was on vacation visiting Disney World with his family for two weeks. (Ex. 50, Welty Dep., 145:12-16, 146:2-9).

**RESPONSE: Undisputed.**

100. Welty did not speak with Dan Gunnell about the Patrick Pursley case. (Ex. 50, Welty Dep., 149:13-21).

**RESPONSE: Disputed.** *See* **PSOF 116.**

101. On June 11, 1993, the firearms evidence was transferred by Greg Hanson of the Rockford Police Department to the Illinois State Police Forensic Science Lab in Broadview, Illinois. (Ex. 44, Striupaitis Dep. Vol. II, 162:7-164:3).

**RESPONSE: Undisputed.**

O. **Dan Gunnell's Physical Examination of the Ballistics Evidence**

102. Dan Gunnell was a forensic scientist specializing in firearms and tool mark identification, who in 1993 was employed by Illinois State Police and was assigned to the suburban Chicago Forensic Science Lab in Broadview, Illinois. (Ex. 52, Gunnell 1994 Trial Testimony, 629:22-630:7). Gunnell was formerly on the Board of Directors and the President of the Association of Firearms and Tool marks Examiners, the professional organization for firearms examiners. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3183:14-RFD Defense 3184:3).

**RESPONSE: Undisputed but clarify that Gunnell did not serve on the Board of Directors or as President until decades after his work on this case. Ex. 58 (Gunnell 2016 Test.) at Pursley 007310-007311.**

103. In June 1993, Gunnell received several items of evidence that were described to him as relating to the Patrick Pursley case, including a Taurus 9 millimeter gun, two shell casings, two cartridge cases, and multiple spent bullets. (Ex. 52, Gunnell 1994 Trial Testimony, 639:15-640:10; 645:14-646:11; 646:23-647:5; 647:13-24; 650:9-651:20).

**RESPONSE: Undisputed.**

104.    After receiving this evidence, Gunnell began his investigation by looking at the fired evidence; this would include looking at the number of lands and grooves as well as the number of twists on the bullets. (Ex. 52, Gunnell 1994 Trial Testimony, 652:11-23). Before the microscopic testing, Gunnell also examined the gun, determined that the gun was operating properly, and checked the safeties. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3203:10-17).

**RESPONSE: Undisputed.**

105.    Gunnell would then put the fired bullets on a comparison microscope, which is essentially two individual microscopes joined by an optic bridge which allows an examiner to look at the left-hand stage and right-hand stage simultaneously, after which Gunnell would then compare both pieces of fired evidence to see if they had the same class characteristics, and would then examine the discharged cartridge cases to see if they had the same class characteristics. (Ex. 52, Gunnell 1994 Trial Testimony, 652:24-653:6).

**RESPONSE: Undisputed.**

106.    If the fired evidence had the same class characteristics as that of the submitted firearm, Gunnell would perform test firings with the firearm; the fired evidence in the Patrick Pursley case had the same class characteristics as the recovered Taurus 9mm firearm. (Ex. 52, Gunnell 1994 Trial Testimony, 653:11-15).

**RESPONSE: Undisputed.**

107.    Once Gunnell had determined that there were class characteristics in common between the firearm and the fired evidence, he then fired two tests and examined those casings and bullets test-to-test in order to see what reproduces both by class characteristic and individual characteristic from test-to-test. (Ex. 52, Gunnell 1994 Trial Testimony, 655:10-16).

**RESPONSE: Undisputed.**

108.    Gunnell performed a microscopic examination of the evidence both test-to-test and then test-to-evidence in this case. (Ex. 52, Gunnell 1994 Trial Testimony, 656:17-20). Gunnell was primarily looking first for breach [sic] face markings, then firing pin impressions, and, if necessary, ejector and extractor markings or chamber markings. (Ex. 52, Gunnell 1994 Trial Testimony, 657:3-6).

**RESPONSE: Undisputed.**

109.    Gunnell issued a report containing his conclusions on October 7, 1993. (Ex. 53, Gunnell October 7, 1993 Firearms Examination Report). Gunnell determined that the two cartridge cases submitted in June 1993 were fired from the Taurus 9 millimeter gun submitted with the evidence. (Ex. 53, Gunnell October 7, 1993 Firearms Examination Report).

**RESPONSE: Undisputed.**

110.    Gunnell testified in court that he found that "both of these two evidentiary discharged cartridge cases were, in fact, fired from those firearm to the exclusion of all other firearms." (Ex. 52, Gunnell 1994 Trial Testimony, 657:7-15). The phrase "to the exclusion of all other firearms" was the accepted verbiage to express an identification in 1993. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3227:18-RFD Defense 3228:9; Ex. 44, Striupaitis Dep. Vol. II, 264:15-265:6).

**RESPONSE: Undisputed. Clarify that "to the exclusion of all other firearms" is no longer accepted terminology and is not used, because it overstates the level of confidence in a match; to properly reach that conclusion, all other firearms in the world would have to be examined. Ex. 48 (DeMuth Dep.) at 148:5-149:6.**

111.    In his comparison between the test fire and the fired cartridge cases submitted to the lab, Gunnell would look at the microscopic stria that were present and also the impressions. (Ex. 52, Gunnell 1994 Trial Testimony, 657:20-658:12).

**RESPONSE: Undisputed.**

112.    It would be impossible for every single mark to match between the test fires and the fired evidence because everything changes slightly during time, such as use of the weapon, and also different metals, and therefore there are no such things as truly homogeneous pieces of metal. (Ex. 52, Gunnell 1994 Trial Testimony, 658:13-24).  The stria on the evidence bullets and the test fired bullets will never perfectly match in a comparison. (Ex. 52, Gunnell 1994 Trial Testimony, 660:8-16).

**RESPONSE: Undisputed that Gunnell so testified. Dispute that "everything changes slightly during time." Ex. 50 (Murdock Civil Report) at 5 (properly stored bullets will not degrade over time). Furthermore, clarify that while "every single" mark or stria need not be matched, markings in key areas including the breech face, firing pin impression, firing pin aperture bulge, and ejector, extractor, and magazine lip marks, must be sufficiently similar in order to support an identification. *Id.* at 6-8; PSOF 123-131.**

113.    Gunnell also examined the evidence bullets compared with the test fired bullets, examining the number of lands and grooves, the width of those lands and grooves, and the direction of the twist; next, he would start looking for the individual or unique characteristics within those lands and grooves, which appear as lines and are basically microscopic stria. (Ex. 52, Gunnell 1994 Trial Testimony, 659:5-22).

**RESPONSE: Undisputed.**

114.     Gunnell concluded that the crime scene bullets and cartridge casings that were submitted to him as evidence were fired from the Taurus 9mm firearm that also was submitted to him as evidence. (Ex. 53, Gunnell October 7, 1993 Firearms Examination Report). Furthermore, Gunnell testified at Pursley's 1994 trial that fired projectiles or bullets were fired from the Taurus firearm to the exclusion of all other firearms. (Ex. 52, Gunnell 1994 Trial Testimony, 662:12-22).

**RESPONSE: Undisputed that Gunnell so concluded and testified. Deny the truth of the matter asserted because the recovered Taurus was in fact not the weapon that fired the recovered bullets and casings. PSOF 123-131.**

115.     Gunnell did not attempt to take photographs of what he saw when he was doing comparisons under the microscope because it was not the practice of the Illinois State Lab to take photographs for comparison purposes. (Ex. 52, Gunnell 1994 Trial Testimony, 662:23-663:7; Ex. 44, Striupaitis Dep., Vol. II, 111:11-18; 112:17-19). According to Gunnell, photomicrographs were not an accepted practice, were discouraged within the discipline, and were not allowed within the Illinois State Police. (Ex. 52, Gunnell 1994 Trial Testimony, 663:8-664:12; Ex. 44, Striupaitis Dep. Vol. II, 226:2-11).

**RESPONSE: Undisputed that Gunnell did not take photographs. Dispute that Gunnell was not allowed to take photographs. The cited passage from Striupaitis does not state that.**

116.     The sketches of the casings and the bullets prepared by Gunnell on his examination report met minimum standards and did not fall below the accreditation standard. (Ex. 44, Striupaitis Dep. Vol. II, 222:9-16).

**RESPONSE: Disputed. Although Striupaitis testified in the cited passage that Gunnell met the minimum standards, he revealed moments later at his deposition that he**

did not actually recall what the minimum standards were and he was *not* testifying that Gunell met the minimum standards with his sketch. Ex 46 (Striupaitis Dep.) at 229:2-17. Striupaitis testified that he would have included more detail in the sketches of the cartridge casings. *Id.* at 220:5-13. Further answering, Gunnell's "sketches" did not identify any features of the casings or bullets that led him to find a match, or contain a single item of information about why he reached his conclusion. Ex. 59 (Gunnell Lab Notes) and 60 (Gunnell Laboratory Report). "Even in 1993, a trained, qualified examiner would have recorded the basis for his or her identification conclusion." Ex. 50 (Murdock Civil Report) at 6. Murdock testified that it is mandatory in forensic science to take high quality case notes. Ex. 57 (Murdock 2019 Trial Tx.) at 33:16-23. Beth Patty also testified that findings need to be properly supported by case notes. Ex. 51 (Patty Dep.) at 23:15-19, 33:13-16. Any time evidence is analyzed "there are a lot of notes to be taken." Ex. 61 (McLain Dep.) at 33:1-19.

117.     Gunnell repackaged the evidence and returned it to the vault until it was returned to the agency. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense at 3235:17-21). Once the evidence was put in the vault and sent back to the Rockford Police Department, Gunnell had no further involvement with the evidence until court proceedings. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3237:10-16).

**RESPONSE: Disputed. Gunnell delivered the evidence directly to Jack Welty, who then "verified" Gunnell's false match. Ex. 42 (ISP evidence receipts) at 1 (documenting that Gunnell hand-delivered Evidence Items 1-4 (the bullets, bullet fragments, and casings) directly back to Welty); Ex. 112 (Gunnell RTA Responses) at Nos. 5-6 (claiming no memory of what he did and admitting that the evidence receipt documents his tendering the evidence directly to Welty); Ex. 41 (Welty Dep.) at 165:13-16. Gunnell delivered the evidence directly**

to Welty even though ISP policy in effect at the time permitted him to simply return the evidence back to RPD. Ex. 48 (DeMuth Dep.) at 47:2-13. He also could have asked RPD to come collect the evidence from his Chicago lab and transport it to Welty, but instead he elected to do hours-long drive to deliver everything in person. Ex. 48 (DeMuth Dep.) at 80:20-81:6; Ex. 41 (Welty Dep.) at 165:17-24.

Welty was in possession of the evidence for more than one month before it was tendered back to Charlene Getty, the RPD evidence tech. Ex. 48 (DeMuth Dep.) at 81:13-24. During this time, Welty approved Gunnell's "identification" of the Taurus as the supposed murder weapon. Ex. 63 (3/14/2011 Email from Defendant Gunnell stating, "I made the original ID that was verified by both Pete Striupaitis and then later by Jack Welty. The case resulted in a conviction.").

118.    Gunnell never spoke with any of the Rockford Defendants about the Andrew Ascher homicide investigation prior to examining the evidence from the case in June 1993. (Ex. 54, Gunnell Response to Pursley's First Set of Request to Admit at 3).

RESPONSE: Denied. Object to Defendant Gunnell's reliance on his own denial to a request for admission as it does not constitute evidentiary proof in support of this allegation. Defendant Gunnell has not cited any testimony on this point, let alone testimony that was subject to cross-examination by Plaintiff. Deny that Defendant Gunnell had personal knowledge of whether he spoke with any RPD Defendants at the time he prepared his RTA responses, in which he admitted that he lacked recall of several different aspects of his work on the case and that "some of the details" of this case "are now fuzzy in his memory." Ex. 115 (Gunnell's Resp. to 1st RTAs); Ex. 112 (Gunnell's Resp. to 2nd RTAs). Denied further as the evidence in the record supports a reasonable inference that Gunnell worked in concert

**with Defendant Forrester through Jack Welty, who initially spoke with Defendant Forrester about the case and helped Forrester by giving a "preliminary opinion" in order to obtain a search warrant; Welty handed off the evidence to Gunnell and then met with Gunnell afterwards to re-take possession of the evidence from Gunnell and approve of Gunnell's match. PSOF 116-119.**

119.    Before examining the Ascher ballistics evidence, Gunnell neither received the evidence directly from Jack Welty nor did Gunnell speak to Welty about the evidence or investigation. (Ex. 54, Gunnell Response to Plaintiff's First Set of Request to Admit at 3).

**RESPONSE: Undisputed that Gunnell did not receive the evidence directly from Welty. Disputed as to the remainder of the allegation, which relies on inadmissible hearsay. Gunnell had no recollection of whether he met with Welty. Ex. 115 (Gunnell's Resp. to 1st RTAs) at 6.**

120.    Gunnell's next involvement looking at the physical evidence occurred in 2012, when he looked at the evidence at the Springfield Forensic Science Laboratory with forensic scientist Beth Patty present. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3238:4-13). When looking at the discharged cartridge cases in 2012, Gunnell concluded that the replication of both individual and class characteristics from the evidence was sufficient to result in a finding that they were both fired from the Taurus 9mm firearm. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3240:15-21).

**RESPONSE: Disputed. In preparation for his trial testimony, Gunnell reviewed the evidence and his opinions with members of the Winnebago County State's Attorney's Office on April 5, 1994. Ex. 116 (Welty 1994 Memo). Object to Defendants' reliance on Gunnell's 2012 conclusions as inadmissible hearsay and undisclosed expert opinions, as well as on the**

**basis that whether Gunnell claimed to have still found a match in 2012 is irrelevant at summary judgment.**

121.    When Gunnell examined the fired bullets in 2012, there did not appear to be the finer microscopic striae that would be necessary to make an identification. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3240:24-RFD Defense 3241:4, 10-13). Gunnell did not write any report based on his examination of the evidence in 2012 because he did not rework the evidence; Gunnell testified that he thought it was a courtesy for him to view the evidence under the microscope. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3243:6-15).

**RESPONSE: Undisputed that Gunnell did not make an identification of the bullets in 2012.**

122.    Gunnell testified in 2016 that the fired bullets looked different after 19 years following his initial examination in 1993; although Gunnell did not know what occurred, he testified that the handling of the evidence, with bodily fluids acting as an etchant, possibly affected the evidence. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3243: 16-20; RFD Defense 3244:1-RFD Defense: 13). Based on his knowledge of firearm examination and testing and his background in metallurgy, Gunnell believed that some of the metals at issue were soft and could be affected over time by various contact with other things. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3252:14-20).

**RESPONSE: Undisputed that Gunnell testified that the bullets did not look the same as he remembered them looking in 1993, but Plaintiff clarifies that Gunnell had no photos from 1993 to confirm that memory. Ex. 58 (Gunnell 2016 testimony) at Pursley 007369. Plaintiff also clarifies that Gunnell's background in metallurgy appeared to be taking some classes in metallurgy. Ex. 58 (Gunnell 2016 testimony) at Pursley 007371:16-19. During his**

testimony at the 2016 post-conviction proceedings, Gunnell abandoned his conclusion that the crime scene bullets matched Pursley's Taurus. Ex. 58 (Gunnell 2016 testimony) at Pursley 007367:10-007368:13. Gunnell also testified that when he looked at the evidence in 2012, he already knew that Patty had deemed the bullets as "inconclusive" as related to Pursley's Taurus and that he did not rework the evidence, was allowed access to it as a "courtesy," and was just looking at with "a little bit more than personal interest." Ex. 58 (Gunnell 2016 testimony) at Pursley 007365:4-007367:14, Pursley 007370:9-15. Dispute the bullets in fact changed in appearance over time. There is no evidence of degradation. Ex. 51 (Patty Dep.) at 133:10-135:21 (no evidence of degradation observed on bullets or cartridge cases); Ex. 50 (Murdock Civil Report) at 5 (no evidence of degradation or damage to the bullets).

123. Gunnell believed that the bullets' condition changed in a way that was material to his examination of the bullets. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3325:10-21).

**RESPONSE: Undisputed that Gunnell so testified but dispute that the bullets' condition changed at all. Ex. 51 (Patty Dep.) at 133:10-135:21 (no evidence of degradation observed on bullets or cartridge cases); Ex. 50 (Murdock Civil Report) at 5 (no evidence of degradation or damage to the bullets).**

**P.    Peter Striupaitis Verified Dan Gunnell's 1993 Firearms Examination Results.**

124. In 1993, Peter Striupaitis was a forensic examiner with the Illinois State Police in Broadview who conducted firearms and tool mark examination. (Ex. 44, Striupaitis Dep. Vol. II, 86:15-87:7, 154:8-10).

**RESPONSE: Undisputed.**

125.    If a firearms examiner determined that two pieces of evidence presented an identification, a second examiner would be necessary to verify the primary examiner's finding of identification. (Ex. 44, Striupaitis Dep. Vol. II, 89:22-91:8). A verification would require looking in the comparison microscope to verify the primary examiner's results. (Ex. 44, Striupaitis Dep. Vol. II, 90:17-91:8).

**RESPONSE: Undisputed, subject to the clarification that it is best practice to conduct blind verifications, meaning the verifier should not know the original analyst's results before conducting his/her own exam. Ex. 62 (Coleman Dep.) at 12:9-14:23; 16:14-17:11; 105:18-106:16.**

126.    Striupaitis did not conduct an examination of the firearms evidence in this case. (Ex. 44, Striupaitis Dep. Vol. II, 166:18-22). Rather, when verifying an identification made by another examiner, the identifying examiner will point out areas of agreement that are important to the verifying examiner, and then the verifying examiner will look at those areas under the comparison microscope to verify the findings. (Ex. 44, Striupaitis Dep. Vol. II, 181:16-20, 182:2-14, 184:16-20, 189:14-190:14).

**RESPONSE: Undisputed that Striupaitis did not conduct an examination of the firearms evidence in this case. Disputed as to the rest of this statement of fact. Ex. 62 (Coleman Dep.) at 12:9-14:23; 16:14-17:11; 105:18-106:16.**

127.    Striupaitis verified Dan Gunnell's findings of identification in this case. (Ex. 44, Striupaitis Dep. Vol. II, 189:7-13, 196:14-20, 211:5-8).

**RESPONSE: Undisputed subject to the clarification that Striupaitis's "verification" was not blind, as would have been proper. Ex. 46 (Striupaitis Dep.) at 184:21-24, 185:6-9; Ex. 62 (Coleman Dep.) at 12:9-14:23; 16:14-17:11; 105:18-106:16.**

**Striupaitis knew that Gunnell had decided there was a match before doing his own look. He understood that Gunnell was calling him over to the microscope to verify an identification. Ex. 46 (Striupaitis Dep.) at 182:2-14. Striupaitis's practice for doing verifications was to look through the scope in the spot where Gunnell had set up the evidence, with Gunnell present. He did not conduct his own examination or review test-to-test comparisons to establish reproducibility. Ex. 46 (Striupaitis Dep.) at 242:22-243:3. He had never not verified one of Gunnell's conclusions.** *Id.* **at 96:23-97:1. In addition, Striupaitis had done "a good number" of verifications in his career; possibly hundreds. Ex. 46 (Striupaitis Dep.) at 95:20-96:16. In all the years he had done verifications, he never disagreed with what the original examiner had laid out in the microscope as a potential identification. Ex. 46 (Striupaitis Dep.) at 96:17-20.**

128.     Striupaitis did not testify at any court hearings concerning Patrick Pursley. (Ex. 44, Striupaitis Dep. Vol. II, 208:19-21).

**RESPONSE: Undisputed.**

**Q.     Patrick Pursley's Firearms Expert at the 1994 Trial—Mark Boese**

130.     Pursley's firearm and tool mark expert in his 1994 criminal trial, Mark Boese, opined that his finding was inconclusive as to whether Dan Gunnell's test fired bullets matched the bullets recovered at the crime scene. (Ex. 43, Boese 1994 Trial Testimony, 836:8-15).

**RESPONSE: Undisputed. Stating further, Boese testified that there was insufficient information available for anyone—including Gunnell—to identify/match Pursley's Taurus with the crime scene bullets. Ex. 65 (Boese Trial Tx.) at 838:16-21.**

131.   Boese therefore could not conclude that the bullets recovered at the crime scene were not fired from the Taurus that the Rockford Police Department recovered in the Pursley case. (Ex. 43, Boese 1994 Trial Testimony, 837:12-16).

**RESPONSE: Undisputed, subject to the clarification that Boese testified that there was insufficient information available for anyone, including Gunnell, to identify or match, Pursley's Taurus with the crime scene bullets. Ex. 65 (Boese Trial Tx.) at 838:16-21.**

132.   Boese, also opined that "a weapon similar to the Taurus or probably another Taurus at least fired the bullet." (Ex. 43, Boese's 1994 Trial Testimony, 801:8-15; 809:5-13).

**RESPONSE: Undisputed.**

**R.   Illinois State Police Firearms Examiner Russell McLain's Examination (2011)**

133.   Russel McLain was a firearm and tool mark examiner employed by ISP at its Forensic Science Lab in Rockford in 2011. (Ex. 55, McLain 2016 Post Conviction Testimony, 87:16-17, 91:7-11, 95:15-18, 96:8-17).

**RESPONSE: Undisputed.**

134.   In 2011, McLain conducted an examination of the crime scene ballistics evidence through the Integrated Ballistics Identification System. (Ex. 55, McLain 2016 Post Conviction Testimony, 101:4-13).

**RESPONSE: Disputed. One does not conduct "examinations" using the Integrated Ballistics Identification System ("IBIS"). IBIS is a diagnostic tool that allows image comparisons between images of questioned evidence to images of other ballistics within its database. *See, e.g,* Ex. 117 (Brate Dep.) at 43:4-45:3. Undisputed that McLain entered the ballistics evidence into IBIS.**

135. In 2011, McLain did not conduct a complete reexamination of the crime scene ballistics evidence because such an examination had already been completed by Dan Gunnell. (Ex. 55, McLain 2016 Post Conviction Testimony, 105:8-14).

**RESPONSE: Undisputed. To clarify: McLain was "there just to do the IBIS comparisons." Ex. 118 (McLain 2016 Testimony) at 114:24-115:2.**

136. McLain had performed hundreds of examinations and analyses of firearms and tool mark evidence. (Ex. 55, McLain 2016 Post Conviction Testimony, 116:22-117:11). In 2011, McLain used his experience as a firearms and tool mark examiner in conducting a physical examination of the crime scene bullets and cartridge casings. (Ex. 55, McLain 2016 Post Conviction Testimony, 119:3-15).

**RESPONSE: Undisputed, subject to the clarification that McLain did not perform a blind verification, which is necessary to avoid confirmation bias. Ex. DEP10 (Coleman Dep.) at 12:9-14:23; 16:14-17:11; 105:18-106:16; Ex. 118 (McLain 2016 Testimony) at 119:23-120:2.**

137. McLain compared Dan Gunnell's 1993 test fired cartridge casings with the cartridge casings from the crime scene and found that they matched and that the test fired cartridge casings and the crime scene cartridge casings were fired out of the same firearm. (Ex. 55, McLain 2016 Post Conviction Testimony, 117:15-118:6, 119:10-15; Ex. 44, Striupaitis Dep. Vol. II, 212:3-11). McLain conducted his examination by using a comparison microscope. (Ex. 55, McLain 2016 Post Conviction Testimony, 118:13-23).

**RESPONSE: Disputed. McLain (1) did not perform a blind verification, which is necessary to avoid confirmation bias, Ex. 62 (Coleman Dep.) at 12:9-14:23; 16:14-17:11; 105:18-106:16; Ex. 118 (McLain 2016 TT) at Pursley 70507:23-7508:2; and (2) was "really**

there just to do the IBIS comparisons," and looked at the evidence under a comparison microscope only as part of his process for entering evidence into IBIS. Ex. 118 (McLain 2016 Testimony) at 114:24-115:2, 118:13-17. He was never asked to evaluate the evidence itself. Ex. 118 (McClain 2016 Testimony) at Pursley 7502:20-23. In fact, McLain had agreed not to evaluate the evidence, but did so anyway. Ex. 118 (McLain 2016 Testimony) at Pursley 007540:9-14. He stated that his examination was not thorough and that he understood that reexamination was against ISP policy. Ex. 118 (McClain 2016 Testimony) at Pursley 007540:15-20, 007542:9-16.

138. McLain also similarly compared Dan Gunnell's 1993 test fired bullets with the bullets from the crime scene and found that one of the crime scene bullets matched, but the comparison on the second crime scene bullet was "inconclusive." (Ex. 55, McLain 2016 Post Conviction Testimony, 119:3-9; Ex. 44, Striupaitis Dep. Vol. II, 212:3-11).

**RESPONSE: Undisputed but misleading because McLain (1) did not perform a blind verification, which is necessary to avoid confirmation bias, Ex. 62 (Coleman Dep.) at 12:9-14:23; 16:14-17:11; 105:18-106:16; and (2) was "really there just to do the IBIS comparisons," and looked at the evidence under a comparison microscope only as part of his process for entering evidence into IBIS. Ex. 118 (McLain 2016 Testimony) at 114:24-115:2, 118:13-17. Stating further, McLain's conclusion about the bullets differed from Gunnell and Patty. 118 (McLain 2016 testimony) at 25:10-22. For instance, ISP examiner Beth Patty also compared the test fired bullets to both crime scene bullets and disagreed with McLain's conclusion that one of them matched. Ex. 51 (Patty Dep.) at 123:16-124:23. In fact, during Beth Patty's exam, she turned bullet 4 in different orientations - or phases - looking to "find something to be able to move on to the level of an identification," but even in other**

orientations there was a little more agreement but nothing sufficient to make an identification. Ex. 119 (Patty 2019 Testimony) at 266:19-268:5. Stating further, even Gunnell was unable to identify the crime scene bullets with Pursley's Taurus. Ex. 52 (Gunnell 2019 Testimony) at 203:1-3.

Stating further, during the middle of her days of analysis, McLain emailed Patty with pictures he took of bullet 4 in his analysis and said that she could look them over and give him a call but that he was "still comfortable with my notes and spent so much time working on it that I would have to remain with the same opinions expressed." Ex. 120 (11.30.2012 McLain emails with Beth Patty).

S.     Illinois State Police Firearms Examiner Beth Patty's Examination (2012)

139.    Beth Patty was employed with the Illinois State Police Forensic Science Services since 1995, and was an Assistant Laboratory Director who had experience with firearms examinations. (Ex. 49, Patty 2016 Post Conviction Testimony, 41:22-42:2).

RESPONSE: Undisputed.

140.    Patty also served as a Quality Review Coordinator with the Illinois State Police. (Ex. 49, Patty 2016 Post Conviction Testimony, 50:3-13).

RESPONSE: Undisputed.

141.    In 2012, Patty conducted a firearms examination in Pursley's case at the Illinois State Police Forensic Science Laboratory in Springfield. (Ex. 49, Patty 2016 Post Conviction Testimony, 51:11-15).

RESPONSE: Undisputed, subject to the clarification that Patty did not conduct a blind examination; she had already reviewed the file in 2007 and knew when she performed her analysis in 2012 that one of her colleagues had identified the crime scene evidence as

83

having come from Pursley's Taurus, and that her colleague's identification was under scrutiny. Ex. 51 (Patty Dep.) at 98:24-99:6, 100:2-16, 102:22-103:16. Plaintiff also clarifies that ISP had somewhere around 30 other examiners had the time who had not previously reviewed the evidence and could have conducted a blind analysis which would have been "ideal" according to Patty. Ex. 51 (Patty Dep.) at 101:20-102:21. She also did not compare ejector marks, extractor marks, or magazine lip marks, despite knowing that those marks contributed to Murdock's elimination conclusion, and despite knowing that these marks are something an examiner should consider. Ex. 121 (Patty 2016 Testimony) at 140:15-141:8. Further, Patty's exam of the cartridge cases was not thorough. For instance, when asked about a particular mark on the firing pin aperture bulge, she testified that she did not "particularly focus in on it…" Ex. 119 (Patty 2016 Testimony) at 139:19-22.

142.    Patty's reexamination consisted of comparing Dan Gunnell's test fired cartridge casings and bullets with the crime scene cartridge casings and bullets through a microscopic analysis. (Ex. 49, Patty 2016 Post Conviction Testimony, 61:1-20, 62:7-8). Based on her microscopic examination, Patty determined that Dan Gunnell's test fired cartridge casings matched the crime scene cartridge casings in this case, and therefore she concluded that the crime scene cartridge casings were fired from the Taurus 9mm firearm recovered in the Pursley case. (Ex. 49, Patty 2016 Post Conviction Testimony, 71:14-24; Ex. 56, Patty Dep., 98:14-23; Ex. 57, Patty December 14, 2012 Firearms Examination Report).

RESPONSE: Undisputed, subject to the clarification that she did not compare ejector marks, extractor marks, or magazine lip marks, despite knowing that those marks contributed to Murdock's elimination conclusion, and despite knowing that these marks are something an examiner should consider. Ex. 121 (Patty 2016 Testimony) at Pursley

**007668:15-23, Pursley 007695:10-16. Further, Patty's exam of the cartridge cases was not thorough. For instance, when asked about a particular mark on the firing pin aperture bulge, she testified that she did not "particularly focus in on it…" Ex. 121 (Patty 2016 Testimony) at Pursley 007666:17-7667:22.**

**In addition, Beth Patty's exam was not blind. She knew when she performed her analysis in 2012 that one of her colleagues had identified the crime scene evidence as having come from Pursley's Taurus, and that her colleague's identification was under scrutiny. Ex. 51 (Patty Dep.) at 98:24-99:6, 100:2-16, 102:22-103:16. Patty had already reviewed Gunnell's file and approved it in 2007. Ex. 51 (Patty Dep.) at 100:2-103:16. Stating further, Patty met with Gunnell to discuss her findings before sending out her reports.  Ex. 119 (Patty 2019 Testimony) at 302:21-24.**

143.    Based on her microscopic examination, Patty could not determine that Dan Gunnell's test fired bullets either matched or eliminated from the crime scene bullets in this case, and therefore her conclusion was "inconclusive" as to whether the crime scene bullets were fired from the Taurus 9mm firearm recovered in the Pursley case. (Ex. 49, Patty 2016 Post Conviction Testimony, 76:7-10; Ex. 56, Patty Dep., 98:24-99:6; Ex. 57, Patty December 14, 2012 Firearms Examination Report).

**RESPONSE: Undisputed.**

**T.    Pursley's Expert John Murdock's Examination (2012)**

144.    John Murdock is a firearms and tool mark examiner retained by Patrick Pursley to conduct an examination of the ballistics evidence from the Ascher homicide. (Ex. 58, John Murdock Report at 1; Ex. 45, Murdock Dep., 7:11-16; 9:18-20; 11:3-21).

**RESPONSE: Undisputed.**

145.    In conducting his examination for this case, Murdock did not conduct a new examination; rather, he relied upon an examination of the evidence he had previously performed in 2012. (Ex. 45, Murdock Dep., 45:12-16). Murdock had the benefit of microscopes with much higher powers of magnification than in 1993. (*Id*. at 221:2-5.)

**RESPONSE**: **The first sentence is undisputed, subject to the clarification that in 2012, Mr. Murdock performed a highly detailed and thorough examination of the firearms evidence, including more than 70 pages of photographs and handwritten notes, Ex. 66 (Murdock Complete Disclosure) at Pursley 10660-10740. The second sentence is disputed to the extent it suggests Mr. Murdock *relied on* higher powers of magnification in 2012 than were available in 1993. Although Murdock's microscopes in 2012 were *capable* of higher powers of magnification than were available in 1993, he did not base all of his conclusions on higher powers of magnification than were available in 1993. Ex. 55 (Murdock Sept. 2021 Dep.) at 218:12-219:6, 221:6-18. In fact, Murdock testified that some of his conclusions that Pursley's Taurus did not fire the crime scene evidence were based on toolmarks viewed at magnifications of 15-30x, which were available in 1993. Ex. 55 (Murdock Sept. 2021 Dep.) at 218:12-219:6, 223:18-225:18.**

146.    In conducting his examination of the Pursley evidence in 2012, Murdock did not test fire the Taurus pistol that was the suspected murder weapon in the Ascher case. (Ex. 45, Murdock Dep., 59:1-8).

**RESPONSE: Undisputed, but immaterial.**

147.    Murdock concluded that the cartridge cases and bullets from the Asher homicide were not fired from the Taurus recovered in the Pursley case, resulting in a finding of elimination, even though Murdock otherwise testified that he thought the evidence looked similar upon initial

examination. (Ex. 58, Murdock Expert Report at 8; Ex. 45, Murdock Dep., 85:16-86:3; 164:9-16; 222:20-223:8). Murdock also testified that at least one series of photos revealed at least some level of quantitative agreement in the evidence, indicating that he believed that led Dan Gunnell to make an identification; Murdock otherwise indicated similarities in the bullets having the same number of land and groove impressions, as well as similar breech face marks. (*Id*. at 91:9-93:20; 152:12-153:1.)

**RESPONSE: Undisputed that Murdock concluded that the cartridge cases and bullets from the Asher homicide were not fired from the Taurus recovered in the Pursley case, resulting in a finding of elimination, but disputed to the extent that "even though Murdock otherwise testified that he thought the evidence looked similar upon initial examination" is misleading and an inaccurate recitation of the testimony. Ex. 55 (Murdock Sept. 2021 Dep.) at 85:16-21. Murdock testified that he initially saw *a* similarity in a single breech-face marking, *id.*, but upon further examination realized that the microscopic detail did not match and was not in the same relative position, which should have been noticed in 1993, *id.***

**Also disputed that "Murdock also testified that at least one series of photos revealed at least some level of quantitative agreement in the evidence, indicating that he believed that led Dan Gunnell to make an identification; Murdock otherwise indicated similarities in the bullets having the same number of land and groove impressions, as well as similar breech face marks." This statement is not supported by Defendants' citations. Murdock testified that the similar arch-shaped marks across the breech face were characteristic of a Taurus during that time, which allowed Defendant Welty to determine that the crime scene evidence**

had likely been fired from a Taurus. Ex. 55 (Murdock 2021 Dep.) at 152:12-153:24. Undisputed that Murdock observed the same number of land and groove impressions.

148.    Although Murdock disagreed with Dan Gunnell's 1993 findings, Murdock testified that he is not offering an opinion that Dan Gunnell fabricated any evidence while undertaking his examination of the ballistics evidence in this case in 1993. (Ex. 45, Murdock Dep., 198:13-16).

**RESPONSE: Undisputed that Mr. Murdock gave this testimony, but object that (1) this testimony goes beyond the scope of his report; (2) Mr. Murdock reviewed only limited firearms evidence and no other evidence in this case and therefore has no foundation to opine about whether Defendant Gunnell fabricated evidence; and (3) his personal opinion—or lack thereof—on the ultimate issue of fabrication is immaterial and inadmissible. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"); *United States v. Neushwander*, 2017 WL 4572212, at \*4 (N.D. Ill. Oct. 14, 2017) ("When an expert attempts to impinge on the role of the jury, the testimony should be barred.") (citing *United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010)). Stating further, Murdock and Coleman both opined that Gunnell clearly would have seen these material differences when looking at the evidence under typical magnification.  PSOF 109, 126, 128, 130.**

149.    In undertaking his evaluation of the evidence in this case, Murdock did not see any evidence or materials indicating that Dan Gunnell, Jack Welty, or Peter Striupaitis rendered any opinions in order to frame Patrick Pursley for the Ascher homicide. (Ex. 45, Murdock Dep., 203:16-23).

**RESPONSE: Disputed. The cited testimony does not support the asserted fact. Further, object that (1) this testimony goes beyond the scope of his report; (2) Mr. Murdock reviewed only limited firearms evidence and no other evidence in this case and therefore has no foundation to opine about whether Gunnell, Welty, or Striupaitis rendered any opinions in order to frame Mr. Pursley; and (3) his personal opinion—or lack thereof—on the ultimate issue of fabrication is immaterial and inadmissible.** *See Good Shepherd Manor Found., Inc. v. City of Momence*, **323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible");** *United States v. Neushwander*, **2017 WL 4572212, at \*4 (N.D. Ill. Oct. 14, 2017) ("When an expert attempts to impinge on the role of the jury, the testimony should be barred.") (citing** *United States v. Lupton*, **620 F.3d 790 (7th Cir. 2010)).**

150.    In undertaking his evaluation of the evidence in this case, Murdock did not see any evidence or materials indicating that any Illinois State Police lab personnel rendered the opinions that they did regarding the ballistics evidence in order to fit a predetermined narrative that was communicated to them by the Rockford Police Department. (Ex. 45, Murdock Dep., 203:24-204:6).

**RESPONSE: Undisputed that Mr. Murdock gave this testimony, but object that (1) this testimony goes beyond the scope of his report; (2) Mr. Murdock reviewed only limited firearms evidence and no other evidence in this case and therefore has no foundation to opine about whether Gunnell, Welty, or Striupaitis rendered any opinions in order to frame Mr. Pursley; and (3) his personal opinion—or lack thereof—on the ultimate issue of fabrication is immaterial and inadmissible.** *See Good Shepherd Manor Found., Inc. v. City of Momence*, **323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will**

determine the outcome of the case is inadmissible"); *United States v. Neushwander*, 2017 WL 4572212, at *4 (N.D. Ill. Oct. 14, 2017) ("When an expert attempts to impinge on the role of the jury, the testimony should be barred.") (citing *United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010)).

151.    Murdock further testified that he has no reason to dispute Jack Welty's conclusion, reached after his initial examination of the ballistics evidence in 1993, that the breech face marks on the evidence cartridge cases corresponded to a Taurus firearm. (Ex. 45, Murdock Dep., 229:22-230:1).

**RESPONSE: Undisputed.**

152.    Gunnell testified that he disagreed with Murdock's conclusions, and that he did not understand how Murdock could have eliminated the bullets from being fired from the Taurus firearms when there was agreement in class characteristics and there was some agreement in individual characteristics; Gunnell believed that would seem to preclude an elimination. (Ex. 48, Gunnell 2016 Post Conviction Testimony, RFD Defense 3255:5-16).

**RESPONSE: Undisputed, subject to the clarification that Gunnell did not examine the extractor, ejector, or magazine lip marks at this time. Ex. 52 (Gunnell 2019 Testimony) at 207, 208.**

**U.    Chris Coleman's Verification of John Murdock's Findings**

153.    Chris Coleman is a firearms and tool mark examiner employed at the Forensic Analytical Crime Lab in Hayward, California. (Ex. 59, Chris Coleman Report at 1).

**RESPONSE: Undisputed.**

154.    Coleman performed a verification of Murdock's 2012 findings, and he was retained as a second expert in this case. (Ex. 59, Chris Coleman Report).

**RESPONSE: Undisputed.**

155.    Coleman testified it is fair to say that two qualified firearms examiners could examine the same evidence and come to different conclusions. (Ex. 46, Coleman Dep., 102:8-12).

**RESPONSE: Undisputed, subject to the clarification that Coleman testified that one examiner might have a more conservative view and decline to make an identification, where another would make an identification. Defs.' Ex. 46 (Coleman Dep.) at 102:8-24. He does not say, as Defendants imply, that qualified examiners could have different opinions as to whether there is an identification or an elimination. *Id.***

156.    Coleman further testified that he does not think that Dan Gunnell fabricated his findings. (Ex. 46, Coleman Dep., 126:21-127:15).

**RESPONSE: Undisputed that Coleman gave this testimony, but object that (1) this testimony goes beyond the scope of Mr. Coleman's report; (2) Mr. Coleman reviewed only limited firearms evidence and no other evidence in this case and therefore has no foundation to offer this opinion; and (3) his personal opinion on the ultimate issue of fabrication is immaterial and inadmissible. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"); *United States v. Neushwander*, 2017 WL 4572212, at \*4 (N.D. Ill. Oct. 14, 2017) ("When an expert attempts to impinge on the role of the jury, the testimony should be barred.") (citing *United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010)). Further, Coleman was not asked to review Gunnells's state of mind or opine about why Gunnell his conclusions. Ex. 62 (Coleman Dep.) at 156:6-11.**

157.    At most, Coleman believes that Dan Gunnell "made a mistake." (Ex. 46, Coleman Dep., 144:3-24).

**RESPONSE: Disputed. This sentence is not supported by this citation and is an incomplete recitation of Coleman's testimony. Def. Ex. 46, 144:3-17. Coleman further testified that the toolmarks that eliminated the Taurus as the crime scene weapon were visible to Gunnell, and if he had seen them, he would have known the Taurus was eliminated as the shooter weapon. *Id.* at 145:13-146:9. Also, object that (1) this testimony goes beyond the scope of Mr. Coleman's report; (2) Mr. Coleman reviewed only limited firearms evidence and no other evidence in this case and therefore has no foundation to offer this opinion; and (3) his personal opinion on the ultimate issue of fabrication is immaterial and inadmissible. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"); *United States v. Neushwander*, 2017 WL 4572212, at \*4 (N.D. Ill. Oct. 14, 2017) ("When an expert attempts to impinge on the role of the jury, the testimony should be barred.") (citing *United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010)).**

## V.     ISP Defendants' Retained Expert Matt Noedel's Examination

158.    Matt Noedel is a firearms and tool mark examiner who was retained by the ISP Defendants to perform a reexamination of the ballistics evidence in the Pursley case. (Ex. 47, Noedel Dep., 22:12-15; Ex. 60, Matt Noedel Expert Report).

**RESPONSE: Undisputed.**

159.    As part of his examination, Noedel reviewed the expert report that was developed by John Murdock in the Pursley matter. (Ex. 47, Noedel Dep., 24:13-17; 38:12-19; Matt Noedel Expert Report at 15).

**RESPONSE: Undisputed.**

160.     Mr. Noedel also conducted an examination of the ballistics evidence in the case, which he conducted in two phases. (Ex. 47, Noedel Dep., 24:10-21). In the first phase, Noedel reviewed the documentation from all expert opinions that have been offered in both the civil and underlying criminal Pursley matters. (Ex. 47, Noedel Dep., 24:10-21). Noedel also reviewed the paper file of the ballistics examination that was performed by Dan Gunnell in 1993. (Ex. 47, Noedel Dep., 33:13-34:16).

**RESPONSE: Undisputed.**

161.     One of Noedel's goals in this first phase of his examination was to assess the veracity of Pursley's allegation that the ISP laboratory fabricated evidence in 1993.  (Ex. 47, Noedel Dep., 33:13-34:16).

**RESPONSE: Undisputed, but immaterial. Object because Noedel's report offers no opinions about whether ISP fabricated evidence, and therefore this opinion is inadmissible. Ex. 122 (Noedel Report); Ex. 123 (Noedel Dep.) at 33:13-35:5; Fed. R. Civ. P. 26(a)(2)(B)(i). In addition, whether ISP fabricated evidence is an ultimate issue in this case, the determination of which belongs to the jury, and Noedel's opinion on the matter would not be admissible. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"); *United States v. Neushwander*, 2017 WL 4572212, at \*4 (N.D. Ill. Oct. 14, 2017) ("When an expert attempts to impinge on the role of the jury, the testimony should be barred.") (citing *United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010)).**

162.     To make that assessment, Noedel considered the following things during phase one of his examination: (1) the existence of obliterations or alterations to the evidence; (2) whether the documentation of the original 1993 examination was reasonable or unreasonable for the time

frame; (3) whether the testimony provided by ISP forensic examiners at previous criminal proceedings in the Pursley matter was reasonable; (4) whether the reanalysis that was completed years later by Murdock that provided a completely opposite opinion from Dan Gunnell's 1993 opinion was a reasonable assessment; and (5) whether the documentation from the reanalysis reasonably allowed for the conclusion of elimination. (Ex. 47, Noedel Dep., 33:13-34:16).

**RESPONSE: Undisputed, but immaterial, assuming that "to make that assessment" refers to whether ISP fabricated evidence. Object because Noedel's report offers no opinions about whether ISP fabricated evidence, and therefore this opinion is inadmissible. Ex. 122 (Noedel Report); Ex. 123 (Noedel Dep.) at 33:13-35:5; Fed. R. Civ. P. 26(a)(2)(B)(i). In addition, whether ISP fabricated evidence is an ultimate issue in this case, the determination of which belongs to the jury, and Noedel's opinion on the matter would not be admissible.** *See Good Shepherd Manor Found., Inc. v. City of Momence*, **323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible");** *United States v. Neushwander*, **2017 WL 4572212, at \*4 (N.D. Ill. Oct. 14, 2017) ("When an expert attempts to impinge on the role of the jury, the testimony should be barred.") (citing** *United States v. Lupton*, **620 F.3d 790 (7th Cir. 2010)).**

163.    After evaluating those categories of information, Noedel concluded that he did not see any evidence of any fabrication by ISP examiners, or of a process that was "way out of line" by the ISP examiners. (Ex. 47, Noedel Dep., at 34:14-16). Noedel spent approximately 20-30 hours on the first phase of his examination. (Ex. 47, Noedel Dep., 43:4-8).

**RESPONSE: Undisputed, but object because Noedel's report offers no opinions about whether ISP fabricated evidence, and therefore this opinion is inadmissible. Ex. 122 (Noedel Report); Ex. 123 (Noedel Dep.) at 33:13-35:5; Fed. R. Civ. P. 26(a)(2)(B)(i). In**

addition, whether ISP fabricated evidence is an ultimate issue in this case, the determination of which belongs to the jury, and Noedel's opinion on the matter would not be admissible. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"); *United States v. Neushwander*, 2017 WL 4572212, at *4 (N.D. Ill. Oct. 14, 2017) ("When an expert attempts to impinge on the role of the jury, the testimony should be barred.") (citing *United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010)).

164.    In the second phase of his examination, Noedel examined the ballistics evidence from the Ascher homicide, including the Taurus pistol, the evidence and test fired bullets, and the evidence and test fired cartridge cases. (Ex. 47, Noedel Dep., at 24:10-25:9; *see generally* Ex. 60, Noedel Report). Also as part of this second phase, Noedel conducted his own test fires of the Taurus pistol. (Ex. 47, Noedel Dep., 25:10-26:2).

RESPONSE: Undisputed.

165.    After completing both phases of his examination of the ballistics evidence, Noedel concluded that "the Taurus pistol could have fired cartridge cases 2A and 2B and should not be eliminated as the murder weapon used [in the Ascher homicide]." (Ex. 47, Noedel Dep., 27:16-28:3; Ex. 60, Noedel Report at 7).

RESPONSE: Undisputed that Noedel so concluded, but dispute the assertion because it is misleading and inadmissible as not generally accepted in the field of firearms and toolmark analysis. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993); *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021). Object to Defendants' reliance on this opinion because it violates Federal Rule of Evidence 702 and should not be presented to the jury. Specifically, Noedel's conclusion that the Taurus "could

have fired" the crime scene evidence is not a generally accepted conclusion in the field. There are only three types of accepted conclusions in firearms and tool mark analysis: identification, elimination, or inconclusive, *see* DSOF 76, and neither the firearms examiner field nor Noedel personally are reevaluating the use of the term "inconclusive," Ex. 123 (Noedel Dep.) at 65:17-66:14. Further, it is not Noedel's personal practice to conclude that a weapon "could have fired" crime scene evidence. Ex. 123 (Noedel Dep.) at 66:8-14. In any event, Matthew Noedel, created 18 new test fires using Pursley's Taurus. Ex. 122 (Noedel Report) at 3. In total he examined 30 test fired cartridge cases and was unable to identify/match the crime scene evidence with Pursley's Taurus. Ex. 123 (Noedel Dep.) at 57:24-58:2.

Stating further, Noedel relied on a number of non-accepted methodologies to come to this conclusion. First, he improperly began his exam by looking for matching information rather than looking for differences that would support an elimination. Ex. 124 (Murdock Civil Rebuttal) at 1 (and references cited therein). Second, he failed to consider whether any similar breech face markings were class, subclass, or individual characteristics, which is required in the field. Ex. 124 (Murdock Civil Rebuttal) at 3. Third, he failed to determine the source of the tool working surface that produced any purportedly matching information. Ex. 124 (Murdock Civil Rebuttal) at 3-4.

**W.      Lack of liability insurance for decedent officers**

166.    City Administrator for the City of Rockford, who acts as the Special Representative for the Estate, has sworn that there is and was no liability insurance policy protecting the Estate of Defendant Forrester (Ex. 61).

**RESPONSE: Undisputed, but immaterial. The City of Rockford is statutorily required to indemnify the Estate of Forrester. 5 ILCS § 350/2.**

**X.     Miscellaneous facts not addressed above**

167.    On June 11, 1993, first degree murder charges against Pursley were authorized by Winnebago County State's Attorney's Office and a warrant was issued for Pursley's arrest by a Winnebago County Circuit judge for the murder of Andrew Ascher. (Ex. 13 at RFD Defense 000118); (Ex. 66 at Pursley 000671-000674).

**RESPONSE: Undisputed.**