# EXHIBIT 1



# Transcript of Patrick Pursley

**Date:** December 9, 2020
**Case:** Pursley -v- The City of Rockford, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

WESTERN DIVISION

-----------------------------x

PATRICK PURSLEY,                    :

                Plaintiff,     :

   v.                               :   Case No. 3:18-CV-50040

CITY OF ROCKFORD, et al.,           :

               Defendants.    :

-----------------------------x


Virtual Deposition of PATRICK PURSLEY

Wednesday, December 9, 2020

9:39 a.m. CST


Job No.:  338028

Pages:  1 - 163

Reported by:  Tiffany M. Pietrzyk, CSR RPR CRR

1            Virtual deposition of PATRICK PURSLEY,

2    pursuant to notice, before Tiffany M. Pietrzyk, a

3    Certified Shorthand Reporter, Registered

4    Professional Reporter, Certified Realtime Reporter,

5    and a Notary Public in and for the State of

6    Illinois.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4        ALISON R. LEFF, ESQUIRE

 5        ROSHNA BALA KEEN, ESQUIRE

 6        LOEVY & LOEVY

 7        311 North Aberdeen

 8        3rd Floor

 9        Chicago, Illinois 60607

10        312.243.5900

11   and

12        ASHLEY WADDELL TINGSTAD, ESQUIRE

13        HOOPER HATHAWAY PRICE BEUCHE & WALLACE

14        343 South Main Street

15        Suite 200

16        Ann Arbor, Michigan 48014

17        734.224.3977

18

19   ON BEHALF OF THE DEFENDANT CITY OF ROCKFORD:

20        IFEANYICHUKWU C. MOGBANA, ESQUIRE

21        CITY OF ROCKFORD DEPARTMENT OF LAW

22        425 East State Street

23        Rockford, Illinois 61104

24        815.987.5540
```

```
1       A P P E A R A N C E S   C O N T I N U E D

2

3    ON BEHALF OF THE DEFENDANTS BOWMAN, GALLARDO,

4    GENENS, HANSON, HOUDE, POBJECKY and SCHMIDT:

5         MICHAEL F. IASPARRO, ESQUIRE

6         HINSHAW & CULBERTSON LLP

7         100 Park Avenue

8         P.O. Box 1389

9         Rockford, Illinois 61105

10        815.490.4900

11

12   ON BEHALF OF THE DEFENDANTS BARTON, PIRAGES,

13   WILLIAM, SCOTT and BISHOP:

14        JOEL M.L. HUOTARI, ESQUIRE

15        WILLIAMSMCCARTHY LLP

16        120 West State Street

17        P.O. Box 219

18        Rockford, Illinois 61105

19        815.987.8900

20

21

22

23

24
```

```
1      A P P E A R A N C E S   C O N T I N U E D

2

3    ON BEHALF OF THE DEFENDANTS FORRESTER, REFFETT,

4    and EKEDAHL:

5         ROBERT C. POTTINGER, ESQUIRE

6         BARRICK, SWITZER, LONG, BALSLEY & VAN EVERA LLP

7         6833 Stalter Drive

8         Rockford, Illinois 61108

9         815.962.6611

10

11   ON BEHALF OF THE DEFENDANTS GUNNELL, STRIUPAITIS

12   and WELTY:

13        SUNIL BHAVE, ESQUIRE

14        ILLINOIS ATTORNEY GENERAL'S OFFICE

15        100 West Randolph Street

16        13th Floor

17        Chicago, Illinois 60601

18        312.814.3000

19

20   ALSO PRESENT:

21        Juan Mamboyo, Planet Depos Remote Technician

22

23

24
```

```
1                  C O N T E N T S

2    EXAMINATION OF PATRICK PURSLEY              PAGE

3      By Mr. Iasparro                             7

4      By Mr. Huotari                            133

5      By Mr. Pottinger                          146

6      By Mr. Iasparro                           157

7      By Mr. Pottinger                          158

8      By Ms. Leff                               159

9

10                 E X H I B I T S

11                  (Attached)

12   DEPOSITION EXHIBITS                         PAGE

13   Exhibit 1       Second Amended Complaint     39

14   Exhibit 2       Photographs                  71

15   Exhibit 3       Handwritten Letter           86

16   Exhibit 4       Handwritten Letter           92

17   Exhibit 5       Handwritten Letter          101

18   Exhibit 6       Handwritten Letter          104

19   Exhibit 7       Handwritten Letter          107

20   Exhibit 8       Handwritten Letter          109

21   Exhibit 9       Samantha Crabtree Affidavit 114

22

23

24
```

```
1              P R O C E E D I N G S
2                  (Witness sworn.)
3   WHEREUPON:
4              PATRICK PURSLEY,
5   called as a witness herein, having been first duly
6   sworn, was examined and testified as follows:
7                  EXAMINATION
8   BY MR. IASPARRO:
9       Q. Good morning, Mr. Pursley.
10      A. Good morning.
11      Q. My name is Michael Iasparro.  I'll be the
12  first attorney asking you some questions today.
13          Mr. Pursley, have you ever testified under
14  oath before?
15      A. I have.
16      Q. And when was that, sir?
17      A. I believe in a deposition regarding a suit
18  against the conditions of confinement.
19      Q. Do you recall when that was?
20      A. About a year ago, year and a half ago.
21      Q. So you've done one of these before, and you
22  know particularly when we're on video, like we are
23  today, it's going to be important for us to make
24  sure we have a clean record.
```

1      So I'll ask that you wait until I finish my

2 question before you start an answer.  There's a

3 little delay, it seems like.  I'll certainly wait

4 for you to finish your answer before I ask any

5 follow-up questions.

6      Does that make sense?

7   A. Yes, sir.

8   Q. All right.

9      If at any time today I ask you a question

10 that you don't understand or you want me to repeat,

11 tell me that.  I want to make sure that we have a

12 clean record and that you understand what I'm asking

13 you.  If you answer a question today, I'm going to

14 presume that you understood what I asked.

15      Is that fair?

16   A. Yes, sir.

17   Q. And if at any time, Mr. Pursley, you need a

18 break for any reason, just let me know.  The only

19 thing I'd ask is that we not take a break while

20 there is a question pending.

21      Okay?

22      Is that all right?

23   A. Yes, sir.

24   Q. Okay.

1          Mr. Pursley, do you have any memory issues

2     which might impact your ability to testify fully and

3     completely today?

4          A. Some.

5          Q. I'm sorry.

6             Did you say no?

7          A. Yes.

8          Q. Okay.

9          A. Yes, I do.

10         Q. You do have memory issues?

11         A. Yes, I do.

12         Q. Okay.

13            Could you tell us about those, please?

14         A. Well, other than time, the time that's

15    passed, I've also had two spine surgeries, and one

16    of them had complications to where my spinal sac was

17    cut and medications that I take.  So there's some

18    memory issues, but I believe I should be able to

19    answer your questions to the best of my ability.

20         Q. Okay.

21            And those two spine surgeries, when were

22    those?

23         A. They were January of '19.  Well, I'm sorry.

24    February of 2019.

1      Q. And was there a second one?

2      A. Yes.  It was also in February of 2019.

3      Q. And when you say there were some

4  complications which have impacted your memory, could

5  you tell me a little bit more about that?  How has

6  it impacted your memory?

7      A. Well, stress.  When I'm not eating

8  correctly, I have a lot of nerve pain.  I have a lot

9  of nerve issues, and I have a slowed down digestive

10 system diagnosed.  So that impacts function.  I

11 sometimes lose things, inaccuracies.  You know, I

12 get flustered.

13     Q. Putting aside the passage of time, which

14 obviously impacts everybody's memory, is there

15 anything about the complications you've suffered

16 from those spine surgeries that has impacted your

17 long-term memory?

18     A. Just to the degree that I stated.  I should

19 be -- I should be fine, though.

20     Q. Okay.

21     A. I will answer all the questions to the best

22 of my ability.

23     Q. Have you taken any medications in the last

24 24 hours, sir?

1    A. Yes, sir.

2    Q. And what are those?

3    A. Oxcarbazepine, Meloxicam, Gabapentin,

4  Losartan, hydrochlorothiazide.

5    Q. And to the best of your knowledge, what do

6  you take those medications for?

7    A. I take those medications -- well, high blood

8  pressure medications.  The Meloxicam is for the

9  swelling in my back.  The Gabapentin is for the

10 nerve pain.  And the oxcarbazepine is for bipolar, I

11 guess like for calmness or mental wellness.  I have

12 a lot of anxieties.

13   Q. Have you been diagnosed with bipolar

14 disorder?

15   A. I have.

16   Q. And when was that diagnosis?

17   A. Probably earlier this year.

18   Q. Do you recall the name of the doctor who

19 diagnosed you with bipolar disorder?

20   A. No.

21   Q. Was that a doctor in the Rockford area or

22 someplace else?

23   A. Champaign.

24   Q. And where are you currently physically

1    located during today's deposition?

2         A. In Mahomet, Illinois, at home.

3         Q. And is that in Champaign, Illinois?

4         A. It's in Champaign County, yes.

5         Q. Okay.  And that's where you live?

6         A. Yes, sir.

7         Q. And who do you live there with?

8         A. Michelle Carr.

9         Q. What is your relationship with Ms. Carr?

10        A. Fiancee, domestic partner, girlfriend.  It

11   varies.

12        Q. In the last 24 hours, Mr. Pursley, have you

13   taken any drugs that we haven't talked about,

14   non-prescribed medication, or alcohol?

15        A. I have not.

16        Q. I'd like to talk a little bit about your

17   background, Mr. Pursley.

18            Can you tell me where you were born and

19   where you grew up?

20        A. I was born in Elgin, Illinois, and I grew up

21   all over Northern Illinois.

22        Q. When you say you grew up all over Northern

23   Illinois, was there a particular town or city where

24   you spent most of your childhood?

1     A. I spent most of my childhood in Elgin.

2     Q. And did you go to school in Elgin?

3     A. I did.

4     Q. How far did you go in school?

5     A. In Elgin?

6     Q. Yes.

7     A. Beginning of the ninth grade.

8     Q. And what happened at that time?

9     A. I was placed into DCFS.

10    Q. Was that in Elgin, or was that someplace

11    else?

12    A. It was Illinois Department of Child and

13    Family Services Agency.

14    Q. And tell me about that.  Did you go to a

15    facility?  Were you placed into a foster home?

16    A. I was placed in, I believe, between 13 and

17    15 different facilities, institutions, and foster

18    homes from 14 to 17.

19    Q. And was that all in the Northern Illinois

20    area?

21    A. Yes, sir.

22    Q. And you indicated you went through ninth

23    grade -- or at least part of ninth grade in Elgin.

24       Did you attend any other high schools

1     anywhere beyond the ninth grade?

2          A. Yes.

3          Q. And where was that?

4          A. Rockford, Illinois.

5          Q. Which high school in Rockford, Illinois?

6          A. West High School.

7          Q. Okay.

8          A. West High School.

9          Q. Thank you.

10              Which years did you attend West High School?

11         A. I believe 1982 or 1983.

12         Q. Did you graduate from West High School or

13    any other high school?

14         A. I did not.

15         Q. When did you first come to Rockford,

16    Illinois?

17         A. I believe in 1980.

18         Q. And how did that come about?

19         A. I was placed in a group home.

20         Q. Do you recall how long you lived in that

21    group home in Rockford?

22         A. Not exactly.

23         Q. Was West High School the last high school

24    you attended in 1982 or 1983?

1      A. I believe so, yes.

2      Q. What did you do after you stopped attending

3  West High School?  Did you begin working somewhere?

4  What did you do?

5      A. I worked.

6      Q. You worked in Rockford?

7      A. Yes, I worked.  I worked in Rockford, yes.

8      Q. And can you tell me where in Rockford you

9  worked starting about that time frame?

10      A. I worked for Joseph Bare, washing cars.  I

11  worked at Rax Roast Beef.

12      Q. Any other jobs that you had back in the

13  early to mid 1980's that you can think of?

14      A. That were in Rockford?

15      Q. Or anywhere else.

16      A. Are you talking just Rockford?  Yes.

17      Q. Okay.

18         Tell me where else you worked, whether it

19  was in Rockford or elsewhere.

20      A. I worked for Griffith Enterprises.  I worked

21  for -- I worked in building renovation with Griffith

22  Enterprises.  I worked in landscaping.  I did summer

23  jobs.

24      Q. You talked a little bit already about some

1    back issues you've had, Mr. Pursley.

2         How would you describe the state of your

3    health as you sit there today?

4       A. Moderate.

5       Q. And why do you say moderate?

6       A. Because I still -- I still deal with daily

7    pain and daily dietary issues and mental faculties.

8       Q. When you say daily pain, you've talked about

9    the back issues.

10        Is the daily pain you're referring to

11   limited to back pain?

12      A. No.

13      Q. What other types of pain do you suffer from?

14      A. Nerve pain that goes down my leg into my

15   ankles.  Even though I have not been diagnosed, I

16   believe like arthritic joints.  Like my shoulders, I

17   have -- that's pretty much it, the nerve pain in my

18   legs and back.

19      Q. When did you first start experiencing back

20   pain or back discomfort?

21      A. Prior to my release from prison.

22      Q. Do you recall about what year that was?

23      A. It was -- I would think around 2017.  It was

24   just in that area.  It was -- I didn't think it

1    was -- I didn't think it was major.

2        Q. Was there something that initiated that

3    pain, that you believe started to cause that pain at

4    that time?

5        A. Workouts, exercise, the jail bunk.  Just

6    different -- different -- you know, different

7    activities.

8        Q. And when were you released from prison,

9    Mr. Pursley?

10       A. I bonded out in April 2017.

11       Q. And as I understand it, there were some

12   intermittent periods of time between April 2017 and

13   your acquittal in January 2019 when you were back

14   incarcerated at the Winnebago County Jail.

15           Is that accurate?

16       A. Yes.

17       Q. The Zoom cut off there for a moment.

18           I don't see Mr. -- there he is.

19           Can everybody hear me?

20           MS. LEFF:  Yes.

21       A. I can.

22           MR. HUOTARI:  I can hear you loud and clear,

23   Mike.

24   BY MR. IASPARRO:

1      Q. Mr. Pursley, I want to start talking about

2   the Andrew Ascher case.  We all know why we're here.

3   Let's start with this.

4          You know a person by the name of Samantha

5   Crabtree.  Is that fair to say?

6      A. Yes.

7      Q. When did you first meet Samantha Crabtree?

8      A. I believe while in work release.

9      Q. Do you recall what year that was?

10     A. Possibly '91 or '92.

11     Q. And where was that when you first met

12  Ms. Crabtree?

13     A. At Burger King.

14     Q. Was that in Rockford?

15     A. Yes.

16     Q. Which Burger King in Rockford?

17     A. Auburn and -- Auburn and Kilbourn.

18     Q. And were you working there at that time?

19     A. Yes.

20     Q. Was Ms. Crabtree also working there at the

21  time?

22     A. Yes.

23     Q. At some point, did you begin a dating

24  relationship with Ms. Crabtree?

1      A. Yes.

2      Q. And to the best of your recollection, when

3  did that relationship begin?

4      A. I believe in the summer of '92.

5      Q. And at some point, did you begin living with

6  Ms. Crabtree?

7      A. Yes.

8      Q. Again, to the best of your recollection,

9  when did you begin living with Ms. Crabtree?

10     A. Probably the same time.

11     Q. Somewhere in the summer of 1992?

12     A. Yes.

13     Q. Where was that, sir?

14     A. On Ashland in Rockford, Illinois.

15     Q. The address I've seen was 901 Ashland,

16  Apartment 2.

17         Does that sound right?

18     A. Yes.

19     Q. Can you describe that apartment for me?

20     A. A two-bedroom apartment upstairs, one bath.

21     Q. Did anybody else live at that apartment with

22  you and Ms. Crabtree?

23     A. Her children.

24     Q. Ms. Crabtree's children?

1      A. Yes.

2      Q. What were their names?

3      A. Marcus, Danny, and Erica.

4      Q. And those three were not your children; is

5  that true?

6      A. Correct.

7      Q. At some point, did Ms. Crabtree become

8  pregnant with your child?

9      A. Yes.

10     Q. And when --

11     A. Yes.

12     Q. Okay.  When do you recall learning that

13  Ms. Crabtree was pregnant with the child that you

14  share?

15     A. I'm not sure.

16     Q. We'll get to this a little bit later on, but

17  do you recall if you learned that information while

18  you were incarcerated at the Winnebago County Jail

19  or before?

20     A. I'm uncertain on that.

21     Q. Okay.  And for time frame purposes, as I

22  understand it, you were arrested for the charges you

23  faced with respect to the Andrew Ascher murder on

24  June 16, 1993.

1          Does that sound accurate?

2      A. Yes.

3      Q. All right.  And as you sit there today, you

4  don't know if you knew whether Ms. Crabtree was

5  pregnant with your child before or after that time;

6  is that a fair statement?

7      A. Yes.

8      Q. Do you recall when Ms. Crabtree had your

9  daughter?

10     A. In January of 1994.

11     Q. And what is that child's name, your

12  daughter's name?

13     A. Nija Pursley.

14     Q. That's N-i-j-a; is that right?

15     A. Yes.

16     Q. Do you and Ms. Crabtree have any other

17  children together?

18     A. No.

19     Q. Mr. Pursley, when is the last time you spoke

20  to Samantha Crabtree?

21     A. A few months ago.

22     Q. Was that in-person or via telephone?

23     A. It was on the phone.

24     Q. And what were the circumstances which led

1  you and Ms. Crabtree to speak by phone a few months

2  ago?

3      A. Regarding my daughter's graduation.

4      Q. When was the last time you saw Ms. Crabtree?

5      A. I may have seen her one or two times since

6  my release.  I can't be certain like what month

7  or -- I haven't seen her this year.

8      Q. And prior to that occasion a few months ago

9  when you spoke on the phone about your daughter's

10  graduation, do you recall the next time preceding

11  that that you spoke to Ms. Crabtree?

12      A. I do not.  It was more or less in passing

13  regarding my daughter.

14      Q. How would you describe the nature of your

15  relationship with Samantha Crabtree today?

16      A. Cordial.  She's my -- the mother of my

17  daughter.  Cordial.

18      Q. Have you had any conversations with Samantha

19  Crabtree about this lawsuit that we're talking about

20  today?

21      A. I have not.

22      Q. How would you describe the nature of your

23  relationship with your daughter Nija?

24      A. Good.

1      Q. Does your daughter Nija have a good

2  relationship with Samantha Crabtree?

3          MS. LEFF:  I'll object to foundation.

4          You can still answer.

5      A. I don't know.

6      Q. Mr. Pursley, are you familiar with a written

7  statement that Ms. Crabtree gave on June 10, 1993,

8  in relation to the Andrew Ascher homicide

9  investigation?

10     A. I am.

11     Q. You've seen that document before?

12     A. I have.

13     Q. Were you present at the Rockford Police

14 Station on June 10, 1993, wherein that statement was

15 given?

16     A. No.

17     Q. Were you present for any interview or

18 interrogation of Samantha Crabtree by Rockford

19 police officers in relation to that written

20 statement?

21     A. No.

22     Q. Do you also have knowledge that Samantha

23 Crabtree testified before the Winnebago County grand

24 jury on June 23, 1993, regarding the Andrew Ascher

1    murder?

2         A. Yes.

3         Q. And have you seen a copy of that testimony,

4    that transcript of her grand jury testimony?

5         A. Yes.

6         Q. Were you present in the grand jury on

7    June 23, 1993, during Samantha Crabtree's testimony?

8         A. No.

9         Q. Were you present in the courtroom on that

10   day when Ms. Crabtree appeared before a circuit

11   court judge and was granted immunity prior to her

12   grand jury testimony?

13        A. No.

14        Q. Do you know a man named Marvin Windham,

15   Mr. Pursley?

16        A. Yes.

17        Q. How do you know Mr. Windham?

18        A. I believe I met him on work release.

19        Q. Do you recall what year that was?

20        A. Not exactly.

21        Q. And work release -- when you say you met him

22   in work release, where would that have been?

23        A. Winnebago County.

24        Q. Did you and Mr. Windham become friends after

1  that time?

2      A. Associates.

3      Q. What do you mean by that?  That word could

4  mean different things to different people.

5      A. I knew him casually.  I really can't -- like

6  friendship is something different.

7      Q. How often would you see Marvin Windham after

8  you met him on work release?

9      A. Could you be more specific?  Are you talking

10  about while in work release?

11      Q. Well, that's fair.

12          Let's talk -- first, let me ask you this:

13  How long were you in work release in Winnebago

14  County?

15      A. A few months.

16      Q. Do you recall when your time at work release

17  in Winnebago County ended?

18      A. Yes.

19      Q. When was that?

20      A. Not the date.  I don't remember the date.  I

21  just know I got violated and got sent back to DOC.

22  I don't know the months or the date.

23      Q. Okay.  How long did you spend back in DOC

24  after you were violated?

1          A. A few more months.

2          Q. Do you recall when you were released from

3    DOC after -- sorry.

4          A. Either --

5          Q. Go ahead.

6          A. Either spring or summer of -- I'm sorry.

7              Either the spring or summer of '92 or '93 --

8    I mean, the spring or summer '92 -- the spring or

9    summer '92.

10         Q. And did you come back to Rockford after your

11   release from DOC at that time?

12         A. Yes.

13         Q. Is that when you began working at the Burger

14   King that we discussed earlier?

15         A. That was when I went back to work at the

16   Burger King.  I worked at Burger King while in work

17   release.  And when I got released, I also worked at

18   Burger King again.

19         Q. Okay.  After you were released from DOC in

20   the spring or summer of '92 after being violated,

21   when do you recall was the next time you encountered

22   or saw Marvin Windham?

23         A. I don't remember the exact month.  It was --

24   I don't remember the next month.  It had to be

1    within a matter of a few months, couple months.

2        Q. And do you recall whether that was just a

3    random-chance encounter or whether one of you

4    initiated that contact?

5        A. I do not recall.

6        Q. Starting with that middle of '92 time frame

7    through June of 1993, so that year or so of spread,

8    could you describe for us how often you saw Marvin

9    Windham over that course of time?

10       A. Occasionally.  I don't -- just occasionally.

11       Q. And what were the circumstances under which

12   you would see Mr. Windham occasionally?

13       A. I helped him move once.  I think we had

14   dinner.  We had dinner at my house.  I seen him in

15   different -- different contexts, different times,

16   visits.

17       Q. How many times would he come to your house

18   or did he come to your house?

19       MS. LEFF:  Object to form.  Incompleteness

20   as to the time period.

21       A. I don't know.

22       Q. Do you recall where he lived, where you

23   helped him move?

24       A. On Rockton.

1      Q. How far from your apartment on Ashland was

2   that?

3      A. A few blocks.

4      Q. During the course of this case and the other

5   proceedings related to this case, the underlying

6   criminal proceedings, have you learned that Marvin

7   Windham provided information to the police regarding

8   the Andrew Ascher homicide?

9      A. Yes.

10      Q. And starting with, in particular, an

11   anonymous phone call on June 8, 1993 to Crime

12   Stoppers, have you learned that Mr. Windham made an

13   anonymous call to Crime Stoppers on June 8, 1993?

14      A. Yes.

15      Q. Were you a party to that conversation?

16      A. No.

17      Q. Did you have any knowledge that Mr. Windham

18   was going to make a call to Crime Stoppers on

19   June 8, 1993, before he did so?

20      A. No.

21      Q. Have you become aware of the fact that

22   Mr. Windham provided a written statement to Rockford

23   police officers on June 12, 1993?

24      A. Yes.

1        Q. Have you seen a copy of that written

2   statement?

3        A. I have.

4        Q. Were you present at the Rockford police

5   department when the Rockford police detectives took

6   the written statement from Marvin Windham on

7   June 12, 1993?

8        A. No.

9        Q. I want to back up for a moment to June 10th

10  of 1993, the date that Ms. Crabtree gave the written

11  statement we talked about earlier.

12        Were you with Ms. Crabtree earlier that day

13  before she went down to the police station?

14        A. I believe so, yes.

15        Q. And where were you with Ms. Crabtree prior

16  to her going down to the police station?

17        MS. LEFF:  I'm going to object to foundation

18  in terms of his knowledge of when she went.

19        Q. Well, let me ask the question a little

20  differently.

21        Do you recall being followed by some

22  Rockford police officers in the afternoon of

23  June 10, 1993, from your apartment on Ashland to a

24  house over on Evergreen?

1    A. I remember being followed, and at that time,

2    I did not know it was Rockford police officers.

3    Q. Okay.  When you say you remember being

4    followed, what was your understanding at that time

5    about who was following you, why you were being

6    followed?

7    A. I -- who was following me and why I was

8    being followed?

9    Q. Yeah.  What I'm interested in knowing is

10   what your understanding was at that time.

11   A. That there was a vehicle parked in front of

12   my house, and when I called down to Samantha, I saw

13   a vehicle parked there.  I believe the engine was

14   running.  When I came downstairs a few minutes later

15   and we left, the vehicle then followed us.

16   Q. And if I understand the course of events,

17   you and Ms. Crabtree ended up over on Evergreen

18   Avenue shortly after that; is that accurate?

19   A. Yes.

20   Q. And were you going to a particular location

21   on Evergreen?

22   A. Yes.

23   Q. And what was that?

24   A. Myra Foster's house.

1      Q. Myra Foster was also known as Peachy; is

2   that correct?

3      A. Yes.

4      Q. What was your relationship with Myra Foster?

5      A. It was a good relationship.  It was a really

6   good relationship.

7      Q. Let me ask it a little differently.

8         How did you know Myra Foster?

9      A. She was my son's -- she is my son's

10  grandmother.

11     Q. And your son's name is what?

12     A. Tremain Anthony Pursley.

13     Q. Between leaving 901 Ashland and getting to

14  Myra Foster's house on Evergreen that afternoon,

15  June 10, 1993, did you at any point come to

16  understand that you were being followed by police

17  officers?

18     A. You're saying from the time we left my house

19  to the time that we arrived at Myra Foster's house,

20  did I know it was police officers?

21     Q. Yes.

22     A. No.

23     Q. Your video turned off there.

24        There you go.

1    A. I'm sorry.  It was --

2    Q. It's okay.

3    A. My apologies.

4    Q. If I understand what happened that day based

5  on my review of the records in this case, you got

6  out of the car and took off running through some

7  yards on Evergreen.

8        Do you recall that?

9        MS. LEFF:  Object to form.

10   Q. I'm sorry.

11       If you answered, I didn't hear you,

12  Mr. Pursley.

13   A. Yes.

14   Q. Why did you take off running from your car

15  that day on Evergreen Avenue?

16   A. Fear.

17   Q. Of what?

18   A. Well, where I lived was kind of dangerous.

19  And so my thinking was if the -- whoever was in this

20  van did not approach Samantha while she was

21  downstairs at the car for a few minutes, and whoever

22  it was, they were possibly after me.  So I felt if I

23  ran, they would focus on me, they would come after

24  me, and that Samantha and the kids would be safe at

1   Myra's house.  We weren't going to Myra's house.  We

2   were going to a birthday party, and I told her to go

3   there as like a safeguard.

4       Q. And the birthday party that you were going

5   to, where was that going to be held?

6       A. It was going to be in Elgin.

7       Q. Before you got out of the car and took off

8   running, did you have any conversation with

9   Ms. Crabtree?

10      A. I don't remember.  I remember telling her to

11  turn, like, you know -- I don't remember the exact

12  nature of the conversation, but I instructed her to

13  go to Myra's house.

14      Q. At some point, did you realize that there

15  were police officers who were chasing you through

16  the neighborhood that day?

17          MS. LEFF:  Object to form.  Assumes facts

18  not in evidence.

19      A. Yes.

20      Q. When was that?

21      A. I would say within -- within the hour that I

22  ran.

23      Q. Did you go track down a Rockford police

24  officer or detective to see what they wanted?

1      A. No.

2      Q. Why not?

3      A. Because I feared incarceration or death or

4  just -- you know, period, just -- I fled.

5      Q. At that time on June 10, 1993, did you have

6  any knowledge that Marvin Windham had made an

7  anonymous call to Crime Stoppers on June 8, 1993?

8      A. No.

9      Q. And at that time -- and by time, I mean when

10 you got out of the car and started running -- did

11 you know that Rockford police detectives had a

12 search warrant to search your and Ms. Crabtree's

13 apartment on Ashland?

14     A. No.

15     Q. When did you first learn that?

16     A. The search warrant?

17     Q. Yes.

18     A. Are you talking about the search warrant?

19     Q. Just the search warrant.

20     A. After my incarceration.

21        After my incarceration.

22     Q. Okay.  So sometime after June 16, 1993?

23     A. Yes.

24     Q. When did you first learn that Marvin Windham

1    had provided information to the police about the

2    Andrew Ascher homicide?

3        A. After my incarceration, also.

4        Q. And when did you first learn that Samantha

5    Crabtree had provided a statement to the police on

6    June 10, 1993?

7        A. The same.

8        Q. Between June 10, 1993, and June 16, 1993,

9    did you talk to Samantha Crabtree at all?

10       A. No.

11       Q. Did you know she had been arrested and

12   locked up in the Winnebago County Jail?

13       A. I believe so, yes.

14       Q. Do you recall how you learned that

15   information?

16       A. I believe through media, media reports.

17       Q. Did you make any attempt to go visit

18   Ms. Crabtree?

19       A. No.

20       Q. Make any efforts to go bond her out?

21       A. No.

22       Q. Did you know what she had been charged with?

23       A. I don't recall that.

24       Q. Mr. Pursley, do you know a man by the name

1    of Lester "Latee" Brown?

2         A. Yes.

3         Q. And to the best of your recollection, when

4    did you first meet Mr. Brown?

5         A. I believe the late '80s.

6         Q. Do you recall where you met him?

7         A. In Rockford.

8         Q. What were the circumstances?

9         A. Probably a friend's house.

10        Q. Did you and Mr. Brown develop a friendship?

11        A. Association.  I would say association.

12        Q. How would you describe the nature of your

13   relationship with Mr. Brown?

14        A. Then or now?  Then or now?

15        Q. That's fair.

16           You said you met him, you think, in the late

17   80's.  Let's use that time frame, late 80's, early

18   90's.

19        A. Yes.  I knew him through the streets.  I

20   hung out with him a little -- hung out with him.

21        Q. Did you commit any crimes with Mr. Brown?

22        A. I would like to plead my Fifth Amendment

23   right to remain silent, to be free from

24   self-incrimination at this time.

1    Q. With respect to any crimes you may have

2    committed with Mr. Brown, is that what you're

3    saying?

4    A. In this instance, yes.

5    Q. Well, I didn't ask you that question with

6    respect to Marvin Windham.

7        Did you commit any crimes with Marvin

8    Windham at any time?

9    A. I would like to assert my Fifth Amendment

10    right to be silent, to be free from

11    self-incrimination.

12    Q. Mr. Pursley, did you commit any crimes with

13    Samantha Crabtree at any time?

14    A. I would, again, like to assert my Fifth

15    Amendment right to remain silent and be free from

16    self-incrimination at this time.

17    Q. Mr. Pursley, did you murder Andrew Ascher

18    with Samantha Crabtree?

19    A. No, I did not murder Andrew Ascher.

20    Q. You understand that Lester Brown gave a

21    written statement to a Rockford police detective and

22    FBI agent on December 29, 1993, regarding his

23    knowledge of the Ascher homicide?

24    A. I've read documentation on it, yes.

1     Q. Okay.  Were you present when Mr. Brown gave

2  that written statement to Detective Forrester and

3  the FBI agent?

4     A. No.

5     Q. Do you recall being visited by Mr. Brown at

6  the Winnebago County Jail after your incarceration

7  on June 16, 1993?

8     A. I do not.

9     Q. When you say you don't recall, are you

10  saying it didn't happen, or you just don't remember?

11     A. I don't remember.

12     Q. If there's documentation from the Winnebago

13  County Jail which indicates Mr. Brown visited you in

14  June of 1993, do you have any reason to dispute

15  that?

16     A. No.  No.

17     Q. And as you sit there today, if Mr. Brown

18  visited you at the Winnebago County Jail in June of

19  1993, do you know why he would have done so?

20        MS. LEFF:  Object to foundation.

21        You can answer, Patrick.

22     A. Well, I would -- I can only assume that I

23  asked him to visit or he came to check on me.  I'm

24  not exactly sure the exact circumstance of that.

1    Q. And if you would have asked him to visit,

2  why would that have been?

3    A. Because you're incarcerated.

4    Q. Do you know if Marvin Windham and Lester

5  Brown knew each other in the summer of 1993?

6    A. I do not know.

7    Q. Do you recall having any conversations with

8  either Marvin Windham or Lester Brown about the

9  other?

10   A. I do not.  I do not know.  I do not know.

11   Q. Bear with me a second, Mr. Pursley.  I'm

12 going to pull up a document I'd like to show you.

13      (Exhibit 1 was marked for identification

14 and is attached to the transcript.)

15   Q. Can you see that video, Mr. Pursley -- or

16 that document?

17   A. Yes.

18   Q. Are you familiar with that document as the

19 second amended complaint that was filed on your

20 behalf about this case pending in federal court in

21 Rockford?

22   A. Yes.

23   Q. Before that complaint was filed, did you

24 have an opportunity to review it, make sure the

1  allegations in it were accurate to the best of your

2  knowledge?

3      A. I did.

4      Q. And I'd like to direct your attention to

5  paragraph 2.

6          Do you see that in front of you?  It says,

7  "The evidence used to secure Plaintiff's

8  conviction was fabricated" --

9      A. Yes.

10     Q. Okay.  I'd just read it for the record.

11         "The evidence used to secure Plaintiff's

12  conviction was fabricated by defendant officers of

13  the Rockford City Police Department and forensic

14  scientists from the Illinois state police crime lab.

15  There was no credible evidence connecting Plaintiff

16  to the crime scene or the murder weapon."

17         Did I read that accurately, Mr. Pursley?

18     A. Yes.

19     Q. Mr. Pursley, what evidence are you

20  contending was fabricated by the defendant officers

21  of the Rockford City Police Department and forensic

22  scientists from the Illinois State Police?

23         MS. LEFF:  Objection.  Calls for a legal

24  conclusion.

1      Q. You can answer.

2      A. Ballistics, most notably; forced confession,

3   as I understand it; disregarding crime scene

4   evidence; and occurrence witness testimony who said

5   I was not the person; disregarding physical evidence

6   at the crime scene; and more or less, advancing a

7   case that was -- that was false, that did not match

8   up to what the crime scene showed.

9      Q. Let's break that down a little bit.

10         Let's start with ballistics.

11         When you say ballistics, what particular

12  ballistics evidence are you contending was

13  fabricated?

14         MS. LEFF:  I'm going to object.  Calls for a

15  legal conclusion, and calls for expert testimony.

16         You can answer to the best of your

17  understanding.

18      A. That the Taurus was used to kill Andy

19  Ascher.

20      Q. Let me ask you a question.  Maybe I should

21  have asked it a couple of questions ago.

22         The word fabricated, what does that mean to

23  you?  What do you understand that to mean?

24         MS. LEFF:  Objection.  Calls for a legal

1   conclusion.

2       A. Made up.

3       Q. So when you testified just a moment ago that

4   the Taurus 9-millimeter handgun -- that the

5   conclusion that the Taurus 9-millimeter handgun was

6   used to kill Andrew Ascher, that that was

7   fabricated, who are you contending made that

8   evidence up, fabricated that evidence?

9       MS. LEFF:  I'll object to lack of

10  foundation.

11      You can answer to the best of your

12  knowledge.

13      A. Ballistics experts, Rockford PD, and a

14  prosecutor that disregarded examination by defense

15  experts who also generated photos to show that the

16  gun was inconclusive or did not match.  This is just

17  my understanding of the case.

18      Q. And what evidence are you aware of that any

19  Rockford police officer or Illinois State Police

20  forensic scientist made up the conclusions or

21  testimony relating to that Taurus 9 millimeter

22  ballistics evidence?

23      MS. LEFF:  Object to the extent it calls for

24  a legal conclusion and for expert opinion.

1        You can answer to the best of your

2   understanding.

3       A. Reports that were in my police reports and

4   testimony that they offered in court and later

5   backed away from or retracted.

6       Q. Well, let me just go down the list here.

7           What, if any, evidence are you aware of that

8   James Barton fabricated or made up any evidence

9   relating to the Ascher homicide investigation?

10          MS. LEFF:  Object.  Calls for a legal

11  conclusion.

12      A. I do not know.

13      Q. What, if any, evidence are you aware of --

14      A. I don't know.

15      Q. No.  I'm going to ask you a different

16  question now.

17          What, if any, evidence are you aware of that

18  Jim Bowman fabricated or made up any evidence

19  relating to the Andrew Ascher investigation?

20          MS. LEFF:  Objection.  Calls for a legal

21  conclusion.

22      A. I do not know.

23      Q. What, if any, evidence are you aware that

24  Ron Gallardo made up or fabricated any evidence

1  relating to the Ascher homicide investigation?

2          MS. LEFF:  Same objection.

3      A. I do not know.

4      Q. What, if any, evidence are you aware of that

5  John Genens made up or fabricated any evidence

6  relating to the Ascher homicide investigation?

7          MS. LEFF:  Objection.  Calls for a legal

8  conclusion.

9      A. I do not know.

10     Q. What, if any, evidence are you aware of that

11 Charlene Getty fabricated or made up any evidence

12 relating to the Ascher homicide investigation?

13         MS. LEFF:  Same objection.

14     A. I do not know.

15     Q. What, if any, evidence are you aware of that

16 Jeff Houde fabricated or made up any evidence

17 relating to the Ascher homicide investigation?

18         MS. LEFF:  Same objection.

19     A. I do not know.

20     Q. What, if any, evidence are you aware of that

21 Christine Bishop fabricated or made up any evidence

22 relating to the Ascher homicide investigation?

23         MS. LEFF:  Objection.  Calls for a legal

24 conclusion.

1    A. I do not know.

2    Q. What, if any, evidence are you aware of that

3    Sam Pobjecky fabricated or made up any evidence

4    relating to the Ascher homicide investigation?

5    MS. LEFF:  Objection.  Calls for a legal

6    conclusion.

7    A. I do not know.

8    Q. What, if any, evidence are you aware of that

9    Mark Schmidt fabricated or made up any evidence in

10    relation to the Ascher homicide investigation?

11    MS. LEFF:  Objection.  Calls for a legal

12    conclusion.

13    A. I do not know.

14    Q. What, if any, evidence are you aware of that

15    Bruce Scott fabricated or made up any evidence

16    relating to the Ascher homicide investigation?

17    MS. LEFF:  Objection.  Calls for a legal

18    conclusion.

19    A. I do not know.

20    Q. What, if any, evidence --

21    A. I do not know.

22    Q. Okay.  What, if any, evidence are you aware

23    of that Doug Williams fabricated or made up any

24    evidence relating to the Ascher homicide

1    investigation?

2          MS. LEFF:  Objection.  Calls for a legal

3    conclusion.

4        A. I do not know.

5        Q. What, if any, evidence are you aware of that

6    Greg Hanson fabricated or made up any evidence

7    relating to the Ascher homicide investigation?

8          MS. LEFF:  Same objection.  Calls for a

9    legal conclusion.

10       A. I do not know.

11       Q. What, if any, evidence are you aware of that

12   Steven Pirages fabricated or made up any evidence

13   relating to the Ascher homicide investigation?

14         MS. LEFF:  Objection.  Calls for a legal

15   conclusion.

16       A. I do not know.

17       Q. What, if any, evidence are you aware of that

18   Howard Forrester fabricated or made up any evidence

19   relating to the Ascher homicide investigation?

20         MS. LEFF:  Objection.  Calls for a legal

21   conclusion.

22       A. Only from what I read in the record, so I

23   really do not know.

24       Q. And we're specific with Forrester now.  Your

1    answer there was a little different, only from what

2    you read in the record.

3         What does that mean?

4       A. Well, I can't say exactly what Howard

5    Forrester did or did not do.  But I know that his --

6    his name is on the most reports, the critical

7    reports, and so I can't say that I know exactly,

8    only from what I read.

9       Q. Okay.  You don't have any firsthand

10   knowledge of what Detective Forrester did in this

11   case because you weren't with him at any time he did

12   any of his investigative activity in relation to the

13   Ascher case.

14        Is that accurate?

15        MS. LEFF:  I'm going to object.  It assumes

16   facts not in evidence.

17      Q. I'm sorry.

18        Can you answer, Mr. Pursley?

19      A. That is accurate.

20        Yes, that is accurate.

21      Q. Okay.  Thank you.

22        What, if any, evidence are you aware of that

23   Gary Reffett fabricated or made up any evidence

24   relating to the Ascher homicide investigation?

1        MS. LEFF:  Objection.  Calls for a legal

2   conclusion.

3        A. I do not know.

4        Q. What, if any, evidence are you aware of that

5   David Ekedahl fabricated or made up any evidence in

6   relation to the Ascher homicide investigation?

7        MS. LEFF:  Objection.  Calls for a legal

8   conclusion.

9        A. I do not know.

10        Q. What, if any, evidence are you aware of that

11   Daniel Gunnell from the State Police crime lab

12   fabricated or made up any evidence in relation to

13   the Ascher homicide case?

14        MS. LEFF:  Objection.  Calls for a legal

15   conclusion.

16        A. From reports that I've seen, his testimony

17   at my first trial, his testimony backtracking during

18   the evidentiary hearing.  So I have no firsthand

19   knowledge, only from what I've read.

20        Q. And with respect to what you've seen or read

21   relating to Daniel Gunnell, is it fair to say that

22   over the course of time in this case going back to

23   your first trial in '94 and through your second

24   trial in January 2019, that there have been a

1    difference of opinion, if you will, expert opinion

2    with respect to the ballistics evidence in this

3    case?

4        A. Yes.

5        Q. In other words, state police crime lab

6    witnesses have testified one way that the Taurus

7    9-millimeter was used to fire shell casings or

8    bullets, and witnesses testifying on your behalf

9    have testified contrary to that.

10           Is that a fair summary?

11        MS. LEFF:  I'm just going to object that it

12    mischaracterizes the record with respect to --

13        A. Yes.

14        MS. LEFF:  -- testimony given by the state.

15        Q. Beyond the disagreement between Mr. Gunnell

16    and the ballistics witnesses that testified on your

17    behalf at your trials, are you aware of any evidence

18    that Mr. Gunnel in any way fabricated or made up any

19    evidence in relation to the Ascher homicide case?

20        MS. LEFF:  Objection.  Calls for a legal

21    conclusion and for expert testimony.

22        A. He -- in my opinion, he changed his

23    testimony.  He walked it back.  He changed his

24    testimony.

1      Q. Okay.  So that's what you're relying upon in

2  making the allegation that he fabricated evidence?

3      MS. LEFF:  Object.  Calls for a legal

4  conclusion and also asks for attorney mental

5  impressions.

6      Q. You can answer, Mr. Pursley.

7      A. To the best of my knowledge.

8      Q. Okay.

9      A. To my understanding --

10     Q. All right.  What evidence are you aware of,

11  Mr. Pursley, that Peter Striupaitis from the state

12  police crime lab fabricated or made up any evidence

13  in relation to the Ascher case?

14     MS. LEFF:  Objection.  Calls for a legal

15  conclusion and for expert testimony.

16     A. I'm unsure.  I don't know.

17     Q. And then, lastly, what evidence are you

18  aware of that Jack Welty from the state police crime

19  lab fabricated or made up any evidence in relation

20  to the Ascher case?

21     MS. LEFF:  Objection.  Calls for a legal

22  conclusion and for expert testimony.

23     A. I'm also unsure on that.

24     Q. One of the other pieces of evidence that you

1  indicated you believe was fabricated in this case

2  were what you referred to as coerced confessions.

3       Did I recall that correctly?

4  A. Yes, sir.

5  Q. Whose confession, if you will, are you

6  contending was coerced?

7       MS. LEFF:  I'm going to object.  Calls for a

8  legal conclusion.  I'll object on the basis of

9  foundation.

10      You can answer to the best of your

11 knowledge, Patrick.

12 A. Samantha Crabtree.

13 Q. And what is the basis of your knowledge to

14 make that contention?

15      MS. LEFF:  Object to form.

16 A. From what I read and what I was told.

17 Q. What you were told by whom?

18      MS. LEFF:  Patrick, I want to caution you

19 not to share any information that was relayed to you

20 during conversations with your counsel.  Okay?

21 Q. And I'm not asking about any of those.  I

22 don't want you to say anything about what you and

23 your lawyers have ever talked about.

24      So my question -- this question is limited

1    to what conversations you have had with anybody

2    other than your lawyers with respect to Samantha

3    Crabtree's coerced confession, as you've

4    characterized it.

5        A. Samantha Crabtree.

6        Q. When did you have those conversations?

7        A. Via letter and phone calls.  Perhaps also on

8    visits.  What happened in court, evidence presented

9    by the defense and evidence by the State.

10       Q. Okay.  And just so I understand it, when you

11   refer to letters, phone calls, perhaps visits, are

12   you going back to the 1993-1994 time frame?

13       A. Yes, sir.

14       Q. Do you recall the last conversation you had

15   with Samantha Crabtree that in any way related to

16   her written statement or her confession, as you've

17   characterized it, being coerced in any way?

18       A. No, not -- no, not exactly.

19       Q. Did you have conversations with anybody

20   else -- again, putting your lawyers aside -- other

21   than Samantha Crabtree regarding her written

22   statement or grand jury testimony being coerced in

23   any way?

24       A. I'm sure I did.

1      Q. Let me ask the question a little

2  differently.

3          Did you have any conversations with anybody,

4  other than Samantha Crabtree, who was present at the

5  time she gave her written statement or grand jury

6  testimony regarding the nature of that statement or

7  testimony?

8      A. Not that I recall.

9      Q. The other category, if I recall correctly,

10  that you listed regarding evidence that you believe

11  was fabricated in this case was crime scene evidence

12  that you believe was disregarded.

13          Did I recall that correctly?

14      A. Yes, sir.

15      Q. What do you mean by that?

16      A. I mean that every single aspect of the

17  state's case, in my opinion, my understanding of the

18  record, was contradicted by the actual events that

19  took place when Andrew Ascher was killed.

20      Q. Okay.  Sticking specifically with the crime

21  scene evidence that you contend was disregarded,

22  what I'm interested in knowing is what specific

23  crime scene evidence you're contending Rockford

24  police disregarded.

1      MS. LEFF:  I'm going to object that it calls

2  for a legal conclusion and also expert testimony.

3      You can answer to the best of your

4  understanding.

5      A. Clothing, direction of travel, footwear,

6  occurrence witness testimony, ballistics, lack of --

7  lack of evidence as far as my clothing was tested

8  for blood.  I believe -- and disregarding the

9  ballistics as well, ballistic evidence that showed

10  contrary.

11      Q. Okay.  With respect to the occurrence

12  witness that you've referenced, who in particular

13  are you referring to?

14      A. David Bodell, as well as -- I believe her

15  name was Becky George.

16      Q. Let's start with David Bodell.

17      Do you have any understanding that David

18  Bodell at any time has identified any particular

19  person as a suspect or the suspect for the Ascher

20  murder?

21      A. No.

22      Q. And same question with respect to Becky

23  George:  Do you have any understanding that Becky

24  George at any time has ever identified any

1    particular person by name as a suspect or the

2    suspect for the Ascher murder?

3        A. No.

4        Q. Okay.  Mr. Pursley, I think the complaint is

5    still up on the screen in front of you.

6            Is it?

7        A. Yes.

8        Q. Okay.  The next paragraph after the one we

9    just talked about is paragraph 3, which reads,

10   "Defendants concealed their fabrication of evidence

11   from Plaintiff along with other exculpatory and

12   impeachment evidence."

13           Did I read that correctly?

14       A. Yes, sir.

15       Q. Now, the word defendants, plural, there

16   encompasses everybody that's listed in the

17   complaint.

18           Who are you contending in particular

19   concealed their fabrication of evidence from you?

20       MS. LEFF:  Objection.  Calls for a legal

21   conclusion.

22       A. The defendants.  I wasn't there, so I don't

23   know exactly.

24       Q. Let me ask the question a little

1    differently.

2          As you sit there right now, are you aware of

3    any particular defendant who concealed his or her

4    fabrication of any particular piece of evidence from

5    you or your lawyers in this case?

6          MS. LEFF:  Objection.  Calls for a legal

7    conclusion.

8       A. I don't know.  I don't know.

9       Q. Mr. Pursley, we've been going about an hour

10   and 15 minutes or so.  How are you doing?  Do you

11   need a break or anything?

12      A. I can go a little bit longer.

13      Q. All right.  I know you mentioned you've got

14   some back issues.  So I don't know if sitting for

15   long periods of time exacerbates that, but let me

16   know if it does.

17         Okay?

18      A. Yes, sir.

19      Q. In June of 1993, Mr. Pursley, did Samantha

20   Crabtree own a Taurus 9-millimeter handgun?

21      A. Yes.

22      Q. Were you with her when she purchased that

23   handgun?

24      A. No.

1      Q. Do you know when she purchased that handgun?

2      A. I remember she purchased the handgun after

3   she got robbed at knifepoint on our doorstep.  She

4   was a manager at Burger King.  I don't remember what

5   month.

6      Q. Do you recall her bringing it home?

7      A. No.

8      Q. Did you ever handle that handgun?

9      A. I'd like to assert my Fifth Amendment right

10   to be free from self-incrimination at this time.

11      Q. In June of 1993, you were a convicted felon

12   at that time; is that true?

13      A. Yes.

14      Q. So it would have been illegal for you to

15   possess a handgun as a convicted felon at that time?

16      MS. LEFF:  Object to the extent it calls for

17   a legal conclusion.

18      A. Yes.  Yes.

19      Q. Do you recall suggesting to Samantha

20   Crabtree after you were charged with the Ascher

21   murder that perhaps Marvin Windham could have used

22   that Taurus 9-millimeter to commit the murder?

23      A. I wouldn't characterize it as I suggested,

24   like I suggested he did.

1    Q. Do you recall raising that as a possibility?

2    A. It's a distinct question in my mind.

3    Q. Why do you say that?

4    A. As I sit here now or then?

5    Q. Let's go back to then.  I want to understand

6    your mindset back in 1993 after you were charged

7    with the Ascher murder.

8    A. I knew I hadn't done it.  I knew I hadn't

9    done it.

10   Q. Well, do you recall raising the possibility

11   that Marvin Windham had used Samantha's Taurus

12   9-millimeter to kill Andrew Ascher?

13   A. I'm -- I don't recall exactly.  I may have

14   inquired.  I may have asked.  But to suggest, I

15   don't recall that.

16   Q. Did you have some concern at that time,

17   after you had been charged with the Ascher murder,

18   that the Taurus 9-millimeter had, in fact, been used

19   to kill Andrew Ascher?

20   A. Yes.

21   Q. Why is that?

22   A. Because of the events that were transpiring.

23   Q. Well, did Marvin Windham have access to that

24   Taurus 9-millimeter owned by Samantha Crabtree?

1          MS. LEFF:  Object to foundation.

2      A. I would -- I would say yes, but I don't

3  know.  Like I did not see that.  I would say yes, he

4  had access.

5      Q. All right.  Let me break that down a little

6  bit.

7          Did you ever see Marvin Windham handle that

8  Taurus 9-millimeter that Samantha owned?

9      A. No.

10      Q. Did you and Marvin ever have any discussions

11  about the Taurus 9-millimeter that Samantha owned?

12      A. Not that I can recall.

13      Q. So why do you, as you sit there today, say

14  that you believe it was a distinct possibility that

15  Marvin used the Taurus 9-millimeter that Samantha

16  owned to kill Andrew Ascher?

17          MS. LEFF:  Objection.  Mischaracterizes

18  testimony.

19      A. After I got locked up and information was

20  provided to me, I came to learn that Marvin may have

21  been in my house, my apartment, on previous

22  occasions without me knowing or being there.

23      Q. How did you learn that information?

24      A. Well, one is protected by attorney-client.

1      Q. I'm not asking you what you talked to your

2 attorneys about now or then.

3          But when you say that, I want to understand,

4 are you referring to the attorneys that represented

5 you back in 1993 and 1994?

6      A. Yes.

7      Q. Okay.  Did you ever have any conversations

8 with Samantha Crabtree about Marvin Windham being in

9 your apartment without you being there?

10      A. I'm sure -- I'm sure I did.

11      Q. Do you recall any of those conversations in

12 particular?

13      A. Not -- not in particular.

14      Q. Mr. Pursley, as you sit there right now, do

15 you know --

16      A. I --

17      Q. I'm sorry.

18          Go ahead.

19      A. I mean, I'm sure I brought it to her.  I

20 just don't remember the whens, the whats, the

21 wheres, the hows.

22      Q. Mr. Pursley, as you sit there today, do you

23 know who killed Andrew Ascher on April 2, 1993?

24      A. No.

1       Q. I'm going to scroll down in the complaint a

2   little bit to paragraph 38.

3           Do you see that in front of you?

4           It says, "Attracted by the cash reward, on

5   June 8, 1993, a man called Crime Stoppers and made a

6   false report.  The man claimed that he had visited

7   Plaintiff the day after the murder and that

8   Plaintiff had confessed to killing Ascher in the

9   course of attempting to rob him."

10          Did I read that accurately, Mr. Pursley?

11      A. Yes, sir.

12      Q. Thank you.

13          Can we agree the man being referred to in

14  that paragraph is Marvin Windham?

15      A. Yes, sir.

16      Q. Do you recall having been visited by Marvin

17  Windham in the days following April 2, 1993?

18      A. I do not.

19      Q. Understanding that you've testified that you

20  did not kill Andrew Ascher, do you recall in early

21  April 1993 learning about the Ascher murder in

22  Rockford?

23      A. No.

24      Q. When do you recall first learning about that

1    murder having taken place?

2        A. I believe when I was wanted.

3        Q. Okay.  When you say when you were wanted,

4    does that mean before you were actually arrested?

5        A. It was the time after I fled, so it was --

6    I'm unsure whether it was through the media prior to

7    my arrest, in that span after the 10th.  That's what

8    I kind of believe, but I know definitively,

9    obviously, once I was arrested.

10       Q. Okay.  So, perhaps, sometime between

11   June 10th and June 16, 1993?

12       A. Yes.

13       Q. And in that time frame, those six days, did

14   you come to understand that the police were looking

15   for you in relation to the Ascher homicide

16   investigation?

17       A. I believe so, yes.

18       Q. Do you recall how you learned that

19   information?

20       A. I believe also through media reports.

21       Q. At any time between June 10th and

22   June 16, 1993, did you go to the Rockford police

23   department and tell them, "Hey, I understand you

24   guys want to talk to me"?

1        A. No.

2        Q. Why not?

3           MS. LEFF:  Objection.  Asked and answered.

4        A. It's -- it's not common practice where I

5     come from.

6        Q. When did you understand or first understand

7     that you had been charged with the Andrew Ascher

8     homicide?

9        A. Upon my arrest.

10       Q. And that was on June 16, 1993, as we've

11    established?

12       A. Yes, sir.

13       Q. And would it be fair to say that you hid

14    from the Rockford police officers on Underwood

15    Street in Rockford that day?

16       A. Yes.

17       Q. Why did you do that?

18       A. Fear.

19       Q. Fear of what?

20       A. Going to jail for something I didn't do,

21    fear of being hurt by the police.

22       Q. At your trial in April of 1994, you

23    presented an alibi defense, some alibi witnesses who

24    indicated you were home the evening of

1    April 2, 1993.

2         Is that accurate?

3    A. Yes.

4    Q. Why didn't you tell the police about that

5    alibi and those alibi witnesses on June 16, 1993?

6         MS. LEFF:  Objection.

7    A. When I was arrested, I asked for my

8    attorney.

9         MS. LEFF:  Objection.  Assumes facts not in

10   evidence.

11        You can answer.

12   Q. I'm sorry.  I didn't hear your answer.

13   A. Because I asked for my attorney.  I asked

14   for an attorney.

15   Q. Didn't you think it was important to tell

16   the police about witnesses who could clear your name

17   right away?

18        MS. LEFF:  Objection.  Argumentative.

19   A. I requested my attorney.

20   Q. Do you recall the first time that

21   information about those alibi witnesses was

22   disclosed to the police or to the prosecution?

23        MS. LEFF:  Objection.  Lack of foundation.

24   A. I do not.

1      Q. In that April 1993 time frame, Mr. Pursley,

2  were you collecting unemployment?

3      A. I was attempting to, I believe.

4      Q. Had you lost your job at Burger King?

5      A. I had.

6      Q. Can you tell me what the circumstances were

7  which led to you losing your job at Burger King?

8      A. I don't remember.

9      Q. Was there some sort of disagreement or

10  argument with the owner of the Burger King, a man

11  named Craig Opine?

12      A. I don't remember that.

13      Q. Do you recall ever having an argument with

14  Mr. Opine, threatening Mr. Opine in any way?

15          MS. LEFF:  Objection.  Asked and answered.

16      A. I don't remember.

17          I don't remember who Mr. Opine is.

18      Q. Okay.  Do you remember the owner of the

19  Burger King that you worked at at Auburn and

20  Kilbourn?

21      A. No.

22      Q. Do you recall ever having a dispute with

23  anybody who worked at the unemployment office about

24  your unemployment benefits?

1      A. No.

2      Q. Meaning that didn't happen, or you just

3   don't remember?

4      A. I was subsequently approved for my

5   unemployment.  I just had been -- I got locked up,

6   but -- so, no, there's no -- there's no dispute.

7   There's no argument.  There's no threats against

8   unemployment.

9      Q. Was Samantha Crabtree still employed in

10  April 1993?

11     A. I believe so.  I'm not sure, but yes, I

12  believe so.

13     Q. Mr. Pursley, prior to your arrest on

14  June 16, 1993, do you recall having ever met

15  Detective Howard Forrester before that?

16     A. Yes.

17     Q. And to the best of your knowledge, when was

18  it that you first met Detective Forrester?

19     A. I believe -- early 80's, I believe, and late

20  80s.  Early 80's and late 80's.

21     Q. And what were the circumstances of your

22  encounters with Mr. Forrester?

23     A. I believe I was sent to prison on a

24  residential burglary.  I believe -- I believe he,

1  again, later questioned me about some cases that I

2  didn't do and threatened to -- threatened to lock me

3  up.

4      Q. When was that?

5      A. I believe late 80's.  I don't have an exact

6  day.

7      Q. Do you recall the particular cases that you

8  were being questioned about at that time?

9      A. I think someone had used a card or something

10  from either a burglary or a robbery.  I'm not sure.

11  But he basically -- he accused me of -- he accused

12  me of crimes.  I told him I didn't do them, and

13  that's -- that's the extent of -- I was being

14  interrogated.  I was being interrogated in the

15  public safety building.

16      Q. This was sometime in the late 1980's?

17      A. Yes.  It was -- he kind of got me there on a

18  ruse regarding something that happened with an

19  acquaintance and a female.  And I'm pretty sure he

20  left a card at the apartment and asked me to come

21  down.  And when I went, he tried to just put a whole

22  bunch of other stuff into the mix -- or on me,

23  however you want to say it.

24      Q. Were you charged with any crime at that time

1  in relation to those incidents?

2       A. The first time, I was sent to prison for a

3  residential burglary.

4       Q. Let me stop you there.

5          Did you do that crime?  Did you commit that

6  residential burglary?

7       A. I did.

8       Q. Okay.  And then the second time in the late

9  80's, were you charged with anything in relation to

10  what Detective Forrester was investigating at that

11  time?

12       A. No.  No.  Not that exchange, no.

13       Q. Okay.  Between that time in the late 1980's

14  and your arrest on June 16, 1993, do you recall any

15  other encounters with Detective Forrester?

16       A. No.

17          MS. LEFF:  When you get to a good spot, I'd

18  like to go off the record for a short break.

19          MR. IASPARRO:  Sure.  Now is as good a time

20  as any.

21          (A short break was had.)

22  BY MR. IASPARRO:

23       Q. Mr. Pursley, did you know in May of 1993

24  that Samantha Crabtree purchased a Beretta

1  9-millimeter firearm?

2      A. Yes.

3      Q. And do you know where she purchased that

4  firearm?

5      A. Not exactly.

6      Q. Were you with her when she purchased it?

7      A. No.

8      Q. Do you recall having a conversation with her

9  about why she wanted to purchase that firearm?

10     A. No.

11     Q. What kind of car did Samantha Crabtree own

12  in April of 1993?

13     A. A Chevy Celebrity, I believe.

14     Q. Do you recall what color it was?

15     A. Brown.

16     Q. At some point in May of 1993, did you or

17  Ms. Crabtree purchase a black Honda?

18     A. I did not purchase a black Honda.  She did

19  not purchase --

20     Q. Do you recall there being a black Honda

21  being parked at your apartment building in June of

22  1993?

23     A. Yes.

24     Q. Whose car was that?

1          MS. LEFF:  Objection.  Lack of foundation.

2      A. It was mine.

3      Q. It was your car?

4      A. Yes.

5      Q. And where did that car come from?

6      A. I believe one of the suburbs.  One of the

7  south suburbs.  I'm not sure.

8      Q. Did you purchase that car?

9      A. It was purchased for me.

10      Q. By whom?

11      A. A childhood friend.

12      Q. What was that childhood friend's name?

13      A. Tommy.

14      Q. Does Tommy have a last name?

15      A. Span.

16      Q. And what was the source of the funds that

17  were used to pay for that car?

18          MS. LEFF:  Object to foundation.

19      A. At this time -- at this time, I would like

20  to assert my Fifth Amendment right to be free from

21  self-incrimination.

22      Q. Was the source of the funds bank robbery

23  proceeds from the robbery of the First Bank North in

24  Rockford on May 12, 1993, Mr. Pursley?

1      A. At this time, I would like to assert my

2  Fifth Amendment right to be free from

3  self-incrimination.

4      Q. Mr. Pursley, do you understand that Samantha

5  Crabtree pled guilty to robbing the First Bank North

6  on Harrison Avenue in Rockford on May 12, 1993?

7      A. Yes.

8      Q. And that in doing so, in pleading guilty,

9  she admitted in open court that she committed that

10  robbery with you.

11      Do you understand that?

12      A. That is what I read, yes.

13      Q. Did you commit that robbery with

14  Ms. Crabtree?

15      MS. LEFF:  Objection.  Asked and answered.

16      A. Once again, I would like to assert my Fifth

17  Amendment right to be free from self-incrimination.

18      Q. Mr. Pursley, did you go in to the First Bank

19  North on Harrison Avenue on May 12, 1993 and rob

20  that bank?

21      A. I would like to assert my Fifth Amendment

22  right to be free from self-incrimination.

23      (Exhibit 2 was marked for identification

24  and is attached to the transcript.)

1      Q. Do you see the photos on the screen there,

2   Mr. Pursley?

3      A. Yes, sir.

4      Q. For the record, these are marked RFD Defense

5   7563 through 7567, a series of five photographs.

6          I'll scroll through them, Mr. Pursley.

7          Would you agree these appear to be photos

8   taken from a bank surveillance system, and they

9   appear to be dated May 12, 1993?

10     A. Yes.

11     Q. Is that you depicted in the photographs

12  robbing the bank, Mr. Pursley?

13     A. Once again, I'd like to assert my right to

14  be free from self-incrimination under the Fifth

15  Amendment.

16     Q. Back in April 1993, Mr. Pursley, what type

17  of clothing did you typically wear on a daily basis?

18     A. Jeans, hoodies, boots.

19     Q. And when you say boots, any particular type

20  of boot more specifically?

21     A. Combat boots.

22     Q. Black combat boots?

23     A. Yes, sir.

24     Q. Did you own a police scanner in that time

1    frame?

2        A. I believe so, yes.

3        Q. Why did you own a police scanner?

4        A. To hear what was going on.

5        Q. To hear what was going on in the

6    neighborhood?

7        A. In the city.

8        Q. Did you own a black backpack during that

9    April through June 1993 time frame?

10       A. I believe so, yes.

11       Q. Mr. Pursley, are you aware of the fact that

12   there was a briefcase recovered from your apartment

13   on Ashland Avenue on June 10, 1993 which belonged to

14   a man whose car was stolen and used during the First

15   Bank North robbery on May 12, 1993?

16       A. I read that in a police report, yes.

17       Q. How do you explain that?

18       A. I'm sorry?

19          How do I explain how it's recovered?

20       Q. Well, how do you explain that a briefcase

21   that belonged to a man that was stolen and used

22   during the First Bank North robbery was located in

23   your apartment on June 10, 1993?

24       A. I would like to assert my Fifth Amendment

1  right to be free from self-incrimination at this

2  time.

3      Q. Mr. Pursley, was Samantha Crabtree telling

4  the truth when she told the Winnebago County Circuit

5  Court that she committed the First Bank North

6  robbery with you on May 12, 1993?

7          MS. LEFF:  Objection.  Asked and answered.

8      A. I would like to assert my Fifth Amendment

9  right to remain free from self-incrimination at this

10  time.

11      Q. During the spring of 1993, Mr. Pursley, were

12  you using any illegal drugs?

13      A. I would like to assert my Fifth Amendment

14  right to be free from self-incrimination at this

15  time.

16      Q. Did you smoke crack cocaine during that time

17  frame?

18      A. I would like to assert my Fifth Amendment

19  right to be free from self-incrimination at this

20  time.

21      Q. Mr. Pursley, did you commit a robbery at the

22  Burger King on Riverside Boulevard in Rockford on

23  April 15, 1993?

24      A. I did not.

1      Q. You understand that Samantha Crabtree

2  provided information to the police that you

3  committed that robbery?

4      A. That is what I read, yes, sir.

5      Q. Can you think of any reason why she would

6  make that up?

7          MS. LEFF:  Object to foundation.

8      A. I can only assume.

9      Q. Well, I don't want you to assume.

10         Do you know why she would say that?

11         MS. LEFF:  Object to foundation.  Calls for

12  speculation.

13     A. No.

14     Q. On June 10, 1993, did you learn -- after you

15  ran from the car that day on Evergreen Avenue, did

16  you learn later that day that the police were

17  searching your apartment at 901 Ashland?

18     A. Did I learn later that day?

19     Q. Yes.

20     A. No.

21     Q. Did you go back to your apartment at 901

22  Ashland that day?

23     A. I believe so.  I'm unsure.  I'm uncertain.

24     Q. Do you have any recollection, as you sit

1    there now, of going back there and thinking to

2    yourself, "Well, somebody's been here and has gone

3    through our things"?

4        A. No.

5        Q. All right.  As you sit there today,

6    Mr. Pursley, do you have any reason to dispute that

7    Rockford police detectives recovered the Taurus

8    9-millimeter firearm which Samantha Crabtree owned

9    from your apartment on June 10, 1993?

10           MS. LEFF:  Object for foundation.

11           You can answer, to the best of your ability.

12       A. I mean, I know they said a gun was taken or

13    two guns were taken.

14       Q. Okay.  You weren't there during the search;

15    right?

16       A. No, sir.

17       Q. And did you return to 901 Ashland at any

18    time between June 10th and June 16, 1993?

19       A. I believe so.

20       Q. Do you recall seeing -- ever seeing the

21    Taurus 9-millimeter handgun that Samantha Crabtree

22    owned at any time during that time frame between

23    June 10th and June 16, 1993?

24       A. No.

1      Q. Do you have any basis to claim that any

2   Rockford police detective or officer planted any

3   evidence or fabricated any evidence in relation to

4   the search of your apartment on June 10, 1993?

5          MS. LEFF:  Object to foundation.  Calls for

6   a legal conclusion.  Calls for expert testimony.

7          You can answer to the best of your ability.

8      A. I don't know.

9      Q. Did you know, Mr. Pursley, on June 10, 1993,

10   that there was a warrant for your arrest for

11   aggravated assault with a firearm in relation to an

12   incident at 609 Woodlawn in Rockford on

13   June 8, 1993?

14      A. Did I know that there was a warrant?

15      Q. Right.

16      A. No, sir.

17      Q. When did you first become aware that there

18   was a warrant for your arrest for that incident on

19   Woodlawn?

20      A. Upon my arrest.

21      Q. Did you know a man named Robert Poe on

22   June 8, 1993?

23      A. I'm going to have to assert my Fifth

24   Amendment right to be free from self-incrimination

1   at this time.

2       Q. Did you know a man named Thomas McCoy, who

3   also went by the nickname Tramp, on June 8, 1993?

4       A. Once again, I'm going to assert my Fifth

5   Amendment right to be free from self-incrimination

6   at this time.

7       Q. And are you aware of the fact that Robert

8   Poe picked you out of a photo lineup on

9   June 9, 1993, and identified you as the man who

10  threatened him with two handguns and shot out his

11  television the day before on Woodlawn?

12      A. Could you repeat the question, please?

13      Q. Sure.

14          Are you aware of the fact that Robert Poe

15  picked you out of a photo lineup on June 9, 1993,

16  and identified you as the man who threatened him

17  with two handguns and shot out his television on

18  Woodlawn Avenue in Rockford the day before?

19      A. Was I aware that he did that on the 9th?

20      Q. Yes.

21      A. Is that the question?

22      Q. That's the question.

23      A. No, I was not.  I was not aware.

24      Q. Did you do that, Mr. Pursley?

1          Did you threaten Mr. Poe with two handguns
2     and shoot out his television on Woodlawn Avenue on
3     June 8, 1993?
4          MS. LEFF:  I'm going to object --
5        A. Once again, I'm going to have to assert my
6     Fifth Amendment right to remain silent, to be free
7     of self-incrimination at this time under the Fifth
8     Amendment.
9        Q. You admitted that to Samantha Crabtree in
10    one of the letters that you wrote to her, didn't
11    you?
12       A. I do not recall.
13       Q. As you sit there today, do you have any
14    knowledge of the information that any Rockford
15    police officer provided to the judge who issued the
16    warrant for your arrest for the Ascher murder?
17         MS. LEFF:  Object to form.  Vague.
18       A. I don't quite get that question, sir.
19       Q. Okay.  You understood when you were arrested
20    on June 16, 1993, that you were being arrested
21    pursuant to a warrant that had been issued for you
22    for the Ascher murder; correct?
23       A. Yes.
24       Q. Okay.  In issuing that warrant, you

1    understood it was issued by a judge?

2        A. Yes, sir.

3        Q. Okay.  My question is, do you have any

4    knowledge of what information, if any, the Rockford

5    police detectives who secured that arrest warrant

6    provided to the judge before the warrant was issued?

7        A. Only what I read.  I don't have independent

8    recollection, no.

9        Q. Okay.  And would you agree, Mr. Pursley,

10   that at the time of your arrest on June 16, 1993,

11   that Rockford police detectives had spoken to and

12   gotten a written statement from Samantha Crabtree

13   which implicated you in the Ascher murder?

14       MS. LEFF:  Object to form.  Lack of

15   foundation.  Calls for a legal conclusion.

16           You can answer to the best of your ability.

17       A. If possible, could you repeat the question?

18   It's a bit convoluted.

19       Q. Sure.

20           So my question is, would you agree that as

21   of the time of your arrest on June 16, 1993,

22   Samantha Crabtree had provided a written statement

23   to police which implicated you in the Ascher murder?

24       A. Yes.

1      Q. And would you agree that as of that date,

2  June 16, 1993, Marvin Windham had also provided a

3  written statement to police implicating you in the

4  murder of Andrew Ascher?

5      MS. LEFF:  I'm going to object to form and

6  vagueness, just as to whether you're asking about

7  his awareness at the time of his arrest or whether

8  he's aware now.

9      You can answer.

10     Q. Let me ask the question again, just so it's

11 clear.

12     Sorry.  Sometimes my lights go off

13 automatically if I don't move around enough.  I

14 apologize.

15     My question, Mr. Pursley, is:  Would you

16 agree that as of the time of your arrest on

17 June 16, 1993, Marvin Windham had provided a written

18 statement to Rockford police detectives which

19 implicated you in the murder of Andrew Ascher?

20     MS. LEFF:  Same objection as to vagueness in

21 terms of what he had knowledge of.

22     A. I'm not sure if I learned it -- I'm not sure

23 if I learned it through the police reports or if the

24 detectives who questioned me actually told me that.

1      Q. Okay.  And I'm not asking -- my question is

2   a little different.

3          I'm not asking when you learned it or how

4   you learned it.  I'm asking you, based on what you

5   know now, understanding that we all have the benefit

6   of hindsight -- and you know this record better than

7   anybody, I'm sure.

8          But would you agree as you sit there now

9   that as of the time of your arrest on June 16, 1993,

10   that Marvin Windham had provided a written statement

11   to the police implicating you in the Ascher murder?

12      A. Yes, sir.

13      Q. Okay.  And would you agree that as of the

14   date of your arrest on June 16, 1993, the Rockford

15   police had already executed that search warrant at

16   901 Ashland?

17          MS. LEFF:  Object to foundation.

18      A. In hindsight?

19      Q. Right.

20      A. Yes.  From reading the police reports, yes,

21   sir.

22      Q. Okay.  And during that search warrant, they

23   recovered a Taurus 9-millimeter handgun, a pair of

24   black Jeans, a hooded sweatshirt, and a police

1    scanner; correct?

2          MS. LEFF:  Object to foundation.

3      A. According to -- according to the documents I

4    read, yes, sir.

5      Q. All right.  Are you contending, Mr. Pursley,

6    that on June 16, 1993, that there was not probable

7    cause to arrest you?

8          MS. LEFF:  Objection.  Calls for a legal

9    conclusion.

10         You can answer, if you understand the

11   question.

12     A. I don't know.  I don't know.

13     Q. And at the time of your arrest on

14   June 16, 1993, you were wearing black combat boots;

15   is that correct?

16     A. I believe so.  Yes, sir.

17     Q. You were taken down to the Rockford police

18   department detective bureau that day, and I think

19   Detectives Forrester and Hanson put you in an

20   interview room; is that accurate?

21     A. Yes, sir.  I believe so.

22     Q. And do you recall those detectives advising

23   you of your Miranda rights that day?

24     A. Not verbatim, but I believe that there's a

1    Miranda -- there's a Miranda page that I've seen in

2    my police reports.

3        Q. Okay.  And you didn't have any interest in

4    talking to them that day about the Ascher homicide,

5    did you?

6            MS. LEFF:  Object to form.

7        A. I requested my attorney.

8        Q. Okay.  How would you describe your demeanor

9    that day, Mr. Pursley?

10           MS. LEFF:  Object to form.  Vague as to time

11   frame.

12       Q. After the time of his arrest.

13           In the detective bureau, how would you

14   describe your demeanor?

15       A. Fearful.

16       Q. What were you fearful of?

17       A. Facing the death penalty for a crime I

18   didn't do.  Fearful of incarceration.  Fearful of

19   losing my life.

20       Q. Did you know what the evidence was --

21       A. That's just in retrospect.

22       Q. Okay.  Did you know what the evidence was

23   against you at that time when you were in the

24   detective bureau, understanding you had been charged

1    with the Ascher murder?  Did you know what the

2    evidence was against you?

3         MS. LEFF:  Object to form.  Assumes facts

4    not in evidence.

5         A. I'm -- I'm unsure.  I'm unsure.  I don't

6    know what the totality is.  I don't know what I knew

7    exactly then.

8         Q. Had you seen or spoken to Samantha Crabtree

9    between June 10th and June 16, 1993?

10        MS. LEFF:  Objection.  Asked and answered.

11        A. No.

12        Q. Upon your arrest on June 16, 1939, and

13   understanding that you had been charged with the

14   Ascher murder, did you have some concern that

15   Samantha Crabtree had provided information to the

16   police implicating you in that murder?

17        A. What time frame, sir?

18        Q. Right upon your arrest.  When you learned

19   you were charged -- you were arrested for and had

20   been charged with the Ascher murder, did you have

21   some concern that Samantha Crabtree had provided

22   information to the police implicating you in that

23   murder?

24        A. I believe as I was told -- you know, I

1   believe that, you know, I was told.  So it's

2   possible -- you know, that's probably a yes.  I

3   can't be exact.

4       Q. You've already testified about some letters

5   that were sent back and forth.  I think that you

6   sent some letters to Samantha Crabtree while the two

7   of you were locked up at the same time at the

8   Winnebago County Jail back in 1993.

9           Is that true?

10      A. Yes.  We had to ask permission to do so.

11      Q. All right.  Is there a handwritten document

12  that's popped up on your screen there, Mr. Pursley?

13      A. Yes, sir.

14      Q. And, for the record, this is -- these are --

15  this documents is Bates numbered Pursley 012080

16  through 012088.  And, I guess, I don't know that

17  I've identified anything yet for purposes of the

18  record, but this would be the third document we've

19  utilized today.  The first one being the second

20  amended complaint, which will be Exhibit 1 to

21  today's deposition, the second one being those bank

22  surveillance photos, and this will be Exhibit 3.

23          (Exhibit 3 was marked for identification

24  and is attached to the transcript.)

1      Q. Mr. Pursley, is this your handwriting in
2  this document?
3      A. Yes, sir.  It appears so.
4      Q. Okay.  And did you write this letter to
5  Samantha Crabtree?
6      A. I do not remember writing it, but I would
7  not say that I did not write it either.
8      Q. Okay.  And I'm going to scroll down to the
9  last page, which appears to be a copy of an
10  envelope.
11         Would you agree with that?
12         It looks like it's the front page of an
13  envelope addressed to Samantha Crabtree.
14      A. Yes, it does.  Yes, sir.
15      Q. Okay.  And at the return address, upper
16  left-hand corner there, it says Patrick Pursley, 420
17  West State.
18         Is that your handwriting?
19      A. Yes, sir.
20      Q. Okay.  420 West State, for the record, was
21  the address of the Winnebago County Jail at the
22  time; correct?
23      A. Yes, sir.
24      Q. All right.  And there's a date stamp here.

1          Do you see that on this envelope,

2    June 18, 1993?

3        A. Yes, sir.

4        Q. And that was -- that would have been two

5    days after your arrest for the Ascher murder;

6    correct?

7        A. I believe so, yes, sir.

8        Q. All right.  Do you recall at that time, two

9    days after your arrest, if you had been provided

10   with copies of any police reports or witness

11   statements as part of the discovery in the criminal

12   case?

13       A. I do not recall.

14       Q. Meaning you just don't know one way or the

15   other?

16       A. Exactly, yes.

17       Q. Did you have any information as of

18   June 18, 1993, that the detectives who had spoken to

19   Samantha Crabtree on June 10th had threatened or

20   coerced her in any way?

21       A. As I sit here, I don't know.

22       Q. All right.  I'm going to direct your

23   attention to the page which is Bates numbered

24   Pursley 12082.

1          Well, that's not going to work well.  I

2     don't know if you can see my cursor there, but it

3     says -- starting on, "Because of a tip from Marvin,

4     the crime stopper, the jealous fella who couldn't

5     prove shit stank if it was packed in his nostrils

6     with a jackhammer.  Think about it.  We did cut him

7     off from the supply of drugs, money, and stamps.

8     Not only that, maybe he was in on the Ascher murder.

9     We did let him use the gun twice.  I can't remember

10    when it was exactly, but how else could they say

11    that one of those gats was used on Ascher?"

12         Did I read that correctly, Mr. Pursley?

13         A. Yes.

14         Q. So would it be fair to say that as of that

15    date, June 18, 1993, that you had some concern that

16    the Taurus 9-millimeter, or one of the guns that

17    Samantha owned, had been used in the Ascher murder?

18         A. From the context of the letter, yes.

19         Q. Okay.  And as of the date of the Ascher

20    murder, April 2, 1993, would you agree that the only

21    firearm that Samantha owned at that time was the

22    Taurus 9-millimeter?

23         MS. LEFF:  Object to foundation.

24         A. To the best of my knowledge.

1      Q. Okay.

2      A. To the best of my knowledge, yes.

3      Q. All right.

4         Mr. Pursley, did Samantha Crabtree have a

5  problem telling the truth back in 1993?

6         MS. LEFF:  Object to foundation.  Object to

7  form.

8         You can answer if you understand the

9  question.

10     A. I mean, if she said I did a murder, then

11 yes, she had an absolute problem telling the truth

12 in 1993.

13     Q. Okay.  Before that, can you recall any

14 examples of a time or times when you knew that

15 Samantha Crabtree had lied to you?

16     A. Yes.  Yes.

17     Q. Okay.  Could you tell us?

18        MS. LEFF:  Object to form.

19     A. Yep.  Things I learned after the fact,

20 people in my house, her possibly with others,

21 whereabouts.

22     Q. Did Samantha Crabtree have any reason to get

23 back at you for anything in June of 1993?

24        MS. LEFF:  Object to form.  Foundation.

1          A. I don't know.  I don't think so.

2          Q. In other words, had you done anything to her

3     that would have upset her, caused her to tell the

4     police that you committed a murder that you really

5     didn't commit?

6          A. I don't believe so.

7          Q. I'm going to scroll down to the page which

8     is marked Pursley 12086.

9          A. For the record, as far as the date that this

10    letter was written, is there a date on the letter

11    itself?  I know you showed me an envelope, but is

12    there a date on the letter itself?

13         Q. And that's a fair question.

14            I have not seen one.  I can represent to

15    you, I have not seen one handwritten or otherwise.

16    The only date I've seen referenced with respect to

17    this letter is that postmark --

18         A. All right.

19         Q. -- which is the way it was produced to us.

20            So at the top of the page that is currently

21    in front of you, Mr. Pursley, I'll try to read this

22    accurately.  It says, "I fucked up on Woodlawn.

23    That was the biggest mistake of my life."

24            Do you see that?

1        MS. LEFF:  Can you identify the Bates again?

2   It's not in the window.

3        MR. IASPARRO:  Sure.  It's Pursley 12086.

4     Q. And scrolling back up there, Mr. Pursley, "I

5   fucked up on Woodlawn.  That was the biggest mistake

6   of my life."

7        Did I read that accurately?

8     A. Yes, sir.

9     Q. And were you referring to the Robert Poe

10  incident on Woodlawn in saying that?

11    A. Once again, I'm going to have to assert my

12  Fifth Amendment right to be free from

13  self-incrimination at this time, sir.

14    Q. Okay.  Put that one to the side for a moment

15  and pull up another document.

16       We'll mark this as 4.

17       (Exhibit 4 was marked for identification

18  and is attached to the transcript.)

19    Q. Bear with me a second.

20       Okay.  Mr. Pursley, do you recognize this as

21  another letter that you wrote to Samantha Crabtree?

22    A. Yes, sir.

23    Q. And this is your handwriting?

24    A. Yes, sir.  I believe so.

1      Q. In the upper right-hand corner of the first

2   page there --

3          MR. IASPARRO:  And for the record, this is

4   Bates number Pursley 12069 through 12079.

5      Q. In the upper right-hand corner, does it say,

6   "2:00 a.m., Saturday"?

7          Is that right?

8      A. My screen is -- yes.

9      Q. Okay.  And I will scroll down to the last

10  page of this exhibit as it was produced to us.

11         Is that your handwriting in the upper

12  left-hand corner that says Patrick Pursley?

13     A. Yes, sir.

14     Q. And would you agree that the postmark date

15  there on the envelope is June 25, 1993?

16     A. Yes, sir.

17     Q. Okay.  Move back up to the page which has

18  the Bates number Pursley 12069, first page.

19         And starting with what's at the top of the

20  sheet here, "The geekers are all" -- "The geekers

21  are geeking in this mutha fucka, and I am oh so

22  tragically faced with documenting of how I looked

23  and acted."

24         Did I read that correctly?

1     A. I believe so.

2     Q. When you use the word geekers, Mr. Pursley,

3  what did you mean?

4        What are geekers?

5     A. Geekers are people who -- it means a few

6  different things.  One, geekers is like if you got

7  something, and people are all -- like all over you

8  and think they gonna get something out of you.

9  Geekers is also drug-related, like drug addicts.

10    Q. And when you said you were oh so tragically

11 faced with documenting of how you looked and acted,

12 what did you mean by that?

13    A. I can't really say.  I don't remember

14 writing -- I don't remember my -- I don't remember

15 writing this letter, or -- I just know we exchanged

16 communication.  I know we had permission to exchange

17 communication, and we wrote while she was in prison

18 and while she was in county jail.

19    Q. Did Samantha Crabtree use drugs during the

20 spring of 1993?

21       MS. LEFF:  Object to foundation.

22       You can answer, if you know.

23    A. Marijuana.

24    Q. Did you ever see her use cocaine?

1      A. No.

2      Q. Scrolling down a little further on this

3  page, Mr. Pursley, it says, "You know we are limited

4  in communicating, but you have to explain fully what

5  you mean about Marvin.  The PD asked if you two were

6  having an affair, only he stated it with less tact.

7  I know this shit is foul.  I know he had to play a

8  role in the murder.  Why else did he wait to report

9  things to Crime Stoppers?"

10        Did I read that accurately?

11     A. Yes.

12     Q. Why at that time did you think that Marvin

13  had to play a role in the murder?

14     A. Once again, I'm -- I'm -- I don't remember

15  writing the letter.  I can't say what my frame of

16  mind was when I wrote the letter.  Obviously, a lot

17  is going on.

18     Q. As you sit there today, do you have -- oh,

19  I'm sorry.

20     A. The best I can say is -- the best I can say

21  is I was trying -- just trying to understand what

22  was going on.  I was trying to understand what was

23  going on.

24     Q. And as you sit there today, do you have any

1    information as to Marvin Windham's whereabouts at

2    the time of Andrew Ascher's murder on April 2, 1993?

3        A. I do not.

4        Q. Do you have any information as you sit there

5    today as to Marvin Windham's involvement in the

6    murder of Andrew Ascher?

7        A. I do not.

8        Q. Scroll down to the next page, which is

9    Pursley 12070.

10            Actually, I'm going to go to the next page,

11   12071.  Starting with the word you at the top of the

12   screen here, Mr. Pursley, do you agree that the

13   letter reads, "You shouldn't have ever said a word

14   about Patrick Anthony Pursley.  Payback is one

15   thing, but a slain pat is another."

16            Do you see that?

17       A. Yes, I see that.

18       Q. Would you agree that that could be construed

19   as threatening in nature?

20           MS. LEFF:  Object to form.  Argumentative.

21       A. It is not threatening.  I was saying where

22   -- if I understand it right, it says a slain pat is

23   another thing.  I was facing the death penalty for

24   something I didn't do.  My language is street

1  language, bombastic.

2      Q. And scrolling down to the bottom of that

3  page, "As for you and the pregnancy, are you sure

4  it's mine and not Marvin's," question mark,

5  exclamation point, exclamation point, question mark.

6          Did I read that accurately?

7      A. Yes.

8      Q. Based on this letter, is it fair to say that

9  you knew Samantha was pregnant at that time?

10      A. Yes.

11      Q. And did you have a real concern that the

12  child was Marvin Windham's and not yours?

13      A. At the time, I had real concern it could be

14  anyone's child and not mine.

15      Q. It turned out that the child was yours?

16  Nija is yours; correct?

17      A. Yes.

18      Q. I'm going to scroll down to Pursley 12076.

19          Starting with the top of the screen, "Also,

20  my love, if you were threatened, intimidated, given

21  false promises of freedom, and emotionally

22  mistreated, tortured, I would seriously consider

23  filing civil suit against the county and DA.  Hold

24  them liable for their misconduct."

1          Did I read that accurately?

2      A. I believe so, yes.

3      Q. And at the time you wrote this letter,

4   Mr. Pursley, did you know if any of that happened to

5   Samantha Crabtree?

6      A. I can't say.  I don't know.  As I sit here

7   now, I don't know, but it appears that way.

8      Q. And at the bottom of the page, would you

9   agree it reads, "It sounded like your statement was

10  coerced out of you, made under stress, duress, and

11  all that."

12         Did I read that accurately?

13     A. Is there -- yes, sir.

14     Q. Okay.  And what did you mean when you said

15  it sounded like her statement was coerced out of

16  her, made under stress, duress, and all that?

17     A. I guess I was looking for -- you know, if

18  the time -- the language of the time, I may have

19  read a case or something that -- you know, I may

20  have read a case and learned that language, so I was

21  categorizing it -- or attempting to categorize it.

22     Q. Did you have any information that the

23  statement that Samantha Crabtree had given had been

24  coerced in any fashion?

1    A. As I sit here now, I don't -- I don't know

2    when this letter was written.  It appears that I got

3    the information just from the language used in the

4    letter.  I'm not -- I can't be certain.

5    Q. Okay.  I'm going to scroll down to the next

6    page.  Starting with the top of the sheet where I've

7    scrolled, "I know one thing, if you dropped it on me

8    because of Marvin, police and my fucking up, you

9    better get a pooper-scooper and get this shit off me

10   because I ain't going to be a fall guy for the state

11   or Marvin."

12       Did I read that accurately?

13   A. I believe so.

14   Q. Would you agree that sentence is threatening

15   in nature?

16   A. No.

17   Q. What did you mean by that statement?

18   A. Well, as I stated previously, I don't

19   remember writing it.  But in the -- just -- from

20   just plain language of what you read me, it means

21   like clean your shit up.  Like to me, that is not a

22   threat.  It just means like, look, clean this shit

23   up.

24   Q. Mr. Pursley, were you a gang member in 1993?

1      A. No.

2      Q. Were you ever a member of the Gangster

3   Disciples?

4      A. I'd like to assert my Fifth Amendment right

5   to be free from self-incrimination at this time.

6      Q. Were you ever affiliated with the Gangster

7   Disciples?

8      A. I would like to assert my Fifth Amendment

9   right to be free -- again free from

10  self-incrimination at this time.

11     Q. This sheet that's on the screen that's part

12  of this Exhibit 4 right now is Pursley 12078.

13         Do you see that?

14         Is that your handwritten name there,

15  Mr. Pursley?

16     A. It is.

17     Q. And the P at the beginning of Patrick and at

18  the beginning of Pursley appear to be in the form of

19  pitchforks.

20         Do you see that?

21     A. That is not -- that is -- that is not.  That

22  is not.  The -- when it says, "Babylon will fall

23  sooner or later, Patrick Pursley," those are just --

24  those are Ps.  They're not pitchforks.  And if it

1    was pitchforks, it would be pitchforks going down,

2    but it's not pitchforks.  And when I did put

3    pitchforks in my name at any time, drawing or

4    anything like that, the natural letter to use would

5    be the T.

6        Q. When you said Babylon will fall sooner or

7    later, what did you mean by that?

8        A. Just the system, the state.  Just the

9    empire.  I read a lot of books on history.

10       Q. I want to show you another exhibit now.

11   We'll mark this as Exhibit 5.

12           (Exhibit 5 was marked for identification

13   and is attached to the transcript.)

14       MR. IASPARRO:  This document is Bates

15   numbered Pursley 12093 through 12099.

16       Q. Mr. Pursley, is that your handwriting on

17   this letter?

18       A. Yes, sir, it appears so.

19       Q. Okay.  And I'll scroll down to the bottom

20   sheet again, as it was produced to us, just to show

21   you.

22           Would you agree that that copy of the

23   envelope there is postmarked July 15, 1993?

24       A. Yes, sir.

1    Q. Okay.  Scrolling back up to Pursley 12093 --

2    bear me with.  I'm trying to find the spot that --

3    all right.

4        Starting with the top of the page where I've

5    scrolled to, "I had to question you as such.  I had

6    to try to unnerve you to see if you were playing me

7    out."

8        Did I read that correctly?

9    A. I believe so, yes.

10   Q. Do you recall what you were referring to in

11   that sentence, Mr. Pursley?

12   A. I do not.

13   Q. Why would you have needed to unnerve

14   Ms. Crabtree?

15   A. I don't recall.  I don't recall what I was

16   talking about in this.

17   Q. And then scrolling down again, top of the

18   screen where I scrolled to, "If you allow the

19   psychological tactics of weakening you to the point

20   of losing my baby, my anger shall not diminish for

21   1001 years.  Do you hear me?"

22       Did I read that correctly?

23   A. Yes.

24   Q. Would you agree that sentence is threatening

1    in nature?

2        A. It was not threatening.  It was talking

3    about how angry or how hurt I would be if she lost

4    my child for not taking care of herself in the

5    county jail.

6        Q. Mr. Pursley, would you characterize yourself

7    as an angry person in the spring and summer of 1993?

8        A. No.  No.

9        Q. Has it surprised you to learn that others

10   have characterized you as such in that time frame?

11       MS. LEFF:  Objection.  Assumes facts not in

12   evidence.  Foundation.

13       A. I don't -- I don't know how to answer that

14   question, Counsel.  Would it surprise me if other

15   people characterized me as angry in that time

16   period?

17       Q. Right.

18       A. Is that the -- is that -- that's a -- that's

19   a complex question in the sense that people will say

20   or can say anything about you at any given moment.

21   I was trying to be a father in 1993.  I was trying

22   to start a business in 1993.  I was trying to do a

23   lot of things.  It doesn't -- to call me an angry

24   person or something, I don't think that's a fair

1    characterization.

2        Q. In that time frame, did you hold any

3    particular views or biases or prejudices towards

4    white people?

5        A. No, sir.

6        Q. Okay.  We're done with that exhibit.  I'm

7    going to show you the next one now, which this will

8    be Pursley Deposition Exhibit 6.

9            (Exhibit 6 was marked for identification

10   and is attached to the transcript.)

11           MR. IASPARRO:  Which, for the record, is

12   Bates numbers Pursley 12046 through 12052.

13       Q. Mr. Pursley, do you recognize this letter as

14   being written in your handwriting?

15       A. Yes, sir.

16       Q. Okay.  And as we've done in the past, I'll

17   scroll down to the last page, Pursley 12052.

18           Do you see the postmark there,

19   July 16, 1993?

20       A. Yes, sir.

21       Q. Okay.  Scrolling back up, the passage I want

22   to show you straddles 12046 and 12047.  Starting

23   with top of where I've scrolled, "I kind of feel

24   like everyone is blowing smoke up my ass lately,

1  including you.  It's like you tell me what I want to

2  hear, and that's it.  Fuck that.  If you're not

3  putting the same energy into getting out the real

4  deal and letting the DA know that you BSed, then

5  what makes me think that after all this time you'll

6  explain to the jury what you told me because the

7  pressure will be ten times worse.  And maybe you

8  really don't love me.  Maybe it's all lies.  Look at

9  it from my perspective.  Actions speak louder than

10  words.  So don't ask me for my guidance because

11  they'll say I put you up to this and that all I want

12  you to do is what your conscience tells you to do."

13          Did I read that accurately?

14      A. I believe so, yes, sir.

15      Q. What were you asking Samantha Crabtree to do

16  at that time?

17      A. Just tell the truth.  Just -- and once

18  again, like I said, I don't remember writing these

19  letters, but from what it sounds like, you know,

20  just in retrospect, just, you know, tell the truth.

21  You're under a lot of pressure in the county jail.

22  You're under a lot more pressure facing the death

23  penalty for something you didn't do.  How the

24  letters are read, it's not -- you know, it's a very

1   frustrating time.  It's a very hurtful time.  It's a

2   very frustrating time.

3       Q. Did you have some concerns that Samantha

4   Crabtree was just telling you what you wanted to

5   hear?

6       A. I had concerns everybody was, including my

7   lawyers.

8       Q. I'm going to scroll down to 12050.

9          All right.  At the top where I've scrolled,

10  Mr. Pursley, "Just write affidavit on top, date it,

11  and sign it."

12         Do you see that?

13      A. Yes, sir.

14      Q. Why did you reference an affidavit in this

15  letter?

16      A. Because I believed that an affidavit to my

17  attorneys explaining what happened during the

18  interrogation and that I didn't commit the murder

19  would be -- would be evidence, would be able to

20  prove my act of innocence.

21      Q. So the --

22      A. It's like jail talk.  People -- you know,

23  people talk, and you think, you know, like you've

24  got to put your own evidence up.

1    Q. So the idea of Samantha Crabtree executing

2    an affidavit, was that your idea?

3    A. I'm not sure who originally thought of it,

4    but I -- like I said, it's so long ago, but that's

5    what we were talking about.

6    Q. Would it be fair to say you were encouraging

7    her to execute an affidavit?

8    A. Yeah.  I asked her -- I asked her, you know,

9    this is -- this is how you do it, yes.

10   Q. All right.  We're done with that one.

11       The next one I'll show you we're going to

12   mark Exhibit 7.

13       (Exhibit 7 was marked for identification

14   and is attached to the transcript.)

15       MR. IASPARRO:  And, for the record, this is

16   Pursley 012100 through 012105.

17   Q. Mr. Pursley, is this document in your

18   handwriting?

19   A. Yes, sir.

20   Q. Okay.  And we've got this one and one other

21   letter.  We're almost done with the letters here.

22       I'll scroll down to the last sheet as it was

23   produced to us, which is Pursley 12105.  And I

24   believe that's a 19, appears to me, but

1  July 19, 1993, appears to be the postmark.

2        Do you agree with that?

3     A. Yes, sir.

4     Q. Okay.  And I'm going to scroll back up to

5  12100.

6        All right.  Top of where I've scrolled, it

7  says, "All I want from you is to mail to Myra in a

8  sealed envelope marked legal mail.  This way we

9  don't have to worry about prying eyes."

10        Did I read that correctly?

11     A. Yes.

12     Q. And is Myra, Myra Foster?

13     A. Yes.

14     Q. What were you asking Ms. Crabtree to mail to

15  Myra?

16     A. I can't be certain.  I really -- it could

17  have been the affidavit.  It could -- I'm not

18  certain.

19     Q. Do you know if Ms. Crabtree followed your

20  instructions in this regard?

21     A. I don't remember.  I'm not sure if she took

22  the affidavit directly down to the attorney or she

23  sent it.

24     Q. And I'll show you the affidavit in a little

1    bit.

2          But the affidavit itself, who wrote it?

3          MS. LEFF:  Object to foundation.

4       Q. Samantha Crabtree's affidavit.

5       A. I'm pretty sure she wrote it.  I don't think

6    I wrote it.

7          MR. IASPARRO:  All right.  This is going to

8    be Exhibit 8.

9          (Exhibit 8 was marked for identification

10   and is attached to the transcript.)

11         MR. IASPARRO:  Which, for the record, is

12   Pursley 12030 through 12038.

13      Q. Mr. Pursley, is this in your handwriting,

14   this letter?

15      A. Yes, sir.

16      Q. And at the upper right-hand corner of the

17   first sheet here, it says, "Tuesday, 7/21."

18         Do you see that?

19      A. Yes.

20      Q. Under that I think it's Ju -- is it Julette,

21   Julette's birthday?

22      A. It's my daughter, yes.

23      Q. Okay.

24      A. Julette.

1      Q. Julette?  And then July 21st, is that her

2  birthday?

3      A. No.  I was mistaken.

4      Q. Okay.  So I'll scroll down to the last

5  sheet, copy of the envelope.

6          Would you agree the postmark on the envelope

7  says July 21, 1993?

8      A. Yes, sir.

9      Q. Let me scroll up to Pursley 12030, first

10 page.  So in reading through this first page of the

11 letter, Mr. Pursley, it seems to me you had

12 knowledge as of this time, July 21, 1993, that

13 Samantha Crabtree had provided information to the

14 police implicating you in those things we've talked

15 before, the Burger King robbery, the bank robbery,

16 as well as the Ascher murder.

17          Is that a fair characterization?

18          MS. LEFF:  Object to form in terms of what

19 you feel.

20     A. Yes.

21          Yes.

22     Q. Okay.  And do you have an understanding

23 having been through this case as long as you have

24 that Lester Brown has indicated that you asked him

1   to kill Marvin Windham?

2          MS. LEFF:  Object to form.  Foundation.

3      A. I have read that, yes, sir.

4      Q. Okay.  Did you ask Lester Brown to kill

5   Marvin Windham?

6      A. No.

7      Q. Do you have any idea why Lester Brown would

8   say such a thing?

9          MS. LEFF:  Objection.  Calls for

10  speculation.  Lack of foundation.

11     A. I do not.  I do not.

12     Q. Did you at any time know a man named Olin

13  Bell, Senior?

14     A. I do not remember Olin Bell, Senior.

15     Q. Over the course of time, with respect to

16  this case, have you been made aware of a written

17  statement executed by a man named Olin Bell, Senior

18  regarding some conversations that he and you had

19  while you were locked up together?

20     A. I learned of that earlier this year, yes,

21  sir.

22     Q. Okay.  Prior to earlier this year, had you

23  ever heard of Olin Bell senior?

24          MS. LEFF:  Object to form.

1       A. I do not know -- no.  It still does not ring

2    a bell.  I do not know who Olin Bell senior is.

3       Q. Okay.  To the best of your knowledge, were

4    you ever incarcerated with a man by the name of Olin

5    Bell, Senior?

6       A. Just from what I was told, sir, not from

7    independent recollection.

8       Q. Scrolling down on the exhibit that is on the

9    screen in front of you to Pursley 12033 -- and the

10   part I'm going to reference straddles over to 12034.

11       Starting with the top of the sheet where

12   I've scrolled, "As far as you, before I put the bite

13   down on your story, I'm going to see if you're going

14   to come correct.  If you know -- if not, you know

15   I'll be forced to shred your shit like cheese, too.

16   Not just you dealing with him or your lying either

17   it has something to do with?"

18       Did I read that correctly?

19       A. Yes, sir.  It appears so.

20       Q. Would you agree that the phrase I'll be

21   forced to shred your shit like cheese, too, is

22   threatening in nature?

23       A. It's not physical threats, sir.  It's

24   talking about her story.  It's talking about in

1    court.  It's just shred her story.

2        Q. And on this date, July 21, 1993,

3    Ms. Crabtree had not yet executed her affidavit, had

4    she?

5        MS. LEFF:  I'm going to object to

6    foundation.

7        A. I do not know.

8        Q. Do you remember, did she execute her

9    affidavit before or after she was released from the

10   Winnebago County Jail?

11       MS. LEFF:  Object to foundation.

12       You can answer, if you know.

13       A. I believe -- I believe it was after.

14       Q. And if you were writing a letter addressed

15   to Samantha at the Winnebago County Jail, that would

16   suggest she was still incarcerated; true?

17       A. Yes, sir.  Yes, sir.

18       Q. I'm going to scroll to Pursley 12035.

19       Starting with top of the page where I've

20   scrolled, the parenthetical, "By the way, do you

21   remember why I told you to write Marvin at work

22   release, what he said he would sell me, Sam.  I

23   won't give you a clue.  Just put it in a letter if

24   you remember.  If not, ask Rachel."

1       Did I read that correctly?

2    A. Yes, sir.

3    Q. Mr. Pursley, what were you talking about

4 there?

5    A. I have no idea.

6    Q. Who is Rachel?

7    A. Probably a former girlfriend.

8    Q. Your former girlfriend?

9    A. Yes.

10   Q. As you sit there today, do you have any

11 reason to understand what you would be asking

12 Samantha to ask Rachel about?

13       MS. LEFF:  Objection.  Asked and answered.

14   A. I do not.

15   Q. Put that aside.

16       MR. IASPARRO:  We'll mark this as 9.

17       (Exhibit 9 was marked for identification

18 and is attached to the transcript.)

19 BY MR. IASPARRO:

20   Q. Mr. Pursley, do you recognize this as the

21 Samantha Crabtree affidavit?

22   A. I will -- I will agree that it is.  I don't

23 remember it.  I haven't seen it in so long.

24   Q. Were you involved at all in drafting this

1    document, Mr. Pursley?

2         MS. LEFF:  Objection.  Asked and answered.

3         A. I don't believe so.

4         Q. Do you recognize the handwriting in this

5    document?

6         A. I believe it's Samantha's handwriting.

7         Q. Do you know for sure?

8         A. No.  I mean, I believe it's her handwriting.

9    I know it's not my handwriting.  It says, "I,

10   Samantha Crabtree..."

11        Q. Did you review this document before Samantha

12   Crabtree executed it?

13        A. I don't remember.  I don't think so.  I

14   don't see how I would have been able to.

15        Q. When was the first time you recall seeing

16   this document?

17        A. I do not recall the first time I seen this

18   document.

19        MR. IASPARRO:  All right.  This might be a

20   good time for just a few minute break.  I've got

21   another section of the deposition I'd like to segue

22   to, and I don't have a whole lot longer.  But I do

23   think about five minutes or so might be helpful.

24        MS. LEFF:  Let's go off the record then.

1          THE WITNESS:  Thank you.

2          (A short break was had.)

3    BY MR. IASPARRO:

4      Q. Mr. Pursley, I want to go back to the

5    complaint again for the next set of questions.  And

6    I'll start showing you the complaint again.  I

7    think -- there we go.

8          All right.  There we go.

9          Do you see that?

10     A. Yes, sir.

11     Q. All right.  I am going to direct your

12   attention now to paragraph 42 on page 6 of the

13   second amended complaint which reads, "On June 10th,

14   Defendants Schmidt, Forrester, Houde, and at least

15   two other defendant officers began following

16   Plaintiff's girlfriend, Samantha Crabtree, and

17   pursued her until she gave them a false statement

18   against Plaintiff."

19         Did I read that accurately?

20     A. Yes, sir.

21     Q. All right.  My question, Mr. Pursley, is, do

22   you have any basis as you sit there today to allege

23   that those three detectives in particular --

24   Detectives Schmidt, Forrester, and Houde -- knew on

1    June 10, 1993 that the written statement provided by

2    Samantha Crabtree regarding the Ascher murder was in

3    any way false?

4         MS. LEFF:  I'm going to object to the extent

5    it calls for a legal conclusion and as to lack of

6    foundation.

7         You can answer the question to the best of

8    your ability.

9         A. Only from what I heard, sir.

10        Q. And when you say only from what you've

11   heard, what do you mean by that?

12        A. What I heard from Samantha and in court

13   and...

14        Q. Okay.  So in terms of their mindset -- and

15   when I say their, I mean Detectives Schmidt,

16   Forrester, and Houde -- do you have any basis of

17   knowledge as to what their mindset was on June 10th

18   of 1993?

19        A. I do not.

20        Q. Okay.  I'm going to scroll down to

21   paragraph 45, "Over the course of several hours,

22   defendant officers, including Forrester and Schmidt,

23   intimidated and coerced Crabtree, threatening to

24   separate her from her children.  Feeding Crabtree

1    details about Ascher's murder that she did not

2    previously know, Defendants coerced Crabtree into

3    fabricating a story implicating Plaintiff in the

4    murder."

5            Did I read that correctly?

6        A. Yes, sir.

7        Q. All right.  I want to make sure I understand

8    this allegation.  Are you alleging that Detectives

9    Forrester and Schmidt fabricated the statement or

10   that Samantha Crabtree did so?

11           MS. LEFF:  I'm going to object.  That calls

12   for a legal conclusion.

13       A. I do not know.  I can't answer that

14   question.

15       Q. Okay.  Do you know if on June 10, 1993, --

16   let me start over.

17           Do you know if Detectives Forrester and

18   Schmidt believed on June 10, 1993, that Samantha

19   Crabtree's written statement was truthful?

20       A. I do not know.

21       Q. Would you agree that her statement was

22   consistent with Marvin Windham's information that he

23   provided to Crime Stoppers two days earlier on

24   June 8, 1993?

1          MS. LEFF:  Object to foundation.  Object to
2    form.
3       A. Not --
4       Q. I'm sorry.  What was your answer?
5       A. I don't know.
6       Q. Okay.  And then turning -- scrolling down to
7    paragraph 46 of the second amended complaint,
8    "Defendants Forrester and Schmidt then brought
9    Crabtree to the back of a police car to the area
10   where Ascher was killed.  Defendants coerced
11   Crabtree into fabricating a story about driving
12   Plaintiff to and from the scene of Ascher's murder
13   on the night he was killed."
14          Did I read that correctly?
15      A. Yes, sir.
16      Q. Which defendants are you alleging coerced
17   Ms. Crabtree into fabricating a story about driving
18   you to and from the scene of Ascher's murder on the
19   night he was killed?
20          MS. LEFF:  I'm going to object to the
21   question.  Calls for a legal conclusion.  Lack of
22   foundation.
23          You can answer to the best of your ability.
24      A. I don't know.  Just what's stated in the

1    complaint.

2        Q. And similar to what I asked you before with

3    respect to paragraph 45, are you alleging that it

4    was Detectives Forrester and/or Schmidt who

5    fabricated that story or that they coerced Samantha

6    Crabtree into fabricating the story?

7            MS. LEFF:  Same objections.  Calls for a

8    legal conclusion.  Lack of foundation.

9        A. I don't know, sir.

10       Q. Okay.  Paragraph 47, "Forrester and Schmidt

11   later brought Crabtree to the identification unit at

12   the police station to meet Defendant Houde.  There

13   the defendant officers coerced Crabtree into falsely

14   claiming that on the night of Ascher's murder

15   Plaintiff wore the clothing and carried the

16   9-millimeter Taurus handgun they said had been

17   recovered from Plaintiff's and her apartment."

18           Did I read that correctly?

19       A. Yes, sir.

20       Q. And similar to the questions I asked with

21   respect to the two preceding paragraphs, who are the

22   defendant officers you are alleging coerced

23   Ms. Crabtree into falsely claiming that on the night

24   of Ascher's murder, you wore the clothing and

1   carried the 9-millimeter Taurus handgun that the

2   police say they recovered from your and

3   Ms. Crabtree's apartment?

4        MS. LEFF:  Objection.  Calls for a legal

5   conclusion.  Lack of foundation.

6      A. Once again, I don't know, sir, only what's

7   alleged in the complaint as the allegation.

8      Q. Okay.  And do you know, are you alleging it

9   was those officers who are identified in paragraph

10  47 who fabricated that information, or that they

11  coerced Ms. Crabtree into making that claim?

12       MS. LEFF:  Same objections as to calling for

13  a legal conclusion and lack of foundation.

14     A. I don't know.

15     Q. All right.  Paragraph 50, "The defendant

16  officers knew the statement they obtained from

17  Crabtree was false.  Her false statement was used to

18  initiate criminal charges against Plaintiff and

19  secure his indictment."

20       Did I read that correctly?

21     A. Yes, sir.

22     Q. Which defendant officers are you alleging

23  knew that Samantha Crabtree's statement was false on

24  June 10, 1993?

1          MS. LEFF:  Objection.  Calls for a legal

2     conclusion.  Lack of foundation.

3          A. Once again, I don't know, sir.  I'm only

4     standing on the complaint.

5          Q. We talked a little bit earlier about

6     Samantha Crabtree's affidavit and the fact that it

7     was executed after she was released from jail;

8     correct?

9          MS. LEFF:  Objection.  Mischaracterizes

10    testimony.

11         A. Yes, sir.

12         Q. Are you aware of the circumstances which led

13    to her release from the Winnebago County Jail in

14    late July 1993?

15         A. Not really.

16         Q. Okay.  All right.  Paragraph 53 of the

17    second amended complaint, "The defendant forensic

18    scientists compared bullets and cartridge casings

19    fired from the Taurus to bullets and casings located

20    at the crime scene and on the victim.  The tests did

21    not establish that the Taurus was the gun used to

22    kill Andrew Ascher."

23         Did I read that correctly?

24         A. Yes, sir.

1      Q. What is your basis for alleging that the

2    tests performed by the Illinois State Police

3    defendant forensic scientists did not establish that

4    the Taurus handgun was the gun used to kill Andrew

5    Ascher?

6           MS. LEFF:  I'm going to object that it calls

7    for a legal conclusion and for expert testimony.

8           You can answer to the best of your ability.

9      A. Just from -- I don't know.  Just from the

10   complaint.  I'm standing on the complaint.

11     Q. Do you have any basis to allege that any of

12   the defendant forensic scientists did anything other

13   than act in good faith in relation to their work on

14   the Ascher homicide in 1993 and 1994?

15          MS. LEFF:  I'll object to the extent that it

16   calls for legal conclusion and for expert testimony

17   as well.

18          You can answer to the best of your ability.

19     A. It's just my -- just my opinion.  It's just

20   my opinion that it was a fabricated identification.

21     Q. I don't know if I asked you this.  I might

22   have asked you this with respect to the officers.

23          But before 1993, had you ever met a man

24   named Daniel Gunnell or a man named Peter

1    Striupaitis or a man named Jack Welty, to the best

2    of your knowledge?

3        A. No, sir.

4        Q. To the best of your knowledge, had any of

5    those individuals been involved in any other

6    investigations or cases that you were in with

7    respect to the Rockford police department?

8        A. Not that I know of, sir.

9        Q. Paragraph 54, reads, "Nevertheless, the

10   defendant forensic scientists fabricated a report

11   stating the science showed with certainty that the

12   Taurus was used in the murder."

13       Did I read that right?

14       A. Yes, sir.

15       Q. What is your basis to make the allegation

16   that the defendant forensic scientists fabricated a

17   report stating that?

18       MS. LEFF:  Objection.  Calls for a legal

19   conclusion and also for expert testimony.

20       You can answer to the best of your ability.

21       A. Just the change in -- the change in their

22   testimony and the aspect that showed the gun that

23   doesn't match.

24       Q. And with respect to change in testimony, are

1    you aware of a change in the science, if you will,

2    between the time of your first trial in 1994 and

3    your post-conviction proceedings in the 2000s with

4    respect to the level of certainty that firearms and

5    ballistics experts can use in matching ballistics

6    evidence?

7          MS. LEFF:  I'll object to the lack in

8    foundation to answer questions like this.  Also,

9    that these questions call for expert testimony.

10         You can answer, if you can.

11     A. I'm only familiar from the stuff that I

12    read.

13     Q. Okay.  Are you aware of any evidence,

14    Mr. Pursley, that any of the Rockford police

15    officers who are named as defendants in the second

16    amended complaint communicated in any way with

17    Daniel Gunnell regarding his analysis or tests

18    performed on the Taurus 9-millimeter handgun

19    recovered from 901 Ashland on June 10, 1993?

20         MS. LEFF:  Object to lack of foundation.

21     A. I am not.  I don't know.

22     Q. What is the evidence, if any, that you are

23    aware of which supports your allegation that the

24    defendant officers and the defendant forensic

1    scientists conspired to fabricate the ballistics

2    evidence results in your case and then to withhold

3    that fabrication from the prosecution and the

4    defense?

5         MS. LEFF:  Objection.  Calls for a legal

6    conclusion and for expert testimony.

7         You can answer to the best of your ability.

8         A. The fact that at my trial, the defense

9    experts normally worked for the state or for the

10   feds, that I was only the fourth defense case they

11   worked for.  It was a reputable lab.  They looked at

12   the gun on three occasions and could not come to the

13   same conclusion that the state's expert did.  And

14   then later, the state's expert, after further gun

15   testing was done in the 2000s, changed their

16   stories.  And the IBIS system did not connect my gun

17   to the crime scene.

18        Q. All right.  Moving down to paragraph 56 of

19   the second amended complaint, "In fabricating the

20   link between the Taurus and Ascher's murder,

21   defendants entered into evidence a gun they knew was

22   not the murder weapon and falsely indicated that it

23   was the murder weapon."

24        Did I read that accurately?

1      A. Yes, sir.

2      Q. What is your basis for making that

3  allegation?

4          MS. LEFF:  I'm just going to object again as

5  to calling for a legal conclusion and for lack of

6  foundation.

7          And I also want to caution Mr. Pursley not

8  to give testimony that reveals the subject of

9  communications between you and your counsel.

10         So you can answer.

11     A. Repeat the question, sir?

12     Q. Well, let me ask it differently.

13         And I agree with Ms. Leff.

14         I'm not asking you to reveal any sort of

15  communications that you and your attorneys may have

16  had in drafting this complaint.  Okay?  Or in

17  formulating these allegations.  What I want to know

18  is what you know in terms of facts that support

19  these allegations.

20         So my question with respect to this

21  paragraph 56 is, what evidence are you aware of, do

22  you have knowledge of, that the murder weapon, that

23  Taurus 9-millimeter that was entered into evidence

24  at your trial was a weapon that the police knew was

1    not actually the murder weapon?

2          MS. LEFF:  Again, I'll object that these

3    questions call for a legal conclusion and for expert

4    testimony and instruct you not to reveal any

5    information that you learned through communication

6    with your counsel.

7       A. I don't know.

8       Q. Going down to paragraph 60, "One of the

9    defendant officers spoke to the victim's mother,

10   Lois Ascher, after Plaintiff's arrest for her son's

11   death.  Mrs. Ascher asked whether the police were

12   sure Plaintiff committed the crime, and the

13   defendant officer responded, 'Well, we have somebody

14   anyway.'"

15         Did I read that accurately?

16      A. Yes, sir.

17      Q. Which defendant officer are you referring to

18   in paragraph 60 of the complaint?

19         MS. LEFF:  I'll object to lack of

20   foundation.

21      A. I don't know.

22      Q. Are you -- do you have any knowledge that

23   any of the named defendant Rockford police officers

24   actually spoke to the victim's mother, Lois Ascher,

1    consistent with the allegations in paragraph 60?

2         MS. LEFF:  Are you asking if he has

3    firsthand knowledge?

4         MR. IASPARRO:  Yes.

5         MS. LEFF:  Object to form.

6      A. Only to what came out in court and what she

7    told the state's attorney's, investigators, and the

8    reports that were taken.

9      Q. Mr. Pursley, as you sit there today, could

10   you please explain what, if any, evidence you are

11   aware of that supports your claim that any of the

12   defendant Rockford police officers conspired in any

13   way with any of the defendant forensic scientists to

14   frame you for the murder of Andrew Ascher?

15        MS. LEFF:  I want to object to this line of

16   questioning again.  Calls for a legal conclusion and

17   for expert testimony.

18        I just want to be clear, to the extent that

19   you're asking him to testify about what evidence

20   supports particular allegations and how he's going

21   to prove his claims, I think these questions call

22   for information that he would know through

23   attorney-client privileged communications.

24        I don't want -- I'm going to instruct him

1   not to give any testimony about facts or about his

2   understanding that he gained through his

3   conversations with his lawyers?

4        MR. IASPARRO:  I'm not asking him about

5   that.  These are his allegations that he's making

6   that these people conspired to frame him.  I want to

7   know what he knows about that.  How does he know

8   that?

9        MS. LEFF:  The question seems to essentially

10  be, how are you going to prove your claims or how

11  have you developed evidence to support your claims.

12  I think you're on the line.  I just want to be clear

13  on that.

14       MR. IASPARRO:  That's not the intent of my

15  question.  I want to know what he knows, not how are

16  you going to prove your claim.  I have an idea of

17  how you're going to try and prove it.  That's

18  between you and us.  What does he know?  So let me

19  ask the question again.

20  BY MR. IASPARRO:

21    Q. Mr. Pursley, do you have any firsthand

22  knowledge that any of the defendant Rockford police

23  officers conspired in any way with any of the

24  defendant forensic scientists to frame you for the

1    murder of Andrew Ascher?

2         A. I don't know.

3         Q. All right.  Last few questions I've got for

4    you before I turn it over to whomever is going to go

5    next are, with respect to your criminal record,

6    Mr. Pursley, if I understand it correctly, you're

7    currently on conditional discharge for a felony

8    offense; is that correct?

9         A. Yes, sir.

10        Q. And that is -- bear with me.

11            I want to make sure I get this right.

12            On April 1, 2019, you pled guilty to the

13   class 4 felony, attempting to defraud a drug screen

14   in Winnebago county; correct?

15        A. Yes, sir.

16        Q. And that was based upon your trying to

17   fabricate the results of a drug screen that you

18   needed to complete while you were on pretrial

19   release?

20            MS. LEFF:  Object to form.

21        A. Yes, sir.

22        Q. Okay.  And you previously testified that you

23   were convicted of residential burglary and sentenced

24   to the Department of Corrections, I think, in the

1    early 1980's; is that right?

2        A. Yes, sir.

3        Q. And were you also convicted of possession of

4    a stolen motor vehicle in Kane County in the early

5    1990's?

6        A. Yes.  Yes, sir.

7        Q. Okay.  And you've also got convictions for

8    violation of the Cannabis Control Act out of Kane

9    County in 1988, a felony conviction?

10       A. Yes, sir.

11       Q. As well as unlawful use of weapons -- or

12   unlawful use of a weapon by a felon in Kane County

13   in 1989?

14       A. I don't think that's correct.  I believe it

15   was Winnebago County.

16       Q. Winnebago?  All right.

17          Do you have any pending criminal offenses as

18   you sit there today, criminal charges?

19       A. No, sir.  No, sir.

20       Q. Okay.  I'm going to hand it over now,

21   Mr. Pursley.  I appreciate your patience today.  I

22   may have a few questions later on to wrap up, but

23   for, now I'm done.

24       A. Thank you.

1      Q. Thank you.

2      A. Thank you.

3          MR. HUOTARI:  Do you mind if we take about

4   ten minutes?

5          MR. IASPARRO:  That's fine with me.

6          (A short break was had.)

7                        EXAMINATION

8   BY MR. HUOTARI:

9      Q. Good afternoon, Mr. Pursley.  My name is

10  Joel Huotari.  I'm one of the attorneys.  I

11  represent a handful of defendants -- James Barton,

12  Bruce Scott, Doug Williams, and Steven Pirages.

13         Are you able to hear me okay?

14     A. Yes, sir.

15     Q. Okay.  Great.  I want to pick up and follow

16  up on a few of the topics that Mr. Iasparro had

17  asked you about a little while ago.

18         Earlier he had asked you a question about

19  paragraph 42 of the amended complaint.

20         MR. HUOTARI:  And, Michael, I don't suppose

21  you're able to put that back up on the screen for us

22  right now so that we can refresh our recollection as

23  to the content of paragraph 42.

24         MR. IASPARRO:  Sure.  One second here.

1        Can everybody see that?

2        MS. LEFF:  Thank you.

3    Q. Mr. Pursley, paragraph 42 of your complaint

4    states that, "On June 10th, Defendants Schmidt,

5    Forrester, Houde, and at least two other defendant

6    officers began following Plaintiff's girlfriend,

7    Samantha Crabtree, and pursued her until she gave

8    them a false statement against Plaintiff."

9        Do you know who the at least two other

10   defendant officers are that are described in that

11   allegation?

12   A. No, sir.

13   Q. Okay.  With respect to the police officer

14   defendants, you had testified earlier that you had

15   some occasion to meet an officer by the name of

16   Forrester prior to the Ascher investigation.

17       Do you remember that?

18   A. Yes, sir.

19   Q. And was he the only defendant officer that

20   you had any experience with prior to the Ascher

21   investigation?

22       MS. LEFF:  I'm going to object to form and

23   foundation.

24   A. I do not know.

1    Q. Okay.  As you sit here today, do you

2  remember having any interactions with any of the

3  other defendant officers prior to the Ascher

4  investigation other than Forrester?

5    A. As I sit here today, I do not remember.

6    Q. Okay.  Thank you.

7     Now, you testified earlier that you're not

8  aware of any evidence that any of the defendant

9  officers in this case fabricated evidence in support

10  of the Ascher investigation.  And what I'd like to

11  know is, do you have any evidence that you're aware

12  of that suggests that any of the defendant officers

13  withheld any evidence relevant to the Ascher

14  investigation.

15    MS. LEFF:  I'm going to object that it

16  mischaracterizes the testimony, misstates the

17  record, calls for a legal conclusion, calls for

18  expert testimony.  And I'm going to instruct

19  Mr. Pursley not to share any information that he

20  learned through attorney-client communications.

21    You can answer.

22    MR. HUOTARI:  For the record, facts are not

23  privileged.  Communications and work product is.  So

24  if Mr. Pursley learned of facts, the facts are not

1    privileged.  You can't have a monopoly on the facts,

2    as you know, Counsel.

3         So my question is whether Mr. Pursley is

4    aware of any facts that support an allegation that

5    any of the defendant officers withheld any evidence

6    relevant to the Ascher investigation.

7         MS. LEFF:  Same objections.

8       A. As I sit here, I do not know.

9       Q. And similarly, as you sit here today, are

10   you aware of any facts that support an allegation

11   that any of the officers conspired, either amongst

12   themselves or amongst anyone else, in support of

13   wrongfully convicting you or depriving you of your

14   civil rights or inflicting the intentional

15   infliction of emotional distress or committing any

16   other wrongdoing that you've complained about.

17        MS. LEFF:  Objection.  Asked and answered

18   and calls for a legal conclusion.

19      A. As I sit here, I do not know.

20      Q. As you sit here today, are you aware of any

21   facts that support an allegation that any of the

22   defendant officers knew of any wrongdoing by other

23   officers or by the codefendants from the Illinois

24   State Police but they failed to intervene to prevent

1    that wrongdoing?

2         MS. LEFF:  Objection.  Calls for legal

3    conclusion.

4         You can answer to the best of your ability.

5         A. As I sit here, I do not know.  I cannot

6    answer that question.

7         Q. Thank you, sir.

8         In a similar vein, as you sit here today,

9    are you aware of any facts to support an allegation

10   that any of the defendants knew you were innocent of

11   the Ascher murder but, nevertheless, intentionally

12   sought to convict you of that murder for the purpose

13   of causing you emotional distress?

14        MS. LEFF:  Objection.  Compound and --

15   objection.  Calls for a legal conclusion.

16        You can answer to the best of your ability.

17        A. As I sit here, I do not know, sir.

18        Q. Do you believe that any of the defendants in

19   this case actually believed that you were the one

20   who killed Andrew Ascher?

21        MS. LEFF:  Objection.  Vague.  Object to

22   form and calls for speculation.

23        A. I do not know.

24        Q. You don't know one way or the other?

1      A. I do not.

2      Q. With respect to the convictions that you

3  testified to earlier when Mr. Iasparro asked you

4  about your prior convictions, did you do time in

5  prison for each of those felony convictions?

6          MS. LEFF:  Objection.  Compound.

7      A. I did, sir.

8      Q. I'm sorry.  I didn't catch your answer.

9      A. Yes, sir.

10      Q. Okay.  So for each of those convictions, you

11  served time in the penitentiary?

12      A. Yes, sir.

13      Q. So by the time you were convicted of the

14  Ascher murder, you had served prison time how many

15  times prior to that?

16      A. Three.

17      Q. Three times?  Okay.

18          So the murder time you served was the fourth

19  time that you were incarcerated?

20      A. Yes, sir.

21      Q. Now, with respect to the bank robbery that

22  you pled the fifth to, do you recall how much time

23  you would have been facing on the bank robbery

24  charge if you were prosecuted for that?

1        MS. LEFF:  I'm going to object.  Calls for

2    facts not in evidence.  Calls for a legal

3    conclusion.  Lack of foundation.

4        A. No, sir.

5        Q. Do you know why the state --

6        A. Once again, I also have to plead the fifth.

7        Q. Okay.  I understand.

8        And do you know why the state chose not to

9    prosecute you for the bank robbery?

10        MS. LEFF:  Objection.  Lack of foundation.

11        A. I do not know, sir.

12        Q. With respect to your prior history of drug

13    use, I believe you testified earlier that you were a

14    user of crack cocaine back in the '93-'94 time

15    frame; is that correct?

16        MS. LEFF:  Objection.  Misstates the record.

17        A. I did not -- I did not state that.  If I

18    did, that's a mistake.  What I said was I would

19    plead the fifth on anything that would incriminate

20    me, if I remember correctly.

21        Q. Oh, I see.  So do you have a history of

22    using crack cocaine in the '93-'94 time frame?

23        MS. LEFF:  Objection.  Asked and answered.

24        A. No.  But, once again, I would plead the

1    fifth to any questions regarding drug use or along

2    that vein.

3        Q. And does that invocation of the Fifth

4    Amendment extend to your use of marijuana?

5        A. At this time, yes, sir.

6        Q. So if I asked you any questions about using

7    any illicit substances at any point in time in your

8    past, you would be invoking the Fifth Amendment; is

9    that right?

10        A. Yes, sir, respectfully.

11        Q. That's not a problem.  I understand.

12            Do you have any physical, medical, or

13    psychiatric conditions that you are seeking damages

14    for from the defendants in this civil case?

15        MS. LEFF:  I'm going to object to the extent

16    it calls for a legal conclusion.

17        A. Just to the extent of what is alleged in the

18    complaint, sir.

19        Q. Okay.  So have you been diagnosed with any

20    medical or psychiatric conditions that you're

21    seeking damages for?

22        MS. LEFF:  Object.  Calls for a legal

23    conclusion.

24        A. Yes.  And just what I stipulated in the

1  complaint, sir.

2      Q. And what are those medical and psychiatric

3  conditions that you assert the defendants in this

4  case have caused you?

5      A. Just what's stipulated in the complaint.

6      Q. And what paragraph can you refer me to to

7  identify the medical and psychiatric conditions that

8  are the subject of your damages claim?

9      A. I cannot right now.

10     Q. So as you sit here today, you're unable to

11 tell me any particular medical, psychological, or

12 physical conditions that are the subject of your

13 damages claim?

14     MS. LEFF:  I'm just going to object to the

15 extent this is calling for a legal conclusion in

16 terms of conditions he is seeking damages for as

17 opposed to conditions that he believes were caused

18 by the defendants.

19     You can answer to the extent you understand

20 the question, Patrick.

21     A. I'm unable to answer the question.  I don't

22 know at this time sitting here.

23     Q. And with respect to your back condition that

24 you had surgery for, you're not claiming that that

1    is a result of anything that the defendants in this

2    case did, are you?

3        A. Again, as I sit here at this time, I do not

4    know.

5        Q. Okay.  And as you sit here today --

6        A. I believe it's a -- it's my objective

7    belief, I believe it is.  This is a continuation,

8    but that's my belief.  It's part of a chain of

9    events.

10       Q. And how did you injure your back?

11       A. But as far as the complexity -- my back got

12   worn out.  And once I -- once I got out, within two

13   months, I worked in building renovation, and I just

14   couldn't do the work.  It just -- it seemed what was

15   beneath the surface had came to the surface

16   abruptly.

17       Q. Okay.  I believe you testified earlier that

18   a part of your back problem arose due to working out

19   while in prison; is that accurate?

20       A. And I believe it was -- just my subjective

21   belief.  I believe it was nutrition, the water,

22   being on the jail bunk so much, as well as the

23   workout, the lack of nutrition as well as the

24   working out.

1          Q. So is it --

2          A. That is just my personal belief.

3          Q. Sorry.  I didn't mean to cut you off.

4             Is it your testimony then that it was the

5     conditions of confinement while you were

6     incarcerated that helped lead to your deteriorated

7     condition?

8          A. Yes, sir.

9          Q. And the conditions of your confinement were

10    actually the subject of a separate civil suit that

11    you brought against the IDOC and others; isn't that

12    right?

13         A. Yes, sir.

14         Q. And you settled that suit with the

15    defendants in that case?

16         A. I believe that case was settled.

17         Q. Okay.  And you're not trying to seek a

18    double-recovery for the same claim that you resolved

19    in that prior litigation, are you?

20         MS. LEFF:  Object to the extent it calls for

21    a legal conclusion.

22            You can answer to the extent you understand.

23         A. I do not know if that's what that is

24    considered.

1    Q. Are you still treating for any physical,

2  psychological, or other condition that you attribute

3  to any of the defendants in this case?

4    A. Yes, sir.

5    Q. And what conditions are you treating for

6  that you attribute to the defendants?

7    A. Once again, just to the basis of knowledge

8  of what's in the complaint, sir.

9    Q. I don't know what that means.

10      I'm asking you what conditions you're

11  currently treating for that you attribute to the

12  defendants in this case.

13    MS. LEFF:  Can you fix your camera so that

14  we can see your face?

15    THE WITNESS:  I didn't know my cam is

16  blocked.  It shouldn't be blocked.  There's

17  documents in my camera.  You should see my face.  I

18  see you.  I'm not -- the video is not blocked.

19  There's a document up on the screen that was not

20  resolved.  Perhaps, if that was taken down --

21    MR. IASPARRO:  I can stop sharing that, if

22  that's all right, Joel.

23    MR. HUOTARI:  Oh, yes, please.  Thank you.

24    MS. LEFF:  Okay.

1     A. It seems frozen.  Is it working now?

2     MS. LEFF:  Yes.

3    Q. Yeah.  That's great, Mr. Pursley.  Thank you

4  for fixing that.

5     So my question to you was whether you're

6  still treating for conditions that you attribute to

7  the wrongdoing you've alleged against the defendants

8  in this case as opposed to treating for lingering

9  conditions that arose as a result of being confined

10  in a jail with improper nutrition or bedding, or

11  whatever other conditions you had in the jail that

12  you settled in the other case.

13    MS. LEFF:  Object to form.

14    A. I'm still being treated for conditions, yes,

15  sir.

16    Q. And what are those conditions?

17    A. Back, high blood pressure, and mental

18  conditions as well.

19    Q. Okay.  And you're actively treating for each

20  of those three types of medical issues?

21    A. Yes, sir.

22    Q. And have you disclosed to your attorneys for

23  production in this case all of the records about the

24  course of treatment for those three conditions?

1          A. I believe I have.

2              MR. HUOTARI:  Thank you very much.  That's

3     all the questions that I have for you, Mr. Pursley.

4     There's a few other attorneys on the line who might

5     have questions at this point, so I'm going to pass

6     along to them thank you.

7                         EXAMINATION

8     BY MR. POTTINGER:

9          Q. Mr. Pursley, my name is Robert Pottinger.  I

10    represent the state defendants that include Howard

11    Forrester and others -- Gary Reffett, David Ekedahl.

12    I just have a few questions for you.

13             With regard to your back injury or spine

14    surgery which you had, I think it was in 2019, have

15    you made any claim for medical negligence in

16    association with that surgery against the doctors?

17         A. I have not.

18         Q. Do you intend to pursue --

19         A. No, I have not.

20         Q. Do you intend to pursue any such claim,

21    Mr. Pursley?

22         A. Not at this time, no, sir.  No, sir, not at

23    this time.

24         Q. Do you believe that you were mistreated by

1    the doctors in some fashion, in your own mind?

2       A. Regarding my surgeries or regarding while I

3    was incarcerated?

4       Q. Just your surgeries, sir.

5       A. No, not -- no.

6       Q. Okay.  You indicated when you spoke with

7    Samantha Crabtree recently that you were discussing

8    your daughter's graduation.

9       Is that true?

10      A. Yes, sir.

11      Q. Okay.  What is your -- what was your

12    daughter graduating from?

13      A. She just got an associate's degree.  I

14    believe she started at Rock Valley, completed it

15    online, but due to the COVID, all live -- you know,

16    it was canceled, live graduation ceremonies were

17    canceled.

18      Q. With regard to -- and we've gone over this a

19    number of times.  I want to be crystal clear on

20    this.  Any sort of writings or notes that you've

21    shared with your attorneys, I am not asking you

22    about or things that they've shared with you.

23      But aside from any communications, writings,

24    documents, e-mails with your attorneys, as it

1   relates to this case or the accusation and ultimate

2   conviction and vacating the conviction with regard

3   to Andrew Ascher, have you made any other writings

4   -- meaning notes, any diaries, or e-mails -- to any

5   other person?

6       A. No, sir, not that I can remember.

7       Q. Did you put together a screenplay or attempt

8   to put together some sort of a commercial production

9   with regard to any of your experiences in life?

10      A. My experience as far as -- as far as my

11  experiences, yeah, what I experienced.

12      Q. Okay.  And tell me a little bit about that.

13  What was that screenplay about?

14      A. Well, I don't know if I have a screenplay

15  because I don't necessarily know how to write a

16  screenplay.  But I've written stories or books and

17  programs, mostly cautionary tales for at-risk youth.

18  I speak publicly and speak to students, even while

19  incarcerated.  Probably ten years before my new

20  trial or getting out on bond, I created content.  So

21  I drew -- I drew from my life experiences.

22      Q. Okay.  And where is that content?  Where are

23  those writings?  I'm going to call them writings

24  generally, and that would include e-mails or things

1    you've put together, audiovisual.  I'll just

2    generally call them writings.

3           Where do you store that information?

4       A. Just generally, I have a website,

5    iamkidculture.org.  There are links on it to social

6    media.  I'm currently working in my office.  There's

7    a book, the Adventures of Kid Culture and the World

8    Explorers.  You know, so I have created a lot of

9    content, including anti- -- like an antigang

10   workbook, various newsletters that are topical.

11      Q. Have you kept any writings specifically

12   with --

13      A. It's not based on --

14      Q. Go ahead.

15      A. I'm sorry.  Go ahead.

16          No.  That's all right.  Go ahead.

17      Q. No.  Go ahead and finish, Mr. Pursley.

18          You said it was not based on --

19      A. It's not based on this.  It's based on my

20   case -- it's not based on my case.  It's based more

21   on life experiences, things I've learned from life.

22      Q. Mr. Iasparro asked you about the bank

23   robbery, and you asserted the Fifth Amendment with

24   regard to your alleged involvement with regard to

1    the bank robbery in May of 1993.

2           He also asked you about, you acknowledged

3    that you were aware that Samantha Crabtree, in her

4    plea agreement or statement to the court, said that

5    you were involved in that bank robbery.

6           Do you recall those questions from

7    Mr. Iasparro?

8        A. I recall the questions, yes, sir.

9        Q. Okay.  Do you have any reason as you sit

10   here now or have you ever had any reason to know why

11   Ms. Crabtree would have included you and stated that

12   you were involved in that bank robbery?

13          MS. LEFF:  Object to foundation.  Calls for

14   speculation.

15       A. Once again --

16       Q. Go ahead, Mr. Pursley.

17       A. Once again, I'm going to assert my Fifth

18   Amendment right.

19       Q. I just want to make sure we're clear on the

20   question.  My question is, do you have any reason to

21   know why she would say such a thing about you,

22   namely, that you were involved in that bank robbery.

23          MS. LEFF:  That question has been asked and

24   answered.

1      Q. Go ahead, Mr. Pursley.

2      A. I don't know.

3      Q. Did you ever attempt to break out of the

4   Winnebago County Jail in August of 1993,

5   Mr. Pursley?

6      A. I may have, but not -- it wasn't like the

7   way it was written in all my -- I may have had

8   intent, but I never committed the act.

9      Q. Okay.  What do you mean the way it was

10  written?

11     A. Well, I guess there was a booth, a glass

12  window booth broken, but that's all I can comment

13  on.

14     Q. You can only comment --

15     A. I'll have to assert my Fifth Amendment right

16  to free --

17     Q. You can --

18     A. I can only comment on the reports I read.

19  As far as like involvement or culpability or guilt,

20  I'd have to assert my Fifth Amendment right to be

21  free from self-incrimination.

22     Q. Did you date Rachel Whitford in 1992?

23     A. I believe so, yes, if that's the right year.

24     Q. Well, how long did you date Rachel Whitford?

1      A. I would think a matter of months.

2      Q. Did you live with her at all?

3      A. No, sir.

4      Q. Did you ever choke or physically abuse

5  Rachel Whitford?

6      A. No, sir.

7      Q. You would deny choking or physically abusing

8  Rachel Whitford at any time; is that your testimony?

9      A. I do not believe I've choked Rachel Whitford

10  in any way.  We broke up on amicable grounds, as far

11  as I remember.

12      Q. I just want to make sure we understand the

13  question.

14      Have you -- my question was, did you ever

15  choke her or physically abuse her in any way.

16      MS. LEFF:  Object to asked and answered.

17      A. Not to the best of my memory.  Not to the

18  best of my memory, no.

19      Q. What does that mean?  That means it's

20  possible that you did, in fact, choke or physically

21  abuse her and just don't recall now because of more

22  factors that have occurred since then?

23      MS. LEFF:  Object to form.

24      A. I do not believe I have.

1    Q. Well, when you say you don't believe you

2    have, so if Rachel Whitford were to testify that, in

3    fact, you did choke her and physically abuse her,

4    you don't have a recollection one way or the other

5    that you could refute that allegation; is that true?

6         MS. LEFF:  Object to form.  Assumes facts

7    not in evidence.  Misstates testimony.

8         A. As I stated --

9         Q. I didn't hear you, Mr. Pursley.

10        A. Just as I stated, I don't remember nothing

11   like that.

12        Q. My question to you, though, is so if she

13   were to say that you did choke her and physically

14   abuse her, you just don't recall so you couldn't

15   deny that allegation, you just wouldn't recall that

16   ever having occurred.

17         Is that what your testimony is?

18         MS. LEFF:  Objection.  Asked and answered.

19   Argumentative.  Misstates the testimony.

20         You can answer to the best of your ability.

21        A. I don't know.  I do not -- I don't remember

22   nothing like that.  I don't even remember arguing

23   with her.

24        Q. Did you ever write a letter to her from jail

1    that you would kill her family?

2        A. Oh, my God.  I hope not.

3        Q. Excuse me?

4        A. No, sir.  This is the first I'm hearing of

5    it.  So I do not know anything about -- I don't know

6    anything about that.

7        Q. So you deny that you wrote her a letter from

8    jail stating that you would kill her family?

9        A. Yes.  That does not sound like something I

10   would say.

11       Q. Did you -- you know her sister, Rachel's

12   sister; is that correct?

13       A. I would need a name, I guess.

14       Q. Do you ever recall burglarizing and

15   vandalizing her sister's house at 1803 Auburn Street

16   in 1992?

17       A. No.

18       Q. Did you date a lady by the name of Diane

19   Winters?

20       A. Yes.

21       Q. Did you ever physically abuse Diane Winters?

22       A. Me and Diane Winters had an altercation.

23   That's what got me sent back to prison from work

24   release.

1      Q. And when was that?

2      A. I'm not sure of the month that I went back

3  to prison from work release, but that was an

4  incident.

5      Q. What happened?

6      A. Had an argument.  I was driving a car,

7  shouldn't have been driving.  Anything else, I'd

8  like to assert the Fifth Amendment right to be free

9  from self-incrimination.  I was rolled up for

10  getting into an argument with her and driving a car

11  that I wasn't supposed to be driving.

12      Q. Did you ever tell her you would kill her?

13      A. No, not that I believe.  I don't...

14      Q. You deny ever saying that to Ms. Winters?

15      A. Yeah.  Nothing I remember.  I don't remember

16  nothing like that.

17      Q. Okay.

18      A. I do not remember anything like that.

19      Q. Prior to May 12, 1993 -- and that's the date

20  that the bank robbery occurred on Harrison -- do you

21  recall whether Ms. Crabtree had in her possession or

22  whether you were in a 1987 Oldsmobile Toronado?

23      MS. LEFF:  I'm going to object to the

24  compound nature of the question.

1      A. I'm --

2          MS. LEFF:  You can answer.

3      A. Once again, I have to assert my Fifth

4  Amendment right.  I would have to assert my Fifth

5  Amendment right to be free from self-incrimination.

6      Q. Okay.  So with regard to the -- I'm sorry.

7  The bank robbery was on May 13, 1993.

8          You will not answer any questions about the

9  1990s at all, is that a fair statement, based on

10  Fifth Amendment rights?

11      A. Yes, sir.

12          MR. POTTINGER:  I don't have any further

13  questions at this time.

14          THE WITNESS:  Thank you.

15          MR. IASPARRO:  Ifean or Sunil, do you guys

16  have any questions?

17          MR. MOGBANA:  This is Ifean.  I don't have

18  any questions.

19          MR. BHAVE:  This is Sunil.  I also don't

20  have questions.

21          MR. IASPARRO:  Hey, Alison, I've got just a

22  couple of follow-ups.

23          MS. LEFF:  Okay.

24                  FURTHER EXAMINATION

1   BY MR. IASPARRO:

2       Q. Mr. Pursley, one additional topic I wanted

3   to ask you about, in February of 1993, Samantha

4   Crabtree went to Rockford Memorial Hospital and was

5   treated for some injuries.  According to a police

6   report that's been produced in this case, which is

7   RFD Defense 266 through 269, she later told

8   Detective Forrester that she went to the hospital at

9   that time in February of '93 because you had beaten

10  her and pointed a gun at her and had pulled the

11  trigger, although the gun was unloaded.

12          Did you do that, sir?

13      A. No, sir.

14      Q. Did you ever beat or physically harm

15  Samantha Crabtree?

16      A. No, sir.

17      Q. Do you have any idea why Ms. Crabtree would

18  tell Detective Forrester that when she spoke to him

19  in August of 1993?

20      A. I have no idea.

21      Q. Did you ever have a disagreement or an

22  argument with Samantha Crabtree in February of 1993

23  about your use of crack cocaine?

24      A. One again, I'm going to have to assert my

1    Fifth Amendment right to be free from

2    self-incrimination, but my answer would be no, sir.

3         MR. IASPARRO:  Thank you.  Those are all the

4    questions I have.

5         MS. LEFF:  If defense counsel doesn't have

6    any additional questions --

7         MR. POTTINGER:  Alison, just one quick

8    question.

9                   FURTHER EXAMINATION

10   BY MR. POTTINGER:

11      Q. Mr. Pursley, I had asked you about Rachel's

12   sister, and at the time, I didn't recall the name

13   myself.

14         Do you know a Pam DeMario?  Does that ring a

15   bell to you as being Rachel's Whitford's sister?

16      A. I believe she did have a sister named Pam.

17      Q. And maybe a husband by the name of Karl?

18   Does that --

19      A. I don't remember that.

20      Q. Did you break into Ms. DeMario, Pam

21   DeMario's, Rachel Whitford's sister's house at any

22   time in your life?

23      A. No, sir, not that I'm aware of.

24      Q. When you say not that you're aware of, I'm

1    just trying to understand.  Is that something you

2    just don't recall doing and it's possible you did do

3    it, or you just flat out deny doing such a thing?

4        A. Well, firstly, I'm asserting my Fifth

5    Amendment right to be free from self-incrimination.

6    Secondly, I don't know what you're talking about.

7        Q. You just don't recall that?

8        MS. LEFF:  Objection.  Asked and answered.

9    Mischaracterizes the testimony.

10       Q. Is that true, Mr. Pursley?  Is that true?

11       A. I guess so.

12       MR. POTTINGER:  That's all I have.  Thank

13   you.

14       THE WITNESS:  Thank you.

15       MS. LEFF:  Any other defense counsel that

16   has questions?

17       I don't see anybody.

18       So I'm going to suggest -- let's go off the

19   record.  Let's come back at 2:15, and I may have a

20   few questions then.

21       (A short break was had.)

22                     EXAMINATION

23   BY MS. LEFF:

24       Q. I have just a few questions for you,

1   Mr. Pursley.

2        Mr. Pursley, did Samantha Crabtree tell you

3   what happened when she talked to the police on

4   June 10, 1993?

5      A. Yes.

6      Q. What did she tell you?

7      A. That she was questioned until late at night.

8   She was pregnant.  She was sick.  They threatened to

9   take her kids.  They threatened to lock her up.

10  That's basically it.  You know, they forced her to

11  incriminate me.

12     Q. At any point, did you ask Sam Crabtree to

13  put false information in an affidavit for you?

14     A. No.

15     Q. At any point, did you ask Sam Crabtree to

16  give false testimony in court for you?

17     A. I have not.

18        MS. LEFF:  Those are all the questions that

19  I have.

20        MR. IASPARRO:  I don't have anything else.

21        MR. HUOTARI:  That's it for me as well.

22        MS. LEFF:  Any follow-up?

23        MR. POTTINGER:  No.

24        MS. LEFF:  All right.  We reserve signature.

1          And, Patrick, you're done.  You can sign

2     off.

3          (Off the record at 2:22 p.m..)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    ACKNOWLEDGMENT OF DEPONENT

2

3          I, PATRICK PURSLEY, do hereby acknowledge

4     that I have read and examined the foregoing

5     testimony, and the same is a true, correct, and

6     complete transcription of the testimony given by me

7     and any corrections appear on the attached errata

8     sheet signed by me.

9

10

11

12     _____                _____

13      (DATE)                         (SIGNATURE)

14

15

16

17

18

19

20

21

22

23

24

```
 1        CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

 2

 3          I, Tiffany M. Pietrzyk, CSR RPR CRR, the

 4   officer before whom the foregoing deposition was

 5   taken, do hereby certify that the foregoing

 6   transcript is a true and correct record of the

 7   testimony given; that said testimony was taken by me

 8   stenographically and thereafter reduced to

 9   typewriting under my direction; that reading and

10   signing was requested; and that I am neither counsel

11   for, related to, nor employed by any of the parties

12   to this case and have no interest, financial or

13   otherwise, in its outcome.

14

15          IN WITNESS WHEREOF, I have hereunto set my

16   hand and affixed my notarial seal this ____th day of

17   _____, 2020.

18

19

20

21

22   _____

23                 My commission expires:

24                 February 28th, 2024
```