# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

— — — — — — — — — — — — — — — — — — — — — — — — — — — —
```
                                )
PATRICK PURSLEY,                )
                                )
              Plaintiff,         )   NO. 3:18-cv-50040
                                )
           vs.                   )   DEPOSITION OF
                                )   MARVIN A. WINDHAM
CITY OF ROCKFORD, JAMES BARTON,  )
JIM BOWMAN, RON GALLARDO,        )
JOHN GENENS, CHARLENE GETTY,     )
JEFF HOUDE, CHRISTINE BISHOP,    )
SAM POBJECKY, MARK SCHMIDT,      )
BRUCE SCOTT, DOUG WILLIAMS,      )
GREG HANSON, STEPHEN PIRAGES,    )
City Administrator for the       )
City of Rockford, as Special     )
Representative for the           )
ESTATE OF HOWARD FORRESTER,      )
ESTATE OF GARY REFFETT and       )
ESTATE OF DAVID EKEDAHL,         )
UNIDENTIFIED EMPLOYEES OF THE    )
ROCKFORD POLICE DEPARTMENT,      )
DANIEL GUNNELL, PETER            )
STRIUPAITIS, JACK WELTY and      )
UNIDENTIFIED EMPLOYEES OF THE    )
ILLINOIS STATE POLICE CRIME LAB, )
                                )
              Defendants.         )
```
— — — — — — — — — — — — — — — — — — — — — — — — — — — —

Deposition of Marvin A. Windham taken on behalf of Jim Bowman, Ron Gallardo, John Genens, Jeff Houde, Sam Pobjecky, Mark Schmidt, Greg Hanson, defendants, in the above-entitled action in the offices of Hinshaw & Culbertson LLP, 100 Park Avenue, Rockford, Illinois, on the 15th day of October, 2019, commencing at 10:17 a.m., as reported and transcribed by Andrea L. D'Agnolo, Certified Shorthand Reporter and Notary Public in and for the State of Illinois.

```
 1                  A P P E A R A N C E S

 2              ATTORNEY ROSHNA BALA KEEN, of the firm
        of Loevy & Loevy, 311 North Aberdeen Street,
 3      Third Floor, Chicago, Illinois 60607, appeared via
        teleconference on behalf of the plaintiff.
 4
                ATTORNEY ASHLEY ROSA WADDELL TINGSTAD,
 5      of the firm of Hooper Hathaway, P.C., 126 North
        Main Street, Ann Arbor, Michigan 48104, appeared
 6      via teleconference on behalf of the plaintiff.

 7              ATTORNEY IFEANYI C. MOGBANA, of
        City of Rockford Department of Law, 425 East State
 8      Street, Rockford, Illinois 61104, appeared on
        behalf of City of Rockford and Charlene Getty,
 9      defendants.

10              ATTORNEY JAMES P. DEVINE, of the firm
        of WilliamsMcCarthy LLP, 120 West State Street,
11      Fourth Floor, P.O. Box 219, Rockford, Illinois
        61105-0219, appeared on behalf of James Barton,
12      Christine Bishop, Bruce Scott, Doug Williams and
        Stephen Pirages, defendants.
13
                ATTORNEY MICHAEL F. IASPARRO, of the
14      firm of Hinshaw & Culbertson LLP, 100 Park Avenue,
        P.O. Box 1389, Rockford, Illinois 61105-1389,
15      appeared on behalf of Jim Bowman, Ron Gallardo,
        John Genens, Jeff Houde, Sam Pobjecky,
16      Mark Schmidt and Greg Hanson, defendants.

17              ATTORNEY ROBERT C. POTTINGER,
        of the firm of Barrick, Switzer, Long,
18      Balsley & Van Evera, LLP, 6833 Stalter Drive,
        Rockford, Illinois 61108, appeared on behalf
19      of the Estate of Howard Forrester, Estate of
        Gary Reffett and Estate of David Ekedahl,
20      defendants.

21              ATTORNEY AMANDA L. KOZAR, of the
        Illinois Attorney General's Office, 100 West
22      Randolph Street, 13th Floor, Chicago, Illinois
        60601, appeared on behalf of Daniel Gunnell,
23      Peter Striupaitis and Jack Welty, defendants.

24              PRESENT:  Patrick Pursley, via
        teleconference.
```

1                       I N D E X

2    WITNESS                 EXAMINATION              PAGE

3    Marvin A. Windham       By Mr. Iasparro           10
                             By Mr. Devine             35
4                            By Mr. Pottinger          41
                             By Mr. Mogbana            47
5                            By Ms. Kozar              59
                             By Mr. Iasparro           61

6

7

8

9

10                            EXHIBITS

11   EXHIBIT                                          MARKED

12   Windham Deposition Exhibit No. 1                   14

13

14

15

16

17

18

19

20   Certificate of Shorthand Reporter                  65

21

22

23

24

1                    P R O C E E D I N G S

2              MR. IASPARRO:  Let the record reflect

3    this is the deposition of Marvin Windham taken

4    pursuant to subpoena and amended notice to all

5    parties that are present, both in the conference

6    room today here at Hinshaw and Culbertson and also

7    on the phone.

8              I guess the best thing to do is to have

9    all parties represented here today introduce

10   themselves before we go any further.

11             This is Michael Iasparro.  I represent

12   seven individually-named defendants in this

13   matter.  Those are Jim Bowman, Ron Gallardo,

14   John Genens, Jeff Houde, Sam Pobjecky,

15   Mark Schmidt and Greg Hanson.

16             MR. DEVINE:  James Devine from

17   WilliamsMcCarthy in Rockford.  I represent

18   Christine McNally Bishop, James Barton,

19   Doug Williams, Bruce Scott and Steve Pirages.

20             MR. POTTINGER:  R.C. Pottinger.  I

21   represent the estates of Howard Forrester,

22   David Ekedahl and Gary Reffett.

23             MS. KOZAR:  Amanda Kozar.  I represent

24   the Illinois State defendants.

1                    MR. MOGBANA:  Ifeanyi Mogbana.  I

2      represent the City of Rockford and Charlene Getty.

3                    MS. KEEN:  Good morning, Mr. Windham

4      and Counsel.  My name is Roshna Keen, and I

5      represent Patrick Pursley.

6                    THE WITNESS:  All right.  How you

7      doing?

8                    MS. TINGSTAD:  Good morning.  My name

9      is Ashley Waddell Tingstad, and I also represent

10     Patrick Pursley.

11                  THE WITNESS:  Good morning.

12                  MR. IASPARRO:  And my understanding is

13     Mr. Pursley is also participating by telephone; is

14     that correct?

15                  MS. KEEN:  That's correct.

16                  MR. IASPARRO:  Mr. Windham, before we

17     get started with questions today, one thing that

18     we're going to do is call the magistrate judge,

19     because we had a conference call with him

20     yesterday with respect to your deposition, and

21     there is at least one matter that the attorneys

22     need to address with him on the phone before we

23     start asking you any questions, okay?

24                  THE WITNESS:  Uh-huh (affirmative

1    response).

2             MR. IASPARRO:  So we're going to

3    conference in the magistrate now --

4             MS. KEEN:  (Interrupting)  Michael?

5             MR. IASPARRO:  Yes.

6             MS. KEEN:  Can I just briefly put my

7    thing on the record for -- before we call the

8    magistrate so that the context is clear?

9             MR. IASPARRO:  Sure.

10            MS. KEEN:  As I stated, Mr. Windham, my

11   name is Roshna Keen.  I'm an attorney and I

12   represent Mr. Pursley.

13            Plaintiff had lodged an objection in

14   proceeding with the deposition today because we

15   had not yet been tendered relevant documents

16   pertaining to your testimony.  We filed a motion

17   to quash.  It's Document No. 133 on the docket in

18   the federal case.

19            As a result of the motion and the court

20   hearing which was held yesterday, this deposition

21   is being done in two parts.  Today the defendants

22   will examine you.  When they are done with their

23   examination, the subpoena is being continued and

24   the deposition is being held open.  Once we obtain

1    the materials that we need, we will then question

2    you.  So you are still under subpoena after you

3    leave here today.

4            At this time if the court reporter

5    could please serve you with a copy of the subpoena

6    for the second part of the deposition for

7    plaintiff's questioning of you.  It's scheduled

8    for December 5 of this year and in the same

9    location where you are sitting right now.

10           If you'd let me know when the court

11   reporter has tendered the subpoena.

12               THE COURT REPORTER:  (Complies.)

13               MR. IASPARRO:  She has.

14               MS. KEEN:  Thank you.

15           So, Mr. Windham, you have now a copy of

16   the subpoena that obligates you to reappear for

17   your deposition so that plaintiff's counsel has an

18   opportunity to question you.  And at this time

19   Judge Johnston will also advise you of your

20   obligation to return and that you're under a

21   continuing subpoena.

22               MR. IASPARRO:  Mr. Windham, do you

23   understand what Ms. Keen told you?

24               THE WITNESS:  Yes.

```
 1              MR. MOGBANA:  That's December 5 at

 2       10:00 o'clock?

 3              MR. IASPARRO:  I believe it's 1:30.

 4              MR. MOGBANA:  1:30.

 5              MR. IASPARRO:  Anything else, Roshna,

 6       before I patch in the magistrate judge?

 7              MS. KEEN:  No.  Thank you.

 8              (Attorney Iasparro calls the chambers

 9       of Magistrate Judge Iain D. Johnston.)

10              (Discussion off the record.)

11              MR. IASPARRO:  Mr. Windham, you heard

12       the introductions.  My name is Michael Iasparro.

13       I represent seven individually-named retired

14       Rockford police officers in a case filed in

15       federal court by Patrick Pursley against the

16       City of Rockford and several officers.

17              Do you understand that?

18              THE WITNESS:  Uh-huh (affirmative

19       response).

20              MR. IASPARRO:  You need to answer --

21              THE WITNESS:  (Interrupting)  Yes.

22              MR. IASPARRO:  Is that a yes?

23              THE WITNESS:  Yes.

24              MR. IASPARRO:  All right.  Have you
```

1       ever given a deposition before, Mr. Windham?

2                    THE WITNESS:  No.

3                    MR. IASPARRO:  So let me go through

4       some ground rules with you before we get started

5       with the formal questions and answers.

6                    I'll be asking questions of you first.

7       Some of the other attorneys in the room may have

8       some questions of you after I'm done.

9                    I'm going to do my best to ask my

10      question and wait for you to answer completely and

11      wait for you to finish your answer before I ask my

12      next question.  That way we have a clean record

13      and Andrea can get down everything everybody is

14      saying in the room.  Is that fair?

15                   THE WITNESS:  Uh-huh, yes.

16                   MR. IASPARRO:  And, secondly, it's

17      difficult for Andrea to take down shrugs of the

18      shoulders or nods of the head.  So to make sure we

19      understand exactly what your answers are, we'd ask

20      that you answer verbally, and if, for example, the

21      answer to a question is yes or no, to say yes or

22      no rather than --

23                   THE WITNESS:  (Interrupting)  Right,

24      okay.  Yes.

1          MR. IASPARRO:  (Continuing) -- uh-huh

2    or huh-uh.  You understand?

3          THE WITNESS:  Yes.

4          MR. IASPARRO:  All right.

5          If for any reason today I ask a

6    question that you didn't hear, you don't

7    understand, you want me to repeat, please tell me

8    that.  I want to make sure you understand what I'm

9    asking you.  If for some reason you want me to

10   rephrase something, I will.  If you don't ask me

11   to do that, I'm going to assume that you

12   understood the questions that I ask you today.  Do

13   you understand that?

14         THE WITNESS:  Yes.

15         MR. IASPARRO:  Is there any reason you

16   could not testify truthfully today, Mr. Windham?

17         THE WITNESS:  No.

18         MR. IASPARRO:  And you understand

19   you're under oath, correct?

20         THE WITNESS:  Yes.

21         MARVIN A. WINDHAM,

22   having been first duly sworn, was examined and

23   testified as follows:

24   BY MR. IASPARRO:

1   Q.   Mr. Windham, what is your full name?

2   A.   Marvin Anthony Windham.

3   Q.   And how old are you, sir?

4   A.   Forty-eight.

5   Q.   What is your date of birth?

6   A.   3-15-71.

7   Q.   Do you currently live here in the Rockford

8        Illinois area?

9   A.   Yes, visiting right now.

10  Q.   Okay.  And who do you live with or who are you

11       visiting here?

12  A.   My niece.

13  Q.   What is her name?

14  A.   Leah, Leah Simms.

15  Q.   And how long have you been visiting here in the

16       Rockford area?

17  A.   About a couple of months.

18  Q.   And before that where were you living?

19  A.   Chicago.

20  Q.   Were you working when you were in Chicago?

21  A.   Labor.

22  Q.   And what do you mean by that?

23  A.   Housing, fixing up houses.

24  Q.   Okay.  Are you working here in the Rockford area?

1  A.  No, not right now.

2  Q.  And who was it that you actually worked for when

3      you were working labor in the Chicago area?

4  A.  Sylvia's Leading Edge.  She do property and all

5      that.

6  Q.  What can --

7           MS. KEEN:  (Interrupting)  Could you

8      spell that, please?

9  BY MR. IASPARRO:

10  Q.  Do you know how to spell that, the company that

11      you worked for?

12  A.  Sylvia's Leading Edge.

13  Q.  Sylvia's?

14  A.  Leading Edge.

15  Q.  And Sylvia would be S-y-l-v-i-a?

16  A.  Yeah.

17  Q.  Could you tell us a little bit about how far you

18      went in school, Mr. Windham, your educational

19      background?

20  A.  The highest I went high school was ninth grade.  I

21      got my GED.

22  Q.  And where was it that you went through ninth

23      grade?

24  A.  Alston High School in Chicago, Illinois.

1  Q.  And how is it that you obtained your GED?

2  A.  In prison.

3  Q.  When was that?

4  A.  2001.

5  Q.  Have you had any additional training or education

6      beyond the GED from 2001?

7  A.  Yes, couple of college credits in a trade, in

8      welding.

9  Q.  And where were those college credits?

10  A.  IVCC in prison.

11  Q.  When was that?

12  A.  2004, 2002, one of them.

13  Q.  All right.  You received your GED, you indicated.

14      Is it -- can I presume that you can read and

15      write, sir?

16  A.  Yes.

17  Q.  Mr. Windham, I want to ask you some questions

18      about a man by the name of Patrick Pursley.  Are

19      you familiar with that person?

20  A.  Yes.

21  Q.  Do you remember when it was when you first met

22      Mr. Pursley?

23  A.  In work release, and I don't remember what year.

24      I think '92.  I think '92.  It's been so long,

1      work release center down the street.

2  Q.  When you say down the street, that would be here

3      in Rockford, Illinois?

4  A.  Yes.

5  Q.  To your knowledge had you ever met Mr. Pursley

6      before then?

7  A.  No.

8  Q.  Do you recall talking to police officers back in

9      1993, June of 1993, and in fact with respect to

10     your knowledge of Mr. Pursley and his involvement

11     in some crimes here in Rockford, Illinois?

12  A.  Yes.

13  Q.  And do you recall giving a written statement to

14     the Rockford police officers investigating

15     Mr. Pursley at that time?

16  A.  Yes.

17           MR. IASPARRO:  Will you mark this,

18     Andrea.

19           We're going to mark as Windham

20     Deposition Exhibit No. 1 a copy of the witness

21     statement that is marked with Bates Nos. RFD

22     Defense 247 through 249.

23           (Windham Deposition Exhibit No. 1 was

24     marked for identification.)

1    BY MR. IASPARRO:

2    Q.   Mr. Windham, I'm handing you what has been marked

3         as Windham Deposition Exhibit No. 1 for

4         identification, ask you to take a look at that,

5         sir.  It's a three-page document.  Would you agree

6         with that?

7    A.   Yes.

8    Q.   And there appear to be some signatures at the

9         bottom of each page of that document.  Do you

10        recognize the signature at the bottom right-hand

11        corner of each page?

12   A.   Yes.

13   Q.   And whose signature is that, sir?

14   A.   Mine's.

15   Q.   And is it dated June 12, 1993?

16   A.   Yes.

17   Q.   Mr. Windham, did you sign all three pages of the

18        witness statement on June 12, 1993?

19   A.   Yes, I did.

20   Q.   Did you provide this witness statement to

21        Detective Bruce Scott of the Rockford Police

22        Department on that date?

23   A.   Yes.

24   Q.   Did anybody force you to provide this statement on

1    June 12, 1993?

2  A.  No.

3  Q.  Did anybody coerce you into giving this statement,

4    Mr. Windham?

5  A.  No.

6  Q.  Mr. Windham, is this your statement from June 12,

7    1993?

8  A.  Yes.

9  Q.  Did anybody put words in your mouth with respect

10    to this witness statement on June 12, 1993?

11  A.  No.

12  Q.  Is the statement that you provided to the Rockford

13    Police Department on June 12, 1993, which is

14    Windham Deposition Exhibit No. 1 -- is it the

15    truth, Mr. Windham?

16  A.  Yes.

17  Q.  And was it the truth on June 12, 1993?

18  A.  Yes.

19  Q.  Does it remain the truth today?

20  A.  Yes.

21  Q.  Did any Rockford police officer at any time,

22    Mr. Windham, threaten you or harass you in any way

23    with respect to providing this witness statement?

24  A.  No.

1   Q.  To the best of your recollection, could you

2       describe the process that Detective Scott employed

3       in having you provide the information that went

4       into this witness statement?

5   A.  Don't understand.

6   Q.  So were you in an interview room with

7       Detective Scott, if you remember?

8   A.  Oh.  Yes.

9   Q.  And was that at the Rockford Police Department?

10   A.  Yes.

11   Q.  Do you remember if anybody else was in the room

12       when you were providing this witness statement?

13   A.  No.  I can't remember.

14   Q.  Okay.  And when you were providing this

15       information to Detective Scott, what was he doing,

16       was he typing it out?

17           MS. KEEN:  Objection, leading.

18           MR. IASPARRO:  You can answer.

19   A.  I think he was writing first.  I can't remember.

20  BY MR. IASPARRO:

21   Q.  Do you remember after this statement was prepared

22       whether you were given an opportunity to read

23       through it?

24   A.  Look it over, yes.

1  Q.  Yes, you were?

2  A.  Yes.

3  Q.  And were you given an opportunity to make any

4     corrections, if necessary?

5  A.  Yes.

6          MS. KEEN:  Objection, leading.

7  BY MR. IASPARRO:

8  Q.  And did Detective Scott ask you if this statement

9     was the truth?

10 A.  Yes.

11         MS. KEEN:  Objection, leading.

12 BY MR. IASPARRO:

13 Q.  And after the statement was given, did he ask you

14    if you would sign the statement?

15 A.  Yes.

16 Q.  And did you agree?

17         MS. KEEN:  Objection, leading, form.

18 BY MR. IASPARRO:

19 Q.  Did you agree to do so?

20 A.  Yes.

21 Q.  Do you remember, Mr. Windham, when you gave this

22    statement on June 12, 1993, were you handcuffed?

23 A.  No.

24 Q.  Were you restrained at all that day on June 12,

```
1      1993, to the best of your recollection?

2   A.  No.

3           MS. KEEN:  Objection, form.

4           MR. IASPARRO:  Your answer was no?

5           THE WITNESS:  No.

6           MR. DEVINE:  Maybe you should clarify

7      that because he just --

8           MR. IASPARRO:  (Interrupting)  Let me

9      ask the question again.

10  BY MR. IASPARRO:

11  Q.  On June 12, 1993, did any Rockford police officer

12      restrain you in any way?

13  A.  No.

14           MS. KEEN:  Objection, form.

15  BY MR. IASPARRO:

16  Q.  And on that day, Mr. Windham, do you recall if

17      your wife and children accompanied you to the

18      Public Safety Building here in Rockford?

19  A.  Yes.

20  Q.  And did they?

21  A.  Yes.

22  Q.  When you were giving this statement to

23      Detective Scott that day, where were your wife and

24      children; do you know?
```

```
 1   A.  In the cafeteria.

 2   Q.  And to the best of your knowledge, were they

 3       treated properly?

 4   A.  Yes.

 5             MS. KEEN:  Objection, foundation, form.

 6   BY MR. IASPARRO:

 7   Q.  At any time did your wife or children ever

 8       say anything to you about being treated

 9       unprofessionally or improperly by any Rockford

10       police officer that day?

11   A.  No.

12   Q.  At any point on June 12, 1993, Mr. Windham, did

13       any Rockford police officer do anything other than

14       ask you to tell the truth?

15   A.  Yes.  That's how he did, ask me to --

16                   MS. KEEN:  (Interrupting)  Objection,

17       form.

18   BY MR. IASPARRO:

19   Q.  I'm sorry.  What was your answer?

20   A.  Yes.  They just told me tell the truth.

21   Q.  They just told you to tell the truth?

22   A.  Yes.

23   Q.  Is that what you did?

24   A.  Yes.
```

1  Q.  Now, I want to back up a few days, if we could,

2      before you gave this written statement,

3      Mr. Windham.  Do you recall calling in to

4      Crime Stoppers on June 8, 1993, and providing some

5      information to Crime Stoppers?

6  A.  Yes.

7  Q.  And was the information you provided to

8      Crime Stoppers, for all intents and purposes,

9      consistent with what information went into the

10     written statement a few days later?

11 A.  Yes.

12 Q.  Why was it --

13              MS. KEEN:  (Interrupting)  Objection,

14     form.

15 BY MR. IASPARRO:

16 Q.  Why was it that you called Crime Stoppers on

17     June 8, 1993, Mr. Windham?

18 A.  Because I was kind of scared.

19 Q.  Scared of what?

20 A.  Of Patrick.  He told me I knew more than what I

21     knew and I'm going to have to start participating.

22 Q.  Start participating in what?

23 A.  In bank robberies and crimes.

24 Q.  Did you want to do that?

 1   A.   No.

 2   Q.   Why not?

 3   A.   I was scared.

 4   Q.   Scared of whom?

 5   A.   Patrick.

 6   Q.   Why were you scared of Patrick?

 7   A.   Dangerous.

 8   Q.   Patrick Pursley was dangerous?

 9   A.   (Witness nods head affirmatively.)

10   Q.   Is that a yes?

11   A.   Yes.

12   Q.   Why did you believe Patrick Pursley was dangerous

13        back in June of 1993?

14   A.   Because he used to ride around with guns, robbing

15        banks and stores and stuff.

16   Q.   Did anybody force you or coerce you in any way

17        into making that phone call to Crime Stoppers on

18        June 8, 1993?

19   A.   No.

20   Q.   Is that --

21             MS. KEEN:  (Interrupting)  Objection,

22        form.

23   BY MR. IASPARRO:

24   Q.   Is that something that you did based upon your own

1   decision?

2   A.   Yes.

3   Q.   And after you called Crime Stoppers, did you call

4        back that day and talk to a couple of detectives?

5             MS. KEEN:  Objection, leading.

6   A.   Can't remember.  I think she connect me to a

7        Foster, Forrester.

8   Q.   Okay.

9   A.   She connect me to them, and then we talk, but I

10       still was kind of scared, you know, so . . .  I'm

11       trying to remember, but . . .

12  Q.   Do you remember how long you talked to the

13       detectives on the phone that day, Mr. Windham?

14  A.   No, I can't remember how long.

15  Q.   And did you provide the detectives your name that

16       day?

17  A.   Yes.

18  Q.   On the Crime Stoppers call?

19  A.   Yes.

20  Q.   It was a few days later that you gave the written

21       statement, correct?

22  A.   Yes.

23  Q.   Why was it that you made the Crime Stoppers call

24       and then it was that couple-of-day gap between

1      then and when you gave the written statement; do

2      you remember?

3   A.  I can't remember.

4              MS. KEEN:  Objection, foundation.

5   BY MR. IASPARRO:

6   Q.  I'm sorry.  Did you say, "I can't remember"?

7   A.  I can't remember.

8   Q.  Okay.  Prior to that Crime Stoppers phone call

9      that you made, Mr. Windham . . .

10  A.  Yeah.

11  Q.  Do you recall if you had ever spoken to either

12     Detective Forrester or Detective Scott with the

13     Rockford Police Department for any reason?

14  A.  No.  I can't . . .  Have I talked to them before I

15     made the call?

16  Q.  Yeah.  Do you remember if you had spoken to either

17     one of those guys before?

18  A.  No, never.  She connected me to them.  I don't

19     know if I called or she connect me to them a

20     couple days later or not, but I talked to her

21     first and I was telling her the information I had.

22     And then I think that's when she, "Hold on.  Let

23     me connect you to these officers," and I think

24     that's when she connect me to Foster or Forrester,

1     whatever.

2  Q.  And to the best of your knowledge, have you ever

3      spoken to him before?

4  A.  No.

5  Q.  On that day on the phone, did either

6      Detective Forrester or Detective Scott provide you

7      with any information or details relating to the

8      murder of a man named Andrew Ascher?

9  A.  No.

10  Q.  Or about a bank robbery committed by a

11      Patrick Pursley?

12  A.  No.

13  Q.  Or any information or details about

14      Patrick Pursley's involvement in Andrew Ascher's

15      murder?

16  A.  No.

17              MS. KEEN:  Objection, form.

18  BY MR. IASPARRO:

19  Q.  And did either of the detectives on the phone that

20      day provide you with any information or details

21      about a Burger King robbery committed by

22      Patrick Pursley?

23  A.  No.

24  Q.  Who was providing the information on the phone

1      that day?

2              MS. KEEN:  Objection, form and assumes

3      facts not in evidence.

4              MR. IASPARRO:  You can answer.

5   A.  I did.

6   BY MR. IASPARRO:

7   Q.  Let's move back to -- I guess forward in time now

8      to the day you gave the written statement,

9      June 12, 1993.  Mr. Windham, who provided the

10     information that went into the written statement

11     on June 12, 1993?

12  A.  Me.  I did.

13  Q.  Did Detective Scott or any other detective provide

14     you any information or details that you didn't

15     know already regarding Patrick Pursley's

16     involvement in the Andrew Ascher murder?

17  A.  No.

18  Q.  How about any information or details regarding a

19     bank robbery committed by Patrick Pursley?

20  A.  No.

21  Q.  Did you provide that information?

22  A.  Yes, I did.

23              MS. KEEN:  Objection, form, assumes

24     facts not in evidence.

1  BY MR. IASPARRO:

2  Q.  And did any detective on June 12, 1993, the day of

3      the written statement, provide any information to

4      you or details to you about a Burger King robbery

5      committed by Patrick Pursley?

6  A.  No.

7              MS. KEEN:  Objection, assumes facts not

8      in evidence, form.

9  BY MR. IASPARRO:

10 Q.  Mr. Windham, do you recall the last time you

11     physically --

12             MS. KEEN:  (Interrupting)  I didn't

13     hear the witness's answer to that, Michael.  What

14     did he say?

15             MR. IASPARRO:  He said, "No."

16 BY MR. IASPARRO:

17 Q.  Mr. Windham, when is the last time you saw

18     Patrick Pursley in person, if you recall?

19 A.  Twenty-some years ago in trial.

20 Q.  Have you spoken to Patrick Pursley since that

21     time?

22 A.  No.

23 Q.  To your knowledge has he made any effort or

24     attempt to reach out to you and speak to you?

1   A.   No.

2   Q.   Has any lawyer on his behalf reached out and tried

3        to interview you?

4   A.   Yes.

5   Q.   Who was that?

6             MS. KEEN:   Objection, form.

7   A.   I don't remember his name.  He came down to

8        Lawrenceville last year, and he said that he was

9        representing Patrick.  And I told him I don't want

10       nothing to do with it.

11  BY MR. IASPARRO:

12  Q.   Lawrenceville is a penitentiary in the state of

13       Illinois?

14  A.   Yes.

15  Q.   And you were incarcerated at that time?

16  A.   Yeah.

17  Q.   Do you remember what month that was?

18  A.   Can't remember.  I want to say something like

19       September.

20  Q.   Of last year, 2018?

21  A.   Yeah.

22  Q.   Do you remember the man's name that came and

23       talked to you?

24  A.   No.

1  Q.  Did he provide you a business card?

2  A.  I think he did.  Can't remember.  I think he did.

3  Q.  Do you remember if he worked for a law firm called

4      Jenner and Block?

5  A.  I can't remember.

6  Q.  And I think you testified just a few moments ago

7      that you told him you didn't want anything to do

8      with the Patrick Pursley matter; is that right?

9  A.  Right.

10  Q.  Why did you say that?

11  A.  Because I -- I thought it really all was over

12     with, but I . . .

13  Q.  Now, let me ask you, at some point after you got

14     out of prison in late 2018, were there some

15     investigators from the Winnebago County State's

16     Attorney's Office that served you with a subpoena?

17  A.  Oh.  Yes.

18  Q.  Where was that?

19  A.  Went the courthouse.  They served me in Lawrence.

20  Q.  At the penitentiary?

21  A.  Yeah.  And they knew my out date was coming soon,

22     and they was saying, you know, that was the

23     subpoena that I supposed to come to.  Think that

24     was in Lawrence.

1  Q.  And did you learn at some point after that that

2      Mr. Pursley's retrial in state court got

3      continued?

4  A.  Yes.

5  Q.  How did you learn that?

6  A.  From them.

7  Q.  From the investigators?

8  A.  Yes.

9  Q.  Did anybody ever serve you with another subpoena

10     for the January trial date; do you remember?

11 A.  No.  I got that subpoena and this one.

12 Q.  Okay.  And you did not testify at Mr. Pursley's

13     retrial in January, 2019, did you?

14 A.  No.

15 Q.  I want to back up to 1993.  After you gave the

16     written statement, do you remember, did you

17     testify before the grand jury?

18 A.  No, just trial.

19 Q.  Okay.  And the trial I think was in April of 1994.

20     Does that sound right?

21 A.  Sounds about right.

22             MS. KEEN:  Objection, leading.

23 BY MR. IASPARRO:

24 Q.  And you understood when you testified in April,

1     1994, you were under oath?

2  A.  Yes.

3  Q.  Did you tell the truth during your testimony at

4     Mr. Pursley's trial in April, 1994?

5  A.  Yes.

6  Q.  I believe, Mr. Pursley (sic), based on some

7     documents that I've reviewed, that you received

8     some money with respect to the information you

9     provided to Crime Stoppers and the police back in

10    1993; is that correct?

11  A.  Yes.

12  Q.  Do you remember how much that was?

13  A.  Can't remember.  I think 1,500 or -- I don't know.

14    I can't remember.

15  Q.  Did you know you were going to receive money

16    before you provided information to Crime Stoppers

17    and the police?

18  A.  Yes.

19  Q.  How did you know that?

20  A.  Just from Crime Stoppers.  Crime Stoppers.

21  Q.  And explain what you mean, what was the basis of

22    your knowledge there, how did you know that?

23  A.  Crime Stoppers, if you turn somebody in with a

24    crime, you get paid so much amount of money.

1   Q.  Was there anything about knowing that you might

2       receive some money that made you say anything that

3       wasn't truthful?

4   A.  No.

5             MS. KEEN:  Objection, form.

6  BY MR. IASPARRO:

7   Q.  If you could look at the first page of your

8       written statement, Mr. Windham, and I'm going to

9       direct your attention to about two-thirds of the

10      way down the page, left-hand side, the sentence

11      that starts with, "He said that he had just killed

12      a pecker the other day and he was going to kill a

13      lot more of them."  Do you see that?

14   A.  Yeah; yes.

15   Q.  And then it goes on, "He pulled out a newspaper

16      clip of the murder of the fireman."  Do you see

17      that?

18   A.  Yeah.

19   Q.  Is the he in those sentences -- that's

20      Patrick Pursley?

21   A.  Yes.

22   Q.  And the statement goes on, "I read the clip and I

23      asked him why he shot him.  He said the paper was

24      lying.  He said he walked up to him and said,

1    'This ain't no joke.  Give me the money.'  He said

2    the guy pulled out his wallet and the lady pulled

3    out her purse.  He said that they were not going

4    to give him their purse or their wallet.  They

5    were just going to give him the money.  He said

6    that is when he shot him two times."  Did I read

7    that accurately?

8  A.  Yes.

9  Q.  And the he in those sentences --

10              MS. KEEN:  (Interrupting)  Michael,

11       where exactly are you reading from?

12              MR. IASPARRO:  Page 1, Bates No. 247,

13       second full paragraph.

14  BY MR. IASPARRO:

15  Q.  The he in those sentences, Mr. Windham, is that

16       Patrick Pursley?

17  A.  Yes.

18  Q.  Did Patrick Pursley admit to you that he killed

19       Andrew Ascher?

20  A.  Yes.

21              MS. KEEN:  Objection, form, foundation,

22       misstates the evidence.

23  BY MR. IASPARRO:

24  Q.  To the best of your knowledge, Mr. Windham, since

1    you testified at Mr. Pursley's trial in April,

2    1994, have you received any messages from

3    Mr. Pursley in any way?

4  A.  No, that I recall.

5  Q.  Any phone calls?

6  A.  No.

7  Q.  Any text messages?

8  A.  No.

9  Q.  Any e-mails?

10  A.  No.

11  Q.  Any letters?

12  A.  No.

13  Q.  And to the best of your knowledge, have you spoken

14    to any lawyers from the law firm Loevy and Loevy

15    about the Patrick Pursley case?

16  A.  No, that I know of, no.

17  Q.  Or other than that attorney that you said came

18    down to Lawrenceville to try to talk to you, have

19    you spoken to any other lawyers at any time about

20    the Patrick Pursley case since 1994?

21  A.  No.

22  Q.  And, for the record, when I served you or when an

23    investigator and I served you with a subpoena for

24    today's deposition, you and I talked about the

1    case, didn't we?

2  A.  Yes.

3  Q.  At any time that day, Mr. Windham, did I say --

4      did I tell you to do anything other than tell the

5      truth?

6  A.  No, you didn't.

7  Q.  And are you -- are you and have you told the truth

8      today, Mr. Windham?

9  A.  Yes.

10          MR. IASPARRO:  I don't have anything

11     further.

12          MR. DEVINE:  I have a few questions,

13     Mr. Windham.

14          My name is James Devine, and I

15     represent several of the police officers in this

16     case.

17 BY MR. DEVINE:

18 Q.  One of the officers I represent is

19     Christine McNally, now known as Christine Bishop.

20     Did you ever hear of her?

21 A.  No.

22 Q.  Do you have any idea who she is?

23 A.  No.

24 Q.  Never talked to her?

1  A.  No.

2  Q.  Okay.  I also represent an officer named

3      James Barton.  You ever hear of James Barton?

4  A.  No.

5  Q.  Never came into contact with him at all?

6  A.  No.

7  Q.  How about an officer by the name of Doug Williams,

8      do you know or did you ever meet Doug Williams?

9  A.  No.

10 Q.  Never came into contact with Doug Williams as far

11     as you know?

12 A.  No.

13            MS. KEEN:  Objection, foundation.

14 BY MR. DEVINE:

15 Q.  And, also, Rockford police officer by the name of

16     Steve Pirages, had you ever come into contact with

17     Steve Pirages?

18 A.  No.

19 Q.  Either before or after your Crime Stoppers

20     involvement in 1993?

21 A.  No.

22 Q.  Okay.  The other person I represent is

23     Bruce Scott.  You have met Bruce Scott; is that

24     correct?

1  A.  Yes.

2  Q.  Before you called Crime Stoppers in June of 1993,

3      had you ever met, talked to or have any knowledge

4      of Bruce Scott?

5  A.  No.

6  Q.  Okay.  In fact, when you called Crime Stoppers,

7      you didn't ask for a specific detective, did you?

8  A.  No.

9  Q.  In June of 1993, how many times did you call

10     Crime Stoppers or the police department; do you

11     remember?

12  A.  Once or twice.

13  Q.  Okay.  We know you called them the first time, and

14     that's when you spoke with Detective Forrester; is

15     that right?

16  A.  It was a lady.  Then she connect me.  She went and

17     got Forrester.

18  Q.  Okay.  And that was strictly a telephone

19     conversation, right?

20  A.  Right.

21  Q.  Then a few days later, you ended up giving the

22     written statement that's been marked as Exhibit 1

23     to Bruce Scott.  Do you recall that?

24  A.  Yes.

1    Q.  Did that follow another call to the police

2         department by you?

3                   MS. KEEN:  Objection, leading.

4                   I'm sorry.  Go ahead.

5    A.  I don't remember.

6    BY MR. DEVINE:

7    Q.  Do you remember if you came down to the police

8         station or did somebody meet you elsewhere and

9         then you go to the police station?

10   A.  Oh, for this statement?  For this statement?

11   Q.  Yes, sir.

12   A.  Oh.  They -- they came and got me and my family,

13        took us down there.

14   Q.  Okay.  Do you know why it was that they came to

15        get you and your family?

16                  MS. KEEN:  Objection, foundation.

17   A.  We had just got back from Chicago.  And they

18        almost apprehended him, so they came and got us

19        for our safety or something.

20   BY MR. DEVINE:

21   Q.  When you say they almost apprehended him, are you

22        talking about Patrick Pursley?

23   A.  Yes.

24   Q.  And when you say that they came to get you for

1  your safety, did you call them and ask them to do

2  that?

3  A.  No.

4  Q.  Okay.  Who came to your home?

5  A.  I don't know.

6  Q.  Okay.  Were you placed under arrest?

7  A.  No.

8  Q.  Did you go down to the --

9          MS. KEEN:  (Interrupting)  Objection,

10  foundation.

11  BY MR. DEVINE:

12  Q.  Did you believe that you were under arrest?

13  A.  No.

14  Q.  Were you placed in handcuffs?

15  A.  No.

16  Q.  Were you told you had to go down to the police

17  station?

18  A.  No.

19  Q.  And when you went down to the police station, did

20  you then give your statement to Bruce Scott?

21  A.  Yes.

22  Q.  Did Officer Scott threaten you in any way?

23  A.  No.

24  Q.  Did Officer Scott promise you anything?

1   A.   No.

2   Q.   Did Officer Scott give you any information that

3        went into the statement that you didn't know

4        about?

5   A.   Pardon me?

6   Q.   Okay.  So did he tell you anything about what you

7        were putting into this written statement?

8   A.   Oh.  No; no.

9   Q.   He didn't say, "Hey, Marvin, say" this, that or

10       the other thing?

11  A.   No.

12  Q.   Did he suggest in any way any of the things that

13       went into that statement?

14  A.   No.

15            MR. DEVINE:  I have no further

16       questions.

17            MS. KEEN:  Objection, form.

18            MR. POTTINGER:  Mr. Windham, my name is

19       R.C. Pottinger.  I represent three officers who

20       have since died.  One of them is Mr. Forrester,

21       Gary Reffett, David Ekedahl.  So I'm going to ask

22       you a few questions about those individuals, if

23       that's okay.

24            THE WITNESS:  Okay.

1   BY MR. POTTINGER:

2   Q.  First with regard to David Ekedahl, have you ever

3       heard that name?

4   A.  No.

5   Q.  Okay.  To your recollection did you have any

6       contact with an individual by the name of

7       David Ekedahl at any time in your life?

8   A.  No.

9               MS. KEEN:  Objection, foundation.

10  BY MR. POTTINGER:

11  Q.  Same thing with Gary Reffett, do you know who

12      Gary Reffett is?

13  A.  No.

14  Q.  Okay.  And did you ever have any contact with

15      Gary Reffett?

16  A.  No.

17  Q.  Okay.  I want to talk to you about Mr. Forrester,

18      okay?

19  A.  Yeah.

20  Q.  You said that you spoke to him on the telephone

21      one time?

22  A.  Yes.

23  Q.  Okay.  Did you ever have any contact with

24      Mr. Forrester, to the best of your recollection,

1       except for that telephone call?

2                   MS. KEEN:  Objection, foundation.

3   A.  At the police station he was helping take care of

4       my family.  That's about it.

5   BY MR. POTTINGER:

6   Q.  Okay.  Was he one of the officers that helped --

7       that picked up your family or you and your family?

8   A.  Yes.

9   Q.  Okay.

10                  MS. KEEN:  Objection, form.

11  BY MR. POTTINGER:

12  Q.  Was that the first time that you had met

13      Mr. Forrester?

14  A.  Yes.

15  Q.  So your contact with Mr. Forrester is you had the

16      telephone call with him, correct?

17  A.  Correct, yes.

18  Q.  And then he was one of the officers that you

19      believe helped pick up you and your family --

20  A.  (Interrupting)  Yeah.

21  Q.  (Continuing) -- and took you to the police station

22      the day you gave this statement?

23  A.  Yes.

24  Q.  Okay.  I want to talk first about the telephone

1     call, okay?

2   A.   Uh-huh (affirmative response).

3   Q.   Did -- during that telephone call did

4     Mr. Forrester coerce you or threaten you in any

5     way?

6   A.   No.

7                 MS. KEEN:  Objection, form.

8   BY MR. POTTINGER:

9   Q.   Did you feel intimidated when you were talking to

10     Mr. Forrester?

11   A.   No.

12   Q.   Did he suggest facts to you about Mr. Pursley or

13     the death of Mr. Ascher, did he tell you how he

14     thought it happened?

15   A.   No, because I didn't even know the name of the

16     person, so . . .

17   Q.   Okay.  Did he tell you any names during the

18     telephone call?

19   A.   No.

20   Q.   Okay.  Did he promise you anything?

21   A.   No.

22   Q.   Did he give you any reason not to be truthful?

23   A.   No.

24                 MS. KEEN:  Objection, form.

1   BY MR. POTTINGER:

2   Q.  Did you speak with him during the ride from your

3       house to the police station?

4   A.  No.

5   Q.  Did your family, your wife and children, believe

6       that during the time that they were at the police

7       station -- apparently Mr. Forrester may have been

8       with them?

9   A.  Uh-huh (affirmative response).

10   Q.  At the cafeteria or some other place -- that they

11       felt threatened or intimidated by Mr. Forrester or

12       any other police officer?

13   A.  No.

14             MS. KEEN:  Objection, foundation, calls

15       for speculation.

16   BY MR. POTTINGER:

17   Q.  After the day you gave the statement, did you have

18       any further communication or contact with

19       Mr. Forrester?

20   A.  Not that I recall.  No.  No.

21   Q.  What's your wife's name?

22   A.  Leann Windham.

23   Q.  Are you still married?

24   A.  Right now we're separated.

1  Q.  And where does Leann live?

2  A.  Minnesota.

3  Q.  Do you have an address for her?

4  A.  No, not right off the top.

5  Q.  Do you have a telephone number for her?

6  A.  Yes.

7  Q.  Do you know what that is?

8  A.  815-723-8756.

9  Q.  And how old are your children now?

10 A.  Twenty-seven and 28.

11 Q.  Without me doing my math, did you both have -- did

12     you have those children at the time you gave that

13     statement?

14 A.  Yes.

15 Q.  Okay.  They must have been really young?

16 A.  Yeah, they was young.

17 Q.  Okay.  Mr. Windham, if later we wanted to contact

18     you or locate you, what's somebody who always

19     knows where you're at, mother . . .

20 A.  My sister.

21 Q.  Okay.  What's her name?

22 A.  Tatianna Johnson.

23 Q.  Can you spell that, please?

24 A.  T-a-t-i-a-n-n-a Johnson.

1  Q.  And where does she live?

2  A.  Auburn Manor.

3  Q.  In Rockford?

4  A.  Yeah.

5  Q.  Do you have a telephone --

6          MS. KEEN:  (Interrupting)  What was

7     that word in Rockford?

8          MR. POTTINGER:  Auburn Manor.

9          MS. KEEN:  Can you spell that?  It's

10    not coming through clearly on the speakerphone.

11          MR. IASPARRO:  It's Auburn,

12    A-u-b-u-r-n.

13          MS. KEEN:  Auburn, okay.

14          MR. IASPARRO:  Manor, M-a-n-o-r.

15  BY MR. POTTINGER:

16  Q.  And what's Tatianna's telephone number?

17  A.  773-562-8909.

18  Q.  Does she work?

19  A.  No.  She in school.

20  Q.  Okay.  Is she married?

21  A.  Yes.

22  Q.  What is her husband's name?

23  A.  Bob Simms.

24          MR. POTTINGER:  I have nothing further.

1           Thank you.

2               THE WITNESS:  You're welcome.

3               MR. MOGBANA:  Good morning,

4       Mr. Windham.

5               THE WITNESS:  Good morning.

6               MR. MOGBANA:  My name is

7       Ifeanyi Mogbana.

8   BY MR. MOGBANA:

9   Q.  In addition to the City of Rockford, I also

10      represent a City of Rockford employee named

11      Charlene Getty.  Have you heard of that name

12      before?

13  A.  No.

14  Q.  So it would be fair to say you haven't had any

15      interaction with Miss Getty?

16  A.  No.

17  Q.  If I heard you correctly earlier, you said you

18      called Crime Stoppers because you were scared or

19      had concerns about your security, correct?

20  A.  Yes.

21  Q.  And the source of that insecurity was because

22      Mr. Pursley was yet to be arrested, correct?

23  A.  Pardon me?

24  Q.  Because Mr. Pursley was yet to be arrested at the

1    time.

2                    MR. DEVINE:  Had not yet been arrested.

3                    MS. KEEN:  Objection to form.

4    A.  No; no.

5    BY  MR. MOGBANA:

6    Q.  Based on what you've testified to this morning,

7        your experience with the officers of the Rockford

8        Police Department on that date in June, 1993, was

9        pleasant and generally within -- within reason

10       relaxed, it wasn't coersive, you didn't feel any

11       pressure; is that correct?

12   A.  No.

13   Q.  You didn't have --

14                   MS. KEEN:  (Interrupting)  Objection,

15       leading and form.

16   BY MR. MOGBANA:

17   Q.  You didn't have an unpleasant experience

18       throughout that episode, correct?

19   A.  No.

20                   MS. KEEN:  Objection, leading.

21   BY MR. MOGBANA:

22   Q.  You also talked --

23                   (A brief interruption.)

24                   (Incoming phone call from the chambers

1    of Magistrate Judge Iain D. Johnston.)

2              MAGISTRATE JOHNSTON:  All right,

3    Counsel.  Got a call to chambers.  What's going

4    on?  How can I help you?

5              MR. IASPARRO:  Good morning, Your

6    Honor.  This is Michael Iasparro on behalf of

7    Officers Bowman, Gallardo, Genens, Houde, Pobjecky

8    Schmidt and Hanson.

9              Judge, we are in the midst of

10   questioning Mr. Windham, defense counsel are

11   questioning Mr. Windham at the deposition

12   consistent with the Court's order yesterday.

13              And I'll turn this over to Ms. Keen,

14   but, briefly, at her request we have served

15   Mr. Windham with a subpoena for the continued

16   deposition on December 5, 1:30 p.m.  And I believe

17   Ms. Keen wanted to ask you to participate this

18   morning just briefly consistent with our

19   discussion yesterday during our telephonic

20   conference.

21              MAGISTRATE JOHNSTON:  Okay.  Ms. Keen,

22   go ahead.

23              MS. KEEN:  Good morning, Your Honor.

24   We wanted to take the Court up on the willingness

1    to advise this witness of his obligation to

2    reappear for the deposition on December 5, 2019,

3    and that he's under a continuing obligation

4    pursuant to the subpoena.

5            MAGISTRATE JOHNSTON:  Okay.  All right.

6            Is Mr. Windham there?

7            THE WITNESS:  Yes.

8            MS. KEEN:  Yes.

9            MAGISTRATE JOHNSTON:  Morning,

10   Mr. Windham.  This is Judge Johnston.  How are

11   you?

12           THE WITNESS:  I'm doing okay.  Good

13   morning.

14           MAGISTRATE JOHNSTON:  All right.  So

15   you're at the deposition at, sounds like, the law

16   firm of Hinshaw Culbertson.  Defense attorneys are

17   asking the questions today.  Mr. Pursley's

18   attorneys are going to ask you questions on

19   December 5, 2019, at 1:30 p.m.

20           So you were served with a subpoena to

21   attend the deposition today.  That subpoena will

22   be continued on through to December 5, 2019, at

23   1:30 p.m.  So you'll need to appear at that date

24   at that time.

1    What's the location of the deposition?

2    MR. IASPARRO:  That will also be here

3    at Hinshaw and Culbertson, Judge.

4    MAGISTRATE JOHNSTON: All right.  So,

5    Mr. Windham, it's going to be the same place,

6    okay?  So just make sure you show up on

7    December 5, 2019, at 1:30 for the resumption of

8    your deposition.  Remember, a subpoena is a court

9    order requiring you to attend, so we don't want

10   the marshals to chase you down, all right?

11   THE WITNESS:  Okay.

12   MAGISTRATE JOHNSTON:  You understand

13   all that, Mr. Windham?

14   THE WITNESS:  Yes.

15   MAGISTRATE JOHNSTON:  All right.  Thank

16   you, sir.

17   Ms. Keen, anything else?

18   MS. KEEN:  No.  Thank you, Your Honor.

19   MAGISTRATE JOHNSTON:  All right.

20   Mr. Iasparro, anything?

21   MR. IASPARRO:  No, Judge.  Thank you.

22   MAGISTRATE JOHNSTON:  All right.

23   Thanks everybody.  Have a good day.

24   MR. DEVINE:  Thanks, Judge.

1           (Whereupon, the teleconference with

2       Magistrate Judge Iain D. Johnston was concluded.)

3   BY MR. MOGBANA:

4   Q.  Mr. Windham, before we had the call, I was asking

5       a few questions, and now I want to ask about the

6       attorney that came down to Lawrenceville.  You

7       said it was about September of last year,

8       approximately?

9   A.  Yes.

10  Q.  Do you recall whether it was a male or a female

11      attorney?

12  A.  It was -- it was two males.

13  Q.  Are you able to give some description about how

14      they looked, the height?  Taking the first one,

15      one of them, how would you describe the person,

16      physical description of the person?

17  A.  I can't recall.  It's hard to describe.

18  Q.  Okay.  Are you able to describe whether they were

19      looking younger or older?

20  A.  They was kind of older.  One of them was the

21      investigator, and the other one said he

22      represented Patrick.

23  Q.  All right.  So to be sure, you had two male

24      visitors.  One was -- described himself to you as

1    an attorney, the other said he was an

2    investigator?

3  A.  Right.

4  Q.  Do you recall how the investigator looked, any

5    description?

6  A.  Can't recall.

7  Q.  Do you recall what race they were, were they white

8    or black?

9  A.  They was white.

10 Q.  Okay.  So both of them were white males?

11 A.  Yes.

12 Q.  Do you recall whether they were slim or big like

13    myself?

14 A.  One -- the investigator was kind of older and kind

15    of chunky.  And the other one was young.

16 Q.  And your recollection is that the attorney looked

17    younger than the investigator?

18 A.  Right, yes.

19 Q.  And that the investigator also looked a bit

20    chunkier than the attorney?

21 A.  Yes.

22 Q.  I visited Lawrenceville myself.  And I know you

23    just don't get to walk in.  Do you recall how the

24    visit came about?  How did you know that you were

1     going to receive visitors on that day?

2  A.  I didn't -- I didn't know that day.  They just

3     called me and told me I had a visit, a special

4     visit -- attorney visit, that what they told me I

5     had.

6  Q.  And by they you mean the corrections officers down

7     there at Lawrenceville?

8  A.  Yes.

9  Q.  Do you recall whether this was just the one

10     time you received visitors from individuals

11     representing Mr. Pursley's interests or whether

12     there was a prior or subsequent occasion?

13  A.  One time.

14  Q.  The one time?

15        MS. KEEN:  Objection, form, foundation.

16  BY MR. MOGBANA:

17  Q.  They introduced themselves, the attorney and the

18     investigator, saying that they are representing

19     Mr. Pursley or Mr. Pursley's interests, and you

20     told them that you don't want to talk about -- you

21     didn't want to talk about it; is that correct?

22  A.  Yes.

23  Q.  What, if anything, else did they tell you at that

24     time?

1  A.  They just told me that they represent him and he's

2      out on appeal or something.  And I told them I

3      didn't want nothing to do with that no more.

4  Q.  Do you recall whether they tried to convince you

5      to talk to them?

6  A.  Yeah, they try.

7              MS. KEEN:  Objection, form, foundation.

8  BY MR. MOGBANA:

9  Q.  Do you recall what they said?

10 A.  I can't remember.  Can't remember.

11 Q.  All right.  Do you recall how long the visit was?

12 A.  About 15 minutes.

13 Q.  All right.  And during those 15 minutes, who would

14     you say was doing the majority of the talking, was

15     it you or was it your visitors at the time?

16 A.  Visitors.

17              MS. KEEN:  Objection, form.

18 BY MR. MOGBANA:

19 Q.  Do you recall whether both of them spoke to you?

20 A.  Yeah, both of them did.

21 Q.  So at some point the investigator --

22 A.  (Interrupting)  Yeah.

23 Q.  (Continuing) -- was talking to you, and then at

24     some point the attorney was talking to you, also?

1  A.  Yeah.

2  Q.  Is there anything that jumps out at you now

3      what -- maybe the one thing each person said

4      regarding why they were there?

5  A.  The attorney said that the gun didn't match,

6      something about the gun didn't match or something.

7  Q.  What about the investigator, was there anything

8      that he said that jumped out to you?

9  A.  No.

10  Q.  Do you remember how the visit concluded?  I mean

11      you didn't walk out.

12  A.  No, I didn't walk out.

13  Q.  All right.

14  A.  Because I said that I didn't want to talk, so they

15      was like, you know, they was ready to go.

16  Q.  All right.  Did they tell you that they would --

17      if you want -- if you change your mind, how you

18      could reach them?

19  A.  Yeah.

20  Q.  Okay.  Do you remember who said --

21           MS. KEEN:  (Interrupting)  Objection.

22  BY MR. MOGBANA:

23  Q.  Do you remember who said that?

24  A.  The attorney.

1   Q.  All right. Do you recall how he said you could

2        get in touch with him?

3   A.  No. I think he left me a card.

4   Q.  They did not or they did?

5   A.  They did.

6   Q.  They did?

7   A.  Yes.

8   Q.  Do you recall where you -- what happened to the

9        card?

10  A.  I don't know. I think I threw it away.

11  Q.  Okay. But you took it from the meeting?

12  A.  Yeah.

13  Q.  All right. Do you recall how long that was in

14       relation to your out date from -- either your

15       out -- your out date from IDOC?

16  A.  It was -- it was real close. I got out in

17       October, October the 1st.

18  Q.  Okay.

19  A.  And it was -- it was real close that they served

20       me with the subpoena because they knew I was

21       getting out.

22  Q.  Okay. I just want to make sure that we're not

23       confusing things. This is the visit from the

24       attorneys who said they were representing

1     Mr. Pursley?

2  A.  Yes.

3  Q.  And you said that they -- they served you with a

4      subpoena during that visit?

5  A.  Yeah; yes.

6  Q.  Okay.  And they -- you said that the visit was

7      close to your out date, correct?

8  A.  Yes.

9  Q.  And your out date was October 1?

10 A.  Yes.

11 Q.  And you left IDOC from Lawrenceville, you didn't

12     transfer to any other location?

13 A.  Huh-uh (negative response).  I went to the county

14     and bonded out.

15 Q.  Okay.

16 A.  I went to Cook County and bonded out October 1.

17 Q.  But just to make sure, the last IDOC facility that

18     you were housed at was Lawrenceville?

19 A.  Pardon me?

20 Q.  From Lawrenceville you moved to Winnebago --

21     sorry, to Cook County Jail, you didn't go to any

22     other IDOC facility?

23 A.  No.

24             MR. MOGBANA:  I don't have any other

```
 1    questions.

 2              MS. KOZAR:  Mr. Windham, I just have a

 3    couple questions.  I represent three individuals

 4    who work for the State of Illinois.  Their names

 5    are Daniel Gunnell, Peter Striupaitis and

 6    Jack Welty.

 7  BY MS. KOZAR:

 8  Q.  Do you recall if during the time back in 1993 when

 9      you were communicating with Crime Stoppers --

10              MS. KEEN:  (Interrupting)  I'm sorry to

11      interrupt.  I can't hear properly.  It's coming in

12      and out.

13              MS. KOZAR:  Okay.  I'm sorry.  I'll

14      talk louder.

15  BY MS. KOZAR:

16  Q.  Do you recall --

17              MS. KEEN:  (Interrupting)  Thank you.

18              MS. KOZAR:  Can you hear me now?

19              MS. KEEN:  Yes, I can.  Thank you.

20  BY MS. KOZAR:

21  Q.  Okay.  Do you recall back in 1993 when you were

22      talking to Crime Stoppers about the incident with

23      Patrick Pursley, did you have any communication

24      with anyone from the State of Illinois at that
```

1    time?

2  A.  No.

3  Q.  Okay.  Do you recognize the name Daniel Gunnell?

4  A.  No.

5  Q.  To your knowledge have you ever had any

6      communication with anyone named Daniel Gunnell?

7  A.  No.

8  Q.  Do you recognize the name Peter Striupaitis?

9  A.  No.

10 Q.  To your recollection have you ever had any

11     communication with anyone by that name?

12 A.  No.

13 Q.  And do you recognize the name John Welty?

14 A.  No.

15 Q.  To your knowledge have you ever had any

16     communication with him?

17 A.  No.

18             MS. KOZAR:  Okay.  I don't have any

19     other questions.

20             MR. IASPARRO:  Mr. Windham, this is

21     Michael Iasparro again.  I'm going to ask you a

22     few questions to wrap up -- unless anybody else

23     has questions after this -- similar to the

24     questions that everybody else has asked you.

1              I represent seven retired Rockford

2         police officers.  I want to ask you about each of

3         them individually as well.

4    BY MR. IASPARRO:

5    Q.   To the best of your knowledge, have you ever met a

6         retired Rockford police officer by the name of

7         Jim Bowman?

8    A.   No.

9    Q.   And to the best of your knowledge, did you have

10        any contact with Mr. Bowman back in 1993 when you

11        were providing information about Patrick Pursley?

12   A.   No.

13   Q.   Do you recognize the name Ron Gallardo?

14   A.   No.

15   Q.   To the best of your knowledge, did you ever have

16        any contact with a Rockford police officer by the

17        name of Ron Gallardo at any time?

18   A.   No.

19   Q.   Do you recognize the name John Genens?

20   A.   No.

21   Q.   To the best of your knowledge, have you ever had

22        any contact with or met a man by the name of

23        John Genens?

24   A.   No.

1  Q.  Do you recognize the name Jeff Houde?

2  A.  No.

3  Q.  To the best of your knowledge, have you ever met

4     or had any contact with Jeff Houde?

5  A.  No.

6  Q.  Recognize the name Sam Pobjecky?

7  A.  No.

8  Q.  To the best of your knowledge, have you ever met

9     or had any contact with a man named Sam Pobjecky?

10  A.  No.

11  Q.  Two more.  Have you ever met a man named

12     Mark Schmidt?

13  A.  No.

14  Q.  Do you recognize that name as a retired Rockford

15     police detective?

16  A.  No.

17  Q.  To the best of your knowledge, did you ever have

18     any contact with Mr. Schmidt?

19  A.  No.

20  Q.  And, lastly, do you recognize the name

21     Greg Hanson?

22  A.  No.

23  Q.  To the best of your knowledge, did you ever have

24     any contact with a Rockford police officer by the

1      name of Greg Hanson at any time?

2   A.   No.

3                MR. IASPARRO:  Thank you.  That's all I

4      have.

5                MR. DEVINE:  Nothing from me.

6                MR. POTTINGER:  No further questions.

7                MS. KOZAR:  Nothing from me.

8                MR. MOGBANA:  Nothing.

9                MS. KEEN:  I'm sorry.  Is someone

10     speaking?

11                MR. IASPARRO:  I think everybody said

12     those are all the questions that we've got, so

13     unless there's anything that anybody needs to put

14     on the record, I think we're done with

15     Mr. Windham's deposition for today at least.

16                MS. KEEN:  Right.  It's just a reminder

17     that we're not done with the deposition in full

18     for today.  The defendants have concluded their

19     questioning of you.  Mr. Pursley's attorneys,

20     that's myself, we are going to be questioning you,

21     as the judge advised.

22                So we look forward to seeing you on

23     December 5 of this year in the same room that

24     you're in right now, because you are under

1    subpoena.  So can we expect to see you in this

2    room on December 5, Mr. Windham?

3              THE WITNESS:  Yes.

4              MS. KEEN:  Okay.  Thank you for your

5    time.

6              MR. IASPARRO:  Thanks everybody.  We

7    will talk to you a little later today.

8              (Whereupon, at 11:24 a.m. on

9    October 15, 2019, this portion of the deposition

10   was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          CERTIFICATE OF SHORTHAND REPORTER

2          I, Andrea L. D'Agnolo, a Certified
Shorthand Reporter and Notary Public in and for
3     the State of Illinois, do certify that the
deposition of Marvin A. Windham was taken
4     before me on the 15th day of October, 2019, at
10:17 a.m., in the offices of Hinshaw & Culbertson
5     LLP, Rockford, Illinois; that said witness was
sworn to testify to the truth and nothing but the
6     truth relative to said cause; that the deposition
is a true and correct record of the testimony
7     given by the witness.

8

9                    _____

10                   Andrea L. D'Agnolo
                     Certified Shorthand Reporter
11

12
                Dated this 29th day of October, 2019.
13

14

15

16

17

18

19

20

21

22

23

24

## A

**aberdeen** 2:2
**able** 52:13,18
**aboveentitled**
  1:20
**accompanied**
  19:17
**accurately** 33:7
**action** 1:20
**addition** 47:9
**additional** 13:5
**address** 5:22 45:3
**administrator**
  1:10
**admit** 33:18
**advise** 7:19 50:1
**advised** 63:21
**affirmative** 5:24
  8:18 43:2 44:9
**affirmatively**
  22:9
**ago** 27:19 29:6
**agree** 15:5 18:16
  18:19
**ahead** 38:4 49:22
**aint** 33:1
**alston** 12:24
**amanda** 2:21 4:23
**amended** 4:4
**amount** 31:24
**andrea** 1:22 9:13
  9:17 14:18 65:2
  65:10
**andrew** 25:8,14
  26:16 33:19
**ann** 2:5
**answer** 8:20 9:10
  9:11,20,21
  17:18 19:4
  20:19 26:4
  27:13
**answers** 9:5,19
**anthony** 11:2
**anybody** 15:24
  16:3,9 17:11
  22:16 30:9
  60:22 63:13
**apparently** 44:7
**appeal** 55:2
**appear** 15:8 50:23

**appeared** 2:3,5,8
  2:11,15,18,22
**apprehended**
  38:18,21
**approximately**
  52:8
**april** 30:19,24
  31:4 34:1
**arbor** 2:5
**area** 11:8,16,24
  12:3
**arrest** 39:6,12
**arrested** 47:22,24
  48:2
**ascher** 25:8 26:16
  33:19 43:13
**aschers** 25:14
**ashley** 2:4 5:9
**asked** 32:23 60:24
**asking** 5:23 9:6
  10:9 50:17 52:4
**assume** 10:11
**assumes** 26:2,23
  27:7
**attempt** 27:24
**attend** 50:21 51:9
**attention** 32:9
**attorney** 2:2,4,7
  2:10,13,17,21
  2:21 6:11 8:8
  34:17 52:6,11
  53:1,16,20 54:4
  54:17 55:24
  56:5,24
**attorneys** 5:21 9:7
  29:16 50:16,18
  57:24 63:19
**auburn** 46:2,8,11
  46:12,13
**avenue** 1:20 2:14

## B

**back** 14:8 21:1
  22:13 23:4 26:7
  30:15 31:9
  38:17 59:8,21
  61:10
**background**
  12:19
**bala** 2:2

**balsley** 2:18
**bank** 21:23 25:10
  26:19
**banks** 22:15
**barrick** 2:17
**barton** 1:6 2:11
  4:18 36:3,3
**based** 22:24 31:6
  48:6
**basis** 31:21
**bates** 14:21 33:12
**behalf** 1:18 2:3,6
  2:8,11,15,18,22
  28:2 49:6
**believe** 8:3 22:12
  31:6 39:12
  42:19 44:5
  49:16
**best** 4:8 9:9 17:1
  19:1 20:2 25:2
  33:24 34:13
  41:24 61:5,9,15
  61:21 62:3,8,17
  62:23
**beyond** 13:6
**big** 53:12
**birth** 11:5
**bishop** 1:8 2:12
  4:18 35:19
**bit** 12:17 53:19
**black** 53:8
**block** 29:4
**bob** 46:23
**bonded** 58:14,16
**bottom** 15:9,10
**bowman** 1:7,18
  2:15 4:13 49:7
  61:7,10
**box** 2:11,14
**brief** 48:23
**briefly** 6:6 49:14
  49:18
**bruce** 1:9 2:12
  4:19 15:21
  36:23,23 37:4
  37:23 39:20
**building** 19:18
**burger** 25:21 27:4
**business** 29:1

## C

**c** 2:1,5,7,17 4:1,20
  40:19
**cafeteria** 20:1
  44:10
**call** 5:18,19 6:7
  22:17 23:3,18
  23:23 24:8,15
  37:9 38:1 39:1
  42:1,16 43:1,3
  43:18 48:24
  49:3 52:4
**called** 21:16 23:3
  24:19 29:3 37:2
  37:6,13 47:18
  54:3
**calling** 21:3
**calls** 8:8 34:5
  44:14
**cant** 17:13,19
  23:6,14 24:3,6,7
  24:14 28:18
  29:2,5 31:13,14
  52:17 53:6
  55:10,10 59:11
**card** 29:1 57:3,9
**care** 42:3
**case** 6:18 8:14
  34:15,20 35:1
  35:16
**cause** 65:6
**center** 14:1
**certificate** 3:20
  65:1
**certified** 1:22
  65:2,10
**certify** 65:3
**chambers** 8:8
  48:24 49:3
**change** 56:17
**charlene** 1:7 2:8
  5:2 47:11
**chase** 51:10
**chicago** 2:3,22
  11:19,20 12:3
  12:24 38:17
**children** 19:17,24
  20:7 44:5 45:9
  45:12
**christine** 1:8 2:12

  4:18 35:19,19
**chunkier** 53:20
**chunky** 53:15
**city** 1:6,10,10 2:7
  2:8 5:2 8:16
  47:9,10
**clarify** 19:6
**clean** 9:12
**clear** 6:8
**clearly** 46:10
**clip** 32:16,22
**close** 57:16,19
  58:7
**coerce** 16:3 22:16
  43:4
**coersive** 48:10
**college** 13:7,9
**come** 29:23 36:16
**coming** 29:21
  46:10 59:11
**commencing** 1:21
**committed** 25:10
  25:21 26:19
  27:5
**communicating**
  59:9
**communication**
  44:18 59:23
  60:6,11,16
**company** 12:10
**completely** 9:10
**complies** 7:12
**concerns** 47:19
**concluded** 52:2
  56:10 63:18
  64:10
**conference** 4:5
  5:19 6:3 49:20
**confusing** 57:23
**connect** 23:6,9
  24:19,23,24
  37:16
**connected** 24:18
**consistent** 21:9
  49:12,18
**contact** 36:5,10
  36:16 41:6,14
  41:23 42:15
  44:18 45:17
  61:10,16,22

62:4,9,18,24
**context** 6:8
**continued** 6:23
30:3 49:15
50:22
**continuing** 7:21
10:1 42:21 50:3
55:23
**conversation**
37:19
**convince** 55:4
**cook** 58:16,21
**copy** 7:5,15 14:20
**corner** 15:11
**correct** 5:14,15
10:19 23:21
31:10 36:24
42:16,17 47:19
47:22 48:11,18
54:21 58:7 65:6
**corrections** 18:4
54:6
**correctly** 47:17
**counsel** 5:4 7:17
49:3,10
**county** 29:15
58:13,16,21
**couple** 11:17 13:7
23:4 24:20 59:3
**coupleofday**
23:24
**court** 1:1 6:19 7:4
7:10,12 8:15
30:2 49:24 51:8
**courthouse** 29:19
**courts** 49:12
**credits** 13:7,9
**crime** 1:15 21:4,5
21:8,16 22:17
23:3,18,23 24:8
31:9,16,20,20
31:23,24 36:19
37:2,6,10 47:18
59:9,22
**crimes** 14:11
21:23
**culbertson** 1:20
2:14 4:50 50:16
51:3 65:4
**currently** 11:7

**D**

**d** 3:1 4:1 8:9 49:1
52:2
**dagnolo** 1:22 65:2
65:10
**dangerous** 22:7,8
22:12
**daniel** 1:14 2:22
59:5 60:3,6
**date** 11:5 15:22
29:21 30:10
48:8 50:23
57:14,15 58:7,9
**dated** 15:15 65:12
**david** 1:12 2:19
4:22 40:21 41:2
41:7
**day** 1:21 18:24
19:16,23 20:10
23:4,13,16 25:5
25:20 26:1,8
27:2 32:12 35:3
42:22 44:17
51:23 54:1,2
65:4,12
**days** 21:1,10
23:20 24:20
37:21
**death** 43:13
**december** 7:8 8:1
49:16 50:2,19
50:22 51:7
63:23 64:2
**decision** 23:1
**defendants** 1:16
1:19 2:9,12,16
2:20,23 4:12,24
6:21 63:18
**defense** 14:22
49:10 50:16
**department** 1:13
2:7 15:22 16:13
17:9 24:13
37:10 38:2 48:8
**deposition** 1:5,18
3:12 4:3 5:20
6:14,20,24 7:6
7:17 9:1 14:20
14:23 15:3
16:14 34:24

49:11,16 50:2
50:15,21 51:1,8
63:15,17 64:9
65:3,6
**describe** 17:2
52:15,17,18
**described** 52:24
**description** 52:13
52:16 53:5
**details** 25:7,13,20
26:14,18 27:4
**detective** 15:21
17:2,7,15 18:8
19:23 24:12,12
25:6,6 26:13,13
27:2 37:7,14
62:15
**detectives** 23:4,13
23:15 25:19
**devine** 2:10 3:3
4:16,16 19:6
35:12,14,17
36:14 38:6,20
39:11 40:15
48:2 51:24 63:5
**didnt** 10:6 26:14
27:12 29:7 35:1
35:6 37:7 40:3,9
43:15 48:10,13
48:17 54:2,2,21
55:3 56:5,6,11
56:12,14 58:11
58:21
**died** 40:20
**difficult** 9:17
**direct** 32:9
**discussion** 8:10
49:19
**district** 1:1,2
**docket** 6:17
**document** 6:17
15:5,9
**documents** 6:15
31:7
**doing** 5:7 17:15
45:11 50:12
55:14
**dont** 10:6,10
13:23 17:5
24:18 28:7,9

31:13 35:10
38:5 39:5 51:9
53:23 54:20
57:10 58:24
60:18
**doug** 1:9 2:12
4:19 36:7,8,10
**drive** 2:18
**duly** 10:22

**E**

**e** 2:1,1 3:1 4:1,1
**earlier** 47:17
**east** 2:7
**edge** 12:4,12,14
**education** 13:5
**educational** 12:18
**effort** 27:23
**either** 24:11,16
25:5,19 36:19
57:14
**ekedahl** 1:12 2:19
4:22 40:21 41:2
41:7
**emails** 34:9
**employed** 17:2
**employee** 47:10
**employees** 1:13
1:15
**ended** 37:21
**episode** 48:18
**estate** 1:11,12,12
2:19,19,19
**estates** 4:21
**evera** 2:18
**everybody** 9:13
51:23 60:24
63:11 64:6
**evidence** 26:3,24
27:8 33:22
**exactly** 9:19 33:11
**examination** 3:2
6:23
**examine** 6:22
**examined** 10:22
**example** 9:20
**exhibit** 3:11,12
14:20,23 15:3
16:14 37:22
**exhibits** 3:10

**expect** 64:1
**experience** 48:7
48:17
**explain** 31:21

**F**

**f** 2:13
**facility** 58:17,22
**fact** 14:9 37:6
**facts** 26:3,24 27:7
43:12
**fair** 9:14 47:14
**familiar** 13:19
**family** 38:12,15
42:4,7,7,19 44:5
**far** 12:17 36:10
**federal** 6:18 8:15
**feel** 43:9 48:10
**felt** 44:11
**female** 52:10
**filed** 6:16 8:14
**finish** 9:11
**fireman** 32:16
**firm** 2:2,5,10,14
2:17 29:3 34:14
50:16
**first** 9:6 10:22
13:21 17:19
24:21 32:7
37:13 41:2
42:12,24 52:14
**fixing** 11:23
**floor** 2:3,11,22
**follow** 38:1
**follows** 10:23
**force** 15:24 22:16
**form** 18:17 19:3
19:14 20:5,17
21:14 22:22
25:17 26:2,23
27:8 28:6 32:5
33:21 40:17
42:10 43:7,24
48:3,15 54:15
55:7,17
**formal** 9:5
**forrester** 1:11
2:19 4:21 23:7
24:12,24 25:6
37:14,17 40:20

41:17,24 42:13
42:15 43:4,10
44:7,11,19
**fortyeight** 11:4
**forward** 26:7
63:22
**foster** 23:7 24:24
**foundation** 20:5
24:4 33:21
36:13 38:16
39:10 41:9 42:2
44:14 54:15
55:7
**fourth** 2:11
**full** 11:1 33:13
63:17
**further** 4:10
35:11 40:15
44:18 46:24
63:6

**G**

**g** 4:1
**gallardo** 1:7,18
2:15 4:13 49:7
61:13,17
**gap** 23:24
**gary** 1:12 2:19
4:22 40:21
41:11,12,15
**ged** 12:21 13:1,6
13:13
**genens** 1:7,19
2:15 4:14 49:7
61:19,23
**generally** 48:9
**generals** 2:21
**getting** 57:21
**getty** 1:7 2:8 5:2
47:11,15
**give** 33:1,4,5
39:20 40:2
43:22 52:13
**given** 9:1 17:22
18:3,13 65:7
**giving** 14:13 16:3
19:22 37:21
**go** 4:10 9:3 38:4,9
39:8,16 49:22
56:15 58:21

**goes** 32:15,22
**going** 5:18 6:2 9:9
10:11 14:19
21:21 31:15
32:8,12 33:3,5
40:21 49:3
50:18 51:5 54:1
60:21 63:20
**good** 5:3,8,11
47:3,5 49:5,23
50:12 51:23
**grade** 12:20,23
**grand** 30:17
**greg** 1:9,19 2:16
4:15 62:21 63:1
**ground** 9:4
**guess** 4:8 26:7
**gun** 56:5,6
**gunnell** 1:14 2:22
59:5 60:3,6
**guns** 22:14
**guy** 33:2
**guys** 24:17

**H**

**handcuffed** 18:22
**handcuffs** 39:14
**handing** 15:2
**hanson** 1:9,19
2:16 4:15 49:8
62:21 63:1
**happened** 43:14
57:8
**harass** 16:22
**hard** 52:17
**hathaway** 2:5
**havent** 47:14
**head** 9:18 22:9
**hear** 10:6 27:13
35:20 36:3
59:11,18
**heard** 8:11 41:3
47:11,17
**hearing** 6:20
**height** 52:14
**held** 6:20,24
**help** 49:4
**helped** 42:6,19
**helping** 42:3
**hes** 50:3 55:1

**hey** 40:9
**high** 12:20,24
**highest** 12:20
**hinshaw** 1:20
2:14 4:6 50:16
51:3 65:4
**hold** 24:22
**home** 39:4
**honor** 49:6,23
51:18
**hooper** 2:5
**houde** 1:8,19 2:15
4:14 49:7 62:1,4
**house** 44:3
**housed** 58:18
**houses** 11:23
**housing** 11:23
**howard** 1:11 2:19
4:21
**huhuh** 10:2 58:13
**husbands** 46:22

**I**

**iain** 8:9 49:1 52:2
**iasparro** 2:13 3:3
3:5 4:2,11 5:12
5:16 6:2,5,9
7:13,22 8:3,5,8
8:11,12,20,22
8:24 9:3,16 10:1
10:4,15,18,24
12:9 14:17 15:1
17:18,20 18:7
18:12,18 19:4,8
19:10,15 20:6
20:18 21:15
22:23 24:5
25:18 26:4,6
27:1,9,15,16
28:11 30:23
32:6 33:12,14
33:23 35:10
46:11,14 49:5,6
51:2,20,21
60:20,21 61:4
63:3,11 64:6
**idea** 35:22
**identification**
14:24 15:4
**idoc** 57:15 58:11

58:17,22
**ifeanyi** 2:7 5:1
47:7
**ill** 9:6 49:13 59:13
**illinois** 1:2,15,21
1:23 2:3,8,11,14
2:18,21,22 4:24
11:8 12:24 14:3
14:11 28:13
59:4,24 65:3,5
**im** 6:11 9:8,9 10:8
10:11 15:2
20:19 21:21
23:10 24:6 32:8
38:4 40:21
50:12 59:10,13
60:21 63:9
**improperly** 20:9
**incarcerated**
28:15
**incident** 59:22
**incoming** 48:24
**indicated** 13:13
**individual** 41:6
**individually** 61:3
**individuallyna...**
4:12 8:13
**individuals** 40:22
54:10 59:3
**information** 17:3
17:15 21:5,7,9
24:21 25:7,13
25:20,24 26:10
26:14,18,21
27:3 31:8,16
40:2 61:11
**insecurity** 47:21
**intents** 21:8
**interaction** 47:15
**interests** 54:11,19
**interrupt** 59:11
**interrupting** 6:4
8:21 9:23 12:7
19:8 20:16
21:13 22:21
27:12 33:10
39:9 42:20 46:6
48:14 55:22
56:21 59:10,17
**interruption**

48:23
**interview** 17:6
28:3
**intimidated** 43:9
44:11
**introduce** 4:9
**introduced** 54:17
**introductions**
8:12
**investigating**
14:14
**investigator**
34:23 52:21
53:2,4,14,17,19
54:18 55:21
56:7
**investigators**
29:15 30:7
**involvement**
14:10 25:14
26:16 36:20
**ivcc** 13:10
**ive** 31:7

**J**

**jack** 1:14 2:23
59:6
**jail** 58:21
**james** 1:6 2:10,11
4:16,18 35:14
36:3,3
**january** 30:10,13
**jeff** 1:8,19 2:15
4:14 62:1,4
**jenner** 29:4
**jim** 1:7,18 2:15
4:13 61:7
**john** 1:7,19 2:15
4:14 60:13
61:19,23
**johnson** 45:22,24
**johnston** 7:19 8:9
49:1,2,21 50:5,9
50:10,14 51:4
51:12,15,19,22
52:2
**joke** 33:1
**judge** 5:18 7:19
8:6,9 49:1,9
50:10 51:3,21

51:24 52:2
63:21
**jumped** 56:8
**jumps** 56:2
**june** 14:9 15:15
15:18 16:1,6,10
16:13,17 18:22
18:24 19:11
20:12 21:4,17
22:13,18 26:9
26:11 27:2 37:2
37:9 48:8
**jury** 30:17

### K

**keen** 2:2 5:3,4,15
6:4,6,10,11 7:14
7:23 8:7 12:7
17:17 18:6,11
18:17 19:3,14
20:5,16 21:13
22:21 23:5 24:4
25:17 26:2,23
27:7,12 28:6
30:22 32:5
33:10,21 36:13
38:3,16 39:9
40:17 41:9 42:2
42:10 43:7,24
44:14 46:6,9,13
48:3,14,20
49:13,17,21,23
50:8 51:17,18
54:15 55:7,17
56:21 59:10,17
59:19 63:9,16
64:4
**kill** 32:12
**killed** 32:11 33:18
**kind** 21:18 23:10
52:20 53:14,14
**king** 25:21 27:4
**knew** 21:20,21
29:21 57:20
**know** 7:10 12:10
19:24 23:10
24:19 26:15
29:22 31:13,15
31:19,22 34:16
36:8,11 37:13

38:14 39:5 40:3
41:11 43:15
45:7 53:22,24
54:2 56:15
57:10
**knowing** 32:1
**knowledge** 14:5
14:10 20:2 25:2
27:23 31:22
33:24 34:13
37:3 60:5,15
61:5,9,15,21
62:3,8,17,23
**known** 35:19
**knows** 45:19
**kozar** 2:21 3:5
4:23,23 59:2,7
59:13,15,18,20
60:18 63:7

### L

**l** 1:22 2:21 65:2
65:10
**lab** 1:15
**labor** 11:21 12:3
**lady** 33:2 37:16
**lastly** 62:20
**late** 29:14
**law** 2:7 29:3
34:14 50:15
**lawrence** 29:19
29:24
**lawrenceville**
28:8,12 34:18
52:6 53:22 54:7
58:11,18,20
**lawyer** 28:2
**lawyers** 34:14,19
**leading** 12:4,12
12:14 17:17
18:6,11,17 23:5
30:22 38:3
48:15,20
**leah** 11:14,14
**leann** 44:22 45:1
**learn** 30:1,5
**leave** 7:3
**left** 57:3 58:11
**lefthand** 32:10
**letters** 34:11

**life** 41:7
**little** 12:17 64:7
**live** 11:7,10 45:1
46:1
**living** 11:18
**llp** 1:20 2:10,14
2:18 65:5
**locate** 45:18
**location** 7:9 51:1
58:12
**lodged** 6:13
**loevy** 2:2,2 34:14
34:14
**long** 2:17 11:15
13:24 23:12,14
55:11 57:13
**look** 15:4 17:24
32:7 63:22
**looked** 52:14 53:4
53:16,19
**looking** 52:19
**lot** 32:13
**louder** 59:14
**lying** 32:24

### M

**m** 1:21 49:16
50:19,23 64:8
65:4
**magistrate** 5:18
6:3,8 8:6,9 49:1
49:2,21 50:5,9
50:14 51:4,12
51:15,19,22
52:2
**main** 2:5
**majority** 55:14
**making** 22:17
**male** 52:10,23
**males** 52:12 53:10
**man** 13:18 25:8
61:22 62:9,11
**manor** 46:2,8,14
46:14
**mans** 28:22
**mark** 1:8,19 2:16
4:15 14:17,19
62:12
**marked** 3:11
14:21,24 15:2

37:22
**married** 44:23
46:20
**marshals** 51:10
**marvin** 1:6,18 3:3
4:3 10:21 11:2
40:9 65:3
**match** 56:5,6
**materials** 7:1
**math** 45:11
**matter** 4:13 5:21
29:8
**mcnally** 4:18
35:19
**mean** 11:22 31:21
54:6 56:10
**meet** 36:8 38:8
**meeting** 57:11
**messages** 34:2,7
**met** 13:21 14:5
36:23 37:3
42:12 61:5,22
62:3,8,11
**michael** 2:13 4:11
6:4 8:12 27:13
33:10 49:6
60:21
**michigan** 2:5
**midst** 49:9
**mind** 56:17
**mines** 15:14
**minnesota** 45:2
**minutes** 55:12,13
**misstates** 33:22
**mogbana** 2:7 3:4
5:1,1 8:1,4 47:3
47:6,7,8 48:5,16
48:21 52:3
54:16 55:8,18
56:22 58:24
63:8
**moments** 29:6
**money** 31:8,15,24
32:2 33:1,5
**month** 28:17
**months** 11:17
**morning** 5:3,8,11
47:3,5 48:6 49:5
49:18,23 50:9
50:13

**mother** 45:19
**motion** 6:16,19
**mouth** 16:9
**move** 26:7
**moved** 58:20
**murder** 25:8,15
26:16 32:16

### N

**n** 2:1 3:1 4:1
**name** 5:4,8 6:11
8:12 11:1,13
13:18 23:15
28:7,22 35:14
36:7,15 40:18
41:3,6 43:15
44:21 45:21
46:22 47:6,11
60:3,8,11,13
61:6,13,17,19
61:22 62:1,6,14
62:20 63:1
**named** 25:8 36:2
47:10 60:6 62:9
62:11
**names** 43:17 59:4
**necessary** 18:4
**need** 5:22 7:1
8:20 50:23
**needs** 63:13
**negative** 58:13
**never** 24:18 35:24
36:5,10
**newspaper** 32:15
**niece** 11:12
**ninth** 12:20,22
**nods** 9:18 22:9
**north** 2:2,5
**northern** 1:2
**nos** 14:21
**notary** 1:22 65:2
**notice** 4:4
**number** 45:5
46:16

### O

**o** 2:11,14 4:1
**oath** 10:19 31:1
**objection** 6:13
17:17 18:6,11

18:17 19:3,14
20:5,16 21:13
22:21 23:5 24:4
25:17 26:2,23
27:7 28:6 30:22
32:5 33:21
36:13 38:3,16
39:9 40:17 41:9
42:2,10 43:7,24
44:14 48:3,14
48:20 54:15
55:7,17 56:21
**obligates** 7:16
**obligation** 7:20
50:1,3
**obtain** 6:24
**obtained** 13:1
**occasion** 54:12
**oclock** 8:2
**october** 1:21
57:17,17 58:9
58:16 64:9 65:4
65:12
**office** 2:21 29:16
**officer** 16:21
19:11 20:10,13
36:2,7,15 39:22
39:24 40:2
44:12 61:6,16
62:24
**officers** 8:14,16
14:8,14 24:23
35:15,18 40:19
42:6,18 48:7
49:7 54:6 61:2
**offices** 1:20 65:4
**oh** 17:8 29:17
38:10,12 40:8
**okay** 5:23 9:24
11:10,24 17:14
23:8 24:8 30:12
30:19 36:2,22
37:6,13,18
38:14 39:4,6
40:6,23,24 41:5
41:14,17,18,23
42:6,9,24 43:1
43:17,20 45:15
45:17,21 46:13
46:20 49:21

50:5,12 51:6,11
52:18 53:10
56:20 57:11,18
57:22 58:6,15
59:13,21 60:3
60:18 64:4
**old** 11:3 45:9
**older** 52:19,20
53:14
**once** 6:24 37:12
**open** 6:24
**opportunity** 7:18
17:22 18:3
**order** 49:12 51:9

**P**

**p** 2:1,1,5,10,11,14
4:1 49:16 50:19
50:23
**page** 3:2 15:9,11
32:7,10 33:12
**pages** 15:17
**paid** 31:24
**paper** 32:23
**paragraph** 33:13
**pardon** 40:5
47:23 58:19
**park** 1:20 2:14
**part** 7:6
**participate** 49:17
**participating**
5:13 21:21,22
**parties** 4:5,9
**parts** 6:21
**patch** 8:6
**patrick** 1:3 2:24
5:5,10 8:15
13:18 21:20
22:5,6,8,12
25:11,14,22
26:15,19 27:5
27:18,20 28:9
29:8 32:20
33:16,18 34:15
34:20 38:22
52:22 59:23
61:11
**pecker** 32:12
**penitentiary**
28:12 29:20

**person** 13:19
27:18 36:22
43:16 52:15,16
56:3
**pertaining** 6:16
**peter** 1:14 2:23
59:5 60:8
**phone** 4:7 5:22
22:17 23:13
24:8 25:5,19,24
34:5 48:24
**physical** 52:16
**physically** 27:11
**pick** 42:19
**picked** 42:7
**pirages** 1:9 2:12
4:19 36:16,17
**place** 44:10 51:5
**placed** 39:6,14
**plaintiff** 1:4 2:3,6
6:13
**plaintiffs** 7:7,17
**pleasant** 48:9
**please** 7:5 10:7
12:8 45:23
**pobjecky** 1:8,19
2:15 4:14 49:7
62:6,9
**point** 20:12 29:13
30:1 55:21,24
**police** 1:13,15
8:14 14:8,14
15:21 16:13,21
17:9 19:11
20:10,13 24:13
31:9,17 35:15
36:15 37:10
38:1,7,9 39:16
39:19 42:3,21
44:3,6,12 48:8
61:2,6,16 62:15
62:24
**portion** 64:9
**pottinger** 2:17 3:4
4:20,20 40:18
40:19 41:1,10
42:5,11 43:8
44:1,16 46:8,15
46:24 63:6
**prepared** 17:21

**present** 2:24 4:5
**pressure** 48:11
**presume** 13:14
**prior** 24:8 54:12
**prison** 13:2,10
29:14
**proceeding** 6:14
**process** 17:2
**promise** 39:24
43:20
**properly** 20:3
59:11
**property** 12:4
**provide** 15:20,24
17:3 23:15 25:6
25:20 26:13,21
27:3 29:1
**provided** 16:12
21:7 26:9 31:9
31:16
**providing** 16:23
17:12,14 21:4
25:24 61:11
**public** 1:22 19:18
65:2
**pulled** 32:15 33:2
33:2
**purposes** 21:8
**purse** 33:3,4
**pursley** 1:3 2:24
5:5,10,13 6:12
8:15 13:18,22
14:5,10,15 22:8
22:12 25:11,22
26:19 27:5,18
27:20 29:8 31:6
32:20 33:16,18
34:3,15,20
38:22 43:12
47:22,24 54:19
58:1 59:23
61:11
**pursleys** 25:14
26:15 30:2,12
31:4 34:1 50:17
54:11,19 63:19
**pursuant** 4:4 50:4
**put** 6:6 16:9 63:13
**putting** 40:7

**Q**

**quash** 6:17
**question** 7:1,18
9:10,12,21 10:6
19:9
**questioning** 7:7
49:10,11 63:19
63:20
**questions** 5:17,23
9:5,6,8 10:12
13:17 35:12
40:16,22 50:17
50:18 52:5 59:1
59:3 60:19,22
60:23,24 63:6
63:12

**R**

**r** 2:1 4:1,20 40:19
**race** 53:7
**randolph** 2:22
**reach** 27:24 56:18
**reached** 28:2
**read** 13:14 17:22
32:22 33:6
**reading** 33:11
**ready** 56:15
**real** 57:16,19
**really** 29:11 45:15
**reappear** 7:16
50:2
**reason** 10:5,9,15
24:13 43:22
48:9
**recall** 14:8,13
19:16 21:3
24:11 27:10,18
34:4 37:23
44:20 52:10,17
53:4,6,7,12,23
54:9 55:4,9,11
55:19 57:1,8,13
59:8,16,21
**receive** 31:15 32:2
54:1
**received** 13:13
31:7 34:2 54:10
**recognize** 15:10
60:3,8,13 61:13
61:19 62:1,6,14

62:20
**recollection** 17:1
  19:1 41:5,24
  53:16 60:10
**record** 4:2 6:7
  8:10 9:12 34:22
  63:14 65:6
**reffett** 1:12 2:19
  4:22 40:21
  41:11,12,15
**reflect** 4:2
**regard** 41:2
**regarding** 26:15
  26:18 56:4
**relating** 25:7
**relation** 57:14
**relative** 65:6
**relaxed** 48:10
**release** 13:23 14:1
**relevant** 6:15
**remain** 16:19
**remember** 13:21
  13:23 17:7,11
  17:13,19,21
  18:21 23:6,11
  23:12,14 24:2,3
  24:6,7,16 28:7
  28:17,18,22
  29:2,3,5 30:10
  30:16 31:12,13
  31:14 37:11
  38:5,7 51:8
  55:10,10 56:10
  56:20,23
**reminder** 63:16
**repeat** 10:7
**rephrase** 10:10
**reported** 1:21
**reporter** 1:22
  3:20 7:4,11,12
  65:1,2,10
**represent** 4:11,17
  4:21,23 5:2,5,9
  6:12 8:13 35:15
  35:18 36:2,22
  40:19 47:10
  55:1 59:3 61:1
**representative**
  1:11
**represented** 4:9

52:22
**representing** 28:9
  54:11,18 57:24
**request** 49:14
**requiring** 51:9
**respect** 5:20 14:9
  16:9,23 31:8
**response** 6:1 8:19
  43:2 44:9 58:13
**restrain** 19:12
**restrained** 18:24
**result** 6:19
**resumption** 51:7
**retired** 8:13 61:1
  61:6 62:14
**retrial** 30:2,13
**return** 7:20
**reviewed** 31:7
**rfd** 14:21
**ride** 22:14 44:2
**right** 5:6 7:9 8:24
  9:23 10:4 11:9
  12:1 13:13 29:8
  29:9 30:20,21
  37:15,19,20
  44:24 45:4 49:2
  50:5,14 51:4,10
  51:15,19,22
  52:23 53:3,18
  55:11,13 56:13
  56:16 57:1,13
  63:16,24
**righthand** 15:10
**robberies** 21:23
**robbery** 25:10,21
  26:19 27:4
**robbing** 22:14
**robert** 2:17
**rockford** 1:6,10
  1:13,21 2:7,8,8
  2:11,14,18 4:17
  5:2 8:14,16 11:7
  11:16,24 14:3
  14:11,14 15:21
  16:12,21 17:9
  19:11,18 20:9
  20:13 24:13
  36:15 46:3,7
  47:9,10 48:7
  61:1,6,16 62:14

62:24 65:5
**ron** 1:7,18 2:15
  4:13 61:13,17
**room** 4:6 9:7,14
  17:6,11 63:23
  64:2
**rosa** 2:4
**roshna** 2:2 5:4
  6:11 8:5
**rules** 9:4

**S**
**s** 2:1 4:1
**safety** 19:18 38:19
  39:1
**sam** 1:8,19 2:15
  4:14 62:6,9
**saw** 27:17
**saying** 9:14 29:22
  54:18
**scared** 21:18,19
  22:3,4,6 23:10
  47:18
**scheduled** 7:7
**schmidt** 1:8,19
  2:16 4:15 49:8
  62:12,18
**school** 12:18,20
  12:24 46:19
**scott** 1:9 2:12
  4:19 15:21 17:2
  17:7,15 18:8
  19:23 24:12
  25:6 26:13
  36:23,23 37:4
  37:23 39:20,22
  39:24 40:2
**second** 7:6 33:13
**secondly** 9:16
**security** 47:19
**see** 32:13,16 64:1
**seeing** 63:22
**sentence** 32:10
**sentences** 32:19
  33:9,15
**separated** 44:24
**september** 28:19
  52:7
**serve** 7:5 30:9
**served** 29:16,19

34:22,23 49:14
  50:20 57:19
  58:3
**seven** 4:12 8:13
  61:1
**shorthand** 1:22
  3:20 65:1,2,10
**shot** 32:23 33:6
**shoulders** 9:18
**show** 51:6
**shrugs** 9:17
**sic** 31:6
**side** 32:10
**sign** 15:17 18:14
**signature** 15:10
  15:13
**signatures** 15:8
**similar** 60:23
**simms** 11:14
  46:23
**sir** 11:3 13:15
  15:5,13 38:11
  51:16
**sister** 45:20
**sitting** 7:9
**slim** 53:12
**somebody** 31:23
  38:8 45:18
**soon** 29:21
**sorry** 20:19 24:6
  38:4 58:21
  59:10,13 63:9
**sound** 30:20
**sounds** 30:21
  50:15
**source** 47:21
**speak** 27:24 44:2
**speakerphone**
  46:10
**speaking** 63:10
**special** 1:10 54:3
**specific** 37:7
**speculation** 44:15
**spell** 12:8,10
  45:23 46:9
**spoke** 37:14 41:20
  55:19
**spoken** 24:11,16
  25:3 27:20
  34:13,19

**stalter** 2:18
**start** 5:23 21:21
  21:22
**started** 5:17 9:4
**starts** 32:11
**state** 1:15,23 2:7
  2:10 4:24 28:12
  30:2 59:4,24
  65:3
**stated** 6:10
**statement** 14:13
  14:21 15:18,20
  15:24 16:3,6,10
  16:12,23 17:4
  17:12,21 18:8
  18:13,14,22
  19:22 21:2,10
  23:21 24:1 26:8
  26:10 27:3
  30:16 32:8,22
  37:22 38:10,10
  39:20 40:3,7,13
  42:22 44:17
  45:13
**states** 1:1 29:15
**station** 38:8,9
  39:17,19 42:3
  42:21 44:3,7
**stephen** 1:9 2:12
**steve** 4:19 36:16
  36:17
**stoppers** 21:4,5,8
  21:16 22:17
  23:3,18,23 24:8
  31:9,16,20,20
  31:23 36:19
  37:2,6,10 47:18
  59:9,22
**stores** 22:15
**street** 2:2,5,8,10
  2:22 14:1,2
**strictly** 37:18
**striupaitis** 1:14
  2:23 59:5 60:8
**stuff** 22:15
**subpoena** 4:4
  6:23 7:2,5,11,16
  7:21 29:16,23
  30:9,11 34:23
  49:15 50:4,20

50:21 51:8
57:20 58:4 64:1
**subsequent** 54:12
**suggest** 40:12
43:12
**supposed** 29:23
**sure** 6:9 9:18 10:8
51:6 52:23
57:22 58:17
**switzer** 2:17
**sworn** 10:22 65:5
**sylvia** 12:15,15
**sylvias** 12:4,12,13

---

**T**
**take** 9:17 15:4
42:3 49:24
**taken** 1:18 4:3
65:3
**talk** 23:4,9 34:18
41:17 42:24
54:20,21 55:5
56:14 59:14
64:7
**talked** 23:12
24:14,20 28:23
34:24 35:24
37:3 48:22
**talking** 14:8
38:22 43:9
55:14,23,24
59:22
**tatianna** 45:22,24
**tatiannas** 46:16
**teleconference**
2:3,6,24 52:1
**telephone** 5:13
37:18 41:20
42:1,16,24 43:3
43:18 45:5 46:5
46:16
**telephonic** 49:19
**tell** 10:7 12:17
20:14,20,21
31:3 35:4,4 40:6
43:13,17 54:23
56:16
**telling** 24:21
**tendered** 6:15
7:11

**testified** 10:23
29:6 30:24 34:1
48:6
**testify** 10:16
30:12,17 65:5
**testimony** 6:16
31:3 65:6
**text** 34:7
**thank** 7:14 8:7
47:1 51:15,18
51:21 59:17,19
63:3 64:4
**thanks** 51:23,24
64:6
**thats** 5:15 8:1
20:15 24:22,24
32:19 37:14,22
40:23 42:4 63:3
63:20
**theres** 63:13
**thing** 4:8 5:17 6:7
40:10 41:11
56:3
**things** 40:12
57:23
**think** 13:24,24
17:19 23:6
24:22,23 29:2,2
29:6,23 30:19
31:13 57:3,10
63:11,14
**third** 2:3
**thought** 29:11
43:14
**threaten** 16:22
39:22 43:4
**threatened** 44:11
**three** 15:17 40:19
59:3
**threepage** 15:5
**threw** 57:10
**time** 7:4,18 14:15
16:21 20:7 26:7
27:10,17,21
28:15 34:19
35:3 37:13 41:7
41:21 42:12
44:6 45:12 48:1
50:24 54:10,13
54:14,24 55:15

59:8 60:1 61:17
63:1 64:5
**times** 33:6 37:9
**tingstad** 2:4 5:8,9
**today** 4:6,9 5:17
6:14,21 7:3 10:5
10:12,16 16:19
35:8 50:17,21
63:15,18 64:7
**todays** 34:24
**told** 7:23 20:20,21
21:20 28:9 29:7
35:7 39:16 54:3
54:4,20 55:1,2
**top** 45:4
**touch** 57:2
**trade** 13:7
**training** 13:5
**transcribed** 1:22
**transfer** 58:12
**treated** 20:3,8
**trial** 27:19 30:10
30:18,19 31:4
34:1
**tried** 28:2 55:4
**true** 65:6
**truth** 16:15,17,19
18:9 20:14,20
20:21 31:3 35:5
35:7 65:5,6
**truthful** 32:3
43:22
**truthfully** 10:16
**try** 34:18 55:6
**trying** 23:11
**turn** 31:23 49:13
**twentyseven**
45:10
**twentysome**
27:19
**twice** 37:12
**two** 6:21 33:6
52:12,23 62:11
**twothirds** 32:9
**typing** 17:16

---

**U**
**uhhuh** 5:24 8:18
9:15 10:1 43:2
44:9

**understand** 7:23
8:17 9:19 10:2,7
10:8,13,18 17:5
51:12
**understanding**
5:12
**understood** 10:12
30:24
**unidentified** 1:13
1:15
**united** 1:1
**unpleasant** 48:17
**unprofessionally**
20:9

---

**V**
**van** 2:18
**verbally** 9:20
**visit** 53:24 54:3,4
54:4 55:11
56:10 57:23
58:4,6
**visited** 53:22
**visiting** 11:9,11
11:15
**visitors** 52:24
54:1,10 55:15
55:16
**vs** 1:5

---

**W**
**waddell** 2:4 5:9
**wait** 9:10,11
**walk** 53:23 56:11
56:12
**walked** 32:24
**wallet** 33:2,4
**want** 10:7,8,9
13:17 21:1,24
28:9,18 29:7
30:15 41:17
42:24 51:9 52:5
54:20,21 55:3
56:14,17 57:22
61:2
**wanted** 45:17
49:17,24
**wasnt** 32:3 48:10
**way** 9:12 16:22
19:12 22:16

32:10 34:3
39:22 40:12
43:5
**wed** 9:19
**welcome** 47:2
**welding** 13:8
**welty** 1:14 2:23
59:6 60:13
**went** 12:18,20,22
17:3 21:9 26:10
29:19 37:16
39:19 40:3,13
58:13,16
**west** 2:10,21
**weve** 63:12
**whats** 44:21 45:18
45:21 46:16
49:3 51:1
**white** 53:7,9,10
**wife** 19:17,23
20:7 44:5
**wifes** 44:21
**williams** 1:9 2:12
4:19 36:7,8,10
**williamsmccart...**
2:10 4:17
**willingness** 49:24
**windham** 1:6,18
3:3,12 4:3 5:3
5:16 6:10 7:15
7:22 8:11 9:1
10:16,21 11:1,2
12:18 13:17
14:19,23 15:2,3
15:17 16:4,6,14
16:15,22 18:21
19:16 20:12
21:3,17 23:13
24:9 26:9 27:10
27:17 32:8
33:15,24 35:3,8
35:13 40:18
44:22 45:17
47:4 49:10,11
49:15 50:6,10
51:5,13 52:4
59:2 60:20 64:2
65:3
**windhams** 63:15
**winnebago** 29:15

58:20
**witness** 3:2 5:6,11
　5:24 7:24 8:18
　8:21,23 9:2,15
　9:23 10:3,14,17
　10:20 14:20
　15:18,20 16:10
　16:23 17:4,12
　19:5 22:9 40:24
　47:2,5 50:1,7,12
　51:11,14 64:3
　65:5,7
**witnesss** 27:13
**word** 46:7
**words** 16:9
**work** 13:23 14:1
　46:18 59:4
**worked** 12:2,11
　29:3
**working** 11:20,24
　12:3
**wrap** 60:22
**write** 13:15
**writing** 17:19
**written** 14:13
　21:2,10 23:20
　24:1 26:8,10
　27:3 30:16 32:8
　37:22 40:7

**X**

**x** 3:1

**Y**

**yeah** 12:16 24:10
　24:16 28:16,21
　29:21 32:14,18
　41:19 42:20
　45:16 46:4 55:6
　55:20,22 56:1
　56:19 57:12
　58:5
**year** 7:8 13:23
　28:8,20 52:7
　63:23
**years** 27:19
**yesterday** 5:20
　6:20 49:12,19
**youd** 7:10
**youll** 50:23

**young** 45:15,16
　53:15
**younger** 52:19
　53:17
**youre** 7:20 10:19
　45:19 47:2
　50:15 63:24
**youve** 48:6

**Z**

**0**

**00** 8:2

**1**

**1** 3:12 8:3,4 14:20
　14:23 15:3
　16:14 31:13
　33:12 37:22
　49:16 50:19,23
　51:7 58:9,16
**10** 1:21 3:3 8:2
　65:4
**100** 1:20 2:14,21
**11** 64:8
**12** 15:15,18 16:1,6
　16:10,13,17
　18:22,24 19:11
　20:12 26:9,11
　27:2
**120** 2:10
**126** 2:5
**133** 6:17
**1389** 2:14
**13th** 2:22
**14** 3:12
**15** 55:12,13 64:9
**15th** 1:21 65:4
**17** 1:21 65:4
**18cv50040** 1:4
**1993** 14:9,9 15:15
　15:18 16:1,7,10
　16:13,17 18:22
　19:1,11 20:12
　21:4,17 22:13
　22:18 26:9,11
　27:2 30:15
　31:10 36:20
　37:2,9 48:8 59:8
　59:21 61:10

**1994** 30:19 31:1,4
　34:2,20
**1st** 57:17

**2**

**2001** 13:4,6
**2002** 13:12
**2004** 13:12
**2018** 28:20 29:14
**2019** 1:21 30:13
　50:2,19,22 51:7
　64:9 65:4,12
**219** 2:11
**24** 64:8
**247** 14:22 33:12
**249** 14:22
**28** 45:10
**29th** 65:12

**3**

**3** 1:4
**30** 8:3,4 49:16
　50:19,23 51:7
**311** 2:2
**31571** 11:6
**35** 3:3

**4**

**41** 3:4
**425** 2:7
**47** 3:4
**48104** 2:5

**5**

**5** 7:8 8:1 49:16
　50:2,19,22 51:7
　63:23 64:2
**500** 31:13
**59** 3:5

**6**

**60601** 2:22
**60607** 2:3
**61** 3:5
**61104** 2:8
**611050219** 2:11
**611051389** 2:14
**61108** 2:18
**65** 3:20
**6833** 2:18

**7**

**7735628909** 46:17

**8**

**8** 21:4,17 22:18
**8157238756** 45:8

**9**

**92** 13:24,24

# WITNESS STATEMENT

Date: 6-12-93

Case No: 93-037212

Start Time: 1847

I, Marvin A. Windham , DOB: 3-15-71 now living at

1224 N. Rockton #2 Phone # none have been advised

by Officers B.Scott and that

they are police officers representing the City of Rockford, Illinois.

I have known Patrick Pursley since December of 1991. We met in prison, at Joliet. We both went to the work release center on Court St. after we got out. While we were still in the work release center he told me that if I knew of anyone selling guns to let him know. I never did know of anyone selling any guns so I did not help him.

Patrick got out of the work release center before I did so I did not see him for about five months. Then one day I was driving down Ashland and Woodlawn and I saw Patrick changing a flat tire so I stopped and talked to him. I got out of the work release center in Dec. of 1992. We started kicking it together the first part of 1993. The first night I went over to his house he was bragging about doing stick ups. He said he had robbed either a mexican or a white guy. Weeks went past and he was trying to get me to go along with him to do jobs. He told me that he went to rob a guy and he did not have any money so he took his car. I think he said that happened in the area of Rockton and Custer.

The first part of April my wife and I and kids had gone to Chicago. We came back about the fifth of April I went over to Patrick's house. He was on the phone talking to some lady at the unemployment office. They messed up or something and he was not getting his unemployment He got mad at her and threatened her, He was tired of these white peckers he was going to start killing them. He cussed at her and then he hung up. He said he was tired of this shit. He said that he had just killed a pecker the other day and he was going to kill a lot more of them. He pulled out a newspaper clip of the murder of the fire man. XXXXXXXX I read the clip and I asked him why he shot him. He said the paper was lying. He said he walked up to him and said this aint no joke, give me the money. He said the guy pulled out his wallet and the lady pulled out her purse. He said that they were not going to give him there purse or their wallet they were just going to Xgive him the money. He said that is when he shot him two times. He said there wasn't much money. He said the part in the paper that was wrong is where one of the bullets was meant for her and he did not leave any money on the dash board like the paper said. I asked him if Sam was with him and he said that she was waiting around

Before signing, I have read/or had read to me this page to make certain that it is my statement and that it is the truth.

Witness _Bruce D Scott_

Signed _Marvin Windham_

Date 6-12-93

Signing time this page 7:54 pm

Page 1 of 3 pages

ORIGINAL

Windham
DEPOSITION
EXHIBIT
No. 1
10-15-19
PENGAD 800-631-6989

RFD Defense 000247

**CONTINUATION OF STATEMENT OF** Marvin A. Windham

the corner for him. The only car they had at that time was a beige Chevey Celebrity. He was bragging how it was a sweet and clean get away. He showed me the gun that he used and it was a 9mm sixteen shot wi black with brown handles. The same day he had his girl friend take the gun to get it adjusted. He said that if he got caught the police would't be able to hook the murder on him by doing something to the gun.

A couple of weeks later he came over to my house. We were watching T.V. and a guy was on the news that he knew called Bingo. He said he use to do stick ups with Bingo. That's when he asked me what was up, was I going out. He had on a black hoody, he had a skull cap that he had made two holes in it on, he had the same 9mm. he had a police scanner with head phones on. I asked him what he was going to do and he said that he was fixing to go get him some money. I told him that I was not going and he said all right I'm out of here. I watched him out side. He took the license plates off the chevy and put a sticker in the back, like he just bought the car, and he took off. I went over to his house the next day about news time. We were watching the news and that is when the Burger King robbery came up The description was wrong. They said 140lbs. and he jumped up and down saying he got a clea: get away, because he only weighs about a 100lbs. They also said that he was dark skinned an he is light skinned. He had his money in the head board of his bed. He showed it to me and told me that it was about $1,500. That is how he use to try and lure me into going with him He was always talking about doing a bank, that was his dream.

At about a coupQe of weeks later Sam and Patrick came by my house. I asked him what he was fdoing. He said he was looking for a car so he could go rob a bank. The next day I went over to his house. I saw him packing his black bag. He put his pistol in the bag, an extra clip, purple mask, police saanner, black pants and a black hoody. he had a purple hat that said Karl Canie, it is a name brand for jeans.

The next day I read in the paper about the bank robbery and from the description I knew it was Patrick. I went over to Patrick's and they were acting like they did not do anything. That is when he let it out. He said that your going to have to be down with this, meaning start doing stick ups with him, because I knew to much. He said I was going to have to stop coming around because I did not want to do nothing. He started saying yeh he did it. He said he stole a car, he said that was an oldsmobile. He said sam met him around the corner and dnove the stolen car to the bank. He went in and stuck up the bank jumped back in the

Before signing, I have read/or had read to me this page to make certain that it is my statement and that it is the truth.

Witness _Bruce D Scott_

Signed _Marvin Windham_

Date 7:54 — 6-12-93

Signing time this page

Page 2 of 3 pages

Witness_____

**CONTINUATION OF STATEMENT OF** _____ Marvin A. Windham _____

stolen car and drove around the corner and met Sam. He said that he threw some money on the pavement by the oldsmobile to throw the police off track. He said he rode on the floor of the car all the way back. He said the kids were in the car too so the police would not stop them. He said that he got sixteen thousand dollars.

After that he bought another car a black Honda Civic. He said that he did not buy the car in Rockford because he was scared to spend money around here. He had Sam buy him another 9mm. and he said that he was not going to do nothing else for awhile. That is also when he made some threats to me that before he goes back to the penitentiary he would know if it was me or Sam and he would kill us before he goes back.

He did tell me that he would get rid of his boots and skull caps after he did stick ups. The only thing that he kept would have been his black hoody. He would even get rid of his boots and buy some more. He always were black combat boots.

After he threatened me that is when I stopped hanging around with him.

End of Statement

Before signing, I have read/or had read to me this page to make certain that it is my statement and that it is the truth.

Witness Bruce D Scott

Signed Marvin Windham

Date 6-12-93

Signing time this page 755 Pm

Page 5 of 5 pages

Witness _____

**ORIGINAL**

RFD Defense 000249