1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ILLINOIS

3                      WESTERN DIVISION

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
4                                )
PATRICK PURSLEY,                 )
5                                )
                Plaintiff,       )   NO. 3:18-CV-50040
6                                )
        vs.                      )   ZOOM VIDEOCONFERENCE
7                                )   DEPOSITION OF
CITY OF ROCKFORD, et al.,        )   ROGER A. CLARK
8                                )
                Defendants.      )
9
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10

11                    Deposition of Roger A. Clark taken

12        via Zoom videoconference on behalf of Jim Bowman,

13        Ron Gallardo, John Genens, Jeff Houde,

14        Sam Pobjecky, Mark Schmidt and Greg Hanson,

15        defendants, in the above-entitled action on the

16        8th day of October, 2021, commencing at

17        10:01 a.m., as reported and transcribed by

18        Andrea L. D'Agnolo, Certified Shorthand Reporter

19        and Notary Public in and for the State of

20        Illinois.

21

22

23

24

```
 1              A P P E A R A N C E S

 2              ATTORNEYS LINDSAY HAGY,
       ROSHNA BALA KEEN and RACHEL BRADY, of the firm
 3     of Loevy & Loevy, 311 North Aberdeen Street,
       Third Floor, Chicago, Illinois 60607, appeared via
 4     Zoom videoconference on behalf of the plaintiff.

 5              ATTORNEYS IFEANYI C. MOGBANA and
       MATTHEW FLORES, of City of Rockford Department of
 6     Law, 425 East State Street, Rockford, Illinois
       61104, appeared via Zoom videoconference on behalf
 7     of City of Rockford and Charlene Getty,
       defendants.
 8
                ATTORNEY JOEL M. HUOTARI, of the firm
 9     of WilliamsMcCarthy LLP, 120 West State Street,
       Fourth Floor, P.O. Box 219, Rockford, Illinois
10     61105-0219, appeared via Zoom videoconference
       on behalf of James Barton, Christine Bishop,
11     Bruce Scott, Doug Williams and Stephen Pirages,
       defendants.
12
                ATTORNEY MICHAEL F. IASPARRO, of the
13     firm of Hinshaw & Culbertson LLP, 100 Park Avenue,
       P.O. Box 1389, Rockford, Illinois 61105-1389,
14     appeared via Zoom videoconference on behalf of
       Jim Bowman, Ron Gallardo, John Genens, Jeff Houde,
15     Sam Pobjecky, Mark Schmidt and Greg Hanson,
       defendants.
16
                ATTORNEY ROBERT C. POTTINGER,
17     of the firm of Barrick, Switzer, Long,
       Balsley & Van Evera, LLP, 6833 Stalter Drive,
18     Rockford, Illinois 61108, appeared via Zoom
       videoconference on behalf of Estate of
19     Howard Forrester, Estate of Gary Reffett and
       Estate of David Ekedahl, defendants.
20
                ATTORNEY SUNIL BHAVE, of the Illinois
21     Attorney General's Office, 100 West Randolph
       Street, 13th Floor, Chicago, Illinois 60601,
22     appeared via Zoom videoconference on behalf of
       Daniel Gunnell, Peter Striupaitis and Jack Welty,
23     defendants.

24
```

```
 1                    I N D E X

 2    WITNESS              EXAMINATION              PAGE

 3    Roger A. Clark       By Mr. Iasparro             4
                           By Mr. Mogbana            168
 4                         By Mr. Huotari            209
                           By Mr. Bhave              246
 5                         By Mr. Pottinger          277
                           By Ms. Hagy               301
 6                         By Mr. Iasparro           307

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20    Certificate of Shorthand Reporter             311

21

22

23

24
```

*Vecchio Court Reporting*

*815-965-9020*

1                  P R O C E E D I N G S

2                      ROGER A. CLARK,

3      having been first duly sworn via Zoom

4      videoconference, was examined and testified as

5      follows:

6  BY MR. IASPARRO:

7  Q.   Morning, Mr. Clark.  For the record would you

8       state your name.

9  A.   Roger Alma Clark.

10                 MR. IASPARRO:  My name is

11     Michael Iasparro, Mr. Clark.  I represent seven

12     of the retired Rockford police officers who are

13     named as defendants in the Patrick Pursley versus

14     City of Rockford, et al., case that we're here

15     about this morning.

16                 You and I have never met; is that

17     accurate?

18                 THE WITNESS:  Yes.

19                 MR. IASPARRO:  Where are you physically

20     located this morning, Mr. Clark?

21                 THE WITNESS:  Santee, California, which

22     is right next to San Diego.

23                 MR. IASPARRO:  I understand from your

24     resume and from the 26(a)(2) expert report that

1  we've received that you've been deposed hundreds

2  of times; is that fair to say?

3              THE WITNESS:  Yes.

4              MR. IASPARRO:  Any reason that you will

5  not be able to testify truthfully, truthfully and

6  accurately this morning?

7              THE WITNESS:  No.

8  BY MR. IASPARRO:

9  Q.  Is it accurate to say, Mr. Clark, that you have

10     not been a sworn law enforcement officer for

11     28 years?

12 A.  Since 1993.  You're correct.

13 Q.  Were you ever the lead detective in any homicide

14     investigation during the course of your law

15     enforcement career?

16 A.  Not the lead detective.

17 Q.  When were you first contacted by counsel for

18     Patrick Pursley with respect to this matter?

19 A.  January 20, 2021.

20 Q.  And who was it that contacted you?

21 A.  Ms. Lindsay Hagy.

22 Q.  Prior to January 20, 2021, had you ever worked

23     with the law firm Loevy and Loevy before?

24 A.  Yes.

 1   Q.   How many times?

 2   A.   I believe there are two other times, maybe three.

 3   Q.   Do you recall the particular cases that you worked

 4        on for Loevy and Loevy besides this one?

 5   A.   No.

 6   Q.   Were those cases that were in the state of

 7        Illinois?

 8   A.   Yes.

 9   Q.   Do you know the jurisdictions where those cases

10        were pending?

11   A.   Chicago.

12   Q.   And when did you work on those other cases for

13        Loevy and Loevy?

14   A.   It's been some time ago.  It's been over -- it's

15        not on the four-year list.  It would be beyond

16        that, maybe ten years ago.

17   Q.   Do you recall the types of cases that you worked

18        on for Loevy and Loevy other than this one?

19             MS. HAGY:  Objection, scope and

20        relevancy.

21             MR. IASPARRO:  You can answer, sir.

22   A.   Cases involving police misconduct.

23   BY MR. IASPARRO:

24   Q.   Do you know if any of those cases had to do with

1      allegations of wrongful conviction?

2   A.   Yes.

3   Q.   Did both or -- both of those cases involve

4        allegations of wrongful conviction?

5   A.   Both?  One I recall did.

6   Q.   And as you sit there today, do you remember the

7        name of that case?

8   A.   As I said earlier, no, I don't remember precise --

9        I remember the detective involved.  His name was

10       Burge.

11  Q.   Jon Burge, Chicago PD?

12  A.   Sounds about right.

13  Q.   What were you hired to do in this case, sir?

14  A.   To review the file and to write a report based on

15       my training and experience.

16  Q.   And you did in fact draft a report which has been

17       produced in this case dated August 20, 2021; is

18       that true?

19  A.   Yes.

20  Q.   I'm going to share with you your document that has

21       appeared in front of you on your screen,

22       Mr. Clark.

23  A.   I see it.

24  Q.   We'll mark this as Exhibit 1 for your deposition.

1    Do you recognize this as the Rule 26(a)(2) report

2    that you drafted with respect to this matter, the

3    Patrick Pursley versus City of Rockford, et al,

4    case?

5  A. Yes.

6  Q. And scrolling down the report itself is 36 pages

7    in length; is that true?

8  A. Yes.

9  Q. And then attached to the report is a copy of your

10    resume or c.v., if you will, followed by a listing

11    of the testimony that you've given in the last

12    four years, correct?

13  A. Yes.

14  Q. How many reports like this have you drafted over

15    the course of the last 28 years?

16          MS. HAGY:  Objection, form.

17  A. I have not counted, but it's probably over 1500.

18  BY MR. IASPARRO:

19  Q. Looking at Line 1 of your report, sir, in

20    particular the first paragraph, it says, "Thank

21    you for retaining me to review and render opinions

22    regarding the investigation into the Andrew Ascher

23    homicide and the subsequent arrest and prosecution

24    of Mr. Patrick Pursley as a result of the actions

1      of Rockford Police Department defendant officers

2      and Illinois State Police defendants."  Did I read

3      that correctly?

4   A.  Yes.

5   Q.  Did you start your analysis with the premise that

6      the arrest and prosecution of Mr. Patrick Pursley

7      was as a result of the actions of the Rockford

8      Police Department defendant officers and Illinois

9      State Police defendants?

10                 MS. HAGY:  Objection, form.

11  A.  I believe that's the heartbeat of the report, and

12     I would agree with that.

13  BY MR. IASPARRO:

14  Q.  Did you ever consider that it was the actions of

15     Mr. Pursley which led to his arrest and

16     prosecution?

17                 MS. HAGY:  Objection, form.

18  A.  Well, I certainly comment on his actions.  This is

19     about his conviction for murder.  I'll wait for

20     the next question.

21  BY MR. IASPARRO:

22  Q.  Did you ever consider that it was the testimony of

23     witnesses implicating Mr. Pursley which led to his

24     arrest and prosecution?

```
 1              MS. HAGY:  Objection, form,
 2      mischaracterizes evidence.
 3   A.  Well, I know it's in my report that there was
 4      witness testimony and comment on the -- on that
 5      and how it was brought into the case that -- by
 6      the Rockford detectives.
 7   BY MR. IASPARRO:
 8   Q.  Did you consider the testimony of
 9      Samantha Crabtree before forming your opinions?
10   A.  Well, of course I did.  I commented on her
11      significantly in my report.
12   Q.  What about the testimony of Marvin Windham, did
13      you consider the testimony of Marvin Windham
14      before forming your opinions?
15   A.  I did, and that's also commented to I think
16      considerable extent in my report.
17   Q.  Did you find their testimony credible, sir?
18              MS. HAGY:  Objection, form.
19   A.  I think I -- and if you look at the next paragraph
20      on the first page, I don't determine credibility.
21      I commented on the -- on what a detective that is
22      assigned to solve the murder would view their --
23      the credibility of their statements.
24   BY MR. IASPARRO:
```

 1   Q.   And with respect to the portion of the report, I

 2        think you're referring to the second paragraph on

 3        Page 1, first sentence that is on the screen in

 4        front of you, "In expressing my opinions in this

 5        report, I do not make credibility determinations."

 6        That's what you wrote, correct?

 7   A.   Yes.  And that's how I took your question.

 8   Q.   Is that a true statement, sir?

 9   A.   I'm sorry?

10             MS. HAGY:  Objection, form,

11        argumentative.

12             THE WITNESS:  I'm sorry.  I didn't

13        catch the question.

14   BY MR. IASPARRO:

15   Q.   I asked if that is a truthful statement.

16   A.   My intention was that everything in the report is

17        truthful, and my testimony today is truthful.  So

18        I consider it was not my position or assignment to

19        determine credibility.

20   Q.   Have you ever been retained in a wrongful

21        conviction case, civil case, by the defense?

22             MS. HAGY:  Objection, form, asked and

23        answered.

24   A.   I do not recall for a murder conviction by the

 1    defense.

 2  BY MR. IASPARRO:

 3  Q.  Will you explain for me your educational

 4      background, sir.

 5  A.  Yes.  The highest level of education is California

 6      POST Command College.  It's a two-year master's

 7      level program where the diploma is given by the

 8      Department of Justice rather than the state --

 9      rather than the university system, and it requires

10      a thesis.  I'll wait for the next question.

11  Q.  I'd like to ask you about your law enforcement

12      background.  As I understand from reviewing your

13      resume, you began your career in 1965 working in

14      the Los Angeles County Jail; is that correct?

15  A.  Yes.

16  Q.  And did you work there for -- it looks like about

17      three years before moving to the patrol division?

18  A.  Yes.  That included the academy attendance.

19  Q.  How long were you in the patrol division?

20  A.  Two years.

21  Q.  And that's with the Los Angeles County Sheriff's

22      Department?

23  A.  Yes.

24  Q.  Patrol is not the same as a detective, is that

1    accurate, with respect to the L.A. County

2    Sheriff's Department?

3  A.  Yes.

4           MS. HAGY:  Objection, form.

5  BY MR. IASPARRO:

6  Q.  I'm sorry.  What was your answer?

7  A.  The answer is yes.

8  Q.  All right.  And I saw a reference in your resume

9    that beginning January of 1970, you were a --

10    what's referred to as a station detective at the

11    San Dimas Station; is that correct?

12  A.  Yes.

13  Q.  What is a station detective?

14  A.  Station -- the sheriff's department in California

15    is like a precinct or a division in a police

16    department.  And it has a detective bureau.  And I

17    was assigned to the detective bureau at the

18    station.  The department also had a detective

19    division as well, so that's the distinction

20    between the two.

21  Q.  So the station detective would not be part of the

22    detective division, if I understand you correctly?

23  A.  Right.  The way the structure of the department

24    is, the station detectives fall into the -- into

```
 1      the patrol division organization, which is --
 2      there were three at the time I was with the
 3      department.
 4   Q. Then moving forward in time, it looks like in
 5      December of 1970, you moved over to the technical
 6      services division; is that correct?
 7   A. Yes.  I was promoted and assigned to the -- what
 8      was commonly called the radio room and plus the
 9      moving of the department from analog to digital
10      system.
11   Q. Did you have any investigate responsibilities
12      while you were assigned to the technical services
13      division?
14   A. No.
15   Q. And then from December of 1972 until December of
16      1973, you were back at the San Dimas Station in
17      the patrol division?
18   A. Yes, as a patrol sergeant or a station sergeant.
19   Q. From February of 1974 through January of 1976, you
20      were in emergency operations in the patrol
21      division; is that right?
22   A. Yes.
23   Q. And what were your responsibilities there?
24   A. So the -- this was a time when the legislature had
```

1    changed California law to place the sheriff into

2    the lead during civil disorders and natural

3    disasters in the county. So it would require the

4    establishment of a bureau, and I was selected with

5    three other sergeants to establish that bureau and

6    write the standing orders for response to those

7    types of incidents.

8  Q.  Did you have any investigative responsibilities

9    while you performed that role?

10  A.  No.

11  Q.  Next it looks like you went to the administrative

12    division and were responsible for federal surplus

13    property for a couple of years; is that right?

14  A.  Yes. Actually that was part of the emergency

15    operations bureau. I never moved the desk, but it

16    was during that time when I worked with federal

17    authorities that I learned that we could access

18    surplus property from federal sources. And that's

19    a standing program. It puts about a million

20    dollars a month into the sheriff's department

21    worth of food and supplies and machinery, et

22    cetera.

23  Q.  Did you have any investigative responsibilities

24    while you served in that capacity?

```
 1                    MS. HAGY:  Objection, form.

 2    A.   No.

 3    BY MR. IASPARRO:

 4    Q.   And next it looks like you were assigned to the

 5         custody division at the central jail between

 6         April, 1978, and April, 1980; is that correct?

 7    A.   Correct.  I was promoted to lieutenant and went

 8         back into the central jail.

 9    Q.   So would that be the corrections side of the

10         sheriff's department?

11    A.   Corrections side, yes.

12    Q.   And then next it appears you were assigned to the

13         field operations -- field operations at the

14         Crescenta Valley Station for four years; is that

15         right?

16    A.   Yes.

17    Q.   First as a watch commander?

18    A.   Right.  There are four major positions for

19         lieutenant, actually three, and then I assumed a

20         command as a lieutenant.  So -- and that, as I

21         said, it's like a precinct, so there's essentially

22         what you're looking at.  One year as a watch

23         commander, next year the detective bureau

24         commander.  The next year is the administrative
```

     1     lieutenant, and then the next year is command in
     2     station.
     3  Q.  And when you say the detective bureau commander,
     4     is that again the station detective bureau?
     5  A.  Yes.
     6          MS. HAGY:  Objection, vague.
     7          THE WITNESS:  As I explained, the
     8     station had a bureau, detective bureau, and a
     9     lieutenant is the typical commander of that part
    10     of the station operation.
    11  BY MR. IASPARRO:
    12  Q.  And again that's separate and apart from the
    13     actual detective division of the L.A. County
    14     Sheriff's Department, correct?
    15          MS. HAGY:  Objection, vague.
    16  A.  Yes.  The sheriff's department had a detective
    17     division as one of its divisions.
    18  BY MR. IASPARRO:
    19  Q.  Were you ever assigned to the actual detective
    20     division during the course of your career?
    21          MS. HAGY:  Objection, vague,
    22     argumentative.
    23          MR. IASPARRO:  How was that vague,
    24     Lindsay?

         1                    MS. HAGY:  Just saying detective
         2       bureau.  I just think it can be misleading.
         3                    MR. IASPARRO:  I didn't say detective
         4       bureau.  I asked him about the detective division.
         5                    I think he understands the question.
         6    A.  No.
         7    BY MR. IASPARRO:
         8    Q.  So just to be clear, you never were assigned to
         9       the detective division of the L.A. County
        10       Sheriff's Department during the course of your law
        11       enforcement career?
        12    A.  Yes, that's correct.
        13    Q.  Moving forward it looks like from May 1 of 1984
        14       until November of 1987 you were with the reserve
        15       forces bureau; is that accurate?
        16    A.  Yes.
        17    Q.  What is that?
        18    A.  So in Los Angeles and the sheriff's department was
        19       the largest sheriff's department in the state,
        20       7,000 sworn and had a large contingent of
        21       reserves.  Every -- almost every department in the
        22       state had reserves.  And the legislature had
        23       changed requirements for reserves.  It was an
        24       intensive project to realign qualifications and

```
 1      make sure the training and certifications
 2      occurred.  And that was the method that the
 3      state -- I worked very closely with the state, and
 4      then they embraced those changes and made them
 5      statewide.  So -- and at that point also I became
 6      a graduate of the POST Command College.
 7  Q.  And it looks like you finished up your career the
 8      last five and a half years or so at field
 9      operations, Region I, NORSAT, N-O-R-S-A-T; is that
10      correct?
11  A.  Yes.
12              MS. HAGY:  Objection, vague.
13  BY MR. IASPARRO:
14  Q.  With what's referred to as the fugitive
15      apprehension unit?
16  A.  More than that.  NORSAT stood for Northern
17      Regional Surveillance and Apprehension Team.  That
18      was the nomenclature, and there were two units in
19      the entire county, one under the auspices of the
20      sheriff's department and was multi-jurisdictional,
21      including federal.  And we were cross sworn as
22      federal officers.  And the other was with the
23      LAPD.  Their team was called SIS, or Special
24      Investigation Section.  They were exclusively LAPD
```

1    officers.

2   Q.   What was the primary role of NORSAT?

3   A.   NORSAT's role was to investigate, surveil and

4        apprehend and a very successful operation.  So

5        often, very often we would be given the case in

6        total.  And as I wrote, 80 percent of the cases

7        were homicide cases, but the rest were

8        kidnappings, extortions, some special

9        surveillances, which I won't talk about more, and

10       large narcotic operations, such as 25 kilos or

11       more, nothing less, et cetera.

12  Q.   Between when you started with the L.A. County

13       Sheriff's Department in 1965 and when you retired

14       in 1993, did the L.A. sheriff's department have

15       designated homicide detectives?

16  A.   Yes.  They had --

17                 MS. HAGY:  (Interrupting)  Objection,

18       form.

19                 THE WITNESS:  They had a homicide

20       bureau in the detective division.

21  BY MR. IASPARRO:

22  Q.   Were you ever assigned to that homicide bureau?

23  A.   As I testified earlier, no.

24  Q.   After you retired your resume indicates that you

```
 1       worked for the State of Ohio (sic) Juvenile

 2       Department of Corrections; is that correct?

 3   A.  Yes.

 4   Q.  What did you do for them?

 5   A.  Well, when I retired I went to Rexburg, Idaho,

 6       with the intention of just doing community service

 7       as well as teach in the high school -- in the

 8       school district, mostly in the high school.  And

 9       because of the work I did with some programs of

10       at-risk youth and establishing an alternative

11       high school, the governor selected me along with

12       11 others to establish the department of juvenile

13       corrections, which was spun off from the Idaho

14       Department of Health and Welfare.  And I did that

15       for 18 months.  And that included running the

16       single juvenile facility, which is in

17       Saint Anthony Idaho, during that time.

18   Q.  Over the course of your law enforcement career,

19       did you ever attend a homicide investigation

20       school or training class?

21   A.  No.

22                MS. HAGY:  Objection, vague.

23                THE WITNESS:  No.

24   BY MR. IASPARRO:
```

```
 1   Q.  You are aware that such courses exist and are

 2       offered around the country, correct?

 3                   MS. HAGY:  Objection, form.

 4   A.  Yes, I'm aware of it.

 5   BY MR. IASPARRO:

 6   Q.  All right.  For example, the University of

 7       Louisville Southern Police Institute, have you

 8       heard of that?

 9                   MS. HAGY:  Objection, form, relevance,

10       scope.

11   A.  I'm not familiar with their program.  I don't -- I

12       would expect there's a number of facilities that

13       offer the training.

14   BY MR. IASPARRO:

15   Q.  All right.  Have you ever held any certification

16       from any source as a lead homicide investigator?

17                   MS. HAGY:  Objection, form.

18   A.  I didn't quite -- a certification from any source,

19       and then I didn't hear the rest of the question.

20   BY MR. IASPARRO:

21   Q.  As a lead homicide investigator.

22   A.  Well, I was certified by the department as a lead

23       investigator and accepted, and I trained both

24       at -- at POST at that time didn't have a
```

1      designated subject expert.  Everything I taught

2      through POST was considered and accepted as -- as

3      qualified and certified the students.  But I was

4      not -- I didn't have a particular certification

5      other than what I've cited in my resume.  I

6      retired out with a POST advanced certificate.

7  Q.  Are you familiar with the Illinois Law Enforcement

8      Training and Standards Board?

9  A.  I'm aware of their -- that Illinois has what I

10     will term POST.  I commented and testified on POST

11     throughout the country and including in Illinois.

12  Q.  Okay.  But my question is specific to Illinois Law

13     Enforcement Training and Standards Board.  Are you

14     familiar with their training and/or standards?

15          MS. HAGY:  Objection, form, asked and

16     answered.

17          Go ahead.

18  A.  Yeah.  I think I did answer it.  It was not given

19     to me as part of the evaluation of this case.  And

20     it -- the curriculum was not provided.  However, I

21     did comment on the officers themselves and their

22     statement that they were not trained in certain

23     key areas.

24  BY MR. IASPARRO:

1   Q.   At the end of your report, the last 21 pages in

2        fact, you list out your various testimony over the

3        course of the last four years, correct?

4   A.   Yes.

5   Q.   Are all of those cases that are listed cases in

6        which you rendered opinions in the area of police

7        practices?

8             MS. HAGY:  Objection, form.

9   A.   As I understand the question, yes.  They're

10       related to the police profession and police

11       procedures.

12  BY MR. IASPARRO:

13  Q.   Do you know if any of the cases that are listed on

14       those 21 pages involved you rendering opinions on

15       the defense side of civil cases?

16            MS. HAGY:  Objection, form.

17  A.   There are -- what you have as listed testimony, I

18       think there are three still on that list that go

19       back to the four years.

20  BY MR. IASPARRO:

21  Q.   That were on the defense side?

22  A.   Yes, testimony.

23  Q.   Okay.  And as you sit there, do you know which

24       ones those are?

 1  A.  I'm just -- I could research it, but there should

 2      be one Virginia Beach for a Virginia trial for

 3      the -- a shooting death by the SWAT team.  I was

 4      their expert.  And it involved an operation like

 5      NORSAT.  There should be one called Rosenblatt

 6      versus Hillsborough.  That was a deposition.

 7      There's one -- and I can't remember the name, but

 8      it was -- the name of the case, but it would be

 9      with Kansas City Missouri Police Department.  And

10      there should be one with Redondo Beach.  That had

11      to do with pursuit procedures.

12  Q.  Mr. Clark, what do you consider to be your area of

13      expertise?

14          MS. HAGY:  Objection, form.

15  A.  Well, I listed it out in my general statement of

16      qualifications, but it's -- briefly it's police

17      procedures that include police administration,

18      detective administration, detective procedures,

19      jail administration, jail procedures, patrol

20      administration, patrol procedures, training and a

21      professional standard as training.  I think that

22      is the broad-brush description.

23  BY MR. IASPARRO:

24  Q.  Are there any national police practices, standards

1    which govern local law enforcement agencies?

2                    MS. HAGY:  Objection, form.

3                    MR. IASPARRO:  I'll just give you a

4    standing objection on form for every question I

5    ask if you want it, Lindsay.

6                    MS. HAGY:  No, thank you.

7                    MR. MOGBANA:  Well, I'm just going to

8    mention here, Lindsay, you essentially are just

9    taking our time.  There are a line of attorneys

10   who would question after Michael does.  So all you

11   are doing -- you make a legal objection.  The

12   witness has no problem.  He understands the

13   question.

14                    But I'm just going to make it on the

15   record that that's improper, but let's see how it

16   goes going forward.

17                    THE WITNESS:  Are you ready or should I

18   wait?

19                    MR. IASPARRO:  I'm ready if you

20   remember the question.

21   A.   I remember the question.  You asked -- and I took

22   in the question any organizations that govern

23   police departments.  And there are a number of

24   federal requirements that would govern and that

```
 1      departments are required to adhere to, but there
 2      is no agency that would govern a police department
 3      unless we talk about a -- something like a consent
 4      decree, which I've been involved with in certain
 5      ways.  So that would be the only time a
 6      national -- in my answer to your question -- a
 7      national organization would have -- would govern a
 8      police department.
 9  BY MR. IASPARRO:
10  Q.  I'm going to turn to Page 6 of your report.  I'll
11      scroll down to it here.
12              THE WITNESS:  I need to make a
13      correction on Page 2.  I'll wait for -- unless --
14      I just need to make you aware of it.
15  BY MR. IASPARRO:
16  Q.  All right.  Let's do that now.
17  A.  Sure.  I've been waiting for the opportunity.  So
18      on Page 2, Item 4 is a list of names and who they
19      are fundamentally and identified briefly and what
20      they -- whether they gave trial or a deposition
21      testimony or both.  First and foremost,
22      Detective Forrester should have been included even
23      though he's deceased because he gave trial
24      testimony and I had reviewed it.  So he's missing
```

1  off that list.  I can explain how this is a -- was

2  a non-precise list that went into the final

3  report.  On (h), 4(h), I mislabeled Mr. Peter

4  Striupaitis.  Let me spell it for you,

5  S-t-r-i-u-i-p-a-i-t-i-s (sic).  He is a lab

6  technician, not a detective.  Also, Jack Welty,

7  which is (i), he was a lab technician and not a

8  detective.  I omitted the testimony of

9  Lester Brown and the deposition testimony of

10  Patrick Pursley himself.  That -- oh, and then

11  on (o), Item (o), the 30(b)(6) witness, I forgot

12  to list that it was deposition and not trial.  So

13  that completes that list of corrections.

14         MS. HAGY:  I also want to add that

15  Mr. Clark has testified since the issuance of this

16  report, so we can update his trial testimony and

17  deposition list, too.

18         MR. MOGBANA:  I understand from the

19  rules you are required to, so it's not whether you

20  can.  You are required to update that, so . . .

21         MS. HAGY:  Sure.  We will.

22  BY MR. IASPARRO:

23  Q.  All right.  Now going to --

24         THE WITNESS:  (Interrupting)  Thank you

1      for that opportunity.

2                    MR. IASPARRO:  Sure.

3    BY MR. IASPARRO:

4    Q.   I direct your attention now to Page 6 of your

5         report, in particular the top paragraph.  And I'm

6         going to focus on the last sentence there where it

7         says, "These methods and principles are also

8         embraced by every state training commission of

9         which I am aware, as well as the national

10        standards established by the U.S. Department of

11        Justice."  Did I read that accurately, sir?

12   A.   Yes.

13   Q.   What part of those national standards established

14        by the U.S. Department of Justice which you refer

15        to in that sentence?

16   A.   Well, they're the constitutional requirements

17        first, which are the bailiwick of the U.S.

18        Department of Justice.  And you may recall, I

19        commented consent decrees.  They're often

20        expressed there on the requirement to follow the

21        rules as outlined in the constitution and to --

22        and that includes force and to guarantee equal

23        access to constitutional requirements under the

24        law.  So -- and there are national standards that

```
 1       are embedded in every POST or the equivalent of
 2       every POST -- some states call it a little
 3       different -- and in their basic training, which is
 4       required in order for a person to exercise police
 5       powers in their particular state.  I could -- you
 6       want me to parse out what those requirements are?
 7   Q.  Let me ask you a couple of follow-up questions.
 8       First, can we agree that there was not and is not
 9       a consent decree that is relevant to this
10       particular case?
11   A.  I agree.  I'm just simply using that as an example
12       of how the -- the question you posed about when
13       can there be imposition by -- by federal source or
14       outside the state.  But I think the brief answer
15       would be that every person under the constitution
16       is entitled to equal -- to process under the law.
17       And when that process is denied, then it's a
18       violation of their constitutional rights.
19   Q.  All right.  I guess what I'm trying to understand
20       is that when you refer to the national standards
21       established by the U.S. Department of Justice, if
22       I'm understanding your testimony correctly, you're
23       referring to the constitutional standards, Fourth
24       Amendment, for example, Fifth Amendment; is that
```

1    what we're talking about?

2              MS. HAGY:  Objection, mischaracterizes

3        prior testimony.

4  A.  Well, it includes that certainly.  I think that's

5        the -- that's the most important aspect, but it

6        includes also that there are standards of

7        investigation and they're typically in case law.

8        And I'm not the lawyer here, but that's expressed

9        in appellate cases and supreme court cases.  And

10       they are the national standards.

11 BY MR. IASPARRO:

12 Q.  I guess what I'm trying to understand is what are

13       the national standards which you're referring to

14       which were established by the U.S. Department of

15       Justice.  Is there some manual or document that

16       I'm unaware of that sets forth what these national

17       standards are by the department of justice?

18              MS. HAGY:  Objection, asked and

19       answered.

20 A.  They are.  And they're -- and my commentary is

21       basic POST.  But a person, an individual is

22       required to be taught and be tested on before they

23       can assume police powers.  But as you are aware,

24       I'm sure, there are even higher levels of

1　　　education that include that.  And as you know in

2　　　my report I talk about one is called Brady.

3　　　That's an example.  So there are cases there are

4　　　national standards, and Brady is one of them.

5　BY MR. IASPARRO:

6　Q.　And every time you refer to POST in your testimony

7　　　today, that is a California training board,

8　　　correct?

9　A.　Well, the California training is called in

10　　　California P-O-S-T, Peace Officer Standards and

11　　　Training.  Our next-door neighbor in Arizona is

12　　　called A-Z POST.  In Texas it's called TCOLE.  But

13　　　they all -- it's equivalent.  There's an

14　　　equivalent.  So I -- you're right.  I'm just using

15　　　it as a generic POST.

16　Q.　Are you aware of any national standards for

17　　　homicide investigations which guide or govern the

18　　　manner in which homicide investigations are

19　　　conducted?

20　　　　　　　　MS. HAGY:  Objection, form, asked and

21　　　answered.

22　A.　There are organizations that teach --

23　　　　　　　　THE WITNESS:  Can I go off the record?

24　　　　　　　　I have an emergency phone call.  Can we

 1      go off the record just for two minutes?

 2                  MR. IASPARRO:  Sure.

 3                  MR. MOGBANA:  Five-minute break real

 4      quick.

 5                  (A brief recess was taken.)

 6  BY MR. IASPARRO:

 7  Q.  All right.  I think where we left off I had

 8      asked you whether you are aware of any national

 9      standards for homicide investigations which guide

10      or govern the manner in which homicide

11      investigations are conducted.

12  A.  Yes.  So --

13                  MS. HAGY:  (Interrupting)  Objection,

14      form, asked and answered.

15                  THE WITNESS:  Okay.  So there -- first

16      of all, the department of justice sponsors studies

17      and makes -- publishes documents and papers and

18      often produces manuals through sponsorship with

19      COPS, C-O-P-S, Community Oriented Policing, and

20      joins in with other organizations like PERF,

21      CALEA, the IACP, all of which contribute

22      documentations or sample training curriculum and

23      so forth.  And I have access to those manuals.  I

24      belong to a number of them.  But they do not

1    forcefully impose their recommendations under the

2    color of law.  It's the department of justice that

3    would have that authority.  That's my answer.

4  BY MR. IASPARRO:

5  Q.  When you say the department of justice would have

6    the authority to impose particular standards under

7    the rule of law, what authority is that?

8  A.  Because they would -- they would impose it through

9    a variety of methods, either civilly or they would

10    impose it through criminal investigations and

11    arrests and prosecution.

12  Q.  All right.  I'm going to scroll up to the bottom

13    of Page 5 of your report now.  You indicate in the

14    last paragraph of Page 5 that you "became very

15    well versed in how to conduct and supervise

16    homicide investigations from start to finish."  Do

17    you see that?

18  A.  Yes.

19  Q.  And the fact is you never actually conducted a

20    homicide investigation from start to finish; isn't

21    that right?

22        MS. HAGY:  Objection, form,

23    mischaracterizes prior testimony.

24  A.  To the contrary.  I commanded some extremely

```
 1      high-level homicide investigations.  And the
 2      question you posed, was I ever the case ace,
 3      a-c-e, or lead investigator assigned and not when
 4      I was a line officer or line detective to a
 5      homicide, but after I assumed command in the
 6      command status, I directed and saw that the
 7      investigations were complete and proper.  I knew
 8      from start to finish how they should be conducted.
 9  BY MR. IASPARRO:
10  Q.  During the course of your career, did you ever
11      interview a homicide suspect?
12  A.  Yes, I've done that.
13  Q.  Ever take a written statement from a homicide
14      suspect?
15  A.  I -- in conjunction with the recorded statement.
16      I had never taken a written interview or conducted
17      one.  It was always recorded and then transcribed.
18  Q.  Were you ever a crime scene investigator during
19      the course of your career?
20  A.  No.
21                  MS. HAGY:  Objection, vague.
22                  THE WITNESS:  I supervised and
23      facilitated -- I think that's a very important
24      word -- the crime scene personnel.
```

```
 1   BY MR. IASPARRO:

 2   Q.   Did you ever work in a crime laboratory?

 3   A.   No.

 4   Q.   Do you have any specialized forensics firearms

 5        training?

 6                  MS. HAGY:  Objection, vague.

 7   A.   Only as provided to me through my crime lab

 8        experience as a detective in association with the

 9        crime lab personnel.

10   BY MR. IASPARRO:

11   Q.   Okay.  Would you consider yourself an expert in

12        the area of forensics firearms examination?

13   A.   Not to the level -- not to the level of Murdock or

14        Coleman.  As a generalist detective, I understand

15        the necessity to preserve and how the evidence

16        should be recovered and how the likely

17        possibilities of investigative leads from firearms

18        evidence.

19   Q.   Are you familiar with Miranda warnings as they're

20        commonly referred to?

21   A.   I am.

22   Q.   And what is your understanding of the

23        circumstances in which Miranda warnings need to be

24        given during the course of a police interview or
```

```
 1      interrogation of an individual?

 2                  MS. HAGY:  Objection, form.

 3   A.  That it's required as a constitutional requirement

 4       when the person is considered to be a suspect in a

 5       crime.

 6   BY MR. IASPARRO:

 7   Q.  Had you ever had occasion to present the results

 8       of a homicide investigation to a prosecutor to

 9       seek authorization of criminal charges against a

10       suspect?

11   A.  I've supervised that process and have been present

12       with the lead detective while that evidence was

13       presented, so the answer is -- both on a federal

14       level and on a state level.

15   Q.  Have you ever had occasion to present the results

16       of a homicide investigation to a judge to seek

17       authorization for an arrest warrant for a suspect?

18   A.  Not written the affidavit.  I approved the

19       affidavit before submission, but I have not -- as

20       I understand the question, I have not done that.

21   Q.  Mr. Clark, up through today's date do you know the

22       amount of time that you spent on this case?

23   A.  I do not know exactly.  I just -- it's a lot of

24       hours.
```

```
 1   Q.   Okay.  And today you're billing out at $350 per
 2        hour; is that correct?
 3   A.   For the testimony, 350 an hour, for the testimony
 4        in this deposition.
 5   Q.   Do you know how many hours you spent authoring
 6        your report?
 7   A.   Yes.  I think it would be safe to say 25 to
 8        30 hours of -- devoted to the report.
 9   Q.   And did you physically type the report?
10   A.   Yes, I did.  That's why -- I'm sorry.  Yes, I did.
11   Q.   Well, I mean it sounds like a silly question, but
12        I mean some people don't physically type it
13        themselves.  That's what I'm asking you.
14   A.   No.  I'm sorry.  And I did not mean to -- it was
15        not -- I did not intend to be silly.  I laughed
16        because I just had to correct something that I
17        should have caught, but that's typical.  The
18        answer is yes, I write the report, and I do it on
19        a computer.
20   Q.   And were any portions of the report written by
21        anybody other than you?
22   A.   No.
23                  MS. HAGY:  Objection.  I'm objecting to
24        questions about drafting under Rule 26.  That's
```

 1      privileged.

 2                    MR. IASPARRO:  You can answer.

 3                    THE WITNESS:  The answer is no.

 4      BY MR. IASPARRO:

 5      Q.   Have either you as a witness or any of your

 6           opinions ever been excluded by any court,

 7           Mr. Clark?

 8      A.   There have been motions in limine as required.

 9           That's all I can recall.  But, yeah, there's

10           motions in limine.

11      Q.   And have you ever had any sanctions imposed

12           against you by any court?

13      A.   There's been one sanction.

14      Q.   What was the nature of that?

15      A.   It was a case involving a shooting death and --

16           and the same law firm and the same police

17           department.  And after writing that report, I was

18           called in to do a deposition on another shooting,

19           same law firm, same department.  And they asked me

20           some questions about the previous report, and I

21           answered those questions.  And then they went to a

22           federal judge, Judge Larson in fact was his name,

23           and alleged that I had violated the

24           confidentiality rules and insisted on a sanction.

1    And in camera he -- he granted the sanction and

2    gave me instructions not to discuss it further and

3    if anybody had any other questions, to -- he would

4    provide those himself.  And that was the result of

5    the sanction.

6  Q.  I want to focus in now on Pages 7 through 9 of

7    your report, the section with the heading, "Brief

8    Overview of Standard Police Practices in 1993 and

9    the Deviations I Observed in this Investigation."

10   Do you see that?

11 A.  Yes.

12 Q.  I want to ask you, are you rendering an opinion in

13   this case, Mr. Clark, that any Rockford Police

14   Department officer or detective engaged in any

15   deliberately-illegal or immoral act that

16   contaminated the core of the Pursley

17   investigation, as you wrote at the bottom of

18   Page 7 of your report?

19        MS. HAGY:  Objection, form.

20 A.  As I answered previously, it's not -- that --

21   Paragraph 2 on Page 1 is -- addresses that kind of

22   accusation, but I need to say my review of this

23   case and how things evolved resulting in his

24   conviction are very troubling based on my

```
 1      understanding of what occurred and what -- and I
 2      can give you some examples.  But I am not -- and I
 3      don't think you can find it in the report, that
 4      I'm not accusing the officers of a -- of -- as
 5      you've asked the question.
 6  BY MR. IASPARRO:
 7  Q.  Did you begin this case with -- from the premise
 8      that Mr. Pursley is innocent of having committed
 9      the Andrew Ascher homicide?
10  A.  Thank you.  Because there -- in your -- when I sat
11      down, of course I have the -- the benefit of the
12      end result and this Judge McGraw's -- McGraw
13      commentary, so I can see it beginning to end.  And
14      that's -- but so I did my very best to go back to
15      the murder itself and then what happened as the
16      investigative process occurred that set into
17      motion the convict -- the wrongful conviction and
18      incarceration for the murder.  So -- I think I
19      lost track of the question.  So that was the
20      process.  I don't know if I answered it
21      completely.  I'll wait for --
22  Q.  (Interrupting)  Let me ask the question maybe a
23      little differently.  As you sit there right now,
24      do you know whether Patrick Pursley killed
```

1   Andrew Ascher?

2 A. Well, I know that he was found -- I'll use the

3   term factually innocent.  He was given -- and was

4   given a declaration of innocence for the murder.

5   And based on the evidence of -- what I have to say

6   is based on the evidence, there is no connection

7   between Pursley and the murder.

8 Q. But you don't know for sure, do you?

9 A. Well, I was not there.  This is long ago.  If he

10   did, he did it with a different gun.  That's for

11   sure, if he did.  And the whole -- the case

12   collapses because the heartbeat of the whole thing

13   is this -- this gun was the murder weapon.

14 Q. I want to talk about that for a second, because in

15   making that statement you have to accept that

16   Mr. Murdock and Mr. Coleman are correct in their

17   opinions and the state police forensic crime lab

18   experts are wrong, right?

19     MS. HAGY:  Objection, form.

20 A. Yeah.  Per the record, you'd accept that on that

21   basis.  Per the record, which went to trial,

22   that's correct, that -- that the crime lab was

23   incorrect.  The process -- and as my commentary

24   is, it has a lot to do with the process was

1      incorrect.

2   BY MR. IASPARRO:

3   Q.   But I mean at bottom you would have to accept,

4        find credible Murdock and Coleman and find not

5        credible the state police crime lab forensics

6        examiners, right?

7             MS. HAGY:  Objection, form, vague,

8        overly broad.

9   A.   In that regard my testimony is that the judge is

10       correct and gave very articulate reasons why and

11       in considerable detail, and I found that those

12       details accurately depicted in the record.

13  BY MR. IASPARRO:

14  Q.   I'm going to turn to the top of Page 8 of your

15       report.  Actually the bottom of Page 7, top of

16       Page 8, so starting with the last paragraph on

17       Page 7.  "These deliberate acts can include

18       statements from witnesses that are extracted

19       through mental coercion and/or physical force,

20       the manipulation of the evidence to favor a

21       predetermined point of view, and hiding

22       exculpatory facts discovered during the

23       investigation that would be important to the

24       defendant.  According to the record, a number of

1    these acts occurred in this case and are listed

2    below."  Did I read that accurately?

3  A.  Yes, you did.

4  Q.  What are you referring to there, "a number of

5    these acts occurred in this case and are listed

6    below"?

7            MS. HAGY:  Objection, form.

8  A.  I'm sorry.  I didn't catch the first part of your

9    question.

10  BY MR. IASPARRO:

11  Q.  I want to know what you're referring to, what are

12    the acts which occurred in this case which fall

13    into those categories of deliberate acts as you've

14    listed them out.

15  A.  Oh.  Thanks.  Because this is the introductory

16    statement that now the report is -- was designed

17    and written with the intent of directing the

18    reader to certain aspects of the evaluation.  And

19    so from that paragraph to Page 36 is my commentary

20    exactly on those points; physical evidence,

21    statements from witnesses, those types of things.

22    And so those aspects, which are exculpatory facts,

23    predetermined point of view, failure to follow

24    leads, they're all -- flow from this page down

```
 1        to 36.  So you want me to --
 2   Q.   (Interrupting)  We'll go through them.  That's
 3        fine.
 4   A.   I'll leave the answer there.  I thought I covered
 5        it.
 6   Q.   Well, that's why we're here today, because we get
 7        to ask questions about what you wrote, right?
 8   A.   Sure.  Yeah.  And I'm happy to talk about any
 9        aspect.  There's a number, so -- but, you know,
10        they go to the physical evidence, how it's
11        harvested and handled, failure to follow leads
12        that indicates you got blinders on, you figure you
13        got your guy and you're not going to follow
14        anything else, and embracing statements that are
15        fragile -- I'll use the term fragile -- and have
16        real problems, and they combine.  It's a perfect
17        storm.  And then he gets convicted.
18   Q.   Middle of Page 8, which is up on your screen right
19        now, paragraph that says, "The Rockford Police
20        Department deviated from standard police practices
21        consistently throughout this investigation in many
22        areas from their handling of the physical evidence
23        to their interrogation of witnesses.  The decision
24        to regularly stray from the standard ways of
```

        1    policing and to cut corners supports a conclusion
        2    that these detectives set their sights on
        3    Mr. Pursley and shaped the evidence and their
        4    reports to fit their suspect."  Did I read that
        5    right?
        6  A.  Yes, you did.
        7  Q.  When you say, "The decision," what decision are
        8    you referring to?
        9  A.  Everything I discuss in the report is a result of
       10    a decision.  For example, having the slugs and
       11    shell casings and keeping them for two months
       12    before you send them to the lab, that is a
       13    decision, and that is contrary to standard
       14    expected and required procedure.  Another would be
       15    failure to explore an ex-husband that has a --
       16    apparently off the rails with the surviving
       17    victim.  Another is the Turner brothers where
       18    these leads were immediate, right after the
       19    murder, and they were not touched.  And then we
       20    have the -- Rebecca's interrogation, those things,
       21    and then how the slugs were finally evaluated.  So
       22    those are all done pursuant -- there were others.
       23    They were all done by the decision of the case
       24    ace, mostly Forrester.

```
 1   Q.   I guess that was my question.  When you say in
 2        that sentence, "The decision," it seems to me that
 3        that's a singular point in time, which I'm trying
 4        to understand what you mean.
 5   A.   Right.  And so -- thank you.  Because you can --
 6        and as a metaphor, you can see this as a pathway
 7        to -- it starts with a murder and ends with
 8        conviction, and it's gone -- and it's -- there
 9        have been mistakes.  And where's the key?  The key
10        one begins with holding on to the most important
11        physical evidence at the -- at the time of the --
12        with the response to the murder, and those are the
13        shell casings and the bullets.  There's just no
14        explanation for that.
15   Q.   Let me ask you some questions about that.  Let's
16        follow up on that a bit.  Would you agree that
17        there was nothing to compare the cartridge cases
18        and fired bullets to on April 2, 1993?
19                   MS. HAGY:  Objection, form.
20   A.   No.  I would -- that is not a valid assumption,
21        and it certainly isn't a valid reason to hold on
22        to the evidence because "I don't have the gun."
23        But it does flavor what I'm talking about.  "Well,
24        I've got a gun.  Now I'm going to supply the lab
```

       1      with the bullets."  So the bullets themselves and
       2      the casings immediately give some very important
       3      information to the investigating officer or the
       4      investigative team.  And as you know Welty said,
       5      "Well, based on the casings," only the casings
       6      apparently, "looks to me like it's one of three
       7      brands, and a Taurus is one of them."  Well, if
       8      they had that, just that information, they'd put
       9      it out on the street we're looking for a Taurus.
      10      And that's a lead.  But they hold on to that for
      11      two months until they get the Taurus.  So you can
      12      see, you know, there's some real conflicts here on
      13      the procedure.  And of course those -- the
      14      physical evidence, the bullets themselves,
      15      et cetera, will land key investigative evidence
      16      that the officers will run with, not just hold on
      17      for two months before they even send them to the
      18      lab.
      19  BY MR. IASPARRO:
      20  Q.  Let me ask you a question in terms of timing.  Is
      21      it your understanding that the Taurus firearm was
      22      recovered from Mr. Pursley's apartment before any
      23      of the crime scene evidence was submitted to
      24      Mr. Welty?

```
 1   A.   I think there's like maybe a day.  I have the

 2        timing down.  Forrester held on to -- now I say

 3        held on to it.  Rockford held on to it.  You

 4        didn't send it to the lab for two months.

 5   Q.   Here's my question, Mr. Clark:  Is it your

 6        understanding that the Taurus 9mm firearm was

 7        recovered from Mr. Pursley's apartment before the

 8        crime scene evidence was submitted to Mr. Welty

 9        for his preliminary examination?

10   A.   No.  My review of the record was it was like one

11        day before when Windham gave the information that

12        there were -- that there were two guns Samantha

13        had and told him about Patrick and the crimes

14        alleged, that then the shell casings went to

15        Windham, and Windham said -- gave three brands,

16        one of which was a Taurus.  And that next day they

17        went and got the Taurus -- got a Taurus out of the

18        apartment.

19   Q.   We're going to talk about all that in more detail.

20        I want to go now to a portion of your report which

21        you entitle, "Overview of the Incident, Brief

22        Overview of Events and Commentary," starting on

23        Page 9.  Do you see that in front of you?

24   A.   Yes.
```

```
 1    Q.   And in particular that, "The Ascher Murder and
 2         Rebecca George's Observations."
 3    A.   Right.
 4    Q.   Okay.  So I'm going to pull up now what I'll mark
 5         as Exhibit 2.  This is a document that -- it's
 6         Bates No. COR and Getty, C-O-R and Getty, 36
 7         through 40, Officer McAnally's report relating to
 8         the Ascher homicide.  Did you review this
 9         document, sir?
10    A.   Yes.  And as you know I reference it on this page.
11    Q.   I'm scrolling down in Officer McAnally's report to
12         the narrative section which begins on Page 4.  And
13         at the bottom of Page 4, you see the portion where
14         Officer McAnally summarized in his initial
15         interview with Becky George, "Becky George told
16         reporting officer," that paragraph there?
17    A.   Yes.
18    Q.   And according to Officer McAnally's report,
19         Miss George said, "An unknown-race male with a ski
20         mask over his face approached the truck.  Suspect
21         had a gun in his hand.  Suspect pointed the gun at
22         Ascher," and then looks like she wrote in, "Gun
23         held in both hands, and told him that he was
24         robbing them and that he wanted their money.
```

 1     According to Becky, Ascher said, 'Oh, God' and

 2     took out his wallet."  And then scrolling down,

 3     "Becky stated she took out her money, told the

 4     suspect that this was all she had.  She stated

 5     Ascher was still taking his money out of his

 6     wallet and the suspect just shot him.  According

 7     to Becky, the suspect then turned and fled.  She

 8     pointed in a southeasterly direction.  She felt he

 9     was only on foot but was unsure."  Did I read that

10     correctly?

11  A.  You did.

12  Q.  All right.  And going back to your report, you

13     indicated that, "Rebecca stated after the shot she

14     saw the assailant run away from the car in an

15     easterly direction."  The report itself actually

16     said southeasterly, correct?

17  A.  You're right.

18  Q.  All right.  And then going back to Miss George's

19     report -- well, your report indicates, "The

20     initial police interview of Rebecca states that

21     the assailant was an unknown-race male with a ski

22     mask over his face."  And --

23  A.  (Interrupting)  That's Page 39, COR and Getty.

24  Q.  Miss George did indicate that he sounded black

1    when he spoke, correct?

2  A.  I have that in that paragraph, yes.

3  Q.  Right.  And you understand that Miss George was

4      only briefly interviewed at the scene by

5      Officer McAnally, who was the first officer on

6      scene, correct?

7  A.  Yes.

8              MS. HAGY:  Objection, form.

9              THE WITNESS:  The answer is yes.

10 BY MR. IASPARRO:

11 Q.  Okay.  And did you review reports indicating that

12     Miss George was interviewed in more detail later,

13     both at the hospital and the police station?

14 A.  Yes.  And there's -- and that's where the

15     statement about her ex-husband comes in.

16 Q.  Okay.  And we'll get to that in a second.  I show

17     you now what's been marked as Exhibit 3, which for

18     the record is COR and Getty 46 to 51.  This is

19     Officer Drnek's report.  Did you review this as

20     well, sir?

21 A.  Yes, and that's what I referenced.

22 Q.  Okay.  And Officer Drnek was the officer who

23     interviewed Miss George at the hospital, correct?

24 A.  Yes.

  1   Q.   And it would be accurate to say that Miss George

  2        told Mr. Drnek that -- told Officer Drnek that she

  3        believed the suspect was a black male because of

  4        his voice?

  5   A.   Yes.

  6   Q.   That he had a thin build?

  7   A.   Yes.

  8   Q.   That the suspect wore a dark-colored ski mask

  9        which was possibly blue as well as dark gloves?

 10   A.   Yes.

 11   Q.   That the suspect said, "This is a holdup" and

 12        repeated that several times?

 13   A.   Yes.

 14   Q.   And I'm looking at the timing of this interview at

 15        the hospital.  Officer Drnek's report indicates

 16        that he arrived at the hospital at about

 17        2215 hours, so about 10:15 p.m., correct?

 18   A.   Correct.

 19   Q.   Which would be about 15 minutes after the murder

 20        itself, according to the other reports in the

 21        case; would you agree with that?

 22   A.   Yes.

 23   Q.   Would it be fair to say that the incident was

 24        probably still pretty fresh in Miss George's mind?

```
 1   A.   Well, it's close in time, and you want to get the
 2        statement close in time, sure.
 3   Q.   All right.  Showing you next what's been marked as
 4        Exhibit 4, COR and Getty 60 to 64.  This is a
 5        report by Detective Bruce Scott.  Did you review
 6        this document as well, sir?
 7   A.   Yes.
 8   Q.   And according to Detective Scott's report, he
 9        interviewed -- first gathered information from
10        Officer Drnek at the hospital and then interviewed
11        Becky George later that evening at the police
12        station, correct?
13   A.   Yes.
14             MS. HAGY:  Objection.
15             Counsel, can you please show where
16        you're reading from when -- or what you're looking
17        at when you're representing the document.
18             MR. IASPARRO:  I wasn't reading from
19        anything right there, but when I do, I will.
20             MS. HAGY:  Okay.  Thank you.
21   BY MR. IASPARRO:
22   Q.   According to Detective Scott's interview of
23        Becky George -- we're looking at Page 4 of his
24        report now -- Miss George indicated she "noticed
```

```
 1        there was a guy standing by the door pointing a
 2        gun at them saying, 'This is a stickup.  This is
 3        no joke.  Give me your wallets.  Hurry, hurry,'"
 4        correct?
 5   A.   Yes.
 6   Q.   And she further indicated that she assumed -- "She
 7        did not see where the suspect went to but assumed
 8        he ran to the east toward Silent Wood rather than
 9        across the field that is there," correct?
10   A.   Yes.
11   Q.   Based upon the three interviews of Miss George,
12        first by Officer McAnally, second by Officer Drnek
13        at the hospital, and then the third by
14        Detective Scott, all that evening of the murder,
15        wouldn't you say it was reasonable based upon
16        those descriptions for the police to have
17        considered robbery a motivation for the crime?
18                 MS. HAGY:  Objection, form.
19   A.   Well, they would consider robbery as one of the
20        motives.  That's not what I wrote in the report --
21        I mean that's -- what I wrote in my report is
22        they considered exclusive, because there are
23        indications that there wasn't a robbery.
24   BY MR. IASPARRO:
```

```
 1   Q.   Well, the information they had was that it was an

 2        attempted robbery that went wrong, went bad,

 3        right?

 4             MS. HAGY:  Objection, form,

 5        mischaracterizes evidence.

 6   A.   It could be a lot of things.  And you're right, it

 7        could be an attempted robbery gone wrong.  It

 8        could be a staged robbery with the intent of

 9        revenge.  It could be a number of things.  They

10        have to keep an open mind.  So for them -- this

11        does not support that these statements by George,

12        which, you know, she's a survivor, et cetera, and

13        you have to ask -- when I read that statement

14        about her ex-husband, I thought, well, okay.

15        We're going to run with that lead and close that

16        door, right?  They didn't even get his name.  So

17        the answer is of course they would consider all

18        the possibilities.  That's what I wrote about

19        before I started commenting on the case in

20        particular, consider all the possibilities.  This

21        is an indication of closed blinders; it's going to

22        be robbery gone bad, this is the way we're going

23        to pursue this case.

24   BY MR. IASPARRO:
```

```
 1   Q.   Wouldn't it be fair to presume that Miss George
 2        would have recognized the physique and mannerisms
 3        of her ex-husband if he in fact was her -- if the
 4        suspect was in fact her ex-husband, don't you
 5        think she would have recognized that and told the
 6        police, "Hey, I think my ex-husband did it"?
 7                  MS. HAGY:  Objection, form, incomplete
 8        hypothetical.
 9   A.   That's a classic excuse for why he didn't follow
10        the lead.  "Well, she would have told me."  No.
11        She did say something.  She's the one.  That --
12        that report about her ex-husband is from her in a
13        very significant circumstance.  And she gave that
14        lead.  And for them to ignore it is -- it's
15        just -- you just don't do that.  But can they
16        think, well -- of course they would ask her,
17        "Well, you gave us a statement about your
18        ex-husband, but why wouldn't you recognize that
19        immediately that it wasn't him or was him?"  But
20        they never talked to her about it, and according
21        to the record.
22   BY MR. IASPARRO:
23   Q.   It's fair to say that as of April 2, 1993, the
24        detectives and officers working the investigation
```

```
 1      had no idea that Patrick Pursley was perhaps a

 2      suspect in the case, right?

 3                MS. HAGY:  Objection, form, calls for

 4      speculation.

 5   A. That's interesting.  At the time of the murder,

 6      all possibilities -- all suspects are in your

 7      brain.  And that includes who could have done this

 8      based on your personal experience as a detective

 9      and the neighborhood and the area you're working

10      and et cetera.  So you keep that all in mind, but

11      they did not know -- it was a whodunit at the time

12      of the murder.

13   BY MR. IASPARRO:

14   Q. And Patrick Pursley's name did not surface until

15      two months later, right, June 8 --

16                MS. HAGY:  (Interrupting)  Objection.

17   A. Are you -- I did not assume that his name

18      surfaced -- did not surface until two months

19      later.  I never assumed that based on what I know

20      about how detectives work.  I could be more

21      precise if you like.

22   BY MR. IASPARRO:

23   Q. Well, have you reviewed any evidence that

24      indicates that Patrick Pursley was developed as a
```

```
 1       suspect in this case prior to June 8, 1993?

 2                   MS. HAGY:  Objection, form.

 3   A.  I recognize that the record does not provide any

 4       other information of how this thug who is in

 5       trouble suddenly surfaces as a call in to

 6       Crime Stoppers.  And then everything moves within

 7       hours after that.  So that's it.  There is nothing

 8       in the record at all.

 9   BY MR. IASPARRO:

10   Q.  Do you have any information as you sit there right

11       now, Mr. Clark, that Patrick Pursley was developed

12       as a suspect but believed to be responsible for

13       the murder of Andrew Ascher before June 8, 1993?

14                   MS. HAGY:  Objection, form.

15   A.  There is nothing in the record before June 8.

16   BY MR. IASPARRO:

17   Q.  And any suggestion that anybody considered

18       Patrick Pursley a suspect before June 8, 1993,

19       would be total speculation on your part, correct?

20                   MS. HAGY:  Objection, form.

21   A.  It is not total speculation because I know the

22       possibilities of manipulating, how he gets

23       involved in the case occur in other investigations

24       I've dealt with and commented on in other cases.
```

1     So Windham's appearance on June 8 is very

2     interesting, the circumstances, what he says and

3     how they move on from there and have not -- have

4     not provided ballistics evidence until Windham

5     shows up.  That's all that I could comment on -- I

6     comment on it in the report, and that's the best I

7     could do because there is no documentation, and

8     they build a fire wall between him and bringing

9     him into the case.

10  BY MR. IASPARRO:

11  Q.  I don't understand what you mean by that, a fire

12      wall, what does that mean?

13  A.  That Windham is a known informant and is working

14      behind the scenes and developing information, and

15      then when they need him to surface in the

16      investigation for -- in order to get their

17      warrants, they identify him at that point as a

18      call-in citizen to Crime Stoppers.

19  Q.  What is your evidence of that, sir?

20  A.  None.

21                  MS. HAGY:  Objection.

22                  THE WITNESS:  There is no evidence.

23      That's exactly what I told you, that it -- what

24      you have to consider as a detective bureau

 1     commander and what I saw -- see other units have

 2     done, and that's why I put all that commentary

 3     before I start talking about the case, that

 4     Windham -- you cannot back away from -- none of

 5     the physical evidence, the key physical evidence,

 6     the slugs and the casings, were ever sent to the

 7     lab.  It is only when Windham shows up.  Now we

 8     go to the lab.  And we go to the gun store and

 9     et cetera.  Okay.  Windham -- but this all happens

10     because Windham happens to read about it in the

11     papers and calls in?  I took it for what it was.

12     That's what's in the record.

13  BY MR. IASPARRO:

14  Q.  Well, why would they wait two months to have, you

15      know, Mr. Windham, the known informant, if you

16      will, provide this information and why didn't they

17      solve the case in two days?  Doesn't make any

18      sense.

19             MS. HAGY:  Objection, form,

20      argumentative.

21  A.  Well, you're assuming that Windham knows about the

22      murder and is set on it or is telling them about

23      it and they're not working on it.  I don't know

24      when Windham originally shows up, if he does at

```
1      all.  I took it from my report that their reports
2      say he shows up on the 8th in their investigation.
3      And --
4  BY MR. IASPARRO:
5  Q.  (Interrupting)  Let me ask you this, Mr. Clark:
6      You are not aware of any evidence that that's
7      wrong, are you?
8              MS. HAGY:  Objection, form.
9  BY MR. IASPARRO:
10 Q.  In other words, you don't -- if you know of any
11     evidence, please enlighten me that Marvin Windham
12     provided any information before June 8, 1993.  Are
13     you aware of any?
14 A.  I think I answered it.
15 Q.  No, you didn't.
16 A.  About three times.  No, there is no such evidence.
17 Q.  Okay.
18 A.  And you asked me how would I know.  It's not --
19     and you said that's speculation.  No, it's not.
20     It's based on what I've seen other detectives do
21     and how they manage cases when they have a focus
22     and don't -- and it closes all possibilities
23     because they focus.
24 Q.  What is your evidence that any detective
```

 1      involved in this investigation was focused on

 2      Patrick Pursley prior to June 8, 1993?

 3              MS. HAGY:  Objection, form,

 4      mischaracterizes prior testimony.

 5  A.  There is none.

 6  BY MR. IASPARRO:

 7  Q.  With respect to Officer Drnek's report, which is

 8      Exhibit 3 -- I'm sorry.  Now I'm going to show you

 9      an exhibit I haven't shown you yet.  This has been

10      marked as Exhibit 5, which is Officer Drnek's

11      second report, COR and Getty 80 and 81.  And you

12      reviewed this, correct, Mr. Clark?

13  A.  Yes.  That's what I referenced.

14  Q.  All right.  And that's the report where Mr. Drnek

15      supplements his prior report and provides the

16      information relating to what Becky George said

17      about her ex-husband, correct?

18  A.  Yes.

19  Q.  All right.  Is there anything in this report that

20      you've reviewed that indicates that Becky George

21      reported to Officer Drnek any prior physical abuse

22      or altercations with her husband?

23              MS. HAGY:  Objection, form.

24  A.  There's nothing about physical abuse.  There's

 1    mental torture.

 2  BY MR. IASPARRO:

 3  Q.  Your report also indicates that the Rockford

 4      Police Department did not pursue alternate

 5      suspects, including an individual observed by the

 6      Dumpster the night of the murder, correct?

 7  A.  Correct.

 8  Q.  What makes you believe or conclude that the police

 9      failed to investigate that lead?

10          MS. HAGY:  Objection, form.

11  A.  Let me just -- I did address that in . . .  I'll

12      give you a . . .

13  BY MR. IASPARRO:

14  Q.  I'll get to that point.  It's Page 11 of your

15      report, which is in front of you on the

16      screen.  The second bullet point says, "The

17      yet-unidentified person observed hiding behind the

18      Dumpster, who possibly lived in the apartments

19      down the street."  And then you reference,

20      "Pages 33 and 34 below," which I'll scroll to now,

21      okay?

22  A.  Sure.

23  Q.  All right.  At Page 33 you have a section titled,

24      "Man Hiding by Dumpster Observed by David Bodell,"

 1    correct?

 2  A.  On Page 33, yeah.  That's what I was trying to --

 3      couldn't remember the page.  So that's the

 4      commentary about the Dumpster, person at the

 5      Dumpster that . . .

 6  Q.  And by your own description that person that

 7      Mr. Bodell saw was never identified, correct?

 8  A.  That person was never identified.

 9  Q.  Are you aware of any evidence anywhere in the

10      record that you've reviewed that the person who

11      Mr. Bodell saw behind the Dumpster was in fact the

12      person who killed Andrew Ascher?

13          MS. HAGY:  Objection, form.

14  A.  The -- it was not -- he was not witnessed to

15      commit the murder.  Is that what you're asking me?

16      He was present and ran away, and he left

17      impressions in the snow.  And there should have

18      been a general briefing, at least we're looking

19      for a possible suspect described as such and such

20      that was seen at the scene of the murder.

21  BY MR. IASPARRO:

22  Q.  Well, that was included in the reports, correct?

23          MS. HAGY:  Objection, form.

24  A.  It's in the reports, but there's nothing about

1    what they did to follow up or inquire or try to

2    locate that person.  That was my commentary.  That

3    was a lead.

4  BY MR. IASPARRO:

5  Q.  Okay.  What should they have done to follow up on

6    an unidentified person that nobody knew about?

7        MS. HAGY:  Objection, form,

8    argumentative.

9  A.  Well, at the very least they would ask in the

10    neighborhood if that kind of description matched

11    anybody that they knew of, and then they would

12    seek that person out, locate him and ask him,

13    "Were you there?" that kind of thing.

14  BY MR. IASPARRO:

15  Q.  You understand David Bodell described that person

16    that he saw crouching behind the Dumpster to have

17    been crouching on the side of the Dumpster

18    opposite from where those tennis shoe prints were

19    found, correct?

20  A.  Yes.  I read his deposition.

21  Q.  And there's no indication anywhere that that

22    person was in any way involved in the Ascher

23    murder, correct?

24        MS. HAGY:  Objection, form.

1  A.  To the contrary.  He's right there at the time.

2      He's seen right there hiding at the time of the

3      murder when the youngster comes out to smoke a

4      cigarette and sees it and hears it.

5  BY MR. IASPARRO:

6  Q.  For all you know, that could have been

7      Patrick Pursley, right?

8                  MS. HAGY:  Objection, form.

9  A.  Yes, it could have been him, but that would then

10     belie Rebecca's commentary.

11 BY MR. IASPARRO:

12 Q.  You're also critical of the Rockford Police

13     Department for not pursuing Antrone and Vantrele

14     Turner as potential suspects.  That --

15 A.  (Interrupting)  Yeah.  That's a big one, because

16     that night there was -- there was -- they were

17     stopped, and a call went out for -- I took it from

18     one of the beat officers, "I got somebody you need

19     to come and see and talk to."

20 Q.  And I'm putting on your screen what's been marked

21     as Exhibit 6, which is COR and Getty 65 through

22     69, Officer Kevin Rice's report relating to that

23     information and Mr. Turner, correct?

24 A.  Correct.

1   Q.  And the information that you reference actually

2       came from an officer from the Loves Park Police

3       Department, Officer Lynde, which he passed along

4       to the Rockford PD, right?

5   A.  Right.

6   Q.  Officer Rice's report is five pages in length, and

7       he in fact did interview each of those persons

8       listed in the report, including both Turner

9       brothers, correct?

10  A.  Yes.

11  Q.  And he interviewed four people whose stories were

12      consistent about what they did that night, which

13      was to go off to a motel in Loves Park, Illinois,

14      correct?

15           MS. HAGY:  Objection, form.

16  A.  The report is -- I don't -- I don't contest

17      anything said in the report.

18  BY MR. IASPARRO:

19  Q.  All right.  Officer Rice searched the car that the

20      Turner brothers were in, right?

21  A.  Yes.

22  Q.  Go back up to Page 13 of your report where you

23      talk about the Turner brothers.  In your report

24      you suggest that the Rockford Police Department's

1     failure to pursue alternate suspects was due to

2     the detectives having "identified a different

3     suspect they like and who they pursued with tunnel

4     vision to the exclusion of others," correct?

5  A.  Yes.

6                MS. HAGY:  Objection.

7                THE WITNESS:  That's -- you read from

8     the last bullet point.

9                Go ahead.  I'm sorry.

10 BY MR. IASPARRO:

11 Q.  As we've already established, Mr. Pursley was not

12    developed as a suspect until two months later,

13    correct?

14                MS. HAGY:  Objection, form.

15 A.  Well, in the record he was identified as a suspect

16    on the 8th, two months later.

17 BY MR. IASPARRO:

18 Q.  The third bullet point underneath your Turner

19    brothers section says, "It is noteworthy that

20    after the Ascher homicide, Antrone Turner was

21    involved in a string of robberies that closely

22    resembled the Ascher crime, including robberies

23    and assault of persons exiting their vehicles."

24    Do you see that?

1  A.  Yes, I do.

2  Q.  Do you find it noteworthy that Mr. Pursley robbed

3      a bank shortly after the Ascher murder with a

4      handgun?

5  A.  You want me to assume he robbed a bank?  I

6      accepted in the record that he was a prime suspect

7      for robbing a bank.

8  Q.  And you understand that Samantha Crabtree gave a

9      statement implicating him and herself in a bank

10     robbery, to which she pled guilty, right?

11               MS. HAGY:  Objection, form,

12     mischaracterizes the evidence.

13 A.  Yes.

14 BY MR. IASPARRO:

15 Q.  And when I asked Mr. Pursley about having robbed

16     the First Bank North with Miss Crabtree, you

17     understand he asserted his Fifth Amendment

18     privilege, right?

19 A.  Yes.

20 Q.  Do you find it noteworthy that Mr. Pursley is also

21     accused of having robbed a Burger King after the

22     robbery -- or after the murder?

23 A.  The Burger King robbery is in the record, and I

24     commented on it.

 1   Q.   Do you think it was appropriate for the Rockford
 2        Police Department to consider other crimes that
 3        Mr. Pursley was alleged to have been involved in
 4        in analyzing the possibility that Mr. Pursley was
 5        a suspect for the Ascher homicide?
 6   A.   Of course.  That also applies to the Turner
 7        brothers and others, I'm sure.  Of course.
 8             MR. IASPARRO:  Mr. Clark, I need a
 9        couple-of-minute break, if you don't mind.
10             THE WITNESS:  This is perfect for me,
11        so . . .
12             MR. IASPARRO:  Why don't we take five
13        minutes.
14             THE WITNESS:  Five minutes would be
15        good.  Thank you.
16             (A brief recess was taken.)
17             MR. MOGBANA:  The city is ready.
18             MR. HUOTARI:  I'm back, too, Michael.
19             Thanks.
20             MR. IASPARRO:  Back on the record.
21   BY MR. IASPARRO:
22   Q.   Mr. Clark, I have on the screen in front of you,
23        scroll down to Page 14 of your report, in
24        particular the section titled, "Failure to Timely

```
 1        Submit the Firearm Evidence."  Do you see that?
 2   A.   Yes.
 3   Q.   And the first sentence says, "RPD deviated from
 4        commonly-accepted practice by failing to send the
 5        ballistics evidence for immediate processing."  My
 6        question for you is where is the commonly-accepted
 7        practice which you referred to in that sentence
 8        requiring the sending of ballistics evidence for
 9        immediate processing documented, where could I
10        find that?
11   A.   That's why I cited the -- that's Item No. 7 on
12        Page 3, "Criminal Investigations."  There's
13        also -- let me . . .  I cited O'Hara's work and
14        the Rockford department's own procedures on the
15        value of physical evidence.  I quoted that in the
16        report.  So -- and I don't think it's -- just on
17        the other side of the coin -- you'll find any, any
18        competent publication or procedural manual that
19        says to hold on to physical evidence that may
20        provide leads until you have a suspect.
21   Q.   What do you mean by immediate processing, what
22        does that mean?
23   A.   Well, it means that when you get it and of course
24        there's -- I'm going to use the term harvest,
```

```
1        whatever the crime scene yields, and there's
2        precise ways to -- and it's always improving -- to
3        secure it, to document it, secure it, create a
4        chain of evidence, not to contaminate it and
5        then -- but get it quickly to a source that can
6        provide investigative leads.  And to not do that
7        just, you know -- it influences the results of the
8        investigation.  In this case we know the Welty, if
9        you take his testimony, said, "Just by looking at
10       the casings, I can narrow it down to three makes
11       of gun."  Well, there's a lot of 9mms out there
12       and -- but he says it's probably going to be a
13       Taurus because that's per the -- the affidavit for
14       the search warrant.  He says, "It's probably one
15       of three but most likely a Taurus."  Well, that's
16       huge.  And they didn't have that information for
17       two months?  That's enormous.
18    Q. You're not suggesting that Mr. Welty's analysis
19       would have somehow been different on April 2,
20       1993, than it was in June of '93, are you?
21    A. No, I'm not saying that because his -- his
22       statement stands -- I mean it is what it is.
23       Welty has history of employment.  He's given
24       testimony before.  He indicated in his deposition,
```

```
1      et cetera, that, "This was the basis of my -- my
2      looking at what I came up with, and I never did a
3      match as far as the slug to the -- to the Taurus
4      that was -- eventually came our way, and -- but I
5      verified it, but I did verify it by the -- when I
6      looked at the -- " what's his -- there's a -- just
7      a minute -- Gunnell, when Gunnell made the match.
8      And all of that is questionable, by the way.  But
9      I'm talking about the investigation as from the
10     time of the murder to the time they claim it's
11     solved and charge Pursley with murder.  So -- and
12     there's just -- I could not -- I looked hard and I
13     reviewed why would they hold on to this for two
14     months.  And the only connection to getting it to
15     the lab was that Windham shows up.
16  Q. Jack Welty from the state police crime lab
17     indicated based on his preliminary analysis that
18     he believed the spent cartridge cases were likely
19     fired by a Taurus 9mm firearm, right?
20  A. Yes.  That's what he says, and that's what's in
21     the affidavit for the search warrant.
22  Q. Right.  And there's no reason not to believe that
23     that's in fact what Welty said, right?
24  A. Well, Welty himself says that's what he said.  So
```

```
 1     I mean that's all I can take, that he said it.

 2     And he says it under oath as well as apparently

 3     saying it verbally to Forrester.

 4  Q. And I think you may have said this earlier, but

 5     you're not suggesting or offering an opinion here

 6     that Jack -- the results of what Jack Welty did

 7     would have been different in April than they were

 8     in June, 1993, right?

 9          MS. HAGY:  Objection, form.

10  A. Well, Welty has never recanted his opinion.

11     That's all I can tell you.

12  BY MR. IASPARRO:

13  Q. I've put up on the screen in front of you a

14     document which has been marked as Exhibit 7 for

15     purposes of today's deposition.  This is COR and

16     Getty 139 through 156.  You've referenced the

17     search warrant and the affidavit in support.  Did

18     you review this document, sir?

19  A. Yeah.  I considered a key summation early in time

20     of what Forrester says they have thus far.

21  Q. Okay.  And in the affidavit itself, which I'll get

22     to, there's a search warrant, then there's a

23     complaint for search warrant, and then affidavit

24     in support of search warrant, which starts on
```

```
 1       Page 7 of the document, correct?
 2   A.  Right.  And that's the document I'm referring to.
 3       He gives -- he lists out other crimes, et cetera.
 4       He lists out the rationale for the search warrant.
 5   Q.  And your understanding was this, as it says, was
 6       an affidavit in support of the search warrant for
 7       Mr. Pursley and Miss Crabtree's apartment,
 8       correct?
 9   A.  Yes.
10   Q.  This was not in support of any sort of arrest
11       warrant for Mr. Pursley, correct?
12   A.  Correct.
13   Q.  And that there's a distinction between an arrest
14       warrant and a search warrant; you understand that,
15       right?
16   A.  Yes, I do.
17   Q.  All right.  And as we've established, I think, the
18       information that Mr. Welty provided regarding his
19       preliminary analysis of the crime scene evidence,
20       in particular those cartridge cases, that in fact
21       was included in Detective Forrester's search
22       warrant affidavit, right?
23   A.  Right.  Last page on the second -- second-to-last
24       page it's there.
```

```
 1   Q.   There we go.  Page 11 of the affidavit, Page 17 of
 2        the exhibit.  So it would be Paragraph 12 of
 3        Detective Forrester's affidavit, correct?
 4   A.   Correct.
 5   Q.   The information provided on June 8, 1993, by
 6        Marvin Windham, based upon your review of the
 7        record, your understanding is that that was
 8        provided anonymously via a Crime Stoppers tip,
 9        correct?
10   A.   Originally, yes.
11   Q.   All right.  So between June 8, 1993, and June 12,
12        1993, do you have any indication that the Rockford
13        Police Department or any members of the department
14        who were involved in this investigation knew that
15        Marvin Windham was in fact the person who provided
16        that Crime Stoppers information on June 8, 1993?
17                 MS. HAGY:  Objection, form.
18   A.   There's nothing in the record.
19   BY MR. IASPARRO:
20   Q.   Okay.  First time that Marvin Windham is
21        identified as the person who provided that
22        information is June 12, 1993; is that right?
23   A.   Identified in the record, yes.
24   Q.   And my question is do you have -- are you aware of
```

1    any evidence that indicates that any members of

2    the investigatory team knew who Marvin Windham was

3    between June 8, 1993, and June 12, 1993, in other

4    words, that it was Windham who provided the

5    Crime Stoppers information?

6         MS. HAGY:  Objection, form, asked and

7    answered.

8  A.  There's nothing in the record.

9  BY MR. IASPARRO:

10 Q.  Okay.  And the information that Mr. Windham

11   provided via the Crime Stoppers tip was included

12   in Detective Forrester's search warrant affidavit,

13   correct?

14 A.  Yes.  He's identified as a informant.

15 Q.  And I guess perhaps you anticipated my next

16   question.  Nowhere in Detective Forrester's search

17   warrant affidavit did he identify that informant

18   by name, correct?

19 A.  Right.  And as you just brought up, Paragraph 6,

20   "On June 8, 1993, an unidentified, confidential

21   informant called."

22 Q.  Well, what's the significance of that?

23 A.  Well, you asked the question.  They had -- and I

24   said according to the record, they had no -- in

1      the record they -- they do not identify Windham

2      until later.

3  Q.  You're unaware of any evidence which indicates

4      they knew that it was Marvin Windham who provided

5      the June 8, 1993, Crime Stoppers tip until

6      June 12, 1993, right?

7           MS. HAGY:  Objection, form, asked and

8      answered.

9  A.  I have no information in -- as I search the

10     record.

11  BY MR. IASPARRO:

12  Q.  Or from any other source?

13  A.  No.  I have -- the other sources that raise my

14     suspicions come from my experience and training

15     and working hundreds of cases where a detective

16     down the road says, "Hey, you guys are working the

17     Ascher murder.  I've got a guy who will make a

18     statement for you."

19  Q.  So my question is you're just speculating in that

20     respect, aren't you?

21  A.  No.  It's not speculation based on how this case

22     evolves and the very unique and to me suspicious

23     circumstances of Windham suddenly appearing in the

24     investigation as he does.

```
 1   Q.   The information provided by Marvin Windham on

 2        June 8, 1993, was corroborated in large part as

 3        indicated by Detective Forrester's search warrant

 4        affidavit, correct?

 5             MS. HAGY:  Objection, form,

 6        mischaracterizes evidence.

 7   A.   I think that needs a bit of a answer.

 8   BY MR. IASPARRO:

 9   Q.   Well, let me break it down.  Let me break it down.

10   A.   I think I got it.  Just let me respond and then

11        maybe parse it out.  I want to be helpful.  We --

12        the Burger King robbery, the bank robbery, the

13        fact that Rebecca's got two guns, one's a Taurus,

14        one's a Beretta, that's verified as far as there

15        was a bank robbery, there was a Burger King

16        robbery, she does have two guns and they are

17        Beretta and they are a Taurus.  That's --

18        according to the record, Windham spouts off and

19        it's there, and they use it for the search

20        warrant.  But it has nothing -- and then the

21        statements about the Ascher murder he alleges,

22        that's not in verified stuff.  So that's -- the

23        thing that needs to be said here is when you're

24        talking to a person like Windham, who has now
```

1    become an informant, they have a big neon sign

2    across their forehead; what do I have to tell you

3    that's going to get me out of trouble?  So -- and

4    that's the way you look at everything he says.  So

5    I'll wait for the next question.

6  Q.  Well, one, Detectives Forrester and Scott didn't

7    know who Marvin Windham was when they talked to

8    him on the phone on June 8, 1993, correct?

9  A.  Yeah.

10          MS. HAGY:  Objection, form,

11    mischaracterizes evidence.

12          THE WITNESS:  I accepted that in the

13    record.  "Look, this guy suddenly calls us, and,

14    by the way, he's -- he's really something, but he

15    calls us voluntarily and we talk to him."  That's

16    the way the record reflects.  And I took it for

17    what it was.  And then I commented on how they

18    need to treat -- knowing finally who he is, how

19    they have to treat what he says.

20  BY MR. IASPARRO:

21  Q.  Well, before they knew who he was.  So based upon

22    the information they were provided on June 8,

23    1993, anonymously pursuant to that Crime Stoppers

24    tip --

 1                    MS. HAGY:  (Interrupting)  Objection.

 2                    MR. IASPARRO:  I haven't even finished

 3          the question, Lindsay.

 4                    MS. HAGY:  Yes.  Go ahead.

 5     BY MR. IASPARRO:

 6     Q.   Based upon the information that

 7          Detective Forrester was provided anonymously on

 8          June 8, 1993, during that Crime Stoppers call,

 9          they learned that a man named Patrick Pursley had

10          a girlfriend at the time and her name was Sam,

11          right?

12     A.   Right.

13     Q.   Yeah.  And that was true, Samantha Crabtree was in

14          fact Patrick Pursley's girlfriend at the time,

15          right?

16     A.   Well, they went out and put her under

17          surveillance.  They verified a lot of things per

18          that statement that was in the record.  Yes, they

19          verified it.

20     Q.   Thank you.  That's one of the things they

21          verified.  They also verified that Patrick Pursley

22          and Samantha Crabtree lived at Woodlawn and

23          Ashland, right?

24     A.   Yes.

```
 1   Q.  And they also verified that Mr. Windham, who at

 2       that point was still anonymous, had provided

 3       accurate details of the bank robbery which she

 4       described, as you just --

 5              MS. HAGY:  (Interrupting)  Objection.

 6   BY MR. IASPARRO:

 7   Q.  (Continuing) -- that bank robbery actually

 8       happened, right?

 9              MS. HAGY:  Objection, form, foundation,

10       mischaracterizes both evidence and prior

11       testimony.

12   A.  Forrester lays all of that out I think in pretty

13       good detail in the warrant affidavit, but -- and

14       that Windham tells him about the bank robbery,

15       tells him about the Burger King and connects those

16       two events to Pursley and then also ties in the

17       murder to Pursley.

18   BY MR. IASPARRO:

19   Q.  And included among that information was that

20       Mr. Pursley after the bank robbery had purchased a

21       black Honda, right?

22   A.  Yes.

23   Q.  And that in fact was observed in the driveway of

24       where Samantha Crabtree and Patrick Pursley lived,
```

1    right?

2  A.  Yes.

3  Q.  And then pursuant to the information provided

4      anonymously by Marvin Windham on June 8, 1993,

5      Rockford police detectives tracked down two ATF

6      forms showing that Crabtree had in fact purchased

7      two 9mm firearms, right?

8  A.  Yes.

9              MS. HAGY:  Objection, form.

10 BY MR. IASPARRO:

11 Q.  One of them on May 20, 1993, after the bank

12     robbery, again consistent with what Marvin Windham

13     told Detective Forrester, right?

14 A.  In the record, correct.

15 Q.  And the other gun was in fact a Taurus 9mm

16     firearm, right?

17 A.  Yes, it was.

18 Q.  Do you have any information that Jack Welty

19     tailored his preliminary analysis and verbal

20     report to Detective Forrester that he thought

21     the crime scene cartridge cases were likely

22     fired by a Taurus 9mm because of something

23     Detective Forrester told him?

24             MS. HAGY:  Objection, form.

 1  A.   There is nothing in Welty's testimony that

 2       indicates, "I was told what to say."  I think that

 3       was the implication of your question, "I was told

 4       what to say."  So -- and as I said, in his

 5       deposition and in his trial testimony, he's

 6       never changed.  There is no contemporary --

 7       contemporous (sic) notations or reports about this

 8       examination.

 9  BY MR. IASPARRO:

10  Q.   And you understand that at the time that

11       Jack Welty provided his preliminary analysis to

12       Forrester, the Taurus 9mm firearm had not yet been

13       recovered from Pursley's apartment, right?

14  A.   According to the record, they had not recovered

15       the gun, but it was -- I think it's even less than

16       24 hours.  They -- the casings go to Welty,

17       casings, according to the search warrant.  Welty

18       says Taurus or a Beretta or Astra, and then they

19       go pick up the -- they do the search warrant and

20       pick up two guns, Beretta and Taurus.

21  Q.   And when you say there was no contemporaneous

22       documentation of the information shared between

23       Welty and Forrester, that's not accurate, is it?

24       We've got this search warrant affidavit which was

1    contemporaneous.

2              MS. HAGY:  Objection, form,

3          mischaracterizes evidence.

4    A.   No.  What you have is Welty -- and I read his

5          deposition.  He said, "Look, all of a sudden I get

6          this call.  I'm going on vacation and I hold it

7          up" or "I'm willing to hold it up.  Well,

8          Forrester gives me these casings to take a look

9          at, and then I told him verbally there's no report

10         of that."  Forrester writes about it in his

11         affidavit, and then he writes more months later.

12         But in the affidavit, that's the only place we

13         have it.

14   BY MR. IASPARRO:

15   Q.   And the affidavit was sworn to under penalty of

16         perjury, right?

17   A.   Well, that's Forrester, right.  And Welty doesn't

18         write a piece of paper about received, looked at,

19         examined and, "This is my conclusion" and put it

20         into the master file for the homicide.

21   Q.   But the affidavit itself in support of the search

22         warrant was sworn to under penalty of perjury, and

23         a judge accepted it in establishing probable cause

24         to search Pursley's apartment, right?

1  A.  Well, sure, but that's not --

2          MS. HAGY:  (Interrupting)  Objection.

3          THE WITNESS:  I'm talking about the way

4      you're supposed to document stuff, especially

5      physical evidence.  But you're right.  That --

6      this is the only place -- you know, that day where

7      we see, "Hey, I sent it to the lab."  The lab guy

8      says it's this, this and gives it to the judge,

9      and the judge says, "Go get it."

10 BY MR. IASPARRO:

11 Q.  And that's what they did, they went and got it,

12     right?

13 A.  Well, that's an interesting thing, because they

14     missed it when they did the search, and it took

15     for Rebecca to show them where it was.  And then

16     they don't document it other than some long-range

17     photograph that shows something like a box stuck

18     between a dresser and a wall.  Yeah.  I'm sorry.

19     But I mean I never saw such documentation of

20     recovery of evidence like that.

21 Q.  We'll get to that in a minute, because I think you

22     skipped over Detective Houde's report, but we'll

23     get to that.  Do you know what the practice was in

24     the Rockford Police Department in 1993 with

1    respect to taking notes and the writing of police

2    reports from those notes?

3          MS. HAGY:  Objection, form, overbroad.

4  A.  As I recall, I saw in the record that they thought

5    it was okay not to keep the notes in the master

6    file in the -- what we call the murder book where

7    the professional standard is -- and it goes back

8    to 1965 for me -- everything goes into the file

9    and is never taken out, never changed, and it's

10   contemporous.  In other words, it's as it occurs

11   and unfolds, so -- but I understand that even

12   though they recorded, video recorded things at the

13   murder scene, they never video or audio recorded

14   any of the statements.  They never -- especially

15   Samantha's -- Crabtree's stuff or Windham.  And

16   they never kept notes that -- to -- for the --

17   that are the basis of their reports that they

18   eventually write.

19  BY MR. IASPARRO:

20  Q.  But let me ask you a little bit about your

21   apparent criticism about the failure to audio or

22   video record statements from Marvin Windham and

23   Samantha Crabtree.  You understand they both

24   testified before the Winnebago County grand jury

```
1        prior to Mr. Pursley being indicted, right?

2    A.   Yes.

3                 MS. HAGY:  Objection, form.

4                 THE WITNESS:  Yes.  They both -- there

5        was grand jury testimony.

6    BY MR. IASPARRO:

7    Q.   Correct.  And the grand jury testimony from

8        both Marvin Windham and Samantha Crabtree was

9        consistent with their written statements provided

10       in the investigation, right?

11   A.   Generally, as I remember.

12   Q.   So the suggestion that somehow this -- that their

13       statements weren't recorded, they actually were

14       transcribed just a few days after they were

15       initially provided, right?

16                 MS. HAGY:  Objection, mischaracterizes

17       both evidence and prior testimony, form.

18   A.   There are no -- and I looked for it.  There are

19       no recordings of the extensive hours-long

20       interrogation of Crabtree or Windham at all.  And

21       there are written documents that in a -- in 1993

22       especially when you have the technology readily

23       available, it's -- I don't understand how it could

24       possibly be considered competent investigative
```

 1    procedure.

 2  BY MR. IASPARRO:

 3  Q.  In 1993 -- am I to understand that you're

 4      testifying or suggesting that in 1993 it was

 5      standard procedure for detectives at the

 6      Los Angeles County Sheriff's Department to video

 7      and audio record interviews of homicide suspects

 8      or witnesses of homicides?

 9  A.  Audio record.  I did it as a detective from the

10      time I was assigned.  And I knew that was going on

11      in 1965 when I came on the department.  I never

12      did an interrogation without recording it.

13  Q.  Do you have any information, Mr. Clark, that any

14      of the detectives involved in the Ascher homicide

15      investigation -- and in particular I want to ask

16      you about Forrester, Scott and Schmidt -- that any

17      of them failed to include complete summaries of

18      what they did during the investigation in their

19      police reports?

20              MS. HAGY:  Objection, vague.

21  A.  I think if you look in particular -- and I comment

22      about Crabtree, Samantha Crabtree's experience and

23      what she has to say about it, that it's very

24      problematic that it was an accurate depiction of

1     what that interrogation was about.

2   BY MR. IASPARRO:

3   Q.   And in terms of what Miss Crabtree had to say

4        about her talking to the police on June 10, 1993,

5        are you -- it seems to me that you're crediting

6        what Samantha Crabtree has indicated about what

7        happened that day.

8              MS. HAGY:   Objection, form,

9        mischaracterizes prior testimony.

10  A.   I think the best way to answer that is a comment

11       on Judge McGraw's observations of Crabtree and

12       Windham when he gives his ruling of innocence.

13       And I agree.   There are lots and lots of problems.

14       And he talks about a certain lax of verification,

15       diligence, et cetera, and changes in testimony as

16       the case unfolds.

17  BY MR. IASPARRO:

18  Q.   By Miss Crabtree, right?

19  A.   Well, he comments on Windham and Crabtree both, as

20       I remember his -- his ruling.   I have a copy of

21       it.   I could go to it.

22  Q.   It will speak for itself.   So in terms of your

23       criticism of contemporaneous or failure to

24       contemporaneously document the June 8, 1993,

1      Crime Stoppers call, we can agree that

2      Detective Forrester did in fact document it in

3      his search warrant affidavit, correct?

4  A.  Only that it --

5           MS. HAGY:  (Interrupting)  Objection,

6      form.

7           THE WITNESS:  I'm sorry.

8           Only that it occurred.  That --

9      that's -- he says that it occurred.  There is

10     nothing in terms of a phone call in or a phone

11     record or recording of that call actually

12     occurring.  It's just that it occurred.  And I'll

13     wait for the next question.

14  BY MR. IASPARRO:

15  Q.  Do you have any information that that call did not

16     occur?  I mean the implication here is that

17     Forrester's making this up or he made it up back

18     on June 10, 1993; is that what you're saying?

19           MS. HAGY:  Objection, form,

20     mischaracterizes prior testimony.

21  A.  That's -- I just reference you back to Number --

22     the second paragraph.  And the answer is

23     Forrester, who is the case ace, as a detective

24     trained 24 years, as I recall experience, knows

1     this contact by an alleged anonymous informant

2     must be documented to the nines because it will be

3     questioned. And the suspect I'm going to arrest

4     requires that information be included in the

5     investigative file. It's not there.

6  BY MR. IASPARRO:

7  Q.  I just -- I don't understand, Mr. Clark. It is

8     documented in a sworn affidavit submitted to the

9     chief judge of the 17th Judicial Circuit, right?

10         MS. HAGY: Objection.

11  A.  The affidavit speaks for itself, and it is a sworn

12     affidavit.

13  BY MR. IASPARRO:

14  Q.  Mr. Windham's statement of June 12, 1993, was in

15     fact documented on June 12, 1993, by way of his

16     sworn statement -- or his written statement,

17     correct, signed written statement?

18  A.  On the 12th.

19  Q.  Yes. So I've pulled up what has been marked as

20     Exhibit 8, COR and Getty 247 to 249 -- or, I'm

21     sorry, 246 to 240 -- I'll get this right, 247 to

22     249. This is a copy of Marvin Windham's written

23     statement from June 12, 1993, correct?

24  A.  Yes.

1  Q.  And that is documentation of Mr. Windham's

2      statement from June 12, 1993; would you agree?

3              MS. HAGY:  Objection, form.

4  A.  That's what the document is.  Exhibit 8 is

5      dated -- his signature dated 6-12-93.

6  BY MR. IASPARRO:

7  Q.  Okay.  And how much more contemporaneous could you

8      get than a signed written statement on the exact

9      day that he gave the statement?

10             MS. HAGY:  Objection, form,

11     argumentative.

12 A.  If that's the day he gave the statement, then it

13     is contemporous.

14 BY MR. IASPARRO:

15 Q.  And you don't have any evidence that it's not the

16     day that Mr. Windham gave a statement, right?

17 A.  That's the 12th.  He allegedly called in on the

18     9th, or 8th or 9th.

19 Q.  Right.  We're talking about the 12th.

20 A.  Talking about the 12th.  That's the second

21     interview.

22 Q.  You reviewed Marvin Windham's deposition

23     testimony, correct?

24 A.  Yes, I did.

```
 1   Q.   And Marvin Windham testified 27, 28 years later
 2        that in fact he gave this written statement on
 3        June 12, 1993, right?
 4   A.   Yes.
 5   Q.   And there's really no dispute that he gave this
 6        statement, is there?
 7   A.   I -- I never considered it into dispute.
 8   Q.   All right.  We go back to your report.  On
 9        Page 17 of your report, you have a section titled,
10        "Windham was Unreliable, and His Statement Alone
11        Did Not Establish Probable Cause to Arrest
12        Pursley."  Do you see that?
13   A.   Yes.
14   Q.   Let me ask you this:  By characterizing Windham as
15        unreliable, aren't you in fact making a
16        credibility determination?
17   A.   No.  It's a professional per the -- and, by the
18        way, this is -- this has been -- it's -- it's been
19        agreed to, and I cited where it was other
20        detectives agreed that it was not probable cause
21        to arrest Pursley for the murder.
22   Q.   Well, that's a little bit different than what you
23        say in your report, but we'll get into that in a
24        minute.
```

1  A.  No.  Sir, this -- this report's about the

2      arresting him for the murder and prosecuting him

3      for the murder.  It's not about arresting and

4      prosecuting him for bank robbery or anything else,

5      the Ascher murder.

6  Q.  I understand that.  Do you have an understanding

7      that the probable cause to arrest Patrick Pursley

8      for the murder of Andrew Ascher was based solely

9      on information provided by Marvin Windham?

10           MS. HAGY:  Objection, form.

11  A.  That's the way it appears to me.  Well, no.  It's

12      in Samantha's Crabtree's statement.  She gives

13      some -- makes a statement about him being there

14      and her in the car, so . . .

15  BY MR. IASPARRO:

16  Q.  All right.  Are you -- you're aware of the fact

17      that a circuit judge in Winnebago County issued an

18      arrest warrant for Patrick Pursley for the murder

19      of Andrew Ascher, right?

20  A.  Yes.

21  Q.  Do you know when that happened?

22  A.  You know, I can't remember.  It was -- he fled

23      when they tried to apprehend him on the 9th,

24      9th or -- it was on the 9th.  Then it was like six

```
 1     days later and there was a warrant for his arrest.
 2  Q.  Okay.  If I represented to you that the arrest
 3      warrant for Andrew Ascher for the charge of first
 4      degree murder -- or, I'm sorry.  Let me back up.
 5      If I represent to you that the arrest warrant for
 6      Patrick Pursley for the offense of first degree
 7      murder of Andrew Ascher was issued by a circuit
 8      judge in Winnebago County on June 11, 1993, do you
 9      have any information to dispute that?
10               MS. HAGY:  Objection.
11               Is this a hypothetical?  Are you going
12      to show him something?
13  BY MR. IASPARRO:
14  Q.  I'm asking you do you know when the arrest warrant
15      was issued.
16  A.  As I sit here, I don't.  But I don't -- I wouldn't
17      contest the date of the search warrant -- I mean
18      the date of the arrest warrant.
19  Q.  Okay.  We're going to -- search warrant was on
20      June 10, 1993.  We've established that, right?
21  A.  Correct.
22  Q.  Okay.  I will represent to you that the arrest
23      warrant was on June 11, 1993, okay?
24  A.  All right.
```

1          MS. HAGY:  Michael, do you have

2     something you can show him or say what you're

3     pointing to?

4          MR. IASPARRO:  Lindsay, I'm

5     representing for the record that the arrest

6     warrant for Patrick Pursley for first degree

7     murder was issued on June 11, 1993, by

8     Judge Kennedy.

9          MS. HAGY:  Do you have the document or

10     can you cite it?

11          MR. IASPARRO:  It's part of the record.

12          MR. MOGBANA:  I think this is just

13     wasting time.  The witness already accepted that,

14     so let's move on.

15          MR. IASPARRO:  Let me ask my questions,

16     okay?

17          MS. HAGY:  Well, I can make my record,

18     also, and I would like to understand that these

19     facts are in evidence or if this is a

20     hypothetical.

21          THE WITNESS:  I don't --

22          MR. IASPARRO:  (Interrupting)  Just

23     wait a minute.  Let's satisfy Lindsay here.  Just

24     wait a second.

1          THE WITNESS:  Yeah.  I don't think it's
2     in my material.
3          MR. IASPARRO:  Well, I'm going to show
4     you because you in fact reviewed the information
5     which establishes this fact.
6  BY MR. IASPARRO:
7  Q.  I'm going to show you what has been marked as
8     Exhibit 12, Document COR and Getty 222.  You
9     reviewed that, right, Mr. Clark?
10  A.  I did, and I have it in my material.  I have
11     COR and Getty 222.
12  Q.  All right.  On -- this is a report drafted by
13     Detective Forrester dated June 11, 1993.  And do
14     you see it says, "On Friday, June 11, 1993, this
15     case was reviewed with Assistant State's Attorney
16     D. Koski and State's Attorney P. Logli.  They
17     authorized a charge of first degree murder.  The
18     complaints were typed up and they were taken in
19     front of Judge Kennedy.  I then signed the
20     complaints, and Judge Kennedy issued the warrant
21     and set bond at no bond."  Do you see that?
22  A.  I see it.
23  Q.  All right.  So the search warrant was conducted on
24     June 10, 1993, right?

1 A. The search warrant was June 10.

2 Q. Right?

3 A. Yes. The search warrant -- I'm sorry. The search

4 warrant was June 10.

5 Q. Okay. You understand that Miss Crabtree was

6 interviewed at the police department, gave her

7 written statement on that same date, June 10,

8 1993, right?

9 A. Yes.

10 Q. June 11, 1993, as we just established, the arrest

11 warrant for first degree murder is issued by

12 Judge Kennedy, right?

13 A. Correct.

14 Q. And it wasn't until the next day, June 12, 1993,

15 that Marvin Windham went on the record and

16 provided a written statement, right?

17 A. The next day Windham, yes.

18 Q. So the suggestion that probable cause was

19 based upon Marvin Windham's statement or

20 Marvin Windham's information doesn't make any

21 sense, does it, because Marvin Windham wasn't even

22 identified until the day after the warrant was

23 issued.

24 MS. HAGY: Objection, mischaracterizes

1    prior testimony.

2  A.   In the record Marvin Windham is not identified

3       until the 12th, all right?  But -- so I don't

4       contest a judicial finding.  And my commentary was

5       that it -- to an investigator there is -- the

6       probable cause still did not exist.  And I comment

7       on that a number of -- there's a number of

8       citations in the report that agreed with that,

9       that the probable cause didn't exist for the

10      murder.

11  BY MR. IASPARRO:

12  Q.   You're basing that solely on the statement of

13      Marvin Windham, you're isolating the statement of

14      Marvin Windham, right?  And that's not accurate

15      because the written statement of Marvin Windham

16      wasn't until one day after a judge determined

17      there was probable cause to arrest Patrick Pursley

18      for first degree murder, right?

19           MS. HAGY:  Objection, form,

20      mischaracterizes prior evidence and prior

21      testimony.

22  A.   The written statement in the record doesn't appear

23      until the 12th signed.  And Rebecca Crabtree was

24      interrogated and made statements on the 10th.

```
1       That's all in the record.

2   BY MR. IASPARRO:

3   Q.  I think you meant Samantha Crabtree, right?

4   A.  I'm sorry.  You're correct, Rebecca Crabtree.

5               MS. HAGY:  Samantha.

6               THE WITNESS:  Excuse me,

7       Samantha Crabtree.  Sorry.

8   BY MR. IASPARRO:

9   Q.  Well, are you aware of the fact that

10      Patrick Pursley was indicted by the Winnebago

11      County grand jury and charged with first degree

12      murder on June 23, 1993?

13  A.  I am.

14  Q.  All right.  Do you know what information the grand

15      jury was provided in order to make its probable

16      cause determination?

17  A.  There's the transcripts there, and there was

18      testimony by Windham and Crabtree both.

19  Q.  Going back to your report, Page 17 at the bottom,

20      bullet point there reads, "Windham was obviously

21      biased and therefore an unreliable informant."  Is

22      that an example of you not making any credibility

23      determinations, Mr. Clark?

24               MS. HAGY:  Objection, form,
```

1    argumentative.

2  A.  No.  That's not a credibility statement.  That's a

3    professional statement on Windham.  We've talked

4    about Windham quite a bit, so I can plow that

5    ground again if you like.

6  BY MR. IASPARRO:

7  Q.  You indicate that Mr. Windham may have been

8    engaged in an affair with Samantha Crabtree, and

9    then you cite the testimony that Samantha Crabtree

10    gave at Mr. Pursley's jury trial in 1994; is that

11    right?

12  A.  Yes.

13  Q.  Do you have any information, have you reviewed

14    anything in the record that any Rockford police

15    officer or detective was aware in June of 1993 of

16    any information from any source and whether true

17    or not that Windham and Crabtree engaged in an

18    affair?

19  A.  There's no investigative reports, and there's no

20    commentary that it was attempt -- even his --

21    vetting him as reliable was ever accomplished, as

22    I would have expected be done.

23  Q.  What I'm trying to understand is if that

24    information didn't come to light until ten months

1      later in April of 1994, how is it relevant to a

2      probable cause analysis made in June of 1993?

3               MS. HAGY:  Objection, form,

4      argumentative.

5  A.  Well, that -- that piece of information would not

6      be in 1993 obviously.

7  BY MR. IASPARRO:

8  Q.  Why do you think the Rockford police detectives

9      working the Ascher homicide case sought to

10     corroborate the information that Windham provided

11     during the Crime Stoppers call?

12              MS. HAGY:  Objection, form.

13 A.  I didn't catch the first part of the question, why

14     did what?

15 BY MR. IASPARRO:

16 Q.  Why do you think the Rockford police detectives

17     took the efforts they did to corroborate the

18     information that Marvin Windham provided during

19     the Crime Stoppers call on June 8, 1993?

20              MS. HAGY:  Objection, form,

21     mischaracterizes evidence.

22 A.  Why do I think they did?

23 BY MR. IASPARRO:

24 Q.  Yes.

```
 1   A.   Well, because that's an investigative lead.  They
 2        didn't ignore all leads.  And they -- this was --
 3        this was glaring stuff that they could follow
 4        through with.
 5   Q.   Some of those things we've talked about before,
 6        the two firearms that Samantha Crabtree had
 7        purchased, the fact that Samantha Crabtree was in
 8        fact Patrick Pursley's girlfriend, where they
 9        lived, that black Honda in the driveway, right?
10   A.   Right.
11   Q.   On Page 19 of your report, you conclude that
12        Mr. Windham was motivated for coming forward due
13        to a desire to collect some sort of financial
14        reward.  Do you see that?
15   A.   Well, he's a cocaine addict, and usually they need
16        money, and there was a $2,700 reward for -- as
17        a -- to provide a tip.  He collected it, by the
18        way.  I understand he collected.
19   Q.   Are you aware of any evidence in the record that
20        Mr. Windham knew about that award at the time that
21        he made that anonymous call on June 8, 1993?
22             MS. KEEN:  I'm sorry, Michael.  I
23        couldn't hear you.  You broke up.  Might have been
24        at my end.  Can you just repeat that.
```

1   BY MR. IASPARRO:

2   Q.   And my question was are you aware of any evidence

3        that Mr. Windham knew about the prospect of a

4        financial reward on June 8, 1993, when he made

5        that Crime Stoppers call?

6                  MS. HAGY:  Objection, form.

7   A.   There's nothing about the Crime Stoppers call

8        other than what appears in Forrester's report or

9        his affidavit.  And that's what I talked about in

10       terms of did he ask for the money there or where's

11       the documentation of the call.  I think it's

12       common knowledge Crime Stoppers provides financial

13       rewards for tips.

14  BY MR. IASPARRO:

15  Q.   And you reviewed the deposition testimony from

16       Marvin Windham, correct?

17  A.   Yes.

18  Q.   Do you recall him testifying that the reason he

19       came forward was because he was afraid of

20       Mr. Pursley?

21  A.   No, I don't --

22                  MS. HAGY:  (Interrupting)  Objection.

23                  THE WITNESS:  I don't recall precisely.

24  BY MR. IASPARRO:

1   Q.  In the top paragraph on Page 19 here, you write,

2       "The detectives investigating this case could not

3       reasonably have relied on Windham's statement

4       unless every key fact was corroborated by good

5       quality evidence."  Do you see that?

6   A.  Yes.

7   Q.  What do you mean by every key fact, which facts

8       are those?

9   A.  Well, they're embedded in the bullet points, and

10      there's a lot of verification that could occur

11      there -- there in the bullet points.

12  Q.  And the phrase "good quality evidence," is that a

13      term of art?  What do you mean by that?

14          MS. HAGY:  Objection, form,

15      argumentative.

16  A.  Well, there's good evidence, and then there's

17      not-so-good evidence.  They're categories.  And

18      the prime evidence is physical.  And even the

19      Rockford statement about physical evidence is

20      something -- and I agree.  It's neutral, doesn't

21      take any side, it's -- doesn't lose its memory,

22      and it will tell you the truth.  So you always

23      seek the very best evidence and you try to verify

24      everything that's said as best you can.

1    BY MR. IASPARRO:

2    Q.   All right.  This list of bullet points is what I

3         think you were just referring to, "Facts in

4         Windham's account were flat-out contradicted, were

5         inconsistent or could not be corroborated."  Is

6         that what you were just referring to?

7    A.   That's -- that was my answer to the question you

8         posed.  I thought that was the best way to do it.

9    Q.   First bullet point you're critical here, "Windham

10        claimed that Pursley told him Andrew and Rebecca,"

11        quote, "'said they weren't going to give him the

12        purse or wallet but just going to give him the

13        money and he shot him twice.'"  Then you cite

14        from the trial testimony of Marvin Windham from

15        April of 1994, right?

16   A.   Yes.

17   Q.   How is trial testimony from a year after the

18        murder, ten months after Pursley's developed as a

19        suspect relevant to what the detectives would have

20        known or done between April and June of 1993?

21             MS. HAGY:  Objection, form.

22   A.   Well, it has to do with -- what you have is you

23        have a survivor of the homicide, Rebecca, and

24        she -- and she clearly says that -- that Ascher

1     wants to -- was willingly giving up the money.

2     And it's a -- Windham's statement, which he says

3     comes from Rebecca -- I mean from Crabtree,

4     differs from what actually occurred according to

5     Rebecca, the survivor.  Now, I think what you

6     asked me is, well, it's been a year later.  Is

7     that -- is that the question?

8  BY MR. IASPARRO:

9  Q.  Yeah.  The question was how is testimony from a

10     year later, 1994 at the jury trial, relevant to

11     what the detectives would have known or done in

12     April and June, 1993.

13  A.  Because they would have verified that statement

14     that Windham says that Pursley says to him, I

15     guess what Rebecca accounts when the crime

16     occurred.  And that's not a year later, and it's

17     not -- that's not an accurate statement of what

18     really happened when the shooting occurred.

19  Q.  Your next bullet point you reference the

20     unemployment office employee who testified again

21     at the trial in April, 1994, right?

22  A.  Right.  So, now, this is the point.  These things

23     should be verified at the time Windham says they

24     happened.  That's not a year later.  Windham says

1        Pursley says dah, dah, dah, but when they look at

2        Rebecca's statement, Rebecca George's statement,

3        that doesn't match what happened.  And again

4        Windham says Pursley said he made this threat.

5        They could go and check it out.  They don't.  So a

6        year later it surfaces not a true statement by

7        Windham.

8  Q.  Are you aware of the fact that Marvin Windham when

9        he first spoke to the police said that that

10       statement was made after Pursley hung up the

11       phone?

12            MS. HAGY:  Objection, form,

13       mischaracterizes evidence.

14  A.  Here's what I think was accurate:  He first said

15       he heard Pursley swear at and threaten the person

16       in the unemployment office and tell the person on

17       the phone that he was going to start killing

18       peckers, dah, dah, dah.  Okay.  Now, when

19       eventually that is looked at and the testimony in

20       the trial and that's finally resolved at the trial

21       as Windham's false statement, he says, "I was

22       there.  I heard this.  On the phone, I heard him

23       on the phone."  And the person on the other end of

24       the line says, "I don't remember that ever

 1    happening.  If it did, I would have documented

 2    it."  That's what I'm talking about.

 3              MS. HAGY:  We've been going for about

 4    another hour.  Do we want to take another short

 5    break soon or . . .

 6              MR. IASPARRO:  I'm happy to take a

 7    break.

 8              Mr. Clark, how are you doing?

 9              THE WITNESS:  Well, I'd like a break.

10    The clock sort of got away from me.

11              And then maybe we can quickly, too,

12    decide after another hour a little lunch.

13              MR. IASPARRO:  Sure.

14              THE WITNESS:  But I'd like the five

15    minutes.  Can we take it now?

16              MR. IASPARRO:  That's fine.

17              THE WITNESS:  Okay.

18              (A brief recess was taken.)

19              MR. IASPARRO:  Everybody back?

20              THE WITNESS:  Got it.

21              MR. POTTINGER:  Here.

22              MR. MOGBANA:  City's back.

23              MR. IASPARRO:  Ready to go back on the

24    record, Mr. Clark?

1          THE WITNESS:  Yeah.  It's fine.  We're

2     all good.

3          MR. IASPARRO:  Okay.

4          THE WITNESS:  Thank you for the break.

5          MR. IASPARRO:  Sure.

6  BY MR. IASPARRO:

7  Q.  We're on Page 20 of your report, Mr. Clark, and

8     I'm looking at the bullet point that begins, "The

9     reports from the Burger King robbery Windham

10     referenced say that witnesses described the robber

11     as white and with a white-sounding voice.  If that

12     is true, Pursley cannot be confused with the

13     person who committed the Burger King crime.  There

14     is no reason he would have told Windham that he

15     did."  Did I read that correctly?

16  A.  That's right.

17  Q.  I'm going to show you what has been marked as

18     Exhibit 9, Schmidt, Bates stamped Schmidt 59

19     through 63.  Did you review this report?

20  A.  Yes, I did.

21  Q.  Okay.  And this is an incident report relating to

22     that Burger King robbery at 909 West Riverside

23     Boulevard that Mr. Windham referenced, correct?

24  A.  Correct.

 1   Q.   And I'll direct your attention to Page 5 of the

 2        report, in particular the last paragraph there.

 3        You see where it says, "Mike and Cliff state they

 4        could not tell if the suspect was black or white

 5        as he wore a ski mask and had gloves on.  However,

 6        Ronald Nance stated he got a good look at the

 7        suspect's face and said he saw white skin around

 8        the suspect's eyes and believes from the suspect's

 9        voice that he was a white male."  Did I read that

10        correctly?

11   A.   You did.

12   Q.   So the fact of the matter is that two witnesses

13        said that they could not tell if the suspect was

14        black or white because he was wearing a ski mask

15        and had gloves on, right?

16   A.   That's right.

17   Q.   And one witness said he saw white skin around the

18        suspect's eyes and believed that from the

19        suspect's voice that he was a white male?

20   A.   Yes.

21   Q.   So going back to your report, contrary to what you

22        wrote at Page 20 of your report, that bullet point

23        we just referenced, multiple witnesses did not

24        describe the Burger King robber as white, only one

1    did, correct?

2              MS. HAGY:  Objection, form.

3  A.  Multiple witness -- the bullet point does not say

4      multiple witnesses.  The report -- and I -- I hung

5      my attention on the last paragraph, by the way.

6      We have a white-sounding voice and a white skin

7      and two others that said they couldn't tell black

8      or white, one way or the other.  But we have

9      visual evidence from the other that says, "I saw

10     around the ski mask and it's white."  So I -- but

11     I parsed it.  I said if it's true, then Pursley

12     could not be confused with the person who

13     committed the burglary, the Burger King crime, and

14     there was no reason that Pursley would say that he

15     did because he didn't do it.  That was -- that

16     needed to be considered and investigated further,

17     resolved one way or the other and as a

18     contradiction of what Windham says Pursley told

19     him.  Because all this is hearsay.  It's Windham

20     saying, "By the way, that is what he told me."

21     And it doesn't -- doesn't iron out very well.  I

22     think the call to the employment office is

23     particularly telling, but you will see in the next

24     bullet point I do acknowledge that there are

1      verifiable things that were verified.

2  BY MR. IASPARRO:

3  Q.   I want to look now at the paragraph under the last

4       bullet point where you say, "Windham's statement

5       did not give probable cause to arrest and charge

6       Pursley with murder."  We now know based upon the

7       line of questioning I asked you regarding the

8       arrest warrant that probable cause was not based

9       on Marvin Windham's written statement, correct?

10 A.   I don't know what --

11               MS. HAGY:  (Interrupting)  Objection,

12       form, mischaracterizes the testimony.

13               THE WITNESS:  I'm sorry.

14               MS. HAGY:  Sorry, Roger.  Go ahead.

15               THE WITNESS:  I only know that the

16       judge considered enough probable cause to issue

17       the arrest warrant on that date that you showed

18       me, the 12th.

19 BY MR. IASPARRO:

20 Q.   Right.  And Marvin Windham had not yet been

21       uncovered or identified as of June 11, 1993,

22       right?

23 A.   Well, I discuss that a lot, and that's -- in the

24       record he is not identified by name signing off

1     until the 12th.

2  Q.  Okay.  Assuming for the sake of argument,

3     Mr. Clark, that that in fact is true, then that

4     completely undercuts your point that the police

5     did not have probable cause to arrest based on

6     Marvin Windham's statement, right?

7          MS. HAGY:  Objection, incomplete

8     hypothetical.

9  A.  No.  Because they had a statement from an alleged

10    confidential, not -- by the way, it's not citizen

11    informant calls Crime Stoppers.  He's -- he's

12    couched as confidential informant.  I don't know

13    how you can take a call in and then tag him with

14    the name confidential without knowing who he is.

15    Nevertheless, I took it that if all that is true,

16    the sequence of events that you just posed, then

17    they're using the unknown -- unidentified call in

18    to Crime Stoppers as the basis.

19 BY MR. IASPARRO:

20 Q.  All right.  The next section of your report that

21    is entitled, "RPD Did Not Disclose Information

22    About Benefits it Provided to Windham."

23 A.  Yes.

24 Q.  And you're critical about an incident that

```
 1      occurred in November, 1993, between Mr. Windham

 2      and his wife, correct?

 3   A.  Yes.

 4           MS. HAGY:  Objection, form,

 5      mischaracterizes evidence.

 6  BY MR. IASPARRO:

 7   Q.  And you would agree that November, 1993, was long

 8      after Patrick Pursley was arrested for and charged

 9      with the murder of Andrew Ascher, right?

10   A.  Well, yeah.  November comes after the murder and

11      the arrest.  That's not long after, but it's

12      after.

13   Q.  All right.  That's also after June 23, 1993, when

14      Pursley was indicted by the grand jury for the

15      murder of Andrew Ascher, right?

16   A.  I would agree.

17   Q.  All right.  And you've reviewed the report of

18      Mr. Windham's Crime Stoppers tip made anonymously

19      on June 8, 1993, his written statement from

20      June 12, 1993, his grand jury testimony from

21      June 23, 1993, his trial testimony from April of

22      1994, and his deposition testimony in this case

23      from October of 2019 and February of 2020, right?

24   A.  Yes.
```

 1   Q.   And would you agree it's fair to characterize all
 2        of those statements and testimony in relation to
 3        Patrick Pursley's involvement in the Ascher murder
 4        as consistent?
 5             MS. HAGY:  Objection, form,
 6        mischaracterizes evidence.
 7   A.   I'd have to compare the -- the consistencies and
 8        any inconsistencies other than what I've commented
 9        for in the report.  You're talking about
10        statements that Windham makes.
11   BY MR. IASPARRO:
12   Q.   Let me ask you a question maybe a little more
13        generally.  In terms of Marvin Windham indicating
14        that Patrick Pursley told him he was responsible
15        for the murder of Andrew Ascher, Marvin Windham
16        has been consistent on that since June of 1993,
17        right?
18   A.   Yeah, he's been consistent.  But this page is
19        about the benefits he receives for that
20        consistency.
21   Q.   We're going to get there.
22   A.   I'm sorry.
23   Q.   We're getting there.  Hold on.
24   A.   Okay.  Because that's the point of this piece of

1    my report.

2  Q.  I know what point you're trying to make.  Do you

3    know --

4  A.  (Interrupting)  No.  I'm not trying to make any

5    point other than I just want to say this is the

6    purpose of that commentary.

7  Q.  Do you know how the Rockford Police Department

8    detective bureau was organized and structured in

9    1993?

10  A.  No.  There's no organizational chart given to me.

11  Q.  Are you aware of whether there was a dedicated

12    domestic violence unit at that time?

13  A.  No.

14             MS. HAGY:  Objection, form.

15  BY MR. IASPARRO:

16  Q.  You don't know?

17  A.  I don't know.

18  Q.  Do you know whether it was unusual at that time in

19    1993 for detectives assigned to the Rockford

20    Police Department's violent crimes unit to follow

21    up on domestic violence incidents?

22             MS. HAGY:  Objection, form.

23  A.  Well, I would assume that there's -- it's

24    generally -- detective bureaus are generally

1        divided into crimes against persons and property

2        crimes, and then there's also a juvenile and a

3        narcotics section, piece typically.  So I'm

4        assuming anything with violence would be just go

5        to the detectives that handle crimes against

6        persons.

7    BY MR. IASPARRO:

8    Q.  I'm going to pull up what's been marked as

9        Exhibit 10, kind of blurry, but that's the way

10       we've got it.  This is marked COR and Getty 1572

11       to 1576.  Did you review this document?

12   A.  Yes.  I remember -- and this is -- I commented --

13       I think it's even cited in my report.  If not,

14       the -- that 1,400 area is.

15   Q.  And focusing in on Detective Forrester's follow-up

16       investigation of the domestic violence incident

17       which you reference in your report from

18       October 15 -- I'm sorry, November 15, 1993, and

19       we're looking now at the fifth page of the

20       exhibit, COR and Getty 1576.  Do you see that?

21   A.  Yes.

22   Q.  My question is do you have any information other

23       than what is set forth in Detective Forrester's

24       report here about what was said between

1     Detective Forrester and Diane Windham on

2     November 18, 1993, regarding Ms. Windham's desire

3     to have Marvin Windham arrested for the

4     November 15, 1993, incident?

5          MS. KEEN:  I think you said Diane,

6     Michael.  You meant Liane.

7          MR. IASPARRO:  If I said Diane, I meant

8     Liane.

9  A.  Yeah.  Well, I took it his wife.  And there's

10     nothing that I recall.

11  BY MR. IASPARRO:

12  Q.  Well, Detective Forrester's report says that

13     Ms. Windham said that she did not wish to have

14     Marvin arrested, right?

15  A.  Yes.

16  Q.  According to Detective Forrester's report, she

17     just wanted him to leave her alone, right?

18  A.  Yes.

19  Q.  Which according to the report, Detective Forrester

20     indicated he communicated to Marvin?

21  A.  Yes.

22  Q.  So going back to your report, your discussion

23     about Mr. Windham being Forrester's witness, as

24     you characterize him, and the suggestion that

1      Detective Forrester encouraged Ms. Windham not to

2      pursue charges against Marvin Windham for the

3      November 15, 1993, incident, you're speculating

4      there, right?

5             MS. HAGY:  Objection, form.

6  A.  It's more than speculation.  It's what I see often

7      when a linchpin informant or linchpin witness --

8      that's my term -- gets in trouble and you really

9      need his or her cooperation to be successful in

10     the prosecution.

11  BY MR. IASPARRO:

12  Q.  Do you know what, if anything, Detective Forrester

13     told the Winnebago County State's Attorney's

14     Office about this November 1993 domestic incident

15     between Marvin Windham and his wife?

16  A.  My information was he never disclosed it.  He kept

17     it to himself.

18  Q.  Well, how do you know that?

19  A.  I don't, other than I couldn't find anything in

20     the record, and so I wrote assuming that the state

21     attorney would be -- would comply with the

22     requirement to turn over all information regarding

23     Windham, there is no evidence that Forrester

24     turned this information over to the state

1      attorney.

2   Q.  And what's your basis to render an opinion that

3       Detective Forrester had an obligation to turn over

4       any information regarding this domestic incident

5       to the state's attorney's office?

6   A.  Thank you for that.  Because this goes to the

7       detectives' required knowledge of Brady, which

8       they deny in their statements and depositions.

9       And that is part of my report here.

10  Q.  That's all -- that's all presumed -- an entire

11      opinion presumes that there was in fact an

12      obligation to turn over this report pursuant to

13      Brady and its progeny, correct?

14  A.  Yes, it does.

15  Q.  And are you saying that there was an obligation

16      under Brady for Detective Forrester to have

17      disclosed this report to the state's attorney's

18      office?

19  A.  Yes, I am.

20  Q.  But you don't know if Detective Forrester

21      encouraged Ms. Windham not to pursue any charges,

22      do you?  All we're going off of is what's in his

23      report.

24  A.  You are correct.

```
 1    Q.   And you really don't know as you sit there today

 2         whether or not the state's attorney's office knew

 3         about this incident, do you?

 4    A.   I do not know.  And if they did, they owed it to

 5         the defense, and that would also be a Brady

 6         violation.

 7    Q.   You're not a lawyer, are you, sir?

 8    A.   No.  I'm a retired detective.  I'm sorry.

 9    Q.   And when you say at the bottom of Page 21 that,

10         "Forrester was required to disclose Windham's

11         criminal activity to the prosecutor and the fact

12         that he intervened to resolve the matter short of

13         an arrest," you don't know if in fact that's what

14         happened, do you?

15                   MS. HAGY:  Objection, form.

16    A.   I see that implicit in the reports.

17    BY MR. IASPARRO:

18    Q.   But you're just speculating that that's what

19         happened.

20    A.   No.  It's not speculation.  That's based on my

21         reading of the reports.

22    Q.   How is it not speculation if you have to use a

23         word like implicit?

24                   MS. HAGY:  Objection, form.
```

```
 1   A.   Where did I use the word implicit?

 2   BY MR. IASPARRO:

 3   Q.   About two sentences.  You just testified --

 4   A.   (Interrupting)  I said disclosing the information

 5        isn't implicit, didn't I?

 6   Q.   No.  My question was your conclusion that "the

 7        fact that he interviewed to resolve the matter

 8        short of an arrest," you're speculating that that

 9        happened, right?

10   A.   No.  I said -- I already answered that question.

11        No.  It's not a speculation.  It's what I see in

12        the reports.

13   Q.   You don't have any basis to conclude that

14        Detective Forrester made a criminal complaint

15        against Mr. Windham go away, do you?

16             MS. HAGY:  Objection, form, asked and

17        answered.

18   A.   Here's what I know:  There was a call -- the wife

19        calls for help.  She -- she prompts it.  Now,

20        these are my words, "He beat me."  The leading

21        investigator of this homicide responds to the

22        house where his linchpin witness is in trouble.

23        And she after calling says, "I really didn't want

24        you guys here, and I don't want you to do
```

```
 1      anything," and he leaves.  And then he doesn't say
 2      anything to anybody.  And he knows if I arrest
 3      this man, he'll come and testify dressed in jail
 4      garb in front of the jury.  And that's a bit of
 5      hyperbole, but that's basically it.
 6   BY MR. IASPARRO:
 7   Q.  So let's break that down a little bit.  The
 8      incident itself happened on November 15, 1993,
 9      when some patrol officers responded and talked to
10      Ms. Windham, right?
11   A.  That's right.  And they don't handle it.  They
12      don't -- okay.  I'll wait for the question.
13   Q.  Well, I guess that's my point.  Where you're going
14      is they didn't make an arrest that day, right?
15   A.  No, they didn't.
16   Q.  And they didn't swear out a criminal complaint,
17      get an arrest warrant for Mr. Windham, right?
18   A.  No.
19   Q.  It was three days later when Detective Forrester
20      went to follow up on that report, and according to
21      his report, Ms. Windham indicated she just wanted
22      to be left alone, she didn't want him arrested,
23      true?
24            MS. HAGY:  Objection, form.
```

1    A.  I only know what's in the report.  Forrester --

2    BY MR. IASPARRO:

3    Q.  (Interrupting)  That's right.

4    A.  (Continuing) -- doesn't say anything further in

5        his trial testimony.

6    Q.  And on Page 21 of your report when you say, "This

7        is an obvious violation of Brady for which

8        Forrester is responsive," or responsible, you

9        would agree that's a legal conclusion you are not

10       qualified to make, right?

11              MS. HAGY:  Objection, form.

12    A.  I'm not qualified as a lawyer.  I'm qualified as a

13       police -- a former police officer, a detective,

14       and a detective bureau commander as I would

15       require and insist that such disclosures be made.

16    BY MR. IASPARRO:

17    Q.  Tell me what your understanding is about the

18       difference between a search warrant and an arrest

19       warrant, Mr. Clark.

20    A.  Well, a search warrant is legal authority to enter

21       a location protected by the Fourth Amendment to --

22       to search for and seize evidence as indicated in

23       the warrant.  An arrest warrant is the

24       authorization to seize an individual for a crime

1    and book them into custody.

2  Q.  During the course of your law enforcement career,

3      how many search warrants affidavits did you draft?

4              MS. HAGY:  Objection, form.

5  A.  Personally probably 50 NORSAT, but I approved --

6      read and approved and authorized ten a month,

7      which would be 120 a year for the five years, so

8      that would be over 700 search warrants as a NORSAT

9      commander.

10 BY MR. IASPARRO:

11 Q.  And in terms of those 50 which you indicated you

12     drafted, were those instances in which you were

13     actually the affiant?

14 A.  Correct.  That's the way I took your question,

15     that I was the affiant about 50 times.

16 Q.  So we're going to go back to Exhibit 7, which is

17     the search warrant, complaint for search warrant

18     and then the search warrant affidavit.  Would

19     you agree that the purpose of the affidavit,

20     Detective Forrester's affidavit in support of the

21     complaint for search warrant, was to establish

22     probable cause to allow the detectives to search

23     Mr. Pursley's and Miss Crabtree's apartment?

24 A.  I would agree.

  1  Q.  All right.  It was not to secure an arrest warrant
  2      for Mr. Pursley, correct?
  3  A.  That is a search warrant affidavit, not an arrest
  4      warrant affidavit.
  5  Q.  Do you have any understanding that
  6      Detective Forrester's search warrant affidavit
  7      was used in any way to secure an arrest warrant
  8      for Patrick Pursley?
  9  A.  Well, I think it was the results of the search and
 10      the facts of this investigation, yeah.
 11  Q.  Well, those are different things.  I'm talking
 12      about the search warrant affidavit itself.  Do
 13      you know whether the affidavit was presented to
 14      Judge Kennedy as part of the request for an arrest
 15      warrant for Mr. Pursley?
 16  A.  As I -- no.  I don't remember that detail, whether
 17      or not it was.
 18  Q.  Okay.  Going back to your report again, Page 23 at
 19      the top there, in this paragraph, this section of
 20      your report, you're discussing the search warrant
 21      affidavit, correct?
 22  A.  Right.
 23  Q.  Okay.  And at the top of Page 23 here where you
 24      say, "The other alleged crimes listed in this

1   warrant do not provide probable cause to arrest

2   Pursley for the Ascher murder because they are

3   unrelated, dissimilar and do not indicate any

4   culpability for the Ascher crime," we agree that

5   the warrant you're talking about here was not

6   submitted in order to establish probable cause for

7   Mr. Pursley's arrest, right?

8               MS. HAGY:  Objection, form.

9   A.  Well, that's the purpose of the seizure, to

10      determine whether -- whether an arrest is

11      authorized or not based on the evidence seized.

12      But -- I'll wait for the next question.

13  BY MR. IASPARRO:

14  Q.  Well, we've already established it was an

15      affidavit for a search warrant, right?  So I guess

16      I'm just confused.  Why are you talking about the

17      other alleged crimes listed in the search warrant

18      affidavit not providing probable cause to arrest

19      Pursley?  That doesn't make any sense because the

20      warrant was for a search, not an arrest, right?

21  A.  Well, right.  So in that regard you're correct,

22      and I would agree.  The point I was trying to make

23      is just because you throw in a -- in the affidavit

24      a bunch of crimes that we think is Pursley's and

```
 1        then say if -- allege, better said, that somehow
 2        these other crimes make him a probable cause
 3        arrest for the Ascher murder, that's what that
 4        paragraph is about.  But I agree, the affidavit
 5        was for search.  And even Pirages says that
 6        doesn't authorize the probable cause for arrest
 7        for murder.  That's in his deposition.
 8   Q.   Yeah.  But you don't have any information that
 9        the authorization to arrest Pursley granted by
10        Judge Kennedy was based upon anything having to do
11        with those other crimes, do you?
12   A.   I do not take umbrage at Judge Kennedy's arrest
13        warrant.  That's -- I -- he's a -- he's a -- he's
14        a judge, and he has the authority to issue arrest
15        warrants.
16   Q.   Okay.  The next paragraph here, "The warrant -- "
17        again we're talking about the search warrant
18        affidavit, as I understand it -- "also includes
19        false information, such as it says that the
20        Burger King robber was described as a
21        light-skinned black male."  Do you see that?
22   A.   Yes.
23   Q.   And then you're critical.  You say, "It is highly
24        improper to misstate evidence to obtain a search
```

```
 1        warrant or for any law enforcement purpose,"
 2        right?
 3   A.   Right.  So they threw in the Burger King robbery
 4        where it couldn't be Pursley if Pursley's black.
 5        The alleged perpetrator is white.  And that would
 6        not be a proper allegation against Pursley to
 7        justify a search warrant.
 8   Q.   Let's go to the search warrant itself.
 9   A.   Correct.  I'm talking about the truthful -- the
10        affiant says everything in here is correct.
11   Q.   I understand that.  Let's look at Paragraph 4 that
12        the affiant swore to regarding that Burger King
13        restaurant.  Page 4 of the search warrant
14        affidavit, so we're on COR and Getty 148 now, back
15        to Exhibit 7.
16   A.   Yeah.  Incidentally, it's interesting that
17        Paragraph 6 is -- he doesn't go chronologically.
18        If you go -- as he lists out those crimes.  Then
19        all of a sudden we sort of leapfrog to the -- sort
20        of like it's an add-on, but he doesn't put it in
21        chronological order.  It's just -- it's just an
22        observation of the warrant -- or the affidavit.
23   Q.   All right.  Let me get to my question here.
24   A.   Sure.
```

1   Q.   I got to find the right -- here it is, right in
2        front of me.  All right.  Right where we were at,
3        Paragraph 4 of the search warrant affidavit,
4        COR and Getty 148, Exhibit 7 for today's
5        deposition.  "On April 15, 1993, at 5:39 a.m.,
6        Burger King restaurant located at 909 West
7        Riverside Boulevard, Rockford, Illinois, was
8        robbed.  The robber was described as a white or
9        light-skinned black male wearing a blue ski mask,
10       dark navy blue zipper-front jacket, well-worn blue
11       jeans, brown work gloves and hard-sole work
12       shoes."  Did I read that correctly?
13  A.   Yes.  You read it exactly as it's written.
14  Q.   Okay.  Well, that's a lot different than your
15       criticism here of Detective Forrester that he only
16       included information that the robber was described
17       as a light-skinned black male.  That's not at all
18       what he said, is it?
19            MS. HAGY:  Objection, form,
20       mischaracterizes evidence and prior testimony.
21  A.   It is -- he wrote what he wrote.
22  BY MR. IASPARRO:
23  Q.   That's my point, "The robber was described as a
24       white or light-skinned black male."

 1   A.   Yeah, and was identified as -- by a -- by a

 2        witness who saw his as white and sounded white.

 3        That's the -- that's the . . .

 4   Q.   He didn't misrepresent anything, he took it right

 5        from the report, didn't he?

 6                  MS. HAGY:  Objection, form,

 7        mischaracterizes evidence and prior testimony.

 8   A.   He didn't include the exculpatory evidence in the

 9        affidavit.

10   BY MR. IASPARRO:

11   Q.   Okay.  All right.  We're moving down the report

12        now.  The next section is entitled -- we're on

13        Page 23 of your report -- "Detectives Skipped

14        Basic Steps and Violated Policies During Their

15        Search of Samantha and Pursley's Apartment and Its

16        Discovery of the Supposed Murder Weapon."

17   A.   Right.

18   Q.   Were you provided as part of your review of this

19        case any photographs taken by Rockford police

20        detectives during the search warrant of

21        Mr. Pursley's and Miss Crabtree's apartment on

22        June 10, 1993?

23   A.   I was.  And it's listed -- let me see if I . . .

24        It's COR and Getty -- I think it's going to be the

```
 1      very first file that I have on my flash drive are
 2      the photographs of the apartment.
 3   Q. All right.  Next exhibit I'm going to show you
 4      has been marked as Exhibit 13.  This is COR and
 5      Getty 345 to 355.
 6   A. That's one of the photographs that I -- in the --
 7      that were provided to me, a set of photographs
 8      provided to me.
 9   Q. All right.  I'm going to scroll down to --
10   A. (Interrupting)  There you go.
11   Q. (Continuing) -- COR and Getty . . .
12   A. Okay.  So right there, this photograph, if you
13      stop.
14   Q. Yes.
15   A. You'll see right on the -- it's sideways, but
16      the -- on this photo below you'll see a black
17      object in between the wall and the dresser.
18      That's the gun case where the Taurus was found.
19   Q. Correct.  And for the record that was COR and
20      Getty 350, the top photo.  And I'm going to scroll
21      down to COR and Getty 351, the top photo as well.
22   A. That's it, yes.
23   Q. All right.  And what you're describing is a black
24      gun case, if you will, between a dresser and a
```

```
1        blue wall, correct?

2   A.   Correct.

3   Q.   Do you have any basis to dispute Detective

4        Jeff Houde's testimony that the Taurus 9mm handgun

5        recovered from Mr. Pursley's apartment on June 10,

6        1993, was in the box depicted in those two

7        photographs we just looked at?

8   A.   Well, that's what the record says.  And the

9        commentary in my report is how incompetently that

10       was documented and -- and taken into evidence.

11       That's what my -- that is allegedly the gun case

12       and the Taurus inside that gun case.

13  Q.   Okay.  Putting aside your criticisms about

14       documentation of things for a moment, do you have

15       any reason to dispute Detective Houde's testimony

16       that the Taurus 9mm firearm was in fact in that

17       box?

18                 MS. HAGY:  Objection, form,

19       argumentative, mischaracterizes evidence.

20  A.   The answer is I took it for the purpose of my

21       report that it -- that was it, that it was the gun

22       case and the Taurus was inside.  I took it as a

23       part of my evaluation.  I think -- and then I

24       commented on how fragile that conclusion is.
```

    1    BY MR. IASPARRO:

    2    Q.   I'm going to show you another exhibit now,

    3         Exhibit 14.  This is COR and Getty 223, 224 and

    4         225.  Have you reviewed this report, Mr. Clark?

    5    A.   I did.

    6    Q.   All right.  And the first page, can we agree this

    7         is Detective Houde's processed evidence report

    8         relating to the search warrant at 901 Ashland,

    9         No. 2, on June 10, 1993?

   10    A.   Okay.

   11    Q.   Any reason to dispute that?

   12              MS. HAGY:  Objection.

   13              Roger, do you need to see the whole

   14    report?  Are you okay?

   15    A.   No.  I remember seeing this.  You know, I found

   16         myself constantly going back to COR and Getty 1

   17         through 333, which is the investigative file.  And

   18         I -- I -- for the purpose of the report, I wrote

   19         that that was the gun case and that was recovered

   20         and that's where the Taurus was after Rebecca

   21         showed them where it was.  She had to show them

   22         where it was.

   23    BY MR. IASPARRO:

   24    Q.   You mean Samantha?

1  A.  I'm sorry, Samantha.  Forgive me.  I won't make

2       that mistake again, Samantha Crabtree.  They --

3       they've come out.  She's waiting in the car, "It's

4       not in there."  She says, "Yes, it is" and goes up

5       there and shows them.

6  Q.  All right.  Page 1 of Detective Houde's report

7       about halfway down, "A Taurus 9mm pistol and its

8       magazine," in parentheses, "which were in a gun

9       box," close paren, "and a plastic Beretta gun box

10      were recovered from between a dresser and wall in

11      the southeast bedroom."  Do you see that?

12  A.  Yes.

13  Q.  Detective Houde in fact documented that in his

14      report, correct?

15  A.  Yes, in the report.

16  Q.  All right.  Now we're going to go down to the

17      third page of his report, COR and Getty 225.  This

18      appears to be a diagram of 901 Ashland, No. 2,

19      correct?

20  A.  Correct.

21  Q.  Which depicts where certain items of evidence were

22      recovered, right?

23  A.  Yes.

24  Q.  And if you see No. 4, it says, "Taurus 9mm and two

1    gun boxes," and then the actual No. 4 on the

2    diagram depicts that location between the dresser

3    and the wall in that bedroom, right?

4  A.  Yes.

5  Q.  All right.  Going back to your report, Page 23,

6    the second paragraph under the section we've been

7    talking about, second sentence says, "The Rockford

8    Police Department's own evidence and property

9    handling procedures in 1993 provided that the

10    evidence and control section of the department

11    should assume responsibility for the transport, by

12    U.S. mail or other means, of evidence that is sent

13    to any outside agency for tests and/or evaluation

14    or to the court for representation in a court of

15    law."  I was a little confused as to why you

16    referenced that particular procedure, Mr. Clark.

17    Can you help me out here?

18  A.  It was intended to reinforce everything I said up

19    to this point, including the shell casings and

20    slugs.  And this is where I decided, you know, to

21    plug in the references for the department's own

22    procedures plus other sources, so that's why it's

23    there.  And as you can see in my report, I'm very

24    critical the way they conducted the search, the

1    way they documented the search, and I think they

2    mishandled the evidence.

3 Q. Are you under the impression that the two firearms

4    recovered from Mr. Pursley's apartment, the Taurus

5    and the Beretta, were not processed for

6    fingerprints?

7 A. Oh, I think it was processed for fingerprints.

8    Yes.  That's before it went to the identification

9    section.

10 Q. Okay.  Are you aware of the fact that one of

11    Miss Crabtree's prints was found on the Taurus?

12 A. Yes, I am aware of it.

13 Q. All right.  And are you aware that one of

14    Mr. Pursley's prints was found on an ammunition

15    box which contained live 9mm rounds?

16 A. Yes.

17 Q. I show you Exhibit 16.  This is COR and Getty 174,

18    and then the other two pages are COR and Getty 171

19    and 172.  The Bates numbers are actually out of

20    order, but the report itself is correct for

21    purposes of the exhibit, Pages 1 through 3.  Have

22    you reviewed this?

23 A. Yes, I did.

24 Q. All right.  And can we agree that this is the

1    evidence report prepared by Detective Houde with

2    respect to the items recovered from 901 Ashland,

3    No. 2, on June 10, 1993?

4 A. Yes.

5 Q. And this is contemporaneous documentation of the

6    recovery of items during that search warrant,

7    correct?

8 A. Yes.

9 Q. Consistent with the police practices you describe

10    in your report?

11 A. Right.

12 Q. So when you say -- I'm going to go to Page 25 of

13    your report now, first full paragraph on Page 25.

14    When you write, "There is no contemporaneous

15    record of what actually existed in the apartment

16    when it was searched, whether a gun was found,

17    what condition it was in or what the serial number

18    was," that's not accurate, is it?

19          MS. HAGY:  Objection, form,

20    mischaracterizes evidence, the report and prior

21    testimony.

22 A. If you go back to Page 24, I talk about how the

23    search and then the discovery of evidence should

24    be handled.  And I think I've adequately

```
 1        criticized on Page 25 the problems.  And I said

 2        there's only photographic documentation of the

 3        Beretta.  There is no photographic documentation

 4        of the Taurus apart from the photo taken across

 5        the room.  Then the next paragraph, those are my

 6        criticisms.  So I would disagree that there's

 7        contemporous commentary about the search.

 8   BY MR. IASPARRO:

 9   Q.   Detective Houde's report, which is Exhibit 16, the

10        evidence report does in fact list the Taurus and

11        includes the serial number, right?  I mean there's

12        no dispute that Taurus was recovered from that

13        apartment, right?

14              MS. HAGY:  Objection, form,

15        mischaracterizes evidence.

16   A.   Well, I think it could legitimately be disputed,

17        but according -- this is a report later on written

18        this is what we got, this is what it is.  I'm

19        talking about how it's supposed to be handled,

20        because it does then open the door -- at the very

21        least criticism on mishandling of the key

22        evidence.  I mean this -- we're talking about

23        murder weapon, okay, in a homicide.

24        That -- and it cannot be overstated.
```

```
 1   Q.   All right.  I understand that.  You --
 2                  MS. HAGY:  (Interrupting)  Sorry;
 3        sorry.  Let him finish.
 4                  THE WITNESS:  May I answer?
 5                  MR. IASPARRO:  Sorry.  Thought you were
 6        done.
 7   A.   They know this going into the apartment, and
 8        what -- and all we get are photographs?  What's
 9        going on?
10   BY MR. IASPARRO:
11   Q.   Are you aware of the fact that Mr. Pursley and his
12        lawyers stipulated during his jury trial back in
13        1994 to the chain of custody relating to all this
14        evidence?
15   A.   Okay.  I'm agnostic about that.
16   Q.   Any reason to dispute that?
17   A.   I don't dispute anything in the record if it's
18        documented and written and certified.  I don't
19        dispute that.  I'm talking about what you do when
20        you're doing a murder investigation, and you know
21        I'm going in that apartment, I'm going to try to
22        find -- and I have information that the murder
23        weapon might be in there, and, by the way, I don't
24        find it, and I have to get the occupant to show
```

1    me.  So I mean that stuff needs to be documented.

2  Q.  I'm showing you Exhibit 19, which is Bates marked

3    Pursley 000756.  Have you ever seen this document

4    before, Mr. Clark?

5  A.  I have everything related to the trial, and I --

6    as I recall the sequence of Bates numbers, yes, I

7    do have it.

8  Q.  All right.  And for purposes of the record today,

9    this is entitled, "Stipulation," correct?

10  A.  Counsel, I agree.  How they conduct his trial is

11    not part of my report.  I don't want to be

12    argumentative.  I just -- I don't understand the

13    stipulation, why they would do it, but

14    nevertheless it was done and then finally

15    challenged and overcome in another trial.

16  Q.  Okay.  Well --

17        MS. HAGY:  (Interrupting)  Michael, can

18    you say the Bates number again?  I missed it.

19        MR. IASPARRO:  One second.

20        MS. HAGY:  Thank you.

21        MR. IASPARRO:  Pursley 756.

22        MS. HAGY:  Okay.

23  BY MR. IASPARRO:

24  Q.  I want to make my record here, Mr. Clark, so

1  please answer my question.  We can agree that this

2  is a document entitled, "Stipulation," correct?

3  A.  Yes.

4  Q.  And it has a file stamp on it April 7, 1994?

5  A.  Okay.

6  Q.  First paragraph of the stipulation, "The following

7  stipulation is entered into between the parties

8  regarding evidence items tagged by the police as,"

9  and then it lists a number including "A48089, a

10  Taurus gun and magazine," lists out some other

11  items, including the fired bullet slug, fired

12  bullet slug, two spent bullet casings and a fired

13  bullet slug fragment.  "These items all were

14  delivered to Illinois State Crime Lab Forensic

15  Scientist Dan Gunnell in the same condition as

16  when they were first tagged into evidence by

17  Rockford police officers," correct?

18  A.  I see it.

19  Q.  That's what it says, that's what Mr. Pursley's

20  lawyers and the state stipulated to.

21  A.  Right.  Okay.

22  MS. HAGY:  Objection.  Counsel is

23  testifying now, and this is beyond scope and

24  irrelevant.

 1   BY MR. IASPARRO:

 2   Q.   Well, this whole stipulation is relevant, isn't

 3        it, Mr. Clark, because it undercuts your criticism

 4        regarding the chain of custody of these very

 5        items?

 6             MS. HAGY:   Objection, mischaracterizes

 7        evidence, his prior testimony, his report.

 8   A.   I disagree with that conclusion, and I have not

 9        altered my written opinion.  This was very

10        significantly mishandled in terms of search and

11        documentation of the search and then the following

12        seizure of evidence.

13   BY MR. IASPARRO:

14   Q.   What would you have done differently?

15             MS. HAGY:   Are you asking him as a

16        defense attorney?  As what?  Because he's not

17        testifying as a defense attorney.

18             MR. IASPARRO:   Clearly not.

19   A.   So I have done a number of very significant

20        searches on -- and supervised and commanded such

21        in very significant cases including death penalty

22        cases and insisted on a very strict protocol of

23        entry and documentation and recording of

24        everything that's done by all personnel under

1    lawful authority in the area searched and the

2    seizure thereof and insisting on competent,

3    trained, forensic lab people to secure that

4    evidence and transport it for further scientific

5    evaluation.

6  BY MR. IASPARRO:

7  Q.  Thank you.  All right.  We're moving on in your

8     report, on to Page 27, the section, "Samantha

9     Crabtree's Statement Bears Hallmarks of Coercion."

10    Do you see that?

11 A.  Yes.

12 Q.  Have you concluded that Samantha Crabtree falsely

13    implicated Patrick Pursley in the murder of

14    Andrew Ascher?

15 A.  Yes.

16          MS. HAGY:  Objection, form.

17          THE WITNESS:  I'm sorry.  The answer is

18    yes.

19 BY MR. IASPARRO:

20 Q.  Well, isn't that a credibility determination?

21 A.  No.  It's --

22          MS. HAGY:  (Interrupting)  Objection.

23          THE WITNESS:  It's based on the

24    commentary of the -- and the record established in

1    the second trial and the finding by the judge.

2  BY MR. IASPARRO:

3  Q.  Well, Samantha Crabtree didn't testify at the

4    second trial, did she?

5  A.  No, she didn't.

6  Q.  She testified -- she gave a written statement,

7    testified at the grand jury consistent with that

8    written statement, recanted by way of affidavit,

9    and then testified at the first trial, right?

10  A.  Yes.

11  Q.  Okay.  So you're not crediting her written

12    statement and grand jury testimony, you are

13    crediting her affidavit and trial testimony from

14    April, 1994?

15  A.  No.

16          MS. HAGY:  Objection.

17          THE WITNESS:  No.  That's not it at

18    all.

19  BY MR. IASPARRO:

20  Q.  Help me understand how that's not it.

21  A.  Because she's not reliable, period.  And that's in

22    the very beginning, and so everything that follows

23    cannot be considered truthful or not truthful.

24    That's, by the way, what the judge says.  You just

1     can't count on anything she's saying whatsoever.

2     However, saying that, this -- these following

3     paragraphs comment on the way she is handled as an

4     informant and statements are taken while in

5     custody, and I think I tried to be complete in

6     that criticism.

7  Q.  But you can't have it both ways, can you,

8     Mr. Clark?  You can't say that she's not credible

9     in any respect but then credit what she says about

10    how she was treated by Detectives Schmidt and

11    Forrester.

12         MS. HAGY:  Objection, form --

13  BY MR. IASPARRO:

14  Q.  (Interrupting)  That's what you're doing, right?

15  A.  No.

16         MS. HAGY:  Objection, form.

17         MS. KEEN:  Let -- counsel is trying to

18    make an objection.

19         THE WITNESS:  Am I ready for the

20    answer?

21         MS. HAGY:  I'm just going to say

22    objection, form, mischaracterizes his testimony.

23         THE WITNESS:  So, no, that is not it at

24    all.  It's not her verbal statements.  It is what

```
 1      is in the record on what they say she went through

 2      when they interrogated her and the statements she

 3      made.  And the commentary that I wrote is this is

 4      obviously such extreme coercion it is unreliable.

 5      I'm not giving her credibility in any regard.

 6  BY MR. IASPARRO:

 7  Q.  So have you concluded that certain Rockford police

 8      detectives manipulated Samantha Crabtree into

 9      falsely implicating Pursley in the Ascher

10      homicide?

11              MS. HAGY:  Objection, form,

12      mischaracterizes his testimony and his report.

13  A.  I think the question is in two parts.  Manipulated

14      her, yes.  And I can be more precise.  Regarding

15      what she says, that's -- it's so -- because of the

16      manipulation and the way she was treated, it makes

17      whatever she says unreliable unless it can be

18      substantiated by other methods.

19  BY MR. IASPARRO:

20  Q.  Isn't that a credibility determination?

21  A.  Oh, absolutely not, no.  This is -- this is -- you

22      bring somebody in and say, "Sis, you're going to

23      jail for bank robbery and you're not going to see

24      your kids until they are 40 years old, and you're
```

1      in a world of hurt," and then they talk to her for

2      a couple of hours and say, "Now we're going to

3      take your statement," after she rolls over and

4      shows them where everything is, et cetera.  And

5      that's considered reliable?  No.

6  Q.  But that's what she said, not what the detective

7      said happened, right?  So you're making --

8              MS. HAGY:  (Interrupting)  Objection.

9  BY MR. IASPARRO:

10 Q.  (Continuing) -- so you're making a credibility

11     determination.

12 A.  No.  I'm making a professional statement about how

13     reliable she would be and why they would know it

14     and what their obligation is to make sure they get

15     a voluntary statement.

16 Q.  And you've said that five or six times, probably

17     more now.  Whenever I ask you about a credibility

18     determination, you dance around it and you say,

19     "No.  It's a professional determination."  Just --

20     it's the same thing, right?

21 A.  No, it isn't.

22              MS. HAGY:  Objection, form,

23     argumentative, mischaracterizes his testimony.

24              THE WITNESS:  It is distinctly

1    different, and that's why I'm saying it the way I

2    am.  And in no way do I intend on dancing on the

3    head of a pin metaphorically to parse out some

4    sort of way to -- it can be taken differently.

5  BY MR. IASPARRO:

6  Q.  All right.  Mr. Clark, you're critical of the

7    detectives, in particular Detectives Forrester and

8    Schmidt, who we are talking about with respect to

9    the Crabtree statement.  You're critical of

10    them for, in your words, delaying advising

11    Miss Crabtree of her Miranda rights; is that

12    accurate?

13  A.  Among other things, yes.

14  Q.  All right.  Well, I'm just focusing in on that

15    for now.  When do you believe the detectives

16    questioning Miss Crabtree were required to advise

17    her of her Miranda rights?

18  A.  The moment she's arrested.

19  Q.  Which was when?

20  A.  Right after Patrick jumps out of the car and runs

21    away and she's still in the car.  They locate her

22    at a porch, I think, and then they take her into

23    custody.

24  Q.  Well, doesn't the record reflect the fact that

1    they asked her if she would come and talk to them

2    and she did so voluntarily?

3  A.  Well, that's what they say.  But I think the

4    totality of the circumstances, it's -- as the

5    record indicates, she's in the car and it's a

6    stolen car, and the boyfriend makes a run for it,

7    and then they take her in tow.  That's in her

8    mind, and as a detective would know, I'm not going

9    to be able to say no.

10 Q.  Is that another professional determination?

11          MS. HAGY:  Objection, form,

12    argumentative.

13 A.  It's a professional requirement to make sure that

14    whatever she's going to say to you is going to be

15    absolutely without coercion.

16 BY MR. IASPARRO:

17 Q.  Can you point me to anywhere in the record which

18    indicates that prior to Miss Crabtree being

19    advised of her Miranda rights she was not free to

20    leave?

21          MS. HAGY:  Objection, form,

22    argumentative.

23 A.  As you asked the question, there's nothing one way

24    or the other.

1    BY MR. IASPARRO:

2    Q.   All right.  We're on Page 27 of your report, and

3         it's the third paragraph from the bottom, the one

4         that begins with, "Forrester's report says she

5         gave three verbal statements about the bank

6         robbery, Burger King robbery, and Ascher murder."

7         You see that?

8    A.   Yes.

9    Q.   And I want to focus in on the last sentence, which

10        says, "This very easily could have had a coercive

11        impact on the rest of her statements, especially

12        if they offered her immunity for the bank robbery

13        if she provided them information about the

14        murder."  Have you reviewed some information that

15        indicates that any Rockford police detective

16        offered Samantha Crabtree immunity for the bank

17        robbery if she provided them information about

18        Pursley's involvement in the Ascher homicide?

19                   MS. HAGY:   Objection, form.

20   A.   I have to go to the grand jury testimony.  There's

21        no direct -- and the COR and Getty 112 to 118.

22        There's no statement, "We offered immunity."

23   BY MR. IASPARRO:

24   Q.   Okay.  You understand that Miss Crabtree pled

1  guilty to that bank robbery?

2  A.  I do.

3  Q.  Okay.  So it doesn't make sense that she would

4      have been offered or granted immunity for the bank

5      robbery, right?

6  A.  Well, there's more to it than just conviction.

7      There's the sentencing and what she's going to

8      face in terms of what's going to be inflicted on

9      her.

10 Q.  Okay.  Well, she went to prison.  I can represent

11     that to you.  If she was provided immunity, she

12     would not be able to be prosecuted for it and

13     convicted of it, true?

14 A.  If she was offered immunity for the crime, often

15     the offers are for lesser sentence or an

16     agreement, plea bargain, those types of things.

17     I've been party to those many, many times.

18 Q.  You're critical of Detective Forrester for having

19     not documented in his report exactly what

20     Miss Crabtree said with respect to her -- her

21     verbal statements regarding the homicide,

22     Burger King robbery and the First Bank North

23     robbery, correct?

24 A.  Yes.  I commented on how the interrogation should

1      occur and how it should be recorded.

2  Q.  Why would it be necessary for him to document what

3      was said when the contemporaneous documentation is

4      her written statements themselves?

5              MS. HAGY:  Objection, form,

6      mischaracterizes evidence.

7  A.  Well, we won't know unless we have a recorded

8      statement to contrast it.  Typically this -- the

9      signed documents or the statement -- and you

10     notice she initialed each paragraph -- are

11     typically as a result of negotiations or comments

12     back and forth or even instructions back and

13     forth.  And that is absent if we don't record it

14     during that entire time she was in -- being

15     confronted by Forrester and others.

16  BY MR. IASPARRO:

17  Q.  Showing you what's been marked as Exhibit 22,

18     COR and Getty 129.  Do you recognize this

19     document, sir?

20  A.  Yes, I do.

21  Q.  And this is a Miranda rights waiver form signed by

22     Miss Crabtree at 5:23 p.m., correct?

23  A.  Exactly.

24  Q.  Do you know as you sit there today when the

1     determination was made by Detectives Forrester

2     and Schmidt and the others involved in the

3     investigation at this time that Miss Crabtree was

4     not going to be free to leave that evening?

5 A.  Well, I don't know because we don't have the

6     recorded record when that announcement was made.

7     We have some comment about what they told her,

8     "You're not going to get out of jail until your

9     children are 40."  And she's pregnant, by the way,

10    when this is occurring.

11 Q.  That's what she said, right?

12 A.  I'm sorry?

13            MS. HAGY:  Objection.

14 BY MR. IASPARRO:

15 Q.  That's what -- Miss Crabtree said that?

16 A.  Right.  She told them she was pregnant.

17 Q.  No.  She's the one who indicated that that threat

18    was made to her, that she wouldn't get out of jail

19    until she was 40 and she wouldn't see her kids?

20 A.  Right, because we have no other recording of -- we

21    have no -- and they didn't put in the -- they

22    didn't -- Forrester didn't write his report, "I

23    told her she wouldn't get out of jail until her

24    children were 40," and then she says dah, dah,

1    dah.  That's not there.

2  Q.  I guess that's my point, Mr. Clark.  And again

3       we'll dance on the pinhead, as you've described,

4       but Detective Forrester's report does not reflect

5       that Samantha Crabtree says it happened, you're

6       crediting Samantha Crabtree, right?

7            MS. HAGY:  Objection, form,

8       mischaracterizes evidence and his prior testimony.

9  A.  No.  As I commented to you, all we know is that

10      she was held -- she wasn't given this Miranda --

11      she wasn't Mirandized until much later after a lot

12      of -- incidentally going to the apartment and

13      coughing up the guns and so forth.  So it is what

14      it is.  And without the recordings, which are so

15      simple, and, by the way, they do it.  We know that

16      because there was a video of the crime scene, the

17      homicide, that it leaves big gaps for writing a

18      report the way you want.  I comment on that later

19      on in my opinion here.

20 BY MR. IASPARRO:

21 Q.  Are you aware of any evidence, Mr. Clark, that you

22      reviewed that on June 10, 1993, when Miss Crabtree

23      was talking to the police officers that she knew

24      what Marvin Windham had told the police

```
 1       anonymously through his Crime Stoppers call on
 2       June 8, 1993?
 3    A. I don't remember if she was confronted with that
 4       Windham had told them certain things.  I'm not
 5       aware of it.  I can't remember.
 6    Q. It wouldn't make sense if she was confronted in
 7       that manner because they didn't know that it was
 8       Marvin Windham who made the Crime Stoppers call at
 9       that point, right?
10              MS. HAGY:  Objection, form,
11       mischaracterizes evidence.
12    A. I don't know one way or the other if she was told,
13       "Marvin Windham called us and told us -- " because
14       she would know Marvin Windham -- "told us" such
15       and such.
16              THE WITNESS:  So in about five minutes
17       can we do an hour's break or lunch break?
18              MR. IASPARRO:  That's fine with me.  I
19       have a few more questions now for you.
20              THE WITNESS:  Sure.
21              MR. IASPARRO:  And I guess that makes
22       sense.  I know the other attorneys probably have
23       some questions for you.
24              MS. HAGY:  Are you able to say,
```

```
1   Michael, how much time you guys have left in
2   total?
3              MR. IASPARRO:  I can't speak for
4   everybody else.  I would say -- you know, I cut a
5   fair amount out of what I've got in my outline
6   here, and I might have another ten minutes or so
7   myself.
8              MS. KEEN:  I have the same question,
9   Lindsay and Counsel, gentlemen, because if it's
10  not a huge amount longer, I wonder if Roger wants
11  another break instead of a big, long lunch break.
12             But I defer to Roger's lunch schedule,
13  but it's just something maybe worth thinking about
14  off the record.
15             THE WITNESS:  I mean I just need a
16  little -- need to put a little something in my
17  stomach.
18             MR. MOGBANA:  Maybe 30 minutes,
19  30-minute break instead of an hour.
20             THE WITNESS:  That will be fine with
21  me.  Thirty minutes is fine.
22             MR. MOGBANA:  So, Michael, when you're
23  done with your line of questioning, maybe we'll
24  come back in 30 minutes.
```

 1                    MS. KEEN:  I can speak for Joel and I
 2          when I say we want to get out of here, Friday
 3          afternoon.
 4                    MR. IASPARRO:  All right.  Mr. Clark,
 5          I've got a few more questions for you now if
 6          that's all right.
 7                    THE WITNESS:  Yes.  That's fine.
 8   BY MR. IASPARRO:
 9   Q.   I want to go to Page 34 of your report.  It's in
10          front of you on the screen, I think.  Under the
11          heading, "To a Reasonably-Trained Law Enforcement
12          Officer, There Was No Evidence-Based Probable
13          Cause to Arrest Pursley."  Do you see that?
14   A.   Yes.
15   Q.   And then you write, "The decision to charge
16          Mr. Pursley was based on RPD's false and distorted
17          presentation of their version of the incident and
18          case."  Do you see that?
19   A.   Yes.
20   Q.   As you sit there right now, do you know what
21          facts and evidence the detectives who met with
22          Judge Kennedy presented to him in support of their
23          request for an arrest warrant for Mr. Pursley for
24          the offense of first degree murder?

1   A.   No.

2   Q.   Is there any way to characterize that paragraph

3        that I just directed you to as containing anything

4        other than your legal conclusion that probable

5        cause was lacking?

6             MS. HAGY:  Objection, form,

7        mischaracterizes his report and his testimony,

8        asked and answered.

9   A.   Yes.  I'm trying to find the citation I gave that

10       one of the investigative teams said there wasn't

11       any probable cause.  He agreed.  But it has to do

12       with the charging in the homicide, not the other.

13       This is strictly about charging him for murder,

14       probable cause for murder.  And I think I can

15       probably find that during lunch on the break.  One

16       second here.  Oh, here it is.  So Genens himself

17       in his deposition, Page 99, said -- oh, no.

18       That's wrong.  Anyway, you may remember I

19       testified as we were going through the report

20       about probable cause from their perspective of

21       whether or not he was -- there's probable cause

22       for arresting him for the homicide.  And those are

23       the reasons, those bullet points.

24   BY MR. IASPARRO:

1  Q.  All right.  You have concluded for yourself that

2      Mr. Pursley did not murder Andrew Ascher?

3           MS. HAGY:  Objection, form,

4      mischaracterizes prior testimony.

5  A.  The -- there's no evidence that he did commit the

6      murder, and the key piece of physical evidence

7      is -- indicates that he -- he did not have in his

8      possession the murder weapon.  At least the murder

9      weapon -- the alleged murder weapon was not

10     recovered, was never recovered, was never

11     recovered.

12  BY MR. IASPARRO:

13  Q.  So in making that determination you are

14     discounting the testimony from the

15     Illinois State Police forensic scientists

16     regarding the Taurus 9mm and the cartridge cases

17     found at the scene, Samantha Crabtree's written

18     statement of June 10, 1993, Marvin Windham's

19     written statement of June 12, 1993, and

20     Lester Brown's written statement from December of

21     1993, correct?

22           MS. HAGY:  Objection, mischaracterizes

23     the evidence.

24  A.  That -- those among others as -- and as noted by

1   the judge in the second trial, and I did find the

2   citation where Detective Pirages agreed in his

3   deposition that other crimes did not establish

4   probable cause.  That was in his deposition on

5   Page 135.

6 Q. Okay.  Well, let's follow up on that.

7   Assuming that's an accurate summary of

8   Detective Pirages's -- Sergeant Pirages at the

9   time -- Sergeant Pirages's deposition testimony,

10   that testimony was that the other crimes, bank

11   robbery and the Burger King robbery, did not

12   establish probable cause to arrest Mr. Pursley for

13   first degree murder, correct?

14     MS. HAGY:  Objection, form.

15 A. That's exactly correct.

16 BY MR. IASPARRO:

17 Q. And that's a lot different from your criticism

18   here on Page 34, which was that the decision to

19   charge Mr. Pursley was based on RPD's false and

20   distorted presentation of their, in quotes,

21   version of the incident and case, right?

22     MS. HAGY:  Objection, form.

23 A. Right.  And it's supported by the three bullet

24   points.  That's the rationale for that paragraph.

1   BY MR. IASPARRO:

2   Q.  And with respect to the bullet point regarding

3       testimony from family and friends about

4       Mr. Pursley's location at the time of the

5       homicide, those are the -- for lack of a better

6       term -- alibi witnesses, if you will, who

7       testified at Mr. Pursley's trial in April, 1994,

8       correct?

9   A.  That's right.  And -- you're correct.

10  Q.  All right.  And none of those people came forward

11      and gave statements to the police in June of 1993

12      when Mr. Pursley was arrested, did they?

13              MS. HAGY:  Objection, form,

14      mischaracterizes evidence.

15  A.  Well, I don't know about them coming forward.  I

16      know the obligation of the detective to

17      reconstruct every minute of that day of the murder

18      for their prime suspect.

19  BY MR. IASPARRO:

20  Q.  Well, do you know when those witnesses who

21      testified at the trial in April, 1994, about

22      Mr. Pursley's whereabouts the night of the Ascher

23      murder -- do you know when they were disclosed by

24      the defense attorneys to the prosecution?

```
 1              MS. HAGY:  Objection, form.
 2   A.   Yeah.  That's the point.  It's -- it was disclosed
 3        in defense, not as part of the investigation.
 4   BY MR. IASPARRO:
 5   Q.   But that doesn't undercut the probable cause
 6        determination, right?
 7   A.   Well, if they -- if they had done their diligence
 8        in the investigation and reconstructed his comings
 9        and goings and contacted those witnesses, they
10        would have said, "Yeah, he was here.  He wasn't
11        there -- he wasn't there for the crime occurred."
12        That would be an expected -- especially the
13        connection they had with him.  That would be an
14        expected investigative workup of the case.
15   Q.   And of course if those family members who cared so
16        much about him would have come forward in June of
17        1993, that might have been helpful, too, right?
18              MS. HAGY:  Objection, argumentative,
19        mischaracterizes evidence.
20   A.   Here's the point:  Knowing typically a suspect
21        will recruit alibis, you preempt that by going out
22        and contacting -- "Did you see him that night?"
23        "Was he with you?"  Close that door before it
24        becomes a problem.  And if they say, "Yeah, he was
```

1    here," then the investigation verifies something

2    different than the Crabtree or Windham says.

3  BY MR. IASPARRO:

4  Q.  You do not know with absolute certainty whether

5    Patrick Pursley killed Andrew Ascher or not,

6    right?

7          MS. HAGY:  Objection, asked and

8    answered, form.

9  A.  No, I don't.  I only know that the murder weapon

10    could not be -- the alleged murder weapon which

11    was connected to him in this case was not the

12    murder weapon.

13  BY MR. IASPARRO:

14  Q.  And you base that on accepting what Mr. Murdock

15    and Mr. Coleman have testified to?

16          MS. HAGY:  Objection, asked and

17    answered, form, mischaracterizes prior testimony.

18  A.  And Judge McGraw, yes.

19          MR. IASPARRO:  All right.  Why don't we

20    take our break now.  I may be done with my

21    questioning.  I'll review my notes during the

22    break, and then I will likely turn it over to my

23    colleagues.

24          THE WITNESS:  Okay.  So it will be

1     36 after the hour?

2              MR. IASPARRO:  Sounds good to me.

3              THE WITNESS:  Okay.  I'm signing off.

4              (A 30-minute recess was taken.)

5              MR. IASPARRO:  Everybody ready?

6              THE WITNESS:  I'm ready.

7              MR. IASPARRO:  Okay.

8              Lindsay, you might object to this, I

9     don't have any more questions.

10             MR. MOGBANA:  I have questions,

11    Michael.  I don't know, am I able to share the

12    screen?  Did you make -- enable that; do you know?

13             MR. IASPARRO:  All right.  We're going

14    to test my capabilities here.

15             (Discussion off the record.)

16             MR. MOGBANA:  Mr. Clark, my name is

17    Ifeanyi Mogbana, and I represent the City of

18    Rockford.

19             I'll have a few questions.

20    BY MR. MOGBANA:

21    Q.  So this is a copy of the report that you

22        submitted, and I -- and it was previously marked.

23        I just want to use my copy so that I'll be able to

24        mutilate it.  So you're looking at a copy, right.

1       Mr. Clark?

2   A.  I am, my copy.

3   Q.  Yes.  So your -- you said that the material

4       provided you, you reviewed plaintiff's first

5       amended complaint, right?

6   A.  Yes.

7   Q.  Are you aware that the plaintiff filed another

8       amended complaint and the first amended complaint

9       isn't the most current complaint?

10  A.  No, I'm not aware of it.

11  Q.  But you did review the first amended complaint?

12  A.  I did.

13  Q.  Okay.  So did you form any opinion about any of

14      the City of Rockford's policies and practices as

15      it relates to the police department?

16  A.  Well, I noted that they said in their depositions

17      they were not trained on policies.

18  Q.  Sorry.  Mr. Clark, that's not my question.  My

19      question is --

20  A.  (Interrupting)  Well, then --

21  Q.  (Interrupting)  Hold on.  Did you form an opinion

22      about specific policies or practices of the police

23      department?

24              MS. HAGY:  Objection, form.

1          And I'd like to ask you please not to

2     cut him off.

3  A.  So I'm taking written policies?  I considered

4     their general orders and the orders that I cited

5     as adequate.  Procedures are I think -- are laced

6     throughout the report and that they have proffered

7     in their depositions when asked that they were

8     following the department procedures.

9  BY MR. MOGBANA:

10 Q.  Again, Mr. Clark, did you form any specific

11    opinions about the City of Rockford police

12    department's policies and procedures?

13          MS. HAGY:  Objection, form, asked and

14    answered.

15 A.  I formed specific opinions regarding Rockford's

16    procedures in this case, and they are reflected in

17    the commentary of the report.  I don't know what

18    else you have in mind.

19 BY MR. MOGBANA:

20 Q.  Well, what I have in mind is the page number

21    where you opined on the City of Rockford police

22    practices and policy.

23 A.  I've always taken your question practices and

24    policies.  That's two separate aspects, but one

```
 1      that comes to mind right away is Page 31.  Let me
 2      bring you to that attention here.  First
 3      paragraph, Page 1 -- 31.
 4   Q. Okay.
 5   A. "Unfortunately Schmidt and Forrester's tactics
 6      seem to be in line with the commonly-accepted
 7      practice of the Rockford Police Department.  There
 8      was a written policy against," quote, "'lengthy
 9      interrogations.'  Several officers like
10      Detective Scott said they were never given
11      training on this policy," cited.  "As experienced
12      detectives they should have known that the
13      interrogation tactics used on Samantha could
14      impact the accuracy of her statement."  That's one
15      example.  There's another one in the report, and
16      if you can give me a minute, I can find it about
17      Brady training and policy and practice.
18   Q. So now you've talked about Page 31.  You said
19      there's another one.  Can you get us there?
20   A. Sure.  Hold on a second.  I mean you've captured
21      my screen.  Let me see what I can do here.  I'm
22      just having to go through memory.
23   Q. I'm scrolling through your report, so you can look
24      at the screen and you can find where exactly.
```

 1          MS. HAGY:  Roger, if he stops sharing

 2     for a moment, can you find it on yours, or are you

 3     able to minimize the zoom so that you can use the

 4     rest of your computer?

 5  A.   The same page.

 6  BY MR. MOGBANA:

 7  Q.   Okay.  So Page 31 for the record.

 8  A.   Last paragraph.

 9  Q.   Okay.

10  A.   "Detective Hanson, however, testified RPD officers

11     were never given any training on the Brady rule or

12     their duty to disclose exculpatory evidence,"

13     their citation.  "If that is true, it is an

14     extreme departure from widely-accepted police

15     department practices and clearly-established

16     expectations.  Failure to train officers on their

17     Brady obligations can lead to criminal defendants

18     not having access to exculpatory information,

19     which can cause innocent people to be convicted."

20     Next -- well, I'll leave it at that.  Those are

21     the two as I sit here.

22  Q.   Okay.  So those are the two opinions that you

23     formed regarding the policies and practices of the

24     police department; is that fair?

1  A.  It's two that come to mind as I sit here, and I

2      think what needs to be inserted in this answer is

3      that throughout my report --

4  Q.  (Interrupting)  Okay.  So, sorry.  I'm going to

5      stop you there.

6              MS. HAGY:  Please don't.  Please don't.

7  A.  You're not giving me an opportunity to answer the

8      question.

9              MR. MOGBANA:  You can make your

10     objection and just stop.

11             Then, Mr. Clark, you need to answer my

12     question.  It's not generally meander.

13             MS. HAGY:  He was answering your

14     question.  I think you need to let --

15             MR. MOGBANA:  (Interrupting)  Lindsay,

16     hold on.  Lindsay, hold on.  Hold on.  Yeah.  We

17     want to wrap this up.  It's a Friday.

18             Mr. Clark, can you hear me?

19             MS. KEEN:  If you don't let him answer,

20     we're going to end the deposition, and we'll --

21             MR. MOGBANA:  (Interrupting)  You can

22     always do that, Roshna.  You know how that all

23     works.  You can always do that.

24             MS. KEEN:  You don't let him answer.

```
 1      That's all we're asking.  That's all we're --

 2                 MS. HAGY:  (Interrupting)  He was

 3      answering your question.

 4                 MR. MOGBANA:  Okay.  You guys don't get

 5      to double-team.  You keep going double-team, I can

 6      still, you know, talk over both of you, and we're

 7      not making any progress.

 8                 You made your objection for the record.

 9      That's fine.

10  BY MR. MOGBANA:

11  Q.  Mr. Clark, my question is you made these two

12      opinions regarding the policies and practices of

13      the Rockford Police Department.  Do you have

14      another specific opinion apart from these two?

15                 MS. HAGY:  Objection.

16  BY MR. MOGBANA:

17  Q.  It's a yes-or-no answer.

18                 MS. HAGY:  Objection, form.

19                 And I'll please implore you to let him

20      answer your question.

21                 MR. MOGBANA:  That's not an objection.

22  BY MR. MOGBANA:

23  Q.  Mr. Clark?

24  A.  Sir, first I want it in the record I was not
```

1       allowed to answer the previous question.  Do you

2       want me to answer that question, the previous

3       question?

4  Q.  Go ahead.

5  A.  Thank you.  I do not incidentally as a segue

6       intend to be contentious.  I don't try to do that.

7       I wanted to say after giving you the two examples

8       that came immediately to my mind, that I consider

9       the entirety of the report reflective on Rockford

10      in a number of ways.  Not anticipating that

11      particular question, that's the best I can do at

12      this time.

13  Q.  So let me ask again.  You said two examples.  You

14      spent hours writing a report, and my question -- I

15      just want to make sure that these two opinions

16      that we fleshed out on Page 31 are the two

17      opinions you have regarding the Rockford Police

18      Department policy and practice; is that correct?

19  A.  No.

20           MS. HAGY:  Objection, form,

21      mischaracterizes his report and his prior

22      testimony.  And this is not a memory test.

23  BY MR. MOGBANA:

24  Q.  Which -- in what other part of your report are

 1     opinions regarding the Rockford Police Department

 2     contained?

 3              MS. HAGY:  Objection, same objections

 4     and calls for a narrative answer, form.

 5              MR. MOGBANA:  Well, we're in a

 6     deposition.  That's why we need a narrative

 7     answer.  That's the point of a deposition.

 8  BY MR. MOGBANA:

 9  Q.  Mr. Clark?

10  A.  I'm ready when you -- the commentary continues.  I

11      mean when the commentary settles down.  I'm ready.

12      So, sir, first, the holding -- the apparent policy

13      and practice of holding on to evidence that should

14      go immediately to the crime lab, the policy --

15  Q.  (Interrupting)  Sorry.  Which page?  Which page?

16      The one you just talked about, which page?  Can

17      you tell me the page that's on?

18  A.  Oh, sure.  Hold on a second.  It would be on

19      Page 13.

20  Q.  Page 13.

21  A.  "The Rockford Police Department Abandoned

22      Generally-Accepted Police Practices with Respect

23      to Physical Evidence."

24  Q.  Okay.  So that's the third opinion.  Which other

1    opinion do you have?

2  A.  Another opinion is Page 10, the "Rockford Police

3      Department's Investigative Failures to Resolve

4      Leads and Develop Evidence of Possible Suspects."

5      Let me continue.  Page 16, "Rockford Police

6      Department Did Not Contemporaneously Document

7      Windham Statements."  Twenty, "RPD Did Not

8      Disclose Information About Benefits it Provided to

9      Windham."  Page 23, "Detectives Skipped Basic

10     Steps and Violated Policies During Their Search of

11     Samantha and Pursley's Apartment and Its Discovery

12     of the Supposed Murder Weapon."  Twenty-five,

13     "Deviations From Standards in Developing

14     Ballistics Evidence."  Twenty-seven, "Samantha

15     Crabtree's Statement Bears Hallmarks of Coercion."

16     Thirty-one, "RPD Ignored Evidence that Undermines

17     Their Case Against Pursley."  That's it.

18  Q.  Okay.  Those are all your opinions, right?

19  A.  Yes.

20  Q.  Okay.

21              MS. HAGY:  Objection.  Sorry.

22              Objection, mischaracterizes his

23     testimony and his report.

24  BY MR. MOGBANA:

```
1    Q.   Okay.  I'll start in the order that you -- sorry,
2         not in the order but in some sequential order
3         starting from Page 10, which I have your report
4         pulled up.  So you would -- all right.  So you
5         said, "The failure to resolve leads and develop
6         evidence of possible suspects."  You see that,
7         that's one of your opinions?
8    A.   Yes.
9    Q.   Did you recognize that to be a policy of the
10        department?
11             MS. HAGY:  Objection, form.
12   A.   As expressed by the officers, yes.
13   BY MR. MOGBANA:
14   Q.   Can you give me a factual basis for your opinion
15        that as expressed by the officers it was the
16        policy of the department to fail to resolve leads?
17             MS. HAGY:  Objection, form.
18   A.   That I saw in each one of their depositions the
19        statements proffered that they adhered to the
20        policies and procedures of the department as they
21        understood them in this investigation and did not
22        deviate from the accepted policies and procedures,
23        formal or informal, from their activities.
24   BY MR. MOGBANA:
```

 1   Q.   Mr. Clark, you understand a policy to be a written

 2        document, right?

 3                  MS. HAGY:   Objection, form.

 4   A.   A policy is a framework to action as defined in

 5        the literature.

 6   BY MR. MOGBANA:

 7   Q.   Mr. Clark, you understand a policy to be a written

 8        document?

 9                  MS. HAGY:   Objection, form, asked and

10        answered, argumentative.

11   A.   No.   A policy can be written or informally

12        understood.

13   BY MR. MOGBANA:

14   Q.   Okay.   So what's your understanding -- what's your

15        understanding of what a custom, a departmental

16        custom is?

17                  MS. HAGY:   Objection, form.

18   A.   A custom is a standing activity or process in the

19        organization.

20   BY MR. MOGBANA:

21   Q.   All right.   So you would agree with me that if a

22        police procedure isn't written, it's a custom, but

23        if it's written, it's a policy; would you agree

24        with that proposition?

1   A.   No, I wouldn't.

2              MS. HAGY:  Objection, form and to the

3         extent that this calls for a legal conclusion.

4              THE WITNESS:  No.  It can be a policy,

5         written or unwritten.  Policy is a framework to

6         action.  It can be either written or it can be

7         understood by the organization as occurring, what

8         to expect when certain things occur.

9   BY MR. MOGBANA:

10  Q.   All right.  You also said that you got -- that

11        Rockford had a policy based on the testimony of

12        the detectives as they understood it; is that

13        fair?  Did I fairly rephrase your prior testimony?

14  A.   Yes.

15             MS. HAGY:  Objection, form.

16  BY MR. MOGBANA:

17  Q.   So if it's how they understood it, how is that the

18        policy of the department if it's how they

19        understood it?

20             MS. HAGY:  Objection, form, calls for a

21        legal conclusion.

22             MR. MOGBANA:  Go ahead, Mr. Clark.

23  A.   Let me see if I can explain it succinctly.  If a

24        seasoned officer -- for example, Rockford with

1     24 years of experience when this occurred --

2     continually and unabated by the department

3     conducts his investigations in certain ways that

4     it -- it is a established policy, not written.

5  BY MR. MOGBANA:

6  Q.  So that wouldn't be custom, that would be policy

7     in your view?

8  A.  It could be a custom.  Often it's called custom

9     and practice.  Those terms often occur in the

10    literature, and it can be a custom, but that

11    custom is a reflection of the department's policy

12    in a circumstance.

13  Q.  All right.  So you said if the detective over a

14    24-year period or some period of time continues

15    acting a certain way unabated -- your words, not

16    mine -- it would be either in your view policy or

17    custom; is that fair?

18        MS. HAGY:  Objection, form, calls for a

19    legal conclusion.

20  A.  I think I would agree -- let me give an example in

21    the context.  Interrogation's not recorded, which

22    appears in the record as routine and what they do.

23    And so I found nothing in the written policy that

24    all interrogations will be recorded one way or the

1     other incidentally. So that is an apparent policy

2     of the department to do interrogations without

3     recording them.

4  BY MR. MOGBANA:

5  Q.  So your -- in your view, the absence of a

6     requirement is a policy, in this case not to

7     document statements in a certain way; did I

8     capture that accurately?

9          MS. HAGY: Objection, form, calls for a

10    legal conclusion.

11         Go ahead.

12  A.  The answer is the policy can be reflective of

13    an act forbidding or commanding it with a

14    consequence attached. So that would be correct,

15    it would -- the absence of a written policy is --

16    does not excuse an officer for failure to conduct

17    properly -- themselves properly.

18  BY MR. MOGBANA:

19  Q.  Mr. Clark, we would make a lot of more progress if

20    you just answer my question. So my question is

21    this: Using your example, the failure to have a

22    policy on a particular topic is a policy in

23    itself; is that your opinion?

24  A.  That's the way I'm answering the question.

1          MS. HAGY:  Objection.

2    BY MR. MOGBANA:

3    Q.   That's a yes or no.  Is that your opinion?

4    A.   No.

5          MS. HAGY:  Objection, argumentative,

6        form.

7          THE WITNESS:  I'm doing my best here,

8        and that's -- it's not a fair way to get my

9        truthful testimony.

10          So the answer is whether -- whether

11        it's written or not, it's what they do, and it's

12        reflective often of policy.

13    BY MR. MOGBANA:

14    Q.   That's not my question.  What I'm trying to get

15        ahold of, Mr. Clark, is if an officer does

16        something a certain way, does that mean that

17        that's the department's policy; is that your

18        testimony?

19          MS. HAGY:  Objection, form, calls for a

20        legal conclusion, argumentative.

21    A.   So you asked me two things in that question.  The

22        answer is no, not always, but it can be.

23    BY MR. MOGBANA:

24    Q.   You also said that you opined that the department,

1     "Abandoned generally-accepted police practices

2     with respect to physical evidence." You see that?

3  A.  Yes.

4  Q.  All right. My question is what policy, what

5     policy did you review that illuminated this

6     departure?

7           MS. HAGY: Objection, form.

8  A.  Thank you. Because it's laced throughout the

9     report, not only --

10  BY MR. MOGBANA:

11  Q.  (Interrupting) Okay. Mr. Clark, laced throughout

12     the report wouldn't help. You're going to ask

13     your question, but I just want to make sure that

14     you're answering my question. You don't just get

15     to opine. This is the time you answer the

16     question. So what --

17           MS. HAGY: (Interrupting) Please --

18     please let him answer. That was --

19  BY MR. MOGBANA:

20  Q.  (Continuing) -- what departmental policy, what

21     specific departmental policy shows a deviation

22     from -- or abandonment from generally-accepted

23     police practices with respect to physical

24     evidence?

1          MS. HAGY:  Objection, argumentative.

2          You can't police his answers.  You need

3     to let him finish or we're going to have to stop

4     and call the judge.

5          THE WITNESS:  So I want it in the

6     record I did not answer the previous question,

7     which I would like --

8  BY MR. MOGBANA:

9  Q.   (Interrupting)  This is the opportunity to do so.

10      This is the opportunity to do so.

11 A.   This is not the same question.  Do you want me to

12      continue with the question at hand?  I'm going to

13      find the quote from the policy.  Page 23.  There

14      will be another one before that.  Quote, "From a

15      police procedures standpoint, it was a

16      well-established, standard practice in 1993 to

17      photograph and accordingly record evidence as

18      found.  The Rockford Police Department's own,"

19      quote, "'evidence and property handling

20      procedures,'" close quote, "in 1993 provided that

21      the evidence and control section of the department

22      would," quote, "'assume responsibility for the

23      transport, by US mail or other means, of evidence

24      that is sent to any outside agency for tests

1    and/or evaluation or to the court for

2    representation in a court of law,'" close quote.

3    "The procedure provided that the crime scene would

4    involve," quote, "'evidence such as fingerprints

5    that should be processed immediately to facilitate

6    the investigation,'" close quote.  Next, "The

7    RPD's guidelines for criminal investigations also

8    emphasized," quote, "'physical evidence does not

9    lie, forget or change its story.'  Your role is to

10    collect and preserve as much physical evidence as

11    possible at any crime scene," close quote.  "The

12    absence of evidence should also be recorded.

13    Officers are directed to refer a case for

14    follow-up if further examination of physical

15    evidence is likely to produce information likely

16    to solve the incident," cited.  "Evidence from a

17    scene was to be collected by identification

18    officers and transported to the RPD's property and

19    evidence unit," quote from deposition.

20    "Detectives would use an ISP transmittal form to

21    identify evidence that they wanted tested by the

22    ISP crime lab," citation.  Let me go to another

23    quote for --

24  Q.  (Interrupting)  For the record, you read from

 1      Page 23 into Page 24; would that be a fair

 2      statement?

 3  A.  Yes, but I haven't finished my answer.

 4  Q.  Go ahead.  Go on.

 5  A.  (No response.)

 6  Q.  Mr. Clark, are we getting there or do you still

 7      need more time?

 8  A.  No.  I'm getting it.  I have one.  I wanted to

 9      make sure that the citation as I recalled it about

10      interrogations -- that I have that citation as

11      well for your . . .  Okay.  One more document.  So

12      on Page 31, I referenced beginning on -- I'm going

13      to start on Page 31, a partial paragraph.  "There

14      is a written policy against," quote, "'lengthy

15      interrogations.'  Several officers like

16      Detective Scott said they were never given any

17      training on this policy," cited (sic).  "As

18      experienced detectives they should have known that

19      the interrogation tactics used on Samantha would

20      impact the accuracy of her statement.

21      Furthermore, RPD should have ensured that

22      detectives were trained on this policy.  If RPD

23      did not train its detectives on what constitutes

24      lengthy or coercive interrogation tactics, it

1     would be an egregious failure that would lead to

2     rampant coercive interrogations and false

3     statements."  I have -- I printed out as part of

4     my handy dandy, be able to reach, COR Getty 2034,

5     which is a procedures policy, General Order 72-5,

6     "Rights of Accused Persons."  And in this

7     seven-page order are clear and direct statements

8     regarding coersive interrogations, Miranda rights

9     and custodial interrogation, et cetera.  And that

10    was what I had in mind when I wrote those two

11    paragraphs that I quoted into the record.  I'll

12    wait for the next question.

13  Q.  Do you agree with me that what you just

14    established is that the City of Rockford has

15    policy on those issues, has a written policy on

16    those topics that you talked about?

17         MS. HAGY:  Objection, form, calls for a

18    legal conclusion.

19  A.  The answer to that is in the administrative realm,

20    why should I do what you write or order me to do

21    when what you do thunders in my ears?  So that's

22    what I meant by my previous testimony about

23    unwritten policies being policies.

24         MR. MOGBANA:  Again, Mr. Clark, we're

1     going to stay here much longer if you continue

2     like this.

3              THE WITNESS:  Sir, I'll stay here until

4     you're done.  I'm happy.  I'm content.

5  BY MR. MOGBANA:

6  Q.  Do you agree that what you read out and what you

7     referenced establishes that the City of Rockford

8     has written policies on the topics that you've

9     talked about?

10             MS. HAGY:  Objection, form,

11    mischaracterizes prior testimony and calls for a

12    legal conclusion.

13  A.  There are written policies.

14  BY MR. MOGBANA:

15  Q.  Thank you, Mr. Clark.

16             MS. HAGY:  He didn't finish.

17             Go on.  Keep going.

18  A.  And I -- I answered the question previously.  You

19    asked me about written policies.

20  BY MR. MOGBANA:

21  Q.  All right.  Hopefully I haven't covered this

22    before, but so one of the policies you said they

23    abandoned generally-accepted practices in regard

24    to physical evidence.  You would agree with me

```
1      that the policy you read shows that the department

2      itself had a policy, right?

3                MS. HAGY:  Objection, form, calls for a

4      legal conclusion.

5   A.  Yes.  There's a written policy about physical

6      evidence.  It's cited in my report.

7   BY MR. MOGBANA:

8   Q.  Thank you.  Then Page 20 -- yeah.  You said the

9      "RPD did not disclose information about the

10      benefits it provided to Windham."  That was one of

11      your -- one of the opinions that you formed

12      regarding the department, right?

13  A.  (No response.)

14  Q.  Page 20.

15  A.  All right.

16  Q.  So my question is it wasn't the department that

17      failed to do anything.  I mean the department is

18      not -- is not an animate object.  It has to be

19      some individual; you would agree with me, right?

20                MS. HAGY:  Objection, form,

21      mischaracterizes prior testimony, calls for a

22      legal conclusion.

23  A.  (No response.)

24  BY MR. MOGBANA:
```

 1   Q.   Mr. Clark, do you understand the question?

 2   A.   The department's made up of persons, personnel.

 3   Q.   Yes.  But their conduct that's attributed to the

 4        department itself.  So what I'm saying is that

 5        this opinion, is it consistent with the department

 6        being able to do anything as an inanimate object,

 7        as an official entity?

 8   A.   Well, of course --

 9             MS. HAGY:  (Interrupting)  Objection,

10        form, vague, confusing, calls for a legal

11        conclusion.

12             THE WITNESS:  Of course, and that has

13        to do with the sergeant in particular in charge of

14        the investigative team.

15   BY MR. MOGBANA:

16   Q.   So what you meant to say here is that someone

17        failed to disclose the information, not that the

18        entity that's the department failed to disclose

19        the information; would that be correct?

20   A.   You're not accurate.  That is not a correct

21        understanding of that statement.

22   Q.   Correct me, please.

23   A.   Yes, I will.  So the definition -- I'll start with

24        the definition of a sergeant is enforces the

1    policies and the procedures of the department.

2    That is the No. 1 civil service definition of a

3    supervisor.  Therefore, when the entire

4    investigative team fails, it is -- falls on the

5    department as a responsibility and -- through the

6    sergeant and the chain of command.

7  Q.  Are you done?

8  A.  Yes.

9  Q.  Okay.  So would it be fair to say that you're

10    imputing the conduct of the sergeant to the

11    department; is that an accurate statement?

12         MS. HAGY:  Objection, form,

13    mischaracterizes his testimony, asked and answered

14    and calls for a legal conclusion.

15  A.  Yes.

16  BY MR. MOGBANA:

17  Q.  All right.  Here you said that No. 7 -- not No. 7,

18    but this particular opinion according to one of

19    those that's formed against the department,

20    against the city is that the "Detectives skipped

21    basic steps and violated policies during their

22    search."  You see that?

23  A.  What page are you at?

24  Q.  It's displayed.  It's Page 23.

1  A.  Okay.  Yes.

2  Q.  So which policies are you saying they violated?

3          MS. HAGY:  Objection, form, calls for a

4      legal conclusion.

5  A.  Evidence and property-handling procedures.

6  BY MR. MOGBANA:

7  Q.  Of the Rockford Police Department, correct?

8  A.  Yes.

9  Q.  So the Rockford Police Department had the policy

10      regarding evidence and properly handling, correct?

11          MS. HAGY:  Objection, form, calls for a

12      legal conclusion.

13  A.  Yes.

14  BY MR. MOGBANA:

15  Q.  All right.  The next one you said, you said,

16      "Deviation from standards in developing ballistics

17      evidence."  You see that?

18  A.  Yes.

19  Q.  All right.  So what policy of the department

20      deviated from standards, what specific written

21      policy?

22          MS. HAGY:  Objection, form, calls for a

23      legal conclusion.

24  A.  Handling of physical evidence, which was cited the

1       previous answer.

2   BY MR. MOGBANA:

3   Q.   All right.  So my question is so the department

4        had a policy regarding this, a written policy

5        regarding this, correct?

6                   MS. HAGY:  Objection, form, calls for a

7        legal conclusion.

8   A.   They had a policy.

9   BY MR. MOGBANA:

10  Q.   All right.  And the best you know, the policy was

11       an okay policy; would that be fair?

12  A.   Was an okay policy?

13                  MS. HAGY:  Objection.

14  BY MR. MOGBANA:

15  Q.   Yeah.

16  A.   The written requirement for evidence to go

17       forthwith to the lab is correct.

18  Q.   That's all I'm asking for at this time.

19       That's all I'm asking.  All right.  Said,

20       "Samantha Crabtree's statement bears hallmarks of

21       coercion," and you said that this is an opinion

22       that you formed against the department, right?

23  A.   Yes.

24  Q.   And didn't you point out that there was a specific

1       policy guiding how the department expects that

2       interviews or interrogations be conducted?

3               MS. HAGY:  Objection, form, calls for a

4       legal conclusion, mischaracterizes prior

5       testimony.

6   BY MR. MOGBANA:

7   Q.  Mr. Clark?

8   A.  I cited General Order 72-5.

9   Q.  So it was a general order regarding the

10      interrogations, correct?

11  A.  Correct.

12  Q.  All right.  And then you also said that one of the

13      opinions that you formed was -- we're now looking

14      at Page 31, the first paragraph, which, you know,

15      you read -- you've read before.  But I'm just

16      going to read the one sentence and -- so that we

17      can get into that.  The top of the page it says,

18      "Unfortunately Schmidt and Forrester's tactics

19      seem to be in line with the commonly-accepted

20      practice in the Rockford Police Department."  Do

21      you see that?

22  A.  Yes.

23  Q.  What facts did you review that led you to conclude

24      that those tactics were in line with the

1    commonly-accepted practice of the department?

2              MS. HAGY:  Objection, form.

3  A.  Well, one of the citations in the -- is the

4    Scott deposition, but it's throughout all the

5    depositions provided when asked about -- about the

6    interrogation, so . . .

7  BY MR. MOGBANA:

8  Q.  How many depositions do you refer to?

9  A.  All of the officers --

10             MS. HAGY:  (Interrupting)  Objection,

11    form.

12             THE WITNESS:  All of the officers that

13    were part of the investigation into the murder,

14    and I listed them out and have identified them.

15    If you want me to go into those depositions, I can

16    find those records.

17  BY MR. MOGBANA:

18  Q.  Well, we may have to get into them, but my

19    question here is how do you get from the

20    depositions you reviewed to conclude that it's a

21    commonly-accepted practice of the department?

22             MS. HAGY:  Objection.

23  BY MR. MOGBANA:

24  Q.  That's the question.

```
 1              MS. HAGY:  Objection, form, asked and
 2        answered.
 3   A.   Let me see -- let me make a count.  Because in
 4        the -- the one was -- as you know, Forrester never
 5        had an opportunity to be deposed.  So in at least
 6        eight of the depositions of the investigative
 7        team, they all affirm that they were never trained
 8        on Brady and they did not consider what they were
 9        doing in the interrogation as contrary to their
10        policy of the department.  That's the best way I
11        can answer that.
12   BY MR. MOGBANA:
13   Q.   Thank you.  You said about eight depositions;
14        would that be fair?
15   A.   You want me to list out the names?
16   Q.   No, don't need to list them.  Just answer the
17        question.  It's about eight depositions; is that
18        fair?
19   A.   Six depositions to be precise.
20   Q.   Okay.
21   A.   And trial testimony of one that was not deposed.
22   Q.   So seven detectives; is that fair?
23   A.   Correct.
24   Q.   Did you have -- did you review anything that
```

```
 1      indicated to you the number of detectives that the

 2      Rockford Police Department had at the time?

 3  A.  No.

 4  Q.  Okay.  So your conclusion is that from seven

 5      detectives out of an unknown number of total

 6      detectives, you form an opinion that a specific

 7      conduct was a common practice of the department;

 8      did I phrase that accurately?

 9              MS. HAGY:  Objection, form, calls for a

10      legal conclusion, mischaracterizes prior

11      testimony.

12  A.  My understanding of the testimony you are correct.

13  BY MR. MOGBANA:

14  Q.  All right.  The next -- not the next sentence but

15      the one following that, and I'm going to highlight

16      it.  Okay.  It's the next sentence.  I'm just

17      going to read it.  It says, "There was a written

18      policy against lengthy interrogations.  Several

19      officers like Detective Scott said they were never

20      given any training on this policy."  So who's

21      they?

22  A.  The detectives involved in the interrogation.

23  Q.  All right.  So you're not -- you're not talking

24      about any officers apart from the seven that you
```

1    read their testimony; is that fair?

2  A.   Yes.

3  Q.   All right.  The next paragraph starts with, "RPD

4       should have ensured that detectives were trained

5       on this policy."  Did you review anything that

6       indicated the training that these officers

7       received?

8            MS. HAGY:  Objection, form.

9  A.   Nothing regarding the individual training records

10      of the officers involved that I can recall.

11  BY MR. MOGBANA:

12  Q.   Did you review anything regarding the Illinois --

13       Illinois -- State of Illinois's law enforcement

14       standards curriculum, did you review anything that

15       would inform you about what a police officer

16       should know before he's sworn in?

17            MS. HAGY:  Objection, form, calls for a

18       legal conclusion, confuses evidence.

19  A.   I'm aware that there is a curriculum and I have

20       access to it and considered it as background

21       information.  So are you -- and the training

22       includes Brady.

23  BY MR. MOGBANA:

24  Q.   Sorry.  I don't understand that.  You said -- did

1      you review the curriculum or you didn't?

2   A.  I did not reference or review the curriculum for

3       this report.

4   Q.  Okay.  You also said that's part of your opinion

5       that "RPD ignored evidence that undermines their

6       case against Pursley."  So -- well, this should

7       be easy.  You're referring to the specific

8       detectives, not the department as an artificial

9       entity, right?

10              MS. HAGY:  Objection, form,

11      argumentative, calls for a legal conclusion and

12      mischaracterizes evidence.

13  A.  The -- I was not given information regarding other

14      cases, so it's all the officers involved, as I

15      have indicated in the first paragraph of my

16      report.

17  BY MR. MOGBANA:

18  Q.  And you also -- you talked a little bit about

19      training, and here at the bottom, "Detective

20      Hanson testified he was never given any training

21      on Brady."  Do you see that?

22  A.  Yes.

23  Q.  All right.  But we established that you didn't

24      review anything to show that -- what the officers

```
 1      were actually trained on; is that fair?
 2                  MS. HAGY:  Objection, form,
 3           mischaracterizes prior testimony.
 4   A.   Yes.  I did not see his training records.
 5   BY MR. MOGBANA:
 6   Q.   Could it be possible that the officers were
 7           trained but simply forgot; is that a possibility?
 8                  MS. HAGY:  Objection, form, incomplete
 9           hypothetical.
10   A.   Well, that's per se incompetence and inadequate
11           training.  So if they don't remember their
12           training, then the training's inadequate.
13   BY MR. MOGBANA:
14   Q.   Again, Mr. Clark, is it possible that the officers
15           were trained but they forgot what they were
16           trained on?
17                  MS. HAGY:  Objection, asked and
18           answered.
19   A.   I don't know in this case -- I don't know if it
20           was possible.  I don't see how it could be, but I
21           don't know.
22   BY MR. MOGBANA:
23   Q.   All right.  You are -- have decades of experience
24           as a police administrator; is that fair?
```

1  A.  Yes.

2  Q.  And in your experience you have not encountered an

3      officer who has been trained but just forgot how

4      they were trained on a particular topic; is that

5      your testimony?

6              MS. HAGY:  Objection, form, calls for a

7      legal conclusion.

8              MR. MOGBANA:  Lindsay, that's

9      completely improper.  This doesn't ask for a legal

10     conclusion.  I'm just forming his experience.

11             Mr. Clark, go ahead.

12 A.  Yeah.  And I have not had that experience.

13 BY MR. MOGBANA:

14 Q.  Thank you.  Mr. Clark, how many articles have you

15     published regarding -- on the topic of police

16     practices that were published?

17 A.  None.

18 Q.  What about articles that were not published?

19 A.  None.

20 Q.  Have you published anything regarding crime scene

21     investigation?

22 A.  No.

23 Q.  What about not published crime scene

24     investigation?

1  A.  No.

2  Q.  Have you published any articles on forensic

3     investigation?

4  A.  No.

5  Q.  What about unpublished regarding forensic

6     investigation?

7  A.  No.

8  Q.  Have you taught any classes on police practices?

9  A.  Have I what?

10  Q.  Have you taught any classes, seminars, you know,

11     things like that or continuing education for law

12     enforcement officers?

13          MS. HAGY:  Objection, form.

14  A.  I've given lectures.  Are we talking about after

15     my retirement or during my career?

16  BY MR. MOGBANA:

17  Q.  During your -- at any time.  At any time.

18  A.  Oh.  I was noted in my fitness reports as a

19     note -- as a -- as a excellent academy instructor

20     on particular four categories, and I have been

21     noted in appellate cases by name.  I'll wait for

22     the next question.  And I have lectured outside of

23     my retirement but not at police academies.

24  Q.  And where did you lecture?

```
 1   A.   The last two have been at the University of

 2        California, Irvine, law school.  I've lectured at

 3        other law schools.  I've lectured at other groups,

 4        at conventions and so forth.

 5   Q.   Have you presented a paper or a class for

 6        continued education for other law enforcement

 7        officers?

 8   A.   No.

 9                  MS. HAGY:  Objection, form.

10   BY MR. MOGBANA:

11   Q.   Okay.  Regardless of topic, you know, you haven't

12        presented a paper for any other peers, any of the

13        other associations, things like that; is that

14        correct?

15                  MS. HAGY:  Objection, form.

16   A.   Any other association?

17   BY MR. MOGBANA:

18   Q.   Of law enforcement -- law enforcement officers.

19   A.   No.

20   Q.   All right.  When was the last time you attended

21        any classes on police practices?

22                  MS. HAGY:  Objection, form.

23   A.   Are you talking about academy classes?

24   BY MR. MOGBANA:
```

```
 1   Q.   No.  Any continued education classes, keeping up
 2        with the trends about what's going on in law
 3        enforcement.
 4                  MS. HAGY:  Objection, form.
 5   A.   I do that in review and conventions.
 6   BY MR. MOGBANA:
 7   Q.   Sorry.  You say you're reviewing conventions?
 8   A.   No, review and attending conventions.
 9   Q.   For example, what kind of conventions are you
10        referring to?
11   A.   Well, the IACP would be an example.
12   Q.   Okay.
13   A.   I -- I subscribe and review all of the literature,
14        and I refresh the learning curriculum throughout
15        the country.
16   Q.   Apart from the IACP, which other organization have
17        you attended their classes as part of an attempt
18        to bring yourself to current times regarding law
19        enforcement policy and practice?
20                  MS. HAGY:  Objection, form.
21   A.   Other than that I have not attended classes.
22   BY MR. MOGBANA:
23   Q.   So you've never attended any classes, correct?
24   A.   As I understand the question --
```

1          MS. HAGY:  (Interrupting)  Objection,

2     form, mischaracterizes his testimony.

3          THE WITNESS:  As I understand the

4     question, yes, I have not.

5  BY MR. MOGBANA:

6  Q.  All right.  So apart from the IACP's subscription

7     that you have, do you have any other

8     subscriptions?

9  A.  Oh, yeah.  I -- the American Corrections

10    Association, CALEA, DOJ, NIJ.  Those are

11    information sources.  And then there's some

12    periodicals, the IACP periodical.  There's another

13    one that's pretty good.  It's called, "Police

14    Magazine."

15 Q.  I read that, too.

16 A.  It's not bad.

17 Q.  It's good.  It's decent.  Do you have any

18    certification in any area of law enforcement?

19 A.  In any other area?

20 Q.  In any area of law enforcement, a certification.

21         MS. HAGY:  Objection, form.

22 A.  I didn't, no, only what I retired out with, the

23    diploma with the -- the graduate of the Command

24    College and the POST advanced certificate, but I'm

```
 1     retired now.

 2  BY MR. MOGBANA:

 3  Q.  All right.  Let's try and make this easier.

 4            MS. HAGY:  I think it's -- we might be

 5       looking at another break pretty soon.  Is there a

 6       good stopping point coming up?

 7            MR. MOGBANA:  We will try to work

 8       towards a -- you know, a stopping point.

 9  BY MR. MOGBANA:

10  Q.  So, Mr. Clark, I'm looking at -- you know, it's

11       No. 6 in the document, but I think it's 42 of 64,

12       the entire document which was produced.  It's

13       subhead entitled, "Degrees and Certification."  Is

14       this the entire -- the entire universe of your

15       certification regarding law enforcement?

16  A.  No.  That POST -- there's a plethora of

17       certifications, but I only cited the last -- the

18       highest level, which is advanced.  There's -- and

19       then the Command College.  So I just kept it

20       brief.

21  Q.  Okay.  So after 1988 did you receive -- have you

22       received any other certifications that are

23       regarding law enforcement?

24  A.  No.
```

```
 1   Q.   Did you review anything in this case -- yeah, in
 2        this case that indicated to you the conduct of any
 3        of the officers or any Rockford police officer in
 4        any other case apart from this Pursley
 5        investigation?
 6             MS. HAGY:  Objection, form.
 7   A.   Only the universe of the investigative file.
 8   BY MR. MOGBANA:
 9   Q.   All right.  So you didn't -- you know, the
10        practice -- in here you refer to practice that you
11        observed from your review you related to what they
12        did in that case -- sorry, in this case; is that
13        fair?
14   A.   Yes.
15             MS. HAGY:  Objection, form.
16             THE WITNESS:  Yes.
17             MR. MOGBANA:  I don't believe I have
18        any other questions.
19             MR. HUOTARI:  I have a few, but,
20        Lindsay, if you want to take a break, that's a
21        fine time to do it.
22             You want to meet back in five minutes?
23             THE WITNESS:  Five minutes.
24             MS. HAGY:  Great.  Thank you.
```

1          MR. HUOTARI:  Thank you.

2               (A brief recess was taken.)

3          MR. HUOTARI:  Back on the record.

4          Good afternoon again, Mr. Clark.  My

5     name is Joel Huotari.  I represent two of the

6     defendant police officers.

7  BY MR. HUOTARI:

8  Q.  You're familiar with good cop/bad cop, right?

9  A.  Oh, sure.

10         MS. HAGY:  Objection, form.

11         MR. HUOTARI:  I'm the good cop this

12    afternoon.  I'll let you guess what

13    Attorney Mogbana is.  You can relax.

14         So I've got a few questions for you,

15    and we may refer to a couple of documents you've

16    seen already.

17  BY MR. HUOTARI:

18  Q.  But to start out I want to kind of back up and

19    approach this from a, you know, 50,000-foot look.

20    When I read your report, it appears to me as that

21    your opinions are essentially that the police

22    could have done a much better job in investigating

23    this homicide; is that fair?

24         MS. HAGY:  Objection, form,

1    mischaracterizes both his report and his prior

2    testimony.

3  A.  I think that's a soft way of saying it.  They were

4      significantly deficient.  In that term, yeah, they

5      should have done a better job.

6  BY MR. HUOTARI:

7  Q.  And some of the ways you've pointed out they could

8      have done a much better job, less deficient job

9      would have been to pursue other suspects, correct?

10 A.  Correct.

11 Q.  Another way would have been to submit evidence to

12     the lab sooner for testing, right?

13          MS. HAGY:  Objection, form,

14     mischaracterizes prior testimony.

15          MR. POTTINGER:  I'm going to weigh in

16     here, Lindsay.  I mean I would just ask -- I mean

17     you conduct your deposition however you want, but

18     if you would review the standing order of

19     depositions, one of them you'll see in terms of

20     objections is the objection of mischaracterizing

21     the testimony is a -- by the local rule, the

22     standing order, is an improper objection.  We'll

23     put that on the record.

24          And asked and answered should only be

1     used in the most extreme circumstances.

2  BY MR. HUOTARI:

3  Q.  My question, Mr. Clark, was one of the ways the

4     police were deficient and could have done a better

5     job in your opinion was they could have submitted

6     evidence to the laboratory sooner than they did,

7     right?

8  A.  Yes.

9  Q.  And another way that you believe they were

10     deficient is they could have converted their notes

11     into police reports sooner, right?

12  A.  Right.  I think we need to say not could have,

13     should have.

14  Q.  Right.  They should have done that sooner,

15     correct?

16  A.  Right.

17  Q.  That's one of your opinions?

18  A.  Yes.

19  Q.  It is not your opinion, however, that any of the

20     defendant officers intentionally conspired to

21     frame Patrick Pursley for a murder that he didn't

22     commit; isn't that right?

23          MS. HAGY:  Objection, form.

24  A.  I agree.

1   BY MR. HUOTARI:

2   Q.   That is correct?

3   A.   Yes.

4   Q.   It is not your opinion that any of the defendant

5        officers falsified evidence; isn't that also

6        correct?

7                    MS. HAGY:  Objection, form.

8   A.   Nothing in the record indicates that.

9   BY MR. HUOTARI:

10  Q.   All right.  And because there's nothing in the

11       record, you don't have that opinion, do you?

12  A.   I didn't write my report with that in mind.

13       Otherwise it would have had a section on filing a

14       false report.

15  Q.   Okay.  So if that opinion is not expressed in your

16       report, it's not an opinion you're going to be

17       testifying about at trial, fair?

18                   MS. HAGY:  Objection, form.

19  A.   Well, I expect to answer any question, but as I

20       sit here, I don't anticipate the question would

21       arise.

22  BY MR. HUOTARI:

23  Q.   And whether it arises or not, you have not

24       expressed that opinion in your report, correct?

1  A.  You are correct.

2  Q.  And is it not your opinion that any of the

3      defendants withheld exculpatory evidence?

4                  MS. HAGY:  Objection, form.

5  BY MR. HUOTARI:

6  Q.  You have not expressed that opinion in your

7      report, have you?

8  A.  Yes.  That's the commentary on Brady, that they

9      did and should not have, and that commentary I can

10      show you the pages.

11  Q.  Okay.  Who specifically withheld what exculpatory

12      evidence?

13  A.  Well, for example, Forrester withheld the evidence

14      of Windham being in trouble and him getting him

15      out of trouble.  I'll say it that way.

16  Q.  Okay.  What other Brady violations are you

17      expressing an opinion of?

18  A.  That it was -- well, let me see how I can express

19      it.  I've already expressed my concerns about

20      Windham coming forward, and I've talked about

21      that.  If -- let me say it this way:  If there

22      were other circumstances of Windham being

23      entered -- entering into the case other than what

24      they allege and I -- or what they reported, then

1    that would be a very significant change.

2 Q.  Of course.  There's no evidence of that in the

3    record, is there?

4              MS. HAGY:  Objection, form.

5 A.  Only in the sense that there's -- when I read this

6    commentary, things don't make very much sense

7    about Windham at all without considering that he

8    was in the background before he was offered as an

9    unknown confidential informant.

10 BY MR. HUOTARI:

11 Q.  So other than with respect to the purported

12    failure to disclose some kind of getting Windham

13    out of trouble by Forrester, are there any other

14    discrete Brady violations that you are expressing

15    an opinion on in your report?

16              MS. HAGY:  Objection, form.

17 A.  Nothing comes to mind as I sit here.

18 BY MR. HUOTARI:

19 Q.  Okay.  Your testimony a moment ago kind of

20    dovetails with another topic I wanted to ask you

21    about.  Today you've expressed some suspicions and

22    some reservations about things that you just don't

23    think smell right, for lack of a better term.  Do

24    you recall testifying to having suspicions today?

```
 1   A.   Yeah.  That's a good way of saying it, smell
 2        right.
 3   Q.   And with respect to those suspicions, would you
 4        agree that those are different from your opinions
 5        about actual wrongdoing that's supported by
 6        evidence in the record?
 7   A.   Yes.  I tried --
 8                  MS. HAGY:  (Interrupting)  Objection,
 9        form.
10                  THE WITNESS:  I tried to put it in that
11        context.
12   BY MR. HUOTARI:
13   Q.   Okay.  So when you testified today about
14        suspicions, those are not opinions about actual
15        wrongdoing that took place, they're suspicions
16        about things that may or may not have happened
17        that you just really don't have an opinion one way
18        or the other about; is that fair?
19                  MS. HAGY:  Objection, mischaracterizes
20        prior testimony, form.
21   A.   I don't think it's accurate to say opinions one
22        way or the other, but I was careful to contain
23        them when I wrote my opinions.
24   BY MR. HUOTARI:
```

```
 1   Q.   Is a suspicion the same as an opinion?

 2   A.   Of course it isn't.

 3              MS. HAGY:  Objection, form.

 4              MR. HUOTARI:  I'm sorry.  You're going

 5        to have to not talk over each other because the

 6        court reporter isn't able to write down both of

 7        your statements at the same time.

 8              MS. HAGY:  Sure.  I'll make my --

 9              MR. HUOTARI:  (Interrupting)  Lindsay,

10        you made your objection.

11              Mr. Clark, could you please answer the

12        question?

13              THE WITNESS:  I said no, it doesn't.

14        They're not the same.

15   BY MR. HUOTARI:

16   Q.   Okay.  Are you employed in any other capacity

17        these days other than as a police practices

18        expert?

19   A.   No.

20   Q.   And you've been exclusively employed in that

21        capacity for a number of years now; is that right?

22   A.   Yes.

23   Q.   How much annually do you make serving as a police

24        practices expert?
```

```
 1              MS. HAGY:  Objection, form.
 2    A.   It's right at 160,000 a year because I'm a
 3         one-person operation.  I'll say it that way.  That
 4         seems to be the maximum capacity what I do, unless
 5         I charged more.
 6    BY MR. HUOTARI:
 7    Q.   You expect you'll make about 160 this year in
 8         2021?
 9              MS. HAGY:  Objection, form.
10    A.   I anticipate 160, maybe a little bit more.
11    BY MR. HUOTARI:
12    Q.   Do you recall when Mr. Iasparro was questioning
13         you earlier about credibility determinations, you
14         would often say your report doesn't contain a
15         credibility determination but it contains a
16         professional opinion or a professional
17         determination.  Can you explain the difference for
18         me?
19              MS. HAGY:  Objection, form,
20         mischaracterizes prior testimony.
21    A.   Yes, I can.  You want me to?
22    BY MR. HUOTARI:
23    Q.   Please.
24    A.   Credibility is the truth, unquestioned truth.
```

```
 1      Professional evaluation is what my -- I have
 2      learned and considered to be likely based on my
 3      professional experience.
 4   Q. So if I understand you correctly, it's a
 5      credibility determination that's informed by your
 6      years of experience and your expertise in the
 7      field; is that fair?
 8              MS. HAGY:  Objection, form,
 9      mischaracterizes prior testimony.
10   A. No.  It's better said more that it -- based on my
11      training and experience is more likely than not.
12   BY MR. HUOTARI:
13   Q. What is more likely than not?
14   A. That the ultimate truth would be in the hands of
15      the jury, as I said, not from me.  But if I were
16      to ask questions, that's the way I would answer
17      it.
18   Q. I'm sorry.  You said something is more likely than
19      not, and I'm not following what you're referring
20      to, that the person's testimony is truthful or
21      untruthful?
22   A. That it's likely to be credible or not credible
23      based on my experience or not credible until
24      verified, those types.
```

1   Q.  Credible or not credible to whom?

2             MS. HAGY:  Objection, form.

3   A.  In this case to the investigative officers.

4  BY MR. HUOTARI:

5   Q.  Okay.  So, for example, if you can see on the

6       screen I've got Page 31 of your report up.  And

7       this part that I'm highlighting says, quote,

8       "Samantha was prosecuted for perjury in connection

9       with the testimony she gave at Mr. Pursley's

10      trial.  The fact that she testified contrary to

11      her grand jury testimony knowing that she would

12      go to prison lends credibility to her trial

13      testimony," unquote.  What did you mean when you

14      said that in your report?

15   A.  Well, exactly what I said.  She -- she changes her

16      written statement at the risk of going to -- being

17      prosecuted criminally for perjury, and she does it

18      anyway, which is extremely risky to her.

19   Q.  But so that makes her more believable to you?

20   A.  Well, that's what I said, that lends credibility.

21      And I want to point out to you I didn't say makes

22      her credible, makes her absolutely credible.  It

23      lends credibility.

24   Q.  In your opinion that makes her more believable

*Vecchio Court Reporting*

*815-965-9020*

1    than not?

2              MS. HAGY:  Objection, form.

3  A.  Yeah.  My experience is that when someone steps

4      forward and says something and puts them at risk

5      of going to jail for saying it, that -- that takes

6      a lot of guts.  And it's usually because they have

7      an overarching desire to tell the truth usually.

8  BY MR. HUOTARI:

9  Q.  Did you know prior to recanting her sworn

10     statement and her grand jury testimony,

11     Samantha Crabtree received letters from

12     Patrick Pursley from jail threatening to, quote,

13     "Shred her shit like cheese if she did not come

14     correct," end quote, and recant her sworn

15     testimony.  Were you made aware of that?

16 A.  Yes.  I reviewed all those letters.

17 Q.  And what effect does that have on your opinion as

18     to her credibility when she recants after

19     receiving those threats?

20 A.  It creates an alternate motive, fear of injury.

21     So it has to be weighed accordingly.

22 Q.  And you've weighed that evidence of those threats

23     against the evidence that she is facing perjury

24     charges and you've come down on the side of

```
 1      finding her more believable than not; is that
 2      right?
 3               MS. HAGY:  Objection, form.
 4   A.  In my experience and based on my reading of the
 5      letters, how they can be taken incidentally, that
 6      I considered it that it lends more credibility to
 7      her final statement when she recants what she said
 8      in the beginning.
 9   BY MR. HUOTARI:
10   Q.  With respect to the alleged coercion of
11      Samantha Crabtree, in your opinion who coerced
12      her?
13   A.  The interrogators.
14   Q.  Who were they?
15   A.  Oh.  Well, it's -- it's listed in the report.
16   Q.  Forrester and Schmidt?
17   A.  I remember some of the things that she said were
18      said to her, but I can't remember exactly -- I'd
19      have to go into the report and take a look --
20   Q.  (Interrupting)  The names Forrester and Schmidt
21      ring a bell to you?
22               MS. KEEN:  Joel, I'm sorry.  We're
23      talk -- I'm hearing you talk at the same time as
24      the witness.  I'm having trouble following.
```

 1  BY MR. HUOTARI:

 2  Q.  Do you recall the names Forrester and Schmidt?

 3  A.  I do.  And one of the ones that stuck in my mind,

 4      "You're not going to see your children until

 5      they're 40."

 6  Q.  Were those the interrogators you're referring to

 7      as having committed the coercion you describe?

 8  A.  You know, I could not hear what you said.  I'm

 9      sorry.

10  Q.  Were those the interrogators that in your opinion

11      coerced Samantha Crabtree?

12  A.  Oh, that's a very coercive statement in my

13      opinion.

14  Q.  Well, I'm asking in your opinion.  It's your

15      opinion that she was coerced, right?

16  A.  Of course.

17              MS. HAGY:  Objection, form.

18  BY MR. HUOTARI:

19  Q.  And who coerced her?

20  A.  Those who interrogated her.

21              MS. HAGY:  Objection, asked and

22      answered.

23              MR. HUOTARI:  Really, Lindsay, that was

24      answered?  I haven't heard that yet.  Maybe I'm

1     not hearing so well.

2             THE WITNESS:  Let me give you the

3     reference in my report.  It starts with -- on

4     Page 27.  And I tried to give it pretty extensive

5     treatment about the coercion.

6 BY MR. HUOTARI:

7 Q.  If you look at your screen, sir, I've got Page 30

8     of your report pulled up.  It says, "The tactics

9     Schmidt and Forrester admitted to using on

10    Samantha, including interrogating her for ten

11    hours even though she refused food, taking a

12    statement in one crime while threatening to charge

13    her for another crime can be coercive."  Is that

14    the coercion that you've expressed your opinion

15    about?

16 A.  Well, that was the concluding -- close to the

17    concluding remarks in that whole treatment as I

18    said.

19 Q.  Are those the interrogators that in your opinion

20    did the coercing?

21 A.  Yes.

22 Q.  And you've said that depriving her of food for

23    ten hours and telling her that she won't see her

24    children for 40 years were coercive, right?

1  A.  Yes.

2  Q.  What other manners, if any, was Samantha Crabtree

3      coerced in here?

4  A.  What other -- well, physically and mentally as

5      indicated.

6  Q.  By depriving her food and telling her she wouldn't

7      see her kids in 40 years?

8          MS. HAGY:  Objection, mischaracterizes

9      his testimony and report.

10  A.  Those are two.  There are others.

11  BY MR. HUOTARI:

12  Q.  How many others?

13  A.  Well, keeping her in the interrogation process for

14      two hours, at least two hours and then longer

15      when -- until she produced the signed statement.

16      Since we don't have -- since we don't have the

17      recordings, we don't know how mentally the

18      interrogation went except for what she says, that

19      she was afraid and that she was willing to give

20      false testimony just to get herself out of

21      trouble.  Those are my -- that's my way of saying

22      it.

23  Q.  In your opinion, are there any other examples of

24      how Samantha Crabtree was coerced or the subject

```
 1      of threats by the interrogators?
 2                  MS. HAGY:  Objection, form.
 3  A.  Well, I think we covered the denying the physical
 4      food, drink and less stressful environment would
 5      be one.  The verbal threat another.  And I --
 6  BY MR. HUOTARI:
 7  Q.  (Interrupting)  Verbal -- hold on.  Before you
 8      move on --
 9                  MS. HAGY:  (Interrupting)  Please let
10      him finish.
11                  MR. HUOTARI:  Excuse me, Lindsay.
12      Excuse me.
13                  MS. KEEN:  No.  Stop it.
14                  MR. HUOTARI:  Let me finish my
15      question.  These interruptions are not productive.
16                  MS. KEEN:  You have been bullying and
17      it's just not cool.  Stop it.
18                  MR. HUOTARI:  I'm not trying to bully
19      anybody.  I'm trying to get my question on the
20      record, and the poor court reporter is going to
21      burn up her machine the way she's typing.
22                  MS. KEEN:  Just stop it.
23                  Everybody stop interrupting Mr. Clark.
24      Knock it off.
```

1          MR. HUOTARI:  You can have time to make

2     your objection, and then we'll go on with the

3     answer to the question, okay?

4          MS. HAGY:  I'm just asking you not to

5     interrupt him.  That's all.

6          MR. HUOTARI:  Well, he said threats.

7          MS. HAGY:  It's pretty simple.

8          MR. HUOTARI:  I asked him a question.

9     He identified threats for the first time after

10    having said there was one threat.  So I'm asking

11    him before he goes on to list other topics in

12    response to my question --

13 BY MR. HUOTARI:

14 Q.   What other threats, Mr. Clark, are you talking

15    about besides the threat --

16          MS. KEEN:  (Interrupting)  Joel, you

17    know you're not allowed to cut the witness off.

18 BY MR. HUOTARI:

19 Q.   (Continuing) -- to take her children away until

20    they're 40 years old?

21          MS. KEEN:  Joel, you know you're not

22    supposed to interrupt the witness.  That's all.

23    Just stop doing it.

24          MR. HUOTARI:  You can make your

         1    objection now, Lindsay.

         2              MS. HAGY:  Well, objection, form,

         3    mischaracterizes testimony.

         4              And please just let him finish his

         5    answer.  It's pretty simple.

         6    BY MR. HUOTARI:

         7    Q.  Mr. Clark, please answer the question.

         8    A.  Thanks.  So I think I tried to condense it down

         9        into the last paragraph on Page 30.  And I say,

        10        "The tactics Schmidt and Forrester admitted to

        11        using on Samantha, included interrogating for ten

        12        hours, even though she refused food and taking her

        13        statement in one crime while threatening to charge

        14        her with another crime."

        15    Q.  Yeah.  I just read that.  I'm sorry.  Go ahead.

        16    A.  Should I continue?

        17    Q.  Please.  I thought you were done.

        18    A.  Oh, no.  So those are coerced, and that's -- I saw

        19        in the record.  Then she adds a statement about

        20        never seeing her children for all practical

        21        purposes and being implicated in the murder.  So

        22        those I think -- that's all I -- -- that's the

        23        best way I can answer it.  I think that's implicit

        24        in the record.

 1  Q.  Yeah.  We've talked about --

 2              MS. HAGY:  (Interrupting)  I'm sorry.

 3      I just need to raise -- I know Mr. Bhave said we

 4      need to finish at 4:00, but you still have

 5      questions and we still have some remaining

 6      questions.

 7              MR. HUOTARI:  Yes.  That's why I'd like

 8      to keep moving.  Thanks.

 9              MR. BHAVE:  Okay.  I just want to say

10      that I do not need to leave at 4:00.  I'm here,

11      and I do have some questions afterwards as well.

12              MS. HAGY:  Okay.  Great.

13              MR. HUOTARI:  Thank you, Counsel.

14  BY MR. HUOTARI:

15  Q.  Mr. Clark, we've covered each of those topics you

16      just identified.  I actually read to you that same

17      sentence a moment ago.  My question was is there

18      anything else in addition to that that in your

19      opinion constitutes coercion or threats to

20      Miss Crabtree?

21              MS. HAGY:  Objection, form,

22      argumentative, misstates prior testimony.

23  A.  As I've answered the question, I think I covered

24      all the aspects.

 1   BY MR. HUOTARI:

 2   Q.   Okay.  There's nothing else?

 3   A.   The length is -- the length of keeping her with

 4        them for the ten-hour period is a considerable

 5        factor.

 6   Q.   Right.  Anything else?

 7   A.   No.

 8   Q.   Thank you.  Did you have an opinion that

 9        Steve Pirages committed any acts of wrongdoing in

10        this case?

11             MS. HAGY:  Objection, calls for a legal

12        conclusion, form.

13   A.   Who did you mention?

14   BY MR. HUOTARI:

15   Q.   Steve Pirages, Steve or Stephen.

16   A.   Yeah, I see it.  He was deposed.  I can't remember

17        specifically what he was involved in.  I'd have

18        to -- nothing comes to mind, though, at this

19        point.  I'd have to take a look at where he

20        appears in my report.

21   Q.   Certainly there's nothing in your report that

22        expresses an opinion that Steve Pirages

23        individually committed any acts of wrongdoing in

24        this case; is that right?

1          MS. HAGY:  Objection, form.

2    A.   Yeah.  It's only as a member of the investigative

3         team there.  He's not listed by name.

4    BY MR. HUOTARI:

5    Q.   And is it the same answer with respect to

6         Bruce Scott?

7          MS. HAGY:  Objection, form,

8         mischaracterizes prior testimony and his report.

9    A.   Yeah.  Neither one of -- neither one testified at

10        trial and were deposed.  And as I sit here, I

11        can't remember what there was in their deposition.

12   BY MR. HUOTARI:

13   Q.   Yeah.  That wasn't my question, sir.  What I'm

14        asking you is whether you have an opinion that

15        Detective Bruce Scott committed any individual

16        acts of wrongdoing.

17          MS. HAGY:  Objection, form, calls for

18        speculation and mischaracterizes his report.

19          Can we have a minute for him to be able

20        to look at his report, because this is kind of

21        verging on a memory test.

22          MR. MOGBANA:  Lindsay, that's improper.

23        You just cannot do that.  If the witness requests

24        it, we'll oblige the witness, but you don't do

```
 1      that.  It's not proper.

 2                MS. HAGY:  You're not my boss.  I'm

 3      going to conduct myself just like you're

 4      conducting yourself.

 5                I'm asking him for a couple minutes to

 6      look at his report.

 7  BY MR. HUOTARI:

 8  Q.  Mr. Clark, would it help for me to direct you to a

 9      particular portion of your report that's on the

10      screen?

11  A.  Of course it would.

12  Q.  What page?

13  A.  Well -- oh.  I thought you had something in mind.

14      I'm sorry.

15  Q.  It's your opinions I'm asking you about, sir.  If

16      you don't have an opinion that Bruce Scott did

17      anything wrong, that's okay.  If you do have an

18      opinion that he did something wrong, please tell

19      me.

20                MS. HAGY:  Objection.

21  A.  I would have to review the report, see if I

22      mention -- I comment on him.  And I can't do a

23      search, electronic search because this computer's

24      captured, so . . .
```

```
 1   BY MR. HUOTARI:

 2   Q.  As you sit here today, you can't recall any

 3       particular acts of wrongdoing by Detective Scott;

 4       is that correct?

 5             MS. HAGY:  Objection, form.

 6   A.  Scott appears on Page 11.  Any -- I criticize him

 7       for not giving contemporous updates and reports as

 8       far as Scott's listed.

 9   BY MR. HUOTARI:

10   Q.  Contemporous?  What's a contemporous report?

11   A.  "Here it appears the primary or lead detectives in

12       the case were Forrester, Schmidt and Scott.  They

13       would have been regularly updated on all

14       developments and also made sure that supervising

15       Sergeant Pirages was also informed of all major

16       developments.  It is standard practice to be

17       expected that the lead/case detectives are aware

18       of all information contained in the police file."

19       And that is in regards to information giving --

20       being provided in real time.

21   Q.  What's a contemporous report?

22             MS. HAGY:  Objection, form,

23       argumentative.

24   A.  It's in terms of actual time instead of being
```

    1       delayed.

    2   BY MR. HUOTARI:

    3   Q.   So it's your opinion that the police officers

    4        should be typing out police reports in real time

    5        as they're investigating a murder?

    6              MS. HAGY:  Objection, form,

    7        argumentative.

    8   A.   No.  But certainly very close when the -- when the

    9        process lends itself, which is typically no more

   10        than a day later.

   11   BY MR. HUOTARI:

   12   Q.   Is there anything wrong with taking notes during

   13        an investigation that are subsequently used to

   14        author a police report?

   15   A.   It depends on --

   16              MS. HAGY:  (Interrupting)  Objection,

   17        form.

   18              THE WITNESS:  (Continuing) -- the

   19        quality of the notes and the fact that they are

   20        preserved as evidence.

   21   BY MR. HUOTARI:

   22   Q.   Do you have any other criticisms of Defendant

   23        Bruce Scott other than not taking contemporous

   24        notes or reports?

1          MS. HAGY:  Objection, form.

2    A.   Let me look.  Let me find out where I mention him

3         again.  He was mentioned again on Page 14 on the

4         second paragraph, and he's criticized and

5         mentioned as being part of the retaining the slugs

6         and the casings and not turning them in to the

7         lab.

8    BY MR. HUOTARI:

9    Q.   So your other criticism of Bruce Scott is that he

10        didn't turn over the evidence to the ISP crime lab

11        fast enough?

12         MS. HAGY:  Objection, form.

13   BY MR. HUOTARI:

14   Q.   Is that your opinion, sir?

15   A.   Well, yes.  And, by the way, it's -- he's

16        listed -- his deposition's listed on --

17        parenthetically in the next paragraph.

18   Q.   What other opinions of Bruce Scott's shortcomings

19        do you have?

20   A.   I didn't hear that, sir.

21   Q.   What other opinions do you have about Bruce Scott

22        and the purported deficiencies in this case?

23   A.   I'm giving a quick scan of my report.

24              (Discussion off the record.)

          1                    MS. HAGY:  Once we get through the
          2            answer to this question, I'm going to ask for a
          3            five-minute break.
          4                    MR. MOGBANA:  That's fine.
          5                    THE WITNESS:  Okay.  Scott is mentioned
          6            again on Page 27.  It has to do with the
          7            interrogation of Samantha Crabtree, and there's a
          8            paragraph, second paragraph on the page.  Do you
          9            want me to read it into the record?
         10    BY MR. HUOTARI:
         11    Q.   No.  I just want to know your opinion of what
         12         wrongdoing Detective Bruce Scott is guilty of.
         13                    MS. HAGY:  Objection, form.
         14    A.   Scott's report contains almost no information
         15         regarding the search as -- but Forrester says to
         16         refer to the report.  The report's deficient.
         17    BY MR. HUOTARI:
         18    Q.   Okay.  What else?
         19    A.   I'm continuing.  Okay.  Scott's mentioned again on
         20         Page 31 on the interrogation.  And Scott in his
         21         deposition says he was not given any training on
         22         lengthy interrogations.
         23    Q.   He did?  Okay.  Anything else?
         24    A.   Okay.  Let me -- continuing on.  Okay.  That would

1     be the extent of my commentary on Scott in the

2     report.

3  Q.  And do you have any opinions about Bruce Scott or

4     Steve Pirages that aren't expressed in your

5     report?

6  A.  No.  I think they're expressed in the report.

7              MS. HAGY:  Can we have a five-minute

8     break?

9              MR. HUOTARI:  Oh, sorry.  You need a

10    break?  Oh, okay.  Sure, five minutes.

11             THE WITNESS:  Five minutes?

12             MR. HUOTARI:  Yeah.  We'll be back at

13    4:27 our time.

14             MR. MOGBANA:  That's fine.

15             (A brief recess was taken.)

16             MR. HUOTARI:  Okay.  Mr. Clark, are you

17    ready to go back on the record?

18             THE WITNESS:  I'm ready.

19  BY MR. HUOTARI:

20  Q.  In setting out to develop your report and form

21    your opinions, what presumptions did you rely

22    upon?

23             MR. HUOTARI:  I didn't get it if you're

24    trying to object.

```
 1   A.   I think I answered it earlier on in the deposition
 2        that -- and I explained that I have this material
 3        with an end result as expressed by the judge and
 4        that I took the very best care -- and I think I
 5        did it -- not to -- to review it from the lens of
 6        the ongoing investigation as when the murder
 7        occurs and they respond, what should they be
 8        doing.  And that's the way I approached the
 9        report.  That's the way I commented on the
10        missteps, the failures to follow the proper
11        procedures and how that creates opportunities for
12        writing reports and -- that exclude exculpatory
13        facts or leads that are required, those things.
14        So -- but I clearly acknowledge at the end of the
15        day we have a judicial finding.  This gun was not
16        the murder weapon.
17   BY MR. HUOTARI:
18   Q.   And that's a presumption you relied upon in
19        formulating your opinions?
20   A.   No.  Please.  See -- no, that's not.  I was
21        careful not to allow it to formulate my opinions.
22        That's what I was trying to explain to you.
23   Q.   Did Judge McGraw's opinion that Patrick Pursley is
24        in fact innocent constitute a presumption that you
```

1     relied upon in formulating your opinions?

2  A.  No.  It's an acknowledgment of the judicial

3     review, the second trial and the result of that

4     second trial.  I have taken the best care I can to

5     explain in this deposition I know that occurred.

6     The finding was unequivocal, not the murder

7     weapon.  But I went back and looked at it as an

8     ongoing investigation where the officers are

9     called to the scene and someone's been shot to

10    death.

11  Q.  So did you have any presumptions when you set out

12    to formulate your opinions in this case?

13  A.  Absolutely not.  And I hope that that's clear in

14    my testimony and the report.  It is, for example,

15    not turning the slugs and the casings over

16    immediately to the lab to get to what they can

17    tell you about the -- the investigator about the

18    crime is not expressed with the knowledge that

19    that eventually worked out to not -- to

20    documenting it was not the murder weapon.

21  Q.  When you set out to formulate your opinions, did

22    you presume that Samantha Crabtree's recantation

23    was truthful and an honest recitation of the

24    facts?

1  A.  Well, I think you're asking me again to explain

2      the statement.  I think her recantance (sic) is

3      very significant in light of what it meant to her

4      in terms of incarceration and punishment for

5      perjury.

6  Q.  Yeah.  We went over that.  Would you agree, sir,

7      that it's very important that police not

8      misrepresent the facts when they are documenting

9      an investigation?

10 A.  Yes.

11 Q.  Would you agree that it's very important that

12     witnesses not misrepresent the facts when

13     providing testimony?

14          MS. HAGY:  Objection, form.

15 A.  Well, I think that's implicit, but I will agree,

16     they shouldn't -- I think what you're saying is

17     witnesses shouldn't lie.

18 BY MR. HUOTARI:

19 Q.  And do you think that expert witnesses are held to

20     the same standard about misrepresenting the facts?

21          MS. HAGY:  Objection, form,

22     argumentative.

23 A.  I agree, and I took -- in my regard I just took an

24     oath to tell the truth.

1   BY MR. HUOTARI:

2   Q.  And do you think that expert witnesses who do

3        misrepresent the facts should be deemed to be less

4        than credible?

5                MS. HAGY:  Objection, form,

6        argumentative, calls for a legal conclusion.

7   A.  Yes.

8   BY MR. HUOTARI:

9   Q.  Do you recall in your report on Page 31

10       writing that, quote, "Several officers like

11       Detective Scott said that they were never given

12       any training on this policy"?  And specifically

13       the policy referenced is a written policy against

14       lengthy interrogations.

15  A.  That's in the first paragraph on Page 31.

16  Q.  That's right.  You recall writing that?

17  A.  Yes, I do.

18  Q.  And is that true?

19  A.  That's my recollection of the depositions.

20  Q.  I'm going to show you Bruce Scott's deposition.  I

21       want you to take a look at that and tell me if you

22       still believe that line in your report is true or

23       whether it's a misrepresentation of Bruce Scott's

24       testimony.  Your report cited the Bruce Scott

1    deposition in 93 to 95. I pulled his deposition

2    transcript up and put it on the screen for you.

3    Page 93, relevant testimony starts where it's

4    highlighted on Line 7. It reads, "Question:

5    Okay. I want to direct your attention to -- "

6    it's now at the very top of the next page, which

7    is Section B(3), so the very first section of the

8    next page it says, quote, "lengthy interrogation

9    or incommunicado incarceration before a statement

10    is made is strong evidence that the accused did

11    not freely waive his rights. Do you see that?"

12    Answer by Bruce Scott: "I see it." "Question:

13    Okay. Do you recall ever being trained on what

14    constitutes a lengthy interrogation?" And there's

15    an objection, which I won't read into the record,

16    followed by another question. "Mr. Scott, can you

17    answer the question if you know the answer?"

18    "Answer: I'd say no, I can't remember," end

19    quote. Was that an accurate recitation of

20    Mr. Scott's testimony during his deposition, sir?

21 A. Yes.

22 Q. And is that consistent with your report that

23    claims Detective Scott said he was never given any

24    training on that policy?

```
1              MS. HAGY:  Objection, form.
2   A.   I understand the point, and I would agree quoting
3        the -- the exact testimony would be best, so I
4        don't contest his answer.
5   BY MR. HUOTARI:
6   Q.   So the statement in your report is a
7        misrepresentation of Bruce Scott's testimony,
8        isn't it?
9   A.   No.
10             MS. HAGY:  Objection, form,
11        mischaracterizes the evidence and the prior
12        testimony.
13             THE WITNESS:  No.  That's how I took
14        his answer as to indicate not trained.
15  BY MR. HUOTARI:
16  Q.   So your testimony then is Bruce Scott said he was
17       never trained on that policy; is that what you're
18       saying?
19  A.   No.  Let me be more precise.  When a person
20       cannot -- I was quoted in a -- in the 9th circuit.
21       Inadequate training is tantamount to no training.
22       And here we have a seasoned detective on such a
23       fundamental aspect of interrogation as coercion
24       who says, "I don't remember being trained."  Now,
```

```
 1      you've asked me, "Well, does that mean he wasn't?"
 2      That's the way I took the answer, and so I'm glad
 3      for the clarification.
 4  Q.  Are you saying he testified he wasn't trained --
 5              MS. HAGY:  (Interrupting)  I think he's
 6      not finished.
 7              Are you finished?
 8              THE WITNESS:  Yes.  I think I answered
 9      the question.
10              MS. HAGY:  Okay.
11  BY MR. HUOTARI:
12  Q.  Are you testifying, sir, that Bruce Scott
13      testified he was never trained on coercion?
14  A.  I've clarified my understanding of that, and I
15      acknowledge I could have quoted him.  For the sake
16      of brevity, I did not.  And so in my answer
17      here -- well, I've answered he's a detective that
18      is -- this is so fundamental.  It's like -- as I
19      said earlier, it's like washing your hands before
20      you go into surgery when you're a doctor.  And he
21      says he can't remember.
22  Q.  You realize the murder was 28 years ago or so,
23      right?
24  A.  Of course I remember the dates of the -- the
```

1  murder.

2 Q. Do you recall training you received three decades

3  ago?

4 A. Well, I remember all the training about coercion

5  and police procedure and recovery of evidence and

6  how to do an investigation.  I remember that very

7  well.

8 Q. Do you recall specific policies that you were

9  trained on 30 or so years ago?

10 A. I remember the -- where all of that was embedded

11  in the department's manual of policy and

12  procedures, and it was called, "Detective

13  Operations."  I know -- and that I remember, and I

14  could go to it even to this day.

15 Q. What was the title of the policy that you were

16  trained on 30 years ago about lengthy

17  interrogations?

18    MS. HAGY:  Objection, form,

19  argumentative.

20 A. My training was that if there is coercion, then it

21  taints the statement, and there are also

22  requirements when the statement is given.  But

23  there is always going to be a test of is the

24  statement coerced and, if so, to what degree and

1    therefore can it be considered reliable.

2    BY MR. HUOTARI:

3    Q.   You honestly believe that retired police officers

4         should be expected to have an independent

5         recollection of individual policies that they were

6         trained on 28 or more years ago?

7              MS. HAGY:  Objection, form,

8         mischaracterizes his testimony, argumentative.

9    A.   To that extent, yes, just as I do.

10   BY MR. HUOTARI:

11   Q.   What color car were you driving in 1993?

12              MS. HAGY:  Objection, form,

13         argumentative, irrelevant.

14   A.   My detective car was unmarked brown with a

15         six-foot antenna on spring -- on a spring.

16   BY MR. HUOTARI:

17   Q.   And what about your personal vehicle?

18   A.   And had a radio that gave me access to two

19         frequencies and had a detachable light and an

20         internal siren.

21   Q.   And what about your personal vehicle?

22              MS. HAGY:  Objection.  This is just

23         wasting time at the end of a really long

24         deposition where other people --

```
 1                    MR. HUOTARI:  (Interrupting)  Yeah.  I
 2          agree.  Let's get down to it.
 3    BY MR. HUOTARI:
 4    Q.  What about your personal vehicle?
 5    A.  A white and blue Pinto two-door.
 6    Q.  What was your address?
 7                    MS. HAGY:  Objection.  That's totally
 8          beyond the scope of this.  Let's just move
 9          forward.
10    A.  118 Sandalwood, Glendora, California.
11                    MR. HUOTARI:  I'll turn it over to one
12          of the defense attorneys at this point.
13                    Thank you for your time, Mr. Clark.
14                    MR. BHAVE:  This is Sunil.  I have a
15          few questions for Mr. Clark.
16                    Mr. Clark, can you see me?
17                    THE WITNESS:  I see you.
18                    MR. BHAVE:  And you can hear me okay?
19                    THE WITNESS:  Yes, I can.
20                    MR. BHAVE:  The facial hair is starting
21          to grow, so I apologize for the informality here.
22                    THE WITNESS:  You look good.
23                    MR. BHAVE:  So do you, Mr. Clark.
24    BY MR. BHAVE:
```

      1   Q.   Mr. Clark, you are not a firearms and toolmarks
      2        examiner, correct?
      3   A.   Correct.
      4   Q.   And you don't have any training in conducting
      5        microscopic examinations of ballistics, such as
      6        cartridge casings and bullets, correct?
      7   A.   To the contrary, that it's done and there's a
      8        process and to match test fires to the evidence
      9        slug and how to also match tool firing print marks
     10        and other toolmarks from the -- from the alleged
     11        murder weapon.  I'm aware of the process.
     12   Q.   But, Mr. Clark, you're not trained in that process
     13        of actually physically conducting the
     14        examinations, correct?
     15   A.   Correct.
     16   Q.   And in this case you did not examine any of the
     17        bullets or cartridge casings under a comparison
     18        microscope, correct?
     19   A.   Correct.
     20   Q.   Mr. Clark, can you turn -- I'm not going to share
     21        a screen with you because I think you have the
     22        report in front of you.
     23   A.   I have it.
     24   Q.   Okay.  Would you turn to Page 25 of your report

1      starting with the section that states, "Deviations

2      from standards in developing ballistics evidence."

3  A.  I have it.

4  Q.  Okay.  In the first sentence you reference, "Two

5      firearms experts retained by Mr. Pursley in 2012

6      who conducted an independent and thorough

7      examination comparing the test fires from the

8      recovered Taurus 9mm to the bullets and casings

9      from the Ascher murder."  Do you see that first

10     sentence?

11  A.  I see it.

12  Q.  What are you basing your assertion that the

13     examination by Mr. Pursley's two firearm experts

14     was an independent and thorough examination?

15  A.  Mainly from the judge's recognition and commentary

16     about their testimony.

17  Q.  And aside from the judge's recognition and

18     commentary, are you basing your opinion that

19     the -- Pursley's experts conducted an independent

20     or thorough examination on anything else?

21  A.  Only that I saw the documents.  I think it's Bates

22     stamped early on in the file that I have where it

23     was sent to -- I saw where Murdock got it on --

24     was sent to him on May 14, 2012.

```
 1   Q.   What documents were those?

 2   A.   Correspondence from the sergeant in Rockford to

 3        Murdock himself explaining it was being shipped to

 4        the sheriff's department there in Contra Costa, I

 5        think.  I think it was Contra Costa.  And the

 6        procedure that it was coming, there are some

 7        procedural things and feel free to contact him by

 8        phone or email.

 9   Q.   But, Mr. Clark, you didn't review any of the

10        examination reports or documentation created by

11        Mr. Murdock in the course of his ballistics

12        examination, did you?

13   A.   Nothing I remember in terms of his work, only his

14        testimony.

15   Q.   Did you review Mr. Murdock's testimony in

16        preparation of your reliance in preparing your

17        expert report?

18   A.   Yes.

19   Q.   Can you show me where that -- maybe I just must

20        have missed it.  Could you show me where on the

21        start of your report you reference Mr. Murdock's

22        testimony?

23   A.   Let me see where it is here.  He's not listed on

24        the -- let me see.  Murdock is not listed in my
```

```
 1        listing of testimony, but he is in the trial.  And
 2        I would have to find the . . .  I think it's going
 3        to be somewhere probably in Pursley -- Page 3,
 4        Item 6, in that listing.  Do you want me to . . .
 5   Q.   Could you just let me know where in your expert
 6        report you've identified reviewing Mr. Murdock's
 7        trial testimony?
 8   A.   Only in the -- in the statement that you read, and
 9        I thought you don't -- wanted to know where in the
10        listing of material reviewed that testimony
11        appears.
12   Q.   And let me back this up.  Did you or did you not
13        review Mr. Murdock's testimony in preparation of
14        your expert report?
15   A.   I did in terms of the trial testimony.
16   Q.   Okay.  And where in your expert report did you
17        document that you reviewed that trial testimony?
18   A.   Other than what -- it's going to be in the list
19        either on page -- I think it's in that section
20        on 6.
21   Q.   Okay.  And where in 6?
22   A.   Well, that's the point.  We'll have to take a
23        break, and I'll -- I can pull it up for you, but
24        it's just going to take a look.  I got to find it.
```

        1          You want me to do that?  I think it's uncontested
        2          based on what the judge's says, and he comments on
        3          the testimony offered to him.
        4    Q.    I want to stick with where the testimony is,
        5          because I'm looking at every sub-item in
        6          Section 6, and nothing sticks out as this would
        7          include testimony from Mr. Murdock.  I'm going off
        8          your titles and your subsections.
        9    A.    Okay.  Well, then I would -- not anticipating this
       10          type of a question, I will -- shall we take a
       11          break and let me do a little search, because I
       12          need the screen for -- to make it more -- to
       13          quickly go to that file.
       14    Q.    We can move on.  We can move on.  Now, Mr. Clark,
       15          if Judge McGraw had determined that Dan Gunnell's
       16          examination was proper and correct, would you have
       17          concluded that Mr. Pursley's two firearms experts
       18          had conducted an independent and thorough
       19          examination?
       20                MS. HAGY:  Objection, form, incomplete
       21          hypothetical.
       22                MR. BHAVE:  Go ahead.
       23    A.    I just never considered anything like that because
       24          that's not what Judge McGraw found to be true.

1  BY MR. BHAVE:

2  Q.  Do you know whether Judge McGraw is a firearms

3      examiner?

4  A.  Oh, my goodness.  I took it that he was not.

5  Q.  And so just to be clear, your conclusion that

6      Mr. Pursley's experts conducted a proper

7      examination is just based on a finding of

8      Judge McGraw?

9  A.  No.  It's supported by the -- Mr. Murdock and

10     Mr. Coleman's reports.

11 Q.  And those reports -- those are inconsistent with

12     Mr. Gunnell's report, correct?

13 A.  Yes.

14 Q.  So why do you believe Mr. Murdock and

15     Mr. Coleman's reports and not Mr. Gunnell's

16     reports?

17            MS. HAGY:  Objection, form.

18            MR. BHAVE:  Go ahead.

19            THE WITNESS:  (No response.)

20            MR. BHAVE:  Go ahead, Mr. Clark.

21 A.  I think the best of all sources of answer -- for

22     this answer to the question is Page 10 of the

23     report of proceedings on January 16, 2019, in

24     People versus Patrick Pursley where the judge

```
 1      discusses at significant extent of the Coleman's

 2      and Murdock's evaluation of the alleged murder

 3      gun.

 4  BY MR. BHAVE:

 5  Q.  Okay.  So then again let's --

 6  A.  (Interrupting)  These are the -- these are the --

 7      sir, please.  The Rockford evidence regarding the

 8      alleged murder weapon.  Now --

 9  Q.  (Interrupting)  Okay.  So --

10  A.  (Continuing) -- there are -- in my -- and let me

11      say this last.  I'll try to be quick.  I have

12      three boxes of material that was sent to me about

13      this case, and in that is more testimony from

14      Murdock and -- regarding the techniques, methods

15      and reasons for his conclusions.  I'll wait for

16      the next question.

17  Q.  Mr. Clark, are you an expert in the techniques and

18      methods of conducting a scientific ballistics

19      examination under a comparison microscope?

20  A.  I think you asked me that question.  I said no.

21  Q.  And so I'll go back.  You referenced

22      Judge McGraw's findings in 2019 again.  Other than

23      those findings, is there any reason for you to

24      believe that Mr. Murdock's conclusions or
```

```
 1      Mr. Coleman's conclusions regarding the ballistics

 2      examinations are correct and Mr. Gunnell's

 3      conclusions are incorrect?

 4              MS. HAGY:  Objection, asked and

 5      answered at length now.

 6  A.  Yes.

 7              MR. BHAVE:  You can answer.

 8  BY MR. BHAVE:

 9  Q.  Is there any other basis other than Judge McGraw's

10      findings in 2019?

11  A.  I said yes.

12  Q.  Okay.  Well, then what are those other bases?

13  A.  Their reports, their examinations of the --

14  Q.  (Interrupting)  Sorry.  Go ahead.  Go ahead.

15      Reports, examinations.  What else?

16  A.  And my review as a detective and a detective

17      commander, having read and understood these types

18      of reports, I found them very credible.  And the

19      history of Gunnell's work, Welty's work and others

20      lacks the same level of credibility.

21  Q.  What is it about Dan Gunnell's history of his work

22      that lacks credibility?

23  A.  Well, as far as I can remember, Welty -- Welty

24      looks only at casings.  The gun finally is sent
```

```
 1        in and given to Gunnell.  Gunnell does the
 2        comparison.  Someway or another Welty takes a look
 3        as well, because the procedure is once you obtain
 4        findings, get it -- have another examiner look at
 5        it.  That's also Peter -- let me --
 6   Q.   (Interrupting)  Striupaitis?
 7   A.   Yeah, allegedly does that.  But the -- and I read
 8        Welty's deposition several times to try to
 9        harmonize the -- this unusual transfer of physical
10        evidence that -- put in his hands, and then
11        eventually the Taurus gets there and it's
12        compared.  I think when the testimony was offered
13        about the findings of Coleman and Murdock, it
14        appeared to me based on my readings and my
15        detective background they were far more credible
16        in terms of proficiency, expertise, diligence in
17        examination and things they considered to make the
18        match or not make the match.  And I can -- and I
19        think Judge McGraw also saw it that way.  I
20        understand why he would.  I would be surprised
21        having read what I read that he would not.  And he
22        did not.  So that's the answer.
23   Q.   And are you aware that Beth Patty -- do you know
24        who Beth Patty is?
```

1   A.   I do.

2   Q.   Are you aware that Beth Patty also disagreed with

3        Mr. Murdock's conclusions?

4                  MS. HAGY:  Objection.  It

5        mischaracterizes evidence.

6   BY MR. BHAVE:

7   Q.   Okay.  Do you know who Russell McLain is?

8   A.   As I sit here, I cannot recall Russell McLain.

9   Q.   So do you --

10  A.   (Interrupting)  It's been a long day.

11  Q.   Can you recall whether Russell McLain had ever

12       conducted an examination of the ballistics

13       evidence?

14  A.   I -- I don't -- as I sit here?  If you want to

15       show me a document, it might spark my memory.  As

16       I said, it's been a long day.  I just cannot

17       recall him.

18  Q.   Okay.  And then, Mr. Clark, you say in the next

19       sentence that Murdock and Coleman's examination

20       "concluded beyond doubt that the recovered Taurus

21       did not fire the bullets that killed Andrew."  Do

22       you see that?

23  A.   Yes.

24  Q.   Is it true that your conclusion here is based

1     again on your determination that Murdock and

2     Coleman correctly analyzed the ballistics evidence

3     and everybody at ISP incorrectly examined the

4     ballistics evidence?

5             MS. HAGY:  Objection, form,

6     mischaracterizes his prior testimony and the

7     evidence.

8             MR. BHAVE:  Go ahead.

9  A.  So the reason -- let me answer it this way:  The

10     reason for a trial is to determine truth.  And the

11     judge so found exactly what you just said, because

12     the implications are if this is not the murder

13     weapon -- which the judge found is not the murder

14     weapon -- then it can only be opined that there

15     was an incompetence at best, very significant,

16     resulting in the conviction and incarceration of

17     an individual for 20 years.

18  BY MR. BHAVE:

19  Q.  Mr. Clark, in your experience, your wealth of

20     experience as a law enforcement officer, have you

21     ever been involved in a case where a judge or a

22     jury found a defendant not guilty but you believe

23     that may have been the incorrect result?

24             MS. HAGY:  Objection, form.

1  A.  Nothing that I was involved in as a law

2      enforcement officer.

3  BY MR. BHAVE:

4  Q.  And you're aware that in 1994 a jury convicted

5      Patrick Pursley based in part on the ballistics

6      evidence, right?

7  A.  Yes, I am.

8  Q.  And so you would agree that that finding would

9      have been consistent with the truth?

10             MS. HAGY:  Objection, form.

11 A.  It's a twisted logic, and I disagree

12     wholeheartedly.

13 BY MR. BHAVE:

14 Q.  And then if you look down two sentences after the

15     one we just discussed, you say, "This is

16     significant because it means Mr. Pursley was

17     convicted based on false information."

18 A.  Yes.

19 Q.  Did you -- by making that statement, do you mean

20     that Dan Gunnell's ballistics conclusions was

21     false information?

22 A.  Yes.

23             MS. HAGY:  Objection, form.

24             THE WITNESS:  Should I answer it again?

1   BY MR. BHAVE:

2   Q.   Could you explain why you believed Dan Gunnell's

3        ballistics examination was false information?

4   A.   Because it was -- the gun was not the murder

5        weapon.

6   Q.   And the gun was not the murder weapon, that

7        conclusion is based on the Court's finding,

8        correct?

9   A.   And which is -- the foundation of the Court's

10       findings are Coleman and Murdock.

11  Q.   All right.  And then you say, "In fact, his Taurus

12       had no connection to the murder."  If I was to ask

13       you the same questions, what is the foundation for

14       that conclusion, it would be the same answer as

15       the false information?

16                   MS. HAGY:  Objection, form.

17  A.   Yes.

18  BY MR. BHAVE:

19  Q.   And then the next sentence you say, "Accordingly,

20       the record evidence in this case was created as a

21       result of the RPD and ISP defendants's deviation

22       from the standard procedures," correct?

23  A.   Yes.

24  Q.   And then if you look at the first sentence of the

     1     next paragraph, you say, "The ballistics evidence
     2     in this case was created after the RPD and ISP
     3     defendants deviated from standard procedures and
     4     their own procedures in several ways," correct?
     5  A.  Yes.
     6  Q.  You did not review any of the procedures or
     7     policy manuals of the Illinois State Police in
     8     preparation of your expert report, correct?
     9            MS. HAGY:  Objection, form,
    10     mischaracterizes his report.
    11  A.  This was not a state police investigation, so my
    12     report does not address actions by the state
    13     police.
    14  BY MR. BHAVE:
    15  Q.  Do you have any opinion -- strike that.  So is it
    16     fair to say that you do not intend to opine on the
    17     actions of the state police?
    18            MS. HAGY:  Objection, form,
    19     mischaracterizes his report and his prior
    20     testimony.
    21  A.  The state police were not involved in the
    22     investigation, except for their lab.  Is that what
    23     you're -- I don't understand the question
    24     otherwise.

1   BY MR. BHAVE:

2   Q.   Do you understand that the state police lab, that

3        the lab is the state police?

4   A.   They're not sworn, but, yes.  I think I just told

5        you, the state police run a lab.  They evaluate

6        evidence, physical evidence.  They're not -- they

7        were not the investigators in this case.

8   Q.   Okay.  And so when you refer to their own

9        procedures in the first sentence of the last

10       paragraph on Page 25, whose own procedures are you

11       referring to?

12  A.   In terms of the lab?

13  Q.   Correct.

14  A.   I talk about Welty a considerable extent and how

15       there was a requirement for him to not -- his lack

16       of formality taints his work on the -- looking at

17       the shell casings, and then it goes downhill from

18       there.  It's in the report.

19  Q.   And, Mr. Clark, I guess my first question was you

20       did not review any of the procedures or policy

21       manuals of the Illinois State Police, correct?

22            MS. HAGY:  Objection, form,

23       mischaracterizes his report and prior testimony.

24  A.   I guess --

1    BY MR. BHAVE:

2    Q.   (Interrupting)  Did you or did you not review the

3         Illinois State Police's policies and procedures?

4    A.   Not their manuals.

5    Q.   Okay.  Did you review any policies and procedures

6         in written form of the Illinois State Police?

7    A.   Not that I recall.

8    Q.   Okay.  And then if you can go to the next page,

9         Mr. Clark.

10   A.   What page are we on?

11   Q.   Twenty-six.

12   A.   All right.

13   Q.   If you look at the second full paragraph and

14        you look at the second sentence, you discuss,

15        "Dan Gunnell was the ISP examiner who compared the

16        Ascher bullets and the Taurus 9mm test fires,"

17        correct?

18   A.   Yes.

19   Q.   And then if you look at the third sentence, you

20        say, "He," referring to Dan Gunnell, "discussed

21        his findings with Jack Welty."  You see that?

22   A.   Yes.

23   Q.   What are you basing that statement on?

24   A.   Welty's deposition.

```
 1   Q.   Are you basing it on anything else?

 2   A.   Let me see.  I have Genens's deposition cited

 3        about Welty, but other than that I'd have to take

 4        another look at that citation.  Welty's own

 5        deposition comments on it as well.

 6   Q.   And then in the next sentence after that, you

 7        said, "From the ISP standpoint, Welty was the lead

 8        ballistics analyst at the ISP lab in 1993, and

 9        this was his case."  You see that sentence?

10   A.   That was supported by Genens's deposition at

11        Page -- starting on Page 101.

12   Q.   And Genens is an ISP employee or a Rockford?

13        Rockford, right?

14   A.   Rockford.

15   Q.   And so is there any -- other than Genens's

16        deposition, is there any other support for the

17        finding that from ISP's standpoint Welty was the

18        lead ballistics analyst?

19   A.   I can't remember if that -- Welty offers himself

20        as the most senior at the lab where he is.  And --

21        and Gunnell was -- was rather new at that time,

22        say it that way.  But Welty was apparently the --

23        I'll use the term go-to guy for the lab on

24        ballistics.
```

```
 1   Q.   And where are you finding that conclusion from,
 2        where are you drawing that conclusion from?
 3   A.   Well, Welty says it himself in his deposition.
 4   Q.   Okay.  And you said go-to guy at the lab for the
 5        ballistics.  Which lab are you talking about?
 6   A.   The one he was located at.  I forget the name of
 7        it, but it's where Forrester goes directly to him,
 8        says, "Look, I need you have to take a quick look
 9        at this."
10   Q.   So that's the Rockford lab I think is what you're
11        referring to?
12   A.   The Rockford lab, yeah.  There's another one that
13        was larger.
14   Q.   There are a number of labs, so would it be fair to
15        say that Welty was the go-to examiner at the
16        Rockford lab?
17   A.   That's the way I understood it.  That's what I
18        took out of the deposition.
19                  MS. HAGY:  Objection.
20   BY MR. BHAVE:
21   Q.   And did you take anything out of the deposition
22        that indicated whether he was the go-to examiner
23        at any of the other ISP laboratories?
24                  MS. HAGY:  Objection, form.
```

1  A.  Not in that context.

2  BY MR. BHAVE:

3  Q.  And then, Mr. Clark, in the next sentence you say,

4      "According to Gunnell, Welty verified Gunnell's

5      results of a conclusive match between Samantha's

6      Taurus and the weapon used to shoot Andrew,"

7      correct?

8  A.  Yes.

9  Q.  What is the support for that conclusion?

10  A.  The support is Welty's deposition, and it was --

11      it's also in the record that Peter Striupaitis --

12  Q.  (Interrupting)  Striupaitis.

13  A.  (Continuing) -- Striupaitis also once Gunnell said

14      he had a match -- I don't know how physically he

15      did this.  I'm assuming he went over to the bench

16      where it was and took a look and says, "Yeah.  You

17      got it right."  That's in the record.

18  Q.  Correct.  Peter Striupaitis's verification is in

19      the record, but what I'm asking you is where are

20      you getting the support that Welty verified

21      Gunnell's conclusions, and you said his

22      deposition, Welty's deposition.  And so now my

23      question is is there any other support that you

24      were relying on to conclude that Welty verified

1     Gunnell's ballistics findings?

2  A.  Just a minute.  So there's a quote on Page 240 of

3     Welty's deposition.  And that's a bad . . .

4  Q.  What does that quote say on Page 240 of

5     Mr. Welty's deposition, Mr. Clark?

6  A.  Pardon me?

7  Q.  What does that quote say on Page 240 of

8     Mr. Welty's deposition?

9  A.  That has to do with June 9.  I want to find where

10     they got the gun and Gunnell looks at it and Welty

11     looks at it as well.  And probably going to take

12     more time -- I'm willing to do it, find it in his

13     deposition.  Just one minute here.  I'd have to

14     use my computer to go through because there's no

15     index for this depo that I got.  Okay.  Page 192.

16  Q.  Hold on.  Let me get there.  One ninety-two?  Go

17     ahead.  This is Welty's deposition?

18  A.  Yeah.

19  Q.  Go ahead.

20  A.  No.  That's not at all what I was looking for

21     either.

22  Q.  Right.

23  A.  This has to do -- he's talking about his

24     experience with Tauruses.

1  Q.  Right.

2  A.  And not the -- his verification of this Taurus

3      with Gunnell.

4  Q.  Yeah.  I'd like to know where you're finding in

5      Welty's deposition that Welty said that he

6      verified the -- Gunnell's findings in 1993.  I

7      don't recall it, but you might, so let me know.

8              THE WITNESS:  You want to have a break?

9      I'll do it.

10              MR. BHAVE:  Sure.

11              THE WITNESS:  All right.  Let's --

12      let's see here.  Wait a minute.  Let's see if I

13      can do it this way.  Let's see.  It's Gunnell,

14      G-u-n-n-e-l (sic), I think.  G-u-n-n-e-l . . .

15              MS. HAGY:  While he's looking, can I

16      please ask the court reporter how much time we

17      have on the record.

18              (Discussion off the record.)

19  A.  Here it is.  Go to Page 169.

20  BY MR. BHAVE:

21  Q.  Okay.  I'm almost there.

22  A.  This is the first.

23  Q.  Go ahead.

24  A.  Going to Page -- the first -- the page prior, it's

     1          going to be 168.  Quote, "Question:  Okay.  And

     2          this has to do -- there's a forwarded message

     3          requesting (sic) a post-conviction IBIS entry

     4          court ruling, and the first," dash, "this is an

     5          email.  It starts out with the -- from

     6          Brennan to Gunnell, and it says, 'Is this

     7          something that concerns -- '" quote, "'As this is

     8          something that concerns one of our own, you, I

     9          haven't distributed it yet to the rest of the

    10          section.  Do you want to handle this with some

    11          background or can I send it out to the masses as

    12          is?'"  And then Dan Gunnell replies, "Whatever you

    13          wish.  I made the original ID, and it was verified

    14          by both Pete Striupaitis and then later by

    15          Jack Welty.  The case resulted in a conviction,"

    16          close quote.  "Do you have any idea why Gunnell

    17          says that you verified this ID?"  Okay.  Now,

    18          there's the start.  If you want to plow some more

    19          ground, we can do it, but that's the way I

    20          remembered it.

    21     Q.   And then look down at the rest of it, Mr. Clark,

    22          because he says at the end there at Line 20 to 23,

    23          he says, "So, yeah, I'm confused by this because I

    24          don't -- I don't know if it's accurate, but I

1     assure you I never did a verification on this --

2     on this case." Did you read that part of the

3     deposition?

4  A.  Yes, I did. I have it in front of me.

5  Q.  And so do you believe Jack Welty's lying when he

6     testified that he never did a verification in this

7     case?

8           MS. HAGY: Objection, form,

9     argumentative, mischaracterizes both the

10    deposition and Mr. Clark's prior testimony.

11          MR. BHAVE: Go ahead, Mr. Clark.

12  A.  Well, we've got contrasting statements, and one is

13    written out. It is what it is.

14  BY MR. BHAVE:

15  Q.  It's not is what it is. There's an email that

16    Mr. Welty did not author and Mr. Welty's sworn

17    testimony. Which one do you believe, Mr. Clark?

18          MS. HAGY: Objection, argumentative,

19    mischaracterizing the evidence.

20  A.  If we go to the -- my Page 26 of my deposition --

21    my report, "In my opinion, it is unusual for an

22    analyst to hand evidence directly to another

23    analyst, especially if the second analyst did not

24    have any work to do on the evidence, such as an

1    examination. This handoff strongly indicates that

2    Welty was in communication with Gunnell about the

3    case and that Welty looked at the evidence, too,

4    either alongside or after Gunnell." Now, you have

5    to go to the paragraph before that. There are

6    documents of transfer, and it goes into Welty's

7    hands from Gunnell.

8  BY MR. BHAVE:

9  Q.  Okay. That's not even remotely responsive to the

10     question that I asked.

11  A.  Well, no. I think it's directly on point,

12     Counsel. I don't want to be argumentative, but

13     look at the paragraph before. It said, "According

14     to Gunnell, Welty verified Gunnell's results of a

15     conclusive match between Samantha's Taurus and the

16     weapon used to shoot Andrew. Gunnell returned the

17     evidence -- " here it is -- "directly back to

18     Welty rather than the evidence vault. Genens

19     testified that the submittal form returning

20     the evidence from Analyst Gunnell at the

21     Broadway (sic) Lab to Jack Welty was something he

22     had not seen in other cases." And I cite it.

23  Q.  Okay. Thank you for --

24  A.  (Interrupting) Wait. One more time. This

1    substantiates Gunnell's written response that we

2    just quoted.  Welty looked at this.

3  Q. And so do you believe Dan Gunnell's email where he

4    stated, "Jack Welty verified my findings," or do

5    you believe Jack Welty's testimony under oath

6    where he said, "I never verified those findings"?

7  A. Well --

8          MS. HAGY:  (Interrupting)  Objection,

9    argumentative.

10          MR. BHAVE:  Why is it argumentative?

11    I'm just asking what does he believe.

12          THE WITNESS:  You're asking -- I

13    don't -- I don't believe anything.  I believe -- I

14    believe what I see in the record, and the judge

15    apparently took a look at it, too.  And there's a

16    direct conflict here.  And unfortunately Gunnell's

17    had a stroke, but he wrote this lucid, and he was

18    an active, seasoned investigator.  He recalled it,

19    and he said what he said.  And that's stunning in

20    terms of later on Welty says, "Not me.  I never

21    touched that after I looked at the shell casings."

22  BY MR. BHAVE:

23  Q. Did you find any other evidence in the record that

24    corroborates Jack Welty verified Dan Gunnell's

1    written findings in 1993?

2  A.   The transfer document --

3           MS. HAGY:  (Interrupting)  Objection,

4      asked and answered.

5           MR. BHAVE:  He's talking.  Ms. Hagy,

6      please don't interrupt your witness.

7           Go ahead.

8           MS. KEEN:  Objection.

9           MR. BHAVE:  Go ahead.

10          THE WITNESS:  He transferred documents

11     to Welty rather than the lab speaks to that

12     reality.

13  BY MR. BHAVE:

14  Q.   Do you have any other evidence to support your

15     finding that Welty verified Dan Gunnell's

16     examination?

17          MS. HAGY:  Objection, asked and

18     answered.

19          MR. BHAVE:  It's not.

20  A.   Nothing comes to mind in this late time of the

21     deposition.  At this moment I can't recall

22     anything as I sit here.

23  BY MR. BHAVE:

24  Q.   I can't as well.  Okay.  And then in the next

          1     paragraph -- you read this to us, Mr. Clark, and

          2     you said, "This handoff between Welty and Gunnell

          3     strongly indicates Welty was in communication with

          4     Gunnell about the case."  But what are you basing

          5     that -- what evidence are you basing that off of,

          6     or is this just an inference that you're drawing?

          7              MS. HAGY:  Objection, asked and

          8     answered, form.

          9  A.  You know, Counsel, if it was just a comment in the

         10     ether that is not supported by anything physical.

         11     We have a transmittal document that another

         12     detective says, "I've never seen this" or "This

         13     doesn't happen," yet it does when Gunnell in a

         14     document written, part without, undeniable, from

         15     Gunnell to Welty that the evidence goes to him.

         16     Well, why is Welty if he's not going to take a

         17     look, et cetera, why is Welty getting it?

         18  BY MR. BHAVE:

         19  Q.  Well, let me ask you this:  Do you think it might

         20     be necessary to transfer the evidence from

         21     Broadview, Illinois, to Rockford, Illinois,

         22     because the prosecution is taking place in

         23     Rockford, Illinois?

         24              MS. HAGY:  Objection, form.

1             MR. BHAVE:  Okay.

2    A.   It would be -- if that was the routine and rather

3         than going directly into the evidence and not back

4         to Welty, yes.

5    BY MR. BHAVE:

6    Q.   Do you know where Broadview, Illinois, is,

7         Mr. Clark?

8             MS. HAGY:  Objection, argumentative,

9         and this line of questioning is assuming facts

10        that aren't in evidence.

11            MR. BHAVE:  I don't even know what that

12        means.

13   BY MR. BHAVE:

14   Q.   Do you know where Broadview, Illinois, is in

15        relation to Rockford, Illinois?

16   A.   No, but it's easily determined.  I didn't think it

17        was essential for the report.

18   Q.   No.  That's fine.  But you're aware that

19        Dan Gunnell conducted the ballistics examination

20        in 1993 in Broadview, Illinois, correct?

21   A.   Yes.

22   Q.   And you're aware that the murder and the

23        prosecution was taking place in Rockford, correct?

24   A.   Right, where Welty was resided as an examiner.

```
 1   Q.   Correct.  And so doesn't it make sense where after
 2        Dan Gunnell's examination in 1993 -- after his
 3        examination completes to send the evidence back to
 4        Rockford?
 5                  MS. HAGY:  Objection, calls for
 6        speculation and mischaracterizing the evidence.
 7   A.   If it's where the evidence -- all the evidence for
 8        the homicide is going to reside in an evidence
 9        locker, yes, according to -- as I had written,
10        according to the proper procedure, but this one
11        was transferred to Welty.
12   BY MR. BHAVE:
13   Q.   And are you aware of what the proper procedures
14        for handling of ballistics evidence is under the
15        Illinois State Police policies and procedures
16        manuals?
17   A.   There was --
18                  MS. HAGY:  (Interrupting)  Objection,
19        form.
20                  THE WITNESS:  There is a deposition on
21        that regard.
22                  MR. BHAVE:  I'll go ahead and strike
23        that question.  I'll strike it, so there's no
24        question.
```

1  BY MR. BHAVE:

2  Q.  Mr. Clark, you're not opining that there was some

3      mishandling of the evidence through its chain of

4      custody between the Illinois State Police

5      laboratories, are you?

6              MS. HAGY:  Objection, form.

7  A.  I would say the departure from the standard

8      procedure is mishandling.

9  BY MR. BHAVE:

10 Q.  Are you aware that the parties have previously

11     stipulated that there was -- the chain of custody

12     was proper?

13 A.  I saw the stipulation earlier in the deposition.

14     I think that's what you're referring to.

15 Q.  Correct.

16 A.  Well, that's a stipulation.

17 Q.  It undercuts your criticism regarding the chain of

18     custody of those items?

19             MS. HAGY:  Objection, form.

20 A.  I'm very critical of any departure from the

21     standard method of transferring evidence.

22 BY MR. BHAVE:

23 Q.  Now, Mr. Clark, I know that you have concluded

24     that the Illinois State Police's -- strike that.

1     You've concluded that Dan Gunnell's examination

2     was not correct; that's a fair -- at least a fair

3     statement, right?

4            MS. HAGY:  Objection, asked and

5     answered.

6  A.  Yes.

7  BY MR. BHAVE:

8  Q.  Okay.  Do you have any reason to believe that

9     Dan Gunnell intended to fabricate evidence in

10    1993?

11           MS. HAGY:  Objection, asked and

12    answered, calls for a legal conclusion.

13  A.  There's nothing in the record.

14           MR. BHAVE:  That's all the questions I

15    have.

16           Thank you.

17           MR. POTTINGER:  Mr. Clark, my name is

18    R.C. Pottinger.  I'm a lawyer.  I represent the

19    estate of Howard Forrester, David Ekedahl and

20    Gary Reffett.

21           I've got a few questions for you.

22    Hopefully we can get through this fairly quickly.

23  BY MR. POTTINGER:

24  Q.  What was the audiovisual recording standards for

      1          police interrogations of witnesses or suspects in
      2          1993?
      3    A.    Record the statement.
      4    Q.    And what do you base that on?
      5    A.    The required diligence for detective
      6          investigations.
      7    Q.    Okay.  That's your opinion?
      8    A.    My opinion and experience, and it was -- it was
      9          required by most agencies that I was aware of.
     10    Q.    Was it required by any agency in the state of
     11          Illinois in 1993 to your knowledge?
     12    A.    I'm not aware.
     13    Q.    Was it required in any -- what states was it
     14          required in 1993, your knowledge?
     15                 MS. HAGY:  Objection, form.
     16    A.    I think there are agencies throughout the entire
     17          United States in 1993 that required recordings.
     18    BY MR. POTTINGER:
     19    Q.    Okay.  What states?
     20    A.    Well, I bumped into --
     21    Q.    (Interrupting)  Just say you don't know.  What
     22          states?
     23                 MS. HAGY:  Objection.
     24    A.    Well, I know New York, California, Arizona,

1    Nevada, Utah.  There are agencies in all those

2    states that -- in 1993.

3  BY MR. POTTINGER:

4  Q.  That the state law required recording of

5    statements by suspects or witnesses in a criminal

6    investigation in those states would be your

7    opinion -- your testimony in 1993?

8  A.  No.

9           MS. HAGY:  Objection, form,

10  mischaracterizes his testimony.

11          MR. POTTINGER:  Lindsay, I'm not going

12  to put up with it.  Mischaracterizing testimony is

13  not a valid objection under the standing rule in

14  this district.  Don't do it again.

15          MS. HAGY:  I can't find that standing

16  rule.  I'm going to make --

17          MR. POTTINGER:  (Interrupting)  Go

18  ahead, Mr. Clark.

19          MS. HAGY:  I'm going to make my

20  objection, and I'm going to ask you to let him

21  answer.

22          MR. POTTINGER:  Stop.  Stop.  You made

23  your objection.

24          MS. HAGY:  You can't boss me around.

        1              MR. POTTINGER:  Mr. Clark, answer the
        2        question.
        3              THE WITNESS:  Okay.  So you added state
        4        law required?
        5  BY MR. POTTINGER:
        6  Q.  Yes.
        7              MS. HAGY:  And I'm going to object on
        8        form and that this is mischaracterizing his prior
        9        testimony.
       10              I have a right to make that objection.
       11              MR. POTTINGER:  Go ahead and answer the
       12        question.
       13  A.  So I'm not aware of any state law requirement in
       14        any of the states I mentioned.
       15  BY MR. POTTINGER:
       16  Q.  Okay.
       17  A.  Or any other state.
       18  Q.  So what do you base that standard on for the
       19        states that you did mention?
       20  A.  The professional standard.
       21  Q.  What professional --
       22  A.  (Interrupting)  Well, I cited O'Hara.  I cited the
       23        IACP Detectives' Investigations.  It was a
       24        standard procedure for proper investigative

```
 1      procedures, especially in homicides, to record.

 2   Q.  Based on IA -- the Illinois Association of Chiefs

 3      of Police or the International Association of

 4      Chiefs of Police; is that correct?

 5   A.  I cited the book, their publication on detective

 6      investigations.

 7   Q.  Have you been involved in a case in your

 8      experience which that standard has been adopted by

 9      a court of law, in any case you've been involved

10      in?

11            MS. HAGY:  Objection, form.

12   A.  No.

13   BY MR. POTTINGER:

14   Q.  Thank you.  I mean go ahead and answer if you want

15      to add.

16   A.  The answer is no.

17   Q.  No.  Go ahead.  Sorry.

18   A.  I'm done.  No.

19   Q.  Okay.  And you made this statement -- and I don't

20      want to beat this issue up.  You said earlier in

21      the deposition -- you were asked about it

22      repeatedly, but I want to ask it again.  You said

23      that's not a credibility statement, it's a

24      professional judgment in answer to many questions.
```

         1    How are those two concepts different?  And my

         2    question is doesn't your rendering of what you

         3    believe to be a professional judgment require you

         4    to make credibility assessments?

         5             MS. HAGY:  Objection, form, asked and

         6    answered, mischaracterizes his prior testimony.

         7             MR. POTTINGER:  I'm going to say this

         8    one more time.  Asked and answered under the

         9    local -- under the rules that we're governing this

        10    deposition -- I'm going to read it.  It says,

        11    "Asked and answered is not -- "

        12             MS. HAGY:  (Interrupting)  I mean --

        13             MR. POTTINGER:  (Interrupting)  I'm

        14    going to read it to you and you're not going to

        15    interrupt me.

        16             "Asked and answered is not an

        17    appropriate objection during depositions absent

        18    truly abusive conduct in extraordinary cases."

        19             You want to put that on the record, go

        20    ahead.

        21             MS. HAGY:  What are you reading?

        22             MR. POTTINGER:  Mr. Clark, go ahead and

        23    answer the question.

        24             MS. HAGY:  What are you reading from?

```
 1                    MR. POTTINGER:  Reading from the

 2        standing order regarding depositions in

 3        United States District Court, Northern District of

 4        Illinois.

 5                    MS. KEEN:  Which judge, R.C., so we can

 6        pull it up?

 7                    MR. POTTINGER:  It's in the standing

 8        order if you go to the Web site.

 9                    It would help us all.  It would help us

10        all if we followed those rules, both sides.

11                    MS. HAGY:  But I mean --

12                    MR. POTTINGER:  (Interrupting)  I'm not

13        getting into this debate.  We can talk about it --

14                    MS. HAGY:  (Continuing) -- asked and

15        answered is important here.  We're going through

16        the same things, and we only have about 20 minutes

17        left for this dep.

18                    We can disagree, but you don't get to

19        control my answers.  This is an adversarial

20        process.

21                    MR. POTTINGER:  Go ahead, Mr. Clark.

22    A.  So as I recall, my answer is credibility is what

23        is the ultimate truth, the ultimate decision.  And

24        what I've tried to express is what the indications
```

```
 1        are based on my professional experience, that
 2        which includes being a detective and weighing
 3        the -- the likelihood of the statement itself.
 4        So -- and I would agree that that -- that is a
 5        flavor of credibility, but it's -- it's necessary
 6        in order to be able to give an opinion.  But I
 7        want to make clear on the record -- and I'm
 8        grateful for the opportunity again -- I'm not here
 9        to determine what the jury's going to determine is
10        true.
11   BY MR. POTTINGER:
12   Q.   Okay.  That's your personal interpretation of the
13        evidence that's been presented to you; is that
14        correct?
15   A.   No.  It's not --
16                  MS. HAGY:  (Interrupting)  Objection,
17        form.
18                  THE WITNESS:  It's not a personal --
19        it's not personal.  It is professional, which is
20        different.
21   BY MR. POTTINGER:
22   Q.   How is that different, how is your personal
23        opinion different from your professional opinion?
24                  MS. HAGY:  Objection.
```

1 A. Oh, you can ask me, "What do you believe as a

2   person?"  And then of course the next -- and, "How

3   would it influence -- how did that influence this

4   report?"  I think I'd be rather blunt.  But I'm

5   trying to keep it based on a detective viewpoint

6   and a detective bureau commander's viewpoint and

7   going to Square 1, which is the murder itself and

8   taking the investigation through, comment there,

9   and of course as I said earlier, I understand the

10   ultimate finding 20 years later is this was not

11   the murder weapon.

12 BY MR. POTTINGER:

13 Q. Is your professional judgment an interpretation of

14   the evidence that this jury would hear if this

15   case were to go to trial?

16 A. Yes.  I'd take great care to make sure they

17   understood this is a professional opinion based on

18   training and experience.

19 Q. So you were rendering professional interpretations

20   of evidence?

21 A. Yes.

22 Q. Is that correct, Mr. Clark?

23 A. You are correct.

24 Q. What methodology did you rely upon to establish

1     your opinions about the Rockford Police Department

2     policies, customs and practices in 1993 as it

3     relates to homicide investigations, if any?

4  A.  I went to the expression of the professional

5     standard in the two volumes that I cited.  They

6     are dated as published at that time, so that's

7     who -- I took care to go to that.  There have been

8     subsequent publications or editions later on.  And

9     I reflected on my experience in 1993, which was my

10    retirement year incidentally, and used that as my

11    basis.

12  Q.  So in summary you used the two publications that

13    you've referenced earlier, along with your own

14    professional judgment based on your experience

15    with the Los Angeles County Sheriff's Department

16    in 1993, up through 1993?

17         MS. HAGY:  Objection, form,

18    mischaracterizes testimony.

19  BY MR. POTTINGER:

20  Q.  Is that fair?

21  A.  In the context of the material provided, which

22    includes the depositions, et cetera.

23  Q.  But the methodology you used was to rely on those

24    two publications as well as your professional

1      opinion; is that right?

2   A.  I think that's fair, your global explanation.

3   Q.  When Detective Forrester met with Liane Windham in

4       November of 1993, just so we're clear, he in fact

5       prepared a report, right?

6   A.  When Windham met -- when Forrester met Windham?

7   Q.  With Liane Windham, his wife, in the domestic

8       violence allegation.

9   A.  Okay.  And the question is?

10  Q.  He prepared a report, correct?

11  A.  He wrote a report, yes.

12  Q.  And that was -- it's been produced in the case, so

13      it's presumably part of the records in your

14      professional judgment, correct?

15  A.  Yes.

16  Q.  Okay.  What do you base your opinion on that

17      Forrester did not share that with the state's

18      attorney's office?

19  A.  According to the record, he never brought it to

20      anybody's attention.

21  Q.  According to what record?

22  A.  The record given to me.  There's no -- there's no

23      memorandum or report that this was routed -- this

24      report involving this key witness was routed to

1    the prosecution and the defense.

2  Q.  So your -- the record that it wasn't done is

3      because you didn't see a memorandum that it was

4      routed?

5              MS. HAGY:  Objection, form,

6      mischaracterizes his testimony.

7  BY MR. POTTINGER:

8  Q.  Is that true?

9  A.  Yes.  Well, and I commented on it in the report,

10     so the report I think has a -- may have another

11     detail, but that's fundamentally it.  It's a

12     Brady -- I put it in the context of Brady.

13 Q.  I understand that you did that, but I'm asking

14     you what proof do you have that Forrester,

15     Howard Forrester, did not route that to the --

16     give that information to the state's attorney's

17     office, if any?

18             MS. HAGY:  Objection, form.

19 A.  The absence of any acknowledgment in the record

20     that that report went anywhere and was used as a

21     defense.

22 BY MR. POTTINGER:

23 Q.  And was used as a defense.  Thank you.  And

24     when -- what do you know happened to the report?

```
 1              MS. HAGY:  Objection, form.
 2   A.  I do not know exactly what happened to the report.
 3   BY MR. POTTINGER:
 4   Q.  You have no indication that Detective Forrester
 5       would have intentionally not given this
 6       information to the state's attorney's office,
 7       correct?
 8              MS. HAGY:  Objection, calls for
 9       speculation.
10   A.  If you ask the question, I have no -- nothing in
11       the record that I saw.
12   BY MR. POTTINGER:
13   Q.  You have no idea what Detective Forrester knew or
14       didn't know about Brady rules; is that correct?
15              MS. HAGY:  Objection, form, calls for
16       speculation.
17   A.  No.
18   BY MR. POTTINGER:
19   Q.  You have no idea; that's correct?
20   A.  Correct.
21              MS. HAGY:  Objection, asked and
22       answered.
23   BY MR. POTTINGER:
24   Q.  You contend that the preliminary examination of
```

1    the shell casings that Forrester provided to Welty
2    in June -- June 9, I believe, of 1993 was
3    improper; is that correct?
4  A. Yes.
5  Q. Why was that an improper investigative technique?
6  A. Because it should have been done immediately upon
7    retrieval of the -- of the -- of those items and
8    sent in to the lab for investigative leads.
9  Q. Okay.  I understand that, for investigative leads,
10    but what about the specific inquiry that
11    Detective Forrester had of Mr. Welty as to whether
12    that -- those shell casings originated from a
13    particular gun?
14  A. Oh, I'm not at all critical of sending it in and
15    saying, "What can we learn from these?"  I'm not
16    critical of that.
17  Q. I mean that's a very appropriate investigative
18    tool that would be following a lead, correct?
19  A. Yes.  It's a key -- it's key evidence, and it
20    would give key information.
21  Q. Right.  So, for instance, in this particular case
22    if Welty were to come back and say, "No.  That was
23    fired from a Smith and Wesson" or "It was fired
24    from a Glock," that would have led to an exclusion

1      of at least that particular gun or that type of

2      gun as being a potential murder weapon, correct?

3   A. No.  It would have been a possible exclusion, but

4      you'd still -- if -- any kind of gun that came

5      across the view of the investigation, the murder

6      investigation would be seized and examined.

7   Q. So but that preliminary -- requesting that a

8      ballistics division, whether in Illinois it's at

9      the Illinois State Police or perhaps internal in a

10     larger police department, is certainly an

11     appropriate investigative technique in your

12     professional judgment; is that correct, Mr. Clark?

13             MS. HAGY:  Objection, form.

14  A. Yes.

15  BY MR. POTTINGER:

16  Q. Thank you.  So is it your testimony that since

17     1965 when you took -- when you or officers under

18     your command and supervision from 1965 through

19     1993 took a statement on the street from a witness

20     or a potential witness or a potential suspect of a

21     crime, that they would have had to record that

22     statement or you would never use it?

23             MS. HAGY:  Objection, form,

24     mischaracterizes his testimony.

1  A.  No.

2  BY MR. POTTINGER:

3  Q.  When do you -- when in your professional judgment

4      do you need to record that?

5  A.  When you bring them to the station and you're

6      taking a statement on a major crime in particular,

7      and generally the implication's that coming to the

8      station to make a statement lends itself to the

9      recording.

10  Q.  In 1993 what percentage of the police departments

11      in this country did that, in other words, always

12      recorded on a homicide case statements given by

13      suspects, potential suspects or witnesses when

14      they were at the station; do you have any idea?

15  A.  I don't know the percentage.

16  Q.  You have no idea?

17  A.  No.  I don't know the percentage.  I've not seen

18      any study of it.

19  Q.  You made the statement, and I think this directly

20      implicates Detective Forrester, that he would

21      write the report the way he wants.  Do you

22      remember making that statement?

23  A.  That -- that what?

24  Q.  That you would be writing a report the way you

1     want.  You believe that Detective Forrester and

2     others believed that Pursley committed this crime

3     and they wrote their reports in a fashion that

4     supported that conclusion; is that true?

5             MS. HAGY:  Objection, form,

6     mischaracterizes his testimony.

7             MR. POTTINGER:  Lindsay, please read

8     the rules after this deposition.

9             MS. HAGY:  You're talking about

10    Judge Seeger's standing orders, and I don't agree

11    with your interpretation of them, and they don't

12    apply.

13            MR. POTTINGER:  Go ahead, Mr. Clark.

14  A.  So that's not what I said in the report.  I said

15    when it's not done according to procedure, then

16    opportunities are present to move the -- change

17    the report or write a report reflective of where

18    you want it to go.  And --

19  BY MR. POTTINGER:

20  Q.  (Interrupting)  Do you have -- Go ahead.

21  A.  Sure.  So it -- it gives an opportunity for the

22    report to be slanted rather than contemporous

23    reports that support a linear, straightforward

24    investigation that includes all possibilities

```
 1      until they are dealt with.
 2   Q.  Okay.  So the -- you believe that the process and
 3       procedures, as I understand, by the Rockford
 4       Police Department -- you believe that as they
 5       existed provided an opportunity for officers to
 6       either slant the -- I'm using your words -- slant
 7       the report, move the report or change the report
 8       the way they want, you believe that opportunity
 9       existed within the process and procedures of the
10       Rockford Police Department in 1993; is that
11       correct, Mr. Clark?
12   A.  I think the better term would be produce a report
13       that supports their suspicions.
14   Q.  Okay.  So let's be clear.  Let's use your word
15       then.  You believe that based on the processes and
16       procedures that existed in 1993, that there was an
17       opportunity to produce a report that was slanted
18       or changed to result -- get a result that the
19       officers or detectives want, that opportunity to
20       sway the processes and procedures existed; is that
21       correct?
22   A.  Yes.
23   Q.  What evidence do you have that in fact any officer
24       in this particular case did slant the report, move
```

```
 1      the report, change the report to the way you

 2      believe they wanted?

 3                  MS. HAGY:  Objection, form.

 4                  MR. POTTINGER:  What's your form

 5      objection?  Lindsay, what is your form objection?

 6                  MS. HAGY:  That that was overbroad,

 7      that it mischaracterizes the prior testimony, and

 8      it calls for a legal conclusion.

 9                  MR. POTTINGER:  All right.  Let's

10      breach that stipulation.

11                  So Mr. Clark would not be in a position

12      to render -- to answer that question because that

13      would be a legal conclusion that he'd be

14      prohibited from making.  Is that your stipulation?

15                  MS. HAGY:  No.  I'm not stipulating to

16      anything.

17                  MR. POTTINGER:  Okay.  Go ahead,

18      Mr. Clark.  You can answer the question.

19  A.  As I recall the question -- then I'm going to ask

20      for a break -- the absence of proper procedure is

21      the fundamental commentary of my report.

22  BY MR. POTTINGER:

23  Q.  Right.

24  A.  And -- wait.  And that absence provides the gaps
```

```
 1        to just simply write a report that's focused on
 2        one conclusion.
 3    Q.  Okay.  Let's assume you're correct that there's
 4        gaps or opportunities that exist in the procedures
 5        that the Rockford Police Department used in 1993
 6        to slant, move or change a report when it's --
 7        let's assume that you're correct about that, that
 8        there's gaps or opportunities.  The question,
 9        though, is did -- do you have any professional
10        judgment that in fact any of the officers in this
11        case did in fact slant, move or change the report
12        into a way that they wanted?
13    A.  Let me take a look.  I think it's addressed in the
14        report, but we -- so we want -- I'm going to
15        exclude the things they did not do and only the
16        things they did do.  Is that in part of your
17        question?
18    Q.  Why don't you answer the question the way you
19        understand it.
20    A.  Okay.  Well, that's the way I understand it, so
21        that's going to be the purpose.  In considering
22        the question I think everything that you asked --
23        everything I'm looking at would be things they did
24        not do, which were -- obviously should have been
```

1  done.  So until we get to the interrogation of

2  Crabtree, the things that were done to her were

3  things that were done, not omitted.  That's

4  considerable.  A lot of this is -- a lot of the

5  commentary, as I took your question, things they

6  did not do fits, and I'm going to exclude that

7  from the answer.  So the coercion of Crabtree I

8  think is things they did as the answer to the

9  question.

10 Q. Maybe I asked that question poorly.  Did any of

11  the officers slant, move or change a report; do

12  you have any evidence of that?

13 A. The evidence is in Crabtree's account of the

14  coercion, and so that's -- that's the evidence.

15 Q. So the only evidence would be what the comparison

16  would be between what the officers reported about

17  Crabtree's confession or statement as opposed to

18  what she ultimately said happened, correct?

19 A. Now -- and I'm trying to be precise.  You said

20  what did, so I excluded what they did not do.

21  This is a direct infliction directed towards a

22  conviction.

23 Q. Okay.  Sounds like the name of a song, infliction

24  towards --

```
 1   A.   (Interrupting)  It did rhyme, but I didn't intend

 2        it.

 3   Q.   What do you mean by that?

 4   A.   Infliction -- in answer to your question, this was

 5        an infliction that led to an unjust conviction.

 6   Q.   Okay.  I understand you have this opinion about

 7        the coercion of Samantha Crabtree, but I just want

 8        to -- then will you answer this question, move on.

 9        Do you have any indication any officers, aside

10        from the Crabtree confession, slanted, moved or

11        changed a report in a fashion that they want; do

12        you have any evidence of that you've seen?

13   A.   No.  As you asked the question, no.

14                  THE WITNESS:  Can I take a break?

15                  MR. POTTINGER:  Sure.  Five minutes.

16                  We'll come back at 6:00 o'clock.

17                  THE WITNESS:  Five minutes would be a

18        blessing.

19                  MR. POTTINGER:  See you at

20        6:00 o'clock.

21                  MS. KEEN:  We have four minutes left

22        for this seven-hour deposition, and then we have

23        some questions that plaintiff is going to ask.

24                  THE WITNESS:  I need the break.
```

1          MS. KEEN:  Oh, yeah.  Of course, Roger,

2      take the break.  That was just so Counsel is aware

3      we have -- this deposition -- defendants'

4      questions have to conclude in four minutes.

5          (A brief recess was taken.)

6          MR. POTTINGER:  Just a couple real

7      quick questions.

8   BY MR. POTTINGER:

9   Q.  Just in reviewing your report I want to make sure

10      I'm clear on this.  You referenced obviously the

11      International Association of Chiefs of Police.

12      And you referenced another resource that would

13      have been applicable to your methodology in 1993,

14      but I didn't see that referenced in your report.

15      Can you tell me what that was?  I think you gave

16      me an acronym for it, and I just wanted to --

17  A.  (Interrupting)  Yeah.  That was -- that's a -- I'm

18      sorry.  That -- because it's cited in the report.

19      This is called, "The Fundamentals of Criminal

20      Investigation, Fifth Edition, Second Printing, by

21      Charles E. O'Hara."

22  Q.  And that was applicable in your opinion in 1993?

23  A.  Right.  They were the go-to publications.  This is

24      the IACP Criminal Investigations.  It's used -- it

      1          was used then in most advanced degrees, this one
      2          from master's level in -- criminal justice
      3          master's level at Weaver College (indicating).
      4    Q.    I just want to understand the resource that you
      5          used to make your professional judgments about
      6          this case.  You cited obviously the IACP.  I
      7          understand that.  That's referenced in your
      8          report, but also the Fundamentals of Criminal
      9          Investigations by O'Hara.  I just wonder if you
     10          had a date, publication date for that.
     11    A.    Yeah.  Let me give you that one.  It's the Fifth
     12          Edition, which was published in 1981.
     13    Q.    Okay.
     14    A.    Charles C. Thomas Publisher, Springfield,
     15          Illinois.
     16                    MR. POTTINGER:  Would it be possible
     17          to -- it looks like -- I don't know if that would
     18          still be in publication, if you could produce
     19          that.  Is that a problem, Lindsay?
     20                    MS. HAGY:  Like the citation or like
     21          the whole book?
     22                    MR. POTTINGER:  The whole book just in
     23          case it's not in publication anymore.
     24                    MS. HAGY:  I mean I can.  I have it,

1      but that will seem -- let's confer about that.

2      Because it's long.  I have -- I'll show it to you.

3      It's super long.

4                    MR. POTTINGER:  Well, I think --

5                    THE WITNESS:  (Interrupting)  Can order

6      it.

7                    MR. POTTINGER:  It's orderable?

8                    We'll figure it out.

9                    MS. HAGY:  We ordered it.

10                   MR. POTTINGER:  Okay.  No further

11     questions.

12                   MS. HAGY:  All right.

13                   Thanks to Roger and to Andrea for

14     bearing with us this whole, long time.

15                   I just have a few questions.

16   BY MS. HAGY:

17   Q.  Mr. Clark, in your experience and expertise, is it

18       the responsibility of the detectives to evaluate

19       the reliability of a witness's testimony?

20   A.  Yes.

21   Q.  And is reliability different than credibility?

22   A.  Yes, in terms of opining what the truth is or not.

23       There has to be some sort of evaluation.

24   Q.  And is that something that a regular detective is

```
 1      trained to do, to evaluate reliability?

 2                    MR. IASPARRO:  Object to form.

 3   A.  Yes.

 4   BY MS. HAGY:

 5   Q.  And I think at the very beginning of your

 6       deposition, you had said that Windham gave

 7       preliminary opinions on the casings.  Am I correct

 8       that you meant Welty gave the preliminary opinions

 9       on the casings?

10   A.  I thought I was saying Welty.  Windham -- I know

11       who Windham is.  He's the confidential informant,

12       so . . .  No.  It was Welty.

13   Q.  Okay.  And to render your report, did you evaluate

14       the activities of the detectives against the

15       applicable policing standards of 1993?

16   A.  I did.

17   Q.  And this report summarizes your findings and

18       opinions of comparing those standards to what

19       happened here?

20   A.  Yes.

21                    MR. IASPARRO:  Objection to form,

22       foundation.

23   BY MS. HAGY:

24   Q.  Sorry.  Do you mind saying your answer again?
```

```
 1    A.   The answer is yes.

 2    Q.   Okay.  Thank you.  And I want to direct you to

 3         Page 23 of your report.  Okay.  I need to look at

 4         the -- do you see the second . . .  Oh.  So the

 5         third paragraph that shows up there right

 6         underneath the bold heading.

 7    A.   Yes.

 8    Q.   It says -- am I correct in saying that it says

 9         that Detective Pirages, or Sergeant Pirages, was

10         present at the search --

11    A.   (Interrupting)  Yes.

12    Q.   (Continuing) -- of the apartment?  And did that

13         search in your opinion meet the standards of a

14         regular police investigation at that time?

15                   MR. IASPARRO:  Objection, form,

16         foundation.

17                   MR. HUOTARI:  Objection, form and

18         foundation.

19                   (A brief interruption.)

20                   MR. HUOTARI:  I think that was both

21         Joel Huotari and Michael Iasparro.

22                   MR. IASPARRO:  Correct.

23                   MS. HAGY:  Did you catch that or should

24         I read that back?
```

1          THE WITNESS:  (No response.)

2          MS. HAGY:  Mr. Clark, did you catch

3     that question?  Did you answer and I just missed

4     it?

5          THE WITNESS:  I think I better hear it

6     read back.

7          MS HAGY:  Would you mind reading that

8     question back, please.

9          (The pending question was read by the

10     court reporter.)

11  A.  No.

12  BY MS. HAGY:

13  Q.  And then I'm going to -- I think that I can just

14     share -- let's see.  I think I need to be a host,

15     but let me see if that's correct.  Okay.  So I'm

16     going to -- we looked a little bit at Mr. Bruce's

17     deposition.  And -- okay.  And this is Page 95

18     of -- and I accidentally said Mr. Bruce.  Sorry.

19     I meant to say Bruce Scott.  Page 95.  Do you see

20     where it says, "Do you remember ever getting

21     trained on what constituted a trick or to be

22     cajoled?"

23  A.  I see it.

24  Q.  What did he say?

```
 1   A.   "No."

 2   Q.   Okay.  I think I'm wrapping up here.

 3              MS. KEEN:  You're still on screen

 4        share.

 5              MS. HAGY:  Oh, sorry.

 6              MS. KEEN:  No.  Just thought I'd remind

 7        you.

 8   BY MS. HAGY:

 9   Q.   Do you -- you testified about evidence being false

10        or fabricated or there was discussion of that

11        earlier.

12              MS. HAGY:  Sorry.  I'm just going to

13        mute myself for one second.

14              (A brief interruption.)

15   BY MS. HAGY:

16   Q.   So am I right in understanding that your report

17        gives -- lists irregularities that could lend

18        themselves to evidence becoming false or

19        fabricated; am I understanding your opinion

20        correctly?

21              MR. IASPARRO:  Objection to form and

22        foundation.

23   A.   Yes.

24              MS. HAGY:  I just need one more minute,
```

1      but I think we're wrapping up here.

2   BY MS. HAGY:

3   Q.  When we were talking earlier about the --

4       Judge Kennedy giving the arrest warrant on -- I

5       believe it was COR and Getty 222, that was

6       Forrester's representation of what happened; am I

7       right?

8              MR. HUOTARI:  Object to form.

9   A.  Yes.

10             MS. HAGY:  Just one second.  I think

11      I'm done.

12  BY MS. HAGY:

13  Q.  So I'm going to show you one more report, but I

14      just have to get it up here.  We're going to be

15      going to the -- back to the report about the

16      Windhams.

17             MS. HAGY:  Okay.  Sorry about this.

18      I'll get it up in just a second.

19             MS. KEEN:  Lindsay, would it help if I

20      screen share?

21             MS. HAGY:  Yeah.  Otherwise, I'm almost

22      on it.  I'm sorry.

23             If you have it, why don't you just --

24      or otherwise I'm very close.

1          Okay.  Thank you.

2          Oh, it went away.

3          Thank you.

4          MS. KEEN:  Can you see the COR and

5     Getty report?  Can you all see COR and Getty 1574?

6          MR. IASPARRO:  Yes.

7          MR. HUOTARI:  Yes.

8          MS. HAGY:  Thank you, Roshna.

9  BY MS. HAGY:

10  Q.  Mr. Clark, do you see where it says, "Liane stated

11      that she wanted Marvin arrested for battery.  She

12      also wished to have him arrested for taking her

13      auto"?

14  A.  Yes.

15  Q.  And does that refresh your recollection on whether

16      she initially wanted Mr. Windham arrested?

17  A.  Yes.

18          MS. HAGY:  That's all my questions.

19          So I appreciate everybody's patience on

20      that.

21          MR. IASPARRO:  Mr. Clark, I have one.

22  BY MR. IASPARRO:

23  Q.  During Ms. Hagy's questions she asked you a couple

24      of questions relating to what she referred to as a

1       regular police investigation standard in 1993.  Do

2       you recall those questions, sir?

3  A.  Yes.

4  Q.  Can you please tell me what a regular police

5       investigation means?

6  A.  I commented -- I tried to set that stage and

7       create that foundation on Page 7.  And I'll just

8       say bluntly the truth, the whole truth, and

9       nothing but the truth.

10  Q.  Okay.  Beyond that is there some document or

11       manual, publication I can look to that's going to

12       explain to me what a regular police investigation

13       was supposed to look like in 1993 in Rockford,

14       Illinois?

15  A.  That was --

16           MS. HAGY:  (Interrupting)  Objection,

17       form, asked and answered.

18           THE WITNESS:  That's the exact reason

19       why I cited the two volumes, O'Hara and the IACP.

20  BY MR. IASPARRO:

21  Q.  Okay.  So those would be the two publications, if

22       you will, that you're relying upon?

23  A.  They're seminal, and I would agree.

24           MR. IASPARRO:  Thank you.

     1                    Nothing further.

     2                    MS. HAGY:  Anybody else?

     3                    MR. HUOTARI:  None for me.

     4                    This is Joel speaking, and if nobody

     5          else has any questions, I would just like to ask

     6          Ms. D'Agnolo for a PDF of the transcript.

     7                    MR. POTTINGER:  Same thing, Andrea.

     8                    MR. IASPARRO:  For me, too.

     9                    Thank you.

    10                    THE WITNESS:  You deserve a medal.

    11                    MS. HAGY:  Yeah.

    12                    MR. BHAVE:  This is Sunil Bhave with

    13          the Illinois State Police defendants.  We'd also

    14          like to get a copy of the PDF transcript.

    15                    Thank you.

    16                    MR. POTTINGER:  Everybody have a great

    17          weekend.

    18                    THE WITNESS:  Okay.  Signing off.

    19                    MS. HAGY:  Thank you, Andrea.

    20                    Thank you, Mr. Clark.  Really

    21          appreciate it.

    22                    MS. KEEN:  Thank you, Mr. Clark.

    23                    (Whereupon, at 6:20 p.m. on October 8,

    24          2021, the deposition was concluded.)

1   ERRATA SHEET

2   DEPOSITION OF ROGER A. CLARK
    (Taken October 8, 2021)

3

4        I, _____, do affirm

    that I have read the foregoing transcript and have

5   found it to be a true and correct record of the

6   testimony given by me at the time of the taking of

7   the deposition.  Otherwise, I have noted any and

8   all necessary corrections in the space provided

9   below.

10

    _____
11  Signed

12       Dated this ___ day of _____, 2021.

13  PAGE   LINE    CORRECTION           REASON

14  ____   ____    _____

15  ____   ____    _____

16  ____   ____    _____

17  ____   ____    _____

18  ____   ____    _____

19  ____   ____    _____

20  ____   ____    _____

21  ____   ____    _____

22  ____   ____    _____

23  ____   ____    _____

24  ____   ____    _____

1            CERTIFICATE OF SHORTHAND REPORTER

2                 I, Andrea L. D'Agnolo, a Certified
      Shorthand Reporter and Notary Public in and for
3     the State of Illinois, do certify that the
      deposition of Roger A. Clark was taken via Zoom
4     videoconference on the 8th day of October, 2021,
      at 10:01 a.m.; that said witness was sworn to
5     testify to the truth and nothing but the truth
      relative to said cause; that the deposition is a
6     true and correct record of the testimony given by
      the witness; and that the reading and signing of
7     the deposition were neither waived nor
      reserved.

8

9

10            _____
              Andrea L. D'Agnolo
11            Certified Shorthand Reporter

12

13            Dated this 23rd day of November, 2021.

14

15

16

17

18

19

20

21

22

23

24

*Vecchio Court Reporting*

*815-965-9020*

## $

**$2,700** [1] - 105:16
**$350** [1] - 38:1

## '

**'93** [1] - 73:20
**'as** [1] - 268:7
**'assume** [1] - 185:22
**'evidence** [2] - 185:19, 186:4
**'is** [1] - 268:6
**'lengthy** [2] - 171:8, 187:14
**'oh** [1] - 51:1
**'physical** [1] - 186:8
**'said** [1] - 108:11
**'this** [1] - 55:2

## 0

**000756** [1] - 144:3

## 1

**1** [11] - 7:24, 8:19, 11:3, 18:13, 40:21, 137:16, 138:6, 140:21, 171:3, 192:2, 285:7
**1,400** [1] - 120:14
**10** [17] - 91:4, 92:18, 97:20, 99:24, 100:1, 100:4, 100:7, 120:9, 134:22, 136:5, 137:9, 141:3, 158:22, 163:18, 177:2, 178:3, 252:22
**100** [2] - 2:13, 2:21
**101** [1] - 263:11
**10:01** [2] - 1:17, 311:4
**10:15** [1] - 53:17
**10th** [1] - 101:24
**11** [11] - 21:12, 64:14, 77:1, 97:8, 97:23, 98:7, 99:13, 99:14, 100:10, 115:21, 232:6
**112** [1] - 154:21
**118** [2] - 154:21, 246:10
**12** [14] - 77:2, 77:11, 77:22, 78:3, 79:6, 93:14, 93:15, 93:23, 94:2, 95:3, 99:8, 100:14, 117:20, 163:19
**120** [2] - 2:9, 128:7

**129** [1] - 156:18
**12th** [8] - 93:18, 94:17, 94:19, 94:20, 101:3, 101:23, 115:18, 116:1
**13** [4] - 68:22, 135:4, 176:19, 176:20
**135** [1] - 164:5
**1389** [1] - 2:13
**139** [1] - 75:16
**13th** [1] - 2:21
**14** [4] - 71:23, 137:3, 234:3, 248:24
**148** [2] - 132:14, 133:4

**1500** [1] - 8:17
**156** [1] - 75:16
**1572** [1] - 120:10
**1574** [1] - 307:5
**1576** [2] - 120:11, 120:20
**16** [4] - 140:17, 142:9, 177:5, 252:23
**160** [2] - 217:7, 217:10
**160,000** [1] - 217:2
**168** [2] - 3:3, 268:1
**169** [1] - 267:19
**17** [3] - 77:1, 95:9, 102:19
**171** [1] - 140:18
**172** [1] - 140:19
**174** [1] - 140:17
**17th** [1] - 93:9
**18** [2] - 21:15, 121:2
**19** [3] - 105:11, 107:1, 144:2
**192** [1] - 266:15
**1965** [6] - 12:13, 20:13, 88:8, 90:11, 291:17, 291:18
**1970** [2] - 13:9, 14:5
**1972** [1] - 14:15
**1973** [1] - 14:16
**1974** [1] - 14:19
**1976** [1] - 14:19
**1978** [1] - 16:6
**1980** [1] - 16:6
**1981** [1] - 300:12
**1984** [1] - 18:13
**1987** [1] - 18:14
**1988** [1] - 207:21
**1993** [119] - 5:12, 20:14, 40:8, 47:18, 57:23, 59:1, 59:13, 59:18, 62:12, 63:2,

73:20, 75:8, 77:5, 77:11, 77:12, 77:16, 77:22, 78:3, 78:20, 79:5, 79:6, 80:2, 81:8, 81:23, 82:8, 84:4, 84:11, 87:24, 89:21, 90:3, 90:4, 91:4, 91:24, 92:18, 93:14, 93:15, 93:23, 94:2, 95:3, 97:8, 97:20, 97:23, 98:7, 99:13, 99:14, 99:24, 100:8, 100:10, 100:14, 102:12, 103:15, 104:2, 104:6, 104:19, 105:21, 106:4, 108:20, 109:12, 115:21, 117:1, 117:7, 117:13, 117:19, 117:20, 117:21, 118:16, 119:9, 119:19, 120:18, 121:2, 121:4, 122:3, 122:14, 126:8, 133:5, 134:22, 136:6, 137:9, 139:9, 141:3, 158:22, 159:2, 163:18, 163:19, 163:21, 165:11, 166:17, 185:16, 185:20, 245:11, 263:8, 267:6, 272:1, 274:20, 275:2, 277:10, 278:2, 278:11, 278:14, 278:17, 279:2, 279:7, 286:2, 286:9, 286:16, 287:4, 292:17, 291:19, 292:10, 294:10, 294:16, 296:5, 299:13, 299:22, 302:15, 308:1, 308:13
**1994** [12] - 103:10, 104:1, 108:15, 109:10, 109:21, 117:22, 143:13, 145:4, 148:14, 165:7, 165:21, 258:4

## 2

**2** [10] - 27:13, 27:18, 40:21, 47:18, 50:5, 57:23, 73:19, 137:9, 138:18, 141:3
**20** [12] - 5:19, 5:22, 7:17, 84:11, 112:7, 113:22, 190:8, 190:14, 257:17, 268:22, 283:16, 285:10
**2012** [2] - 248:5,

248:24
**2019** [4] - 117:23, 252:23, 253:22, 254:10
**2020** [1] - 117:23
**2021** [10] - 1:16, 5:19, 5:22, 7:17, 217:8, 309:24, 310:2, 310:12, 311:4, 311:13
**2034** [1] - 188:4
**209** [1] - 3:4
**21** [4] - 24:1, 24:14, 124:9, 127:6
**219** [1] - 2:9
**22** [1] - 156:17
**2215** [1] - 53:17
**222** [3] - 99:8, 99:11, 306:5
**223** [1] - 137:3
**224** [1] - 137:3
**225** [2] - 137:4, 138:17
**22nd** [1] - 311:13
**23** [13] - 102:12, 117:13, 117:21, 129:18, 129:23, 134:13, 139:5, 177:9, 185:13, 187:1, 192:24, 268:22, 303:3
**24** [5] - 85:16, 92:24, 141:22, 181:1, 187:1
**24-year** [1] - 181:14
**240** [4] - 93:21, 266:2, 266:4, 266:7
**246** [2] - 3:4, 93:21
**247** [2] - 93:20, 93:21
**249** [2] - 93:20, 93:22
**25** [7] - 20:10, 38:7, 141:12, 141:13, 142:1, 247:24, 261:10
**26** [2] - 38:24, 269:20
**26(a)(2** [2] - 4:24, 8:1
**27** [5] - 95:1, 147:8, 154:2, 223:4, 235:6
**277** [1] - 3:5
**28** [5] - 5:11, 8:15, 95:1, 243:22, 245:6

## 3

**3** [5] - 52:17, 63:8, 72:12, 140:21, 250:3
**30** [7] - 38:8, 160:18, 160:24, 223:7, 227:9, 244:9, 244:16
**30(b)(6** [1] - 28:11
**30-minute** [2] - 160:19, 168:4
**301** [1] - 3:5
**307** [1] - 3:6

**31** [12] - 171:1, 171:3, 171:18, 172:7, 175:16, 187:12, 187:13, 195:14, 219:6, 235:20, 240:9, 240:15
**311** [2] - 2:3, 3:20
**33** [3] - 64:20, 64:23, 65:2
**333** [1] - 137:17
**34** [3] - 64:20, 161:9, 164:18
**345** [1] - 135:5
**350** [2] - 38:3, 135:20
**351** [1] - 135:21
**355** [1] - 135:5
**36** [5] - 8:6, 44:19, 45:1, 50:6, 168:1
**39** [1] - 51:23
**3:18-CV-50040** [1] - 1:5

## 4

**4** [11] - 3:3, 27:18, 50:12, 50:13, 54:4, 54:23, 132:11, 132:13, 133:3, 138:24, 139:1
**4(h** [1] - 28:3
**40** [9] - 50:7, 150:24, 157:9, 157:19, 157:24, 222:5, 223:24, 224:7, 226:20
**42** [1] - 207:11
**425** [1] - 2:6
**46** [1] - 52:18
**4:00** [2] - 228:4, 228:10
**4:27** [1] - 236:13

## 5

**5** [4] - 34:13, 34:14, 63:10, 113:1
**50** [3] - 128:5, 128:11, 128:15
**50,000-foot** [1] - 209:19
**51** [1] - 52:18
**59** [1] - 112:18
**5:23** [1] - 156:22
**5:39** [1] - 133:5

## 6

**6** [10] - 27:10, 29:4, 67:21, 78:19, 132:17, 207:11, 250:4, 250:20, 250:21, 251:6

**6-12-93** [1] - 94:5
**60** [1] - 54:4
**60601** [1] - 2:21
**60607** [1] - 2:3
**61104** [1] - 2:6
**61105-0219** [1] - 2:10
**61105-1389** [1] - 2:13
**61108** [1] - 2:18
**63** [1] - 112:19
**64** [2] - 54:4, 207:11
**65** [1] - 67:21
**6833** [1] - 2:17
**69** [1] - 67:22
**6:00** [2] - 298:16, 298:20
**6:20** [1] - 309:23

---

### 7

**7** [15] - 40:6, 40:18, 43:15, 43:17, 72:11, 75:14, 76:1, 128:16, 132:15, 133:4, 145:4, 192:17, 241:4, 308:7
**7,000** [1] - 18:20
**700** [1] - 128:8
**72-5** [2] - 188:5, 195:8
**756** [1] - 144:21

---

### 8

**8** [32] - 43:14, 43:16, 45:18, 58:15, 59:1, 59:13, 59:15, 59:18, 60:1, 62:12, 63:2, 77:5, 77:11, 77:16, 78:3, 78:20, 79:5, 80:2, 81:8, 81:22, 82:8, 84:4, 91:24, 93:20, 94:4, 104:19, 105:21, 106:4, 117:19, 159:2, 309:23, 310:2
**80** [2] - 20:6, 63:11
**81** [1] - 63:11
**8th** [5] - 1:16, 62:2, 69:16, 94:18, 311:4

---

### 9

**9** [5] - 40:6, 49:23, 112:18, 266:9, 290:2
**901** [3] - 137:8, 138:18, 141:2
**909** [2] - 112:22, 133:6
**93** [2] - 241:1, 241:3
**95** [3] - 241:1, 304:17, 304:19

**99** [1] - 162:17
**9mm** [14] - 49:6, 74:19, 84:7, 84:15, 84:22, 85:12, 136:4, 136:16, 138:7, 138:24, 140:15, 163:16, 248:8, 262:16
**9mms** [1] - 73:11
**9th** [6] - 94:18, 96:23, 96:24, 242:20

---

### A

**a.m** [3] - 1:17, 133:5, 311:4
**A48089** [1] - 145:9
**abandoned** [2] - 184:1, 189:23
**Abandoned** [1] - 176:21
**abandonment** [1] - 184:22
**Aberdeen** [1] - 2:3
**able** [12] - 5:5, 153:9, 155:12, 159:24, 168:11, 168:23, 172:3, 188:4, 191:6, 216:6, 230:19, 284:6
**above-entitled** [1] - 1:15
**absence** [6] - 182:5, 182:15, 186:12, 288:19, 295:20, 295:24
**absent** [2] - 156:13, 282:17
**absolute** [1] - 167:4
**absolutely** [4] - 150:21, 153:15, 219:22, 238:13
**abuse** [2] - 63:21, 63:24
**abusive** [1] - 282:18
**academies** [1] - 203:23
**academy** [3] - 12:18, 203:19, 204:23
**accept** [2] - 42:15, 42:20, 43:3
**accepted** [17] - 22:23, 23:2, 70:6, 72:4, 72:6, 81:12, 86:23, 98:13, 171:6, 172:14, 178:22, 184:1, 184:22, 189:23, 195:19, 196:1, 196:21
**Accepted** [1] - 176:22
**accepting** [1] -

167:14
**access** [6] - 15:17, 29:23, 33:23, 172:18, 199:20, 245:18
**accidentally** [1] - 304:18
**accomplished** [1] - 103:21
**according** [25] - 43:24, 50:18, 51:1, 51:6, 53:20, 54:8, 54:22, 57:20, 78:24, 80:18, 85:14, 85:17, 109:4, 121:16, 121:19, 126:20, 142:17, 192:18, 265:4, 270:13, 275:9, 275:10, 287:19, 287:21, 293:15
**accordingly** [3] - 185:17, 220:21, 259:19
**account** [2] - 108:4, 297:13
**accounts** [1] - 109:15
**accuracy** [2] - 171:14, 187:20
**accurate** [19] - 4:17, 5:9, 13:1, 18:15, 53:1, 83:3, 85:23, 90:24, 101:14, 109:17, 110:14, 141:18, 152:12, 164:7, 191:20, 192:11, 215:21, 241:19, 268:24
**accurately** [6] - 5:6, 29:11, 43:12, 44:2, 182:8, 198:8
**accusation** [1] - 40:22
**Accused** [1] - 188:6
**accused** [2] - 70:21, 241:10
**accusing** [1] - 41:4
**ace** [3] - 35:2, 46:24, 92:23
**ACE** [1] - 35:3
**acknowledge** [3] - 114:24, 237:14, 243:15
**acknowledgment** [2] - 238:2, 288:19
**acronym** [1] - 299:16
**act** [2] - 40:15, 182:13
**acting** [1] - 181:15
**action** [3] - 1:15, 179:4, 180:6

**actions** [6] - 8:24, 9:7, 9:14, 9:18, 260:12, 260:17
**active** [1] - 271:18
**activities** [2] - 178:23, 302:14
**activity** [2] - 124:11, 179:18
**acts** [9] - 43:17, 44:1, 44:5, 44:12, 44:13, 229:9, 229:23, 230:16, 232:3
**actual** [6] - 17:13, 17:19, 139:1, 215:5, 215:14, 232:24
**add** [3] - 28:14, 132:20, 281:15
**add-on** [1] - 132:20
**added** [1] - 280:3
**addict** [1] - 105:15
**addition** [1] - 228:18
**address** [3] - 64:11, 246:6, 260:12
**addressed** [1] - 296:13
**addresses** [1] - 40:21
**adds** [1] - 227:19
**adequate** [1] - 170:5
**adequately** [1] - 141:24
**adhere** [1] - 27:1
**adhered** [1] - 178:19
**administration** [4] - 25:17, 25:18, 25:19, 25:20
**administrative** [3] - 15:11, 16:24, 188:19
**administrator** [1] - 201:24
**admitted** [2] - 223:9, 227:10
**adopted** [1] - 281:8
**advanced** [4] - 23:6, 206:24, 207:18, 300:1
**adversarial** [1] - 283:19
**advise** [1] - 152:16
**advised** [1] - 153:19
**advising** [1] - 152:10
**affair** [2] - 103:8, 103:18
**affiant** [4] - 128:13, 128:15, 132:10, 132:12
**affidavit** [45] - 37:18, 37:19, 73:13, 74:21, 75:17, 75:21, 75:23, 76:6, 76:22, 77:1, 77:3, 78:12, 78:17,

80:4, 83:13, 85:24, 86:11, 86:12, 86:15, 86:21, 92:3, 93:8, 93:11, 93:12, 106:9, 128:18, 128:19, 128:20, 129:3, 129:4, 129:6, 129:12, 129:13, 129:21, 130:15, 130:18, 130:23, 131:4, 131:18, 132:14, 132:22, 133:3, 134:9, 148:8, 148:13
**affidavits** [1] - 128:3
**affirm** [2] - 197:7, 310:3
**afraid** [2] - 106:19, 224:19
**afternoon** [3] - 161:3, 209:4, 209:12
**afterwards** [1] - 228:11
**agencies** [4] - 26:1, 278:9, 278:16, 279:1
**agency** [4] - 27:2, 139:13, 185:24, 278:10
**agnostic** [1] - 143:15
**ago** [10] - 6:14, 6:16, 42:9, 214:19, 228:17, 243:22, 244:3, 244:9, 244:16, 245:6
**agree** [41] - 9:12, 30:8, 30:11, 47:16, 53:21, 91:13, 92:1, 94:2, 107:20, 117:7, 117:16, 118:1, 127:9, 128:19, 128:24, 130:4, 130:22, 131:4, 137:6, 140:24, 144:10, 145:1, 179:21, 179:23, 181:20, 188:13, 189:6, 189:24, 190:19, 211:24, 215:4, 239:6, 239:11, 239:15, 239:23, 242:2, 246:2, 258:8, 284:4, 293:10, 308:23
**agreed** [5] - 95:19, 95:20, 101:8, 162:11, 164:2
**agreement** [1] - 155:16
**ahead** [33] - 23:17, 69:9, 82:4, 115:14, 175:4, 180:22, 182:11, 187:4, 202:11, 227:15, 251:22, 252:18,

252:20, 254:14,
257:8, 266:17,
266:19, 267:23,
269:11, 272:7, 272:9,
275:22, 279:18,
280:11, 281:14,
281:17, 282:20,
282:22, 283:21,
293:13, 293:20,
295:17
**ahold** [1] - 183:15
**al** [3] - 1:7, 4:14, 8:3
**alibi** [1] - 165:6
**alibis** [1] - 166:21
**allegation** [2] -
132:6, 287:8
**allegations** [2] - 7:1,
7:4
**allege** [2] - 131:1,
213:24
**alleged** [14] - 39:23,
49:14, 71:3, 93:1,
116:9, 129:24,
130:17, 132:5, 163:9,
167:10, 221:10,
247:10, 253:2, 253:8
**allegedly** [3] - 94:17,
136:11, 255:7
**alleges** [1] - 80:21
**allow** [2] - 128:22,
237:21
**allowed** [2] - 175:1,
226:17
**Alma** [1] - 4:9
**almost** [4] - 18:21,
235:14, 267:21,
306:21
**alone** [2] - 121:17,
126:22
**Alone** [1] - 95:10
**alongside** [1] - 270:4
**altercations** [1] -
63:22
**altered** [1] - 146:9
**alternate** [3] - 64:4,
69:1, 220:20
**alternative** [1] -
21:10
**amended** [4] - 169:5,
169:8, 169:11
**Amendment** [4] -
30:24, 70:17, 127:21
**American** [1] - 206:9
**ammunition** [1] -
140:14
**amount** [3] - 37:22,
160:5, 160:10
**analog** [1] - 14:9
**analysis** [7] - 9:5,
73:18, 74:17, 76:19,

84:19, 85:11, 104:2
**Analyst** [1] - 270:20
**analyst** [5] - 263:8,
263:18, 269:22,
269:23
**analyzed** [1] - 257:2
**analyzing** [1] - 71:4
**Andrea** [6] - 1:18,
301:13, 309:7,
309:19, 311:2, 311:10
**Andrew** [19] - 8:22,
41:9, 42:1, 59:13,
65:12, 96:8, 96:19,
97:3, 97:7, 108:10,
117:9, 117:15,
118:15, 147:14,
163:2, 167:5, 256:21,
265:6, 270:16
**Angeles** [5] - 12:14,
12:21, 18:18, 90:6,
286:15
**animate** [1] - 190:18
**announcement** [1] -
157:6
**annually** [1] - 216:23
**anonymous** [3] -
83:2, 93:1, 105:21
**anonymously** [6] -
77:8, 81:23, 82:7,
84:4, 117:18, 159:1
**answer** [88] - 6:21,
13:6, 13:7, 23:18,
27:6, 30:14, 34:3,
37:13, 38:18, 39:2,
39:3, 45:4, 52:9,
56:17, 80:7, 91:10,
92:22, 108:7, 136:20,
143:4, 145:1, 147:17,
149:20, 173:2, 173:7,
173:11, 173:19,
173:24, 174:17,
174:20, 175:1, 175:2,
176:4, 176:7, 182:12,
182:20, 183:10,
183:22, 184:15,
184:18, 185:6, 187:3,
188:19, 194:1,
197:11, 197:16,
212:19, 216:11,
218:16, 226:3, 227:5,
227:7, 227:23, 230:5,
235:2, 241:12,
241:17, 241:18,
242:4, 242:14, 243:2,
243:16, 252:21,
252:22, 254:7,
255:22, 257:9,
258:24, 259:14,
279:21, 280:1,
280:11, 281:14,

281:16, 281:24,
282:23, 283:22,
295:12, 295:18,
296:18, 297:7, 297:8,
298:4, 298:8, 302:24,
303:1, 304:3
**answered** [42] -
11:23, 23:16, 31:19,
32:21, 33:14, 39:21,
40:20, 41:20, 62:14,
78:7, 79:8, 125:10,
125:17, 162:8, 167:8,
167:17, 170:14,
179:10, 189:18,
192:13, 197:2,
201:18, 210:24,
222:22, 222:24,
228:23, 237:1, 243:8,
243:17, 254:5, 272:4,
272:18, 273:8, 277:5,
277:12, 282:6, 282:8,
282:11, 282:16,
283:15, 289:22,
308:17
**answering** [4] -
173:13, 174:3,
182:24, 184:14
**answers** [2] - 185:2,
283:19
**antenna** [1] - 245:15
**Anthony** [1] - 21:17
**anticipate** [2] -
212:20, 217:10
**anticipated** [1] -
78:15
**anticipating** [2] -
175:10, 251:9
**Antrone** [2] - 67:13,
69:20
**anyway** [2] - 162:18,
219:18
**apart** [7] - 17:12,
142:4, 174:14,
198:24, 205:16,
206:6, 208:4
**apartment** [17] -
48:22, 49:7, 49:18,
76:7, 85:13, 86:24,
128:23, 134:21,
135:2, 136:5, 140:4,
141:15, 142:13,
143:7, 143:21,
158:12, 303:12
**Apartment** [2] -
134:15, 177:11
**apartments** [1] -
64:18
**apologize** [1] -
246:21
**apparent** [3] - 88:21,

176:12, 182:1
**appear** [1] - 101:22
**appearance** [1] -
60:1
**appeared** [8] - 2:3,
2:6, 2:10, 2:14, 2:18,
2:22, 7:21, 255:14
**appearing** [1] - 79:23
**appellate** [2] - 31:9,
203:21
**applicable** [3] -
299:13, 299:22,
302:15
**applies** [1] - 71:6
**apply** [1] - 293:12
**appreciate** [2] -
307:19, 309:21
**apprehend** [2] -
20:4, 96:23
**apprehension** [1] -
19:15
**Apprehension** [1] -
19:17
**approach** [1] -
209:19
**approached** [2] -
50:20, 237:8
**appropriate** [4] -
71:1, 282:17, 290:17,
291:11
**approved** [3] - 37:18,
128:5, 128:6
**April** [17] - 16:6,
47:18, 57:23, 73:19,
75:7, 104:1, 108:15,
108:20, 109:12,
109:21, 117:21,
133:5, 145:4, 148:14,
165:7, 165:21
**area** [9] - 24:6,
25:12, 36:12, 58:9,
120:14, 147:1,
206:18, 206:19,
206:20
**areas** [2] - 23:23,
45:22
**argument** [1] - 116:2
**argumentative** [33] -
11:11, 17:22, 61:20,
66:8, 94:11, 103:1,
104:4, 107:15,
136:19, 144:12,
151:23, 153:12,
153:22, 166:18,
179:10, 183:5,
183:20, 185:1,
200:11, 228:22,
232:23, 233:7,
239:22, 240:6,
244:19, 245:8,

245:13, 269:9,
269:18, 270:12,
271:9, 271:10, 274:8
**arise** [1] - 212:21
**arises** [1] - 212:23
**Arizona** [2] - 32:11,
278:24
**Arrest** [2] - 95:11,
161:13
**arrest** [49] - 8:23,
9:6, 9:15, 9:24, 37:17,
76:10, 76:13, 93:3,
95:21, 96:7, 96:18,
97:1, 97:2, 97:5,
97:14, 97:18, 97:22,
98:5, 100:10, 101:17,
115:5, 115:8, 115:17,
116:5, 117:11,
124:13, 125:8, 126:2,
126:14, 126:17,
127:18, 127:23,
129:1, 129:3, 129:7,
129:14, 130:1, 130:7,
130:10, 130:18,
130:20, 131:3, 131:6,
131:9, 131:12,
131:14, 161:23,
164:12, 306:4
**arrested** [9] - 117:8,
121:3, 121:14,
126:22, 152:18,
165:12, 307:11,
307:12, 307:16
**arresting** [3] - 96:2,
96:3, 162:22
**arrests** [1] - 34:11
**arrived** [1] - 53:16
**art** [1] - 107:13
**articles** [3] - 202:14,
202:18, 203:2
**articulate** [1] - 43:10
**artificial** [1] - 200:8
**Ascher** [41] - 8:22,
41:9, 42:1, 50:1, 50:8,
50:22, 51:1, 51:5,
59:13, 65:12, 66:22,
69:20, 69:22, 70:3,
71:5, 79:17, 80:21,
90:14, 96:5, 96:8,
96:19, 97:3, 97:7,
104:9, 108:24, 117:9,
117:15, 118:3,
118:15, 130:2, 130:4,
131:3, 147:14, 150:9,
154:6, 154:18, 163:2,
165:22, 167:5, 248:9,
262:16
**Ashland** [4] - 82:23,
137:8, 138:18, 141:2
**aside** [3] - 136:13,

248:17, 298:9
**aspect** [3] - 31:5, 45:9, 242:23
**aspects** [4] - 44:18, 44:22, 170:24, 228:24
**assailant** [2] - 51:14, 51:21
**assault** - 69:23
**asserted** [1] - 70:17
**assertion** [1] - 248:12
**assessments** [1] - 282:4
**assigned** [12] - 10:22, 13:17, 14:7, 14:12, 16:4, 16:12, 17:19, 18:8, 20:22, 35:3, 90:10, 119:19
**assignment** [1] - 11:18
**Assistant** [1] - 99:15
**association** [2] - 36:8, 204:16
**Association** [4] - 206:10, 281:2, 281:3, 299:11
**associations** [1] - 204:13
**assume** [7] - 31:23, 58:17, 70:5, 119:23, 139:11, 296:3, 296:7
**assumed** [5] - 16:19, 35:5, 55:6, 55:7, 58:19
**Assuming** [1] - 164:7
**assuming** [6] - 61:21, 116:2, 120:4, 122:20, 265:15, 274:9
**assumption** [1] - 47:20
**assure** [1] - 269:1
**Astra** [1] - 85:18
**at-risk** [1] - 21:10
**ATF** [1] - 84:5
**attached** [2] - 8:9, 182:14
**attempt** [2] - 103:20, 205:17
**attempted** [2] - 56:2, 56:7
**attend** [1] - 21:19
**attendance** [1] - 12:18
**attended** [4] - 204:20, 205:17, 205:21, 205:23
**attending** [1] - 205:8
**attention** [6] - 29:4, 113:1, 114:5, 171:2,

241:5, 287:20
**Attorney** [4] - 2:21, 99:15, 99:16, 209:13
**attorney** [4] - 122:21, 123:1, 146:16, 146:17
**ATTORNEY** [4] - 2:8, 2:12, 2:16, 2:20
**Attorney's** [1] - 122:13
**attorney's** [6] - 123:5, 123:17, 124:2, 287:18, 288:16, 289:6
**attorneys** [4] - 26:9, 159:22, 165:24, 246:12
**ATTORNEYS** [2] - 2:2, 2:5
**attributed** [1] - 191:3
**audio** [4] - 88:13, 88:21, 90:7, 90:9
**audiovisual** [1] - 277:24
**August** [1] - 7:17
**auspices** [1] - 19:19
**author** [2] - 233:14, 269:16
**authoring** [1] - 38:5
**authorities** [1] - 15:17
**authority** [6] - 34:3, 34:6, 34:7, 127:20, 131:14, 147:1
**authorization** [4] - 37:9, 37:17, 127:24, 131:9
**authorize** [1] - 131:6
**authorized** [3] - 99:17, 128:6, 130:11
**auto** [1] - 307:13
**available** [1] - 89:23
**Avenue** [1] - 2:13
**award** [1] - 105:20
**aware** [42] - 22:1, 22:4, 23:9, 27:14, 29:9, 31:23, 32:16, 33:8, 62:6, 62:13, 65:9, 77:24, 96:16, 102:9, 103:15, 105:19, 106:2, 110:8, 119:11, 140:10, 140:12, 140:13, 143:11, 158:21, 159:5, 169:7, 169:10, 199:19, 220:15, 232:17, 247:11, 255:23, 256:2, 258:4, 274:18, 274:22, 275:13, 276:10, 278:9, 278:12, 280:13, 299:2

**AZ** [1] - 32:12

# B

**B(3** [1] - 241:7
**background** [6] - 12:4, 12:12, 199:20, 214:8, 255:15, 268:11
**bad** [4] - 56:2, 56:22, 206:16, 266:3
**bailiwick** [1] - 29:17
**BALA** [1] - 2:2
**Ballistics** [1] - 177:14
**ballistics** [24] - 60:4, 72:5, 72:8, 193:16, 247:5, 248:2, 249:11, 253:18, 254:1, 256:12, 257:2, 257:4, 258:5, 258:20, 259:3, 260:1, 263:8, 263:18, 263:24, 264:5, 266:1, 274:19, 275:14, 291:8
**Balsley** [1] - 2:17
**bank** [19] - 70:3, 70:5, 70:7, 70:9, 80:12, 80:15, 83:3, 83:7, 83:14, 83:20, 84:11, 96:4, 150:23, 154:5, 154:12, 154:16, 155:1, 155:4, 164:10
**Bank** [2] - 70:16, 155:22
**bargain** [1] - 155:16
**Barrick** [1] - 2:17
**Barton** [1] - 2:10
**base** [4] - 167:14, 278:4, 280:18, 287:16
**based** [44] - 7:14, 40:24, 42:5, 42:6, 48:5, 55:11, 55:15, 58:8, 58:19, 62:20, 74:17, 77:6, 79:21, 81:21, 82:6, 96:8, 100:19, 115:6, 115:8, 116:5, 124:20, 130:11, 131:10, 147:23, 161:16, 164:19, 180:11, 218:2, 218:10, 218:23, 221:4, 251:2, 252:7, 255:14, 256:24, 258:5, 258:17, 259:7, 281:2, 284:1, 285:5, 285:17, 286:14, 294:15
**Based** [1] - 161:12
**bases** [1] - 254:12
**basic** [3] - 30:3,

31:21, 192:21
**Basic** [2] - 134:14, 177:9
**basing** [7] - 101:12, 248:12, 248:18, 262:23, 263:1, 273:4, 273:5
**basis** [10] - 42:21, 74:1, 88:17, 116:18, 123:2, 125:13, 136:3, 178:14, 254:9, 286:11
**Bates** [7] - 50:6, 112:18, 140:19, 144:2, 144:6, 144:18, 248:21
**battery** [1] - 307:11
**Beach** [2] - 25:2, 25:10
**bearing** [1] - 301:14
**Bears** [2] - 147:9, 177:15
**bears** [1] - 194:20
**beat** [3] - 67:18, 125:20, 281:20
**became** [2] - 19:5, 34:14
**Becky** [9] - 50:15, 51:1, 51:3, 51:7, 54:11, 54:23, 63:16, 63:20
**become** [1] - 81:1
**becomes** [1] - 166:24
**becoming** [1] - 305:18
**bedroom** [2] - 138:11, 139:3
**began** [1] - 12:13
**begin** [1] - 41:7
**beginning** [6] - 13:9, 41:13, 148:22, 187:12, 221:8, 302:5
**begins** [4] - 47:10, 50:12, 112:8, 154:4
**behalf** [7] - 1:12, 2:4, 2:6, 2:10, 2:14, 2:18, 2:22
**behind** [4] - 60:14, 64:17, 65:11, 66:16
**belie** [1] - 67:10
**believable** [3] - 219:19, 219:24, 221:1
**believes** [1] - 113:8
**bell** [1] - 221:21
**belong** [1] - 33:24
**below** [5] - 44:2, 44:6, 64:20, 135:16, 310:9
**bench** [1] - 265:15
**benefit** [1] - 41:11

**Benefits** [2] - 116:22, 177:8
**benefits** [2] - 118:19, 190:10
**Beretta** [7] - 80:14, 80:17, 85:18, 85:20, 138:9, 140:5, 142:3
**best** [16] - 41:14, 60:6, 91:10, 107:23, 107:24, 108:8, 175:11, 183:7, 194:10, 197:10, 227:23, 237:4, 238:4, 242:3, 252:21, 257:15
**Beth** [3] - 255:23, 255:24, 256:2
**better** [10] - 131:1, 165:5, 209:22, 210:5, 210:8, 211:4, 214:23, 218:10, 294:12, 304:5
**between** [25] - 13:20, 16:5, 20:12, 42:7, 60:8, 76:13, 77:11, 78:3, 85:22, 87:18, 108:20, 117:1, 120:24, 122:15, 127:18, 135:17, 135:24, 138:10, 139:2, 145:7, 265:5, 270:15, 273:2, 276:4, 297:16
**beyond** [5] - 6:15, 145:23, 246:8, 256:20, 308:10
**BHAVE** [51] - 2:20, 228:9, 246:14, 246:18, 246:20, 246:23, 246:24, 251:22, 252:1, 252:18, 252:20, 253:4, 254:7, 254:8, 256:6, 257:8, 257:18, 258:3, 258:13, 259:1, 259:18, 260:14, 261:1, 262:1, 264:20, 265:2, 267:10, 267:20, 269:11, 269:14, 270:8, 271:10, 271:22, 272:5, 272:9, 272:13, 272:19, 272:23, 273:18, 274:1, 274:5, 274:11, 274:13, 275:12, 275:22, 276:1, 276:9, 276:22, 277:7, 277:14, 309:12
**Bhave** [3] - 3:4, 228:3, 309:12
**biased** [1] - 102:21
**big** [4] - 67:15, 81:1,

158:17, 160:11
**billing** [1] - 38:1
**Bishop** [1] - 2:10
**bit** [10] - 47:16, 80:7,
88:20, 95:22, 103:4,
126:4, 126:7, 200:18,
217:10, 304:16
**black** [14] - 51:24,
53:3, 83:21, 105:9,
113:4, 113:14, 114:7,
131:21, 132:4, 133:9,
133:17, 133:24,
135:16, 135:23
**blessing** [1] - 298:18
**blinders** [2] - 45:12,
56:21
**blue** [6] - 53:9,
133:9, 133:10, 136:1,
246:5
**blunt** [1] - 285:4
**bluntly** [1] - 308:8
**blurry** [1] - 120:9
**board** [1] - 32:7
**Board** [2] - 23:8,
23:13
**Bodell** [4] - 64:24,
65:7, 65:11, 66:15
**bold** [1] - 303:6
**bond** [2] - 99:21
**book** [5] - 88:6,
128:1, 281:5, 300:21,
300:22
**boss** [2] - 231:2,
279:24
**bottom** [9] - 34:12,
40:17, 43:3, 43:15,
50:13, 102:19, 124:9,
154:3, 200:19
**Boulevard** [2] -
112:23, 133:7
**Bowman** [2] - 1:12,
2:14
**box** [6] - 87:17,
136:6, 136:17, 138:9,
140:15
**Box** [2] - 2:9, 2:13
**boxes** [2] - 139:1,
253:12
**boyfriend** [1] - 153:6
**Brady** [19] - 32:2,
32:4, 123:7, 123:13,
123:16, 124:5, 127:7,
171:17, 172:11,
172:17, 197:8,
199:22, 200:21,
213:8, 213:16,
214:14, 288:12,
289:14
**BRADY** [1] - 2:2
**brain** [1] - 58:7

**brands** [2] - 48:7,
49:15
**breach** [1] - 295:10
**break** [29] - 33:3,
71:9, 80:9, 111:5,
111:7, 111:9, 112:4,
126:7, 159:17,
160:11, 160:19,
162:15, 167:20,
167:22, 207:5,
208:20, 235:3, 236:8,
236:10, 250:23,
251:11, 267:8,
295:20, 298:14,
298:24, 299:2
**Brennan** [1] - 268:6
**brevity** [1] - 243:16
**brief** [11] - 30:14,
33:5, 40:7, 71:16,
111:18, 207:20,
209:2, 236:15, 299:5,
303:19, 305:14
**Brief** [1] - 49:21
**briefing** [1] - 65:18
**briefly** [3] - 25:16,
27:19, 52:4
**bring** [4] - 150:22,
171:2, 205:18, 292:5
**bringing** [1] - 60:8
**broad** [2] - 25:22,
43:8
**broad-brush** [1] -
25:22
**Broadview** [4] -
273:21, 274:6,
274:14, 274:20
**Broadway** [1] -
270:21
**broke** [1] - 105:23
**brothers** [6] - 46:17,
68:9, 68:20, 68:23,
69:19, 71:7
**brought** [3] - 10:5,
78:19, 287:19
**Brown** [1] - 28:9
**brown** [2] - 133:11,
245:14
**Brown's** [1] - 163:20
**Bruce** [20] - 2:11,
54:5, 230:6, 230:15,
231:16, 233:23,
234:9, 234:18,
234:21, 235:12,
236:3, 240:20,
240:23, 240:24,
241:12, 242:7,
242:16, 243:12,
304:18, 304:19
**Bruce's** [1] - 304:16
**brush** [1] - 25:22

**build** [2] - 53:6, 60:8
**bullet** [21] - 64:16,
69:8, 69:18, 102:20,
107:9, 107:11, 108:2,
108:9, 109:19, 112:8,
113:22, 114:3,
114:24, 115:4,
145:11, 145:12,
145:13, 162:23,
164:23, 165:2
**bullets** [10] - 47:13,
47:18, 48:1, 48:14,
247:6, 247:17, 248:8,
256:21, 262:16
**bully** [1] - 225:18
**bullying** [1] - 225:16
**bumped** [1] - 278:20
**bunch** [1] - 130:24
**bureau** [19] - 13:16,
13:17, 15:4, 15:5,
15:15, 16:23, 17:3,
17:4, 17:8, 18:2, 18:4,
18:15, 20:20, 20:22,
60:24, 119:8, 127:14,
285:6
**bureaus** [1] - 119:24
**Burge** [2] - 7:10,
7:11
**Burger** [17] - 70:21,
70:23, 80:12, 80:15,
83:15, 112:9, 112:13,
112:22, 113:24,
114:13, 131:20,
132:3, 132:12, 133:6,
154:6, 155:22, 164:11
**burglary** [1] - 114:13
**burn** [1] - 225:21
**BY** [334] - 4:6, 5:8,
6:23, 8:18, 9:13, 9:21,
10:7, 10:24, 11:14,
12:2, 13:5, 16:3,
17:11, 17:18, 18:7,
19:13, 20:21, 21:24,
22:5, 22:14, 22:20,
23:24, 24:12, 24:20,
25:23, 27:9, 27:15,
28:22, 29:3, 31:11,
33:6, 34:3, 34:4, 35:9,
36:1, 36:10, 37:6,
39:4, 41:6, 43:2,
43:13, 44:10, 48:19,
52:10, 54:21, 55:24,
56:24, 57:22, 58:13,
58:22, 59:9, 59:16,
60:10, 61:13, 62:4,
62:9, 63:6, 64:2,
64:13, 65:21, 66:4,
66:14, 67:5, 67:11,
68:18, 69:10, 69:17,
70:14, 71:21, 75:12,

77:19, 78:9, 79:11,
80:8, 81:20, 82:5,
83:6, 83:18, 84:10,
85:9, 86:14, 87:10,
88:19, 89:6, 90:2,
91:2, 91:17, 92:14,
93:6, 93:13, 94:6,
94:14, 96:15, 97:13,
99:6, 101:11, 102:2,
102:8, 103:6, 104:7,
104:15, 104:23,
106:1, 106:14,
106:24, 108:1, 109:8,
112:6, 115:2, 115:19,
116:19, 117:6,
118:11, 119:15,
120:7, 121:11,
122:11, 124:17,
125:2, 126:6, 127:2,
127:16, 128:10,
130:13, 133:22,
134:10, 137:1,
137:23, 142:8,
143:10, 144:23,
146:1, 146:13, 147:6,
147:19, 148:2,
148:19, 149:13,
150:6, 150:19, 151:9,
152:5, 153:16, 154:1,
154:23, 156:16,
157:14, 158:20,
161:8, 162:24,
163:12, 164:16,
165:1, 165:19, 166:4,
167:3, 167:13,
168:20, 170:9,
170:19, 172:6,
174:10, 174:16,
174:22, 175:23,
176:8, 177:24,
178:13, 178:24,
179:6, 179:13,
179:20, 180:9,
180:16, 181:5, 182:4,
182:18, 183:2,
183:13, 183:23,
184:10, 184:19,
185:8, 189:5, 189:14,
189:20, 190:7,
190:24, 191:15,
192:16, 193:6,
193:14, 194:2, 194:9,
194:14, 195:6, 196:7,
196:17, 196:23,
197:12, 198:13,
199:11, 199:23,
200:17, 201:5,
201:13, 201:22,
202:13, 203:16,
204:10, 204:17,
204:24, 205:6,

205:22, 206:5, 207:2,
207:9, 208:8, 209:7,
209:17, 210:6, 211:2,
212:1, 212:9, 212:22,
213:5, 214:10,
214:18, 215:12,
215:24, 216:15,
217:6, 217:11,
217:22, 218:12,
219:4, 220:8, 221:9,
222:1, 222:18, 223:6,
224:11, 225:6,
226:13, 226:18,
227:6, 228:14, 229:1,
229:14, 230:4,
230:12, 231:7, 232:1,
232:9, 233:2, 233:11,
233:21, 234:8,
234:13, 235:10,
235:17, 236:19,
237:17, 239:18,
240:1, 240:8, 242:5,
242:15, 243:11,
245:2, 245:10,
245:16, 246:3,
246:24, 252:1, 253:4,
254:8, 256:6, 257:18,
258:3, 258:13, 259:1,
259:18, 260:14,
261:1, 262:1, 264:20,
265:2, 267:20,
269:14, 270:8,
271:22, 272:13,
272:23, 273:18,
274:5, 274:13,
275:12, 276:1, 276:9,
276:22, 277:7,
277:23, 278:18,
279:3, 280:5, 280:15,
281:13, 284:11,
284:21, 285:12,
286:19, 288:7,
288:22, 289:3,
289:12, 289:18,
289:23, 291:15,
292:2, 293:19,
295:22, 299:8,
301:16, 302:4,
302:23, 304:12,
305:8, 305:15, 306:2,
306:12, 307:9,
307:22, 308:20

---

## C

**c.v** [1] - 8:10
**cajoled** [1] - 304:22
**CALEA** [2] - 33:21,
206:10
**California** [10] - 4:21,
12:5, 13:14, 15:1,

32:7, 32:9, 32:10, 204:2, 246:10, 278:24
**call-in** [1] - 60:18
**camera** [1] - 40:1
**cannot** [8] - 61:4, 112:12, 142:24, 148:23, 230:23, 242:20, 256:8, 256:16
**capabilities** [1] - 168:14
**capacity** [4] - 15:24, 216:16, 216:21, 217:4
**capture** [1] - 182:8
**captured** [2] - 171:20, 231:24
**car** [10] - 51:14, 68:19, 96:14, 138:3, 152:20, 152:21, 153:5, 153:6, 245:11, 245:14
**care** [4] - 237:4, 238:4, 285:16, 286:7
**cared** [1] - 166:15
**career** [10] - 5:15, 12:13, 17:20, 18:11, 19:7, 21:18, 35:10, 35:19, 128:2, 203:15
**careful** [2] - 215:22, 237:21
**cartridge** [7] - 47:17, 74:18, 76:20, 84:21, 163:16, 247:6, 247:17
**Case** [1] - 177:17
**case** [91] - 4:14, 7:7, 7:13, 7:17, 8:4, 10:5, 11:21, 20:5, 23:19, 25:8, 30:10, 31:7, 35:2, 37:22, 39:15, 40:13, 40:23, 41:7, 42:11, 44:1, 44:5, 44:12, 46:23, 53:21, 56:19, 56:23, 58:2, 59:1, 59:23, 60:9, 61:3, 61:17, 73:8, 79:21, 91:16, 92:23, 99:15, 104:9, 107:2, 117:22, 134:19, 135:18, 135:24, 136:11, 136:12, 136:22, 137:19, 161:18, 164:21, 166:14, 167:11, 170:16, 182:6, 186:13, 200:6, 201:19, 208:1, 208:2, 208:4, 208:12, 213:23, 219:3, 229:10, 229:24, 232:12, 234:22, 238:12, 247:16,

253:13, 257:21, 259:20, 260:2, 261:7, 263:9, 268:15, 269:2, 269:7, 270:3, 273:4, 281:7, 281:9, 285:15, 287:12, 290:21, 292:12, 294:24, 296:11, 300:6, 300:23
**cases** [31] - 6:3, 6:6, 6:9, 6:12, 6:17, 6:22, 6:24, 7:3, 20:6, 20:7, 24:5, 24:13, 24:15, 31:9, 32:3, 47:17, 59:24, 62:21, 74:18, 76:20, 79:15, 84:21, 146:21, 146:22, 163:16, 200:14, 203:21, 270:22, 282:18
**casings** [25] - 46:11, 47:13, 48:2, 48:5, 49:14, 61:6, 73:10, 85:16, 85:17, 86:8, 139:19, 145:12, 234:6, 238:15, 247:6, 247:17, 248:8, 254:24, 261:17, 271:21, 290:1, 290:12, 302:7, 302:9
**catch** [5] - 11:13, 44:8, 104:13, 303:23, 304:2
**categories** [3] - 44:13, 107:17, 203:20
**caught** [1] - 38:17
**central** [2] - 16:5, 16:8
**certain** [12] - 23:22, 27:4, 44:18, 91:14, 138:21, 150:7, 159:4, 180:8, 181:3, 181:15, 182:7, 183:16
**certainly** [6] - 9:18, 31:4, 47:21, 229:21, 233:8, 291:10
**certainty** [1] - 167:4
**Certificate** [1] - 3:20
**CERTIFICATE** [1] - 311:1
**certificate** [2] - 23:6, 206:24
**Certification** [1] - 207:13
**certification** [6] - 22:15, 22:18, 23:4, 206:18, 206:20, 207:15
**certifications** [3] - 19:1, 207:17, 207:22
**Certified** [3] - 1:18,

311:2, 311:11
**certified** [3] - 22:22, 23:3, 143:18
**certify** [1] - 311:3
**cetera** [13] - 15:22, 20:11, 48:15, 56:12, 58:10, 61:9, 74:1, 76:3, 91:15, 151:4, 188:9, 273:17, 286:22
**chain** [7] - 73:4, 143:13, 146:4, 192:6, 276:3, 276:11, 276:17
**challenged** [1] - 144:15
**change** [8] - 186:9, 214:1, 293:16, 294:7, 295:1, 296:6, 296:11, 297:11
**changed** [6] - 15:1, 18:23, 85:6, 88:9, 294:18, 298:11
**changes** [3] - 19:4, 91:15, 219:15
**characterize** [3] - 118:1, 121:24, 162:2
**characterizing** [1] - 95:14
**charge** [9] - 74:11, 97:3, 99:17, 115:5, 161:15, 164:19, 191:13, 223:12, 227:13
**charged** [3] - 102:11, 117:8, 217:5
**charges** [4] - 37:9, 122:2, 123:21, 220:24
**charging** [2] - 162:12, 162:13
**Charlene** [1] - 2:7
**Charles** [2] - 299:21, 300:14
**chart** [1] - 119:10
**check** [1] - 110:5
**cheese** [1] - 220:13
**Chicago** [4] - 2:3, 2:21, 6:11, 7:11
**chief** [1] - 93:9
**Chiefs** [3] - 281:2, 281:4, 299:11
**children** [6] - 157:9, 157:24, 222:4, 223:24, 226:19, 227:20
**Christine** [1] - 2:10
**chronological** [1] - 132:21
**chronologically** [1] - 132:17
**cigarette** [1] - 67:4
**Circuit** [1] - 93:9

**circuit** [3] - 96:17, 97:7, 242:20
**circumstance** [2] - 57:13, 181:12
**circumstances** [6] - 36:23, 60:2, 79:23, 153:4, 211:1, 213:22
**cited** [1] - 187:17
**citation** [8] - 162:9, 164:2, 172:13, 186:22, 187:9, 187:10, 263:4, 300:20
**citations** [2] - 101:8, 196:3
**cite** [4] - 98:10, 103:9, 108:13, 270:22
**cited** [21] - 23:5, 72:11, 72:13, 95:19, 120:13, 170:4, 171:11, 186:16, 190:6, 193:24, 195:8, 207:17, 240:24, 263:2, 280:22, 281:5, 286:5, 299:18, 300:6, 308:19
**citizen** [2] - 60:18, 116:10
**City** [11] - 2:5, 2:7, 4:14, 8:3, 25:9, 168:17, 169:14, 170:11, 170:21, 188:14, 189:7
**city** [2] - 71:17, 192:20
**CITY** [1] - 1:7
**city's** [1] - 111:22
**civil** [4] - 11:21, 15:2, 24:15, 192:2
**civilly** [1] - 34:9
**claim** [1] - 74:10
**claimed** [1] - 108:10
**claims** [1] - 241:23
**clarification** [1] - 243:3
**clarified** [1] - 243:14
**clark** [4] - 4:7, 5:9, 180:22, 304:2
**CLARK** [3] - 1:7, 4:2, 310:2
**Clark** [109] - 1:11, 3:3, 4:9, 4:11, 4:20, 7:22, 25:12, 28:15, 37:21, 39:7, 40:13, 49:5, 59:11, 62:5, 63:12, 71:8, 71:22, 90:13, 93:7, 99:9, 102:23, 111:8, 111:24, 112:7, 116:3, 127:19, 137:4, 139:16, 144:4,

144:24, 146:3, 149:8, 152:6, 158:2, 158:21, 161:4, 168:16, 169:1, 169:18, 170:10, 173:11, 173:18, 174:11, 174:23, 176:9, 179:1, 179:7, 182:19, 183:15, 184:11, 187:6, 188:24, 189:15, 191:1, 195:7, 201:14, 202:11, 202:14, 207:10, 209:4, 211:3, 216:11, 225:23, 226:14, 227:7, 228:15, 231:8, 236:16, 246:13, 246:15, 246:16, 246:23, 247:1, 247:12, 247:20, 249:9, 251:14, 252:20, 253:17, 256:18, 257:19, 261:19, 262:9, 265:3, 266:5, 268:21, 269:11, 269:17, 273:1, 274:7, 276:2, 276:23, 277:17, 279:18, 280:1, 282:22, 283:21, 285:22, 291:12, 293:13, 294:11, 295:11, 295:18, 301:17, 307:10, 307:21, 309:20, 309:22, 311:3
**Clark's** [1] - 269:10
**class** [2] - 21:20, 204:5
**classes** [8] - 203:8, 203:10, 204:21, 204:23, 205:1, 205:17, 205:21, 205:23
**classic** [1] - 57:9
**clear** [8] - 18:8, 188:7, 238:13, 252:5, 284:7, 287:4, 294:14, 299:10
**clearly** [4] - 108:24, 146:18, 172:15, 237:14
**clearly-established** [1] - 172:15
**Cliff** [1] - 113:3
**clock** [1] - 111:10
**close** [13] - 54:1, 54:2, 56:15, 138:3, 166:23, 185:20, 186:2, 186:6, 186:11,

223:16, 233:8, 268:16, 306:24
**closed** [1] - 56:21
**closely** [2] - 19:3, 69:21
**closes** [1] - 62:22
**cocaine** [1] - 105:15
**coerced** [8] - 221:11, 222:11, 222:15, 222:19, 224:3, 224:24, 227:18, 244:24
**coercing** [1] - 223:20
**Coercion** [2] - 147:9, 177:15
**coercion** [16] - 43:19, 150:4, 153:15, 194:21, 221:10, 222:7, 223:5, 223:14, 228:19, 242:23, 243:13, 244:4, 244:20, 297:7, 297:14, 298:7
**coercive** [4] - 188:2, 222:12, 223:13, 223:24
**coersive** [3] - 154:10, 187:24, 188:8
**coin** [1] - 72:17
**Coleman** [7] - 36:14, 42:16, 43:4, 167:15, 255:13, 257:2, 259:10
**Coleman's** [5] - 252:10, 252:15, 253:1, 254:1, 256:19
**collapses** [1] - 42:12
**colleagues** [1] - 167:23
**collect** [2] - 105:13, 186:10
**collected** [3] - 105:17, 105:18, 186:17
**College** [5] - 12:6, 19:6, 206:24, 207:19, 300:3
**color** [2] - 34:2, 245:11
**colored** [1] - 53:8
**combine** [1] - 45:16
**coming** [6] - 105:12, 165:15, 207:6, 213:20, 249:6, 292:7
**comings** [1] - 166:8
**command** [6] - 16:20, 17:1, 35:5, 35:6, 192:6, 291:18
**Command** [4] - 12:6, 19:6, 206:23, 207:19
**commanded** [2] -

34:24, 146:20
**commander** [9] - 16:17, 16:23, 16:24, 17:3, 17:9, 61:1, 127:14, 128:9, 254:17
**commander's** [1] - 285:6
**commanding** [1] - 182:13
**commencing** [1] - 1:16
**comment** [14] - 9:18, 10:4, 23:21, 60:5, 60:6, 90:21, 91:10, 101:6, 149:3, 157:7, 158:18, 231:22, 273:9, 285:8
**commentary** [26] - 31:20, 41:13, 42:23, 44:19, 61:2, 65:4, 66:2, 67:10, 101:4, 103:20, 119:6, 136:9, 142:7, 147:24, 150:3, 170:17, 176:10, 176:11, 213:8, 213:9, 214:6, 236:1, 248:15, 248:18, 295:21, 297:5
**Commentary** [1] - 49:22
**commented** [16] - 10:10, 10:15, 10:21, 23:10, 29:19, 59:24, 70:24, 81:17, 118:8, 120:12, 136:24, 155:24, 158:9, 237:9, 288:9, 308:6
**commenting** [1] - 56:19
**comments** [4] - 91:19, 156:11, 251:2, 263:5
**commission** [1] - 29:8
**commit** [3] - 65:15, 163:5, 211:22
**committed** [8] - 41:8, 112:13, 114:13, 222:7, 229:9, 229:23, 230:15, 293:2
**common** [2] - 106:12, 198:7
**commonly** [8] - 14:8, 36:20, 72:4, 72:6, 171:6, 195:19, 196:1, 196:21
**commonly-accepted** [6] - 72:4, 72:6, 171:6, 195:19, 196:1, 196:21
**communicated** [1] -

121:20
**communication** [2] - 270:2, 273:3
**Community** [1] - 33:19
**community** [1] - 21:6
**compare** [2] - 47:17, 118:7
**compared** [2] - 255:12, 262:15
**comparing** [2] - 248:7, 302:18
**comparison** [4] - 247:17, 253:19, 255:2, 297:15
**competent** [2] - 72:18, 89:24, 147:2
**complaint** [10] - 75:23, 125:14, 126:16, 128:17, 128:21, 169:5, 169:8, 169:9, 169:11
**complaints** [2] - 99:18, 99:20
**complete** [3] - 35:7, 90:17, 149:5
**completely** [3] - 41:21, 116:4, 202:9
**completes** [2] - 28:13, 275:3
**comply** [1] - 122:21
**computer** [3] - 38:19, 172:4, 266:14
**computer's** [1] - 231:23
**concepts** [1] - 282:1
**concerns** [3] - 213:19, 268:7, 268:8
**conclude** [7] - 64:8, 105:11, 125:13, 195:23, 196:20, 265:24, 299:4
**concluded** [8] - 147:12, 150:7, 163:1, 251:17, 256:20, 276:23, 277:1, 309:24
**concluding** [2] - 223:16, 223:17
**conclusion** [43] - 46:1, 86:19, 125:6, 127:9, 136:24, 146:8, 162:4, 180:3, 180:21, 181:19, 182:10, 183:20, 188:18, 189:12, 190:4, 190:22, 191:11, 192:14, 193:4, 193:12, 193:23, 194:7, 195:4, 198:4, 198:10, 199:18,

200:11, 202:7, 202:10, 229:12, 240:6, 252:5, 256:24, 259:7, 259:14, 264:1, 264:2, 265:9, 277:12, 293:4, 295:8, 295:13, 296:2
**conclusions** [7] - 253:15, 253:24, 254:1, 254:3, 256:3, 258:20, 265:21
**conclusive** [2] - 265:5, 270:15
**condense** [1] - 227:8
**condition** [2] - 141:17, 145:15
**conduct** [10] - 34:15, 144:10, 182:16, 191:3, 192:10, 198:7, 208:2, 210:17, 231:3, 282:18
**conducted** [14] - 32:19, 33:11, 34:19, 35:8, 35:16, 99:23, 139:24, 195:2, 248:6, 248:19, 251:18, 252:6, 256:12, 274:19
**conducting** [4] - 231:4, 247:4, 247:13, 253:18
**conducts** [1] - 181:3
**confer** [1] - 301:1
**confession** [2] - 297:17, 298:10
**confidential** [6] - 78:20, 116:10, 116:12, 116:14, 214:9, 302:11
**confidentiality** [1] - 39:24
**conflict** [1] - 271:16
**conflicts** [1] - 48:12
**confronted** [3] - 156:15, 159:3, 159:6
**confused** [5] - 112:12, 114:12, 130:16, 139:15, 268:23
**confuses** [1] - 199:18
**confusing** [1] - 191:10
**conjunction** [1] - 35:15
**connected** [1] - 167:11
**connection** [5] - 42:6, 74:14, 166:13, 219:8, 259:12
**connects** [1] - 83:15

**consent** [3] - 27:3, 29:19, 30:9
**consequence** [1] - 182:14
**consider** [14] - 9:14, 9:22, 10:8, 10:13, 11:18, 25:12, 36:11, 55:19, 56:17, 56:20, 60:24, 71:2, 175:8, 197:8
**considerable** [5] - 10:16, 43:11, 229:4, 261:14, 297:4
**considered** [19] - 23:2, 37:4, 55:17, 55:22, 59:17, 75:19, 89:24, 95:7, 114:16, 115:16, 148:23, 151:5, 170:3, 199:20, 218:2, 221:6, 245:1, 251:23, 255:17
**considering** [2] - 214:7, 296:21
**consistencies** [1] - 118:7
**consistency** [1] - 118:20
**consistent** [11] - 68:12, 84:12, 89:9, 118:4, 118:16, 118:18, 141:9, 148:7, 191:5, 241:22, 258:9
**consistently** [1] - 45:21
**conspired** [1] - 211:20
**constantly** [1] - 137:16
**constitute** [1] - 237:24
**constituted** [1] - 304:21
**constitutes** [3] - 187:23, 228:19, 241:14
**constitution** [2] - 29:21, 30:15
**constitutional** [5] - 29:16, 29:23, 30:18, 30:23, 37:3
**contact** [2] - 93:1, 249:7
**contacted** [3] - 5:17, 5:20, 166:9
**contacting** [1] - 166:22
**contain** [2] - 215:22, 217:14
**contained** [3] - 140:15, 176:2, 232:18

**containing** [1] - 162:3

**contains** [2] - 217:15, 235:14

**contaminate** [1] - 73:4

**contaminated** [1] - 40:16

**contemporaneous** [7] - 85:21, 86:1, 91:23, 94:7, 141:5, 141:14, 156:3

**Contemporaneousl y** [1] - 177:6

**contemporaneousl y** [1] - 91:24

**contemporary** [1] - 85:6

**contemporous** [10] - 85:7, 88:10, 94:13, 142:7, 232:7, 232:10, 232:21, 233:23, 293:22

**contend** [1] - 289:24

**content** [1] - 189:4

**contentious** [1] - 175:6

**contest** [4] - 68:16, 97:17, 101:4, 242:4

**context** [5] - 181:21, 215:11, 265:1, 286:21, 288:12

**contingent** [1] - 18:20

**continually** [1] - 181:2

**continue** [4] - 177:5, 185:12, 189:1, 227:16

**continued** [2] - 204:6, 205:1

**continues** [2] - 176:10, 181:14

**continuing** [3] - 203:11, 235:19, 235:24

**Continuing** [11] - 83:7, 127:4, 135:11, 151:10, 184:20, 226:19, 233:18, 253:10, 265:13, 283:14, 303:12

**Contra** [2] - 249:4, 249:5

**contradicted** [1] - 108:4

**contradiction** [1] - 114:18

**contrary** [7] - 34:24, 46:13, 67:1, 113:21, 197:9, 219:10, 247:7

**contrast** [1] - 156:8

**contrasting** [1] - 269:12

**contribute** [1] - 33:21

**control** [3] - 139:10, 185:21, 283:19

**conventions** [5] - 204:4, 205:5, 205:7, 205:8, 205:9

**converted** [1] - 211:10

**convict** [1] - 41:17

**convicted** [5] - 45:17, 155:13, 172:19, 258:4, 258:17

**conviction** [14] - 7:1, 7:4, 9:19, 11:21, 11:24, 40:24, 41:17, 47:8, 155:6, 257:16, 268:3, 268:15, 297:22, 298:5

**cool** [1] - 225:17

**cooperation** [1] - 122:9

**cop** [2] - 209:8, 209:11

**cop/bad** [1] - 209:8

**COPS** [1] - 33:19

**copy** [8] - 8:9, 91:20, 93:22, 168:21, 168:23, 168:24, 169:2, 309:14

**COR** [31] - 50:6, 51:23, 52:18, 54:4, 63:11, 67:21, 75:15, 93:20, 99:8, 99:11, 120:10, 120:20, 132:14, 133:4, 134:24, 135:4, 135:11, 135:19, 135:21, 137:3, 137:16, 138:17, 140:17, 140:18, 154:21, 156:18, 188:4, 306:5, 307:4, 307:5

**core** [1] - 40:16

**corners** [1] - 46:1

**correct** [170] - 5:12, 8:12, 11:6, 12:14, 13:11, 14:6, 16:6, 16:7, 17:14, 18:12, 19:10, 21:2, 22:2, 24:3, 32:8, 38:2, 38:16, 42:16, 42:22, 43:10, 51:16, 52:1, 52:6, 52:23, 53:17, 53:18, 54:12, 55:4, 55:9, 59:19, 63:12, 63:17, 64:6, 64:7, 65:1, 65:7, 65:22, 66:19, 66:23, 67:23, 67:24, 68:9, 68:14, 69:4, 69:13, 76:1, 76:8, 76:11, 76:12, 77:3, 77:4, 77:9, 78:13, 78:18, 80:4, 81:8, 84:14, 89:7, 92:3, 93:17, 93:23, 94:23, 97:21, 100:13, 102:4, 106:16, 112:23, 112:24, 114:1, 115:9, 117:2, 123:13, 123:24, 128:14, 129:2, 129:21, 130:21, 132:9, 132:10, 135:19, 136:1, 136:2, 138:14, 138:19, 138:20, 140:20, 141:7, 144:9, 145:2, 145:17, 155:23, 156:22, 163:21, 164:13, 164:15, 165:8, 165:9, 175:18, 182:14, 191:19, 191:20, 191:22, 193:7, 193:10, 194:5, 194:17, 195:10, 195:11, 197:23, 198:12, 204:14, 205:23, 210:9, 210:10, 211:15, 212:2, 212:6, 212:24, 213:1, 220:14, 232:4, 247:2, 247:3, 247:6, 247:14, 247:15, 247:18, 247:19, 251:16, 252:12, 254:2, 259:8, 259:22, 260:4, 260:8, 261:13, 261:21, 262:17, 265:7, 265:18, 274:20, 274:23, 275:1, 276:15, 277:2, 281:4, 284:14, 285:22, 285:23, 287:10, 287:14, 289:7, 289:14, 289:19, 289:20, 290:3, 290:18, 291:2, 291:12, 294:11, 294:21, 296:3, 296:7, 297:18, 302:7, 303:8, 303:22, 304:15, 310:5, 311:6

**correction** [1] - 27:13

**CORRECTION** [1] - 310:13

**Corrections** [2] - 21:2, 206:9

**corrections** [5] - 16:9, 16:11, 21:13, 28:13, 310:8

**correctly** [10] - 9:3, 13:22, 30:22, 51:10, 112:15, 113:10, 133:12, 218:4, 257:2, 305:20

**correspondence** [1] - 249:2

**corroborate** [2] - 104:10, 104:17

**corroborated** [3] - 80:2, 107:4, 108:5

**corroborates** [1] - 271:24

**Costa** [2] - 249:4, 249:5

**couched** [1] - 116:12

**coughing** [1] - 158:13

**counsel** [4] - 5:17, 144:10, 145:22, 149:17

**Counsel** [6] - 54:15, 160:9, 228:13, 270:12, 273:9, 299:2

**count** [2] - 149:1, 197:3

**counted** [1] - 8:17

**country** [4] - 22:2, 23:11, 205:15, 292:11

**county** [2] - 15:3, 19:19

**County** [13] - 12:14, 12:21, 13:1, 17:13, 18:9, 20:12, 88:24, 90:6, 96:17, 97:8, 102:11, 122:13, 286:15

**couple** [8] - 15:13, 30:7, 71:9, 151:2, 209:15, 231:5, 299:6, 307:23

**couple-of-minute** [1] - 71:9

**course** [30] - 5:14, 8:15, 10:10, 17:20, 18:10, 21:18, 24:3, 35:10, 35:19, 36:24, 41:11, 48:13, 56:17, 57:16, 71:6, 71:7, 72:23, 128:2, 166:15, 191:8, 191:12, 214:2, 216:2, 222:16, 231:11, 243:24, 249:11, 285:2, 285:9, 299:1

**courses** [1] - 22:1

**court** [13] - 31:9, 39:6, 39:12, 139:14, 186:1, 186:2, 216:6, 225:20, 267:16, 268:4, 281:9, 304:10

**Court** [1] - 283:3

**COURT** [1] - 1:1

**Court's** [2] - 259:7, 259:9

**covered** [5] - 45:4, 189:21, 225:3, 228:15, 228:23

**Crabtree** [57] - 10:9, 70:8, 70:16, 82:13, 82:22, 83:24, 84:6, 88:23, 89:8, 89:20, 90:22, 91:3, 91:6, 91:11, 91:18, 91:19, 100:5, 101:23, 102:3, 102:4, 102:7, 102:18, 103:8, 103:9, 103:17, 105:6, 105:7, 109:3, 138:2, 147:12, 148:3, 150:8, 152:9, 152:11, 152:16, 153:18, 154:16, 154:24, 155:20, 156:22, 157:3, 157:15, 158:5, 158:6, 158:22, 167:2, 220:11, 221:11, 222:11, 224:2, 224:24, 228:20, 235:7, 297:2, 297:7, 298:7, 298:10

**Crabtree's** [14] - 76:7, 88:15, 90:22, 96:12, 128:23, 134:21, 140:11, 147:9, 163:17, 177:15, 194:20, 238:22, 297:13, 297:17

**create** [2] - 73:3, 308:7

**created** [3] - 249:10, 259:20, 260:2

**creates** [2] - 220:20, 237:11

**credibility** [28] - 10:20, 10:23, 11:5, 11:19, 95:16, 102:22, 103:2, 147:20, 150:5, 150:20, 151:10, 151:17, 217:13, 217:15, 217:24, 218:5, 219:12, 219:20, 219:23, 220:18, 221:6, 254:20, 254:22,

281:23, 282:4,
283:22, 284:5, 301:21
**credible** [14] - 10:17,
43:4, 43:5, 149:8,
218:22, 218:23,
219:1, 219:22, 240:4,
254:18, 255:15
**credit** [1] - 149:9
**crediting** [4] - 91:5,
148:11, 148:13, 158:6
**Crescenta** [1] -
16:14
**crime** [40] - 35:18,
35:24, 36:2, 36:7,
36:9, 37:5, 42:17,
42:22, 43:5, 48:23,
49:8, 55:17, 69:22,
73:1, 74:16, 76:19,
84:21, 109:15,
112:13, 114:13,
127:24, 130:4,
155:14, 158:16,
166:11, 176:14,
186:3, 186:11,
186:22, 202:20,
202:23, 223:12,
223:13, 227:13,
227:14, 234:10,
238:18, 291:21,
292:6, 293:2
**Crime** [21] - 59:6,
60:18, 77:8, 77:16,
78:5, 78:11, 79:5,
81:23, 82:8, 92:1,
104:11, 104:19,
106:5, 106:7, 106:12,
116:11, 116:18,
117:18, 145:14,
159:1, 159:8
**crimes** [15] - 49:13,
71:2, 76:3, 119:20,
120:1, 120:2, 120:5,
129:24, 130:17,
130:24, 131:2,
131:11, 132:18,
164:3, 164:10
**Criminal** [3] -
299:19, 299:24, 300:8
**criminal** [10] - 34:10,
37:9, 72:12, 124:11,
125:14, 126:16,
172:17, 186:7, 279:5,
300:2
**criminally** [1] -
219:17
**critical** [11] - 67:12,
108:9, 116:24,
131:23, 139:24,
152:6, 152:9, 155:18,
276:20, 290:14,

290:16
**criticism** [9] - 88:21,
91:23, 133:15,
142:21, 146:3, 149:6,
164:17, 234:9, 276:17
**criticisms** [3] -
136:13, 142:6, 233:22
**criticize** [1] - 232:6
**criticized** [2] - 142:1,
234:4
**cross** [1] - 19:21
**crouching** [2] -
66:16, 66:17
**Culbertson** [1] - 2:13
**culpability** [1] -
130:4
**current** [2] - 169:9,
205:18
**curriculum** [7] -
23:20, 33:22, 199:14,
199:19, 200:1, 200:2,
205:14
**custodial** [1] - 188:9
**custody** [9] - 16:5,
128:1, 143:13, 146:4,
149:5, 152:23, 276:4,
276:11, 276:18
**custom** [10] - 179:15,
179:16, 179:18,
179:22, 181:6, 181:8,
181:10, 181:11,
181:17
**customs** [1] - 286:2
**cut** [4] - 46:1, 160:4,
170:2, 226:17

# D

**D'Agnolo** [4] - 1:18,
309:6, 311:2, 311:10
**dah** [9] - 110:1,
110:18, 157:24, 158:1
**Dan** [15] - 145:15,
251:15, 254:21,
258:20, 259:2,
262:15, 262:20,
268:12, 271:3,
271:24, 272:15,
274:19, 275:2, 277:1,
277:9
**dance** [2] - 151:18,
158:3
**dancing** [1] - 152:2
**dandy** [1] - 188:4
**Daniel** [1] - 2:22
**dark** [3] - 53:8, 53:9,
133:10
**dark-colored** [1] -
53:8
**dash** [1] - 268:4

**date** [7] - 37:21,
97:17, 97:18, 100:7,
115:17, 300:10
**dated** [5] - 7:17,
94:5, 99:13, 286:6
**Dated** [2] - 310:12,
311:13
**dates** [1] - 243:24
**David** [4] - 2:19,
64:24, 66:15, 277:19
**days** [5] - 61:17,
89:14, 97:1, 126:19,
216:17
**dealt** [2] - 59:24,
294:1
**death** [4] - 25:3,
39:15, 146:21, 238:10
**debate** [1] - 283:13
**decades** [2] -
201:23, 244:2
**deceased** [1] - 27:23
**December** [4] - 14:5,
14:15, 163:20
**decent** [1] - 206:17
**decide** [1] - 111:12
**decided** [1] - 139:20
**decision** [10] - 45:23,
46:7, 46:10, 46:13,
46:23, 47:2, 161:15,
164:18, 283:23
**declaration** [1] - 42:4
**decree** [2] - 27:4,
30:9
**decrees** [1] - 29:19
**dedicated** [1] -
119:11
**deemed** [1] - 240:3
**defendant** [7] - 9:1,
9:8, 43:24, 209:6,
211:20, 212:4, 257:22
**Defendant** [1] -
233:22
**Defendants** [1] - 1:8
**defendants** [13] -
1:15, 2:7, 2:11, 2:15,
2:19, 2:23, 4:13, 9:2,
9:9, 172:17, 213:3,
260:3, 309:19
**defendants'** [1] -
299:3
**defendants's** [1] -
259:21
**defense** [13] - 11:21,
12:1, 24:15, 24:21,
124:5, 146:16,
146:17, 165:24,
166:3, 246:12, 288:1,
288:21, 288:23
**defer** [1] - 160:12
**deficiencies** [1] -

234:22
**deficient** [5] - 210:4,
210:8, 211:4, 211:10,
235:16
**defined** [1] - 179:4
**definition** [3] -
191:23, 191:24, 192:2
**degree** [10] - 97:4,
97:6, 98:6, 99:17,
100:11, 101:18,
102:11, 161:24,
164:13, 244:24
**degrees** [2] - 207:13,
300:1
**delayed** [1] - 233:1
**delaying** [1] - 152:10
**deliberate** [2] -
43:17, 44:13
**deliberately** [1] -
40:15
**deliberately-illegal**
[1] - 40:15
**delivered** [1] -
145:14
**denied** [1] - 30:17
**deny** [1] - 123:8
**denying** [1] - 225:3
**dep** [1] - 283:17
**Department** [42] -
2:5, 9:1, 9:8, 12:8,
12:22, 13:2, 17:14,
18:10, 20:13, 21:2,
21:14, 25:9, 29:10,
29:14, 29:18, 30:21,
31:14, 40:14, 45:20,
64:4, 67:13, 68:3,
71:2, 77:13, 87:24,
90:6, 119:7, 171:7,
174:13, 175:18,
176:1, 176:21, 177:6,
193:7, 193:9, 195:20,
198:2, 286:1, 286:15,
294:4, 294:10, 296:5
**department** [63] -
13:14, 13:16, 13:18,
13:23, 14:3, 14:9,
15:20, 16:10, 17:16,
18:18, 18:19, 18:21,
19:20, 20:14, 21:12,
22:22, 27:2, 27:8,
31:17, 33:16, 34:2,
34:5, 39:17, 39:19,
77:13, 90:11, 100:6,
139:10, 169:15,
169:23, 170:8,
172:15, 172:24,
178:10, 178:16,
178:20, 180:18,
181:2, 182:2, 183:24,
185:21, 190:1,

190:12, 190:16,
190:17, 191:4, 191:5,
191:18, 192:1, 192:5,
192:11, 192:19,
193:19, 194:3,
194:22, 195:1, 196:1,
196:21, 197:10,
198:7, 200:8, 249:4,
291:10
**Department's** [5] -
68:24, 119:20, 139:8,
177:3, 185:18
**department's** [7] -
72:14, 139:21,
170:12, 181:11,
183:17, 191:2, 244:11
**departmental** [3] -
179:15, 184:20,
184:21
**departments** [3] -
26:23, 27:1, 292:10
**departure** [4] -
172:14, 184:6, 276:7,
276:20
**depicted** [2] - 43:12,
136:6
**depiction** [1] - 90:24
**depicts** [2] - 138:21,
139:2
**depo** [1] - 266:15
**deposed** [5] - 5:1,
197:5, 197:21,
229:16, 230:10
**DEPOSITION** [2] -
1:7, 310:2
**deposition** [73] -
7:24, 25:6, 27:20,
28:9, 28:12, 28:17,
38:4, 39:18, 66:20,
73:24, 75:15, 85:5,
86:5, 94:22, 106:15,
117:22, 131:7, 133:5,
162:17, 164:3, 164:4,
164:9, 173:20, 176:6,
176:7, 186:19, 196:4,
210:17, 230:11,
235:21, 237:1, 238:5,
240:20, 241:1,
241:20, 245:24,
255:8, 262:24, 263:2,
263:5, 263:10,
263:16, 264:3,
264:18, 264:21,
265:10, 265:22,
266:3, 266:5, 266:8,
266:13, 266:17,
267:5, 269:3, 269:10,
269:20, 272:21,
275:20, 276:13,
281:21, 282:10,

293:8, 298:22, 299:3, 302:6, 304:17, 309:24, 310:7, 311:3, 311:5, 311:7

**Deposition** [1] - 1:11

**deposition's** [1] - 234:16

**depositions** [17] - 123:8, 169:16, 170:7, 178:18, 196:5, 196:8, 196:15, 196:20, 197:6, 197:13, 197:17, 197:19, 210:19, 240:19, 282:17, 283:2, 286:22

**depriving** [2] - 223:22, 224:6

**describe** [3] - 113:24, 141:9, 222:7

**described** [9] - 65:19, 66:15, 83:4, 112:10, 131:20, 133:8, 133:16, 133:23, 158:3

**describing** [1] - 135:23

**description** [3] - 25:22, 65:6, 66:10

**descriptions** [1] - 55:16

**deserve** [1] - 309:10

**designated** [2] - 20:15, 23:1

**designed** [1] - 44:16

**desire** [3] - 105:13, 121:2, 220:7

**desk** [1] - 15:15

**detachable** [1] - 245:19

**detail** [6] - 43:11, 49:19, 52:12, 83:13, 129:16, 288:11

**details** [2] - 43:12, 83:3

**Detective** [60] - 27:22, 54:5, 54:8, 54:22, 55:14, 76:21, 77:3, 78:12, 78:16, 80:3, 82:7, 84:13, 84:20, 84:23, 87:22, 92:2, 99:13, 120:15, 120:23, 121:1, 121:12, 121:16, 121:19, 122:1, 122:12, 123:3, 123:16, 123:20, 128:20, 129:6, 133:15, 136:3, 136:15, 137:7, 138:6,

141:1, 142:9, 155:18, 158:4, 164:2, 164:8, 171:10, 172:10, 187:16, 198:19, 200:19, 230:15, 232:3, 235:12, 240:11, 241:23, 287:3, 289:4, 289:13, 290:11, 292:20, 293:1, 303:9

**detective** [65] - 5:13, 5:16, 7:9, 10:21, 12:24, 13:10, 13:13, 13:16, 13:17, 13:18, 13:21, 13:22, 16:23, 17:3, 17:4, 17:8, 17:13, 17:16, 17:19, 18:1, 18:3, 18:4, 18:9, 20:20, 25:18, 28:6, 28:8, 35:4, 36:8, 36:14, 37:12, 40:14, 58:8, 60:24, 62:24, 79:15, 90:9, 92:23, 103:15, 119:8, 119:24, 124:8, 127:13, 127:14, 138:13, 151:6, 153:8, 154:15, 165:16, 181:13, 242:22, 243:17, 244:12, 245:14, 254:16, 255:15, 273:12, 278:5, 281:5, 284:2, 285:5, 285:6, 301:24

**Detectives** [5] - 81:6, 149:10, 152:7, 157:1, 192:20

**detectives** [45] - 10:6, 13:24, 20:15, 46:2, 57:24, 58:20, 62:20, 69:2, 84:5, 90:5, 90:14, 95:20, 104:8, 104:16, 107:2, 108:19, 109:11, 119:19, 120:5, 128:22, 134:13, 134:20, 150:8, 152:7, 152:15, 161:21, 171:12, 177:9, 180:12, 186:20, 187:18, 187:22, 187:23, 197:22, 198:1, 198:5, 198:6, 198:22, 199:4, 200:8, 232:11, 232:17, 294:19, 301:18, 302:14

**Detectives'** [1] - 280:23

**detectives'** [1] -

123:7

**determination** [15] - 95:16, 102:16, 147:20, 150:20, 151:11, 151:18, 151:19, 153:10, 157:1, 163:13, 166:6, 217:15, 217:17, 218:5, 257:1

**determinations** [3] - 11:5, 102:23, 217:13

**determine** [6] - 10:20, 11:19, 130:10, 257:10, 284:9

**determined** [3] - 101:16, 251:15, 274:16

**Develop** [1] - 177:4

**develop** [2] - 178:5, 236:20

**developed** [4] - 58:24, 59:11, 69:12, 108:18

**developing** [3] - 60:14, 193:16, 248:2

**Developing** [1] - 177:13

**developments** [2] - 232:14, 232:16

**deviate** [1] - 178:22

**deviated** [4] - 45:20, 72:3, 193:20, 260:3

**deviation** [3] - 184:21, 193:16, 259:21

**deviations** [2] - 177:13, 248:1

**Deviations** [1] - 40:9

**devoted** [1] - 38:8

**diagram** [2] - 138:18, 139:2

**Diane** [3] - 121:1, 121:5, 121:7

**Diego** [1] - 4:22

**difference** [2] - 127:18, 217:17

**different** [17] - 30:3, 42:10, 69:2, 73:19, 75:7, 95:22, 129:11, 133:14, 152:1, 164:17, 167:2, 215:4, 282:1, 284:20, 284:22, 284:23, 301:21

**differently** [3] - 41:23, 146:14, 152:4

**differs** [1] - 109:4

**digital** [1] - 14:9

**diligence** [4] - 91:15, 166:7, 255:16, 278:5

**Dimas** [2] - 13:11, 14:16

**diploma** [2] - 12:7, 206:23

**direct** [9] - 29:4, 113:1, 154:21, 188:7, 231:8, 241:5, 271:16, 297:21, 303:2

**directed** [4] - 35:6, 162:3, 186:13, 297:21

**directing** [1] - 44:17

**direction** [2] - 51:8, 51:15

**directly** [6] - 264:7, 269:22, 270:11, 270:17, 274:3, 292:19

**disagree** [4] - 142:6, 146:8, 258:11, 283:18

**disagreed** [1] - 256:2

**disasters** [1] - 15:3

**Disclose** [2] - 116:21, 177:8

**disclose** [6] - 124:10, 172:12, 190:9, 191:17, 191:18, 214:12

**disclosed** [4] - 122:16, 123:17, 165:23, 166:2

**disclosing** [1] - 125:4

**disclosures** [1] - 127:15

**discounting** [1] - 163:14

**discovered** [1] - 43:22

**Discovery** [2] - 134:16, 177:11

**discovery** [1] - 141:23

**discrete** [1] - 214:14

**discuss** [4] - 40:2, 46:9, 115:23, 262:14

**discussed** [2] - 258:15, 262:20

**discusses** [1] - 253:1

**discussing** [1] - 129:20

**Discussion** [3] - 168:15, 234:24, 267:18

**discussion** [2] - 121:22, 305:10

**disorders** [1] - 15:2

**displayed** [1] - 192:24

**dispute** [10] - 95:5, 95:7, 97:9, 136:3,

136:15, 137:11, 142:12, 143:16, 143:17, 143:19

**disputed** [1] - 142:16

**dissimilar** [1] - 130:3

**distinction** [2] - 13:19, 76:13

**distinctly** [1] - 151:24

**distorted** [2] - 161:16, 164:20

**distributed** [1] - 268:9

**district** [2] - 21:8, 279:14

**DISTRICT** [2] - 1:1, 1:2

**District** [1] - 283:3

**divided** [1] - 120:1

**division** [19] - 12:17, 12:19, 13:15, 13:19, 13:22, 14:1, 14:6, 14:13, 14:17, 14:21, 15:12, 16:5, 17:13, 17:17, 17:20, 18:4, 18:9, 20:20, 291:8

**DIVISION** [1] - 1:3

**divisions** [1] - 17:17

**doctor** [1] - 243:20

**Document** [2] - 99:8, 177:6

**document** [34] - 7:20, 31:15, 50:5, 50:9, 54:6, 54:17, 73:3, 75:14, 75:18, 76:1, 76:2, 87:4, 87:16, 91:24, 92:2, 94:4, 98:9, 120:11, 144:3, 145:2, 156:2, 156:19, 179:2, 179:8, 182:7, 187:11, 207:11, 207:12, 250:17, 256:15, 272:2, 273:11, 273:14, 308:10

**documentation** [13] - 60:7, 85:22, 87:19, 94:1, 106:11, 136:14, 141:5, 142:2, 142:3, 146:11, 146:23, 156:3, 249:10

**documentations** [1] - 33:22

**documented** [11] - 72:9, 93:2, 93:8, 93:15, 111:1, 136:10, 138:13, 140:1, 143:18, 144:1, 155:19

**documenting** [2] - 238:20, 239:8

**documents** [8] - 33:17, 89:21, 156:9, 209:15, 248:21, 249:1, 270:6, 272:10
**DOJ** [1] - 206:10
**dollars** [1] - 15:20
**domestic** [6] - 119:12, 119:21, 120:16, 122:14, 123:4, 287:7
**done** [35] - 35:12, 37:20, 46:22, 46:23, 58:7, 61:2, 66:5, 103:22, 108:20, 109:11, 143:6, 144:14, 146:14, 146:19, 146:24, 160:23, 166:7, 167:20, 189:4, 192:7, 209:22, 210:5, 210:8, 211:4, 211:14, 227:17, 247:7, 281:18, 288:2, 290:6, 293:15, 297:1, 297:2, 297:3, 306:11
**door** [6] - 32:11, 55:1, 56:16, 142:20, 166:23, 246:5
**double** [2] - 174:5
**double-team** [2] - 174:5
**doubt** [1] - 256:20
**Doug** [1] - 2:11
**dovetails** [1] - 214:20
**down** [27] - 8:6, 27:11, 41:11, 44:24, 49:2, 50:11, 51:2, 64:19, 71:23, 73:10, 79:16, 80:9, 84:5, 126:7, 134:11, 135:9, 135:21, 138:7, 138:16, 176:11, 216:6, 220:24, 227:8, 246:2, 258:14, 268:21
**downhill** [1] - 261:17
**draft** [2] - 7:16, 128:3
**drafted** [4] - 8:2, 8:14, 99:12, 128:12
**drafting** [1] - 38:24
**drawing** [2] - 264:2, 273:6
**dressed** [1] - 126:3
**dresser** [5] - 87:18, 135:17, 135:24, 138:10, 139:2
**drink** [1] - 225:4
**Drive** [1] - 2:17
**drive** [1] - 135:1
**driveway** [2] - 83:23,

105:9
**driving** [1] - 245:11
**Drnek** [7] - 52:22, 53:2, 54:10, 55:12, 63:14, 63:21
**Drnek's** [4] - 52:19, 53:15, 63:7, 63:10
**due** [2] - 69:1, 105:12
**duly** [1] - 4:3
**Dumpster** [8] - 64:6, 64:18, 64:24, 65:4, 65:5, 65:11, 66:16, 66:17
**during** [28] - 5:14, 15:2, 15:16, 17:20, 18:10, 21:17, 35:10, 35:18, 36:24, 43:22, 82:8, 90:18, 104:11, 104:18, 128:2, 134:20, 141:6, 143:12, 156:14, 162:15, 167:21, 192:21, 203:15, 203:17, 233:12, 241:20, 282:17, 307:23
**During** [2] - 134:14, 177:10
**duty** [1] - 172:12

# E

**early** [2] - 75:19, 248:22
**ears** [1] - 188:21
**easier** [1] - 207:3
**easily** [2] - 154:10, 274:16
**East** [1] - 2:6
**east** [1] - 55:8
**easterly** [1] - 51:15
**easy** [1] - 200:7
**Edition** [2] - 299:20, 300:12
**editions** [1] - 286:8
**education** [5] - 12:5, 32:1, 203:11, 204:6, 205:1
**educational** [1] - 12:3
**effect** [1] - 220:17
**efforts** [1] - 104:17
**egregious** [1] - 188:1
**eight** [3] - 197:6, 197:13, 197:17
**either** [8] - 34:9, 39:5, 180:6, 181:16, 250:19, 266:21, 270:4, 294:6

**Ekedahl** [2] - 2:19, 277:19
**electronic** [1] - 231:23
**email** [4] - 249:8, 268:5, 269:15, 271:3
**embedded** [3] - 30:1, 107:9, 244:10
**embraced** [2] - 19:4, 29:8
**embracing** [1] - 45:14
**emergency** [3] - 14:20, 15:14, 32:24
**emphasized** [1] - 186:8
**employed** [2] - 216:16, 216:20
**employee** [2] - 109:20, 263:12
**employment** [2] - 73:23, 114:22
**enable** [1] - 168:12
**encountered** [1] - 202:2
**encouraged** [2] - 122:1, 123:21
**end** [12] - 24:1, 41:12, 41:13, 105:24, 110:23, 173:20, 220:14, 237:3, 237:14, 241:18, 245:23, 268:22
**ends** [1] - 47:7
**Enforcement** [3] - 23:7, 23:13, 161:11
**enforcement** [21] - 5:10, 5:15, 12:11, 18:11, 21:18, 26:1, 128:2, 132:1, 199:13, 203:12, 204:6, 204:18, 205:3, 205:19, 206:18, 206:20, 207:15, 207:23, 257:20, 258:2
**enforces** [1] - 191:24
**engaged** [3] - 40:14, 103:8, 103:17
**enlighten** [1] - 62:11
**enormous** [1] - 73:17
**ensured** [2] - 187:21, 199:4
**enter** [1] - 127:20
**entered** [2] - 145:7, 213:23
**entering** [1] - 213:23
**entire** [8] - 19:19, 123:10, 156:14, 192:3, 207:12,

207:14, 278:16
**entirety** [1] - 175:9
**entitle** [1] - 49:21
**entitled** [7] - 1:15, 30:16, 116:21, 134:12, 144:9, 145:2, 207:13
**entity** [3] - 191:7, 191:18, 200:9
**entry** [2] - 146:23, 268:3
**environment** [1] - 225:4
**equal** [2] - 29:22, 30:16
**equivalent** [3] - 30:1, 32:13, 32:14
**ERRATA** [1] - 310:1
**especially** [7] - 87:4, 88:14, 89:22, 154:11, 166:12, 269:23, 281:1
**essential** [1] - 274:17
**essentially** [3] - 16:21, 26:8, 209:21
**establish** [7] - 15:5, 21:12, 128:21, 130:6, 164:3, 164:12, 285:24
**Establish** [1] - 95:11
**established** [15] - 29:10, 29:13, 30:21, 31:14, 69:11, 76:17, 97:20, 100:10, 130:14, 147:24, 172:15, 181:4, 185:16, 188:14, 200:23
**establishes** [2] - 99:5, 189:7
**establishing** [2] - 21:10, 86:23
**establishment** [1] - 15:4
**Estate** [3] - 2:18, 2:19, 2:19
**estate** [1] - 277:19
**et** [16] - 1:7, 4:14, 8:3, 15:21, 20:11, 48:15, 56:12, 58:10, 61:9, 74:1, 76:3, 91:15, 151:4, 188:9, 273:17, 286:22
**ether** [1] - 273:10
**evaluate** [4] - 261:5, 301:18, 302:1, 302:13
**evaluated** [1] - 46:21
**evaluation** [9] - 23:19, 44:18, 136:23, 139:13, 147:5, 186:1, 218:1, 253:2, 301:23

**evening** [3] - 54:11, 55:14, 157:4
**events** [2] - 83:16, 116:16
**Events** [1] - 49:22
**eventually** [5] - 74:4, 88:18, 110:19, 238:19, 255:11
**Evera** [1] - 2:17
**evidence** [188] - 10:2, 36:15, 36:18, 37:12, 42:5, 42:6, 43:20, 44:20, 45:10, 45:22, 46:3, 47:11, 47:22, 48:14, 48:15, 48:23, 49:8, 56:5, 58:23, 60:4, 60:19, 60:22, 61:5, 62:6, 62:11, 62:16, 62:24, 65:9, 70:12, 72:5, 72:8, 72:15, 72:19, 73:4, 76:19, 78:1, 79:3, 80:6, 81:11, 83:10, 86:3, 87:5, 87:20, 89:17, 94:15, 98:19, 101:20, 104:21, 105:19, 106:17, 107:5, 107:12, 107:16, 107:17, 107:18, 107:19, 107:23, 110:13, 114:9, 117:5, 118:6, 122:23, 127:22, 130:11, 131:24, 133:20, 134:7, 134:8, 136:10, 136:19, 137:3, 138:21, 139:8, 139:10, 139:12, 140:2, 141:1, 141:20, 141:23, 142:10, 142:15, 142:22, 143:14, 145:8, 145:16, 146:7, 146:12, 147:4, 156:6, 158:8, 158:21, 159:11, 161:21, 163:5, 163:6, 163:23, 165:14, 166:19, 172:12, 176:13, 178:6, 184:2, 184:24, 185:17, 185:21, 185:23, 186:8, 186:10, 186:12, 186:15, 186:16, 186:19, 186:21, 189:24, 190:6, 193:5, 193:10, 193:17, 193:24, 194:16, 199:18, 200:5, 200:12, 210:11,

211:6, 212:5, 213:3, 213:12, 213:13, 214:2, 215:6, 220:22, 220:23, 233:20, 234:10, 241:10, 242:11, 244:5, 247:8, 248:2, 253:7, 255:10, 256:5, 256:13, 257:2, 257:4, 257:7, 258:6, 259:20, 260:1, 261:6, 269:19, 269:22, 269:24, 270:3, 270:17, 270:18, 270:20, 271:23, 272:14, 273:5, 273:15, 273:20, 274:3, 274:10, 275:3, 275:6, 275:7, 275:8, 275:14, 276:3, 276:21, 277:9, 284:13, 285:14, 285:20, 290:19, 294:23, 297:12, 297:13, 297:14, 297:15, 298:12, 305:9, 305:18

**Evidence** [6] - 72:1, 161:12, 176:23, 177:4, 177:14, 177:16

**Evidence-Based** [1] - 161:12

**evolved** [1] - 40:23

**evolves** [1] - 79:22

**ex** [9] - 46:15, 52:15, 56:14, 57:3, 57:4, 57:6, 57:12, 57:18, 63:17

**ex-husband** [9] - 46:15, 52:15, 56:14, 57:3, 57:4, 57:6, 57:12, 57:18, 63:17

**exact** [3] - 94:8, 242:3, 308:18

**exactly** [12] - 37:23, 44:20, 60:23, 133:13, 155:19, 156:23, 164:15, 171:24, 219:15, 221:18, 257:11, 289:2

**EXAMINATION** [1] - 3:2

**examination** [25] - 36:12, 49:9, 85:8, 186:14, 248:7, 248:13, 248:14, 248:20, 249:10, 249:12, 251:16, 251:19, 252:7, 253:19, 255:17, 256:12, 256:19,

259:3, 270:1, 272:16, 274:19, 275:2, 275:3, 277:1, 289:24

**examinations** [5] - 247:5, 247:14, 254:2, 254:13, 254:15

**examine** [1] - 247:16

**examined** [4] - 4:4, 86:19, 257:3, 291:6

**examiner** [7] - 247:2, 252:3, 255:4, 262:15, 264:15, 264:22, 274:24

**examiners** [1] - 43:6

**example** [15] - 22:6, 30:11, 30:24, 32:3, 46:10, 102:22, 171:15, 180:24, 181:20, 182:21, 205:9, 205:11, 213:13, 219:5, 238:14

**examples** [4] - 41:2, 175:7, 175:13, 224:23

**excellent** [1] - 203:19

**except** [2] - 224:18, 260:22

**exclude** [3] - 237:12, 296:15, 297:6

**excluded** [2] - 39:6, 297:20

**exclusion** [3] - 69:4, 290:24, 291:3

**exclusive** [1] - 55:22

**exclusively** [2] - 19:24, 216:20

**exculpatory** [8] - 43:22, 44:22, 134:8, 172:12, 172:18, 213:3, 213:11, 237:12

**excuse** [5] - 57:9, 102:6, 182:16, 225:11, 225:12

**exercise** [1] - 30:4

**exhibit** [6] - 63:9, 77:2, 120:20, 135:3, 137:2, 140:21

**Exhibit** [22] - 7:24, 50:5, 52:17, 54:4, 63:8, 63:10, 67:21, 75:14, 93:20, 94:4, 99:8, 112:18, 120:9, 128:16, 132:15, 133:4, 135:4, 137:3, 140:17, 142:9, 144:2, 156:17

**exist** [4] - 22:1, 101:6, 101:9, 296:4

**existed** [5] - 141:15, 294:5, 294:9, 294:16,

294:20

**exiting** [1] - 69:23

**expect** [4] - 22:12, 180:8, 212:19, 217:7

**expectations** [1] - 172:16

**expected** [6] - 46:14, 103:22, 166:12, 166:14, 232:17, 245:4

**expects** [1] - 195:1

**experience** [27] - 7:15, 36:8, 58:8, 79:14, 90:22, 92:24, 181:1, 201:23, 202:2, 202:10, 202:12, 218:3, 218:6, 218:11, 218:23, 220:3, 221:4, 257:19, 257:20, 266:24, 278:8, 281:8, 284:1, 285:18, 286:9, 286:14, 301:17

**experienced** [2] - 171:11, 187:18

**expert** [14] - 4:24, 23:1, 25:4, 36:11, 216:18, 216:24, 239:19, 240:2, 249:17, 250:5, 250:14, 250:16, 253:17, 260:8

**expertise** [4] - 25:13, 218:6, 255:16, 301:17

**experts** [6] - 42:18, 248:5, 248:13, 248:19, 251:17, 252:6

**explain** [9] - 12:3, 28:1, 180:23, 217:17, 237:22, 238:5, 239:1, 259:2, 308:12

**explained** [2] - 17:7, 237:2

**explaining** [1] - 249:3

**explanation** [2] - 47:14, 287:2

**explore** [1] - 46:15

**express** [2] - 213:18, 283:24

**expressed** [14] - 29:20, 31:8, 178:12, 178:15, 212:15, 212:24, 213:6, 213:19, 214:21, 223:14, 236:4, 236:6, 237:3, 238:18

**expresses** [1] - 229:22

**expressing** [3] - 11:4, 213:17, 214:14

**expression** [1] -

286:4

**extensive** [2] - 89:19, 223:4

**extent** [6] - 10:16, 180:3, 236:1, 245:9, 253:1, 261:14

**extortions** [1] - 20:8

**extracted** [1] - 43:18

**extraordinary** [1] - 282:18

**extreme** [3] - 150:4, 172:14, 211:1

**extremely** [2] - 34:24, 219:18

**eyes** [2] - 113:8, 113:18

## F

**fabricate** [1] - 277:9

**fabricated** [2] - 305:10, 305:19

**face** [4] - 50:20, 51:22, 113:7, 155:8

**facial** [1] - 246:20

**facilitate** [1] - 186:5

**facilitated** [1] - 35:23

**facilities** [1] - 22:12

**facility** [1] - 21:16

**facing** [1] - 220:23

**fact** [49] - 7:16, 24:2, 34:19, 39:22, 57:3, 57:4, 65:11, 68:7, 74:23, 76:20, 77:15, 80:13, 82:14, 83:23, 84:6, 84:15, 92:2, 93:15, 95:2, 95:15, 96:16, 99:4, 99:5, 102:9, 105:7, 105:8, 107:4, 107:7, 110:8, 113:12, 116:3, 123:11, 124:11, 124:13, 125:7, 136:16, 138:13, 140:10, 142:10, 143:11, 152:24, 219:10, 233:19, 237:24, 259:11, 287:4, 294:23, 296:10, 296:11

**factor** [1] - 229:5

**facts** [15] - 43:22, 44:22, 98:19, 107:7, 108:3, 129:10, 161:21, 195:23, 237:13, 238:24, 239:8, 239:12, 239:20, 240:3, 274:9

**factual** [1] - 178:14

**factually** [1] - 42:3

**fail** [1] - 178:16

**failed** [5] - 64:9, 90:17, 190:17, 191:17, 191:18

**failing** [1] - 72:4

**fails** [1] - 192:4

**failure** [13] - 44:23, 45:11, 46:15, 69:1, 71:24, 88:21, 91:23, 172:16, 178:5, 182:16, 182:21, 188:1, 214:12

**failures** [1] - 237:10

**Failures** [1] - 177:3

**fair** [30] - 5:2, 53:23, 57:1, 57:23, 118:1, 160:5, 172:24, 180:13, 181:17, 183:8, 187:1, 192:9, 194:11, 197:14, 197:18, 197:22, 199:1, 201:1, 201:24, 208:13, 209:23, 212:17, 215:18, 218:7, 260:16, 264:14, 277:2, 286:20, 287:2

**fairly** [2] - 180:13, 277:22

**fall** [2] - 13:24, 44:12

**falls** [1] - 192:4

**false** [13] - 110:21, 131:19, 161:16, 164:19, 188:2, 212:14, 224:20, 258:17, 258:21, 259:3, 259:15, 305:9, 305:18

**falsely** [2] - 147:12, 150:9

**falsified** [1] - 212:5

**familiar** [5] - 22:11, 23:7, 23:14, 36:19, 209:8

**family** [2] - 165:3, 166:15

**far** [6] - 74:3, 75:20, 80:14, 232:8, 254:23, 255:15

**fashion** [2] - 293:3, 298:11

**fast** [1] - 234:11

**favor** [1] - 43:20

**fear** [1] - 220:20

**February** [2] - 14:19, 117:23

**federal** [9] - 15:12, 15:16, 15:18, 19:21, 19:22, 26:24, 30:13, 37:13, 39:22

felt [1] - 51:8
few [9] - 89:14, 159:19, 161:5, 168:19, 208:19, 209:14, 246:15, 277:21, 301:15
field [5] - 16:13, 19:8, 55:9, 218:7
Fifth [4] - 30:24, 70:17, 299:20, 300:11
fifth [1] - 120:19
figure [2] - 45:12, 301:8
file [12] - 7:14, 86:20, 88:6, 88:8, 93:5, 135:1, 137:17, 145:4, 208:7, 232:18, 248:22, 251:13
filed [1] - 169:7
filing [1] - 212:13
final [2] - 28:2, 221:7
finally [5] - 46:21, 81:18, 110:20, 144:14, 254:24
financial [3] - 105:13, 106:4, 106:12
findings [13] - 253:22, 253:23, 254:10, 255:4, 255:13, 259:10, 262:21, 266:1, 267:6, 271:4, 271:6, 272:1, 302:17
fine [12] - 45:3, 111:16, 112:1, 159:18, 160:20, 160:21, 161:7, 174:9, 208:21, 235:4, 236:14, 274:18
fingerprints [3] - 140:6, 140:7, 186:4
finish [10] - 34:16, 34:20, 35:8, 143:3, 185:3, 189:16, 225:10, 225:14, 227:4, 228:4
finished [5] - 19:7, 82:2, 187:3, 243:6, 243:7
fire [3] - 60:8, 60:11, 256:21
firearm [7] - 48:21, 49:6, 74:19, 84:16, 85:12, 136:16, 248:13
Firearm [1] - 72:1
firearms [10] - 36:4, 36:12, 36:17, 84:7, 105:6, 140:3, 247:1, 248:5, 251:17, 252:2
fired [8] - 47:18,

74:19, 84:22, 145:11, 145:12, 290:23
fires [3] - 247:8, 248:7, 262:16
firing [1] - 247:9
firm [7] - 2:2, 2:8, 2:13, 2:17, 5:23, 39:16, 39:19
First [2] - 70:16, 155:22
first [54] - 4:3, 5:17, 8:20, 10:20, 11:3, 16:17, 27:21, 29:17, 30:8, 33:15, 44:8, 52:5, 54:9, 55:12, 72:3, 77:20, 97:3, 97:6, 98:6, 99:17, 100:11, 101:18, 102:11, 104:13, 108:9, 110:9, 110:14, 135:1, 137:6, 141:13, 145:6, 145:16, 148:9, 161:24, 164:13, 169:4, 169:8, 169:11, 171:2, 174:24, 176:12, 195:14, 200:15, 226:9, 240:15, 241:7, 248:4, 248:9, 259:24, 261:9, 261:19, 267:22, 267:24, 268:4
fit [1] - 46:4
fitness [1] - 203:18
fits [1] - 297:6
five [18] - 19:8, 33:3, 68:6, 71:12, 71:14, 111:14, 128:7, 151:16, 159:16, 177:12, 208:22, 208:23, 235:3, 236:7, 236:10, 236:11, 298:15, 298:17
five-minute [1] - 33:3, 235:3, 236:7
flash [1] - 135:1
flat [1] - 108:4
flat-out [1] - 108:4
flavor [2] - 47:23, 284:5
fled [2] - 51:7, 96:22
fleshed [1] - 175:16
Floor [3] - 2:3, 2:9, 2:21
FLORES [1] - 2:5
flow [1] - 44:24
focus [5] - 29:6, 40:6, 62:21, 62:23, 154:9
focused [2] - 63:1, 296:1

focusing [2] - 120:15, 152:14
follow - 29:20, 30:7, 44:23, 45:11, 45:13, 47:16, 57:9, 66:1, 66:5, 105:3, 119:20, 120:15, 126:20, 164:6, 186:14, 237:10
follow-up [3] - 30:7, 120:15, 186:14
followed [3] - 8:10, 241:16, 283:10
following [8] - 145:6, 146:11, 149:2, 170:8, 198:15, 218:19, 221:24, 290:18
follows [2] - 4:5, 148:22
food [6] - 15:21, 223:11, 223:22, 224:6, 225:4, 227:12
foot [2] - 51:9, 245:15
FOR [1] - 1:2
forbidding [1] - 182:13
force [2] - 29:22, 43:19
forcefully [1] - 34:1
forces [1] - 18:15
foregoing [1] - 310:4
forehead [1] - 81:2
foremost [1] - 27:21
Forensic [1] - 145:14
forensic [5] - 42:17, 147:3, 163:15, 203:2, 203:5
forensics [3] - 36:4, 36:12, 43:5
forget [2] - 186:9, 264:6
forgive [1] - 138:1
forgot [4] - 28:11, 201:7, 201:15, 202:3
form [257] - 8:16, 9:10, 9:17, 10:1, 10:18, 11:10, 11:22, 13:4, 16:1, 20:18, 22:3, 22:9, 22:17, 23:15, 24:8, 24:16, 25:14, 26:2, 26:4, 32:20, 33:14, 34:22, 37:2, 40:19, 42:19, 43:7, 44:7, 47:19, 52:8, 55:18, 56:4, 57:7, 58:3, 59:2, 59:14, 59:20, 61:19, 62:8, 63:3, 63:23, 64:10, 65:13, 65:23,

66:7, 66:24, 67:8, 68:15, 69:14, 70:11, 75:9, 77:17, 78:6, 79:7, 80:5, 81:10, 83:9, 84:9, 84:24, 86:2, 88:3, 89:3, 89:17, 91:8, 92:6, 92:19, 94:3, 94:10, 96:10, 101:19, 102:24, 104:3, 104:12, 104:20, 106:6, 107:14, 108:21, 110:12, 114:2, 115:12, 117:4, 118:5, 119:14, 119:22, 122:5, 124:15, 124:24, 125:16, 126:24, 127:11, 128:4, 130:8, 133:19, 134:6, 136:18, 141:19, 142:14, 147:16, 149:12, 149:16, 149:22, 150:11, 151:22, 153:11, 153:21, 154:19, 156:5, 156:21, 158:7, 159:10, 162:6, 163:3, 164:14, 164:22, 165:13, 166:1, 167:8, 167:17, 169:13, 169:21, 169:24, 170:10, 170:13, 174:18, 175:20, 176:4, 178:11, 178:17, 179:3, 179:9, 179:17, 180:2, 180:15, 180:20, 181:18, 182:9, 183:6, 183:19, 184:7, 186:20, 188:17, 189:10, 190:3, 190:20, 191:10, 192:12, 193:3, 193:11, 193:22, 194:6, 195:3, 196:2, 196:11, 197:1, 198:6, 198:9, 199:8, 199:17, 200:10, 201:2, 201:8, 202:6, 203:13, 204:9, 204:15, 204:22, 205:4, 205:20, 206:2, 206:21, 208:6, 208:15, 209:10, 209:24, 210:13, 211:23, 212:7, 212:18, 213:4, 214:4, 214:16, 215:9, 215:20, 216:3, 217:1, 217:9, 217:19, 218:8, 219:2, 220:2, 221:3,

222:17, 225:2, 227:2, 228:21, 229:12, 230:1, 230:7, 230:17, 232:5, 232:22, 233:6, 233:17, 234:1, 234:12, 235:13, 236:20, 239:14, 239:21, 240:5, 242:1, 242:10, 244:18, 245:7, 245:12, 251:20, 252:17, 257:5, 257:24, 258:10, 258:23, 259:16, 260:9, 260:18, 261:22, 262:6, 264:24, 269:8, 270:19, 273:8, 273:24, 275:19, 276:6, 276:19, 278:15, 279:9, 280:8, 281:11, 282:5, 284:17, 286:17, 288:5, 288:18, 289:1, 289:15, 291:13, 291:23, 293:5, 295:3, 295:4, 295:5, 302:2, 302:21, 303:15, 303:17, 305:21, 306:8, 308:17
formal [1] - 178:23
formality [1] - 261:16
formed [6] - 170:15, 172:23, 190:11, 192:19, 194:22, 195:13
former [1] - 127:13
forming [3] - 10:9, 10:14, 202:10
forms [1] - 84:6
formulate [1] - 237:21, 238:12, 238:21
formulating [2] - 237:19, 238:1
Forrester [64] - 2:19, 27:22, 46:24, 49:2, 75:3, 75:20, 81:6, 82:7, 83:12, 84:13, 84:20, 84:23, 85:12, 85:23, 86:8, 86:10, 86:17, 90:16, 92:2, 92:23, 99:13, 121:1, 121:19, 122:1, 122:12, 122:23, 123:3, 123:16, 123:20, 124:10, 125:14, 126:19, 127:1, 127:8, 133:15, 149:11, 152:7, 158:18, 156:15,

157:1, 157:22, 197:4, 213:13, 214:13, 221:16, 221:20, 222:2, 223:9, 227:10, 232:12, 235:15, 264:7, 277:19, 287:3, 287:6, 287:17, 288:14, 288:15, 289:4, 289:13, 290:1, 290:11, 292:20, 293:1

**Forrester's** [19] - 76:21, 77:3, 78:12, 78:16, 80:3, 92:17, 106:8, 120:15, 120:23, 121:12, 121:16, 121:23, 128:20, 129:6, 154:4, 158:4, 171:5, 195:18, 306:6

**forth** [7] - 31:16, 33:23, 120:23, 156:12, 156:13, 158:13, 204:4

**forthwith** [1] - 194:17

**forward** [11] - 14:4, 18:13, 26:16, 105:12, 106:19, 165:10, 165:15, 166:16, 213:20, 220:4, 246:9

**forwarded** [1] - 268:2

**foundation** [8] - 83:9, 259:9, 259:13, 302:22, 303:16, 303:18, 305:22, 308:7

**four** [10] - 6:15, 8:12, 16:14, 16:18, 24:3, 24:19, 68:11, 203:20, 298:21, 299:4

**four-year** [1] - 6:15

**Fourth** [3] - 2:9, 30:23, 127:21

**fragile** [3] - 45:15, 136:24

**fragment** [1] - 145:13

**frame** [1] - 211:21

**framework** [2] - 179:4, 180:5

**free** [3] - 153:19, 157:4, 249:7

**freely** [1] - 241:11

**frequencies** [1] - 245:19

**fresh** [1] - 53:24

**Friday** [3] - 99:14, 161:2, 173:17

**friends** [1] - 165:3

**front** [13] - 7:21,

11:4, 49:23, 64:15, 71:22, 75:13, 99:19, 126:4, 133:2, 133:10, 161:10, 247:22, 269:4

**fugitive** [1] - 19:14

**full** [2] - 141:13, 262:13

**fundamental** [3] - 242:23, 243:18, 295:21

**fundamentally** [2] - 27:19, 288:11

**Fundamentals** [2] - 299:19, 300:8

**furthermore** [1] - 187:21

### G

**Gallardo** [2] - 1:13, 2:14

**gaps** [4] - 158:17, 295:24, 296:4, 296:8

**garb** [1] - 126:4

**Gary** [2] - 2:19, 277:20

**gathered** [1] - 54:9

**Genens** [5] - 1:13, 2:14, 162:16, 263:12, 270:18

**Genens's** [3] - 263:2, 263:10, 263:15

**General** [2] - 188:5, 195:8

**general** [4] - 25:15, 65:18, 170:4, 195:9

**General's** [1] - 2:21

**generalist** [1] - 36:14

**Generally** [1] - 176:22

**generally** [9] - 89:11, 118:13, 119:24, 173:12, 184:1, 184:22, 189:23, 292:7

**generally-accepted** [3] - 184:1, 184:22, 189:23

**Generally-Accepted** [1] - 176:22

**generic** [1] - 32:15

**gentlemen** [1] - 160:9

**George** [16] - 50:15, 50:19, 51:24, 52:3, 52:12, 52:23, 53:1, 54:11, 54:23, 54:24, 55:11, 56:11, 57:1, 63:16, 63:20

**George's** [4] - 50:2, 51:18, 53:24, 110:2

**Getty** [32] - 2:7, 50:6, 51:23, 52:18, 54:4, 63:11, 67:21, 75:16, 93:20, 99:8, 99:11, 120:10, 120:20, 132:14, 133:4, 134:24, 135:5, 135:11, 135:20, 135:21, 137:3, 137:16, 138:17, 140:17, 140:18, 154:21, 156:18, 188:4, 306:5, 307:5

**girlfriend** [3] - 82:10, 82:14, 105:8

**given** [8] - 8:11, 12:7, 20:5, 23:18, 36:24, 42:3, 42:4, 73:23, 119:10, 158:10, 171:10, 172:11, 187:16, 198:20, 200:13, 200:20, 203:14, 235:21, 240:11, 241:23, 244:22, 255:1, 287:22, 289:5, 292:12, 310:6, 311:6

**glad** [1] - 243:2

**glaring** [1] - 105:3

**Glendora** [1] - 246:10

**global** [1] - 287:2

**Glock** [1] - 290:24

**gloves** [4] - 53:9, 113:5, 113:15, 133:11

**go-to** [5] - 263:23, 264:4, 264:15, 264:22, 299:23

**God'** [1] - 51:1

**goings** [1] - 166:9

**goodness** [1] - 252:4

**govern** [7] - 26:1, 26:22, 26:24, 27:2, 27:7, 32:17, 33:10

**governing** [1] - 282:9

**governor** [1] - 21:11

**graduate** [2] - 19:6, 206:23

**grand** [12] - 88:24, 89:5, 89:7, 102:11, 102:14, 117:14, 117:20, 148:7, 148:12, 154:20, 219:11, 220:10

**granted** [3] - 40:1, 131:9, 155:4

**grateful** [1] - 284:8

**great** [4] - 208:24, 228:12, 285:16,

309:16

**Greg** [2] - 1:14, 2:15

**ground** [2] - 103:5, 268:19

**groups** [1] - 204:3

**grow** [1] - 246:21

**guarantee** [1] - 29:22

**guess** [12] - 30:19, 31:12, 47:1, 78:15, 109:15, 126:13, 130:15, 158:2, 159:21, 209:12, 261:19, 261:24

**guide** [2] - 32:17, 33:9

**guidelines** [1] - 186:7

**guiding** [1] - 195:1

**guilty** [4] - 70:10, 155:1, 235:12, 257:22

**gun** [32] - 42:10, 42:13, 47:22, 47:24, 50:21, 55:2, 61:8, 73:11, 84:15, 85:15, 135:18, 135:24, 136:11, 136:12, 136:21, 137:19, 138:8, 138:9, 139:1, 141:16, 145:10, 237:15, 253:3, 254:24, 259:4, 259:6, 266:10, 290:13, 291:1, 291:2, 291:4

**Gun** [1] - 50:22

**GUNNEL** [1] - 267:14

**Gunnell** [29] - 2:22, 74:7, 145:15, 255:1, 262:15, 262:20, 263:21, 265:4, 265:13, 266:10, 267:3, 267:13, 268:6, 268:12, 268:16, 270:2, 270:4, 270:7, 270:14, 270:16, 270:20, 273:2, 273:4, 273:13, 273:15, 274:19, 277:9

**Gunnell's** [20] - 251:15, 252:12, 252:15, 254:2, 254:19, 254:21, 258:20, 259:2, 265:4, 265:21, 266:1, 267:6, 270:14, 271:1, 271:3, 271:16, 271:24, 272:15, 275:2, 277:1

**guns** [5] - 49:12, 80:13, 80:16, 85:20, 158:13

**guts** [1] - 220:6

**guy** [7] - 45:13, 55:1, 79:17, 81:13, 87:7, 263:23, 264:4

**guys** [4] - 79:16, 125:24, 160:1, 174:4

### H

**HAGY** [376] - 2:2, 6:19, 8:16, 9:10, 9:17, 10:1, 10:18, 11:10, 11:22, 13:4, 16:1, 17:6, 17:15, 17:21, 18:1, 19:12, 20:17, 21:22, 22:3, 22:9, 22:17, 23:15, 24:8, 24:16, 25:14, 26:2, 26:6, 28:14, 28:21, 31:2, 31:18, 32:20, 33:13, 34:22, 35:21, 36:6, 37:2, 38:23, 40:19, 42:19, 43:7, 44:7, 47:19, 52:8, 54:14, 54:20, 55:18, 56:4, 57:7, 58:3, 58:16, 59:2, 59:14, 59:20, 60:21, 61:19, 62:8, 63:3, 63:23, 64:10, 65:13, 65:23, 66:7, 66:24, 67:8, 68:15, 69:6, 69:14, 70:11, 75:9, 77:17, 78:6, 79:7, 80:5, 81:10, 82:1, 82:4, 83:5, 83:9, 84:9, 84:24, 86:2, 87:2, 88:3, 89:3, 89:16, 90:20, 91:8, 92:5, 92:19, 93:10, 94:3, 94:10, 96:10, 97:10, 98:1, 98:9, 98:17, 100:24, 101:19, 102:5, 102:24, 104:3, 104:12, 104:20, 106:6, 106:22, 107:14, 108:21, 110:12, 111:3, 114:2, 115:11, 115:14, 116:7, 117:4, 118:5, 119:14, 119:22, 122:5, 124:15, 124:24, 125:16, 126:24, 127:11, 128:4, 130:8, 133:19, 134:6, 136:18, 137:12, 141:19, 142:14, 143:2, 144:17, 144:20, 144:22, 145:22, 146:6, 146:15, 147:16, 147:22,

148:16, 149:12, 149:16, 149:21, 150:11, 151:8, 151:22, 153:11, 153:21, 154:19, 156:5, 157:13, 158:7, 159:10, 159:24, 162:6, 163:3, 163:22, 164:14, 164:22, 165:13, 166:1, 166:18, 167:7, 167:16, 169:24, 170:13, 172:1, 173:6, 173:13, 174:2, 174:15, 174:18, 175:20, 176:3, 177:21, 178:11, 178:17, 179:3, 179:9, 179:17, 180:2, 180:15, 180:20, 181:18, 182:9, 183:1, 183:5, 183:19, 184:7, 184:17, 185:1, 188:17, 189:10, 189:16, 190:3, 190:20, 191:9, 192:12, 193:3, 193:11, 193:22, 194:6, 194:13, 195:3, 196:2, 196:10, 196:22, 197:1, 198:9, 199:8, 199:17, 200:10, 201:2, 201:8, 201:17, 202:6, 203:13, 204:9, 204:15, 204:22, 205:4, 205:20, 206:1, 206:21, 207:4, 208:6, 208:15, 208:24, 209:10, 209:24, 210:13, 211:23, 212:7, 212:18, 213:4, 214:4, 214:16, 215:8, 215:19, 216:3, 216:8, 217:1, 217:9, 217:19, 218:8, 219:2, 220:2, 221:3, 222:17, 222:21, 224:8, 225:2, 225:9, 226:4, 226:7, 227:2, 228:2, 228:12, 228:21, 229:11, 230:1, 230:7, 230:17, 231:2, 231:20, 232:5, 232:22, 233:6, 233:16, 234:1, 234:12, 235:1, 235:13, 236:7, 239:14, 239:21, 240:5, 242:1, 242:10, 243:5, 243:10, 244:18, 245:7,

245:12, 245:22, 246:7, 251:20, 252:17, 254:4, 256:4, 257:5, 257:24, 258:10, 258:23, 259:16, 260:9, 260:18, 261:22, 264:19, 264:24, 267:15, 269:8, 269:18, 271:8, 272:3, 272:17, 273:7, 273:24, 274:8, 275:5, 275:18, 276:6, 276:19, 277:4, 277:11, 278:15, 278:23, 279:9, 279:15, 279:19, 279:24, 280:7, 281:11, 282:5, 282:12, 282:21, 282:24, 283:11, 283:14, 284:16, 284:24, 286:17, 288:5, 288:18, 289:1, 289:8, 289:15, 289:21, 291:13, 291:23, 293:5, 293:9, 295:3, 295:6, 295:15, 300:20, 300:24, 301:9, 301:12, 301:16, 302:4, 302:23, 303:23, 304:2, 304:7, 304:12, 305:5, 305:8, 305:12, 305:15, 305:24, 306:2, 306:10, 306:12, 306:17, 306:21, 307:8, 307:9, 307:18, 308:16, 309:2, 309:11, 309:19
**hagy** [1] - 3:5
**Hagy** [2] - 5:21, 272:5
**Hagy's** [1] - 307:23
**hair** [1] - 246:20
**half** [1] - 19:8
**halfway** [1] - 138:7
**hallmarks** [1] - 194:20
**Hallmarks** [2] - 147:9, 177:15
**hand** [3] - 50:21, 185:12, 269:22
**handgun** [2] - 70:4, 136:4
**handle** [3] - 120:5, 126:11, 268:10
**handled** [4] - 45:11, 141:24, 142:19, 149:3
**handling** [7] - 45:22,

139:9, 185:19, 193:5, 193:10, 193:24, 275:14
**handoff** [2] - 270:1, 273:2
**hands** [5] - 50:23, 218:14, 243:19, 255:10, 270:7
**handy** [1] - 188:4
**Hanson** [4] - 1:14, 2:15, 172:10, 200:20
**happy** [3] - 45:8, 111:6, 189:4
**hard** [2] - 74:12, 133:11
**hard-sole** [1] - 133:11
**harmonize** [1] - 255:9
**harvest** [1] - 72:24
**harvested** [1] - 45:11
**head** [1] - 152:3
**heading** [3] - 40:7, 161:11, 303:6
**Health** [1] - 21:14
**hear** [8] - 22:19, 105:23, 173:18, 222:8, 234:20, 246:18, 285:14, 304:5
**heard** [5] - 22:8, 110:15, 110:22, 222:24
**hearing** [2] - 221:23, 223:1
**hears** [1] - 67:4
**hearsay** [1] - 114:19
**heartbeat** [2] - 9:11, 42:12
**held** [7] - 22:15, 49:2, 49:3, 50:23, 158:10, 239:19
**help** [8] - 125:19, 139:17, 148:20, 184:12, 231:8, 283:9, 306:19
**helpful** [2] - 80:11, 166:17
**herself** [2] - 70:9, 224:20
**Hiding** [1] - 64:24
**hiding** [3] - 43:21, 64:17, 67:2
**high** [4] - 21:7, 21:8, 21:11, 35:1
**high-level** [1] - 35:1
**higher** [1] - 31:24
**highest** [2] - 12:5, 207:18
**highlight** [1] - 198:15
**highlighted** [1] -

241:4
**highlighting** [1] - 219:7
**highly** [1] - 131:23
**Hillsborough** [1] - 25:6
**himself** [8] - 28:10, 40:4, 74:24, 122:17, 162:16, 249:3, 263:19, 264:3
**Hinshaw** [1] - 2:13
**hired** [1] - 7:13
**history** [3] - 73:23, 254:19, 254:21
**hold** [16] - 47:21, 48:10, 48:16, 72:19, 74:13, 86:6, 86:7, 118:23, 169:21, 171:20, 173:16, 176:18, 225:7, 266:16
**holding** [3] - 47:10, 176:12, 176:13
**holdup** [1] - 53:11
**homicide** [43] - 5:13, 8:23, 20:7, 20:15, 20:19, 20:22, 21:19, 22:16, 22:21, 32:17, 32:18, 33:9, 33:10, 34:16, 34:20, 35:1, 35:5, 35:11, 35:13, 37:8, 37:16, 41:9, 50:8, 69:20, 71:5, 86:20, 90:7, 90:14, 104:9, 108:23, 125:21, 142:23, 150:10, 154:18, 155:21, 158:17, 162:12, 162:22, 165:5, 209:23, 275:8, 286:3, 292:12
**homicides** [2] - 90:8, 281:1
**Honda** [2] - 83:21, 105:9
**honest** [1] - 238:23
**honestly** [1] - 245:3
**hope** [1] - 238:13
**hopefully** [2] - 189:21, 277:22
**hospital** [6] - 52:13, 52:23, 53:15, 53:16, 54:10, 55:13
**host** [1] - 304:14
**Houde** [4] - 1:13, 2:14, 138:13, 141:1
**Houde's** [6] - 87:22, 136:4, 136:15, 137:7, 138:6, 142:9
**hour** [8] - 38:2, 38:3, 111:4, 111:12,

160:19, 168:1, 229:4, 298:22
**hour's** [1] - 159:17
**hours** [14] - 37:24, 38:5, 38:8, 53:17, 59:7, 85:16, 89:19, 151:2, 175:14, 223:11, 223:23, 224:14, 227:12
**hours-long** [1] - 89:19
**house** [1] - 125:22
**Howard** [3] - 2:19, 277:19, 288:15
**huge** [2] - 73:16, 160:10
**hundreds** [2] - 5:1, 79:15
**hung** [2] - 110:10, 114:4
**HUOTARI** [84] - 2:8, 71:18, 208:19, 209:1, 209:3, 209:7, 209:11, 209:17, 210:6, 211:2, 212:1, 212:9, 212:22, 213:5, 214:10, 214:18, 215:12, 215:24, 216:4, 216:9, 216:15, 217:6, 217:11, 217:22, 218:12, 219:4, 220:8, 221:9, 222:1, 222:18, 222:23, 223:6, 224:11, 225:6, 225:11, 225:14, 225:18, 226:1, 226:6, 226:8, 226:13, 226:18, 226:24, 227:6, 228:7, 228:13, 228:14, 229:1, 229:14, 230:4, 230:12, 231:7, 232:1, 232:9, 233:2, 233:11, 233:21, 234:8, 234:13, 235:10, 235:17, 236:9, 236:12, 236:16, 236:19, 236:23, 237:17, 239:18, 240:1, 240:8, 242:5, 242:15, 243:11, 245:2, 245:10, 245:16, 246:1, 246:3, 246:11, 303:17, 303:20, 306:8, 307:7, 309:3
**Huotari** [3] - 3:4, 209:5, 303:21
**hurry** [2] - 55:3
**hurt** [1] - 151:1

**husband** [10] - 46:15, 52:15, 56:14, 57:3, 57:4, 57:6, 57:12, 57:18, 63:17, 63:22

**hyperbole** [1] - 126:5
**hypothetical** [6] - 57:8, 97:11, 98:20, 116:8, 201:9, 251:21

**I**

**IA** [1] - 281:2
**IACP** [8] - 33:21, 205:11, 205:16, 206:12, 280:23, 299:24, 300:6, 308:19
**IACP's** [1] - 206:6
**IASPARRO** [212] - 2:12, 4:6, 4:10, 4:19, 4:23, 5:4, 5:8, 6:21, 6:23, 8:18, 9:13, 9:21, 10:7, 10:24, 11:14, 12:2, 13:5, 16:3, 17:11, 17:18, 17:23, 18:3, 18:7, 19:13, 20:21, 21:24, 22:5, 22:14, 22:20, 23:24, 24:12, 24:20, 25:23, 26:3, 26:19, 27:9, 27:15, 28:22, 29:2, 29:3, 31:11, 32:5, 33:2, 33:6, 34:4, 35:9, 36:1, 36:10, 37:6, 39:2, 39:4, 41:6, 43:2, 43:13, 44:10, 48:19, 52:10, 54:18, 54:21, 55:24, 56:24, 57:22, 58:13, 58:22, 59:9, 59:16, 60:10, 61:13, 62:4, 62:9, 63:6, 64:2, 64:13, 65:21, 66:4, 66:14, 67:5, 67:11, 68:18, 69:10, 69:17, 70:14, 71:8, 71:12, 71:20, 71:21, 75:12, 77:19, 78:9, 79:11, 80:8, 81:20, 82:2, 82:5, 83:6, 83:18, 84:10, 85:9, 86:14, 87:10, 88:19, 89:6, 90:2, 91:2, 91:17, 92:14, 93:6, 93:13, 94:6, 94:14, 96:15, 97:13, 98:4, 98:11, 98:15, 98:22, 99:3, 99:6, 101:11, 102:2, 102:8, 103:6, 104:7, 104:15, 104:23, 106:1, 106:14, 106:24, 108:1, 109:8, 111:6, 111:13, 111:16, 111:19, 111:23, 112:3, 112:5, 112:6, 115:2, 115:19, 116:19, 117:6, 118:11, 119:15, 120:7, 121:7, 121:11, 122:11, 124:17, 125:2, 126:6, 127:2, 127:16, 128:10, 130:13, 133:22, 134:10, 137:1, 137:23, 142:8, 143:5, 143:10, 144:19, 144:21, 144:23, 146:1, 146:13, 146:18, 147:6, 147:19, 148:2, 148:19, 149:13, 150:6, 150:19, 151:9, 152:5, 153:16, 154:1, 154:23, 156:16, 157:14, 158:20, 159:18, 159:21, 160:3, 161:4, 161:8, 162:24, 163:12, 164:16, 165:1, 165:19, 166:4, 167:3, 167:13, 167:19, 168:2, 168:5, 168:7, 168:13, 302:2, 302:21, 303:15, 303:22, 305:21, 307:6, 307:21, 307:22, 308:20, 308:24, 309:8

**Iasparro** [5] - 3:3, 3:6, 4:11, 217:12, 303:21
**IBIS** [1] - 268:3
**ID** [2] - 268:13, 268:17
**Idaho** [3] - 21:5, 21:13, 21:17
**idea** [6] - 58:1, 268:16, 289:13, 289:19, 292:14, 292:16
**identification** [2] - 140:8, 186:17
**identified** [17] - 27:19, 65:7, 65:8, 69:2, 69:15, 77:21, 77:23, 78:14, 100:22, 101:2, 115:21, 115:24, 134:1, 196:14, 226:9, 228:16, 250:6
**identify** [4] - 60:17, 78:17, 79:1, 186:21

**IFEANYI** [1] - 2:5
**Ifeanyi** [1] - 168:17
**ignore** [2] - 57:14, 105:2
**ignored** [1] - 200:5
**Ignored** [1] - 177:16
**illegal** [1] - 40:15
**ILLINOIS** [1] - 1:2
**Illinois** [44] - 1:20, 2:3, 2:6, 2:9, 2:13, 2:18, 2:20, 2:21, 6:7, 9:2, 9:8, 23:7, 23:9, 23:11, 23:12, 68:13, 133:7, 145:14, 163:15, 199:12, 199:13, 260:7, 261:21, 262:3, 262:6, 273:21, 273:23, 274:6, 274:14, 274:15, 274:20, 275:15, 276:4, 276:24, 278:11, 281:2, 283:4, 291:8, 291:9, 300:15, 308:14, 309:13, 311:3
**Illinois's** [1] - 199:13
**illuminated** [1] - 184:5
**immediate** [4] - 46:18, 72:5, 72:9, 72:21
**immediately** [7] - 48:2, 57:19, 175:8, 176:14, 186:5, 238:16, 290:6
**immoral** [1] - 40:15
**immunity** [6] - 154:12, 154:16, 154:22, 155:4, 155:11, 155:14
**impact** [3] - 154:11, 171:14, 187:20
**implicated** [2] - 147:13, 227:21
**implicates** [1] - 292:20
**implicating** [3] - 9:23, 70:9, 150:9
**implication** [2] - 85:3, 92:16
**implication's** [1] - 292:7
**implications** [1] - 257:12
**implicit** [6] - 124:16, 124:23, 125:1, 125:5, 227:23, 239:15
**implore** [1] - 174:19
**important** [8] - 31:5, 35:23, 43:23, 47:10,

48:2, 239:7, 239:11, 283:15
**impose** [4] - 34:1, 34:6, 34:8, 34:10
**imposed** [1] - 39:11
**imposition** [1] - 30:13
**impression** [1] - 140:3
**impressions** [1] - 65:17
**improper** [7] - 26:15, 131:24, 202:9, 210:22, 230:22, 290:3, 290:5
**improving** [1] - 73:2
**imputing** [1] - 192:10
**IN** [1] - 1:1
**inadequate** [3] - 201:10, 201:12, 242:21
**inanimate** [1] - 191:6
**incarceration** [4] - 41:18, 239:4, 241:9, 257:16
**Incident** [1] - 49:21
**incident** [13] - 53:23, 112:21, 116:24, 120:16, 121:4, 122:3, 122:14, 123:4, 124:3, 126:8, 161:17, 164:21, 186:16
**incidentally** [6] - 132:16, 158:12, 175:5, 182:1, 221:5, 286:10
**incidents** [2] - 15:7, 119:21
**include** [6] - 25:17, 32:1, 43:17, 90:17, 134:8, 251:7
**included** [10] - 12:18, 21:15, 27:22, 65:22, 76:21, 78:11, 83:19, 93:4, 133:16, 227:11
**includes** [10] - 29:22, 31:4, 31:6, 58:7, 131:18, 142:11, 199:22, 284:2, 286:22, 293:24
**including** [10] - 19:21, 23:11, 64:5, 68:8, 69:22, 139:19, 145:9, 145:11, 146:21, 223:10
**incommunicado** [1] - 241:9
**incompetence** [2] - 201:10, 257:15

**incompetently** [1] - 136:9
**incomplete** [4] - 57:7, 116:7, 201:8, 251:20
**inconsistencies** [1] - 118:8
**inconsistent** [2] - 108:5, 252:11
**incorrect** [4] - 42:23, 43:1, 254:3, 257:23
**incorrectly** [1] - 257:3
**independent** [5] - 245:4, 248:6, 248:14, 248:19, 251:18
**index** [1] - 266:15
**indicate** [5] - 34:13, 51:24, 103:7, 130:3, 242:14
**indicated** [18] - 51:13, 54:24, 55:6, 73:24, 74:17, 80:3, 91:6, 121:20, 126:21, 127:22, 128:11, 157:17, 198:1, 199:6, 200:15, 208:2, 224:5, 264:22
**indicates** [17] - 20:24, 45:12, 51:19, 53:15, 58:24, 63:20, 64:3, 78:1, 79:3, 85:2, 153:5, 153:18, 154:15, 163:7, 212:8, 270:1, 273:3
**indicating** [2] - 52:11, 118:13
**indicating)** [1] - 300:3
**indication** [5] - 56:21, 66:21, 77:12, 289:4, 298:9
**indications** [1] - 55:23, 283:24
**indicted** [3] - 89:1, 102:10, 117:14
**individual** [9] - 31:21, 37:1, 64:5, 127:24, 190:19, 199:9, 230:15, 245:5, 257:17
**individually** [1] - 229:23
**inference** [1] - 273:6
**inflicted** [1] - 155:8
**infliction** [4] - 297:21, 297:23, 298:4, 298:5
**influence** [2] - 285:3
**influences** [1] - 73:7

**inform** [1] - 199:15
**informal** [1] - 178:23
**informality** [1] - 246:21
**informally** [1] - 179:11
**informant** [14] - 60:13, 61:15, 78:14, 78:17, 78:21, 81:1, 93:1, 102:21, 116:11, 116:12, 122:7, 149:4, 214:9, 302:11
**Information** [2] - 116:21, 177:8
**information** [73] - 48:3, 48:8, 49:11, 54:9, 56:1, 59:4, 59:10, 60:14, 61:16, 62:12, 63:16, 67:23, 68:1, 73:16, 76:18, 77:5, 77:16, 77:22, 78:5, 78:10, 79:9, 80:1, 81:22, 82:6, 83:19, 84:3, 84:18, 85:22, 90:13, 92:15, 93:4, 96:9, 97:9, 99:4, 100:20, 102:14, 103:13, 103:16, 103:24, 104:5, 104:10, 104:18, 120:22, 122:16, 122:22, 122:24, 123:4, 125:4, 131:8, 131:19, 133:16, 143:22, 154:13, 154:14, 154:17, 172:18, 186:15, 190:9, 191:17, 191:19, 199:21, 200:13, 206:11, 232:18, 232:19, 235:14, 258:17, 258:21, 259:3, 259:15, 288:16, 289:6, 290:20
**informed** [2] - 218:5, 232:15
**initial** [2] - 50:14, 51:20
**initialed** [1] - 156:10
**injury** [1] - 220:20
**innocence** [2] - 42:4, 91:12
**innocent** [4] - 41:8, 42:3, 172:19, 237:24
**inquire** [1] - 66:1
**inquiry** [1] - 290:10
**inserted** [1] - 173:2
**inside** [2] - 136:12, 136:22

**insist** [1] - 127:15
**insisted** [2] - 39:24, 146:22
**insisting** [1] - 147:2
**instance** [1] - 290:21
**instances** [1] - 128:12
**instead** [3] - 160:11, 160:19, 232:24
**Institute** [1] - 22:7
**instructions** [2] - 40:2, 156:12
**instructor** [1] - 203:19
**intend** [5] - 38:15, 152:2, 175:6, 260:16, 298:1
**intended** [2] - 139:18, 277:9
**intensive** [1] - 18:24
**intent** [2] - 44:17, 56:8
**intention** [2] - 11:16, 21:6
**intentionally** [2] - 211:20, 289:5
**interesting** [4] - 58:5, 60:2, 87:13, 132:16
**internal** [2] - 245:20, 291:9
**International** [2] - 281:3, 299:11
**interpretation** [3] - 284:12, 285:13, 293:11
**interpretations** [1] - 285:19
**interrogated** [3] - 101:24, 150:2, 222:20
**interrogating** [2] - 223:10, 227:11
**interrogation** [22] - 37:1, 45:23, 46:20, 89:20, 90:12, 91:1, 155:24, 171:13, 187:19, 187:24, 188:9, 196:6, 197:9, 198:22, 224:13, 224:18, 235:7, 235:20, 241:8, 241:14, 242:23, 297:1
**interrogation's** [1] - 181:21
**interrogations** [14] - 171:9, 181:24, 182:2, 187:10, 187:15, 188:2, 188:19, 195:2, 195:10, 198:18, 235:22, 240:14,

244:17, 278:1
**interrogators** [5] - 221:13, 222:6, 222:10, 223:19, 225:1
**interrupt** [4] - 226:5, 226:22, 272:6, 282:15
**Interrupting** [73] - 20:17, 28:24, 33:13, 41:22, 45:2, 51:23, 58:16, 62:5, 67:15, 82:1, 83:5, 87:2, 92:5, 98:22, 106:22, 115:11, 119:4, 125:4, 127:3, 135:10, 143:2, 144:17, 147:22, 149:14, 151:8, 169:20, 169:21, 173:4, 173:15, 173:21, 174:2, 176:15, 184:11, 184:17, 185:9, 186:24, 191:9, 196:10, 206:1, 215:8, 216:9, 221:20, 225:7, 225:9, 226:14, 228:2, 233:16, 243:5, 246:1, 253:6, 253:9, 254:14, 255:6, 256:10, 262:2, 265:12, 270:24, 271:8, 272:3, 275:18, 278:21, 279:17, 280:22, 282:12, 283:12, 284:16, 293:20, 298:1, 299:17, 301:5, 303:11, 308:16
**interrupting** [1] - 225:23
**interruption** [2] - 303:19, 305:14
**interruptions** [1] - 225:15
**intervened** [1] - 124:12
**interview** [9] - 35:11, 35:16, 36:24, 50:15, 51:20, 53:14, 54:22, 68:7, 94:21
**interviewed** [8] - 52:4, 52:12, 52:23, 54:9, 54:10, 68:11, 100:6, 125:7
**interviews** [3] - 55:11, 90:7, 195:2
**introductory** [1] - 44:15
**investigate** [3] - 14:11, 20:3, 64:9
**investigated** [1] - 114:16

**investigating** [4] - 48:3, 107:2, 209:22, 233:5
**Investigation** [3] - 19:24, 40:9, 299:20
**investigation** [52] - 5:14, 8:22, 21:19, 31:7, 34:20, 37:8, 37:16, 40:17, 43:23, 45:21, 57:24, 60:16, 62:2, 63:1, 73:8, 74:9, 77:14, 79:24, 89:10, 90:15, 90:18, 120:16, 129:10, 143:20, 157:3, 166:3, 166:8, 167:1, 178:21, 186:6, 196:13, 202:21, 202:24, 203:3, 203:6, 208:5, 233:13, 237:6, 238:8, 239:9, 244:6, 260:11, 260:22, 279:6, 285:8, 291:5, 291:6, 293:24, 303:14, 308:1, 308:5, 308:12
**investigations** [14] - 32:17, 32:18, 33:9, 33:11, 34:10, 34:16, 35:1, 35:7, 59:23, 181:3, 186:7, 278:6, 281:6, 286:3
**Investigations** [4] - 72:12, 280:23, 299:24, 300:9
**investigative** [26] - 15:8, 15:23, 36:17, 41:16, 48:4, 48:15, 73:6, 89:24, 93:5, 103:19, 105:1, 137:17, 162:10, 166:14, 191:14, 192:4, 197:6, 208:7, 219:3, 230:2, 280:24, 290:5, 290:8, 290:9, 290:17, 291:11
**Investigative** [1] - 177:3
**investigator** [9] - 22:16, 22:21, 22:23, 35:3, 35:18, 101:5, 125:21, 238:17, 271:18
**investigators** [1] - 261:7
**investigatory** [1] - 78:2
**involve** [2] - 7:3, 186:4
**involved** [21] - 7:9, 24:14, 25:4, 27:4,

59:23, 63:1, 66:22, 69:21, 71:3, 77:14, 90:14, 157:2, 198:22, 199:10, 200:14, 229:17, 257:21, 258:1, 260:21, 281:7, 281:9
**involvement** [2] - 118:3, 154:18
**involving** [3] - 6:22, 39:15, 287:24
**iron** [1] - 114:21
**irregularities** [1] - 305:17
**irrelevant** [2] - 145:24, 245:13
**Irvine** [1] - 204:2
**isolating** [1] - 101:13
**ISP** [11] - 186:20, 186:22, 234:10, 257:3, 259:21, 260:2, 262:15, 263:7, 263:8, 263:12, 264:23
**ISP's** [1] - 263:17
**issuance** [1] - 28:15
**issue** [3] - 115:16, 131:14, 281:20
**issued** [7] - 96:17, 97:7, 97:15, 98:7, 99:20, 100:11, 100:23
**issues** [1] - 188:15
**item** [1] - 251:5
**Item** [4] - 27:18, 28:11, 72:11, 250:4
**items** [9] - 138:21, 141:2, 141:6, 145:8, 145:11, 145:13, 146:5, 276:18, 290:7
**itself** [19] - 8:6, 41:15, 51:15, 53:20, 75:21, 86:21, 91:22, 93:11, 126:8, 129:12, 132:8, 140:20, 182:23, 190:2, 191:4, 233:9, 284:3, 285:7, 292:8

## J

**Jack** [14] - 2:22, 28:6, 74:16, 75:6, 84:18, 85:11, 262:21, 268:15, 269:5, 270:21, 271:4, 271:5, 271:24
**jacket** [1] - 133:10
**jail** [11] - 16:5, 16:8, 25:19, 126:3, 150:23, 157:8, 157:18, 157:23, 220:5, 220:12

**Jail** [1] - 12:14
**James** [1] - 2:10
**January** [5] - 5:19, 5:22, 13:9, 14:19, 252:23
**jeans** [1] - 133:11
**Jeff** [3] - 1:13, 2:14, 136:4
**Jim** [2] - 1:12, 2:14
**job** [5] - 209:22, 210:5, 210:8, 211:5
**joel** [1] - 221:22
**JOEL** [1] - 2:8
**Joel** [6] - 161:1, 209:5, 226:16, 226:21, 303:21, 309:4
**John** [2] - 1:13, 2:14
**joins** [1] - 33:20
**joke** [1] - 55:3
**Jon** [1] - 7:11
**judge** [23] - 37:16, 39:22, 43:9, 86:23, 87:8, 87:9, 93:9, 96:17, 97:8, 101:16, 115:16, 131:14, 148:1, 148:24, 164:1, 185:4, 237:3, 252:24, 257:11, 257:13, 257:21, 271:14, 283:5
**Judge** [22] - 39:22, 41:12, 91:11, 98:8, 99:19, 99:20, 100:12, 129:14, 131:10, 131:12, 161:22, 167:18, 237:23, 251:15, 251:24, 252:2, 252:8, 253:22, 254:9, 255:19, 293:10, 306:4
**judge's** [3] - 248:15, 248:17, 251:2
**judgment** [8] - 281:24, 282:3, 285:13, 286:14, 287:14, 291:12, 292:3, 296:10
**judgments** [1] - 300:5
**Judicial** [1] - 93:9
**judicial** [3] - 101:4, 237:15, 238:2
**jumps** [1] - 152:20
**June** [72] - 58:15, 59:1, 59:13, 59:15, 59:18, 60:1, 62:12, 63:2, 73:20, 75:8, 77:5, 77:11, 77:16, 77:22, 78:3, 78:20, 79:5, 79:6, 80:2, 81:8, 81:22, 82:8, 84:4,

91:4, 91:24, 92:18, 93:14, 93:15, 93:23, 94:2, 95:3, 97:8, 97:20, 97:23, 98:7, 99:13, 99:14, 99:24, 100:1, 100:4, 100:7, 100:10, 100:14, 102:12, 103:15, 104:2, 104:19, 105:21, 106:4, 108:20, 109:12, 115:21, 117:13, 117:19, 117:20, 117:21, 118:16, 134:22, 136:5, 137:9, 141:3, 158:22, 159:2, 163:18, 163:19, 165:11, 166:16, 266:9, 290:2
**jurisdictional** [1] - 19:20
**jurisdictions** [1] - 6:9
**jury** [20] - 88:24, 89:5, 89:7, 102:11, 102:15, 103:10, 109:10, 117:14, 117:20, 126:4, 143:12, 148:7, 148:12, 154:20, 218:15, 219:11, 220:10, 257:22, 258:4, 285:14
**jury's** [1] - 284:9
**justice** [5] - 31:17, 33:16, 34:2, 34:5, 300:2
**Justice** [6] - 12:8, 29:11, 29:14, 29:18, 30:21, 31:15
**justify** [1] - 132:7
**juvenile** [3] - 21:12, 21:16, 120:2
**Juvenile** [1] - 21:1

## K

**Kansas** [1] - 25:9
**KEEN** [23] - 2:2, 105:22, 121:5, 149:17, 160:8, 161:1, 173:19, 173:24, 221:22, 225:13, 225:16, 225:22, 226:16, 226:21, 272:8, 283:5, 298:21, 299:1, 305:3, 305:6, 306:19, 307:4, 309:22
**keep** [7] - 56:10, 58:10, 88:5, 174:5,

189:17, 228:8, 285:5
**keeping** [4] - 46:11, 205:1, 224:13, 229:3
**Kennedy** [8] - 98:8, 99:19, 99:20, 100:12, 129:14, 131:10, 161:22, 306:4
**Kennedy's** [1] - 131:12
**kept** [3] - 88:16, 122:16, 207:19
**Kevin** [1] - 67:22
**key** [14] - 23:23, 47:9, 48:15, 61:5, 75:19, 107:4, 107:7, 142:21, 163:6, 287:24, 290:19, 290:20
**kidnappings** [1] - 20:8
**kids** [3] - 150:24, 157:19, 224:7
**killed** [4] - 41:24, 65:12, 167:5, 256:21
**killing** [1] - 110:17
**kilos** [1] - 20:10
**kind** [10] - 40:21, 66:10, 66:13, 120:9, 205:9, 209:18, 214:12, 214:19, 230:20, 291:4
**King** [17] - 70:21, 70:23, 80:12, 80:15, 83:15, 112:9, 112:13, 112:22, 113:24, 114:13, 131:20, 132:3, 132:12, 133:6, 154:6, 155:22, 164:11
**Knock** [1] - 225:24
**knowing** [4] - 81:18, 116:14, 166:20, 219:11
**knowledge** [5] - 106:12, 123:7, 238:18, 278:11, 278:14
**known** [6] - 60:13, 61:15, 108:20, 109:11, 171:12, 187:18
**knows** [3] - 61:21, 92:24, 126:2
**Koski** [1] - 99:16

## L

**L.A** [5] - 13:1, 17:13, 18:9, 20:12, 20:14
**lab** [40] - 28:5, 28:7, 36:7, 36:9, 42:17,

42:22, 43:5, 46:12, 47:24, 48:18, 49:4, 61:7, 61:8, 74:15, 74:16, 87:7, 147:3, 176:14, 186:22, 194:17, 210:12, 234:7, 234:10, 238:16, 260:22, 261:2, 261:3, 261:5, 261:12, 263:8, 263:20, 263:23, 264:4, 264:5, 264:10, 264:12, 264:16, 272:11, 290:8
**Lab** [2] - 145:14, 270:21
**laboratories** [2] - 264:23, 276:5
**laboratory** [2] - 36:2, 211:6
**labs** [1] - 264:14
**laced** [3] - 170:5, 184:8, 184:11
**lack** [3] - 165:5, 214:23, 261:15
**lacking** [1] - 162:5
**lacks** [2] - 254:20, 254:22
**land** [1] - 48:15
**LAPD** [2] - 19:23, 19:24
**large** [3] - 18:20, 20:10, 80:2
**larger** [2] - 264:13, 291:10
**largest** [1] - 18:19
**Larson** [1] - 39:22
**last** [22] - 8:11, 8:15, 19:8, 24:1, 24:3, 29:6, 34:14, 43:16, 69:8, 76:23, 113:2, 114:5, 115:3, 154:9, 172:8, 204:1, 204:20, 207:17, 227:9, 253:11, 261:9
**late** - 272:20
**laughed** [1] - 38:15
**law** [38] - 5:10, 5:14, 5:23, 12:11, 15:1, 18:10, 21:18, 26:1, 29:24, 30:16, 31:7, 34:2, 34:7, 39:16, 39:19, 128:2, 132:1, 139:15, 186:2, 199:13, 203:11, 204:2, 204:3, 204:6, 204:18, 205:2, 205:18, 206:18, 206:20, 207:15, 207:23, 257:20,

258:1, 279:4, 280:4, 280:13, 281:9
**Law** [4] - 2:6, 23:7, 23:12, 161:11
**lawful** [1] - 147:1
**lawyer** [4] - 31:8, 124:7, 127:12, 277:18
**lawyers** [2] - 143:12, 145:20
**lax** [1] - 91:14
**lays** [1] - 83:12
**lead** [21] - 5:13, 5:16, 15:2, 22:16, 22:21, 22:22, 35:3, 37:12, 48:10, 56:15, 57:10, 57:14, 64:9, 66:3, 105:1, 172:17, 188:1, 232:11, 263:7, 263:18, 290:18
**lead/case** [1] - 232:17
**leading** [1] - 125:20
**leads** [12] - 36:17, 44:24, 45:11, 46:18, 72:20, 73:6, 105:2, 178:5, 178:16, 237:13, 290:8, 290:9
**Leads** [1] - 177:4
**leapfrog** [1] - 132:19
**learn** [1] - 290:15
**learned** [3] - 15:17, 82:9, 218:2
**learning** [1] - 205:14
**least** [8] - 65:18, 66:9, 142:21, 163:8, 197:5, 224:14, 277:2, 291:1
**leave** [4] - 45:4, 121:17, 153:20, 157:4, 172:20, 228:10
**leaves** [2] - 126:1, 158:17
**lecture** [1] - 203:24
**lectured** [1] - 203:22, 204:2, 204:3
**lectures** [1] - 203:14
**led** [5] - 9:15, 9:23, 195:23, 290:24, 298:5
**left** [6] - 33:7, 65:16, 126:22, 160:1, 283:17, 298:21
**legal** [30] - 26:11, 127:9, 127:20, 162:4, 180:3, 180:21, 181:19, 182:10, 183:20, 188:18, 189:12, 190:4, 190:22, 191:10, 192:14, 193:4, 193:12, 193:23,

194:7, 195:4, 198:10, 199:18, 200:11, 202:7, 202:9, 229:11, 240:6, 277:12, 295:8, 295:13

**legislature** [2] - 14:24, 18:22

**legitimately** [1] - 142:16

**lend** [1] - 305:17

**lends** [6] - 219:12, 219:20, 219:23, 221:6, 233:9, 292:8

**length** [5] - 8:7, 68:6, 229:3, 254:5

**lengthy** [7] - 187:24, 198:18, 235:22, 240:14, 241:8, 241:14, 244:16

**lens** [1] - 237:5

**less** [5] - 20:11, 85:15, 210:8, 225:4, 240:3

**lesser** [1] - 155:15

**Lester** [2] - 28:9, 163:20

**letters** [3] - 220:11, 220:16, 221:5

**level** [11] - 12:5, 12:7, 35:1, 36:13, 37:14, 207:18, 254:20, 300:2, 300:3

**levels** [1] - 31:24

**Liane** [5] - 121:6, 121:8, 287:3, 287:7, 307:10

**lie** [2] - 186:9, 239:17

**lieutenant** [5] - 16:7, 16:19, 16:20, 17:1, 17:9

**light** [7] - 103:24, 131:21, 133:9, 133:17, 133:24, 239:3, 245:19

**light-skinned** [4] - 131:21, 133:9, 133:17, 133:24

**likelihood** [1] - 284:3

**likely** [12] - 36:16, 73:15, 74:18, 84:21, 167:22, 186:15, 218:2, 218:11, 218:13, 218:18, 218:22

**limine** [2] - 39:8, 39:10

**linchpin** [3] - 122:7, 125:22

**Lindsay** [23] - 5:21, 17:24, 26:5, 26:8,

82:3, 98:4, 98:23, 160:9, 168:8, 173:15, 202:8, 208:20, 210:16, 216:9, 222:23, 225:11, 227:1, 230:22, 279:11, 293:7, 295:5, 300:19, 306:19

**LINDSAY** [1] - 2:2

**lindsay** [1] - 173:16

**LINE** [1] - 310:13

**Line** [3] - 8:19, 241:4, 268:22

**line** [11] - 26:9, 35:4, 110:24, 115:7, 160:23, 171:6, 195:19, 195:24, 240:22, 274:9

**linear** [1] - 293:23

**list** [15] - 6:15, 24:2, 24:18, 27:18, 28:1, 28:2, 28:12, 28:13, 28:17, 108:2, 142:10, 197:15, 197:16, 226:11, 250:18

**listed** [19] - 24:5, 24:13, 24:17, 25:15, 44:1, 44:5, 44:14, 68:8, 129:24, 130:17, 134:23, 196:14, 221:15, 230:3, 232:8, 234:16, 249:23, 249:24

**listing** [4] - 8:10, 250:1, 250:4, 250:10

**lists** [6] - 76:3, 76:4, 132:18, 145:9, 145:10, 305:17

**literature** [3] - 179:5, 181:10, 205:13

**live** [1] - 140:15

**lived** [4] - 64:18, 82:22, 83:24, 105:9

**LLP** [3] - 2:9, 2:13, 2:17

**local** [3] - 26:1, 210:21, 282:9

**locate** [3] - 66:2, 66:12, 152:21

**located** [3] - 4:20, 133:6, 264:6

**location** [3] - 127:21, 139:2, 165:4

**locker** [1] - 275:9

**Loevy** [10] - 2:3, 5:23, 6:4, 6:13, 6:18

**logic** [1] - 258:11

**Logli** [1] - 99:16

**long-range** [1] - 87:16

**look** [40] - 10:19, 81:4, 81:13, 86:5, 86:8, 90:21, 110:1, 113:6, 115:3, 132:11, 171:23, 209:19, 221:19, 223:7, 229:19, 230:20, 231:6, 234:2, 240:21, 246:22, 250:24, 255:2, 255:4, 258:14, 259:24, 262:13, 262:14, 262:19, 263:4, 264:8, 265:16, 268:21, 270:13, 271:15, 273:17, 296:13, 303:3, 308:11, 308:13

**looked** [11] - 74:6, 74:12, 86:18, 89:18, 110:19, 136:7, 238:7, 270:3, 271:2, 271:21, 304:16

**looking** [20] - 8:19, 16:22, 48:9, 53:14, 54:16, 54:23, 65:18, 73:9, 74:2, 112:8, 120:19, 168:24, 195:13, 207:5, 207:10, 251:5, 261:16, 266:20, 267:15, 296:23

**looks** [12] - 12:16, 14:4, 15:11, 16:4, 18:13, 19:7, 48:6, 50:22, 254:24, 266:10, 266:11, 300:17

**Los** [5] - 12:14, 12:21, 18:18, 90:6, 286:15

**lose** [1] - 107:21

**lost** [1] - 41:19

**Louisville** [1] - 22:7

**Loves** [2] - 68:2, 68:13

**lucid** [1] - 271:17

**lunch** [5] - 111:12, 159:17, 160:11, 160:12, 162:15

**lying** [1] - 269:5

**Lynde** [1] - 68:3

# M

**machine** [1] - 225:21

**machinery** [1] - 15:21

**Magazine** [1] - 206:14

**magazine** [2] -

138:8, 145:10

**mail** [2] - 139:12, 185:23

**major** [3] - 16:18, 232:15, 292:6

**male** [9] - 50:19, 51:21, 53:3, 113:9, 113:19, 131:21, 133:9, 133:17, 133:24

**man** [3] - 64:24, 82:9, 126:3

**manage** [1] - 62:21

**manipulated** [2] - 150:8, 150:13

**manipulating** [1] - 59:22

**manipulation** [2] - 43:20, 150:16

**manner** [3] - 32:18, 33:10, 159:7

**mannerisms** [1] - 57:2

**manners** [1] - 224:2

**manual** [4] - 31:15, 72:18, 244:11, 308:11

**manuals** [6] - 33:18, 33:23, 260:7, 261:21, 262:4, 275:16

**mark** [1] - 7:24, 50:4

**Mark** [2] - 1:14, 2:15

**marked** [14] - 52:17, 54:3, 63:10, 67:20, 75:14, 93:19, 99:7, 112:17, 120:8, 120:10, 135:4, 144:2, 156:17, 168:22

**marks** [1] - 247:9

**Marvin** [46] - 10:12, 10:13, 62:11, 77:6, 77:15, 77:20, 78:2, 79:4, 80:1, 81:7, 84:4, 84:12, 88:22, 89:8, 93:22, 94:22, 95:1, 96:9, 100:15, 100:19, 100:20, 100:21, 101:2, 101:13, 101:14, 101:15, 104:18, 106:16, 108:14, 110:8, 115:9, 115:20, 116:6, 118:13, 118:15, 121:3, 121:14, 121:20, 122:2, 122:15, 158:24, 159:8, 159:13, 159:14, 163:18, 307:11

**mask** [7] - 50:20, 51:22, 53:8, 113:5, 113:14, 114:10, 133:9

**masses** [1] - 268:11

**master** [2] - 86:20, 88:5

**master's** [3] - 12:6, 300:2, 300:3

**match** [10] - 74:3, 74:7, 110:3, 247:8, 247:9, 255:18, 265:5, 265:14, 270:15

**matched** [1] - 66:10

**material** [7] - 99:2, 99:10, 169:3, 237:2, 250:10, 253:12, 286:21

**matter** [5] - 5:18, 8:2, 113:12, 124:12, 125:7

**MATTHEW** [1] - 2:5

**maximum** [1] - 217:4

**McAnally** [3] - 50:14, 52:5, 55:12

**McAnally's** [3] - 50:7, 50:11, 50:18

**McGraw** [7] - 41:12, 167:18, 251:15, 251:24, 252:2, 252:8, 255:19

**McGraw's** [5] - 41:12, 911:1, 237:23, 253:22, 254:9

**McLain** [3] - 256:7, 256:8, 256:11

**mean** [38] - 38:11, 38:12, 38:14, 43:3, 47:4, 55:21, 60:11, 60:12, 72:21, 72:22, 73:22, 75:1, 87:19, 92:16, 97:17, 107:7, 107:13, 109:3, 137:24, 142:11, 142:22, 144:1, 160:15, 171:20, 176:11, 183:16, 190:17, 210:16, 219:13, 243:1, 258:19, 281:14, 282:12, 283:11, 290:17, 298:3, 300:24

**meander** [1] - 173:12

**means** [6] - 72:23, 139:12, 185:23, 258:16, 274:12, 308:5

**meant** [8] - 102:3, 121:6, 121:7, 188:22, 191:16, 239:3, 302:8, 304:19

**medal** [1] - 309:10

**meet** [2] - 208:22, 303:13

**member** [1] - 230:2

**members** [3] - 77:13,

78:1, 166:15
**memorandum** [2] - 287:23, 288:3
**memory** [5] - 107:21, 171:22, 175:22, 230:21, 256:15
**mental** [2] - 43:19, 64:1
**mentally** [2] - 224:4, 224:17
**mention** [5] - 26:8, 229:13, 231:22, 234:2, 280:19
**mentioned** [5] - 234:3, 234:5, 235:5, 235:19, 280:14
**message** [1] - 268:2
**met** [5] - 4:16, 161:21, 287:3, 287:6
**metaphor** [1] - 47:6
**metaphorically** [1] - 152:3
**method** [2] - 19:2, 276:21
**methodology** [3] - 285:24, 286:23, 299:13
**methods** [5] - 29:7, 34:9, 150:18, 253:14, 253:18
**michael** [1] - 98:1
**MICHAEL** [1] - 2:12
**Michael** [10] - 4:11, 26:10, 71:18, 105:22, 121:6, 144:17, 160:1, 160:22, 168:11, 303:21
**microscope** [2] - 247:18, 253:19
**microscopic** [1] - 247:5
**middle** [1] - 45:18
**might** [9] - 105:23, 143:23, 160:6, 166:17, 168:8, 207:4, 256:15, 267:7, 273:19
**Mike** [1] - 113:3
**million** [1] - 15:19
**mind** [19] - 53:24, 56:10, 58:10, 71:9, 153:8, 170:18, 170:20, 171:1, 173:1, 175:8, 188:10, 212:12, 214:17, 222:3, 229:18, 231:13, 272:20, 302:24, 304:7
**mine** [1] - 181:16
**minimize** [1] - 172:3
**minute** [15] - 33:3,

71:9, 74:7, 87:21, 95:24, 98:23, 165:17, 171:16, 230:19, 235:3, 236:7, 266:2, 266:13, 267:12, 305:24
**minutes** [20] - 33:1, 53:19, 71:13, 71:14, 111:15, 159:16, 160:6, 160:18, 160:21, 160:24, 208:22, 208:23, 231:5, 236:10, 236:11, 283:16, 298:15, 298:17, 298:21, 299:4
**Miranda** [8] - 36:19, 36:23, 152:11, 152:17, 153:19, 156:21, 158:10, 188:8
**Mirandized** [1] - 158:11
**mischaracterizes** [72] - 10:2, 31:2, 34:23, 56:5, 63:4, 70:12, 80:6, 81:11, 83:10, 86:3, 89:16, 91:9, 92:20, 100:24, 101:20, 104:21, 110:13, 115:12, 117:5, 118:6, 133:20, 134:7, 136:19, 141:20, 142:15, 146:6, 149:22, 150:12, 151:23, 156:6, 158:8, 159:11, 162:7, 163:4, 163:22, 165:14, 166:19, 167:17, 175:21, 177:22, 189:11, 190:21, 192:13, 195:4, 198:10, 200:12, 201:3, 206:2, 210:1, 210:14, 215:19, 217:20, 218:9, 224:8, 227:3, 230:8, 230:18, 242:11, 245:8, 256:5, 257:6, 260:10, 260:19, 261:23, 269:9, 279:10, 282:6, 286:18, 288:6, 291:24, 293:6, 295:7
**mischaracterizing** [5] - 210:20, 269:19, 275:6, 279:12, 280:8
**misconduct** [1] - 6:22
**mishandled** [2] - 140:2, 146:10

**mishandling** [3] - 142:21, 276:3, 276:8
**mislabeled** [1] - 28:3
**misleading** [1] - 18:2
**misrepresent** [4] - 134:4, 239:8, 239:12, 240:3
**misrepresentation** [2] - 240:23, 242:7
**misrepresenting** [1] - 239:20
**Miss** [29] - 50:19, 51:18, 51:24, 52:3, 52:12, 52:23, 53:1, 53:24, 54:24, 55:11, 57:1, 70:16, 76:7, 91:3, 91:18, 100:5, 128:23, 134:21, 140:11, 152:11, 152:16, 153:18, 154:24, 155:20, 156:22, 157:3, 157:15, 158:22, 228:20
**missed** [4] - 87:14, 144:18, 249:20, 304:3
**missing** [1] - 27:24
**Missouri** [1] - 25:9
**misstate** [1] - 131:24
**misstates** [1] - 228:22
**missteps** [1] - 237:10
**mistake** [1] - 138:2
**mistakes** [1] - 47:9
**MOGBANA** [86] - 2:5, 26:7, 28:18, 33:3, 71:17, 98:12, 111:22, 160:18, 160:22, 168:10, 168:16, 168:20, 170:9, 170:19, 172:6, 173:9, 173:15, 173:21, 174:4, 174:10, 174:16, 174:21, 174:22, 175:23, 176:5, 176:8, 177:24, 178:13, 178:24, 179:6, 179:13, 179:20, 180:9, 180:16, 180:22, 181:5, 182:4, 182:18, 183:2, 183:13, 183:23, 184:10, 184:19, 185:8, 188:24, 189:5, 189:14, 189:20, 190:7, 190:24, 191:15, 192:16, 193:6, 193:14, 194:2,

194:9, 194:14, 195:6, 196:7, 196:17, 196:23, 197:12, 198:13, 199:11, 199:23, 200:17, 201:5, 201:13, 201:22, 202:8, 202:13, 203:16, 204:10, 204:17, 204:24, 205:6, 205:22, 206:5, 207:2, 207:7, 207:9, 208:8, 208:17, 230:22, 235:4, 236:14
**Mogbana** [3] - 3:3, 168:17, 209:13
**moment** [6] - 136:14, 152:18, 172:2, 214:19, 228:17, 272:21
**money** [7] - 50:24, 51:3, 51:5, 105:16, 106:10, 108:13, 109:1
**month** [2] - 15:20, 128:6
**months** [15] - 21:15, 46:11, 48:11, 48:17, 49:4, 58:15, 58:18, 61:14, 69:12, 69:16, 73:17, 74:14, 86:11, 103:24, 108:18
**morning** [4] - 4:7, 4:15, 4:20, 5:6
**most** [8] - 31:5, 47:10, 73:15, 169:9, 211:1, 263:20, 278:9, 300:1
**mostly** [2] - 21:8, 46:24
**motel** [1] - 68:13
**motion** [1] - 41:17
**motions** [2] - 39:8, 39:10
**motivated** [1] - 105:12
**motivation** [1] - 55:17
**motive** [1] - 220:20
**motives** [1] - 55:20
**move** [13] - 60:3, 98:14, 225:8, 246:8, 251:14, 293:16, 294:7, 294:24, 296:6, 296:11, 297:11, 298:8
**moved** [3] - 14:5, 15:15, 298:10
**moves** [1] - 59:6
**moving** [7] - 12:17, 14:4, 14:9, 18:13, 134:11, 147:7, 228:8

**MR** [480] - 4:6, 4:10, 4:19, 4:23, 5:4, 5:8, 6:21, 6:23, 8:18, 9:13, 9:21, 10:7, 10:24, 11:14, 12:2, 13:5, 16:3, 17:11, 17:18, 17:23, 18:3, 18:7, 19:13, 20:21, 21:24, 22:5, 22:14, 22:20, 23:24, 24:12, 24:20, 25:23, 26:3, 26:7, 26:19, 27:9, 27:15, 28:18, 28:22, 29:2, 29:3, 31:11, 32:5, 33:2, 33:3, 33:6, 34:4, 35:9, 36:1, 36:10, 37:6, 39:2, 39:4, 41:6, 43:2, 43:13, 44:10, 48:19, 52:10, 54:18, 54:21, 55:24, 56:24, 57:22, 58:13, 58:22, 59:9, 59:16, 60:10, 61:13, 62:4, 62:9, 63:6, 64:2, 64:13, 65:21, 66:4, 66:14, 67:5, 67:11, 68:18, 69:10, 69:17, 70:14, 71:8, 71:12, 71:17, 71:18, 71:20, 71:21, 75:12, 77:19, 78:9, 79:11, 80:8, 81:20, 82:2, 82:5, 83:6, 83:18, 84:10, 85:9, 86:14, 87:10, 88:19, 89:6, 90:2, 91:2, 91:17, 92:14, 93:6, 93:13, 94:6, 94:14, 96:15, 97:13, 98:4, 98:11, 98:12, 98:15, 98:22, 99:3, 99:6, 101:11, 102:2, 102:8, 103:6, 104:7, 104:15, 104:23, 106:1, 106:14, 106:24, 108:1, 109:8, 111:6, 111:13, 111:16, 111:19, 111:21, 111:22, 111:23, 112:3, 112:5, 112:6, 115:2, 115:19, 116:19, 117:6, 118:11, 119:15, 120:7, 121:7, 121:11, 122:11, 124:17, 125:2, 126:6, 127:2, 127:16, 128:10, 130:13, 133:22, 134:10, 137:1, 137:23, 142:8, 143:5, 143:10, 144:19, 144:21, 144:23,

146:1, 146:13, 146:18, 147:6, 147:19, 148:2, 148:19, 149:13, 150:6, 150:19, 151:9, 152:5, 153:16, 154:1, 154:23, 156:16, 157:14, 158:20, 159:18, 159:21, 160:3, 160:18, 160:22, 161:4, 161:8, 162:24, 163:12, 164:16, 165:1, 165:19, 166:4, 167:3, 167:13, 167:19, 168:2, 168:5, 168:7, 168:10, 168:13, 168:16, 168:20, 170:9, 170:19, 172:6, 173:9, 173:15, 173:21, 174:4, 174:10, 174:16, 174:21, 174:22, 175:23, 176:5, 176:8, 177:24, 178:13, 178:24, 179:6, 179:13, 179:20, 180:9, 180:16, 180:22, 181:5, 182:4, 182:18, 183:2, 183:13, 183:23, 184:10, 184:19, 185:8, 188:24, 189:5, 189:14, 189:20, 190:7, 190:24, 191:15, 192:16, 193:6, 193:14, 194:2, 194:9, 194:14, 195:6, 196:7, 196:17, 196:23, 197:12, 198:13, 199:11, 199:23, 200:17, 201:5, 201:13, 201:22, 202:8, 202:13, 203:16, 204:10, 204:17, 204:24, 205:6, 205:22, 206:5, 207:2, 207:7, 207:9, 208:8, 208:17, 208:19, 209:1, 209:3, 209:7, 209:11, 209:17, 210:6, 210:15, 211:2, 212:1, 212:9, 212:22, 213:5, 214:10, 214:18, 215:12, 215:24, 216:4, 216:9, 216:15, 217:6, 217:11, 217:22, 218:12, 219:4, 220:8, 221:9, 222:1, 222:18,

222:23, 223:6, 224:11, 225:6, 225:11, 225:14, 225:18, 226:1, 226:6, 226:8, 226:13, 226:18, 226:24, 227:6, 228:7, 228:9, 228:13, 228:14, 229:1, 229:14, 230:4, 230:12, 230:22, 231:7, 232:1, 232:9, 233:2, 233:11, 233:21, 234:8, 234:13, 235:4, 235:10, 235:17, 236:9, 236:12, 236:14, 236:16, 236:19, 236:23, 237:17, 239:18, 240:1, 240:8, 242:5, 242:15, 243:11, 245:2, 245:10, 246:1, 246:11, 246:3, 246:11, 246:14, 246:18, 246:20, 246:23, 246:24, 251:22, 252:1, 252:18, 252:20, 253:4, 254:7, 254:8, 256:6, 257:8, 257:18, 258:3, 258:13, 259:1, 259:18, 260:14, 261:1, 262:1, 264:20, 265:2, 267:10, 267:20, 269:11, 269:14, 270:8, 271:10, 271:22, 272:5, 272:9, 272:13, 272:19, 272:23, 273:18, 274:1, 274:5, 274:11, 274:13, 275:12, 275:22, 276:1, 276:9, 276:22, 277:7, 277:14, 277:17, 277:23, 278:18, 279:3, 279:11, 279:17, 279:22, 280:1, 280:5, 280:11, 280:15, 281:13, 282:7, 282:13, 282:22, 283:1, 283:7, 283:12, 283:21, 284:11, 284:21, 285:12, 286:19, 288:7, 288:22, 289:3, 289:12, 289:18, 289:23, 291:15, 292:2, 293:7, 293:13, 293:19, 295:4, 295:9, 295:17, 295:22,

298:15, 298:19, 299:6, 299:8, 300:16, 300:22, 301:4, 301:7, 301:10, 302:2, 302:21, 303:15, 303:17, 303:20, 303:22, 305:21, 306:8, 307:6, 307:7, 307:21, 307:22, 308:20, 308:24, 309:3, 309:7, 309:8, 309:12, 309:16
**MS** [397] - 6:19, 8:16, 9:10, 9:17, 10:1, 10:18, 11:10, 11:22, 13:4, 16:1, 17:6, 17:15, 17:21, 18:1, 19:12, 20:17, 21:22, 22:3, 22:9, 22:17, 23:15, 24:8, 24:16, 25:14, 26:2, 26:6, 28:14, 28:21, 31:2, 31:18, 32:20, 33:13, 34:22, 35:21, 36:6, 37:2, 38:23, 40:19, 42:19, 43:7, 44:7, 47:19, 52:8, 54:14, 54:20, 55:18, 56:4, 57:7, 58:3, 58:16, 59:2, 59:14, 59:20, 60:21, 61:19, 62:8, 63:3, 63:23, 64:10, 65:13, 65:23, 66:7, 66:24, 67:8, 68:15, 69:6, 69:14, 70:11, 75:9, 77:17, 78:6, 79:7, 80:5, 81:10, 82:1, 82:4, 83:5, 83:9, 84:9, 84:24, 86:2, 87:2, 88:3, 89:3, 89:16, 90:20, 91:8, 92:5, 92:19, 93:10, 94:3, 94:10, 96:10, 97:10, 98:1, 98:9, 98:17, 100:24, 101:19, 102:5, 102:24, 104:3, 104:12, 104:20, 105:22, 106:6, 106:22, 107:14, 108:21, 110:12, 111:3, 114:2, 115:11, 115:14, 116:7, 117:4, 118:5, 119:14, 119:22, 121:5, 122:5, 124:15, 124:24, 125:16, 126:24, 127:11, 128:4, 130:8, 133:19, 134:6, 136:18, 137:12, 141:19, 142:14,

143:2, 144:17, 144:20, 144:22, 145:22, 146:6, 146:15, 147:16, 147:22, 148:16, 149:12, 149:16, 149:17, 149:21, 150:11, 151:8, 151:22, 153:11, 153:21, 154:19, 156:5, 157:13, 158:7, 159:10, 159:24, 160:8, 161:1, 162:6, 163:3, 163:22, 164:14, 164:22, 165:13, 166:1, 166:18, 167:7, 167:16, 169:24, 170:13, 172:1, 173:6, 173:13, 173:19, 173:24, 174:2, 174:15, 174:18, 175:20, 176:3, 177:21, 178:11, 178:17, 179:3, 179:9, 179:17, 180:2, 180:15, 180:20, 181:18, 182:9, 183:1, 183:5, 183:19, 184:7, 184:17, 185:1, 188:17, 189:10, 189:16, 190:3, 190:20, 191:9, 192:12, 193:3, 193:11, 193:22, 194:6, 194:13, 195:3, 196:2, 196:10, 196:22, 197:1, 198:9, 199:8, 199:17, 200:10, 201:2, 201:8, 201:17, 202:6, 203:13, 204:9, 204:15, 204:22, 205:4, 205:20, 206:1, 206:21, 207:4, 208:6, 208:15, 208:24, 209:10, 209:24, 210:13, 211:23, 212:7, 212:18, 213:4, 214:4, 214:16, 215:8, 215:19, 216:3, 216:8, 217:1, 217:9, 217:19, 218:8, 219:2, 220:2, 221:3, 221:22, 222:17, 222:21, 224:8, 225:2, 225:9, 225:13, 225:16, 225:22, 226:4, 226:7, 226:16, 226:21, 227:2, 228:2, 228:12, 228:21, 229:11,

230:1, 230:7, 230:17, 231:2, 231:20, 232:5, 232:22, 233:6, 233:16, 234:1, 234:12, 235:1, 235:13, 236:7, 239:14, 239:21, 240:5, 242:1, 242:10, 243:5, 243:10, 244:18, 245:7, 245:12, 245:22, 246:7, 251:20, 252:17, 254:4, 256:4, 257:5, 257:24, 258:10, 258:23, 259:16, 260:9, 260:18, 261:22, 264:19, 264:24, 267:15, 269:8, 269:18, 271:8, 272:3, 272:9, 272:17, 273:7, 273:24, 274:8, 275:5, 275:18, 276:6, 276:19, 277:4, 277:11, 278:15, 278:23, 279:9, 279:15, 279:19, 279:24, 280:7, 281:11, 282:5, 282:12, 282:21, 282:24, 283:5, 283:11, 283:14, 284:16, 284:24, 286:17, 288:5, 288:18, 289:1, 289:8, 289:15, 289:21, 291:13, 291:23, 293:5, 293:9, 295:3, 295:6, 295:15, 298:21, 299:1, 300:20, 300:24, 301:9, 301:12, 301:16, 302:4, 302:23, 303:23, 304:2, 304:7, 304:12, 305:3, 305:5, 305:6, 305:8, 305:12, 305:15, 305:24, 306:2, 306:10, 306:12, 306:17, 306:19, 306:21, 307:4, 307:8, 307:9, 307:18, 308:16, 309:2, 309:11, 309:19, 309:22
**multi** [1] - 19:20
**multi-jurisdictional** [1] - 19:20
**multiple** [3] - 113:23, 114:3, 114:4
**Murder** [3] - 50:1,

134:16, 177:12
**murder** [99] - 9:19, 10:22, 11:24, 41:15, 41:18, 42:4, 42:7, 42:13, 46:19, 47:7, 47:12, 53:19, 55:14, 58:5, 58:12, 59:13, 61:22, 64:6, 65:15, 65:20, 66:23, 67:3, 70:3, 70:22, 74:10, 74:11, 79:17, 80:21, 83:17, 88:6, 88:13, 95:21, 96:2, 96:3, 96:5, 96:8, 96:18, 97:4, 97:7, 98:7, 99:17, 100:11, 101:10, 101:18, 102:12, 108:18, 115:6, 117:9, 117:10, 117:15, 118:3, 118:15, 130:2, 131:3, 131:7, 142:23, 143:20, 143:22, 147:13, 154:6, 154:14, 161:24, 162:13, 162:14, 163:2, 163:6, 163:8, 163:9, 164:13, 165:17, 165:23, 167:9, 167:10, 167:12, 196:13, 211:21, 227:21, 233:5, 237:6, 237:16, 238:6, 238:20, 243:22, 244:1, 247:11, 248:9, 253:2, 253:8, 257:12, 257:13, 259:4, 259:6, 259:12, 274:22, 285:7, 285:11, 291:2, 291:5
**Murdock** [16] - 36:13, 42:16, 43:4, 167:14, 248:23, 249:3, 249:11, 249:24, 251:7, 252:9, 252:14, 253:14, 255:13, 256:19, 257:1, 259:10
**Murdock's** [7] - 249:15, 249:21, 250:6, 250:13, 253:2, 253:24, 256:3
**must** [2] - 93:2, 249:19
**mute** [1] - 305:13
**mutilate** [1] - 168:24

## N

**name** [21] - 4:8, 4:10,

7:7, 7:9, 25:7, 25:8, 39:22, 56:16, 58:14, 58:17, 78:18, 82:10, 115:24, 116:14, 168:16, 203:21, 209:5, 230:3, 264:6, 277:17, 297:23
**named** [2] - 4:13, 82:9
**names** [4] - 27:18, 197:15, 221:20, 222:2
**Nance** [1] - 113:6
**narcotic** [1] - 20:10
**narcotics** [1] - 120:3
**narrative** [3] - 50:12, 176:4, 176:6
**narrow** [1] - 73:10
**national** [13] - 25:24, 27:6, 27:7, 29:9, 29:13, 29:24, 30:20, 31:10, 31:13, 31:16, 32:4, 32:16, 33:8
**natural** [1] - 15:2
**nature** [1] - 39:14
**navy** [1] - 133:10
**necessary** [4] - 156:2, 273:20, 284:5, 310:8
**necessity** [1] - 36:15
**need** [31] - 27:12, 27:14, 36:23, 40:22, 60:15, 67:18, 71:8, 81:10, 105:15, 122:9, 137:13, 160:15, 160:16, 173:11, 173:14, 176:6, 185:2, 187:7, 197:16, 211:12, 228:3, 228:4, 228:10, 236:9, 251:12, 264:8, 292:4, 298:24, 303:3, 304:14, 305:24
**needed** [1] - 114:16
**needs** [4] - 80:7, 80:23, 144:1, 173:2
**negotiations** [1] - 156:11
**neighbor** [1] - 32:11
**neighborhood** [2] - 58:9, 66:10
**neon** [1] - 81:1
**neutral** [1] - 107:20
**Nevada** [1] - 279:1
**never** [44] - 4:16, 15:15, 18:8, 34:19, 35:16, 57:20, 58:19, 65:7, 65:8, 74:2, 75:10, 85:6, 87:19, 88:9, 88:13, 88:14, 88:16, 90:11, 95:7,

122:16, 163:10, 171:10, 172:11, 187:16, 197:4, 197:7, 198:19, 200:20, 205:23, 227:20, 240:11, 241:23, 242:17, 243:13, 251:23, 269:1, 269:6, 271:6, 271:20, 273:12, 287:19, 291:22
**nevertheless** [2] - 116:15, 144:14
**new** [1] - 263:21
**New** [1] - 278:24
**next** [47] - 4:22, 9:20, 10:19, 12:10, 15:11, 16:4, 16:12, 16:23, 16:24, 17:1, 32:11, 49:16, 54:3, 78:15, 81:5, 92:13, 100:14, 100:17, 109:19, 114:23, 116:20, 130:12, 131:16, 134:12, 135:3, 142:5, 172:20, 186:6, 188:12, 193:15, 198:14, 198:16, 199:3, 203:22, 234:17, 241:6, 241:8, 253:16, 256:18, 259:19, 260:1, 262:8, 263:6, 265:3, 272:24, 285:2
**next-door** [1] - 32:11
**night** [5] - 64:6, 67:16, 68:12, 165:22, 166:22
**NIJ** [1] - 206:10
**nines** [1] - 93:2
**ninety** [1] - 266:16
**ninety-two** [1] - 266:16
**NO** [1] - 1:5
**nobody** [2] - 66:6, 309:4
**nomenclature** [1] - 19:18
**non** [1] - 28:2
**non-precise** [1] - 28:2
**none** [7] - 60:20, 61:4, 63:5, 165:10, 202:17, 202:19, 309:3
**NORSAT** [7] - 19:9, 19:16, 20:2, 25:5, 128:5, 128:8
**NORSAT's** [1] - 20:3
**North** [3] - 2:3, 70:16, 155:22

**NORTHERN** [1] - 1:2
**Northern** [2] - 19:16, 283:3
**not-so-good** [1] - 107:17
**Notary** [2] - 1:19, 311:2
**notations** [1] - 85:7
**note** [1] - 203:19
**noted** [5] - 163:24, 169:16, 203:18, 203:21, 310:7
**notes** [9] - 88:1, 88:2, 88:5, 88:16, 167:21, 211:10, 233:12, 233:19, 233:24
**noteworthy** [3] - 69:19, 70:2, 70:20
**nothing** [31] - 20:11, 47:17, 59:7, 59:15, 63:24, 65:24, 77:18, 78:8, 80:20, 85:1, 92:10, 106:7, 121:10, 153:23, 181:23, 199:9, 212:8, 212:10, 214:17, 229:2, 229:18, 229:21, 249:13, 251:6, 258:1, 272:20, 277:13, 289:10, 308:9, 309:1, 311:5
**notice** [1] - 156:10
**noticed** [1] - 54:24
**November** [12] - 18:14, 117:1, 117:7, 117:10, 120:18, 121:2, 121:4, 122:3, 122:14, 126:8, 287:4, 311:13
**nowhere** [1] - 78:16
**number** [20] - 22:12, 26:23, 33:24, 43:24, 44:4, 45:9, 56:9, 101:7, 141:17, 142:11, 144:18, 145:9, 146:19, 170:20, 175:10, 198:1, 198:5, 216:21, 264:14
**Number** [1] - 92:21
**numbers** [2] - 140:19, 144:6

## O

**o'clock** [2] - 298:16, 298:20
**O'Hara** [4] - 280:22, 299:21, 300:9, 308:19

**O'Hara's** [1] - 72:13
**oath** [3] - 75:2, 239:24, 271:5
**object** [8] - 135:17, 168:8, 190:18, 191:6, 236:24, 280:7, 302:2, 306:8
**objecting** [1] - 38:23
**objection** [323] - 6:19, 8:16, 9:10, 9:17, 10:1, 10:18, 11:10, 11:22, 13:4, 16:1, 17:6, 17:15, 17:21, 19:12, 20:17, 21:22, 22:3, 22:9, 22:17, 23:15, 24:8, 24:16, 25:14, 26:2, 26:4, 26:11, 31:2, 31:18, 32:20, 33:13, 34:22, 35:21, 36:6, 37:2, 38:23, 40:19, 42:19, 43:7, 44:7, 47:19, 52:8, 54:14, 55:18, 56:4, 57:7, 58:3, 58:16, 59:2, 59:14, 59:20, 60:21, 61:19, 62:8, 63:3, 63:23, 64:10, 65:13, 65:23, 66:7, 66:24, 67:8, 68:15, 69:6, 69:14, 70:11, 75:9, 77:17, 78:6, 79:7, 80:5, 81:10, 82:1, 83:5, 83:9, 84:9, 84:24, 86:2, 87:2, 88:3, 89:3, 89:16, 90:20, 91:8, 92:5, 92:19, 93:10, 94:3, 94:10, 96:10, 97:10, 100:24, 101:19, 102:24, 104:3, 104:12, 104:20, 106:6, 106:22, 107:14, 108:21, 110:12, 114:2, 115:11, 116:7, 117:4, 118:5, 119:14, 119:22, 122:5, 124:15, 124:24, 125:16, 126:24, 127:11, 128:4, 130:8, 133:19, 134:6, 136:18, 137:12, 141:19, 142:14, 145:22, 146:6, 147:16, 147:22, 148:16, 149:12, 149:16, 149:18, 149:22, 150:11, 151:8, 151:22, 153:11, 153:21,

154:19, 156:5, 157:13, 158:7, 159:10, 162:6, 163:3, 163:22, 164:14, 164:22, 165:13, 166:1, 166:18, 167:7, 167:16, 169:24, 170:13, 173:10, 174:8, 174:15, 174:18, 174:21, 175:20, 176:3, 177:21, 177:22, 178:11, 178:17, 179:3, 179:9, 179:17, 180:2, 180:15, 180:20, 181:18, 182:9, 183:1, 183:5, 183:19, 184:7, 185:1, 188:17, 189:10, 190:3, 190:20, 191:9, 192:12, 193:3, 193:11, 193:22, 194:6, 194:13, 195:3, 196:2, 196:10, 196:22, 197:1, 198:9, 199:8, 199:17, 200:10, 201:2, 201:8, 201:17, 202:6, 203:13, 204:9, 204:15, 204:22, 205:4, 205:20, 206:1, 206:21, 208:6, 208:15, 209:10, 209:24, 210:13, 210:20, 210:22, 211:23, 212:7, 212:18, 213:4, 214:4, 214:16, 215:8, 215:19, 216:3, 216:10, 217:1, 217:9, 217:19, 218:8, 219:2, 220:2, 221:3, 222:17, 222:21, 224:8, 225:2, 226:2, 227:1, 227:2, 228:21, 229:11, 230:1, 230:7, 230:17, 231:20, 232:5, 232:22, 233:6, 233:16, 234:1, 234:12, 235:13, 239:14, 239:21, 240:5, 241:15, 242:1, 242:10, 244:18, 245:7, 245:12, 245:22, 246:7, 251:20, 252:17, 254:4, 256:4, 257:5, 257:24, 258:10, 258:23, 259:16, 260:9, 260:18, 261:22, 264:19,

264:24, 269:8, 269:18, 271:8, 272:3, 272:8, 272:17, 273:7, 273:24, 274:8, 275:5, 275:18, 276:6, 276:19, 277:4, 277:11, 278:15, 278:23, 279:9, 279:13, 279:20, 279:23, 280:10, 281:11, 282:5, 282:17, 284:16, 284:24, 286:17, 288:5, 288:18, 289:1, 289:8, 289:15, 289:21, 291:13, 291:23, 293:5, 295:3, 295:5, 302:21, 303:15, 303:17, 305:21, 308:16
  **objections** [2] - 176:3, 210:20
  **obligation** [5] - 123:3, 123:12, 123:15, 151:14, 165:16
  **obligations** [1] - 172:17
  **oblige** [1] - 230:24
  **observation** [1] - 132:22
  **Observations** [1] - 50:2
  **observations** [1] - 91:11
  **observed** [4] - 64:5, 64:17, 83:23, 208:11
  **Observed** [2] - 40:9, 64:24
  **obtain** [2] - 131:24, 255:3
  **obvious** [1] - 127:7
  **obviously** [6] - 102:20, 104:6, 150:4, 296:24, 299:10, 300:6
  **occasion** [2] - 37:7, 37:15
  **occupant** [1] - 143:24
  **occur** [6] - 59:23, 92:16, 107:10, 156:1, 180:8, 181:9
  **occurred** [16] - 19:2, 41:1, 41:16, 44:1, 44:5, 44:12, 92:8, 92:9, 92:12, 109:4, 109:16, 109:18, 117:1, 166:11, 181:1, 238:5
  **occurring** [3] -

92:12, 157:10, 180:7
  **occurs** [2] - 88:10, 237:7
  **October** [6] - 1:16, 117:23, 120:18, 309:23, 310:2, 311:4
  **OF** [5] - 1:2, 1:7, 1:7, 310:2, 311:1
  **offense** [2] - 97:6, 161:24
  **offer** [1] - 22:13
  **offered** [9] - 22:2, 154:12, 154:16, 154:22, 155:4, 155:14, 214:8, 251:3, 255:12
  **offering** [1] - 75:5
  **offers** [2] - 155:15, 263:19
  **office** [9] - 109:20, 110:16, 114:22, 123:5, 123:18, 124:2, 287:18, 288:17, 289:6
  **Office** [2] - 2:21, 122:14
  **officer** [21] - 5:10, 35:4, 40:14, 48:3, 50:16, 52:5, 52:22, 68:2, 68:6, 68:19, 103:15, 127:13, 180:24, 182:16, 183:15, 199:15, 202:3, 208:3, 257:20, 258:2, 294:23
  **Officer** [19] - 32:10, 50:7, 50:11, 50:14, 50:18, 52:5, 52:19, 52:22, 53:2, 53:15, 54:10, 55:12, 63:7, 63:10, 63:21, 67:22, 68:3, 161:12
  **officers** [50] - 4:12, 9:1, 9:8, 19:22, 20:1, 23:21, 41:4, 48:16, 57:24, 67:18, 126:9, 145:17, 158:23, 171:9, 172:10, 172:16, 178:12, 178:15, 186:13, 186:18, 187:15, 196:9, 196:12, 198:19, 198:24, 199:6, 199:10, 200:14, 200:24, 201:6, 201:14, 203:12, 204:7, 204:18, 208:3, 209:6, 211:20, 212:5, 219:3, 233:3, 238:8, 240:10, 245:3, 291:17, 294:5,

294:19, 296:10, 297:11, 297:16, 298:9
  **official** [1] - 191:7
  **often** [10] - 20:5, 29:19, 33:18, 122:6, 155:14, 181:8, 181:9, 183:12, 217:14
  **Ohio** [1] - 21:1
  **old** [2] - 150:24, 226:20
  **omitted** [2] - 28:8, 297:3
  **once** [3] - 235:1, 255:3, 265:13
  **one** [99] - 6:4, 6:18, 7:5, 16:22, 17:17, 19:19, 25:2, 25:5, 25:7, 25:10, 32:2, 32:4, 35:17, 39:13, 47:10, 48:6, 48:7, 49:10, 49:16, 55:19, 57:11, 67:15, 67:18, 73:14, 81:6, 82:20, 84:11, 101:16, 113:17, 113:24, 114:8, 114:17, 135:6, 140:10, 140:13, 144:19, 153:23, 154:3, 157:17, 159:12, 162:10, 162:15, 170:24, 171:14, 171:15, 171:19, 176:16, 177:16, 178:7, 178:18, 181:24, 185:14, 187:8, 187:11, 189:22, 190:10, 190:11, 192:18, 193:15, 195:12, 195:16, 196:3, 197:4, 197:21, 198:15, 206:13, 210:19, 211:3, 211:17, 215:17, 215:21, 217:3, 222:3, 223:12, 225:5, 226:10, 227:13, 230:9, 246:11, 258:15, 264:6, 264:12, 266:13, 266:16, 268:8, 269:12, 269:17, 270:24, 275:10, 282:8, 296:2, 300:1, 300:11, 305:13, 305:24, 306:10, 306:13, 307:21
  **one's** [2] - 80:13, 80:14
  **one-person** [1] -

217:3
  **ones** [2] - 24:24, 222:3
  **ongoing** [2] - 237:6, 238:8
  **open** [2] - 56:10, 142:20
  **operation** [4] - 17:10, 20:4, 25:4, 217:3
  **Operations** [1] - 244:13
  **operations** [6] - 14:20, 15:15, 16:13, 19:9, 20:10
  **opine** [2] - 184:15, 260:16
  **opined** [3] - 170:21, 183:24, 257:14
  **opining** [2] - 276:2, 301:22
  **opinion** [71] - 40:12, 75:5, 75:10, 123:2, 123:11, 146:9, 158:19, 169:13, 169:21, 174:14, 176:24, 177:1, 177:2, 178:14, 182:23, 183:3, 191:5, 192:18, 194:21, 198:6, 200:4, 211:5, 211:19, 212:4, 212:11, 212:15, 212:16, 212:24, 213:2, 213:6, 213:17, 214:15, 215:17, 216:1, 217:16, 219:24, 220:17, 221:11, 222:10, 222:13, 222:14, 222:15, 223:14, 223:19, 224:23, 228:19, 229:8, 229:22, 230:14, 231:16, 231:18, 233:3, 234:14, 235:11, 237:23, 248:18, 260:15, 269:21, 278:7, 278:8, 279:7, 284:6, 284:23, 285:17, 287:1, 287:16, 298:6, 299:22, 303:13, 305:19
  **opinions** [39] - 8:21, 10:9, 10:14, 11:4, 24:6, 24:14, 39:6, 42:17, 170:11, 170:15, 172:22, 174:12, 175:15, 175:17, 176:1,

177:18, 178:7, 190:11, 195:13, 209:21, 211:17, 215:4, 215:14, 215:21, 215:23, 231:15, 234:18, 234:21, 236:3, 236:21, 237:19, 237:21, 238:1, 238:12, 238:21, 286:1, 302:7, 302:8, 302:18

**opportunities** [4] - 237:11, 293:16, 296:4, 296:8

**opportunity** [12] - 27:17, 29:1, 173:7, 185:9, 185:10, 197:5, 284:8, 293:21, 294:5, 294:8, 294:17, 294:19

**opposed** [2] - 297:17

**opposite** [1] - 66:18

**order** [18] - 30:4, 60:16, 102:15, 130:6, 132:21, 140:20, 178:1, 178:2, 188:7, 188:20, 195:9, 210:18, 210:22, 283:2, 283:8, 284:6, 301:5

**Order** [2] - 188:5, 195:8

**orderable** [1] - 301:7

**ordered** [1] - 301:9

**orders** [4] - 15:6, 170:4, 293:10

**organization** [5] - 14:1, 27:7, 179:19, 180:7, 205:16

**organizational** [1] - 119:10

**organizations** [3] - 26:22, 32:22, 33:20

**organized** [1] - 119:8

**Oriented** [1] - 33:19

**original** [1] - 268:13

**originally** [2] - 61:24, 77:10

**originated** [1] - 290:12

**otherwise** [4] - 212:13, 260:24, 306:21, 306:24

**Otherwise** [1] - 310:7

**outline** [1] - 160:5

**outlined** [1] - 29:21

**outside** [4] - 30:14, 139:13, 185:24, 203:22

**overarching** [1] - 220:7

**overbroad** [2] - 88:3, 295:6

**overcome** [1] - 144:15

**overly** [1] - 43:8

**overstated** [1] - 142:24

**overview** [1] - 49:21

**Overview** [2] - 40:8, 49:22

**owed** [1] - 124:4

**own** [11] - 65:6, 72:14, 139:8, 139:21, 185:18, 260:4, 261:8, 261:10, 263:4, 268:8, 286:13

## P

**p.m** [3] - 53:17, 156:22, 309:23

**P.O** [2] - 2:9, 2:13

**Page** [102] - 11:3, 27:10, 27:13, 27:18, 29:4, 34:13, 34:14, 40:18, 40:21, 43:14, 43:15, 43:16, 43:17, 44:19, 45:18, 49:23, 50:12, 50:13, 51:23, 54:23, 64:14, 64:23, 65:2, 68:22, 71:23, 72:12, 76:1, 77:1, 95:9, 102:19, 105:11, 107:1, 112:7, 113:1, 113:22, 124:9, 127:6, 129:18, 129:23, 132:13, 134:13, 138:6, 139:5, 141:12, 141:13, 141:22, 142:1, 147:8, 154:2, 161:9, 162:17, 164:5, 164:18, 171:1, 171:3, 171:18, 172:7, 175:16, 176:19, 176:20, 177:2, 177:5, 177:9, 178:3, 185:13, 187:1, 187:12, 187:13, 190:8, 190:14, 192:24, 195:14, 219:6, 223:4, 223:7, 227:9, 232:6, 234:3, 235:6, 235:20, 240:9, 240:15, 241:3, 247:24, 250:3, 252:22, 261:10, 263:11, 266:2, 266:4, 266:7, 266:15, 267:19, 267:24,

269:20, 303:3, 304:17, 304:19, 308:7

**PAGE** [2] - 3:2, 310:13

**page** [27] - 10:20, 44:24, 50:10, 65:3, 76:23, 76:24, 118:18, 120:19, 137:6, 138:17, 170:20, 172:5, 176:15, 176:16, 176:17, 188:7, 192:23, 195:17, 231:12, 235:8, 241:6, 241:8, 250:19, 262:8, 262:10, 267:24

**pages** [6] - 8:6, 24:1, 24:14, 68:6, 140:18, 213:10

**Pages** [3] - 40:6, 64:20, 140:21

**paper** [3] - 86:18, 204:5, 204:12

**papers** [2] - 33:17, 61:11

**Paragraph** [6] - 40:21, 77:2, 78:19, 132:11, 132:17, 133:3

**paragraph** [45] - 8:20, 10:19, 11:2, 29:5, 34:14, 43:16, 44:19, 45:19, 50:16, 52:2, 92:22, 107:1, 113:2, 114:5, 115:3, 129:19, 131:4, 131:16, 139:6, 141:13, 142:5, 145:6, 154:3, 156:10, 162:2, 164:24, 171:3, 172:8, 187:13, 195:14, 199:3, 200:15, 227:9, 234:4, 234:17, 235:8, 240:15, 260:1, 261:10, 262:13, 270:5, 270:13, 273:1, 303:5

**paragraphs** [2] - 149:3, 188:11

**pardon** [1] - 266:6

**paren** [1] - 138:9

**parentheses** [1] - 138:8

**parenthetically** [1] - 234:17

**Park** [3] - 2:13, 68:2, 68:13

**parse** [3] - 30:6, 80:11, 152:3

**parsed** [1] - 114:11

**part** [28] - 13:21,

15:14, 17:9, 23:19, 29:13, 44:8, 59:19, 80:2, 98:11, 104:13, 123:9, 129:14, 134:18, 136:23, 144:11, 166:3, 175:24, 188:3, 196:13, 200:4, 205:17, 219:7, 234:5, 258:5, 269:2, 273:14, 273:13, 296:16

**partial** [1] - 187:13

**particular** [29] - 6:3, 8:20, 23:4, 29:5, 30:5, 30:10, 34:6, 50:1, 56:20, 71:24, 76:20, 90:15, 90:21, 113:2, 139:16, 152:7, 175:11, 182:22, 191:13, 192:18, 202:4, 203:20, 231:9, 232:3, 290:13, 290:21, 291:1, 292:6, 294:24

**particularly** [1] - 114:23

**parties** [2] - 145:7, 276:10

**parts** [1] - 150:13

**party** [1] - 155:17

**passed** [1] - 68:3

**pathway** [1] - 47:6

**patience** [1] - 307:19

**Patrick** [38] - 4:13, 5:18, 8:3, 8:24, 9:6, 28:10, 41:24, 49:13, 58:1, 58:14, 58:24, 59:11, 59:18, 63:2, 67:7, 82:9, 82:14, 82:21, 83:24, 96:7, 96:18, 97:6, 98:6, 101:17, 102:10, 105:8, 117:8, 118:3, 118:14, 129:8, 147:13, 152:20, 167:5, 211:21, 220:12, 237:23, 252:24, 258:5

**PATRICK** [1] - 1:4

**patrol** [10] - 12:17, 12:19, 12:24, 14:1, 14:17, 14:18, 14:20, 25:19, 25:20, 126:9

**Patty** [3] - 255:23, 255:24, 256:2

**PD** [2] - 7:11, 68:4

**PDF** [2] - 309:6, 309:14

**Peace** [1] - 32:10

**peckers** [1] - 110:18

**peers** [1] - 204:12

**penalty** [3] - 86:15, 86:22, 146:21

**pending** [2] - 6:10, 304:9

**people** [6] - 38:12, 68:11, 147:3, 165:10, 172:19, 245:24

**People** [1] - 252:24

**per** [7] - 38:1, 42:20, 42:21, 73:13, 82:17, 95:17, 201:10

**percent** [1] - 20:6

**percentage** [3] - 292:10, 292:15, 292:17

**PERF** [1] - 33:20

**perfect** [2] - 45:16, 71:10

**performed** [1] - 15:9

**perhaps** [3] - 58:1, 78:15, 291:9

**period** [4] - 148:21, 181:14, 229:4

**periodical** [1] - 206:12

**periodicals** [1] - 206:12

**perjury** [6] - 86:16, 86:22, 219:8, 219:17, 220:23, 239:5

**perpetrator** [1] - 132:5

**person** [26] - 30:4, 30:15, 31:21, 37:4, 64:17, 65:4, 65:6, 65:8, 65:10, 65:12, 66:2, 66:6, 66:12, 66:15, 66:22, 77:15, 77:21, 80:24, 110:15, 110:16, 110:23, 112:13, 114:12, 217:3, 242:19, 285:2

**person's** [1] - 218:20

**personal** [8] - 58:8, 245:17, 245:21, 246:4, 284:12, 284:18, 284:19, 284:22

**personally** [1] - 128:5

**personnel** [4] - 35:24, 36:9, 146:24, 191:2

**Persons** [1] - 188:6

**persons** [5] - 68:7, 69:23, 120:1, 120:6, 191:2

**perspective** [1] - 162:20

**Pete** [1] - 268:14
**Peter** [5] - 2:22, 28:3, 255:5, 265:11, 265:18
**phone** [9] - 32:24, 81:8, 92:10, 110:11, 110:17, 110:22, 110:23, 249:8
**photo** [4] - 135:16, 135:20, 135:21, 142:4
**photograph** [3] - 87:17, 135:12, 185:17
**photographic** [2] - 142:2, 142:3
**photographs** [6] - 134:19, 135:2, 135:6, 135:7, 136:7, 143:8
**phrase** [2] - 107:12, 198:8
**physical** [27] - 43:19, 44:20, 45:10, 45:22, 47:11, 48:14, 61:5, 63:21, 63:24, 72:15, 72:19, 87:5, 107:18, 107:19, 163:6, 184:2, 184:23, 186:10, 186:14, 189:24, 190:5, 193:24, 225:3, 255:9, 261:6, 273:10
**Physical** [1] - 176:23
**physically** [6] - 4:19, 38:9, 38:12, 224:4, 247:13, 265:14
**physique** [1] - 57:2
**pick** [2] - 85:19, 85:20
**piece** [5] - 86:18, 104:5, 118:24, 120:3, 163:6
**pin** [1] - 152:3
**pinhead** [1] - 158:3
**Pinto** [1] - 246:5
**Pirages** [11] - 2:11, 131:5, 164:2, 164:8, 229:9, 229:15, 229:22, 232:15, 236:4, 303:9
**Pirages's** [2] - 164:8, 164:9
**pistol** [1] - 138:7
**place** [6] - 15:1, 86:12, 87:6, 215:15, 273:22, 274:23
**Plaintiff** [1] - 1:5
**plaintiff** [3] - 2:4, 169:7, 298:23
**plaintiff's** [1] - 169:4
**plastic** [1] - 138:9
**plea** [1] - 155:16
**pled** [2] - 70:10, 154:24

**plethora** [1] - 207:16
**plow** [2] - 103:4, 268:18
**plug** [1] - 139:21
**plus** [2] - 14:8, 139:22
**Pobjecky** [2] - 1:14, 2:15
**point** [43] - 19:5, 43:21, 44:23, 47:3, 60:17, 64:14, 64:16, 69:8, 69:18, 83:2, 102:20, 108:9, 109:19, 109:22, 112:8, 113:22, 114:3, 114:24, 115:4, 116:4, 118:24, 119:2, 119:5, 126:13, 130:22, 133:23, 139:19, 153:17, 158:2, 159:9, 165:2, 166:2, 166:20, 176:7, 194:24, 207:6, 207:8, 219:21, 229:19, 242:2, 246:12, 250:22, 270:11
**pointed** [3] - 50:21, 51:8, 210:7
**pointing** [2] - 55:1, 98:3
**points** [6] - 44:20, 107:9, 107:11, 108:2, 162:23, 164:24
**police** [93] - 4:12, 6:22, 13:15, 24:6, 24:10, 25:16, 25:17, 25:24, 26:23, 27:2, 27:8, 30:4, 31:23, 36:24, 39:16, 42:17, 43:5, 45:20, 51:20, 52:13, 54:11, 55:16, 57:6, 64:8, 74:16, 84:5, 88:1, 90:19, 91:4, 100:6, 103:14, 104:8, 104:16, 110:9, 116:4, 127:13, 134:19, 141:9, 145:8, 145:17, 150:7, 154:15, 158:23, 158:24, 165:11, 169:15, 169:22, 170:11, 170:21, 172:14, 172:24, 179:22, 184:1, 184:23, 185:2, 185:15, 199:15, 201:24, 202:15, 203:8, 203:23, 204:21, 206:13, 208:3, 209:6, 209:21,

211:4, 211:11, 216:17, 216:23, 232:18, 233:3, 233:4, 233:14, 239:7, 244:5, 245:3, 260:11, 260:13, 260:17, 260:21, 261:2, 261:3, 261:5, 278:1, 291:10, 292:10, 303:14, 308:1, 308:4, 308:12
**Police** [47] - 9:1, 9:2, 9:8, 9:9, 22:7, 25:9, 40:8, 40:13, 45:19, 64:4, 67:12, 68:2, 68:24, 71:2, 77:13, 87:24, 119:7, 119:20, 139:8, 163:15, 171:7, 174:13, 175:17, 176:1, 176:21, 176:22, 177:2, 177:5, 185:18, 193:7, 193:9, 195:20, 198:2, 260:7, 261:21, 262:6, 275:15, 276:4, 281:3, 281:4, 286:1, 291:9, 294:4, 294:10, 296:5, 299:11, 309:13
**Police's** [2] - 262:3, 276:24
**policies** [25] - 169:14, 169:17, 169:22, 170:3, 170:12, 170:24, 172:23, 174:12, 178:20, 178:22, 188:23, 189:8, 189:13, 189:19, 189:22, 192:1, 192:21, 193:2, 244:8, 245:5, 262:3, 262:5, 275:15, 286:2
**Policies** [2] - 134:14, 177:10
**policing** [2] - 46:1, 302:15
**Policing** [1] - 33:19
**policy** [69] - 170:22, 171:8, 171:11, 171:17, 175:18, 176:12, 176:14, 178:9, 178:16, 179:1, 179:4, 179:7, 179:11, 179:23, 180:4, 180:5, 180:11, 180:18, 181:4, 181:6, 181:11, 181:16, 181:23, 182:1, 182:6, 182:12, 182:15, 182:22, 183:12, 183:17, 184:4, 184:5, 184:20,

184:21, 185:13, 187:14, 187:17, 187:22, 188:5, 188:15, 190:1, 190:2, 190:5, 193:9, 193:19, 193:21, 194:4, 194:8, 194:10, 194:11, 194:12, 195:1, 197:10, 198:18, 198:20, 199:5, 205:19, 240:12, 240:13, 241:24, 242:17, 244:11, 244:15, 260:7, 261:20
**poor** [1] - 225:20
**poorly** [1] - 297:10
**porch** [1] - 152:22
**portion** [4] - 11:1, 49:20, 50:13, 231:9
**portions** [1] - 38:20
**posed** [4] - 30:12, 35:2, 108:8, 116:16
**position** [2] - 11:18, 295:11
**positions** [1] - 16:18
**possession** [1] - 163:8
**possibilities** [7] - 36:17, 56:18, 56:20, 58:6, 59:22, 62:22, 293:24
**possibility** [2] - 71:4, 201:7
**possible** [8] - 65:19, 178:6, 186:11, 201:6, 201:14, 201:20, 291:3, 300:16
**Possible** [1] - 177:4
**possibly** [3] - 53:9, 64:18, 89:24
**POST** [16] - 12:6, 19:6, 22:24, 23:2, 23:6, 23:10, 30:1, 30:2, 31:21, 32:6, 32:10, 32:12, 32:15, 206:24, 207:16
**post** [1] - 268:3
**post-conviction** [1] - 268:3
**potential** [5] - 67:14, 291:2, 291:20, 292:13
**POTTINGER** [52] - 2:16, 111:21, 210:15, 277:17, 277:23, 278:18, 279:3, 279:11, 279:17, 279:22, 280:1, 280:5, 280:11, 280:15, 281:13, 282:7, 282:13, 282:22,

283:1, 283:7, 283:12, 283:21, 284:11, 284:21, 285:12, 286:19, 288:7, 288:22, 289:3, 289:12, 289:18, 289:23, 291:15, 292:2, 293:7, 293:13, 293:19, 295:4, 295:9, 295:17, 295:22, 298:15, 298:19, 299:6, 299:8, 300:16, 300:22, 301:4, 301:7, 301:10, 309:7, 309:16
**Pottinger** [2] - 3:5, 277:18
**powers** [2] - 30:5, 31:23
**practical** [1] - 227:20
**practice** [17] - 72:4, 72:7, 87:23, 171:7, 171:17, 175:18, 176:13, 181:9, 185:16, 195:20, 196:1, 196:21, 198:7, 205:19, 208:10, 232:16
**practices** [20] - 24:7, 25:24, 45:20, 141:9, 169:14, 169:22, 170:22, 170:23, 172:15, 172:23, 174:12, 184:1, 184:23, 189:23, 202:16, 203:8, 204:21, 216:17, 216:24, 286:2
**Practices** [2] - 40:8, 176:22
**precinct** [2] - 13:15, 16:21
**precise** [8] - 7:8, 28:2, 58:21, 73:2, 150:14, 197:19, 242:19, 297:19
**precisely** [1] - 106:23
**predetermined** [2] - 43:21, 44:23
**preempt** [1] - 166:21
**pregnant** [2] - 157:9, 157:16
**preliminary** [9] - 49:9, 74:17, 76:19, 84:19, 85:11, 289:24, 291:7, 302:7, 302:8
**premise** [2] - 9:5, 41:7
**preparation** [3] - 249:16, 250:13, 260:8

**prepared** [3] - 141:1, 287:5, 287:10

**preparing** [1] - 249:16

**present** [6] - 37:7, 37:11, 37:15, 65:16, 293:16, 303:10

**presentation** [2] - 161:17, 164:20

**presented** [6] - 37:13, 129:13, 161:22, 204:5, 204:12, 284:13

**preserve** [2] - 36:15, 186:10

**preserved** [1] - 233:20

**presumably** [1] - 287:13

**presume** [2] - 57:1, 238:22

**presumed** [1] - 123:10

**presumes** [1] - 123:11

**presumption** [2] - 237:18, 237:24

**presumptions** [2] - 236:21, 238:11

**pretty** [7] - 53:24, 83:12, 206:13, 207:5, 223:4, 226:7, 227:5

**previous** [6] - 39:20, 175:1, 175:2, 185:6, 188:22, 194:1

**previously** [4] - 40:20, 168:22, 189:18, 276:10

**primary** [2] - 20:2, 232:11

**prime** [3] - 70:6, 107:18, 165:18

**principles** [1] - 29:7

**print** [1] - 247:9

**printed** [1] - 188:3

**Printing** [1] - 299:20

**prints** [3] - 66:18, 140:11, 140:14

**prison** [2] - 155:10, 219:12

**privilege** [1] - 70:18

**privileged** [1] - 39:1

**probable** [27] - 86:23, 95:20, 96:7, 100:18, 101:6, 101:9, 101:17, 102:15, 104:2, 115:5, 115:8, 115:16, 116:5, 128:22, 130:1, 130:6, 130:18, 131:2, 131:6,

162:4, 162:11, 162:14, 162:20, 162:21, 164:4, 164:12, 166:5

**Probable** [2] - 95:11, 161:12

**problem** [3] - 26:12, 166:24, 300:19

**problematic** [1] - 90:24

**problems** [3] - 45:16, 91:13, 142:1

**procedural** [2] - 72:18, 249:7

**procedure** [15] - 46:14, 48:13, 90:1, 90:5, 139:16, 179:22, 186:3, 244:5, 249:6, 255:3, 275:10, 276:8, 280:24, 293:15, 295:20

**procedures** [39] - 24:11, 25:11, 25:17, 25:18, 25:19, 25:20, 72:14, 139:9, 139:22, 170:5, 170:8, 170:12, 170:16, 178:20, 178:22, 185:15, 185:20, 188:5, 192:1, 193:5, 237:11, 244:12, 259:22, 260:3, 260:4, 260:6, 261:9, 261:10, 261:20, 262:3, 262:5, 275:13, 275:15, 281:1, 294:3, 294:9, 294:16, 294:20, 296:4

**proceedings** [1] - 252:23

**process** [16] - 30:16, 30:17, 37:11, 41:16, 41:20, 42:23, 42:24, 179:18, 224:13, 233:9, 247:8, 247:11, 247:12, 283:20, 294:2, 294:9

**processed** [4] - 137:7, 140:5, 140:7, 186:5

**processes** [2] - 294:15, 294:20

**processing** [3] - 72:5, 72:9, 72:21

**produce** [4] - 186:15, 294:12, 294:17, 300:18

**produced** [4] - 7:17, 207:12, 224:15, 287:12

**produces** [1] - 33:18

**productive** [1] - 225:15

**profession** [1] - 24:10

**professional** [30] - 25:21, 88:7, 95:17, 103:3, 151:12, 151:19, 153:10, 153:13, 217:16, 218:1, 218:3, 280:20, 280:21, 281:24, 282:3, 284:1, 284:19, 284:23, 285:13, 285:17, 285:19, 286:4, 286:14, 286:24, 287:14, 291:12, 292:3, 296:9, 300:5

**proffered** [2] - 170:6, 178:19

**proficiency** [1] - 255:16

**progeny** [1] - 123:13

**program** [3] - 12:7, 15:19, 22:11

**programs** [1] - 21:9

**progress** [2] - 174:7, 182:19

**prohibited** [1] - 295:14

**project** [1] - 18:24

**promoted** [2] - 14:7, 16:7

**prompts** [1] - 125:19

**proof** [1] - 288:14

**proper** [7] - 35:7, 132:6, 231:1, 237:10, 251:16, 252:6, 275:10, 275:13, 276:12, 280:24, 295:20

**properly** [3] - 182:17, 193:10

**property** [7] - 15:13, 15:18, 120:1, 139:8, 185:19, 186:18, 193:5

**property-handling** [1] - 193:5

**proposition** [1] - 179:24

**prosecuted** [3] - 155:12, 219:8, 219:17

**prosecuting** [2] - 96:2, 96:4

**prosecution** [10] - 8:23, 9:6, 9:16, 9:24, 34:11, 122:10, 165:24, 273:22, 274:23, 288:1

**prosecutor** [2] -

37:8, 124:11

**prospect** [1] - 106:3

**protected** [1] - 127:21

**protocol** [1] - 146:22

**provide** [7] - 40:4, 59:3, 61:16, 72:20, 73:6, 105:17, 130:1

**Provided** [2] - 116:22, 177:8

**provided** [42] - 23:20, 36:7, 60:4, 62:12, 76:18, 77:5, 77:8, 77:15, 77:21, 78:4, 78:11, 79:4, 80:1, 81:22, 82:7, 83:2, 84:3, 85:11, 89:9, 89:15, 96:9, 100:16, 102:15, 104:10, 104:18, 134:18, 135:7, 135:8, 139:9, 154:13, 154:17, 155:11, 169:4, 185:20, 186:3, 190:10, 196:5, 232:20, 286:21, 290:1, 294:5, 310:8

**provides** [3] - 63:15, 106:12, 295:24

**providing** [2] - 130:18, 239:13

**Public** [2] - 1:19, 311:2

**publication** [6] - 72:18, 281:5, 300:10, 300:18, 300:23, 308:11

**publications** [5] - 286:8, 286:12, 286:24, 299:23, 308:21

**published** [8] - 202:15, 202:16, 202:18, 202:20, 202:23, 203:2, 286:6, 300:12

**Publisher** [1] - 300:14

**publishes** [1] - 33:17

**pull** [4] - 50:4, 120:8, 250:23, 283:6

**pulled** [4] - 93:19, 178:4, 223:8, 241:1

**punishment** [1] - 239:4

**purchased** [3] - 83:20, 84:6, 105:7

**purported** [2] - 214:11, 234:22

**purpose** [7] - 119:6,

128:19, 130:9, 132:1, 136:20, 137:18, 296:21

**purposes** [4] - 75:15, 140:21, 144:8, 227:21

**purse** [1] - 108:12

**PURSLEY** [1] - 1:4

**Pursley** [91] - 4:13, 5:18, 8:3, 8:24, 9:6, 9:15, 9:23, 28:10, 40:16, 41:8, 41:24, 42:7, 46:3, 58:1, 58:24, 59:11, 59:18, 63:2, 67:7, 69:11, 70:2, 70:15, 70:20, 71:3, 71:4, 74:11, 76:7, 76:11, 82:9, 82:21, 83:16, 83:17, 83:20, 83:24, 89:1, 95:12, 95:21, 96:7, 96:18, 97:6, 98:6, 101:17, 102:10, 106:20, 108:10, 109:14, 110:1, 110:4, 110:10, 110:15, 112:12, 114:11, 114:14, 114:18, 115:6, 117:8, 117:14, 118:14, 129:2, 129:8, 129:15, 130:2, 130:19, 131:9, 132:4, 132:6, 143:11, 144:3, 144:21, 147:13, 150:9, 161:13, 161:16, 161:23, 163:2, 164:12, 164:19, 165:12, 167:5, 177:17, 200:6, 208:4, 211:21, 220:12, 237:23, 248:5, 250:3, 252:24, 258:5, 258:16, 293:2

**Pursley's** [30] - 48:22, 49:7, 58:14, 82:14, 85:13, 86:24, 103:10, 105:8, 108:18, 118:3, 128:23, 130:7, 130:24, 132:4, 134:15, 134:21, 136:5, 140:4, 140:14, 145:19, 154:18, 165:4, 165:7, 165:22, 177:11, 219:9, 248:13, 248:19, 251:17, 252:6

**pursuant** [4] - 46:22, 81:23, 84:3, 123:12

**pursue** [6] - 56:23, 64:4, 69:1, 122:2,

123:21, 210:9
**pursued** [1] - 69:3
**pursuing** [1] - 67:13
**pursuit** [1] - 25:11
**put** [15] - 48:8, 61:2, 75:13, 82:16, 86:19, 132:20, 157:21, 160:16, 210:23, 215:10, 241:2, 255:10, 279:12, 282:19, 288:12
**puts** [2] - 15:19, 220:4
**putting** [2] - 67:20, 136:13

## Q

**qualifications** [2] - 18:24, 25:16
**qualified** [4] - 23:3, 127:10, 127:12
**quality** [3] - 107:5, 107:12, 233:19
**questionable** [1] - 74:8
**questioned** [1] - 93:3
**questioning** [6] - 115:7, 152:16, 160:23, 167:21, 217:12, 274:9
**questions** [35] - 30:7, 38:24, 39:20, 39:21, 40:3, 45:7, 47:15, 98:15, 159:19, 159:23, 161:5, 168:9, 168:10, 168:19, 208:18, 209:14, 218:16, 228:5, 228:6, 228:11, 246:15, 259:13, 277:14, 277:21, 281:24, 298:23, 299:4, 299:7, 301:11, 301:15, 307:18, 307:23, 307:24, 308:2, 309:5
**quick** [5] - 33:4, 234:23, 253:11, 264:8, 299:7
**quickly** [4] - 73:5, 111:11, 251:13, 277:22
**quite** [2] - 22:18, 103:4
**quote** [27] - 108:11, 171:8, 185:13, 185:14, 185:19, 185:20, 185:22, 186:2, 186:4, 186:6, 186:8, 186:11,

186:19, 186:23, 187:14, 219:7, 220:12, 220:14, 240:10, 241:8, 241:19, 266:2, 266:4, 266:7, 268:1, 268:7, 268:16
**quoted** [5] - 72:15, 188:11, 242:20, 243:15, 271:2
**quotes** [1] - 164:20
**quoting** [1] - 242:2

## R

**R.C** [2] - 277:18, 283:5
**race** [2] - 50:19, 51:21
**RACHEL** [1] - 2:2
**radio** [2] - 14:8, 245:18
**rails** [1] - 46:16
**raise** [2] - 79:13, 228:3
**rampant** [1] - 188:2
**ran** [2] - 55:8, 65:16
**Randolph** [1] - 2:21
**range** [1] - 87:16
**rather** [9] - 12:8, 12:9, 55:8, 263:21, 270:18, 272:11, 274:2, 285:4, 293:22
**rationale** [2] - 76:4, 164:24
**reach** [1] - 188:4
**read** [44] - 9:2, 29:11, 44:2, 46:4, 51:9, 56:13, 61:10, 66:20, 69:7, 86:4, 112:15, 113:9, 128:6, 133:12, 133:13, 186:24, 189:6, 190:1, 195:15, 195:16, 198:17, 199:1, 206:15, 209:20, 214:5, 227:15, 228:16, 235:9, 241:15, 250:8, 254:17, 255:7, 255:21, 269:2, 273:1, 282:10, 282:14, 293:7, 303:24, 304:6, 304:9, 310:4
**reader** [1] - 44:18
**readily** [1] - 89:22
**reading** [9] - 54:16, 54:18, 124:21, 221:4, 282:21, 282:24, 283:1, 304:7, 311:6
**readings** [1] - 255:14

**reads** [2] - 102:20, 241:4
**ready** [11] - 26:17, 26:19, 71:17, 111:23, 149:19, 168:5, 168:6, 176:10, 176:11, 236:17, 236:18
**real** [6] - 33:3, 45:16, 48:12, 232:20, 233:4, 299:6
**realign** [1] - 18:24
**reality** [1] - 272:12
**realize** [1] - 243:22
**really** [10] - 81:14, 95:5, 109:18, 122:8, 124:1, 125:23, 215:17, 222:23, 245:23, 309:20
**realm** [1] - 188:19
**REASON** [1] - 310:13
**reason** [14] - 5:4, 47:21, 74:22, 106:18, 112:14, 114:14, 136:15, 137:11, 143:16, 253:23, 257:9, 257:10, 277:8, 308:18
**reasonable** [1] - 55:15
**Reasonably** [1] - 161:11
**reasonably** [1] - 107:3
**Reasonably-Trained** [1] - 161:11
**reasons** [3] - 43:10, 162:23, 253:15
**Rebecca** [13] - 50:2, 51:13, 51:20, 87:15, 101:23, 102:4, 108:10, 108:23, 109:3, 109:5, 109:15, 110:2, 137:20
**Rebecca's** [4] - 46:20, 67:10, 80:13, 110:2
**recalled** [2] - 187:9, 271:18
**recant** [1] - 220:14
**recantance** [1] - 239:2
**recantation** [1] - 238:22
**recanted** [2] - 75:10, 148:8
**recanting** [1] - 220:9
**recants** [2] - 220:18, 221:7
**receive** [1] - 207:21
**received** [6] - 5:1,

86:18, 199:7, 207:22, 220:11, 244:2
**receives** [1] - 118:19
**receiving** [1] - 220:19
**recess** [7] - 33:5, 71:16, 111:18, 168:4, 209:2, 236:15, 299:5
**recitation** [1] - 238:23, 241:19
**recognition** [2] - 248:15, 248:17
**recognize** [5] - 8:1, 57:18, 59:3, 156:18, 178:9
**recognized** [2] - 57:2, 57:5
**recollection** [3] - 240:19, 245:5, 307:15
**recommendations** [1] - 34:1
**reconstruct** [1] - 165:17
**reconstructed** [1] - 166:8
**record** [109] - 4:7, 26:15, 32:23, 33:1, 42:20, 42:21, 43:12, 43:24, 49:10, 52:18, 57:21, 59:3, 59:8, 59:15, 61:12, 65:10, 69:15, 70:6, 70:23, 71:20, 77:7, 77:18, 77:23, 78:8, 78:24, 79:1, 79:10, 80:18, 81:13, 81:16, 82:18, 84:14, 85:14, 88:4, 88:22, 90:7, 90:9, 92:11, 98:5, 98:11, 98:17, 100:15, 101:2, 101:22, 102:1, 103:14, 105:19, 111:24, 115:24, 122:20, 135:19, 136:8, 141:15, 143:17, 144:8, 144:24, 147:24, 150:1, 152:24, 153:5, 153:17, 156:13, 157:6, 160:14, 168:15, 172:7, 174:8, 174:24, 181:22, 185:6, 185:17, 186:24, 188:11, 209:3, 210:23, 212:8, 212:11, 214:3, 215:6, 225:20, 227:19, 227:24, 234:24, 235:9, 236:17, 241:15, 259:20,

265:11, 265:17, 265:19, 267:17, 267:18, 271:14, 271:23, 277:13, 278:3, 281:1, 282:19, 284:7, 287:19, 287:21, 287:22, 288:2, 288:19, 289:11, 291:21, 292:4, 310:5, 311:6
**recorded** [13] - 35:15, 35:17, 88:12, 88:13, 89:13, 156:1, 156:7, 157:6, 181:21, 181:24, 186:12, 292:12
**recording** [8] - 90:12, 92:11, 146:23, 157:20, 182:3, 277:24, 279:4, 292:9
**recordings** [4] - 89:19, 158:14, 224:17, 278:17
**records** [4] - 196:16, 199:9, 201:4, 287:13
**recovered** [17] - 36:16, 48:22, 49:7, 85:13, 85:14, 136:5, 137:19, 138:10, 138:22, 140:4, 141:2, 142:12, 163:10, 163:11, 248:8, 256:20
**recovery** [3] - 87:20, 141:6, 244:5
**recruit** [1] - 166:21
**Redondo** [1] - 25:10
**refer** [9] - 29:14, 30:20, 32:6, 186:13, 196:8, 208:10, 209:15, 235:16, 261:8
**reference** [11] - 13:8, 50:10, 64:19, 68:1, 92:21, 109:19, 120:17, 200:2, 223:3, 248:4, 249:21
**referenced** [16] - 52:21, 63:13, 75:16, 112:10, 112:23, 113:23, 139:16, 187:12, 189:7, 240:13, 253:21, 286:13, 299:10, 299:12, 299:14, 300:7
**references** [1] - 139:21
**referred** [5] - 13:10, 19:14, 36:20, 72:7, 307:24
**referring** [17] - 11:2, 30:23, 31:13, 44:4,

44:11, 46:8, 76:2, 108:3, 108:6, 200:7, 205:10, 218:19, 222:6, 261:11, 262:20, 264:11, 276:14

**Reffett** [2] - 2:19, 277:20

**reflect** [2] - 152:24, 158:4

**reflected** [2] - 170:16, 286:9

**reflection** [1] - 181:11

**reflective** [4] - 175:9, 182:12, 183:12, 293:17

**reflects** [1] - 81:16
**refresh** [2] - 205:14, 307:15

**refused** [2] - 223:11, 227:12

**regard** [6] - 43:9, 130:21, 150:5, 189:23, 239:23, 275:21

**regarding** [39] - 8:22, 76:18, 115:7, 121:2, 122:22, 123:4, 132:12, 145:8, 146:4, 150:14, 155:21, 163:16, 165:2, 170:15, 172:23, 174:12, 175:17, 176:1, 188:8, 190:12, 193:10, 194:4, 194:5, 195:9, 199:9, 199:12, 200:13, 202:15, 202:20, 203:5, 205:18, 207:15, 207:23, 235:15, 253:7, 253:14, 254:1, 276:17, 283:2

**regardless** [1] - 204:11

**regards** [1] - 232:19
**Region** [1] - 19:9
**Regional** [1] - 19:17
**regular** [5] - 301:24, 303:14, 308:1, 308:4, 308:12

**regularly** [2] - 45:24, 232:13

**reinforce** [1] - 139:18

**related** [3] - 24:10, 144:5, 208:11
**relates** [2] - 169:15, 286:3

**relating** [7] - 50:7,

63:16, 67:22, 112:21, 137:8, 143:13, 307:24
**relation** [2] - 118:2, 274:15

**relative** [1] - 311:5
**relax** [1] - 209:13
**relevance** [1] - 22:9
**relevancy** [1] - 6:20
**relevant** [6] - 30:9, 104:1, 108:19, 109:10, 146:2, 241:3
**reliability** [3] - 301:19, 301:21, 302:1
**reliable** [5] - 103:21, 148:21, 151:5, 151:13, 245:1
**reliance** [1] - 249:16
**relied** [3] - 107:3, 237:18, 238:1
**rely** [3] - 236:21, 285:24, 286:23
**relying** [2] - 265:24, 308:22

**remaining** [1] - 228:5
**remarks** [1] - 223:17
**remember** [35] - 7:6, 7:8, 7:9, 25:7, 26:20, 26:21, 65:3, 89:11, 91:20, 96:22, 110:24, 120:12, 129:16, 137:15, 159:3, 159:5, 162:18, 201:11, 221:17, 221:18, 229:16, 230:11, 241:18, 242:24, 243:21, 243:24, 244:4, 244:6, 244:10, 244:13, 249:13, 254:23, 263:19, 292:22, 304:20
**remembered** [1] - 268:20

**remind** [1] - 305:6
**remotely** [1] - 270:9
**render** [4] - 8:21, 123:2, 295:12, 302:13
**rendered** [1] - 24:6
**rendering** [4] - 24:14, 40:12, 282:2, 285:19

**repeat** [1] - 105:24
**repeated** [1] - 53:12
**repeatedly** [1] - 281:22

**rephrase** [1] - 180:13
**replies** [1] - 268:12
**report** [261] - 4:24, 7:14, 7:16, 8:1, 8:6, 8:9, 8:19, 9:11, 10:3, 10:11, 10:16, 11:1,

11:5, 11:16, 24:1, 27:10, 28:3, 28:16, 29:5, 32:2, 34:13, 38:6, 38:8, 38:9, 38:18, 38:20, 39:17, 39:20, 40:7, 40:18, 41:3, 43:15, 44:16, 46:9, 49:20, 50:7, 50:11, 50:18, 51:12, 51:15, 51:19, 52:19, 53:15, 54:5, 54:8, 54:24, 55:20, 55:21, 57:12, 60:6, 62:1, 63:7, 63:11, 63:14, 63:15, 63:19, 64:3, 64:15, 67:22, 68:6, 68:8, 68:16, 68:17, 68:22, 68:23, 71:23, 72:16, 84:20, 86:9, 87:22, 95:8, 95:9, 95:23, 99:12, 101:8, 102:19, 105:11, 106:8, 112:7, 112:19, 112:21, 113:2, 113:21, 113:22, 114:4, 116:20, 117:17, 118:9, 119:1, 120:13, 120:17, 120:24, 121:12, 121:16, 121:19, 121:22, 123:9, 123:12, 123:17, 123:23, 126:20, 126:21, 127:1, 127:6, 129:18, 129:20, 134:5, 134:11, 134:13, 136:9, 136:21, 137:4, 137:7, 137:14, 137:18, 138:6, 138:14, 138:15, 138:17, 139:5, 139:23, 140:20, 141:1, 141:10, 141:13, 141:20, 142:9, 142:10, 142:17, 144:11, 146:7, 147:8, 150:12, 154:2, 154:4, 155:19, 157:22, 158:4, 158:18, 161:9, 162:7, 162:19, 168:21, 170:6, 170:17, 171:15, 171:23, 173:3, 175:9, 175:14, 175:21, 175:24, 177:23, 178:3, 184:9, 184:12, 190:6, 200:3, 200:16, 209:20, 210:1, 212:12, 212:14, 212:16, 212:24,

213:7, 214:15, 217:14, 219:6, 219:14, 221:15, 221:19, 223:3, 223:8, 224:9, 229:20, 229:21, 230:8, 230:18, 230:20, 231:6, 231:9, 231:21, 232:10, 232:21, 233:14, 234:23, 235:14, 235:16, 236:2, 236:5, 236:6, 236:20, 237:9, 238:14, 240:9, 240:22, 240:24, 241:22, 242:6, 247:22, 247:24, 249:17, 249:21, 250:6, 250:14, 250:16, 252:12, 252:23, 260:8, 260:10, 260:12, 260:19, 261:18, 261:23, 269:21, 274:17, 285:4, 287:5, 287:10, 287:11, 287:23, 287:24, 288:9, 288:10, 288:20, 288:24, 289:2, 292:21, 292:24, 293:14, 293:17, 293:22, 294:7, 294:12, 294:17, 294:24, 295:1, 295:21, 296:1, 296:6, 296:11, 296:14, 297:11, 298:11, 299:9, 299:14, 299:18, 300:8, 302:13, 302:17, 303:3, 305:16, 306:13, 306:15, 307:5
**report's** [2] - 96:1, 235:16

**reported** [4] - 1:17, 63:21, 213:24, 297:16
**reporter** [4] - 216:6, 225:20, 267:16, 304:10
**Reporter** [4] - 1:18, 3:20, 311:2, 311:11
**REPORTER** [1] - 311:1
**reporting** [1] - 50:16
**reports** [32] - 8:14, 46:4, 52:11, 53:20, 62:1, 65:22, 65:24, 85:7, 88:2, 88:17, 90:19, 103:19, 112:9,

124:16, 124:21, 125:12, 203:18, 211:11, 232:7, 233:4, 233:24, 237:12, 249:10, 252:10, 252:11, 252:15, 252:16, 254:13, 254:15, 254:18, 293:3, 293:23

**represent** [7] - 4:11, 97:5, 97:22, 155:10, 168:17, 209:5, 277:18
**representation** [3] - 139:14, 186:2, 306:6
**represented** [1] - 97:2
**representing** [2] - 54:17, 98:5
**request** [2] - 129:14, 161:23
**requesting** [2] - 268:3, 291:7
**requests** [1] - 230:23
**require** [3] - 15:3, 127:15, 282:3
**required** [20] - 27:1, 28:19, 28:20, 30:4, 31:22, 37:3, 39:8, 46:14, 123:7, 124:10, 152:16, 237:13, 278:5, 278:9, 278:10, 278:13, 278:14, 278:17, 279:4, 280:4
**requirement** [8] - 29:20, 37:3, 122:22, 153:13, 182:6, 194:16, 261:15, 280:13
**requirements** [6] - 18:23, 26:24, 29:16, 29:23, 30:6, 244:22
**requires** [2] - 12:9, 93:4
**requiring** [1] - 72:8
**research** [1] - 25:1
**resembled** [1] - 69:22
**reservations** [1] - 214:22
**reserve** [1] - 18:14
**reserved** [1] - 311:7
**reserves** [3] - 18:21, 18:22, 18:23
**reside** [1] - 275:8
**resided** [1] - 274:24
**resolve** [4] - 124:12, 125:7, 178:5, 178:16
**Resolve** [1] - 177:3
**resolved** [2] - 110:20, 114:17

resource [2] - 299:12, 300:4
respect [18] - 5:18, 8:2, 11:1, 13:1, 63:7, 79:20, 88:1, 141:2, 149:9, 152:8, 155:20, 165:2, 184:2, 184:23, 214:11, 215:3, 221:10, 230:5
Respect [1] - 176:22
respond [2] - 80:10, 237:7
responded [1] - 126:9
responds [1] - 125:21
response [9] - 15:6, 47:12, 187:5, 190:13, 190:23, 226:12, 252:19, 271:1, 304:1
responsibilities [4] - 14:11, 14:23, 15:8, 15:23
responsibility [4] - 139:11, 185:22, 192:5, 301:18
responsible [4] - 15:12, 59:12, 118:14, 127:8
responsive [2] - 127:8, 270:9
rest [6] - 20:7, 22:19, 154:11, 172:4, 268:9, 268:21
restaurant [2] - 132:13, 133:6
result [12] - 8:24, 9:7, 40:4, 41:12, 46:9, 156:11, 237:3, 238:3, 257:23, 259:21, 294:18
resulted [1] - 268:15
resulting [2] - 40:23, 257:16
results [7] - 37:7, 37:15, 73:7, 75:6, 129:9, 265:5, 270:14
resume [6] - 4:24, 8:10, 12:13, 13:8, 20:24, 23:5
retained [2] - 11:20, 248:5
retaining [2] - 8:21, 234:5
retired [9] - 4:12, 20:13, 20:24, 21:5, 23:6, 124:8, 206:22, 207:1, 245:3
retirement [3] - 203:15, 203:23,

286:10
retrieval [1] - 290:7
returned [1] - 270:16
returning [1] - 270:19
revenge [1] - 56:9
review [41] - 7:14, 8:21, 40:22, 49:10, 50:8, 52:11, 52:19, 54:5, 75:18, 77:6, 112:19, 120:11, 134:18, 167:21, 169:11, 184:5, 195:23, 197:24, 199:5, 199:12, 199:14, 200:1, 200:2, 200:24, 205:5, 205:8, 205:13, 208:1, 208:11, 210:18, 231:21, 237:5, 238:3, 249:14, 249:15, 250:13, 254:16, 260:6, 261:20, 262:2, 262:5
reviewed [22] - 27:24, 58:23, 63:12, 63:20, 65:10, 74:13, 94:22, 99:4, 99:9, 99:15, 103:13, 106:15, 117:17, 137:4, 140:22, 154:14, 158:22, 169:4, 196:20, 220:16, 250:10, 250:17
reviewing [4] - 12:12, 205:7, 250:6, 299:9
reward [3] - 105:14, 105:16, 106:4
rewards [1] - 106:13
Rexburg [1] - 21:5
rhyme [1] - 298:1
Rice [1] - 68:19
Rice's [2] - 67:22, 68:6
rights [8] - 30:18, 152:11, 152:17, 153:19, 156:21, 168:6, 188:8, 241:11
ring [1] - 221:21
risk [3] - 21:10, 219:16, 220:4
risky [1] - 219:18
Riverside [2] - 112:22, 133:7
road [1] - 79:16
robbed [5] - 70:2, 70:5, 70:15, 70:21, 133:8

robber [6] - 112:10, 113:24, 131:20, 133:8, 133:16, 133:23
robberies [2] - 69:21, 69:22
robbery [34] - 55:17, 55:19, 55:23, 56:2, 56:7, 56:8, 56:22, 70:10, 70:22, 70:23, 80:12, 80:15, 80:16, 83:3, 83:7, 83:14, 83:20, 84:12, 96:4, 112:9, 112:22, 132:3, 150:23, 154:6, 154:12, 154:17, 155:1, 155:5, 155:22, 155:23, 164:11
robbing [2] - 50:24, 70:7
ROBERT [1] - 2:16
ROCKFORD [1] - 1:7
Rockford [75] - 2:5, 2:6, 2:7, 2:9, 2:13, 2:18, 4:12, 4:14, 8:3, 9:1, 9:7, 10:6, 40:13, 45:19, 49:3, 64:3, 67:12, 68:4, 68:24, 71:1, 72:14, 77:12, 84:5, 87:24, 103:14, 104:8, 104:16, 107:19, 119:7, 119:19, 133:7, 134:19, 139:7, 145:17, 150:7, 154:15, 168:18, 170:11, 170:21, 171:7, 174:13, 175:9, 175:17, 176:1, 176:21, 177:2, 177:5, 180:11, 180:24, 185:18, 188:14, 189:7, 193:7, 193:9, 195:20, 198:2, 208:3, 249:2, 253:7, 263:12, 263:13, 263:14, 264:10, 264:12, 264:16, 273:21, 273:23, 274:15, 274:23, 275:4, 286:1, 294:3, 294:10, 296:5, 308:13
Rockford's [2] - 169:14, 170:15
ROGER [3] - 1:7, 4:2, 310:2
Roger [10] - 1:11, 3:3, 4:9, 115:14, 137:13, 160:10, 172:1, 299:1, 301:13, 311:3

Roger's [1] - 160:12
role [4] - 15:9, 20:2, 20:3, 186:9
rolls [1] - 151:3
Ron [2] - 1:13, 2:14
Ronald [1] - 113:6
room [2] - 14:8, 142:5
Rosenblatt [1] - 25:5
Roshna [2] - 173:22, 307:8
ROSHNA [1] - 2:2
rounds [1] - 140:15
route [1] - 288:15
routed [3] - 287:23, 287:24, 288:4
routine [2] - 181:22, 274:2
RPD [12] - 72:3, 116:21, 172:10, 177:7, 177:16, 187:21, 187:22, 190:9, 199:3, 200:5, 259:21, 260:2
RPD's [4] - 161:16, 164:19, 186:7, 186:18
rule [5] - 34:7, 172:11, 210:21, 279:13, 279:16
Rule [2] - 8:1, 38:24
rules [7] - 28:19, 29:21, 39:24, 282:9, 283:10, 289:14, 293:8
ruling [3] - 91:12, 91:20, 268:4
run [5] - 48:16, 51:14, 56:15, 153:6, 261:5
running [1] - 21:15
runs [1] - 152:20
Russell [3] - 256:7, 256:8, 256:11

## S

safe [1] - 38:7
Saint [1] - 21:17
sake [2] - 116:2, 243:15
Sam [3] - 1:14, 2:15, 82:10
Samantha [45] - 10:9, 49:12, 70:8, 82:13, 82:22, 83:24, 88:23, 89:8, 90:22, 91:6, 102:3, 102:5, 102:7, 103:8, 103:9, 105:6, 105:7, 134:15, 137:24, 138:1, 138:2, 147:8, 147:12, 148:3,

150:8, 154:16, 158:5, 158:6, 163:17, 171:13, 177:11, 177:14, 187:19, 194:20, 219:8, 220:11, 221:11, 222:11, 223:10, 224:2, 224:24, 227:11, 235:7, 238:22, 298:7
Samantha's [4] - 88:15, 96:12, 265:5, 270:15
sample [1] - 33:22
San [3] - 4:22, 13:11, 14:16
sanction [4] - 39:13, 39:24, 40:1, 40:5
sanctions [1] - 39:11
Sandalwood [1] - 246:10
Santee [1] - 4:21
sat [1] - 41:10
satisfy [1] - 98:23
saw [20] - 13:8, 35:6, 51:14, 61:1, 65:7, 65:11, 66:16, 87:19, 88:4, 113:7, 113:17, 114:9, 134:2, 178:18, 227:18, 248:21, 248:23, 255:19, 276:13, 289:11
scan [1] - 234:23
scene [19] - 35:18, 35:24, 48:23, 49:8, 52:4, 52:6, 65:20, 73:1, 76:19, 84:21, 88:13, 158:16, 163:17, 186:3, 186:11, 186:17, 202:20, 202:23, 238:9
scenes [1] - 60:14
schedule [1] - 160:12
Schmidt [16] - 1:14, 2:15, 90:16, 112:18, 149:10, 152:8, 157:2, 171:5, 195:18, 221:16, 221:20, 222:2, 223:9, 227:10, 232:12
school [6] - 21:7, 21:8, 21:11, 21:20, 204:2
schools [1] - 204:3
scientific [2] - 147:4, 253:18
Scientist [1] - 145:15
scientists [1] - 163:15

**scope** [4] - 6:19, 22:10, 145:23, 246:8
**Scott** [31] - 2:11, 54:5, 55:14, 81:6, 90:16, 171:10, 187:16, 196:4, 198:19, 230:6, 230:15, 231:16, 232:3, 232:6, 232:12, 233:23, 234:9, 234:21, 235:5, 235:12, 235:20, 236:1, 236:3, 240:11, 240:24, 241:12, 241:16, 241:23, 242:16, 243:12, 304:19
**Scott's** [10] - 54:8, 54:22, 232:8, 234:18, 235:14, 235:19, 240:20, 240:23, 241:20, 242:7
**screen** [19] - 7:21, 11:3, 45:18, 64:16, 67:20, 71:22, 75:13, 161:10, 168:12, 171:21, 171:24, 219:6, 223:7, 231:10, 241:2, 247:21, 251:12, 305:3, 306:20
**scroll** [6] - 27:11, 34:12, 64:20, 71:23, 135:9, 135:20
**scrolling** [4] - 8:6, 50:11, 51:2, 171:23
**se** [1] - 201:10
**search** [69] - 73:14, 74:21, 75:17, 75:22, 75:23, 75:24, 76:4, 76:6, 76:14, 76:21, 78:12, 78:16, 79:9, 80:3, 80:19, 85:17, 85:19, 85:24, 86:21, 86:24, 87:14, 92:3, 97:17, 97:19, 99:23, 100:1, 100:3, 127:18, 127:20, 127:22, 128:3, 128:8, 128:17, 128:18, 128:21, 128:22, 129:3, 129:6, 129:9, 129:12, 129:20, 130:15, 130:17, 130:20, 131:5, 131:17, 131:24, 132:7, 132:8, 132:13, 133:3, 134:20, 137:8, 139:24, 140:1, 141:6, 141:23, 142:7, 146:10, 146:11,

192:22, 231:23, 235:15, 251:11, 303:10, 303:13
**Search** [2] - 134:15, 177:10
**searched** [3] - 68:19, 141:16, 147:1
**searches** [1] - 146:20
**seasoned** [3] - 180:24, 242:22, 271:18
**second** [31] - 11:2, 42:14, 52:16, 55:12, 63:11, 64:16, 76:23, 92:22, 94:20, 98:24, 139:6, 139:7, 144:19, 148:1, 148:4, 162:16, 164:1, 171:20, 176:18, 234:4, 235:8, 238:3, 238:4, 262:13, 262:14, 269:23, 303:4, 305:13, 306:10, 306:18
**Second** [1] - 299:20
**second-to-last** [1] - 76:23
**section** [20] - 40:7, 50:12, 64:23, 69:19, 71:24, 95:9, 116:20, 120:3, 129:19, 134:12, 139:6, 139:10, 140:9, 147:8, 185:21, 212:13, 241:7, 248:1, 250:19, 268:10
**Section** [3] - 19:24, 241:7, 251:6
**secure** [5] - 73:3, 129:1, 129:7, 147:3
**see** [90] - 7:23, 26:15, 34:17, 40:10, 41:13, 47:6, 48:12, 49:23, 50:13, 55:7, 61:1, 67:19, 69:24, 72:1, 87:7, 95:12, 99:14, 99:21, 99:22, 105:14, 107:5, 113:3, 114:23, 120:20, 122:6, 124:16, 125:11, 131:21, 134:23, 135:15, 135:16, 137:13, 138:11, 138:24, 139:23, 145:18, 147:10, 150:23, 154:7, 157:19, 161:13, 161:18, 166:22, 171:21, 178:6, 180:23, 184:2,

192:22, 193:17, 195:21, 197:3, 200:21, 201:4, 201:20, 210:19, 213:18, 219:5, 222:4, 223:23, 224:7, 229:16, 231:21, 237:20, 241:11, 241:12, 246:16, 246:17, 248:9, 248:11, 249:23, 249:24, 256:22, 262:21, 263:2, 263:9, 267:12, 267:13, 271:14, 288:3, 298:19, 299:14, 303:4, 304:14, 304:15, 304:19, 304:23, 307:4, 307:5, 307:10
**Seeger's** [1] - 293:10
**seeing** [2] - 137:15, 227:20
**seek** [4] - 37:9, 37:16, 66:12, 107:23
**seem** [3] - 171:6, 195:19, 301:1
**sees** [1] - 67:4
**segue** [1] - 175:5
**seize** [2] - 127:22, 127:24
**seized** [2] - 130:11, 291:6
**seizure** [3] - 130:9, 146:12, 147:2
**selected** [2] - 15:4, 21:11
**seminal** [1] - 308:23
**seminars** [1] - 203:10
**send** [6] - 46:12, 48:17, 49:4, 72:4, 268:11, 275:3
**sending** [2] - 72:8, 290:14
**senior** [1] - 263:20
**sense** [9] - 61:18, 100:21, 130:19, 155:3, 159:6, 159:22, 214:5, 214:6, 275:1
**sent** [9] - 61:6, 87:7, 139:12, 185:24, 248:23, 248:24, 253:12, 254:24, 290:8
**sentence** [24] - 11:3, 29:6, 29:15, 47:2, 72:3, 72:7, 139:7, 154:9, 155:15, 195:16, 198:14, 198:16, 228:17,

248:4, 248:10, 256:19, 259:19, 259:24, 261:9, 262:14, 262:19, 263:6, 263:9, 265:3
**sentences** [2] - 125:3, 258:14
**sentencing** [1] - 155:7
**separate** [2] - 17:12, 170:24
**sequence** [2] - 116:16, 144:6
**sequential** [1] - 178:2
**sergeant** [7] - 14:18, 191:13, 191:24, 192:6, 192:10, 249:2
**Sergeant** [4] - 164:8, 164:9, 232:15, 303:9
**sergeants** [1] - 15:5
**serial** [2] - 141:17, 142:11
**served** [1] - 15:24
**service** [2] - 21:6, 192:2
**services** [2] - 14:6, 14:12
**serving** [1] - 216:23
**set** [9] - 41:16, 46:2, 61:22, 99:21, 120:23, 135:7, 238:11, 238:21, 308:6
**sets** [2] - 31:16
**setting** [1] - 236:20
**settles** [1] - 176:11
**seven** [7] - 4:11, 177:14, 188:7, 197:22, 198:4, 198:24, 298:22
**seven-hour** [1] - 298:22
**seven-page** [1] - 188:7
**several** [7] - 53:12, 171:9, 187:15, 198:18, 240:10, 255:8, 260:4
**shall** [1] - 251:10
**shaped** [1] - 46:3
**share** [7] - 7:20, 168:11, 247:20, 287:17, 304:14, 305:4, 306:20
**shared** [1] - 85:22
**sharing** [1] - 172:1
**SHEET** [1] - 310:1
**shell** [8] - 46:11, 47:13, 49:14, 139:19, 261:17, 271:21,

290:1, 290:12
**sheriff** [1] - 15:1
**Sheriff's** [7] - 12:21, 13:2, 17:14, 18:10, 20:13, 90:6, 286:15
**sheriff's** [9] - 13:14, 15:20, 16:10, 17:16, 18:18, 18:19, 19:20, 20:14, 249:4
**shipped** [1] - 249:3
**shit** [1] - 220:13
**shoe** [1] - 66:18
**shoes** [1] - 133:12
**shoot** [2] - 265:6, 270:16
**shooting** [4] - 25:3, 39:15, 39:18, 109:18
**short** [3] - 111:4, 124:12, 125:8
**shortcomings** [1] - 234:18
**SHORTHAND** [1] - 311:1
**Shorthand** [4] - 1:18, 3:20, 311:2, 311:11
**shortly** [1] - 70:3
**shot** [4] - 51:6, 51:13, 108:13, 238:9
**show** [22] - 52:16, 54:15, 63:8, 87:15, 97:12, 98:2, 99:3, 99:7, 112:17, 135:3, 137:2, 137:21, 140:17, 143:24, 200:24, 213:10, 240:20, 249:19, 249:20, 256:15, 301:2, 306:13
**showed** [2] - 115:17, 137:21
**showing** [4] - 54:3, 84:6, 144:2, 156:17
**shown** [1] - 63:9
**shows** [11] - 60:5, 61:7, 61:24, 62:2, 74:15, 87:17, 138:5, 151:4, 184:21, 190:1, 303:5
**shred** [1] - 220:13
**sic** [6] - 21:1, 85:7, 239:2, 267:14, 268:3, 270:21
**sic)** [2] - 28:5, 187:17
**side** [8] - 16:9, 16:11, 24:15, 24:21, 66:17, 72:17, 107:21, 220:24
**sides** [1] - 283:10
**sideways** [1] - 135:15
**sights** [1] - 46:2

**sign** [1] - 81:1

**signature** [1] - 94:5

**Signed** [1] - 310:11

**signed** [7] - 93:17, 94:8, 99:19, 101:23, 156:9, 156:21, 224:15

**significance** [1] - 78:22

**significant** [8] - 57:13, 146:19, 146:21, 214:1, 239:3, 253:1, 257:15, 258:16

**significantly** [3] - 10:11, 146:10, 210:4

**signing** [4] - 115:24, 168:3, 309:18, 311:6

**Silent** [1] - 55:8

**silly** [2] - 38:11, 38:15

**simple** [3] - 158:15, 226:7, 227:5

**simply** [3] - 30:11, 201:7, 296:1

**single** [1] - 21:16

**singular** [1] - 47:3

**siren** [1] - 245:20

**SIS** [1] - 19:23

**Sis** [1] - 150:22

**sit** [17] - 7:6, 24:23, 41:23, 59:10, 97:16, 124:1, 156:24, 161:20, 172:21, 173:1, 212:20, 214:17, 230:10, 232:2, 256:8, 256:14, 272:22

**site** [1] - 283:8

**six** [5] - 96:24, 151:16, 197:19, 245:15, 262:11

**six-foot** [1] - 245:15

**ski** [7] - 50:19, 51:21, 53:8, 113:5, 113:14, 114:10, 133:9

**skin** [3] - 113:7, 113:17, 114:6

**skinned** [4] - 131:21, 133:9, 133:17, 133:24

**skipped** [2] - 87:22, 192:20

**Skipped** [2] - 134:13, 177:9

**slant** [6] - 294:6, 294:24, 296:6, 296:11, 297:11

**slanted** [3] - 293:22, 294:17, 298:10

**slug** [5] - 74:3, 145:11, 145:12, 145:13, 247:9

**slugs** [6] - 46:10, 46:21, 61:6, 139:20, 234:5, 238:15

**smell** [2] - 214:23, 215:1

**Smith** [1] - 290:23

**smoke** [1] - 67:3

**snow** [1] - 65:17

**soft** [1] - 210:3

**sole** [1] - 133:11

**solely** [2] - 96:8, 101:12

**solve** [3] - 10:22, 61:17, 186:16

**solved** [1] - 74:11

**someone** [2] - 191:16, 220:3

**someway** [1] - 255:2

**somewhere** [1] - 250:3

**song** [1] - 297:23

**soon** [2] - 111:5, 207:5

**sooner** [4] - 210:12, 211:6, 211:11, 211:14

**sorry** [52] - 11:9, 11:12, 13:6, 38:10, 38:14, 44:8, 63:8, 69:9, 87:18, 92:7, 93:21, 97:4, 100:3, 102:4, 102:7, 105:22, 115:13, 115:14, 118:22, 120:18, 124:8, 138:1, 143:2, 143:3, 143:5, 147:17, 157:12, 169:18, 173:4, 176:15, 177:21, 178:1, 199:24, 205:7, 208:12, 216:4, 218:18, 221:22, 222:9, 227:15, 228:2, 231:14, 236:9, 254:14, 281:17, 299:18, 302:24, 304:18, 305:5, 305:12, 306:17, 306:22

**sort** [7] - 76:10, 105:13, 111:10, 132:19, 152:4, 301:23

**sought** [1] - 104:9

**sounded** [2] - 51:24, 134:2

**sounding** [2] - 112:11, 114:6

**sounds** [4] - 7:12, 38:11, 168:2, 297:23

**source** [6] - 22:16, 22:18, 30:13, 73:5,

79:12, 103:16

**sources** [5] - 15:18, 79:13, 139:22, 206:11, 252:21

**southeast** [1] - 138:11

**southeasterly** [2] - 51:8, 51:16

**Southern** [1] - 22:7

**space** [1] - 310:8

**spark** [1] - 256:15

**speaking** [1] - 309:4

**speaks** [2] - 93:11, 272:11

**Special** [1] - 19:23

**special** [1] - 20:8

**specialized** [1] - 36:4

**specific** [12] - 23:12, 169:22, 170:10, 170:15, 174:14, 184:21, 193:20, 194:24, 198:6, 200:7, 244:8, 290:10

**specifically** [3] - 213:11, 229:17, 240:12

**speculating** [4] - 79:19, 122:3, 124:18, 125:8

**speculation** [13] - 58:4, 59:19, 59:21, 62:19, 79:21, 122:6, 124:20, 124:22, 125:11, 230:18, 275:6, 289:9, 289:16

**spell** [1] - 28:4

**spent** [5] - 37:22, 38:5, 74:18, 145:12, 175:14

**sponsors** [1] - 33:16

**sponsorship** [1] - 33:18

**spouts** [1] - 80:18

**spring** [2] - 245:15

**Springfield** [1] - 300:14

**spun** [1] - 21:13

**Square** [1] - 285:7

**stage** [1] - 308:6

**staged** [1] - 56:8

**Stalter** [1] - 2:17

**stamp** [1] - 145:4

**stamped** [2] - 112:18, 248:22

**Standard** [1] - 40:8

**standard** [19] - 25:21, 45:20, 45:24, 46:13, 88:7, 90:5, 185:16, 232:16, 239:20, 259:22,

260:3, 276:7, 276:21, 280:18, 280:20, 280:24, 281:8, 286:5, 308:1

**Standards** [4] - 23:8, 23:13, 32:10, 177:13

**standards** [23] - 23:14, 25:24, 29:10, 29:13, 29:24, 30:20, 30:23, 31:6, 31:10, 31:13, 31:17, 32:4, 32:16, 33:9, 34:6, 193:16, 193:20, 199:14, 248:2, 277:24, 302:15, 302:18, 303:13

**standing** [12] - 15:6, 15:19, 26:4, 55:1, 179:18, 210:18, 210:22, 279:13, 279:15, 283:2, 283:7, 293:10

**standpoint** [3] - 185:15, 263:7, 263:17

**stands** [1] - 73:22

**start** [12] - 9:5, 34:16, 34:20, 35:8, 61:3, 110:17, 178:1, 187:13, 191:23, 209:18, 249:21, 268:18

**started** [2] - 20:12, 56:19

**starting** [6] - 43:16, 49:22, 178:3, 246:20, 248:1, 263:11

**starts** [6] - 47:7, 75:24, 199:3, 223:3, 241:3, 268:5

**State** [19] - 1:19, 2:6, 2:9, 9:2, 9:9, 21:1, 145:14, 163:15, 199:13, 260:7, 261:21, 262:3, 262:6, 275:15, 276:4, 276:24, 291:9, 309:13, 311:3

**state** [30] - 4:8, 6:6, 12:8, 18:19, 18:22, 19:3, 29:8, 30:5, 30:14, 37:14, 42:17, 43:5, 74:16, 113:3, 122:20, 122:24, 145:20, 260:11, 260:12, 260:17, 260:21, 261:2, 261:3, 261:5, 278:10, 279:4, 280:3, 280:13, 280:17

**state's** [6] - 123:5, 123:17, 124:2,

287:17, 288:16, 289:6

**State's** [3] - 99:15, 99:16, 122:13

**statement** [102] - 11:8, 11:15, 23:22, 25:15, 35:13, 35:15, 42:15, 44:16, 52:15, 54:2, 56:13, 57:17, 70:9, 73:22, 79:18, 82:18, 93:14, 93:16, 93:17, 93:23, 94:2, 94:8, 94:9, 94:12, 94:16, 95:2, 95:6, 96:12, 96:13, 100:7, 100:16, 100:19, 101:12, 101:13, 101:15, 101:22, 103:2, 103:3, 107:3, 107:19, 109:2, 109:13, 109:17, 110:2, 110:6, 110:10, 110:21, 115:4, 115:9, 116:6, 116:9, 117:19, 148:6, 148:8, 148:12, 151:3, 151:12, 151:15, 152:9, 154:22, 156:8, 156:9, 163:18, 163:19, 163:20, 171:14, 187:2, 187:20, 191:21, 192:11, 194:20, 219:16, 220:10, 221:7, 222:12, 223:12, 224:15, 227:13, 227:19, 239:2, 241:9, 242:6, 244:21, 244:22, 244:24, 250:8, 258:19, 262:23, 277:3, 278:3, 281:19, 281:23, 284:3, 291:19, 291:22, 292:6, 292:8, 292:19, 292:22, 297:17

**Statement** [3] - 95:10, 147:9, 177:15

**Statements** [1] - 177:7

**statements** [30] - 10:23, 43:18, 44:21, 45:14, 56:11, 80:21, 88:14, 88:22, 89:9, 89:13, 101:24, 118:2, 118:10, 123:8, 149:4, 149:24, 150:2, 154:5, 154:11, 155:21, 156:4, 165:11, 178:19, 182:7, 188:3, 188:7, 216:7, 269:12,

279:5, 292:12

**states** [10] - 30:2, 51:20, 248:1, 278:13, 278:19, 278:22, 279:2, 279:6, 280:14, 280:19

**STATES** [1] - 1:1

**States** [2] - 278:17, 283:3

**statewide** [1] - 19:5

**Station** [3] - 13:11, 14:16, 16:14

**station** [16] - 13:10, 13:13, 13:14, 13:18, 13:21, 13:24, 14:18, 17:2, 17:4, 17:8, 17:10, 52:13, 54:12, 292:5, 292:8, 292:14

**status** [1] - 35:6

**stay** [2] - 189:1, 189:3

**Stephen** [2] - 2:11, 229:15

**Steps** [2] - 134:14, 177:10

**steps** [2] - 192:21, 220:3

**Steve** [5] - 229:9, 229:15, 229:22, 236:4

**stick** [1] - 251:4

**sticks** [1] - 251:6

**stickup** [1] - 55:2

**still** [14] - 24:18, 51:5, 53:24, 83:2, 101:6, 152:21, 174:6, 187:6, 228:4, 228:5, 240:22, 291:4, 300:18, 305:3

**stipulated** [3] - 143:12, 145:20, 276:11

**stipulating** [1] - 295:15

**stipulation** [10] - 144:9, 144:13, 145:2, 145:6, 145:7, 146:2, 276:13, 276:16, 295:10, 295:14

**stolen** [1] - 153:6

**stomach** [1] - 160:17

**stood** [1] - 19:16

**stop** [11] - 135:13, 173:5, 173:10, 185:3, 225:13, 225:17, 225:22, 225:23, 226:23, 279:22

**stopped** [1] - 67:17

**Stoppers** [20] - 59:6, 60:18, 77:8, 77:16, 78:5, 78:11, 79:5,

81:23, 82:8, 92:1, 104:11, 104:19, 106:5, 106:7, 106:12, 116:11, 116:18, 117:18, 159:1, 159:8

**stopping** [2] - 207:6, 207:8

**stops** [1] - 172:1

**store** [1] - 61:8

**stories** [1] - 68:11

**storm** [1] - 45:17

**story** [1] - 186:9

**straightforward** [1] - 293:23

**stray** [1] - 45:24

**street** [3] - 48:9, 64:19, 291:19

**Street** [4] - 2:3, 2:6, 2:9, 2:21

**stressful** [1] - 225:4

**strict** [1] - 146:22

**strictly** [1] - 162:13

**strike** [4] - 260:15, 275:22, 275:23, 276:24

**string** [1] - 69:21

**STRIUIPAITIS** [1] - 28:5

**Striupaitis** [7] - 2:22, 28:4, 255:6, 265:11, 265:12, 265:13, 268:14

**Striupaitis's** [1] - 265:18

**stroke** [1] - 271:17

**strong** [1] - 241:10

**strongly** [2] - 270:1, 273:3

**structure** [1] - 13:23

**structured** [1] - 119:8

**stuck** [2] - 87:17, 222:3

**students** [1] - 23:3

**studies** [1] - 33:16

**study** [1] - 292:18

**stuff** [5] - 80:22, 87:4, 88:15, 105:3, 144:1

**stunning** [1] - 271:19

**sub** [1] - 251:5

**sub-item** [1] - 251:5

**subhead** [1] - 207:13

**subject** [2] - 23:1, 224:24

**submission** [1] - 37:19

**submit** [1] - 210:11

**Submit** [1] - 72:1

**submittal** [1] -

270:19

**submitted** [6] - 48:23, 49:8, 93:8, 130:6, 168:22, 211:5

**subscribe** [1] - 205:13

**subscription** [1] - 206:6

**subscriptions** [1] - 206:8

**subsections** [1] - 251:8

**subsequent** [2] - 8:23, 286:8

**subsequently** [1] - 233:13

**substantiated** [1] - 150:18

**substantiates** [1] - 271:1

**successful** [2] - 20:4, 122:9

**succinctly** [1] - 180:23

**sudden** [2] - 86:5, 132:19

**suddenly** [3] - 59:5, 79:23, 81:13

**suggest** [1] - 68:24

**suggesting** [3] - 73:18, 75:5, 90:4

**suggestion** [4] - 59:17, 89:12, 100:18, 121:24

**summaries** [1] - 90:17

**summarized** [1] - 50:14

**summarizes** [1] - 302:17

**summary** [2] - 164:7, 286:12

**summation** [1] - 75:19

**SUNIL** [1] - 2:20

**Sunil** [2] - 246:14, 309:12

**super** [1] - 301:3

**supervise** [1] - 34:15

**supervised** [3] - 35:22, 37:11, 146:20

**supervising** [1] - 232:14

**supervision** [1] - 291:18

**supervisor** [1] - 192:3

**supplements** [1] - 63:15

**supplies** [1] - 15:21

**supply** [1] - 47:24

**support** [15] - 56:11, 75:17, 75:24, 76:6, 76:10, 86:21, 128:20, 161:22, 263:16, 265:9, 265:10, 265:20, 265:23, 272:14, 293:23

**supported** [6] - 164:23, 215:5, 252:9, 263:10, 273:10, 293:4

**supports** [2] - 46:1, 294:13

**Supposed** [2] - 134:16, 177:12

**supposed** [4] - 87:4, 142:19, 226:22, 308:13

**supreme** [1] - 31:9

**surface** [3] - 58:14, 58:18, 60:15

**surfaced** [1] - 58:18

**surfaces** [2] - 59:5, 110:6

**surgery** [1] - 243:20

**surplus** [2] - 15:12, 15:18

**surprised** [1] - 255:20

**surveil** [1] - 20:3

**surveillance** [1] - 82:17

**Surveillance** [1] - 19:17

**surveillances** [1] - 20:9

**surviving** [1] - 46:16

**survivor** [3] - 56:12, 108:23, 109:5

**suspect** [34] - 35:11, 35:14, 37:4, 37:10, 37:17, 46:4, 50:20, 50:21, 51:4, 51:6, 51:7, 53:3, 53:8, 53:11, 55:7, 57:4, 58:2, 59:1, 59:12, 59:18, 65:19, 69:3, 69:12, 69:15, 70:6, 71:5, 72:20, 93:3, 108:19, 113:4, 113:13, 165:18, 166:20, 291:20

**suspect's** [5] - 113:7, 113:8, 113:18, 113:19

**Suspects** [1] - 177:4

**suspects** [11] - 58:6, 64:5, 67:14, 69:1, 90:7, 178:6, 210:9, 278:1, 279:5, 292:13

**suspicion** [1] - 216:1

**suspicions** [7] - 79:14, 214:21, 214:24, 215:3, 215:14, 215:15, 294:13

**suspicious** [1] - 79:22

**SWAT** [1] - 25:3

**sway** [1] - 294:20

**swear** [2] - 110:15, 126:16

**Switzer** [1] - 2:17

**swore** [1] - 132:12

**sworn** [15] - 4:3, 5:10, 18:20, 19:21, 86:15, 86:22, 93:8, 93:11, 93:16, 199:16, 220:9, 220:14, 261:4, 269:16, 311:4

**system** [2] - 12:9, 14:10

**T**

**tactics** [8] - 171:5, 171:13, 187:19, 187:24, 195:18, 195:24, 223:8, 227:10

**tag** [1] - 116:13

**tagged** [2] - 145:8, 145:16

**tailored** [1] - 84:19

**taints** [2] - 244:21, 261:16

**talks** [1] - 91:14

**tantamount** [1] - 242:21

**taught** [4] - 23:1, 31:22, 203:8, 203:10

**Taurus** [42] - 48:7, 48:9, 48:11, 48:21, 49:6, 49:16, 49:17, 73:13, 73:15, 74:3, 74:19, 80:13, 80:17, 84:15, 84:22, 85:12, 85:18, 85:20, 135:18, 136:4, 136:12, 136:16, 136:22, 137:20, 138:7, 138:24, 140:4, 140:11, 142:4, 142:10, 142:12, 145:10, 163:16, 248:8, 255:11, 256:20, 259:11, 262:16, 265:6, 267:2, 270:15

**Tauruses** [1] - 266:24

**TCOLE** [1] - 32:12

**teach** [2] - 21:7, 32:22

**Team** [1] - 19:17

**team** [10] - 19:23, 25:3, 48:4, 78:2, 174:5, 191:14, 192:4, 197:7, 230:3

**teams** [1] - 162:10

**technical** [2] - 14:5, 14:12

**technician** [2] - 28:6, 28:7

**technique** [2] - 290:5, 291:11

**techniques** [2] - 253:14, 253:17

**technology** [1] - 89:22

**ten** [9] - 6:16, 103:24, 108:18, 128:6, 160:6, 223:10, 223:23, 227:11, 229:4

**ten-hour** [1] - 229:4

**tennis** [1] - 66:18

**term** [11] - 23:10, 42:3, 45:15, 72:24, 107:13, 122:8, 165:6, 210:4, 214:23, 263:23, 294:12

**terms** [19] - 48:20, 91:3, 91:22, 92:10, 106:10, 118:13, 128:11, 146:10, 155:8, 181:9, 210:19, 232:24, 239:4, 249:13, 250:15, 255:16, 261:12, 271:20, 301:22

**test** [7] - 168:14, 175:22, 230:21, 244:23, 247:8, 248:7, 262:16

**tested** [2] - 31:22, 186:21

**testified** [25] - 4:4, 20:23, 23:10, 28:15, 88:24, 95:1, 109:20, 125:3, 148:6, 148:7, 148:9, 162:19, 165:7, 165:21, 167:15, 172:10, 200:20, 215:13, 219:10, 230:9, 243:4, 243:13, 269:6, 270:19, 305:9

**testify** [4] - 5:5, 126:3, 148:3, 311:5

**testifying** [7] - 90:4, 106:18, 145:23, 146:17, 212:17,

214:24, 243:12

**testimony** [152] - 8:11, 9:22, 10:4, 10:8, 10:12, 10:13, 10:17, 11:17, 24:2, 24:17, 24:22, 27:21, 27:24, 28:8, 28:9, 28:16, 30:22, 31:3, 32:6, 34:23, 38:3, 43:9, 63:4, 73:9, 73:24, 83:11, 85:1, 85:5, 89:5, 89:7, 89:17, 91:9, 91:15, 92:20, 94:23, 101:1, 101:21, 102:18, 103:9, 106:15, 108:14, 108:17, 109:9, 110:19, 115:12, 117:20, 117:21, 117:22, 118:2, 127:5, 133:20, 134:7, 136:4, 136:15, 141:21, 146:7, 148:12, 148:13, 149:22, 150:12, 151:23, 154:20, 158:8, 162:7, 163:4, 163:14, 164:9, 164:13, 165:3, 167:17, 175:22, 177:23, 180:11, 180:13, 183:9, 183:18, 188:22, 189:11, 190:21, 192:13, 195:5, 197:21, 198:11, 198:12, 199:1, 201:3, 202:5, 206:2, 210:2, 210:14, 210:21, 214:19, 215:20, 217:20, 218:9, 218:20, 219:9, 219:11, 219:13, 220:10, 220:15, 224:9, 224:20, 227:3, 228:22, 230:8, 238:14, 239:13, 240:24, 241:3, 241:20, 242:3, 242:7, 242:12, 242:16, 245:8, 248:16, 249:14, 249:15, 249:22, 250:1, 250:7, 250:10, 250:13, 250:15, 250:17, 251:3, 251:4, 251:7, 253:13, 255:12, 257:6, 260:20, 261:23, 269:10, 269:17, 271:5, 279:7, 279:10, 279:12, 280:9, 282:6, 286:18,

288:6, 291:16, 291:24, 293:6, 295:7, 301:19, 310:6, 311:6

**testing** [1] - 210:12

**tests** [2] - 139:13, 185:24

**Texas** [1] - 32:12

**THE** [92] - 1:1, 1:2, 4:18, 4:21, 5:3, 5:7, 11:12, 17:7, 20:19, 21:23, 26:17, 27:12, 28:24, 32:23, 33:15, 35:22, 39:3, 52:9, 60:22, 69:7, 71:10, 71:14, 81:12, 87:3, 89:4, 92:7, 98:21, 99:1, 102:6, 106:23, 111:9, 111:14, 111:17, 111:20, 112:1, 112:4, 115:13, 115:15, 143:4, 147:17, 147:23, 148:17, 149:19, 149:23, 151:24, 159:16, 159:20, 160:15, 160:20, 161:7, 167:24, 168:3, 168:6, 180:4, 183:7, 185:5, 189:3, 191:12, 196:12, 206:3, 208:16, 208:23, 215:10, 216:13, 223:2, 233:18, 235:5, 236:11, 236:18, 242:13, 243:8, 246:17, 246:19, 246:22, 252:19, 258:24, 267:8, 267:11, 271:12, 272:10, 275:20, 280:3, 284:18, 298:14, 298:17, 298:24, 301:5, 304:1, 304:5, 308:18, 309:10, 309:18

**themselves** [7] - 23:21, 38:13, 48:1, 48:14, 156:4, 182:17, 305:18

**therefore** [3] - 102:21, 192:3, 245:1

**thereof** [1] - 147:2

**thesis** [1] - 12:10

**they've** [1] - 138:3

**thin** [1] - 53:6

**thinking** [1] - 160:13

**third** [7] - 55:13, 69:18, 138:17, 154:3, 176:24, 262:19, 303:5

**Third** [1] - 2:3

**thirty** [2] - 160:21, 177:16

**thirty-one** [1] - 177:16

**Thomas** [1] - 300:14

**thorough** [4] - 248:6, 248:14, 248:20, 251:18

**threat** [5] - 110:4, 157:17, 225:5, 226:10, 226:15

**threaten** [1] - 110:15

**threatening** [3] - 220:12, 223:12, 227:13

**threats** [7] - 220:19, 220:22, 225:1, 226:6, 226:9, 226:14, 228:19

**three** [17] - 6:2, 12:17, 14:2, 15:5, 16:19, 24:18, 48:6, 49:15, 55:11, 62:16, 73:10, 73:15, 126:19, 154:5, 164:23, 244:2, 253:12

**threw** [1] - 132:3

**throughout** [9] - 23:11, 45:21, 170:6, 173:3, 184:8, 184:11, 196:4, 205:14, 278:16

**throw** [1] - 130:23

**thug** [1] - 59:4

**thunders** [1] - 188:21

**ties** [1] - 83:16

**Timely** [1] - 71:24

**timing** [3] - 48:20, 49:2, 53:14

**tip** [6] - 77:8, 78:11, 79:5, 81:24, 105:17, 117:18

**tips** [1] - 106:13

**title** [1] - 244:15

**titled** [3] - 64:23, 71:24, 95:9

**titles** [1] - 251:8

**today** [12] - 7:6, 11:17, 32:7, 38:1, 45:6, 124:1, 144:8, 156:24, 214:21, 214:24, 215:13, 232:2

**today's** [3] - 37:21, 75:15, 133:4

**took** [30] - 11:7, 26:21, 51:2, 51:3, 61:11, 62:1, 67:17, 81:16, 87:14, 104:17, 116:15, 121:9, 128:14, 134:4, 136:20, 136:22,

215:15, 237:4, 239:23, 242:13, 243:2, 252:4, 264:18, 265:16, 271:15, 286:7, 291:17, 291:19, 297:5

**tool** [2] - 247:9, 290:18

**toolmarks** [2] - 247:1, 247:10

**top** [10] - 29:5, 43:14, 43:15, 107:1, 129:19, 129:23, 135:20, 135:21, 195:17, 241:6

**topic** [5] - 182:22, 202:4, 202:15, 204:11, 214:20

**topics** [4] - 188:16, 189:8, 226:11, 228:15

**torture** [1] - 64:1

**total** [5] - 20:6, 59:19, 59:21, 160:2, 198:5

**totality** [1] - 153:4

**totally** [1] - 246:7

**touched** [2] - 46:19, 271:21

**tow** [1] - 153:7

**toward** [1] - 55:8

**towards** [3] - 207:8, 297:21, 297:24

**track** [1] - 41:19

**tracked** [1] - 84:5

**train** [2] - 172:16, 187:23

**trained** [26] - 22:23, 23:22, 92:24, 147:3, 169:17, 187:22, 197:7, 199:4, 201:1, 201:7, 201:15, 201:16, 202:3, 202:4, 241:13, 242:14, 242:17, 242:24, 243:4, 243:13, 244:9, 244:16, 245:6, 247:12, 302:1, 304:21

**Trained** [1] - 161:11

**Training** [3] - 23:8, 23:13, 32:11

**training** [38] - 7:15, 19:1, 21:20, 22:13, 23:14, 25:20, 25:21, 29:8, 30:3, 32:7, 32:9, 33:22, 36:5, 79:14, 171:11, 171:17, 172:11, 187:17, 198:20, 199:6, 199:9, 199:21, 200:19, 200:20, 201:4, 201:11, 201:12,

218:11, 235:21, 240:12, 241:24, 242:21, 244:2, 244:4, 244:20, 247:4, 285:18
**training's** [1] - 201:12
**transcribed** [3] - 1:17, 35:17, 89:14
**transcript** [4] - 241:2, 309:6, 309:14, 310:4
**transcripts** [1] - 102:17
**transfer** [4] - 255:9, 270:6, 272:2, 273:20
**transferred** [2] - 272:10, 275:11
**transferring** [1] - 276:21
**transmittal** [2] - 186:20, 273:11
**transport** [3] - 139:11, 147:4, 185:23
**transported** [1] - 186:18
**treat** [2] - 81:18, 81:19
**treated** [2] - 149:10, 150:16
**treatment** [2] - 223:5, 223:17
**trends** [1] - 205:2
**trial** [40] - 25:2, 27:20, 27:23, 28:12, 28:16, 42:21, 85:5, 103:10, 108:14, 108:17, 109:10, 109:21, 110:20, 117:21, 127:5, 143:12, 144:5, 144:10, 144:15, 148:1, 148:4, 148:9, 148:13, 164:1, 165:7, 165:21, 197:21, 212:17, 219:10, 219:12, 230:10, 238:3, 238:4, 250:1, 250:7, 250:15, 250:17, 257:10, 285:15
**trick** [1] - 304:21
**tried** [8] - 96:23, 149:5, 215:7, 215:10, 223:4, 227:8, 283:24, 308:6
**trouble** [9] - 59:5, 81:3, 122:8, 125:22, 213:14, 213:15, 214:13, 221:24, 224:21

**troubling** [1] - 40:24
**truck** [1] - 50:20
**true** [22] - 7:18, 8:7, 11:8, 82:13, 103:16, 110:6, 112:12, 114:11, 116:3, 116:15, 126:23, 155:13, 172:13, 240:18, 240:22, 251:24, 256:24, 284:10, 288:8, 293:4, 310:5, 311:6
**truly** [1] - 282:18
**truth** [15] - 107:22, 217:24, 218:14, 220:7, 239:24, 257:10, 258:9, 283:23, 301:22, 308:8, 308:9, 311:5
**truthful** [9] - 11:15, 11:17, 132:9, 148:23, 183:9, 218:20, 238:23
**truthfully** [2] - 5:5
**try** [8] - 66:1, 107:23, 143:21, 175:6, 207:3, 207:7, 253:11, 255:8
**trying** [17] - 30:19, 31:12, 47:3, 65:2, 103:23, 119:2, 119:4, 130:22, 149:17, 162:9, 183:14, 225:18, 225:19, 236:24, 237:22, 285:5, 297:19
**tunnel** [1] - 69:3
**turn** [10] - 27:10, 43:14, 122:22, 123:3, 123:12, 167:22, 234:10, 246:11, 247:20, 247:24
**turned** [2] - 51:7, 122:24
**Turner** [9] - 46:17, 67:14, 67:23, 68:8, 68:20, 68:23, 69:18, 69:20, 71:6
**turning** [2] - 234:6, 238:15
**twenty** [4] - 177:7, 177:12, 177:14, 262:11
**twenty-five** [1] - 177:12
**twenty-seven** [1] - 177:14
**twenty-six** [1] - 262:11
**twice** [1] - 108:13
**twisted** [1] - 258:11
**two** [65] - 6:2, 12:6,

12:20, 13:20, 19:18, 33:1, 46:11, 48:11, 48:17, 49:4, 49:12, 58:15, 58:18, 61:14, 61:17, 69:12, 69:16, 73:17, 74:13, 80:13, 80:16, 83:16, 84:5, 84:7, 85:20, 105:6, 113:12, 114:7, 125:3, 136:6, 138:24, 140:3, 140:18, 145:12, 150:13, 170:24, 172:21, 172:22, 173:1, 174:11, 174:14, 175:7, 175:13, 175:15, 175:16, 183:21, 188:10, 204:1, 209:5, 224:10, 224:14, 245:18, 246:5, 248:4, 248:13, 251:17, 258:14, 266:16, 282:1, 286:5, 286:12, 286:24, 308:19, 308:21
**two-door** [1] - 246:5
**two-year** [1] - 12:6
**type** [4] - 38:9, 38:12, 251:10, 291:1
**typed** [1] - 99:18
**types** [6] - 6:17, 15:7, 44:21, 155:16, 218:24, 254:17
**typical** [2] - 17:9, 38:17
**typically** [6] - 31:7, 120:3, 156:8, 156:11, 166:20, 233:9
**typing** [2] - 225:21, 233:4

## U

**U.S** [6] - 29:10, 29:14, 29:17, 30:21, 31:14, 139:12
**ultimate** [4] - 218:14, 283:23, 285:10
**ultimately** [1] - 297:18
**umbrage** [1] - 131:12
**unabated** [2] - 181:2, 181:15
**unaware** [2] - 31:16, 79:3
**uncontested** [1] - 251:1
**uncovered** [1] - 115:21
**undeniable** [1] -

273:14
**under** [25] - 19:19, 29:23, 30:15, 30:16, 34:1, 34:6, 38:24, 75:2, 82:16, 86:15, 86:22, 115:3, 123:16, 139:6, 140:3, 146:24, 161:10, 247:17, 253:19, 271:5, 275:14, 279:13, 282:8, 282:9, 291:17
**undercut** [1] - 166:5
**undercuts** [3] - 116:4, 146:3, 276:17
**undermines** [1] - 200:5
**Undermines** [1] - 177:16
**underneath** [2] - 69:18, 303:6
**understood** [9] - 178:21, 179:12, 180:7, 180:12, 180:17, 180:19, 254:17, 264:17, 285:17
**unemployment** [2] - 109:20, 110:16
**unequivocal** [1] - 238:6
**unfolds** [2] - 88:11, 91:16
**unfortunately** [3] - 171:5, 195:18, 271:16
**unidentified** [4] - 64:17, 66:6, 78:20, 116:17
**unique** [1] - 79:22
**unit** [4] - 19:15, 119:12, 119:20, 186:19
**United** [2] - 278:17, 283:3
**UNITED** [1] - 1:1
**units** [2] - 19:18, 61:1
**universe** [2] - 207:14, 208:7
**university** [1] - 12:9
**University** [2] - 22:6, 204:1
**unjust** [1] - 298:5
**unknown** [5] - 50:19, 51:21, 116:17, 198:5, 214:9
**unknown-race** [2] - 50:19, 51:21
**unless** [6] - 27:3, 27:13, 107:4, 150:17, 156:7, 217:4

**unmarked** [1] - 245:14
**unpublished** [1] - 203:5
**unquestioned** [1] - 217:24
**unquote** [1] - 219:13
**unrelated** [1] - 130:3
**Unreliable** [1] - 95:10
**unreliable** [4] - 95:15, 102:21, 150:4, 150:17
**unsure** [1] - 51:9
**untruthful** [1] - 218:21
**unusual** [3] - 119:18, 255:9, 269:21
**unwritten** [2] - 180:5, 188:23
**up** [60] - 19:7, 30:7, 34:12, 37:21, 45:18, 47:16, 50:4, 60:5, 61:7, 61:24, 62:2, 66:1, 66:5, 68:22, 74:2, 74:15, 75:13, 78:19, 85:19, 85:20, 86:7, 92:17, 93:19, 97:4, 99:18, 105:23, 109:1, 110:10, 119:21, 120:8, 120:15, 126:20, 138:4, 139:18, 158:13, 164:6, 173:17, 178:4, 186:14, 191:2, 205:1, 207:6, 209:18, 219:6, 223:8, 225:21, 241:2, 250:12, 250:23, 279:12, 281:20, 283:6, 286:16, 303:5, 305:2, 306:1, 306:14, 306:18
**update** [2] - 28:16, 28:20
**updated** [1] - 232:13
**updates** [1] - 232:7
**US** [1] - 185:23
**Utah** [1] - 279:1

## V

**vacation** [1] - 86:6
**vague** [11] - 17:6, 17:15, 17:21, 17:23, 19:12, 21:22, 35:21, 36:6, 43:7, 90:20, 191:10
**valid** [3] - 47:20, 47:21, 279:13

**Valley** [1] - 16:14
**value** [1] - 72:15
**Van** [1] - 2:17
**Vantrele** [1] - 67:13
**variety** [1] - 34:9
**various** [1] - 24:2
**vault** [1] - 270:18
**vehicle** [3] - 245:17, 245:21, 246:4
**vehicles** [1] - 69:23
**verbal** [6] - 84:19, 149:24, 154:5, 155:21, 225:5, 225:7
**verbally** [2] - 75:3, 86:9
**verging** [1] - 230:21
**verifiable** [1] - 115:1
**verification** [6] - 91:14, 107:10, 265:18, 267:2, 269:1, 269:6
**verified** [23] - 74:5, 80:14, 80:22, 82:17, 82:19, 82:21, 83:1, 109:13, 109:23, 115:1, 218:24, 265:4, 265:20, 265:24, 267:6, 268:13, 268:17, 270:14, 271:4, 271:6, 271:24, 272:15
**verifies** [1] - 167:1
**verify** [2] - 74:5, 107:23
**versed** [1] - 34:15
**version** [2] - 161:17, 164:21
**versus** [4] - 4:13, 8:3, 25:6, 252:24
**vetting** [1] - 103:21
**via** [11] - 1:12, 2:3, 2:6, 2:10, 2:14, 2:18, 2:22, 4:3, 77:8, 78:11, 311:3
**victim** [1] - 46:17
**video** [5] - 88:12, 88:13, 88:22, 90:6, 158:16
**VIDEOCONFEREN CE** [1] - 1:6
**videoconference** [9] - 1:12, 2:4, 2:6, 2:10, 2:14, 2:18, 2:22, 4:4, 311:4
**view** [7] - 10:22, 43:21, 44:23, 181:7, 181:16, 182:5, 291:5
**viewpoint** [2] - 285:5, 285:6
**Violated** [2] - 134:14,

177:10
**violated** [3] - 39:23, 192:21, 193:2
**violation** [3] - 30:18, 124:6, 127:7
**violations** [2] - 213:16, 214:14
**violence** [5] - 119:12, 119:21, 120:4, 120:16, 287:8
**violent** [1] - 119:20
**Virginia** [2] - 25:2
**vision** [1] - 69:4
**visual** [1] - 114:9
**voice** [5] - 53:4, 112:11, 113:9, 113:19, 114:6
**volumes** [2] - 286:5, 308:19
**voluntarily** [2] - 81:15, 153:2
**voluntary** [1] - 151:15
**vs** [1] - 1:6

# W

**wait** [18] - 9:19, 12:10, 26:18, 27:13, 41:21, 61:14, 81:5, 92:13, 98:23, 98:24, 126:12, 130:12, 188:12, 203:21, 253:15, 267:12, 270:24, 295:24
**waiting** [2] - 27:17, 138:3
**waive** [1] - 241:11
**waived** [1] - 311:7
**waiver** [1] - 156:21
**wall** [7] - 60:8, 60:12, 87:18, 135:17, 136:1, 138:10, 139:3
**wallet** [3] - 51:2, 51:6, 108:12
**wallets** [1] - 55:3
**wants** [3] - 109:1, 160:10, 292:21
**warnings** [2] - 36:19, 36:23
**warrant** [79] - 37:17, 73:14, 74:21, 75:17, 75:22, 75:23, 75:24, 76:4, 76:6, 76:11, 76:14, 76:22, 78:12, 78:17, 80:3, 80:20, 83:13, 85:17, 85:19, 85:24, 86:22, 92:3, 96:18, 97:1, 97:3, 97:5, 97:14, 97:17,

97:18, 97:19, 97:23, 98:6, 99:20, 99:23, 100:1, 100:3, 100:4, 100:11, 100:22, 115:8, 115:17, 126:17, 127:18, 127:19, 127:20, 127:23, 128:17, 128:18, 128:21, 129:1, 129:3, 129:4, 129:6, 129:7, 129:12, 129:15, 129:20, 130:1, 130:5, 130:15, 130:17, 130:20, 131:13, 131:16, 131:17, 132:1, 132:7, 132:8, 132:13, 132:22, 133:3, 134:20, 137:8, 141:6, 161:23, 306:4
**warrants** [4] - 60:17, 128:3, 128:8, 131:15
**washing** [1] - 243:19
**wasting** [2] - 98:13, 245:23
**watch** [2] - 16:17, 16:22
**ways** [9] - 27:5, 45:24, 73:2, 149:7, 175:10, 181:3, 210:7, 211:3, 260:4
**wealth** [1] - 257:19
**weapon** [22] - 42:13, 142:23, 143:23, 163:8, 163:9, 167:9, 167:10, 167:12, 237:16, 238:7, 238:20, 247:11, 253:8, 257:13, 257:14, 259:5, 259:6, 265:6, 270:16, 285:11, 291:2
**Weapon** [2] - 134:16, 177:12
**wearing** [2] - 113:14, 133:9
**Weaver** [1] - 300:3
**Web** [1] - 283:8
**weekend** [1] - 309:17
**weigh** [1] - 210:15
**weighed** [2] - 220:21, 220:22
**weighing** [1] - 284:2
**Welfare** [1] - 21:14
**well-established** [1] - 185:16
**well-worn** [1] - 133:10
**Welty** [64] - 2:22, 28:6, 48:4, 48:24,

49:8, 73:8, 73:23, 74:16, 74:23, 74:24, 75:6, 75:10, 76:18, 84:18, 85:11, 85:16, 85:17, 85:23, 86:4, 86:17, 254:23, 255:2, 261:14, 262:21, 263:3, 263:7, 263:17, 263:19, 263:22, 264:3, 264:15, 265:4, 265:20, 265:24, 266:10, 267:5, 268:15, 269:16, 270:2, 270:3, 270:14, 270:18, 270:21, 271:2, 271:4, 271:20, 271:24, 272:11, 272:15, 273:2, 273:3, 273:15, 273:16, 273:17, 274:4, 274:24, 275:11, 290:1, 290:11, 290:22, 302:8, 302:10, 302:12
**Welty's** [17] - 73:18, 85:1, 254:19, 255:8, 262:24, 263:4, 265:10, 265:22, 266:3, 266:5, 266:8, 266:17, 267:5, 269:5, 269:16, 270:6, 271:5
**Wesson** [1] - 290:23
**West** [4] - 2:9, 2:21, 112:22, 133:6
**WESTERN** [1] - 1:3
**whatsoever** [1] - 149:1
**whereabouts** [1] - 165:22
**white** [19] - 112:11, 113:4, 113:7, 113:9, 113:14, 113:17, 113:19, 113:24, 114:6, 114:8, 114:10, 132:5, 133:8, 133:24, 134:2, 246:5
**white-sounding** [2] - 112:11, 114:6
**whodunit** [1] - 58:11
**whole** [9] - 42:11, 42:12, 137:13, 146:2, 223:17, 300:21, 300:22, 301:14, 308:8
**wholeheartedly** [1] - 258:12
**widely** [1] - 172:14
**widely-accepted** [1] - 172:14
**wife** [5] - 117:2, 121:9, 122:15,

125:18, 287:7
**Williams** [1] - 2:11
**WilliamsMcCarthy** [1] - 2:9
**willing** [3] - 86:7, 224:19, 266:12
**willingly** [1] - 109:1
**Windham** [117] - 10:12, 10:13, 49:11, 49:15, 60:4, 60:13, 61:4, 61:7, 61:9, 61:10, 61:15, 61:21, 61:24, 62:11, 74:15, 77:6, 77:15, 77:20, 78:2, 78:4, 78:10, 79:1, 79:4, 79:23, 80:1, 80:18, 80:24, 81:7, 83:1, 83:14, 84:4, 84:12, 88:15, 88:22, 89:8, 89:20, 91:12, 91:19, 94:16, 95:1, 95:10, 95:14, 96:9, 100:15, 100:17, 100:21, 101:2, 101:13, 101:14, 101:15, 102:18, 102:20, 103:3, 103:4, 103:7, 103:17, 104:10, 104:18, 105:12, 105:20, 106:3, 106:16, 108:9, 108:14, 109:14, 109:23, 109:24, 110:4, 110:7, 110:8, 112:9, 112:14, 112:23, 114:18, 114:19, 115:20, 116:22, 117:1, 118:10, 118:13, 118:15, 121:1, 121:3, 121:13, 121:23, 122:1, 122:2, 122:15, 122:23, 123:21, 125:15, 126:10, 126:17, 126:21, 158:24, 159:4, 159:8, 159:13, 159:14, 167:2, 177:7, 177:9, 190:10, 213:14, 213:20, 213:22, 214:7, 214:12, 287:3, 287:6, 287:7, 302:6, 302:10, 302:11, 307:16
**Windham's** [18] - 60:1, 93:14, 93:22, 94:1, 94:22, 100:19, 100:20, 107:3, 108:4, 109:2, 110:21, 115:4, 115:9, 116:6, 117:18,

121:2, 124:10, 163:18

**Windhams** [1] - 306:16

**Winnebago** [5] - 88:24, 96:17, 97:8, 102:10, 122:13

**wish** [2] - 121:13, 268:13

**wished** [1] - 307:12

**withheld** [3] - 213:3, 213:11, 213:13

**WITNESS** [91] - 3:2, 4:18, 4:21, 5:3, 5:7, 11:12, 17:7, 20:19, 21:23, 26:17, 27:12, 28:24, 32:23, 33:15, 35:22, 39:3, 52:9, 60:22, 69:7, 71:10, 71:14, 81:12, 87:3, 89:4, 92:7, 98:21, 99:1, 102:6, 106:23, 111:9, 111:14, 111:17, 111:20, 112:1, 112:4, 115:13, 115:15, 143:4, 147:17, 147:23, 148:17, 149:19, 149:23, 151:24, 159:16, 159:20, 160:15, 160:20, 161:7, 167:24, 168:3, 168:6, 180:4, 183:7, 185:5, 189:3, 191:12, 196:12, 206:3, 208:16, 208:23, 215:10, 216:13, 223:2, 233:18, 235:5, 236:11, 236:18, 242:13, 243:8, 246:17, 246:19, 246:22, 252:19, 258:24, 267:8, 267:11, 271:12, 272:10, 275:20, 280:3, 284:18, 298:14, 298:17, 298:24, 301:5, 304:1, 304:5, 308:18, 309:10, 309:18

**witness** [22] - 10:4, 26:12, 28:11, 39:5, 98:13, 113:17, 114:3, 121:23, 122:7, 125:22, 134:2, 221:24, 226:17, 226:22, 230:23, 230:24, 272:6, 287:24, 291:19, 291:20, 311:4, 311:6

**witness's** [1] - 301:19

**witnessed** [1] - 65:14

**witnesses** [19] - 9:23, 43:18, 44:21, 45:23, 90:8, 112:10, 113:12, 113:23, 114:4, 165:6, 165:20, 166:9, 239:12, 239:17, 239:19, 240:2, 278:1, 279:5, 292:13

**wonder** [2] - 160:10, 300:9

**Wood** [1] - 55:8

**Woodlawn** [1] - 82:22

**word** [4] - 35:24, 124:23, 125:1, 294:14

**words** [8] - 62:10, 78:4, 88:10, 125:20, 152:10, 181:15, 292:11, 294:6

**wore** [2] - 53:8, 113:5

**works** [1] - 173:23

**workup** [1] - 166:14

**world** [1] - 151:1

**worn** [1] - 133:10

**worth** [2] - 15:21, 160:13

**wrap** [1] - 173:17

**wrapping** [2] - 305:2, 306:1

**write** [15] - 7:14, 15:6, 38:18, 86:18, 88:18, 107:1, 141:14, 157:22, 161:15, 188:20, 212:12, 216:6, 292:21, 293:17, 296:1

**writes** [2] - 86:10, 86:11

**writing** [8] - 39:17, 88:1, 158:17, 175:14, 237:12, 240:10, 240:16, 292:24

**written** [60] - 35:13, 35:16, 37:18, 38:20, 44:17, 89:9, 89:21, 93:16, 93:17, 93:22, 94:8, 95:2, 100:7, 100:16, 101:15, 101:22, 115:9, 117:19, 133:13, 142:17, 143:18, 146:9, 148:6, 148:8, 148:11, 156:4, 163:17, 163:19, 163:20, 170:3, 171:8, 179:1, 179:7, 179:11, 179:22, 179:23, 180:5, 180:6, 181:4, 181:23, 182:15, 183:11, 187:14, 188:15, 189:8, 189:13, 189:19, 190:5, 193:20, 194:4, 194:16, 198:17, 219:16, 240:13, 262:6, 269:13, 271:1, 272:1, 273:14, 275:9

**wrongdoing** [7] - 215:5, 215:15, 229:9, 229:23, 230:16, 232:3, 235:12

**wrongful** [4] - 7:1, 7:4, 11:20, 41:17

**wrote** [19] - 11:6, 20:6, 40:17, 45:7, 50:22, 55:20, 55:21, 56:18, 113:22, 122:20, 133:21, 137:18, 150:3, 188:10, 215:23, 271:17, 287:11, 293:3

## Y

**year** [16] - 6:15, 12:6, 16:22, 16:23, 16:24, 17:1, 108:17, 109:6, 109:10, 109:16, 109:24, 110:6, 128:7, 217:2, 217:7, 286:10

**years** [27] - 5:11, 6:16, 8:12, 8:15, 12:17, 12:20, 15:13, 16:14, 19:8, 24:3, 24:19, 92:24, 95:1, 128:7, 150:24, 181:1, 216:21, 218:6, 223:24, 224:7, 226:20, 243:22, 244:9, 244:16, 245:6, 257:17, 285:10

**yes-or-no** [1] - 174:17

**yet-unidentified** [1] - 64:17

**yields** [1] - 73:1

**York** [1] - 278:24

**youngster** [1] - 67:3

**yourself** [4] - 36:11, 163:1, 205:18, 231:4

**youth** [1] - 21:10

## Z

**zipper** [1] - 133:10

**zipper-front** [1] - 133:10

**ZOOM** [1] - 1:6

**zoom** [1] - 172:3

**Zoom** [9] - 1:12, 2:4, 2:6, 2:10, 2:14, 2:18, 2:22, 4:3, 311:3