# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

August 20, 2021

Roshna Bala Keen, Esq.
Rachel Brady, Esq.
Lindsay Hagy, Esq.
Loevy & Loevy
311 North Aberdeen Street, Third Floor Chicago, IL 60607

Ashley Rosa Waddell Tingstad
Treetown Law, PLLC
214 N. Fourth Avenue, 2nd Floor
Ann Arbor, MI 48104
ashley@treetownlaw.com

**Regarding:** *Patrick Pursley, v. City of Rockford, Illinois, et al. Case No. 3:18-cv-50040*

Dear Counsel:

Thank you for retaining me to review and render opinions regarding the investigation into the Andrew Ascher homicide and the subsequent arrest and prosecution of Mr. Patrick Pursley (Mr. Pursley) as a result of the actions of Rockford Police Department (RPD) Defendant Officers and Illinois State Police (ISP) Defendants. Mr. Pursley was acquitted at a subsequent re-trial and declared "factually innocent" by the Winnebago County Criminal Court. Pursuant to the requirements of Rule 26, I have reviewed investigative reports, deposition transcripts and other material (as listed below) provided to me thus far regarding this case. Please be advised that if additional materials become available, a supplemental report may be necessary.

In expressing my opinions in this report I do not make credibility determinations. That is, I do not opine for the trier of fact regarding who are the more believable witnesses - Mr. Pursley or the Defendants in this case. Although I may describe certain conduct, if believed, as contrary to sound and standard police practices, the resolution of any factual conflicts is obviously within the purview of a jury to decide.

## Material Provided and Reviewed Thus Far:

1. Plaintiff's First Amended Complaint.

2. Protective Order.

3. Defendants' Responses to Second Set of Interrogatories.

4. Testimony (Deposition Transcripts and/or Trial Testimony):
   a. RPD Detective Jeffrey Houde deposition and trial testimony
   b. RPD Evidence/Property Technician Charlene Getty deposition and trial testimony
   c. RPD Detective Gregory Hanson deposition
   d. RPD ID Officer/Sergeant John Genens deposition and trial testimony
   e. RPD Sergeant Stephen Pirages deposition
   f. RPD Detective Mark Schmidt deposition and trial testimony
   g. RPD Detective Scott Bruce deposition
   h. RPD Detective Peter Striuipaitis deposition
   i. RPD Detective Jack Welty deposition and trial testimony
   j. RPD Officer Rinaldo Gallardo trial testimony
   k. RPD Officer James Bowman trial testimony
   l. RPD Officer James Barton trial testimony
   m. RPD Officer Douglas Williams trial testimony
   n. RPD Officer Christine McNally trial testimony
   o. Illinois State Police 30(b)(6) Witness William Eugene Demuth
   p. Samantha Crabtree trial testimony
   q. Samantha Crabtree Grand Jury testimony
   r. Samantha Crabtree deposition
   s. Marvin Windham deposition
   t. Marvin Windham grand jury testimony
   u. Marvin Windham trial testimony
   v. Ann Switzer deposition
   w. Dan Gunnell 1994 trial testimony
   x. David Bodell Deposition

5. Rockford Police Department Procedures:
   a. C&G 907-1458 – Entire Manual.
   b. COR&GETTY2018-2025 - Guidelines for Criminal Investigations.
   c. COR&GETTY2026-2033 - Evidence and property handling procedures
   d. COR&GETTY2034-2042 - Rights of Arrested Person

6. Evidentiary Documents:
    a. C&G 1-333 (Ascher Investigation File)
    b. C&G 345-55 Photos from 6.10.1993.
    c. Opinion granting COI
    d. "2 Teens Charged with Murder," *Rockford Star*, May 12, 1994
    e. PURSLEY1806-07 (*People v. Antrone Turner,* Statement of State's Attorney)
    f. PURSLEY1809-10 (*People v. Antrone Turner,* People's Motion in Limine 2)
    g. PURSLEY1814 (*People v. Antrone Turner,* Probable Cause Statement)
    h. Schmidt 59-67 (Burger King Robbery Documents)
    i. Schmidt 73-119 (First Bank North Robbery Documents)
    j. Schmidt 120-132 (Poe Shooting Documents)
    k. Grand Jury Testimony of Samantha Crabtree
    l. Samantha Crabtree Affidavit
    m. Pursley 2960-2961 (Peoples Exhibit 55)
    n. Pursley 39262-63 (Declaration of Mandy Santiago)
    o. WCSAO 351-54, Pursley 15136-37 (Answers to Discovery Motions)
    p. C&G 1660-1664
    q. Pursley 12030-12163 (Crabtree-Pursley Correspondence)
    r. FBI Subpoena Response 1-147

7. Other Material:
    a. Criminal Investigations, International Association of Chiefs of Police, Kendall/Hunt Publishing, Dubuque, Iowa, 1989
    b. *Brady v. Maryland*, 373 U.S. 83 (1963)

## Qualifications and Methodology

My opinions are based in part on my training, professional experience and education. I am a twenty-seven-year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993.

My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18-month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served in the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This

process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career from November 1987 to March 31, 1993, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects. In the course of my work in N.O.R.S.A.T., as well as my prior law enforcement experience, I became very well-versed in how to conduct and supervise homicide investigations from start to finish, how to interview witnesses, identify and/or eliminate suspects, pursue leads generated from the physical evidence, how to document police activities in reports, preserve evidence, and determine when sufficient evidence existed to pursue arrests and criminal charges.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

On June 16, 2021, I was selected by the Los Angeles County District Attorney as a member of FACCT - an independent team assigned to re-examine fatal use of force incidents by law enforcement officers and recommend further action when appropriate.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On

October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons. I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law, Los Angeles, California. On February 18, 2020, and on March 10, 2021, I lectured (at request) at the University of California - Irvine, School of Law, Civil Rights Litigation Clinic.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in Border Network, et al. v. Otero County, et al., Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

To formulate my opinions in this case, I reviewed the factual record and evaluated the Ascher homicide investigation in light of my law enforcement experience, training, and education about reasonable and generally accepted police practices.

**Brief Overview Of Standard Police Practices in 1993 And The Deviations I Observed In This Investigation:**

As a former police detective and commander of detective units, I can attest to the latitude and discretion placed into the hands of investigators to follow leads and solve crimes. Detectives must have investigative authority to be effective, but it is a public trust necessarily linked to the oath offered at trials to provide only "the truth, the whole truth, and nothing but the truth." Thus, detectives in 1993 were trained that criminal investigations must, above all, be an honest search for the truth – this is the moral obligation required and implicit in the detective assignment.

The practical, legal, and moral impediments to an honest investigation range from simple incompetence to deliberately illegal and immoral acts that contaminate the core of the investigation itself. These deliberate acts can include statements from witnesses that are

extracted through mental coercion, and/or physical force, the manipulation of the evidence to favor a predetermined point of view, and hiding exculpatory facts discovered during the investigation that would be important to the defendant. According to the record, a number of these acts occurred in this case and are listed below.

Detectives typically gather evidence through two primary sources: Physical Evidence and Witness Accounts. Physical evidence is always prized as the best indicator of what actually occurred.

Physical evidence (when gathered and processed correctly) does not have memory lapses, cannot be corrupted, and does not prevaricate. On the other hand, detectives are well aware that informant accounts can be notoriously unreliable and require vigorous corroboration from other facts connected to the investigation, particularly when informants have something to gain or something to hide.

The Rockford Police Department deviated from standard police practices consistently throughout this investigation in many areas, from their handling of the physical evidence to their interrogation of witnesses. The decision to regularly stray from the standard ways of policing and to cut corners supports a conclusion that these detectives set their sights on Mr. Pursley and shaped the evidence and their reports to fit their suspect.

The detective investigation resulting in the arrest, booking and prosecution of Mr. Pursley was grossly deficient and did not meet the legal and professional standards and procedures required from every certified officer and which are taught at every academy and which are also required by State and Federal Law. These basic standards are reflected in the RPD's policy documents, criminal investigation books from the time period, and were routinely taught to law enforcement officers including me over the years.

The facts in the record document a misleading investigation by the Defendant Detectives and Investigators in particular. It cannot be overstated that they were trained investigators allegedly versed in the detective skills and who, by virtue of their training and experience, would be expected to know what was required in an investigation of this type. In my opinion, without any difficulty whatsoever the Defendants should have obtained the obvious evidence that would establish that Mr. Pursley was not and could not have been present at the scene of the crime. There was in fact no dependable evidence that could corroborate that Mr. Pursley was involved, and in fact the Detectives failed to pursue many leads about other suspects.

The following statement is not meant to be an all-inclusive recitation of the facts related to the arrest, investigation, prosecution, and conviction of Patrick Pursley. It is simply a

framework based on the documents and material reviewed, which should make the following opinions easier to understand.

**Brief Overview of Events and Commentary:**

**The Ascher Murder and Rebecca George's Observations**

On April 2, 1993 at around 10 pm, Andrew Ascher (Andrew) and his girlfriend Rebecca George (Rebecca) were parked in a residential parking area in front of Rebecca's brother's condominium at 2709 Silent Wood Trail in Rockford, Illinois. They were talking inside the parked car. The driver's side door of the Ford Explorer was slightly opened. A man wearing a face mask approached the driver's side of the car and pulled the door wider open. The man pointed a gun at the couple and demanded their wallets.

When interviewed, Rebecca reported that she removed cash from her purse and offered it to the perpetrator. He would not take the money. Rebecca began looking in her purse for something else to offer the man.

At the same time, Andrew was reaching for his wallet, the assailant suddenly fired the gun, striking Andrew twice in the head. Rebecca stated after the shots she saw the assailant run away from the car in an easterly direction. (COR&GETTY40; T.154 ("T." refers to the 1994 Criminal Trial Transcript)). After Andrew was shot, Rebecca ran to her brother's apartment to call the police.

The initial police interview of Rebecca states that the assailant was an "unknown race male with a ski mask over his face." (COR&GETTY 39). Rebecca said he "sounded Black when he spoke." Her observations about the assailant's race or appearance provided very little in the way of leads and could not allow the police to confidently narrow down to one race.

RPD Officers and Detectives including Schmidt, Forrester, Genens, Houde, Williams, Barton, and Reffett reported to the crime scene and found the victim with his wallet in his lap. There were several $20 bills in the wallet and other bills on his lap. (COR&GETTY36-40). It was standard police practice at the time to explore possible motives for the crime, in an effort to identify a suspect. Here, it is required in a reasonable police investigation to have considered since no money was taken that robbery was not the actual motive for this crime. It is standard investigative procedure to look at the motive for a killing, but I did not find any reports documenting that RPD explored other possible motives. Given that the assailant did not complete the robbery, other motivations including revenge required investigation.

Rebecca told the Rockford Register Star two days after the murder that she believed the second shot may actually have been intended for her. (Pursley 2960-61.) Accordingly, RPD should have explored people who had motive to harm her or her boyfriend.

Andrew Ascher was transported to a hospital where he died from the gunshot wounds. Police recovered three bullet casings and a bullet fragment from the car where Andrew was shot. Another spent bullet was recovered from Andrew's shoulder after the autopsy. Three days later, on April 5, 1993, another spent bullet was recovered from the dash of Andrew's explorer.

**RPD's Investigative Failures to Resolve Leads and Develop Evidence of Possible Suspects**

Law Enforcement Officers in 1993 were trained to a professional investigative standard that recognizes the constitutional reality of presumed innocence. This means that, within the limits of circumstances, all reported crimes require a competent and unbiased investigation to determine:

> (1)  the likelihood that a crime had occurred and;

> (2)  the probability of identifying a suspect who can be convicted for that crime.

The object of a competent investigation according to minimal standard practices in 1993 – especially in a case of this type – was to impartially develop a case that can be successfully prosecuted, or acknowledge the deficiencies and work for further facts that develop the truth of the matter. In my opinion, the established methods to do this were not followed here prior to Mr. Pursley's arrest.

Detectives are trained that they must follow the evidence where it leads, including doing an initial canvass, interviews of any eyewitnesses, and inspection of the physical and forensic evidence. Those are crucial and necessary steps at the outset of any homicide investigation. If there are leads or possible suspects who are ruled out, that too should be documented and explained. Both the detectives investigating the homicide and the RPD chain of command are responsible for ensuring the integrity of the investigation.

Detectives are required to share all relevant information with each other in real time as the investigation is evolving. That is how teams of detectives can keep the investigation moving forward intelligently, and how the lead or case detectives knows everything that's happening in the investigation. This commonly occurs through verbal updates between detectives and supervisors, and through the sharing of written notes and reports. In this case, detectives testified that the practice in RPD was no different than what I have

described as the general practice. Detective Hanson testified that detectives kept each other apprised of investigative steps, and they would get reports from other units. (Hanson Dep. 55.) In addition to sharing relevant information with the assigned detectives on any given shift, the supervisor and the case detective are concerned with every aspect of the case and try to learn all the relevant facts as they are being gathered.

Here, it appears the primary, or lead, detectives in the case were Forrester, Schmidt and Scott. They would have been regularly updated on all developments and also made sure that supervising Sergeant Pirages was also informed of all major developments. (Pirages Dep. 86, 306; Schmidt Dep. 33-34.) It is standard practice and to be expected that the lead/case detectives are aware of all information contained in the police file.

**Failure to investigate initial suspects in the Ascher Case:**

In my opinion, RPD departed from standard police practices and abdicated their duty to seek the truth because they did not pursue alternate suspects, including investigating:

- Rebecca George's ex-husband
- The yet-unidentified person observed hiding behind the dumpster who possibly lived in the apartments down the street (see pages 33-34 below)
- Antrone and Vantrele Turner, two brothers who were thought to be involved in the crime and later turned out to commit a string of similar robbery/murders.

As noted above, several detectives were assigned to participate in the initial investigation. Forrester was the case lead and was working closely with Detectives Schmidt, Scott, Hanson, Pirages, and Houde. (Pirages Dep. 86; Genens Dep. 113; Schmidt Dep. 158; *see also* COR&GETTY 1-333.) Based on the work performed in the case and the testimony from Schmidt, it appears that Forrester was the case detective, along with Schmidt and Scott who played central roles. (Genens Dep. 113; Schmidt Dep. 158; Pursley 005948.) There were at least two initial suspects who should have been thoroughly investigated. The RPD Detectives did not investigate any suspects, however, until they received a Crime Stoppers call in June 1993. (Schmidt Dep. 98-100.) If they did investigate these suspects, there is no record of it, nor an explanation of why those suspects were ruled out. This was improper, as I explain below.

### *Rebecca George's Ex-Husband*

- The day after the shooting, at the hospital, Rebecca told an officer with the RPD that she had problems with her ex-husband after their divorce. She did not specify what those problems were and was not questioned further. She said that her

boyfriend Andrew, the victim, would often help her resolve them. (COR&GETTY81.) She told the RPD that her ex-husband "played games" in order to "mentally torture her." (COR&GETTY81.) The RPD report stated that the reporting officer did not obtain Rebecca's ex-husband's name or question her further about the problems he had with her. (COR&GETTY81.) This report is contained within the police file and would have been received by Sgt. Pirages. (Hanson Dep. at 130-104.) It is reasonable to believe that the detectives investigating the case would have learned this information about what the eyewitness said.

- As I note above, Rebecca told a reporter that she thought the second shot may actually have been intended for her, and that she was spared because her boyfriend Andrew's body had shielded her from the bullet.

- Based on accepted practices in criminal investigation in 1993, it was a glaring deviation from standard police investigative techniques for the detectives investigating the Ascher homicide to ignore Rebecca George's ex-husband as a potential suspect. There is no evidence that Detectives Forrester, Schmidt, Scott, or any other detectives, or Sergeant Pirages, took steps to find out the ex-husband's name or attempt to interview him about the murder. We do not know if he had an alibi or access to a firearm. If he was in fact a disgruntled ex-husband who was upset that Rebecca was romantically involved with another man that would constitute a fairly classic motive. It would also explain why no money was ever taken from either the victim or Rebecca.

- The record does not indicate the ex-husband's race. But again, we do not know the race of the perpetrator. Rebecca initially said the person sounded Black but specifically was noted in the police report as being unable to identify race ("unknown race male with a ski mask over his face"). At trial, she did say she saw Black skin around the eyes. But that statement was much later on after the investigation was over, and in any case, we cannot be sure she was describing the perpetrator, as opposed to Mr. Pursley who was sitting in the courtroom as the defendant. It is a common phenomenon to incorporate the features of the accused suspect into their memories of the perpetrator, such that when they see a defendant in the courtroom, they are likely to pick out that defendant or describe the assailant as resembling the defendant, because of the strong propensity to assume that the defendant is the assailant. The memory is contaminated by information learned after the incident, such as the name and identity of the person who was charged with the crime. It is much more likely that Rebecca's accounts given shortly after the murder and two days later, before a suspect was named, accurately reflect her observations.

***Turner Brothers***

- RPD was notified of Antrone and Vantrele Turner and it was thought they may have been involved in the Ascher murder. The reason why they were linked to this murder does not appear in any report, but this is important information that should have been documented.

- They lived two blocks (4232 Harrison Ave.) from the Ascher murder (2709 Silentwood Trail). According to a police report, one of the Turner brothers had a prior armed robbery and was seen dressed in all black. Vantrele and his brother Antrone were interviewed by RPD on April 3, 1993 at 3:15 am, at their home. (COR&GETTY 65-69.) They did not have a clear alibi and were involved in smashing the glass on another car that same night. RPD officers investigating this case "believed this black male may have been involved in this [Ascher] homicide." (COR&GETTY 65-69.)

- It is noteworthy that after the Ascher homicide, Antrone Turner was involved in a string of robberies that closely resembled the Ascher crime, including robberies and assault of persons exiting their vehicles. (*See, e.g*, PURSLEY1806-07.)

- The detectives' failure to pursue, let alone rule out, Turner as a suspect is an omission that does not have a legitimate explanation, based on standard police practices. Typically, when detectives fail to pursue alternate suspects, it is because they have identified a different suspect they like and who they pursue with "tunnel vision" to the exclusion of others.

## RPD Abandoned Generally Accepted Police Practices with Respect to the Physical Evidence

In a basic investigative failure, the case detectives did not submit the bullets and casings from the crime scene to be tested until after they had a suspect weapon in mind. Then, they mishandled the Taurus 9mm that they recovered from Samantha's home and had large gaps in their documentation of the seized evidence, which allowed them to represent the condition of the handgun in a way that was favorable to their pursuit of Pursley.

The failure to following established protocols for handling physical evidence is very problematic, especially in a case like this where there physical evidence is at the center of the police case. Failing to follow procedures gives detectives the opportunity to cut corners, shape the evidence after it has been recovered, and prepare the reporting after the fact to fit the theory they are pursuing.

*Failure to timely submit the firearm evidence*

RPD deviated from commonly accepted practice by failing to send the ballistics evidence for immediate processing. Instead, Forrester and the assigned detectives held onto the evidence and did not submit it for analysis until after they had a suspect and specific firearm in mind, at which point they got a preliminary, informal opinion instead of a formal report.

Forrester made the calls about what testing should be done. (Genens Dep. 153.) That is typical in police investigations, for the case detective to make decisions about when to submit evidence for testing, and what kinds of tests to request. In my many years of experience working on and supervising criminal investigations, the case detective or primary detective is the one who directs the steps in the investigation, including whether and when to have evidence examined. Forrester, Schmidt, and Scott, all of whom played central role in the case, were in the best position to control when and how the slugs and casings were examined in the Ascher investigation.

After the bullets, bullet fragments, and casings were recovered, they were not sent for processing to the entity who did evidence analysis for the RPD: the Illinois State Police crime lab. (Hanson Dep. 131-132; Scott Dep. 152-153.) Instead, they sat at the RPD evidence and recovered property section for two months. (Getty Dep. 75.) The slugs and casings was not evaluated until *after* the detectives had a suspect in mind (Patrick Pursley) and had a specific firearm that they believed was involved in the crime.

It was a basic investigative failure to sit on the crime scene evidence for two months instead of having it examined and suggests that the detectives were not actively trying to investigate the case. Crime scene evidence can provide valuable information about the crime, such type of firearm and ammunition was used, whether there are any unique or distinctive characteristics of the weapon, and such. It will help detectives identify what weapon they are looking for, and potentially tie together different crimes. Sgt. Pirages testified at his deposition that it would make sense to submit the crime scene evidence only after there was a gun to compare it to (Pirages Dep. at 258-262), but earlier he had testified that such evidence should be submitted soon (Pirages Dep. at 172-177, 180-181), and the standard police practices in 1993, as now, would be to submit the crime scene evidence for testing even before a suspect weapon was obtained so that any clues from the evidence could be gathered. (Genens Dep. 103-05; Pirages Dep. 174-179.) In 1993, Identification Detective Genens would also "very frequently" send casings or bullets over to the Crime Lab without a gun in order to develop leads for an investigation. (Genens Dep. 103-05.)

***Detectives Submit Crime Scene Evidence After They Have A Suspect***

As I note above, Detective Forrester waited until he had a suspect and a suspect weapon before submitting the slugs and casings to the lab. The evidence was in the RPD evidence room from April 2 until June, when Forrester spoke with informant Marvin Windham about Patrick Pursley. According to the police reports, on June 8, Windham told Forrester that Patrick Pursley was in possession of two 9mm handguns. That same day, Detective Hanson obtained records showing that Pursley's girlfriend Samantha Crabtree had purchased a 9 mm Beretta and a 9 mm Taurus. Specific make and model were provided.

On June 9, Forrester arranged for the two Ascher bullet casings, bullet fragment, and spent casings to go to Jack Welty (Welty) of ISP.

Welty and Forrester knew each other prior to the Pursley matter. (Welty Dep. 127-28.) Welty did a preliminary examination for Forrester without doing a full analysis. (T. 262, 252-53 (Welty).) It appears this was quite unusual within RPD to get a verbal "preliminary opinion," especially on a rush basis. None of the RPD Detectives or ISP examiners could point to another situation in which this occurred. (Scott Dep. 79-80; Welty Dep. 143-44; Individual Defendants' Responses to Second Set of Interrogatories, ROG 1 (Welty; Schmidt; Hanson).)

We do not know what information was exchanged between Forrester and Welty before Welty began his investigation, because Welty's notes have never been disclosed regarding this conversation or his work on the case. Forrester did not disclose his notes or report on this conversation either, other than simply to indicate that he had the evidence tested. (PURSLEY 003213-15.) It is likely that Welty and Forrester spoke about the case before Welty examined the evidence. Welty believes he knew the case involved was high profile and time-sensitive. (Welty Dep. 145-148.)

Welty told Forrester that the three main types of guns possibly shot those casings – a Taurus, a Beretta, or an Astra, but the "most likely" would be a Taurus. (COR&GETTY 155-156; Pirages Dep. 219; T. 263-65 (Welty).) No one from RPD made a contemporaneous report of this conversation, either.

If this were an appropriately conducted criminal investigation in 1993, Forrester should have documented the information he gave to Welty. Welty should have submitted his own notes and report so that we could have a real-time view of what went into Welty's analysis. If Welty knew the police were hoping to match a Taurus, or if Welty said there were any unusual features or marks on the crime scene bullets and casings, that information is highly relevant and should have been documented. Their failure to do so was improper based on established standards for criminal investigations.

**Marvin Windham Gives Them A Crime Stoppers Tip, But The Detectives Improperly Pursue This Tip In Several Ways**

On June 8, 1993, a caller later identified as Marvin Windham called Crime Stoppers and said he had information about the person who had killed Andrew, robbed a bank, and burglarized a Burger King. Detectives Forrester and Scott participated in the call. Detective Forrester wrote a report of the conversations with this caller ten days later. (COR&GETTY 109-110.)

The caller (Windham) said that he knew "for sure" that Pursley killed Andrew and that he still had the gun at his apartment. The caller told Detectives Forrester and Scott that he had known Pursley for several years and that Pursley would brag to him about committing crimes, and that on April 3 or 5, he went to Pursley's house and overheard Pursley on the phone with someone from the unemployment office, and that he got mad at her and hung up. According to the caller, Pursley said "he was tired of this shit" and tired of "these white peckers and was going to start killing them," and that he had just killed one the other day and planned to kill more. According to the report, the caller (Windham) said Pursley told him that he told the victims "this ain't no joke, give me your money," and that the victims said they would give him their money but not their wallets or purses. The report also says that the caller said that Pursley told him he shot the man twice in the head, and then ran to his girlfriend's car and she drove them away. (COR&GETTY 109.) The report also says the caller (Windham) said that Pursley showed him a newspaper clipping about the murder. The report says that the caller told them that Pursley told them that he had to get the gun adjusted after the Ascher murder. (COR&GETTY 110.)

The report says that the caller (Windham) told them that Pursley always wears combat boots when he commits a crime, and that Pursley showed him the 9mm semiautomatic pistol, and the report says that the caller told them that Pursley told him that he and his girlfriend, Sam, had stolen a car and robbed a bank. According to the report, Pursley told the crime stopper that he committed the robbery while holding a police scanner and had his gun in his pocket but never had to use it, and that he was wearing his ski mask. The report says that the caller also told them that Pursley told him he had robbed a Burger King about four weeks ago. (COR&GETTY 110.)

### *RPD Did Not Contemporaneously Document the Windham Statements*

I did not find any contemporaneous documentation of the Crime Stoppers call in the RPD file. The only report of this call was written **after Pursley was arrested**. It would be standard procedure to make a record of a call with this level of detailed inculpatory information right away, so the information could be verified. The fact that Scott and

Forrester did not make a contemporaneous report of this call is a significant departure from widely accepted police practice.

It appears that RPD officers had a practice of writing a summary police report at the end of a case, with the information they believed to be relevant at the time the case was cleared and closed. Pirages testified that this could be weeks after events took place. But officers should be trained that once a case file is opened, they should document all investigative leads with a report. This is as fundamental as a surgeon washing his hands before surgery. The report must be contemporaneous, and under no circumstances should a detective wait until an investigation is over before memorializing the investigation. The purpose of police reports is so police can refresh their recollections at trial and provide *all* the information about the case to the prosecutor. If officers are not preparing reports of their steps along the way, it is impossible for a prosecutor/criminal defense attorney to follow along and develop exculpatory evidence. If detectives do not write reports right away, the event becomes stale in everyone's memory, evidence can be lost, and the story can changes to fit the outcome. Because detectives must pursue the truth, the pathway beginning to end must be documented. Contemporaneous documentation becomes even more important when officers are dealing with statements that were allegedly made by unreliable witnesses, because the details are often what reveals whether the witness is credible. When officers do not memorialize the statements immediately, it allows the detective to write the results with the specific outcome in mind. If RPD did not train its detectives to make contemporaneous reports, RPD committed egregious violations of standard police practice. If it did not, it could lead to inaccurate documentation, lead manipulation, and focus on innocent people.

RPD also did not make a contemporaneous report of Windham's second statement.

### *Windham Was Unreliable, and His Statement Alone Did Not Establish Probable Cause to Arrest Pursley*

It was certainly reasonable for the police to investigate Marvin Windham's tip. However, the requirement for the detectives was to test the information and investigate whether there was independent, reliable evidence of what Windham alleged. However, the records shows that the information Windham provided about the Ascher murder and Patrick Pursley's involvement suffered from obvious problems and therefore could not constitute probable cause to arrest Pursley, or even conclude that he was involved in the crime:

- Windham was obviously biased and therefore an unreliable informant. At the time the police got the tip from him, Windham had an extensive criminal record, a drug addiction, and may have been engaged in an affair with Pursley's girlfriend, Samantha Crabtree, while he was married and father to three children. (T. 569-

572, 607, 617-18.) Windham denied the affair at trial T. 604, but Pursley's girlfriend, Samantha Crabtree, gave multiple sworn statements that she and Windham were involved in an affair that began in February 1993 and continued through early June 1993. (T. 418.)

- Windham said he was selling cocaine in April 1993 and was an addict by December 1993. (T. 607 (Windham).) His criminal record indicates multiple drug-related offenses. It was standard practice then and now to review a witness's rap sheet, so that the detectives would be aware of the strong possibility that Windham was addicted to drugs and possibly even on drugs whey were interacting with him.

- There was a financial reward for solving the Ascher murder, not other crimes. A trained, experienced detective like Forrester, Scott, Schmidt, and others working this case would recognize that someone with an active addition may be particularly willing to win the reward money at all costs.

This evidence should have given the detectives strong reason to view Windham's statements with great suspicion. It has long been taught to police officers that it is critical to examine the motives of a witness when evaluating how credible they are, how much to rely on their statements, and how much independent corroboration to seek out. RPD should have considered these many red flags in evaluating Windham's susceptibility and credibility.

According to standard police procedure in 1993, when working with an informant, "Law enforcement has the responsibility to evaluate the informant and the information given in order to arrive at the truth. Thus, the motive is important, and an attempt to determine the motive should be made." (Criminal Investigations 127.) Assessing the credibility of a source is a fundamental aspect of gathering testimonial evidence in a criminal investigation. The quality of a witness's credibility and believed truthfulness when offering his account of an event will often influence how much weight to give to the evidence when reaching certain conclusions throughout the investigative process. In my opinion, relying on information that is not properly vetted against objective factors, or failing to take reasonable steps to corroborate the information provided by a source, is a departure from commonly accepted police practice.

Windham was not a known informant who had proven to be reliable in the past and had been vetted through approved police channels. So his credibility and reliability were unknown and had to be viewed with scrutiny. Even if the detectives believed Windham gave accurate information about Pursley in regard to certain things, they were obligated to investigate whether he had truthful information about the Ascher murder. Evidence involving different crimes cannot be lumped together.

A major red flag with Marvin Windham was that he did not come forward and report any of his supposed information until a financial reward was offered. Windham was addicted to drugs and had a strong financial need. The detectives investigating this case could not reasonably have relied on Windham's statement unless every key fact was corroborated by good quality evidence. That did not happen, however. The standard practice in 1993 would have been to verify the statements made in an informant call, particularly one subject to a financial reward. Detective Schmidt acknowledged that "a lot of times" they would try to corroborate statements from witnesses. (Schmidt Dep. 113.) Detective Bruce Scott, who took Windham's statement, testified that he had never had any contact with Windham before and thought he was being truthful. Scott Dep. 185. Scott testified that he did not know about the cash reward until trial. Experienced police officers know that crime stoppers and similar tip lines often involve financial rewards. Scott does not remember taking any steps to verify Windham's statements. (Scott Dep. 137, 185-86.) Failing to explore possible motives for an informant's testimony was contrary to standard police practice.

Facts in Windham's account were flat-out contradicted, were inconsistent, or could not be corroborated. For example:

- Windham claimed that Pursley told him Andrew and Rebeca "said they weren't going to give him the purse or wallet but just going to give him the money, and he shot him twice." (T.577-78 (Windham).) However, Rebecca does not say that, and this description of the crime is inaccurate. (T.160-169 (Rebecca George).)

- Windham first said he heard Pursley swear at and threaten the person from the unemployment office and tell the person on the phone that he was going to start killing white peckers but later said that he heard Patrick saying those things after he hung up the phone (and thus not being contradicted by the unemployment office employee). The record does not suggest that anyone at RPD tried to interview the employee with whom Pursley spoke, which is a basic investigative step that RPD failed to do. That employee testified at trial and disputed Windham's account by testified that she had no memory or record of Pursley threatening her. (T.760-764 (Tickner).)

- Windham said Pursley pulled out a newspaper clipping of "the fire man;" and that Pursley threatened to kill him and Samantha if he got sent to the penitentiary for these crimes. (COR&GETTY 247-49.)  But there was no such newspaper clipping found at Pursley's residence. (COR&GETTY 245; T.735) (stipulation that Houde would testify that "no newspaper clippings or articles regarding the Andy Ascher homicide were recovered" from Pursley's apartment).

- Also, the fact that Windham referred to the victim as the "fire man" suggests that he had been reading outside information about the crime. That information does not appear in the newspaper clipping Windham claims Pursley showed him. (Pursley 2960-61 (People's Exhibit 55).)

- The reports from the Burger King Robbery Windham referenced say that witnesses described the robber as white and with a white-sounding voice. (COR&GETTY 247-249.) If that is true, Pursley cannot be confused with the person who committed the Burger King crime; there is no reason he would have told Windham that he did.

- While there were elements of what Windham told to police that proved to be true and could be corroborated, for instance, that Pursley had a bag of money and appeared to be in possession of a stolen car, Windham did not seem to have credible evidence about the Ascher homicide. The information Windham reportedly gave the police about the Ascher crime were details he would have known just from being friends with Samantha Crabtree (i.e., what guns she bought) or details he got from the news (that a white man was shot in his car, etc.). The non-public details he offered were wrong: Pursley did not have a newspaper article at his house about the crime, and his unemployment case worker was not threatened as Windham claimed.

Windham's statement did not give probable cause to arrest and charge Pursley with murder. At this point, the detectives could have followed up on Windham's accusation by investigating Pursley, but unless the investigation turned up reliable evidence that indicated Pursley's guilt, they were not justified in arresting or initiating charges against Pursley for the Ascher crime.

### *RPD Did Not Disclose Information About Benefits It Provided to Windham*

There are also factors that suggest Windham may have had a "cozy relationship" with RPD. Windham gave his statement in June of 1993. In November of 1993, Windham assaulted his wife and stole her car. The responding officer observed physical injuries. His wife wanted Windham arrested for battery and also for stealing her automobile. (COR&GETTY 1572-1754.) But Windham was not arrested. Instead, Detective Forrester got involved in this domestic violence matter.

Ordinarily this would be a case that Forrester would not handle, because he was a homicide detective and one of the most senior, if not the most senior, detective in the unit at the time. In my years of experience handling and supervising investigations, a senior detective in the violent crimes division would only be involved in a situation like this if

there was some other connection. In this case, Windham was clearly Forrester's witness and had been giving Forrester statements against Pursley. Forrester contacted Windham's wife and wrote a report stating that she did not want to pursue charges. (COR&GETTY1572-1576.)

Merely a week or so later, Marvin Windham allegedly tried to enter his ex-wife's home again, this time different patrol officers and arrested him on scene for disorderly conduct on November 24, 1993. (COR&GETTY1577-1583.) The ex-wife did want to have Windham arrested. The fact that she was willing to file a complaint against Windham indicates that she was not too afraid to do so, and it becomes particularly inexplicable why Forrester reported that she didn't want to pursue charges after being badly beaten the previous week.

In addition, Detectives Reffett and Genens investigated a robbery at another Burger King in September 1993, where Windham was a suspect. (COR&GETTY1563-1568.) Windham was never questioned in connection with that robbery. (Windham Dep. 241.) The similarity of Windham accusing Pursley of a Burger King robbery (without any corroborating evidence) and then himself being a suspect in that very crime a few months later is not something to gloss over. If Windham was in fact involved in this robbery, it was obviously the type of crime that he was willing to commit and may even have contemplated a few months earlier when he called Crime Stoppers to report Patrick Pursley for various crimes.

Windham was arrested by Rockford Police for domestic battery on March 28, 1994. (COR&GETTY1660-1664.) These charges were dismissed less than two weeks after he testified at Pursley's criminal trial. (PURSLEY 014051.) In my experience, if a key trial witness has this extensive of a criminal record and has pending charges, it is possible for police to offer leniency in order to ensure that witnesses will continue telling a particular story. The timing of the arrest and dismissal of charges strongly indicates that the police were trying to control Windham for the Pursley trial.

The State's Attorney disclosed all the pending charges to Mr. Pursley and his defense attorney, but this incident was not disclosed, nor was Forrester's involvement disclosed. (WCSAO 351-354; Pursley 15136-37.) Assuming that the State's Attorney would comply with the requirement to turn over all information regarding Windham, there is no evidence that Forrester turned this information over to the State's Attorney. This is an obvious violation of *Brady* for which Forrester is responsive. Forrester was required to disclose Windham's criminal activity to the prosecutor and the fact that he intervened to resolve the matter short of an arrest. Making a criminal complaint go away is a significant benefit to give a witness, particularly here where domestic abuse cases can in some instances be charged as felonies. In fact, the police report documenting this information

does not appear in the RPD police file for the Ascher homicide investigation and there is no record of Forrester having ever disclosed or told this development to the prosecution.

Windham also admitted that the State paid him for his cooperation, and that, in addition to money, he asked the State for leniency for his wife in connection with a criminal case she was facing at the time. T.587 (Windham).

By the time he testified at trial, Windham's story was that Pursley told him he had to adjust the gun so the police wouldn't be able to pin the murder on him. (Pursley 4998.) Details about the gun being "adjusted" are first seen in Forrester's complaint for search warrant dated June 10, 1993. The warrant says that that Windham told him that Pursley had his girlfriend, Samantha, take the gun to a shop for repairs. But the report of Windham's statement on June 12 says Windham told them Pursley had the gun adjusted so it couldn't be "traced back" to him. This phrasing also appears in Forrester's police report dated June 18. Detective Schmidt and Detective Forrester then asked Samantha about adjustments to the gun because Windham had informed them that the gun had been changed. (Schmidt Dep. 186-87.) He testified that he did not know at the time what kind of make the gun was. (Pursley 4999.) This is contrary to his grand jury testimony that the gun was a Taurus. (PURSLEY14046.) The fact that his testimony changed on this point suggests that he had been made aware by some source that a Taurus was found at Pursley's apartment. There is no reason a witness should have known this information unless it was publicly available (which casts doubt that Pursley actually provided him with this information), or provided to him by police. Either one undermines Windham's usefulness in uncovering the truth.

**Forrester Swears Out a Search Warrant**

On June 10, Defendants Schmidt, Forrester, Houde, and at least two other Defendant Officers began following Mr. Pursley's girlfriend, Samantha Crabtree. Before arriving at the police station, the RPD obtained a search warrant, entered and searched the residence that Samantha and Pursley shared.

Forrester swore out an affidavit for a search warrant for the offense of first degree murder/armed robbery, that listed details of everything Windham had told them. It includes the Burger King robbery, the bank robbery, the shooting at Robert Poe's house, and the Ascher shooting. (COR&GETTY 142.)

RPD had not connected Pursley to any of these crimes, and Detective Pirages testified that there was no reason to think these crimes were connected. In my experience, the only reason to include other crimes in a warrant affidavit is that there is rock-solid physical evidence connecting them. A statement of one witness with credibility problems is not

sufficient. The other alleged crimes listed in this warrant do not provide probable cause to arrest Pursley for the Ascher murder because they are unrelated, dissimilar, and do not indicate any culpability for the Ascher crime. Detective Pirages agreed at his deposition that the other crimes did not establish probable cause.

The warrant also includes false information, such as it says that the Burger King robber was described as a light skinned black male. (COR&GETTY 148.) It is highly improper to misstate evidence to obtain a search warrant or for any law enforcement purpose. The witness in fact said "he got a good look at the suspect's face and said he saw white skin around the suspect's eyes and believes from the suspect's voice that he was a w/m." (Schmidt 63.)

**Detectives Skipped Basic Steps and Violated Policies During Their Search of Samantha and Pursley's Apartment, and Its Discovery of the Supposed Murder Weapon**

While Samantha waited in the car, Detectives Pirages, Ekedahl, Hanson, and Scott searched her and Pursley's apartment. The RPD recovered a nine-millimeter Taurus model firearm, a Beretta model firearm, articles of Mr. Pursley's clothing and a pair of black combat boots. Arguably the most important piece of evidence the detectives were searching for was the Ascher murder weapon, which according to them was believed to be a Taurus 9mm. The detectives photographed nearly every aspect of the residence and the recovered items but failed to photograph the thing they were most focused on: the Taurus. This glaring omission is extremely troubling for several reasons.

From a police procedures standpoint, it was a well-established, standard practice in 1993 to photograph and accordingly record evidence as it is found. The Rockford Police Department's own "Evidence and Property Handling Procedures" in 1993 provided that the Evidence and Control Section of the Department should "[a]ssume responsibility for the transport, by U.S. Mail or other means, of evidence that is sent to any outside agency for tests and/or evaluation, or to the court for representation in a court of law." (COR&GETTY2032.) The procedure provided that the crime scene could involve "[e]vidence such as fingerprints that should be processed immediately to facilitate the investigation." (COR&GETTY2028.)

The RPD's Guidelines for Criminal Investigations also emphasized, "[p]hysical evidence does not: Lie, forget, or change its story. Your role is to collect and preserve, as much physical evidence as possible, at any crime scene." (COR&GETTY2020.) The absence of evidence should also be recorded. Officers were directed to refer a case for follow up if the further examination of physical evidence was likely to produce information likely to solve the incident. (COR&GETTY2023.) Evidence from a scene was to be collected by

Identification Officers and transported to the RPD's Property and Evidence Unit. (Genens Dep. 74-75; 83-84.) Detectives would use an ISP transmittal form to identify evidence that they wanted tested by the ISP crime lab. (Genens Dep. 99-100.)

In 1993, standard procedure was to photograph key evidence collected and to secure and photograph weapons prior to transportation. The Illinois State Police's Firearms and Toolmarks Procedures Manual reflects the standard at this time: "All firearms should be treated as though they are loaded until the examiner proves they are not!" (ISP Defendants Supplemental 00008.) The International Association of Chief of Police, *Criminal Investigations*, also provided typical guidance for documenting evidence collection, "After an item considered pertinent to the case under investigation has been located, do not disturb it until it is photographed, measurements are made, its position is recorded," its description is entered, and if, warranted it is processed for fingerprints. (*Criminal Investigations* at 33-34.)  This is very important because the condition of the evidence may be relevant to the case, as it was here. The location and condition of the Taurus 9mm handgun reportedly recovered from Samantha Crabtree's apartment were clearly relevant to the investigation, because witnesses provided statements about the gun being cleaned, altered, or repaired after the shooting. Evidence may also be tested for fingerprints, biological evidence, and the like, so it is important to record the condition in which such evidence is found before handling.

The RPD employees in this case, including Jeff Houde, John Genens, and Sgt. Pirages, made it clear that the Taurus 9mm should not have been touched or moved until it was photographed, to document the condition it was in. The gun box should have been opened and any weapon inside checked for bullets, so as not to transport a loaded weapon. Each item within the box, plus the box, had to be separately tagged and documented. As Mr. Houde and Mr. Genens explained, it was common for police departments to apply the same evidence procedures for evidence recovered through search warrants as for crime scenes. (Houde Dep. 35; Genens Dep. 73-74.) Consistent with the minimum standards described by the International Association of Chiefs of Police, Sergeant Pirages stated that a gun recovered pursuant to a search warrant would be "photographed, noted, whatever notes were appropriate, measure it, if that was appropriate, and, uh, mark it and tag it." (Pirages Dep. 170.)

None of this was done of the supposed murder weapon, which is unacceptable from a police practices standpoint. We do not have a record of where or how the weapon was found and what condition it was in. The lack of contemporaneous documentation can be very purposeful where detectives do not want to be bound to a particular set of facts. It was improper and also highly unusual to have no record of the recovered firearm. We do not know if a Taurus 9mm was actually located inside the apartment; or whether it had

scratches inside the barrel when it was found; whether it was loaded, or anything else about it.

There is no contemporaneous record of what actually existed in the apartment when it was searched, whether a gun was found, what condition it was in, or what the serial number was. See Scott report of the search. (COR&GETTY 242-246.) No one from RPD ever explained why the detectives significantly deviated from protocol in documenting this search.

There is only photographic documentation of the Beretta. The Beretta was checked for ammunition and secured, as was RPD procedure for transporting a weapon. There was no photographic documentation of the Taurus, apart from a photo taken from across the room of the gun box between the dresser and the wall, and no documentation that it was checked for ammunition or secured for transport.

According to RPD, the Taurus was recovered in a box without the box ever being opened, examined, or photographed. (Houde Dep. 136.) This statement is unbelievable, especially because the detectives followed protocol for the Beretta. In my experience, it would be very uncommon for a police officer in 1993 to collect a box, especially a box they characterize as being a gun box, without securing anything within that box.

**Deviations from standards in developing ballistics evidence**

Per the record, it is documented that two firearms experts retained by Mr. Pursley in 2012 (nearly 20 years after his conviction) conducted an independent, thorough examination comparing test fires from the recovered (alleged murder weapon) Taurus 9mm to the bullets and casings from the Ascher murder and which were obviously the key physical evidence in this case. The examination concluded beyond doubt that the recovered Taurus **did not** fire the bullets that killed Andrew. Accordingly, the criminal court vacated Mr. Pursley, then acquitted him at the re-trial, and subsequently declared upon testimony and proof that Mr. Pursley was factually innocent of the homicide. This is significant because it means Mr. Pursley was convicted based on false information, and in fact his Taurus had no connection to the murder. Accordingly, the record evidence in this case was created as a result of the RPD and ISP Defendants' deviation from the standard procedures. And in my opinion cannot be excused for this obvious dereliction of their duties and oath as detectives.

The ballistics evidence in this case was created after the RPD and ISP Defendants deviated from standard procedures and their own procedures in several ways. After Windham's statements regarding a Taurus, the RPD and ISP Defendants took the unusual step of creating a preliminary, oral report. Following Samantha's interrogation, and

Windham's statements, the RPD submitted the Taurus and Beretta handgun to the ISP crime lab for testing.

There were many deviations from procedure in the chain of custody of the evidence going from RPD to ISP and back. Chain of custody was not followed. Charlene Getty testified at her deposition that evidence went back and forth between detectives and ISP employees, when the evidence should have been checked into and out of the evidence vault instead.

Forrester and possibly other detectives working on the case had their suspect in mind when Dan Gunnell was asked to compare the Taurus 9mm to the Ascher evidence. Dan Gunnell was the ISP examiner who compared the Ascher bullets/casings and the Taurus 9mm test fires. He discussed his findings with Jack Welty, who had done the preliminary review on June 9 and had already spoken to Forrester. From the ISP standpoint, Welty was the lead ballistics analyst at the ISP lab in 1993 and this was his case. (Genens Dep. 101-102, 162 ("It was Jack Welty's case.").) According to Gunnell, Welty verified Gunnell's results of a conclusive "match" between Samantha's Taurus and the weapon used to shoot Andrew. Gunnell returned the evidence directly back to Jack Welty rather than to the evidence vault. Genens testified that the submittal form returning the evidence from analyst Gunnell at the Broadview Lab to Jack Welty was something he had not seen in other cases. (Genens Dep. 193.)

In my opinion is it unusual for an analyst to hand evidence directly to another analyst, especially if the second analyst did not have any work to do on the evidence such as an examination. This handoff strongly indicates that Welty was in communication with Gunnell about the case and that Welty looked at the evidence too, either alongside or after Gunnell.

It is improper to have had multiple undocumented communications about the tested evidence. Welty and Gunnell communicated about the case, and Welty and Forrester communicated about the case. Welty and Gunnell communicated about the case, and Welty and Forrester communicated about the case. The failure to document these conversations means there is no documentation that could contradict the detectives' theory, and it allows for after-the-fact presentation of evidence as purely favorable to the detectives' theories.

Although ISP and many laboratories often assist police departments in their investigations, they are separate agencies and should be interacting at arm's length, with all protocols observed and all interactions properly documented. The ISP analysis should not be influenced by the RPD detectives' suspicions or theories. It should be the other way around.

**Samantha Crabtree's Statement Bears Hallmarks of Coercion**

RPD deviated from standard police practices in their questioning of Samantha Crabtree by, among other things, delaying her *Miranda* rights even though she was a suspect in a bank robbery, not giving her food for over 11 hours, and threatening to separate her from her children. They also deviated from standard police practices by taking Sam to crime scene and evidence lab, and by failing to make contemporaneous reports of their interviews with her. These departures set the stage for Samantha to be manipulated into falsely implicating Pursley in the Ascher homicide.

Detectives Scott, Pirages, Ekedahl, Hanson, and Houde searched Samantha's apartment. She told them where the two guns were, but they told her that they had located one but not the other. Samantha went upstairs with them and pointed out the other gun. (COR&GETTY 112.) There is very little documentation about this search. Detective Forrester says in his report to refer to Detective Scott's report, but Detective Scott's report contains almost no information. (COR&GETTY 245.) This is unusual. If Pursley were a legitimate suspect, the search and the items collected would have been thoroughly documented in contemporaneous photographs and reports.

After searching Samantha's apartment, Defendants brought Samantha to the police station for interrogation. Samantha, who was pregnant at the time, was initially given no Miranda warnings even though Windham had told them she was Pursley's accomplice in Andrew's murder. The detectives questioned Samantha about several different cases they were pursuing against Pursley. (T. 513 (Schmidt).)

Forrester's report says she gave three verbal statements about the bank robbery, Burger King robbery, and Ascher murder, yet his report includes details only about the bank robbery. Specifically, they told her that she had been implicated in the bank robbery. This very easily could have had a coercive impact on the rest of her statements, especially if they offered her immunity for the bank robbery if she provided them information about the murder, like she testified that they did. (COR&GETTY 112-118; Crabtree Grand Jury Testimony.)

One of the only details Forrester wrote about the murder in the initial part of Samantha's interview is that he asked "If it was proved that your gun was involved in the murder, what would you say." He wrote that Samantha responded "If my gun was involved in the murder then Patrick would have done it." (COR&GETTY 114.)

Forrester's report includes very few details about her original statements regarding the Burger King and the Ascher murder. The report reflects that she told them she knew nothing about Pursley's involvement in the Ascher murder other than he was not home at

the time, and she did not provide details about the Burger King robbery other than to say sometimes Pursley was out of the house from 4:30am until 11:00 am. (COR&GETTY 112-118.) The report says that she was asked again about the murder, and she said that around the time of Andy's murder Pursley was gone, and asked her to come pick him up later that night. She said that he was wearing his black combat boots, black jeans, and a black hoodie. She said that around that time, he threw away the bullets. (COR&GETTY 115.)

After that, Forrester and Schmidt read Samantha her *Miranda* rights in connection with the bank robbery. They told her that she was not telling the truth and they wanted her to be completely honest. Forrester wrote that Samantha then gave complete verbal statement as to what happened with the bank robbery, the murder, and the Burger King. (COR&GETTY 116.) Forrester's report says Samantha gave them Pursley's involvement in three separate felonies, but yet he made no record of what she said. Given that she was a critical witness, any detective would have known to take detailed contemporaneous notes about her statements, so they could be compared with her signed statements for consistency and to determine her credibility. This is standard practice.

Rather than memorializing Samantha's statement, Detectives Schmidt and Forrester took Samantha on a drive to various locations associated with the Ascher shooting and the bank robbery. Detectives Forrester and Schmidt brought Samantha to the identification unit at the police station to meet Defendant Houde. (Houde Dep. 85-87.) The Detectives told Houde that they wanted Samantha to look at the Taurus and some of Patrick's clothing. (Houde Dep. 92.) The officers showed Samantha the Taurus and reported that she identified it as the weapon used by Pursley on the night of the Ascher homicide. (Houde Dep. 87.) According to the report, she identified the Taurus as the gun Pursley had the night Andrew was shot. (COR&GETTY224.)

The RPD Detectives deviated from their own practices and from standard practices in bringing Samantha to the crime scene and to the identification unit. Identification Detective Genens, who became a Sergeant in July 1993, testified that it was "not normal" for a witness to be brought to or present in the identification unit. (Genens Dep. 141-42.) I agree with Detective Genens. It is a departure from standard police practice to provide details of a crime to a witness. This can have the effect of corrupting the witness's memory. The RPD took what they admitted to be unusual steps in bringing Samantha to the search warrant recovery process and the ISP identification unit. (Houde Dep. 96.)

Samantha then signed three separate detailed statements about the Burger King robbery, the bank robbery, and the Ascher murder. She admitted helping drive Pursley from the bank robbery and the murder. (T. 540-41 (Schmidt); Schmidt 116-119.) She said Pursley

told her he robbed the Burger King. (Schmidt 66-67.) She also provided a detailed statement about her and Pursley's role in the Ascher shooting. (COR&GETTY122-127.)

By the time Samantha signed the typed accounts, she had been interrogated for 10 hours. Detectives told her she was going to prison and they would never see her children again. (T. 427.) Detectives Forrester and Schmidt used tactics that were widely known to be intimidating including threatening to separate Samantha from her children.

RPD departed from accepted police procedures during their interrogation of Samantha and their evaluation of the weight of her statement. First, her statement contains several things that are obviously not true. They include:

- in the report documenting Samantha's statement, she implicates herself as the get-away driver. But this is contradicted by eyewitness Bodell's statement that the shooter fled on foot.

- she mentions Pursley's involvement in the Burger King robbery, but as I explained above, the Burger King robber looked and sounded white, and Pursley is obviously Black. Not only does this suggest that Samantha's statement was false, but this strikes me as obviously unreliable because Marvin Windham also talked about Pursley's involvement in the Burger King robbery. The fact that their stories both contain the same false information suggests that they were aware of one another's false stories.

- she said that she did not have the gun altered, contrary to what Windham said. (COR&GETTY122-127; COR&GETTY57, 210.)

Samantha testified at the Grand Jury that she and Pursley went out looking for a house to break in to, and she was driving. She testified that she drove him to Silentwood Terrace, that he got out, she heard two gun shots, and he ran back to the car and told her to drive away. That's when she saw the gun. She also testified that received immunity for her testimony against Pursley. (Crabtree Grand Jury Testimony.)

Before trial, Samantha wrote an affidavit stating that RPD had questioned her "repeatedly for over 10 hours with only short allotments for rest and recuperation." She averred that the detectives threatened her and told her if she did not cooperate completely, she would go to prison for a long time. She wrote in her affidavit that they told her "you know what we want to hear," and that they wanted to "nail Patrick." She averred that RPD basically fed her information about the crime and she agreed to recite it. She included a list of things she had lied to RPD about, and said in her affidavit that she did not know anything about the Ascher shooting. (RPD Defendants 5246-5254.)

During her trial testimony, Samantha stated that she lied in her statements implicating Pursley and in her grand jury testimony. (T. 409 (Crabtree).) Samantha was still in custody when she gave her grand jury testimony. (T. 419.) She explained that during her interrogation, she was pregnant and sick and closed in a room with RPD Detectives Schmidt and Forrester. (T.413-14.) Samantha was interrogated over the course of 10 to 11 hours. (T. 427.) Samantha told Detective Schmidt that she was throwing up. (T. 447.) Detective Schmidt knew that Samantha had not eaten anything from the time her interview started at 2:30 p.m. to the time it ended at almost midnight. (Schmidt Dep. 247.) She felt intimidated, and the Detectives told her that they could make it so that she would not see her children until they were 40. (T. 412-415.) Even the RPD defendants testified at trial that Samantha cried during her interrogation that her children would be taken away. T. 526 (Schmidt). Samantha testified: "Detective Forrester told me that he wanted Patrick Pursley, and I was the person who could give him to him." (T. 417.) Samantha testified that Detectives Forrester and Schmidt supplied her with the facts and details in her statements. (T. 421.) Samantha stated that many of the facts were not true including that she was not broke in April 1993 and had about $2,000 to $2,500 from a recent tax refund. (T. 423.) Samantha also testified that Windham had previously handled the Taurus she owned and even borrowed it. (T. 428, 431.) She also testified that she and Windham had an affair that ended in June. (T418.) The likelihood of false testimony from both parties are obvious.

RPD's policy on custodial interrogations notified officers that "[l]engthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not freely waive his rights." (COR&GETTY2036.) Any evidence of threats would also be taken to show that any waiver of rights was not voluntary. *Id.* The RPD Detectives also did not follow standard practices in providing *Miranda* warnings to a suspect before interrogation. The RPD detectives did not follow standards in interviewing a suspect who they knew to be sick and unable to eat. If Samantha's affidavit and trial testimony are true, the Detectives violated standard police practices by threatening her and feeding her facts for her statement.

Even if Samantha was not being truthful in her affidavit, at a bare minimum, the tactics Schmidt and Forrester used on Samantha can have the effect of being coercive and causing a witness to provide a statement that they believe the police want them to provide, even though it's not true. The tactics Schmidt and Forrester admitted to using on Samantha, including interrogating her for 10 hours even though she refused food, and taking her statement in one crime while threatening to charge her for another crime, can be coercive. Witnesses in these conditions will often try to help themselves and provide whatever information they believe will keep them from trouble. In Samantha's case, it was no secret that RPD was going to charge her with the bank robbery. She had an incentive to provide information that she thought Schmidt and Forrester wanted from her.

Unfortunately, Schmidt and Forrester's tactics seem to be in line with the commonly accepted practice in the Rockford Police Department. There was a written policy against "lengthy interrogations," several officers, like Detective Scott, said that they were never given any training on this policy. (Scott Dep. at 93-95.) As experienced detectives, they should have known that the interrogation tactics used on Samantha could impact the accuracy of her statement.

Furthermore, RPD should have ensured that detectives were trained on this policy. If RPD did not train its detectives on what constitutes lengthy or coercive interrogation tactics, it would be an egregious failure that could lead to rampant coercive interrogations and false statements.

Samantha was prosecuted for perjury in connection with the testimony she gave at Mr. Pursley's trial. The fact that she testified contrary to her grand jury testimony, knowing that she would go to prison, lends credibility to her trial testimony.

## RPD Ignored Evidence That Undermines Their Case Against Pursley

In *Brady v. Maryland*, the Supreme Court held that withholding exculpatory evidence violates due process "where the evidence is material either to guilt or to punishment," and the court determined that under Maryland state law the withheld evidence could not have exculpated the defendant but was material to the level of punishment he would be given. Hence the Maryland Court of Appeals' ruling was affirmed. (*Brady v. Maryland*, 373 U.S. 83 (1963).)

A defendant's request for "Brady disclosure" refers to the holding of the Brady case, and the numerous state and federal cases that interpret its requirement that the prosecution disclose material exculpatory evidence to the defense. Exculpatory evidence is "material" if "there is a reasonable probability that his conviction or sentence would have been different had these materials been disclosed." *Brady* evidence includes statements of witnesses or physical evidence that conflicts with the prosecution's witnesses, and evidence that could allow the defense to impeach the credibility of a prosecution witness. Every Detective since the decision was handed down is trained regarding, "The Brady Rule," and this would have been the minimally accepted standard for police officers in 1993. In 1993, reasonably trained officers would have minimally been trained to understand what exculpatory evidence was and what their *Brady* obligations were.

Det. Hanson, however, testified RPD officers they were never given any training on the *Brady* Rule or their duty to disclose exculpatory evidence. Hanson Dep. 58, 61. If that is true, it is an extreme departure from widely accepted police department practices and clearly established expectations. Failure to train officers on their *Brady* obligations can

lead to criminal defendants not having access to exculpatory information, which can cause innocent people to be convicted.

As indicated above, documentation of evidence is required and crucial because unless it is included into the detective's investigative file (sometimes called the Murder Book) it will not be made available to the district attorney, and thus it will not be turned over to the defense and a constitutional rights violation will occur. Police officers are trained to document all evidence, including exculpatory evidence.

In the first two months of the investigation, RPD learned several categories of information that pointed away from Pursley as the killer. This should have boosted their efforts to keep investigating other suspects. Instead, they set their sights on Pursley in spite of it. Their failure to meaningfully factor in evidence that Pursley was *not* the perpetrator is a serious matter, because it violates police norms to follow the evidence wherever it leads.

### Patrick Pursley's Whereabouts on April 2, 1993

First, Mr. Pursley had an alibi. RPD learned that in April 1993, Mr. Pursley was a twenty-seven-year-old resident of the City of Rockford, and lived with his girlfriend, twenty-four-year-old Samantha Crabtree (Samantha). He had a ten-year-old son and a four-year-old daughter. Mr. Pursley reports that he had a close relationship with his children and was actively involved in their lives.

There were at least four witnesses who placed Mr. Pursley at another location at the time of the murder of Andrew Ascher. On the night of April 2, 1993, Mr. Pursley says that he was home with Samantha, his son Anthony, and Anthony's young uncle, Aaron. Numerous people corroborated Mr. Pursley's alibi. Myra Foster, Anthony's grandmother, and Tracy Foster, Anthony's mother, both testified that Mr. Pursley picked up Anthony and Aaron from Myra's home earlier that day. Penny Bunnell, a friend of Myra Foster, also testified that Mr. Pursley had come to pick up the boys from Myra's home on April 2, 1993. Additionally, Samantha testified that she was with Mr. Pursley at home when the murder took place. Mr. Pursley testified at his deposition that he had no connection to Andrew Ascher, nor did he have any involvement in Andrew's murder.

This should have led RPD to investigate other suspects.

### Pursley had no connection to Rebecca or Andrew and no motive

Beyond that, RPD never uncovered any motive for Mr. Pursley. Although the victim and Ms. George were getting out money, the shooter did not appear to have taken any money.

I also did not find any evidence in the record that RPD discovered any connection between Mr. Pursley and the victim or his girlfriend. There is some evidence from Marvin Windham that Mr. Pursley talked about a racial motive for the murder. According to Windham, Mr. Pursley spoke about "white peckers." Mr. Pursley testified at his deposition that he did not hold any particular animus toward white people. His girlfriend at the time, Samantha Crabtree, was a white woman. Also, Windham's statement about "white pecker" seemed to change over time, which is a strong indicator that it is not a credible statement or that it has been manipulated (see section on Marvin Windham below). There is no evidence in the record from which a reasonably trained police officer would have considered race to be a motive in the Ascher crime.

### Man Hiding By Dumpster Observed by David Bodell

The initial neighborhood canvass unturned one witness to the aftermath of the homicide. On April 3, 1993, the RPD interviewed David Bodell who lived in the housing complex in front of which Andrew was shot. (COR&GETTY52-58.)

Bodell heard three gunshots, hit the floor, and then looked out his window and went outside. (T. 997-98 (Bodell).) He saw a man crouching beside the dumpster. T. 999 (Bodell). When lights and sirens started to approach, Bodell saw the man run away in a "southeasterly across the field toward Swan Hillman School." (COR&GETTY210; T. 1005 (Bodell).) Investigators from the RPD located tennis shoe prints in the snow near the dumpster where David Bodell saw the man. (Houde Dep. 55.) It is not clear whether this tennis shoe was connected to the crouched man, or whether that man had moved at all near the dumpster before Bodell saw him. Bodell testified at the trial that he estimated the man was about 6'3" and that he could have been taller or shorter, but Bodell was on lower ground. Patrick Pursley is 5'10". It is not common in my years of police experience for a person who is 5'10" to be confused for someone who looks 6'3" tall.

Bodell also said that the man took off running through a field on foot, at the moment when police sirens became audible.

Mr. Pursley did not match the description provided by David Bodell of the man he saw flee the scene. Nor did the combat boots seized from Mr. Pursley's apartment match the footprint tennis shoe print in the snow near the dumpster.

The RPD followed minimum standards in conducting a neighborhood canvass soon after the homicide. See Criminal Investigations at 7. However, minimum standards for a homicide investigation in 1993 would have also required officers to follow-up on the person observed by Bodell who left shoeprints behind the dumpster. There is no

indication that a minimally typical follow-up was conducted on this evidence. (*See e.g.*, Pirages Dep. 217.)

Two months after the murder, the RPD appeared to have done very little on the case and had little interest in the leads that had surfaced thus far. They put out a reward until they received information from Crime Stoppers, and did not investigate any suspects until this time. (Pirages Dep. 218-19; Schmidt Dep. 98-100.)

### Mr. Pursley's Clothing Did Not Match the Perpetrator's.

In addition, the ISP crime lab found no blood on the clothing Defendants seized from Mr. Pursley's home. Nor did the sweatshirt Defendants seized—a pullover—match the description Rebecca George provided of her attacker's zip-up sweatshirt. (*See* Houde Dep. 93.)

### To A Reasonably Trained Law Enforcement Officer, There Was No Evidence-Based Probable Cause to Arrest Pursley

The decision to charge Mr. Pursley was based on RPD's false and distorted presentation of "their" version of the incident and case. Specifically, the Defendant Detectives created the illusion of probable cause with falsehoods and critical omissions, including:

- A statement from Samantha Crabtree that was obtained through improper coercion and threats, where those threats/coercion were not disclosed, and who was fed information and forced into implicating Pursley.

- Ballistics results that could not have matched the casings and slugs to the Taurus found at Samantha Crabtree's apartment, believed to be the murder weapon, and the failure to disclose the communications and circumstances that led to this match

- Omissions:
  - The fact that Mr. Pursley's hoodie, seized from Samantha Crabtree's apartment, did not match the description of the hoodie given by Rebecca George.

  - The fact that Mr. Pursley's boots, seized from Samantha Crabtree's apartment, did not match the footprints left at the scene near the dumpster.

  - Testimony from family and friends about Mr. Pursley's location at the time of the homicide

By the time Mr. Pursley was arrested, RPD had gathered the following evidence against him: Marvin Windham's statements (which were unreliable), Samantha Crabtree's statements (which she has recanted and were the product of undisclosed and improper coercion), and Welty's preliminary identification of the bullets and casings at the crime scene coming from a Taurus. (WCSAO 1639-1642.) For the reasons I discussed above, neither Samantha's nor Windham's statements were reliable. RPD also may have believed that Pursley was involved in other crimes, including a bank robbery, a shooting at Robert Poe's apartment, and a Burger King robbery. I discussed above why we know Pursley was not involved in the Burger King robbery, and neither of the other crimes could have formed the basis for him to be pursued for the murder because there was no physical or eyewitness evidence tying him to that crime. That leaves only the firearms evidence as establishing a basis to arrest him. If the Taurus test fires in fact did not match the crime scene casings and slugs, then there is no competent evidence connecting Mr. Pursley to the crime.

**Lester Brown As A Witness**

In December 1993, Lester Brown was arrested on a charge of armed robbery. (COR&GETTY 281-82.) He met with prosecutor David Koski, and then Sergeant Pirages assigned Detective Forrester to take a statement from him. Brown claimed that he visited Pursley at the Winnebago County Jail, and that Pursley asked Brown to kill Marvin Windham.  After failing to come forward with any information about the Ascher homicide from April 1993 to the beginning of December 1993, Brown told Forrester that he had learned about Pursley's arrest from "the street" and the news. (COR&GETTY 285.)

The detectives were not aware of this information when they decided to arrest and initiate charges against Pursley. As far as whether it lends credibility to the police case, Lester Brown's statement had to be corroborated to be believed, given his strong incentive to lie. Brown was facing charges for an armed robbery. He entered into an agreement to receive a sentence for armed robbery at the low end of the guidelines in exchange, in part, for testimony against Pursley. (FBI Subpoena Response 15-30.) He did not come forward unless and until he had something significant to gain.  The police did not corroborate Brown's statement.

**Concluding Remarks:**

In 1993 Mr. Pursley was convicted of the murder of Andrew Ascher based on the testimony of a single witness, Marvin Windham, and the omission of exculpatory evidence. The firearm recovered from Samantha's apartment in fact did not match the Ascher evidence, and the circumstances surrounding that supposed "match" was highly

suspect in the many irregularities from evidence-handling procedures. It is uncontested that the court, upon thorough and complete review found Mr. Pursley's case, found him to be factually innocent. Due to the malfeasance, Mr. Pursley spent 23 years incarcerated for a crime he did not commit.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct. Executed August 27, 2021, at Santee, California.

Roger A. Clark

EXPERIENCE

**Police Procedures Consultant (self employed)**
April 1, 1993 to Present................................................................. **28 years**

I have been certified by Federal and State courts as expert in jail and police
procedures in Federal and State Courts.  I select my cases carefully and have
consulted in approximately 2200 cases thus far since my retirement from the
Los Angeles County Sheriff's Department.

**Substitute Teacher, Madison School District**
August 1994 to 2003........................................................................ **9 years**

I substitute teach at all levels in the school district (elementary to high school).
As a volunteer, I wrote and managed a $85,000.00 federal grant for our
Central High School.  This grant is in its sixth year and has generated
$510,000.00 for the school.

**District Liaison, State of Idaho Department of Juvenile Corrections**
August 1, 1995 to March 1, 1997.........................................**1 year, 7 months**

I represented the new Department of Juvenile Corrections to the ten counties
in the Seventh Judicial District.  As such, I worked closely with Probation
Officers, County Commissioners, Judges, other state agencies, private care
providers, etc. in the implementation of the new Idaho Juvenile Corrections
Act of 1995.  I wrote or participated in the writing of several federal grants for
the District.  I conducted training - both formal and informal - and developed a
series of new therapy programs for juveniles with private care providers.  I
also served as the Director of the Detention Center and the State Placement
Coordinator during this time.

**Los Angeles County Sheriff's Department**
December 1, 1965 to March 31, 1993................................**27 years 4 months**

**Note:** In 1993 the Los Angeles County Sheriff's Department had 7,000 sworn and 3,000 civilian personnel and a daily County Jail inmate population of 23,000.

### Service as a Lieutenant (15 Years, 0 Months):

**1. Field Operations Region I**
**NORSAT**                    11/15/87 to 3/31/93   **64 months**

I commanded a specialized unit created to investigate, locate, observe and arrest major (career) criminal offenders. This unit was designed as a multijurisdictional effort for the cities in the northern region of Los Angeles County. The command consisted of four (4) Sergeants, seventeen (17) Deputies, four (4) Police Officers, twenty five (25) Reserves, and three (3) civilian employees. The 1992 budget set at $1.5 million. The arrest rate averaged 500 career criminal arrests per year with a 97% conviction rate and no shots fired (on either side) for 61 consecutive months.

Significant contributions while assigned at this Bureau were:

- Increase in participating police agencies.
- Direct participation with corporate (private) agencies.
- Formation of a reserve and volunteer unit.
- Establishment of NORSAT Foundation private funding.
- Computerization of the unit.
- Promotion of fourteen personnel.
- Fleet expansion from 13 to 28 vehicles (donated).
- Formation of the DEA Valley Task Force.
- Field Operations Directive 89-3.

**2. Executive Offices**
**Reserve Forces Bureau**      05/01/84 to 11/15/87   **42 months**

I was the administrative officer to a specialized bureau responsible for coordinating the activities of 1,000 sworn reserve personnel, 900 civilian

volunteers, and 450 law enforcement explorer scouts. The Bureau identifies programs for their effective utilization throughout the Department; develops and tracks training programs; sponsors activities designed to promote growth and keep morale at high levels.

Significant contributions while assigned at this bureau are:

- Total restructure of the Academy training process for reserve Deputies.
- Implementation of upgrade programs to move lower level reserves to level I status.
- Departmental Reserve Certification procedures.
- Annual leadership seminar.
- The Reserve News, a nationally recognized police magazine.
- Computerization of the Bureau.


3. **Field Operations Region I**
   **Crescenta Valley Station**      04/01/80 to 05/01/84  **49 months**

Crescenta Valley Station is a full service police facility of 100 personnel serving a population of 50,000 (including the Contract City of La Canada-Flintridge) and a total area of 250 square miles. During my four years service at this facility I served in every management role:

- **Nine months** as the Station Commander during an extended absence by the Captain (08/01/83 TO 05/01/84).
- **Sixteen months** as the Operations Lieutenant (03/01/82 TO 08/01/83).
- **Twelve months** as the station Detective Bureau Commander (03/01/81 to 01/01/82).
- **Twelve months** as a Watch Commander (04/01/80 to 03/01/81).

Significant contributions while assigned at this command are:

- Negotiation of an enhanced city contract (at a savings to the City).
- Formation of a volunteer community support group.
- Development and implementation of an integrated community emergency response plan.
- High School undercover narcotics operation.
- Restructure of the Station Detective Bureau.
- The annual station picnic, which was effective in boosting station morale.

**4.     Custody Division**
**       Central Jail**                    04/01/78 to 04/01/80  **24 months**

The Los Angeles County Central Jail is the largest jail facility in the State of California, with a daily inmate population of seven thousand (7,000), an assigned staff of six hundred (600), and two hundred (200) civilian personnel. My service at this command was equally divided into two major assignments:

- Training and Logistics Lieutenant (04/01/79 to 04/01/8).
- Watch Commander (04/01/78 to 04/01/79).

Significant contributions while assigned at this command are:

- "Hot Fire" Training program, which is now a State (POST) mandated training module for all custody personnel throughout California.
- The "Defend in Place" fire safety operational plan for jail facilities.
- New fire safety specifications for jail bedding and mattresses.
- The development of fire safe jail mattress material.
- The development of a facility emergency response plan.
- The computerization of training, timekeeping, and scheduling for the facility (800 sworn and 200 civilian personnel).
- "Spouse day at CJ"--A program for spouses of employees.


**Service as a Sergeant (6 Years, 4 Months):**


**5.     Administrative Division**
**       Federal Surplus Property**    01/12/76 to 04/01/78  **27 months**

This program was entirely my idea and developed while I was assigned at my previous assignment (Emergency Operations Bureau). The unit provides millions of dollars in free federal excess and surplus food and property from clothing to heavy equipment and aircraft to the department each year. I am very proud of this contribution to the Department.


**6.     Patrol Division**
**       Emergency Operations**    02/01/74 to 01/12/76  **23 months**

I was among the original personnel that formed this unit which blended the activities of the Department's planning    unit with emergency operations planning and preparation. I was assigned as the Personnel and Logistics Sergeant.

Significant contributions while assigned at this command are:

- Formation of a new County Emergency Operations Center.
- Participation in the 1974 Federal earthquake studies of Los Angeles County.
- Development of the Department's specialized Field Command Post equipment.
- Development of the Department's Field Booking Team.


**7.     Patrol Division**
**Civil Defense Bureau**     12/01/73 to 02/01/74  **02 months**

I was assigned to this unit to facilitate the orderly transition into the new Emergency Operations Bureau.


**8.     Patrol Division**
**San Dimas Station**     12/12/72 to 12/01/73  **12 months**

I performed all the duties of a Watch and Patrol Sergeant.  I also frequently served as the Watch Commander.


**9.     Technical Serviced Division**
**Communications Bureau**     12/01/71 to 12/12/72  **12 months**


I served as the Watch Commander in The Sheriff's Department's old radio room located at the Hall of Justice, and assisted in the transition to the existing communications facility.


**Service as a Deputy (6 Years, 0 Months):**


**10.     Patrol Division**
**San Dimas Station**
**Detective Bureau**     01/01/70 to 12/01/71  **23 months**

I served as a Station Detective assigned to the evening watch.  I handled the first response to all crimes requiring investigations.  I processed all evening juvenile matters, prepared criminal complaints and juvenile petitions.

11. **Patrol Division**
    **San Dimas Station Patrol**    01/29/68 to 01/01/70  **24 months**

I performed all duties assigned to Station Patrol:  Jailer, Desk, Watch Deputy, Patrol, and Traffic.


12. **Technical Services Division**
    **Transportation Bureau**    11/01/67 to 01/29/68  **02 months**

I was temporarily assigned to the Beverly Hills Municipal Court pending my assignment to a Patrol Station.


13. **Custody Division**
    **Central Jail**    05/06/66 to 11/01/67  **18 months**

I returned to my previous assignment at the Central Jail after graduation from the Academy.  I performed all aspects of a Custody Deputy i.e. Module Officer, Prowler, Control Booth, High Power, etc.


14. **Administrative Division**
    **Academy**    01/17/66 to 05/06/66  **04 months**

I was a Sheriff's trainee assigned to Class #110.


15. **Custody Division**
    **Central Jail**    12/01/65 to 01/17/66  **01 month**

I was a pre-academy Custody Deputy assigned to the Central Jail as an "off the street" Deputy Sheriff.


## DEGREES AND CERTIFICATION

| | | |
|---|---|---|
| P.O.S.T. Command College (Class #5) | POST | 1988 |
| Management Certification | POST | 1980 |
| Advanced Certification | POST | 1975 |
| Associate of Science Degree | Chaffey College | 1971 |

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

**UPDATED LIST OF SWORN TESTIMONY FOR RULE 26**

**August 28, 2017 to August 26, 2021**
(Revised August 27, 2021

**Trial:**  August 28, 2017.  The Estate of Angel Lopez, et al., v. City of San Diego, et al.  Case No.: 13CV2240 GPC BGS.

**Deposition:**  September 7, 2017.  Arthur Moore, et al, v. City of Berkeley et al, Case No.: 14-cv-000669 CRB.

**Deposition:**  September 8, 2017.  Estate of Ruben Nunez, et al v. County of San Diego, et al., Case 3:16-cv-01412-BEN-MDD.

**Trial.**  September 11, & 12, 2017.  Kierra Williamson, Princeton Williamson, and Michael Williamson, vs. Chicago Police Officer Wilfredo Ortiz, et al., Case No.: 14 CV 6397.

**Trial.**  September 15, & 18, 2017.  Lee Darnell Watson, vs. City of San Jose, et al., Case No.: 3:15-cv-04054.

**Deposition:**  September 20, 2017.  Aubrey Williams vs. City of Birmingham, et al., Case No.: 2:16-cv-00650-JEO.

**Deposition:**  September 25, 2017, Douglas Cruse and Iveta Cruse, v. Jacob Emory Swigger, and Signal Hill Police Department, et al.  Superior Court (Los Angeles County) Case No. BC602211.

**Deposition:**  September 27, 2017.  Lastenia Marizol Rodriguez, vs. City of Fontana, et al., Case No. 5:16-cv-01903 JGB-KK.

**Deposition:**  September 28, 2017.  Herbert O. Allen v. City of Santa Monica, et al, USDC Case No. 2:11-cv-10139 R-GJS

**Trial:**  October 5, 2017.  Graciela Herrera, et. al., v. City of Los Angeles, et al., USDC Case No.:2:16-cv-02719-DSF-SK.

**Deposition:**  October 9, 2017.  Dionne Smith-Downs, et al v. City of Stockton, et al.  Case No. 2:10-cv-02495 MCE-GGH.

**Deposition:** October 12, 2017.  Evangelina Gonzalez and Victor Gonzalez vs. County of Los Angeles, Deputies Adrian Dominguez, Steven Velasquez, et al., Case No.: 2:16-cv-07018

**Deposition:** October 13, 2017, & December 15, 2017.  Felipe Navarro, et al., vs. State of New Mexico, et al., Case No.: 2:16-cv-01180 MCA/CG.

**Trial:** October 17, 2017.  Mayumi Donaldson, et al. v. Deputy U.S. Marshal Michael Hall, et al. Case No. 3:15-cv-00908 BAS-KSC.

**Deposition:** October 19, 2017.  Giselle Genesis Lopez, et al v. City of Inglewood, et al. Superior Court (Los Angles County) Case No. Case No. BC563203.

**Trial.** October 25, 2017.Randy Conan v. City of Fontana, et. al. Case No. 15:16-cv-01261.

**Trial.** October 27, 2017.  Estate of Manuel Diaz, Genevieve Huizar, v. City of Anaheim, et al. USDC Case No. 12-01897 JVS (RNBx).

**Trial.** November 7, 2017.  William Mears, et al., v. City of Los Angeles, Case No.: CV 15-08441 JAK (AJWx).

**Trial:** November 15, 2017.  Shellabarger et al, v. Dicharry et al, Case No. 13-cv-00188-TLN-CMK.

**Deposition:** November 21, 2017.  Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No., 16-cv-06073-TJH-MRW

**Deposition:** November 27, 2017.  Monica Ortiz, et al. v. City of Rialto, et al., Case No. 5:16-cv-01384-JGB. (KSx).

**Deposition:** December 1, 2017.  C.R. Co-Successor-in-Interest to Decedent Rakeem Rucks, et al., vs. City of Antioch, et al., Case No.: C16-03742 JST.

**Trial:** December 8, 2017, Sammy Sanchez, et al v. City of Tucson, et al.  USDC Case No. 72-1576857.

**Deposition:** December 11, 2017.  Estate of Roshad McIntosh, v. City of Chicago, et al. USDC Case No. 1:15-cv-01920

**Deposition:** December 14, 2017.  Taylor Swift vs. David Woo, Vera Hicks, et al.  USDC Case No.: 3:17-cv-00866-VC.

**Deposition:** December 18, 2017.  Domingo Davis, Jr., vs. City of Santa Clara and Cuong Phan,

Case No. 5:15-CV-05603-EJD.

**Deposition:** December 27, 2017.  Estate of Pierre Loury v. City of Chicago, et al.  USDC Case No. 1:16-C-04452.

**Trial:** January 11, 2018.  Giselle Genesis Lopez, et al v. City of Inglewood, et al. Superior Court (Los Anges County) Case No. Case No. BC563203.

**Deposition:** January 12, 2018.  Filiberto Valencia, Sr., et al., vs. City of Stockton, et al., Case No.: 2:16-cv-02081-JAM-AC.

**Deposition:** January 16, 2018.  Edmon Washington v. City of Los Angeles, et al., Case No. 2:17-02829-PA (FFMx)

**Deposition:** January 22, 2018.  Shainie Lindsey, et al., vs. City of Pasadena, et al., Case No.: CV 16-8602 SJO (RAOx).

**Trial:** January 24, 2018.  Penelope Armstrong, v. County of Los Angeles, et al., Superior Court Case No.:BC528453

**Deposition:** January 30, 2018.  Joe Robles and Elvira Robles vs. Aransas County, Texas: Matthew Campbell Individually, Civil Action No.: 2:15.

**Trial:** February 1, 2018.  S.B. a minor, et al (Brown), v. County of San Diego, et al., Case No. 14CV0072, JAH KSC.

**Deposition:** February 1, 2018.. Jenny Tucker, et al., v. The County of Riverside, et al., Case No.: 5:16-CV-02275-JGB (DTBx).

**Trial:** February 7, 2018.  People v. Gilberto Fajardo.  Superior Court, State of California, (Kern County). Case No. BF160536A

**Deposition:** February 8, 2018.  Archibald et al. v. County of San Bernardino et al. USDC Case No. CV 16-01128 AB (SPx). Mr. Dale K. Galipo

**Deposition:** February 12, 2018.  Estate of Johnny Martinez, et al. v. County of Los Angeles, et al., Superior Court, State of California, (Los Angeles County), Case No. BC579140 MPL (Dept 34).

**Deposition:** February 14, 2018.  Maria Hernandez; A.J., Jr., et al, . City of Los Angeles, et al Case No. 2:16-c-02689 AB (JEMx).

**Deposition:** February 15, 2018.  Marc Alan Corbin, v. County of Los Angeles, et al., Superior Court, State of California (Los Angeles County), Case No. BC 512036

**Trial:** February 22, 2018. Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al. Case No. 2:16-c-02689 AB (JEMx).

**Deposition:** February 23, 2018. Robert Ayala, vs. Aransas County, Texas and Anthony Ciarletta, In The United States District Court For The Southern District of Texas Corpus Christi Division, Case No. 1:15

**Hearing:** March 7, 2018. People v. Michael David Suyssman, Superior Court, State of California (Los Angeles County), Case No. M232634DV.

**Trial:** March 13, 2018: April 10, 2014. Chien Van Bui, et al, vs. City and County of San Francisco, et al. USDC Case No. CV 11-04189 LB.

**Deposition:** March 19, 2018. Kevin Foy vs. Pulaski County, Arkansas, Austin Callahan, et al., Case No.: 4:17-cv-358-BSM.

**Deposition:** March 23, 2018. Anthony Wilson, et al., vs. City of Douglasville, GA, et al.., Case No.: 1:17-cv-00634-ELR.

**Trial:** March 26, 2018. Adolfo Garcia, et al v. William Davidson, et al. Superior Court (San Diego County) Case N0. 37-2014-00021070 CU-CR-CTL.

**Deposition:** March 27, 2018. Jane Doe vs. County of Fresno, et al. Superior Court State of California, (Fresno County) Case No. 16CECG03273

**Deposition:** March 28, 2018. Phillip Murry v. North Las Vegas Police Department, etal. Case No.: 2:17-cv-00157-APG-CWH.

**Deposition:** April 5, 2018. Alma Ramirez, et al, v. City of Gilroy, et al. Case No. 5:17-cv-00625 HRL

**Deposition:** April 12, 2018. Melane Jackson v. City of Los Angeles, et al., Superior Court, State of California (Los Angeles County) Case No. BC609513.

**Deposition:** April 17, 2018.1701. Leticia Solis, et al, v. City of City of Los Angeles, et al. Case No. 2:17-cv-02352, AB-PJW

**Deposition:** April 19, 2018. Jesse Sanchez, v. City of Stockton, et al. Superior Court State of California (San Joaquin County), Case No. CV-2015-0006499.

**Trial:** April 20, 2018. Ethan Morse vs. County of Merced, et al., Case No.: 1:16-CV-00142-

DAD-SKO

**Deposition:** April 26, 2018.  Marco A. Figueroa vs. City of Casa Grande, et al., Case No: 2: 16-CV-03275-ROS

**Deposition:** April 27, 2018.  Tanya A., et al., v. City of San Diego, et al.,  Case No.: 3:14-cv-01942-L-RBB, and Jane Doe, v. City of San Diego, et al.  Case No.  14cv1941-L-AGS.

**Trial:** April 30, 2018. Melane Jackson v. City of Los Angeles, et al., Superior Court, State of California (Los Angeles County) Case No. BC609513.

**Trial:** May 1, 2018.  Estate of Gustavo Najera, et al. v. City of Anaheim, et al., Case No. 8:16-CV-01243 JLS (JCG).

**Trial:** May 3, 2018.  Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No., 16-cv-06073-TJH-MRW.

**Deposition:** May 8, 2018.  Amber Wallisa, v. City of Hesperia, et al., Case No.: 5:16-cv-2638.

**Trial:** May 10, 2018.  The People of the State of California v. Michael David Sussman.  Case No. M232634DV.

**Deposition:** May 11, 2018.  Rosamanda Flores vs. The City of Concord, et al., Case No.: 4:15-cv-05244-PJH, and Rosamanda Flores vs. The City of Concord, et al., Case No.: 4:17-cv-05810-PJH (Combined by the Court).

**Deposition:** May 18, 2018.  Estrella Lysandra Zayas vs. State of California, et al., Case No.: 3:17-CV-02739-EMC.

**Deposition:** May 22, 2018.  Denise Garcia vs. Harris County, Texas, et al., Case No.: 4:16-cv-2134.

**Trial:** May 24, 2018.  Graciela Lopez Franco, et al, v. United States, et al.  Case No. 15-cv-2626 - JM (RBB).

**Deposition:** May 29, 2018.  Royce Belcher vs. Williamson County, Texas Deputy Jeremy Ellison, individually, and Deputy Gauna, Individually, Case No.: 1:17-cv-00153-SS.

**Deposition:** June 4, 2018.  Cynthia Briones, et al., v. City of Ontario et al., Case No.: 5:17-cv-00590-DMG-JPR.

**Deposition:** June 5, 2018.  E.H., (Martin Hurtado deceased) et al. v. City of Long Beach, et al. Case No. 2:16-v-09641-SJO (KSx).

**Deposition:** June 6, 2018. R.J. v. City of Los Angeles, et al., Case No. 2:16-CV-07232 CBM (Skx).

**Deposition**: June 11, 2018. Chandra Jacquez individually, and as successor-in-interest to Richard Jacquez (deceased), v. City of San Jose, et al. Case No. 5:16-CV-5343. NC.

**Deposition:** June 12, 2018. Kelly Carter vs. County of Alameda, et al., Case No.: 3:16-cv-05132-WHO.

**Trial:** June 14, 2018. Leticia Solis, et al, v. City of City of Los Angeles, et al. Case No. 2:17-cv-02352, AB-PJW

**Trial:** June 14, 2018, Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.

**Trial**: June 19, 2018. Floyde Armbrester, v. City of Berkeley et al. Case No. 3:16-cv-04615.

**Deposition:** June 20, 2018. Ashley Lauren Watts vs. City of Newport Beach, Christine Maroney, Monica Aguilar, et al., Case No.: 8:17-cv-01099-AG (Skx).

**Deposition:** June 25, 2018. Matthew Francois, v. The City of San Diego, et al. Superior Court, State of California (San Diego County), Case No. 37-2016-00003251.

**Deposition:** July 12, 2018. Maurice Lallemand v. County of Los Angeles, et al., Case No. CV17-00781 JAK (SS)

**Trial:** July 19, 2018. Matthew Francois, v. The City of San Diego, et al. Superior Court, State of California (San Diego County), Case No. 37-2016-00003251, CU-OB-CTL.

**Deposition:** July 24, 2018. Cesar Cuellar, Sr. et al. v. City of Laredo (Texas), et al. USDC Case No. 5:17-cv-00076.

**Trial**: July 26, 2018. Jesse Sanchez, v. City of Stockton, et al. Superior Court State of California (San Joaquin County), Case No. CV-2015-0006499.

**Trial:** August 7, 2018. Tan Lam v. City of Los Banos, et al. Case No. 2:15-cv-00531 MCE, KJN.

**Deposition:** August 8, 2018. Dane Zeen, v. County of Sonoma, et al, Case No. Case No: 3:17-cv-02056-LB

**Deposition:** August 9, 2018. Aram Tagmazyan, Angela Tagmazyan, v. City of Los Angeles, et al. Superior Court (Los Angeles County) Case No. BC561908.

**Deposition** August 13, 2018. Marina Borawick, v. City of Los Angeles, et al. Case No. 2:17-cv-02036 BRO-JC

**Trial:** August 20, 2018. Dane Zeen, v. County of Sonoma, et al, Case No. Case No: 3:17-cv-02056-LB.

**Trial:** August 24, 2018. Gina Best and Shaun Lowrance, et al., vs. Virginia Beach Police Officers Ferreira, Roys, Thorson, and Ziemer, Case No.: CL17-1137.

**Trial:** August 29, 2018. People v, Jon Luthuli Larson, Superior Court State of California (Napa County), Case No. CR

**Deposition:** August 30, 2018. Wilson Ramos, As Administrator of the Estate of Jose A. Maldonado, v. Town of East Hartford, et al. Case No. 3:16-cv-00166 VLB

**Deposition:** September 5, 2018. Teresa Dominguez, et al, vs. City of Los Angeles, et al. Case No.: CV 17-04557 DMG (PLAx).

**Trial:** September 6, 2018. Chandra Jacquez individually, and as successor-in-interest to Richard Jacquez (deceased), v. City of San Jose, et al. Case No. 5:16-CV-5343. NC.

**Deposition:** September 7, 2018. Teresa Todero, as Special Administrator of the Estate of Charles Todero vs. City of Greenwood, Brian Blackwell, Renee Elliott, and Elizabeth Laut, Case No. 1:17-cv-01698-TWP-MJD.

**Deposition:** September 14, 2018. David P. Demarest vs. The City of Vallejo, et al. Case No.: 2:16-cv-0227-GEB-KJN.

**Deposition:** September 21, 2018. Taina Rozier, et al (Okwera Olango, deceased), v. City of El Cajon, et al. USDC Case No. 17-cv-347-BAS-NLS, and Case No. 3:17-cv-00089 BAS-NLS, and Lucy Olango, v. City of El Cajon, et al., Superior Court Case No. 37-2017-00005331 CU-PO-CTL

**Deposition:** October 9, 2018. Joseph Earl Wheeler vs. Graves County Kentucky and Graves County Sheriff's Department and Dewayne Redmon, et al., Case No.: 5:17-cv-38-TBR.

**Deposition:** October 11, 2018. Jimmy Brooks vs. City of Vallejo, et al., Case No.: 2:16-cv-02376-WBS - EFB.

**Trial:** October 19, 2018 and October 23, 2018. People v. Steve Rodriguez, San Bernardino Case No: MWV1507990.

**Trial:** October 31, 2018 and November 1, 2018, Alma Rosa Godinez, v. San Diego County, et

al. Case No. 3:16-cv-00236 BAS-NLS.

**Trial:**  November 2, 2018.  Jenny Tucker, et al., v. The County of Riverside, et al., Case No.: 5:16-CV-02275-JGB (DTBx).

**Deposition:**  November 6, 2018.  Ramon Cortesluna, v. City of Union City Police Officer Manuel Leon, et al, Case No.: 3:17-cv-05133-JSC.

**Deposition:**  November 7, 2018.  Estate of Kevin Matthews, et al., vs. City of Dearborn (Michigan), et al.  Case No. 2:16-cv-13763  GCS-SDD

**Deposition:**  November 8, 2018.  D.F., M.F., A.F., N.F., (Minors), Panfilo Flores, and Yolanda Flores, v. City of Anaheim, et al. Case No. 8:17-cv-01194 AG-JCG.

**Trial:**  November 14, 2018:  Estrella Lysandra Zayas vs. State of California, et al., Case No.: 3:17-CV-02739-EMC.

**Trial:**  November 15, 2018.  Teresa Dominguez, et al, vs. City of Los Angeles, et al. Case No.: CV 17-04557 DMG (PLAx).

**Deposition:**  November 16, 2018.  Roy Nelson III, Successor-in-Interest to Decedent Roy Nelson; Orenell Stevens, Individually, v. City of Hayward, et al. USDC Case No. 3:16-cv-7222

**Deposition:**  November 20, 2018.  Neftali Monzon, et al. v. City of Murrieta, et al.  Case No. 2:17-cv-01371 ODW (Skx)

**Deposition:**  November 21, 2018.  Leticia Barron vs. State of California, Case No.: 8:17-cv-01275-JVS-KES.

**Deposition:**  November 27, 2018.  Estate of Juan Manuel Avila, JR., et al.  v. City of Long Beach, et al. Case No. 2:17-CV-05067 AB JPR.

**Deposition:**  November 29, 2018.  Chris Mathis, v. Nicholas Stevens and Edward Black.  USDC (Texas) Case No. 3:17-cv-1835-S.

**Deposition:**  November 30, 2018.  Trinidad Brown vs. Eddie Diaz, Eric Howard, Laertis Moraitis, and Daniel Villalobos, Case No.: 2:17-cv-01157-KJM-AC.

**Trial:**  December 3, 2018 and December 4, 2018.  Donna Lancaster, v. Kansas City Board of Police Commissioners, et al., Case No.:4:14-cv-00171-SOW.

**Deposition:**  December 5, 2018.  Ryan M. Larson vs. John L. Sander, et al., Case No.: 0:17-cv-00063.

**Deposition:** December 11, 2018. Leslie A. Merritt, Jr. vs. State of Arizona, et al., United States District Court, District of Arizona, Case No. CV17-4540-PHX-DGC

**Trial:** December 13, 2018. Leticia Barron vs. State of California, Case No.: 8:17-cv-01275-JVS-KES.

**Deposition:** December 14, 2018. Estate of Joseph Valverde (Isabelle Padilla), et al, v. Justin Dodge, and the City and County of Denver, Colorado, Case No. 1:16-cv-01703 MSK-KMT.

**Trial:** December 19, 2018. People v. Anthony J. McGaff. Superior Court, San Diago County, California, Case No. SCE379648, DA NO. MBQ014.

**Trial:** January 17, 2019. L. Alicia Rascon, individually, et al., vs. Clinton H. Brookins, et al. Case No.: 2:14-cv-00749-PHX-JJT.

**Deposition:** January 30, 2019.. Xaime Casillas v. City of Los Angeles, et al. USDC Case No. 2:16-cv-09606-TJH-GJS

**Deposition:** January 31, 2019. Tony Nunez, et al. v. City of San Jose, et al. Case No. 17-cv-03860 LHK.

**Deposition:** February 4, 2019, Kathryn Green (individually and as a representative of the Estate of Patrick Green, Deceased), David Green, vs. Harris County, Texas, Former Harris County Sheriff, et al., Case No.: 4:16-cv-00893.

**Deposition:** February 6, 2019. Sofia Valenzuela (Jose Romero), et al, v. City of Long Beach, et al. Superior Court Case No. BC672993.

**Deposition:** February 7, 2019. Rubia Rosaura Serna, et al. v. City of Bakersfield and Reagan Selman U.S. Dist. Court, Eastern District of CA - Case No. 1:17-CV-01290-LJO-JLT.

**Deposition:** February 11, 2019. Annice Evans (aka Ramos), et al. v. City of Vallejo, et al. Case No: 2:17-cv-01619-TLN-AC.

**Depositoin:** February 15, 2019 L.M., et al., vs. City of Redding, et al., Case No.: 2:14-CV-00767 MCE-AC.

**Trial:** February 20, 2019. Akrem Azzam vs. City of Houston, Texas, et al., Case No.: 4:17-cv-1242.

**Trial:** February 22, 2019. Moises Palacios, Victoria et al., v. City of Los Angeles, et al., Case No.: 14-cv-09639-MJF (AJWx).

**Trial:** February 27, 2019. Russell Tenorio v. Brian Pitzer, et al., Case No.: 2012-CV-01295

LH/KBM.

**Trial:**  March 4, 2019.  Sofia Valenzuela (Jose Romero), et al, v. City of Long Beach, et al. Superior Court Case No. BC672993.

**Deposition:**  March 5, 2019.  Puente, an Arizona Nonprofit Corporation, et al, v. City of Phoenix, et al., Case No. 2:18-cv-02778-JJT.

**Deposition:**  March 8, 2019.  Lawrence, et al. v. Las Vegas Metropolitan Police Department, et al. (USDC Case No. 2:16-cv-03039-JCM-NJK)

**Deposition:**  March 12, 2019.  Estate of Omar Gonzalez, et al. vs . City of Los Angeles, Officer Eden Medina, et al., Case No.: BC660356.

**Deposition:**  March 14, 2019.  Jasmin Salcido, et al., vs. City of Whittier, et al., Case No.: 2:17-cv-8819-CBM (Asx).

**Deposition:**  March 19, 2019.  L.F., a minor, by and through Danisha Brown, and K.F., a minor, by and through Danisha Brown, vs. City of Stockton, et al.  Case No.: 2:17-cv-01648-KJM-DB.

**Deposition:**  March 25, 2019.  Kevin DeCarlo, et al. v. City of Vallejo, et al. Case No. 4:18-cv-00109 JSW.

**Deposition:**  April 5, 2019.  Jacob Gorsky, and Olesya Gorsky, v. Harris County, Texas, et al. Case No; 4:16-cv-2877

**Trial:**  April 11, 2019, &April 12, 2019.  Estate of Omar Gonzalez, et al. vs . City of Los Angeles, Officer Eden Medina, et al., Case No.: BC660356.

**Trial:**  April 15, 2019.  The State of Arizona vs. John David Rothrock, Case No.: CR2016-137374-001.

**Deposition:** April 19, 2019.  Estate of Mark Roshawn Adkins, et al. v. County of San Diego, et al.  Case No 18-cv-0371-H-MDD.

**Deposition:**  May 8, 2019.  M.J.L.H. (Hurtado), et al, v. City of Pasadena, et al.  Case No.: 2:18-cv-03249 JFW (SSx)

**Deposition:**  May 20, 2019.  Jayd Schroeder, v. Rialto Police Department.  Case No. 5:18-cv-00427 SP.

**Deposition:**  May 30, 2019 Mary H. Garcia, individually and successor-in-interest to Estate of Phillip Soto Garcia Jr., et al., vs. Sergeant Ayala; et al., Case No.: 5:15-cv-839- SJO (Asx).

**Trial:** June 5, 2019. Schroeder, Jayd v. Wright, Steven and Parcher, Nicholas, Case No. 5:18-cv-00427-SP.

**Deposition:** June 10, 2019. Jason Anderson, v. City of Vallejo, et al. Case No. 2:17-cv-00137-JAMDB.

**Trial:** June 24, 2019. Tony Nunez, et al. v. City of San Jose, et al. Case No. 17-cv-03860 LHK.

**Deposition:** July 8, 2019. Sierra Rivera, et al, v. County of Sacramento, et al. Case No.: 2:18-cv-00056 WBS EFB.

**Deposition:** July 19, 2019. John Gocke vs. United States of America, et al., Case No.: 5:16-cv-01560 MWF (DTBx).

**Deposition:** July 22, 2019. Dennis Todd Rogers, Jr., et al vs. County of Los Angeles, et al., Case No.: 2:17-cv-05236-AB-E and Janet Williams vs County of Los Angeles, et al., Case No.: 2:17-cv-05640-AB-E.

**Trial:** July 25, 2019. E.V., A Minor, (Sanchez) et al, v. City of Anaheim, et al. Superior Court (Orange County) Case No: 30-2015 00770859 CU-MC-CJC.

**Trial:** July 29, 2019. Lucy Olango, v. City of El Cajon, et al. Superior Court. San Diego County (California) Case No. 37-2017-00005331 CU-PO-CTL.

**Deposition:** July 30, 2019. Yolanda Banks-Reed, et al, v. Bay Area Rapid Transit, et al., Case No.: 4:18-cv-05755-YGR.

**Deposition:** August 13, 2019. L.D. (DeLeon), et al. v. City of Los Angeles, et al. USDC Case No.: 2-16-cv-04626 PSG.

**Deposition:** August 22, 2019. Hwa Sung Sim vs. Monica Duran, et al, Case No.: 1:16-cv-01051-DAD-SAB.

**Deposition:** August 29, 2019. Betty Casey, et al. v. Richard W. Sanders, et al. USDC Case No: 7:17-cv-00145 KKC-EBA.

**Hearing:** August 30, 2019. People v. Joshua Justiniano. Superior Court, Ventura County, (California) Case No 2018008290.

**Deposition:** September 3, 2019. A.B. (Birtcher), et al. vs. County of San Diego, et al., Case No.: 3:18-cv-01541-MMS-LL.

**Trial:**  September 5, 2019.  People v. Joshua Justiniano.  Superior Court, Ventura County, (California)  Case No 2018008290.

**Deposition:**  September 16, 2019.  Joseph Lee Green, et al, v. City of Stockton, et al.  Superior Court, San Joaquin County, Case No. 39-2011-00271041 CU-PO-STK

**Deposition:**  September 18, 2019.  Erwin Duero-Young vs. City of Oceanside, et al.  Case No.: 3:18-cv-01569-H-MDD.

**Deposition:**  September 23, 2019.  Estate of Tyler S. Rushing, Scott K. Rushing, and Paula L. Rushing, vs. AG Private Protection, Inc.; Edgar Sanchez, City of Chico Police Department, et al., Case No. 2:18-cv-01692-MCE-AC.

**Deposition:**  September 25, 2019.  Tyrone Johnson, vs. County of San Bernardino, et al.  Case No. 5:18-cv-01054-DMG-GJS

**Deposition:**  October 1, 2019.  Susan M. Huntzinger, et al., vs. Toby Coyle, Individually and in his Capacity as a Kentucky State Police Officer, Case No.: 5:17-cv-00184-KKC.

**Trial:**  October 2, 2019.  Hwa Sung Sim vs. Monica Duran, et al, Case No.: 1:16-cv-01051-DAD-SAB.

**Trial:**  October 3, 2019, and October 7, 2019.  Marcus Vaughn, et al. v. City of Los Angeles, et al.  Case No. 2:16-cv-03086 AB-AJW.

**Deposition:**  October 8, 2019.  The Estate of Clemente Najera-Aguirre, et al, vs. County of Riverside, et al.  Case No.: 5:18-cv-00762-DMG-SP.

**Deposition:**  October 10, 2019.  Daniel Andrews v. City of Henderson, et al. Case No.: 2:18-cv-01625-RFB-PAL.

**Deposition:**  October 18, 2019.  Darcy Harper vs. City of Merced, et al., Case No.: 1:18-cv-00562 LJO SKO.

**Deposition:**  October 21, 2019.  1934.  Estate of Athony Soderberg, et al, v. City of Los Angeles, et al,  Case No. 2:18-cv-03861 FMO-JPR.

**Deposition:**  November 5, 2019.  Nicholas K. Vieira, vs. Joseph Zalec, City of Antioch, County of Sacramento, Case No.: 3:18-cv-05431 VC.

**Trial:**  November 6, 2019.  Dionne Smith-Downs, et al v. City of Stockton, et al.  Case No. 2:10-cv-02495 MCE-GGH.

**Deposition:**  November 14, 2019.  Ann Janette Cortez vs. City of Los Angeles, et al., Case No.: 2:18-cv-03248-CAS-JPR.

**Deposition:**  November 18, 2019.  Alexander Herd, et al. v. County of San Bernardino, et al. USDC Case No.: 5:18-cv-01244-AB-SP.

**Deposition:**  November 19, 2019.  Christopher D. Hall, Administratrix of the Estate of William Allen Young, vs. Russell Braun, et al.  Case No.: 3:17-CV-00481-DJH-RSE.

**Deposition:**  November 25, 2019.  Adrian Miranda, vs. City of Casa Grande, et al., Case No. S1100CV201801191.

**Deposition:**  November 26, 2019.  Matthew Kass v. Alameda, et al.; Case No.: 3:18-cv-01302-CRB.

**Deposition:**  December 6, 2019.  Jennifer Landeros, Individually and as Successor in Interest to Daniel Landeros, et al., v. City of Elk Grove, et al. Case No.: 2:17-cv-02598-KJM-CKD.

**Deposition:**  December 11, 2019.  Richard William Kollin v. City of Tehachapi, et al.  Case No, l:18-cv-00617-LJO-JLT.

**Deposition:**  December 13, 2019.  Richard Donastorg, vs. City of Ontario, et al.  Case No.: 5:18-cv-00992-JGB-SP.

**Deposition:**  January 6, 2020. James M. Lacy, et al. v. County of San Diego, et al.  Superior Court (San Diego County), Case No. 37-2018-00017428, CU-PO-CTL

**Deposition:**  January 13, 2020.  J.M. et al., vs. County of Stanislaus, et al., Case No.: 1:18-cv-01034-LJO-SAB.

**Deposition:**  Marco Contreras v. City of Compton, et al.  Case No.  2:17-cv-08834 FFM.

**Trial:**  January 15, 2020.  Joseph Lee Green, et al, v. City of Stockton, et al.  Superior Court, San Joaquin County, Case No. 39-2011-00271041 CU-PO-STK

**Deposition:**  January 16, 2020.  Puente, an Arizona Nonprofit Corporation, et al, v. City of Phoenix, et al., Case No. 2:18-cv-02778-JJT.

**Deposition:**  January 22, 2020.  Robert Strong v. City of Vallejo, Jarrett Tonn, Andrew Bidou, et al., Case No.: 2:18-CV-01246-WBS-AC.

**Trial**:  January 24, 2020 and January 28, 2020.  L.D. (DeLeon), et al. v. City of Los Angeles, et

al. USDC Case No.: 2-16-cv-04626 PSG.

**Trial:** February 4, 2020 & February 5, 2020. Rebecca Brown, et al v. City of San Diego, et al. Case No. 15-CV-1583-DMS-WVG

**Deposition:** February 14, 2020. Zared Rodriguez Suarez, v. City of Salinas, et al., Case No.: 3:18-cv-056515-VC.

**Trial:** February 20, 2020. James M. Lacy, et al. v. County of San Diego, et al. Superior Court, San Diego County, Case No. 37-2018-00017428 CU-PO-CTL

**Trial:** December 26, 2019 & February 25, 2020. 1972. People v. Rafael Garcia and Raquel Garcia,. Superior Court (Riverside County) Case No. RIF 1702728.

**Trial:** February 26, 2020. Phillip Murry v. North Las Vegas Police Department, et al. Case No.: 2:17-cv-00157-APG-CWH.

**Trial:** February 11, 2020, February 12, 2020, February 21, 2020 and February 28, 2020. Yolanda Banks-Reed, et al, v. Bay Area Rapid Transit, et al., Case No.: 4:18-cv-05755-YGR.

**Deposition:** March 2, 2020: Monique Morgan v. City of Los Angeles and Leovardo Guillen USDC Case No.: 2:17-cv-06693.

**Deposition**. March 26, 2020. Gilberto Fajardo, v, City of San Bernardino, et al. Case No. 1:16-at-00364.

**Deposition:** March 31, 2020. Shane Horton, by his guardian ad litem, Yvonne Horton, v. City of Santa Maria, et al. Case No. 2:14-cv-06135 SJO-PJW.

**Deposition:** April 9, 2020, Bob Anderson, Administrator of the Estate of Charles Christopher McClure, et al., vs. City of Fulton, Kentucky, et al., Case No.: 5:18-cv-00032-TBR.

**Deposition:** April 16, 2020. Mora et. al. v. City Of Garden Grove et al. Case No: 8:19-cv-00418-JLS-JDE.

**Deposition:** April 20, 2020. Travis Mihalovic, v. City of Turlock, et al. Case No. 1:17-cv-01742 LJO-SAB.

**Deposition:** April 22, 2020. Charmane Henderson, individually and as successor-in-interest to Decedent Deautry Charles Ross, vs. City of Torrance, a municipal corporation, et al., Case No.: 2:18-cv-03918-MWF-E.

**Deposition:** April 28, 2020. Estate of Clifford Tucker, by Donald Scott Tucker, Personal Representative, vs. Marquette County, Keith Romback And Mark Ulvila, Case No. 2:19-cv-00078.

**Deposition:** May 4, 2020. Adorthus Cherry v. Modesto Police Sgt. James "Derrick" Tyler and Lt. Terry Seese, No. 1:18-cv-01268-LJO-EPG (EDCA).

**Deposition:** May 5, 2020. Charmane Henderson, individually and as successor-in-interest to Decedent Deautry Charles Ross, vs. City of Torrance, a municipal corporation, et al., Case No.: 2:18-cv-03918-MWF-E.

**Deposition:** May 12, 2020. Quanice Hayes, vs. City of Portland, and Officer Andrew Hearst, Case No. Case No. 3;18-cv-00988-AC.

**Deposition:** May 14, 2020. Jason B. Perkins, Plaintiff, v. City of Modesto, et al., Case No.: 1:19-cv-00126-LJO-EPG.

**Deposition:** June 2, 2020. Antony Jackson, et al. v. City of Los Angeles, et al. Case No. 2:19-CV-02254-GW-RAO.

**Deposition:** June 4, 2020. Araceli Flores (Juan Barillas), v. City of Los Angeles, et al. Case No. 2:18-cv-09936.

**Deposition:** June 9, 2020. AGG a minor, et al. v. City of Hayward, et al. Case No.: 4:19-cv-00697 DMR.

**Deposition:** June 12, 2020. Remi Hamilton, et al. v. City of Covina, et al. Case No.: 2:18-CV-09822 JAK (MAAK).

**Deposition:** June 15, 2020. Wilbert Winchester, v. Oakland Housing Authority, et al. Case No. 3:19-cv-02653-JCS.

**Deposition:** June 24, 2020: Samuel Kolb, et al, v. Placer. County, et al. Case No. 2:19-cv-00079 DB.

**Deposition:** June 30, 2020. Thomas Irwin plaintiff, v. Officer J. Santiago, in his individual capacity, Officer R. Roberts, in his individual capacity, Officer B. J. Ivy, in his individual capacity, and City of Garland, Case No.: 3:19-cv-2926-B.

**Deposition:** July 6, 2020. Michael Scott Taylor, et al., v. Calaveras County, et al. Case No. 1:18-at-00403, BAM.

**Deposition:** July 9, 2020. Anyka Harris, et al. v. City of Tulare, et al. Case No. 1:18-cv-01135, LJO-SKO .

**Deposition:** July 13, 2020. Tammy Shidler and Gary Shidler v. County of San Bernardino USDC Case No. 5:19-cv-00503-CAS-SHKx.

**Deposition:** July 17, 2020. The Estate of VU ANH NGO, et al. v. County of Riverside, et al. Superior Court Case, RIC 1902381.

**Deposition:** July 20, 2020. Sheldon Lockett et al. v. County of Los Angeles, et al. Case No. 2:18-cv-05838 PJW.

**Trial:** August 12, 2020. James Adams, v. State of California, et al. Case No. 3:16-cv-02161 W-NLS.

**Deposition:** August 18, 2020. Carlos M. Gomez, Sr. vs. City of Vacaville, a public entity, Vacaville Police Officer, William Boehm, et al., Case No.: 2:18-cv-02968.

**Deposition:** September 24, 2020. Black & Brown Liberation, et al (ACLU of Indiana), v. City of Fort Wayne, et al. Case No. 1:20-cv-00240 (Indiana) DRL-SLC

**Trial:** October 7 & 8, 2020; 1318. Christian Longoria, et al., v. Pinal County (Arizona), et al. Case No. 2:15 CV 00043 PHX SRB

**Deposition:** October 24, 2020. Susan Peck (Paul Mono deceased), et al. v. County of Orange, et al., Case No. 2:19-cv-04654.

**Deposition:** October 27, 2020. Jennifer Buenrostro-Briano, et al v. Farmersville Police Department, et al. Case No. 1:19-cv-01382 LJO-SAB.

**Trial:** October 30, 2020. Leslie A. Merritt, Jr. vs. State of Arizona, et al., United States District Court, District of Arizona, Case No.: CV17-4540-PHX-DGC.

**Deposition:** November 9, 2020. Florentina Pelayo, (Petrica Muntean), v. City of Anaheim, et al. Case No.:8:19-cv-02318, DOC (ADSx).

**Deposition:** December 4, 2020. Melanie Dunne, et al, v. City of Las Cruces (New Mexico), et al. Case No. D-307-CV-2018-02315.

**Deposition:** December 14, 2020. Cristobal Solano; M.H., et al. v. County of Orange, et al.; USCD Case No. 8:19-cv-00549-JVS-ADS.

**Deposition:** December 22, 2020. John F. Dunham v. County of Monterey, et al. Case No.: 3:18-cv-04467-EDL.

**Deposition:** December 28, 2020. Cameron Vincent, v. City and County of San Francisco, et al. Case No: 19-cv-0329..

**Deposition:** January 6, 2021. Rashid Adan vs. City of San Diego and Officer Jason Langley, Case No.: 3:19-cv-1523-LAB-AHG.

**Deposition:** January 11, 2021. Sabrina Paloni, et al. v.City of Albuquerque, et al. Judicial District Case No. D-202-CV-201800015.

**Deposition:** January 14, 2021. William Bernal, and Celia Bernal, Plaintiffs, vs. Sacramento County Sheriff Department, et al., Case No.: 2:19-cv-00482-MCE-AC.

**Deposition:** January 22, 2021. Tracy Jenkins, as Personal Representative of the Estate of Theoddeus R. Gray, et. al. v Tom Price, Jessie Smith, James Ziemiecki, Trevor Head, Travis Kaufman and City of St. Clair Shores, Michigan (19-cv-10383)

**Deposition:** January 27, 2021. Jose Magana, (Omar Magana), v. City of Los Angeles, et al. Case No. 2:19-cv-03631 CAS-AGR.

**Deposition:** February 1, 2021. Estate of Logan Johnsrud, et al. v. Deputy Nathan Dean and Wood County, Wisconsin., Case No. 20-CV-108.

**Deposition:** February 3, 2021. Harry Donald Lemly, Jr., v. California Department of Parks and Recreation, et al. Case No. 8:19-CV-01603 DOC DFM.

**Deposition:** February 9, 2021. Christopher Ramos. v. County of Alameda et al. Case No. 4:19-cv-05715 DMR

**Deposition:** February 10, 2021. Casmir Anumudu vs. David Salvador, Andrew Essig, et al., Case No.: 2:19-cv-04045-ODW.

**Deposition:** February 18, 2021. Abraam Sweiha. v. Alameda County, et al; Case No.: 3:19-cv-03098-LB.

**Deposition:** February 19, 2021. Albert Anthony Arteaga, v. City of Oakley, et al.. Case No. 3:19-cv-05725

**Deposition.** February 22, 2021. Jeannie Atienza, v Andrew Hall Case No.: 3:19-cv-03440.

**Preliminary Hearing**. February 23, 2021 and February 24, 2021. People v. Terrance Stangle Case No 20013301.

**Deposition:**  February 26, 2021.  D.T., a minor by and through his guardian Tanika Tyler  vs. San Diego Metropolitan Transit Services, et al., Case No.: 3:19-cv-1523-LAB-AHG.

**Deposition:**  March 3, 2021  James Stewart, et al. v. County of Yuba, et al., Case No.: 2:19-cv-01744-TLN-DB.

**Deposition:**  March 4, 2021.  Judy O'Neil, v. City and County of San Francesco, et al.; Case No.: 3:17-cv-07190-JCS.

**Deposition:**  March 11, 2021.  Vincent Henderson vs. Harris County Sheriff's Department, Rick Hickman, Michael Richard, Dan Richards, A/K/A Dan Richardson, and Deputy Brisco, Case No.: 4:18-CV-413

**Deposition:**  March 18, 2021 Cynthia Ames, individually and as a successor in interest of Henry Simmons, deceased, v. County of San Bernardino, et al., Case No.: 5:18-cv-01362-SJO-FFM.

**Deposition:**  March 19, 2021  Zakhary Gabriel Mallett, v. County of Los Angeles, et al  Case No.: 2:19-cv-8506.

**Deposition:**  March 24, 2021.  Lourdes Toman, et al. v. City of Fullerton, et al.  Case No.: 8:20-cv-00046 DOC-KES.

**Deposition:**  April 1, 2021.  Matthew Burghardt, as guardian of Matthew B. Burghardt, and Christian Beard v. Officer Ezekiel Ryan, and Officer Kristopher London.  Consolidated Case Nos.:5:18CV00325, and 5:18CV02788.

**Deposition:**  April 9, 2021 (continued from December 4, 2020)  Melanie Dunne, et al, v. City of Las Cruces (New Mexico), et al. Case No. D-307-CV-2018-02315.

**Deposition:**  April 13, 2021.  Villegas v. City of Los Angeles – C.D. Cal. Case No. 20-cv-07469-SB-JC.

**Deposition:**  April 14, 2021.  Songhai Smith, v. City and County of Los Angeles, et al. Case No. 2:20-cv-03118-RGK.

**Deposition:**  April 15, 2021.  James B. Shelton v. John Brandon et. al.,  Case No. 4:19-cv-00023 (Tennessee).

**Deposition:**  April 23, 2021.  M.A., et al. v. County of San Bernardino, et al.  Case No. 8:20-cv-00567-and Z.M.A. v. County of San Bernardino, et al. Case No. 5:20-cv-00589-JFW-SHK

**Deposition:**  May 3, 2021.  Jeremy Holloway, Plaintiff, vs. County of Orange, Deputy Chad

Renegar, individually and as a peace officer, et. al, Case Number: 8:19-cv-01514-DOC-DFM.

**Deposition:** May 10, 2021. David Andrews, Plaintiff, vs. County of Orange; Robert Seamans; Stephen Harder, et al., Case No.: 8:20-cv-00925-JLS-ADS.

**Trial:** May 12, 2021. Araceli Flores (Juan Barillas), v. City of Los Angeles, et al. Case No. 2:18-cv-09936 .

**Deposition:** May 18, 2021. Sophia Larios, v. City of Long Beach, et al. Case No.: 2:18-cv-10486 PSG (PJWx)

**Deposition:** May 19, 2021. Shellie Cooke, v. City ot Los Angeles, et al. Case No. 18STCV00882.

**Deposition:** May 21, 2021. Bellagio Brown, Vs. City of Ontario; Gabriel Gutierrez, et al., Case No.: 5:20-cv-00476-DMG-SHK.

**Deposition:** May 24, 2021. Kenneth Chamberlain, Jr. v. City of White Plains (New York), et al. Case No. 12-CV-5142 (CS).

**Deposition:** June 2, 2021. J.A.J., et al., vs. Efrain Jimenez, et al., Case No.: 1:18-cv-01138 DAD-SKO.

**Trial:** June 11, 2021. Richard Donastorg, vs. City of Ontario, et al. Case No.: 5:18-cv-00992-JGB-SP.

**Trial:** June 11, 2021. Harry Donald Lemly, Jr., v. California Department of Parks and Recreation, et al. Case No. 8:19-CV-01603 DOC DFM.

**Deposition:** June 14, 2021. Paul R. Conforti, and Humana Caresource, vs. City of Franklin, Officer Christopher Rydelski, Officer Gary Wallace, et al., Case No.: 2020CV000758.

**Deposition:** June 15, 2021, Rosa "Patti" Andrade, et al., vs. City of Tucson, et al. Case No. C20194291.

**Deposition:** June 16, 2021. Barry John Montgomery, Jr. v. County of Los Angeles, et al. Case No. BC692204.

**Trial:** June 23, 2021. People v. Richard Lechuga, Superior Court(San Diego County), Case No. CE395395, DA No. NIBT461.

**Trial:** July 6 & 7, 2021. Jose Gomez, v. City of Houston, et al. Case No. 18-cv-1224.

**Deposition:**  July 13, 2021.  Nicholas Robinson v. City of San Jose, et al.  Case No.: 5:19-CV-06768NC.

**Deposition:**  July 15, 2021.  Michael Moore vs. City of Los Angeles, et al.  Case No.: -cv-03053-AB-AGR..

**Trial:**  July 19, 2021 and July 20, 2021.  Villegas v. City of Los Angeles – C.D. Cal. Case No. 20-cv-07469-SB-JC.

**Trial:**  July 22, 2021.  The Estate of Vu Anh Ngo, et al. v. County of Riverside, et al.  Superior Court Case, RIC 1902381.

**Deposition:**  July 30, 2021.  Donnie Woodral v. County of Stanislaus, et al.  Case No.: 1:20-cv-00372

**Deposition:**  August 2, 2021.  Darryl Speer v. County of San Bernardino USDC Case No. 5:20-cv-00044-JGB-SPx.

**Deposition:**  August 5, 2021.  Juan Jose Bermudez, v.  County of San Bernardino, et al.  Case No. 5:20-CV-438 JGB (SHKx).

**Depostion:**  August 9, 2021.  Marco Ortiz, v. San Joaquin County, et al.  Case No.. 2:20-cv-00217-JAM-CKD.

**Trial:**  August 12, 2021  Darryl Speer v. County of San Bernardino USDC Case No. 5:20-cv-00044-JGB-SPx.

**Deposition:**  August 16, 2021.  Cynthia Heffner Roberts, et al v. Manuel Cruz, Individually. Case No. 3:19-CV-186 RGJ-RSE (Kentucky).

**Deposition:**  August 17, 2021.  Gerardo Wence, v. Rayann Cruz.  Contra Costa County Superior Court  Case No.: CIVMSC18-02060.

**Deposition:**  August 20, 2021.  B.P., et al. v. County of San Bernardino, et al.  Case No.: 5:19-cv-01243.  JGB-SP.

**Deposition:**  August 24, 2021.  Rosa Ester Brizuela, et al,  v. City of Sparks; et al.  Case No.3:19-CV-00692-MMD-WGC.

**Deposition:**  August 25, 2021.  Robin Leeann Moore-Brown, et al, v. ·City of North Las Vegas, et al.  Case No. 2:20-CV-01649-GMN-DJA.

**Trial:**  August 26, 2021.  Jeremy Holloway, Plaintiff, vs. County of Orange, Deputy Chad Renegar, individually and as a peace officer, et. al, Case Number: 8:19-cv-01514-DOC-DFM.

# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

August 27, 2021

Roshna Bala Keen, Esq.
Rachel Brady, Esq.
Lindsay Hagy, Esq.
Loevy & Loevy
311 North Aberdeen Street, 3rd Floor
Chicago, IL 60607


Ashley Rosa Waddell Tingstad
Treetown Law, PLLC
214 N. Fourth Avenue, 2nd Floor
Ann Arbor, MI 48104


***Regarding:***     ***Patrick Pursley, v. City City of Rockford, Illinois, et al. Case No. 3:18-cv-50040***


Dear Counsel:

My Fee Schedule is as follows:

- Travel time at the rate of $50.00 per hour.
- (Travel via automobile to and from San Diego to Los Angeles 8 hours $400.00)
- All case review, consulting, and writing of expert opinions (such as Rule 26 reports) at $250.00 per hour.
- All testimony (either at trial or deposition) at $350.00 per hour, with a two hour minimum required.
- A retainer fee of $3,500.00 when initially retained will be used against the above listed fees.  Subsequent billings at the rates specified.
- A "rush fee" of $500.00 for work required less than three weeks from notice/retention.
- An invoice will be submitted periodically upon request reflecting the activities and charges associated with the account.  Payment is due upon receipt of the invoice.

There is no formal contract required.  My Federal Tax ID Number is **72-1576857.**

Sincerely,

*Roger A. Clark*

Roger A. Clark