## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Patrick Pursley, | |
| Plaintiff, | Case No. 3:18-cv-50040 |
| v. | Honorable Iain D. Johnston |
| City of Rockford et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Patrick Pursley spent twenty-three years incarcerated for a murder he says he didn't commit. He was acquitted at his criminal retrial and granted a Certificate of Innocence. Pursley brings this action against a slew of defendants, of whom the following remain: the City of Rockford (the "City"); Rockford Police Department (RPD) detectives Howard Forrester, Jeff Houde, Mark Schmidt, and Bruce Scott; and Illinois State Police lab analysts Daniel Gunnell and Jack Welty. Before the Court are two motions for summary judgment: the first from the City, Forrester, Houde, Schmidt, and Scott (the "Rockford defendants") and the second from Gunnell and Welty (the "ISP defendants"). For the following reasons, the ISP defendants' motion is granted, and the Rockford defendants' motion is granted in part and denied in part.

## I.  Legal Standard

### A.  Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmovant; it does not require that the dispute be resolved conclusively in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The Court must construe the evidence and all reasonable inferences in favor of the nonmovant. *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). The Court need not draw every conceivable inference in favor of the nonmovant, only reasonable ones. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005).

### B.  Local Rule 56.1

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). In theory, the statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). Factual allegations "should not contain legal argument," and responses "may not set forth any new facts." LR 56.1(d)(4), (e)(2). A response that disputes an asserted fact "must cite specific evidentiary material." LR 56.1(e)(3). "District courts are 'entitled to expect strict compliance' with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that

does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606-07 (N.D. Ill. 2011); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities."). Neither the language nor the intent of Local Rule 56.1 was followed in this case.

## II. Analysis

This matter is, in short, a mess. The parties presented the Court with 533 pages of Rule 56.1 statements, briefing, and ancillary briefing. In the statements of fact and responses, both parties strayed far from Rule 56.1's requirements. The paragraphs were not short, nor did they "contain only one or two individual allegations." *Malec*, 191 F.R.D. at 583. The statements were also not limited to material facts—some were immaterial, and others weren't facts. The list goes on. The Court held a status hearing to address the flagrant violations of Rule 56.1, Dkt. 387, but ultimately the parties could not agree on how best to proceed. Rule 56.1 was intended to simplify the summary judgment process, *Mirza v. Dep't of the Treasury ex rel. Rubin*, 17 F. Supp. 2d 759, 762 (N.D. Ill. 1998). That certainly didn't happen in this case.[1]

---

[1] The Court also notes the sheer number of claims and defendants. The kitchen sink approach rarely leads to a just, speedy, and inexpensive resolution of actions. *See Suttman-Villars v. Argon Med. Devices, Inc.*, 553 F. Supp. 3d 946, 954 (D.N.M. 2021) (noting the unfair burden on courts). And when a valid claim exists—as is the case here—the weak and unnecessary claims distract from and diminish the value of the valid claim. *See Gurman v. Metro Hous. & Redevelopment Auth.*, 842 F. Supp. 2d 1151, 1154 (D. Minn. 2011) ("The bad obscures the good.").

Upon the Court's initial, cursory examination of the materials before the Court, two things were clear: there are factual disputes, and there are matters that can be resolved as a matter of law. Given the latter, the Court could not take the suggestion by Pursley's counsel to cursorily deny the summary judgment motions just because the statements of fact are heavily disputed or because there are very few facts left if violations of Rule 56.1 are ignored. Instead, the Court has waded through the sea of documents. Before analyzing Pursley's claims, the Court addresses a few issues that apply broadly to the claims in this case, including Defendants' *Daubert* motion.

## A. Overarching Matters

### 1. *Crabtree's prior testimony*

Defendants argue that Samantha Crabtree should be "disqualified" as a witness because she invoked her Fifth Amendment privilege against self-incrimination and because her prior statements, testimony, and affidavits are inadmissible hearsay. Dkt. 344 at 7 n.2. Pursley contends that Crabtree's prior testimony can be introduced as a hearsay exception. Dkt. 356 at 24. This is not the first time the parties have briefed this issue, and both parties unhelpfully incorporated their previous arguments into their summary judgment briefing. *See* Dkt. 372 at 3 & n.2; Dkt. 380 at 10.[2]

---

[2] The motion to disqualify was fully briefed, with a surreply, so the Court is surprised that another surreply was required this time to address the issue. If the briefs on this issue corresponded to common-law pleading documents, we've gone past the surrebutter. *See* Bryan A. Garner, *Garner's Dictionary of Legal Usage* 181 (3d ed. 2011).

The prior testimony exception to hearsay under Federal Rule of Evidence 804(b)(1) allows the admission of testimony from a prior trial, hearing, or deposition if the declarant is unavailable and if the party had an opportunity and similar motive to develop the testimony. Fed. R. Evid. 804(b)(1). There is no dispute that Crabtree would be unavailable under Rule 804(a); the parties dispute only whether the prosecutors at Pursley's criminal trial are predecessors-in-interest to the Rockford defendants in this case.

The Federal Rules of Evidence don't define "predecessor-in-interest." *See Volland-Golden v. City of Chicago*, 89 F. Supp. 3d 983, 986 (N.D. Ill. 2015). "Circumstances or factors which influence motive to develop testimony include '(1) the type of proceeding in which the testimony [was] given, (2) trial strategy, (3) the potential penalties or financial stakes, and (4) the number of issues and parties.'" *United States v. Reed*, 227 F.3d 763, 768 (7th Cir. 2000) (alteration in original) (quoting *United States v. Feldman*, 761 F.2d 380, 385 (7th Cir. 1985)).

Courts have split as to whether state prosecutors are predecessors-in-interest to law enforcement officers named as defendants in civil rights lawsuits. This Court finds the second factor—trial strategy—particularly relevant, as "[i]t is well-settled that strategies for civil and criminal trials may differ greatly." *Feldman*, 761 F.2d at 385. In addressing this issue, then-District Judge David Hamilton observed critical differences in this regard:

> Prosecutors in criminal trials (as well as in depositions) usually have their hands full trying to protect the public and secure a just result in the criminal prosecution. Under [the plaintiff's] theory [that prosecutors are predecessors-in-interest] here, those busy prosecutors would also

> need to think and act as surrogate defense counsel for future civil rights
> lawsuits against officers who are not their clients. (Put aside for the
> moment the complications presented when more than one police officer
> might face a future lawsuit.) At the risk of stating the obvious, even
> those prosecutors who might have the needed knowledge to take on
> these additional responsibilities would rarely have the time or
> inclination to do so.

*Butler v. Indianapolis Metro. Police Dep't*, No. 07-cv-1103, 2009 U.S. Dist. LEXIS 59665, at *6-7 (S.D. Ind. July 13, 2009). Then-District Judge Amy St. Eve later expanded on Judge Hamilton's discussion, noting that prosecutors represent a sovereignty rather than individuals, and "a prosecutor's motive in securing [a] just result differs from a civil attorney's motive when representing a defendant in a civil rights lawsuit." *Hill v. City of Chicago*, No. 06 C 6772, 2011 U.S. Dist. LEXIS 98494, at *9 (N.D. Ill. Sept. 1, 2011). Attorneys who have served as both prosecutors and civil rights defense counsel well recognize the issues identified by Judge Hamilton and Judge St. Eve. And the ethical issues—such as who is the client—can be layered on top.

Cross examination of witnesses requires discretion and judgment. Sometimes, poking a few critical holes in a witness' testimony makes more sense than fully obliterating a witness. And sometimes adverse witnesses have helpful testimony, too. So, counsel must make judgment calls on whether eliciting the favorable testimony is more important than impeaching the stuffing out of those types of witnesses.

This difference in motive can be seen in this case. The prosecution at Pursley's criminal trial wanted Crabtree to testify that Pursley committed the murder and to impeach her when she told a different story. Dkt. 359-82 at 53:6-20.

Its goal wasn't to defend against allegations of fabrication and coercion by the police officers. The prosecution also referred to "detectives" generally and wasn't concerned about which individual detective did what. Although Crabtree did speak specifically about Detectives Forrester and Schmidt at times during her testimony, Dkt. 252 at 4, that doesn't show that the prosecutors were motivated to develop a future defense for those particular detectives.

The potential penalties and financial stakes involved are also different. The Rockford defendants (including the City) have financial and reputational motives to clear their names of personal liability. *Hill*, 2011 U.S. Dist. LEXIS 98494, at *10. Prosecutors, on the other hand, enjoy prosecutorial immunity as "advocate[s] for the State" during trial. *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)).

Pursley provides three examples of district courts ruling the other way. In *Kluppelberg v. Burge*, the prior testimony came from a hearing on a motion for a new trial in a criminal case. Order at 5, No. 13 CV 3963 (N.D. Ill. Aug. 4, 2017), Dkt. 365. The court characterized the scope of the proceeding as limited, with the focus on impeaching the witnesses and their prior testimony. *Id*. The fact that the prior proceeding was focused on impeaching those witnesses distinguishes *Kluppelberg* from this case.

In *Volland-Golden v. City of Chicago*, the plaintiff brought an excessive force claim after being acquitted on false charges of resisting a peace officer and battery. 89 F. Supp. 3d at 984. Only he and the two officers that stopped him testified at the

criminal trial, so the jury had to decide who to believe. *Id.* After filing the civil rights lawsuit, the plaintiff passed away, so the question was whether to admit the plaintiff's prior testimony. *Id.* Defendants argue that *Volland-Golden* is distinguishable from this case because of the plethora of evidence in this case— Crabtree's testimony didn't play the same crucial role in Pursley's criminal trial because there were other witnesses, like Marvin Windham. Dkt. 247 at 8-9. Even though the prosecution may have cross examined Crabtree at length, the Court agrees that the motive is different when Crabtree's testimony wasn't the same make-or-break factor that the testimony in *Volland-Golden* was.

Finally, in *Fields v. City of Chicago*, the prior proceeding was the penalty phase of a criminal trial, where the jury was called upon to decide on a death sentence. No. 10 C 1168, 2014 U.S. Dist. LEXIS 14621, at *28 (N.D. Ill. Feb. 6, 2014). Judge Matthew Kennelly acknowledged that to some extent, *Fields* was indistinguishable from *Hill*, but that he "respectfully disagree[d]" with Judge St. Eve's decision in *Hill*. *Id.* at *29 n.5. This Court acknowledges that there is some similarity in motive in this case, but the Court disagrees that it is similar enough to treat the prosecutors in Pursley's criminal case as predecessors-in-interest to the Rockford defendants, especially considering the difference in potential penalties and financial stakes. Judge Hamilton and Judge St. Eve have identified the better approach—particularly under the facts presented in this case. Crabtree's testimony is not admissible under Rule 804(b)(1).

Pursley then argues that, in the alternative, Crabtree's testimony can be admitted as a statement against interest. Dkt. 356 at 27-28. This hearsay exception allows evidence to be admitted if "(1) the declarant is unavailable as a witness, (2) the statement was against the declarant's penal interest when made, and (3) corroborating circumstances clearly suggest that the statement is trustworthy." *United States v. Ferrell*, 816 F.3d 433, 439 (7th Cir. 2015) (quoting *United States v. Jackson*, 540 F.3d 578, 588 (7th Cir. 2008)); *Am. Auto. Accessories, Inc. v. Fishman*, 175 F.3d 534, 541 (7th Cir. 1999).[3] The party seeking admission has the burden of showing each element. *United States v. Chang*, 999 F.3d 1059, 1069 (7th Cir. 2021).

The first two elements are not at issue. As with before, Crabtree's unavailability isn't disputed. Defendants don't address Pursley's argument that Crabtree's statements were against her penal interest, and indeed Crabtree was later charged with perjury. However, Pursley doesn't address the question of trustworthiness at all. Because Pursley hasn't met his burden, this isn't a viable route to admit Crabtree's testimony either.

Pursley makes one last appeal to admissibility in noting the residual exception under Rule 807. Dkt. 356 at 28 n.14. His one-sentence footnote doesn't develop the argument, so the Court doesn't find Rule 807 to be a basis to admit Crabtree's testimony. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.

---

[3] Rule 804(b)(3) does not address the corroborating circumstances requirement in civil cases. Fed. R. Evid. 804(b)(3) advisory committee's note to 2010 amendment. However, the Seventh Circuit has held that it applies. *Am. Auto. Accessories*, 175 F.3d at 541. (It appears the Seventh Circuit is alone in this regard. *See United States v. Kivanc*, 714 F.3d 782, 792 (4th Cir. 2013). That the Seventh Circuit is alone in this regard is of no moment to a district court in the Seventh Circuit.)

1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments . . . are waived."). And even if the argument weren't waived, in its discretion, the Court wouldn't allow this testimony under Rule 807. *United States v. Moore*, 824 F.3d 620, 622 (7th Cir. 2016). Pursley has failed to establish all five requirements under Rule 807. *Id*. Crabtree's testimony is excluded.

### 2. *Roger Clark's expert report*

Defendants also move to exclude the opinion testimony of Roger Clark. Dkt. 373. The admissibility of opinion witness testimony is governed by Federal Rule of Evidence 702 and the principles established in the Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). For a court to consider an opinion, the district court must evaluate four factors: (1) if the witness is qualified to provide the opinion; (2) whether the testimony will assist the trier of fact; (3) whether the testimony is based on sufficient facts or data and reliable principles and methods; and (4) whether the opinion is based on a reliable application of the principles and methods to the facts of the case. *See Lees v. Carthage Coll.,* 714 F.3d 516, 521-22 (7th Cir. 2013); *Daubert*, 509 U.S. at 589-96. Opinion testimony is not limited to scientific evidence and can be based on personal experience and knowledge, so long as it is reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 147-50 (1999). "[E]xtensive hands-on experience over a meaningful period of time which a person develops a working expertise in a certain area" may qualify a person to provide opinion testimony in that area. *See Jones v. Lincoln Elec., Co.,* 188 F.3d 709, 725 (7th Cir. 1999). The proponent bears

the burden to establish the necessary evidentiary foundation for an opinion.

*Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 782 (7th Cir. 2017).

Clark *might* be qualified to be a police practices expert in certain areas, and Defendants don't challenge Clark's background and qualifications. Clark spent twenty-seven years in the Los Angeles County Sheriff's Department. Dkt. 359-21 at 3. Between his fifteen years as a lieutenant and six as a sergeant, Clark has twenty-one years of supervisory experience. *Id.* He received an advanced certificate from the California Commission on Peace Officer Standards and Training (POST), and he graduated the POST Command College, a masters-level program. *Id.* He trained other officers and helped develop training curricula. *Id.* at 4-5.

Defendants describe Clark's role as telling Pursley's story "through the mouth of a police-officer-turned-expert." Dkt. 373 at 2. In addition to accusing Clark of just regurgitating Pursley's version of the facts,[4] Defendants argue that Clark's proffered opinions are deficient in several ways.

---

[4] Clark is offered for his opinion testimony, not factual testimony, so Clark is not allowed to testify merely to a version of the facts. *See* Fed. R. Evid. 702. But Clark's narration may also be flawed for other reasons, such as his choice to refer to Crabtree by first name while referring to everyone else by last name, perhaps to engender sympathy toward Crabtree. *See, e.g., Gabriel P. v. Suedi D.*, 46 Cal. Rptr. 3d 437, 439 n.2 (Cal. Dist. Ct. App. 2006) (using first names to "humanize" the decision); *cf. Naming Conventions*, Eur. Inst. for Gender Equal., https://eige.europa.eu/publications-resources/toolkits-guides/gender-sensitive-communication/challenges/subordination-and-trivialisation/naming-conventions (last visited Feb. 29, 2024) (discouraging the use of different naming conventions, such as last names for men and first names for women, because it can show a lack of respect); Stav Atir & Melissa J. Ferguson, *How Gender Determines the Way We Speak About Professionals*, 115 Proc. Nat'l Acad. Scis. U.S.A. 7278 (2018) (observing that when talking about professionals, people are more likely to refer to women by first name and men by last name and discussing resulting perceptions based on that difference).

a. *Conclusory opinions with no methodology*

Defendants argue that Clark isn't specific enough when he says things departed from accepted or standard practices. Dkt. 373 at 6-8. In response, Pursley points to the beginning section of Clark's report, as well as Clark's explanation of his claimed methodology during his deposition. Dkt. 377 at 5.

Clark's "Qualifications and Methodology" section is almost entirely about his background and experience; the only sentence about methodology is the last paragraph: "To formulate my opinions in this case, I reviewed the factual record and evaluated the Ascher homicide investigation in light of my law enforcement experience, training, and education about reasonable and generally accepted police practices." Dkt. 359-21 at 7. So as to not bury the lede, that's not an acceptable description of methodology. Pursley also includes in his cited pages Clark's overview of standard police practices in 1993 and the deviations he found. Dkt. 377 at 5. In this overview, Clark provides barely any more detail as to his methodology. He starts by framing this as being about truth: "[D]etectives in 1993 were trained that criminal investigations must, above all, be an honest search for the truth – this is the moral obligation required and implicit in the detective assignment." Dkt. 359-21 at 7. The rest of the section states that the RPD detectives were "grossly deficient and did not meet the legal and professional standards and procedures," but doesn't explain *how* Clark came to that conclusion (in fairness, this is an overview). *Id.* at 8. The only other information that hints at methodology is Clark's explanation that he's looking at standards that were

> required from every certified officer and which are taught at every academy and which are also required by State and Federal Law. These basic standards are reflected in the RPD's policy documents, criminal investigation books from the time period, and were routinely taught to law enforcement officers including me over the years.

*Id.* In his deposition, Clark testified that he also cited two publications from 1993 on the professional standard. Dkt. 377-2 at 286:4-7. The Court found only two citations to these 1993 standards in the report. In most other instances, Clark's opinions consist of merely declaring that something was a failure or a deviation from standard protocol. *See, e.g.*, Dkt. 359-21 at 14.[5] "Expert" opinions can't just be *ipse dixit. Wendler & Erza, P.C. v. Am. Int'l Group, Inc.*, 521 F.3d 790, 791 (7th Cir. 2008).

Pursley goes on to argue that Clark's methodology is "reliable and commonly accepted." Dkt. 377 at 11-13. But Clark generally doesn't provide enough information to conclude that his opinions "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d); *Lees*, 714 F.3d at 524 n.3 ("The label is not important. What matters is whether he consulted reliable sources and provided reasoned explanations connecting the source material to his conclusions."); *see also Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) ("A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court

---

[5] For instances where Clark relies on evidence in the factual record (such as a detective's deposition testimony) to explain what a typical procedure would have been, Defendants also argue that Clark's opinions offer nothing that the jury couldn't do on its own. The Court addresses this argument below.

in *Daubert*." (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999))). In most of his report, Clark doesn't explain "how" or "why" he reached his conclusions. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The critical inquiry is whether there is a connection between the data employed and the opinion offered . . . ."); *Salgado by Salgado v. GMC*, 150 F.3d 735, 742 n.6 (7th Cir. 1998); *Andersen v. City of Chicago*, 454 F. Supp. 3d 808, 818-19 (N.D. Ill. 2020). The burden is on Pursley to show *how* Clark's opinions pass muster under Rule 702 and *Daubert*, but his arguments miss the point, instead focusing on the kind of analysis that Clark purports to do. For example, he cites *Jimenez v. City of Chicago*, in which the court found that the expert's testimony about how a reasonable police investigator would have solved the murder was admissible, but the court didn't analyze how the expert got to that opinion (because the parties didn't raise it). 732 F.3d 710, 719, 722 (7th Cir. 2013).

Pursley also argues that Defendants' experts use the same flawed methodology. Dkt. 377 at 1 n.1.[6] In the case that he cites, the court merely makes the observation that the police practices expert proposed by the defendants in that case wouldn't fare much better than Clark under *Daubert*, but it's a throwaway parenthetical that doesn't affect the court's analysis. *See Baldauf v. Davidson*, No. 04-cv-1571, 2007 U.S. Dist. LEXIS 53925, at *16 (N.D. Ill. July 24, 2007). Indeed,

---

[6] The Court often sees this type of argument in *Daubert* motions. It is not a compelling argument and provides no analytical basis under *Daubert* and Rule 702 to admit opinion testimony. *Trexler v. City of Belvidere*, No. 3:20-cv-50113, 2023 U.S. Dist. LEXIS 12662, at *22 (N.D. Ill. Jan. 25, 2023) ("Two wrongs do not make a right."). This argument is also a surefire way to lose credibility.

the court continued on to limit Clark's testimony, without analyzing the defendants' proposed expert. *Id.* at *20-21. Pursley didn't file any motion to limit or exclude Defendants' experts, so the Court sees no reason to examine Defendants' expert reports at this time.

### b. Credibility determinations

Next, channeling El Guapo, Defendants argue that Clark offers "a plethora of credibility opinions." Dkt. 381 at 4. Focusing on the examples about Windham, Pursley responds that the examples Defendants provide take things out of context. Dkt. 377 at 21-22. A police practices expert can testify to "what a reasonable police investigator should have done when presented with these conflicting and/or inculpatory statements during the murder investigation" without opining on whose testimony should be believed. *Jimenez*, 732 F.3d at 723. The Court finds that to be the case with the first five examples in Defendants' table, Dkt. 373 at 8. Clark calls Windham unreliable from the perspective of a reasonable detective deciding how to handle that part of the investigation, not from the perspective of a factfinder.

But there are other statements that do appear to make credibility assessments, despite Clark's disclaimer. For example, Clark flat-out describes a statement from Houde's testimony as "unbelievable" because it would be "very uncommon" in his experience. Dkt. 359-21 at 25. And when discussing the interrogation of Crabtree, Clark lists aspects of Crabtree's statements that he deems "obviously not true." *Id.* at 29. In these instances, Clark's opinions as to who should be believed must be excluded. *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000); *see also Jimenez*, 732 F.3d at 723.

15

### c. *Legal conclusions about probable cause*

Defendants also challenge Clark's opinions on what constituted probable cause. Although Federal Rule of Evidence 704 allows opinion witnesses to testify as to the ultimate issue in an action, the rule still doesn't authorize opinions to be legal conclusions. *Good Shepherd Manor Found., Inc. v. City Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Indeed, the Seventh Circuit has reiterated on many occasions that an expert may not offer legal opinions. *See Jimenez*, 732 F.3d at 720. "When an expert offers an opinion relevant to applying a legal standard such as probable cause, the expert's role is 'limited to describing sound professional standards and identifying departures from them.' " *Id.* (quoting *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997)). Applications of law to fact are left for the factfinder. *Good Shepherd Manor Found.*, 323 F.3d at 564; *Trexler v. City of Belvidere*, No. 3:20-cv-50113, 2023 U.S. Dist. LEXIS 12662, at *11 (N.D. Ill. Jan. 25, 2023).

Pursley's response is that Defendants mischaracterize Clark's opinions. Dkt. 377 at 18-19. But when Clark uses the phrase "probable cause" in his report, he does more than simply utter the phrase. He opines on whether probable cause existed based on the evidence before the detectives. *See, e.g.*, Dkt. 359-21 at 20 ("Windham's statement did not give probable cause to arrest and charge Pursley with murder."). Unsurprisingly, this is most evident with the section titled "To [a] Reasonably Trained Law Enforcement Officer, There Was No Evidence-Based Probable Cause to Arrest Pursley," where Clark lists the evidence that the detectives had and how it didn't amount to probable cause. *Id.* at 33. These opinions go beyond describing professional standards and identifying departures from them

16

and "invade[] the province of both the jury and this Court." *Andersen*, 454 F. Supp. 3d at 819.

### d. Opinions about coercion and ballistics testing

Although Defendants generally don't challenge Clark's qualifications to opine on police practices, they do challenge his qualifications to opine on two specific topics. Dkt. 373 at 11.

The first is the subject of coercive investigations and false confessions, for which courts have required a social psychology background instead of a policing background to opine on such matters. *E.g.*, *Harris v. City of Chicago*, No. 14 C 4391, 2017 U.S. Dist. LEXIS 115421, at *11-15 (N.D. Ill. July 25, 2017).[7] Clark testified in his deposition that his area of expertise is police procedures, with no indication that he considered coercion to fall under that umbrella, *see* Dkt. 377-2 at 25:12-22, nor does his background suggest experience with social psychology or other related fields, *see* Dkt. 359-21 at 3-7. Pursley doesn't dispute Clark's lack of qualifications in this regard; instead, Pursley responds that Clark's opinions are limited to police practices regarding interrogation of witnesses and providing *Miranda* warnings. Dkt. 377 at 19. In support, Pursley cites a case where an expert was allowed to opine only on "the failure to document any *Miranda* warnings" but was excluded from testifying about other aspects of an interrogation that allegedly led to a coerced confession. *Andersen*, 454 F. Supp. 3d at 820.

---

[7] *Harris* may be distinguishable from this case because the issue was whether the proposed expert was qualified to rebut a social psychologist's expert opinions, but Pursley doesn't dispute that Clark lacks the qualifications regarding coercion and false confessions.

Even just the heading for this section of Clark's report shows that Clark's opinions go further than standard *Miranda* procedure: "Samantha Crabtree's Statement Bears Hallmarks of Coercion." Dkt. 359-21 at 27. Then Clark concludes the first paragraph in this section with further discussion about whether Crabtree was coerced: "These departures [from standard police practices] set the stage for [Crabtree] to be manipulated into falsely implicating Pursley in the Ascher homicide." *Id.*; *see also id.* at 30 ("[A]t a bare minimum, the tactics Schmidt and Forrester used on [Crabtree] can have the effect of being coercive and causing a witness to provide a statement that they believe the police want them to provide, even though it's not true."). The Court expects "expert" who are paid large sums of money to provide opinion testimony saying what they mean and meaning what they say—it's not a lot to ask. *Trexler*, 2023 U.S. Dist. LEXIS 91694, at *2-3. The Court generally agrees with Defendants' characterization of Clark's testimony regarding the interrogation of Crabtree and her statement, so Clark's testimony on what would have coerced, manipulated, or corrupted Crabtree is excluded.

Second, Defendants challenge Clark's ability to opine on the ballistics testing. Dkt. 373 at 12-13. Again, Pursley contends that Defendants mischaracterize Clark's opinions. Dkt. 377 at 19-20.

In the part of the report that Pursley cites, a section titled "Failure to timely submit the firearm evidence," Clark discusses the two-month delay in the detectives sending the gun to the ISP crime lab. This section runs into the methodology issues described above, but Pursley is right that Clark doesn't opine on the quality or

credibility of the ballistics analysis in that section. Looking at the next page, under the section titled "Detectives Submit Crime Scene Evidence After They Have [a] Suspect," Clark discusses the interactions between Forrester and Welty. Dkt. 359-21 at 15. In that section, he states that getting a verbal preliminary opinion from Welty was unusual is closer to opining on the ballistics testing and that Forrester and Welty should have taken better notes of their conversations. *Id.* The opinions on Welty's conduct in the ISP crime lab go beyond Clark's experience as an officer in a sheriff's department—those opinions are excluded. (The opinions on Forrester's conduct don't have the same scope issue but do face the methodology issues discussed earlier.) Similarly, Clark's opinions on how Gunnell and Welty conducted their end of the ballistics examination, *id.* at 26, goes beyond Clark's experience and is also excluded.

Defendants' argument relies on examples from Clark's deposition, where Clark testified that he found the reports from Pursley's ballistics experts to be more credible than the work from Gunnell and Welty and therefore he believed that Gunnell's conclusions were incorrect. Dkt. 373 at 12-13 (citing Dkt. 377-2 at 253:21-254:20). Clark's report is not as explicit. He does rely on Pursley's ballistics experts' findings to conclude that RPD and ISP deviated from standard procedures, but he doesn't analyze the ballistics findings themselves; instead, the reliance on Pursley's ballistics experts reads more as relying on Pursley's versions of the facts, which doesn't affect admissibility under *Daubert*. *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 810 (N.D. Ill. 2013).

### e. Opinions about Defendants violating their own policies

Finally, Defendants argue that Clark's opinions on whether the RPD detectives violated RPD policies should be excluded because such opinions offer nothing that the average juror isn't capable of determining. Dkt. 373 at 15. Pursley responds that this "myopic parsing" misses the full impact of Clark's report, as he discusses RPD's policies alongside broader policing standards. Dkt. 377 at 23-24. Discussion of local policy and how it compares to widely accepted standards can be helpful, *Andersen*, 454 F. Supp. 3d at 820, and Clark does sometimes discuss both RPD procedures and more widely used standards in analyzing a particular piece of conduct, *see, e.g.*, Dkt. 359-21 at 23-24. In these instances, the reference to RPD procedure doesn't alone disqualify Clark's testimony, but it is still subject to the earlier analysis of Clark's methodology. Where Clark makes a comparison to only RPD procedures, those opinions are excluded. *See Andersen*, 454 F. Supp. 3d at 820.

\*     \*     \*

Defendants charitably describe Clark's track record "somewhat checkered," Dkt. 373 at 1, and the Court can see why other courts have found the need to limit or exclude Clark's testimony. Indeed, a reasonable person might wonder why Clark still offers opinions such as these and counsel pay for them after courts have repeatedly notified him and the counsel who hire him that these types of opinions aren't admissible. Clark's opinions fail to utilize his experience to help a factfinder understand the evidence and issues in a way permissible under Rule 702 and *Daubert*. His opinions also include improper credibility assessments and legal determinations, and some of his opinions go beyond his areas of expertise. Based on

the analysis above, the only pieces of admissible opinion testimony from Clark are his opinions on: (1) the lack of contemporaneous documentation of the Crime Stoppers call, Dkt. 359-21 at 16-17; (2) how a reasonable detective would view Windham as an informant, specifically as it relates to his potential motive, *id.* at 18; (3) how the detectives handled the recovery of Pursley's firearms after searching Pursley and Windham's apartment departed from standard practice, but *not* the speculation as to why there was lackluster documentation, *id.* at 23-24; and (4) the lack of "detailed contemporaneous notes" about Crabtree's statements, *id.* at 28.[8] Other than that, Clark's testimony is excluded.

### 3. Estate of Howard Forrester

The Rockford defendants put forward two affirmative defenses to argue that all claims against the estate of Howard Forrester should be barred.

The Rockford defendants first argue that the claims against Forrester's estate are time-barred by the statute of limitations because the estate wasn't properly named as a defendant until the amended complaint, by which time the statute of limitations had expired. Dkt. 344 at 21.[9] The initial complaint in this case, which named "Howard Forrester" as a defendant, was filed on February 1, 2018. Dkt. 1. The next month, in a joint status report filed on March 16, 2018,

---

[8] The Court finds that the listed testimony is admissible in that it survives Defendants' *Daubert* challenge, but this does not preclude other potential barriers to admissibility (such as relevance).

[9] Contrary to Pursley's summary of the procedural history, Dkt. 356 at 64 n.29, Forrester didn't fail to plead this affirmative defense, *see* Dkt. 150 (affirmative defenses 10-18). The motion for leave to file amended affirmative defenses sought to argue that the state law claims were subject to a one-year statute of limitations, instead of the two-year limit originally argued. Dkt. 284 ¶¶ 13-14.

Pursley acknowledged that Forrester was deceased. Dkt. 19-1 at 2. On March 15, 2019, Pursley moved to appoint and substitute a special representative for Forrester (and others) under 735 ILCS 5/13-209. Dkt. 57. The motion was granted on June 5, 2019. Dkt. 93. Six days later, special representatives were identified. Dkt. 94. Finally, on June 25, 2019, the second amended complaint was filed, and it named as a defendant "City Administrator for the City of Rockford, as Special Representative for the ESTATE OF HOWARD FORRESTER." Dkt. 100.

Pursley argues that the date of accrual for his tort claims is January 16, 2019, the day he was found not guilty in a retrial of his criminal case. Dkt. 356 at 64. However, as the Rockford defendants explain, that doesn't make sense because it means his initial complaint would have been premature when it was filed nearly a year before that, on February 1, 2018. *See Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994).

The Rockford defendants' argument rests on the assumption that Forrester's estate is a new party, to which Pursley argues that the claims against the estate relate back to the timely claims in the initial complaint. Dkt. 356 at 64 n.29. He cites *Stewart v. Special Adm'r of the Est. of Mesrobian*, 559 F. App'x 543 (7th Cir. 2014), in which the Seventh Circuit applied Federal Rule of Civil Procedure 15(c). In that case, because the claims arose out of the same transaction and because the defendants received notice within the Rule 4(m) service period, the amended complaint was held to relate back to the original complaint, making the claims against the defendant's estate timely. *Id.* at 547-48; *see also* Fed. R. Civ. P.

15(c)(1)(C). The Rockford defendants don't grapple with the issue of relation back, except when arguing that, if the accrual date was after the filing of the initial complaint, the amended claims arise out of a different transaction. Dkt. 372 at 14. Having already rejected an accrual date of January 16, 2019, the Court infers that the Rockford defendants don't dispute that the claims against Forrester's estate arise out of the same transaction.

As to the notice requirement, Pursley argues that neither the City nor the Forrester estate opposed the motion to appoint and substitute a special representative, which appears to be at least half right: the Rockford defendants filed their response on April 9, 2019, which was before the extended Rule 4(m) deadline of June 25, 2019, to say that they didn't object to the motion, and the list of defendants on that filing included the City but not Forrester's estate (or the City Administrator). Dkts. 63, 72. The timing of service on the Forrester estate isn't helpful either, as it wasn't served until June 26, 2019. Dkt. 105.

Rather than speculate as to when the City Administrator received notice, the Court finds that the statute allowing the appointment of a special representative, section 13-209, provides more straightforward guidance as to how to proceed, given a recent decision from the Illinois Supreme Court. The relevant portions of 735 ILCS 5/13-209 are as follows:

> (b) If a person against whom an action may be brought dies before the expiration of the time limited for the commencement thereof, and the cause of action survives, and is not otherwise barred:
>
> . . .

(2) if no petition has been filed for letters of office for the deceased's estate, the court, upon the motion of a person entitled to bring an action and after the notice to the party's heirs or legatees as the court directs and without opening an estate, may appoint a special representative for the deceased party for the purposes of defending the action. If a party elects to have a special representative appointed under this paragraph (2), the recovery shall be limited to the proceeds of any liability insurance protecting the estate and shall not bar the estate from enforcing any claims that might have been available to it as counterclaims.

(c) If a party commences an action against a deceased person whose death is unknown to the party before the expiration of the time limited for the commencement thereof, and the cause of action survives, and is not otherwise barred, the action may be commenced against the deceased person's personal representative if all of the following terms and conditions are met:

. . .

(4) In no event can a party commence an action under this subsection (c) unless a personal representative is appointed and an amended complaint is filed within 2 years of the time limited for the commencement of the original action.

735 ILCS 5/13-209(b) to (c).

In *Lichter v. Carroll*, the Illinois Supreme Court addressed the time limit for a plaintiff that learns of a death after the statute of limitations has run and moves to appoint a special representative. 2023 IL 128468 ¶ 17 (Ill. 2023). The court held that subsection 209(b)(2) applied in part because the deceased defendant passed away before the statute of limitations had run. *Id.* ¶ 20. The plain language of 209(b)(2) doesn't require the plaintiff to be aware of the death when filing an action. *Id.* ¶ 27. The court then applied the time limit from 209(c)(4) to 209(b)(2), allowing the appointment of a special representative "within two years 'of the time limit[] for the commencement of the original action.'" *Id.* ¶ 33 (alteration in original) (quoting

24

735 ILCS 5/13-209(c)(4)). Although *Lichter* addressed this time limit for a plaintiff who learned of the defendant's death after the limitations period had run, there's no language in 209(b) that would suggest a different time limit based on when the plaintiff learned of a defendant's death. *See also Weston v. City of Chicago*, No. 20-cv-6189, 2024 U.S. Dist. LEXIS 7601, at *10-11 (N.D. Ill. Jan. 16, 2024).

In this case, the day Mr. Pursley's conviction was vacated—March 3, 2017—is the earliest possible date suggested by either party to start counting down. Dkt. 344 at 26. The state claims have a one-year statute of limitations, and the federal claims have a two-year limit. *William v. Lampe*, 399. F.3d 867, 870 (7th Cir. 2005); 745 ILCS 10/8-101(a); *Savory v. Lyons*, 469 F.3d 667, 673 (7th Cir. 2006); 735 ILCS 5/13-202. That means the statute of limitations expired on March 3, 2018, for the state claims, and March 3, 2019, for the federal claims. Within two years of that, as instructed by *Lichter*, provides deadlines of March 3, 2020, and March 3, 2021, which were both after the second amended complaint was filed on June 25, 2019. The claims against Forrester are therefore timely.

Defendants also argue that section 13-209(b)'s limitation of recovery to the proceeds of liability insurance bars the claims against Forrester's estate. Dkt. 344 at 29-31. Pursley argues that because Defendants failed to raise this as an affirmative defense in its answer to the second amended complaint, they have waived it. Dkt. 356 at 67.

Even if it weren't waived, the Rockford defendants' argument wouldn't be reason to terminate Forrester's estate from this case. The Rockford defendants first

argue that all the state claims against Forrester's estate must be granted summary judgment, so there is no liability to indemnify. Dkt. 344 at 31 n.4. That isn't a reason to wholesale bar the claims against Forrester's estate; whether the claims are entitled to summary judgment for lack of factual disputes has nothing to do with the liability insurance issue. *See Brown v. City of Chicago*, No. 19 C 4082, 2020 U.S. Dist. LEXIS 147247, at *6 (N.D. Ill. Jan. 28, 2020).

The Rockford defendants' argument rests on the assumption that there is no liability insurance,[10] but Pursley argues that the City's indemnification obligation is functionally equivalent to liability insurance in this context. Dkt. 356 at 67. The Rockford defendants' cited authority doesn't address whether such an interpretation is valid; their argument rests on the literal meaning of "liability insurance." Pursley provides three cases that speak to this issue in the context of section 13-209 and/or the Illinois Probate Act, which has a similar provision. Dkt. 380 at 6-7; Dkt. 391.[11]

---

[10] It's not clear that this is a correct assumption. And, again, the Local Rule 56.1 facts are unhelpful. Pursley's counsel notes that they discovered from another action against the City that the City had insurance for at least some of the relevant years, despite representations that the City made during discovery in this case. Dkt. 380 at 8 n.2. The email correspondence attached that Pursley provided included some of the same defense counsel in this case, so defense counsel should have known this when drafting their briefs in this case. *Id.* Even if there were no liability insurance, the Rockford defendants' argument that the section 13-209's language *bars* claims is also unconvincing. The plain language is about limiting the amount to be recovered, which is demonstrated by Defendants' example of *Knauerhaze v. Nelson*, 836 N.E.2d 640 (Ill. App. Ct. 2005), where the court relied on similar language in a different Illinois statute to affirm a reduced award of damages. 836 N.E.2d at 666. Defendants' citation to *Stewart*, 559 F. App'x at 548, doesn't help either because *Stewart* interpreted the Illinois Probate Act's language that explicitly bars specific claims, in stark contrast to section 13-209. *See* 755 ILCS 5/18-12(b)-(c).

[11] The relevant language from the Illinois Probate Act: "(b) . . . [A]ll claims which could have been barred under this Section are, in any event, barred 2 years after decedent's death . . . . (c) This Section does not bar actions to establish liability of the decedent to the extent the estate is protected by liability insurance." 755 ILCS 5/18-12(b)-(c).

The most helpful is *Weston v. City of Chicago*, No. 20-cv-6189, 2024 U.S. Dist. LEXIS 7601 (N.D. Ill. Jan. 16, 2024). In that case, the court noted that Illinois Probate Act's exception for claims covered by liability insurance is presumably because those claims "would not necessarily hinder the stated goal of facilitating orderly resolution of estates." *Id.* at *7. Similarly, the court found, for claims that are covered by indemnification, a judgment would not impede the settlement of the decedent's estate. *Id.* at *8. Section 13-209 and the Illinois Probate Act appear to use the phrase "liability insurance" in similar ways (and the parties don't argue otherwise), so the Court finds that the City's indemnification in this case serves as liability insurance for Forrester's estate for the purposes of section 13-209. *See also Brown*, 2020 U.S. Dist. LEXIS 147247, at *6-7 (addressing the two statutes' liability insurance provisions together).

### 4. *Qualified immunity (RPD detectives)*

The Rockford defendants' arguments about qualified immunity don't change the analyses later in this opinion, so the Court acknowledges the issue up front. They argue that the officers are entitled to qualified immunity on the basis that there was no underlying constitutional violation, but they do not address whether there was a clearly established constitutional right. Dkt. 344 at 19. So qualified immunity would apply to any claims that independently deserve summary judgment, and it wouldn't apply to any claims that do survive summary judgment.

### B. The Claims

Based on the matrix of claims and defendants that Pursley provided the Court, Dkt. 338, there are nine claims that Pursley pursues.[12]

#### 1. Fabrication of evidence (due process)

At the heart of this case is the claim that Defendants fabricated evidence to convict Pursley. "It is well-established that 'a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (alteration in original) (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). In addition to the deprivation of liberty, the police officers must have "created evidence that they knew to be false." *Id.* (quoting *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014)).

There are three pieces of evidence that Pursley alleges were fabricated. Defendants don't dispute that the jury credited these in reaching a guilty verdict (leading to his loss of liberty), *see* Dkt. 344 at 13, so the question is whether there's a genuine dispute that Defendants knowingly created false evidence.

#### a. Crabtree's statement

Because Crabtree's prior testimony must be excluded, there are few admissible facts on the issue: the RPD detectives believe that Crabtree's statement implicating Pursley was true and say that they didn't coerce Crabtree, Dkt. 348 ¶ 62; Crabtree cried during her interrogation, Dkt. 357 ¶ 19; her statement

---

[12] The matrix did not include the failure-to-intervene claim, so the Court treats that claim as abandoned.

contained an objectively false fact (about the Taurus being the murder weapon); and the RPD detectives took Crabtree to the evidence unit to physically view the Taurus, *id.* ¶ 32. Viewing these facts in light most favorable to Pursley, there isn't enough to reasonably infer that the Rockford defendants knowingly created false evidence. Crabtree's crying doesn't go one way or the other: any reason for why she cried during the interrogation would be speculation. That the officers violated protocol to allow Crabtree to view the Taurus is certainly odd, but it's not enough to nudge the inference that the officers knew the Taurus wasn't the murder weapon (in crafting Crabtree's statement) from conceivable to reasonable.

### b. *Windham's signed statement and testimony*

The parties heavily dispute the facts surrounding Windham's signed statement and testimony. Pursley argues that Defendants fabricated Windham's version of events to connect Pursley and his gun to the murder. Dkt. 356 at 6-7. Resolving factual disputes in Pursley's favor, Pursley didn't tell Windham that he was involved in the murder, nor did he show Windham a gun. Dkt. 357 ¶ 51. But to the grand jury, Windham testified that Pursley showed him the gun. *Id.* ¶ 56. And at trial, Windham identified a photo of the gun that Pursley purportedly showed him. *Id.* ¶ 58. Yet Windham was unfamiliar with gun brands and said he probably just "guessed at" the Taurus identification. *Id.* ¶ 57. And Pursley's Taurus wasn't the murder weapon. *Id.* ¶¶ 126-27, 130. Windham also had the motivation to go with this fabrication scheme. When he testified at the criminal trial, he was facing disorderly conduct and domestic battery charges. *Id.* ¶ 61. He also asked for leniency for his wife in connection with a criminal case she was facing. *Id.* ¶ 65.

Based on those facts, a reasonable jury could find that the RPD detectives fabricated facts for Windham to use in his statement and testimony.

Defendants offer no arguments specific to the fabrication of Windham's testimony in their opening brief, waiting until their reply brief to discuss Windham's interactions with the RPD detectives; those arguments are ignored. *See James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998) ("Arguments raised for the first time in a reply brief are waived."). The only evidence Defendants offer is that the Rockford defendants say they didn't fabricate any evidence, Dkt. 348 ¶ 62, but weighing competing testimony is a job for the jury, *Liberty Lobby*, 477 U.S. at 255. Defendants' intervening/superseding cause defense doesn't help either, as looking at the facts in Pursley's favor indicates that the RPD detectives knew Windham had told them one thing and something different made it into his signed statement.

### c. The ballistics "match"

The last alleged piece of fabricated evidence is the ballistics analysis that "matched" Pursley's Taurus with the murder weapon. The two ISP analysts—Gunnell and Welty—played different roles, and ISP puts forth some different arguments for each of them, so the Court analyzes each analyst separately.

### i. Gunnell

Pursley argues that a jury could conclude Gunnell's opinion was fabricated because of how deficient his analysis was. Gunnell based his "match" only on the similarities in an arch-shaped breech face impression. Dkt. 357 ¶ 91. But Gunnell and other ISP analysts were trained to look at more than just one small area of a bullet or cartridge case. *Id.* ¶¶ 96, 120. ISP's training taught analysts to look at

firing pin impressions, ejector marks, extractor marks, and magazine lip marks. *Id.*
¶ 93. And the differences in other parts of the cartridge cases and bullets—in the
breech face marks, extractor marks, firing pin impressions, and magazine marks—
were clear, according to Pursley's experts. *Id.* ¶¶ 128, 130.

And yet, these differences weren't incorporated into Gunnell's report or notes
on his examination. *Id.* ¶ 111. Although the parties dispute the propriety of
Gunnell's sparse notes, when making reasonable inferences in Pursley's favor, it
further supports the conclusion that Gunnell didn't consider these differences in his
examination. Indeed, during trial, Gunnell referred to these as "variable
conditions," even though that wasn't a phrase used within ISP. *Id.* ¶¶ 103-04. This
also wasn't Gunnell's first time performing a firearm comparison examination. He
had attended a formal training program in firearm identification for two years after
joining the ISP lab in 1990, and he had performed about 200 examinations per year
after his formal training. *Id.* ¶¶ 92-93; Dkt. 359-47 at 635:23-637:1. That further
allows for a reasonable inference that Gunnell knew what he was doing.

The ISP defendants frame this as mere negligence by pointing to the "sheer
number" of different expert conclusions. Dkt. 347 at 16. But that alone doesn't
overcome the evidence of how much Gunnell failed to follow the process for a
firearm comparison examination that he had been trained and expected to do. There
is enough evidence, especially considering that the ballistics "match" turned out to
be incorrect, that a reasonable jury could find that Gunnell knowingly put forth a
false "match."

Because there is a genuine dispute as to whether Gunnell fabricated evidence, the Court must address the issue of qualified immunity. The ISP defendants argue that they are entitled to qualified immunity on Pursley's federal claims because there was no constitutional violation and because there was no clearly established constitutional right in 1993 to "a certain standard of documentation by expert witnesses." *Id.* at 28. Pursley's response addresses only the qualified immunity assertion made by the Rockford defendants. *See* Dkt. 356 at 62 ("Defendants make no arguments about whether the rights at issue were clearly established by 1993 . . . ."). Although the Court might disagree with the ISP defendants' framing of what constitutional right needs to be clearly established, it's not necessary to determine what the right level of generality might be. The invocation of qualified immunity shifts the burden to Pursley to show the violation of a clearly established constitutional right. *Estate of Davis v. Ortiz*, 987 F.3d 635, 638-39 (7th Cir. 2021). By failing to respond to ISP's argument, Pursley has failed to meet that burden, so Gunnell is entitled to qualified immunity.

### ii. Welty

The parties first dispute the scope of Pursley's claims against Welty. *See* Dkt. 358 ¶ 98. The confusion appears to stem from Pursley's response to Welty's interrogatory that asks what actions Welty is allegedly liable for. Pursley answered that "for the purpose of helping members of the Rockford Police Department frame [Pursley], Defendant Welty fabricated a 'preliminary opinion,' " departed from ISP's common practice in conducting this preliminary evaluation, provided this opinion, and "testified in support of his conclusion" at Pursley's 1994 trial. Dkt. 348-51 at 2.

This response suggests that Pursley was focused only on actions related to Welty's preliminary evaluation, but Pursley's response brief discusses Welty's role after Gunnell conducted his examination. Interrogatory responses generally aren't binding, but if an answer becomes outdated, a party should supplement or change its previous interrogatory response. 7 James Wm. Moore et al., *Moore's Federal Practice – Civil* § 33.78 (3d ed. 2023); Fed. R. Civ. P. 26(e). It's not asking a lot of plaintiffs to explain their claims when they allege law enforcement officers framed them, resulting in decades of incarceration. Pursley failed to timely supplement his interrogatory answer, so in the Court's discretion, it limits his claim to the interrogatory answer. Summary judgment is required for this reason alone.

Even if the claims against Welty aren't limited by the interrogatory, there's no factual basis to conclude that Welty could be liable. On the issue of fabrication, Pursley's response brief mentions Welty only twice: that Welty talked to Forrester and agreed to report a positive identification, and that there's email proof of Welty verifying Gunnell's match. Dkt. 356 at 40. For the proposition that Welty and Forrester agreed to provide a positive identification, the cited facts show only that Welty agreed to help Forrester. Dkt. 357 ¶¶ 72-74. As for the verification of the "match," Pursley cites no statement of fact, and the verification stamp on Gunnell's report bears the initials of Peter Striupaitis. Dkt. 348-53 at PURSLEY 013938-40. The record doesn't show that Welty influenced the result of Gunnell's work, so summary judgment is required as to the fabrication claim against Welty.

## 2. Withholding of evidence (due process)

Pursley next alleges that Defendants failed to disclose evidence required under *Brady v. Maryland*, 373 U.S. 83 (1963). "To show a *Brady* violation, a plaintiff must demonstrate (1) that the evidence in question was favorable to his defense, either because it had exculpatory or impeachment value; (2) that the state 'suppressed' the favorable evidence either willfully or inadvertently; and (3) prejudice ensued, which occurs if the evidence was material." *Goudy v. Cummings*, 922 F.3d 834, 838 (7th Cir. 2019). Like with the fabrication of evidence claim, there are three buckets of evidence that Pursley claims were withheld.

### a. Crabtree's statement and Defendants' coercive tactics

For Crabtree's statement, Pursley argues that the fabrication of the statement and the coercive tactics that led to it should have been disclosed. But because Pursley has not established a genuine dispute as to the fabrication of that statement, there is no dispute as to a *Brady* violation for evidence of fabrication. Nor is there any admissible evidence to show the officers' coercive interrogation tactics, so there is no possible *Brady* violation based on the record.

### b. Windham's statement and special treatment

Next is the issue of evidence relating to the fabrication of Windham's statements and the special treatment that Windham allegedly received. Pursley and the Rockford defendants talk past each other in their arguments on *Brady* concerning evidence related to Windham. Attacking only the second required element of a *Brady* violation, Defendants' argument relies on the assertion from the Rockford defendants that they didn't fabricate or withhold evidence. Dkt. 344 at 5.

34

Pursley, on the other hand, focuses on the materiality of the evidence and the prejudice that ensued. Dkt. 356 at 45-48. Implicit in his argument is the assumption that none of the material evidence was turned over to the prosecutor's office, but Pursley never offers any facts or arguments on the action itself of withholding evidence.

Although Pursley didn't respond to Defendants' (admittedly bare-bones) argument, however, that doesn't automatically doom his prospects on this part of the claim. *See Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992). Defendants' statement that the officers both didn't fabricate evidence and didn't withhold evidence relies on the assumption that there was no fabrication of evidence. But Pursley has established a genuine dispute as to the fabrication of evidence with regards to Windham, and it strains the imagination to think that the officers would've disclosed the fabrication of evidence after vehemently denying it. The reasonable inference based on the officers' affidavit statements is that they didn't disclose any evidence of fabrication (because the story they've maintained is that there was no fabrication). This part of the claim survives summary judgment.

### c. *Ballistics identification*

The ISP defendants' argument rests on their contention that there was no fabrication of evidence. Dkt. 347 at 14; Dkt. 374 at 4. But this fails for the claim against Gunnell because, as discussed above, Pursley has established a genuine dispute as to Gunnell's role in fabricating evidence. In addition, Pursley argues that Gunnell hid the fact that he saw meaningful differences, obfuscating it with the made-up term "variable conditions." Dkt. 356 at 49. However, the qualified

immunity analysis from earlier still applies. Summary judgment is also appropriate for the claim against Welty because there's no genuine dispute as to Welty fabricating evidence.

### 3. Unlawful detention & malicious prosecution

For both of these claims, Defendants raise the existence of probable cause as an absolute defense. Dkt. 344 at 14; Dkt. 347 at 21-22. "Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). "Probable cause exists where the police officer is aware of facts and circumstances 'sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Coleman v. City of Peoria*, 925 F.3d 336, 350 (7th Cir. 2019) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The Court "look[s] only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003).

Defendants present a list of facts that supported probable cause at the time, but not all of those facts can be considered. Some lack proper citations.[13] Others are based on Windham's statement and testimony, which a reasonable jury could

---

[13] The Court excludes facts presented without citation to the statements of fact. *See* LR 56.1(g) ("When addressing facts, the memorandum must cite directly to specific paragraphs in the LR 56.1 statements or responses."). Defendants submitted an oversized statement of fact with 167 paragraphs, many of which contain several facts each, so the Court is perplexed as to how Defendants then found this to be insufficient and needed to directly cite to the record in drafting their motion for summary judgment.

conclude was fabricated. *See Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011) (finding a lack of probable cause based on statements known to be false).

But Crabtree's statement implicating Pursley in the Ascher murder does support a finding of probable cause. "The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp*, 320 F.3d at 743. "[O]nce such a reasonably credible complaint has been made, the existence of probable cause to arrest does not depend upon the actual truth of the complaint." *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000).[14] Rather than deny that Crabtree's statement implicated him, Pursley argues that Crabtree's signed statement cannot support probable cause because it was fabricated. Dkt. 356 at 57. But he has failed to establish a genuine dispute as to the fabrication of the statement, so there's nothing from the parties to indicate that the officers should have questioned the credibility of Crabtree's statement. With Crabtree's statement, no reasonable jury could find a lack of probable cause. Summary judgment is granted for the unlawful detention and malicious prosecution claims.

In addition, although the statements that implicated Pursley in other crimes cannot support the probable cause defense to a malicious prosecution claim, they do bolster probable cause in defense of the unlawful detention claim. *See Holmes v.*

---

[14] Pursley's hearsay objections are meritless in this context, as the probable cause inquiry considers the potential hearsay for only the limited purpose of determining the effect such statements would have on the officers. *See Woods*, 234 F.3d at 987.

*Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007). Crabtree's statement implicated Pursley in a bank robbery and a Burger King robbery. Dkt. 348 ¶¶ 49-50. There was also the incident with Robert Poe, who reported that someone shot his television. *Id.* ¶ 38. He gave a description of the shooter that matched Pursley, and he identified Pursley in a photo array. *Id.* Moreover, there was an active arrest warrant out for Pursley. *Id.* ¶ 39. This evidence only underscores that no reasonable jury could find a lack of probable cause.

### 4. *Intentional infliction of emotional distress (IIED)*

For a claim of IIED, Illinois law requires three elements: (1) extreme and outrageous conduct, (2) an intent to inflict severe emotional distress or knowledge that there was a high probability of doing so, and (3) severe emotional distress caused by the conduct. *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015). There are three nonexclusive factors that go to the question of whether conduct is objectively extreme and outrageous: "the degree of power or authority the defendant holds over the plaintiff," "whether the defendant knew the plaintiff was particularly susceptible to emotional distress and acted inappropriately despite that knowledge," and "whether the defendant reasonably believed that his objective was legitimate." *Cairel v. Alderden*, 821 F.3d 823, 835-36 (7th Cir. 2016) (citations omitted).

The Rockford defendants and Pursley focus on the first two elements. The Rockford defendants argue that the only admissible evidence on this claim shows that the officers "diligently investigat[ed] the murder" and that their intent was simply to solve the murder and ensure justice. Dkt. 344 at 17. The facts that they cite to include the general statement that the officers who are still alive disclaim

any wrongdoing, Dkt. 348 ¶ 62, and a slew of statements related to the interrogation of Crabtree, *id.* ¶¶ 63-72. Pursley responds that intentionally fabricating evidence to deprive Pursley of his liberty is "extreme and outrageous." Dkt. 356 at 61.

Similar to other claims, the parties' arguments depend on whether Pursley established a genuine dispute as to the fabrication of evidence in the first place. He has done so as it relates to Windham's statement and testimony. A reasonable jury could conclude that the officers' conduct in fabricating that evidence was "extreme and outrageous." The police officers were in a position of authority and, crucially, went beyond ordinary investigation tactics. *See Cairel*, 821 F.3d at 836 ("Defendants' positions of power as law enforcement would be a problem . . . only if their actions were far out of bounds for an interrogation of a lawfully arrested suspect."); *Velez v. City of Chicago*, No. 18-cv-08144, 2023 U.S. Dist. LEXIS 176434, at *46-47 (contrasting the fabrication of evidence with the "ordinary interrogation tactics" in *Cairel*). It is also reasonable to infer that the officers who knowingly created false evidence would have known there to be a high probability of inflicting severe emotional distress by falsely framing an innocent person. Summary judgment is denied on the IIED claim as it relates to the Rockford defendants' conduct in fabricating Windham's testimony.

The ISP defendants argue that they didn't intentionally engage in any misconduct. Dkt. 347 at 24. Pursley makes no reference to ISP's argument in his response brief, so he has waived this issue. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d

461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). With no indication from either party that ISP's alleged misconduct was intentional, there can be no IIED claim against the ISP defendants. Summary judgment is granted on the IIED claim as it relates to the ISP defendants.

### 5. Conspiracy (federal and state law)

The last claims against the RPD detectives and ISP analysts are conspiracy claims under § 1983 and under Illinois state law. Under § 1983, a conspiracy claim requires: "(1) an underlying constitutional violation and (2) an agreement among the defendants to inflict the unconstitutional harm." *Green v. Howser*, 942 F.3d 772, 778 (7th Cir. 2019). Circumstantial evidence can establish a conspiracy, but only without speculation. *Daugherty v. Harrington*, 906 F.3d 606, 612 (7th Cir. 2018). Under Illinois law, civil conspiracy requires "an agreement and a tortious act committed in furtherance of that agreement." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). It is an intentional tort that requires proof of knowing and voluntary participation in a common scheme. *Id.* If the conspiracy is shown by circumstantial evidence, the evidence must be clear and convincing. *Id.* Conspiracy is not an independent basis of liability under Section 1983 or under Illinois law. *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008); *Coghlan v. Beck*, 984 N.E.2d 132, 151 (Ill. App. Ct. 2013).

### a. Between RPD and ISP

Pursley alleges that there was a conspiracy between the RPD detectives and ISP analysts to fabricate the ballistics "match." Defendants argue that there is no underlying constitutional violation and that there is no evidence of agreement.

Pursley's argument that RPD and ISP conspired largely rests on Welty as "the link between the RPD Defendants and ISP Defendant Gunnell." Dkt. 356 at 53. But Pursley failed to establish a genuine dispute as to Welty's role in the fabrication of evidence, so there can be no conspiracy claim against Welty. *See Smith*, 550 F.3d at 617; *Coghlan*, 984 N.E.2d at 151. Removing Welty's actions from the picture undermines most of the factual basis propping up Pursley's conspiracy claim, and the remaining facts fare no better. Ignoring Welty's actions, the remaining facts are that Gunnell and the RPD detectives both incorrectly concluded that the Taurus was the murder weapon, that Forrester spoke on the phone with Welty, and that there are no records of those phone calls. Dkt. 356 at 51-52.

Starting with the fact that Gunnell and RPD came to the same incorrect conclusion, that is evidence of only similar conduct and nothing more. Under state law, the Illinois Supreme Court has held that parallel conduct alone is insufficient to show agreement. *McClure*, 720 N.E.2d at 259. And that principle is consistent with how other federal courts have treated § 1983 conspiracy. *See, e.g.*, *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013); *Mahoney v. Beacon Health Ventures*, 585 F. Supp. 3d 1161, 1171 (N.D. Ill. 2022). To infer some kind of meeting of the minds based on that alone would require speculation.

Adding the fact that Forrester spoke to Welty doesn't create a reasonable inference of agreement either. Pursley focuses on Welty's failure to make notes of the exchange, but that says nothing about Forrester's intent to enter into a conspiracy. And nothing else suggests any impropriety with their relationship. *Cf.*

*Starks v. City of Waukegan*, 123 F. Supp. 3d 1036, 1065 (N.D. Ill. 2015) ("But *most* forensic odontologists who work on a criminal investigation will have *some* sort of 'pre-existing relationship' with investigators; after all, that is how they are contacted and become involved in the first place."). Any reasonable inference based on these facts suggests only that Forrester had a good working relationship with the ISP forensics lab.

### b. Among RPD

Pursley also argues that the RPD detectives conspired among themselves. The Rockford defendants argue simply that there's no evidence of agreement or wrongdoing. Dkt. 344 at 18. Pursley has established a genuine dispute as to the fabrication of Windham's statement and testimony, so it is at issue whether the Rockford defendants entered into a conspiracy to fabricate that evidence. Pursley offers the following facts as evidence of agreement: that Forrester, Schmidt, and Scott communicated with each other while working on the investigation, Dkt. 357 ¶ 132; that Houde collected the gun and failed to follow protocol, *id.* ¶¶ 12-13; that Houde, Forrester, and Schmidt had Crabtree look at the Taurus in violation of RPD protocol, *id.* ¶ 32.

Showing Crabtree the Taurus cannot be the basis for a conspiracy claim because it relates to the claim that the officers fabricated Crabtree's testimony, for which Pursley has failed to establish a genuine dispute. Similarly, that Houde may have violated protocol in how he handled the Taurus doesn't go toward showing an agreement to fabricate Windham's statement and testimony. Perhaps the officers could have done better to follow protocol, but sloppy investigative work doesn't

make a conspiracy. *See Smyth v. Powe*, Nos. 07 C 1616, 07 C 5251, 2012 U.S. Dist. LEXIS 113, at \*13-14 (N.D. Ill. Jan. 3, 2012); *Womack v. Conley*, 595 F. App'x 489, 494-95 (6th Cir. 2014). As for the fact that Forrester, Schmidt, and Scott communicated with each other while working, Pursley offers nothing to show an agreement. To assert a conspiracy from mere communication calls for speculation. *Cf. Goetzke v. Ferro Corp.*, 280 F.3d 766, 778 (7th Cir. 2002).

　　*6.* Monell

　　Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality can be liable for violating the Constitution or federal law. *Stockton v. Milwaukee County*, 44 F.4th 605, 617 (7th Cir. 2022). First, there needs to be a deprivation of a federal right. *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022). A plaintiff must then connect that deprivation of a constitutional right to a municipal action, such as a failure to provide proper training. *Stockton*, 44 F.4th at 617; *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Next, the plaintiff must show that the municipal action amounts to deliberate indifference. *Stockton*, 44 F.4th at 617. And finally, the plaintiff must show that the municipal action was the "moving force" behind the constitutional injury. *Id.* A municipality can be liable for a failure to act without a pattern of constitutional violations when it is "so obvious" that there need to be protocols to address a situation. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017) (quoting *City of Canton*, 489 U.S. at 390 n.10).

　　Pursley focuses most of his *Monell* arguments on establishing a failure to train detectives to avoid coercive investigations. Dkt. 356 at 68-70. However, there

is no genuine dispute as to the coercion of Crabtree, so there is no underlying deprivation of a federal right. A failure-to-train claim regarding coercive investigations cannot survive summary judgment. *See Helbachs Café*, 46 F.4th at 530. This evidence also cannot establish a failure to train detectives to not fabricate evidence. *See Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) (stating that "coerced," "fabricated," and "false" testimony "mean three different things").

That leaves the factual allegation that RPD detectives are not trained on the duty to disclose material exculpatory and impeachment evidence. Dkt. 356 at 68. The Rockford defendants object to this fact because it came from a fact witness rather than a 30(b)(6) witness, and so therefore the witness didn't have personal knowledge under Federal Rule of Evidence 602 to say what training all officers receive. Dkt. 372 at 19-20. In his deposition, RPD Detective Greg Hanson drew from his personal experience when answering that he remembered no specific training or anything in writing that instructed him on the need to disclose exculpatory evidence to the prosecutor. Dkt. 359-44 at 58:21-61:11. In the absence of evidence to the contrary, Hanson's testimony could lend to the inference that there is no such training for RPD detectives more generally.

But then on the question of whether the City acted with deliberate indifference, Pursley reverts back to discussing the lack of training on coercive investigations. Again, because there is no genuine dispute as to an underlying constitutional violation stemming from coercive investigative techniques, Pursley's

*Monell* claim cannot rely on the City's behavior (or lack thereof) as it relates to coercive investigations.

> ### 7. *Indemnification*

The Rockford defendants first argue that § 1983 claims cannot be indemnified because there is no *respondeat superior* liability, but that incorrectly conflates indemnification with a substantive claim of vicarious liability. *Turner v. City of Chicago*, No. 12 C 9994, 2013 U.S. Dist. LEXIS 113122, at *21 (N.D. Ill. Aug. 12, 2013); *see also Clark v. Cook Cnty. Sheriff's Off.*, Nos. 19 C 7131, 21 C 3093, 2023 U.S. Dist. LEXIS 108076, at *23 (N.D. Ill. June 20, 2023). The Rockford defendants then argue that there's no liability to indemnify because all of Pursley's claims are defective. Because the fabrication of evidence, *Brady*, and IIED claims as they relate to Windham's testimony survive summary judgment, the indemnification claim survives as it relates to those claims.[15]

## III. Conclusion

The motion to exclude Clark's opinion testimony is granted in part and denied in part. The Rockford defendants' motion for summary judgment is granted in part and denied in part. The ISP defendants' motion for summary judgment is granted. The claims that survive summary judgment are the due process (fabrication of evidence and withholding of evidence) and IIED claims—against Defendants Scott, Schmidt, Houde, and Forrester's estate—and the indemnification

---

[15] The Rockford defendants likewise argue that, under the Illinois Tort Immunity Act, 745 ILCS 10/2-109, the City is not liable because no city employee is liable. Dkt. 344 at 19-20. For the same reason, this affirmative defense fails against the claims that survive.

claim against the City. Defendants Gunnell and Welty are terminated from the case. Pursley's motion to strike is denied as moot.

The parties should consult with each other to decide whether they would like to schedule a settlement conference with Magistrate Judge Schneider or whether they would like to prepare a final pretrial order. Counsel should file a notice with the Court by April 5, 2024, as to how they would like to proceed.

As a final note, in the future, counsel shouldn't expect the Court to spend significant amounts of time addressing summary judgment motions that fail to comply with Local Rule 56.1. Rather, in the future, the Court will simply strike all the statements and corresponding briefs and require that they be resubmitted in compliance with the rule. Please do better.

Date: March 11, 2024

Honorable Iain D. Johnston
United States District Judge